# 13-4074

## United States Court of Appeals for the Second Circuit

DR. LEONARD MORSE,

*Plaintiff-Appellee,*

v.

JOHN FUSTO, Special Assistant Attorney General,
JOSE CASTILLO, individually, Senior Special Investigator,

*Defendants-Appellants,*

ELIOT SPITZER, individually, ROBERT H. FLYNN, individually, Senior Special Auditor
Investigator, LEVON AHARONYAN, individually, Senior Special Investigator,
JAMES SERRA, individually, Senior Special Investigator,
DESIGN DENTAL STUDIO, INC., OFFICE OF THE ATTORNEY GENERAL,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of New York

---

### JOINT APPENDIX: VOLUME 1 (JA1–JA294)

---

LAW OFFICES OF JON L. NORINSBERG
Suite 2700
225 Broadway
New York, NY 10007
212-791-5396

*Attorney for Appellee*

ERIC T. SCHNEIDERMAN
  *Attorney General of the
  State of New York*
120 Broadway, 25th Floor
New York, New York 10271
(212) 416-8020

*Attorney for Appellants*

# TABLE OF CONTENTS

Page

**VOLUME 1**

Docket Sheet ...................................................................JA1

Complaint, filed Nov. 16, 2007, with exhibits.............................JA21

Amended Complaint, filed June 15, 2011 ................................JA124
  (*Exhibits reproduced with original Complaint*)

Second Amended Complaint, filed July 5, 2011........................JA149
  (*Exhibits reproduced with original Complaint*)

Trial Transcripts.............................................................JA175

**VOLUME 2**

Trial Transcripts.............................................................JA295

| *Witness* | *Direct* | *Cross* | *Redirect* | *Recross* |
|---|---|---|---|---|
| J. Castillo | 189* | 217 | 225 | 227 |
| J. Fusto | 228 | 346 | 370 | 382 |
| J. Serra | 285 | 291 | 292 | |
| R. Flynn | 297 | 313 | 322 | 323 |
| L. Deluca | 325 | 334 | 340 | |
| L. Morse | 384 | 414<br>455 | 455 | |
| E. Mantell | 444 | 450 | 454 | |
| L. Aharonyan | 478 | 480 | | |
| C. Erath | 482 | 486 | | |
| *\*Pages refer to Joint Appendix pagination.* | | | | |

PAGE

**VOLUME 2 (cont'd)**

Court Exhibit 1 – Jury instructions............................................................JA538

Court Exhibit 2 – Verdict sheet ................................................................JA557

Court Exhibit 3 – Note from jury ..............................................................JA560

Court Exhibit 4 – Note from jury ..............................................................JA561

Court Exhibit 5 – Note from jury ..............................................................JA562

Court Exhibit 6 – Note from jury ..............................................................JA564

Court Exhibit 7 – Note from jury ..............................................................JA565

Judgment, filed Sept. 16, 2013................................................................JA566

Notice of Appeal, filed Oct. 15, 2013.......................................................JA567

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:07−cv−04793−CBA−RML

Morse v. Spitzer et al
Assigned to: Chief Judge Carol Bagley Amon
Referred to: Magistrate Judge Robert M. Levy
Cause: 42:1983 Civil Rights Act

Date Filed: 11/16/2007
Date Terminated: 09/20/2013
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Dr. Leonard Morse**

represented by **Jon L. Norinsberg**
Law Office of Jon L. Norinsberg
225 Broadway, Suite 2700
New York, NY 10007
212−791−5396
Fax: 212−406−6890
Email: norinsberg@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eliot Spitzer**
*individually*

represented by **Seth J. Farber**
N.Y.S. Office of the Attorney General
120 Broadway
24th Floor
New York, NY 10271
212−416−8029
Fax: 212−416−6075
Email: seth.farber@oag.state.ny.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Y. Miller**
N.Y.S. Office of the Attorney General
120 Broadway
12th Floor
New York, NY 10271
212−417−5390
Fax: 212−417−4604
Email: christopher.miller@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Fusto**
*Special Assistant Attorney General*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Y. Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jose Castillo**
*individually, Senior Special Investigator*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

|                                                                                          |                  | **Christopher Y. Miller**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**Robert H. Flynn**
*individually, Senior Special Auditor Investigator*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Y. Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Levon Aharonyan**
*individually, Senior Special Investigator*
*TERMINATED: 04/08/2010*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Serra**
*individually, Senior Special Investigator*
*TERMINATED: 04/08/2010*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Design Dental Studio, Inc.**

**Defendant**

**Office of the Attorney General**
*Attn: Seth Farber, Esq.*

represented by **Seth J. Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/16/2007 | 1 | COMPLAINT against Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James A. Serrao, Design Dental Studio, Inc. $ 350, filed by Leonard Morse. (Attachments: # 1 Civil Cover Sheet) (Bowens, Priscilla) (Additional attachment(s) added on 11/19/2007: # 2 exhibits) (Bowens, Priscilla). (Additional attachment(s) added on 11/21/2007: # 3 complaint) (Bowens, Priscilla). (Entered: 11/19/2007) |
| 11/16/2007 | | Summons Issued as to Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James A. Serrao, Design Dental Studio, Inc.. (Bowens, Priscilla) (Entered: 11/19/2007) |
| 11/27/2007 | 2 | SCHEDULING ORDER: An initial conference has been scheduled for March 19, 2008 at 4:00 p.m., before the Honorable Robert Levy, United States Magistrate Judge at 225 Cadman Plaza East, Brooklyn, New York. Parties are directed to check–in with chambers, Room 1223–S, upon arrival. All counsel must be present. Plaintiff(s) counsel is directed to confirm with defendant(s) counsel that all necessary participants are aware of this conference. Ordered by Magistrate Judge Robert M. Levy on 11/27/07. (Marino, Janine) (Entered: 11/27/2007) |
| 11/28/2007 | 3 | SUMMONS Returned Executed by Leonard Morse. Eliot Spitzer served on 11/23/2007, answer due 12/13/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |
| 11/28/2007 | 4 | SUMMONS Returned Executed by Leonard Morse. John Fusto served on 11/26/2007, answer due 12/17/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |

| | | |
|---|---|---|
| 11/28/2007 | 5 | SUMMONS Returned Executed by Leonard Morse. Jose Castillo served on 11/20/2007, answer due 12/10/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |
| 11/28/2007 | 6 | SUMMONS Returned Executed by Leonard Morse. Robert H. Flynn served on 11/20/2007, answer due 12/10/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |
| 11/28/2007 | 7 | SUMMONS Returned Executed by Leonard Morse. James A. Serrao served on 11/20/2007, answer due 12/10/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |
| 11/28/2007 | 8 | SUMMONS Returned Executed by Leonard Morse. Design Dental Studio, Inc. served on 11/24/2007, answer due 12/14/2007. (Norinsberg, Jon) (Entered: 11/28/2007) |
| 12/10/2007 | 9 | STIPULATION *of State Defendants' Time to Answer or Move* by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra (Farber, Seth) Modified on 12/11/2007 (Levy, Robert). (Entered: 12/10/2007) |
| 12/11/2007 | | ORDER granting 9 Motion for Extension of Time to Answer Eliot Spitzer answer due 1/18/2008. Ordered by Judge Robert M. Levy on 12/11/07. (Levy, Robert) (Entered: 12/11/2007) |
| 01/18/2008 | 10 | Letter MOTION to Dismiss *per Chambers Rule 3A seeking leave to file motion to dismiss* by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. Responses due by 1/25/2008 (Farber, Seth) (Entered: 01/18/2008) |
| 01/22/2008 | | Motions terminated: 10 Letter MOTION to Dismiss *per Chambers Rule 3A seeking leave to file motion to dismiss* filed by Levon Aharonyan, John Fusto, Jose Castillo, Eliot Spitzer, James Serra, Robert H. Flynn. This motion is terminated as per Chambers; this is not a fully briefed motion. (Abdallah, Fida) (Entered: 01/22/2008) |
| 01/23/2008 | | ORDER :re 10 Letter on behalf of State Defendants seeking leave to file a motion to dismiss is referred to Magistrate Judge Levy. All dispositive motions filed in this case will be referred to Magistrate Judge Levy for report and recommendation. So Ordered. by Judge Amon on 1/23/2008. (Liberatore, Marie) (Entered: 01/23/2008) |
| 01/23/2008 | 11 | Letter *setting forth motion briefing schedule* by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra (Farber, Seth) (Entered: 01/23/2008) |
| 01/24/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth J. Farber. The parties have narrowed the issues on the motion to dismiss. Briefing schedule adopted. Conference scheduled for 2/21/08 at 10:30 (tel), following filing of defendants' 12(b)(6) motion to discuss status and need for discovery related to motion.Pre Motion Conference held on 1/24/2008 (Levy, Robert) (Entered: 01/24/2008) |
| 01/28/2008 | 12 | ANSWER to 1 Complaint, by John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 01/28/2008) |
| 02/12/2008 | 13 | Letter MOTION for Extension of Time to File *to file motion to dismiss* by Eliot Spitzer. (Farber, Seth) (Entered: 02/12/2008) |
| 02/13/2008 | | ORDER granting 13 Motion for Extension of Time to File 12(b)(6) Motion to February 19, 2007. Ordered by Judge Robert M. Levy on 2/13/08. (Levy, Robert) (Entered: 02/13/2008) |
| 02/18/2008 | 14 | Notice of MOTION to Dismiss by Eliot Spitzer. Responses due by 3/12/2008 (Farber, Seth) (Entered: 02/18/2008) |
| 02/18/2008 | 15 | MOTION to Dismiss *Memorandum of Law in Support of Motion to Dismiss* by Eliot Spitzer. Responses due by 3/12/2008 (Farber, Seth) (Entered: 02/18/2008) |
| 02/21/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Because there may be disputed factual issues re: defendant Spitzer's 12(b)(6)motion to dismiss, plaintiff requests and is granted 90 days to complete discovery relevant to the motion. Discovery will also proceed as to the remaining causes of action. Next conference 5/21/08 at 10:30 (tel). A |

| | | |
|---|---|---|
| | | schedule for full briefing of the motion will be set at that time. Defendant will be afforded an opportunity to revise the motion to reflect any developments in discovery. Accordingly, the motion is deemed withdrawn without prejudice to reinstatement at the 5/21/08 conference or to filing in updated form thereafter.Pre Motion Conference held on 2/21/2008. (Levy, Robert) (Entered: 02/21/2008) |
| 02/21/2008 | | ORDER deeming 14 Motion to Dismiss suspended and/or withdrawn without prejudice, to permit discovery and, at defendant's discretion, re–filing or supplementation consistent with the minute entry dated 2/21/08. Ordered by Judge Robert M. Levy on 2/21/08. (Levy, Robert) (Entered: 02/21/2008) |
| 02/21/2008 | | ORDER deeming 15 Motion to Dismiss suspended and/or withdrawn without prejudice consistent with minute entry dated 2/21/08. Ordered by Judge Robert M. Levy on 2/21/08. (Levy, Robert) (Entered: 02/21/2008) |
| 05/12/2008 | 16 | First MOTION to Compel by Leonard Morse. (Norinsberg, Jon) (Entered: 05/12/2008) |
| 05/14/2008 | 17 | Letter MOTION for Leave to File *Motion for Protective Order, and/or to renew motion to dismiss, and in opposition to plaintiff's letter seeking leave to file motion to compel* by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 05/14/2008) |
| 05/21/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg; Seth Farber. (1) By 5/30/08 defendants shall, to the extent they have not already done so, produce patient charts, sample medicaid forms and all other documents requested in document requests 12–32 and mentioned in plaintiff's 5/12/08 letter; however, with respect to request 24 (lab invoices), defendants shall confirm by 5/30/08 whether they exist and if so, whether defendants assert a grand jury privilege as to those documents. To the extent such documents have already been produced, defendants shall identify them by Bates number. (2) By June 6, 2008, defendants shall produce a privilege log identifying documents withheld for privilege (in this case, grand jury privilege). (3)As to the discovery requests relating to the press release alone, the parties will meet and confer to resolve all remaining disputes. Next conference: 6/26/08 at 11:00 (tel)(to resolve disputes over privilege log and to discuss briefing schedule for motion to dismiss). Discovery Hearing held on 5/21/2008 (Levy, Robert) (Entered: 05/21/2008) |
| 06/26/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg; Seth Farber, Scott Spiegelman. (1) Parties will submit simultaneous letter briefs and oppositions re: grand jury exhibits: 7/3/08 motions; 7/10/08 oppositions. Parties would like ruling prior to 7/24/08 deposition. (2) No other outstanding disputes. (3) Next conference 7/22/08 at 10:30 (tel)(ruling on grand jury exhibits).Discovery Hearing held on 6/26/2008 (Levy, Robert) (Entered: 06/26/2008) |
| 07/03/2008 | 18 | MEMORANDUM in Opposition re 16 First MOTION to Compel *by letter dated July 3, 2008 addressing issue of grand jury secrecy and need to first seek relief in state court* filed by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 07/03/2008) |
| 07/03/2008 | 19 | First MOTION to Compel *release of Grand Jury Minutes and Materials* by Leonard Morse. (Norinsberg, Jon) (Entered: 07/03/2008) |
| 07/10/2008 | 20 | REPLY in Opposition re 19 First MOTION to Compel *release of Grand Jury Minutes and Materials*, 16 First MOTION to Compel *by Letter dated July 10, 2008 on issue of first applying to state court for state grand jury materials* filed by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 07/10/2008) |
| 07/22/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg; Seth Farber. Motion to compel production of certain grand jury records GRANTED for the reasons explained in the decision read into the record during this hearing. Defendants will produce grand jury exhibits by 7/25/08 and will file a privilege log and supporting letter brief by 8/1/08 in the event they assert privilege with respect to any portion of the grand jury transcripts. Defendants' counsel will report at the next conference re: status of representation of defendant |

**JA4**

| | | |
|---|---|---|
| | | Spitzer and any other outstanding discovery issues. Next conference 8/6/08 at 10:00 (tel).Discovery Hearing held on 7/22/2008 (Tape #10:44–11:03.) (Levy, Robert) (Entered: 07/22/2008) |
| 07/22/2008 | | ORDER granting 19 Motion to Compel per decision read into record of 7/22/08 hearing. Ordered by Judge Robert M. Levy on 7/22/08. (Levy, Robert) (Entered: 07/22/2008) |
| 07/31/2008 | 21 | REPLY in Opposition re 16 First MOTION to Compel *Letter of July 31, 2008 in support of in camera review and opposition to disclosure of grand jury transcripts* filed by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 07/31/2008) |
| 07/31/2008 | | ORDER: The telephone conference scheduled for August 6, 2008 has been adjourned to Thursday, August 7, 2008 at 2:30 p.m., before the Hon. Robert M. Levy, USMJ at (718) 613–2340. Plaintiff's counsel is directed to initiate conference call and confirm with defendants' counsel that all necessary participants are aware of scheduled conference. Ordered by Magistrate Judge Robert M. Levy on 7/31/08. (Marino, Janine) (Entered: 07/31/2008) |
| 08/05/2008 | 22 | REPLY to Response to Motion re 19 First MOTION to Compel *release of Grand Jury Minutes and Materials* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 08/05/2008) |
| 08/06/2008 | 23 | RESPONSE in Opposition re 19 First MOTION to Compel *release of Grand Jury Minutes and Materials*, 17 Letter MOTION for Leave to File *Motion for Protective Order, and/or to renew motion to dismiss, and in opposition to plaintiff's letter seeking leave to file motion to compel*, 16 First MOTION to Compel *Letter of August 6, 2008 in response to plaintiff's counsel's letter of August 5, 2008 regarding issues of grand jury materials* filed by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 08/06/2008) |
| 08/07/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. (1) By 8/20/08, defendants shall provide an affidavit from a person with knowledge stating that s/he has made a diligent search with respect to the inability to produce Grand Jury Exhibit 7 and explaining in detail the reasons why that exhibit cannot be produced. (2) Ruling on privilege logs submitted 7/31/08 with grand jury transcripts: Following in camera review of the grand jury transcripts, the documents are ordered disclosed by 8/15/08 for the reasons explained at the conference and in my privilege ruling read into the record on 7/22/08. The transcripts are subject to the existing protective order and shall be for attorney's eyes only. On consent, plaintiff's counsel shall not contact any grand jury witnesses without prior notice to defendants' counsel and, if defendants object, prior written authorization from the court. Similarly, the exhibits previously redacted on grand jury privilege grounds shall be produced in unredacted form by 8/15/08. Finally, responses to previously served written discovery requests shall be supplemented, where appropriate, by 8/15/08 to conform to the court's rulings on grand jury privilege issues. Next conference 9/4/08 at 4:30 (tel). Discovery Hearing held on 8/7/2008 (Levy, Robert) (Entered: 08/07/2008) |
| 09/04/2008 | | Minute Entry for proceedings held before Judge Robert M. Levy: John Norinsberg, Seth Farber. Discovery proceeding. Parties expect most of depositions will be completed by 10/31/08. Next conference 11/3/08 at 3:30 (tel).Status Conference held on 9/4/2008 (Tape #4:35–end.) (Levy, Robert) (Entered: 09/04/2008) |
| 11/03/2008 | | Minute Entry for proceedings held before Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Discovery proceeding well. All discovery disputes have been resolved and none are anticipated at this time. Next conference 1/23/09 at 2:00 (tel).Status Conference held on 11/3/2008 (Tape #3:35–end.) (Levy, Robert) (Entered: 11/03/2008) |
| 11/03/2008 | | ORDER granting in part and denying in part 16 Motion to Compel. Ordered by Judge Robert M. Levy on 5/21/08 (entered 11/3/08). (Levy, Robert) (Entered: 11/03/2008) |

**JA5**

| | | |
|---|---|---|
| 11/03/2008 | | ORDER granting in part and denying in part 17 Motion. Ordered by Judge Robert M. Levy on 5/21/08 (entered 11/3/08). (Levy, Robert) (Entered: 11/03/2008) |
| 11/05/2008 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Chris Carlson, Deborah Simmons. Messages were left for Mr. Seeblom, but he could not be reached. Discussion of proposed infant compromise documents. Mr. Carlson will submit a motion to approve a proposed exemplar guardian's affidavit. The court will rule on it expeditiously.Status Conference held on 11/5/2008 (Tape #11:07–11:24.) (Levy, Robert) (Entered: 11/05/2008) |
| 11/05/2008 | | ORDER re Status Conference: Please disregard the 11/5/08 Minute Entry, which was filed under this case in error. Ordered by Judge Robert M. Levy on 11/5/08. (Levy, Robert) (Entered: 11/05/2008) |
| 01/23/2009 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Discovery in the "non–Spitzer" part of the case progressing well and should be complete in 60 days.Counsel estimate that the "Spitzer discovery" should take 60–90 days and would entail 2–3 depositions, as well as responses to previously served interrogatories and document requests. Next conference 4/3/09 at 10:30 (tel).[Tape: 2:04–2:17].Status Conference held on 1/23/2009 (Levy, Robert) (Entered: 01/23/2009) |
| 03/30/2009 | | ORDER: The telephone conference scheduled for April 3, 2009 has been adjourned to Monday, May 4, 2009 at 2:15 p.m., before the Hon. Robert M. Levy, USMJ at (718) 613–2340. Plaintiff's counsel is directed to initiate conference and confirm with opposing counsel that all necessary participants are aware of date and time of scheduled conference. Ordered by Magistrate Judge Robert M. Levy on 3/30/2009. (Marino, Janine) (Entered: 03/30/2009) |
| 05/04/2009 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Non–Spitzer discovery deadline 6/30/09. Next conference 7/14/09 at 11:00 (tel).Status Conference held on 5/4/2009 (Levy, Robert) (Entered: 05/04/2009) |
| 06/23/2009 | 24 | Letter MOTION for Extension of Time to Complete Discovery by Eliot Spitzer, John Fusto, Jose Castillo, Robert H. Flynn, Levon Aharonyan, James Serra. (Farber, Seth) (Entered: 06/23/2009) |
| 06/24/2009 | | ORDER granting 24 Motion for Extension of Time to August 14, 2009 to Complete Discovery. The status conference scheduled for July 14, 2009 is adjourned to 9/8/09 at 3:30 (tel). Ordered by Magistrate Judge Robert M. Levy on 6/24/2009. (Levy, Robert) (Entered: 06/24/2009) |
| 09/08/2009 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. (1) Defendants will submit a pre–motion conference letter to Judge Amon re: the non–Spitzer discovery issues by 9/25/09. (2) Spitzer discovery to be completed by 12/31/09. Next conference 1/13/10 at 2:15 (tel). Status Conference held on 9/8/2009 (Levy, Robert) (Entered: 09/08/2009) |
| 09/25/2009 | 25 | Letter MOTION for Leave to File *motion for summary judgment per Chambers Rule 3(a)* by Levon Aharonyan, Jose Castillo, Robert H. Flynn, John Fusto, James Serra, Eliot Spitzer. (Farber, Seth) (Entered: 09/25/2009) |
| 10/07/2009 | 26 | REPLY in Opposition *to Defendants' Pre–Motion Letter* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 10/07/2009) |
| 10/09/2009 | 27 | NOTICE OF PREMOTION CONFERENCE: A premotion conference is hereby scheduled in the above–captioned case for OCTOBER 27, 2009 at 10:00am before the Honorable Carol Bagley Amon, United States District Court, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York in Courtroom No. 10D on the 10th Floor, unless otherwise noted. (Liberatore, Marie) (Entered: 10/09/2009) |
| 10/28/2009 | | ORDER granting 25 Motion for Leave to File. Ordered by Judge Carol B. Amon on 10/28/2009. (Rossen, Benjamin) (Entered: 10/28/2009) |
| 10/28/2009 | | Minute Order for proceedings held before Judge Carol B. Amon:Pre Motion Conference held via telephone on 10/28/2009.State Defendants are permitted to |

**JA6**

| | | proceed with a motion for summary judgment. The parties have agreed on the following briefing schedule: State Defendants will serve their opening brief on November 23, 2009, a response will be due by January 8, 2010, reply on January 22, 2010. The parties are directed to file a letter with the Court confirming htis schedule and will proceed with all remaining discovery in the case. (Court Reporter Fred Guerino.) (Rossen, Benjamin) (Entered: 10/28/2009) |
|---|---|---|
| 10/30/2009 | 28 | ORDER confirming "State Defendants" briefing schedule discussed at the Pre–Motion Conference. Ordered by Judge Carol B. Amon on 10/27/2009. (Clarke, Melonie) (Entered: 10/30/2009) |
| 11/23/2009 | 29 | Letter by Levon Aharonyan, Jose Castillo, Robert H. Flynn, John Fusto, James Serra, Eliot Spitzer (Farber, Seth) (Entered: 11/23/2009) |
| 12/31/2009 | 30 | Third MOTION for Extension of Time to Complete Discovery by Leonard Morse. (Norinsberg, Jon) (Entered: 12/31/2009) |
| 01/04/2010 | | ORDER granting 30 Motion for Extension of Time to 3/31/10 to Complete Discovery. The conference scheduled for 1/13/10 is adjourned to 4/6/10 at 11:30 (tel). Ordered by Magistrate Judge Robert M. Levy on 1/4/2010. (Levy, Robert) (Entered: 01/04/2010) |
| 01/06/2010 | 31 | First MOTION for Extension of Time to File Response/Reply *opposition papers to defendants' Motion for Summary Judgment* by Leonard Morse. (Norinsberg, Jon) (Entered: 01/06/2010) |
| 01/11/2010 | | ORDER: re 31 Motion on behalf of plaintiff for an extension of time to file his opposition papers to defendants' motion for summary judgment. APPLICATION GRANTED. Plaintiff's opposition papers due February 15, 2010 and defendants' reply papers due March 10, 2010. So Ordered by Judge Carol B. Amon on 1/11/2010. (Liberatore, Marie) (Entered: 01/11/2010) |
| 02/12/2010 | 32 | MOTION for Extension of Time to File Response/Reply *to Defendants Motion for Summary Judgment* by Leonard Morse. (Norinsberg, Jon) (Entered: 02/12/2010) |
| 02/23/2010 | | ORDER granting 32 Motion for Extension of Time to March 5, 2010 to file opposition papers. Defendant's reply papers due March 19, 2010. So Ordered by Judge Carol B. Amon on 2/19/2010. (Liberatore, Marie) (Entered: 02/23/2010) |
| 03/04/2010 | 33 | Third MOTION for Extension of Time to File Response/Reply *to Defendants Summary Judgment motion* by Leonard Morse. (Norinsberg, Jon) (Entered: 03/04/2010) |
| 03/10/2010 | | ORDER: re 33 Plaintiff's request for an extension to file his opposition papers to defendants' motion for summary judgment from March 5, 2010 to April 2, 2010. APPLICATION GRANTED. So Ordered by Judge Carol B. Amon on 3/10/2010. (Liberatore, Marie) (Entered: 03/10/2010) |
| 04/02/2010 | 34 | Final MOTION for Extension of Time to File Response/Reply *to Defendants' Motion for Summary Judgment* by Leonard Morse. (Norinsberg, Jon) (Entered: 04/02/2010) |
| 04/06/2010 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Order granting on consent motion for extension of time to 6/30/10 to complete discovery. Next conference 6/30/10 at 11:00 a.m. by telephone. Telephone Conference held on 4/6/2010. (Marino, Janine) (Entered: 04/06/2010) |
| 04/06/2010 | 35 | STIPULATION *discontinuing action as against defendants Serra and Aharonyan and concerning ninth, tenth and eleventh claims for relief* by Levon Aharonyan, Jose Castillo, Robert H. Flynn, John Fusto, James Serra, Eliot Spitzer (Farber, Seth) (Entered: 04/06/2010) |
| 04/06/2010 | 36 | STIPULATION *of Confidentiality* by Levon Aharonyan, Jose Castillo, Robert H. Flynn, John Fusto, James Serra, Eliot Spitzer (Farber, Seth) Modified on 5/20/2010 (Levy, Robert). (Entered: 04/06/2010) |

**JA7**

| 04/08/2010 | 37 | ORDER granting 34 Motion for Extension of Time to File Response/Reply. Ordered by Judge Carol B. Amon on 4/6/2010. (Abdallah, Fida) (Entered: 04/08/2010) |
|---|---|---|
| 04/08/2010 | 38 | STIPULATION AND ORDER: The above–entitled action as against Dfts James Serra and Levon Aharonyan is hereby discontinued, with prejudice, and without costs to any party. This stipulation is not intended to discontinue any other claims which may or may not exist and which were not the subject of the above–entitled action. Claims asserted against Dft Eliot Spitzer in the ninth, tenth, and eleventh claims for relief are deemed also asserted against Dft John Fusto. Ordered by Judge Carol B. Amon on 4/7/2010. (Abdallah, Fida) (Entered: 04/08/2010) |
| 04/16/2010 | 39 | First MOTION for Extension of Time to File Response/Reply as to 37 Order on Motion for Extension of Time to File Response/Reply *by letter dated April 16, 2010* by Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 04/16/2010) |
| 04/22/2010 | | ORDER: re 39 State Defendants' motion for an extension of time to serve reply papers with respect to their motion for summary judgment from April 23, 2010 to May 18, 2010. APPLICATION GRANTED. So Ordered by Judge Carol B. Amon on 4/22/2010. (Liberatore, Marie) (Entered: 04/22/2010) |
| 05/18/2010 | 40 | Notice of MOTION for Summary Judgment by Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 05/18/2010) |
| 05/20/2010 | 41 | MOTION REFERRED: 40 Defendants Eliot Spitzer, John Fusto, Jose Castillo, Robert Flynn, James Serra and Levon Aharonyan (collectively the State Defendants) Motion for Summary Judgment 40 filed in the above–captioned case is hereby referred to Magistrate Judge Levy for report and recommendation.SO ORDERED by Judge Amon on 5/20/10. (Liberatore, Marie) (Entered: 05/20/2010) |
| 05/20/2010 | | ORDER granting 36 Motion to File Under Seal. Ordered by Magistrate Judge Robert M. Levy on 5/20/2010. (Levy, Robert) (Entered: 05/20/2010) |
| 05/21/2010 | 42 | ORDER endorsed on Letter dated 5/20/2010, from Seth Farber to Judge Amon, re sealing documents: These matters are referred to Magistrate Judge Levy. Ordered by Judge Carol B. Amon on 5/20/2010. (Abdallah, Fida) (Entered: 05/21/2010) |
| 05/21/2010 | | ORDER RE: 40 Notice of Motion for Summary Judgment filed by John Fusto, Jose Castillo, Eliot Spitzer, Robert H. Flynn. Oral Argument has been scheduled for Friday, July 16, 2010 at 3:30 p.m., before the Hon. Robert M. Levy, USMJ at 225 Cadman Plaza East, Brooklyn, NY. Ordered by Magistrate Judge Robert M. Levy on 5/21/2010. (Marino, Janine) (Entered: 05/21/2010) |
| 05/26/2010 | 43 | First MOTION to Adjourn Conference *Oral Argument* by Leonard Morse. (Norinsberg, Jon) (Entered: 05/26/2010) |
| 05/26/2010 | | ORDER granting 43 Motion to Adjourn 7/16/10 Oral Argument to 8/5/10 at 11:00. Ordered by Magistrate Judge Robert M. Levy on 5/26/2010. (Levy, Robert) (Entered: 05/26/2010) |
| 08/05/2010 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Decision reserved.Motion Hearing held on 8/5/2010 re 40 Notice of MOTION for Summary Judgment filed by John Fusto, Jose Castillo, Eliot Spitzer, Robert H. Flynn [Tape 11:11–12:17] (Levy, Robert) (Entered: 08/05/2010) |
| 09/29/2010 | 44 | TRANSCRIPT of Proceedings held on 8/5/10, before Judge Levy. Court Transcriber ARIA TRANSCRIPTIONS, Telephone number 215–767–7700. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2010. Redacted Transcript Deadline set for 11/1/2010. Release of Transcript Restriction set for 12/28/2010. (Hong, Loan) (Entered: 09/29/2010) |
| 03/17/2011 | 46 | MOTION for Reconsideration by Leonard Morse. (Norinsberg, Jon) (Entered: 03/17/2011) |

**JA8**

| 03/18/2011 | 47 | RESPONSE in Opposition re 46 MOTION for Reconsideration *by letter of March 18, 2011* filed by Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 03/18/2011) |
|---|---|---|
| 03/21/2011 | 48 | REPLY to Response to Motion re 46 MOTION for Reconsideration filed by Leonard Morse. (Norinsberg, Jon) (Entered: 03/21/2011) |
| 03/21/2011 | | ORDER: A telephone conference has been scheduled for March 22, 2011 at 10:00 a.m., before the Hon. Robert M. Levy, USMJ at (718) 613–2340. Plaintiffs' counsel is directed to initiate conference call. Ordered by Magistrate Judge Robert M. Levy on 3/21/2011. (Marino, Janine) (Entered: 03/21/2011) |
| 03/22/2011 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. (1) Argument heard on motion for reconsideration. Decision reserved. (2) Defendants' counsel will submit a request to Judge Amon to extend the time to file objections to the Report and Recommendations. (3) Discovery as to the Spitzer claims shall begin and be completed by 6/30/11. (4) Next conference 7/12/11 at 12:30 (tel).Motion Hearing held on 3/22/2011 re 46 MOTION for Reconsideration filed by Leonard Morse (Tape #10:03–10:26.) (Levy, Robert) (Entered: 03/22/2011) |
| 03/22/2011 | 49 | Letter MOTION for Extension of Time to File *Objections to Report and Recommendation* by Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 03/22/2011) |
| 03/22/2011 | 50 | ORDER denying 46 Motion for Reconsideration. Ordered by Magistrate Judge Robert M. Levy on 3/22/2011. (Gapinski, Michele) Modified on 3/25/2011 (Gapinski, Michele). (Entered: 03/22/2011) |
| 03/22/2011 | 54 | REDACTED MEMORANDUM AND ORDER: On March 15, 2011, I issued a Report and Recommendation with respect to the state defendants' motion for summary judgment (the RFamiliarity with the RRis assumed. Plaintiff Leonard Morse (plaintiff or Morse) now moves for reconsideration of my recommendation that summary judgment be granted on his claim for denial of a fair trial due to fabrication of evidence. For the reasons stated in the attached Redacted Memorandum &Order, the motion is denied, but plaintiff is invited to seek leave to amend his fabrication of evidence claim, if he so desires. Ordered by Magistrate Judge Robert M. Levy on 3/22/2011. (Marino, Janine) See attached Redacted Memorandum &Order. (Entered: 03/31/2011) |
| 03/23/2011 | 51 | TRANSCRIPT of Proceedings held on March 22, 2011, before Judge Levy. Court Transcriber Transcription Plus II, Telephone number 516–783–3720. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/13/2011. Redacted Transcript Deadline set for 4/25/2011. Release of Transcript Restriction set for 6/21/2011. (Rocco, Christine) (Entered: 03/23/2011) |
| 03/23/2011 | | ORDER: re 49 – Motion filed by the State Defendants requesting an additional two weeks from March 29, 2011 until April 12, 2011 to submit objections to the RRwith consent. If the motion for reconsideration is denied, objections remain due on March 29, 2011. So Ordered by Judge Carol B. Amon on 3/23/2011. (Liberatore, Marie) (Entered: 03/23/2011) |
| 03/29/2011 | 52 | OBJECTION to 45 Report and Recommendations filed by Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 03/29/2011) |
| 03/31/2011 | 53 | REDACTED REPORT AND RECOMMENDATION: By order dated May 20, 2010, the Hon. Carol Bagley Amon, United States District Judge, referred the state defendants' motion for partial summary judgment to me for a report and recommendation. I heard oral argument on August 5, 2010. For the reasons stated in the attached Redacted Report &Recommendation, I respectfully recommend that plaintiff's first, seventh, and eighth causes of action be dismissed for failure to state a claim, and that the state defendants' motion for summary judgment be granted with respect to plaintiff's sixth and twelfth causes of action. I further recommend that the state defendants' summary judgment motion be denied with respect to plaintiff's second and third causes of action, for false arrest and malicious prosecution. Any objections to this Report and Recommendation must be filed with |

| | | |
|---|---|---|
| | | the Clerk of the Court, with courtesy copies to Judge Amon and to my chambers, within fourteen (14) days. Failure to file objections within the specified time waives the right to review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e). Ordered by Magistrate Judge Robert M. Levy on 3/15/11. (Marino, Janine) See attached Redacted Report &Recommendation for details. (Entered: 03/31/2011) |
| 04/04/2011 | 55 | First MOTION for Extension of Time to File Response/Reply *to Defendants Objections to Magistrate Judge Levys Report and Recommendation* by Leonard Morse. (Norinsberg, Jon) (Entered: 04/04/2011) |
| 04/04/2011 | | ORDER: re 55 Motion for an extension from April 12, 2011 until April 22, 2011 to respond to defendants' objections to Magistrate Judge Levy's Report with consent. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 4/4/2011. (Liberatore, Marie) (Entered: 04/04/2011) |
| 04/13/2011 | 56 | Second MOTION for Extension of Time to File Response/Reply by Leonard Morse. (Norinsberg, Jon) (Entered: 04/13/2011) |
| 04/15/2011 | | ORDER: re 56 Motion for an extension from April 22, 2011 until April 29, 2011 to respond to defendants' objections to Magistrate Judge Levy's Report. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 4/14/2011. (Liberatore, Marie) (Entered: 04/15/2011) |
| 04/25/2011 | 57 | MOTION for Extension of Time to File Response/Reply by Leonard Morse. (Norinsberg, Jon) (Entered: 04/25/2011) |
| 04/26/2011 | 58 | ORDER granting 57 Motion for Extension of Time to File Response/Reply; Plaintiff requests a brief extension from 4/29/11 until 5/6/11 to respond to defts' objections to Mag Levy's report; Application granted. Ordered by Chief Judge Carol Bagley Amon on 4/26/2011. (Fernandez, Erica) (Entered: 04/26/2011) |
| 05/06/2011 | 59 | REPLY in Opposition *to defendants objections to the report and recommendation* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 05/06/2011) |
| 05/19/2011 | 60 | NOTICE OF ORAL ARGUMENT: Oral argument is hereby scheduled on the objections filed to the Magistrate Judges Report and Recommendation for JUNE 23, 2011 at 2:30pm before Chief Judge Amon in Courtroom 10 D. (Liberatore, Marie) (Entered: 05/19/2011) |
| 06/15/2011 | 61 | Letter *regarding filing amended complaint* by Leonard Morse (Attachments: # 1 Exhibit) (Norinsberg, Jon) (Entered: 06/15/2011) |
| 06/15/2011 | 62 | AMENDED COMPLAINT against Eliot Spitzer, filed by Leonard Morse. (Attachments: # 1 Exhibit) (Norinsberg, Jon) (Entered: 06/15/2011) |
| 06/24/2011 | | AMENDED Summons Issued as to Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer. (Sica, Michele) (Entered: 06/24/2011) |
| 06/24/2011 | | Minute Entry: Oral argument held before Chief Judge Amon on June 23, 2011 on the objections to the Magistrate Judge's report and recommendation. Appearances: For Plaintiff – Jon Norinsberg. For Defendants – AAG Seth Farber. DECISION RESERVED. (Court Reporter Burt Sulzer.) (Liberatore, Marie) (Entered: 06/24/2011) |
| 07/05/2011 | 63 | AMENDED COMPLAINT *Second Amended Complaint* against Eliot Spitzer, filed by Leonard Morse. (Attachments: # 1 Exhibit) (Norinsberg, Jon) (Entered: 07/05/2011) |
| 07/05/2011 | 64 | STIPULATION re 63 Amended Complaint by Leonard Morse (Norinsberg, Jon) Modified on 7/11/2011 (Levy, Robert). (Entered: 07/05/2011) |
| 07/05/2011 | | Ammended Summons Issued as to Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer. (Marziliano, August) (Entered: 07/15/2011) |
| 07/06/2011 | 65 | SCHEDULING ORDER: Parties request a 90–day extension of time from 7/1/11 to 10/1/11; Application granted. Telephone Conference set for 10/12/2011 02:30 PM before Magistrate Judge Robert M. Levy. (Fernandez, Erica) (Entered: |

**JA10**

| | | |
|---|---|---|
| | | 07/06/2011) |
| 07/11/2011 | | ORDER approving 64 Stipulation. Ordered by Magistrate Judge Robert M. Levy on 7/11/2011. (Levy, Robert) (Entered: 07/11/2011) |
| 08/08/2011 | 66 | ANSWER to 63 Amended Complaint *Answer to Second Amended Complaint* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer. (Farber, Seth) (Entered: 08/08/2011) |
| 09/30/2011 | 67 | ORDER: ADOPTING IN PART REPORT AND RECOMMENDATIONS 45 AND 53 and granting in part and denying in part 40 Motion for Summary Judgment; For the reasons stated, the defendants' motion for summary judgment is granted with respect to all claims except Morse's fabrication of evidence claims against Fusto and Castillo. The parties are directed to inform the Court within fourteen days of the date of this Order how they propose to proceed in this matter. Ordered by Chief Judge Carol Bagley Amon on 9/30/2011. (Fernandez, Erica) (Entered: 09/30/2011) |
| 10/12/2011 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. In view of the pending motions, the next conference will be held on 12/9/11 at 2:30 by telephone. Status Conference held on 10/12/2011 (Levy, Robert) (Entered: 10/12/2011) |
| 10/13/2011 | | NOTICE OF PREMOTION CONFERENCE BY TELEPHONE: A premotion conference will be held by telephone on Friday, October 14, 2011 at 9:00am before Chief Judge Amon. AAG Seth Farber is directed to coordinate the conference call to chambers (718) 613–2410. (Liberatore, Marie) (Entered: 10/13/2011) |
| 10/14/2011 | | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Pre Motion Conference held on 10/14/2011. Both parties will move for reconsideration of the Court's September 30, 2011 order granting in part and denying in part the defendants' motion for summary judgment. Motion papers are due October 21, 2011. Response papers are due October 28, 2011. Replies shall be filed with the Court, along with the entire set of motion papers, by November 3, 2011. (Turner–Dodge, Lee) (Entered: 10/14/2011) |
| 10/21/2011 | 69 | Letter *transmitting documents to Jon Norinssberg, counsel for plaintiff,* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer (Farber, Seth) (Entered: 10/21/2011) |
| 10/21/2011 | 70 | Letter *transmitting documents to Seth Farber, counsel for defendants* by Leonard Morse (Norinsberg, Jon) (Entered: 10/21/2011) |
| 10/28/2011 | 71 | Letter *transmitting documents to Jon Norinssberg, counsel for plaintiff,* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer (Farber, Seth) (Entered: 10/28/2011) |
| 10/28/2011 | 72 | Letter *transmitting documents to Seth Farber, counsel for defendants* by Leonard Morse (Norinsberg, Jon) (Entered: 10/28/2011) |
| 11/03/2011 | 73 | Notice of MOTION for Reconsideration re 67 Order Adopting Report and Recommendations, Order on Motion for Summary Judgment, Order on Report and Recommendations,,,,,,,,,, by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General. (Attachments: # 1 Memorandum in Support State Defendants' Moving Memorandum, # 2 Memorandum in Opposition Plaintiff's Opposition, # 3 Memorandum in Support State Defendants' Reply Memorandum) (Farber, Seth) (Entered: 11/03/2011) |
| 11/03/2011 | 74 | MOTION for Reconsideration *of Court's Dismissal of Plaintiff's Malicious Prosecution Claim* by Leonard Morse. (Norinsberg, Jon) (Entered: 11/03/2011) |
| 11/03/2011 | 75 | MEMORANDUM in Opposition *to Defendants' Motion for Reconsideration* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 11/03/2011) |
| 11/03/2011 | 76 | MEMORANDUM in Opposition re 74 MOTION for Reconsideration *of Court's Dismissal of Plaintiff's Malicious Prosecution Claim* filed by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General. (Farber, Seth) (Entered: 11/03/2011) |

**JA11**

| 11/04/2011 | 77 | REPLY to Response to Motion re 74 MOTION for Reconsideration *of Court's Dismissal of Plaintiff's Malicious Prosecution Claim* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 11/04/2011) |
|---|---|---|
| 11/09/2011 | 78 | ORDER directing the Plaintiff to file additional transcripts with the Court by November 14, 2011, in connection with the parties' motions for reconsideration. Ordered by Chief Judge Carol Bagley Amon on 11/9/2011. (Amon, Carol) (Entered: 11/09/2011) |
| 11/10/2011 | 79 | Letter *to Honorable Carol Bagley Amon, Chief Judge enclosing requested deposition transcripts* by Leonard Morse (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Norinsberg, Jon) (Entered: 11/10/2011) |
| 12/09/2011 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Further discovery schedule deferred until pending motions are decided. Next conference 3/2/12 at 11:00 (tel).Status Conference held on 12/9/2011 (Levy, Robert) (Entered: 12/09/2011) |
| 03/02/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: John Norinsberg, Seth Farber. Further discovery deferred until motions for reconsideration have been decided, as those decisions will dictate the course or discovery. Next conference 5/2/12 at 11:30 (tel).Status Conference held on 3/2/2012 (Levy, Robert) (Entered: 03/02/2012) |
| 04/10/2012 | | Email Notification Test for Jon L. Norinsberg – DO NOT REPLY. (Barrett, C) (Entered: 04/10/2012) |
| 04/10/2012 | | Email Notification Test for Jon L. Norinsberg – DO NOT REPLY. (Barrett, C) (Entered: 04/10/2012) |
| 05/02/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Further discovery and possible settlement conference deferred until motions for reconsideration have been decided. Next conference 7/10/12 at 4:30 (tel)(status).Status Conference held on 5/2/2012 (Levy, Robert) (Entered: 05/02/2012) |
| 07/10/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Counsel present by telephone. Scheduling order deferred pending decisions of pending motions. Next conference 9/27/12 at 11:30 (tel).Status Conference held on 7/10/2012 (Levy, Robert) (Entered: 07/10/2012) |
| 08/03/2012 | 80 | ORDER denying 73 74 . The parties' motions for reconsideration of the Court's September 30, 2011 order are denied. The parties are directed to inform the Court within 14 days of the date of this order how they propose to proceed. Ordered by Chief Judge Carol Bagley Amon on 8/2/2012. (Entered: 08/03/2012) |
| 08/15/2012 | 81 | STATUS REPORT by Leonard Morse (Norinsberg, Jon) (Entered: 08/15/2012) |
| 08/16/2012 | 82 | Letter *from Seth Farber, Esq.* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer (D'alessio, Lisa) (Entered: 08/16/2012) |
| 08/16/2012 | | NOTICE OF TELEPHONE STATUS CONFERENCE: Re: 81 82 . A status conference will be held by telephone on September 6, 2012 at 4:45pm before Chief Judge Amon. Jon Norinsberg is directed to coordinate the conference call to chambers 718–613–2410. (Liberatore, Marie) (Entered: 08/16/2012) |
| 09/07/2012 | | Minute Entry: Status conference held on 9/6/2012 before Chief Judge Amon.Appearances: For Plaintiff – Jon Norinsberg. For Defendants – AAG Seth Farber.Discovery shall be completed on outstanding claims and deposition transcripts provided by November 15, 2012. Defendants' motion for summary judgment shall be served by November 30, 2012. Plaintiff shall serve his response by December 20, 2012. Defendants' reply due December 31, 2012. Oral argument is scheduled for January 10, 2013 at 2:00pm. Jury selection and trial set for Monday, January 28, 2013 at 9:30am. (Court Reporter Gene Rudolph.) (Liberatore, Marie) (Entered: 09/07/2012) |
| 10/23/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. Ruling made at deposition of AAG Mahoney.Discovery Hearing held on 10/23/2012 (Levy, Robert) (Entered: 10/23/2012) |

| | | |
|---|---|---|
| 11/14/2012 | 83 | Letter MOTION for Leave to File *Motion for Protective Order and proposing schedule for same* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer. (Farber, Seth) (Entered: 11/14/2012) |
| 11/14/2012 | | ORDER RE 83 – Schedule approved. Oral argument is set for December 20, 2012 at 2:30 p.m. in Courtroom 11–B. Ordered by Magistrate Judge Robert M. Levy on 11/14/2012. (Marino, Janine) (Entered: 11/14/2012) |
| 11/15/2012 | | Parties Telephone Request to Adjourn the Oral Argument scheduled for December 20, 2012 to November 29, 2012 at 3:00 PM (Marino, Janine) (Entered: 11/15/2012) |
| 11/15/2012 | | ORDER RE Parties Motion to Adjourn the Oral Argument to NOVEMBER 29, 2012 at 3:00 PM. Application granted, on consent. Oral argument adjourned to November 29, 2012 at 3:00 PM in Courtroom 11–B. All counsel must appear in–person. Ordered by Magistrate Judge Robert M. Levy on 11/15/2012. (Marino, Janine) (Entered: 11/15/2012) |
| 11/16/2012 | 84 | Letter MOTION for Protective Order , Letter MOTION to Quash by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer. (Attachments: # 1 Exhibit Exhibit A to application for protective order, # 2 Exhibit Exhibit B to application for protective order, # 3 Exhibit Exhibit C to application for protective order, # 4 Exhibit Exhibit D to application for protective order) (Farber, Seth) (Entered: 11/16/2012) |
| 11/21/2012 | 85 | MOTION for Extension of Time to File Response/Reply as to 84 Letter MOTION for Protective Order Letter MOTION to Quash by Leonard Morse. (Norinsberg, Jon) (Entered: 11/21/2012) |
| 11/26/2012 | 86 | RESPONSE in Opposition re 84 Letter MOTION for Protective Order Letter MOTION to Quash filed by Leonard Morse. (Norinsberg, Jon) (Entered: 11/26/2012) |
| 11/29/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: John Norinsberg, Seth Farber. Oral argument heard. Protective Order granted for the reasons explained on the record, specifically that plaintiff has not satisfied his burden of proving Spitzer's personal involvement.Motion Hearing held on 11/29/2012 84 Letter MOTION for Protective Order Letter MOTION to Quash filed by Eliot spitzer (Tape #3:34–4:15.) (Levy, Robert) (Entered: 11/29/2012) |
| 11/29/2012 | | ORDER granting 84 Motion for Protective Order; granting 84 Motion to Quash for the reasons explained in detail on the record. Ordered by Magistrate Judge Robert M. Levy on 11/29/2012. (Levy, Robert) (Entered: 11/29/2012) |
| 11/29/2012 | | ORDER granting 85 Motion for Extension of Time to File Response/Reply. Ordered by Magistrate Judge Robert M. Levy on 11/22/2012. (Levy, Robert) (Entered: 11/29/2012) |
| 11/30/2012 | 87 | Letter *transmitting papers to Jon Norinsberg* by John Fusto, Eliot Spitzer (Farber, Seth) (Entered: 11/30/2012) |
| 12/04/2012 | | ORDER: A telephone conference has been scheduled for December 6, 2012 at 4:00 p.m., before the Hon. Robert M. Levy, USMJ at (718) 613–2340. Ordered by Magistrate Judge Robert M. Levy on 12/4/2012. (Marino, Janine) (Entered: 12/04/2012) |
| 12/06/2012 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg, Seth Farber. (1) JPTO shall be filed by 12/21/12. (2) Motions in limine shall be filed by 1/14/13; oppositions by 1/21/13. (3) To the extent there are any objections to the court's 11/29/12 ruling regarding the Spitzer deposition, the parties agree that they shall be addressed in the briefing of the motion for partial summary judgment concerning the claims against Spitzer. Final Pretrial Conference held on 12/6/2012 (Levy, Robert) (Entered: 12/06/2012) |
| 12/18/2012 | 88 | Letter MOTION for Extension of Time to File Response/Reply *in motion for partial summary judgment* by Jose Castillo, Robert H. Flynn, John Fusto, Office of the Attorney General, Eliot Spitzer. (Farber, Seth) (Entered: 12/18/2012) |

| 12/18/2012 | 89 | ORDER granting 88 Motion for Extension of Time to File Response/Reply; Defts request a brief extension of the State Defts' time to submit their Reply papers in support of their motion; Application granted. Ordered by Chief Judge Carol Bagley Amon on 12/18/2012. (Fernandez, Erica) (Entered: 12/18/2012) |
|---|---|---|
| 12/19/2012 | 90 | Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief* by John Fusto, Eliot Spitzer. Responses due by 12/21/2012 (Farber, Seth) (Entered: 12/19/2012) |
| 12/19/2012 | 91 | DECLARATION re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief Declaration of Eliot Spitzer* by John Fusto, Eliot Spitzer (Farber, Seth) (Entered: 12/19/2012) |
| 12/19/2012 | 92 | DECLARATION re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief Declaration of Seth Farber* by John Fusto, Eliot Spitzer (Attachments: # 1 Exhibit Exhibit A to Farber Decl. – part 1, # 2 Exhibit A to Farber Decl. – part 2, # 3 Exhibit B to Farber Decl., # 4 Exhibit C to Farber Decl. – part 1, # 5 Exhibit C to Farber Decl. – part 2, # 6 Exhibit C to Farber Decl. – part 3, # 7 Exhibit D to Farber Decl,, # 8 Exhibit E to Farber Decl., # 9 Exhibit F to Farber Decl., # 10 Exhibit G to Farber Decl.) (Farber, Seth) (Entered: 12/19/2012) |
| 12/19/2012 | 93 | MEMORANDUM in Support re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief* filed by John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 12/19/2012) |
| 12/19/2012 | 94 | RULE 56.1 STATEMENT re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief* filed by John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 12/19/2012) |
| 12/21/2012 | 95 | MEMORANDUM in Opposition re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 12/21/2012) |
| 12/21/2012 | 96 | DECLARATION re 95 Memorandum in Opposition by Leonard Morse (Attachments: # 1 Exhibit A–W) (Norinsberg, Jon) (Entered: 12/21/2012) |
| 12/21/2012 | 97 | RULE 56.1 STATEMENT *in Response to Defendants Local Rule 56.1 Statement* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 12/21/2012) |
| 12/21/2012 | 98 | RULE 56.1 STATEMENT filed by Leonard Morse. (Norinsberg, Jon) (Entered: 12/21/2012) |
| 12/21/2012 | 99 | AFFIDAVIT/AFFIRMATION *Rule 56 (f) Affidavit* by Leonard Morse (Norinsberg, Jon) (Entered: 12/21/2012) |
| 12/21/2012 | 100 | Proposed Pretrial Order *Proposed Joint Pre−Trial Order* by Jose Castillo, Robert H. Flynn, John Fusto, Leonard Morse, Office of the Attorney General, Eliot Spitzer (Farber, Seth) (Entered: 12/21/2012) |
| 12/26/2012 | 101 | Letter *transmitting papers to Seth Farber, Esq.* by Leonard Morse (Norinsberg, Jon) (Entered: 12/26/2012) |
| 12/28/2012 | 102 | NOTICE of Appearance by Christopher Y. Miller on behalf of Jose Castillo, Robert H. Flynn, John Fusto, Eliot Spitzer (aty to be noticed) (Miller, Christopher) (Entered: 12/28/2012) |
| 01/04/2013 | 103 | TRANSCRIPT of Proceedings held on 11/29/12, before Judge Levy. Court Transcriber TRANSCRIPTION PLUS II, Telephone number 718−987−4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/25/2013. Redacted Transcript Deadline set for 2/4/2013. Release of Transcript Restriction set for 4/4/2013. (Hong, Loan) (Entered: 01/04/2013) |
| 01/04/2013 | 104 | REPLY in Support re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief Reply Declaration of Seth Farber*, AFFIDAVIT/DECLARATION in Support re 90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief* filed |

**JA14**

| | | by John Fusto, Eliot Spitzer. (Attachments: #_1 Exhibit Exhibit "H" to Reply Declaration of Seth Farber) (Farber, Seth) (Entered: 01/04/2013) |
|---|---|---|
| 01/04/2013 | 105 | MEMORANDUM in Support re_90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief Reply Memorandum of State Defendants in Further Support of Motion for Partial Summary Judgment* filed by John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 01/04/2013) |
| 01/04/2013 | 106 | RULE 56.1 STATEMENT re_90 Notice of MOTION for Partial Summary Judgment *dismissing fifth, sixth and seventh claims for relief State Defendants' Reply Statement Pursuant to Local Rule 56.1* filed by John Fusto, Eliot Spitzer. (Farber, Seth) (Entered: 01/04/2013) |
| 01/10/2013 | | Minute Entry: Re: 90 Motion for Partial Summary Judgment. Oral argument held on before Chief Judge Carol Bagley Amon on 1/10/2013. Appearances: For Plaintiff – Jon Norinsberg. For Defendants – Seth Farber and Chistopher Miller. Order granting Defendants' motion forthcoming. Per Magistrate Judge Levy's 12/6/12 Order – motions in limine are due 1/14/2013 and oppositions by 1/21/2013. An updated joint PTO and proposed jury instructions are due by 1/18/2013. Parties shall contact Magistrate Judge Levy if settlement is a possibility. (Court Reporter Gene Rudolph.) (Liberatore, Marie) (Entered: 01/10/2013) |
| 01/14/2013 | | SCHEDULING ORDER: This matter has been referred to the undersigned for jury selection. Jury selection will commence on Monday, January 28, 2013 at 9:30 a.m. in Courtroom 10D. Any proposed voir dire questions should be filed by 1/23/13. The proposed voir dire questions should also include a list of witnesses, as well as the names of people and places which may figure prominently in the trial. Ordered by Magistrate Judge Viktor V. Pohorelsky on 1/14/2013. (Toritto, Jim) (Entered: 01/14/2013) |
| 01/14/2013 | 107 | Letter *transmitting papers to Jon Norinsberg* by Jose Castillo, John Fusto (Farber, Seth) (Entered: 01/14/2013) |
| 01/15/2013 | 108 | ORDER granting 90 Motion for Partial Summary Judgment; For the reasons stated above, Defendants' motion for summary judgment on Morse's "press release claims"the fair trial claim, defamation claim, and "stigma plus" clam is granted. Morse's request to depose Defendant Spitzer is denied as moot. Trial is scheduled to proceed on Morse's one remaining claim in this action: whether Fusto and Castillo fabricated evidence material to securing the indictment.. Ordered by Chief Judge Carol Bagley Amon on 1/14/2013. (Fernandez, Erica) (Entered: 01/15/2013) |
| 01/16/2013 | 109 | Letter MOTION to Continue *and Adjourn Trial until 2−4−13 or 2−11−13* by Jose Castillo, John Fusto. (Farber, Seth) (Entered: 01/16/2013) |
| 01/16/2013 | | ORDER: re 109 Motion to adjourn trial date. Jury selection will go forward on January 28, 2013 before Magistrate Judge Pohorelsky. Trial will commence on February 4, 2013 at 9:30am before Chief Judge Amon in Courtroom 10 D. Parties are to report to Courtroom 10D after jury selection on January 28, 2013. So Ordered by Chief Judge Carol Bagley Amon on 1/16/2013. (Liberatore, Marie) (Entered: 01/16/2013) |
| 01/18/2013 | 110 | Proposed Jury Instructions by Leonard Morse (Norinsberg, Jon) (Entered: 01/18/2013) |
| 01/18/2013 | 111 | Proposed Findings of Fact by Leonard Morse (Norinsberg, Jon) (Entered: 01/18/2013) |
| 01/18/2013 | 112 | Proposed Jury Instructions by Jose Castillo, John Fusto (Attachments: #_1 Proposed Verdict Sheet) (Farber, Seth) (Entered: 01/18/2013) |
| 01/18/2013 | 113 | Proposed Pretrial Order *Revised Joint Pre−Trial order* by Jose Castillo, John Fusto, Leonard Morse (Farber, Seth) (Entered: 01/18/2013) |
| 01/21/2013 | 114 | MEMORANDUM in Opposition *to Defendant's Motion to Preclude Plaintiff's Experts* filed by Leonard Morse. (Norinsberg, Jon) (Entered: 01/21/2013) |
| 01/21/2013 | 115 | TRIAL BRIEF *In Opposition to Defendant's Motion to Preclude Fact Witness* by Leonard Morse (Norinsberg, Jon) (Entered: 01/21/2013) |

| 01/21/2013 | 116 | TRIAL BRIEF *Declaration with Exhibits* by Leonard Morse (Norinsberg, Jon) (Entered: 01/21/2013) |
|---|---|---|
| 01/21/2013 | 117 | Notice of MOTION in Limine *re plaintiff's expert witnesses* by Jose Castillo, John Fusto. (Attachments: #1 Notice of Motion IN limine motion re plaintiff's fact witnesses, #2 Declaration Seth Farber Declaration in Support of IN Limine Motions, #3 Exhibit Exhibit A to Farber Declaration, #4 Exhibit Exhibit B to Farber Declaration, #5 Exhibit Exhibit C to Farber Declaration, #6 Exhibit Exhibit D to Farber Declaration, #7 Exhibit Exhibit E to Farber Declaration, #8 Exhibit Exhibit F to Farber Declaration, #9 Exhibit Exhibit G to Farber Declaration, #10 Exhibit Exhibit H to Farber Declaration, #11 Exhibit Exhibit I to Farber Declaration, #12 Exhibit Exhibit J to Farber Declaration, #13 Exhibit Exhibit K to Farber Declaration, #14 Exhibit Exhibit L to Farber Declaration, #15 Exhibit Exhibit M to Farber Declaration, #16 Exhibit Exhibit N to Farber Declaration, #17 Exhibit Exhibit O to Farber Declaration, #18 Exhibit Exhibit P to Farber Declaration, #19 Exhibit Exhibit Q to Farber Declaration, #20 Exhibit Exhibit R to Farber Declaration, #21 Exhibit Exhibit S to Farber Declaration, #22 Exhibit Exhibit T to Farber Declaraiton, #23 Exhibit Exhibit U to Farber Declaraiton, #24 Exhibit Exhibit V to Farber Declaration, #25 Exhibit Exhibit W to Farber Declaration, #26 Exhibit Exhibit X to Farber Declaration, #27 Memorandum in Support State Defendants' Memorandum in Support of In Limine Motion re: Plaintiff's proposed Expert Witnesses, #28 Memorandum in Support State Defendants' Memorandum in Support of In Lmine Motion re: Plaintiff's Proposed Fact Witnesses) (Farber, Seth) (Entered: 01/21/2013) |
| 01/22/2013 | 118 | AFFIDAVIT/DECLARATION in Support re 117 Notice of MOTION in Limine *re plaintiff's expert witnesses Supplemental Declaration of Seth Farber annexing Mantell deposition transcript* filed by Jose Castillo, John Fusto. (Attachments: #1 Exhibit Exhibit Y to Farber Declaration – part 1, #2 Exhibit Exhibit Y to Farber Declaration – part 2) (Farber, Seth) (Entered: 01/22/2013) |
| 01/23/2013 | 119 | Proposed Voir Dire by Leonard Morse (Norinsberg, Jon) (Entered: 01/23/2013) |
| 01/23/2013 | 120 | Proposed Voir Dire by Jose Castillo, John Fusto (Miller, Christopher) (Entered: 01/23/2013) |
| 01/24/2013 | | ORDER re: Settlement Conference scheduled for Friday, January 25, 2013: There is now an opening in my calendar at 2:45. If counsel are free to begin the conference at that time, they are requested to so advise chambers at (718) 613–2340. Ordered by Magistrate Judge Robert M. Levy on 1/24/2013. (Levy, Robert) (Entered: 01/24/2013) |
| 01/25/2013 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Jon Norinsberg; Seth Farber, Christopher Miller. Extensive settlement discussions. This case has not settled. As discussed at this conference, the parties are invited to contact chambers at any time, including after jury selection, to resume negotiations.Settlement Conference held on 1/25/2013 (Levy, Robert) (Entered: 01/25/2013) |
| 01/28/2013 | 121 | Proposed Jury Instructions by Leonard Morse (Norinsberg, Jon) (Entered: 01/28/2013) |
| 01/28/2013 | 122 | Proposed Jury Instructions by Leonard Morse (Norinsberg, Jon) (Entered: 01/28/2013) |
| 01/28/2013 | 142 | Minute Entry for proceedings held before Magistrate Judge Viktor V. Pohorelsky:Jury Selection held on 1/28/2013. Counsel for parties present. Jury empaneled. (Fernandez, Erica) (Entered: 02/20/2013) |
| 01/29/2013 | | Minute Entry: Pretrial conference held before Chief Judge Amon on 1/28/2013.Appearances for Plaintiff – Jon Norinsberg. For Defendants – Christopher Miller and Seth Farber. Rulings made on the record as follows: Plaintiff is precluded from questioning regarding the AG Office's decision to drop a civil case against Morse after his acquittal in his criminal trial. Plaintiff may question Defendant Fusto about whether the 2006 gubernatorial election influenced his decision to prosecute, but may not explore the issue further. Defendants will redact irrelevant portions of Ex. G and Court will give jury appropriate instruction when exhibit is introduced. Plainitf may introduce Exs. 6, 7, 8 to show his |

**JA16**

| | | indictment was widely publized. Plaintiff may not introduce Exs. 10, 63, 66, 131 and any other portions of Morse's criminal trial transcript except for purposes of impeachment. Plaintiff may call Dr. DeLuca. Plaintiff may not call Janine Rivera. Parties will stipulate Morse was excluded from Medicaid as a result of his indictment. DECISION RESERVED on all other matters. Pretrial conference scheduled for Friday, February 1, 2013 at 2:00 p.m. (Court Reporter Richard Barry.) (Liberatore, Marie) (Entered: 01/29/2013) |
|---|---|---|
| 01/29/2013 | 123 | CORRECTED MEMORANDUM AND ORDER: This corrected MOreflects a change correcting a typographical error in the Court's original MOissued September 30, 2011 67 . At page 11, paragraph 1, the beginning of the second sentence has been changed from "If not" to "If so". No change has been made to the substance of the opinion. Modified on 1/30/2013 as per chambers (Fernandez, Erica). (Entered: 01/29/2013) |
| 01/29/2013 | 124 | CORRECTED MEMORANDUM AND ORDER: This corrected MOreflects a change correcting a typographical error in the Court's original MOon reconsideration issued August 2, 2012 DE 80 . On page 15, paragraph 2, "invoives" has been changed to "invoices." No change has been made to the substance of the opinion. (Fernandez, Erica) Modified on 1/30/2013 as per chambers (Fernandez, Erica). (Entered: 01/29/2013) |
| 01/31/2013 | 125 | TRIAL BRIEF *State Defendants' Letter Brief on Issue of Spoliation* by Jose Castillo, John Fusto (Attachments: # 1 Exhibit Exhibit "A" to spoliation position letter, # 2 Exhibit Exhibit B to spoliation position letter, # 3 Exhibit Exhibit C to spoliation position letter, # 4 Exhibit Exhibit D to spoliation positino letter) (Farber, Seth) (Entered: 01/31/2013) |
| 02/01/2013 | 126 | Joint MOTION for Protective Order by Jose Castillo, John Fusto. (Attachments: # 1 Proposed Order) (Miller, Christopher) (Entered: 02/01/2013) |
| 02/01/2013 | 127 | Minute Entry: Final Pretrial Conference held before Chief Judge Amon on 2/1/2013. Rulings made on the record: Dr. Salzberg may not testify; Dr. Morse's wife may testify; Dr. Morse may testify he was audited on prior occasions without problems but may not introduce exhibits regarding those other audits; Defendants may introduce grand jury transcripts into evidence; Plaintiff's request for a spoliation charge is denied. Parties will submit proposed language (jointly, to the extent possible) regarding the following by the morning of February 4, 2013: Elements of the charges put before the grand jury; limiting instruction re: grand jury transcripts; and interrogatories on the substantive elements of Plaintiff's claim and on the immunity defense. Trial to begin at 9:30 a.m. on 2/4/13. (Court Reporter Richard Barry.) (Baek, Hanna) (Entered: 02/01/2013) |
| 02/04/2013 | 128 | ORDER granting 126 Motion for Protective Order; Joint proposed HIPAA Qualified protective order to disclose protected health information. Ordered by Chief Judge Carol Bagley Amon on 2/1/2013. (Fernandez, Erica) (Entered: 02/04/2013) |
| 02/04/2013 | 129 | Proposed Jury Instructions by Jose Castillo, John Fusto (Farber, Seth) (Entered: 02/04/2013) |
| 02/04/2013 | 130 | Proposed Jury Instructions by Leonard Morse (Norinsberg, Jon) (Entered: 02/04/2013) |
| 02/04/2013 | 131 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon: Jury Trial held on 2/4/2013. Counsel for parties present. Juror sworn, Trial commenced. Opening statements held. Jose Castillo sworn and examined. John Fausto sworn &examined. Trial continued for 2/5/2013 at 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Fernandez, Erica) (Entered: 02/05/2013) |
| 02/05/2013 | 132 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/5/2013. Counsel for parties present. Examination of John Fausto continued. Direct exam concluded. Cross will commence after examination of next witness. James Serra sworn &examined. Trial continued 2/6/2013 at 09:00 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 02/06/2013) |

**JA17**

| 02/06/2013 | 137 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/6/2013. Counsel for parties present. Robert Flynn sworn &examined. Dr. Linda DeLuca sworn &examined. John Fausto resumes the stand (cross−exam). Trial continued to 2/7/13 at 9:00 AM before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 02/13/2013) |
|---|---|---|
| 02/07/2013 | 134 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/7/2013. Counsel for parties present. Examination of John Fausto continued. Pltf Leonard Morse sworn and examined. Trial continued to 2/8/2013 at 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 02/12/2013) |
| 02/08/2013 | 135 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/8/2013. Counsel for parties present. Examination of Dr.Morse continued. Dr. Edmund Mantell sworn &examined. Pltff Rests.Rule 50 arguments heard. Jury Trial set for 2/11/2013 at 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 02/12/2013) |
| 02/10/2013 | 133 | Draft Jury Instructions and Verdict Sheet proposed by the Court. (Baek, Hanna) (Entered: 02/10/2013) |
| 02/11/2013 | 136 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/11/2013. Counsel for parties present. Leron Aharonyan sworn &examined. Christopher Erath sworn &examined. Dft Rests. Summations held (12:15− 3:30). Jury Trial continued to 2/12/2013 at 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 02/12/2013) |
| 02/12/2013 | 138 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Jury Trial held on 2/12/2013. Counsel for parties present. Jury Charged (10:18 am). Deliberations held (11:15 am). Deliberations concluded (3:53 pm).Verdict rendered. Jury polled. Verdict sheet attached. Post trial briefing scheduled: dft's Rule 50 motion to be filed 3/12/13; pltff's response to be filed 4/5/13; dft's reply to be filed 4/12/13. (Court Reporter Michele Nardone.) (Fernandez, Erica) (Entered: 02/13/2013) |
| 02/13/2013 | 139 | JURY VERDICT SHEET DATED 2/12/13. (Fernandez, Erica) (Entered: 02/13/2013) |
| 02/13/2013 | 140 | COURT EXHIBIT 7: Jury Note (Fernandez, Erica) (Entered: 02/13/2013) |
| 02/14/2013 | 141 | COURT EXHIBITS: #1, #3−#6 attached. (Fernandez, Erica) (Entered: 02/14/2013) |
| 03/12/2013 | 143 | Letter *transmitting papers to Jon Norinsberg* by Jose Castillo, John Fusto (Farber, Seth) (Entered: 03/12/2013) |
| 03/26/2013 | 144 | First MOTION for Extension of Time to File Response/Reply *to defendants motion, brought pursuant to Rule 50 and Rule 59* by Leonard Morse. (Norinsberg, Jon) (Entered: 03/26/2013) |
| 03/27/2013 |  | ORDER: re 144 Plaintiff's motion that the briefing schedule be revised as follows with consent. Plaintiff's opposition due May 3, 2013; Defendants' reply papers due May 22, 2013. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 3/27/2013. (Liberatore, Marie) (Entered: 03/27/2013) |
| 04/23/2013 | 145 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 1/10/13, before Judge Amon. Court Reporter/Transcriber Rudolph, Telephone number 718−613−2538. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/14/2013. Redacted Transcript Deadline set for 5/24/2013. Release of Transcript Restriction set for 7/22/2013. (Rudolph, Gene) (Entered: 04/23/2013) |
| 04/30/2013 | 146 | Second MOTION for Extension of Time to File Response/Reply *to defendants motion, brought pursuant to Rule 50 and Rule 59* by Leonard Morse. (Norinsberg, |

**JA18**

| | | Jon) (Entered: 04/30/2013) |
|---|---|---|
| 05/01/2013 | | ORDER: re 146 Request that the briefing schedule be revised as follows on consent – Plaintiff's opposition due May 17, 2013; Defendants' reply papers due June 7, 2013. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 5/1/2013. (Liberatore, Marie) (Entered: 05/01/2013) |
| 05/17/2013 | 147 | Letter *of transmittal to Seth Farber, Esq.* by Leonard Morse (Norinsberg, Jon) (Entered: 05/17/2013) |
| 05/29/2013 | 148 | Letter MOTION for Extension of Time to File Response/Reply by Jose Castillo, John Fusto. (Farber, Seth) (Entered: 05/29/2013) |
| 05/31/2013 | | ORDER: re 148 Defendants' motion for extension of time to June 21, 2013 to file reply on consent. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 5/30/2013. (Liberatore, Marie) (Entered: 05/31/2013) |
| 06/21/2013 | 149 | Notice of MOTION for Judgment as a Matter of Law *and*, First MOTION for New Trial *Pursuant to FRCP 50 and/or 59 and Memorandum in Support* by Jose Castillo, John Fusto. (Attachments: # 1 Memorandum in Support) (Farber, Seth) (Entered: 06/21/2013) |
| 06/21/2013 | 150 | MEMORANDUM in Opposition re 149 Notice of MOTION for Judgment as a Matter of Law *and* First MOTION for New Trial *Pursuant to FRCP 50 and/or 59 and Memorandum in Support* filed by Leonard Morse. (Farber, Seth) (Entered: 06/21/2013) |
| 06/21/2013 | 151 | REPLY in Support re 149 Notice of MOTION for Judgment as a Matter of Law *and* First MOTION for New Trial *Pursuant to FRCP 50 and/or 59 and Memorandum in Support Defendants' Reply Memorandum of Law and Declaration of Seth Farber in further support* filed by Jose Castillo, John Fusto. (Attachments: # 1 Declaration Reply Decl. of Seth Farber in Further Support of Defendants' R. 50 and 59 Motion, # 2 Exhibit Ex. A to Farber Reply Decl.) (Farber, Seth) (Entered: 06/21/2013) |
| 08/29/2013 | 152 | ORDER denying 149 Motion for Judgment as a Matter of Law; granting in part and denying in part 149 Motion for New Trial. Defendants motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 is DENIED; Defendants motion for a new trial on liability under Fed. R. Civ. P. 59 is DENIED; Defendants motion for a new trial on damages under Fed. R. Civ. P. 59 is GRANTED with respect to both the compensatory and punitive damage awards unless plaintiff elects to accept a remitted compensatory award for mental and emotional pain and suffering of $400,000 (for a total compensatory award of $4,624,936) and a remitted punitive damage award of $100,000. Ordered by Chief Judge Carol Bagley Amon on 8/27/2013. (Baek, Hanna) (Entered: 08/29/2013) |
| 09/13/2013 | 153 | Letter *accepting remittur* by Leonard Morse (Norinsberg, Jon) (Entered: 09/13/2013) |
| 09/13/2013 | | ORDER: re 153 Letter filed on behalf of Dr. Leonard Morse advising the Court that plaintiff accepts the Court's remittur pursuant to the Court's order, dated Auust 29, 2013 and requests the Court enter judgment against Defendants Fusto and Castillo and also requests that the application for attorneys' fees be deferred pending resolution of the appeal. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 9/13/2013. (Liberatore, Marie) (Entered: 09/13/2013) |
| 09/16/2013 | 154 | CLERK'S JUDGMENT directing that judgment is hereby entered in favor of Plaintiff Leonard Morse and against Defendants John Fusto and Jose Castillo, jointly and severally, in the remittur amount of $4,624,936.00 for compensatory damages plus as against Defendant John Fusto for punitive damages in the amount of $75,000.00 and as against Defendant Jose Castillo for punitive damages in the amount of $25,000.00. Ordered by Chief Judge Carol Bagley Amon on 9/16/2013. c/m with appeal pkg (Fernandez, Erica) (Entered: 09/16/2013) |
| 10/15/2013 | 155 | NOTICE OF APPEAL as to 154 Clerk's Judgment,, by Jose Castillo, John Fusto. (Farber, Seth) (Entered: 10/15/2013) |

**JA19**

| 10/15/2013 | 156 | USCA Appeal Fees received $ 455.00 receipt number 4653065324 re 155 Notice of Appeal filed by John Fusto, Jose Castillo (McGee, Mary Ann) (Entered: 10/15/2013) |
|---|---|---|
| 10/15/2013 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 155 Notice of Appeal 156 USCA Fee (McGee, Mary Ann) (Entered: 10/15/2013) |

**JA20**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

DR. LEONARD MORSE,

                                        Plaintiffs,

                        -against-

ELIOT SPITZER, Individually, Special Assistant Attorney
General JOHN FUSTO, Individually, Senior Special
Investigator JOSE CASTILLO, Individually, Senior Special
Auditor Investigator ROBERT H. FLYNN, Individually,
Senior Special Investigator LEVON AHARONYAN,
Individually, Senior Special Investigator JAMES A. SERRA,
Individually, and DESIGN DENTAL STUDIO, Inc.,

                                        Defendants.

-------------------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   NOV 16 2007   ★

BROOKLYN OFFICE

**COMPLAINT**

**CV 07     4793**

**JURY TRIAL DEMANDED**

**ECF CASE**

AMON, J.

LEVY, M.J.

Plaintiff, DR. LEONARD MORSE, by his attorney, Jon L. Norinsberg, complaining of the defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

## JURISDICTION

2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

3.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.



**JA21**

10.     At all times hereinafter mentioned, defendant ROBERT H. FLYNN ("FLYNN") was a Senior Special Investigator working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office located at 120 Broadway, in the County, City and State of New York.

11.     At all times hereinafter mentioned, defendant JAMES A. SERRA ("SERRA") was a Senior Special Investigator working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office, located at 120 Broadway, in the County, City and State of New York.

12.     At all times hereinafter mentioned, defendant LEVON AHARONYAN ("AHARONYAN") was a Supervising Investigator for the New York State Department of Health and Chief Auditor for the New York State Medicaid system, investigating New York Medicaid providers throughout the metropolitan region in the City and State of New York.

13.     At all times hereinafter, DESIGN DENTAL STUDIO, INC., was and is a domestic corporation licensed to do business in the State of New York, with its principal place of business located at 1760 72nd Street, in the County of Kings, in the City and State of New York.

14.     At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or the New York State Attorney General's Office.

## FACTS

15.     Plaintiff, DR. LEONARD MORSE, was and is a dentist duly licensed to practice dentistry in the State of New York

16.     For thirty years, DR. LEONARD MORSE and his staff delivered high-quality

## VENUE

4.      Venue is properly laid in the Eastern District of New York under 28 U.S.C.

§ 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to

Fed. R. Civ. P. 38(b).

## PARTIES

6.      At all times hereinafter mentioned, plaintiff DR. LEONARD MORSE  was a

dentist duly licensed to practice dentistry in the State of New York, and was the sole proprietor of

580 Dental P.C., a company located at 580 Fifth Avenue, in the County of Kings, in the City and

State of New York.

7.      At all times hereinafter mentioned, defendant ELIOT SPITZER ("SPITZER")

was the Attorney General of the State of New York, and was directly  responsible for the

policies, practices, procedures and guidelines of  the New York State Attorney General's Office,

including but not limited to, its Medicaid Fraud Control Unit and its Press Release Division.

8.      At all times hereinafter mentioned, defendant JOHN FUSTO ("FUSTO") was a

Special Assistant Attorney General working in the Medicaid Fraud Control Unit of the New

York State Attorney General's Office, located at 120 Broadway, in the County, City and State of

New York.

9.      At all times hereinafter mentioned, defendant JOSE CASTILLO ("CASTILLO")

was a Senior Special  Auditor Investigator working in the Medicaid Fraud Control Unit of the

New York State Attorney General's Office, located at 120 Broadway, in the County, City and

State of New York.

**JA23**

dental care to patients in the Park Slope community from his office located at 580 Fifth Avenue, in the county of Kings, in the City and State of New York.

17.     For thirty years years, plaintiff DR. LEONARD MORSE was a lawfully authorized Medicaid provider, assigned New York State Medicaid Provider Identification Number 00294977.

18.     During this time, Dr. Morse treated over 30,000 dental patients through the medicaid program. All of Dr. Morse's patients came from referrals, and he never advertised or solicited for business.

19.     Dr. Morse's office handled approximately 6,000 dental patient visits annually, including adults and children, and he often treated several generations of the same family.

20.     Despite his large volume of patients, Dr. Morse had an impeccable and exemplary track record as a dentist.

21.     None of Dr. Morse's patients had ever filed a complaint against him.

22.     None of Dr. Morse's patients had ever filed a dental malpractice claim against him.

23.     Apart from his dental practice, Dr. Morse also served as the Assistant Director of the Dental Medicine Residency Program at New York Methodist Hospital in Park Slope, where he was responsible for the teaching, training and supervision of dental residents affiliated with said hospital.

24.     Dr. Morse was also the Section Chief of the Restorative Dentistry Program at Methodist Hospital, and was inducted into the International College of Dentistry in 2006.

25.     Over a thirty year period, Dr. Morse was subjected to four comprehensive audits by the New York State Department of Health.

26.     None of the audits of Dr. Morse's dental practice ever revealed any evidence of any impropriety or wrongdoing by Dr. Morse.

27.     In all of his years in practice, Dr. Morse had never before been accused of any crime or misdemeanor.

**The Origins of Dr. Morse's Prosecution: A New York Times Investigation Reveals Defendant Spitzer's Failure To Address Medicaid Abuse.**

28.     The origins of the prosecution against Dr. Morse may be traced back to an investigation conducted by the New York Times, which was as reported on July 19, 2005 in an article entitled "As Medicaid Balloons, Watchdog Force Shrinks ." See Exhibit A, annexed hereto.

29.     In this article, the New York Times noted that "New York's Medicaid program pays more than a million claims a day, feeding a $44.5 billion river of checks ... Yet the state, charged with protecting those dollars, has done little to stop them from draining away." Id.

30.     After documenting the decline in New York State's efforts to fight medicaid fraud, the article made it clear where the fault lies: "The responsibility for prosecuting Medicaid fraud lies with the state Attorney General, Eliot Spitzer, who runs the Medicaid Fraud Control Unit", and *Mr. Sptizer's zeal in fighting corporate abuses has not been matched by his efforts in fighting medicaid fraud*." Id. (emphasis supplied).

**Spitzer's Failure To Address Medicaid Fraud Becomes A Campaign Issue.**

31.     As a result of the New York Times investigation, the issue of medicaid fraud – and more particularly, defendant's Spitzer's handling of this issue – began to receive significant coverage in the New York press.

32.     For example, on March 30, 2006, an article appeared in the New York Sun

entitled "Spitzer's Medicaid Boast." See Exhibit B.

33.     This article began by noting that "Eliot Spitzer has discovered the importance of cracking down on Medicaid fraud", and concluded by noting that "both candidates are fighting about who is or isn't doing the best job pursuing fraud cases." Id.

34.     Similarly, on April 3, 2006,  an article appeared in the New York Post entitled "Spitzer on the Hunt for State's Top Health-care 'Criminals'." See Exhibit C.

35.     This article noted  that "Attorney General Eliot Spitzer has launched a massive manhunt to find nine of New York's health-care monsters – fugitives who are accused of ripping off millions from taxpayers in bogus Medicaid billing scams ...." Id.

36.     Then, on April 11, 2006, an article appeared in the New York Times entitled "POLICING MEDICAID FRAUD BECOMES CAMPAIGN ISSUE." See Exhibit D.

37.     This article confirmed that Spitzer's handling of medicaid fraud as Attorney General had become an important campaign issue in the 2006  gubernatorial campaign:

> Trailing Attorney General Elliot Spitzer by 50 percentage points or more in polls for the Democratic nomination for governor, Thomas R. Suozzi has seized on medicaid fraud as an attention-getting issue, repeatedly telling audiences that *Mr. Spitzer has not done much to fight abuse of the program.*

Id. (emphasis supplied)

38.     Several other articles appeared in local New York newspapers which similarly highlighted the issue of medicaid fraud, and made it clear that Spitzer was becoming increasingly aware of the importance of this issue in the upcoming campaign.

**A Dormant 4-Year-Old Investigation Is Suddenly Revived By Defendant Spitzer.**

39.     As  a result of  the growing press coverage on medicaid fraud – and its potential impact on Spitzer's chances of winning the Democratic nomination for Governor – defendant

Spitzer felt compelled to find a high-profile medicaid fraud case which would prove that he was, in fact, cracking down on medicaid fraud.

40.     The case chosen was that of DR. LEONARD MORSE, whose files had originally been subpoenaed by the Medicaid Fraud Control Unit four years earlier, on October 18, 2002.

41.     Dr. Morse was chosen as a target by defendants because he was one of the state's highest medicaid billers, due to the fact that – unlike most private dentists – he readily welcomed medicaid recipients, and in fact, 95% of his practice consisted of medicaid recipients.

42.     At the time of the audit in 2002, Dr. Morse – who had previously been subject to four comprehensive audits by the New York State Department of Health, and who had never been charged with any fraud or wrongdoing – readily agreed to provide all records subpoenaed by the Medicaid Fraud Control Unit.

43.     The Medicaid Fraud Control Unit reviewed all of the records submitted by Dr. Morse and once again – as with the previous four audits – found no evidence of any fraud or wrongdoing.

44.     In the next four years, from 2002 to 2006, the Medicaid Fraud Control Unit took no legal action against Dr. Morse.

45.     In the Spring of 2006, however, just as defendant Spitzer's failure to crack down on medicaid fraud became a campaign issue, the long-dormant investigation into Dr. Morse was suddenly revived.

**Dr. Morse Is Charged With A Million Dollar Medicaid Theft.**

46.     Notwithstanding Dr. Morse's long and exemplary career as a dentist, on April 5, 2006, defendants suddenly – and without any warning – charged him with committing a million dollar medicaid theft.

**JA27**

47.     Specifically, defendants charged Dr. Morse with one count of Grand Larceny in the First Degree, a class "B" felony, carrying a maximum of 25 years, and 11 counts of Offering a False Instrument for Filing in the First Degree, a Class "E" felony.

48.     As discussed in more detail below, these charges were completely false, and were brought for the sole purpose of helping defendant Spitzer win the Democratic nomination for Governor of New York State.

**Dr. Morse Is Forced To Surrender.**

49.     After learning of these charges, Dr. Morse, who had just recently underwent surgery – and was still recovering – requested a brief period of time for him to convalesce prior to surrendering.

50.     Defendants refused to accommodate this request. Instead, defendant Serra threatened to forcibly remove Dr. Morse from his home at " 2:00 in the morning", and to "drag him to jail," if he did not voluntarily surrender to police.

51.     Dr. Morse agreed to surrender to police at the 72nd Precinct in the County of Kings, in the City and State of New York.

52.     On April 5th, 2006, defendants Serra and Flynn formally took Dr. Morse into custody and placed him under arrest.

53.     As a result of his unlawful arrest, Dr. Morse remained in jail for several hours prior to being released on his own recognizance.

**Defendant Spitzer Issues A Press-Release Boasting About The Indictment of Dr. Morse.**

54.     The arrest of Dr. Morse initially went unnoticed by the press and by the public at large.

55.     There was no coverage of Dr. Morse's arrest by any media outlet, including

newspapers, radio stations, television networks or the Internet

56.    All of this changed, however, on April 11, 2006, when defendant Spitzer issued a press release announcing Dr. Morse's indictment for a "million dollar medicaid theft." See Exhibit E.

57.    Spitzer's press-release boasted, in an all-capital letters headline, that: "BROOKLYN DENTIST  INDICTED FOR MILLION DOLLAR MEDICAID THEFT." Id.

58.    The press release went on to state that  "Attorney General Spitzer announced today that a grand jury has charged a Brooklyn dentist with *stealing more than $1 million from the Medicaid program*." Id. (emphasis supplied).

59.    To ensure maximum publicity, Defendant Spitzer  had this press release translated into several foreign languages, including  Russian and Korean.  A copy of the Russian and Korean press releases, respectively, are annexed hereto as Exhibit F and Exhibit G.   As a result, the story was picked up and received widespread coverage on Russian and Korean websites.  See, e.g., Exhibit H.

60.    Spitzer's motive for issuing the press release was entirely political, and  had nothing to do with carrying out his official duties, responsibilities or functions as Attorney General of the State of New York.

61.    As documented above, Spitzer needed a high-profile medicaid case to counter the accusations of his political opponent, Thomas R. Suozzi – and thus increase his chances of winning the Democratic nomination for Governor – and so he chose Dr. Morse's case as a means of convincing New York voters that he was "tough" on medicaid fraud.

**Spitzer's Press Release Causes An Avalanche of Bad Publicity For Dr. Morse.**

62.    As a result of Spitzer's multi-lingual press release, the story of Dr. Morse's arrest

– which had not received any media coverage up to that point – became the subject of extensive coverage in the local press and media.

63. For example, on April 12, 2006, the New York Post ran a story entitled "DENTIST PULLED $ 1M FRAUD." See Exhibit I.

64. In this article, the Post – which immediately recognized the connection between Suozzi's attacks on Spitzer, on the one hand, and the resulting indictment of Dr. Morse, on the other – reported as follows:

> With gubernatorial opponent Tom Suozzi nipping at his heels over Medicaid reform, state Attorney General Eliott Spitzer announced that he nabbed a Brooklyn dentist who allegedly stole more than $1 million from the program. Spitzer, a Democrat considered the front-runner for governor, reported the indictment of Leonard Morse, charged with billing Medicaid for dentures that he never delivered and for procedures he never performed.

Id.

65. Similar stories appeared in the New York Daily News, Newsday, and other local publications. See, e.g., Exhibit J.

66. The story of Dr. Morse's indictment also received vast coverage on the Internet, resulting in thousands of stories about Dr. Morse's "million dollar theft" across the world. See, e.g., the internet results for stories relating to "Dr. Leonard Morse", annexed hereto as Exhibit K.

67. In fact, the story eventually received world-wide coverage, being translated into Chinese, Japanese, Italian, French, German, Arabic, Swedish and Portuguese.

**Dr. Morse Is Summarily Excluded From The Medicaid Program Without An Opportunity To Be Heard.**

68. Apart from the damaging publicity, Dr. Morse also suffered severe economic losses when he was summarily excluded from the Medicaid program. See "Notice of Immediate

Agency Action", dated May 19, 2006, annexed hereto as Exhibit L.

69.    This decision was made without affording Dr. Morse the most basic and fundamental due process rights – as guaranteed by the 5th and 14th Amendments to the Constitution – such as the opportunity to be heard, the right to confront adverse witnesses, the right to present witnesses and evidence on one's own behalf, etc.

70.    The immediate effect of this decision was that it forced Dr. Morse to completely shut down his practice, since the vast majority of his patients were medicaid recipients, and he was no longer authorized to perform any dental services on such patients.

**Dr. Morse Is Forced To Wait Fifteen Months Before He Can Contest The Charges.**

71.    After his arrest on April 5, 2006, Dr. Morse was required to make multiple court appearances to defend himself against the false charges which defendants had brought against him.

72.    It was not until June 26, 2007 – or approximately 15 months after his indictment – that Dr. Morse's case finally went to trial.

73.    The trial against Dr. Morse was presided over by the Honorable John P. Walsh, at 320 Jay Street, the County of Kings, in the City and State of New York.

**The Prosecution's Case Completely Falls Apart At Trial.**

74.    At Dr. Morse's trial, the glaring deficiencies in the prosecution's case were fully exposed.

75.    Despite having access to thousands of patient files from Dr. Morse – and having seized 287 of these files for a comprehensive audit – the prosecution called just three patients of Dr. Morse.

76.    These patients were called to prove that Dr. Morse -- while having provided *some*

dental services to these patients– had nonetheless billed medicaid for additional dental services which he had not performed.

77.    In order to prove this point, the prosecution needed first to establish that these medicaid recipients were, in fact, patients of Dr. Morse.

78.    At trial, however,  none of these "patients" even  recognized Dr. Morse, much less testified that they had received any dental treatment from him.

79.    In fact,  one of the alleged "patients" of Dr. Morse, Intisar Ahiri, specifically denied that he had ever been treated by Dr. Morse:

> Q: Do you recall when you went there what work you had done?
> A: Cavities and dental work, but *he wasn't my doctor.*
> Q: Do you recall who treated you there?
> A: No.
> Q: When you said "he", you pointed at someone?
> A: The one with the black suit, blue tie. I said *he was never my doctor.  He never even looked in my mouth.*  The other doctor that works with him, which is the next room, was my doctor.

See Trial Transcript, annexed hereto as Exhibit M,  at 36 (emphasis supplied).

80.    Another alleged "patient" of Dr. Morse called by  the prosecution, Miriam Perez, similarly testified that she did not recognize Dr. Morse as the dentist who treated her:

> Q: And do you recall the dentist's name that treated you?
> A: No.
> Q: I'm going to ask you to look around this courtroom and ask you if     you recognize anyone?
> A: *Truthfully, I don't.*

Id.  at 88 (emphasis supplied).

81.    The third and final "patient" of Dr. Morse, Sawsan Suliman, also testified that she could not positively identify Dr. Morse as the dentist who treated her:

> Q: Do you see that person in this courtroom today?
> A: Maybe he.

Q: Well, if you're not sure.
A: *I don't know. I don't know.*

Id. at 95.

82.     Thus, none of the alleged "patients" called by the prosecution so much as *recognized* Dr. Morse, much less testified that they had received dental treatment from him.

83.     The reason for this was that all of these patients had been treated by Dr. Ketover – who had worked with Dr. Morse for 25 years, and whose dental work was lawfully billed under Dr. Morse's medicaid provider number – and so these patients could not have given *any* testimony regarding what dental work Dr. Morse had, or had not, performed on their behalf.

84.     Despite having four years to investigate Dr. Morse – and having full access to all of Dr. Morse's patient charts – the prosecution did not produce a single witness at trial who was actually a *real* patient of Dr. Morse.

**The Prosecution's Manufactured "Billing Records."**

85.     Apart from the testimony provided by these "patients", there were other glaring deficiencies in the prosecution's case.

86.     For example, the prosecution had based a large portion of its case on certain alleged "billing records" belonging to defendant Design Dental Studio, Inc.

87.     These alleged "billing records" – which were intended to prove that Dr. Morse had fraudulently billed Medicaid for dental services that he never performed – were used by defendants as the basis for establishing the "million dollar theft" charges against Dr. Morse.

88.     At trial, however, it was revealed that these so-called "billing records" were <u>not</u> the actual business records of defendant Design Dental Studio, Inc., but instead, were records which had been *manufactured* by defendants in order to prove their case against Dr. Morse.

89.     In fact, it was revealed that the *real* business records of Design Dental Studio, Inc. had been *thrown out* by Design Dental Studio, Inc. once payment had been received from Dr. Morse.

**JA33**

90.     Rather than simply acknowledge this fact, the owner of Design Dental Studio, Inc, Nisan Yushvayev,  gave multiple and contradictory accounts regarding the origin of these records.

91.     After listening to Mr. Yushvyav's conflicting testimony, Judge Walsh stated his views on the record about this witness' credibility:

> "I don't believe him.  That's the bottom line.
> That's what it comes down to."

Trial Transcript at 78 (emphasis supplied).

92.     Accordingly,  Judge Walsh  refused to allow into evidence any of the alleged "billing  records" of Design Dental Studio, which defendants had  manufactured for purposes of bringing a case against Dr. Morse.

**The Prosecution Acknowledges Its Failures During Summation.**

93.     At the close of the prosecution's case, both sides were given an opportunity to give a summation to the Court.

94.     Before starting, the prosecutor told the Judge that his summation  would be "very brief[]", and that he was giving one only  because he was "probably required by law" to do so. Trial Transcript at 115.

95.     In his summation, Defendant Fusto immediately conceded that the prosecution had failed to prove its  "million dollar theft" claim, as alleged in the indictment:

> Obviously, this indictment needs to be adjusted for purposes of your consideration.  I mean, I'll start off just by saying the indictment charges for count one grand larceny in the first degree.  *We obviously have not approached the statutory element of that of a million dollars ....*

Id. (emphasis supplied).

96.     Defendant Fusto further conceded that the most the Court could find Dr. Morse guilty of would be a theft of *$3,000.00* – or approximately $997,000.00 less than the amount alleged in the indictment:

**JA34**

[A]t this point[,] through the auditor's testimony combined with the patients [,]I believe that the *best that the Court can consider at this point [is] grand larceny in the third degree, in excess of $3,000.00.*"

Id. at 115-116  (emphasis supplied).

97.     Thus, the prosecution's case had gone from a  "million dollar medicaid theft" – as Spitzer had boasted in his multi-lingual press release on April 11, 2006 -- to a $3,000.00 claim, *at best*.

98.     Defendant Fusto also conceded that nine of the twelve counts in the indictment would "obviously have to be dismissed", as the prosecution had not produced any of the patients relating to these counts. Id. at 116.

**Dr. Morse Is Acquitted of All Charges By Justice Walsh.**

99.     Notwithstanding the fact that the prosecution had lowered its charges to Grand Larceny in the Third Degree –  and that as a result, it needed only to prove that Dr. Morse had defrauded medicaid of  $3,000.00 – Judge Walsh *still* found that the prosecution had not proved its case.

100.    Specifically, Judge Walsh found that the prosecution had failed to make out a *prima facie* case against Dr. Morse, and thus declared Dr. Morse not guilty of all charges.

101.    On August 2, 2007, all charges against plaintiff LEONARD MORSE were thus dismissed.

**The Irreparable Harm To Dr. Morse's Reputation And Career.**

102.    Notwithstanding his acquittal, Dr. Morse's reputation has been permanently and irreparably harmed by defendants' false accusations.

103.    There are literally thousands of postings on the Internet which still mention Dr. Morse's name in connection with medicaid fraud.  See, e.g., Exhibit K.

104.    There are no Internet postings which mention Dr. Morse's acquittal.

105.    Dr. Morse has been shunned by friends, neighbors and relatives in his own

**JA35**

community as a result of the false charges brought against him.

106.   Dr. Morse was terminated from his position as an Assistant Director of the Dental Medical Residency Program at Methodist Hospital as a result of the false charges brought against him.

107.   Most importantly, Doctor Morse's career as a dentist has been permanently and irreparably destroyed as a result of the false charges brought against him.

108.   Since his acquittal, Dr. Morse has tried repeatedly to find work as a dentist, but the notoriety of his case – and in particular, of being known as the dentist who committed a "million dollar medicaid theft" – has made it impossible for him to find work.

**The Nature Of This Action**.

109.   This action seeks redress against defendants for their unlawful and egregious conduct in: (1) falsely accusing Dr. Morse of committing medicaid fraud, when they knew that these allegations were completely untrue; (2) manufacturing false "billing records" and then using these same false records to secure an indictment; (3) giving false and misleading testimony before the Grand Jury to secure an indictment; (4) publicizing Dr. Morse's indictment solely for the purposes of advancing the political and personal ambitions of defendant Spitzer; and (5) causing severe and irreparable harm to Dr. Morse's reputation, and permanently destroying his ability to make a living as a dentist.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

110.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "109" with the same force and effect as if fully set forth herein.

**JA36**

111.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States.

112.    All of the aforementioned acts deprived plaintiff DR. LEONARD MORSE of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

113.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

(Defendants Serra, Flynn, Castillo and Aharonyan)

114.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "113" with the same force and effect as if fully set forth herein.

115.    As a result of defendants' aforementioned conduct, plaintiff DR. LEONARD MORSE was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

116.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and

professional reputation destroyed, and lost his livelihood as a dentist.

## THIRD CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

(Defendants Castillo, Flynn and Aharonyan)

117.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "116" with the same force and effect as if fully set forth herein.

118.     Defendants, individually and collectively, manufactured false evidence and forwarded this false evidence to prosecutors in the New York State Attorney General's Office.

119.     Defendants manufactured such false evidence for the sole purpose of securing an indictment against Dr. Morse.

120.     Defendants also gave false and misleading testimony before the Grand Jury.

121.     In particular, defendants repeatedly and deliberately misled the Grand Jury regarding, inter alia: i) the amount of money actually received by Dr. Morse from medicaid; ii) the methodology employed for making such false calculations; ii) the manufactured "billing records" which were used as a foundation for making such false calculations; iv) the impossibility of multiple-billing by Dr. Morse, due to inherent safeguards in the medicaid computer system; v) the impossibility of Dr. Morse submitting records to medicaid without specifying the exact tooth number and quadrant where the work was being performed; vi) the fact that there was another dentist working in Dr. Morse's office, Dr. Brian Ketover, whose dental work was lawfully being billed under the same medicaid provider number as Dr. Morse, and whose work accounted for a significant portion of the bills submitted by Dr. Morse; vii) the fact that medicaid reimbursement rates had increased substantially over the time period covered by the investigation, and that the lower rates being used by defendants were outdated and inaccurate; and viii) the fact that defendants had analyzed only 4 months of Dr. Morse's records, and not 36 months of records, as they told the Grand Jury;

**JA38**

122.    In addition to the foregoing, defendant Castillo further misled the Grand Jury by testifying that there were certain documents "missing" from Dr. Morse's dental charts – namely, the prescriptions that Dr. Morse had given for the dental laboratory work to be performed – when in fact defendant Castillo knew this to be untrue.

123.    In so testifying, Defendant Castillo wilfully and deliberately created the false impression that Dr. Morse was *hiding* essential records from the auditor's review, when in fact defendant Castillo knew that such records were not required to be maintained after a one year period. See New York State Education Law, Article 133 § 6611 (requiring only that "one copy shall be retained by the practitioner of dentistry for a period of one year."), annexed hereto as Exhibit N.

124.    All of the foregoing false and misleading testimony by defendants was given for the sole purpose of securing an indictment against Dr. Morse.

125.    Apart from giving false and misleading testimony, Defendants also did not make a complete and full statement of facts to the Grand Jury, and intentionally withheld and concealed exculpatory evidence from the Grand Jury.

126.    Defendants were directly and actively involved in the initiation of criminal proceedings against Dr. Morse.

127.    Defendants lacked probable cause to initiate criminal proceedings against Dr. Morse.

128.    Defendants acted with malice in initiating criminal proceedings against Dr. Morse.

129.    Defendants were also directly and actively involved in the continuation of criminal proceedings against Dr. Morse.

130.    Defendants lacked probable cause to continue criminal proceedings against Dr. Morse.

131.    Defendants acted with malice in continuing criminal proceedings against Dr.

**JA39**

Morse.

132.    Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings.

133.    Notwithstanding the perjurious and fraudulent conduct of defendants, the criminal proceedings were terminated in Dr. Morse's favor on August 2, 2007,  when the Honorable John P.Walsh acquitted Dr. Morse of all charges.

134.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## FOURTH CLAIM FOR RELIEF
## DENIAL OF CONSTITUTIONAL RIGHT TO
## FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE

(Defendants Fusto, Castillo, Flynn, and Aharonyan)

135.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "134" with the same force and effect as if fully set forth herein.

136.    Despite having access to thousands of Dr. Morse's patient files, and seizing 287 of them, defendants could not find any evidence of wrongdoing on the part of Dr. Morse.

137.    Rather than concede this fact, defendants Fusto, Castillo, Flynn and Aharonyan conspired to manufacture evidence against Dr. Morse to ensure that his prosecution would go forward.

138.    Specifically, these defendants – acting in concert with Nisan Yushvayev, the owner of defendant Design Dental Studio, Inc. -- created completely false and misleading  billing

**JA40**

records to be used against Dr. Morse in his criminal prosecution. <u>See, e.g.</u>, Exhibit O.

139.    These records did not belong to Dr. Morse, nor to any of his laboratory vendors, but instead,  were created solely for the purpose of securing an indictment against Dr. Morse.

140.    After these false billing records were created, defendants used these same false records  to make completely spurious accounting projections in order  to reach their goal of creating a  "million dollar medicaid theft" by Dr. Morse.

141.    These false billing records were used by defendants throughout all phases of the criminal proceedings.

142.    In creating false evidence against Dr. Morse, and in providing false and misleading testimony with respect thereto, defendants violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

143.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## FIFTH CLAIM FOR RELIEF
## <u>MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C.§ 1983</u>

(Defendants Serra, Flynn, and Castillo)

144.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "143" with the same force and effect as if fully set forth herein.

145.    Defendants issued legal process to place plaintiff DR. LEONARD MORSE under arrest.

146.    Defendants arrested plaintiff DR. LEONARD MORSE in order to obtain a collateral objective outside the legitimate ends of the legal process, including currying favor with their superiors and saving their jobs at the Medicaid Fraud Control Unit of the New York State Attorney General's Office.

147.    Defendants acted with intent to do harm to plaintiff DR. LEONARD MORSE, without excuse or justification.

148.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

### SIXTH CLAIM FOR RELIEF
### INDUCEMENT OF FALSE TESTIMONY IN VIOLATION OF 42 U.S.C. § 1983

(Defendants Fusto, Castillo, Flynn and Serra)

149.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "148" as if the same were more fully set forth at length herein.

150.    Defendant Fusto, acting in an investigative capacity, met with and interviewed several patients of Dr. Morse during his pre-trial investigation.

151.    Defendant Fusto, acting in an investigative capacity, met with and interviewed several dental lab vendors of Dr. Morse during his pre-trial investigation.

152.    At these meetings, and continuing thereafter, Defendant Fusto harassed, threatened, intimidated, manipulated , and coerced these witnesses to give false testimony against Dr. Morse.

153.    Defendants Castillo, Flynn, Serra, acting on behalf of defendant Fusto and under

**JA42**

his direct supervision, likewise harassed, threatened, intimidated, manipulated and coerced these witnesses to give false testimony against Dr. Morse

154.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**SEVENTH CLAIM FOR RELIEF**
**DESTRUCTION OF EXCULPATORY EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983**

(Defendants Fusto, Castillo, Flynn and Serra)

155.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "154" as if the same were more fully set forth at length herein.

156.    Defendant Fusto, acting in an investigative capacity, issued subpoenas commanding Dr. Morse to produce the complete dental charts for 287 of his patients.

157.    Dr. Morse fully complied with said subpoenas and produced the complete dental charts for all 287 patients identified.

158.    These patient charts contained material and exculpatory information which directly contradicted many of the charges that had been brought by defendants against Dr. Morse

159.    Dr. Morse's attorney repeatedly requested copies of the these patient files in order to fully prepare for trial, but such requests were denied.

160.    Throughout all phases of the criminal proceedings, including the trial,  defendants refused to produce such records and claimed instead that the records had been "lost."

161.    The records were not, in fact, "lost" but were at all times readily accessible to the prosecution.

**JA43**

162.   Defendants deliberately and intentionally claimed that such records had been "lost" in order to impair Dr. Morse's ability to fully and adequately prepare for trial.

163.   As a result of defendants' unlawful actions, plaintiff DR. LEONARD MORSE was denied an opportunity to fully and adequately prepare for trial, and to present material and exculpatory evidence in his own behalf, in violation of his rights under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

## EIGHTH CLAIM FOR RELIEF
## CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS

(Defendants Fusto, Castillo, Flynn, Serra and Aharonyan)

164.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "165" as if the same were more fully set forth at length herein

165.   Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest, prosecution, pretrial detention, conviction and imprisonment of plaintiff DR. LEONARD MORSE.

166.   Throughout the period of the conspiracy, the defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for plaintiff's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe plaintiff guilty of any crime.

167.   Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of plaintiff DR. LEONARD MORSE: (a) manufactured false evidence; (b) pressured, bribed, coerced and induced witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony; (c) failed to correct such false statements and testimony; and (d)

**JA44**

withheld from the Grand Jury and trial judge evidence favorable to the accused on the issue of guilt or innocence.

168.   The aforesaid conduct of defendants operated to deprive plaintiff DR. LEONARD MORSE of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

(a)   Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b)   Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c)   Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and

(d)   To timely disclosure of all evidence favorable to the defense on the issues of guilt or innocence and/or punishment, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

169.   As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist

### NINTH CLAIM FOR RELIEF
### DENIAL OF FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO
### <u>EXTRAJUDICIAL STATEMENTS MADE BY SPITZER</u>

(Defendant Sptizer)

170.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "169" as if the same were more fully set forth at length herein.

171.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

172.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his officials duties, responsibilities, or functions as Attorney General of the State of New York.

173.    Rather, defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

174.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE were false and misleading.

175.    Defendant SPITZER knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people.

176.    Defendant SPITZER knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE would create a highly prejudicial and inflamed atmosphere against plaintiff.

177.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff DR .LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

**JA46**

178.   This extensive news coverage had a profound impact on both the prosecution and defense.

179.   As a result of SPITZER's extrajudicial statements to the press, the prosecution (defendants Fusto, Castillo, Flynn and Aharonyan) felt compelled to continue their case against Dr. Morse – despite knowing that there were enormous holes in their case, and that they would not be able to obtain a conviction – out of concern that dismissing this "high-profile" case would be extremely damaging to defendant Spitzer.

180.   As a result of SPITZER's extrajudicial statements to the press, the defense was forced to waive Dr. Morse's constitutional right to trial by jury, due to concerns that the extensive adverse publicity would prevent a jury from being fair and impartial.

181.   As a result of the foregoing, plaintiff Dr. LEONARD MORSE was deprived of his liberty, was selectively and unfairly prosecuted, was denied fundamental constitutional rights, was forced to waive his right to trial by jury, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## TENTH CLAIM FOR RELIEF
## "STIGMA PLUS" CLAIM UNDER 42 U.S.C. § 1983 DUE TO
## <u>EXTRAJUDICIAL STATEMENTS MADE BY SPITZER</u>

(Defendant Spitzer)

182.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "181" as if the same were more fully set forth at length herein.

183.   Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

184.   Defendant SPITZER's extrajudicial statements were not made for the purpose of

carrying out his official duties, responsibilities, or functions as Attorney General of the State of New York.

185.    Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

186.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE were false and misleading.

187.    Defendant SPITZER knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

188.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff DR. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

189.    As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged.

190.    As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was summarily excluded from the medicaid program.

191.    Dr. Morse's summary exclusion from the medicaid program destroyed his dental practice, since  95% of Dr. Morse's patients were medicaid recipients.

192.    Dr. Morse was never afforded an opportunity for a name-clearing hearing prior to being summarily excluded from medicaid.

193.    As a result of SPITZER's extrajudicial statements to the press, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was

summarily excluded from the Medicaid program, was deprived of his right to a name-clearing hearing prior to said termination, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

194.    All of the foregoing acts by defendants deprived plaintiff DR. LEONARD MORSE of federally protected rights, including, but not limited to, the right:

A.    Not to be deprived of liberty or property without due process of law;

B.    To be free from seizure and arrest not based upon probable cause;

C.    To be free from unwarranted and malicious criminal prosecution;

D.    Not to have cruel and unusual punishment imposed upon him; and

E.    To receive equal protection under the law.

## ELEVENTH CLAIM FOR RELIEF
## DEFAMATION UNDER NEW YORK STATE LAW

(Defendant Spitzer)

195.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "194" as if the same were more fully set forth at length herein.

196.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

197.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of The State of New York.

198.    Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

199.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff

**JA49**

DR. LEONARD MORSE were false and misleading.

200.    Defendant SPITZER acted with malice in making false and misleading statements about plaintiff DR. LEONARD MORSE.

201.    Defendant SPITZER acted with a reckless disregard for the truth in making false and misleading statements about plaintiff DR. LEONARD MORSE.

202.    Defendant Sptizer made such statements without privilege or authorization from plaintiff DR. LEONARD MORSE.

203.    Defendant SPITZER knew that his extrajudicial statements about plaintiff DR. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

204.    As a result of defendant SPITZER's extrajudicial statements to the press, plaintiff DR .LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

205.    As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged, and his career as a dentist was permanently destroyed.

206.    Spitzer's extrajudicial statements about plaintiff DR. LEONARD MORSE constitute defamation *per se*.

207.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist

## TWELFTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## UNDER NEW YORK STATE LAW

### (All defendants)

206.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "205" as if the same were more fully set forth at length herein.

207.    Defendants engaged in extreme and outrageous conduct toward plaintiff DR. LEONARD MORSE.

208.    Defendants' conduct was intended to cause plaintiff Dr. LEONARD MORSE to suffer severe emotional distress.

209.    Defendants disregarded a substantial probability that their condcut would cause Dr. LEONARD MORSE to suffer severe emotional distress.

210.    As a result of defendants' actions, Dr. LEONARD MORSE did in fact suffer severe emotional distress.

## THIRTEENTH CLAIM FOR RELIEF
## *PRIMA FACIE* TORT UNDER NEW YORK STATE LAW

### (All defendants)

210.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "209" as if the same were more fully set forth at length herein.

211.    Defendants intentionally inflicted harm on plaintiff DR. LEONARD MORSE.

212.    Defendants inflicted such harm without excuse or justification

213.    Defendants' acts or series of acts would otherwise have been lawful, except as alleged herein.

214.    The harm inflicted by defendants resulted in specific and measurable damages to plaintiff DR. LEONARD MORSE.

**JA51**

215.   As a result of all the foregoing unlawful actions of defendants, plaintiff DR. LEONARD MORSE is entitled to compensatory damages in the sum of twenty-five million dollars ($25,000,000.00), and is further entitled to punitive damages in the sum of fifty million dollars ($50,000,000.00).

**WHEREFORE**, plaintiff DR. LEONARD MORSE demands judgment in the sum of twenty-five million dollars ($25,000,000.00) in compensatory damages, fifty million dollars ($50,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated:   New York, New York
         November 16, 2007

BY:   _____
      JON L. NORINSBERG (JN-2133)
      Attorney for Plaintiff
      225 Broadway, Suite 2700
      New York, New York 10007
      (212) 791-5396

.

**Exhibit A**

# As Medicaid Balloons, Watchdog Force Shrinks

By MICHAEL LUO
and CLIFFORD J. LEVY

New York's Medicaid program pays more than a million claims a day, feeding a $44.5 billion river of checks to radiologists and ambulance drivers, brain surgeons and orderlies, medical centers and corner pharmacies. Many who get those checks pocket more money than they deserve, and millions of taxpayer dollars are believed to be lost every day to theft and waste.

Yet the state, charged with protecting those dollars, has done little to stop them from draining away.

A yearlong New York Times investigation found only a thin, overburdened security force standing between this enormous program and the unending attempts to steal from it. Even as spending by New York Medicaid has more than tripled since the late 1980's, the number of fraud investigators who guard its cash register has fallen by half, and several of their leaders have quit or retired in disillusionment.

Of the 400 million claims that Medicaid paid last year, Health Department regulators uncovered just 37 cases of suspected fraud, far fewer than their counterparts in any other large state, even though New York's Medicaid budget is by far the largest in the nation. Many experts say that it is likely that at least 10 percent and probably more of New York Medicaid dollars are stolen or wasted.

In dozens of interviews, prosecutors, lawmakers and former regulators said the program paid for almost everything and scrutinized almost nothing, in large part because its primary mission has been to ensure that there are enough health care providers in the system to address the needs of the poor. It often appears that the Health Department is barely even looking: There are more than 140,000 hospitals, nursing homes, doctors and other health care providers in the system, but the department visited just 95 in the 2004 fiscal year to audit their billings.

Analyzing Medicaid data obtained under the state's Freedom of Information Law, The New York Times identified scores of instances in which the claims of health care providers jumped markedly in a single year. These spikes are a classic indication of possible improper billing, yet few of those providers had even part of their billings audited by the department, state records show.

New York's Medicaid program, once the pride of the Great Society era, has become a system "that almost begs people to steal," said Michael A. Zegarelli, a senior New York Medicaid regulator until 2003 and a past president of the national association of Medicaid oversight officials.

Meanwhile, other states, including California and Texas, have increased their antifraud efforts and discovered what seems a simple truth: The effort to seek out theft and unnecessary spending can more than pay for itself, just as a parking violations bureau brings in revenue. Workers assigned to Medicaid fraud prosecution units around the nation help bring in an average of $200,000 each in recoveries, according to federal statistics.

Twenty-five years ago, New York was in the vanguard of fraud preven-

*Continued on Page B2*

---

**PROGRAM DISORDER**

*High Costs, Little Scrutiny*

---

JA54

THE NEW YORK TIMES **METRO** TUESDAY, JULY 19, 2005

# As New York Medicaid Balloons, Antifraud Watchdog Force Shrinks

Continued From Page A1

tion. But over the decades it has failed to maintain the investment in employees necessary to close the door on thievery and abuse. Repeated delays stretched the replacement of a 1970-era computer system that could barely detect fraud into a severe problem, allowing billions to slip by with little scrutiny.

As dozens of former employees describe the state's antifraud effort it has been plagued by the same gridlock that has stifled innovation in Albany for years: bureaucratic infighting, allegiance to partisan patronage and, some say, a bipartisan reliance on public indifference.

In an interview, Dennis P. Whalen, executive deputy commissioner of the Health Department, said combating fraud remained a major goal. He denied that the department had been slow to pursue Medicaid cheats, saying the state had cleaned up the program, saying that new computer systems have improved the state's detection efforts.

"This is a red flag for them," Mr. Hannon said of the poor people who need it," said Elisa Gilmartin in Albany for years: be-

"There is all this money that is being drained away and not being spent on care for the poor people who need it," said Elisa beth Benjamin, who spent eight years as a lawyer at the Legal Aid Society specializing in Medicaid. "It's analogous to the $5,000 toilet seat in the military."

## Investigation Staff is Cut

More than a dozen years ago, in the heyday of the unit charged with fighting Medicaid fraud and abuse in New York City, doctors and state employees would troop out to locations throughout the city for a regular series of shady doctors operating low-quality, high-volume clinics known as "Medicaid mills," said James Mehmet, who retired from the State Health Department in 2001. Mr. Mehmet was the unit's chief of investigators in New York City when investigators went undercover as patients to see how they were treated by a doctor or a pharmacist.

The doctor's office, the unit's staff was drained away and the budget was slashed, and lawyers, as well as nurses, dentists and auditors — all medical review specialists — lost the energy and ambition of the office. Mr.



Boxes of cases in the attorney general's Medicaid Fraud Control Unit, where the size of the staff has failed to keep up with the program's growth.

## Falling Behind

of the state's biggest Medicaid fraud cases.

"Investigating is a small part of the job."

In 2002 from $78,800 in 1996, according to billing records analyzed by The Times. But the department never referred the case to the state attorney general's office.

It was only when prosecutors in the attorney general's office got a tip through another case that they found out about Mr. Iglobadeara, who pleaded guilty last year to grand larceny after billing for drugs he never dispensed.

## Prosecution Unit Shrinks

The strong low profile given to anti fraud contrasts sharply with the situation in other states. In 1998, California, which had several high-profile Medicaid fraud cases in 1996, added about 600 employees to its existing staff of about 40 charged with rooting out abuse. The number of fraud cases re-

"The strategies that we have pursued have made more sense and have been successful," Mr. Spitzer said.

However, the attorney general's office has had few such breakthroughs. None have shaken the health care industry in the major nursing homes conducted by his predecessors in the 1970's.

The relatively low profile given to anti fraud efforts dates to before Mr. Spitzer's term in office. The size of the fraud control unit dropped by more than 40 percent over

that when they turned over evidence of fraud to the attorney general's office, the prosecutors often took months or even years to piece together a case, all while the fraudulent activity continued to siphon money from the system. Medicaid officials said they preferred a civil case to stop the fraud immediately.

"They were a battleground," said Mr. Ives Gareau, a former director of the attorney general's office, referring to the cases. "Has 50 percent of the cases in the department, referred to the attorney general's office since 2000 were still open

## Dwindling Enforcement

New York conducts fewer on-site audits of providers than many other states with large Medicaid rolls.

| State | SPENDING (billions) | ONSITE AUDITS |
|---|---|---|
| Ohio | $10.6 | 292 |
| Ill. | 11.2 | 336 |
| Tex. | 17.3 | 150 |
| Calif. | 33.4 | 130 |
| Pa. | 13.3 | 130 |
| N.Y. | 44.5 | 95 |
| Fla. | 14.4 | not available |

Prosecutors in New York's Medicaid program have been opening fewer investigations.

| State | SPENDING (billions) | CASES REFERRED TO PROSECUTORS |
|---|---|---|
| Tex. | 17.3 | 257 |
| Calif. | 33.4 | 135 |
| Ohio | 10.6 | 112 |
| Fla. | 14.4 | 96 |
| Pa. | 13.3 | 64 |
| Ill. | 11.2 | 61 |
| N.Y. | 44.5 | 37 |

'97 '98 '99 '00 '01 '02 '03 '04

Sources: State Medicaid programs; Centers for Medicare and Medicaid Services; New York State Medicaid Fraud Control Unit

Florida does not differentiate between types of audits.

The New York Times

## Behind the Scenes, Turf Battles

## Resisting Reform

## Program Disorder

This article is the second in a series examining the security, effectiveness and cost of New York's Medicaid program and the state's biggest expense.

The first article is online at

www.nytimes.com/nyregion.

**Exhibit B**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 6 of 71 PageID #: 8

# The New York Sun

**Free Online Book**
Future Human Evolution Eugenics in the 21s
Century
www.whatwemaybe.org

**March 30, 2006 Edition > Section: Editorials > Printer-Friendly Version**

# Spitzer's Medicaid Boast

New York Sun Staff Editorial
March 30, 2006
URL: http://www.nysun.com/article/30104

Eliot Spitzer has discovered the importance of cracking down on Medicaid fraud, but instead of launching more vigorous enforcement efforts he's merely trying to take credit for the heavy lifting that others have already done. Witness a press release issued Tuesday on his official Web site touting the record amount of money he claims to have recovered from "wrongdoers" in 2005. The total hit $2.8 billion, including $273.5 million raked in by the Medicaid Fraud Control Unit, a stunning increase over the previous record for Medicaid fraud recoveries, $62.5 million, set in 2004.

If that seems like good news, it's not something for which Mr. Spitzer can claim all the credit, as his gubernatorial primary opponent, Thomas Suozzi, was only too happy to note yesterday. Mr. Suozzi pointed out that $171 million

ADVERTISEMENT



cafe.ihibo.com                    Ads by Goooooogle

ADVERTISEMENT

**Free Online Book**
Future Human Evolution Eugenics in the 21st
Century
www.whatwemaybe.org

**Law redefined as:**
- a Competition of Arguments - in Social Practices
www.hellevig.net

Ads by Google

ADVERTISEMENT

**JA58**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 7 of 71 PageID #: 9



of that money in 2005 came from a large, multi-state case spearheaded by the federal Department of Justice. In other words, the Bush administration was the lead player in the case that brought in 63% of the Medicaid fraud recoveries for which Mr. Spitzer's press release now claims credit. Meantime, Mr. Spitzer's office has a record of spending nearly as much investigating fraud as it ever recovers, compared to states like California or Texas that gain back two or four times as much as they spend.

As the attorney general discloses in a report filed to the Department of Health and Human Services, that $171 million came from the Serono settlement, a case in which a pharmaceutical company pleaded guilty to improperly marketing an AIDS drug. The settlement was split between the federal government and 40 states. Lawyers in Mr. Spitzer's Medicaid unit played an important role in pursuing the investigation, but that's the norm in such cases. A spokesman for the Department of Justice, Charles Miller, tells us that local officials almost always take the lead in gathering evidence in their own backyards before handing cases off to federal prosecutors. It wasn't Mr. Spitzer who spotted the fraud; the case started with a tip from a Serono employee in Massachusetts.

If New York taxpayers were defrauded to the tune of $171 million in the Serono case, kudos for Mr. Spitzer for helping to get that money back, even though the boasts in his press release may be a bit exaggerated. Fraud eats up between 10% and 40% of the state's $46 billion Medicaid program. But fraud isn't the only problem. While both candidates are fighting about who is or isn't doing the best job pursuing fraud cases, New Yorkers are still waiting to hear what they will do about the far bigger scandal - the Medicaid monies that are spent legally but wastefully.

**March 30, 2006 Edition > Section: Editorials > Printer-Friendly Version**

**Free Online Book**
Future Human Evolution Eugenics in the 21st
Century
www.whatwemaybe.org

**Workplace Ethics Training**
Web-based, customizable modules,
multilingual, cultural adaptation
www.globalcompliance.com

**Exhibit C**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 9 of 71 PageID #: 11

This is the html version of the file http://www.transparency.org/content/download/5637/32638/file/USA_2006-04-03.pdf.
G o o g l e automatically generates html versions of documents as we crawl the web.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:9Fd_R9OGQQEJ:www.transparency.org/content/download/5637/32638/file/USA_2006-04-
03.pdf+NEW+YORK+MEDICAID+FRAUD+CONTROL+UNIT&hl=en&ct=clnk&cd=71&gl=ag

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **new york medicaid fraud control unit**

**Page 1**

The **New York** Post, April 3, 2006 Monday

## SPITZER ON THE HUNT FOR STATE'S TOP HEALTH-CARE 'CRIMINALS'

BYLINE: CARL CAMPANILE

State Attorney General Eliot Spitzer has launched a massive manhunt to find nine o **New York's** health-care monsters - fugitives who are accused of ripping off million from taxpayers in bogus **Medicaid** billing scams, peddling prescription drugs and abusing frail nursing-home patients, The Post has learned.

Many of the Nasty Nine are foreigners who are believed to have fled the country.

The "Most Wanted" list obtained by The Post includes a Pakistani native who allegedly billed **Medicaid**, the government's health-insurance program for the need) more than a million dollars for services he never performed on hundreds of phantom patients.

Farhat Syed Quadri operated a medical clinic - called Citywide Ultrasound Group - out of a storefront on Queens Boulevard in Forest Hills. The firm performed

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 10 of 71 PageID #: 12

out of a storefront on Queens Boulevard in Forest Hills. The firm performed sonograms on pregnant women and echocardiograms for heart patients.

In business for years, Quadri allegedly stole "in excess of $1 million" by falsely billing **Medicaid** for bogus tests. He bought film used in the tests from a middleman try to disguise the **fraud**, his indictment said. Born in Karachi, Quadri shut down his office and is believed to have fled to Pakistan after grand-larceny charges were filed against him.

Spitzer said Quadri and the others are in his cross hairs. Investigators from his **Medicaid-fraud control unit** last week flocked to the last known addresses of the fugitives, some of whom have been missing for a decade.

"When **Medicaid** cheats or other criminals flee the country or go into hiding, my office uses a variety of surveillance and investigative techniques to apprehend them, Spitzer told The Post.

"Warrants are issued and renewed, leads are pursued, and state, federal and international law-enforcement are all kept apprised of fugitives. Even criminals who flee to foreign countries will face charges."

Last year, Spitzer extradited fugitive quack plastic surgeon Dean Faiello from Costa Rica for allegedly murdering one of his patients. Three dozen fugitives have been apprehended since 1999.

Other alleged thieves on the Nasty Nine list include:

\* Doctor-businessman Peter Herman, who used his two companies - Stroke Prevention and Circulatory Testing Systems - to allegedly loot $776,000 from **Medicaid.**

Herman, who also goes by the alias Peter Berger, is accused of illegally billing **Medicaid** for Doppler blood tests given to nursing-home patients as far back as 199 His indictment alleges that the tests either were given by employees without medica backgrounds. or not all.

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 11 of 71 PageID #: 13

Herman disappeared after being charged with two counts of grand larceny and a cou
of offering a false instrument.

* Satyanan Gosein, a bookkeeper for Beth Israel Medical Center who was in charge
of paying vendors that performed hospital services. But instead, he turned greedy by
allegedly forging and cashing more than $200,000 in hospital checks in his name.
Sources believe that Gosein fled to his native Trinidad after he was charged with
grand larceny.

* Podiatrist Chen Chuan is wanted for scamming **Medicaid** with a stinky shoe
scheme. The Chinese native claimed to provide customized orthotics, arch support f
the feet, to hundreds of **Medicaid** patients at his office at 8 Chatham Square.

But authorities say at least $93,000 in **Medicaid** claims he filed were bogus.

Four other fugitives, three of whom may now be in the Dominican Republic, are
accused of engaging in **Medicaid** drug theft and diversion scams.

Julio Gonzalez allegedly used 22 doctored **Medicaid** cards to fill 61 prescriptions
worth thousands of dollars. Gonzalez was charged with grand larceny after
pharmacists in Queens fingered him as a pill dealer.

His last known address is Academy Street in Washington Heights. A relative there
confirmed that Gonzalez is in the Dominican Republic.

Convicted drug dealer Luis Cruz, a k a Hymie Cruz, pleaded guilty to two counts of
possession of a forged instrument for using a forged **Medicaid** card to get
prescriptions. Facing four years in prison, the Puerto Rican native failed to show up
court for his sentencing.

Ramon Llaverias of Queens and Victor Pineyro of The Bronx also are wanted for
illegally buying thousands of dollars of prescription drugs. Llaverias' last known
address is 35-51 95th St. in Jackson Heights, and Pineyro gave a bogus address on
Pelham Parkway South.

The only woman on the list is Robin Stultz, a nursing assistant who was arrested in
2003 for allegedly slapping a mentally incompetent patient in the face at the Folts
Nursing Home in upstate Herkimer County. Facing public-health and endangerment
charges, she flew the coop.

The Attorney General's Office investigates patient abuse as well as health-care **frau**

Democrat Spitzer is considered the favorite in his quest to succeed lame-duck

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 12 of 71 PageID #: 14

Republican Gov. Pataki. And **Medicaid fraud** has emerged as a burning issue in the governor's race.

---

**Page 3**

Spitzer's crusade against misdeeds on Wall Street corruption has burnished his image as a fighter for the little guy.

But his opponents argue the attorney general hasn't been as aggressive in prosecuting public corruption - particularly abuses in **New York's** massive $45 billion **Medicaid** program.

Spitzer disagrees.

He points out that his **Medicaid fraud-control unit** recovered a record $219 million last year - a 150 percent increase over the prior year. The 245 successful cases include 122 convictions and 123 successful civil-enforcement actions, including big-ticket cases against pharmaceutical companies, hospitals and nursing homes.

As part of a federal and multistate probe, Spitzer's office recovered more than $80 million from Serono Inc., a Massachusetts-based company accused of illegally boosting sales of an anti-AIDS drug called Serostim - by paying kickbacks to doctors and pharmacists and marketing the drug for purposes not approved by the federal Food and Drug Administration.

Serostim is illicitly used by body builders and other athletes to build muscle mass.

Spitzer complained the state budget just approved by lawmakers does not include his suggested measures to help his office better combat **Medicaid fraud**. He recommends a False Claims Act - used at the federal level - that allows whistleblowers to file lawsuits against **Medicaid** scammers and receive a percentage of the recoveries.

Discussions on **Medicaid** reforms are ongoing.

"I urge them to reach agreement on a strong **Medicaid-fraud** reform package as soon as possible." Spitzer said.

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 13 of 71 PageID #: 15

---

New York[#x2019]s most-wanted medical fugitives - Details of schemes, as alleged by Eliot Spizter:

RAMON LLAVERIAS

Date of birth: Jan. 29, 1962

Birthplace: Dominican Republic

Occupation: Prescription-drug peddler

Charge: Criminal diversion of prescription medication

Amount stolen: Unknown

Scheme: Bought prescription drugs off street and resold them

**Page 4**

JULIO GONZALEZ

Alias: Edwardo Gonzalez

Date of birth: Nov. 26, 1949

Birthplace: Dominican Republic

Occupation: Prescription-drug peddler

Amount stolen: Thousands of dollars

Charge: Grand Larceny, theft of **Medicaid** program

**JA65**

Case 1:07-cv-04793-CBA-RML Document 1-3 Filed 11/16/07 Page 14 of 71 PageID #: 16

Scheme: Used 22 different **Medicaid** cards to fill 61 prescriptions

FARHAT SYED QUADRI

Alias: Karim Gora

Date of birth: Nov. 19, 1963

Birthplace: Karachi, Pakistan

Occupation: Owner of Citywide Ultrasound Group

Amount stolen: Over $1 million

Charge: Grand larceny in first degree

Scheme: Stole more than $1 million from **Medicaid** by filing phony financial report of performing sonograms and echocardiograms to hundreds of patients

VICTOR PINEYRO

Alias: Victor Santiago

Date of birth: March 17, 1957

Birthplace: Dominican Republic

Occupation: Convicted peddler of prescription drugs

Amount stolen: unknown

Charge: Two counts of criminal diversion of prescription medication Scheme: Boug prescription drugs off street and resold them

CHEN CHUAN

**JA66**

Case 1:07-cv-04793-CBA-RML    Document 1-3    Filed 11/16/07    Page 15 of 71 PageID #: 17

Date of birth: Dec. 12, 1952

Birthplace: China

Occupation: Podiatrist

Amount stolen: Nearly $100,000

Charge: Two felony charges of grand larceny in second degree and filing falsified instruments in first degree

Scheme: Falsely billed **Medicaid** for nearly $100,000, claiming he provided orthotic to hundreds of patients. He never did.

ROBIN STULTZ

Occupation: Nursing assistant

Charge: Willful violation of public health law, endangering welfare of mentally incompentent nursing home patient.

Offense: Slapped nursing home patient

PETER HERMAN

Occupation: Physician, Circulatory Testing Systems

Amount stolen: $776,000

Charge: Grand larceny and filing false instrument

Scheme: Billed **Medicaid** for unauthorized and unnecessary blood tests

SATYANAN GOSEIN

Birthplace: Trinidad

Occupation: Bookkeeper, Beth Israel Medical Center

Amount stolen: Over $200,000

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 16 of 71 PageID #: 18

Charge: Grand Larceny in second degree

Scheme: Cashed forged hospital checks to himself

LUIS CRUZ

Alias: Hymie Cruz

Date of birth: Sept. 10, 1947

**Page 6**

Birthplace: Puerto Rico

Occupation: Convicted drug peddler

Amount stolen: Unknown

Charges: pleaded guilty to two counts of possession of forged instrument in second degree. Failed to show for sentencing

Scheme: Bought prescription drugs with a forged **Medicaid** card

Copyright 2006 N.Y.P. Holdings, Inc.
All Rights Reserved

**JA68**

**Exhibit D**

# Policing Medicaid Fraud Becomes Campaign Issue

### By RICHARD PÉREZ-PEÑA

Trailing Attorney General Eliot Spitzer by 50 percentage points or more in polls for the Democratic nomination for governor, Thomas R. Suozzi has seized on Medicaid fraud as an attention-getting issue, repeatedly telling audiences that Mr. Spitzer has not done much to fight abuse of the program.

As recently as Saturday, at a forum on the state budget, the two men traded harsh words on Medicaid. Mr. Spitzer said that his office has recouped record amounts of money from people who cheat Medicaid, the health care program for the poor, that the figures are rising fast, and that Mr. Suozzi and others are raising unrealistic expectations of a greater bonanza from fraud enforcement.

Mr. Suozzi, the Nassau County executive, accused Mr. Spitzer of neglecting Medicaid in favor of more headline-grabbing pursuits. He contends that the sums recovered by Mr. Spitzer are small, in light of the size of New York's program and the resources at the attorney general's disposal.

A review of the records shows that to some extent, they are both right. But a close look at Mr. Suozzi's statements also shows that he has tended to stretch his claims, sometimes to the breaking point.

Yet Mr. Spitzer and his aides, by arguing that Medicaid fraud has been exaggerated, have given Mr. Suozzi more ammunition. They have made Mr. Spitzer sound like a defender of a system that many New Yorkers believe is indefensible — even as he contends that he is aggressively trying to clean it up.

Through 2003, the money recovered from Medicaid abuse cases brought by Mr. Spitzer's office was about average or well below average compared with other states, depending on the measuring stick used. But those figures were far higher than what was collected under Mr. Spitzer's predecessor, and collections by his Medicaid enforcement team have soared since 2003, outpacing other

*Continued on Page B4*

JA70

## ling Bill Over Tax Credit

ial lofts. Renewing the law ty of the city, and has been verage with the Assembly se leverage the governor is · use against the State Senhreat to block one of its top its plan to send out propsbate checks shortly before mber elections. And he o so in a way that his aides annot be overridden, the e said.

ernor had proposed sendsbate checks to homeowne New York City who live listricts that agree to limit ading growth. The Legislaiced it with a plan to give scks to homeowners across including those in New . The governor is prepared tat that plan is an illegal alf his own — and therefore t have to carry it out.
ing that arguments — and ient that the Legislature's rease health care spending gal — the Pataki adminisseizing on several recent isions. One held that the er in creating budgets rests jovernor, and sharply limegislature's ability to alter als.

A second, which was decided this year in a case that pitted the New York City Council against Mayor Michael R. Bloomberg, held that executives do not have to enforce laws that they deem illegal or unconstitutional.

The Legislature, for its part, is preparing to pass a bill that leaders in both houses say should clean up any technical or constitutional problems in the budget that they passed last week. But the Pataki administration said that it might not be enough, the aide said.

Mr. Silver said on Monday that the Legislature's budget provided for health care, education spending, and other vital items. "The only thing the governor can talk about is technicalities," he said. "He refuses to engage in substantive issues."

Mr. Silver said that Mr. Pataki was hiding "behind constitutional technicalities that may or may not apply."

Edmund J. McMahon, a budget analyst with the Manhattan Institute, said it was unclear how the latest chapter of the budget saga would play out: a negotiated agreement, vetoes, overrides, or legal wrangling. "We're in murky waters," he said. "The question is, what does the governor really want?"

## der to 10 Days in Jail



Michelle V. Agins/The New York Times

eporter, and Roger L. Green, center, and State Senator John
orters in court when the union officials were sentenced.

as of the labor dispute.
lic officials have characleadership as unyielding
ponsible, while militant

But Roger L. Green, a Democratic state assemblyman from Brooklyn, who attended the protest in support of the union, said Mr. Toussaint's jail

## Medicaid Prosecution at Issue In Spitzer-Suozzi Campaign

*Continued From Page B1*

states.

Mr. Suozzi said in an interview that Mr. Spitzer had focused more on prosecuting fraud in places like Wall Street, which are not the traditional terrain of a state attorney general. Medicaid "was never made the cause célèbre that the attorney general made other causes," Mr. Suozzi said, adding, "I think it was a bad choice."

The Spitzer camp says it took over an office that did not previously attempt to bring ambitious fraud cases, which take years to build. "We planted all these seeds years ago, and now we're reaping the harvest," said Peter Pope, deputy attorney general in charge of the criminal division. "We've reconceived the way things are done, and we've been successful."

Experts around the country praise New York's Medicaid Fraud Control Unit, part of Mr. Spitzer's office, and they caution that state-by-state comparisons can be tricky and misleading. They also cite factors, like the laws available in each state, that appear to put Mr. Spitzer at a disadvantage.

"New York's Medicaid Fraud Control Unit does very well. They do very good work," said Barbara Zelner, counsel for the National Association of Medicaid Fraud Control Units. "They are a national leader."

Still, Mr. Spitzer often seems sensitive to any criticism of the state's Medicaid program, insisting on making the distinctions between criminal fraud, abuses that are not criminal, and mere waste.

On Saturday, he said of efforts to restrain the growth of Medicaid spending, "Anyone who tells you that antifraud efforts alone are enough just isn't leveling with you."

Earlier last week, he told a group in Manhattan that in Medicaid, "98 percent of that money, I would venture to say, is spent where it's supposed to be." He added: "The notion that 10 percent is fraud I think is probably overstated."

Mr. Suozzi pounced on that statement, saying Mr. Spitzer was not admitting that Medicaid fraud was a problem. He scoffed at the suggestion that just 2 percent is lost to fraud, insisting that the real figure is at least 10 percent. Even 2 percent, he noted, would be almost $900 million a year — several times the amount Mr. Spitzer's office recovers.

New York has the nation's most expensive Medicaid program, at

the size of New York's Medicaid fraud unit, it was worse than the national average, but not near the bottom.

Mr. Suozzi said that through 2003, the performance of that unit under Mr. Spitzer was "the worst in the country," though when that claim was questioned, he amended it to "the worst of any large state." But the data do not appear to support him.

New York's collections jumped to $88.5 million and then $219.1 million in the 2004 and 2005 fiscal years, according to Mr. Spitzer's office. The federal government has not yet published reports for those years, but officials in other states who have seen preliminary numbers say New York's recoveries were easily the largest.

New York's figures for the 2006 fiscal year will break last year's record, thanks to a settlement with Serono Inc., the maker of an AIDS drug, which will pay the state $171 million. That was a case in which the federal government and the states worked together, and it resulted in payments to every state.

Mr. Suozzi said that New York should not claim credit for such multistate cases, because the federal government takes the lead role, and that Mr. Spitzer's office "had nothing to do with increasing the numbers."

But such settlements accounted

### In defending his record, the attorney general seems to be defending the system.

for only about one-quarter of New York's collections in the last fiscal last year, even without them, the state would have collected far more than any other state. In the Serono case, "the attorney who led the team for the states was from New York's attorney general's office," said Ms. Zelner, the counsel for the national association.

Officials around the country say Mr. Spitzer's numbers would look much better if he did not lack a crucial weapon — a law that allows individuals to sue for Medicaid fraud.

Fifteen states, including Califor-

$44.5 billion a year. Forty-seven states and the District of Columbia have Medicaid Fraud Control Units, which receive federal funds, and again, New York's is the largest. It prosecutes people for criminal fraud and for abuse of nursing home residents, and sues for repayment of

nia, Texas and Florida, and the federal government have such laws, which allow prosecutors to join the whistle-blower suits, bring many more cases to their attention and give them greater powers to subpoena records.

"I would be crippled without it,"

**Exhibit E**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 21 of 71 PageID #: 23

# Press Releases

Office of the New York State Attorney General

| | |
|---|---|
| Department of Law<br>120 Broadway<br>New York, NY 10271 | Department of Law<br>The State Capitol<br>Albany, NY 12224 |
| For More Information:<br>212-416-8060 | For Immediate Release<br>April 11, 2006 |

### BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT

Attorney General Spitzer announced today that a grand jury has charged a Brooklyn dentist with stealing more than $1 million from the Medicaid program.

The indictment unsealed last week in Kings County Supreme Court alleges that Leonard Morse fraudulently billed Medicaid for new dentures that he never delivered and for denture repairs that he never performed.

According to prosecutors, these billings – which included claims for repairing broken or missing teeth, broken clasps and for denture relinings – were often submitted for services provided to Medicaid patients who did not even wear dentures.

The indictment alleges that Morse submitted his false claims to Medicaid through 580 Dental P.C., a company located at 580 Fifth Avenue in Brooklyn of which he was the proprietor, and that Medicaid paid over $1 million on the basis of those claims.

Morse 47, of Kings Point in Nassau County, was charged with one count of Grand Larceny in the First Degree, a class "B" felony, carrying a maximum sentence of 25 years and 11 Counts of Offering a False Instrument for Filing in the First Degree, a Class "E" felony. Morse surrendered to investigators of the Attorney General's office and pleaded not guilty before Acting Supreme Court Justice John P. Walsh, who presided at the arraignment.

The case is being prosecuted by Special Assistant Attorney General John Fusto, of the Attorney General's Medicaid Fraud Control Unit. Senior Special Investigators Robert Flynn and James Serra and Senior Special Auditor Investigator Jose Castillo assisted in the investigation.

The charges against Morse are accusations and the defendant is presumed innocent until and unless proven guilty.

---

**JA73**

**Exhibit F**

# News from

Department of Law
120 Broadway
New York, NY 10271

Department of Law
The State Capitol
Albany, NY 12224

# Attorney General

# Eliot Spitzer

**11 апреля 2006 года**

Контактный телефон: 212-416-8060

Для немедленного распространения

## ПРОГРАММА «МЕДИКЭЙД»:
## БРУКЛИНСКИЙ ЗУБНОЙ ВРАЧ ОСУЖДЕН ЗА МОШЕННИЧЕСТВО

*По сообщению пресс-службы генпрокуратуры штата,* 11 апреля Генпрокурор Элиот Спитцер (Eliot Spitzer) объявил, что члены большого жюри признали зубного врача из Бруклина виновным в краже $1 млн. долларов из бюджета программы «Медикэйд».

Конверт с приговором был открыт на прошлой неделе в Верховном Суде штата в графстве Кингз. Согласно приговору, Леонард Морсе (Leonard Morse) выставлял программе «Медикэйд» счета за зубоврачебные услуги, которые он никогда не оказывал.

Согласно стороне обвинения, эти счета выставлялись якобы за установление зубных протезов или коронок и восстановительное лечение поломанных зубов. Пациенты, медицинские страховки которых использовались для прикрытия и выставления счетов программе «Медикэйд», никогда не носили коронки и не нуждались в протезировании.

Согласно иску, Морсе оформлял счета через свою клинику 580 Dental P.C., которая расположена по адресу д. 580 на 5-ой Авеню в Бруклине. В результате программа «Медикэйд» выплатила ему по этим счетам более $1 млн. долларов.

47-летний Морс проживает в Кингз-Пойнт, графство Нэссо. Он был обвинен в мошенничестве в крупных размерах в 1-ой степени (преступление класса «Б»). Ему грозит до 25 лет тюрьмы. А также за ним 11 нарушений за подачу ложных документов в 1-ой степени (правонарушение класса «Е»). Морс сдался следователям из генпрокуратуры, но заявил, что не является виновным судье Джону П. Уолшу (John P. Walsh), который заседал во время предварительного слушания по делу.

Дело ведет Спец. асс. генпрокурора Джон Фусто (John Fusto) из Отдела по борьбе с махинациями по программе «Медикэйд». Гл. спец. следователи Роберт Флинн (Robert Flynn) и Джеймс Серра (James Serra), а также гл. спец. следователь-аудитор Хосе Кастильо (Jose Castillo) помогали следствию.

До вынесения окончательного приговора подсудимый считается невиновным.

**Exhibit G**

## 新 闻 发 布

纽约州总检察长艾略特·斯皮策（Eliot Spitzer）办公室

Department of Law
The State Capitol
Albany, NY 12224
2006 年 04 月 11 日

Department of Law
120 Broadway
New York, NY 10271

详情请拨打 212-416-8060

### 布鲁克林牙医涉嫌医疗补助欺诈百万美元遭起诉

纽约州总检察长艾略特·斯皮策（Eliot Spitzer）近日宣布大陪审团已经指控布鲁克林一名牙医，称其从医疗补助计划中偷窃达一百万美元。

此案于上周在皇帝区高级法院展开。Leonard Morse 被指控对从他从来没有为病人安装的假牙以及从来没有做过的假牙修补服务向医疗补助计划收费。

据控方称，这些提交的收费账单中所提供的服务包括修补破损或脱落的牙齿，保持牙破损，以及假牙换套等。而这些医疗补助对象很多都根本没有假牙。

此项指控称 Morse 通过位于布鲁克林 580 第五大道的一家公司，580 Dental P.C.向医疗补助提交他的虚假费用声明。他本人是这家公司的拥有者。医疗补助根据这些声明向他支付了一百多万美元。

Morse 现年 47 岁，位于纳索郡 Kings Point。他被指控犯有一项一级大盗窃罪，乃 "B" 等重罪，最多将被判处 25 年有期徒刑。另外还被控犯有 11 项一级 "提供制造虚假文件的工具" 罪，乃 "E" 等重罪。Morse 接受检查长办公室调查人员的调查，在负责此次提讯的助理高级法院法官 John P. Walsh 前表示不服罪。

此案由检察长医疗欺诈控制单元特别助理检察长 John Fusto 负责指控。高级特别调查员 Robert Flyn 和 James Serra，以及高级特别审计调查员 Jose Castillo 对此案的调查提供协助。

对 Morse 的指控目前只是怀疑。被告在没有被证明有罪之前是无罪的。

**Exhibit H**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 27 of 71 PageID #: 29



**russianNY**
Adventure in cyberspace
●com

Google Search  ○ Web ● russianny.com

🎟 Билеты  📧 Почта  📷 Фото  💬 Чат  💬 Форум  💑 Знакомства  📋 Объявлен

Login/

**Сегодня**

Новости
Легкие Новости
Происшествия
Программы ТВ
Погода
Юмор
Гороскоп

russianny.com :: новости :: 4/13/2006

Наш С

# ПРОГРАММА «МЕДИКЭЙД»:БРУКЛИНСКИЙ ЗУБНОЙ ВРАЧ ОСУЖДЕН ЗА МОШЕННИЧЕСТВО

DA
ME
K

По сообщению пресс-службы генпрокуратуры штата, 11 апреля Генпрокурор Элиот Спитцер (Eliot Spitzer) объявил, что члены большого жюри признали зубного врача из Бруклина виновным в краже $1 млн. долларов из бюджета программы «Медикэйд».

**BENEFIT**
IDENTIFICATION CARD

Наш С

WILK

**Площадка**

**Hot Or Not!**
**Blogs**

Регистрация
Почта
Чат
RNY Top
Знакомства
Форум
Объявления
Фото-галлерея

Конверт с приговором был открыт на прошлой неделе в Верховном Суде штата в графстве Кингз. Согласно приговору, Леонард Морсе (Leonard Morse) выставлял программе счета за зубоврачебные услуги, которые он никогда не оказывал.

Согласно стороне обвинения, эти счета выставлялись якобы за установление зубных протезов или коронок и восстановительное лечение поломанных зубов. Пациенты, медицинские страховки которых использовались для прикрытия и выставления счетов программе «Медикэйд», никогда не носили коронки и не нуждались в протезировании.

Ново
Стрел
State
Ватик
запов

**Развлечения**

TV Live
Афиша
Касса
Ночная Жизнь
Всё Радио
Кино
Спорт
Для Взрослых

Согласно иску, Морсе оформлял счета через свою клинику 580 Dental P.C., которая расположена по адресу д. 580 на 5-ой Авеню в Бруклине. В результате программа «Медикэйд» выплатила ему по этим счетам более $1 млн. долларов.

водит
Как м
отлож
Нимф
или б

47-летний Морс проживает в Кингз-Пойнт, графство Нэссо. Он был обвинен в мошенничестве в крупных размерах в 1-ой степени (преступление класса «Б»). Ему грозит до 25 лет тюрьмы. А также за ним 11 нарушений за подачу ложных документов в 1-ой степени (правонарушение класса «Е»). Морс сдался следователям из генпрокуратуры, но заявил, что не является виновным судье Джону П. Уолшу (John P. Walsh), который заседал во время предварительного слушания по делу.

Рыно
скати
предс
Игры
Диета

**Бизнес**

Yellow Pages
Человек и Закон
Финансы
Недвижимость

Дело ведет Спец. асс. генпрокурора Джон Фусто (John Fusto) из Отдела по борьбе с махинациями по программе «Медикэйд». Гл. спец. следователи Роберт Флинн (Robert Flynn) и Джеймс Серра (James Serra),

Няня

**Стиль Жизни**

Музыка

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 28 of 71 PageID #: 30

Культура, Искусство
Красота и Здоровье
Все для дома
Мода
Путешествия
Наши Дети
Автоновости
Образование, Работа



Наш Спонсор

732.972.1000 ext. 304

Бизнесы ★ ★ ★

AMC Loews Fantasy 5
Bryant Park
Clearviews Cinema 100
Clearviews Soundview Cinemas
Jackson Triplex Theatre
Kew Gardens Cinemas

полный список ▶▶▶▶▶

а также гл. спец. следователь-аудитор Хосе Кастильо (Jose Castillo) помогали следствию.

До вынесения окончательного приговора подсудимый считается невиновным.

Контактный телефон: 212-416-8060

серёж

Судья

Закон

"Душе

Гарле

Найти

Надво

Наш С

87

RUS
COI

Hi-1

■ Anti
Strate

Eu
>>
▶ По

□ Н
□ Б
□ Ф
□ Бо
□ М
□ Чо
□ До
□ Ат
□ Хо
□ Со
□ Со



на russianNY•com

**Другие Новости**

- СУД ПРОСЛУШИВАЕТ СТРАШНУЮ ЗАПИСЬ С БОРТА UNITED 93
- "SOUTH PARK" МСТИТ ТЕЛЕВИДЕНИЮ ЗА ПРОРОКА МОХАММЕДА
- НОВЫЙ ОРЛЕАН ПОДРАСТЕТ НА 3 ФУТА
- ВИННИ ПУХ ПОЛУЧАЕТ ЗВЕЗДУ ГЕРОЯ ГОЛЛИВУДА
- В ДЕТРОЙТЕ РАССТРЕЛЯН КОЛЛЕГА ЭМИНЕМА
- ИРАН НАМЕРЕН ЗАПУСТИТЬ ШИРОКОМАСШТАБНОЕ ПРОИЗВОДСТВО УРАНА
- ПОЛИЦИЯ И ДЕПАРТАМЕНТ ЗАЩИТЫ ДЕТЕЙ НАВЕЩАЮТ ДОМ БРИТНИ
- ИРАН ПРОИЗВОДИТ СВОЙ ПЕРВЫЙ УРАН!
- ДЖЕННИФЕР ЛОПЕС ОБВИНЯЕТ СВОЕГО БЫВШЕГО МУЖА В ШАНТАЖЕ
- СЛУЖБА 911 - ПОД СЛЕДСТВИЕМ!
- ПРОФСОЮЗНЫЙ ГЛАВАРЬ ОТПРАВИТСЯ ЗА РЕШЕТКУ
- БАНДА ЧЕРНОКОЖИХ ПОГРОМЩИКОВ УСТРАИВАЕТ ТРАВЛЮ БЕЛОГО ПОДРОСТКА
- Лебединая верность
- Китайцы изобрели новый вид взяток
- Американский взгляд на Ислам
- Ребенок стоит четверть миллиона
- Час "99 Красных Шаров" на VH1 Classic!
- Хроника нецензурных слов
- В Великобритании обнаружена 300-летняя книга в переплете из человеческой кожи
- Интервью Льва Трахтенберга с зоны
- Лев Трахтенберг. "На нарах с дядей Сэмом" - В ПОСЛЕДНИЙ ПУТЬ
- ДОЛГОЖДАННОЕ ВОЗВРАЩЕНИЕ
- Деньги и признание профессионалов - разные понятия
- Секта "Череп и кости" объединяет представителей американской элиты
- Проект Акта о Реформе Иммиграционного Законодательства: Скажите Свое Слово Сейчас, или Замолчите Навсегда
- "Наши" обокрали Уолл-стрит на 7 млн долларов!
- ПРОГРАММА «МЕДИКЭЙД»:БРУКЛИНСКИЙ ЗУБНОЙ ВРАЧ ОСУЖДЕН ЗА МОШЕННИЧЕСТВО
- СЕДЕР С ВИНОМ, МАЦА И ГОРЬКАЯ ЗЕЛЕНЬ
- Группа Ума Турман Братья Кристовские ( концерты в Нью-Йорке)
- Main Page LinkSet (Left)
- MAIN PAGE LINKS (RIGHT)



RUSSIANNY.com
About us | Advertise with us | Feedback

JA80

**Exhibit I**

New York Post, Wednesday, April 12, 2006   nypost.com



**Exhibit J**

# Brooklyn Dentist Charged in Million-Dollar Medicaid Theft

## He Submitted Denture Billings for Patients Who Didn't Wear Dentures

BROOKLYN — A grand jury has charged a Brooklyn dentist with stealing more than $1 million from the Medicaid program, New York State Attorney General Eliot Spitzer announced yesterday.

The indictment unsealed last week, in Kings County Supreme Court, alleges that Leonard Morse, who lives in Kings Point, Long Island, but practices in Brooklyn, billed Medicaid for new dentures he never delivered, and for denture re-

Please turn to page 2

# Brooklyn Dentist Charged in Million-Dollar Medicaid Theft

Continued from page 1.
pairs he never performed.

According to prosecutors, these billings were often submitted for services provided to Medicaid patients who did not even wear dentures.

Morse submitted his false claims, according to the charges, to Medicaid through 580 Dental P.C., a company located at 580 Fifth Avenue, Brooklyn, that he owned. Medicaid paid more than $1 million on the basis of these claims.

Morse, 47, was charged with one count of Larceny in the First Degree, a B felony carrying a maximum sentence of 25 years; and 11 counts of Offering a False Instrument for Filing in the First Degree, a Class E felony.

Morse pleaded guilty before Brooklyn State Supreme Court Justice John P. Walsh, who presided at the arraignment.

The case is being prosecuted by Special Assistant Attorney General John Pusto, of the state Attorney General's Medicaid Fraud Control Unit.

**JA84**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 33 of 71 PageID #: 35

# North Country
## ——Gazette——
Serving New York State and Beyond
News - Comment - Investigative Reports

Ads by Google

**Volunteer Ringtone**
Send this complimentary ringtone to your phone right now!
RingRingMobile.com

**Tell Your Debt To Be Gone**
Turn Your Debt Into Wealth Using Only The Income You Currently Make!
SimplyClickThisLink.com/t

**Africa Eco Volunteer Work**
Volunteer Work at Wildlife Projects Find Out How to Get Involved Today!
www.EnkosiniEcoExperier

**Volunteer Abroad: Summer**
Spaces still available for 2007 summer programs - contact us today!
www.crossculturalsolution

Originally Posted - April 11, 20(

# HEADLINES

return hom

## AG: Brooklyn Dentist Defrauded Medicaid

BROOKLYN---A grand jury has charged a Brooklyn dentist with stealing more than $1 million from the Medicaid program.

The indictment unsealed last week in Kings County Supreme Court allege: that Leonard Morse fraudulently billed Medicaid for new dentures that he never delivered and for denture repairs that he never performed.

According to prosecutors, these billings – which included claims for repairing broken or missing teeth, broken clasps and for denture relinings were often submitted for services provided to Medicaid patients who did no even wear dentures.

The indictment alleges that Morse submitted his false claims to Medicaid through 580 Dental P.C., a company located at 580 Fifth Avenue in Brooklyn of which he was the proprietor, and that Medicaid paid over $1 million on the basis of those claims.

Morse 47, of Kings Point in Nassau County, was charged with one count o grand larceny in the first degree, a class B felony, carrying a maximum sentence of 25 years and 11 counts of offering a false instrument for filing in the first degree, a class E felony.

Morse surrendered to investigators of the Attorney General's office and pleaded not guilty before Acting Supreme Court Justice John P. Walsh,

**Exhibit K**

Case 1:07-cv-04793-CBA-RME   Document 1-3   Filed 11/16/07   Page 35 of 71 PageID #: 37

Web   Images   Video   News   Maps   Gmail   more ▼                      Sign in

Google

                    LEONARD MORSE DDS                    [ Search ]   Advanced Search
                                                         Preferences
                                                         New! View and manage your web history

**Web**        Results **1 - 10** of about **132,000** for **LEONARD MORSE DDS**. (0.14 seconds)

# BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT

The indictment unsealed last week in Kings County Supreme Court alleges that **Leonard Morse** fraudulently billed Medicaid for new dentures that he never ...
www.oag.state.ny.us/press/2006/apr/apr11a_06.html - 13k - Cached - Similar pages

## Elise **Morse** — Janey **Morse** : ZoomInfo Business People Information

**Morse**, Harry, Dental Implants Online, Harry **Morse DDS** 10666 Mills Rd ... **Morse**, J. Council on Ethical and Judicial Affairs, By **Leonard J. Morse**, MD . ...
www.zoominfo.com/people/level2page28187.aspx - 102k - Cached - Similar pages

## The FAIR Foundation is dedicated to fair and equitable ...

FAIR's CEO and Founder, Richard Darling, **DDS**, has now given over 100 presentations in the ... we take this opportunity to profile **Leonard J. Morse**, MD., ...
fairfoundation.org/news_letter/2006/05dec/newsletter.htm - 52k - Cached - Similar pages

### The FAIR Foundation is dedicated to fair and equitable ...

**Leonard** J. **Morse**, MD; Commissioner of Public Health, Worcester, Massachusetts; ... Charles J. Goodacre, **DDS**, MSD; Dean of the School of Dentistry, ...
www.fairfoundation.org/organdonation/contactcongressfororgandonation.htm - 43k - Cached - Similar pages
[ More results from www.fairfoundation.org ]

# **Leonard** A. Koltun, **DDS**, MS, Ph.D - Curriculum Vitae

Ph.D. New York University 1976; **D.D.S.** New York University 1981 ... LoBue, J., Fredrickson, T.N., Gallicchio, V., **Morse**, B.S., Edinger, F., Roy, M., ...
www.**leonard**akoltun**dds**msphd.com/aboutus/aboutus1.html - 14k - Cached - Similar pages

## staugustine.com: Story Archives

Dianne **Morse**, DDS. • William **Morse**, DDS. • Marcia Nemecek, DMD ..... **Leonard** Shvartzman, MD, 248 Southpark Circle East, 32086, 824-7110 ...
campaign98.staugustine.com/Health/physicians.shtml - 80k - Cached - Similar pages

## [DOC] Options for Affordable Care

File Format: Microsoft Word - View as HTML
Prepared by the Staff of the **Morse** Institute Library; funded in part by the **Leonard Morse** Grants Panel of the MetroWest Community Health Care Foundation and ...

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 36 of 71 PageID #: 38

www.mchcf.org/publications/docs/Options_Affordable_Care_Rev.doc - Similar pages

### [PDF] GIVE AND
File Format: PDF/Adobe Acrobat - View as HTML
**Leonard Morse** Grants Panel. Carolyn Ferrucci. Marijane Norris Geary, Chair. Jane
Lenarsky, Vice Chair. Rabbi Daniel Liben. Jane Williams **...**
www.mchcf.org/publications/docs/Annual_Report_2005.pdf - Similar pages

## Kernersville Chamber of Commerce, Kernersville North Carolina
Nelson H. **Leonard, DDS** 120 S. Cherry St. 336.996.2651. **Morse** & Doyle, **DDS**, PA 633
Hopkins Rd. 336.996.4400. Walker & Walker George Walker, **DDS ...**
www.kernersvillenc.com/shell.php?page=healthcare - 22k - Cached - Similar pages

## Kernersville, North Carolina Dentists
BERKY ZOLTAN T **DDS** MS **... LEONARD** NELSON H **DDS**. 120 S Cherry St, 996-2651.
Kernersville, NC 27284-2708. **MORSE** AND DOYLE **DDS** PA **...**
kernersville.bestredyp.com/dentists.html - 79k - Cached - Similar pages


1 2 3 4 5 6 7 8 9 10    **Next**

Try Google Desktop: search your computer as easily as you search the web.

---

LEONARD MORSE DDS        Search

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

---

©2007 Google - Google Home - Advertising Programs - Business Solutions - About Google

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 37 of 71 PageID #: 39

Web   Images   Video   News   Maps   Gmail   more ▾                                          Sign in

## Google

LEONARD MORSE+DENTIST                     [ Search ]   Advanced Search
                                                        Preferences
                                          New! View and manage your web history

**Web**                              Results 1 - **10** of about 162,000 for **LEONARD MORSE+DENTIST**. (0.22 seconds)

## BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT
BROOKLYN **DENTIST** INDICTED FOR MILLION DOLLAR MEDICAID THEFT ... Supreme
Court alleges that **Leonard Morse** fraudulently billed Medicaid for new dentures that ...
www.oag.state.ny.us/press/2006/apr/apr11a_06.html - 13k - Cached - Similar pages

## Nexus
**Leonard** P. **Morse** Kevin M. Murphy Daniel J. Palermo Philip Person Vijay Pharar Michael
S. Preston Howard S. Rock Jon Rogers Bruce T. Sallen Mark A. Schachman ...
www.nyu.edu/dental/nexus/issues/summer2003/thankyou.html - 18k -
Cached - Similar pages

### Nexus
**Leonard** P. **Morse** Daniel J. Palermo Jacqueline Pastore Philip Person ... that were made
to the College of **Dentistry** from September 1, 2002 – August 31, 2003: ...
www.nyu.edu/dental/nexus/issues/winter2004/benefactors.html - 19k -
Cached - Similar pages
[ More results from www.nyu.edu ]

## AG: Brooklyn Dentist Defrauded Medicaid
BROOKLYN---A grand jury has charged a Brooklyn **dentist** with stealing more ... alleges
that **Leonard Morse** fraudulently billed Medicaid for new dentures that ...
www.northcountrygazette.org/articles/041106**Dentist**Defraud.html - 8k -
Cached - Similar pages

## Offering low-cost dental care - Natick, MA - Natick Bulletin and Tab
With a grant of more than $145000 from the **Leonard Morse** Grants Panel of the
MetroWest Community Healthcare Foundation, the council established a dental ...
www.townonline.com/natick/homepage/x947676728 - 31k - Cached - Similar pages

[DOC] Options for Affordable Care
File Format: Microsoft Word - View as HTML
Prepared by the Staff of the **Morse** Institute Library; funded in part by the **Leonard Morse**
Grants Panel of the MetroWest Community Health Care Foundation and ...
www.mchcf.org/publications/docs/Options_Affordable_Care_Rev.doc - Similar pages

### ::The MetroWest Community Health Care Foundation::
From the Foundation's **Leonard Morse** Grants Panel (benefiting the Natick community) -.
Catholic Charities Archdiocese of Boston ...
www.mchcf.org/grants/pastgrants2006.html - 39k - Cached - Similar pages
[ More results from www.mchcf.org ]

## Elizabeth Morse — Janey Morse : ZoomInfo Business People Information
**Morse**, J. Council on Ethical and Judicial Affairs, By **Leonard** J. **Morse**, MD ... Dr. J.
**Leonard Morse** strongly believed this when . ...
www.zoominfo.com/people/level2page28187.aspx - 102k - Cached - Similar pages

## Harvard University Library Notes
A champagne toast (donated by OVID Technologies, Inc.) followed Dr. Gray's address, after
which Dr. **Leonard Morse** unveiled the new Countway logo. ...
hul.harvard.edu/publications/hul_notes_1299/countway.html - 6k - Cached - Similar pages

## NEIGHBORHOOD REPORT: BEDFORD-STUYVESANT; Prison Van Is a Link For ...

Ms. Rose is indefatigable, said Dr. **Leonard** P. **Morse**, a **dentist** at Brook Medical and

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 38 of 71 PageID #: 40

Dental in Park Slope, where she was an office manager from the ...
query.nytimes.com/gst/fullpage.html?res=9D02E6DC1F3DF933A15751C1A96E958260 -
28k - Cached - Similar pages


**1** [2](#) [3](#) [4](#) [5](#) [6](#) [7](#) [8](#) [9](#) [10](#)          **Next**

---

LEONARD MORSE+DENTIST          [ Search ]

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

---

©2007 Google - Google Home - Advertising Programs - Business Solutions - About Google

**JA90**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 39 of 71 PageID #: 41

Google

**Web**  Images  Groups  News  Scholar  **more »**

LEONARD MORSE+KINGS POINT    [ Search ]  **Advanced Search**
Preferences

New! View and manage your web history

**Web**    Results **1 - 10** of about 178,000 for **LEONARD MORSE+KINGS POINT**. (0.12 seconds)

## BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT
The indictment unsealed last week in **Kings** County Supreme Court alleges that **Leonard**
**Morse** fraudulently billed Medicaid for new dentures that he never ...
www.oag.state.ny.us/press/2006/apr/apr11a_06.html - 13k - Cached - Similar pages

[PDF] BROOKLYN DENTIST Indicted for Million Dollar Medicaid Theft - Korean
File Format: PDF/Adobe Acrobat - View as HTML
**Leonard Morse** 被指控对从他从来没有为病人安装的假牙 ... **Morse** 现年47 岁，位于纳索郡
**Kings Point**。他被指控犯有一项一级大盗窃罪，乃"B"等重 ...
www.oag.state.ny.us/.../apr/BROOKLYN%20DENTIST%20INDICTED%20FOR%
20MILLION%20DOLLAR%20MEDICAID%20THEFT.pdf - Similar pages

## Kings Point Alumni On-line Community - Previous Award Winners
The Honorable Clarence G. **Morse**. Maritime Administrator, United States ... Co-President
of the **Kings Point** Retirees Continuing selfless dedication to the ...
www.usmmaaa.com/previousawardwinners.HTM - 384k - Cached - Similar pages

## Daniel - Encyclopedia.com
In these chapters the supernatural power behind the **kings** of this world is ... died Saturday
in the **Leonard Morse** Hospital, Natick ... former Louise R. ...
www.encyclopedia.com/doc/1E1-Daniel-book.html - 74k - Cached - Similar pages

## Hearts in Atlantis (2001): Anthony Hopkins, David **Morse**, Anton ...
Unfortunately, the newest cinematic adaptation of **King's** work, Hearts in Atlantis, ... To
hammer home the **point** that this childhood existence is bliss, ...
www.popmatters.com/film/reviews/h/hearts-in-atlantis.shtml - 52k - Cached - Similar pages

[PDF] T a b l e   o f   C o n t e n t s   Volume I  Acknowledgments ...
File Format: PDF/Adobe Acrobat - View as HTML
may be viewed in the Hosmer **Morse** Museum of American Art. Some of the outbuildings
remain and have ..... Barstow, William Slocum – **Kings Point** – Elm **Point** ...
spinzialonglandestates.com/longislandsample.pdf - Similar pages

## Telegraph Music Easy Listening
Six **Leonard** Cohen classic albums on CD: Songs of **Leonard** Cohen, Songs from a Room,
.... The **Morse** set has music from all 33 episodes starring John Thaw. ...
cdshop.telegraph.co.uk/acatalog/Online_Catalogue_Easy_Listening_15.html - 77k -
Cached - Similar pages

## ili: leon county florida old newspaper articles
lincoln mercury **kings** auto mall led undercar lights linkin park mp3 hybrid theory .... **leonard**
**morse** hospital natick lco estate agents cambridge uk ...
andrei-kann.blogspot.com/2007/10/leon-county-florida-old-newspaper.html - 90k -
Cached - Similar pages

## Midwest Collegiate Sailing Association - ICSARegatta Notes
The trophy was donated by the **Kings Point** Maritime Assoc., ... in a single District raced
against other District teams prior to the **Morse** Trophy, it became, ...
www.mcsasail.org/ICSARegattaNotes - 56k - Cached - Similar pages

Support Groups

**JA91**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 40 of 71 PageID #: 42

**Morse** Adult Day Center at Boynton Beach, 8500 Jog Road ... We Care Social Hall, **Kings**
**Point** 2nd Friday of month, 10:30 am - 12:00 Noon (residents only) ...
www.alz.org/seflorida/in_my_community_support.asp - 37k - Cached - Similar pages

Result Page:     **1** 2 3 4 5 6 7 8 9 10     **Next**

---

LEONARD MORSE+KINGS POINT   [ Search ]

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

---

Google Home - Advertising Programs - About Google

©2007 Google



**Advanced Search**

LEONARD MORSE          [ Search ]

**Searched for LEONARD MORSE.**          Results **1 - 3** of about **3**. Search took **0.01** seconds.

Sort by: Date / Relevance

## BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT
... indictment unsealed last week in Kings County Supreme Court alleges that **Leonard Morse** fraudulently billed Medicaid for new dentures that he never delivered ...
www.oag.state.ny.us/press/2006/apr/apr11a_06.html - 13k

## [PDF] BROOKLYN DENTIST Indicted for Million Dollar Medicaid Theft - ...
... 11 Department of Law 120 Broadway New York, NY 10271 212-416-8060 · Eliot Spitzer **Leonard Morse Morse** 580 580 Dental PC **Morse** 47 Kings Point" B" 25 11 "" " E ...
www.oag.state.ny.us/press/2006/apr/BROOKLYN%20DENTIST%20INDICTED%20FOR%20MILLION%20DOLLAR%20MEDICAID%20THEFT.pdf

## [PDF] NR_BrooklynDentist_MedicaidFraud - Russian
... 11 2006 : 212-416-8060 «»: - , 11 (Eliot Spitzer) , $1 . «». .**Leonard Morse**) «» , . 580 Dental PC, . 580 5- . «» $1 . . 47- -, . 1 ...
www.oag.state.ny.us/press/2006/apr/NR_BrooklynDentist_MedicaidFraud_RUS.pdf

LEONARD MORSE          [ Search ]

Powered by Google

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 42 of 71 PageID #: 44



Web | Images | Audio | Video | News | Yellow Pages | Wh
Pages

LEONARD MORSE DDS

☐ Exact Phrase | Advanced | Preferences

## Web Search Results for "LEONARD MORSE DDS"

Search Filter: Moderate

View Results
From:



More Engines | View
Demo

All Search Engines  1 - 20 of 54  (About Results)          1 | 2 | 3  Next >

**Are you looking for?**

No Suggestions Found.

1. **BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT**
   The indictment unsealed last week in Kings County Supreme Court alleges that **Leonard Morse** fraudulently billed Medicaid for new dentures that he never ...
   www.oag.state.ny.us/press/2006/apr/apr11a_06.html [Found on Google]

2. Find a **DDS** in Your Area
   Find Dentists by Area & Dental Need Search Online or Call 800-336-8478.
   Sponsored by: www.1800dentist.com/ [Found on Ads by Google]

3. Kim **Morse** ? Meredith **Morse** : ZoomInfo Business People Information
   Morse, Leonard, The FAIR Foundation Inc, FAIR's rebuttal was submitted to Forbes Magazine by our Founder, Richard Darling, DDS, and by FAIR . ...
   www.zoominfo.com/people/level2page28189.aspx [Found on Google]

4. Morse, **Leonard** P, **DDS** - Brook Medical & - Brooklyn, New York : Citysearch.com
   Get details on Morse, **Leonard** P, **DDS** - Brook Medical & Dental - Brooklyn, NY, at Citysearch - over 1 million user reviews & editorials about local businesses.
   www.citysearch.com/profile/7357482 [Found on Yahoo! Search]

5. Morris dentist
   Professional local dental office We Take The Time To Do Things Right
   Sponsored by: www.drbennettdmd1.com/ [Found on Ads by Google]

6. Elizabeth **Morse** ? Janey **Morse** : ZoomInfo Business People Information
   Morse, Harry, Dental Implants Online, Harry **Morse DDS** 10666 Mills Rd,Houston - TX 77070 .... Dr. J. **Leonard Morse** strongly believed this when . ...
   www.zoominfo.com/people/level2page28187.aspx [Found on Google]

7. Hospitals in Framingham, Massachusetts
   Himelhoch, Deborah A **DDS** - Himelhoch Deborah A DDS. 550 Worcester Rd. Framingham, MA ... **Leonard Morse** Hospital. 67 Union St. Natick, MA (508) 650-7000 ...
   www.dmgeneral.com/MA/515.html [Found on Yahoo! Search]

8. Worcester Telegram & Gazette News

Worcester Commissioner of Public Health Dr. **Leonard** J. **Morse**
displays a receptacle which will be used for disposal of used needles
and syringes. ...
www.telegram.com/article/20070907/NEWS/709070762/1... [Found
on Google]

9.  The FAIR Foundation is dedicated to fair and equitable
    distributions of Nation Ins...
    ... premature degenerative maladies", says **Leonard** Morse, Chair
    Emeritus of the ... Dr. Richard Darling, DDS, called on President Bush
    to prorate funding allocated ...
    www.fairfoundation.org/media/news_results.htm [Found on Yahoo!
    Search]

10. NEIGHBORHOOD REPORT: BEDFORD-STUYVESANT; Prison
    Van Is a Link For ...
    Ms. Rose is indefatigable, said Dr. **Leonard** P. **Morse**, a dentist at
    Brook Medical and Dental in Park Slope, where she was an office
    manager from the ...
    query.nytimes.com/gst/fullpage.html?res=9D02E6DC1F... [Found on
    Google]

11. MASSACHUSETTS Group Health
    CENTER **LEONARD** MORSE. HOSPITAL. 67 UNION ST (508) 650-
    7000. NEWTON. NEWTON WELLESLEY. HOSPITAL ... Langston, John
    DDS. 16 Waterhouse Rd (508) 759-4495 ...
    www.bc.edu/offices/uhs/meta-elements/pdf/2007massp... [Found on
    Yahoo! Search]

12. Dentist Directory
    Find A Good Dentist Near You. Read Doctor Reviews & Ratings Here.
    Sponsored by: RevolutionHealth.com/ [Found on Ads by Google]

13. The FAIR Foundation is dedicated to fair and equitable ...
    Richard Darling, DDS; Founder, President, Chief Executive Officer
    and Chairman of the ... **Leonard** J. **Morse**, MD; Commissioner of
    Public Health, Worcester, ...
    www.fairfoundation.org/Board/board.htm [Found on Google]

14. MCOH - Fluoride
    Michael Monopoli, DDS, MPH. Edward Morin, D.M.D.. Alexander M. ...
    **Leonard** Morse, M.D. Seema Naravane, M.D. Long N. Nguyen, M.D.
    Orlando Nieves, M.D. ...
    www.fluoridefacts.org/fluoride/flu_supp_300doc.asp [Found on Yahoo!
    Search]

15. The FAIR Foundation is dedicated to fair and equitable ...
    **Leonard** J. **Morse**, MD; Commissioner of Public Health, Worcester,
    Massachusetts; ... Charles J. Goodacre, DDS, MSD; Dean of the
    School of Dentistry, ...
    www.fairfoundation.org/organdonation/contactcongre... [Found on
    Google]

16. Class Notes
    **Leonard** Morse, of Worcester, Mass., was given the Key to the City
    from Mayor ... Liburd and her husband, Derek Brown, **DDS** '95, of
    Glen Burnie, Md., are the ...
    www.umm.edu/bulletin/winter97/class.html [Found on Yahoo! Search]

17. Find **Leonard** Morse, $9.95
    Get phone number, address & more on **Leonard** morse. Instant

Make **Question.com** your homepage                Can't find what you want? **Ask your question here**

# Question.com
### Sharing Knowledge

 Home     Internet     Forum    Medical  Au

Popular Articles Latest Articles | Encyclopedia | Dictionary | Famous Quotes NEW! | Countries | Computing

| LEONARD MORSE +FRAUD | | **Site Search!** |

**Web Search!**

Browse: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z   Help

**South Africa Krugerrand**
Buy Krugerrand gold coins:
durable South African bullion.
Since 1975.
www.BlanchardOnline.com

**Dress African products**
50+ Dress products to choose
from Shop and Compare at Pronto!
Pronto.com

**African Home Decor**
Imported unique decor from Africa
Wholesalers welcome
www.thebananabox.com

**Jagen in Namibia**
Spezialisiertes jagen \
Leoparden Professione
Namibia
www.jagdfarm-humm

Ac

**Search Results**                              Results **1 - 15** for **LEONARD MORSE +FRAUD**.

*Sorry your search produced no results. Try results from the
Internet below...*


www.IMVU.com                    Ads by Goooooogle

1.  BROOKLYN DENTIST INDICTED FOR MILLION
    DOLLAR MEDICAID THEFT
    ... Supreme Court alleges that Leonard Morse
    fraudulently billed Medicaid for new ... General
    John Fusto, of the Attorney General's Medicaid
    Fraud Control Unit. ...
    www.oag.state.ny.us

2.  GENERAL LABORATORY INFORMATION
    Anatomic Pathology and Rapid Response Lab
    Medical Director, Leonard Morse Hospital ... by
    Congress to indemnify and eliminate fraud,
    abuse, and waste ...
    www.mwmc.com

**Related Sites and Content**
Encyclopedia
Dictionary
Countries
Famous Quotes
Computing Dictionary

3.  IN THE UNITED STATES COURT OF APPEALS FOR
    THE THIRD CIRCUIT Docket No. 04-2550
    Leonard Morse, Comments from Physicians, in
    Massachusetts Medical Society, in ... markets, to
    combat waste, fraud, and abuse in health
    insurance and health ...
    www.pipatl.org

4.  Murtha Cullina LLP - Attorneys At Law
    ... Vermont, Dartmouth College, the Leonard
    Morse Hospital in Natick, Salem Hospital, ...
    been appointed as counsel to investigate matters
    of bankruptcy fraud. ...
    www.murthalaw.com

5.  UNITED STATES DISTRICT COURT FOR THE
    DISTRICT OF RHODE ISLAND JOHN OLIVEIRA :
    Plaintiff, : : v. : C.A. No. 02-383 ...
    ... Dismissal or [for] ma[king] fraud[ulent]
    statement. in Federal Court. ... See MacKnight v.
    Leonard Morse Hospital, 828 F.2d 48, 52 (1. st.
    Cir. ...
    www.rid.uscourts.gov

6.  Commonwealth
    MetroWest Medical Center – Leonard Morse.
    Hospital, Natick. • Milton Hospital, Milton ... was
    not terminated because of fraud or nonpayment
    of premium. ...
    www.mass.gov

7.  Holland & Hart Health Care Law Blog: AMA adopts
    guidelines for Physicians providing "Boutique Care."
    ... with their physician," said Leonard Morse, MD,
    Chair, Council on Ethical and Judicial Affairs. ...
    Statute, CMP and "fraud and abuse" defense,
    healthcare ...
    hollandhart.typepad.com

8.  Tenet to sell two Mass. hospitals, 25 others - Boston
    Business Journal:
    MetroWest includes the 182-bed Leonard Morse
    Campus and its 238-bed Union Campus. ...
    investigating Tenet for alleged fraud and
    misconduct, though the ...
    boston.bizjournals.com

9.  Wilson-Epes Standardized Format for Legal Briefs
    Amicus Leonard Morse, M.D., specializes in
    internal. medicine-infectious diseases. ... waste,
    fraud, and abuse in health insurance and health.
    17 ...
    www.aapsonline.org

10. THE OUTLOOK
    Leonard Morse Hospitals. For more information
    about the film, visit. www.oneineight.net. ... the
    lowest rates of voter fraud in. the country, and
    the ...
    www.lwvnatick.org

11. Amazon.com: "hospital mergers": Key Phrase page
    ... supracompetitive returns, health care fraud,
    group practice without walls, ... American Home,
    Old Kent, Leonard Morse, unaffiliated banks,
    foreign ownership ...
    amazon.com

12. Commonwealth
    Leonard Morse Hospital. 67 Union Street. Natick,
    MA 01760. 508-650-7000. Needham, MA ... was
    not terminated because of fraud or nonpayment
    of premium. ...
    www.mass.gov

13. Natick Police Department Public Log Page: 1
    07-595 1057 Walk-In - LARCENY / FORGERY/
    FRAUD Report to be filed ... A1 transporting one
    BLS to Leonard Morse Hospital with an. officer
    on board. Narrative: ...
    www.natickpolice.org

14. Holland & Hart Health Care Law Blog
    ... 75 of CME in professional ethics and health
    care fraud. ... with their physician," said Leonard
    Morse, MD, Chair, Council on Ethical and

JA97

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 46 of 71 PageID #: 48

Judicial Affairs. ...
www.hollandhart.com

15.  Worcester Community Cable Access | The People's
     Channel
     ... in cases of accounting fraud to banks and
     other parties ... Konnie sits down with Dr.
     Leonard Morse to talk about Community
     Immunity, Saturday October 13th ...
     wccatv.com


**Next**


LEONARD MORSE +FRAUD                                    [ Search ]


**Home  Encyclopedia  Dictionary  Countries  Famous Quotes  Computing Dictionary**

Browse: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

Advertise - Contact Us - Privacy Policy - Drugs.com

© 2004 Question.com. All Rights Reserved.
0 ms

Information.com
Case 1:07-cv-04793-CBA-RML    Document 1-3    Filed 11/16/07    Page 47 of 71 PageID #: 49


**information**.com

| Login | Join Now | Customize |

Web Search    Encyclopedia    Shopping        Blogs        Articles        Groups

LEONARD MORSE DDS                                              | Find Information |

**Search Results Will Never Be The Same.**

Make Us Your Homepage  |  Feedback  |  Suggest A Source  |  About Information.com  |  Ads by Revenue.net

## Related Searches

| versace | designer | scarves | gucci | mens fashion |
| neckwear | ferragamo | gifts for men | armani | ties |

Sponsored links

1. **BROOKLYN DENTIST Indicted for Million Dollar Medicaid Theft - Korean**
   **Leonard Morse** □□□□□□□□□□□□□□□□□□. □□□□□□□□□□□□ □□□□□□□□□□□ □□□□□□□□□
   □□□□□□□□□□□□□□□ ...
   Save - Save with **Note** - Share
   www.oag.state.ny.us

2. **Kernersville Chamber of Commerce, Kernersville North Carolina**
   Nelson H. **Leonard, DDS** 120 S. Cherry St. 336.996.2651. **Morse** & Doyle, **DDS**, PA 633 Hopkins Rd.
   336.996.4400. Walker & Walker George Walker, **DDS** ...
   Save - Save with **Note** - Share
   www.kernersvillenc.com

3. **Leonard A. Koltun, DDS, MS, Ph.D - Curriculum Vitae**
   Ph.D. New York University 1976; D.D.S. New York University 1981 ... LoBue, J., Frederickson, T.N.,
   Gallicchio, V., **Morse**, B.S., Edinger, F., Roy, M., ...
   Save - Save with **Note** - Share
   www.leonardakoltunddsmsphd.com

4. **AGD - Academy of General Dentistry**
   Mark Benavides, **DDS**, Jolynn Galvin, **DDS**, **Leonard** Maida, **DDS**, Jamie L. Shore, **DDS** .... James D.
   Carney, **DDS**, Paul F. Havey, DMD, William J. **Morse**, **DDS** ...
   Save - Save with Note - Share
   www.agd.org

5. **staugustine.com: Story Archives**
   Dianne **Morse, DDS**. □ William **Morse, DDS**. □ Marcia Nemecek, DMD ..... **Leonard** Shvartzman, MD, 248
   Southpark Circle East, 32086, 826-7110 ...
   Save - Save with **Note** - Share
   campaign98.staugustine.com

6. **New York, NY - Dentist Reviews, Ratings & Recommendations.**
   **Morse**, **Leonard** Dentist, Great Neck, NY Mosery, Rafael Dentist, Brooklyn, NY Moses, Alison Dentist, New
   York, NY Moses, Mark Oral Surgeon, New York, NY ...
   Save - Save with **Note** - Share

new-york.doctoroogle.com

7. <u>Donors to the AAP Foundation Sustaining Fund</u>
Mohammad Moini Stephen G. **Morse** Catherine Mowry, **DDS** Russell J Nisengard ... Mark Thurber, **DDS**
**Leonard** Tibbetts Marvin A. Tuckman, in honor of Dr. Abram ...
**Save - Save with Note - Share**
www.perio.org

8. <u>List of Reviewers & Authors</u>
... Jose Gerardo G. Masso, **DDS** - Oral and Maxillofacial Surgeon, Hospital Adolfo ... **Leonard Morse**, MD -
Commissioner of Public Health, City of Worcester, ...
**Save - Save with Note - Share**
www.elib.gov.ph

9. <u>List of Reviewers & Authors</u>
... Apex Family Medicine, Denver, Colorado, USA; Jose Gerardo G. Masso, **DDS**. ... USA; **Leonard Morse**,
MD - Commissioner of Public Health, City of Worcester, ...
**Save - Save with Note - Share**
www.elib.gov.ph

10. <u>AllPages.com - Yellow Pages Listings for Businesses between Leo - Leo</u>
**Leonard Morse** Hospital, Framingham Union Hospital 115 Lincoln Street .... **Leonard** Patricia Hawkins
**DDS** 4804 South Cliff Avenue ...
**Save - Save with Note - Share**
www.allpages.com

**1 2 3 4 5 6 7 8 9 10 Next »**

Web Search 🔳   [ Find Information ]

Information Home | Feedback

Privacy Policy | Terms of Service | About Information.com | Our Mission | Login | Join Now | Help

2005 Information.com

**JA100**

All4One Search: LEONARD MORSE+FRAUD
Case 1:07-cv-04793-CBA-RML  Document 1-3  Filed 11/16/07  Page 49 of 71 PageID #: 51



**All4One**
and one for all

All4One.com - The Ori

**Home Page**          **Web site submission**          **User Tips**          **Ab(**

## LEONARD MORSE+FRAUD

ISS: Mediumship: Direct Connection to a Level of the Afterlife ...
With many thanks to Dr. Don Morse, President of the Academy. Mediums
Afterlife, Telepathy or Fraud? - Michael Tymn - ...
http://www.survivalafterdeath.org/articles/other/tymn.htm (Google)

BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT
... Supreme Court alleges that Leonard Morse fraudulently billed Medicai(
Attorney General's Medicaid Fraud Control Unit. ...
http://www.oag.state.ny.us/press/2006/apr/apr11a_06.html (Yahoo! Search)

The Risks Digest Volume 21: Issue 70
Leonard Erickson (aka shadow{G}) shadow@krypton.rain.com last resor
zero desire to communicate using Morse Code, ...
http://catless.ncl.ac.uk/Risks/21.70.html (Google)

Council Meeting Minutes - 14 November 1996 Page 1 MINUTES OF THE .
Kilbey, Knight, Lancaster, Langley, Leonard, Livney, Lonsdale, Major, Mil
Price, O'Shea, Osborne, Oswell, Payne, ...
http://www.hillingdon.gov.uk/central/democracy/comm_reports/other_decisio

Tenet to sell two Mass. hospitals, 25 others - Boston Business Journal:
MetroWest includes the 182-bed Leonard Morse Campus and its 238-bed
alleged fraud and misconduct, though the ...
http://boston.bizjournals.com/boston/stories/2004/01/26/daily28.html?jst=b_

The Four Word Film Review
David Morse · Ron Rifkin · Leonard L. Thomas · Michael Shamus Wiles · S
Josh_the_c8t ...
http://www.fwfr.com/display.asp?ID=2314 (Google)

IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT D
Leonard Morse, Comments from Physicians, in Massachusetts Medical So
and abuse in health insurance and health ...
http://www.aapsonline.org/confiden/cvt-amicus.pdf (Yahoo! Search)

history of lisbon, nh
... carried by dint of bulldozing and fraud, yet there was no redress, inas
Windham [NH] and removed to this town, to a farm on ...
http://www.nh.searchroots.com/documents/grafton/History_Lisbon_NH.txt (Ya

Amazon.co.uk: ""CHEAP THRILLS" - 25 Drama DVDs for Under A Fiver!&
The cast, the settings, Leonard's brutal, witty and clever script. ... Both I
Morse the drunk driver who took a ...
http://www.amazon.co.uk/quot-CHEAP-THRILLS-Drama-Fiver/lm/35SQS08X4J

Stories for 13 March 2007
I write in response to the sentencing of Leonard Morrison for the despica
be shown on ITV3 next month. more. ...
http://archive.oxfordmail.net/2007/3/13/ (Google)

Wilson-Epes Standardized Format for Legal Briefs
Amicus Leonard Morse, M.D., specializes in internal. medicine-infectious
health insurance and health. 17 ...
http://www.aapsonline.org/judicial/cfh-06-14-06.pdf (Yahoo! Search)

Stories for 5 November 2004

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 50 of 71 PageID #: 52

Poet Brian Morse encouraged the children to display their creative sides
Leonard was equipped with a new wheelchair, ...
http://archive.thisiswiltshire.co.uk/2004/11/5/ (Google)

Beginning July/August 2
been later indicted for fraud or illegal denial of services. And ... merger c
CEO, with Framingham ...
http://www.acpenet.org/MembersOnly/pejournal/1999/JulyAugust.pdf (Yahoo!

Holland & Hart Health Care Law Blog
... 75 of CME in professional ethics and health care fraud. ... with their p
Council on Ethical and Judicial Affairs. ...
http://www.hollandhart.com/healthcare/2003_07_01_archive.htm (Yahoo! Sear

Carl's Cam: War Memorial, Railway Station, Chester, Cheshire.
MORSE, J. SWINDON ALDER, A E ALDER, W G AMOR, G ANSTEY, F C AR'
LEWIS, F J LEWIS, H S LEWIS, T A LITTLE, H G ...
http://www.carlscam.com/chester/gwrmem.htm (Google)

**Home Page**          **Free web site submission**          **User Tips**          *

JA102

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 51 of 71 PageID #: 53

 **Web** | Images | Audio | Video New! | News | Yellow Pages | White Pages

LEONARD MORSE +FRAUD                                    [ Search ]   Preferenc

Now Searching: [ Google   YAHOO! SEARCH   Live Search   Ask ]   Learn More

## Web Search Results for "LEONARD MORSE +FRAUD"

Searcl

Now Searching   **Google**   YAHOO! SEARCH    Live Search   And More...

**1 - 20 of 83** from All Search Engines  (About Results)

1 | 2 | 3 | 4

1.  **Report Government Fraud**
    Medicare, Defense, Construction Over $1 Billion Awarded to Date
    Sponsored by: www.800EndFraud.com/ [Found on Ads by Google]

    **Are you look**

    No Suggestions

2.  **BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT**
    ... County Supreme Court alleges that **Leonard Morse** fraudulently billed Medicaid for new
    dentures ... of the Attorney General?s Medicaid **Fraud** Control Unit. ...
    www.oag.state.ny.us/press/2006/apr/apr11a_06.html [Found on Google, Windows Live,
    Yahoo! Search]

3.  **Hemming Morse, Inc.: Information and Much More from Answers.com**
    Its forensic accounting and **fraud** investigation team has expertise in uncovering ... Be the
    first to tackle these... What was **Leonard F Morse** college Major? ...
    www.answers.com/topic/hemming-morse-inc [Found on Google, Windows Live]

4.  **Federal Fraud**
    There are Huge Rewards for exposing **Fraud** against the U.S. Government
    Sponsored by: FederalFraud.com/ [Found on Ads by Google]

5.  **AMA (Virtual Mentor) Clinical Case 1**
    Commentaries by Peter Mansky, MD, Claire Wang, MD, and **Leonard J. Morse**, MD .....
    **Leonard Morse**, MD, is currently the commissioner of public health in ...
    www.ama-assn.org/ama/pub/category/10970.html [Found on Google, Ask.com]

6.  **They're All Scams**
    These websites are absolute scams I will show you the ones that work
    Sponsored by: AbsoluteWealthPackage.com/ [Found on Ads by Google]

7.  **LEONARD MORSE'S INFO**
    Detailed accurate background data from $9.95. Locate People instantly.
    Sponsored by: www.veromi.com [Found on Ads by Ask.com]

8.  **Holland & Hart Health Care Law Blog: AMA adopts guidelines for ...**
    ... said **Leonard Morse**, MD, Chair, Council on Ethical and Judicial Affairs. ... Stark law,
    Anti-kickback Statute, CMP and ?fraud and abuse? defense, ...
    hollandhart.typepad.com/healthcare/2003/07/ama_ado... [Found on Google, Yahoo!
    Search]

9.  **Fraud**
    Save up to 50% on Fraud. Search over 15,000 sites with one click. Your source for everything
    under the sun!.
    Sponsored by: www.FindStuff.com [Found on Ads by Ask.com, LookSmart]

10. **THE OUTLOOK**
    **Leonard Morse** Hospitals. For more information about the film, visit. www.oneineight.net.
    .... documented evidence of voting fraud, and that it ...

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 52 of 71 PageID #: 54

lwvnatick.org/Fall_2005_newsletter.pdf [Found on Google, Yahoo! Search]

11.   JAMA -- Abstract: Legal Issues in Scientific Research, January 2 ...
      ... responsible for combating **fraud** and abuse have focused greater attention ... Karine
      Morin, Herbert Rakatansky, Frank A. Riddick, Jr, **Leonard J. Morse**, ...
      jama.ama-assn.org/cgi/content/abstract/287/1/85 [Found on Google, Windows Live]

12.   RoadDave Blog Version
      RoadDave Blog Version
      road-dave.spaces.live.com/ [Found on Ask.com]

13.   Natick Police Department Public Log Page: 1
      A1 transporting one BLS to **Leonard Morse** Hospital Natick. Refer To Fire Case: 07-158-IN ...
      Caller reports possible attempted **fraud** via text message. ...
      www.natickpolice.org/Public_Log/2007/JAN/Natick_Po... [Found on Google]

14.   Natick Police Department Public Log Page: 1
      07-4023 1200 Phone - LARCENY / FORGERY/ FRAUD. Report to be filed. Call Taker: 41598 -
      ROURKE, ..... A1 transporting one to **Leonard Morse** Hospital Natick. ...
      www.natickpolice.org/Public_Log/2007/MAR/Natick_Po... [Found on Google]

15.   Norman Solomon: The Ghost of Wayne Morse
      ... as she zigzags from Nixon campaigner and vote-fraud ... **Leonard** Peltier vs. Scooter
      Libby: the Hero and the Henchman ... The Ghost of Wayne **Morse**. By NORMAN SOLOMON
      www.counterpunch.org/solomon07192007.html [Found on Windows Live]

16.   AMA (Virtual Mentor) Clinical Case 1
      ... or competence, or engaging in **fraud** or deception, to appropriate entities" [2] ...
      **Leonard Morse**, MD, is currently the commissioner of public health in Worcester, ...
      www.ama-assn.org/ama/pub/category/print/10970.html [Found on Yahoo! Search]

17.   IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT Docket No.
      04-2550
      **Leonard Morse**, Comments from Physicians, in Massachusetts Medical Society, in ...
      markets, to combat waste, fraud, and abuse in health insurance and health ...
      www.pipatl.org/data/library/cvt-amicus.pdf [Found on Yahoo! Search]

18.   Natick Police Department Public Log Page: 1
      Sherborn A1 transporting one BLS to **Leonard Morse** Hospital. Natick. ..... 06-9703 1255
      Walk-In - LARCENY / FORGERY/ FRAUD Report to be filed ...
      www.natickpolice.com/Public_Log/2006/JUN/Natick_Po... [Found on Google]

19.   Morse | www.drivereducation4.info
      Top Sites About "Morse" Last updated : ... â?¢ Fairbanks â?¢ **Morse** 10. "Hack" star **Morse** is
      happy to cop a supporting ...
      www.drivereducation4.info/Morse.htm [Found on Ask.com]

20.   George Beres: Censorship in the Land of Wayne **Morse**
      My First Encounter with **Leonard** Peltier. Greg Moses ... The Great WMD Fraud: Time for an
      Accounting. Jorge Mariscal ... Censorship in the Land of Wayne **Morse** Banning Ward ...
      www.counterpunch.org/beres02192005.html [Found on Windows Live]

1 | 2 | 3 | 4 | 5   Next >



Web | Images | Audio | Video New! | News | Yellow Pages | White Pages

LEONARD MORSE +FRAUD                    [ Search ]  Preferenc

Now Searching: Learn More

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 53 of 71 PageID #: 55



About   |   About Dogpile   |   Tools & Tips   |   Download Toolbar   |   Add Dogpile Search to Your Site   |   Privacy Policy
|   Terms of Use   |   Contact Us

© 2007 InfoSpace, Inc. All Rights Reserved.

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 54 of 71 PageID #: 56



Web | Images | Audio | Video | News | Yellow Pages | Wt Pages

LEONARD MORSE +FRAUD                                          SE

☐ Exact Phrase | Advanced | Preferences

## Web Search Results for "LEONARD MORSE +FRAUD"          Search Filter: Moderate

View Results From:   [All Search Engines] [Google] [YAHOO! SEARCH] [msn Search] [41]    More Engines | View Demo

All Search Engines  1 - 20 of 81  (About Results)         1 | 2 | 3 | 4 | 5    Next >

Are you looking for?

No Suggestions Found.

1. **BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT**
   ... County Supreme Court alleges that **Leonard Morse** fraudulently billed Medicaid for new dentures ... of the Attorney General?s Medicaid **Fraud** Control Unit. ...
   www.oag.state.ny.us/press/2006/apr/apr11a_06.html [Found on Google, Windows Live, Yahoo! Search]

2. **Natick Police Department Public Log Page: 1**
   A1 transporting one BLS to **Leonard Morse** Hospital Natick. Refer To Fire Case: 07-158-IN ... Caller reports possible attempted **fraud** via text message. ...
   www.natickpolice.org/Public_Log/2007/JAN/Natick_Po... [Found on Google]

3. **Natick Police Department Public Log Page: 1**
   07-4023 1200 Phone - LARCENY / FORGERY/ FRAUD. Report to be filed. Call Taker: 41598 - ROURKE, ..... A1 transporting one to **Leonard Morse** Hospital Natick. ...
   www.natickpolice.org/Public_Log/2007/MAR/Natick_Po... [Found on Google]

4. **Natick Police Department Public Log Page: 1**
   Sherborn A1 transporting one BLS to **Leonard Morse** Hospital. Natick. ..... 06-9703 1255 Walk-In - LARCENY / FORGERY/ **FRAUD** Report to be filed ...
   www.natickpolice.com/Public_Log/2006/JUN/Natick_Po... [Found on Google]

5. **AMA (Virtual Mentor) Clinical Case 1**
   ... or competence, or engaging in **fraud** or deception, to appropriate entities" [2] ... **Leonard** Morse, MD, is currently the commissioner of public health in Worcester, ...
   www.ama-assn.org/ama/pub/category/print/10970.html [Found on Yahoo! Search]

6. **THE OUTLOOK**
   **Leonard Morse** Hospitals. For more information about the film, visit. www.oneineight.net. .... documented evidence of voting fraud, and that it ...
   lwvnatick.org/Fall_2005_newsletter.pdf [Found on Google, Yahoo! Search]

7. **Hemming Morse, Inc.: Information and Much More from**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 55 of 71 PageID #: 57

Answers.com
Its forensic accounting and **fraud** investigation team has expertise in
uncovering ... Be the first to tackle these... What was **Leonard** F
**Morse** college Major? ...
www.answers.com/topic/hemming-morse-inc [Found on Google,
Windows Live]

8. AMA (Virtual Mentor) Clinical Case 1
Commentaries by Peter Mansky, MD, Claire Wang, MD, and **Leonard**
J. Morse, MD ..... **Leonard** Morse, MD, is currently the commissioner
of public health in ...
www.ama-assn.org/ama/pub/category/10970.html [Found on Google,
Ask.com]

9. IN THE UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT Docket No. 04-2550
**Leonard** Morse, Comments from Physicians, in Massachusetts
Medical Society, in ... markets, to combat waste, fraud, and abuse in
health insurance and health ...
www.pipatl.org/data/library/cvt-amicus.pdf [Found on Yahoo! Search]

10. Holland & Hart Health Care Law Blog: AMA adopts
guidelines for ...
... said **Leonard** Morse, MD, Chair, Council on Ethical and Judicial
Affairs. ... Stark law, Anti-kickback Statute, CMP and ?fraud and
abuse? defense, ...
hollandhart.typepad.com/healthcare/2003/07/ama_ado... [Found on
Google, Yahoo! Search]

11. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
RHODE ISLAND JOHN OLIVEIRA : Plai...
... Dismissal or [for] ma[king] fraud[ulent] statement. in Federal
Court. ... See MacKnight v. **Leonard** Morse Hospital, 828 F.2d 48,
52 (1. st. Cir. ...
www.rid.uscourts.gov/opinions/magistrate_judges/01... [Found on
Yahoo! Search]

12. VM -- An Impaired Physician's Physician, September
2003 ...
Commentary by Peter Mansky, MD, Claire Wang, MD, and **Leonard**
Morse, MD ..... or engaging in **fraud** or deception, to appropriate
entities" [2]. ...
virtualmentor.ama-assn.org/2003/09/ccas1-0309.html [Found on
Google]

13. Murtha Cullina LLP - Attorneys At Law
... Vermont, Dartmouth College, the **Leonard** Morse Hospital in
Natick, Salem Hospital, ... been appointed as counsel to investigate
matters of bankruptcy fraud. ...
www.murthalaw.com/Attorneys/AttorneyView.asp?Attor... [Found on
Yahoo! Search]

14. RoadDave Blog Version
RoadDave Blog Version
road-dave.spaces.live.com/ [Found on Ask.com]

15. **LEONARD** MORSE'S INFO
Detailed accurate background data from $9.95. Locate People
instantly.

**JA107**

Case 1:07-cv-04793-CBA-RML    Document 1-3    Filed 11/16/07    Page 56 of 71 PageID #: 58

Sponsored by: www.veromi.com [Found on Ads by Ask.com]

16. **Fraud**
Save up to 50% on Fraud. Search over 15,000 sites with one click.
Your source for everything under the sun!.
Sponsored by: www.FindStuff.com [Found on Ads by Ask.com, LookSmart]

17. Norman Solomon: The Ghost of Wayne **Morse**
... as she zigzags from Nixon campaigner and vote-fraud ... **Leonard**
Peltier vs. Scooter Libby: the Hero and the Henchman ... The Ghost
of Wayne Morse. By NORMAN SOLOMON
www.counterpunch.org/solomon07192007.html [Found on Windows
Live]

18. UNITED STATES DISTRICT COURT DISTRICT OF
MASSACHUSETTS
... requires evidence of fraud, deceitful action or dishonest ... 2003),
citing MacKnight v. **Leonard Morse** Hosp., 828 F.2d 48, 51 (1st
Cir.1987). " Animosity ...
pacer.mad.uscourts.gov/dc/cgi-bin/recentops.pl?fil... [Found on Yahoo!
Search]

19. Frauds
Find Links, Tips and Discounts at CouponMountain
Sponsored by: www.couponmountain.com/ [Found on LookSmart]

20. **Morse** | www.drivereducation4.info
Top Sites About "Morse" Last updated : ... ? Fairbanks ? **Morse** 10.
"Hack" star **Morse** is happy to cop a supporting ...
www.drivereducation4.info/Morse.htm [Found on Ask.com]

**1** | 2 | 3 | 4 | 5 Next >

**Web** | Images | Audio | Video | News | Yellow Pages | White Pages

LEONARD MORSE +FRAUD

SEARCH

☐ Exact Phrase | **Advanced** | **Preferences**

Tell a Friend | About MetaCrawler | Tools & Tips | Privacy Policy | Terms of Use | Contact Us
Add Metacrawler Search to Your Site

infospace. About | Mobile | Search & Directory | Careers | Press | Investor Relations

InfoSpace Network: Dogpile | WebCrawler | MetaCrawler | InfoSpace | Moviso
InfoSpace Resources: Search Engines | Yellow Pages | White Pages | Town Directories | Business Categories | Maps | Ringtones

© 2007 InfoSpace, Inc. All Rights Reserved

**Exhibit L**



**STATE OF NEW YORK**
**OFFICE OF THE MEDICAID INSPECTOR GENERAL**
Riverview Center, 150 Broadway
Albany, New York 12204

GEORGE E. PATAKI
GOVERNOR

KIMBERLY A. O'CONNOR
MEDICAID INSPECTOR GENERAL

LEONARD MORSE
580 FIFTH AVE
BROOKLYN, NY 11215

NOTICE OF IMMEDIATE AGENCY ACTION
PROVIDER ID # 00294977

Dear Provider:

THE NEW YORK STATE OFFICE OF THE MEDICAID INSPECTOR GENERAL (OMIG) IS
EXCLUDING YOU FROM PARTICIPATION IN THE MEDICAID PROGRAM.

1. The Office of the Medicaid Inspector General has made this determination because you were
   charged with a crime relating to the furnishing or billing for medical care, services or supplies.

2. This action is being taken based on the New York State Department of Health's (DOH) regulations
   authorizing sanctions of a provider who is charged with a crime [18 NYCRR 515.7(b)].

3. Your exclusion from the Medicaid Program is effective five (5) days from the date of this notice.

4. Within thirty (30) days from the date of this notice, you may submit written arguments or
   documentation on the following issues only:

   (a) whether the determination is based upon a mistake of fact;
   (b) whether the indictment resulted from furnishing or billing for medical care, services or
       supplies;
   (c) whether the sanction imposed is appropriate.

5. Submit your written arguments or documentation to:

   Ms. Janine Y. Daniels Rivera
   NYS Department of Health
   Division of Legal Affairs
   Bureau of Administrative Hearings
   Corning Tower, Room 2438
   Empire State Plaza
   Albany, NY 12237

**JA110**

6. After we review your submission, we shall advise you if we will change our action in any way.

7. You will receive separate notice of any additional actions which we determine to take, including recovery of overpayments.

8. You may request reinstatement into the Medicaid Program upon a favorable disposition of the indictment. The procedures for seeking reinstatement are described in the New York State Department of Health's (DOH) regulations [18 NYCRR 515.10].

Sincerely,

Robert Tengeler, Director
Bureau of Investigations & Enforcement

Dated: 5/19/06

**Exhibit M**

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF KINGS - CRIMINAL TERM - PART 10
 2    ------------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,
 3
                       -against-
 4
      LEONARD MORSE,
 5                                        Defendant.
      ------------------------------------------------X
 6    Indictment # 1547/06                 TRIAL

 7

 8                                  320 Jay Street
                                    Brooklyn, New York  11201
 9                                  July 16, 2007

10    B E F O R E:

11                    HONORABLE JOHN P. WALSH,
                              Justice.
12
      A P P E A R A N C E S:
13
                      OFFICE OF THE ATTORNEY GENERAL
14                         BY:  JOHN FAUSTO, ESQ.
                           Assistant Attorney General
15                         For the People

16
                      N. RICHARD WOOL, ESQ.
17                         475 South Oyster Bay Road
                           Plainview, New York 11803
18                         For the Defendant

19

20

21                           _____

22

23

24
                              Marc Shiffman
25                            Senior Court Reporter
```

**JA113**

Direct-Ahiri/Fausto                                      3 u

```
 1  else?

 2      A    No.

 3      Q    You need to answer for the record?

 4      A    No.

 5      Q    Have you ever gone to a location here in

 6  Brooklyn known as 580 Dental?

 7      A    Yes.

 8      Q    Do you know where that's located?

 9      A    That's on Prospect and Fifth Avenue.

10      Q    Did you actually go there for dental

11  treatment?

12      A    I haven't been there in a long time.

13      Q    Do you recall about when you went?

14      A    About three, four years ago.

15      Q    You don't recall the exact dates?

16      A    No.

17      Q    Do you recall when you went there what work

18  you had done?

19      A    Cavities and dental work but he wasn't my

20  doctor.

21      Q    Do you recall who treated you there?

22      A    No.

23      Q    When say you said "he," you pointed at

24  someone?

25      A    The one with the black suit, blue tie.
```

MS

**JA114**

1              MR. FAUSTO:  Indicating Dr. Morse.

2      A   I said he was never my doctor.  He never even

3   looked in my mouth.  The other doctor that works with

4   him, which is the next room was my doctor.

5      Q   Let me ask you this question.  Do you wear

6   dentures?

7      A   What?

8      Q   Did you wear dentures?

9      A   No.

10     Q   Do you know what a denture is?

11     A   No.

12     Q   False teeth?

13     A   No.

14     Q   You do not wear any dentures at all?

15     A   No.

16     Q   Did you ever go to 580 Dental, whether it was

17  Dr. Morse or the other dentist, did they ever give

18  you -- or go there for any denture work?

19     A    No.

20             MR. FAUSTO:  I have no further

21     questions.

22  CROSS-EXAMINATION

23  BY MR. WOOL:

24     Q   Do you know where your Medicaid card is

25  today?

MS

**JA115**

Cross-Ahiri/Wool                                      38

```
 1        A    Where is it?

 2        Q    Yes.

 3        A    I can come back tomorrow with it if you want.

 4        Q    Does it have your picture on it?

 5        A    What is it?

 6        Q    Does it have your picture on it?

 7        A    Not no more.

 8        Q    It doesn't have a picture on it?

 9        A    It used to have a picture on it.  I have my

10   old one with a picture on it.

11        Q    Who treated you at 580 Dental?  What was the

12   name of the doctor?

13        A    I think it was Dr. Kay, the one with the

14   curly hair, not him.

15        Q    Have you ever seen this gentleman before?

16        A    He works right next -- they work together in

17   different rooms.

18        Q    At any time did he ever work on your mouth?

19        A    He never even looked in my mouth.

20        Q    So he wouldn't know whether -- what work you

21   had; is that correct?

22        A    No.

23             MR. WOOL:  Judge, can I have a moment.

24        Q    Do you recall going to that office on 28

25   separate visits?
```

MS

**JA116**

1           MR. FAUSTO:  All right.

2           THE COURT:  I don't believe him.  That's

3    the bottom line.  That's what it comes down to.

4           MR. FAUSTO:  That's entirely within your

5    prerogative.

6           THE COURT:  I understand.

7           MR. FAUSTO:  Look, I have to say at the

8    outset --

9           THE COURT:  It is what it is.  This is

10   certainly no criticism on you.

11          MR. FAUSTO:  I don't take it as such.

12          THE COURT:  It is what it is.  This is

13   apparently the way these places operate.  That's

14   what it is.  That's what you're stuck with.

15          You need him for anything else?

16          MR. FAUSTO:  No.

17          THE COURT:  Do you need him?

18          MR. WOOLY:  No.

19          THE COURT:  Okay.  So he is finished.

20          You have anyone else?

21          MR. FAUSTO:  Today, no.

22          At this point --

23          THE COURT:  You want to go off the

24   record?

25          MR. WOOL:  Can we approach, Judge.

                        MS

**JA117**

Proceedings

```
 1                    The People rest.

 2                    THE COURT:  The People rest.

 3                    MR. WOOLF:  Judge, at this time the defendant

 4         would move for an order of this Court dismissing the

 5         case for failure to have a prima facie case.

 6                    THE COURT:  That's denied.

 7                    MR. WOOLF:  Thank you.

 8                    THE COURT:  Is there going to be a defense

 9         case?

10                    MR. WOOLF:  Judge, at this time the defendant

11         rests.

12                    THE COURT:  Okay.  And do you want to make a

13         closing argument?

14                    MR. FAUSTO:  Just very briefly.  I'm probably

15         required by law.

16                    THE COURT:  Do you want to make one?

17                    MR. WOOLF:  I'll see, Judge.

18                    THE COURT:  Okay.

19                    MR. FAUSTO:  Obviously this indictment needs

20         to be adjusted for purposes of your consideration.  I

21         mean, I'll start off just by saying the indictment

22         charges for count one grand larceny in the first

23         degree.  We obviously have not approached the statutory

24         element of that of a million dollars, so at this point

25         through the auditor's testimony combined with the
```

tjs

**JA118**

1  patients I believe that the best -- that the Court can

2  consider at this point grand larceny in the third

3  degree, in excess of $3,000.

4          In addition, this was a twelve-count

5  indictment and based on the patients that were

6  presented here, I believe that I can only address count

7  two, count four and count five, and the remainder will

8  obviously have to be dismissed.

9          The reason I say that is because those counts

10  relate specifically to the false filing counts for the

11  three patients that were presented to you, and with

12  that I'll begin.  The reason I brought that up is it

13  will make organizing my summation much clearer.

14          At this point three patients have testified,

15  Miriam Perez, Intisar Ahiri and Sawsan Suliman.  Each

16  one of these patients said something slightly

17  different, however they clearly made reference to the

18  fact that based on the fact that they either did not

19  have dentures or did not have denture repair work on

20  these visits all of them had gone to this dental

21  office.  Dr. Morse had billed for services that he had

22  not performed.

23          Now, I know counsel will make reference to

24  the fact that certainly one of the patients said that

25  Dr. Morse hadn't performed the services, that it was

tjs

**JA119**

**Exhibit N**

Case 1:07-cv-04793-CBA-RML   Document 1-3   Filed 11/16/07   Page 69 of 71 PageID #: 71

6. A dentist licensed in another state or country who is employed on a full-time basis by a registered dental school as a faculty member with the rank of assistant professor or higher from conducting research and clinical demonstrations as a part of such employment, under the supervision of a licensed dentist and on the premises of the school. No fee may be charged for the practice of dentistry authorized by this subdivision.

7. A dentist licensed in another state or country who is visiting an approved dental school to receive dental instruction for a period not to exceed ninety days from engaging in clinical practice, provided such practice is limited to such instruction and is under the direct supervision of a licensed dentist.

8. Any student matriculated in an accredited dental school located outside New York state from engaging in appropriately supervised clinical practice as part of the school's dental program in a teaching hospital which has a teaching affiliation agreement with the student's dental school.

---

## § 6611. Special provisions.

1. Except upon the written dental laboratory prescription of a licensed dentist and except by the use of impressions or casts made by a licensed dentist, no dental laboratory shall furnish, supply, construct, reproduce, place, adjust, or repair any dental prosthesis, device, or appliance. A dental laboratory prescription shall be made out in duplicate. It shall contain such data as may be prescribed by the commissioner's regulations. One copy shall be retained by the practitioner of dentistry for a period of one year. The other copy shall be issued to the person, firm or corporation engaged in filling dental laboratory prescriptions, who or which shall each retain and file in their respective offices or places of business their respective copies for a period of one year.

2. The department is empowered to inspect and to have access to all places, including the office or offices of a licensed dentist, where copies of dental laboratory prescriptions issued by him are retained as required by this section, and to all places where dental laboratory prescriptions are filled or to any workroom or workrooms in which prosthetic restorations, prosthetic dentures, bridges, orthodontic or other appliances or structures to be used as substitutes for natural teeth or tissue or for the correction of malocclusion or deformities are made, repaired or altered, with power to subpoena and examine records of dental laboratory prescriptions. A person who fails to grant access to such places or who fails to maintain prescriptions as required by this section shall be guilty of a class A misdemeanor.

3. The department may arrange for the conduct of clinical examinations in the clinic of any school of dentistry or dental hygiene within or outside the state for dental or dental hygiene candidates.

4. A not-for-profit dental or medical expense indemnity corporation or hospital service corporation organized under the insurance law or pursuant to special legislation may enter into contracts with dentists or partnerships of dentists to provide dental care on its behalf for persons insured under its contracts or policies.

5. Legally incorporated dental corporations existing and in operation prior to January first, nineteen hundred sixteen, may continue to operate through licensed dentists while conforming to the provisions of this title. Any such corporation which shall be dissolved or cease to exist or operate for any reason whatsoever shall not be permitted to resume operations. No such corporation shall change its name or sell its franchise or transfer its corporate rights directly or indirectly, by transfer of capital stock control or otherwise, to any person or to another corporation without permission from the department, and any corporation so changing its name or so transferring its franchise or corporate rights without such permission shall be deemed to have forfeited its rights to exist and may be dissolved by an action brought by the attorney general.

6. Notwithstanding any inconsistent provision of any general, special or local law, any licensed dentist who voluntarily and without the expectation of monetary compensation renders first aid or emergency treatment at the scene of an accident or other emergency, outside of a hospital or any other place having proper and necessary medical equipment, to a person who is unconscious, ill or injured shall not be liable for damages for injuries alleged to have been sustained by such person or for damages for the death of such person alleged to have occurred by reason of an act or omission in the rendering of such first aid or emergency treatment unless it is established that such injuries were or such death was caused by gross negligence on the part of such dentist. Nothing in this subdivision shall be deemed or construed to relieve a licensed dentist from liability for damages for injuries or death caused by an act or omission on the part of a dentist while rendering professional services in

**Exhibit O**

| | | | | | | |
|---|---|---|---|---|---|---|
| ZT85096Z | RODRIGUEZ | STACY | $87.00 | 6/4/2002 | 05650 Tooth | ADD TOOTH TO EXISTING PARTIAL DENTURE |
| ZT85096Z | RODRIGUEZ | STACY | $87.00 | 6/4/2002 | 05650 Tooth | ADD TOOTH TO EXISTING PARTIAL DENTURE |
| ZT85096Z | RODRIGUEZ | STACY | -$87.00 | 6/4/2002 | 05650 Tooth | ADD TOOTH TO EXISTING PARTIAL DENTURE |
| ZT85096Z | RODRIGUEZ | STACY | $174.00 | 6/4/2002 | 05630 Clsp | REPAIR OR REPLACE BROKEN CLASP |
| ZT85096Z | RODRIGUEZ | STACY | $174.00 | 6/4/2002 | 05630 Clsp | REPAIR OR REPLACE BROKEN CLASP |
| ZT85096Z | RODRIGUEZ | STACY | -$174.00 | 6/4/2002 | 05630 Clsp | REPAIR OR REPLACE BROKEN CLASP |
| ZT85096Z | RODRIGUEZ | STACY | $174.00 | 6/4/2002 | 05760 Reline | RELINE UPPER PART DENTURE LAB |
| ZT85096Z | RODRIGUEZ | STACY | $174.00 | 6/4/2002 | 05760 Reline | RELINE UPPER PART DENTURE LAB |
| ZT85096Z | RODRIGUEZ | STACY | -$174.00 | 6/4/2002 | 05760 Clmp | RELINE UPPER PART DENTURE LAB |
| ZT85096Z Total | | | $435.00 | | | |

**JA123**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
DR. LEONARD MORSE,

                                                        **AMENDED COMPLAINT**

                         Plaintiff,                    **07 CV 4793 (CBA) (RML)**

        -against-                               **JURY TRIAL DEMANDED**

                                                        **ECF CASE**

ELIOT SPITZER, Individually, Special Assistant Attorney
General JOHN FUSTO, Individually, Senior Special
Investigator,  JOSE CASTILLO, Individually, and Senior
Special Auditor Investigator ROBERT H. FLYNN, Individually,

                    Defendants.
-------------------------------------------------------------------------X

       Plaintiff, DR. LEONARD MORSE, by his attorney, Jon L. Norinsberg, complaining of

the defendants, respectfully alleges as follows:

### PRELIMINARY STATEMENT

       1.      Plaintiff brings this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as said rights are secured by said statutes and the Constitutions of the State of New York

and the United States.

### JURISDICTION

       2.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the

First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

       3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

### VENUE

       4.      Venue is properly laid in the Eastern District of New York under 28 U.S.C.

§ 1391(b), in that this is the District in which the claim arose.

**JA124**

## JURY DEMAND

5.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.     At all times hereinafter mentioned, plaintiff DR. LEONARD MORSE was a dentist duly licensed to practice dentistry in the State of New York, and was the sole proprietor of 580 Dental P.C., a company located at 580 Fifth Avenue, in the County of Kings, in the City and State of New York.

7.     At all times hereinafter mentioned, defendant ELIOT SPITZER ("SPITZER") was the Attorney General of the State of New York, and was directly responsible for the policies, practices, procedures and guidelines of the New York State Attorney General's Office, including but not limited to, its Medicaid Fraud Control Unit and its Press Release Division.

8.     At all times hereinafter mentioned, defendant JOHN FUSTO ("FUSTO") was a Special Assistant Attorney General working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office, located at 120 Broadway, in the County, City and State of New York.

9.     At all times hereinafter mentioned, defendant JOSE CASTILLO ("CASTILLO") was a Senior Special Auditor Investigator working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office, located at 120 Broadway, in the County, City and State of New York.

10.     At all times hereinafter mentioned, defendant ROBERT H. FLYNN ("FLYNN") was a Senior Special Investigator working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office located at 120 Broadway, in the County, City and State of New York.

11.     At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or the New York State Attorney General's Office.

## FACTS

12.     Plaintiff, DR. LEONARD MORSE, was and is a dentist duly licensed to practice dentistry in the State of New York

13.     For thirty years, DR. LEONARD MORSE and his staff delivered high-quality dental care to patients in the Park Slope community from his office located at 580 Fifth Avenue, in the county of Kings, in the City and State of New York.

14.     For thirty years years, plaintiff DR. LEONARD MORSE was a lawfully authorized Medicaid provider, assigned New York State Medicaid Provider Identification Number 00294977.

15.     During this time, Dr. Morse treated over 30,000 dental patients through the medicaid program. All of Dr. Morse's patients came from referrals, and he never advertised or solicited for business.

16.     Dr. Morse's office handled approximately 6,000 dental patient visits annually, including adults and children, and he often treated several generations of the same family.

17.     Despite his large volume of patients, Dr. Morse had an impeccable and exemplary track record as a dentist.

18.     None of Dr. Morse's patients had ever filed a complaint against him.

19.     None of Dr. Morse's patients had ever filed a dental malpractice claim against him.

20.     Apart from his dental practice, Dr. Morse also served as the Assistant Director of the Dental Medicine Residency Program at New York Methodist Hospital in Park Slope, where he was

responsible for the teaching, training and supervision of dental residents affiliated with said hospital.

21.     Dr. Morse was also the Section Chief of the Restorative Dentistry Program at Methodist Hospital, and was inducted into the International College of Dentistry in 2006.

22.     Over a thirty year period,  Dr. Morse was subjected to four  comprehensive  audits by the New York State Department of Health.

23.     None of the audits of Dr. Morse's dental practice  ever revealed any evidence of any impropriety or wrongdoing by Dr. Morse.

24.     In all of his years in practice, Dr. Morse had  never before been accused of any crime or misdemeanor.

**The Origins of Dr. Morse's Prosecution: A New York Times Investigation  Reveals Defendant Spitzer's Failure To Address Medicaid Abuse.**

25.     The  origins  of  the  prosecution  against  Dr. Morse  may  be  traced  back  to  an investigation conducted by the New York Times, which was as reported on  July 19, 2005  in an article  entitled "As Medicaid Balloons, Watchdog Force Shrinks ." See Exhibit A, annexed hereto.

26.     In this article, the New York Times noted that "New York's Medicaid program pays more than a million claims a day, feeding a $44.5 billion river of checks ... Yet the state, charged with protecting those dollars, has done little to stop them from draining away." Id.

27.     After documenting the decline in New York State's efforts to fight medicaid fraud, the article made it clear where the fault lies:  "The responsibility for prosecuting Medicaid fraud lies with the state Attorney General, Eliot Spitzer, who runs the Medicaid Fraud Control Unit", and "*Mr. Sptizer's zeal in fighting corporate abuses has not been matched by his efforts in fighting medicaid fraud*." Id. (emphasis supplied).

**Spitzer's Failure To Address Medicaid Fraud Becomes A Campaign Issue**.

28.      As a result of the New York Times investigation, the issue of medicaid fraud – and more particularly, defendant's Spitzer's handling of this issue – began to receive significant coverage in the New York press.

29.      For example, on March 30, 2006, an article appeared in the New York Sun entitled "Spitzer's Medicaid Boast." See Exhibit B.

30.      This article began by noting that "Eliot Spitzer has discovered the importance of cracking down on Medicaid fraud", and concluded by noting that "both candidates are fighting about who is or isn't doing the best job pursuing fraud cases." Id.

31.      Similarly, on April 3, 2006, an article appeared in the New York Post entitled "Spitzer on the Hunt for State's Top Health-care 'Criminals'." See Exhibit C.

32.      This article noted that "Attorney General Eliot Spitzer has launched a massive manhunt to find nine of New York's health-care monsters – fugitives who are accused of ripping off millions from taxpayers in bogus Medicaid billing scams ...." Id.

33.      Then, on April 11, 2006, an article appeared in the New York Times entitled "POLICING MEDICAID FRAUD BECOMES CAMPAIGN ISSUE." See Exhibit D.

34.      This article confirmed that Spitzer's handling of medicaid fraud as Attorney General had become an important campaign issue in the 2006 gubernatorial campaign:

> Trailing Attorney General Elliot Spitzer by 50 percentage points or more in polls for the Democratic nomination for governor, Thomas R. Suozzi has seized on medicaid fraud as an attention-getting issue, repeatedly telling audiences that *Mr. Spitzer has not done much to fight abuse of the program*.

Id. (emphasis supplied)

35.      Several other articles appeared in local New York newspapers which similarly

highlighted the issue of medicaid fraud, and made it clear that Spitzer was becoming increasingly

aware of the importance of this issue in the upcoming campaign.

**A Dormant 4-Year-Old Investigation Is Suddenly Revived By Defendant Spitzer**.

36.     As a result of the growing press coverage on medicaid fraud – and its potential

impact on Spitzer's chances of winning the Democratic nomination for Governor – defendant Spitzer

felt compelled to find a high-profile medicaid fraud case which would prove that he was, in fact,

cracking down on medicaid fraud.

37.     The case chosen was that of DR. LEONARD MORSE, whose files had originally

been subpoenaed by the Medicaid Fraud Control Unit four years earlier, on October 18, 2002.

38.     Dr. Morse was chosen as a target by defendants because he was one of the state's

highest medicaid billers, due to the fact that – unlike most private dentists – he readily welcomed

medicaid recipients, and in fact, 95% of his practice consisted of medicaid recipients.

39.     At the time of the audit in 2002, Dr. Morse – who had previously been subject to four

comprehensive audits by the New York State Department of Health, and who had never been

charged with any fraud or wrongdoing – readily agreed to provide all records subpoenaed by the

Medicaid Fraud Control Unit.

40.     The Medicaid Fraud Control Unit reviewed all of the records submitted by Dr.

Morse and once again – as with the previous four audits – found no evidence of any fraud or

wrongdoing.

41.     In the next four years, from 2002 to 2006, the Medicaid Fraud Control Unit took no

legal action against Dr. Morse.

42.     In the Spring of 2006, however, just as defendant Spitzer's failure to crack down on

medicaid fraud became a campaign issue, the long-dormant investigation into Dr. Morse was

**JA129**

suddenly revived.

**Dr. Morse Is Charged With A Million Dollar Medicaid Theft**.

43.     Notwithstanding Dr. Morse's long and exemplary career as a dentist, on April 5, 2006, defendants suddenly – and without any warning – charged him with committing a million dollar medicaid theft.

44.     Specifically, defendants charged Dr. Morse with one count of Grand Larceny in the First Degree, a class "B" felony, carrying a maximum of 25 years, and 11 counts of Offering a False Instrument for Filing in the First Degree, a Class "E" felony.

45.     As discussed in more detail below, these charges were completely false, and were brought for the sole purpose of helping defendant Spitzer win the Democratic nomination for Governor of New York State.

**Dr. Morse Is Forced To Immediately Surrender.**

46.     After learning of these charges, Dr. Morse, who had just recently underwent surgery – and was still recovering – requested a brief period of time for him to convalesce prior to surrendering.

47.     Defendants refused to accommodate this request. Instead, defendant Serra threatened to forcibly remove Dr. Morse from his home at " 2:00 in the morning", and to "drag him to jail," if he did not voluntarily surrender to police.

48.     Dr. Morse agreed to surrender to police at the 72nd Precinct in the County of Kings, in the City and State of New York.

49.     On April 5th, 2006, defendants Serra and Flynn formally took Dr. Morse into custody and placed him under arrest.

50.     As a result of his unlawful arrest, Dr. Morse remained in jail for several hours prior

to being released on his own recognizance.

**Defendant Spitzer Issues A Press-Release Boasting About The Indictment of Dr. Morse.**

51.     The arrest of Dr. Morse initially went unnoticed by the press and by the public at large.

52.     There was no coverage of Dr. Morse's arrest by any media outlet, including newspapers, radio stations, television networks or the Internet

53.     All of this changed, however, on April 11, 2006, when defendant Spitzer issued a press release announcing Dr. Morse's indictment for a "million dollar medicaid theft." See Exhibit E.

54.     Spitzer's press-release boasted, in an all-capital letters headline, that: "BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT." Id.

55.     The press release went on to state that "Attorney General Spitzer announced today that a grand jury has charged a Brooklyn dentist with *stealing more than $1 million from the Medicaid program*." Id. (emphasis supplied).

56.     To ensure maximum publicity, Defendant Spitzer had this press release translated into several foreign languages, including Russian and Korean. A copy of the Russian and Korean press releases, respectively, are annexed hereto as Exhibit F and Exhibit G. As a result, the story was picked up and received widespread coverage on Russian and Korean websites. See, e.g., Exhibit H.

57.     Spitzer's motive for issuing the press release was entirely political, and had nothing to do with carrying out his official duties, responsibilities or functions as Attorney General of the State of New York.

58.     As documented above, Spitzer needed a high-profile medicaid case to counter the accusations of his political opponent, Thomas R. Suozzi – and thus increase his chances of winning

**JA131**

the Democratic nomination for Governor – and so he chose Dr. Morse's case as a means of convincing New York voters that he was "tough" on medicaid fraud.

**Spitzer's Press Release Causes An Avalanche of Bad Publicity For Dr. Morse.**

59.     As a result of Spitzer's multi-lingual press release, the story of Dr. Morse's arrest – which had not received any media coverage up to that point – became the subject of extensive coverage in the local press and media.

60.     For example, on April 12, 2006, the New York Post ran a story entitled "DENTIST PULLED $ 1M FRAUD."  See Exhibit I.

61.     In this article, the Post  –  which immediately recognized the connection between Suozzi's attacks on Spitzer, on the one hand, and the resulting indictment of Dr. Morse, on the other – reported as follows:

> With gubernatorial opponent Tom Suozzi nipping at his heels over Medicaid reform, state Attorney General Eliott Spitzer announced that he nabbed a Brooklyn dentist who allegedly stole more than $1 million from the program.  Spitzer, a Democrat considered the front-runner for governor, reported the indictment of Leonard Morse, charged with billing Medicaid for dentures that he never delivered and for procedures he never performed.

Id.

62.     Similar stories appeared in the New York Daily News, Newsday, and other local publications.  See, e.g., Exhibit J.

63.     The story of Dr. Morse's indictment also received vast coverage on the Internet, resulting in thousands of stories about Dr. Morse's "million dollar theft" across the world.  See, e.g., the internet results for stories relating to  "Dr. Leonard Morse", annexed hereto as Exhibit K.

64.     In fact, the story eventually received world-wide coverage, being translated into Chinese, Japanese, Italian, French, German, Arabic, Swedish and Portuguese.

**Dr. Morse Is Summarily Excluded From The Medicaid Program Without An Opportunity To Be Heard.**

65. Apart from the damaging publicity, Dr. Morse also suffered severe economic losses when he was summarily excluded from the Medicaid program. See "Notice of Immediate Agency Action", dated May 19, 2006, annexed hereto as Exhibit L.

66. This decision was made without affording Dr. Morse the most basic and fundamental due process rights – as guaranteed by the 5th and 14th Amendments to the Constitution – such as the opportunity to be heard, the right to confront adverse witnesses, the right to present witnesses and evidence on one's own behalf, etc.

68. The immediate effect of this decision was that it forced Dr. Morse to completely shut down his practice, since the vast majority of his patients were medicaid recipients, and he was no longer authorized to perform any dental services on such patients.

**Dr. Morse Is Forced To Wait Fifteen Months Before He Can Contest The Charges.**

69. After his arrest on April 5, 2006, Dr. Morse was required to make multiple court appearances to defend himself against the false charges which defendants had brought against him.

70. It was not until June 26, 2007 – or approximately 15 months after his indictment – that Dr. Morse's case finally went to trial.

71. The trial against Dr. Morse was presided over by the Honorable John P. Walsh, at 320 Jay Street, the County of Kings, in the City and State of New York.

**The Prosecution's Case Completely Falls Apart At Trial.**

72. At Dr. Morse's trial, the glaring deficiencies in the prosecution's case were fully exposed.

73. Despite having access to thousands of patient files from Dr. Morse – and having seized 329 of these files for a comprehensive audit – the prosecution called just three patients of Dr.

**JA133**

Morse.

74.     These patients were called to prove that Dr. Morse – while having provided *some*

dental services to these patients– had nonetheless billed medicaid for additional dental services

which he had not performed.

75.     In order to prove this point, the prosecution needed first to establish that these

medicaid recipients were, in fact, patients of Dr. Morse.

76.     At trial, however, none of these "patients" even recognized Dr. Morse, much less

testified that they had received any dental treatment from him.

77.     In fact, one of the alleged "patients" of Dr. Morse, Intisar Ahiri, specifically denied

that he had ever been treated by Dr. Morse:

> Q: Do you recall when you went there what work you had done?
> A: Cavities and dental work, but *he wasn't my doctor.*
> Q: Do you recall who treated you there?
> A: No.
> Q: When you said "he", you pointed at someone?
> A: The one with the black suit, blue tie. I said *he was never my doctor.  He never
> even looked in my mouth.*  The other doctor that works with him, which is the next
> room, was my doctor.

<u>See</u> Trial Transcript, annexed hereto as Exhibit M,  at 36 (emphasis supplied).

78.     Another alleged "patient" of Dr. Morse called by the prosecution, Miriam Perez,

similarly testified that she did not recognize Dr. Morse as the dentist who treated her:

> Q: And do you recall the dentist's name that treated you?
> A: No.
> Q: I'm going to ask you to look around this courtroom and ask you if       you
> recognize anyone?
> A: *Truthfully, I don't.*

<u>Id</u>.  at 88 (emphasis supplied).

79.     The third and final "patient" of Dr. Morse, Sawsan Suliman, also testified that she

could not positively identify Dr. Morse as the dentist who treated her:

> Q: Do you see that person in this courtroom today?
> A: Maybe he.
> Q: Well, if you're not sure.
> A: *I don't know.  I don't know.*

Id. at 95.

80.     Thus, none of the alleged "patients" called by the prosecution so much as *recognized*

Dr. Morse, much less testified that they had received dental treatment from him.

81.     The reason for this was that all of these patients had been treated by Dr. Ketover –

who had worked with Dr. Morse for 25 years, and whose dental work was lawfully billed under Dr.

Morse's medicaid provider number – and so these patients could not have given *any* testimony

regarding what dental work Dr. Morse had, or had not, performed on their behalf.

82.     Despite having four years to investigate Dr. Morse – and having  full access to all of

Dr. Morse's patient charts – the prosecution did not produce a single witness at trial who was

actually a *real* patient of Dr. Morse.

**The Prosecution's Manufactured "Billing Records**."

83.     Apart from the testimony provided by these  "patients", there were other glaring

deficiencies in the prosecution's case.

84.     For example, the prosecution had based a large portion of its case on certain alleged

"billing records"  belonging to defendant Design Dental Studio, Inc.

85.     These alleged  "billing records" –  which were intended to prove that Dr. Morse had

fraudulently billed Medicaid for dental services that he never performed –  were used by defendants

as the basis for establishing the "million dollar theft" charges  against Dr. Morse.

86.     At trial, however, it was revealed that these so-called  "billing records" were not the

actual business records of defendant Design Dental Studio, Inc., but instead, were records which had

been *manufactured* by defendants in order to prove their case against Dr. Morse.

87.     In fact, it was revealed that the *real* business records of Design Dental Studio, Inc.

**JA135**

had been *thrown out* by Design Dental Studio, Inc. once payment had been received from Dr. Morse.

88.    Rather than simply acknowledge this fact, the owner of Design Dental Studio, Inc,

Nisan Yushvayev,  gave multiple and contradictory accounts regarding the origin of these records.

89.  After listening to Mr. Yushvyav's conflicting testimony,  Judge Walsh stated his views

on the record about this witness' credibility:

> *"I don't believe him.  That's the bottom line.*
> That's what it comes down to."

Trial Transcript at 78 (emphasis supplied).

90.    Accordingly,  Judge Walsh  refused to allow into evidence any of the alleged "billing

records" of Design Dental Studio, which defendants had  manufactured for purposes of bringing a

case against Dr. Morse.

**The Prosecution Acknowledges Its Failures During Summation.**

91.    At the close of the prosecution's case, both sides were given an opportunity to give

a summation to the Court.

92.    Before starting, the prosecutor told the Judge that his summation  would be "very

brief[]", and that he was giving one only  because he was "probably required by law" to do so.  Trial

Transcript at 115.

93.    In his summation, Defendant Fusto immediately conceded that the prosecution had

failed to prove its  "million dollar theft" claim, as alleged in the indictment:

> Obviously, this indictment needs to be adjusted for purposes of your consideration.
> I mean, I'll start off just by saying the indictment charges for count one grand larceny
> in the first degree.  *We obviously have not approached the statutory element of that*
> *of a million dollars ....*

Id. (emphasis supplied).

94.    Defendant Fusto further conceded that the most the Court could find Dr. Morse guilty

of would be a theft of *$3,000.00* – or approximately $997,000.00 less than the amount alleged in the

indictment:

**JA136**

[A]t this point[,] through the auditor's testimony combined with the patients [,]I believe that the *best that the Court can consider at this point [is] grand larceny in the third degree, in excess of $3,000.00*."

Id. at 115-116  (emphasis supplied).

95.     Thus, the prosecution's case had gone from a  "million dollar medicaid theft" – as Spitzer had boasted in his multi-lingual press release on April 11, 2006 – to a $3,000.00 claim, *at best*.

96.   Defendant Fusto also conceded that nine of the twelve counts in the indictment would "obviously have to be dismissed", as the prosecution had not produced any of the patients relating to these counts. Id. at 116.

**Dr. Morse Is Acquitted of All Charges By Justice Walsh.**

97.     Notwithstanding the fact that the prosecution had lowered its charges to Grand Larceny in the Third Degree –  and that as a result, it needed only to prove that Dr. Morse had defrauded medicaid of $3,000.00 – Judge Walsh *still* found that the prosecution had not proved its case.

98.     Specifically, Judge Walsh found that the prosecution had failed to make out a *prima facie* case against Dr. Morse, and thus declared Dr. Morse not guilty of all charges.

99.     On August 2, 2007, all charges against plaintiff LEONARD MORSE were thus dismissed.

**The Irreparable Harm To Dr. Morse's Reputation And Career.**

100.    Notwithstanding his acquittal, Dr. Morse's reputation has been permanently and irreparably harmed by defendants' false accusations.

101.    There are literally thousands of postings on the Internet which still mention Dr. Morse's name in connection with medicaid fraud.  See, e.g., Exhibit K.

102.   There are no Internet postings which mention Dr. Morse's acquittal.

103.   Dr. Morse has been shunned by friends, neighbors and relatives in his own community

**JA137**

as a result of the false charges brought against him.

104.     Dr. Morse was terminated from his position as an Assistant Director of the Dental Medical Residency Program at Methodist Hospital as a result of the false charges brought against him.

105.     Most importantly, Doctor Morse's career as a dentist has been permanently and irreparably destroyed as a result of the false charges brought against him.

106.     Since his acquittal, Dr. Morse has tried repeatedly to find work as a dentist, but the notoriety of his case – and in particular, of being known as the dentist who committed a "million dollar medicaid theft" – has made it impossible for him to find work.

**The Nature Of This Action**.

107.     This action seeks redress against defendants for their unlawful and egregious conduct in: (1) falsely accusing Dr. Morse of committing medicaid fraud, when they knew that these allegations were completely untrue; (2) manufacturing false "billing records" and then using these same false records to secure an indictment; (3) giving false and misleading testimony before the Grand Jury to secure an indictment; (4) publicizing Dr. Morse's indictment solely for the purposes of advancing the political and personal ambitions of defendant Spitzer; and (5) causing severe and irreparable harm to Dr. Morse's reputation, and permanently destroying his ability to make a living as a dentist.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

108.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "107" with the same force and effect as if fully set forth herein.

109.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States.

110.     All of the aforementioned acts deprived plaintiff DR. LEONARD MORSE of the

**JA138**

rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth,

Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in

violation of 42 U.S.C. §1983.

111.     As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his

liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist.

## SECOND CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

112.     Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "111" with the same force and effect as if fully set forth herein.

113.     As a result of defendants' aforementioned conduct, plaintiff DR. LEONARD MORSE

was subjected to an illegal, improper and false arrest by the defendants and taken into custody and

caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants

in criminal proceedings, without any probable cause, privilege or consent.

114.     As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his

liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist.

## THIRD CLAIM FOR RELIEF
### MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

115.     Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "114" with the same force and effect as if fully set forth herein.

116.     Defendants, individually and collectively, manufactured false evidence and forwarded

**JA139**

this false evidence to prosecutors in the New York State Attorney General's Office.

117.    Defendants manufactured such false evidence for the sole purpose of securing an indictment against Dr. Morse.

118.    Defendants also gave false and misleading testimony before the Grand Jury.  In particular, defendants repeatedly and deliberately misled the Grand Jury regarding, inter alia: i) the amount of money actually received by Dr. Morse from medicaid; ii) the methodology employed for making such false calculations; ii) the  manufactured "billing records" which were used as a foundation for making such false calculations; iv) the impossibility of multiple-billing by Dr. Morse, due to inherent safeguards in the medicaid computer system; v) the impossibility of Dr. Morse submitting records to medicaid without specifying the exact tooth number and quadrant where the work was being performed; vi) the fact that there was another dentist working in Dr. Morse's office, Dr. Brian Ketover, whose dental work was lawfully being billed under the same medicaid provider number as Dr. Morse, and whose work accounted for a significant portion of the bills submitted by Dr. Morse; vii) the fact that medicaid reimbursement rates had increased substantially over the time period covered by the investigation, and that the lower rates being used by defendants were outdated and  inaccurate; and viii) the fact that defendants had analyzed only 4 months of Dr. Morse's records, and not 36 months of records, as they told the Grand Jury;

119.    In addition to the foregoing, defendant Castillo further misled the Grand Jury by testifying that there were certain documents "missing" from  Dr. Morse's dental charts – namely, the prescriptions that Dr. Morse had given for the dental laboratory work to be performed – when in fact defendant Castillo knew this to be untrue.

120.    In so testifying, Defendant Castillo wilfully and deliberately created the false impression that Dr. Morse was *hiding* essential records from the auditor's review, when in fact defendant Castillo knew that such records were not required to be maintained after a one year period. See New York State Education Law, Article 133 § 6611 (requiring only that "one copy shall be

**JA140**

retained by the practitioner of dentistry for a period of one year."), annexed hereto as Exhibit N.

121.    All of the foregoing false and misleading testimony by defendants was  given for the sole purpose of securing an indictment against Dr. Morse.

122.    Apart from giving false and misleading testimony, Defendants also did not make a complete and full statement of facts to the Grand Jury, and intentionally withheld and concealed exculpatory evidence from the Grand Jury.

123.    Defendants were directly and actively involved in the initiation of criminal proceedings against Dr. Morse.

124.    Defendants lacked probable cause to initiate criminal proceedings against Dr. Morse.

125.    Defendants acted with  malice in initiating criminal proceedings against Dr. Morse.

126.    Defendants were also directly and actively involved in the continuation of criminal proceedings against Dr. Morse.

127.    Defendants lacked probable cause to continue criminal proceedings against Dr. Morse.

128.    Defendants acted with  malice in continuing criminal proceedings against Dr. Morse.

129.    Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings.

130.    Notwithstanding the perjurious and fraudulent conduct of defendants, the criminal proceedings were terminated in Dr. Morse's favor on August 2, 2007,  when the Honorable John P. Walsh acquitted Dr. Morse of all charges.

131.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist.

**FOURTH CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO**
**FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE**

132.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "131" with the same force and effect as if fully set forth herein.

133.    Despite having access to thousands of Dr. Morse's patient files – and seizing 329 of

these files – defendants could not find *any* evidence of criminal wrongdoing on the part of Dr.

Morse.

134.    Rather than concede this fact, defendants Fusto and Castillo  manufactured evidence

against  Dr. Morse  in  order  to  overcome  the   deficiencies  in  their  case,   and  ensure  that  his

prosecution would move forward.

135.    Specifically, these defendants created completely false and misleading  billing

records to be used against Dr. Morse in his criminal prosecution.  See, e.g., Exhibit O.

136.    These records did not belong to Dr. Morse, nor to any of his laboratory vendors, but

instead,  were created solely by defendants for the purpose of securing an indictment against Dr.

Morse.

137.    Specifically, defendants manufactured evidence by, inter alia: (1) merging the billing

records of three separate patients into one "super patient" to support the prosecution's claim of over-

billing; (2)  deleting material information from Dr. Morse's actual billing records  to create the false

impression that Dr. Morse had repeatedly billed Medicaid for the same work, when in fact, Dr.

Morse's *actual* vendor statements proved conclusively that this was not the case; and (3) creating

a false "billing summary"– which listed multiple procedures which Dr. Morse had *never* actually

billed Medicaid for – to support their claim of triple-billing by Dr. Morse.

**JA142**

138.   These false billing documents were created by defendant Castillo in accordance with the suggestions, input and guidance from defendant Fusto.

139.   After these false billing records were created, defendants used these same false records to make completely spurious accounting projections in order to reach their goal of creating a "million dollar medicaid theft" by Dr. Morse.

140.   These false billing records were used by defendants throughout all phases of the criminal proceedings.

141.   In creating false evidence against Dr. Morse, and in providing false and misleading testimony with respect thereto, defendants violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

142.   As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was subject to onerous and restrictive bail conditions, was required to attend court proceedings for over one year, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**FIFTH CLAIM FOR RELIEF**
**DENIAL OF FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO**
**EXTRAJUDICIAL STATEMENTS MADE BY SPITZER**

143.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "142" as if the same were more fully set forth at length herein.

144.   Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

145.   Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his officials duties, responsibilities, or functions as Attorney General of the State of New

**JA143**

York.

146.    Rather, defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

147.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

148.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people.

149.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would create a highly prejudicial and inflamed atmosphere against plaintiff.

150.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr . LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

151.    This extensive news coverage had a profound impact on both  the prosecution and defense.

152.    As a result of SPITZER's extrajudicial statements to the press, the prosecution (defendants Fusto, Castillo and Flynn) felt compelled to continue their case against Dr. Morse – despite knowing that there were enormous holes in their case, and that they would not be able to obtain a conviction – out of concern that dismissing this "high-profile" case would be extremely damaging to defendant Spitzer.

153. As a result of SPITZER's extrajudicial statements to the press, the defense was forced to waive Dr. Morse's constitutional right to trial by jury, due to concerns that the extensive  adverse publicity would prevent a jury from being fair and impartial.

154.    As a result of the foregoing, plaintiff Dr. LEONARD MORSE was deprived of his

**JA144**

liberty, was selectively and unfairly prosecuted, was denied fundamental constitutional rights, was forced to waive his right to trial by jury, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## SIXTH CLAIM FOR RELIEF
## "STIGMA PLUS" CLAIM UNDER 42 U.S.C. §  1983 DUE TO
## EXTRAJUDICIAL STATEMENTS MADE BY SPITZER

155.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "154" as if the same were more fully set forth at length herein.

156.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

157.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of the State of New York.

158.    Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

159.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

160.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

161.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

**JA145**

162.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged.

163.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was summarily excluded from the medicaid program.

164.     Dr. Morse's summary exclusion from the medicaid program destroyed his dental practice, since  95% of Dr. Morse's patients were medicaid recipients.

165.     Dr. Morse was never afforded an opportunity for a name-clearing hearing prior to being summarily excluded from medicaid.

166.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was deprived of his right to a name-clearing hearing prior to said termination, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

167.     All of the foregoing acts by defendants deprived plaintiff DR. LEONARD MORSE of federally protected rights, including, but not limited to, the right:

       A.     Not to be deprived of liberty or property without due process of law;

       B.     To be free from seizure and arrest not based upon probable cause;

       C.     To be free from unwarranted and malicious criminal prosecution;

       D.     Not to have cruel and unusual punishment imposed upon him; and

       E.     To receive equal protection under the law.

**SEVENTH CLAIM FOR RELIEF**
**<u>DEFAMATION UNDER NEW YORK STATE LAW</u>**

168.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "167" as if the same were more fully set forth at length herein.

**JA146**

168.     Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

169.     Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of The State of New York.

170.     Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

171.     Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

172.     Defendant SPITZER acted with malice in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

173.     Defendant SPITZER acted with a reckless disregard for the truth in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

174.      Defendant Sptizer made such statements without privilege or authorization from plaintiff Dr. LEONARD MORSE.

175.     Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

176.     As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

177.     As a result of SPITZERs extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged, and his career as a dentist was permanently destroyed.

**JA147**

178.    Spitzer's extrajudicial statements about plaintiff Dr. LEONARD MORSE

constitute defamation *per se*.

179.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his

liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist

180.    As a result of all the foregoing unlawful actions of defendants, plaintiff Dr.

LEONARD MORSE is entitled to compensatory damages in the sum of twenty-five million dollars

($25,000,000.00), and is further entitled to punitive damages in the sum of fifty million dollars

($50,000,000.00).

**WHEREFORE**, plaintiff Dr. LEONARD MORSE demands judgment in the sum of twenty-

five million dollars ($25,000,000.00) in compensatory damages, fifty million dollars

($50,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated:   New York, New York
            June 15, 2011

                                        BY:      _____/S_____
                                                 JON L. NORINSBERG
                                                 norinsberg@aol.com
                                                 Attorney for Plaintiff
                                                 225 Broadway, Suite 2700
                                                 New York, New York 10007
                                                 (212) 791-5396

**JA148**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DR. LEONARD MORSE,

**SECOND AMENDED COMPLAINT**

Plaintiff,  <u>**07 CV 4793**</u> **(CBA) (RML)**

-against-  **JURY TRIAL DEMANDED**

**ECF CASE**

ELIOT SPITZER, Individually, Special Assistant Attorney
General JOHN FUSTO, Individually, Senior Special
Investigator,  JOSE CASTILLO, Individually, and Senior
Special Auditor Investigator ROBERT H. FLYNN, Individually,

Defendants.
------------------------------------------------------------------------X

Plaintiff, DR. LEONARD MORSE, by his attorney, Jon L. Norinsberg, complaining of
the defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action for compensatory damages, punitive damages and
attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil
rights, as said rights are secured by said statutes and the Constitutions of the State of New York
and the United States.

**JURISDICTION**

2.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the
First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

**VENUE**

4.      Venue is properly laid in the Eastern District of New York under 28 U.S.C.
§ 1391(b), in that this is the District in which the claim arose.

**JA149**

**JURY DEMAND**

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to

Fed. R. Civ. P. 38(b).

**PARTIES**

6.      At all times hereinafter mentioned, plaintiff DR. LEONARD MORSE  was a dentist

duly licensed to practice dentistry in the State of New York, and was the sole proprietor of 580

Dental P.C., a company located at 580 Fifth Avenue, in the County of Kings, in the City and State

of New York.

7.      At all times hereinafter mentioned, defendant ELIOT SPITZER ("SPITZER")

was the Attorney General of the State of New York, and was directly  responsible for the policies,

practices, procedures and guidelines of  the New York State Attorney General's Office, including

but not limited to, its Medicaid Fraud Control Unit and its Press Release Division.

8.      At all times hereinafter mentioned, defendant JOHN FUSTO ("FUSTO") was a

Special Assistant Attorney General working in the Medicaid Fraud Control Unit of the New York

State Attorney General's Office, located at 120 Broadway, in the County, City and State of New

York.

9.      At all times hereinafter mentioned, defendant JOSE CASTILLO ("CASTILLO") was

a Senior Special  Auditor Investigator working in the Medicaid Fraud Control Unit of the New York

State Attorney General's Office, located at 120 Broadway, in the County, City and State of New

York.

10.      At all times hereinafter mentioned, defendant ROBERT H. FLYNN ("FLYNN") was

a Senior Special  Investigator working in  the Medicaid Fraud Control Unit of the New York State

Attorney General's Office located at 120 Broadway, in the County, City and State of New York.

11.     At all times hereinafter mentioned, the defendants, either personally or through their

employees, were acting under color of state law and/or in compliance with the official rules,

regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or

the New York State Attorney General's Office.

## FACTS

12.     Plaintiff, DR. LEONARD MORSE, was and is a dentist duly licensed to practice

dentistry in the State of New York

13.     For thirty years, DR. LEONARD MORSE and his staff delivered high-quality dental

care to patients in the Park Slope community from his office  located at 580 Fifth Avenue, in the

county of Kings, in the City and State of New York.

14.     For thirty years  years, plaintiff DR. LEONARD MORSE was a lawfully authorized

Medicaid provider, assigned New York State Medicaid Provider Identification Number 00294977.

15.     During this time, Dr. Morse treated over 30,000 dental patients through the medicaid

program. All of Dr. Morse's patients came from referrals, and  he never advertised or solicited for

business.

16.     Dr. Morse's office handled approximately 6,000 dental patient visits annually,

including adults and children, and he often treated several generations of the same family.

17.     Despite his large volume of patients, Dr. Morse had an impeccable and exemplary

track record as a dentist.

18.     None of Dr. Morse's patients had ever filed a complaint against him.

19.     None of Dr. Morse's patients had ever filed a dental malpractice claim against him.

20.     Apart from his dental practice, Dr. Morse also served as the Assistant Director of the

Dental Medicine Residency Program at New York Methodist Hospital in Park Slope, where he was

**JA151**

responsible for the teaching, training and supervision of dental residents affiliated with said hospital.

21.     Dr. Morse was also the Section Chief of the Restorative Dentistry Program at Methodist Hospital, and was inducted into the International College of Dentistry in 2006.

22.     Over a thirty year period,  Dr. Morse was subjected to four  comprehensive  audits by the New York State Department of Health.

23.     None of the audits of Dr. Morse's dental practice  ever revealed any evidence of any impropriety or wrongdoing by Dr. Morse.

24.     In all of his years in practice, Dr. Morse had  never before been accused of any crime or misdemeanor.

**The Origins of Dr. Morse's Prosecution: A New York Times Investigation  Reveals Defendant Spitzer's Failure To Address Medicaid Abuse.**

25.     The  origins  of  the  prosecution  against  Dr.  Morse  may  be  traced  back  to  an investigation conducted by the New York Times, which was as reported on  July 19, 2005  in an article  entitled "As Medicaid Balloons, Watchdog Force Shrinks ." See Exhibit A, annexed hereto.

26.     In this article, the New York Times noted that "New York's Medicaid program pays more than a million claims a day, feeding a $44.5 billion river of checks ... Yet the state, charged with protecting those dollars, has done little to stop them from draining away." Id.

27.     After documenting the decline in New York State's efforts to fight medicaid fraud, the article made it clear where the fault lies:  "The responsibility for prosecuting Medicaid fraud lies with the state Attorney General, Eliot Spitzer, who runs the Medicaid Fraud Control Unit",  and "*Mr. Sptizer's zeal in fighting corporate abuses has not been matched by his efforts in fighting medicaid fraud*." Id. (emphasis supplied).

**Spitzer's Failure To Address Medicaid Fraud Becomes A Campaign Issue**.

28.      As a result of the New York Times investigation, the issue of medicaid fraud – and more particularly, defendant's Spitzer's handling of this issue – began to receive significant coverage in the New York press.

29.      For example, on March 30, 2006, an article appeared in the New York Sun entitled "Spitzer's Medicaid Boast." See Exhibit B.

30.      This article began by noting that "Eliot Spitzer has discovered the importance of cracking down on Medicaid fraud", and concluded by noting that "both candidates are fighting about who is or isn't doing the best job pursuing fraud cases." Id.

31.      Similarly, on April 3, 2006, an article appeared in the New York Post entitled "Spitzer on the Hunt for State's Top Health-care 'Criminals'." See Exhibit C.

32.      This article noted that "Attorney General Eliot Spitzer has launched a massive manhunt to find nine of New York's health-care monsters – fugitives who are accused of ripping off millions from taxpayers in bogus Medicaid billing scams ...." Id.

33.      Then, on April 11, 2006, an article appeared in the New York Times entitled "POLICING MEDICAID FRAUD BECOMES CAMPAIGN ISSUE." See Exhibit D.

34.      This article confirmed that Spitzer's handling of medicaid fraud as Attorney General had become an important campaign issue in the 2006 gubernatorial campaign:

> Trailing Attorney General Elliot Spitzer by 50 percentage points or more in polls for the Democratic nomination for governor, Thomas R. Suozzi has seized on medicaid fraud as an attention-getting issue, repeatedly telling audiences that *Mr. Spitzer has not done much to fight abuse of the program*.

Id. (emphasis supplied)

35.      Several other articles appeared in local New York newspapers which similarly

**JA153**

highlighted the issue of medicaid fraud, and made it clear that Spitzer was becoming increasingly aware of the importance of this issue in the upcoming campaign.

**A Dormant 4-Year-Old Investigation Is Suddenly Revived By Defendant Spitzer**.

36.     As  a result of  the growing press coverage on medicaid fraud – and its potential impact on Spitzer's chances of winning the Democratic nomination for Governor – defendant Spitzer felt compelled to find a high-profile medicaid fraud case which would prove that he was, in fact, cracking down on medicaid fraud.

37.     The case chosen was that of DR. LEONARD MORSE, whose files had originally been subpoenaed by the Medicaid Fraud Control Unit four years earlier, on October 18,  2002.

38.     Dr. Morse was chosen as a target by defendants  because he was one of the state's highest medicaid billers, due to the fact that –  unlike most private dentists –  he readily welcomed medicaid recipients, and in fact,  95% of his practice consisted of  medicaid recipients.

39.     At the time of the audit in 2002, Dr. Morse – who had previously been subject to four comprehensive audits by the New York State Department of Health, and who had never been charged with any fraud or wrongdoing – readily agreed to provide all records subpoenaed by  the Medicaid Fraud Control Unit.

40.     The  Medicaid Fraud Control Unit  reviewed all of  the records submitted by Dr. Morse and once again – as with the previous four audits – found no evidence of any fraud or wrongdoing.

41.     In the next four years, from 2002 to 2006, the  Medicaid Fraud Control Unit took no legal action against Dr. Morse.

42.     In the Spring of 2006, however, just as defendant Spitzer's failure to crack down on medicaid fraud became a campaign issue, the long-dormant investigation into Dr. Morse was

**JA154**

suddenly revived.

**Dr. Morse Is Charged With A Million Dollar Medicaid Theft**.

43.      Notwithstanding Dr. Morse's long and exemplary career as a dentist, on April 5, 2006, defendants suddenly – and without any warning – charged him with committing a million dollar medicaid theft.

44.      Specifically, defendants charged Dr. Morse with one count of Grand Larceny in the First Degree, a class "B" felony, carrying a maximum of 25 years, and 11 counts of Offering a False Instrument for Filing in the First Degree, a Class "E" felony.

45.      As discussed in more detail below, these charges were completely false, and were brought for the sole purpose of helping defendant Spitzer win the Democratic nomination for Governor of New York State.

**Dr. Morse Is Forced To Immediately Surrender.**

46.      After learning of these charges, Dr. Morse, who had just recently underwent surgery – and was still recovering – requested a brief period of time for him to convalesce prior to surrendering.

47.      Defendants refused to accommodate this request. Instead, defendant Serra threatened to forcibly remove Dr. Morse from his home at " 2:00 in the morning", and to "drag him to jail," if he did not voluntarily surrender to police.

48.      Dr. Morse agreed to surrender to police at the 72nd Precinct in the County of Kings, in the City and State of New York.

49.      On April 5th, 2006, defendants Serra and Flynn formally took Dr. Morse into custody and placed him under arrest.

50.      As a result of his unlawful arrest, Dr. Morse remained in jail for several hours prior

**JA155**

to being released on his own recognizance.

**Defendant Spitzer Issues A Press-Release Boasting About The Indictment of Dr. Morse.**

51.     The arrest of Dr. Morse initially went unnoticed by the press and by the public at large.

52.     There was no coverage of Dr. Morse's arrest by any media outlet, including newspapers, radio stations, television networks or the Internet

53.     All of this changed, however, on April 11, 2006, when defendant Spitzer issued a press release announcing Dr. Morse's indictment for a "million dollar medicaid theft." See Exhibit E.

54.     Spitzer's press-release boasted, in an all-capital letters headline, that: "BROOKLYN DENTIST INDICTED FOR MILLION DOLLAR MEDICAID THEFT." Id.

55.     The press release went on to state that "Attorney General Spitzer announced today that a grand jury has charged a Brooklyn dentist with *stealing more than $1 million from the Medicaid program*." Id. (emphasis supplied).

56.     To ensure maximum publicity, Defendant Spitzer had this press release translated into several foreign languages, including Russian and Korean. A copy of the Russian and Korean press releases, respectively, are annexed hereto as Exhibit F and Exhibit G.   As a result, the story was picked up and received widespread coverage on Russian and Korean websites. See, e.g., Exhibit H.

57.     Spitzer's motive for issuing the press release was entirely political, and had nothing to do with carrying out his official duties, responsibilities or functions as Attorney General of the State of New York.

58.     As documented above, Spitzer needed a high-profile medicaid case to counter the accusations of his political opponent, Thomas R. Suozzi – and thus increase his chances of winning

**JA156**

the Democratic nomination for Governor – and so he chose Dr. Morse's case as a means of

convincing New York voters that he was "tough" on medicaid fraud.

**Spitzer's Press Release Causes An Avalanche of Bad Publicity For Dr. Morse.**

59.     As a result of Spitzer's multi-lingual press release, the story of Dr. Morse's arrest –

which had not received any media coverage up to that point – became the subject of extensive

coverage in the local press and media.

60.     For example, on April 12, 2006, the New York Post ran a story entitled "DENTIST

PULLED $ 1M FRAUD."   See Exhibit I.

61.     In this article, the Post  –  which immediately recognized the connection between

Suozzi's attacks on Spitzer, on the one hand, and the resulting indictment of Dr. Morse, on the other

–  reported as follows:

> With gubernatorial opponent Tom Suozzi nipping at his heels over Medicaid reform,
> state Attorney General Eliott Spitzer announced that he nabbed a Brooklyn dentist
> who allegedly stole more than $1 million from the program.  Spitzer, a Democrat
> considered the front-runner for governor, reported the indictment of Leonard Morse,
> charged with billing Medicaid for dentures that he never delivered and for procedures
> he never performed.

Id.

62.     Similar stories appeared in the New York Daily News, Newsday, and other local

publications.  See, e.g., Exhibit J.

63.     The story of Dr. Morse's indictment also received vast coverage on the Internet,

resulting in thousands of stories about Dr. Morse's "million dollar theft" across the world.  See, e.g.,

the internet results for stories relating to  "Dr. Leonard Morse", annexed hereto as Exhibit K.

64.     In fact, the story eventually received world-wide coverage, being translated into

Chinese, Japanese, Italian, French, German, Arabic, Swedish and Portuguese.

**JA157**

**Dr. Morse Is Summarily Excluded From The Medicaid Program Without An Opportunity To Be Heard.**

65.     Apart from the damaging publicity, Dr. Morse also suffered severe economic losses when he was summarily excluded from the Medicaid program.  See "Notice of Immediate Agency Action", dated May 19, 2006, annexed hereto as Exhibit L.

66.     This decision was made without affording Dr. Morse the most basic and fundamental due process rights – as guaranteed by the 5th and 14th Amendments to the Constitution – such as the opportunity to be heard, the right to confront adverse witnesses, the right to present witnesses and evidence on one's own behalf, etc.

68.     The immediate effect of this decision was that it forced Dr. Morse to completely shut down his practice, since the vast majority of his patients were medicaid recipients, and  he was no longer authorized to perform any dental services on such patients.

**Dr. Morse Is Forced To Wait Fifteen Months Before He Can Contest The Charges.**

69.     After his arrest on April 5, 2006, Dr. Morse was required to make multiple court appearances to defend himself against the false charges which defendants had brought against him.

70.     It was not until June 26, 2007 – or approximately 15 months after his indictment – that Dr. Morse's case finally went to trial.

71.     The trial against Dr. Morse was presided over by the Honorable John P. Walsh,  at 320 Jay Street,  the County of Kings, in the City and State of New York.

**The Prosecution's Case Completely Falls Apart At Trial.**

72.     At Dr. Morse's trial, the glaring deficiencies in the prosecution's case were fully exposed.

73.     Despite having access to thousands of patient files from Dr. Morse –  and having seized 329 of these files for a comprehensive audit – the prosecution called just three patients of Dr.

Morse.

74.     These patients were called to prove that Dr. Morse – while having provided *some*

dental services to these patients– had nonetheless billed medicaid for additional dental services

which he had not performed.

75.     In order to prove this point, the prosecution needed first to establish that these

medicaid recipients were, in fact, patients of Dr. Morse.

76.     At trial, however,  none of these "patients" even  recognized Dr. Morse, much less

testified that they had received any dental treatment from him.

77.     In fact,  one of the alleged "patients" of Dr. Morse, Intisar Ahiri, specifically denied

that he had ever been treated by Dr. Morse:

> Q: Do you recall when you went there what work you had done?
> A: Cavities and dental work, but *he wasn't my doctor.*
> Q: Do you recall who treated you there?
> A: No.
> Q: When you said "he", you pointed at someone?
> A: The one with the black suit, blue tie. I said *he was never my doctor.  He never even looked in my mouth*.  The other doctor that works with him, which is the next room, was my doctor.

See Trial Transcript, annexed hereto as Exhibit M,  at 36 (emphasis supplied).

78.     Another alleged "patient" of Dr. Morse called by  the prosecution, Miriam Perez,

similarly testified that she did not recognize Dr. Morse as the dentist who treated her:

> Q: And do you recall the dentist's name that treated you?
> A: No.
> Q: I'm going to ask you to look around this courtroom and ask you if       you recognize anyone?
> A: *Truthfully, I don't.*

Id.  at 88 (emphasis supplied).

79.     The third and final "patient" of Dr. Morse, Sawsan Suliman, also testified that she

could not positively identify Dr. Morse as the dentist who treated her:

**JA159**

> Q: Do you see that person in this courtroom today?
> A: Maybe he.
> Q: Well, if you're not sure.
> A: *I don't know. I don't know.*

Id. at 95.

80.     Thus, none of the alleged "patients" called by the prosecution so much as *recognized*

Dr. Morse, much less testified that they had received dental treatment from him.

81.     The reason for this was that all of these patients had been treated by Dr. Ketover –

who had worked with Dr. Morse for 25 years, and whose dental work was lawfully billed under Dr.

Morse's medicaid provider number – and so these patients could not have given *any* testimony

regarding what dental work Dr. Morse had, or had not, performed on their behalf.

82.     Despite having four years to investigate Dr. Morse – and having full access to all of

Dr. Morse's patient charts – the prosecution did not produce a single witness at trial who was

actually a *real* patient of Dr. Morse.

**The Lab Invoices Are Deemed Untrustworthy and Inadmissible At Trial**

83.     Apart from the testimony provided by these "patients", there were other glaring

deficiencies in the prosecution's case.

84.     For example, the prosecution had based a large portion of its case on certain alleged

"invoices" belonging to defendant Design Dental Studio, Inc.

85.     These "invoices" – which defendant Fusto would later concede were "sloppy",

"handwritten", "lacking detail" and "incomplete" – were used by defendants as the primary basis

for concluding that the Dr. Morse had stolen over $1,000,000.00 from Medicaid.

86.     At trial, however, it was revealed that these so-called "invoices" contained *multiple*

alterations, deletions, cross-outs and date changes, raising serious questions as to the origin and

authenticity of such records.

87.     Further, there were almost one full year of invoices which were *completely missing*

from the Design Dental records, despite the fact that Dr. Morse had done business with this lab each and every month during the thirty six month audit period.

88.     In attempting to explain the patent deficiencies with these lab "invoices", the owner of Design Dental Studio, Inc, Nisan Yushvayev, gave multiple and contradictory accounts regarding the origin of these records.

89.  After listening to Mr. Yushvyav's conflicting testimony, Judge Walsh stated his views on the record about this witness' credibility:

> *"I don't believe him.  That's the bottom line.*
> That's what it comes down to."

Trial Transcript at 78 (emphasis supplied).

90.     Accordingly, Judge Walsh  refused to allow into evidence any of the "invoices" of Design Dental Studio, finding that these records were not sufficiently reliable or trustworthy to  be considered a "business record" under New York State law.

**The Prosecution Acknowledges Its Failures During Summation.**

91.     At the close of the prosecution's case, both sides were given an opportunity to give a summation to the Court.

92.     Before starting, the prosecutor told the Judge that his summation  would be "very brief[]", and that he was giving one only  because he was "probably required by law" to do so.   Trial Transcript at 115.

93.     In his summation, Defendant Fusto immediately conceded that the prosecution had failed to prove its  "million dollar theft" claim, as alleged in the indictment:

> Obviously, this indictment needs to be adjusted for purposes of your consideration.
> I mean, I'll start off just by saying the indictment charges for count one grand larceny
> in the first degree.  *We obviously have not approached the statutory element of that*
> *of a million dollars ....*

Id. (emphasis supplied).

94.     Defendant Fusto further conceded that the most the Court could find Dr. Morse guilty

**JA161**

of would be a theft of *$3,000.00* – or approximately $997,000.00 less than the amount alleged in the indictment:

> [A]t this point[,] through the auditor's testimony combined with the patients [,]I believe that the *best that the Court can consider at this point [is] grand larceny in the third degree, in excess of $3,000.00.*"

Id. at 115-116  (emphasis supplied).

95.    Thus, the prosecution's case had gone from a  "million dollar medicaid theft" – as Spitzer had boasted in his multi-lingual press release on April 11, 2006 – to a $3,000.00 claim, *at best*.

96.   Defendant Fusto also conceded that nine of the twelve counts in the indictment would "obviously have to be dismissed", as the prosecution had not produced any of the patients relating to these counts. Id. at 116.

**Dr. Morse Is Acquitted of All Charges By Justice Walsh.**

97.    Notwithstanding the fact that the prosecution had lowered its charges to Grand Larceny in the Third Degree –  and that as a result, it needed only to prove that Dr. Morse had defrauded medicaid of  $3,000.00 – Judge Walsh *still* found that the prosecution had not proved its case.

98.    Specifically, Judge Walsh found that the prosecution had failed to make out a *prima facie* case against Dr. Morse, and thus declared Dr. Morse not guilty of all charges.

99.    On August 2, 2007, all charges against plaintiff LEONARD MORSE were thus dismissed.

**The Irreparable Harm To Dr. Morse's Reputation And Career.**

100.    Notwithstanding his acquittal, Dr. Morse's reputation has been permanently and irreparably harmed by defendants' false accusations.

101.    There are literally thousands of postings on the Internet which still mention Dr. Morse's name in connection with medicaid fraud.  See, e.g., Exhibit K.

**JA162**

102.   There are no Internet postings which mention Dr. Morse's acquittal.

103.   Dr. Morse has been shunned by friends, neighbors and relatives in his own community as a result of the false charges brought against him.

104.   Dr. Morse was terminated from his position as an Assistant Director of the Dental Medical Residency Program at Methodist Hospital as a result of the false charges brought against him.

105.   Most importantly, Doctor Morse's career as a dentist has been permanently and irreparably destroyed as a result of the false charges brought against him.

106.   Since his acquittal, Dr. Morse has tried repeatedly to find work as a dentist, but the notoriety of his case – and in particular, of being known as the dentist who committed a "million dollar medicaid theft" – has made it impossible for him to find work.

**The Nature Of This Action**.

107.   This action seeks redress against defendants for their unlawful and egregious conduct in: (1) falsely accusing Dr. Morse of committing Medicaid fraud, when they knew that these allegations were completely untrue; (2) manufacturing false billing "summaries" which, inter alia, materially altered the *actual* vender statements submitted by Dr. Morse to Medicaid and thereby misled and deceived the Grand Jury (see ¶137, infra.); (3) giving false and misleading testimony before the Grand Jury to secure an indictment (see ¶118, infra.); (4) publicizing Dr. Morse's indictment solely for the purposes of advancing the political and personal ambitions of defendant Spitzer; and (5) causing severe and irreparable harm to Dr. Morse's reputation, and permanently destroying his ability to make a living as a dentist.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

108.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "107" with the same force and effect as if fully set forth herein.

**JA163**

109.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States.

110.    All of the aforementioned acts deprived plaintiff DR. LEONARD MORSE of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

111.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

### SECOND CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

(Defendant's Fusto,  Castillo and Flynn)

112.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "111" with the same force and effect as if fully set forth herein.

113.    As a result of defendants' aforementioned conduct, plaintiff DR. LEONARD MORSE was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

114.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**JA164**

**THIRD CLAIM FOR RELIEF**
**MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983**

(Defendants Castillo and Flynn)

115.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "114" with the same force and effect as if fully set forth herein.

116.    Defendants, individually and collectively, manufactured false evidence and forwarded

this false evidence to prosecutors in the New York State Attorney General's Office.

117.    Defendants manufactured such false evidence for the sole purpose of securing an

indictment against Dr. Morse.

118.    Defendants also gave false and misleading testimony before the Grand Jury.  In

particular, defendants repeatedly and deliberately misled the Grand Jury regarding, inter alia: i) the

amount of money actually received by Dr. Morse from Medicaid; ii) the methodology employed for

making such false calculations; ii) the fact that there were  nineteen months of lab invoices missing

out of a thirty six month audit period;  iv) the impossibility of  multiple-billing by Dr. Morse, due

to inherent safeguards in the medicaid computer system; v) the impossibility of Dr. Morse submitting

records to medicaid without specifying the exact tooth number and quadrant where the work was

being performed; vi) the fact that there was another dentist working in Dr. Morse's office, Dr. Brian

Ketover, whose dental work was lawfully being billed under the same medicaid provider number as

Dr. Morse, and whose work accounted for a significant portion of the bills submitted by  Dr. Morse;

vii) the fact that medicaid reimbursement rates had increased substantially over the time period

covered by the investigation, and that the lower rates being used by defendants were outdated and

inaccurate; and viii) the fact that defendants had analyzed only 4 months of Dr. Morse's records, and

not 36 months of records, as they told the Grand Jury;

119.    In addition to the foregoing, defendant Castillo further misled the Grand Jury by

testifying that there were certain documents "missing" from  Dr. Morse's dental charts – namely,

**JA165**

the prescriptions that Dr. Morse had given for the dental laboratory work to be performed – when in fact defendant Castillo knew this to be untrue.

120.    In so testifying, Defendant Castillo wilfully and deliberately created the false impression that Dr. Morse was *hiding* essential records from the auditor's review, when in fact defendant Castillo knew that such records were not required to be maintained after a one year period. See New York State Education Law, Article 133 § 6611 (requiring only that "one copy shall be retained by the practitioner of dentistry for a period of one year."), annexed hereto as Exhibit N.

121.    All of the foregoing false and misleading testimony by defendants was given for the sole purpose of securing an indictment against Dr. Morse.

122.    Apart from giving false and misleading testimony, Defendants also did not make a complete and full statement of facts to the Grand Jury, and intentionally withheld and concealed exculpatory evidence from the Grand Jury.

123.    Defendants were directly and actively involved in the initiation of criminal proceedings against Dr. Morse.

124.    Defendants lacked probable cause to initiate criminal proceedings against Dr. Morse.

125.    Defendants acted with  malice in initiating criminal proceedings against Dr. Morse.

126.    Defendants were also directly and actively involved in the continuation of criminal proceedings against Dr. Morse.

127.    Defendants lacked probable cause to continue criminal proceedings against Dr. Morse.

128.    Defendants acted with  malice in continuing criminal proceedings against Dr. Morse.

129.    Defendants misrepresented and falsified evidence throughout all phases of the

**JA166**

criminal proceedings.

130.   Notwithstanding the perjurious and fraudulent conduct of defendants, the criminal

proceedings were terminated in Dr. Morse's favor on August 2, 2007,  when the Honorable John P.

Walsh acquitted Dr. Morse of all charges.

131.   As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his

liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist.

**FOURTH CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO**
**FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE**
(Defendants Fusto and Castillo)

132.   Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "131" with the same force and effect as if fully set forth herein.

133.   Despite having access to thousands of Dr. Morse's patient files – and seizing 329 of

these files – defendants could not find *any* evidence of criminal wrongdoing on the part of Dr.

Morse.

134.   Rather than concede this fact, defendants Fusto and Castillo  manufactured evidence

against Dr. Morse in order to overcome the  deficiencies in their case,  and ensure that his

prosecution would move forward.

135.   Specifically, these defendants created completely false and misleading  billing

records to be used against Dr. Morse in his criminal prosecution.  See, e.g., Exhibit O.

136.   These records did not belong to Dr. Morse, nor to any of his laboratory vendors, but

instead,  were created solely by defendants for the purpose of securing an indictment against Dr.

Morse.

**JA167**

137.   Specifically, defendants manufactured evidence by, <u>inter</u> <u>alia</u>: (1) merging the billing records of three separate patients into one "super patient" to support the prosecution's claim of over-billing; (2) deleting material information from Dr. Morse's actual billing records to create the false impression that Dr. Morse had repeatedly billed Medicaid for the same work for several different patients, when in fact, Dr. Morse's *actual* vendor statements proved conclusively that this was not the case; and (3) creating a false "billing summary"– which listed multiple procedures which Dr. Morse had *never* actually billed Medicaid for – to support their claim of triple-billing by Dr. Morse.

138.   These false billing documents were created by defendant Castillo in accordance with the suggestions, input and guidance from defendant Fusto.

139.   After these false billing records were created, defendants used these same false records to make completely spurious accounting projections in order to reach their goal of creating a "million dollar medicaid theft" by Dr. Morse.

140.   These false billing records were used by defendants throughout all phases of the criminal proceedings.

141.   In creating false evidence against Dr. Morse, and in providing false and misleading testimony with respect thereto, defendants violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

142.   As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was subject to onerous and restrictive bail conditions, was required to attend court proceedings for over one year, was denied fundamental constitutional rights, was publicly embarrassed  and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**FIFTH CLAIM FOR RELIEF**
**DENIAL OF FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO**
**EXTRAJUDICIAL STATEMENTS MADE BY SPITZER**

143.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "142" as if the same were more fully set forth at length herein.

144.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

145.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his officials duties, responsibilities, or functions as Attorney General of the State of New York.

146.    Rather, defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

147.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

148.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people.

149.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would create a highly prejudicial and inflamed atmosphere against plaintiff.

150.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr . LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

151.    This extensive news coverage had a profound impact on both  the prosecution and defense.

152.    As a result of SPITZER's extrajudicial statements to the press, the prosecution

**JA169**

(defendants Fusto, Castillo and Flynn) felt compelled to continue their case against Dr. Morse – despite knowing that there were enormous holes in their case, and that they would not be able to obtain a conviction – out of concern that dismissing this "high-profile" case would be extremely damaging to defendant Spitzer.

153. As a result of SPITZER's extrajudicial statements to the press, the defense was forced to waive Dr. Morse's constitutional right to trial by jury, due to concerns that the extensive adverse publicity would prevent a jury from being fair and impartial.

154. As a result of the foregoing, plaintiff Dr. LEONARD MORSE was deprived of his liberty, was selectively and unfairly prosecuted, was denied fundamental constitutional rights, was forced to waive his right to trial by jury, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**SIXTH CLAIM FOR RELIEF**
**"STIGMA PLUS" CLAIM UNDER 42 U.S.C. § 1983 DUE TO**
**EXTRAJUDICIAL STATEMENTS MADE BY SPITZER**

155. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "154" as if the same were more fully set forth at length herein.

156. Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

157. Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of the State of New York.

158. Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

**JA170**

159.     Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

160.     Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

161.     As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

162.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged.

163.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was summarily excluded from the medicaid program.

164.     Dr. Morse's summary exclusion from the medicaid program destroyed his dental practice, since  95% of Dr. Morse's patients were medicaid recipients.

165.     Dr. Morse was never afforded an opportunity for a name-clearing hearing prior to being summarily excluded from medicaid.

166.     As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was deprived of his right to a name-clearing hearing prior to said termination, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

167.     All of the foregoing acts by defendants deprived plaintiff DR. LEONARD MORSE of federally protected rights, including, but not limited to, the right:

        A.     Not to be deprived of liberty or property without due process of law;

**JA171**

B.     To be free from seizure and arrest not based upon probable cause;

C.     To be free from unwarranted and malicious criminal prosecution;

D.     Not to have cruel and unusual punishment imposed upon him; and

E.     To receive equal protection under the law.

## SEVENTH CLAIM FOR RELIEF
## DEFAMATION UNDER NEW YORK STATE LAW

168.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "167" as if the same were more fully set forth at length herein.

168.   Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

169.   Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of The State of New York.

170.   Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

171.   Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

172.   Defendant SPITZER acted with malice in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

173.   Defendant SPITZER acted with a reckless disregard for the truth in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

174.    Defendant Sptizer made such statements without privilege or authorization from plaintiff Dr. LEONARD MORSE.

175.   Defendant SPITZER knew that his extrajudicial statements about plaintiff

**JA172**

Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

176.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

177.    As a result of SPITZERs extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged, and his career as a dentist was permanently destroyed.

178.    Spitzer's extrajudicial statements about plaintiff Dr. LEONARD MORSE constitute defamation *per se*.

179.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist

180.    As a result of all the foregoing unlawful actions of defendants, plaintiff Dr. LEONARD MORSE is entitled to compensatory damages in the sum of twenty-five million dollars ($25,000,000.00), and is further entitled to punitive damages in the sum of fifty million dollars ($50,000,000.00).

**WHEREFORE**, plaintiff Dr. LEONARD MORSE demands judgment in the sum of twenty-five million dollars ($25,000,000.00) in compensatory damages, fifty million dollars ($50,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

**JA173**

Dated:   New York, New York
         July 1, 2011

                                    BY:   _____/S_____
                                          JON L. NORINSBERG
                                          norinsberg@aol.com
                                          Attorney for Plaintiff
                                          225 Broadway, Suite 2700
                                          New York, New York 10007
                                          (212) 791-5396

**JA174**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
DR. LEONARD MORSE,             : 07-CV-4793(CBA)

              Plaintiff,       :
                               :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
ELIOT SPITZER,                 : Monday, February 4, 2013
Individually; Special          : 9:30 a.m.
Assistant Attorney             :
General JOHN FUSTO,            :
Individually; Senior
Special Investigator JOSE
CASTILLO, Individually;
Senior Special Audit
Investigator ROBERT H.
FLYNN, Individually;
Senior Special
Investigator LEVON
AHARONYAN, Individually;
Senior Special
Investigator JAMES A.
SERRA, Individually, and
DESIGN DENTAL STUDIO,
INC.,

              Defendants.      :
- - - - - - - - - - - - - - -X
        TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
      BEFORE THE HONORABLE CAROL BAGLEY AMON
      UNITED STATES CHIEF DISTRICT COURT JUDGE

           A P P E A R A N C E S :

For the Plaintiff:    JON L. NORINSBERG
                      225 Broadway, Suite 2700
                      New York, New York 10007
                 BY:  JON L. NORINSBERG, ESQ.

---

For the Defendants:   HON. ERIC T. SCHNEIDERMAN
                      NYS Attorney General
                      120 Broadway, 12th Floor
                      New York, New York 10271-007
                 BY:  CHRISTOPHER Y. MILLER, ESQ.
                      SETH J. FARBER, ESQ.


Court Reporter:   Lisa Schwam, CSR, CRR, RMR
                  Official Court Reporter
                  Telephone: (718) 613-2268

Proceedings recorded by computerized stenography. Transcript
produced by Computer-Aided Transcription.

---

1           (In open court.)

2           (The following proceedings occurred outside the

3    presence of the jury.)

4           THE COURTROOM DEPUTY:  Morse versus Spitzer.

5    Please state your appearances for the record.

6           MR. NORINSBERG:  John Norinsberg on behalf of

7    plaintiff.

8           MR. MILLER:  Christopher Miller from the Office of

9    the Attorney General on behalf of the defendants.

10          MR. FARBER:  Seth Farber also from the Attorney

11   General's Office for defendants, Your Honor.

12          THE COURT:  All right.  Good morning.  The jury's

13   all here.  We're prepared to proceed.  Everyone ready to go?

14          MR. NORINSBERG:  Yes.

15          THE COURT:  All right.  What we'll do is I'll

16   bring the jury out.  I'll ask if the jury is satisfactory to

17   the plaintiff and to the defendant.  I'm then going to give

18   them some opening instructions, and then we'll proceed with

19   the opening statement by the plaintiff and the defense.

20          We're all set on a game plan?

21          MR. NORINSBERG:  Yes.

22          MR. MILLER:  Yes, Your Honor.

23          THE COURT:  Do you have any exhibit lists there?

24          THE COURTROOM DEPUTY:  I put them up there for

25   you.

---

1           THE COURT:  Okay.

2           (Jurors enter the courtroom.)

3           THE COURT:  All right.  Please be seated.  I think

4    I'm going to have to tell you to stand again in a moment,

5    but I just wanted to introduce myself first.

6           Good morning.  I am Judge Amon, and I am the Judge

7    who will be presiding over the civil case Morse versus

8    Spitzer.

9           And the very first thing that I have to ask, first

10   of all, is the jury satisfactory to the plaintiff?

11          MR. NORINSBERG:  Satisfactory to plaintiff, Your

12   Honor.

13          THE COURT:  And to the defendants?

14          MR. MILLER:  Yes, Your Honor.

15          THE COURT:  The first thing I have to do is ask

16   you to stand back up so we can swear you in.  My courtroom

17   deputy will administer an oath to you.

18          (Jurors sworn.)

19          THE COURT:  You can be seated.  All right.  Now,

20   before we begin the trial, I want to just give you some

21   opening instructions.  And the most important opening

22   instruction that I have to give you is not to discuss the

23   case with anyone.  This includes discussing the case in

24   person, in writing, by phone, by electronic means, text

25   messaging, e-mailing, Facebook, Twitter, blogging, Internet

chatrooms, Web sites, any other features in which you can
communicate with anyone.  You are not to communicate in any
way with anyone else about the case.

Now, if you have to tell someone such as your
spouse or your employer that you're serving on jury duty and
approximately how long the case is going to last, that's
fine, but inevitably sometimes people ask you what the case
is about.  Please tell them that you are under strict
instructions from the Court not to discuss the case.

And, you know, the reason for that I think is
probably obvious to all of you.  We want you to decide this
case solely on the evidence presented in this courtroom and
not on the basis of anything else or what anyone else has
heard about the evidence or thinks about the case.

If you are asked or approached in any way about
your jury service or anything else about this case, you
should respond that you've been ordered by the Judge not to
discuss the matter.  If someone does contact you about the
case, you need to report that to me as soon as possible, but
don't discuss that fact with any of your fellow jurors
because if something were to happen that would affect the
ability of one juror to serve fair and impatiently, we don't
want to have that spread to the rest of the jurors.

Now, along these same lines, you should not try to
access any information about the case or do any independent

research on any issue that arises in the case from any
outside source.  And that includes dictionaries, reference
books, or on the Internet.  I know that there's a temptation
for people to go home and turn on the computer and Google
the parties, the attorneys, or something about the case.
Please do not do that.  It is extremely important that you
make your determination only on what you hear in the
courtroom.

In the very unlikely event that you were to see
anything in the media about this case, please turn it off,
stop reading it, don't pay any attention to it.  It's your
sworn duty to decide this case solely and wholly on the
evidence presented in the courtroom.

Now, let me tell you a little bit about how the
trial will proceed.  The lawyers will make opening
statements.  In their opening statements, the attorneys will
give you an overview of the case and what they think the
evidence will -- what evidence will be produced.  You should
know and understand quite clearly that what is said in these
opening statements is not itself evidence.  The evidence
will only come from the witness stand and any exhibits that
are any introduced.  So the lawyers will just review with
you what they think the evidence will show.  But, again, the
opening statements are not evidence.

What happens next is that the plaintiff, who has

the burden of proof to establish by a preponderance of the
evidence the elements of this depravation of liberty claim,
will call witnesses and introduce items into evidence as
exhibits.  You will have the opportunity to examine these
exhibits, if not right at the moment, then certainly the
exhibits will be available to you during your deliberations.
It's important that you pay careful attention to the
testimony of witnesses.

Now, generally what will happen is the plaintiff
will call witnesses and present his case first.  Then the
defendant will call witnesses and present their case.
Generally, each witness will be examined by the party who
called him or her to testify and then the opposing party
will cross-examine him.  In this case, some of the witnesses
will be called by both the plaintiff and the defendants.  So
to save time, we may do things out of order and have the
defendants examine some of the witnesses as their part of
the defense before the plaintiff has finished presenting his
case.  That may or may not happen.

Once all of the evidence is in, then each party is
going to sum up the evidence and tell you what they believe
the evidence has shown.  Your job is to determine the facts.
And that's a very important role that you have.  As Judge, I
have no role to play at all in your determination of what
the facts are.  What I'm going to have to do at the end of

the trial after the evidence is presented and all of the
attorneys have given their closing statements, I'm going to
have to instruct you on the law and you have to take the law
from the Court.  So if you perceive that the law as stated
by the lawyers is different from the law as stated by me,
it's my instructions that you have to follow.

It may happen that during the course of a trial,
attorneys may stand to object to evidence or questions.
What they're doing is asking me to make a ruling of law on
the admissibility of the evidence.  If I sustain an
objection, it means that I think the law does not permit the
evidence in question.  You are to disregard the question
asked and you can't speculate about how it might have been
answered.  You simply don't have any evidence before you on
the subject.

If I sustain an objection after an answer is
given, I will strike the answer, meaning that you are not to
consider it at all in your deliberations and you are to act
as if the answer had never been given.

If I overrule an objection, it means that I find
the law allows the evidence to come before you.  You should
not, however, attach any special weight to evidence that
comes in over objection.  You should consider it together
with all the other evidence.

I'll tell you that no statement, ruling, or remark

which the Court may make during the course of the
proceedings is intended to indicate any opinions that I have
about the case.  I might ask a question of a witness, but I
do so only -- I will do so, rather, only to bring out
matters that I think need to be brought out, not to indicate
any opinion on the facts or weight you should give the
testimony of that witness.  Again, you must base your
verdict only on what you see and hear in the courtroom.

Please do not discuss the case, even among
yourselves, until all the evidence has been presented and I
have instructed you on the law and directed you to begin
your deliberations.  You're not to discuss the case even
among yourselves before that time.  And the reason for that
is it's important to keep an open mind and make sure that
you hear all the evidence before you begin to discuss the
case.

Please have no discussion with the attorneys,
parties, or witnesses in this case.  By that, I mean, not
only to avoid conversation about the case, but to avoid any
conversation at all with the counsel or the parties, even to
say hello.  It's very important that we keep the appearance
of propriety.  And if someone saw a juror who was talking
with a party or lawyer, that person might think that
something improper was being discussed so please do not do
that.  I should tell you; the attorneys, as Officers of the

Court, are particularly sensitive to this so if you were to
see one of the attorneys in the lobby downstairs and they
turned around and walked the other way, no one means to be
rude.  They just understand what an important consideration
this is.

With those opening instructions, we will now turn
to the beginning of the trial and the opening statements by
the plaintiff.

Counsel.

PLAINTIFF'S OPENING STATEMENT

MR. NORINSBERG:  Before we begin, allow me to
reintroduce myself.  My name is Jon Norinsberg and I
represent Dr. Leonard Morse and his wife, Darrell, who is
here sitting at the table as well.

Ladies and Gentlemen, the case that you're about
to hear is an important case and it's a disturbing case.
It's a case about a man who was wrongfully indicted based on
false evidence and it's a case about the two defendants who
did this to him, a former prosecutor named John Fusto and a
state auditor named Jose Castillo.  And this case is about
the consequences of this wrongful indictment; about a
dentist who lost a practice he had built up over 30 years
and who has had his reputation permanently destroyed by what
happened.

That's an overview of what our case is about here

today.  Now, to understand what happened, the indictment
took place in 2006.  We have to go back in time to 2002 when
the events first started.  At that time, Dr. Morse had been
practicing the better part of 30 years.  He is a highly
successful dentist.  He had built up his practice with his
own bare hands from scratch.  Wound up having eight people
working in the office.  He had another dentist working
full-time.  It was in Park Slope.

He was well-respected in the community.  He never
even had to advertise.  People would send their family
members -- grandparents, children, parents -- would come to
him over the years.  He also at that time was an assistant
director in Methodist Hospital, and he was a section chief
of restorative dentistry at that hospital.

What happened in April of 2002 an
investigation was opened up.  There at some point after
9/11, you'll learn there were a lot of temporary Medicaid
cards that were issued so there was a lot of extra patients
that were going around with cards and they were going and
getting dentistry services.  And that resulted in an
increase in dentistry services for a lot of dentists in the
metropolitan region, and Mr. Morse was one of them.

So there was an audit that was opened up.  This
was nothing unusual for Dr. Morse because in his career he
actually had four other audits, four prior audits, over 30

years in the course of doing business.  Every single audit
turned out fine.  Never once was there any finding of
improper billing.  Never once was he found sanctioned or
disciplined or found to be doing anything improper.  So the
audit that took place in 2002, as far as Dr. Morse was
concerned, was really not much different than anything else
that had happened.

So they opened up this audit in 2002, and they
interviewed Dr. Morse.  You'll learn from the people who
interviewed him, he was fully cooperative, gave them all the
files.  Whatever they wanted, he gave to them.  They wanted
additional records, he gave it to them.  What happened?
2002, nothing happened.  2003, nothing happened.  2004,
nothing happened.  2005, nothing happened.

It got to the point where the investigators,
you're going to learn, the state's own investigators who are
former police officers, actually went around -- went to the
boss of the prosecutor, John Fusto, the defendant in this
case, they went above him to the boss and said what is going
on here?  This case is four years old.  Nothing's happening.
You need to light a fire under this guy.  Either this is a
case or it's not a case.

And what you'll learn is shortly after that,
Mr. Fusto decided to speak to his auditor and have his
auditor change his calculations in this case.  And you're

1  going to learn not from us, from one of the state's own
2  investigators, he is going to tell you that what -- he's a
3  former police officer, and he's going to tell you that what
4  Mr. Fusto was doing at that time as far as he was concerned
5  was not on the up and up. He thought what Mr. Fusto was
6  doing was trying to suborn perjury.
7        MR. MILLER: Objection.
8        MR. NORINSBERG: He thought that what Mr. Fusto
9  was doing was trying to alter documented evidence. This is
10  their witness, not our witness. Former police officer.
11        And you'll learn, Ladies and Gentlemen, he
12  testified at his deposition, he said in my 37 years in law
13  enforcement, I have never heard of a prosecutor try to do
14  what Mr. Fusto did. And wouldn't you know it, shortly after
15  in the winter of 2006, all of a sudden now the auditor comes
16  up with a million-dollar fraud calculation.
17        Now, mind you, Ladies and Gentlemen, there were no
18  fraud calculations, not one single finding or calculation
19  from 2002 all the way up until the winter of 2006. And all
20  of a sudden there's a fraud calculation.
21        But, Ladies and Gentlemen, what Mr. Fusto did with
22  this auditor having the auditor alter evidence was just the
23  tip of the iceberg. You're going to learn, Ladies and
24  Gentlemen, that these two defendants in this case literally
25  falsified records and presented those records to the grand

1  jury. And you're going to learn that there are three key
2  pieces of false evidence in this case that they actually
3  used to secure an indictment.
4        The first one is what they did is they literally
5  merged the patient records of three separate patients named
6  Edwin Gonzalez, merged it all into one superpatient and
7  presented it to the grand jury to show how Dr. Morse was
8  overbilling. So literally, you have one Edwin Gonzalez who
9  is living in the Bronx. Another Edwin Gonzalez in
10  Manhattan. Another one in Brooklyn. One is born in 1960.
11  One is born in 1980. One is born in 1963. Three different
12  Edwin Gonzalezes. Three different addresses. Three
13  different birth dates. Three different Medicaid numbers.
14  What these defendants did, they merged it all into one and
15  presented it to the grand jury as if this was one single
16  patient.
17        And you're going to learn, Ladies and Gentlemen,
18  that the billings relating to this super-patient, Edwin
19  Gonzalez, constituted 25 percent of the total billings that
20  this auditor testified to in the grand jury. So it was
21  significant what they did.
22        You'll also learn the auditor himself later
23  admitted that it would be improper to merge three different
24  patient records into one and that you can't do it by
25  accident. He would later admit that.

1        So that was the first piece of falsified evidence
2  you're going to hear about in this trial, these records and
3  pieces of evidence, you're going to hear. You'll have a
4  chance to look at it on your own and see.
5        The second piece of falsified evidence they had,
6  they had a completely fake triple billing record for a
7  patient where they tripled the amount of billings that the
8  patient had. This patient's name is Stacy Rodriguez.
9  You're going to get to see with your own eyes what happened
10  here. The original bill that Dr. Morse submitted to
11  Medicaid showed only three procedures on the particular date
12  in question. What did these defendants do? They present a
13  bill, a summary of the bills that shows nine procedures,
14  nine procedures, on the same day. And then just to drive
15  the point home, to make sure that the grand jury understood
16  it, they called an expert in, Linda DeLuca, who is a
17  dentist. She appeared before the grand jury and she
18  testified, yes, this seems very unusual. There's nine
19  procedures here. Everything's in triplicate. It doesn't
20  really make sense.
21        So that was the second piece of falsified evidence
22  that they had. The third thing they did, they took the
23  actual original records in their original format, clearly
24  show where the work was done by Dr. Morse on which specific
25  teeth. What they did is they removed the tooth numbers so

1  that when somebody is looking at these records, you can go
2  no longer tell what work was done on the tooth. All you see
3  is the same procedure over and over again. In reality, the
4  doctor's working on several different teeth. What the grand
5  jury is seeing is the same thing over and over and over
6  again.
7        And again, how do they use this? They use this
8  falsified record to make sure that the grand jury got the
9  point by having Dr. DeLuca, the witness, the dentist, come
10  in and testify. You'll learn over and over again that
11  Dr. DeLuca was saying this is unusual. Look at all these
12  procedures. They never actually showed her the real dental
13  records. Not once. She never actually looked at
14  Dr. Morse's actual records. She only looked at these fake
15  records that they have put together.
16        So you have three different types of records.
17  You're going to see, Ladies and Gentlemen, these records
18  were material to the indictment. They were likely to
19  influence a grand jury's decision and they did. They made
20  sure of that through the testimony of this witness.
21        Now, you're going to hear these records came in
22  the form of two different exhibits. There's Grand Jury 7.
23  You're going to hear a lot about this exhibit. Grand Jury
24  11. You'll see some of the exhibit is similar, but you'll
25  see how these exhibits are different, and you'll see how

1  these two exhibits contain the falsified evidence that I've

2  just described to you.

3       Now, as a result of this false evidence, Dr. Morse

4  was indicted.  He was indicted on grand larceny, indicted on

5  a number of false instrument charges.  And you're going to

6  hear he had to wait 15 months to prove his innocence until

7  he finally got to trial and was eventually acquitted of all

8  these charges.

9       So what happened after Dr. Morse was indicted?

10  Well, the consequences were very severe and very immediate.

11  First thing that happened is he lost his Medicaid

12  privileges.  He was suspended from Medicaid as a result of

13  this indictment.  Now, for some dentists maybe that wouldn't

14  be a big deal.  For Dr. Morse, 95 percent of his patient

15  base were Medicaid patients.  He was in an area a lot of

16  dentists didn't want to deal with this.  A lot of dentists

17  prefer to be somewhere else.  He was in an area where this

18  was the nature of his patient base.  And when you take away

19  his Medicaid license, you're really shutting down his

20  practice.

21       And that's exactly what happened in a very real

22  sense.  What took 30 years to build up was taken away in

23  five days.  Medicaid gave him a five-day notice and this was

24  it.  He had only five days and he had to stop practicing.

25  What that led him to do over that summer, his income was

1  drastically reduced and he had to sell his practice in a

2  fire sale to the guy, the other dentist, Dr. Ketover, who

3  was working there as his partner.  He took a substantial

4  loss on the sale price of the practice just to try to get

5  something out of it.

6       But what was worse, even worse than losing his

7  Medicaid privileges, what was worse was shortly after he was

8  indicted, the Attorney General's Office issued a press

9  release boasting about this million-dollar Medicaid fraud

10  case.  They had nailed this doctor who was stealing a

11  million dollars from Medicaid.  And they put this out and

12  this story went viral.  First, the *New York Post* picked it

13  up.  The *Daily News* ran it talking about Dr. Morse and how

14  he stole all this money.  And then it went on the Internet

15  and it went national and then it literally went around the

16  world.  There was news coverage in countries all over the

17  world about this story for this doctor.

18       And you'll learn, Ladies and Gentlemen, that after

19  he was acquitted, there's not one single story ever posted

20  out there about his acquittal.  And to this day, this story

21  is out there.  I'll talk to you shortly about how it still

22  affects him, still plagues him to this day.

23       Anyway, as I mentioned before, Dr. Morse had to

24  spend 15 months waiting to go to trial.  These were very

25  serious charges.  He was looking at mandatory jail time.  He

1  was facing up to 5 to 15 years in jail if he was convicted.

2  But he wanted to go to trial, and he did go to trial.  And

3  even the prosecutor said that he was adamant and insisting

4  he was completely innocent.

5       So he went to trial.  And Ladies and Gentlemen,

6  you're going to hear from Dr. Morse and from the prosecutor

7  what happened at the trial.  In this case what happened at

8  the trial, literally their entire case fell apart at the

9  seems.

10       Now, I want you to understand when we're talking

11  about the problems, the weaknesses that were exposed at

12  trial, it's very important because it connects back to why

13  they falsified the records.  The two go hand in hand.  The

14  weaknesses of that case, which I'm going to talk about, led

15  them to try to fix the problems of false evidence.

16       Some of the things that came out during the trial,

17  the prosecutor got up there and said, Judge, I'm going to

18  prove to you Dr. Morse stole over a million dollars in

19  Medicaid.  That was in his opening statement.  By the time

20  he got to the closing statement, he said, okay, it's true we

21  haven't come anywhere close to a million dollars, but we

22  still can prove that he stole $3,000.

23       So the million-dollar fraud case went from a

24  million dollars down to $3,000.  And they still couldn't

25  prove the case.  The prosecutor also told the Judge in his

1  opening statement, Judge, you're going to hear from

2  Dr. Morse's patients.  They're going to tell you how they

3  never received the services that Dr. Morse billed for.

4  Guess what, Ladies and Gentlemen, not one, not one single

5  patient from Dr. Morse came into that courtroom and

6  testified against him.

7       MR. FARBER:  Objection.

8       MR. NORINSBERG:  You'll learn that the grand

9  total, they brought a grand total of three different

10  patients that came in there and --

11       THE COURT:  Can I see the parties at sidebar for a

12  moment.

13       (Sidebar conference.)

14       (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  I didn't want to interrupt your
2  opening statement about your objection about the perjury.  I
3  don't think the Court had particularly ruled on that so I
4  didn't sustain the objection.
5    But I have some concern about what you're doing
6  now.  You're going into what happened at the trial.  You're
7  trying to suggest that somehow it's a motive, but I'm not
8  understanding the nature of this argument.
9    MR. NORINSBERG:  What I'm going to do, I'm going
10  to talk specifically about weaknesses in their case and why
11  they had to do it, why they had to fabricate evidence.
12  That's what I'm trying to do.  I'm trying to show them that
13  what happened at trial, the way it fell apart, is exactly
14  why they did this.  That's what I want to do.
15    I'm about to lay out all the evidence.  I'm almost
16  done with the trial section.  That to me directly connected
17  it.  The weaknesses that were shown at trial show the
18  problems in this case.  That's why they were motivated.
19    MR. MILLER:  I don't see how they connect, Your
20  Honor.  To the extent the weakness at trial were that the
21  patients weren't treated by Morse, I don't see how that
22  relates to the fabricated evidence.  The allegedly
23  fabricated evidence is about excessive services, not by a
24  particular person.  The weakness at trial was that patients
25  didn't identify Dr. Morse as their doctor.  That's not what

1  his allegation is about the allegedly fabricated evidence.
2  The fabricated evidence allegation is that he tried to make
3  it seem like all this work was done that wasn't.
4    MR. NORINSBERG:  It's the whole argument.  The
5  point is they didn't have the evidence against him; that's
6  why they had to falsify it.  That's the whole point.  That's
7  what was shown at trial.  That's my whole theory of the
8  case, Your Honor.  They didn't have the evidence; that's why
9  they made up the evidence.
10    MR. MILLER:  We're not even disputing that some of
11  the charges were genuine like with Stacy Rodriguez.  It's
12  amount of excessiveness.  The fabrication allegations are
13  that there were excessive services not by a particular
14  doctor.  All the failures at trial were that the patients
15  didn't identify Dr. Morse as their doctor and that Ketover
16  might have been the doctor and therefore there wasn't
17  intent.
18    MR. NORINSBERG:  That's not true.  There was a lot
19  more that showed how weak this case was.
20    THE COURT:  Did they put these same exhibits in at
21  trial?
22    MR. NORINSBERG:  No, they didn't.  They didn't
23  try.  There was a judge that made a ruling on it and they
24  didn't try to.
25    Your Honor, I just be asked to be able to present

1  my case here.  This is my whole theory of the case.
2    THE COURT:  I wish I had known that you were going
3  to go into what happened in the trial.  I'll instruct the
4  jury at the end of your opening about what actually comes
5  into evidence, but go ahead.
6    (End sidebar conference.)
7    (Continued on the next page.)

1    MR. NORINSBERG:  You're going to learn, Ladies and
2  Gentlemen, at this trial, they called a grand total of three
3  witnesses.  None of them had been treated by Dr. Morse.
4  These three witnesses, two of them literally said -- it came
5  out of trial -- they didn't even know what a denture was.
6  They didn't know what false teeth were.  This is the type of
7  evidence.
8    The third one, Miriam Perez, the state actually
9  had evidence all along that she did have dentures, but they
10  still called her as a witness.
11    You'll learn, Ladies and Gentlemen, that the
12  evidence that the prosecutor tried to present evidence from
13  one of the labs that Dr. Morse was dealing with called
14  Design Dental -- there are two labs, one is Nu-Life, one is
15  Design Dental -- you're going to learn that the records, the
16  prosecutor himself had said and would later admit these
17  records didn't even look like invoices.  They're sloppy,
18  incomplete, handwritten, lacking detail.  Yet he tried to
19  offer these records into evidence, and the Judge found that
20  the records were not admissible.  And the witness was not
21  credible.
22    All in all, Ladies and Gentlemen, you'll learn
23  that after all the case was presented, the Judge found not
24  guilty across the boards.  Grand larceny charge, not guilty.
25  Charge relating to Sawson Suliman, not guilty.  The charge

relating to Intisar Ahiri, not guilty.  The charge relating
to Miriam Perez, not guilty.  Across the boards.  Across the
boards, Ladies and Gentlemen.

Now, the prosecutor, you'll learn Mr. Fusto wasn't
actually there when the verdict came in.  He had literally
gotten a new job while the case was still pending.  But he
later learned about the verdict.  He was asked later on was
he surprised?  Were you surprised what happened in the
verdict?  You know what he said?  He said, no, I wasn't
surprised.  It was a weak case.  Yes, it was a weak case,
Ladies and Gentlemen.  And you're going to learn it was also
a dishonest case.  It was a case that was deceptive and
built on misleading records.

And I want to talk now about some of the
weaknesses that came up in this case because, again, when
you understand the problems in that case, you'll understand
why these records were falsified.

All along the prosecution was claiming that they
had done an audit based on three years of records, three
years of invoices from these two labs I just mentioned.
Another audit, their million-dollar calculation was based on
this.  But it turned out, Ladies and Gentlemen, they are
actually missing 19 months of those records.  So if you
think about it in the 36-month audit period, 19 months they
were missing records from one lab or another which they

never told Dr. Morse about, where he didn't learn about it
until this case.  And you'll learn that the auditor would
later admit that when you're missing so many records, when
you're missing 19 months of records out of a 36-month
period, it's impossible to actually make a ceiling and say
what Dr. Morse could have billed Medicaid, the most he could
have billed.

In other words, to be clear, the auditor had told
the grand jury this is the most he could have billed
Medicaid, 733,000.  That's the absolute most.  Now he's
admitting later on with 19 months of records, this ceiling
goes out the window.  That there is no way of knowing if
you're missing so many records.  You don't know how much
work was done during those months.  You have no way of
knowing what the total amount would be that Dr. Morse could
have billed Medicaid.  So the truth came out later on.

You're also going to learn that the records that
they did have, they had the Design Dental records that I
mentioned to you before that the Judge wouldn't allow in.
These records had obvious alterations to them.  You can
actually see it with your own eyes.  The years are changed
and crossed out on multiple records.  The records are barely
legible.  They waited so many years to actually try to get
the records, they never got the originals even though the
lab offered the originals.  By the time they got around to

it, they had copies they couldn't even read.  This is what
they are building their case on.

MR. MILLER:  Objection.

MR. NORINSBERG:  The other lab, the Nu-Life lab,
which you'll learn, they actually had records that you
couldn't even see what the procedures were at all.

Most importantly, Ladies and Gentlemen, what
you're going to learn about this four-year investigation is
it reached a complete dead end.  By the winter of 2004 they
wasted so much time to get to the point they had nothing.
You'll learn the prosecutor himself said he was asked why
didn't you move for a grand jury indictment in 2004?  We
didn't have enough evidence.  We still had to keep
investigating.  Why didn't you do it in 2005?  We didn't
have enough evidence.  We still needed to investigate.
Well, what happened in 2006, he was asked?  Did you get any
more new evidence that you didn't have in 2004 and 2005?  He
said no.

So the same problems that existed in 2004 were
there in 2006.  And I want you to just understand that
because it's going to tie back to the falsified records.

Now, you're going to learn, Ladies and Gentlemen,
that in this four-year investigation, they did virtually
nothing.  There were 329 files that had been subpoenaed.
They didn't speak to 317 out of 329 patients.  They never

even spoke to them.  The 12 that they did speak to, you'll
learn they only spoke on the telephone.  The investigator
would later say, well, I wanted to go out and visit them,
but the prosecutor didn't think I needed to.

You'll see when you put all of this together that
almost nothing was accomplished in that period.  And where
they ended up when they were presenting this case to the
grand jury was exactly where they were at 2004 when they
didn't have enough evidence.

Now, what did the defendants have to say about
this?  You're going to learn very shortly what they have to
say.  We're going to get right down to business here in this
trial.  My first two witnesses, I'm going to call the
auditor and then I'm going to call the prosecutor.  So you
won't have to wait very long to find out about this case.

What I expect the proof to show, Ladies and
Gentlemen, is that these two witnesses have massive
credibility problems.  Not small, massive.  You'll learn,
for example, the auditor who is going to be the first
witness, remember how he swore under oath that he told the
grand jury that Dr. Morse stole over a million dollars?
You'll learn that he filled out an affidavit in this lawsuit
where all of a sudden it went from a million dollars, now
it's down to $275,000.

And you'll learn he was asked about that.  How is

**JA181**

 1  it possible that you said it's a million one and now you're
 2  saying it's 275?  How is that possible?  You know what he
 3  said, Ladies and Gentlemen?  He said I don't have any
 4  explanation.  You'll learn that at other times his numbers
 5  had been all over the place.  One time it was 1.1 million.
 6  Another time 744,000.  Another time 600,000.  Still another
 7  time 275,000.  And yet another time all the way down to
 8  160,000.  A million dollars off from what he told the grand
 9  jury.
10          And what's important to understand is what he's
11  basing his analysis on is only two sets of lab bills.  The
12  evidence itself that he's basing his investigation on never
13  changes.  And that's critical to understand in this trial.
14  It's only two sets of lab bills, yet the evidence doesn't
15  change but the numbers keep changing.  You're going to learn
16  also that this auditor when he was asked at his deposition
17  to explain, explain to us how did you actually make your
18  calculations in this case, he said I don't remember.  He has
19  no memory of how he did any of his calculations.
20          You'll learn, Ladies and Gentlemen, that he
21  literally had to write out a script before he went to
22  testify at the grand jury to have every question and every
23  answer that he's supposed to give when he went to the grand
24  jury.  And you're going to see that script.  And you're
25  going to learn how here this auditor originally denied under

 1  oath that he had wrote the script and then when he was shown
 2  a copy of it, finally had to admit that he actually wrote
 3  this out.  He had to write out all the answers so that he
 4  would know what to tell the grand jury.
 5          And you'll learn that he did the same thing,
 6  Ladies and Gentlemen, at the end of the trial at the trial
 7  itself.  He had to write out another script so he'd remember
 8  what to say when he got to that trial.
 9          So you're going to see there are a lot of
10  credibility issues here.  You're also going to learn that
11  this auditor, he has claimed that everything he did was
12  trying to help out Dr. Morse and do what he called
13  Morse-friendly calculations.  You'll learn he consistently
14  used the wrong prices when he was trying to figure out
15  Medicaid ceilings.  Consistently.  He was supposed to say
16  look at the Medicaid chart.  He prepared a chart showing
17  what the prices were and he used the wrong one.  Every
18  procedure that he was looking at he used the wrong number,
19  the outdated, lower, incorrect number.
20          When he was asked about that, you'll learn what he
21  said.  He was asked, why were you using the wrong numbers
22  all the way through?  You know what he said?  You'll learn
23  here today.  I don't have any explanation for that.
24          You'll learn, Ladies and Gentlemen, another thing
25  he did that was very damaging here to Dr. Morse.  Dr. Morse

 1  had sent in a package of all the checks he had paid to the
 2  lab.  It came out to $318,000 of checks.  The auditor
 3  somehow left out an entire year of checks, an entire year.
 4  He was asked about that.  He has no explanation for how that
 5  happened.
 6          So you'll be the judges.  You'll decide this case.
 7  You'll decide the credibility for this auditor.  And as I
 8  just told you, you'll hear from Mr. Fusto as a second
 9  witness, the prosecutor himself.  What the proof is going to
10  show is that he, too, has very serious credibility issues in
11  this case.  For example, you're going to learn, Ladies and
12  Gentlemen, that while he was there in front of the grand
13  jury and he was presenting evidence and telling the grand
14  jury that it's $1.1 million, at the same time behind closed
15  doors he was telling his boss actually the numbers are half
16  a million dollar lower, $600,000.  Literally one day apart
17  from when he was presenting this.
18          You'll learn, Ladies and Gentlemen, that he filled
19  out an affidavit in this lawsuit that has blatantly false
20  statements that he knew were false when he made them.  We're
21  going to cross-examine him on that, and you'll see what came
22  out on that.
23          You'll also learn, Ladies and Gentlemen, that
24  there was a rule in his office with no exceptions.  If
25  you're going to ask for a B felony indictment -- this is

 1  what this is -- you need to prepare a written summary to
 2  your boss to get permission.  You'll learn that Mr. Fusto
 3  himself said there are no exceptions.  That's the rule.
 4          What happened in this case?  He said to his boss
 5  when he was asked to summarize the evidence, well, this time
 6  I prefer to just do it orally.  You'll see, Ladies and
 7  Gentlemen -- one last thing -- you'll learn that they had an
 8  expert available, this Dr. DeLuca.  They kept this expert in
 9  the dark throughout the period.  They did not show her the
10  actual patient charts.  They never had her look at the
11  people who are testifying at the grand jury.
12          They never had her look at the x-rays to see what
13  was done on these people.  Instead of doing that, they
14  showed her only these falsified billing summaries that they
15  themselves created.  That's what I expect the evidence is
16  going to show, Ladies and Gentlemen.
17          Now, you'll also, as I mentioned earlier, you'll
18  learn and you'll hear evidence about Mr. Fusto having his
19  auditor change the findings.  Now, you'll learn how the
20  defendants are saying, no, we are just trying to give him
21  lower findings, not higher.  You'll decide whether that's
22  true.
23          For those of you who are expecting a dramatic
24  moment in court where the defendants are just going to admit
25  that they did this, forget about that.  It's never going to

**JA182**

happen.  I expect these defendants will look you directly in
the eye and tell you the same lies they have told throughout
this case.  But it's going to be up to you to actually
evaluate the evidence and make your own decisions.  You'll
be the ones who have the final say on this.

Now, Ladies and Gentlemen, I want to talk very
briefly, and then I'll conclude my opening, about the
damages that Dr. Morse suffered from this indictment.  The
number one thing, Ladies and Gentlemen, apart from
everything else that happened, is it destroyed his practice.
You'll learn not just his practice but his ability to
actually be a dentist.  You'll learn that to this day he is
known as the doctor who stole a million dollars from
Medicaid.  He has tried repeatedly to get jobs to try to do
something and practice dentistry since this time.  It's
impossible.  He hasn't gotten a single interview, and he had
stellar qualifications before this ever happened.

You'll learn, Ladies and Gentlemen, when you can
see it with your own eyes in black and white what his income
was before.  He was earning a good living.  He was earning
in the range of 200- to $300,000 a year.  Sometimes it went
up, sometimes it went down, but it was in that range.

Now, afterwards, you can see with your own eyes
his tax returns afterwards, the five years since this,
literally it's $17,000 on average every year.  If he had any

saving grace, he has been allowed finally to go back to
Methodist Hospital.  He is no longer the assistant director,
but at least he's there and he's teaching and he's earning
some money doing that.

But at this point in time, he had planned -- he
had signed a lease for his practice to go up until the year
2022.  He had signed that lease.  That was his expectation
how long he was going to work.  You'll learn it's impossible
now for him to do it.  He lost his patient base.  He cannot
get a job as a dentist anymore.  And that's what the
evidence is going to show.

You'll also hear, and I'll let Dr. Morse describe
himself, how his reputation has been affected.  How
embarrassing it is.  What he has to do even when he's
teaching in class.  He has to disclose every time there's a
new set of students to talk about it because he knows they
are going to look it up on the Internet anyway and what
affect that this has had.

Now, Ladies and Gentlemen, one last thing.  You're
going to hear from two economists in this case.  You're
going to hear from a professor at Pace University's School
of Business, Dr. Mantell.  He is going to help you
understand the calculations and the figures and the ways
economists look at not just what happened in the past, but
how we project what a dollar is worth not now but five years

from now or ten years from now.

You'll also learn that the defendants have hired
an expert, not somebody from the State of New York.  You'll
hear he's an expert from Massachusetts.  He does a lot of
work for the Attorney General's Office.  And you'll learn
that this expert has no opinion as to what Dr. Morse's past
lost earnings is.  Has no opinion as to what the fair market
value was of his practice was when he sold it.  Has no
opinion as to how much money Dr. Morse is going to lose in
the future.  No opinion.

So, again, when we come back to a theme in this
case of credibility, I put it back to you as jurors to
evaluate this.  And when you're hearing from a professor of
economics and you're hearing it from the expert for the
defense, you'll decide as to what's more credible.

Now, Ladies and Gentlemen, in a minute or two
you're going to hear from defense counsel.  They are going
to get up, and I expect you're going to hear from the
defense in this case what a strong case they had.  How
strong their case was to the grand jury.  How the fabricated
evidence really isn't fabricated.  How if it is, it was just
a mistake.  How Dr. Morse is really to blame for everything
that happened.

The only thing I want to say to you, and I'm
making that promise now, none of this is going to stand up.

And when I give you my closing argument, I'm going to go
back through it and together we're going to work through it
together.  We're going to dismantle each and every one of
these phoney defenses that are being made in this case.

But what we're going to do right now is ask you to
simply listen to the evidence carefully.  We need you to do
that.  Pay close attention.  If you do that, Ladies and
Gentlemen, if you do that and if you honor the pledges that
you made during jury selection, you will get the right
verdict in this case.  And that is to hold these two
defendants accountable at long last for what they did to
Dr. Morse.  Thank you.

THE COURT:  All right.  Ladies and Gentlemen, I
just want to remind you about one of my opening
instructions.  And that was that what is said in opening
statements, and this applies to plaintiff's opening
statement as well as defendant's opening statements, is not
itself evidence.  So if something is said that ultimately
does not become a part of the evidence in this case, you
cannot consider it in any way simply because that statement
was made in an opening statement.

Counsel.

DEFENDANTS' OPENING STATEMENT

MR. FARBER:  Good morning.  I am Assistant
Attorney General Seth Farber.  With me at counsel table is

**JA183**

1   Special Assistant Attorney General Chris Miller.  It is our
2   privilege to represent in this case former Assistant
3   Attorney General John Fusto and auditor investigator Jose
4   Castillo.
5           I'm going to turn the clock back now seven years.
6   Actually, seven years to this month, February 2006.  Special
7   Assistant John Fusto is finalizing his preparations for
8   presenting a case to the grand jury.  The case involves the
9   plaintiff here, Dr. Leonard Morse.  The allegations against
10  Dr. Morse will ultimately consist of one charge, of grand
11  larceny, specifically theft from the Medicaid program in
12  excess of $1 million, as well as 11 counts of what is called
13  offering a false instrument for filing, which literally
14  means submitting a piece of paper to the state that's false
15  for the purpose of defrauding the state.
16          Those are the charges he's working on.  To do that
17  he has prepared a number of grand jury subpoenas.  He will
18  present those grand jury subpoenas to the investigators
19  assisting him on this case, two of which will testify here.
20  They are James Serra and Robert Flynn.  You will hear from
21  them that they, in fact, served the subpoenas and from time
22  to time they investigated various aspects of this case.  You
23  will also hear that Mr. Fusto asked auditor Castillo to
24  prepare a group of computer printout spreadsheets for the
25  purpose of assisting him with presenting his charges to the

---

1   grand jury.
2           Now, a grand jury, by way of background, is very
3   much like yourselves.  It is a group of citizens brought
4   together to make a decision.  You'll be making a decision on
5   the civil verdict.  The grand jury makes a decision as to
6   whether or not an individual or individuals are to be
7   charged with a crime.
8           And that's what this grand jury was going to do.
9   That's part of our justice system is that a group of
10  citizens makes the calls as to whether they believe there's
11  probable cause.  And we believe the evidence will show that
12  there was overwhelming evidence of probable cause concerning
13  Dr. Morse.  Specifically, the exhibits, the spreadsheets
14  that Mr. Castillo was preparing, you will learn eventually
15  came to be called Grand Jury Exhibit 7 and Grand Jury
16  Exhibit 11.
17          Now, Grand Jury 11 consists of the same six sheets
18  that Grand Jury 11 does plus two additional patients so in
19  effect your evaluation in this case will ultimately concern
20  eight pieces of paper.  Grand Jury 11, these are patient
21  spreadsheets.  These concern specific data fields downloaded
22  from a Medicaid claims database.  And that's what you'll
23  hear about.
24          And the fact of the matter is the real question is
25  how remarkably unremarkable these spreadsheets are.  At the

---

1   end of the day, they are simply computer downloads.
2   Nonetheless, to understand this case better, we're going to
3   turn the clock back again an additional four years to around
4   the year 2002.
5           As a result of the World Trade Center tragedy in
6   which thousands of New Yorkers lost their jobs, including
7   among others myself, the Department of Health issued
8   thousands and thousands of additional temporary Medicaid
9   cards for the purpose of alleviating some of the financial
10  suffering by New Yorkers.  Unsurprisingly, because there
11  were so many more people in the Medicaid system, a number of
12  Medicaid providers -- and by "Medicaid provider," this could
13  be a doctor, a hospital, a nursing home or a dentist -- a
14  number of Medicaid providers had a sudden spike upward in
15  their billings.
16          Now, the Department of Health certainly expected
17  some of this by issuing new cards.  Certain practitioners,
18  however, had a dramatically unexpected spike.  And among
19  those practices was Dr. Morse's, which is also called 580
20  Dental or Brook Medical.  The practice was located not very
21  far from here at 580 5th Avenue in the Park Slope section.
22  And the Department of Health asked the Attorney General's
23  Medicaid Fraud Control Unit to investigate a number of these
24  practices.  And Dr. Morse's was one of these practices.
25          So this dental practice was assigned to Special

---

1   Assistant Attorney General Fusto, and Mr. Fusto then
2   directed some investigators to conduct some investigative
3   tasks.  One of the first tasks that it performed in 2002 was
4   simply to go out to Dr. Morse and talk to him.  They also
5   requested some records from him.
6           In the course of talking to Dr. Morse, they
7   learned a number of interesting things about his practice.
8   It's a rather large-volume practice.  Dr. Morse testified
9   that he had between 30- and 35,000 patients.  There was a
10  second dentist working there, Dr. Brian Ketover who
11  Dr. Morse told the investigators was paid on a commission
12  basis.
13          Dr. Morse personally was responsible for retaining
14  all patient records.  That's something he told the
15  investigators.  He told them for denture work, he sent out
16  his dentures to two labs.  And you'll learn about them
17  extensively.  One was Nu-Life, one was called Design Dental.
18  And most significantly, Dr. Morse told the investigators
19  that he personally did all Medicaid claims billing himself.
20          Now, the overwhelming billings and all the
21  relevant bills in this case were electronic.  At some point
22  at the beginning of the Medicaid program going back to the
23  1970s, just about all claims were filed on paper.  Over the
24  years, most claims filed are electronic.  Dr. Morse
25  essentially files almost all his claims electronically and

**JA184**

1    certainly all the claims that were relevant here.

2         So Dr. Morse personally entered those claims.  He

3    told the investigators at least that he doesn't use a

4    billing clerk.  He doesn't use a billing service.  He does

5    it himself.  So after the investigators heard those facts,

6    they made their requests, and then eventually they came back

7    and got some patient records from Dr. Morse.

8         Now, also in the course of this investigation a

9    number of things were observed.  First of all, over the

10   three-year period that was being specifically looked at, and

11   that is the years 2000, 2001 and 2002, Dr. Morse had billed

12   the Medicaid program just over $4 million.  Again, as I

13   said, it's a high-volume practice.  One of the things

14   Dr. Morse said is that he sees typically 20 to 22 dental

15   patients a day.

16        Nonetheless, it was observed that of the

17   $4 million plus in claims, 1.9 million or almost half were

18   specifically for denture-related services.  Now, this seemed

19   unusually high to the investigators and so they investigated

20   further.  And so one trend they observed was that there were

21   a rather significant number of patients who were fairly

22   young, in some cases under 30, who were having Medicaid

23   claims filed for them for denture services.  And again, this

24   struck the investigators as significant.

25        So they began to make some phone calls.  And they

1    discovered that a surprising number of the people they

2    talked to actually told them what do you mean?  I don't wear

3    dentures.  Or in some cases, well, I wear dentures but

4    Dr. Morse didn't do anything that he claimed he did for me.

5    I don't know what you're talking about.  And so this in turn

6    led to further investigation.

7         Now, as I said, Dr. Morse had been asked for his

8    patients records, and counsel indicated Dr. Morse was very

9    cooperative in providing records.  And we're not disputing

10   that Dr. Morse provided records for the patients that the

11   Medicaid Fraud Control Unit asked for.

12        As an aside, by the way, the mission of the

13   Medicaid Fraud Control Unit is to investigate and prosecute,

14   prosecute where appropriate, situations where Medicaid

15   providers -- those doctors, hospitals, dentists, whatever --

16   might take advantage or overbill the Medicaid system.

17   That's the job of the unit.  That's the job of its

18   prosecutors, auditors, investigators, to protect the

19   taxpayer from people who abuse the system.

20        So the investigators, the auditors, and Special

21   Assistant Fusto received the evidence from Dr. Morse.  And

22   what's interesting is what wasn't there.  What wasn't there

23   were prescriptions for dentures.  Now, while this might not

24   be a big deal in many dental practices, considering that

25   this was almost half of Dr. Morse's billings, this was a

1    rather significant omission.  So they continued to look for

2    it; couldn't find prescriptions.

3         Eventually Dr. Morse was asked, well, where are

4    your denture prescriptions?  And he said, oh, I throw them

5    away after exactly one year.  And he had his particular

6    legal theory for why he did that.  Although we believe the

7    evidence will show that he actually signed a certification

8    with the Medicaid program that he would keep records for six

9    years, including prescriptions.  And, indeed, you will learn

10   that Medicaid regulations provide that you're supposed to

11   keep that kind of record for six years.

12        Well, he didn't.  Didn't provide any

13   prescriptions.  This led to another investigation which is,

14   well, if he's not providing us prescriptions, how can the

15   state determine that he actually did this denture work?  And

16   so they looked for another -- they requested whatever

17   records were available from the two laboratories, Nu-Life

18   and Design Dental.

19        Now, it turns out that Nu-Life was a rather

20   professional looking organization that had denture

21   laboratories, produced reasonably professional resources.

22   The other laboratory, Design Dental, appeared to be

23   operating out of the basement of its owner, a man named

24   Nissan Yushvayev who lives -- at least the residence and the

25   laboratory were in the Bay Ridge section of Brooklyn.  And

1    the investigators found it difficult to communicate with

2    Mr. Yushvayev because he is a Russian speaker.  They

3    eventually brought back a Russian interpreter from the

4    Attorney General's Office, and eventually they got copies of

5    invoices from Mr. Yushvayev, head of Design Dental, and they

6    got copies of invoices from the Nu-Life laboratory.

7         What the investigators learned is that neither set

8    of lab invoices came with prescriptions.  One of the labs

9    said that they returned all prescriptions to Dr. Morse with

10   their invoice.  The other lab said they destroyed all

11   prescriptions after a year, although they believed the

12   dentist would retain prescriptions.

13        So these are the invoices that arrived at the

14   Attorney General's Office to evaluate this case.  By the

15   way, Dr. Morse was also asked at some point for copies of

16   his prescriptions.  You will learn that Dr. Morse destroyed

17   his prescriptions, and he destroyed the laboratory invoices

18   for denture work.

19        So the laboratory invoices arrive at the Attorney

20   General's Office.  The Nu-Life invoices, which were neat and

21   typed, contain a problem; they don't state what service was

22   performed.  They just have patient name, date, and amount.

23   The Design Dental invoices at least solve that problem.

24   They do have a brief description of services.  The problem

25   is often their services don't match services specifically

that Medicaid is supposed to pay for. Further, the patients
didn't necessarily match Dr. Morse's Medicaid patients.

Another problem was sheer legibility and generally
these were problems. Yet another problem was the fact that
of the approximately three-year period that was requested,
neither lab produced a full set.

Now, the labs were actually subpoenaed for this
information in late 2002, approximately October. And so it
appears that they were asked for 33 months each or 66 total.
Neither lab produced that. There were months that were
never produced. And so the Attorney General's Office
basically had to conduct their evaluation of what these lab
invoices would allow Dr. Morse to bill for based on what
they had.

You must keep in mind that it would have been
wonderful if Dr. Morse had complied with Medicaid
regulations and kept his prescriptions or if he had complied
with sound accounting principles and kept his laboratory
invoices, but he didn't do that. He, for whatever reason,
wanted to make sure that those were unavailable to anyone in
the future and he did.

That said, the invoices were evaluated and there
were difficulties in evaluating them. As a result, the fact
of the matter is a number of calculations were run based on
a number of theories. And the fact is, the evidence you'll

hear is that what Mr. Castillo was asked to do is compute a
ceiling, which is to say, the most Dr. Morse could bill the
Medicaid program for denture work based on the available
evidence. And their were different calculations, there's no
question about that. This was painstaking work. It took a
long time. Some people were frustrated by how long it took,
no question, but that's how it was.

Eventually the Attorney General's Office concluded
that the combination of the fact that no records were
available, largely because Dr. Morse had sought to it they
were not available, and the fact that the records that were
available analyzed still showed a large gap between what he
billed Medicaid and what he could document, the Attorney
General's Office in the interest of protecting the taxpayer
from those who might defraud it determined that it was
appropriate to charge Dr. Morse with grand larceny in excess
of a million dollars. And you will find that the amount of
their analysis was approximately $1.15 million.

Were there other calculations? Absolutely. In
fact, there were even calculations run after the eventual
trial and acquittal. By the way, it's undisputed that
Dr. Morse was tried and he was acquitted. That's in this
country, the prosecution doesn't win every case. There are
some countries where it does. Thankfully, we don't live in
one of them.

But the fact that the prosecution doesn't win any
case is no indication whatsoever that anyone did anything
wrong in the course of prosecuting it, nor certainly is it
proof whatsoever of fabrication of evidence.

In any event, this will roll the clock back up to
2006. Mr. Fusto is preparing his case to the grand jury. A
number of patients had previously said we don't wear
dentures or other determinations had been made concerning
who should be called to the grand jury in some cases from
reviewing their patient records. And Mr. Fusto identified
ten patients that he wanted to call to the grand jury, as
well as the lab owners, the Design Dental owner, Mr.
Yushvayev, the owner of Nu-Life.

He also called investigator Flynn. He called
auditor Castillo. He called Dr. DeLuca. He called a
gentleman who I anticipate you'll be hearing from named
Aharonyan. He is an employee of the State's Department of
Health. And Mr. Aharonyan was actually an early witness.
He provided some background including Dr. Morse's enrollment
package with the Medicaid program. He provided proof of
payment from the Medicaid program to Dr. Morse.

And among the things he provided was something
called a provider profile. Specifically, this was a
printout of claims data pertaining to Dr. Morse for this
three-year period.

Now, I think from Mr. Norinsberg's openings you
can anticipate that there is an allegation that somehow
there is a piece of paper called a claim or a billing record
and it has somehow been altered or fabricated to get to
Grand Jury Exhibit 7 or 11. The fact is there's no such
piece of paper. In fact, there's no such combination of
pieces of paper. There are only data fields in a database
as originally entered by Dr. Morse's own hands into a
computer submitted to the Medicaid program and then stored
at the Department of Health.

And then when the Department of Health makes a
determination to pay those claims, then it gets entered into
the database that is eventually used for this purpose and
becomes -- snapshots of it become the provider profile. In
any event, the provider profile that Mr. Aharonyan produced
was thousands of pages.

In addition, eight patients testified. As
indicated by Mr. Norinsberg, those patients are Intisar and
Nassa Ahiri -- I believe they were brother and sister --
Miriam Perez, Stacy Rodriguez, Asi Othman, Edwin Gonzalez,
and one or two others.

You will learn that seven of them testified at the
grand jury that they didn't wear dentures and yet Dr. Morse
claimed dentures for them. The eighth patient testified and
you will learn this from -- you will be presented evidence

**JA186**

of testimony of the grand jury for purpose of your
evaluation. Asi Othman testified that he actually had
partial dentures, but Dr. Morse didn't do the work he
claimed on the date that he claimed.

In addition, the lab owners testified, yes, we're
lab owners. We were asked by Dr. Morse to do laboratory
work and we did and these are our invoices. Mr. Flynn, the
investigator, testified about aspects of his investigation,
including some of the things that Dr. Morse told him which
are some of the things I have told you Dr. Morse told
investigators. And John Fusto called Jose Castillo
essentially to testify, one, about his analysis and
contrary -- you'll draw your own conclusions as to how much
Mr. Castillo understands about his analysis, but
Mr. Castillo understands how he calculated the ceiling here.

And Mr. Castillo understands just how difficult
doing so is made by the state of the records caused by the
fact that Dr. Morse sought to it that the original and
expected records were unavailable. You'll hear about that.
And you'll hear about the creation that specifically the
preparation of the relevant exhibits here that you're going
to decide that they are a fabrication and, if so, was that
fabrication material for the indictment.

And what Mr. Castillo and Mr. Fusto are going to
tell you is that at the time of grand jury preparation

around February of 2006, Mr. Fusto asked Castillo to do
these spreadsheets. He asked him for certain fields. And
Mr. Fusto went to the database and provided documents with
these fields.

We anticipate that Mr. Castillo will tell you that
he did so consistent with his training with his forensic
training. That when you pull up a new document, you pull it
from the original database so that it's not corrupted by
things you may have printed out before from other databases
which may in turn have changed for other reasons. So he
printed this fresh from the database and presented this to
Mr. Fusto for use in the grand jury.

The specific fields were fields that Mr. Fusto
believed were relevant to prosecuting a false instrument
claim. One of them is something called a CIN number, which
actually stands for Client Investigation Number. This is
like a Social Security number. It's unique to every
Medicaid recipient. It follows them around for the rest of
their life. If someone gets married and divorced and their
name changes, the CIN number stays the name. Name of the
patient, last name first, then the amount claimed. Then the
date of service provided. Then an invoice number. This is
created by the Medicaid system to track basically specific
claims as they are filed and keep track of them.

Then something called a Julian date. The Julian

calendar is sort of each year 1 through 365. So technically
today would be 35th day of the year and December 31st is
365. But the Julian date is kept as part of the provider
profile as the date claimed hit the Medicaid system. So in
theory, a claim is entered by a provider. It may or may not
instantaneously register in the Medicaid system. When it
registers, that becomes the Julian date or in this case the
date claim presented. Very important in a false filing
case.

And then finally the last two columns were
procedure. This is a set of numerical numbers that Medicaid
attaches to specific services. In this case, I think all of
the procedures you're going to see start with 5. 5 is the
denture series.

And finally a verbal description from the Medicaid
manual as to what the services are. In this case, most of
the services of relevance concern denture repairs. So
repair denture, repair tooth, something of that nature.
Some other service is listed, but that's basically the
spreadsheet. And you will hear that all Mr. Castillo did
was execute the query. He went to the database and printed
out these cases for each of these eight patients based on
these criteria.

Now, let me take an aside on tooth number. Tooth
number is unquestionably one of the fields available to

include in this document. Another one is something called
surface code. You should -- you can tell from feeling your
own teeth that there are actually five surfaces plus a root
on each tooth. You have the front, back, side, and of
course the top or the bottom. The surface code wasn't
provided in this either.

You'll also see that there are other codes
available on these data fields that could have been in the
spreadsheet; patient address, Social Security number, birth
date, county, county of the provider. Lots and lots of
fields not chosen. One of them was tooth number.

(Continued on the next page.)

1   MR. FARBER:  You will hear -- the evidence will
2   show you -- that Mr. Fusto did not believe that tooth number
3   was a particularly relevant issue in a case such as this
4   where the allegation is the service wasn't performed at all.
5   In a case where, for example, a dentist may claim ten
6   fillings and the issue was one filling, perhaps it might be
7   more relevant.  Mr. Fusto didn't think it was relevant here
8   want.  Mr. Castillo wasn't asked to provide it, so he didn't
9   provide it.
10          He did provide the printouts from this database,
11  and a couple of things popped up from the printout.  I'm
12  going to talk about two specific patients, because these are
13  plaintiff's rather serious alligations.  In fact, when you
14  see the documents, as I began, what's remarkable, you'll see
15  how unremarkable they are.
16          One of these patients is Stacey Rodriguez.  Now,
17  there are nine liens on Stacey Rodriguez.  Why are there
18  nine lines?  Because at some point, Dr. Morse made an
19  adjustment to the claims he filed and the system recorded
20  that, that adjustment, and then it immediately credited out
21  to make sure there wouldn't be a change with payment.
22          So, for example, you'll see denture repair,
23  $174,000.  And then under it, you'll see denture repair,
24  $174.  Then under that, you'll see minus $174.  The total,
25  the bottom of the payable, will not reflect nine claims.  It

1   will reflect three claims.  Why did this happen?  Because
2   Mr. Castillo literally printed out exactly what he was asked
3   to do, which is Dr. Morse's denture claims for this patient
4   between -- for this period of time.  So that's what the
5   system spit out.
6           Now, what happened with that case is interesting,
7   because the adjustments were not made simultaneously.  The
8   adjustments were actually made several months later, around
9   September of 2002.  The original claims were April 2002.
10  For whatever reason the adjustments were made, it had no
11  effect on the dollars.
12          Now, unfortunately, I anticipate that Mr. Fusto
13  will tell you that when he used that document with
14  Dr. DeLuca, he simply made a mistake.  He just didn't catch
15  the signs.  And I believe Dr. DeLuca will tell you she
16  didn't catch the minus signs either.  So they proceeded as
17  if it were nine claims.  That's a mistake.  The face of the
18  document is -- shows clearly that there are minus signs.
19          And the other interesting thing in this case, we
20  anticipate Mr. Castillo is everything that you know what the
21  different Edwin Gonzalez's in the database.  Now, each of
22  the these patients, as I said, has their own individual CIN
23  number.  And that's the first column.  And you'll see just
24  from the face of the document, there are three different CIN
25  numbers.  They're not buried in the documents.  No one had

1   anything to hide here.  So simply called the other Edwin
2   Gonzalez's.  There are different periods of time.  One of
3   these, Edwin Gonzalez, testified he didn't get the denture
4   services provided by Dr. Morse.
5           Now, another interesting is that the evidence will
6   show you that Dr. Morse was not actually charged for
7   anything involving Edwin Gonzalez.  This is simply evidence
8   offered by the special assistant Fusto can do.  He can put
9   in additional evidence for Dr. Morse, and that's what he did
10  in this case with respect to Edwin Gonzalez.  And the
11  document itself, however, is not fabricated.  It is simply a
12  printout of what was in the database.  There's no
13  alteration.  It simply is.  And, quite frankly, if, in fact,
14  Edwin Gonzalez testified that any of the work wasn't done on
15  that page, it would be evidence of a false filing.
16          Now, a word on Dr. DeLuca, who we've mentioned.
17  You'll hear much about the fact that Dr. DeLuca wasn't shown
18  tooth numbers.  Now, the evidence is going to show you that
19  Mr. Fusto called Dr. DeLuca to basically a clinical
20  assessment that, in her view, the specific billings for the
21  specific six patients he showed her.  And by the way, Dr.
22  DeLuca only saw Exhibit 7.  She did not see Exhibit 11.  She
23  saw nothing on patient Edwin Gonzalez or Mary Perez.  She
24  saw the other six patients' printouts.  And she concluded,
25  "Well, this looks clinically questionable to me.  I don't

1   know why you would do these services."
2           Now, Dr. Morse will tell you that, of course, "If
3   you only saw the tooth numbers, then you would know what I
4   was doing and you would have no such questions."  We believe
5   the evidence will show that even if Dr. DeLuca had tooth
6   numbers, she would have concluded that there were still
7   clinical questions raised by this, possibly not the
8   identical clinical questions, but substantially the same
9   clinical questions.
10          In any event, what you have, then, are a dentist
11  with a regulatory obligation to keep records, who's made
12  sure he hasn't kept any.  It's a prudent financial
13  obligation to keep invoices.  He's going to tell you he
14  destroyed them himself.  He's got almost $2 million in
15  claims based on these records that he's made sure aren't
16  available.  And an evaluation of laboratory invoices that
17  could be obtained shows that it's still reasonable to
18  believe that he's still overbilled the Medicaid program by
19  an excess of a million dollars.
20          And you've got a number of patients come to a
21  grand jury, testify under oath that they did not receive
22  services claimed.  That's the basis for the indictment.  And
23  we believe the evidence will show you that's why the grand
24  jury indicted.  It had less -- or, more accurately,
25  nothing -- to do with the particulars of grand jury

1   Exhibits 7 or 11, which, by the way, were not fabricated

2   documents.  They were entirely accurate printouts of

3   Department of Health Medicaid claims data.  But that,

4   ultimately, is going to be your task.

5          So we're going to roll the clock all the way back

6   to the present moment, and so that's where we are.

7   Dr. Morse brought this case in 2007, shortly after he was

8   acquitted.  And as I said, the fact that he was acquitted is

9   certainly not proof of anything that the prosecution did

10  wrong.  And, ultimately, another question that the evidence

11  will present is the Latin doctrine known as pro bono or,

12  simply, who benefits.

13         Special assistant Fusto, like me, is a civil

14  servant, or was a civil servant, doing his job, as was

15  Mr. Castillo.  Dr. Morse, as the evidence will show, made

16  hundreds of thousands of dollars a year from a

17  poverty-reduction program.  So, you know, part of your

18  evaluation, who benefits.

19         All right.  We turn the clock back to the present.

20  You will hear the witnesses.  You will see the exhibits.  We

21  believe that once you have seen and heard all of the

22  witnesses, seen and evaluated all of the exhibit evidence,

23  you will come to the only reasonable verdict possible here,

24  a verdict for the defendant.  Thank you.

25         THE COURT:  All right.  Thank you, Counsel.

---

1          Do you want to call your first witness?

2          MR. NORINSBERG:  Yes, your Honor.  I call

3   Defendant Jose Castillo.

4          THE COURT:  Would you raise your right hand.

5   JOSE CASTILLO, having first been duly sworn, was examined and

6   testified as follows:

7          THE WITNESS:  Jose Castillo.  J-O-S-E

8   C-A-S-T-I-L-L-O.

9   DIRECT EXAMINATION

10  BY MR. NORINSBERG:

11  Q   Good morning, Mr. Castillo.

12  A   Good morning.

13  Q   You're here pursuant to a subpoena, correct?

14  A   Yes.

15  Q   And you have previously given sworn testimony relating

16  to this case, correct?

17  A   Yes.

18  Q   You had testified at a deposition, correct?

19  A   Yes.

20  Q   You also testified at a grand jury; is that correct?

21  A   Yes.

22  Q   And you've reviewed your testimony before coming here

23  today, right?

24  A   Yes.

25  Q   Are you currently employed, sir?

---

1   A   Yes.

2   Q   You're employed at the New York State Attorney

3   General's office?

4   A   No.

5   Q   Where were you employed?

6   A   I own my own business.

7   Q   Okay.  And back in April of 2006, were you employed at

8   the Attorney General's office?

9   A   Yes.

10  Q   How long did you work there in total, sir?

11  A   About eight and a half years.

12  Q   You started in February 2003; is that correct?

13  A   Yes.

14  Q   And you were assigned a particular unit, the Medicaid

15  Fraud Control Unit, correct?

16  A   Yes.

17  Q   You were there the entire time, right?

18  A   Yes.

19  Q   And your position at this unit was as a special

20  auditor/investigator, right?

21  A   Yes.

22  Q   Your duties were to review Medicaid bills of providers

23  and make sure they are compliant with rules and regs; isn't

24  that correct?

25  A   Yes.

---

1   Q   At some point you were assigned to the case of

2   Dr. Leonard Morse; is that correct?

3   A   Yes.

4   Q   Now, you told us that you started at the Attorney

5   General's office in 2003.  When were you first assigned to

6   Dr. Morse's case?

7   A   Around 2005, I believe.

8   Q   It was actually August of 2004.  Does that sound right?

9   A   Could be.

10         THE COURT:  I'm sorry.  What?

11         THE WITNESS:  Could be 2004.

12  BY MR. NORINSBERG

13  Q   And you were working with an assistant attorney general

14  named John Fusto, correct?

15  A   Yes.

16  Q   Worked together on this case, correct?

17  A   Yes.

18  Q   And in August of 2004, you had a meeting with

19  attorney/investigator Fusto and with other members of the

20  team; is that correct?

21  A   Yes.

22  Q   You also met about the investigators James Serra and

23  Robert Flynn; is that correct?

24  A   Yes.

25  Q   You learned at that time, in August of 2004, that

1    Dr. Morse was being investigated for dental procedures he

2    didn't perform, correct?

3    A    Yes.

4    Q    Now, at some point you learned that there was an audit

5    period that you were going to focus on in this case, right?

6    A    Yes.

7    Q    The audit period was 2000 to 2002, correct?

8    A    Yes.

9    Q    And you were the one that was responsible for making

10   fraud calculations for these year periods; is that correct?

11   A    Yes.

12   Q    And in your capacity as senior auditor in this case,

13   you testified before the grand jury, true?

14   A    Yes.

15   Q    You told the grand jury that the amount of fraud was

16   $1.1 million or so; is that correct?

17   A    Yes.

18   Q    Now, you filled out an affidavit in this lawsuit,

19   right, sir?

20   A    Yes.

21   Q    And in this lawsuit, you said that the amount of fraud

22   was actually as low as $275,000, true?

23        MR. FARBER:  Objection.

24        THE COURT:  What's the basis of the objection?

25        MR. FARBER:  It's not what the affidavit said.

---

1         THE COURT:  So it's a good-faith basis?

2         MR. FARBER:  Assumes facts not in evidence.

3         THE COURT:  Do you have a copy of the exhibit,

4    Counsel?

5         MR. NORINSBERG:  Yes, your Honor.

6         THE COURT:  Do you want to rephrase your question?

7         MR. NORINSBERG:  Sure.

8    BY MR. NORINSBERG

9    Q    Did you represent in an affidavit that Dr. Morse had

10   made fraudulent claims to the Medicaid program for at least

11   $275,000?

12   A    Yes.

13   Q    Now, the difference between what you told the grand

14   jury of 1.1 million and the 275,000 is almost $900,000; is

15   that correct?

16   A    Yes.

17   Q    Can you please tell this jury, do you have any

18   explanation for the difference between the testimony before

19   the grand jury and the $275,000 figure?

20   A    I'm trying to -- to remember what happened at that

21   time.

22   Q    My question is, Mr. Castillo -- and it's a yes-or-no

23   question -- do you have any explanation for how it is you

24   told the grand jury it was $1.1 million, but in your

25   affidavit you said the amount might be around $275,000?  Do

---

1    you have any explanation for the jury?  Yes or no, sir?

2    A    No.

3    Q    So, no, you do not have an explanation, right?

4    A    No.

5    Q    Now, you also told a colleague of yours that the amount

6    of fraud was approximately $275,000, correct?

7    A    Based on the chart, yes.

8    Q    And, sir, in your -- the same affidavit, if you give

9    Dr. Morse full credit, the amount might be as low as

10   $160,000, right?

11   A    If he would have the evidence, that's possible.

12   Q    But you wrote in your affidavit that it could have been

13   as low as $160,000.  True or not true?

14   A    I don't remember.

15   Q    Mr. Castillo, do you have any recollection of the

16   calculations in this case?

17   A    Yes.

18   Q    Referring to your deposition, page 28, line 13,

19   "QUESTION:  Can you tell us, sir, as you sit here right now,

20   do you have any recollection of your calculations in this

21   case?

22        "ANSWER:  I don't remember."

23        Do you recall being asked that question and giving that

24   answer under oath, sir?

25   A    Yes.

---

1    Q    So at your deposition, which was just one year after

2    this criminal trial, you said under oath that you don't

3    remember anything about your calculations, true?

4    A    Yes.

5    Q    Now, before you testified in front of the grand jury,

6    did you ever prepare a document setting forth the questions

7    that should be asked and the answers that you intended to

8    give?

9    A    Yes.

10   Q    Referring to your deposition, page 33, line 12,

11   "QUESTION:  Have you ever prepared a document setting forth

12   the questions which should be asked and the answers which

13   you intend to give?

14        "ANSWER:  No."

15        Do you recall being asked that question and giving that

16   answer at your deposition?

17   A    I don't remember.

18   Q    Do you recall being asked the following question and

19   giving the following answer, page 31, line 18?

20        "QUESTION:  Did you -- and did you ever prepare any

21   type of sheet or document which would list what questions

22   Mr. Fusto should ask and what answers you were going to

23   give?

24        "ANSWER:  No."

25        Do you recall giving that testimony, sir?

1  A   I don't remember.

2  Q   Sir, you gave that sworn testimony at your deposition,

3  didn't you?

4  A   I don't remember if I was asked those questions.

5  Q   Do you recall answering the following question on

6  page 34, line 2?

7      "QUESTION:  Did you ever offer to write up the answers

8  that you intended to give in this matter?

9      "ANSWER:  No."

10     MR. FARBER:  Objection.

11     THE COURT:  Is it not a proper reading of the

12 transcript?  What is your objection?

13     MR. FARBER:  I'm not objecting to the wording of

14 the transcript.  My objection is that there's no

15 foundational question appropriate to a reading of the

16 transcript.

17     THE COURT:  I'll sustain the objection.

18 BY MR. NORINSBERG

19 Q   Mr. Castillo, would you agree, sir, that, in fact, you

20 did prepare a written document that had all the questions

21 and all the answers you were going to give at the grand

22 jury?  Would you agree with that, sir?

23 A   I did have the piece of paper, but that piece of paper

24 just represents -- those were just my notes.

25 Q   They were just your notes.  It wasn't like a question

1  and answer?

2  A   It wasn't a question and answer.  They were just my

3  notes.

4      MR. NORINSBERG:  May I approach the witness, your

5  Honor?

6      THE COURT:  Yes.

7  BY MR. NORINSBERG

8  Q   I'm showing you what's been marked as Plaintiff's

9  Exhibit 21.  (Handing.)

10     Do you recognize that document, sir?

11 A   Yes.

12 Q   And are these the notes that you were just referring

13 to?

14 A   Yes.

15 Q   And it's your handwriting, right, sir?

16 A   Yes.

17 Q   You do see questions on this sheet, do you not, sir?

18 A   I see numbers.

19 Q   You don't see any numbers on the sheet?

20 A   Yes, I see questions.

21 Q   Do you also see a little thing that says "answer" and

22 then it shows what your answer is supposed to be?

23 A   Yes, I see it.

24     MR. NORINSBERG:  I offer this into evidence, your

25 Honor.

1      THE COURT:  Twenty-one will be received.

2      (Plaintiff's Exhibit 21 received in evidence.)

3      MR. NORINSBERG:  I'd like to publish it to the

4  jury, your Honor.

5      MR. FARBER:  Objection.

6      THE COURT:  You want to put it on the ELMO?

7      MR. NORINSBERG:  Was going to publish it manually.

8  We can move on.  I'll do it later.

9      THE COURT:  Why don't you move on.

10 BY MR. NORINSBERG

11 Q   Now, sir, would you agree that you wrote out the

12 answers of what you were supposed to say to the grand jury

13 because you wanted to make it easy as to what you were going

14 to have to testify to?  Right?

15 A   No.

16 Q   Referring to your deposition, page 36, line 23,

17 "QUESTION:  Why was it necessary for you to write out your

18 answers?

19     "ANSWER:  It will make it easy for my testimony."

20     MR. FARBER:  Objection.

21 BY MR. NORINSBERG

22 Q   Do you recall being asked that question and giving that

23 answer?

24     THE COURT:  Overruled.

25 A   Yes.

1  BY MR. NORINSBERG

2  Q   Now, did you ever go through what your expected

3  testimony was going to be, with Mr. Fusto at that time?

4  A   I just -- like I said, they were my notes, and I

5  just -- I reviewed them.

6  Q   Me question is, Mr. Castillo, did you go through what

7  your expected testimony was going to be in front of the

8  grand jury with Mr. Fusto?

9  A   No.

10 Q   Now, in your career as an auditor, have you ever told

11 the prosecutor what to ask you?

12 A   No.

13 Q   And you don't have any type of custom and practice

14 preparing questions and answers like this; is that correct?

15 A   No.

16 Q   But did you it in this case, right?

17 A   Yes.

18 Q   Now, during this investigation, Mr. Castillo, you

19 learned that Dr. Morse was doing business with two dental

20 labs, correct?

21 A   Correct.

22 Q   One design lab was called Design Dental, correct?

23 A   Yes.

24 Q   The other was called Nu-Life, correct?

25 A   Yes.

1  Q    You looked at the invoices from these two labs; is that
2  correct?
3  A    Yes.
4  Q    And your fraud calculations are based entirely on what
5  appears on these two sets of invoices from the labs, true?
6  A    Yes.
7       MR. NORINSBERG:  May I approach the witness, your
8  Honor?
9       THE COURT:  Yes.
10 BY MR. NORINSBERG:
11 Q    I'd like to show you now what's been marked as
12 Plaintiff's Exhibit 132.  (Handing.)
13      Do you recognize that document, sir?
14 A    Yes.
15 Q    Can you identify it for the record, what the document
16 is?
17 A    Invoices from the Nu-Life.
18 Q    I'm going to show you what's been marked as Plaintiff's
19 Exhibit 92.  Can you please identify for the record what
20 those records are.  (Handing.)
21 A    Invoices from the Dental Design lab.
22      MR. NORINSBERG:  I offer those two documents into
23 evidence, your Honor.
24      MR. FARBER:  No objection.
25      THE COURT:  Ninety-two and 132?  They'll be

---

1  received.
2       (Plaintiff's Exhibit 92 and 132 received in
3  evidence.)
4  BY MR. NORINSBERG:
5  Q    Now, Mr. Castillo, can we agree that you did not
6  acquire any additional evidence from Design Dental invoice
7  at any time during your investigation?
8  A    This is what I use, and these were the documents that
9  were provided.
10 Q    Did you acquire any additional evidence apart from the
11 Design Dental invoices?
12 A    I'm not the one who makes those decision.  I had
13 mentioned it to the attorney, Fusto, that we're missing
14 invoices.  But I wasn't -- it wasn't up to me to make those
15 decisions to subpoena for more.
16 Q    So you told Mr. Fusto that you're missing the invoices;
17 is that correct?
18 A    Yes.
19 Q    When did you tell that to Mr. Fusto?
20 A    During the course of the investigation.
21 Q    Well, the investigation spanned four years.  At what
22 point did you point out to Mr. Fusto that you're missing
23 records from Design Dental?
24 A    I wasn't assigned to this investigation from the
25 beginning.  Somebody else was assigned to this investigation

---

1  in the beginning.  So from when I got -- from where I was
2  assigned to this investigation, I had mentioned it to -- I
3  had asked the attorney, Fusto, about these records.  I asked
4  him if these were all the invoices that we -- that the
5  office received from the laboratories, and he said yes.
6       And I asked him, also, if there were any other ways
7  that we can get more records, and he said to me that there
8  were no more records, that the laboratories said there were
9  no more records.
10 Q    And he told you not to worry about it, right?
11 A    He didn't say -- he didn't tell me not to worry about
12 it.  He just said there were no more records available
13 because the laboratory did not have more records and
14 Dr. Morse didn't have any other records.
15 Q    And you were missing almost a full year of records from
16 Design Dental invoices; is that correct?
17 A    Based on what we have, yes.
18 Q    And can we agree that apart from the record from Design
19 Dental that's in front of you right now, there were other
20 sources that you locked at to determine what -- the maximum
21 amount Dr. Morse could have billed Medicaid?
22 A    Can you repeat the question?
23 Q    Apart from looking at those Design Dental invoices,
24 were there any other records you looked at to project the
25 ceiling, the maximum amount of money, that Dr. Morse could

---

1  bill Medicaid?
2  A    No.
3  Q    Also, you have the Design Dental -- the Nu-Life
4  invoices in front of you?
5  A    Correct.
6  Q    Would you agree with respect to doing your Nu-Life
7  calculations, they were based only on looking at those
8  invoices?  Correct?
9  A    Yes.
10 Q    Now, let's start with your calculation about Design
11 Dental.  You have previously testified that the most
12 Dr. Morse could have billed Medicaid for Design Dental for
13 the years 2000 and 2002 were $733,000; is that correct?
14 A    Based on the documentation we have, yes.
15 Q    That's what you told the grand jury, correct?
16 A    Yes.
17 Q    But you were missing almost a full year of invoices,
18 weren't you?
19 A    They were missing.  The office was missing those
20 documents, and there was no other way they could have gotten
21 those the documents because --
22 Q    Mr. Castillo, I'm asking a simple question.
23 A    Okay.  No.  Yes.
24 Q    You were missing a full year of invoices, right?
25 A    Yes.

**JA192**

1  Q   So when you told the grand jury that the most that
2  Dr. Morse could have billed was 733,000, that was only based
3  on the invoices you had, correct?
4  A   Correct.
5  Q   You never told the grand jury that you were missing a
6  full year of invoices, did you?
7  A   I was never asked.
8  Q   So if you were asked, you would have told that to the
9  grand jury?
10  A   I would have told them we were missing invoices.
11  Q   That would be important information for the grand jury
12  to know, wouldn't it?
13        MR. FARBER:  Objection.
14        THE COURT:  I'll sustain the objection.
15  BY MR. NORINSBERG
16  Q   Would it be fair to say, Mr. Castillo, that you have no
17  idea of any of the work that was done by Design Dental
18  during the 11 months of missing records?
19  A   Of course not, because I didn't have nothing to back it
20  up.
21  Q   Would it be fair to say that you have no idea how much
22  Design Dental charged Dr. Morse during those 11 months?
23  A   No.
24  Q   The answer is you agree you don't have any basis or any
25  idea how much they charged him during that time, right?

---

1  A   For those months, no.
2  Q   And, in fact, you have no idea as to what -- the actual
3  maximum amount that Dr. Morse could have billed Medicaid
4  during those 11 months.  True or not true?
5  A   True.
6  Q   You couldn't actually determine the maximum amount of
7  money that Dr. Morse billed during those months, could you?
8        MR. FARBER:  Objection.
9        THE COURT:  Overruled.
10  A   No.
11  BY MR. NORINSBERG
12  Q   In other words, no, you could not, by that calculation,
13  right?
14  A   Not without the documentation.
15  Q   So when you told the grand jury that the maximum was
16  $700,000, that was false?
17  A   That wasn't false.  It was based on documentation.
18  Q   The reality is you had no idea what the maximum was
19  that Dr. Morse could have billed in those three years for
20  Design Dental, true?
21        MR. FARBER:  Objection.
22        THE COURT:  Overruled.
23  A   I'm sorry?
24  BY MR. NORINSBERG
25  Q   The reality is even though you told them there was a

---

1  ceiling, you actually had no idea what that ceiling was,
2  true?
3  A   I gave Dr. Morse credit for what we had.
4  Q   Now, you told us a few moments ago that you realized
5  that there were missing invoices from Design Dental, right?
6  A   Yes.
7  Q   Yet when I first asked you that question about missing
8  invoices at your deposition, you claimed that you didn't
9  realize that there were any missing invoices; isn't that
10  true?
11  A   I don't remember.
12  Q   Referring to your deposition page 22, line 11,
13  "QUESTION:  Now, at some point in your investigation, did
14  you realize that you were missing certain invoices?
15      "ANSWER:  No, I didn't realize."
16        MR. FARBER:  Objection.
17  BY MR. NORINSBERG
18  Q   Do you recall being asked that question and giving that
19  answer?
20  A   I don't remember.
21  Q   In fact, Mr. Castillo, you were the one who discovered
22  that there were 11 months of missing invoices for Design
23  Dental, right?
24  A   Yes.
25  Q   You discovered that while you were organizing the

---

1  invoices, true?
2  A   Yes, while I was organizing all the documents that we
3  have available.  Yes.
4  Q   So you did know from the outset about the missing
5  invoices, right?
6  A   Yes.
7  Q   So when I asked you that question at your deposition,
8  why did you say you didn't know?
9  A   I don't know if you asked me that question.  I don't
10  remember.
11  Q   Do you want me to read it again?
12  A   No, you don't have to.  Like I said, I don't remember.
13  Q   Now, you also knew about the Nu-Life invoices, right?
14  A   Yes.
15  Q   You knew that you were missing eight months of Nu-Life
16  invoices, correct?
17  A   Yes.
18        MR. NORINSBERG:  Your Honor, I'd like to put up an
19  exhibit on the easel over there.
20        THE COURT:  Is it in evidence?
21        MR. NORINSBERG:  I can have the witness identify
22  it.
23        THE COURT:  You have to do that.
24        MR. NORINSBERG:  I'm pretty sure counsel won't
25  object.

1    THE COURT:  What exhibit is it?

2    MR. NORINSBERG:  Plaintiff's Exhibit 4.

3    THE COURT:  Any objection?

4    MR. FARBER:  Bear with us.  I have it, your Honor.

5    No objection.

6    THE COURT:  Plaintiff's Exhibit 4 will be

7    received.

8    MR. FARBER:  We do have yellow highlighted

9    portions that were not on the exhibit we have.

10   MR. NORINSBERG:  I think it will be easier for us

11   to follow here, your Honor.

12   MR. FARBER:  I have no objection to them.

13   THE COURT:  Four is received.

14   (Plaintiff's Exhibit 4 received in evidence.)

15   BY MR. NORINSBERG

16   Q    Mr. Castillo, can you please step down, if you could,

17   for a moment?

18   Mr. Castillo, do you recognize what this chart is?

19   A    Yes.

20   Q    This is a chart you yourself prepared; is that correct?

21   A    Yes.  It was requested by one of the attorneys.

22   Q    And in this chart, among other things, you note all the

23   months of missing invoices; is that correct?

24   A    Correct.

25   Q    So, for example, looking at Column F, we could look at

1    Nu-Life, and if you work down the Column B, can see the

2    month and when the missing invoices are?

3    A    Correct.

4    Q    So, for example, January 2000, missing invoices from

5    Nu-Life, correct?

6    A    Yes.

7    Q    February 2000, missing invoices, right?

8    A    Correct.

9    Q    Go down to July 2000.  Missing invoices from Nu-Life,

10   correct?

11   A    Yes.

12   Q    Again, missing invoices in August 2000?

13   A    Yes.

14   Q    And then again going down to October 2000, missing

15   invoices also, correct?

16   A    Yes.

17   Q    Then we go to the bottom.  We see October 2002, more

18   missing invoices, correct?

19   A    Yes.

20   Q    November 2002, again, missing invoices from Nu-Life,

21   correct?

22   A    Right.

23   Q    And, again, in the last month, December 2002, missing

24   invoices, correct?

25   A    Yes.

1    Q    Now, this whole Column F just pertains to the one lab,

2    Nu-Life, right?

3    A    Yes.

4    Q    If we go back to the Column D, that pertains to the

5    other lab, Design Dental, correct?

6    A    Yes.

7    Q    I'm still going to ask you questions, but I just wanted

8    for you to identify the months here that are missing.  And

9    let's start with February, okay?

10   A    Uh-huh.

11   Q    If you take a look at February --

12   MR. FARBER:  Which year?

13   MR. NORINSBERG:  Of 2000.

14   A    For which laboratory?

15   BY MR. NORINSBERG

16   Q    For Design Dental.

17   A    Okay.

18   Q    Can you tell the members of the jury what work did the

19   lab do for Dr. Morse in February 2000?

20   A    There's no way to know, because we didn't have the

21   documentation here.  It's missing.

22   Q    How much money did Design Dental charge Dr. Morse in

23   February 2000?

24   A    $32,000 and change.

25   Q    Referring to your deposition, "QUESTION:  How much

1    money did Design Dental charge Dr. Morse for the work they

2    did in February 2000?"  It's page 55, line 5.

3    "ANSWER:  I don't know."

4    A    This was what was paid to Dr. Morse from the Medicaid

5    department.

6    Q    How much did Design Dental charge Dr. Morse for that

7    month, sir?

8    A    I don't know.  There's no documentation for that.

9    Q    Would it be fair to say you don't know?

10   MR. FARBER:  Objection.

11   THE COURT:  I'll sustain the objection.

12   BY MR. NORINSBERG

13   Q    What is the maximum amount Dr. Morse could have

14   properly billed Medicaid for work done by Design Dental in

15   February 2000?

16   A    There's no way to know, because there's no

17   documentation.

18   Q    The answer is "I don't know."  Isn't that what you

19   testified to at your deposition?

20   MR. FARBER:  Objection.

21   THE COURT:  I'll allow it if you're seeking to use

22   his deposition testimony.  Is that correct?

23   MR. NORINSBERG:  Yes.

24   BY MR. NORINSBERG

25   Q    Reading from your deposition, line 11, "QUESTION:  What

1  would be the maximum amount of money that Dr. Morse could
2  bill Medicaid for the work done by Design Dental in
3  February 2000?
4      "ANSWER:  I don't know."
5      Do you recall giving that testimony, sir?
6  A   Yes, I recall.
7  Q   You gave that testimony under oath, correct?
8  A   Yes.
9  Q   You swore to tell the truth, right?
10 A   Absolutely.
11 Q   And you were telling the truth, right?
12 A   Yeah.  There's no way to know how much he could have
13 billed if I don't have no records in front of me to analyze
14 that.
15 Q   You had this chart in front of you at the deposition,
16 didn't you?
17 A   What chart?  This chart?
18 Q   The chart you prepared.
19 A   I prepared this, but this is what Medicaid paid for.
20 Q   Would it be fair to say that you also don't know what
21 work Design Dental did for Dr. Morse in the month of March
22 of 2000?
23 A   No.
24 Q   And you don't know how much Design Dental charged
25 Dr. Morse in March 2000, correct?

1  A   No.
2  Q   And you don't know what the maximum amount of money
3  that could have -- that Dr. Morse could have billed Medicaid
4  for March 2000, correct?
5  A   No.
6  Q   And you don't know what work Design Dental did for
7  Dr. Morse in April 2000, correct?
8  A   No.
9  Q   And you don't know how much money Design Dental charged
10 Dr. Morse for the work done in April 2000, do you?
11 A   No.
12 Q   And you don't know what the maximum amount of money is
13 Dr. Morse could have properly billed Medicaid in April 2000,
14 correct?
15 A   No.
16 Q   And you also don't know what's the maximum amount of
17 money Dr. Morse could have billed Medicaid for work done in
18 May of 2000 for Design Dental, correct?
19 A   No.
20 Q   And you don't know the maximum amount of money
21 Dr. Morse could have billed Medicaid for work done in June
22 of 2000, correct?
23 A   No.
24 Q   And you don't know the maximum amount of money
25 Dr. Morse could have billed Medicaid for July of 2000,

1  correct?
2  A   No.
3  Q   You also don't know the maximum amount of money
4  Dr. Morse could have billed Medicaid in August 2000,
5  correct?
6  A   No.
7  Q   Now, we just have spent -- just now covered the year
8  2000.  You had previously testified that the most Dr. Morse
9  could have billed for that same year was $90,000, correct?
10 A   I don't remember.
11 Q   Referring to your deposition, page 45, line 3,
12 "QUESTION:  And then for the year 2000, you gave a
13 calculation of $90,048; is that correct?"
14     That's on the first page.
15     "ANSWER:  Yes."
16     Do you recall giving that testimony, sir?
17 A   It's possible that I gave it.  I don't remember.
18 Q   So, you were saying under oath that the maximum was
19 $90,000 for that year, 2000.  But we just went through the
20 entire year, and you don't know what the maximum is for
21 almost every single month in that year; isn't that true?
22 A   That's possible.  But I don't have all the
23 documentation that I had available when I worked for the
24 Attorney General's office, so I can't use it.
25 Q   But you had it when you were doing these calculations,

1  didn't you, sir?
2  A   It's possible, but I don't remember.
3  Q   And, also, before you --
4      THE COURT:  Excuse me.  Do you have any need for
5  the witness to stand in front of the exhibit anymore?  Do
6  you have any other questions about the exhibit?
7      MR. NORINSBERG:  I'm just checking to see on
8  Nu-Life, your Honor.
9      He can go back.
10     THE COURT:  Would you please resume the stand.
11
12 BY MR. NORINSBERG
13 Q   Mr. Castillo, when you appeared at a deposition, it was
14 back in 2008, correct?
15 A   I guess, yes.  I don't remember what it was.
16 Q   Okay.  But you were still working for the Attorney
17 General's office at that time, true?
18 A   Yes.
19 Q   And at that time, you had access to all the records
20 that were in the Morse file relating to your calculations,
21 didn't you?
22 A   Yes.
23 Q   And you knew, when you testified at that deposition,
24 you were testifying under oath, correct?
25 A   Yes.

1  Q    So when you testified under oath that the maximum
2  Dr. Morse could have billed for the year 2000 was $90,000,
3  that testimony was false, wasn't it?
4            MR. FARBER:  Objection.
5            THE COURT:  I'll allow him to answer.
6  A    No.
7  BY MR. NORINSBERG
8  Q    The truth is, Mr. Castillo, you have no idea what's the
9  maximum amount Dr. Morse could have billed Medicaid during
10 those 11 months.  True or not true?
11 A    No, because I didn't have the documents available.
12 Q    Okay.  Referring to your deposition, page 63, line 8,
13 "QUESTION:  Would it be fair to say that you have no idea
14 what the maximum amount of money was that Dr. Morse could
15 have billed Medicaid during those 11 months?
16    "ANSWER:  Yes."
17    Do you recall being asked that question and giving that
18 answer?
19 A    It's possible.
20 Q    Do you recall being asked that question and giving that
21 answer, sir?
22 A    I don't remember.
23 Q    The fact is, you gave Dr. Morse zero credit for that
24 entire year just about, correct?
25 A    If I didn't have the documents, how could I give him

1  credit?
2  Q    So the answer would be that you gave him zero credit;
3  is that correct?
4  A    For those months, yes.
5  Q    Would you agree that if you had, in fact, given
6  Dr. Morse credit for those 11 months, that would have had a
7  significant impact on your calculations?
8  A    If I had the documentation available that I can review,
9  yeah, it's possible.
10 Q    Would you also agree that if you had the full three
11 years of records from Design Dental, that the ceiling that
12 you told the grand jury about would have been much higher?
13           MR. FARBER:  Objection.
14           THE COURT:  I'll sustain the objection.
15 BY MR. NORINSBERG
16 Q    Now, with Nu-Life you testified that the most Dr. Morse
17 could have billed Medicaid for the Nu-Life Labs was $86,400;
18 is that correct?
19 A    Yes.
20 Q    But when you gave that $86,400 maximum ceiling, you
21 weren't taking into account any of the months that were
22 missing, were you, sir?
23 A    No, I wasn't taking it.
24 Q    So, far example, you didn't give Dr. Morse any credit
25 for any work done in January 2000, did you?

1  A    I mean --
2  Q    The answer is yes or no.
3  A    I can't say yes or no because I don't have, you know,
4  the -- what I need to refer to.  You expect me to remember
5  from 2005 numbers and what I -- the calculation that I did
6  just by, you know, asking me.  That is not fair.
7  Q    Well, let me say this, sir:  You knew this trial was
8  coming up at some point, correct?
9  A    Yes.
10 Q    And you also knew that this lawsuit has been going on
11 for five years, correct?  Is that correct?
12 A    No, because, first of all --
13 Q    Did you know?
14 A    Let me answer.  Let me answer.
15 Q    Please do.
16 A    So what you're getting to is I knew that I was supposed
17 to come here to testify and I should have reviewed the
18 records --
19 Q    Not necessarily this week.  Not necessarily last week.
20 Just sometime in the last few months, sir.
21 A    We have -- we had some problems in communicating.
22 Q    Okay.  Well, let me read to you -- when it's
23 appropriate, I'm going to read the answers and questions
24 that you gave when you had a better memory.  And I'll see if
25 that refreshes your memory, okay?

1            MR. FARBER:  Objection.
2            THE COURT:  I'll sustain the objection.
3  BY MR. NORINSBERG
4  Q    Did you give Dr. Morse any credit for the month of
5  February 2000?
6            MR. FARBER:  Objection.
7            THE COURT:  Let me see if I can just clarify
8  something.
9        I take it it was your position, when you were
10 doing the review, that you made the assumption, good or bad,
11 that if you didn't have records for that month, the work
12 wasn't done.  Is that correct?  In other words, if you
13 didn't have supporting records from the lab, your
14 assumption, whether a correct or incorrect assumption, was
15 that no work was done for that period if you didn't have the
16 records from the lab.  Is that what you did.
17           THE WITNESS:  If I didn't have the records, I
18 didn't give Dr. Morse credit.
19           THE COURT:  So that was an assumption that you
20 operated on?
21           THE WITNESS:  That's the assumption that I was
22 told to operate.
23 BY MR. NORINSBERG
24 Q    You were told that by Mr. Fusto?
25 A    Correct.

1   Q    Okay.  So I have a 36-month audit period.  You didn't
2   give Dr. Morse credit for approximately 19 months of work;
3   is that correct?
4   A    If there was no documents, no.
5   Q    And you also indicated that part of your evaluation
6   would be to figure out what the proper Medicaid price would
7   be for Dr. Morse when he was charging for a procedure; is
8   that correct?
9   A    For which laboratory?
10  Q    In terms of when Dr. Morse -- whatever lab he was
11  working with, if Dr. Morse did certain work, you were going
12  to look at the dental prices under Medicaid and determine
13  what the most was that Dr. Morse could have charged Medicaid
14  for that procedure?
15  A    Yes.
16  Q    And you did that for the Design Dental records,
17  correct?
18  A    Yes.
19  Q    And the Medicaid fees did not stay the same throughout
20  this audit period, did it?
21  A    The fees -- the prices changed -- I would say every
22  year, every year and a half, Medicaid changes the prices.
23  Q    So the prices increased during the course of this audit
24  period, correct?
25  A    Increased, stayed the same.

1   Q    Referring to your deposition page 96, line 9,
2   "QUESTION:  So, did the prices increase during the course of
3   this audit period?
4        "ANSWER:  Yes."
5   Do you recall giving that testimony, sir?
6   A    Yes.
7   Q    Now, you claim that you took into account the Medicaid
8   fees that were increasing when you were figuring out the
9   money that Dr. Morse could charge Medicaid, correct?
10  A    Yes.
11  Q    In fact, Mr. Castillo, you were consistently using
12  lower prices for all the procedures that you looked at;
13  isn't that true?
14       MR. FARBER:  Objection.
15       THE COURT:  I'll sustain the objection to the form
16  of the question.
17  BY MR. NORINSBERG
18  Q    Were you consistently using lower prices, according to
19  the Medicaid chart, for full upper dentures without having
20  the --
21       THE COURT:  I take it your question -- you mean
22  lower prices than what Medicaid was, in fact, reimbursing at
23  that period of time?
24       MR. NORINSBERG:  Yes.  Thank you for clarifying.
25  That is what I meant, your Honor.  May I ask the question

1   again?
2        THE COURT:  Do you understand the question.
3        THE WITNESS:  Yes, I do understand the question,
4   your Honor.
5        THE COURT:  So what period of time are you
6   referring to?
7        MR. NORINSBERG:  During the audit period, 2000 and
8   2002.
9        THE COURT:  Were there occasions that he did this?
10  Did he do this every time?  What is your question?
11       MR. NORINSBERG:  My question is, whether or not he
12  was consistently using lower prices, outdated, wrong
13  Medicaid prices for all procedures during the audit period.
14  That's my question.
15       THE WITNESS:  Your Honor, I did --
16       THE COURT:  Did you do that or not?
17       THE WITNESS:  There were cases I was giving
18  Dr. Morse more than what the Medicaid reimbursement was,
19  because it wasn't clear.  The documentation was not clear.
20  I had to --
21       THE COURT:  You mean it wasn't clear as to the
22  date of the services?
23       THE WITNESS:  Correct.  Exactly.
24       Look at this documentation.  It was just hard.  I
25  couldn't just say to the attorney, "I can't read this."  If

1   I can't read, I can't analyze this.  So then Dr. Morse
2   wouldn't have gotten any credit.  And I did my best to
3   analyze this.  I mean, it's possible that I gave him less, a
4   few times, but it's also possible that I could have given
5   him more credit for it.
6   BY MR. NORINSBERG
7   Q    Referring to your deposition, page 9, line 5,
8   "QUESTION:  So Mr. Castillo, based on the records you just
9   looked at, you were consistently using lower prices for full
10  upper dentures, full lower dentures, partial upper dentures,
11  partial lower dentures, and realign procedures, correct?
12       "ANSWER:  Based on the charts, yes."
13       MR. FARBER:  Objection.
14  BY MR. NORINSBERG
15  Q    Do you recall being asked that question and giving that
16  answer?
17       MR. FARBER:  Objection.
18       THE COURT:  Can I see the parties over here at
19  side bar, please?
20       (Side bar begins.)
21       (Continued on the next page.)
22
23
24
25

**JA197**

1    THE COURT:  Ladies and gentlemen of the jury, why

2  don't I excuse you for a midmorning recess and give you about

3  ten minutes back in the jury room.

4

5    (The jury exits.)

6

7    THE COURT:  Mr. Castillo, you can stand down and

8  return in ten minutes.

9    (Side bar begins.)

10    (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1    THE COURT:  What is the basis of your objection?

2    MR. FARBER:  It's a foundation objection, your

3  Honor.  He asked him a very specific document.  And at this

4  point, Mr. Castillo -- based on the very specific document he

5  was shown, yes, the implication here is that we're coming

6  back to consistently under all circumstances, gave him --

7    THE COURT:  Is your contention that he was only

8  shown one chart or something and this is not a fair question

9  because he was only shown one document?  I don't understand

10  your objection.

11    MR. FARBER:  Yes.  Correct, your Honor.

12    THE COURT:  What documents was he shown?

13    MR. FARBER:  From the record he was just shown.

14    MR. NORINSBERG:  There's probably 40 pages of

15  deposition testimony that lead up to that summarizing

16  question.

17    THE COURT:  I mean, I'd understand your objection

18  if it was one page he was answering with respect to

19  something.

20    MR. FARBER:  Exhibit 7 to the deposition, which

21  was entitled "Medicaid Prices Per Unit."  And then he was

22  asked about a number of other documents, also dealing with

23  specific dates.  It's a much more limiting line of

24  questioning than as what's being asked in court.

25    THE COURT:  Well, I don't know what -- I can't

---

1  understand what records we just looked at.  Was he looking

2  at August and September?

3    MR. NORINSBERG:  We went through an entire year,

4  year and a half.  We went through each one of these

5  procedures that I surmised, and every single one of them, he

6  said he was giving the wrong price.  And that question just

7  summarized what he had just told me after painstaking

8  questioning, over 40 pages of questions.

9    MR. FARBER:  He was asked about a number of

10  things, and he was asked some very specific questions and

11  some very general questions.

12    THE COURT:  I can't tell from what you've said

13  that there's a basis for the objection.  So at this point,

14  I'm going to overrule the objection.

15    MR. FARBER:  Thank you, your Honor.

16    (Side bar ends.)

17    (Continued on the next page.)

18

19

20

21

22

23

24

25

---

1    (The Honorable Judge Carol Amon takes the bench.)

2    THE COURT:  Let's bring the jury out.  We're going

3  till 1:15, and then we'll take an hour for lunch.

4    (The jury entered.)

5    THE COURT:  Ladies and gentlemen, please be

6  seated.

7    Mr. Castillo, please resume the stand.

8    Mr. Norinsberg.

9  BY MR. NORINSBERG

10  Q    Mr. Castillo, do you have any explanation why you were

11  consistently using the wrong lower price for all five of the

12  procedures when you were trying to figure out the Medicaid

13  prices?

14    MR. FARBER:  Objection.

15    THE COURT:  I'll sustain the objection.  Form a

16  new question.

17  BY MR. NORINSBERG

18  Q    Do you have any explanation for why you were

19  consistently using lower Medicaid prices when you were

20  trying to figure out the most Dr. Morse could have charged

21  Medicaid?

22    MR. FARBER:  Objection.

23    THE COURT:  Sustained.

24  BY MR. NORINSBERG

25  Q    Do you have any explanation, sir, as to why you might

**JA198**

1  have used the wrong prices when you were doing your
2  calculations?
3  A    Without having the manual, the Medicaid manual, it's
4  hard for me to say that I was using the lowest prices.  I
5  can tell you that I gave Dr. Morse more than what he was
6  supposed to get reimbursed from Medicaid, using these
7  documents.
8  Q    Referring to your deposition page 120, line 11,
9  "QUESTION:  Now, for these five different procedures that we
10 just covered, do you have any explanation, as you sit here
11 today, as to why you were consistently using a lower price
12 for all five procedures?
13     "ANSWER:  I don't have an explanation."
14     MR. FARBER:  Objection.
15 BY MR. NORINSBERG
16 Q    Do you recall being asked that question and giving that
17 answer?
18 A    I remember if you asked me that question.
19 Q    Now, when you were doing your calculations, you
20 actually prepared a chart with the Medicaid price in it,
21 correct?
22 A    Yes.
23 Q    You made a chart based on the prices that Medicaid
24 would allow for charging certain procedures, correct?
25 A    Yes.

---

1  Q    And you put together that chart based on the Medicaid
2  prices in the dental manual, correct?
3  A    Yes.
4  Q    And you yourself actually had that chart in front of
5  you when you were doing your calculations, correct?
6  A    Yes.
7  Q    And, Mr. Castillo, you have no reason to doubt that the
8  chart that you yourself prepared is accurate, correct?
9  A    It was accurate.
10 Q    It was accurate, but you didn't use the prices that you
11 yourself put in the chart, did you?
12 A    I don't know if -- I mean, you keep saying that I
13 didn't use.  But as an auditor, I need to see -- I mean,
14 give me an incident of something that I did and I'll say yes
15 or no.
16 Q    Let me see if I can make this clearer.  You prepared a
17 chart with Medicaid prices.  You had that chart in front of
18 you, but you didn't use those prices.  You used different
19 prices, lower, outdated prices, when you were doing the
20 calculations.  True or not true?
21     MR. FARBER:  Objection.
22 A    Not true.
23 BY MR. NORINSBERG
24 Q    And when you were asked at your deposition why you were
25 doing that, you had no explanation.  True or not true?

---

1  A    If you asked me and you have it in there.  I'm not sure
2  if you asked me that question.
3  Q    Referring to your deposition, page 120, line 11,
4  "QUESTION:  Now, for these five different procedures that we
5  just covered, do you have any explanation, as you sit here
6  today, as to why you were consistently using a lower price
7  for all five procedures?
8      "ANSWER:  I don't have an explanation."
9      MR. FARBER:  Objection.
10     THE COURT:  I'll sustain the objection.  I don't
11 think it's a fair question without the five -- without
12 identifying the five documents that are being talked about.
13     MR. NORINSBERG:  Okay.
14     THE COURT:  And perhaps you need to lay the
15 foundation perhaps, if you have those five documents,
16 showing them to the witness.
17     MR. NORINSBERG:  Well, it's actually much more
18 than five documents.  There's probably around 40 --
19     THE COURT:  You made reference to five in the
20 question.
21     MR. NORINSBERG:  Full upper dentures, full lower
22 dentures, partial upper dentures, partial lower dentures,
23 and realign procedures.  And during the deposition, we went
24 through depositions that covered each one.
25     THE COURT:  Don't -- that's a speaking

---

1  explanation.
2  BY MR. NORINSBERG
3  Q    Now, Mr. Castillo, at your deposition you said you were
4  going to look at the dental manual afterwards to see why you
5  had used the wrong prices; is that correct?
6  A    I don't remember.
7  Q    Did you ever look at the dental manual after the
8  deposition?
9  A    I don't remember if I did, because I believe I was
10 giving the right price based on that quantity of the
11 documents that we got from the laboratory.  And we didn't
12 get it from Dr. Morse.
13 Q    Well, talking up to this point, now -- we were talking
14 about Design Dental.  I'd like to switch gears and ask you
15 some questions about Nu-Life, if I could, okay?
16 A    Okay.
17 Q    Now, on Nu-Life you were able to identify a total of
18 231 patients on those invoices; is that correct?
19 A    I guess.
20 Q    And you claimed previously that you gave Dr. Morse
21 credit for every single name on those invoices, isn't that
22 true?
23     MR. FARBER:  Objection.
24     THE COURT:  Previously when?  You asked him here?
25 BY MR. NORINSBERG

1    Q    At your deposition.

2    A    I don't remember.

3    Q    Do you recall being asked the following question and

4    giving the following answer? Page 163, line 15. QUESTION:

5    Next paragraph, quote, "That decision was made that we have

6    to assume that all those families on the invoices were

7    Medicaid recipients and for that, Dr. Morse will get credit

8    for every single family on the invoices. Example, if there

9    were 3,000 names on the invoices, Dr. Morse will get credit

10   for 3,000 patients."

11        Do you recall giving testimony to that effect, sir?

12   A    Yes. That was our method that we used. We had to give

13   him the benefit of the doubt that he did some work during

14   those years.

15   Q    Okay.

16        But my question is specific, though. The decision you

17   made was you were going to give him credit for every single

18   name that appeared on the Nu-Life invoices; is that correct?

19   A    I don't remember if it was that way for Nu-Life.

20   Q    You don't remember if it was for what?

21   A    For the Nu-Life Laboratory.

22   Q    Okay.

23        I'd like to show you a document.

24        MR. NORINSBERG:  May I approach, your Honor?

25        THE COURT:  Yes.  Does this have an exhibit

---

1    number?

2        MR. NORINSBERG:  Yes, Exhibit 18.

3    BY MR. NORINSBERG

4    Q    Do you recognize this document, Mr. Castillo?

5    (Handing.)

6    A    Yeah.  This is my notes.

7    Q    And is that a set of notes you prepared in connection

8    with your trial testimony?

9    A    This is just my notes.

10   Q    And does it say at the first page "for trial

11   testimony?"

12   A    Yeah.  Notes.

13   Q    And you recognize that as your own CIN notes, right?

14   A    Yes.

15        MR. NORINSBERG:  I offer that exhibit into

16   evidence.

17        MR. FARBER:  There's no objection to this exhibit.

18   However, I have a concern about the next question. Can we

19   have a side bar, your Honor?

20        THE COURT:  Exhibit 18 will be received.

21        (Plaintiff's Exhibit 18 received in evidence.)

22        (Side bar begins.)

23        (Continued on the next page.)

24

25

---

1        MR. FARBER:  This is prepared with this witness.

2        MR. NORINSBERG:  I don't plan to offer statements

3    he made in here.  My questions have nothing to do with the

4    trial.

5        THE COURT:  Your opening statement did say that.

6        MR. NORINSBERG:  I will be talking about portions

7    of the trial and not about this witness.

8        THE COURT:  I'm not going to permit you to ask

9    about whether the judge found --

10       MR. NORINSBERG:  He stipulated to it, that the

11   witness wasn't credible.  It's a stipulated fact.

12       MR. FARBER:  You said he wasn't credible?

13       MR. NORINSBERG:  That the witness wasn't credible.

14       MR. FARBER:  The witness, one of trial witnesses,

15   was found not credible at trial.

16       THE COURT:  You stipulated to that.

17       MR. FARBER:  That's a stipulated fact.  But that's

18   at trial, your Honor, over a year later.

19       MR. NORINSBERG:  For purposes of this objection,

20   I'm not going into trial testimony at all.  It's a statement

21   that he made.

22       THE COURT:  Do you intend to elicit the judge's

23   evaluation of exhibits?

24       MR. NORINSBERG:  Except for the one fact that we

25   stipulated to it, no.

---

1        THE COURT:  Didn't you mention that in your

2    opening?

3        MR. NORINSBERG:  Yes, that one fact.

4        THE COURT:  No.  You mentioned -- I thought I

5    heard you say about the trial judge finding the exhibits --

6        MR. NORINSBERG:  Perhaps I misheard you, that the

7    witness they brought in to lay a foundation for the

8    documents and ruled it was inadmissible -- we stipulated to

9    that.

10       MR. FARBER:  No, we have not.  We stipulated as to

11   the finding of the witness.  We haven't made any other

12   stipulation, other than the acquittal and that one finding

13   as to -- that you said was not credible at trial.  It's a

14   very limited stipulation.

15       THE COURT:  But I thought you were attempting to

16   elicit -- or you need to put before the jury the judge's

17   assessment of the records.  Am I wrong about that?

18       MR. NORINSBERG:  I said that in connection with

19   those documents, he found the witness -- they were trying to

20   introduce those documents -- to be not believable, and he

21   didn't allow those records into evidence, which I think we

22   all agree on.  They want to argue that the only reason they

23   couldn't prove their case is because they didn't have the

24   records in evidence.  I don't think anyone's disputing that.

25       THE COURT:  Okay.

**JA200**

1          (Side bar ends.)

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. NORINSBERG:

2   Q    Mr. Castillo, you just identified Plaintiff's Exhibit

3   18 as a record you created; is that correct?

4   A    Yes, my notes.

5   Q    Your notes.  Now, according to your notes, it says,

6   "The decision that was made was that we have to assume that

7   all those families on the invoices were Medicaid recipients

8   and for that Dr. Morse will get credit for every single name

9   on the invoices.  Example, if there were 3,000 names on the

10  invoices, Dr. Morse gets credit for 3,000 patients."

11       That's what you wrote in your notes; is that correct?

12  A    Yes.

13  Q    In fact, you did not give Dr. Morse credit for every

14  single name on the Nu-Life invoice, did you?

15  A    I don't remember.

16  Q    You actually excluded one-third of the invoices; isn't

17  that true?

18  A    I don't remember.

19  Q    Do you remember excluding 87 patients?

20  A    I don't remember.

21  Q    Referring to your deposition, page 168, line 19,

22  "QUESTION:  And out of the remaining patients that you

23  excluded are 87, correct?

24       "ANSWER:  Correct."

25       Does that refresh your memory at all, sir?

1   A    It's possible.  But behind that, there was a method

2   that we used, so I can't -- I mean, I can't tell you why I

3   excluded those or they're based on.

4   Q    Okay.

5        But as you sit here today, you don't know what the

6   basis was for excluding those 87 patients?

7   A    I don't remember that.

8   Q    You don't remember how you went about deciding to

9   exclude those 87 patients, right?

10  A    No, I don't remember.

11  Q    Mr. Castillo, do you remember any part -- any part of

12  the process that lead you to exclude one-third of the

13  patients of Nu-Life from your calculations?

14  A    I don't remember.  But I remember a little bit about

15  the method that we're using here.

16  Q    Okay.

17       Do you recall being asked the following question and

18  giving the following answer at your deposition --

19       MR. FARBER:  Your Honor, he was not finished with

20  his answer.

21       THE COURT:  Do you want to complete your answer?

22       THE WITNESS:  No.  I'm okay.

23  BY MR. NORINSBERG

24  Q    "QUESTION:  Do you remember any part of the process

25  that lead you to conclude that those 87 patients were not,

1   in fact, Medicaid patients?

2        "ANSWER:  I don't remember."

3        Referring to your deposition, page 176, line 23,

4   "QUESTION:  Now, when you excluded the 87 patients, how did

5   you go about doing that?

6        "ANSWER:  I don't remember exactly how I excluded those

7   patients."

8        Page 168, line 102.  "But as you sit here today, you

9   don't know what basis -- what the basis was for excluding

10  those 87?

11       "ANSWER:  No, I don't remember."

12  Q    Do you recall being asked those questions and giving

13  those answers at your deposition?

14  A    It's possible.

15  Q    It's possible?

16  A    Yes.

17  Q    So when you wrote in your notes, that you were actually

18  giving credit for all the patients on here, that was false,

19  wasn't it?

20       MR. FARBER:  Objection.

21  A    No.

22       THE COURT:  I'll sustain the objection.

23  BY MR. NORINSBERG

24  Q    Was it Mr. Fusto's suggestion to exclude the 87

25  patients?

1  A    No.

2  Q    Page 167, line 23. "QUESTION:  Okay.  So you were

3  following the instructions from Mr. Fusto when you excluded

4  the 87 patients; is that correct, sir?

5      "ANSWER:  Correct."

6      Do you recall giving that testimony, Mr. Castillo?

7  A    It's possible that I said that.

8  Q    Well, you just told us that Mr. Fusto didn't give you

9  instructions on that, didn't you?

10  A    No, he didn't give me.  I only remember the method we

11  used back then to exclude those patients.  So he was in

12  charge of the case.  He had given me a lot of instructions,

13  and I followed those instructions.  But I don't remember he

14  has to -- I mean, why to exclude those patients at that

15  time.

16  Q    Now, would you agree that the first step to determine

17  if Dr. Morse overbilled Medicaid would be to determine what

18  work he performed?  Would you agree with that?

19  A    Could you repeat the question?

20  Q    Would you agree that the first step to determine if

21  Mr. Morse overbilled Medicaid would be to determine what

22  work he performed?

23  A    The work that he performed?

24  Q    Would that be the first step in order to determine if

25  he overbilled Medicaid?

1  A    Well, you have to remember that I wasn't assigned to

2  the case at that time, so I don't know the basis.  When I

3  took over, I was told that he was being investigated for

4  denture work that he performed --

5  Q    Referring to your deposition, page 17, line 6,

6  "QUESTION:  Now, would you agree, Mr. Castillo, in order to

7  determine if Dr. Morse overbilled Medicaid, the first step

8  would actually be to determine what work he performed?

9  Would you agree with that?

10      "ANSWER:  Yes."

11      Do you recall giving that testimony?  Yes?

12  A    It's possible.

13  Q    And then once you know what work he performed, you did

14  determine how much reimbursement he's entitled to, correct?

15  A    I don't remember.

16  Q    Referring to your deposition, page 17, line 14,

17  "QUESTION:  Once you know the work performed, you can

18  determine how much reimbursement he's entitled to, correct?

19      "ANSWER:  Correct."

20      Do you recall giving that testimony, Mr. Castillo?

21  A    I don't remember.

22  Q    Would you agree, Mr. Castillo that, in order to

23  determine if Dr. Morse is overbilling Medicaid, you must

24  know what procedures he's billing for?  Is that yes or no?

25  Would you agree with that?

1  A    In his case, yes, he was being investigated for the

2  work that he -- the denture work that he supposedly

3  performed.

4  Q    My question is, in order to determine if Dr. Morse was

5  overbilling Medicaid, you must know what procedures he's

6  billing for.  True or not true?

7  A    Yes.

8  Q    Now, there are no procedures listed anywhere on the

9  Nu-Life invoices that you have; isn't that true?

10  A    Right.

11  Q    There are no procedure codes on there either, are

12  there?

13  A    No.

14  Q    There's no indication whatsoever what work was

15  performed --

16  A    No.

17  Q    -- by this lab for Dr. Morse, if you look at those

18  notes.  True or not true?

19  A    I'm sorry?  Say that again.

20  Q    There's no indication anywhere on those invoices as to

21  what procedures and what work was done by this lab for

22  Dr. Morse, true?

23  A    No.

24  Q    And you actually realized at some point that there were

25  no procedure codes listed on those invoices, right?

1  A    Yes.

2  Q    And Mr. Fusto told you don't worry about that, right?

3      MR. FARBER:  Objection.

4      THE COURT:  Overruled.  Did he say that or not?

5      THE WITNESS:  No.

6  BY MR. NORINSBERG

7  Q    Did he make a suggestion and then you followed his

8  suggestion?

9  A    He didn't make though suggestion.

10  Q    Referring to your deposition, page 137, line 12,

11  "QUESTION:  So Mr. Fusto made a suggestion to you, and you

12  followed his suggestion?

13      "ANSWER:  Correct."

14      Do you recall being asked that question and giving that

15  answer?

16  A    It's possible, but not the way that you said.

17  Q    But that was your testimony, wasn't it, sir?

18  A    It might have been my testimony, but not suggesting.

19  He might have giving me a direction and I followed that

20  direction.  It was not a suggestion.

21  Q    The question that you were asked at your deposition was

22  Mr. Fusto made, quote, a suggestion, end quote, and you

23  followed his, quote, suggestion, end quote, correct?

24  A    It's possible.

25  Q    Now, you told the grand jury that the most Dr. Morse

1  could have billed for this particular lab, the Nu-Life Lab,
2  was $86,400; is that correct?
3  A   Yes.
4  Q   Do you recall, Mr. Castillo, actually doing a
5  calculation at another time in which you said the maximum
6  amount was $136,000, not $86,000?  Do you recall that, sir?
7  A   I recall doing a lot of analysis.  That's part of our
8  job as an auditor.  And by the way, we have a policy with --
9      MR. NORINSBERG:  There's no question pending, your
10 Honor.
11     May I approach the witness, your Honor?
12     THE COURT:  Yes.
13 BY MR. NORINSBERG
14 Q   I'd like to show you what's been identified as
15 Plaintiff's Exhibit 25.  (Handing.)
16 A   Okay.
17 Q   Do you recognize this document, sir?
18 A   I recognize the analysis, but that's not my
19 handwriting.
20 Q   But that's a chart that you prepared, isn't it?
21 A   It's possible they prepared it.
22     THE COURT:  What exhibit number is that?
23     THE WITNESS:  Twenty-five.
24 BY MR. NORINSBERG
25 Q   Is it also possible that at some point you calculated

1  that Dr. Morse -- that the maximum amount Dr. Morse could
2  have billed Medicaid for Nu-Life was actually $136,000?
3  A   Like I said, I did a lot of analysis.  It's possible
4  that this could've been my analysis.  But the handwriting on
5  top, that's not mine.
6  Q   Okay.  But the document, the chart itself, do you agree
7  that you prepared this chart?
8  A   I'm not going to agree to something that's labeled with
9  somebody else's handwriting.
10 Q   But you gave it to us during discovery.  You gave us
11 this document, didn't you?
12     MR. FARBER:  Objection.
13     THE COURT:  Sustained.
14 BY MR. NORINSBERG
15 Q   This came from the New York State Attorney General's
16 office, didn't it?
17 A   Yes, it came from them.
18 Q   And you were the only auditor working on this case from
19 2004 up until the time of the trial, true?
20 A   My supervisor too.
21 Q   There was another auditor that might have done this?
22 A   I don't think so.  I mean, I think this could be my
23 chart, my analysis.  And it could be another way the
24 attorney, Fusto, asked me to analyze the data.
25     MR. NORINSBERG:  I offer Plaintiff's Exhibit 25

1  into evidence.
2      THE COURT:  Twenty-five will be received.
3      (Plaintiff's 25 received in evidence.)
4  BY MR. NORINSBERG
5  Q   Now, directing your attention to the bottom of this
6  document, there's a column that says "Total Money from
7  Invoices, Nu-Life Lab."
8      Do you see that?
9  A   Yes.
10 Q   And it says $136,469; is that correct?
11 A   Yes.
12 Q   Now, you have previously testified at your deposition
13 that that was just a preliminary number; is that correct?
14 A   Yeah.  Every chart that we prepare is just a
15 preliminary for our purpose of -- during the course of the
16 investigation, we prepared a lot of charts.  We -- we use
17 those charts -- as an auditor, we can't delete that
18 information.  Every chart that we prepare, we have to keep
19 it.  But that doesn't necessarily mean we're going to use
20 it.
21 Q   At the top of this particular chart, it says "Final
22 Findings," doesn't it, sir?
23 A   It does, but --
24     MR. FARBER:  Objection.
25     THE COURT:  Overruled.

1  BY MR. NORINSBERG
2  Q   Is that true or not true?
3  A   Yeah.  It says that.
4  Q   So this wasn't a preliminary finding.  It was a final
5  finding, wasn't it?
6  A   I don't know.  I can't tell you because that's --
7  whoever wrote this, it's not mine.  The chart could have
8  been meant as an exercise that I was doing, a request maybe
9  attorney Fusto might ask and -- but it says here "Final
10 Findings."  But that's not my handwriting.  I can't tell you
11 whoever wrote in there, it was used for a final finding.
12 Q   You do agree that you're the only one who did these
13 calculations, right?
14 A   Yes.
15 Q   And you also agree that there are no other auditors
16 working on this case after August of 2004?
17 A   Yes.
18 Q   Now, the number that is written on this chart is
19 $50,000 higher than what you told the grand jury.  True or
20 not true?
21     MR. FARBER:  Objection.
22     THE COURT:  What's the basis of the objection?
23     MR. FARBER:  There are lots of numbers on this
24 chart.  There are lots of numbers on 25.
25     THE COURT:  Which number are you referring to?

1  MR. NORINSBERG:  The $136,000 number that I've
2  been asking questions about.
3  BY MR. NORINSBERG
4  Q    That number was $50,000 higher than what you swore
5  under oath to the grand jury to be; isn't that true?
6  A    It's possible.  If you calculate it, yes, it's true.
7  Q    Now, can you please tell this jury, is there any reason
8  why the numbers would change from $50,000 higher to what you
9  told the grand jury?
10    MR. FARBER:  Objection.
11    THE COURT:  Overruled.
12  A    A reason?  I can't tell you a reason why.  It was just
13  a different way of analyzing the records.
14  BY MR. NORINSBERG
15  Q    Okay.  Looking --
16  A    Can I finish?
17  Q    Sure.
18  A    The way the schedules -- we work on the case, the
19  attorney will make requests to me, asking different ways of
20  analyzing the data, to give Dr. Morse, you know, as much
21  credit as we can.  This was another way of analyzing the
22  data.  When attorney Fusto will ask to analyze the data the
23  way that he wants, we analyze it, we present it to him.  He
24  is the one that decides which chart he will use.
25    I mean, like I said before, I work -- I prepare many

1  charts, but that doesn't mean -- I mean, the numbers might
2  claim, but it doesn't mean I manipulate any data.  It's just
3  different ways of analyzing whatever was given to us by the
4  laboratory.
5  Q    Referring to your deposition, page 158, line 18,
6  "QUESTION:  I understand your testimony, sir.  I'm asking
7  you now, is there any reason?
8    "ANSWER:  No, there's no reason."
9    Page 158, line 24.  "QUESTION:  Is there any reason you
10  can think of as to why the numbers would be $50,000 apart
11  from your preliminary calculations to your final
12  calculations when the underlying source, the invoices, has
13  never changed?
14    "ANSWER:  No.  I can't think of any reason."
15    Do you recall being asked that question and giving that
16  answer?
17  A    It's possible.
18  Q    You said at your deposition that you couldn't think of
19  any reason why the numbers would change by $50,000, isn't
20  that true?
21  A    It's possible.
22  Q    Well, I just read your testimony, sir.
23  A    If you read it, that's what I said.  It's possible.  I
24  don't remember if you asked me that question, but if it's
25  there, it's there.

1  Q    With the Design Dental invoices, on those calculations
2  you also had a number that was $50,000 higher than what you
3  told the grand jury; isn't that true?
4  A    I don't remember the numbers.
5    MR. NORINSBERG:  May I approach the witness, your
6  Honor.
7    THE COURT:  Yes.
8  BY MR. NORINSBERG
9  Q    I'd like to show you Plaintiff's Exhibit 24.
10  (Handing.)
11    Do you recognize your handwriting on this document?
12  A    Yes.  That's mine.
13  Q    You prepared this document; is that correct?
14  A    I don't know -- yes, a note for formal file, trying to
15  analyze the data, yes.
16  Q    Does that -- does this document refresh your memory
17  that you had the maximum amount for Design Dental at
18  $784,318, or $50,000 higher than what you eventually told
19  the grand jury?  Does that refresh your memory?
20  A    If I had the two numbers, yeah, I could say yes.
21  Q    And you have no explanation for that either, do you,
22  sir?
23  A    This is my explanation, trying to analyze the records.
24  Q    That's your explanation?
25  A    Try to analyze the records, and you tell me if they're

1  easy to analyze these records.  I was -- I prepare
2  different -- different charts.  I went through these records
3  many, many teams, trying to give Dr. Morse as much credit as
4  I could without knowing that all these names here were
5  Medicaid recipients.  My office asked Dr. Morse to come over
6  and tried to work with him to identify if these recipients
7  were all Medicaid recipients.  He came and he got frustrated
8  that he couldn't even analyze all this data.  There's
9  question marks here that I put here that I can't read.
10  Q    Actually, what happened was during that meeting, he
11  actually showed you that you had made multiple mistakes.
12  You got angry you and stormed out of the room, isn't that
13  true?
14  A    No, I didn't.  He did.
15  Q    And by the way, just so we're clear, your office had an
16  opportunity to get the original records from these labs
17  which were clear and easy to read but your office chose not
18  to do that; isn't that correct?
19    MR. FARBER:  Objection.
20    THE COURT:  Is the objection whether there's a
21  good-faith basis for the question?
22    MR. FARBER:  It is.
23    THE COURT:  I'll sustain the objection.
24  BY MR. NORINSBERG
25  Q    To your knowledge, Mr. Castillo, did you ask Mr. Fusto

1  to get clearer records?

2  A   There were no clearer records.

3  Q   Were you aware of the fact that when the investigator

4  Flynn and the investigator Serra originally went to the

5  labs, the labs gave them an original set of documents, but

6  they chose not to take it?  Were you aware of that?

7  A   No.

8  Q   And so whenever you looked at something that was

9  illegible, you gave zero credit for that as well, right?

10 A   Yes.  It was illegible.

11 Q   And there were 326 entries you gave zero credit for as

12 well, correct?

13 A   Yeah, I guess, I'm assuming.  If I couldn't read, I

14 couldn't give him credit for it.

15 Q   If you had the original records, you would've been able

16 to give him credit for that, right?

17 A   Of course.

18         THE COURT:  Assuming the original records showed

19 that.

20         THE WITNESS:  Right, assuming.

21 BY MR. NORINSBERG:

22 Q   Now, did you ever conclude, Mr. Castillo, that the

23 amount of fraud in this case was not $1.1 million, but it

24 was actually only $744,000?  Did you ever reach that

25 conclusion at any time in your investigation?

---

1  A   I don't remember.  It's possible.  Are you asking me to

2  remember numbers here, there?  Show me something.  If I

3  prepare, I prepare.

4         MR. NORINSBERG:  May I approach, your Honor?

5         THE COURT:  Yes.

6  BY MR. NORINSBERG:

7  Q   You wanted me to show you something?

8  A   Yeah, sure.

9  Q   Take a look at what's been marked as Plaintiff's

10 Exhibit 4A and 4B.  (Handing.)

11     Were those charts you prepared, Mr. Castillo?

12 A   Yes.  Yes.

13 Q   And according to those charts, the amount of fraud is

14 $744,000, right?  It's a yes or no.  Is that correct?

15 A   The number, yes.

16 Q   Now, that number represents the amount of money that

17 Medicaid overpaid Dr. Morse, according to your calculations,

18 right?

19 A   Yes.

20 Q   The answer is yes?

21 A   Yes.

22 Q   And yet when you appeared before the grand jury, you

23 told them a number that $400,000 higher than that number,

24 right?

25 A   This is just another form analyzing the data.

---

1  Q   Was this just another preliminary finding you made?

2  A   Preliminary.  However you want to call it, everything

3  that we prepare is a preliminary.

4  Q   And even when the document says on it "Final Finding,"

5  your view would be it's preliminary; is that correct?

6         MR. FARBER:  Objection.

7         THE COURT:  Sustained.

8  BY MR. NORINSBERG:

9  Q   Now, at some point you calculated the fraud amount to

10 be approximately $600,000; isn't that true?

11 A   I don't remember.

12 Q   Did you ever tell Mr. Fusto that the amount of fraud

13 was approximately $600,000, not 1.1 million?

14 A   I mean, we had discussions, but I never said to him

15 that based on all these analysis, the fraud could be

16 744,600.  All of those words are preliminary work.

17 Q   But the evidence that you're basing your analysis on

18 never changed.  The evidence is just the two sets of

19 invoices, right?

20 A   Yeah, but the --

21 Q   Is that correct, sir?

22         MR. FARBER:  Objection.

23         THE COURT:  I guess the question was, you were

24 basing your analysis -- every time there was an analysis

25 done, was it, in fact, based on the same underlying

---

1  material?

2         THE WITNESS:  Yes, your Honor.  Yes.

3  BY MR. NORINSBERG:

4  Q   So even though you're looking at the same underlying

5  material, which never changes, the numbers keep climbing

6  when you do your fraud calculations; is that right?

7  A   It could've climbed, because by going back and

8  reviewing the records one more time, trying to give

9  Mr. Morse credit, more credit, maybe I would have recognized

10 something else.

11 Q   So, for example, when the numbers went from 1.1 million

12 all the way down to $275,000, that's just because you

13 recognized something else in these lab invoices?

14 A   It's possible.

15 Q   Now, as you sit here right now, do you have any

16 recollection of your calculations in this case?

17 A   Some of them.

18 Q   But do you recall testifying at your deposition as

19 follows, page 28, line 13?  "QUESTION:  Can you tell us,

20 sir, as you sit here right now, do you have any recollection

21 of your calculations in this case?"

22     "ANSWER:  I don't remember."

23     Do you recall that?

24 A   Yeah.  You didn't have this.

25 Q   So would you agree, sir -- has your memory gotten

1  better now where you can explain some of your calculations?
2          MR. FARBER:  Objection.
3          THE COURT:  I'll sustain.
4  BY MR. NORINSBERG
5  Q    You actually had those documents in front of you at
6  your deposition, didn't you, sir?
7  A    I don't remember if I had.
8  Q    You don't remember being asked the questions about the
9  documents I just showed you?
10 A    You might have asked the questions, but I don't
11 remember if you had these documents in front of you.
12 Q    Do you remember being shown the document with $744,000
13 and claiming that it was just a preliminary finding?
14 A    I don't remember.
15 Q    Referring to your deposition, page 213, line 24,
16 "QUESTION:  And yet, on the schedule you have the amount of
17 overpayment is just $744,006, correct?
18     "ANSWER:  Yes.  But this is preliminary work.  It's not
19 the final findings."
20     Do you recall giving that testimony, sir?
21 A    It's possible.
22 Q    Now, when you testified to the grand jury, you told the
23 grand jury that the total amount of billings for patients
24 they heard from was around $10,493; is that correct?
25         THE COURT:  What is the question again?

1  BY MR. NORINSBERG:
2  Q    When you testified to the grand jury about Dr. Morse's
3  total billings for the patients that testified at the grand
4  jury, you said the total amount was $10,493, right.
5          THE WITNESS:  Your Honor, without having something
6  in front of me, you know, I can't say --
7          THE COURT:  Do you want to show him the testimony?
8  This is preliminary to what?  You didn't ask him any
9  foundational questions.
10         MR. NORINSBERG:  We're leading into Grand Jury 11.
11 BY MR. NORINSBERG
12 Q    Do you recall being asked the following questions and
13 giving the following answers at your deposition?
14     "QUESTION:  Now you testified to the grand jury about
15 Dr. Morse's total billings for these patients, correct?
16     "ANSWER:  Correct."
17     Page 234, line 13.  "QUESTION:  So the total amount for
18 the recipients you testified was $10,493?
19     "ANSWER:  Yes."
20     Does that refresh your memory, sir, as to what you told
21 the grand jury?
22 A    It's possible.
23 Q    You reviewed your grand jury testimony at some point
24 before coming here, didn't you?
25 A    Well, no.

1  Q    In the last few months, did you review it?
2  A    No.  After coming back from watching my father die --
3  Q    Okay, sir.  You're going to use that as the reason why
4  you haven't looked at your grand jury testimony?
5          THE COURT:  I would suggest we not have this
6  argument going on.  If -- the witness can give an
7  explanation as to why he didn't do it, if that's the
8  question you're asking.
9          Did you -- I think the question was, have you
10 reviewed your grand jury testimony and your trial testimony
11 recently?
12         THE WITNESS:  Your Honor, I attempted to, but I --
13         MR. NORINSBERG:  Objection, your Honor.
14         THE COURT:  You weren't able to do it.
15         THE WITNESS:  Right.
16         THE COURT:  You had a personal problem, right?
17         THE WITNESS:  Correct.  Yes.
18 BY MR. NORINSBERG
19 Q    Now, do you recall when you were testifying in the
20 grand jury that you were shown a document that was
21 identified as Grand Jury Exhibit 11?  Do you recall that?
22 A    Can you repeat the question, please?
23 Q    Do you recall being shown a document that was
24 identified as Grand Jury Exhibit 11?
25 A    When?

1  Q    I'm sorry?
2  A    When?
3  Q    During your grand jury testimony.
4  A    Yes, it's possible.  Uh-huh.
5          MR. NORINSBERG:  May I approach, your Honor?
6          THE COURT:  Yes.  What exhibit number is this?
7          MR. NORINSBERG:  Exhibit 133.
8  BY MR. NORINSBERG
9  Q    I'd like you to take a look at this document, and when
10 you have had a chance to do so, just let me know.
11 (Handing.)
12 A    Yeah.  I prepared this document.
13 Q    And I'd like to direct your attention to the last page
14 of this document.  Do you see that there's a patient there
15 named Edwin Gonzalez?
16 A    Yes.
17 Q    And the billing information for this Edwin Gonzalez
18 appears on this schedule as well; is that correct?
19 A    Yes.
20 Q    In fact, Mr. Castillo, the billing information appears
21 for three different Edwin Gonzalezes on this schedule.  True
22 or not true?
23 A    Correct.
24 Q    And the first Edwin Gonzalez has a Medicaid
25 identification number that starts with ZE4; is that correct?

1    A    Yes.

2    Q    The second Edwin Gonzalez has a Medicaid identification

3    number that starts with WB1, correct?

4    A    Yes.

5    Q    And the third Edwin Gonzalez has a Medicaid number that

6    starts with WA3, correct?

7    A    Yes.

8    Q    So there are three different patients we're talking

9    about here; is that correct?

10   A    Yes.

11   Q    Now, Mr. Castillo, would you agree that it would be

12   improper to lump three patients together as one patient?

13   Would you agree with that?

14          MR. FARBER:  Objection.

15          THE COURT:  Overruled.

16   A    I would agree --

17   BY MR. NORINSBERG

18   Q    Would you agree that that would be improper?

19   A    No.  This is the --

20   Q    The question is simple, Mr. Castillo.

21   A    Well --

22   Q    Would it be improper to lump together three different

23   patients into one patient?

24          THE COURT:  For what purpose?  Maybe that will

25   make your question clearer.

---

1    BY MR. NORINSBERG

2    Q    To put a billing sheet in front of a grand jury that

3    puts together the billing records of all three patients and

4    merges it into one billing record.  Wouldn't that be

5    improper?

6          THE WITNESS:  Your Honor, when I prepared this,

7    the attorney in charge of the case asked a specific -- told

8    me specific directions:  "I want everybody named --

9    everybody whose family is Edwin Gonzalez on this

10   spreadsheet."

11         It wasn't just for one particular Edwin Gonzalez.

12         THE COURT:  You understood that the three people

13   on the spreadsheet were three different people?

14         THE WITNESS:  Right.  I raised that question to

15   the attorney in charge of the case, and he made the decision

16   to -- you know, to take those three different people.  The

17   reason why, I don't know.

18         THE COURT:  You mean and then add them up as if

19   they were one?

20         THE WITNESS:  I don't know if it was -- I don't

21   know what reason why.

22         THE COURT:  What's reflected on those?

23         THE WITNESS:  It's reflected that we add up those

24   three different people.

25   BY MR. NORINSBERG

---

1    Q    So Mr. Fusto actually asked you to put these three

2    Edwin Gonzalezes together?

3    A    I recall that he asked me -- he directed me to take

4    every Edwin Gonzalez that's there in the data, that we

5    received from the data, from the DH, and put it in this

6    spreadsheet.

7    Q    Did you ask him why you were being asked to put

8    together three patients together in this chart?

9    A    No, I didn't ask.

10   Q    And going back to the question I asked you before,

11   would you agree that it's improper to merge together three

12   different patients into one billing record?

13         MR. FARBER:  Objection.

14         THE COURT:  He can answer.

15   A    I don't know if it's improper.  You're going to have to

16   ask attorney Fusto the reason why he make that request.

17   BY MR. NORINSBERG

18   Q    Referring to your deposition, page 237, line 24,

19   "QUESTION:  Wouldn't it be improper to do that?

20    "ANSWER:  I would think so."

21   Do you recall giving that testimony?

22   A    I don't remember.

23   Q    Would you agree that it wouldn't be possible to

24   accidentally simply lump three different people into one

25   person if they have different dates of birth and lived in

---

1    different parts of the city?

2    A    Like I said, I wouldn't have done it accidentally.  It

3    was a request that was made.

4    Q    So it couldn't have been done by accident, right?

5    A    No.

6    Q    Now, before you put together these different patients

7    into one patient, you'd look at the patient's background

8    information to see what their date of birth and address was,

9    right?

10   A    Yes.

11   Q    And you did check their dates of birth and addresses,

12   correct?

13   A    Yes.

14   Q    Would you agree that you then added up all of the

15   billings from these three Edwin Gonzalezes and you included

16   that in your testimony to the grand jury?  Is that correct?

17   A    Yeah.  I added up all the numbers, yes.

18   Q    And the total number for all of these Edwin Gonzalezes,

19   put together, was about 25 percent of the $10,000 number you

20   had told the grand jury, right?

21   A    It's possible, yeah.

22   Q    Now, would you agree that the schedule is also supposed

23   to be based solely on billings for dentures which took place

24   inside the audit period?  Right?

25         MR. FARBER:  Objection.

**JA207**

1      THE COURT:  What's the basis of the objection?

2      MR. FARBER:  There's no foundation for that.

3      MR. NORINSBERG:  He can testify to that if he

4  doesn't know.

5  A   No, I don't know.

6  BY MR. NORINSBERG

7  Q   What's that?  Do you know?

8  A   No.

9  Q   Would you agree that you would have no reason to

10  include bills outside of the audit period when you were

11  doing the $10,000 calculation?

12  A   I followed the directions.

13  Q   Would you agree that you would have no reason to

14  include bills outside of the audit period as part of the

15  $10,000 calculation?

16      MR. FARBER:  Objection.

17      THE COURT:  Overruled.

18  A   I followed the directions, yes.

19  BY MR. NORINSBERG

20  Q   Referring to your deposition, page 235, line 16,

21  "QUESTION:  Would there be any reason that you can think of,

22  as you sit here today, as to why you might have included

23  bills outside the audit period as part of your $10,000

24  calculation?

25      "ANSWER:  No.  I wouldn't have no reason."

1  Q   Do you recall giving that testimony, sir?

2  A   It's possible.

3  Q   So you would exclude bills outside the audit period,

4  right?

5  A   It's possible, yeah.

6  Q   But, in fact, you actually included bills that went all

7  the way back to 1998 on that schedule, didn't you?

8  A   According to the chart, yes.  But I was following

9  directions, and the directions were to get all the Edwin

10  Gonzalezes and put them in the chart.

11  Q   But you're still the auditor.  You're the one doing the

12  actual calculations?

13  A   Yeah.  But I don't make the decisions.

14  Q   Why would you have records that go past the audit

15  period, all the way back to 1998, when the audit period

16  didn't start until 2000?  Do you have any explanation?

17  A   I have no explanation.

18  Q   Didn't Mr. Fusto tell you that you should only include

19  records from 2000, 2001, and 2002?

20  A   Like I told you before, I was told to look for all the

21  Edwin Gonzalezes.

22  Q   Sir, can you tell us right now when exactly did you

23  create this document?

24  A   Might be a couple of weeks, three weeks before the

25  grand jury.

1  Q   Could it have been a month before the grand jury?

2  A   It's possible.

3  Q   Could it have been two months before the grand jury?

4  A   I don't know.

5  Q   As you sit here today, do you have any idea as to the

6  actual date on which you created that document?

7  A   No.  It was five, six years ago.

8  Q   Was the schedule that you have in front of you

9  originally part of a much larger schedule that you prepared

10  at Mr. Fusto's instructions?

11  A   It's possible, yeah.

12  Q   And if it was part of a larger schedule, when would you

13  have created that larger schedule?

14  A   Before this.  When, I don't know.  During the course of

15  the investigation.

16  Q   So the document that we're talking about now could have

17  been part of a larger document that was created much earlier

18  in the investigation; is that correct?

19      MR. FARBER:  Objection.

20      THE COURT:  I'll sustain the objection.

21  BY MR. NORINSBERG

22  Q   I'd like to show you Plaintiff's Exhibit 136.

23  (Handing.)

24      Do you recognize this document, sir?

25  A   Yes.

1  Q   Did you prepare this document?

2  A   Yes.

3  Q   What's the date of on the document?

4  A   2/11/05.

5  Q   And what was the purpose of creating this document,

6  sir?

7  A   According to my notes here, my language, it says that

8  attorney Fusto asked me to prepare a list of recipients and

9  get the charge, their charge, because somebody -- it was

10  going to go to Albany and have them reviewed.

11  Q   And at that time, did you prepare a schedule based on

12  that information?

13  A   I don't know.  I don't see the schedule here.

14  Q   Okay.

15      In the schedule that you have in front of you, Grand

16  Jury 11, was that schedule created at some point at or

17  around the time you wrote this note in February of 2005?

18  A   Which is Exhibit --

19  Q   Grand Jury 11, the one you have in front of you, the

20  Edwin Gonzalez exhibit.

21      MR. FARBER:  He needs to know the exhibit number

22  here.

23      THE COURT:  Which exhibit?

24      MR. NORINSBERG:  133.

25  A   The question again?

BY MR. NORINSBERG

Q    Did you prepare Exhibit 133 at around the same time you

prepared this note?

A    I don't remember.

     MR. NORINSBERG:  May I approach the witness, your

Honor?

     THE COURT:  Yes.

BY MR. NORINSBERG

Q    I'd like to show you Plaintiff's Exhibit 130.

(Handing.)

     Do you recognize that document, sir?

A    Yeah, but there's some -- it's some chart I prepared.

Q    So you prepared this chart, Exhibit 130; is that

correct?

A    Yeah.

Q    And that chart looks very similar to Grand Jury 11,

right?

     MR. FARBER:  Objection.

     THE COURT:  I'll sustain the objection in that

form.

BY MR. NORINSBERG

Q    Does the chart appear to look like a similar format as

the chart that appears in front of you in Grand Jury 11?

A    Yes.

---

Q    It's similar in format, but it has a lot more patients

on it, right?

A    Yeah, I guess.

Q    When did you prepare Plaintiff's Exhibit 30?

A    I don't remember when I prepared this.

Q    Could it have been 2004?

     THE COURT:  Are you talking about 130?  He said

30.

     MR. NORINSBERG:  130.

A    Yeah, I don't remember.

BY MR. NORINSBERG

Q    Could it have been 25?

A    I don't remember.

     MR. NORINSBERG:  I offer Plaintiff's Exhibit 130

into evidence and 136 into evidence.

     THE COURT:  They'll be received.

     (Plaintiff's Exhibits 130 and 136 received in

evidence.)

     THE COURT:  Ladies and gentlemen, at this point

we'll take the luncheon recess, and we'll resume at 2:15.

     (The jury exited.)

     THE COURT:  You can step down.  We'll resume at

2:15 p.m.

     Counsel, how much longer do you need?

     MR. NORINSBERG:  I'm going to guess 45 minutes

---

with him.

     THE COURT:  What is your plan?  Do you intend to

cross-examine?

     MR. FARBER:  We intend to do the redirect and the

general direct.

     THE COURT:  Okay.  That's fine.

     MR. NORINSBERG:  Your Honor, I know every judge is

different.  In terms of me approaching the witness, is it

something the Court would prefer me to ask each time, or can

we waive that?

     THE COURT:  If you have an exhibit to show him,

you can indicate you want to show him an exhibit.  That's

fine.  You have permission to do that.

     MR. NORINSBERG:  Okay.  Thank you.

     (Continued on the next page.)

---

     (The Honorable Carol Amon takes the bench.)

     THE COURT:  Are we ready to proceed?

     MR. NORINSBERG:  Yes, your Honor.

     THE COURT:  Bring the jury in.

     Mr. Castillo, you may return to the stand.

     (The witness takes the witness stand.)

     (The jury entered.)

     THE COURT:  Be seated, please.

BY MR. NORINSBERG:

Q    Good afternoon, Mr. Castillo.

A    Good afternoon.

Q    I'd like to show you now some blowup documents of some

of the Design Dental records.

A    Okay.

Q    If you could come down for a minute, sir.

A    (Witness complies.)

Q    I'd like to just direct your attention, if we could, to

the top right hand part.  Do you see the date on this

document?

A    February 2000.

Q    And do you see a marking there that looks like a 1?

A    Looks like a 1.

Q    Okay.

     Let's start now looking -- this is July 2000?

A    Yeah.

1  Q    Somebody appears to have put a 1 there over the 2000;
2  is that correct?
3  A    I'm assuming, yeah.
4  Q    Who did that?
5  A    I don't know.
6  Q    Did you ever ask --
7         THE COURT:  For the record, Counsel, could you
8  please indicate what document and what exhibit you're
9  referring to?
10        MR. NORINSBERG:  Sure.  It's Plaintiff's Exhibit
11  92.  This is a blowup version of several select documents
12  from 92.
13        THE COURT:  All right.
14  BY MR. NORINSBERG:
15  Q    Now showing you a month.  I think that's August.
16  A    Yes.
17  Q    Do you see there appears to be an alteration to the
18  year 2000?  Somebody appears to have written in 1 there.
19        Do you see that?
20  A    Yes.
21  Q    Who did that?
22  A    I don't know.
23  Q    When was that done?
24  A    When was done what?
25  Q    When was that alteration put in?

1  A    I don't know.  Why are you asking me?  I didn't do it.
2  Q    I show you now March 2002.  Do you see where it appears
3  to have originally been March 2000?
4  A    Yeah, appears to.
5  Q    Then somebody put in a 2.  So it's not 2000, it's 2002.
6         Do you see that?
7  A    Yes, I see.
8  Q    When was that done?
9  A    I don't know.  Why are you asking me?
10  Q    Did you ever ask Mr. Fusto about the apparent
11  alterations in the dates of these documents?
12  A    No.
13  Q    Did that raise any concerns in your mind as it to
14  whether or not these records were, in fact, reliable records
15  that you could build your entire analysis on?
16        MR. FARBER:  Objection.
17        THE COURT:  I'll note the standing objection.
18  BY MR. NORINSBERG:
19  Q    Looking again at June 2000, do you see there appears to
20  be again an alteration?  That 2000 appears to have been
21  changed to 2002.
22        Do you see that?
23  A    Yeah, I see it.
24  Q    So was this document from 2000 or 2002?
25  A    Looks like from 2000.

1  Q    Do you have any idea why someone would have written in
2  2002 if it was from 2000?
3  A    No.
4  Q    Did you notice these alterations yourself?
5  A    No, I didn't.
6  Q    You never noticed that when you were going through
7  them?
8  A    No.
9  Q    Did you ever have -- did Mr. Fusto ever point that out
10  to you, these date changes?
11  A    No.
12  Q    Thank you, Mr. Castillo.
13        Now, I'd like to show you two documents and have you
14  take a look at them.  I'm showing you what's been marked
15  Plaintiff's 44 and Plaintiff's 134.  (Handing.)
16        Let's start with 44.
17  A    Okay.
18  Q    Does that appear to be one of the documents that was
19  used during the grand jury proceedings as Grand Jury Exhibit
20  7?
21  A    Yeah, looks like it.
22  Q    Okay.  And the other document, does that appear to be a
23  document that at some point you prepared?
24  A    Yes.
25  Q    Okay.  I'd like to --

1         THE COURT:  There are two documents before the
2  witness?
3         MR. NORINSBERG:  Yes.
4         THE COURT:  And the first one bears what exhibit
5  number?
6         THE WITNESS:  134.
7         MR. NORINSBERG:  The first one was Exhibit 44.
8         THE COURT:  So the one you've identified as Grand
9  Jury Exhibit 7 is exhibit what for trial purposes?
10        MR. NORINSBERG:  44.
11        THE COURT:  He's the one that's looking at it.
12  Does it say 44?
13        THE WITNESS:  44.  I'm sorry.
14        THE COURT:  All right.  So that's Exhibit 44.
15        Now, you have another document in front of you as
16  well?
17        THE WITNESS:  Yes.
18        THE COURT:  What exhibit number is on that?
19        THE WITNESS:  134 and 134A.
20  BY MR. NORINSBERG:
21  Q    Now, I'm going to try to put these on screen, and maybe
22  we can follow them together.
23        THE COURT:  Is 134 in evidence?
24        MR. NORINSBERG:  I'm sorry, your Honor.  I'm going
25  to offer both of these documents into evidence.

**JA210**

1           MR. FARBER:  He hasn't laid a foundation for 134.
2     We have no objection to 44.
3           THE COURT:  44 will be admitted.  Also standing
4     objection as to 134.
5           (Plaintiff's Exhibit 44 received in evidence.)
6     BY MR. NORINSBERG:
7     Q    Can you take a look at 134 and tell us what type of
8     information did you put into this record when you created
9     it?
10          THE COURT:  Has he said he created it?
11          MR. NORINSBERG:  Yes, he said it.
12          THE COURT:  I'm sorry.  I didn't hear that.
13          MR. FARBER:  I didn't hear that either.
14          THE COURT:  Is that a document that you created.
15          THE WITNESS:  I'm not sure I -- I'm not sure if I
16    created it.
17    BY MR. NORINSBERG:
18    Q    Does it appear to be a document that you created?
19          MR. FARBER:  Objection.
20          THE COURT:  Yeah, I'll sustain the objection.
21    A    I'm not sure.
22    Q    Do you know of anyone else in your office on the
23    investigative team who would have created this document?
24    A    I don't know.  The auditor who was assigned on the case
25    before I was assigned.

---

1     Q    The auditor before you did this?
2     A    I don't know.  There's only two people that had access
3     to do this.
4     Q    Okay.
5          Let's talk about Grand Jury Exhibit 7.  Do you
6     recognize this document, sir?
7     A    Yes.
8     Q    Okay.  Now, would you agree that this document lists
9     the number of procedures on the right-hand column that were
10    performed; is that correct?
11    A    Yes.
12    Q    And there's a procedure code, and that's left blank; is
13    that correct?
14          MR. FARBER:  Objection.  Objection, your Honor.
15          THE COURT:  What's the basis for the objection?
16          MR. FARBER:  One, it mischaracterizes the
17    document; and two, the famous hearsay adage that the
18    document speaks for itself.  And it does mischaracterize the
19    document.
20          THE COURT:  You've seen this document before,
21    correct?
22          THE WITNESS:  Yes, ma'am.
23          THE COURT:  Does this document contain procedure
24    codes?
25          THE WITNESS:  Yes.

---

1          THE COURT:  So what numbers are the procedure
2     codes?
3          THE WITNESS:  05650, 05761.
4          THE COURT:  So the numbers in that column are
5     procedure codes?
6          THE WITNESS:  Yeah.
7          THE COURT:  What do you recognize this document to
8     be?  You said you recognized it.
9          THE WITNESS:  Yeah.
10         THE COURT:  What do you recognize it to be?
11         THE WITNESS:  It's one of the exhibits that we
12    used for grand jury, I think.
13         THE COURT:  All right.  So this is one of the
14    documents that was put before the grand jury?
15         THE WITNESS:  I believe so, ma'am.
16         THE COURT:  All right.  You recognize it as that?
17         THE WITNESS:  Yes.
18         THE COURT:  All right.  So the procedure codes,
19    those are the procedure codes that you've just identified?
20         THE WITNESS:  Uh-huh.
21         THE COURT:  All right.  Do you want to question
22    further about the document?
23         MR. NORINSBERG:  Yes.
24    BY MR. NORINSBERG:
25    Q    Now, Mr. Castillo, this document was actually taken

---

1     from another document, wasn't it?
2     A    Yes.
3     Q    The other document has tooth numbers for every single
4     procedure that's performed, doesn't it?
5          MR. FARBER:  Objection.
6          THE COURT:  Overruled.
7     A    Yes.
8     Q    Can you please tell the jury why are there no
9     mention -- why is there no mention of any tooth numbers on
10    these documents?
11    A    That's based on what the attorney in the case wants to
12    have.  I don't think he felt it necessary to have the tooth
13    number on the spreadsheet.
14    Q    Referring to your deposition, Page 240, line 5, do you
15    recall being asked the following question and giving the
16    following answer:
17         "Q  Now, why is there no mention of any tooth numbers
18    on these documents?
19         "A  I don't remember why not."
20         Do you recall giving that testimony at your deposition?
21    A    Yeah, it's possible.
22    Q    Now, in the original document that this comes from,
23    there's an entire column, a column that actually talks about
24    tooth numbers, right?
25    A    I'm sorry, can you repeat the question?

1  Q   In the original format of this document, there's an
2  entire column that talks about tooth numbers, right?
3  A   Yes.
4          MR. FARBER:  Objection.
5  BY MR. NORINSBERG:
6  Q   And the column tells you the exact tooth that Dr. Morse
7  did his work on, correct?
8          MR. FARBER:  Same objection.
9          THE COURT:  Overruled.  You can redirect if you
10 wish.
11         Did you create this document?
12         THE WITNESS:  Which one, ma'am?
13         THE COURT:  The document that's in front of you,
14 Exhibit 44.
15         THE WITNESS:  44, yeah.
16         THE COURT:  Can you tell us what you did in order
17 to produce this document?  Do you recall?
18         THE WITNESS:  I took the information, some of the
19 fields that came from the Department of Health, and the
20 fields that are chosen and in this spreadsheet are basically
21 the fields that were chosen by Attorney Fusto.
22         THE COURT:  All right.  So when you say "fields,"
23 just tell us what you do.  There's a database of
24 information?  Is there a database of information?
25         THE WITNESS:  Yes.

1          THE COURT:  And you go to the computer and you do
2  what?  You ask for certain things?
3          THE WITNESS:  No.  Just choose the -- there's a
4  mass data that we get from the Department of Health.  Once
5  we get it, we make a copy of that data, and we use the
6  copy -- we make a copy of the data that we get from the
7  Department of Health, and then we use the copy to pull the
8  information from.  Okay.  Once we -- once Attorney Fusto
9  decides what fields are we going to need --
10         THE COURT:  Fields being?  Give me an example of a
11 field.
12         THE WITNESS:  Fields could be the procedure code,
13 a last name, a CIN number.  Those are fields.  Invoice
14 number, date of service, amount paid.  Those are fields.
15         THE COURT:  Is this something you plug into a
16 computer, and then it produces a document?
17         THE WITNESS:  No, we don't plug anything.  It's
18 already in there from the Department of Health.
19         THE COURT:  But you've got this database that has
20 all this stuff in it, right?
21         THE WITNESS:  Yes.
22         THE COURT:  So in order to produce this document
23 that we see, how do you physically create the document?
24         THE WITNESS:  How do I physically?  We know the
25 person that we need to pull the information from.  We just

1  filter, and we just get all the person's information.  Now,
2  instead of having 2,000 patients, you only have -- you
3  filter, and you only have the patient that you're looking
4  for.
5          THE COURT:  So you say -- you input something that
6  just says give me patient --
7          THE WITNESS:  Right.  There's formulas, and also
8  there's a tool in there that you can use to just filter one
9  particular patient instead of looking at thousands of them.
10         THE COURT:  But you're creating this document by
11 working on a computer, right?
12         THE WITNESS:  Yes.
13         THE COURT:  So you input what you want, the fields
14 that you want.
15         THE WITNESS:  The fields that I want.
16         THE COURT:  And then you get a document that spits
17 out, essentially, that has the information on it?
18         THE WITNESS:  Yes, ma'am.
19         THE COURT:  Okay.  But you tell it what you're
20 interested in.
21         THE WITNESS:  Exactly.  The field that we are
22 interested in, which already contains the information that
23 was submitted by the doctor through the Department of
24 Health.
25         THE COURT:  Okay.  So this database has the

1  doctor's information.
2          THE WITNESS:  All the doctor information, yes.
3          THE COURT:  And you plug in the fields that you're
4  looking for?
5          THE WITNESS:  Exactly.
6          THE COURT:  Just as an example, give me all the
7  information on patient X?
8          THE WITNESS:  Actually, it's different.  It's a
9  different format.  You just sort it by name or you just put
10 out the CIN number on the column.
11         THE COURT:  And what's a CIN number?
12         THE WITNESS:  A CIN number is a number that's
13 assigned to -- it's a unique number that's assigned to each
14 Medicare recipient.
15         THE COURT:  So every Medicare recipient has its
16 own --
17         THE WITNESS:  A CIN number.
18         THE COURT:  Has its own recipient number?
19         THE WITNESS:  Exactly.  You just look for them.
20 There's a look-up pattern that you just put the CIN number
21 in there, and it gives you all the -- everything that was
22 billed under that recipient.
23         THE COURT:  Under that --
24         THE WITNESS:  Particular, yes.
25         THE COURT:  And it could've been by different

**JA212**

1  doctors, so you have to filter it by doctors as well?
2      THE WITNESS:  By doctors also, too.  Once you get
3  that recipient, all the information for that recipient, you
4  just -- then you just import it to Excel, because now we get
5  on Axis format.  Then you import everything from that
6  particular recipient and you import it into Excel; and then
7  from Excel, you select the fields that you wanted to use for
8  that particular recipient.
9      THE COURT:  Okay.
10  BY MR. NORINSBERG:
11  Q    Mr. Castillo, did you discuss with the attorney, John
12  Fusto, whether or not the column with tooth numbers should
13  be included on this chart?
14  A    No, I didn't.
15  Q    Referring to your deposition, Page 245, line 2:
16      "Q  Did you discuss whether or not you should include
17  the column for tooth numbers with Mr. Fusto?
18      "A  I don't remember.
19      Do you recall giving that testimony back at your
20  deposition?
21  A    It's possible.
22  Q    So back at your deposition, you couldn't remember if
23  you had a conversation with Mr. Fusto about the tooth
24  numbers, right?
25  A    Yes.

1  Q    But now you just told us no, you didn't have a
2  conversation?
3  A    No.  No, I didn't have.
4  Q    Now, is it possible you actually did have a
5  conversation with Mr. Fusto and you don't remember?
6      MR. FARBER:  Objection.
7      THE COURT:  Sustained.
8  BY MR. NORINSBERG:
9  Q    Can you tell us, Mr. Castillo, what year was this
10  document created?
11  A    I don't remember the year.
12  Q    Do you remember whether this document was part of a
13  larger document, a larger schedule that Mr. Fusto had asked
14  you to create?
15  A    Yeah, it's possible.
16  Q    And if it were part of a larger schedule, do you know
17  when that schedule was created?
18  A    No.
19  Q    So it could be 2004, 2005, 2006, right?
20  A    Could have been, yes.
21  Q    Was there an earlier version of this document that, in
22  fact, clearly showed tooth numbers with each and every
23  procedure listed?
24      MR. FARBER:  Objection.
25      THE COURT:  Overruled.

1  A    It's possible.
2      THE COURT:  You mean that he created?
3      MR. NORINSBERG:  Yes.
4      THE COURT:  Is that what you're asking?
5      MR. NORINSBERG:  Yes.
6      THE COURT:  So just so you understand the
7  question, did you create a version of this document before
8  the one in front of you, Exhibit 44, that had -- was the
9  same except it had tooth numbers?
10      THE WITNESS:  Yes, ma'am.
11      THE COURT:  You did create it?
12      THE WITNESS:  I did create it.
13      THE COURT:  You did create a document like that?
14      THE WITNESS:  Yes.  As a part of the request.
15  BY MR. NORINSBERG:
16  Q    And that document is in front of you as 134, isn't it?
17  A    Yeah, could've been this one.  Could have been another
18  one that has more fields.
19      MR. NORINSBERG:  I offer 134 into evidence, your
20  Honor.
21      MR. FARBER:  Objection.  He still hasn't laid a
22  foundation for it.
23      THE COURT:  I sustain the objection.
24  BY MR. NORINSBERG:
25  Q    Now, as part of your calculations in this case, did you

1  do some calculations as to how much Dr. Morse paid the labs
2  over the three-year period?
3  A    I don't remember.
4  Q    Okay.
5      Do you recall testifying at your deposition that
6  Dr. Morse paid approximately $226,000 to the labs during the
7  audit period?
8  A    That is possible.
9  Q    And do you recall actually telling that same number to
10  the grand jury, that Dr. Morse paid $226,000 approximately,
11  to the labs?  Do you recall that?
12  A    No, I don't remember.
13  Q    Now, Mr. Castillo, you actually left out a full year of
14  checks that Dr. Morse paid to the labs, didn't you?
15      THE COURT:  When?  At what point in time?
16
17  BY MR. NORINSBERG:
18  Q    When you did your calculations.
19      THE COURT:  What calculations?
20      MR. NORINSBERG:  As to how much money Dr. Morse
21  paid to the labs.
22      THE COURT:  Did you do a calculation about how
23  much money the doctor paid the labs?  Did you do a
24  calculation like that?
25      THE WITNESS:  I don't remember.

1       MR. NORINSBERG:  Just going through the grand jury
2  testimony, your Honor, if the Court would bear with me for
3  one minute.
4  BY MR. NORINSBERG:
5  Q   Referring to your testimony before the grand jury,
6  Page 21, Line 17.
7       "Q  Did you make a total of how much both labs
8  together --
9       "A  Uh-huh.
10      "Q  -- charged Dr. Morse?
11      "A  Yes.  I had to.  I had to correct the number.  The
12  total amount this lab charged Dr. Morse using these prices
13  was $172,280, and the total amount, the total amount of
14  money using the -- using the lab prices was $226,881
15  combined.
16      "Q  That's for both labs?
17      "A  For both labs."
18      Do you recall giving that testimony at your grand jury,
19  sir?
20  A   Yes.
21  Q   Okay.
22      So you actually told the grand jury it was roughly
23  $226,000 that Dr. Morse had paid both labs during the audit
24  period, right?
25  A   It's possible that I did.

1  Q   In fact, he actually paid $318,000 to the labs, didn't
2  he?
3       THE WITNESS:  Your Honor, it's hard for me to
4  visualize all the numbers the counselor is saying because I
5  don't have the documentation in front of me.  So I can't --
6       THE COURT:  Well, then you can say without the --
7       THE WITNESS:  Without the documentation, I
8  can't --
9       THE COURT:  Without the documentation, he doesn't
10  know.
11  BY MR. NORINSBERG:
12  Q   Now, I'd like to show you Plaintiff's Exhibit 29.
13  (Handing.)
14      I ask you if you recognize this document.
15  A   Yes, I do.
16  Q   Can you tell the members of the jury what do you
17  recognize that document to be?
18  A   This is the checks that -- this is the checks that I
19  believe were paid to these two laboratories by Dr. Morse.
20  Q   And did you prepare this summary?
21  A   As an inventory, yes.
22  Q   Okay.
23      You prepared it as an inventory based on your review of
24  the checks, right?
25  A   Yes.

1  Q   Okay.
2       MR. NORINSBERG:  I'd like to offer Plaintiff's
3  Exhibit 29 into evidence.
4       MR. FARBER:  No objection, your Honor.
5       THE COURT:  29 is received.
6       (Plaintiff's Exhibit 29 received in evidence.)
7  BY MR. NORINSBERG:
8  Q   I'd like you to take a look at this document.  Do you
9  have it in front of you, sir?
10  A   Yes.
11  Q   And I'd like to direct your attention, if I could, to
12  the last column on the right, the second-to-last column,
13  where it says "Date."
14      Do you see that, sir?
15  A   I'm sorry, where?
16  Q   Looking at the document, on the right-hand side, the
17  second-to-last column, "Date"?
18  A   Okay.
19  Q   And do you see -- you've listed these checks in
20  chronological order, right, sir?
21  A   It looks like it's in date order.
22  Q   Okay.
23      So they're going in the sequence of the dates.  From
24  1999, you're going all the way up to 2002, correct?
25  A   Correct.

1  Q   And I'd like to focus right now on the entry of
2  9-14-2000.  Do you have that entry in front of you?
3  A   For which laboratory?
4  Q   We're looking at this column right here, sir, under
5  Nu-Life.  Do you see it?
6  A   The date, please.
7  Q   Yes.  9-14-2000?
8  A   Yes.
9  Q   And the next entry is 10-1-2001; is that correct?
10  A   Yes.
11  Q   So there's essentially an entire year of checks that
12  are skipped between those two numbers; isn't that true?
13      MR. FARBER:  Objection.
14      THE COURT:  What's the basis for the objection?
15      MR. FARBER:  The document speaks for itself, and
16  it implies the existence of checks.
17      THE COURT:  Overruled.
18  BY MR. NORINSBERG:
19  Q   Now, are there any checks listed for the month of
20  November 2000 on this document?
21  A   No.
22  Q   Are there any checks listed for the month of December
23  2000?
24  A   No.
25  Q   How about January 2001?

1   A    No.

2   Q    February 2001?

3   A    No.

4   Q    March 2001?

5   A    No.

6   Q    April 2001?

7   A    No.

8   Q    May 2001?

9   A    No.

10  Q    June 2001?

11  A    No.

12  Q    July 2001?

13  A    No.

14  Q    August 2001?

15  A    No.

16  Q    September 2001?

17  A    No.

18  Q    So there are no checks listed during that entire

19  one-year period; isn't that true?

20  A    Yes.

21  Q    Now, it's your claim that you didn't have the checks

22  during that period; is that correct?

23  A    Yes.

24  Q    In fact, Mr. Castillo, you don't know if you had the

25  checks for those 11 months; true or not true?

---

1   A    I didn't have it in my possession.

2   Q    Referring to your deposition, Page 201, Line 13.

3        "Q  As you sit here today, do you know whether or not

4   you had the checks for those 11 months?

5        "A  I don't know."

6        Do you recall giving that testimony, sir?

7   A    Yeah, possibly.

8   Q    And, in fact, you also testified that you don't know if

9   you had the checks and simply failed to include it in your

10  calculations, true?

11  A    No.

12  Q    Referring to your deposition, page 202, line 12.

13       "Q  Is it also possible that you did have the checks

14  but that you failed to include it in your calculations?

15       "A  I don't know."

16       MR. FARBER:  Objection.

17  BY MR. NORINSBERG:

18  Q    Do you recall giving that testimony?

19       MR. FARBER:  That is not the testimony on the

20  transcript.

21  BY MR. NORINSBERG:

22  Q    Do you recall giving the testimony that I just asked

23  you, sir?

24       THE COURT:  Well, do I need to look at the

25  transcript here at side bar?  Do I need to see it?

---

1        MR. NORINSBERG:  I'll go to the page, your Honor.

2   That is the answer.

3        THE COURT:  All right.  Can I see the parties at

4   side bar.

5        (Side bar begins.)

6        (Continued on the next page.)

---

1        THE COURT:  I can't believe that I have to call the

2   two of you over here to look at the transcript.

3        MR. NORINSBERG:  I read it exactly as it was.

4   Right here (indicating).

5        MR. FARBER:  He read the top question.

6        MR. NORINSBERG:  You're looking at a different

7   question.

8        THE COURT:  Do you see this?  This is the question

9   he's asking about.  He says, "Is it possible that you did

10  have the checks but that you failed to include it in your

11  calculation?"  And he goes, "I don't know."

12       ATTORNEY2:  What page is that?

13       THE COURT:  That's 202.

14       MR. FARBER:  The reference I have is 201.  If the

15  question references 202, line 12, then I withdraw my

16  objection.

17       THE COURT:  Did you give the page?

18       MR. NORINSBERG:  That's the page.

19       THE COURT:  Did you give it before you read it?

20       MR. NORINSBERG:  Yes.  I'll do it again, though.

21       (Sidebar ends.)

22       (Continued on the next page.)

**JA215**

1  THE COURT:  Should I reread the question for the
2  record, your Honor?
3  THE COURT:  Yes.  I think you'll need to.
4  DIRECT EXAMINATION (CONTINUED)
5  BY MR. NORINSBERG:
6  Q  Referring to your deposition, Mr. Castillo, page 202,
7  line 12:
8  "Question:  Is it also possible that you did have the
9  checks, but that you failed to include it in your
10  calculation?
11  "Answer:  I don't know."
12  Do you recall giving that testimony, sir?
13  A  Yes, it's possible.
14  Q  An according to your deposition testimony, it was
15  possible that you had your missing checks but simply didn't
16  include it in your calculations, true?
17  MR. FARBER:  Objection.
18  THE COURT:  Sustained.
19  Q  Now, did you ever ask the attorney John Fusto for the
20  one year of checks that were missing?
21  A  Yes, I did ask.
22  Q  And what did Mr. Fusto say to you when you asked about
23  the one year of missing checks?
24  A  He said that's everything that we got from -- these
25  checks were at the office even before I was assigned to the

1  case.  And as a preliminary -- as a part of my duty is to do
2  an inventory of some of the records that was given to me by
3  the previous auditor.  And that's what I did.  I inventoried
4  this, and I raised the question and the attorney Fusto said
5  that that's everything that we got.  We got from where,
6  don't know, but those are the checks that I got on my
7  possession.
8  Q  Okay.  So just so I'm clear, when you did the
9  inventory, you realized that you were missing a year of
10  checks.  You mention it to Mr. Fusto, and then Mr. Fusto
11  responded to that; is that correct?
12  A  Yeah, he respond.
13  Q  Okay.  And at your deposition, you testified you didn't
14  remember anything that Mr. Fusto told you about?
15  A  I didn't remember, no.
16  Q  Do you remember now?
17  A  What he told me?
18  Q  Yeah.
19  A  Yeah, I just said.  That's everything that the office
20  received.
21  Q  Did he ever tell you don't worry about it?
22  A  No, he didn't tell me.
23  Q  Now, when you were working at the Attorney General's
24  Office, Mr. Castillo, you would investigate maybe three
25  cases a year; is that correct?

1  A  Yes.
2  Q  So the Morse case would have been one of just three
3  cases that you were investigating; is that right?
4  A  Possible, yes.
5  Q  Are you a CPA, sir?
6  A  No, I'm not.
7  Q  And are you a statistician at all?
8  A  What?
9  Q  Do you have any special training that you received for
10  doing your job at the Attorney General's Office?
11  A  I have my internship with the office.
12  Q  Okay.  So you have an internship, and after that did
13  you receive any additional training?
14  A  Yeah.  We had yearly training.
15  Q  You actually have graduated from college in 2003; is
16  that correct?
17  A  Yes.
18  Q  Okay.  And you started working on this case one year
19  later in 2004, correct?
20  A  It's possible.
21  Q  This was your first job out of college when you were
22  evaluating this million-dollar case, right?
23  A  I mean, related to my accounting background?
24  Q  Referring to your deposition, page 8, line 16.
25  "Question:  So this was your first job out of college?

1  "Answer:  Correct."
2  A  This was my first job, yes, as an accountant.
3  Q  Thank you, Mr. Castillo.  I have nothing further.
4  THE COURT:  Counsel, I take it you want to do both
5  cross and your own direct of this witness in your case as
6  well, correct?
7  MR. FARBER:  Yes, your Honor.  We want to do the
8  direct as if we were calling him.
9  THE COURT:  All right.  I explained this to you in
10  my opening instructions, Ladies and Gentlemen, just so you
11  understand it because it's a little unusual.  To avoid
12  having to call a witness back once the plaintiff rests and
13  it becomes the defendants' case, what happens is that we go
14  a little bit out of order and counsel will now be asking
15  questions related to the direct testimony as well as through
16  this witness putting on part of the defendants' case and the
17  defendants' testimony.
18  So this is what we refer to here as the "shortness
19  of life" principle.  Instead of bringing everybody back and
20  bringing everyone here longer, we do it in this fashion.  It
21  becomes a little disjointed so I just wanted you to
22  understand that that's why this attorney will be doing that.
23  Okay.
24  MR. FARBER:  Thank you, your Honor.
25

**JA216**

1  DIRECT EXAMINATION

2  BY MR. FARBER:

3  Q    Good afternoon, Mr. Castillo.

4  A    Good afternoon.

5  Q    Mr. Castillo, where did you attend college?

6  A    C.W. Post University.

7  Q    All right.  And what was your -- you obtained a degree?

8  A    Yes.  Bachelor degree in accounting.

9  Q    And do you have other -- there came a time when you

10 worked for the Attorney General's Office, correct?

11 A    Yeah.  I did my internship with the office for six,

12 seven months prior.

13 Q    Do you remember when that was?

14 A    I think it was July 2002, I think.

15 Q    Had you graduated college yet?

16 A    No.

17 Q    And besides that, do you have any other experience in

18 auditing or accounting?

19 A    No, sir.

20 Q    All right.  Can you describe the training you received

21 at the Attorney General's Office.

22 A    During my internship or during --

23 Q    Both during your internship and after your internship.

24 A    During my internship, I helped the senior auditors to

25 review records, prescriptions, do inventories.  Whatever

1  they need me to do, I did.  Once I was hired by the Attorney

2  General's Office, they trained me for two, three months.

3  And then after that I was assigned to a different case.  Not

4  this one.  I was assigned to another case with other senior

5  auditors.  And that's how I start learning the tools and

6  everything that I need to be trained -- need to

7  be -- everything that I need to know before they started

8  giving me a case.

9  Q    Okay.  When you say "tools," what are you talking

10 about?

11 A    Tools.  How to order data from the Department of

12 Health.  Had to do with the proper inventories.  How to

13 label the records that we receive for when

14 providers -- mostly during the year, we go to a conference

15 where we learn different things.  And during the conference,

16 how to -- like, they teach us how to do presentations for

17 grand juries.  How to use that data that we get from the

18 data warehouse.  How the providers submit the claims.

19 Q    So what does your training consist of concerning

20 presenting data for grand jury, for example?

21 A    Consist?  Basically, we know -- I mean,

22 we -- basically, it's what -- the issue of the investigation

23 is different.  Each attorney is different.  Attorneys tend

24 to -- some attorneys they tend to request, you know,

25 different fields.  You know, for grand jury we get together

1  first and then the attorney start deciding what fields they

2  need, what documents they need.  If we don't have those

3  documents available because those documents are -- belongs

4  to each department, we get to request them.  We had to go to

5  channels to get to those records to put into evidence.

6  Q    Were you given specific training concerning the

7  preparation of documents?

8  A    Yes.

9  Q    What was that training?

10 A    The training for these specific documents?

11 Q    For the preparation of documents.

12 A    We don't get training.  I'm sorry.  We don't get

13 training for specific documents.  It's just based on what

14 the training needs to present to the grand jury.

15 Q    Tell me, when you were hired by the Attorney General,

16 were you assigned to any particular division of the Attorney

17 General's Office?

18 A    Medicaid Fraud Control Unit.

19 Q    And can you tell me what is the Medical Fraud Control

20 Unit.

21 A    The Medicaid Fraud Control Unit, it is a prosecution

22 unit that investigates Medicaid fraud.

23 Q    And do you know what the Medicaid program is?

24 A    Yes.  It's an assistant that is given to people that

25 need -- people on need to -- for them to have some sort of

1  benefits such as going to the doctors, dentist, any kind of

2  service -- medical service that they need.

3  Q    Medicaid program sometimes known as the medical

4  assistance program?

5  A    Correct.

6  Q    And did you have a particular position or assignment

7  with the Medicaid Fraud Control Unit?

8  A    I was in special auditor investigator.

9  Q    And were you assigned to report to a specific person or

10 persons?

11 A    Yes.

12 Q    Who were you assigned to report to?

13 A    In this case, I was assigned to report to Richard Porto

14 and then also we had to report to Arthur Lipstein.

15 Q    And what was Richard Porto's position?

16 A    Assistant chief auditor.

17 Q    And was he your direct supervisor?

18 A    On that case, yes.

19 Q    And who was Arthur Lipstein?  What position did he

20 have?

21 A    The chief auditor of the unit.

22 Q    All right.  Now, from time to time you were assigned to

23 individual cases for investigation of prosecution, correct?

24 A    Yes.

25 Q    Do you recall how those cases were staffed?

1  A   One auditor, supervisor, an attorney, and sometimes two
2  investigators, sometimes one investigator.
3  Q   And during your -- how long were you with the Attorney
4  General's Office?
5  A   8 1/2 years.
6  Q   And in that 8 1/2 years, how many different cases or
7  prosecutions, investigations, did you work on?
8  A   Three per year.
9  Q   Different three per year?
10  A   Yeah.
11  Q   Sometimes three follow through?
12  A   Sometimes three follow through.
13  Q   So from beginning to end, about how many different
14  cases?
15  A   10, 12.
16  Q   All right.  And besides the case of Dr. Leonard Morse,
17  did you have occasion to work on other cases involving
18  dentists?
19  A   Yes.
20  Q   And how many other dental cases did you work on?
21  A   I think two before that and -- yes, two before that.
22  Q   There come a time when you began working on the case of
23  Dr. Leonard Morse?
24  A   Yes.
25  Q   And when did that take place?

1  A   I don't know if it was 2004, 2005.  I don't remember.
2  Q   All right.  Do you know who Tim Johnson is?
3  A   Yeah.  Tim Johnson was an auditor with -- for the unit.
4  Q   And do you know if Tim Johnson had worked on the case
5  of Leonard Morse?
6  A   He was the first one assigned to the case.
7  Q   And what happened to Tim Johnson?
8  A   He went to work in Boston.
9  Q   So he left the Medicaid Fraud Control unit?
10  A   Yeah.
11  Q   Is it fair to say you took over the auditor
12  responsibility on Morse when he left?
13  A   Yes.  I was assigned to the case.
14  Q   And when you were assigned to that case, can you tell
15  me what the initial tasks you performed when you were first
16  assigned were.
17  A   When we -- when I was assigned to the case, we had a
18  meeting with the whole thing.  I was told by my supervisor,
19  Richard Porto, to go over all the records that we had.
20  Start getting familiar with the case.
21  Q   Did you speak to anyone?
22  A   What do you mean by "speak"?
23  Q   Did you speak to anyone at the time that you were
24  performing your first tasks on the Morse case?
25  A   Yeah.  Well, we always got in touch -- I mean, we keep

1  in touch with the attorney in charge of the case.
2  Q   That would be Special Assistant Attorney General Fusto?
3  A   Yes.
4  Q   Anyone else you spoke to?
5  A   I spoke to my supervisor on a daily basis.  From time
6  to time, I spoke to the investigators.
7  Q   All right.  Can you tell me what a data warehouse is.
8  A   Data warehouse is a unit within the Department of
9  Health that keeps all the information, all the bills, that
10  providers submit to the Department of Health.
11  Q   When you say "providers," do you mean Medicaid
12  providers?
13  A   I'm sorry.  Medicaid providers, yes.
14  Q   Okay.  And how is this data kept?
15  A   On computer system, I guess.  They started to keep some
16  Medicaid providers.  They do the claims by paperwork.  So
17  what -- this data warehouse, they get all the information
18  and then put it on an Access format and they keep it there
19  for review for purpose of if they need to go back and make
20  adjustments or anything.
21  Q   Is the data warehouse also sometimes known as a claims
22  database?
23  A   Yes.
24  Q   And you said the Department of Health has a data
25  warehouse, correct?

1  A   Yeah.  They are the ones that had the originals.
2  Q   Does the Attorney General's Office or the Medicaid
3  Fraud Control Unit maintain the data warehouse?
4  A   Yes.
5  Q   And as far as you know, what information is contained
6  in the Medicaid Fraud Control Unit's warehouse?
7  A   Whatever we get from the Department of Health.  The
8  provider's profile.
9  Q   All right.  Well, let me ask you, what is a provider
10  profile?
11  A   Provider profile is all the information that the
12  providers submit to Medicaid.
13  Q   When you say "all the information that the providers
14  submit to Medicaid," specifically are you referring to
15  claims information?
16  A   Claims information.
17  Q   And as far as you know, how is that information
18  submitted to the Department of Health?
19  A   In this case, electronically.
20  Q   And regarding Dr. Leonard Morse, did you have occasion
21  to request data from the Department of Health?
22  A   Yes.
23  Q   And what did you request?
24  A   All his -- all the billings that he submit to
25  Medicaid -- to the U.S. department.

**JA218**

1  Q   Do you know how long Dr. Morse has been in the Medicaid
2  program?
3  A   He's been around for quite a while.  20, 30 years.
4  Q   Did you request data for that entire 20-, 30-year
5  period?
6  A   I don't think they even have that from all that.
7  Q   Did you request data from a specific time period?
8  A   Actually, the data was already in by the time I was
9  assigned to the Attorney General's Office.  I just took the
10 years that we were interested on.
11 Q   And what years were you interested in?
12 A   I think it was 2000, 2001, 2002.
13 Q   Okay.  Did you ever discuss with anyone why those
14 particular years had been selected?
15 A   Because that's when Dr. Morse has the higher billings
16 for dentures.
17 Q   Someone tell you that?
18 A   Yeah.  I think it was discussed during one of the
19 meetings that we had with investigators and the attorney.
20 Q   Okay.  All right.  Have you had occasion to print out
21 information from the data warehouse?
22 A   Yeah.  All my spreadsheets came from the data -- I
23 mean, from my analysis that I did, those I print out.
24 Q   All right.  Now, Her Honor asked you questions
25 previously on how you created documents, correct?

1  A   Yeah.
2  Q   And is it fair to say that each time you created a
3  spreadsheet, you created it in the way you described?
4  A   Yes.
5  Q   All right.  Am I correct that you did not take
6  documents you'd already prepared and then use them to create
7  further documents?
8        MR. NORINSBERG:  Objection.
9        THE COURT:  I'll sustain it -- I mean, I'll
10 overrule the objection and let him answer.
11 A   Could you repeat.  I'm sorry.  Repeat the question.
12       MR. FARBER:  Your Honor, if I could ask the
13 question be read back.
14       THE COURT:  Could you read it pack.
15       (Record read as requested.)
16 A   No.
17 Q   Not correct?
18 A   Uh-huh.
19       THE COURT:  No, wait a minute.  You've got too
20 many "nots" in there.  Why don't you ask the question again.
21       MR. FARBER:  I will rephrase.
22       THE WITNESS:  Okay.
23 Q   You testified that to create your spreadsheet, you
24 would download data from data warehouse or a claims
25 database, correct?

1  A   Yes.
2  Q   And in the course of creating your spreadsheets, did
3  you create documents any other way?
4  A   Everything that I created came from the original -- we
5  get the original.  We order the original.  We get the
6  original.  We make a copy of the original.  And then from
7  the copy we start taking fields to create -- to use in Excel
8  to create the spreadsheet based on the attorney's demand.
9  Q   All right.  And then you have something in Excel,
10 correct?
11 A   Right.
12 Q   And you print that out, correct?
13 A   Yes.  It's easy to work in Excel than Access.
14 Q   And in the course -- start over.
15     During the case of Dr. Morse, do you recall what
16 spreadsheets you created?
17 A   A bunch of them.
18 Q   Okay.  And what was the purpose of these spreadsheets?
19 A   It was basically preliminary work first.
20 Q   Preliminary work for what purpose?
21 A   For the purpose of -- for the purpose of -- for the
22 purpose of seeing what Dr. Morse had billed Medicaid for
23 dentures.
24 Q   Did there come a time when you saw patient records
25 provided by Dr. Leonard Morse?

1  A   Yes.
2  Q   About when did that happen?
3  A   I don't remember when that happened.  Probably when I
4  was doing my inventory, 2004.
5  Q   Around the time you began working on this case?
6  A   Yes.
7  Q   What did you do with those patient records?
8  A   What did I do?
9  Q   Yeah.  What did you do with them?
10 A   I reviewed them.  I was told by -- we had a meeting
11 with the attorney Fusto and investigators.  And during that
12 meeting, attorney Fusto asked me to go over all the charges
13 that we received and to look for prescriptions or invoices
14 from the laboratory.
15 Q   Okay.  And in -- did you find prescriptions?
16 A   No.
17 Q   Did you find laboratory invoices?
18 A   No.
19 Q   Did you there come a time when you saw laboratory
20 invoices concerning Dr. Morse, regardless of the patients?
21 A   No.
22 Q   Let me direct you to some of the documents in front of
23 you.  I believe Mr. Norinsberg handed you a number of
24 documents, right?
25 A   Yes.

**JA219**

1    Q    Look in those documents.  Do you see laboratory
2    invoices?
3    A    No.  Basically, my spreadsheets that I worked on.
4    Q    All right.  Do you recall testifying about laboratory
5    invoices today?
6    A    When?
7    Q    Today.  Do you recall testifying about laboratory
8    invoices?
9    A    No, I don't think so.
10   Q    Do you know what Design Dental is?
11   A    Design Dental?
12   Q    Yes.  What's Design Dental?
13   A    It's a laboratory that provides service for Dr. Morse
14   on dentures -- denture repairs.
15   Q    And you conducted an analysis of his inventories,
16   correct?
17   A    Yes.
18   Q    And Mr. Norinsberg showed you some of those invoices;
19   did he not?
20   A    Oh, I'm sorry?
21   Q    Did you not see -- did Mr. Norinsberg not show you some
22   laboratory invoices?
23   A    Yeah, he showed me these (indicating).
24   Q    Okay.  All right.  When did you first see those?
25   A    I'm going to assume that I saw them when I was assigned

1    to the case and I was told to go over all the documents that
2    the office received.
3    Q    So those were part of the documents you found when you
4    were first assigned to the case?
5    A    Yes.
6    Q    Now, were you asked to do anything with those
7    laboratory invoices?
8    A    First they asked me to try to match -- review them.
9    Try to match the names on the invoices with the names that
10   we have on the data -- from the names -- the patient's name
11   that Dr. Morse and the claims were submitted to Medicaid.
12   Q    Okay.  And what else were you asked to do regarding
13   these lab invoices?
14   A    Trying to find out, you know, by reviewing the records,
15   trying to find out what the work was done for these
16   patients.
17   Q    Okay.  And at some point in time, did you calculate
18   something that you called a ceiling?
19   A    Yeah.
20   Q    All right.  And can you -- what is a ceiling, as you
21   describe it?
22   A    The ceiling is -- it's a -- the ceiling is the most
23   Dr. Morse could have billed Medicaid.
24   Q    Okay.  And how did you come about figuring out what
25   that ceiling was?

1    A    By reviewing the records.
2    Q    What records did you review?
3    A    The invoices.
4    Q    Okay.  And how did you come about finding what the
5    ceiling was?
6    A    By giving -- first of all, we didn't know if all of
7    these patients were Medicaid patients.  During one of the
8    meetings, we had to decide how we going to analyze these
9    invoices.  And we decide that by looking at these invoices,
10   it was going to be hard because they were illegible.  Most
11   of them were illegible.  But we believe that
12   Mr. -- Dr. Morse had, you know, performed some work during
13   these years, and we had to give him credit for something on
14   these invoices.
15   Q    How did you decide how much to give him credit for?
16   A    Well, I looked at the Medicaid manual and tried to
17   identify -- trying to identify the work for the -- the work
18   that was done for the patient and look back -- look to the
19   Medicaid manual and give Dr. Morse the credit -- give
20   Dr. Morse the amount of money that was paying during that
21   year for that particular procedure code.
22        One of the examples here could be like upper, lower,
23   full.  I don't know how much it was paid at that time, but
24   because of this -- that particular patient had a lower, full
25   denture.  If Medicaid pays 300 or 400, we gave him 300, 400,

1    whatever amount was paid, we gave Dr. Morse the credit for.
2    Regardless if it was a Medicaid recipient or it was a
3    Medicaid recipient, he got credit for that.
4    Q    That's if you could determine the procedure?
5    A    Procedure, yes.
6    Q    Okay.  And did there come a time when you reached a
7    ceiling calculation with respect to each of these two
8    laboratories?
9    A    Yeah.
10   Q    And did you reach one final ceiling calculation with
11   respect to each laboratory?
12   A    Yes.  The one that I testified in the grand jury.
13   Q    Did you make other calculations concerning ceilings to
14   each laboratory?
15   A    We try different -- we tried different ways
16   to -- different ways to calculate this because we felt that,
17   you know, we had to give Dr. Morse credit for.  And
18   ultimately, we got to a point that we got together with the
19   investigators and the whole team, we got together and
20   present several calculations.  And we reviewed them, and the
21   attorney in the case, John Fusto, decide that we -- whatever
22   testify on court that was the more reasonable ceiling that
23   we were going to use on the grand jury.
24   Q    Okay.  Do you recall Mr. Norinsberg asked you about
25   having included -- done an analysis that showed a larceny

1  amount of approximately $275,000?

2  A   Yes.

3  Q   Do you recall the circumstances of the calculation of

4  the $275,000 number?

5  A   I don't remember.

6  Q   All right.  Now, I think Mr. Norinsberg alluded that

7  this was mentioned in your declaration submitted in summary

8  judgment.

9      Do you recall that?

10 A   No, I don't recall that.

11 Q   All right.  Do you recall some of the criteria used for

12 making different calculations?

13 A   No, I don't remember the criterias.

14 Q   Do you recall running a calculation where if there was

15 so much as just an invoice for the month, Morse was given

16 credit for the entire month?  Do you recall that scenario?

17     MR. NORINSBERG:  Objection to leading.

18     THE COURT:  Overruled.

19 A   It's possible that I was asked to do that.

20 Q   All right.  But you did testify that there came a time

21 when you reached a final conclusion that was presented to

22 the grand jury, correct?

23 A   Yes.

24 Q   By the way, what is your understanding of what a grand

25 jury is?

1  A   A grand jury is a group of people that's sworn in court

2  for trial -- for trial, grand jury.

3  Q   Have you ever testified before a grand jury?

4  A   Before this case, yes.

5  Q   All right.

6  A   I did twice, I think.

7  Q   Did you testify before a grand jury in the Morse case?

8  A   Yes.

9  Q   All right.  Was Dr. Morse present when you testified

10 before the grand jury?

11 A   I don't remember.  I don't think so.

12 Q   When you testified to the grand jury, do you recall

13 what your final calculation as to the amount of larceny was?

14 A   Final calculation?  I think it was a little over a

15 million dollars.

16 Q   Do you recall anything more specific than that?

17 A   A million 195.

18 Q   All right.  Did you have occasion to discuss your

19 calculations from time to time with either Investigator Jim

20 Serra or Bob Flynn?

21 A   With Serra -- I mean, with investigators?

22 Q   Yeah, with the investigators.

23 A   We normally do it during a meeting with the

24 whole -- with, you know, the whole team.

25 Q   Well, whether at a meeting or otherwise, do you recall

1  complaining to either Mr. Serra or Mr. Flynn about Mr. Fusto

2  asking you to change your calculation?

3  A   No.

4  Q   Do you recall making any complaints to Arthur Lipstein

5  concerning any aspect of the Morse case?

6  A   No, I didn't make any complaints to -- as orders, we

7  get everything three to six months supervisor, including

8  Arthur Lipstein, they need to know the status of the cases.

9  And all the cases that we had, we have to give them an

10 analysis what was done, what needs to be done, and I mention

11 to -- one of the questions came up, why my case wasn't

12 moving?  And I said it wasn't moving because of the attorney

13 probably was busy with other cases.

14     But as far as I said, I was complaining that attorney

15 Fusto asked me to change information, I never complained

16 that.  Even if he did, I would have done -- I'm not going to

17 do it.

18 Q   All right.  Do you recall a time when attorney Fusto

19 told you that the Morse case was ready to go to the grand

20 jury?

21 A   Yeah.

22 Q   All right.  And what happened when attorney Fusto told

23 you that the Morse case was ready to go to the grand jury?

24 A   Well, we had to prepare schedules, things that he

25 needed to introduce during the grand jury.

1  Q   Okay.  And what do you recall him telling you about

2  that?

3  A   He told me a list of recipients that we need to prepare

4  schedules for.

5  Q   All right.  Do you recall when this took place?

6  A   Two, three weeks before grand jury.

7  Q   All right.  And do you recall when Mr. Fusto's

8  presentation to the grand jury began?

9  A   No, I don't remember.

10 Q   If I told you March of 2006, would that -- does that

11 help you remember?

12 A   Yeah.  It's possible, yes.

13 Q   So is it -- are you saying that you would have prepared

14 your schedules approximately -- how far?

15 A   Three weeks before, three, a month before that.

16 Q   Approximately February of 2006?

17 A   Yes.

18 Q   Let me turn your attention to what's in front of you.

19 It should be Exhibit 130.

20     Do you see Exhibit 130?

21 A   I'm looking for it.  Yes.

22 Q   Okay.  And you prepared Exhibit 130, correct?

23 A   Yes.

24 Q   All right.  And do you know if the patients listed on

25 Exhibit 130 are the patients that Mr. Fusto prepared grand

1  jury subpoenas for?
2       MR. NORINSBERG:  Objection.
3       THE COURT:  Overruled.
4       THE WITNESS:  I think so, yes.
5  Q    And do you know if grand jury subpoenas were
6  successfully served on all of these patients?
7  A    I'm not sure because normally when a subpoena has to be
8  issued, it's been done between the attorney and the
9  investigator.  So I didn't take part in those.
10 Q    All right.  Now, let me turn to your attention to what
11 Mr. Norinsberg showed you as Plaintiff's Exhibit 44, which
12 is also described as Grand Jury Exhibit 11.
13 A    44?
14 Q    44.
15 A    I don't have 44.
16      MR. FARBER:  Your Honor, I'm going to hand the
17 witness the exhibit.
18      THE COURT:  Is that Exhibit 44 you're handing to
19 the witness?
20      MR. FARBER:  I have handed the witness Exhibit 44,
21 your Honor.
22 Q    Mr. Castillo, you've seen Exhibit 44?
23 A    Yes.
24 Q    All right.  And looking at Exhibit 44 and Exhibit 130,
25 can you tell us relative to each other when these two

1  documents were created?
2  A    It was before the grand jury took part.
3  Q    Relative to each other, were they created approximately
4  the same time?
5       MR. NORINSBERG:  Objection; leading.
6       THE COURT:  Or different times?
7       THE WITNESS:  I believe it was at the same time.
8       THE COURT:  Okay.
9  Q    All right.  And what did you do physically to prepare
10 these two documents?
11 A    Basically, like I said before, each attorney handles
12 cases differently.  Each attorney would like to have
13 different fields.  Depends upon the investigation.  So in
14 this case, I was told by attorney John Fusto the fields that
15 he wanted to have on these spreadsheets.
16 Q    Okay.  And what fields did he tell you he wanted to
17 have?
18 A    He wants to have CIN number, last name, first name,
19 amount paid by Medicaid, date of service, invoice number,
20 Julian date, the procedure code, procedure description.
21 Q    What's an invoice number?
22 A    An invoice number is a number that is given to a claim
23 was submitted by the provider to Medicaid.
24 Q    What's Julian date?
25 A    The Julian date is the date the provider submits the

1  claim when he hits the button -- if he does it
2  electronically on the computer, it's entered and the date
3  the claim is submitted to Medicaid.
4  Q    And what's the procedure code?
5  A    The procedure code is the code that is given to -- the
6  number or code that is given to -- the number that is given
7  to the work that was done on the patient.
8  Q    Okay.  And where does your procedure description come
9  from?
10 A    All these data come from the Department of Health from
11 that warehouse.
12 Q    Okay.  And with respect to Exhibit 44, you see that?
13 A    Yes.
14 Q    Did you personally create any of the data that's
15 contained on those pages?
16 A    I took the information from the data that was given to
17 us from the Department of Health and just prepared the
18 spreadsheet.  Either you can copy/paste it or sometimes we
19 use tools that allow us to put those fields the way that the
20 attorney wants it.
21      As far as me saying, you know, he gets paid a hundred
22 dollars or $200 or change the number, can't do it.  It's
23 basically all this data, we take it from the data that was
24 given to us by the Department of Health.
25 Q    Is that what you did with respect to Exhibit 44?

1  A    Yes.
2  Q    All right.  On Exhibit 44, let me turn your attention
3  to the page dealing with patient Stacy Rodriguez.
4  A    Okay.
5  Q    Do you see that?
6  A    Yes.
7  Q    All right.  Third line down and looking in the "Amount
8  Paid" column, see minus $87?
9  A    Yes.
10 Q    What is that?
11 A    It looks like Dr. Morse submitted a claim for a
12 repair -- repair or replace broken clasp.  And he submit the
13 claim.  Somehow an adjustment was made later on.  And then
14 another claim was submitted for the same procedure code.  So
15 basically what you have is deposit going in, making an
16 adjustment which eliminates the first claim and allows you
17 to put a new claim for the same procedure.
18      So technically, you see three different lines, but only
19 the doctor was paid only for one.
20 Q    And is this how you -- is this document in front of
21 you, this Stacy Rodriguez page, is this how the Medicaid
22 claims computer system provided the document in response to
23 the field request you made?
24 A    Yes.
25      THE COURT:  Just so I'm clear, that basically is

1  only one $87 charge.
2          THE WITNESS:  $87 charge.  You see three different
3  lines.
4          THE COURT:  Right.
5          THE WITNESS:  The first one goes in.  And then
6  they made an adjustment --
7          THE COURT:  The second one is the adjustment?
8          THE WITNESS:  Right, the second one.  The minus,
9  the minus.  So you have one positive 87.
10         THE COURT:  It's kind of hard to see on my copy.
11 That's a positive.
12         THE WITNESS:  There's one positive and one minus
13 and then another positive.  So the negative wipes out one of
14 the positive and then you just have only one payment.
15         THE COURT:  So only one payment was made to the
16 doctor for that patient and that procedure?
17         THE WITNESS:  For that procedure, yes, yes.
18         THE COURT:  But the number at the bottom where it
19 says "Total."
20         THE WITNESS:  435?
21         THE COURT:  Yes.  Does that accurately calculate
22 what was added and subtracted and all that?
23         THE WITNESS:  For three different procedures for
24 three claims.  Not for nine, for three.
25         THE COURT:  So 435 is just three procedures.

1          THE WITNESS:  Three procedures.
2          THE COURT:  And that's because some of these
3  figures are minuses.
4          THE WITNESS:  Right.  But we can't -- for this
5  purpose, I was told not to -- sometimes, like I said,
6  depends on attorneys.  They don't like to show the negative.
7  So we just take the negative, right, let's say one positive,
8  one negative, that wipes out.  And some attorneys they don't
9  like to have that.  But in this case, the attorney John
10 Fusto told me that he would like to have for this patient,
11 he would like to have the information identical of the way
12 that we got it from the Department of Health.
13         THE COURT:  Okay.  But the 435 is the correct
14 number of billing at the bottom?
15         THE WITNESS:  Yes, yes.
16         MR. FARBER:  Your Honor, I'd like to show the
17 witness Defendants' Exhibit G.
18 Q    Mr. Castillo, could you tell me what Exhibit G is.
19 A    This is documents that comes from the Department of
20 Health.
21 Q    And you've earlier testified about something called a
22 Medicaid provider profile, correct?
23 A    Yes.
24 Q    All right.  Do you recognize these pages as having some
25 relationship to a Medicaid provider profile?

1  A    Yes.
2  Q    And what is that relationship?
3  A    The relationship is that some -- the information here
4  is similar to the information that we received through an
5  e-mail from the Department of Health.
6  Q    Well, do you recognize the documents in front of you as
7  a portion of the provider profile pertaining Dr. Morse?
8  A    Yes.  What happened is the provider profile is a huge,
9  huge data so they not going to -- in order to make this
10 printout, they have to take the fields that the Department
11 of Health think is important and they put it in this format
12 instead of printing out a huge paper.
13 Q    Right.  But those documents are a portion of
14 Dr. Morse's provider profile?
15 A    Yes.
16         MR. FARBER:  I would respectfully move Exhibit G
17 into evidence, your Honor.
18         MR. NORINSBERG:  No objection.
19         THE COURT:  All right.  G is received.
20         (Government Exhibit G received in evidence.)
21 Q    Let me turn your attention to the portion of Exhibit G
22 concerning Stacy Rodriguez.
23 A    Okay.
24 Q    Do you see that?
25 A    Yes.

1  Q    Do you see Stacy Rodriguez?
2  A    Yes.
3  Q    On the document in front of you, do you see the minus
4  signs?
5  A    Yes.
6  Q    On those means signs, do those minus signs conform to
7  the minus signs in Exhibit 44 pertaining to Stacy Rodriguez?
8  A    Yes.
9  Q    Now, let me turn your attention back to
10 Exhibit -- actually, let me -- continue looking at Stacy
11 Rodriguez.
12      Do you see a column on that document called "Tooth
13 Number"?
14 A    Yes.
15 Q    And do you see a column called "Surface Number"?
16 A    Yes.
17 Q    Okay.  And turning your attention back to Exhibit
18 44 -- back to 44.
19 A    Yes.
20 Q    Am I correct there aren't -- you don't see either tooth
21 number or surface number, correct?
22 A    On 44, no.
23 Q    Okay.
24         THE COURT:  Is it in G?
25         THE WITNESS:  On G, yes, the two numbers.

1    THE COURT:  So you see the tooth numbers in G but
2  not in 44?
3    THE WITNESS:  Not in 44.
4    THE COURT:  Okay.
5  Q    And did Mr. Fusto ask you to put in either tooth number
6  or surface number when you prepared Exhibit 44?
7  A    No, he didn't ask.
8  Q    Did he ask you not to put in tooth number or surface
9  number when he asked you to create Exhibit 44?
10  A    No.  The instructions were specifically, I want these
11  fields, and I want to see these fields for each recipient.
12  Q    Okay.  Did he explain to you why he wanted those
13  particular fields?
14  A    No, not really.
15  Q    Did you ever have occasion to discuss with him why he
16  wanted those particular fields?
17  A    I don't think so.
18  Q    All right.  And besides preparing Exhibit 44 or perhaps
19  Exhibit 133, did you do anything else to prepare for the
20  Attorney General's presentation to the grand jury concerning
21  Dr. Morse?
22  A    It's possible, but I don't remember.
23  Q    Did you testify to the grand jury?
24  A    Yes.
25  Q    Do you recall testifying to the grand jury?

---

1  A    Yes.
2  Q    Do you remember what you testified about to the grand
3  jury?
4  A    Yes, here and there.  But I don't -- here and there I
5  do remember what I testify.
6  Q    Do you remember testifying concerning Grand Jury
7  Exhibit 11 or Exhibit 44 in front of you?
8  A    44, yes.
9  Q    What did you testify about that?
10  A    What did he testify?
11  Q    What did you testify about that?
12  A    I believe I testified, I'm not sure, that this
13  was -- these ones were the patients that were treated by
14  Dr. Morse for dentures, but in fact they didn't have
15  dentures -- denture work.
16  Q    All right.  Now, each of the pages in Exhibit 44 happen
17  to have a dollar total for services provided there, correct?
18  A    Yes.
19  Q    Do you know the elements of the crime of offering a
20  false instrument for filing?
21  A    No.
22  Q    Do you know if there's a dollar threshold in the crime
23  of offering a false instrument for filing?
24  A    No.
25  Q    Do you know if those documents, that is to say, Exhibit

---

1  44, was used by Mr. Fusto to advance the offering of false
2  instrument for filing charge?
3  A    I don't know.
4  Q    Okay.  All right.  Mr. Fusto ever talk to you about the
5  elements of the offering of false filing charge?
6  A    I don't remember he did.
7  Q    Do you know if Mr. Fusto asked you to prepare totals of
8  the dollar column on these claims?
9  A    Yes.
10  Q    Okay.  And did you ever ask him why he asked you to
11  total them?
12  A    No.
13  Q    And do you personally know the thresholds, and I'm
14  talking in dollars, for larceny crimes under New York state
15  law?
16  A    No, sir.
17  Q    Going back to Exhibit 44.  Do you have any reason to
18  believe that the data on those pages is not exactly the same
19  data that was contained in the claims database?
20  A    It is the same data.
21  Q    Am I correct that the data in that claims database
22  originated when Dr. Morse himself files his claims?
23  A    When he submit the claims, yes.
24  Q    All right.
25    THE COURT:  Ladies and Gentlemen, we'll take a

---

1  ten-minute recess.
2    (Jurors exit the courtroom.)
3    (Recess taken.)
4    THE COURT:  Before we bring the jury out, I just
5  had a question.  I had asked the attorneys to provide me
6  with what they believe the charge should contain on the
7  elements of the grand larceny and false filing and also to
8  provide interrogatories.
9    MR. NORINSBERG:  Right.
10    THE COURT:  And you were supposed to have that
11  this morning.
12    Has anyone filed it?
13    MR. NORINSBERG:  Well, we worked out -- I think
14  we've come to some compromises on some of the language.  We
15  were very, very close last night on some of the things.  I
16  don't know whether we actually are there yet.  But we were
17  hoping to submit it as a joint filing as opposed to one side
18  doing one or the other.
19    There are some things that we're not going to
20  agree on, but there are certain things that we can agree on.
21  One is the charges of the elements I think we're in
22  agreement.
23    THE COURT:  Well, we can talk about this after the
24  jury goes home.
25    MR. MILLER:  We have a document that we can hand

**JA224**

1  up.
2       THE COURT:  That you do agree on?
3       MR. MILLER:  We agree on one of the three issues,
4  but I don't think we're that close on the actual instruction
5  so we prepared our own.  I can provide it to you.
6       THE COURT:  Why don't you talk about it a little
7  bit more after the jury goes.
8       (Jurors enter the courtroom.)
9       THE COURT:  Okay.  Please be seated.
10      MR. FARBER:  Your Honor, I have no further
11  questions of Mr. Castillo.
12      THE COURT:  All right.
13 CROSS-EXAMINATION
14 BY MR. NORINSBERG:
15 Q    Good afternoon again, Mr. Castillo.
16 A    Good afternoon.
17 Q    Do you recognize this as the Stacy Rodriguez page that
18 was part of Exhibit 7?
19 A    Yes.
20      THE COURT:  Wait a minute.  You're confusing
21 things.  It is now trial Exhibit 44?
22      MR. NORINSBERG:  I believe it's 44.
23      MR. FARBER:  Your Honor, I thought 44 was 11.  In
24 effect --
25      MR. NORINSBERG:  No, I think 130 was 11.

1       MR. FARBER:  No.  130 was not 11.
2       MR. NORINSBERG:  Well, let's take a look and we'll
3  find out.  44 is Grand Jury 7.
4       THE COURT:  All right.  Now you want to ask him
5  about 44 which is Grand Jury Exhibit 7?
6       MR. NORINSBERG:  Yes.
7       THE COURT:  We just need to keep the numbers
8  straight because it's confusing.
9       MR. NORINSBERG:  Yes, your Honor.
10      THE COURT:  Ladies and Gentlemen, certain exhibits
11 were marked with numbers before the grand jury.  The two
12 that are particular relevantly here are what has been
13 referred to as Grand Jury Exhibit 7 and Grand Jury Exhibit
14 11.  But then they are given different numbers when they
15 become exhibits in this trial.  So what was introduced
16 before the grand jury as Grand Jury Exhibit 7 is now
17 referred to in trial as Exhibit 44.
18      And I don't know -- 11 is?  Do we have an
19 agreement on what 11 was marked as?  Is that 130; is that
20 correct?
21      MR. FARBER:  The list says 133, your Honor.
22      MR. NORINSBERG:  It's 133.
23      THE COURT:  So 133.  All right.  So which exhibit
24 are you questioning about?
25      MR. NORINSBERG:  44.

1       THE COURT:  44.  Okay.
2  Q    Could you come down, sir.
3       Now, is this the Stacy Rodriguez portion of the
4  exhibit, Grand Jury 7, that you were referring to before?
5  A    Yes.
6  Q    Okay.  We can agree that there are nine separate
7  procedures that are shown on this exhibit; is that correct?
8  A    Yes.
9  Q    Now, you testified earlier that Mr. Fusto wants to get
10 things identical to the way they were originally submitted
11 in Medicaid; is that correct?
12      MR. FARBER:  Objection.
13      THE COURT:  I'll sustain the objection to the form
14 of that question.
15 Q    The way this was originally submitted to Medicaid,
16 there were three procedures that related to dentures; isn't
17 that true?
18 A    I have to see it.  I don't remember.
19 Q    You would recognize an original vendor statement if you
20 saw one, right?
21 A    Yes.
22 Q    Can you come here for a minute, sir.
23      Do you recognize this as an original vendor statement?
24 A    Yes.
25      THE COURT:  Does that have a number?  What are you

1  showing him?
2       MR. NORINSBERG:  The smaller version.  I don't
3  have the number on the blowup, your Honor.
4       THE COURT:  Is it part of another exhibit?
5       MR. NORINSBERG:  Yes.  It's its own exhibit.
6       THE COURT:  Well, then, you have to give a number.
7  It's completely confusing to show a blowup without a number.
8       Is it in evidence?
9       MR. NORINSBERG:  Not yet.  I'm going to offer it,
10 your Honor, once I lay the foundation, as Exhibit 145.
11      MR. FARBER:  What number?
12      MR. NORINSBERG:  145.
13      THE COURT:  Which is not on your exhibit list?
14      MR. NORINSBERG:  No.
15 Q    Do you recognize this document, sir?
16 A    Yes.
17 Q    What do you recognize this document to be?
18 A    To be a remittance statement.
19 Q    And this relates to 580 Dental; is that correct?
20 A    Yes.
21 Q    And it has a billing entry for the same date that the
22 billing entry for Stacy Rodriguez appeared here; is that
23 correct?
24 A    Correct.
25      MR. NORINSBERG:  I'd like to offer this into

**JA225**

1  evidence, your Honor.
2      MR. FARBER:  Objection, your Honor.  That's not a
3  document we produced.  That's a document Dr. Morse produced.
4      MR. NORINSBERG:  The witness just identified it.
5      THE WITNESS:  Identified it as some document that
6  we receive from Medicaid department.  We don't produce this.
7  We don't prepare this.
8  Q   I understand.  But do you have any reason to doubt the
9  accuracy of the document?
10 A   I'm sorry?
11 Q   Do you have any reason to doubt the accuracy of the
12 document?
13 A   I don't know because this is -- that's what Dr. Morse
14 submit to Medicaid -- to the DOH department.
15 Q   Actually, this is sent from Medicaid to Dr. Morse; is
16 that correct?
17 A   Yes.
18      MR. NORINSBERG:  Okay.  I offer this document into
19 evidence.
20      THE COURT:  Is there an objection?
21      MR. FARBER:  No, your Honor.
22      THE COURT:  All right.  It's received.
23      (Plaintiff's Exhibit 145 received in evidence.)
24 Q   If you could, Mr. Castillo, just come back here
25 (indicating).  The original remittance shows three

---

1  procedures relating to denture work for Dr. Morse for this
2  patient on June 4th, 2002; is that correct?
3  A   Yes.
4  Q   And yet when it appeared before the grand jury, those
5  three procedures became nine procedures, correct?
6      MR. FARBER:  Objection.
7      THE COURT:  I'll sustain the objection.
8  Q   Now, is it your testimony that Dr. Morse is to blame
9  for the fact that there are nine separate procedures listed
10 on the document that was shown to the grand jury?  Yes or
11 no, sir?
12 A   No.  I need to explain.
13 Q   You can't answer the question yes or no?
14 A   Not without explaining.
15 Q   Now, you also gave testimony a few moments ago on
16 Exhibit G; is that correct?
17 A   Yes.
18      THE COURT:  Does he need to be standing there?
19      MR. NORINSBERG:  Just for one more minute.
20      THE COURT:  Okay.
21 Q   Exhibit G is the provider profile for Dr. Morse; is
22 that correct?
23 A   Yes.
24 Q   And on this exhibit in the original format it clearly
25 shows all of the tooth numbers that were worked on; is that

---

1  correct?
2      MR. FARBER:  Objection.
3      THE COURT:  What's the basis of the objection?
4      MR. FARBER:  Characterization.  Original format.
5      THE COURT:  I'll sustain the objection to the form
6  of the question.
7  Q   On the provider profile which you gave testimony about
8  just a few minutes before when Mr. Farber was asking you
9  questions, on that profile there's a column relating to
10 tooth code; is that correct?
11 A   Right.
12 Q   And if you follow that column all the way down, for
13 every single procedure there's an actual tooth number that's
14 identified; isn't that true?
15 A   Correct.
16 Q   But none of those tooth numbers appear on any of the
17 documents in Grand Jury 7; is that correct?
18 A   Not in here (indicating).
19 Q   Thank you, sir.
20      THE COURT:  Can he resume the stand?
21      MR. NORINSBERG:  Yes.
22 Q   Now, you testified earlier that Mr. Fusto told you that
23 he liked to have the information identical to what is in the
24 Department of Health records, correct?
25 A   In terms of the money wise.

---

1  Q   In terms of money wise, but not in terms of procedures?
2  A   In terms of money, he would like to have -- keep the
3  same as we got it from the Department of Health.
4  Q   But not in terms of the actual procedures, he didn't
5  talk to you about that?
6  A   He just select the fields, and he told me the fields
7  that he wants to have on my spreadsheet and that's what I
8  prepared.
9  Q   Now, you testified earlier that you first saw the
10 invoices in this case when you first were assigned to the
11 case; is that correct?
12 A   Yes.
13 Q   Okay.  So you first saw these invoices sometime around
14 2004, correct?
15 A   Right.
16 Q   But you didn't formulate any calculations relating to
17 the million-dollar finding until 2006; isn't that true?
18 A   I wasn't asked.
19 Q   So it was two years later after you looked at these
20 invoices, that was the first time that you ever came up with
21 a million-dollar number; isn't that true?
22      MR. FARBER:  Objection.
23      THE COURT:  What's the basis of the objection?
24      MR. FARBER:  He never came up with a
25 million-dollar number.  He came up with other calculations

**JA226**

1  of various kinds.

2          THE COURT:  Was one of the calculations that you

3  reached a million dollars or more?  Was that one of the

4  calculations that you reached?

5          THE WITNESS:  Probably, your Honor.

6  Q   And you reached that calculation in the winter of 2006

7  shortly before the grand jury presentation; is that correct?

8  A   I don't remember.

9  Q   And you reached the million-dollar calculation after

10  Mr. Fusto had asked you to recalculate your fraud findings;

11  isn't that true?

12  A   I don't remember that.

13  Q   And isn't it true that after Mr. Fusto asked you to

14  recalculate your findings, you were upset and you actually

15  went to investigator James Serra and told him that you're

16  very uncomfortable with what Mr. Fusto was asking you to do;

17  isn't that true?

18          MR. FARBER:  Objection.

19  A   No.

20  Q   I'd like you to assume --

21          THE COURT:  I'll sustain the objection.

22          MR. NORINSBERG:  I'd like to read in for your

23  Honor and possibly refresh the memory of the witness with

24  the testimony of Mr. Serra who he is going to be here.

25          THE COURT:  No.  I'll sustain the objection.

---

1  First of all, this seems to me to be outside of the cross

2  and direct and also an inappropriate question.

3          MR. NORINSBERG:  The only thing, your Honor, that

4  I would like to point out is that during this witness'

5  testimony he was asked whether he complained to Mr. Serra.

6          THE COURT:  Asked by whom?

7          MR. NORINSBERG:  By Mr. Farber during the direct.

8  He asked him whether he complained to Mr. Fusto, and he

9  said -- Mr. Castillo said the only thing he complained about

10  was the pace of the investigation.

11          THE WITNESS:  I didn't complain.

12          THE COURT:  I'm going to sustain the objection.

13  Q   Did there come a time, sir, where you complained to

14  Arthur Lipstein about being asked to change your fraud

15  calculations in this case?

16  A   No, never.

17  Q   You're sure about that, right, sir?

18  A   Yes.

19  Q   Wasn't there a meeting between you, Officer Serra and

20  Arthur Lipstein relating to this very issue?

21          MR. FARBER:  Objection.

22          THE COURT:  Overruled.

23  A   I don't think so.  I mean, it might have been -- we

24  might have had a meeting, but I never complained about

25  attorney Fusto asking me to change or to do anything

---

1  inappropriate.

2  Q   Okay.  Do you recall being present in a meeting in

3  which investigator Serra was present, you were present,

4  investigator Flynn was present and Arthur Lipstein was

5  present?

6  A   We had several meetings during the investigation that I

7  can't recall specifically that meeting.

8  Q   Of all those several meetings, do you recall a

9  particular meeting dealing with the fact that you've been

10  asked to change your fraud calculations in this case?

11  A   No.  Because I was never asked to change anything.

12  Q   That's your testimony here today under oath, correct?

13  A   Yeah.  And that's my testimony.

14          MR. NORINSBERG:  Nothing further.

15          THE COURT:  Anything else?

16          MR. FARBER:  I just have one or two questions,

17  your Honor.

18          THE COURT:  Based on what counsel just asked?

19          MR. FARBER:  One is based on what counsel just

20  asked.  One I simply want the witness to introduce Grand

21  Jury 11.  I was under the mistaken impression I had.

22          THE COURT:  So you want to reopen to introduce

23  Grand Jury 11?

24          MR. NORINSBERG:  It's already in evidence as what

25  was 133.

---

1          MR. FARBER:  If 133 is in, then I don't need to

2  move it in.

3          THE COURT:  I believe I have it in.

4          MR. FARBER:  Okay.

5          THE COURT:  No, actually, I don't.  Are you moving

6  it in, Mr. Norinsberg?

7          MR. NORINSBERG:  Yes.  It's Grand Jury 11, 133.

8          THE COURT:  I didn't have it marked in.  It's in.

9          (Plaintiff's Exhibit 133 received in evidence.)

10          THE COURT:  Do you have one other matter you want

11  to ask him?

12          MR. FARBER:  Yes, your Honor.

13  CROSS-EXAMINATION

14  BY MR. FARBER:

15  Q   Is 133 in front of you, Mr. Castillo?

16  A   Yes.

17  Q   And take a look at Exhibit 130 and Exhibit 44.  My

18  question is, do you recall if you created Exhibit 133 at the

19  same time as Exhibits 44 and 130 or at different times than

20  Exhibit 44?

21  A   Honestly, I don't remember.

22  Q   Let me turn your attention back to page 44 -- to

23  Exhibit 44.  I'm sorry.  Turn your attention to the Stacy

24  Rodriguez page.

25  A   Okay.

1    Q    Turn your attention to the column called "Julian Date."
2    What's Julian date again?
3    A    Julian date is the date that in this case Dr. Morse
4    submit the claim to the Department of Health.
5    Q    Okay.  And reading down the Julian date column, are
6    those dates all the same?
7    A    No, there's different dates.
8    Q    Okay.  And do you know why they're different dates?
9    A    No, I don't know why.
10   Q    All right.  If you could look at Exhibit G pertaining
11   to Stacy Rodriguez.
12   A    Yes.
13   Q    Okay.  All right.  Do you see the minus signs on that
14   document that we talked about before?
15   A    Yes.
16   Q    All right.  Is there a column on that document
17   pertaining --
18            THE COURT:  Which document are you talking about?
19            MR. FARBER:  I'm referring to Exhibit G.
20            THE COURT:  Does it have a page number?
21            MR. FARBER:  Does it have a page number?
22            THE COURT:  Does it have a page number?
23            THE WITNESS:  Page 23-10.
24   Q    Does that have a column called "Billing Cycle," sir?
25   A    Yes.

---

1    Q    Okay.  With respect to Invoice 113386, the first time
2    it's entered, do you see what billing cycle it's entered in?
3    A    I'm sorry.  Which one?
4    Q    Invoice 113386 first submitted June 5th, 2002.
5    A    Okay.
6    Q    What billing cycle is indicated?
7    A    326.
8    Q    Okay.  Do you see the minus sign, the minus sign with
9    respect to the $87 or the $174?
10   A    Yes.
11   Q    Is that the same billing cycle, sir?
12   A    287s are in the same cycle.
13   Q    Right.
14   A    One negative and one positive.  And the other 87 is in
15   cycle 294.
16   Q    So are they all in the same cycle or are there two
17   different billing cycles?
18   A    Two different billing cycles.
19   Q    Okay.  And the minus sign, is that --
20   A    It's in 326 billing cycle.
21   Q    Okay.  And do you know what billing cycles are as far
22   as the Medicaid program goes?
23   A    I don't remember that billing cycle.
24   Q    Would it refresh your recollection --
25            MR. NORINSBERG:  Objection.

---

1            THE COURT:  Yes.  I'll sustain the objection.
2    Q    All right.  Do you know if it was a later billing
3    cycle?
4    A    I believe one was a later billing cycle.
5    Q    Is that where the minus sign came in?
6            MR. NORINSBERG:  Objection.
7            THE COURT:  Yes.  I'll sustain the objection.
8            THE WITNESS:  It's possible.
9            THE COURT:  I sustained the objection.
10           THE WITNESS:  Sorry.
11           MR. FARBER:  Nothing further, your Honor.
12           THE COURT:  Okay.  Thank you.  You can step down.
13           Do you want to call your next witness?
14           MR. NORINSBERG:  At this time, the plaintiff calls
15   defendant John Fusto to the stand.
16
17   JOHN FUSTO, called by the plaintiff, having been first duly
18                  sworn, was examined and testified as
19                  follows:
20
21           THE COURT:  Please be seated.  State and spell
22   your name for the record.
23           THE WITNESS:  John Fusto.  John, J-o-h-n; Fusto,
24   F-u-s-t-o.
25   DIRECT EXAMINATION

---

1    BY MR. NORINSBERG:
2    Q    Good afternoon, Mr. Fusto.
3    A    Good afternoon.
4    Q    You and I have met before; is that correct, sir?
5    A    Yes, sir.
6    Q    You appeared at a deposition?
7    A    Yes.
8    Q    And in this case, you've also provided two declarations
9    or affidavits; is that correct?
10   A    I believe so, yes.
11   Q    And you reviewed your prior testimony before coming
12   here today, correct?
13   A    Yes.
14   Q    Now, directing your attention to 2002, you were working
15   at the New York State Attorney General's Office, correct?
16   A    Yes, sir.
17   Q    You were a Special Assistant Attorney General?
18   A    Yes, sir.
19   Q    And you actually had started there in February 2001 and
20   resigned in July of 2007, correct?
21   A    I might have resigned in June but left at the end of
22   July of 2007.
23   Q    Okay.  You left actually while the Morse trial was
24   still going on before the verdict; isn't that true?
25   A    If I recall when the close of evidence was, I wasn't

**JA228**

1  there for the verdict so I left either right at the close of

2  evidence or shortly thereafter.

3  Q    Now, your role as an Assistant Attorney General was to

4  act as a team leader in the investigator group; is that

5  correct?

6  A    Yes, sir.

7  Q    And do you know an individual by the name of Jose

8  Castillo, correct?

9  A    Yes, sir.

10  Q    Mr. Castillo was an auditor at the Medicaid Fraud

11  Control Unit, correct?

12  A    Yes, sir.

13  Q    And if we call that MFCU, that refers to Medicaid Fraud

14  Control Unit?

15  A    Yes.

16  Q    Now, you actually were assigned this case in April of

17  2002; is that correct?

18  A    I know it was sometime 2002, yes.  I'll accept April.

19  Q    Yeah.  There was actually a case opening memo of April

20  5th, 2002, correct?

21  A    Again, I'll accept that date.

22  Q    But you didn't actually present the case to the grand

23  jury until four years later in March of 2006, true?

24  A    That's true.

25  Q    Now, you didn't move for an indictment in the winter of

---

1  2004 because you felt you needed to get more evidence; is

2  that correct?

3  A    In the winter of 2004?

4  Q    Yes.

5  A    Well, I'm sure in the winter of 2004 because I didn't

6  go into the grand jury until a little over a year later or

7  more, I would assume that would be true.

8  Q    It's actually because you didn't feel your

9  investigation was complete enough in the winter of 2004 to

10  go to the grand jury, true?

11  A    I would not disagree with that.

12  Q    You would agree with that?

13  A    Yeah, I'm sorry.  I would agree with that, yes.

14  Q    And the following year, the calendar year of 2005, you

15  also did not move to present this case in front of the grand

16  jury at that time, correct?

17  A    That's correct.

18  Q    And you didn't present it to a grand jury in 2005

19  because, once again, you felt you did not have enough

20  evidence to present the case to a grand jury, true?

21  A    I probably hadn't completed what we needed to do so I

22  guess in the broad sense that would be true, yes.

23  Q    Would you agree from the winter of 2006 until two years

24  later, March 2006, your investigation of this case would be

25  described as sporadic at best?

---

1  A    I'm sorry?

2           MR. MILLER:  Objection.  I think he got the dates

3  wrong.  I think you used 2006 twice.

4           MR. NORINSBERG:  Okay.

5  Q    Would you agree that from the time the winter of 2004

6  until the time when you presented this case in 2006 to the

7  grand jury, that two-year period in between, your

8  investigation was at best sporadic?

9  A    I would say that's true.

10  Q    Would you also agree, Mr. Fusto, that literally months

11  could go by and nothing was being done on the case?

12  A    That's true, sure.

13  Q    And you did not find any new evidence from 2004 until

14  the time that you presented this case to the grand jury in

15  2006, true?

16  A    There may have been -- I'm sorry.  Could you repeat the

17  date range again.  I'm sorry.

18  Q    From February of 2004 up until March of 2006, two years

19  later, you did not discover any new evidence?  True or not

20  true?

21  A    There may have been the identification of a few more

22  patients.  There may have been, but I think overall that

23  would be true.

24  Q    So overall you would agree you didn't discover any new

25  evidence in that two-year period, correct?

---

1  A    Well, we hadn't completed calculating the use of the

2  invoices.

3  Q    My question is, sir, would you agree that you had not

4  discovered any new evidence during that two-year period?

5  A    In 2004 to 2006?

6  Q    Yes.

7  A    If I knew the date when the invoices from the labs came

8  in, I would probably agree with that.  I just don't

9  know -- the reason I'm hesitating, I don't know when the lab

10  invoices actually came in.

11  Q    Well, would you agree that whatever lack of evidence

12  you had in 2004 that stopped you from going to the grand

13  jury was the same lack of evidence that existed in 2006 when

14  you actually presented the grand jury?  Isn't that true?

15  A    I'm sorry.  I'm going to ask you to rephrase it.

16  Q    Would you agree that whatever stopped you from

17  presenting the case to the grand jury in 2004 and 2005

18  hadn't changed when you actually did present the case in

19  2006?

20  A    I guess to some degree that would be true.

21  Q    The only thing that actually changed during that

22  two-year period was that you had decided to do a new method

23  of calculating the fraud; isn't that true?

24  A    Well, not a new method.  I think that we were

25  struggling to find a method to quantify what we believed was

1  a fraud.
2  Q    And would you agree, sir, that you were required to
3  provide status reports to your bosses to keep them updated
4  on the status of your investigation?
5  A    Of all our cases, yeah.  Yes.
6  Q    Do you know who Felice
7  Sontupe is?
8  A    Felice Sontupe was at one point a supervisor in
9  Medicaid Fraud.
10  Q    Okay.  Was she your immediate supervisor during the
11  time when you were handling the Morse case?
12  A    I mean, she was a supervisor.  I'm not sure whether she
13  was my immediate one.  I reported to a number of people.
14  Q    Okay.  You testified at your deposition she was your
15  immediate supervisor, true?
16  A    Okay.  If it says it, then that's what I said, yes.
17  Q    Now, in March of 2006 -- March 1st, 2006 -- you wrote a
18  status report to your boss; is that correct?
19  A    I guess so.
20  Q    I'd like to show you what's been marked as Plaintiff's
21  53.
22  A    Okay.
23  Q    Do you recognize that document?
24  A    It looks like a six-month report.
25  Q    Did you prepare this document on March 1st, 2006?

1  A    I don't think I prepared the document on March 1st.  I
2  think I may have updated it on March 1st.
3  Q    Okay.  You updated it on March 1st, 2006.  Is that your
4  testimony?
5  A    That would be -- by looking at the document, that would
6  be my recollection.
7         MR. NORINSBERG:  I offer Plaintiff's Exhibit 53
8  into evidence, your Honor.
9         MR. MILLER:  No objection.
10         THE COURT:  53 is received.
11         (Plaintiff's Exhibit 53 received in evidence.)
12  Q    Now, I'd like to direct your attention to paragraph 3
13  on this report.
14  A    Yes, sir.
15  Q    Do you see where it says, quote, "The amount of fraud
16  is approximately $600,000"?  Do you see that, sir?
17  A    Yes.
18  Q    So according to the status report of March 1st, 2006,
19  the amount of fraud was approximately $600,000; is that
20  correct?
21  A    Well, as I mentioned --
22  Q    Is that correct, sir?
23  A    I'm sorry.  Please repeat that one more time.
24  Q    As of the date of this report, March 1st, 2006, you
25  wrote, "The amount of fraud is approximately 600,000"; is

1  that correct?
2  A    That's what the document says, yes.
3  Q    And the very next day you presented this case to the
4  grand jury on March 2nd, 2006; is that correct?
5  A    Yes.
6  Q    And at the grand jury, you presented evidence that the
7  amount of fraud was actually over $1 million, correct?
8  A    I did, yes.
9  Q    You presented evidence through Mr. Castillo that the
10  amount of fraud was 1,151,068.  Is that correct, sir?
11  A    Yes.
12  Q    So at the same time that you were presenting evidence
13  to the grand jury that the fraud was over $1.15 million, you
14  were telling your supervisor it was $600,000; is that
15  correct?
16  A    Yes.  From the document, yes, that would be an accurate
17  statement.
18  Q    So there was over a $500,000 difference from the number
19  that you gave to your supervisor and the number you gave to
20  the grand jury; is that correct?
21  A    Yes.
22  Q    Can you please explain to the members of this jury how
23  is it possible to have such a large discrepancy between the
24  number that you told your supervisor and the number that you
25  presented to the grand jury?

1  A    As I recall, the office for administrative purposes
2  wanted more frequent updates about our cases.  Our cases had
3  a tendency to take a long time.
4         I'm sorry.  And at some point in -- I'm thinking in
5  2005, they had asked for a six-month case report on all of
6  our cases.  And when I -- because I don't think this is the
7  first one.  Just by looking at it, when I read paragraph 8,
8  it says, "The case is ready for the grand jury.  The
9  expected presentation is in January 2006."  So clearly much
10  of this document was written before.
11         And when I sent the six-month update, I think the only
12  thing I put in there was, "Case presently in Kings County
13  Grand Jury.  Indictment expected within three weeks."  The
14  $600,000 was probably based on a much earlier report that I
15  just simply didn't change the number in this document.
16  Q    So your explanation was based on an earlier report.  Is
17  that your sworn testimony here, sir?
18  A    That's my best guess.
19  Q    Do you recall testifying at your deposition the
20  following -- giving the following testimony, page 147, line
21  12:
22         "Question:  How can you explain such a large
23  discrepancy between the number you told your supervisor and
24  the number that you presented to the grand jury"
25         "Answer:  Because actually I can't.  I don't know."

**JA230**

1    Do you recall giving that testimony at your deposition?
2 So according to your sworn deposition testimony --
3 A    The answer is yes.  You read it.  I recall it, yes.
4 Q    So your sworn testimony at your deposition when you
5 were asked for an explanation, you didn't have an
6 explanation, did you?
7 A    Based on my answer, I guess at that time I didn't.
8 Q    But now you do have one.  Now that we're in front of a
9 jury, you have an answer, yes?
10 A    I'm looking at the document.  I've had to focus a
11 little bit more on it than I did at the deposition.
12 Q    You were shown the document at the deposition.  You
13 looked at it and reviewed it carefully before you were asked
14 any questions, true?
15 A    I'll accept that.  I'm just telling you this is my best
16 recollection of it.
17 Q    Now, Mr. Fusto, from the date that this status report
18 was submitted on March 1st, 2006, until the date that Mr.
19 Castillo testified on March 22nd, 2006, you did not discover
20 any new evidence, did you?
21 A    From March 1st to the -- as I mentioned, there may have
22 been a couple more patients that were identified.  I'm not
23 sure.  But in large measure, that would be a correct
24 statement.
25 Q    Referring to your deposition, page 148, line 21.

1    "Question:  From the date that you wrote this status
2 report, March 1, 2006, until the date when Mr. Castillo
3 testified on March 22nd, 2006, did you discover any
4 additional evidence?
5    "Answer:  No."
6    Do you recall giving that testimony, sir?
7 A    I'll accept you're reading it accurately, yes.
8 Q    So according to your deposition testimony, from the
9 time this report was submitted until the time Mr. Castillo
10 testified, you didn't discover any new evidence, correct?
11 A    No.  Nothing that affected the larceny.
12 Q    Now, according to the status report, you were planning
13 on bringing charges for grand larceny in the second degree,
14 not the first degree; is that correct?
15 A    I'm sorry.  May I?
16    Yes, that would be correct.
17 Q    Now, the statutory requirement to meet grand larceny in
18 the second degree is only $50,000, is that correct?
19 A    Correct.
20 Q    Yet the statutory requirement for grand larceny in the
21 first degree is $1 million, right?
22 A    Yes.
23 Q    So there's a big difference between grand larceny in
24 the first degree and grand larceny in the second degree,
25 true?

1 A    Yes.
2 Q    And as of March 1st, 2006, the top counts that you were
3 going to seek was grand larceny in the second degree, true?
4 A    No, I would not agree with that.
5 Q    Referring to your deposition, page 151, line 8.
6    "Question:  So would it be fair to say that as of
7 March 1st, 2006, the top count that you were going to seek
8 in this indictment was grand larceny in the second degree?
9    "Answer:  I wrote it.  I can't really remember exactly
10 why I would have written it in that way, but I wrote it."
11    Do you recall giving that testimony?
12 A    I recall the testimony.  I just want to ask, are you
13 referring to when I said I wrote it to the report to the
14 supervisor?
15 Q    I'm referring to the fact that you wrote grand larceny
16 in the second degree as the top charge that you were
17 seeking.
18    Do you recall that, sir?  You wrote it?
19 A    I wrote it, but I'm assuming you're talking about the
20 document you just showed me.  That's all I wanted to
21 clarify.
22 Q    That's correct.
23 A    Okay.
24 Q    There's no mention of grand larceny in the first degree
25 anywhere in this status report, is there?

1 A    I don't see it, no.
2 Q    You see the section, it says grand larceny 2, right?
3 A    Yes.
4 Q    No mention of grand larceny 1, correct?
5 A    Correct.
6 Q    And again, the date of this report is just a few weeks
7 before Mr. Castillo testified about his million-dollar
8 calculations, right?
9 A    Yes.
10 Q    Now, you would want to be as careful and accurate as
11 possible when updating your supervisor?  Yes or no?
12 A    I try to be.
13 Q    You have no reason to intentionally deceive your
14 supervisor, right?
15 A    No.
16 Q    Did Jose Castillo do further recalculations of the
17 numbers from the time that you wrote this report on
18 March 1st to March 22nd three weeks later?
19 A    No, not that I'm aware of.
20 Q    Do you recall testifying at the deposition as follows,
21 page 152, line 12:
22    "Question:  From the time that you wrote this report on
23 March 1st, 2006, until the time when Mr. Castillo testified
24 on March 22nd, 2006, did you do any further recalculations
25 with the numbers?

1    "Answer:  I am sure we did."

2        Do you recall that?

3    A    Do I recall the statement?

4    Q    Do you recall asking that question and giving that

5    answer, sir?

6    A    I don't recall specifically, but I'll accept what

7    you're reading.

8    Q    So according to your deposition testimony, you are sure

9    that you did do recalculations of Mr. Castillo's numbers

10   from the date of this report until the time when you

11   testified, right?

12       MR. MILLER:  Objection.

13       THE COURT:  Overruled.

14   Q    Isn't that true?

15   A    That he did recalculations?

16   Q    That you're sure that he did, according to your

17   deposition testimony?

18   A    According to the deposition testimony, I'll accept

19   that, yes.

20   Q    And the calculations might have actually changed during

21   that three-week period, right, sir?

22   A    I couldn't say for sure.  I knew what we went -- when

23   we were going into the grand jury, I knew what that number

24   was.

25   Q    Now, you testified at your deposition that all Mr.

---

1    Castillo was doing when he was doing the recalculations was

2    just double-checking to make sure that he had the right

3    numbers; is that true?

4        MR. MILLER:  Objection.

5        THE COURT:  Foundation?

6        MR. MILLER:  He can't just ask him about his

7    deposition testimony.  He needs to ask him a question.

8        THE COURT:  Yes.  I'll sustain the objection.

9    Q    Is it your best memory that Mr. Castillo went back and

10   double-checked things and made some new calculations?

11   A    Well, I'm sure he went back and double-checked things.

12   It's the new calculations that I think I'm having a little

13   difficulty understanding.  But he clearly would have done

14   that.

15   Q    Well --

16       THE COURT:  Clearly would have done what?

17       THE WITNESS:  Double-checked his work as he was

18   preparing for the grand jury.

19   Q    Well, would double-checking his work explain why his

20   numbers would go up half a million dollars?

21   A    Well --

22   Q    Would it, yes or no?

23   A    I'm not sure that's -- the numbers that you're

24   referring to in this report were the numbers that were

25   at -- were firmly set at March 1st when the report was

---

1    created.

2    Q    Do you recall being asked the following questions, sir,

3    at your deposition, page 153, line 16:

4    "Question:  Those new calculations might account for

5    the fact that the amount of fraud has risen by over

6    $500,000?

7    "Answer:  I couldn't answer that with any accuracy.  I

8    don't know."

9        Do you recall being asked that question and giving that

10   answer?

11   A    I don't recall -- I'll accept that you're reading

12   accurately, yes.

13   Q    So according to your deposition testimony, the new

14   calculations might have accounted for an extra $500,000 in

15   the fraud projections, but you couldn't say for sure?  Yes

16   or no?

17       MR. MILLER:  Objection.

18   A    No.  What I've been saying --

19   Q    The answer is yes or no, sir.

20   A    From what date to what date?

21   Q    From the date of your status report that was submitted

22   on March 1st, until the date three weeks later when Mr.

23   Castillo testified about his million-dollar fraud

24   calculations.

25       THE COURT:  What's the question about that?

---

1    Q    Would your numbers have changed by over $500,000 during

2    that time period?

3    A    From March 1st to March 22nd?

4    Q    Yes.

5    A    I don't believe that they did, no.

6        MR. NORINSBERG:  Your Honor, this would be an

7    appropriate time.

8        THE COURT:  All right.  Ladies and Gentlemen, I'll

9    excuse you for the evening with the admonition of course not

10   to discuss the case with anyone.  And we'll resume at 9:30

11   tomorrow morning.  Thank you.

12       (Jurors exit the courtroom.)

13       THE COURT:  Sir, you can step down.

14       What have you all agreed on in connection with the

15   request that the Court had at our last pretrial conference?

16       MR. MILLER:  I think we've agreed on the language

17   concerning the elements of the underlying criminal charges,

18   but I don't think we agreed on the instruction regarding the

19   jury transcripts, though plaintiffs -- defendants and I

20   believe plaintiffs have a proposal.  And we have a proposal

21   for a special verdict form, too.  And I don't think we're in

22   agreement with plaintiff's counsel.

23       THE COURT:  Do you think you're going to reach an

24   agreement if you speak about it any longer or not?

25       MR. MILLER:  I don't think so.

1    MR. NORINSBERG:  Well, just to be clear, when I
2  spoke to Mr. Farber yesterday, I thought we had
3  substantially agreed on questions 1 and 2 with minor
4  tinkering on the grand jury sheet.  Now, he did say, in
5  fairness to Mr. Farber, that he needed to confer with
6  Mr. Miller.  But my discussion with Mr. Farber led me to
7  believe that questions 1 and 2 were pretty much in
8  agreement.
9        MR. FARBER:  1 and 5, I believe.
10       MR. NORINSBERG:  The first question is the fraud
11  question and the materiality question.  I thought we had
12  reached an agreement.
13       THE COURT:  Are you talking about --
14       MR. NORINSBERG:  On the special interrogatories,
15  on the verdict sheet.
16       MR. FARBER:  Well, we reached a limited agreement
17  on 1 and another interrogatory --
18       THE COURT:  Why don't you sit here and talk about
19  it.  At 5:30 you can just ECF with the court what you've
20  agreed on --
21       MR. MILLER:  Sure.
22       THE COURT:  -- and your differences so I have it
23  this evening at some point.
24       MR. MILLER:  Yes, your Honor.
25       THE COURT:  All right.  I'll see everyone at 9:30

1  tomorrow morning.
2        MR. MILLER:  Your Honor, can I raise one issue
3  quickly?
4        THE COURT:  Yes.
5        MR. MILLER:  We submitted a proposed order
6  concerning HIPAA.
7        THE COURT:  Yes, I signed it.
8        MR. MILLER:  Okay.  Thank you.
9        MR. FARBER:  One last thing.  As a scheduling
10  matter, our economists -- your economist needs to come in
11  Thursday.  I think our economist is only available Wednesday
12  or Thursday actually.
13       MR. NORINSBERG:  The Court had asked me to find
14  out.  He said he could possibly come in on Wednesday but
15  the way we're going right now, I don't know.  Maybe we should
16  just stick with the original plan of Thursday morning.
17       THE COURT:  Well, who else do we have?
18       MR. NORINSBERG:  Tomorrow we finish Fusto.  Then
19  we're going --
20       THE COURT:  You'll be with Fusto all day?
21       MR. NORINSBERG:  No.  But probably as long as I
22  was with Castillo, which will probably get us past the
23  morning session.
24       THE COURT:  Then we have --
25       MR. NORINSBERG:  Maybe not.  Maybe I'll finish by

1  morning.
2        THE COURT:  Then we have?
3        MR. NORINSBERG:  Then we have Serra.  Then we have
4  Flynn.  And then if we have any extra time, my client could
5  go on.
6        THE COURT:  Who do you expect to be here
7  Wednesday?
8        MR. NORINSBERG:  Dr. DeLuca would be here on
9  Wednesday, my client, Darrell Morse.  I don't know.  I'm
10  just getting nervous about booking the expert and making him
11  come in on a day that we're still putting on other
12  witnesses.
13       MR. FARBER:  We would consent to going out of
14  order if necessary.
15       MR. NORINSBERG:  I don't want to do that.
16  Strategically, I'd rather put my case-in-chief on before I
17  put my economist on.  I'm only trying to say I did call him
18  per the Court's order, but I request permission from the
19  Court to just leave him on Thursday morning.
20       THE COURT:  Well, I mean, I think we need to see
21  what happens.  It may very well be that he won't be needed
22  before then, but he might be as well.  I'd like to leave the
23  option open.  I don't want the jurors sitting around with
24  nothing to do.
25       What does he have to do on Wednesday?

1        MR. NORINSBERG:  He is a professor, but I think
2  Wednesday -- it's a busy job.
3        THE COURT:  Does he have a class?
4        MR. NORINSBERG:  I think he's pretty much open on
5  Wednesday actually.
6        THE COURT:  It seems like he's more available than
7  any of the rest of us.  I think he could possibly be a
8  little flexible.
9        MR. NORINSBERG:  Okay.
10       THE COURT:  Just tell him to be flexible.  He can
11  come in on a phone call, correct?
12       MR. NORINSBERG:  Yes.  But he really wanted to
13  know this morning like please tell me which day I need to
14  come in.  I just told him I would raise it with the Court,
15  but I don't know.  I'll take counsel up on his offer.  I
16  guess what he's saying is if we book him for Wednesday
17  afternoon and we're still in my case, we'll put him on.
18       I just strategically didn't want to do that, but
19  if the Court's concerned, I have to do that.
20       MR. FARBER:  I have to bring my expert from
21  Massachusetts.
22       THE COURT:  He has to be here on Thursday?
23       MR. FARBER:  He is not available Friday.  That's
24  my concern.  I would bring him down Thursday.
25       MR. NORINSBERG:  In the morning?

**JA233**

```
 1        MR. FARBER:  I can bring him down any time.  He is
 2   available Thursday.  It's a question of you tell me.  If
 3   we're on our case by then, I'm happy to put him in.  The
 4   question is I don't know if we'll be on our case.  That
 5   becomes a question.  But he's certainly available either
 6   morning or afternoon Thursday.
 7        THE COURT:  How long would your expert take?
 8        MR. NORINSBERG:  Not that long.  I'm going to
 9   guess 45 minutes to an hour.
10        THE COURT:  So if your expert testifies Thursday
11   morning, then we should be able to finish him so your expert
12   could testify Thursday, correct?
13        MR. FARBER:  Absolutely.
14        THE COURT:  Why don't you tell him that we're
15   going to do our best to have him testify on Thursday, but
16   the possibility exists that the Judge may tell you to call
17   him and come on Wednesday.
18        MR. NORINSBERG:  I'll tell him just that.
19        MR. FARBER:  Thank you, your Honor.
20        THE COURT:  All right.
21        (Time noted:  5:04 p.m.)
22        (Proceedings adjourned until Tuesday, February 5,
23   2013, at 9:30 a.m.)
24
25
```

```
 1                           INDEX
 2   WITNESS                           DIRECT   CROSS
 3
 4   JOSE CASTILLO
 5   By Mr. Norinsberg
 6   By Mr. Farber
 7
 8   JOHN FUSTO
 9   By Mr. Norinsberg
10
11                          EXHIBITS
12
13   PLAINTIFF:                         PAGE
14        4                              77
15       18                             102
16       21                              67
17       25                             115
18       29                             159
19       44                             145
20       53                             223
21       92                              70
22      130                             138
23      132                              70
24      133                             213
25      136                             138
```

```
 1                  EXHIBITS (CONTINUED)
 2      145                             206
 3
 4   GOVERNMENT:                        PAGE
 5        G                             196
```

**$**

**$1.15** [2] - 46:18, 223:13
**$10,000** [4] - 132:19, 133:11, 133:15, 133:23
**$10,493** [1] - 125:24, 126:4, 126:18
**$136,469** [2] - 113:6, 114:2, 117:1
**$136,469** [1] - 115:10
**$160,000** [2] - 63:10, 63:13
**$17,000** [1] - 33:25
**$172,280** [1] - 157:13
**$174** [2] - 53:24, 214:9
**$174,000** [1] - 53:23
**$200** [1] - 191:22
**$226,000** [3] - 156:6, 156:10, 157:23
**$226,881** [1] - 157:14
**$275,000** [8] - 28:24, 61:22, 62:11, 62:19, 62:25, 63:6, 124:12, 185:1, 185:4
**$3,000** [2] - 19:22, 19:24
**$300,000** [1] - 33:21
**$318,000** [2] - 31:2, 158:1
**$32,000** [1] - 79:24
**$400,000** [1] - 122:23
**$50,000** [6] - 116:19, 117:4, 117:8, 118:10, 118:19, 119:2, 119:18, 226:18
**$500,000** [4] - 223:18, 231:6, 231:14, 232:1
**$600,000** [7] - 31:16, 123:10, 123:13, 222:16, 222:19, 223:14, 224:14
**$700,000** [1] - 74:16
**$733,000** [1] - 72:13
**$744,000** [3] - 121:24, 122:14, 125:12
**$745,000** [1] - 125:17
**$784,318** [1] - 119:18
**$86,000** [1] - 113:6
**$86,400** [3] - 86:17, 86:20, 113:2
**$87** [4] - 192:8, 193:1, 193:2, 214:9
**$90,000** [2] - 83:9, 83:19, 85:2
**$90,048** [1] - 83:13
**$900,000** [1] - 62:14

**0**

**05650** [1] - 147:3
**05761** [1] - 147:3
**07-CV-4793(CBA** [1] - 1:3

**1**

**1** [24] - 37:12, 51:1, 140:21, 140:22, 141:14, 141:18, 223:7, 226:21, 226:21, 228:4, 233:3, 233:7, 233:9, 233:17
**1,151,068** [1] - 223:10
**1.1** [3] - 29:5, 31:14, 61:16, 62:14, 62:24, 121:23, 123:13, 124:11
**1/2** [1] - 41:17
**1/2** [2] - 173:5, 173:6
**10** [1] - 173:15
**10-1-2001** [1] - 160:9

**10007** [1] - 1:22
**102** [2] - 108:8, 238:15
**10271-2007** [1] - 2:2
**11** [40] - 16:24, 37:12, 38:16, 38:17, 38:18, 38:20, 48:5, 55:22, 57:1, 73:18, 73:22, 74:4, 75:12, 75:22, 80:25, 85:10, 85:15, 86:6, 97:8, 99:3, 126:10, 127:21, 127:24, 136:16, 136:19, 137:17, 137:24, 161:25, 162:4, 189:12, 198:7, 201:23, 201:25, 202:1, 202:14, 202:18, 202:19, 211:21, 211:23, 212:7
**113386** [2] - 214:1, 214:4
**115** [1] - 238:17
**12** [6] - 28:1, 64:10, 112:10, 162:12, 164:15, 165:7, 173:15, 224:21, 228:21
**120** [3] - 2:2, 97:8, 99:3
**12th** [1] - 2:2
**13** [4] - 63:18, 124:19, 126:17, 162:2
**130** [7] - 137:10, 137:14, 138:7, 138:9, 138:14, 138:17, 188:18, 189:8, 238:22
**132** [4] - 69:12, 69:25, 70:2, 238:23
**133** [4] - 137:24, 138:2, 137:2, 197:19, 202:21, 202:22, 202:23, 211:25, 212:1, 212:7, 212:9, 212:15, 212:18, 238:24
**134** [4] - 143:15, 144:6, 144:19, 144:23, 145:1, 145:4, 145:7, 155:16, 155:19
**134A** [1] - 144:19
**136** [4] - 135:22, 138:15, 138:17, 238:25
**137** [1] - 112:10
**138** [3] - 238:22, 238:25
**14** [1] - 110:16
**145** [4] - 204:10, 204:12, 205:23, 239:2
**147** [1] - 224:20
**148** [1] - 225:25
**15** [4] - 17:6, 18:24, 19:1, 101:4
**151** [1] - 227:5
**152** [1] - 228:21
**153** [1] - 231:3
**158** [2] - 118:5, 118:9
**159** [1] - 238:18
**16** [4] - 133:20, 167:24, 231:3
**160,000** [1] - 29:6
**163** [1] - 101:4
**167** [1] - 109:2
**168** [2] - 106:21, 108:8
**17** [3] - 110:5, 110:16, 157:6
**176** [1] - 108:3
**18** [6] - 64:19, 102:2, 102:20, 102:21, 102:3, 118:5, 238:15
**19** [5] - 25:23, 25:24, 26:4, 26:11, 89:2, 106:21
**196** [1] - 239:5
**1960** [1] - 14:10

**1963** [1] - 14:11
**1970s** [1] - 40:23
**1980** [1] - 14:11
**1998** [2] - 134:7, 134:15
**1999** [1] - 159:24
**1:15** [1] - 96:3
**1st** [14] - 221:17, 221:25, 222:1, 222:2, 222:3, 222:18, 222:24, 225:18, 225:21, 227:2, 227:7, 228:18, 228:23, 230:25, 231:22, 232:3

**2**

**2** [7] - 56:14, 65:6, 142:5, 153:15, 228:2, 233:3, 233:7
**2,000** [1] - 151:2
**2/11/05** [1] - 136:4
**20** [3] - 41:14, 177:3, 177:4
**20th** [1] - 33:21
**2000** [41] - 41:11, 61:7, 72:13, 78:4, 78:7, 78:9, 78:12, 78:14, 79:13, 79:19, 79:23, 80:2, 80:15, 81:3, 81:22, 81:25, 82:4, 82:7, 82:10, 82:13, 82:18, 82:22, 82:25, 83:4, 83:8, 83:12, 83:19, 85:2, 86:25, 88:5, 91:7, 134:16, 134:19, 140:20, 140:24, 141:1, 141:18, 142:3, 142:5, 142:19, 142:20, 142:24, 142:25, 143:2, 160:20, 160:23, 177:12
**2001** [13] - 41:11, 134:19, 160:25, 161:2, 161:6, 161:8, 161:10, 161:12, 161:14, 161:16, 171:12, 216:19
**2002** [13] - 11:2, 11:15, 12:5, 12:8, 12:13, 13:19, 39:4, 40:3, 41:11, 45:6, 54:9, 61:7, 72:13, 78:17, 78:20, 78:23, 91:8, 134:19, 142:2, 142:5, 142:21, 142:24, 142:25, 159:24, 169:14, 177:12, 206:2, 214:4, 216:14, 217:17, 217:18, 217:20
**2003** [4] - 12:13, 59:12, 60:5, 167:15
**2004** [12] - 27:9, 27:12, 27:17, 27:19, 28:8, 60:8, 60:11, 60:18, 60:25, 114:19, 116:16, 138:6, 154:19, 167:19, 174:1, 180:4, 208:14, 218:1, 218:3, 218:5, 218:9, 219:5, 219:13, 219:18, 220:5, 220:12, 220:17
**2005** [13] - 12:14, 27:14, 27:17, 60:7, 87:5, 136:17, 154:19, 174:1, 218:14, 218:18, 220:17, 224:5
**2006** [43] - 11:2, 13:15, 13:19, 27:16, 27:20, 37:6, 47:6, 50:1, 59:7, 154:19, 188:10, 188:16, 208:17, 209:6, 217:23, 218:23, 218:24, 219:3, 219:6, 219:15, 219:18, 220:5, 220:13, 220:23, 221:3, 221:25, 222:3, 222:18, 222:24, 223:4, 224:9, 225:18, 225:19, 226:2, 226:3, 227:2, 227:7, 228:23, 228:24
**2007** [3] - 57:7, 216:20, 216:22
**2008** [1] - 84:14
**201** [1] - 162:2, 164:14

```
1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - -X
3    DR. LEONARD MORSE,          :  07-CV-4793(CBA)
4           Plaintiff,           :
5        -against-               :  United States Courthouse
                                    Brooklyn, New York
6                                 :
7    ELIOT SPITZER, et al.,      :  Tuesday, February 5, 2013
8           Defendants.           :  9:30 a.m.
9    - - - - - - - - - - - - - - - -X
10      TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
11     BEFORE THE HONORABLE CAROL BAGLEY AMON
       UNITED STATES CHIEF DISTRICT COURT JUDGE
12
13          A P P E A R A N C E S :
14   For the Plaintiff:    JON L. NORINSBERG
                            225 Broadway, Suite 2700
                            New York, New York 10007
15                     BY:  JON L. NORINSBERG, ESQ.
16   For the Defendants:  HON. ERIC T. SCHNEIDERMAN
                          NYS Attorney General
17                        120 Broadway, 12th Floor
                          New York, New York 10271-007
18                   BY:  CHRISTOPHER Y. MILLER, ESQ.
                          SETH J. FARBER, ESQ.
19
20
21   Court Reporter:  Lisa Schwam, CSR, RPR, RMR
                       Official Court Reporter
22                     Telephone:  (718) 613-2268
23   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-Aided Transcription.
24
25
```

---

```
1            (In open court.)
2        THE COURTROOM DEPUTY:  Morse versus Spitzer.
3        THE COURT:  Good morning.  Mr. Fusto, do you want
4    to resume the stand.
5        (Jurors enter the courtroom.)
6        THE COURT:  All right.  Good morning, Ladies and
7    Gentlemen.  Please be seated.  I think we're ready to begin.
8        Mr. Norinsberg.
9    DIRECT EXAMINATION (CONTINUED)
10   BY MR. NORINSBERG:
11   Q    Good morning, Mr. Fusto.
12   A    Good morning, sir.
13   Q    Mr. Fusto, before you actually charged the grand jury
14   in this case, you were required to run by your supervisor
15   the proposed charges, correct?
16   A    Yes.
17   Q    And ordinarily what would you do is you write up a memo
18   and you lay out what your evidence is and what you would
19   like to charge, correct?
20   A    Sometimes.  Sometimes not.  Sometimes I do it orally.
21   Q    Would you agree, sir, that the memo itself was called
22   the "Request to Indict" memo?
23   A    I'm sorry.
24   Q    The memo that you're supposed to write for your
25   supervisor is called a "Request to Indict" memo, correct?
```

---

```
1    A    Yes.
2    Q    And the purpose of this form is to let the supervisor
3    know what you were doing so they can approve or make any
4    edits, right?
5    A    They wouldn't make any edits to the memo.
6    Q    To the charges that you were going to instruct the jury
7    on?
8    A    Yes.  Normal process would be you draft up the
9    indictment and you send it to -- in this case it would have
10   been Peter Bloch.  And he'd go through it and make edits.  A
11   lot of it had to do with language because he was very
12   particular about how a charge is supposed to read.
13   Q    Presenting a written summary of the evidence was the
14   administrative policy of your office; is that correct?
15   A    I can't really say whether it was a policy.  I mean, I
16   would probably say more often than not I just told Peter
17   Bloch orally what my evidence was.
18   Q    Referring to your deposition, page 160, line 3.
19       "Question:  Why would you have to present in writing
20   the evidence that you had to back up your proposed charges?
21       "Answer:  It was administrative policy of the office
22   before I got there, and it's probably still going on now."
23       Do you recall giving that testimony, sir?
24   A    Okay.
25   Q    So according to your deposition testimony, it was, in
```

---

```
1    fact, administrative policy of your office to do a written
2    summary, correct?
3    A    Okay.  It was a policy.  I just wanted to clarify.  It
4    was one that many of us didn't follow.
5    Q    Well, in fact, Mr. Fusto, there were no exceptions to
6    that rule; isn't that true?  Yes or no?
7    A    I can't answer that.
8    Q    Referring to your deposition, page 160, line 14.
9        "Question:  So there were no exceptions to that rule?
10       "Answer:  Not that I'm aware of."
11   A    Okay.
12   Q    Page 160, line 19.
13       "Question:  Regardless of how experienced you were as a
14   prosecutor?
15       "Answer:  No, there were no exceptions."
16       Do you recall giving that testimony under oath, Mr.
17   Fusto?
18   A    I did I guess, yes.
19   Q    According to your sworn deposition testimony, there
20   were no exceptions.  You had to put together a written
21   summary; isn't that true?
22   A    I guess based on my recollection then, yes, that would
23   have been true.
24   Q    But you didn't do that in this case, did you, Mr.
25   Fusto?
```

**JA235**

1 A   I did not, no.

2 Q   You prepared a report -- you prepared proposed charges

3 that you sent to your supervisor and you asked for approval,

4 correct?

5 A   Yes.

6 Q   And your supervisor, Peter Bloch, told you that I don't

7 recall seeing any written summary of this evidence that you

8 have.  Can you please provide me with that one.

9     Do you recall that, Mr. Fusto?

10 A   Do I recall him saying that?

11 Q   Do you recall him actually sending you an e-mail saying

12 that he did not remember seeing a written summary of the

13 evidence and that he needed one before he could actually

14 approve your charges?

15 A   I think you showed me that e-mail so, yes, there would

16 be that e-mail, yes.

17 Q   I'd like to show you what's been marked as Plaintiff's

18 56 and have you take a look at it if you could.

19 A   Sure.  Okay.

20 Q   Do you recognize that e-mail, sir?

21 A   Yes.

22 Q   That's an e-mail exchange between you and Mr. Bloch; is

23 that correct?

24 A   Yes.

25 Q   Dated March 17th, 2006, right?

1 A   Yes.  I'm sorry; it starts March 16th.

2 Q   Okay.  That's the time that you were presenting this

3 case to a grand jury, correct?

4 A   Yes.

5     MR. NORINSBERG:  I offer Plaintiff's 56 into

6 evidence.

7     MR. MILLER:  No objection.

8     THE COURT:  56 will be received.

9     (Plaintiff's Exhibit 56 received in evidence.)

10 Q   Now, this is the e-mail we were just referring to; is

11 that correct, Mr. Fusto?

12 A   Yes, sir.

13 Q   So if we start from the bottom -- the e-mail chain

14 starts at the bottom -- you wrote to Mr. Bloch, your

15 supervisor, and you said, "Here is the proposed larceny

16 count"; is that correct?

17 A   Yes, sir.

18 Q   You were referring to the gland larceny and first

19 degree million-dollar count, correct?

20 A   Correct.

21 Q   Then Peter Bloch responded to you in the middle, he

22 said, "On language I don't have many changes, but I don't

23 remember reviewing any summary of the evidence and I can't

24 approve a B Felony indictment without doing so"; is that

25 correct?

1 A   Yes.

2 Q   Then you wrote in response, "Can I come down?  I'd

3 prefer to do it orally."  Is that correct?

4 A   Yes.

5 Q   Even though you just testified a few moments ago that

6 it was administrative policy of the office to do written

7 summaries and that there were no exceptions to that rule,

8 correct?

9 A   Yes.

10 Q   Now, yesterday we had focused a little bit on the

11 status report that you had submitted to your other

12 supervisor, Felice Sontupe.

13     Do you recall that?

14 A   Yes.

15 Q   In that status report, you were asked to identify if

16 there were any special issues in this particular case; is

17 that correct?

18 A   I'm assuming that's correct.

19 Q   I'm going to put it up here.

20     THE COURT:  Is this in evidence?

21     MR. NORINSBERG:  Yes, it's in evidence.

22     THE COURT:  What is it?

23     MR. NORINSBERG:  Plaintiff's 53.

24 Q   Now, directing your attention to the bottom paragraph 9

25 of that document.  You see that, Mr. Fusto?

1 A   Yes, sir.

2 Q   Now, again, we're looking at your March 1, 2006, status

3 report that was sent to your supervisor right before you

4 started the grand jury proceedings, right?

5 A   Yes.

6 Q   Okay.  And you were asked to identify any special

7 issues in the case, correct?

8 A   Yes.

9 Q   And the first thing you said is, "Attorney recognizes

10 the case is old"; is that correct?

11 A   Yes, sir.

12 Q   So you felt that it was important to acknowledge and

13 explain to your supervisor that the case was old, correct?

14 A   I think they could have figured that out for themselves

15 at that point, yes.

16 Q   But you put in an explanation right afterwards as to

17 why the case had taken so long to get to the grand jury; is

18 that correct?

19 A   Yes.

20 Q   You wrote, "Minor delay occasioned by change in

21 auditor."  That was your first explanation for why it took

22 four years to go to grand jury; is that correct?

23 A   That was one of them, yes.

24 Q   That's the first thing you listed, correct?

25 A   Uh-huh.

1  Q   Now, actually, the change in auditor took place not in
2  2006, it took place all the way back in 2004; isn't that
3  correct?
4  A   Yes.
5  Q   That really wasn't the reason why this case took so
6  long, was it, sir?  Yes or no?
7  A   It was one of the reasons.  It wasn't the only reason.
8  Q   And then you wrote, "Delay mostly because attorney
9  needed to recalculate method of determining amount of
10 fraud."
11     Do you see that?
12 A   Yes, sir.
13 Q   When exactly did you decide that you needed to
14 recalculate the method of fraud?
15 A   Well, we were going back and forth with Jose.  I'm
16 sorry; could you just scroll this one down.
17 Q   Sure.
18 A   I just want to see the date.
19 Q   The date -- what date are you referring to?
20 A   Well, the date of this.  The reason I'm having --
21 Q   Of the report?
22 A   Well, this is the six-month report, the March 1st one.
23 Q   Right.
24 A   Okay.  This report was basically a version of an
25 earlier one.  It was a policy that they had instituted

1  several months earlier because the administration was
2  concerned about a lot of cases that seemed to be old so they
3  wanted six-month updates on everybody's cases.  So when I
4  wrote this, I didn't -- that section I don't believe was
5  written on March 1st.  It had probably been written earlier.
6      But in answer to your question, we had been working on
7  recalculations of things from the invoices for months before
8  that, months.
9  Q   You had the invoices for four years, didn't you?
10 A   Yes, it's true.
11 Q   How long could it possibly take to recalculate invoices
12 which came from only two labs and were just a few inches
13 thick each?
14 A   Because I don't think that Mr. Johnson -- I think at
15 that point -- and please, I'm trying to go back seven years.
16 I think at that point we had the invoices.  I don't think we
17 had even settled on how to calculate or even what the method
18 was going to be until much earlier when we started to really
19 focus on the case.  There was a long period of time that we
20 didn't focus on the case, and I, you know -- it's kind of
21 the way it goes sometimes.
22 Q   When you say you need to recalculate the method of
23 determining amount of fraud, that means you had a method of
24 calculating the fraud and you had to recalculate, right?
25 A   We had a method.  We had a theory or an idea.  The

1  underlying data -- because if you look at the invoices, the
2  underlying data, there was a tremendous amount of subjective
3  decisions that we had to make in terms of what this data
4  means in regards to Dr. Morse's billings.
5  Q   My question is simply this, sir:  You had an original
6  method of calculating fraud and then you changed the method;
7  is that correct?
8  A   I think changing the method may not be the right word.
9  I think what we were doing was we were changing the
10 decisions about what we were going to give credit for and
11 not going to give credit for, things of that nature.
12 Q   And would it be fair to say, sir, that the very first
13 time that you actually came up with this million-dollar
14 figure was right about the same time that you were
15 presenting this case to the grand jury?
16 A   Could you define "right about the same time" because it
17 was close to when we were putting the case to the grand
18 jury, yes.
19 Q   How would you define "close," Mr. Fusto?  Was it a week
20 or two?
21 A   No.  I would probably say it was sometime in either
22 late December or very early January of 2006.
23 Q   In fact, the first time that you actually came up with
24 the million-dollar number was in March of 2006?  Yes or no?
25 A   No.

1  Q   Now, sir, you referred before, you were saying that
2  these were six-month reports.  In fact, you were making
3  these reports every month, weren't you?
4  A   That's -- I have trouble answering that question
5  because I think they changed it from six months to a month.
6  There were different protocols that the administration was
7  asking us to do.  That's my best memory of it.
8  Q   Well, just for example, you wrote another report on
9  March 29th, just 28 days after this report, didn't you?
10 A   I take your word for it, sure.
11 Q   And you were writing monthly reports, right, sir?
12 A   It's very possible that at this point they had changed
13 it to monthly reports.
14 Q   Now, you were working on only six to eight fraud cases
15 at any one time; is that correct?
16 A   Thereabouts, yes.
17 Q   And your caseload was relatively small compared to what
18 it had been when you were in the DA's office, right?
19 A   Yes.
20 Q   In the DA's office, you'd have 20 or 25 cases on your
21 desk, right?
22 A   Could be, sure.
23 Q   So with these six to eight cases, the Morse case would
24 have been one of those six to eight cases you were working
25 on, right?

1    A    Yes.

2         THE COURT:  Let me just clarify something because

3    I don't believe it's in evidence.  You at one point in time

4    were with the district attorney's office.

5         THE WITNESS:  Yes, Your Honor.

6         THE COURT:  When was that?

7         THE WITNESS:  February of '91 to August of 1993.

8         THE COURT:  And which district attorney's office?

9         THE WITNESS:  Kings County, here.

10        THE COURT:  Okay.

11   Q    Now, I had asked you a few moments ago whether or not

12   the first time that you came up with the million-dollar

13   figure was close in time to the grand jury presentation.

14        Do you remember that?

15   A    Yes.

16   Q    Would you agree it was actually at the time of the

17   grand jury presentation?

18   A    Well, it was -- the exact date I don't recall, but it

19   was around the time -- the statement was around the time of

20   the grand jury.

21        THE COURT:  What was around?

22        THE WITNESS:  I believe the final calculation of

23   the million dollars.

24        THE COURT:  So this was close in time to the

25   presentation of the grand jury?

1         THE WITNESS:  Yes.  My best guess is that it was

2    either in late December of 2005 or early part of 2006.

3         THE COURT:  All right.  Which would have been a

4    couple months before the grand jury, right, or like six

5    weeks before the grand jury?

6         THE WITNESS:  Approximately, yes.

7    Q    Let's see if we can clarify this further.  Would you

8    agree that the first time you had the million-dollar figure

9    was sometime in the year 2006?

10   A    Well, as I said, it could have been very early in 2006,

11   yes.

12   Q    Referring to your deposition page 136, line 10.

13        "Question:  When was the first point in time when you

14   actually had concrete numbers relating to the amount that

15   Dr. Morse had overbilled Medicaid?

16        "Answer:  Sometime in 2006 with the presentation."

17        Do you recall giving that testimony?

18   A    Okay, yes.

19   Q    And reading from 137, line 10.

20        "Question:  And what number did you come up with?

21        "Answer:  I don't remember exactly.  I believe it was

22   over a million dollars at the time of the grand jury

23   presentation."

24        Do you recall that?

25   A    Yes.

1    Q    Now, sir, you told us yesterday that in your memo here,

2    you originally had grand larceny in the second degree as

3    your top charge; is that correct?

4    A    I think at some point, yes, that was the idea.

5    Q    But you presented to this grand jury grand larceny in

6    the first degree; is that correct?

7    A    Yes, sir.

8    Q    When exactly in 2006 did the charge change from second

9    degree grand larceny up to a million-dollar grand larceny

10   charge?

11   A    I'm not sure that it changed in 2006.  I know it would

12   have changed in the period of time leading to the grand jury

13   presentation.  The reason being is because we were still

14   making decisions about what credit to give Dr. Morse or what

15   not to.

16   Q    Sir, can you pinpoint for this jury at any time frame

17   where you actually first came up with the grand larceny in

18   the first degree charge?

19   A    Beyond what I just said, I can't give you an exact

20   date, no.

21   Q    Now, during the course of your presentation to the

22   grand jury, you questioned Mr. Castillo about certain

23   patient billing summaries; is that correct?

24   A    I believe I did, yes.

25   Q    And one of those summaries is what we previously

1    identified as the summary involving a patient named Edwin

2    Gonzalez.  Do you recall that?

3    A    Yes, sir.

4    Q    Do you have that summary in front of you?  It's Exhibit

5    133.

6    A    Yes, I do.  Yes, sir.

7    Q    Do you recognize that, sir?

8    A    Yes, I do.

9    Q    Do you recognize that as a document that you used

10   during the grand jury presentation, correct?

11   A    I do, yes.

12   Q    Now, according to the document in front of you on the

13   last page, there's a patient Edwin Gonzalez that's listed,

14   correct?

15   A    Yes, sir.

16   Q    And according to this document, you have three

17   different Edwin Gonzalezes listed on this page; isn't that

18   correct?

19   A    Yes, I see that.

20   Q    Now, I'd like to show you what's been marked as

21   Plaintiff's 44 for identification.

22   A    Sure.

23   Q    Do you recognize this as Edwin Gonzalez profile?

24   A    Yes.

25        MR. MILLER:  Your Honor, which exhibit are we

1  talking about?  He's showing up a blowup of 44?  What are we
2  looking at?
3        MR. NORINSBERG:  It's a blowup of 44.
4        THE COURT:  Well, wait a minute.  I thought you
5  were showing him 133.
6        MR. NORINSBERG:  I was.  133 relates to the same
7  information, the same patient as 44.
8        THE COURT:  So which exhibit are you showing him;
9  44 or 133?
10        MR. NORINSBERG:  44 right now.
11        MR. MILLER:  I think he should show him the
12  exhibit as opposed to the demonstrative.
13        MR. NORINSBERG:  I'm about to lay a foundation,
14  and then I'd like to ask questions for the jury with this
15  exhibit with Mr. Fusto.
16        THE COURT:  Which page of 44?
17        MR. NORINSBERG:  The last page.
18        THE COURT:  Which is Perez?
19        MR. NORINSBERG:  It's Gonzalez.
20        MR. MILLER:  Can I see the demonstrative?
21        MR. NORINSBERG:  Yes.
22        Your Honor, I'm not sure what the exact number is.
23  There's 150 exhibits.
24        THE COURT:  But I have to know what exhibit it is.
25        MR. NORINSBERG:  Can I relabel it as 146?

---

1        THE COURT:  No.  Come here a minute.  Let me just
2  see the parties at sidebar.
3        (Sidebar conference.)
4        (Continued on the next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1        THE COURT:  Are you purporting to show him
2  something that was a grand jury exhibit or not?
3        MR. NORINSBERG:  It's not the grand jury.  I
4  misspoke when I said 44.  I was trying to go from my memory.
5        THE COURT:  We can't do this here.  Grant Jury 7,
6  which is 44 as I understand it, is a document that doesn't
7  have anything related to Gonzalez in it.  Then I see Grand
8  Jury Exhibit 11 is simply Gonzalez, correct?
9        MR. NORINSBERG:  Yes.  This is another exhibit I
10  showed the witness at his deposition.  I do have it in the
11  JPO.  I apologize to the Court.
12        THE COURT:  But it's neither of the grand jury
13  exhibits that were shown.
14        MR. NORINSBERG:  This was a predicate question.  I
15  was using 133 to lead into another Edwin Gonzalez which I
16  previously showed the witness at the deposition.  And I
17  could identify looking at the chart, Your Honor.
18        THE COURT:  Has it previously been marked?
19        MR. NORINSBERG:  Yes.  No.
20        THE COURT:  Is it 130?
21        MR. NORINSBERG:  I can find it if you give me one
22  second.
23        It's 33.
24        THE COURT:  What is -- this has not been admitted
25  into evidence.

---

1        MR. NORINSBERG:  Not yet.
2        THE COURT:  You can't ask him questions about
3  something that's not admitted into evidence.  If you want to
4  lay a foundation --
5        MR. NORINSBERG:  I was trying to do that, Your
6  Honor, when I got objected to.  I want to lay a foundation.
7  That's why I didn't show the exhibit.  I was just trying to
8  have him look at it.  My apologies for mislabeling the
9  number.
10        THE COURT:  You have to understand why that's a
11  problem.
12        MR. NORINSBERG:  It is a problem.  You know, I
13  apologize sincerely.
14        THE COURT:  All right.  This is very confusing.
15  All of these Gonzalezes, it's not a fair way to approach it.
16  So if you want --
17        MR. NORINSBERG:  I apologize.
18        THE COURT:  -- to lay a foundation for it, fine.
19        (End sidebar conference.)
20        (Continued on the next page.)
21
22
23
24
25

**JA239**

1    MR. NORINSBERG:  So just to clarify on the record,
2    the document I'm showing Mr. Fusto is Exhibit 33.  It's not
3    44 as I previously said.  That was my mistake.
4         THE COURT:  Okay.
5    Q   Can you please take a look, Mr. Fusto, at Exhibit 33.
6    A   Yes.
7    Q   Do you recognize this containing --
8         THE COURT:  I take it that's a blowup of 33 is
9    what you're showing him?
10        MR. NORINSBERG:  Yes.
11        MR. MILLER:  Your Honor, it's a multi-page
12   document.  I think the witness should see it.
13        MR. NORINSBERG:  This document contains everything
14   in those three pages put into one.
15        THE COURT:  You want to just look at it to see if
16   it's a copy of 33.
17        THE WITNESS:  I'm sorry; did you say 33?
18        MR. NORINSBERG:  Yes.  Right here (indicating).
19        THE WITNESS:  But you said --
20        MR. MILLER:  Four-page composite document.  That's
21   only one of the pages.  If you could just show him the
22   paper, then he can look at it.
23        MR. NORINSBERG:  That is the exact same document.
24   That paper was too large so it's cut into four pages.
25        THE COURT:  Let me see it.

---

1         Counsel, that couldn't possibly be this entire
2    document.
3         MR. NORINSBERG:  The way it comes there were four
4    separate pages of this information.
5         Okay.  We'll lay the foundation.
6         THE COURT:  Do you have your own copy of 33?
7         MR. NORINSBERG:  Sure.
8    Q   Let me show you what's been marked as 33-A, B, C, and
9    D.  Take a look at that.
10   A   Thank you.  Okay.
11   Q   Do you recognize this as being information relating to
12   the patient Edwin Gonzalez?
13   A   On 33, yes.
14   Q   Okay.  Now, do you see the same information in a
15   different format but the same information that's reflected
16   in those documents on here as well?
17   A   That appears to be from the actual provider profile and
18   this I think is from the auditor's data warehouse, but the
19   information would be the same.
20        MR. NORINSBERG:  So I offer 33 into evidence, Your
21   Honor.
22        THE COURT:  First of all, establish what it is.
23   Q   Can you tell us for the record what this is that we're
24   looking at.
25        THE COURT:  Which one?  Are they the same document

---

1    or not, Mr. Fusto?
2         THE WITNESS:  The information I believe would be
3    the same.  What I'm looking at here is --
4         THE COURT:  When you say "here," you're referring
5    to the blowup?
6         THE WITNESS:  Yes.
7         THE COURT:  What is the blowup?
8         THE WITNESS:  The blowup, by looking at it,
9    appears to be information that comes from the actual
10   provider profile.
11        THE COURT:  And what's the provider profile?
12        THE WITNESS:  That's the Department of Health
13   database.  It's the whole database.  The fields may be in
14   different orders and obviously the fonts are different, but
15   the information in 33, which appears to come from the
16   auditor from the data warehouse, would be the same.  So the
17   information is the same.
18        THE COURT:  Are they coming from two different
19   places?
20        THE WITNESS:  No.  This would be derived from this
21   (indicating).  That's all I wanted to clarify.
22        THE COURT:  Tell us precisely what 33 is and how
23   33 compares to the chart which we ought to call something
24   else?
25        Do you have another exhibit?

---

1         MR. NORINSBERG:  We'll call it 33-D.
2         THE COURT:  The chart.
3         MR. MILLER:  Which page is the demonstrative?
4         MR. NORINSBERG:  D.
5         THE COURT:  The demonstrative is now D.
6         MR. MILLER:  The fourth page of 33?
7         THE WITNESS:  Yes.
8         MR. MILLER:  We don't have a marked copy of 33-D.
9    So I have a four-page 33.  I just want to know if it's the
10   fourth page or a different page.
11        THE WITNESS:  33-D, as Edwin Gonzalez, appears to
12   be the same.
13        THE COURT:  As everything that's in 33?
14        THE WITNESS:  I'm sorry.  Could you hold that up
15   so I am compare.
16        Yes.
17        THE COURT:  Tell us once again what you have as
18   33-A through C.  What is that document?
19        THE WITNESS:  33-A through C.  A appears -- A,
20   B -- A and B appear to be patient information that appears
21   to be from the auditor's data warehouse query from the
22   profile.  D and C appear to be pages actually from the
23   profile.  In other words, the information would be the same;
24   it just comes in slightly different format.  But the
25   information is the same.

1    THE COURT:  But you're talking about D and C.  I
2  think D was the chart.  You know, this is --
3           THE WITNESS:  Yes, D is a smaller version of this
4  (indicating).
5           THE COURT:  So A, B and C are the same type of
6  document or not?
7           THE WITNESS:  The same type, yes.
8           THE COURT:  All right.  All three, A, B and C, or
9  are C and D something different?
10          THE WITNESS:  C and D look like they're pages from
11 the profile.  And A and D look like they were from the data
12 warehouse.
13          THE COURT:  And then this chart now has to be
14 marked E because the papers are A, B, C and D.  So E now is
15 the chart.  That is what document?
16          THE WITNESS:  D.  D appears to be a blowup of this
17 (indicating).
18          THE COURT:  So we'll call the blowup D-1, okay.
19 But A, B, C, and D would have been part of the same document
20 or are they really -- are A and B a form of document and C
21 and D something different?
22          THE WITNESS:  I would say A and B would be, just
23 by looking at them, they appear to be different documents.
24          THE COURT:  A and B are?
25          THE WITNESS:  Yes.

1           THE COURT:  They are different documents from C
2  and D, you mean?  They come from different places?
3           THE WITNESS:  Yes.
4           THE COURT:  All right.  A and B come from where?
5           THE WITNESS:  This, as I said just by looking at
6  it, this was a spreadsheet that the auditor, when he does
7  his query from the provider profile, comes down in what
8  looks like an Excel spreadsheet.
9           THE COURT:  All right.  So then A and B are
10 something that the auditor would have produced?
11          THE WITNESS:  I believe that would be the case,
12 yes.
13          THE COURT:  Okay.  And they pertain to a
14 particular patient?
15          THE WITNESS:  A and B is Edwin Gonzalez.  B is
16 Edwin Gonzalez but also appears to be Stacy Rodriguez as
17 well.
18          THE COURT:  And C and D, they would be more the
19 original records, is that correct, what was in the data
20 profile?
21          THE WITNESS:  Exactly.
22          THE COURT:  And they pertain to what patients?
23          THE WITNESS:  Reading them together, it looks like
24 it's all Edwin Gonzalez.
25          THE COURT:  So now what we've called D-1 is just a

1  blowup of D?
2           THE WITNESS:  Correct.
3           THE COURT:  And that is from the provider -- the
4  Medicaid records, the provider profile?
5           THE WITNESS:  Exactly, yes.
6           THE COURT:  All right.  You want to offer them in?
7           MR. NORINSBERG:  Yes.  I'm offering all of those
8  exhibits in.
9           THE COURT:  All right.  Any objection?
10          MR. MILLER:  I'm going to object, Your Honor.
11          THE COURT:  Can I see you at sidebar.
12          (Sidebar conference.)
13          (Continued on the next page.)
14
15
16
17
18
19
20
21
22
23
24
25

1           THE COURT:  What are you objecting to?
2           MR. MILLER:  I don't think the witness is really
3  qualified to say exactly where the data comes from so I
4  think that, you know, he was trying to help and say what he
5  thought it came from, but I'm not sure that he really knows
6  exactly how the auditors work and where exactly they get all
7  their data so that --
8           THE COURT:  What auditor produced that?  Would
9  that have been Castillo?
10          MR. MILLER:  This is a composite exhibit created,
11 I believe, for summary judgment for them.  I mean, this is
12 not -- I mean, there are no Bates numbers.  I don't think
13 this was in consecutive Bates order.  It might have been.
14 But I don't think this is a collection of our files.
15          You know, I just don't think he's really qualified
16 to say what -- for instance, this is the data -- the
17 provider profile.  I mean, I think he's going -- he's trying
18 to help and he's being truthful in that regard.  I'm not
19 sure that he's really qualified to do this, though.
20          MR. NORINSBERG:  He laid the foundation.  If he
21 has issues, he can bring that out in his questioning of the
22 witness.
23          THE COURT:  Do you have a real -- again, do we
24 have -- is there any serious question about the authenticity
25 of these documents?

1  MR. MILLER:  They come from our files.  I'm not
2  disagreeing with that.
3      THE COURT:  Do we really need to at this point
4  have somebody come in from Medicaid to identify these?
5      MR. MILLER:  Right.  Well, it would have been
6  probably Mr. Castillo.  I mean, I guess -- I'm concerned
7  about --
8      THE COURT:  I'm sorry.  Is the auditor who
9  presumably would have discussed this information, would that
10 have been Castillo in this case?  Is he the auditor who
11 would have downloaded the information?
12     MR. MILLER:  Yes.  Mr. Fusto, as I understand it,
13 did not create spreadsheets like this.
14     THE COURT:  Castillo wasn't asked about these
15 records?
16     MR. NORINSBERG:  No.  C and D he clearly
17 identified as being from the Medicaid system.  He laid the
18 foundation.  They have issues.  They can bring that out
19 during cross.
20     THE COURT:  You know, we can't just play games
21 with documents.  You have to get a document into evidence.
22 If there's some question about the authenticity of the
23 document, fine.  If there's not, then I don't see the need
24 to have to require Mr. Norinsberg to bring somebody in here
25 to do this.

1  MR. MILLER:  Right.  I just want to be clear on
2  this.  If I look at the last page, to me it looks more like
3  a spreadsheet as opposed to something from the provider
4  profile.  He said it's from the provider profile.  I don't
5  think it's quite from the provider profile.  That's my
6  concern.  I just think it's getting a little confusing.  I
7  think this is another Excel spreadsheet.  It's not the
8  provider profile.
9      Is it Medicaid data, yes.  Is it from our files,
10 yes.  Was it generated from some of the data sources, fine.
11 But I'm just saying it's getting a little confusing about
12 where the data came from and that's where I think -- I don't
13 think he's qualified to talk about where it came from and
14 that sort of thing.  I just don't want it to end up being a
15 confusing discussion.  If you want to ask him what the
16 spreadsheets show.
17     THE COURT:  If they come into evidence.  Are you
18 objecting to them coming into evidence?  That's the --
19     MR. MILLER:  I don't think he's properly
20 identified them.  I don't think this comes from a provider
21 profile.  That said, you know, I don't want to have to call
22 another witness to get these in, but I just want the Court
23 to be aware of my concerns.
24     THE COURT:  Are you objecting to them coming in or
25 not?

1  MR. MILLER:  I think I will object to questions
2  about where they come -- additional questions about where
3  these come from other than, you know, that they are Medicaid
4  claims data.  It's claims data.  But in terms of exactly
5  where it came from --
6      THE COURT:  But it's not something -- we're not
7  disputing what was auditor versus what was claims data in
8  the Medicaid system; is that correct?
9      MR. MILLER:  Well, the auditor has access to all
10 the data.  So when he says it's an auditor spreadsheet, I
11 think it's fine to come in as long as, you know, there isn't
12 questioning about, well, this one comes from here and this
13 one comes from there.  If he's going to go down a road to
14 try and establish that this came from a particular source
15 other than it's just Medicaid -- if he wants to say it's
16 Medicaid data, it's fine.  But if he wants to say it comes
17 from this particular source, then I have a problem.  I'm not
18 sure where he's going with it.
19     If he wants to say that there's Medicaid data to
20 show these fields, that's fine.  But I don't want to get
21 into -- if the cross is going to be about where it comes
22 from, then I object.
23     MR. NORINSBERG:  I'm not going to ask any
24 questions about where it's coming from.  I think the Court
25 already established it very clearly on the record.  I'm not

1  planning on getting into that at all.
2      THE COURT:  Well, all right.  Then I'll receive
3  them into evidence.
4      (End sidebar conference.)
5      (Continued on the next page.)

**JA242**

1    THE COURT:  All right.  Exhibits 33-A through D
2    and D-1 are received.
3          (Plaintiff's Exhibits 33-A, B, C, D and D-1
4    received in evidence.)
5    Q    Mr. Fusto, if you could please step down and take a
6    look at this document.
7    A    Sure.
8    Q    Now, looking at the document -- and I know it's
9    probably still hard to read here -- but do you see the first
10   line here that's highlighted?  That pertains to Edwin
11   Gonzalez; is that correct?
12   A    Yes.
13          THE COURT:  Is this D-1?
14          MR. NORINSBERG:  This is D-1, Your Honor, yes.
15   Q    That Edwin Gonzalez lives in Brooklyn; is that correct?
16   A    That's what it says, yes.
17   Q    That Edwin Gonzalez is born in December of 1980,
18   correct?
19   A    That's what it says, yes.
20   Q    And the second one that's highlighted, this Edwin
21   Gonzalez, he lives in New York, Manhattan; is that correct?
22   A    Appears from the record, yes.
23   Q    This Edwin Gonzalez was born in 1960; is that correct?
24   A    Yes.
25   Q    Then there's a third Edwin Gonzalez over here

1    (indicating) that lives in the Bronx; is that correct?
2    A    Yes.
3    Q    That Edwin Gonzalez was born in 1963; is that correct?
4    A    Yes.
5    Q    On the document that you presented to the grand jury,
6    you merged all three of these Edwin Gonzalezes and presented
7    it as a single patient to the grand jury; isn't that true?
8    Yes or no, sir?
9    A    I didn't merge them.  They all appeared on the same
10   sheet.
11   Q    Well, you heard Mr. Castillo's testimony yesterday?
12          THE COURT:  Excuse me.  Can he resume the stand?
13          MR. NORINSBERG:  Yes.
14          THE COURT:  I think we're going to need that
15   exhibit out of the way because the jurors can't see the
16   witness.
17   Q    Can we agree, Mr. Fusto, that the billing records of
18   these three separate patients were merged into and presented
19   as one document to the grand jury?
20   A    Yes.  They all appeared on the same single sheet as you
21   see there.  Something similar to that, yes.
22   Q    Okay.  So when the grand jury was looking at the total
23   billings for Edwin Gonzalez, they were looking actually at
24   the total billings of three different patients merged into
25   one, true?

1    A    They weren't merged into one.  They were three on one
2    sheet.  In other words --
3    Q    Okay.  But only one Edwin Gonzalez actually appeared in
4    front of the grand jury; is that correct?
5    A    Yes.
6    Q    So there were two additional Edwin Gonzalezes that the
7    grand jury never heard or saw whose billing records,
8    nonetheless, appeared on that document, correct?
9    A    Yes.
10   Q    It was misleading to the grand jury, wasn't it?
11   A    I don't think it was, but I could see that there would
12   be -- if there was a view of it, you might get confused.
13   Q    Well, for somebody who is not acquainted with Medicaid,
14   there would be no way of knowing that there were three
15   different patients on that grand jury exhibit, would there
16   be?
17   A    I'm sorry.  Could you repeat that.
18   Q    For somebody who is not familiar with Medicaid, just
19   looking at that chart that the grand jury saw, there would
20   be no way to realize that you actually have three separate
21   patients?  It would appear as if it's just one Edwin
22   Gonzalez, wouldn't it?
23          MR. MILLER:  Objection.
24          THE COURT:  Overruled.
25   A    Well, there's three different CIN patient

1    identification numbers of the addresses and things like that
2    are all different.  But the CIN number, we're talking about -- it
3    Q    Okay.  But the CIN number, we're talking about -- it
4    just says ADCIN, right?  The column itself says "ADCIN,"
5    right?
6          MR. MILLER:  Objection.  This is not the document
7    that was before the grand jury.
8          THE COURT:  You want to show the Exhibit 133,
9    please.
10          MR. NORINSBERG:  Sure.
11   Q    Do you have 133 in front of you, sir?
12   A    I do, yes.  Just give me a second to find it.  Please
13   bear with me.  I know it's here.
14          THE COURT:  133?
15          THE WITNESS:  Yes, Your Honor.
16          THE COURT:  It should be just a single page.
17          THE WITNESS:  I found it.  Thank you.
18          THE COURT:  All right.
19          MR. NORINSBERG:  I'll put it on the ELMO.
20          THE COURT:  Let me see that.  Can I see it?
21          THE WITNESS:  Sure.
22          THE COURT:  Can I see the parties at sidebar.
23          (Sidebar conference.)
24          (Continued on the next page.)
25

**JA243**

1  THE COURT:  133 is not the exhibit that went
2  before the grand jury.
3  MR. NORINSBERG:  Yes, it is.
4  THE COURT:  Only this last page, right?
5  MR. NORINSBERG:  No, the whole thing.
6  THE COURT:  Okay.  I'm sorry.  I misunderstood
7  because what was appended to --
8  MR. NORINSBERG:  The reason why it's confusing is
9  7 looks very familiar to 11.  It's only different in the
10 last two pages that are different.
11 THE COURT:  This is not what was appended to the
12 summary judgment motion papers, which is what I've had in my
13 folder as Grand Jury Exhibit 7 and 11.  That's not what we
14 have, is it?
15 MR. MILLER:  Your Honor, I think the record at the
16 grand jury was a little confusing in that 7 was used with
17 the promise of following up later.  Later it's referred to
18 as 11 when Castillo puts it in.  In other words, DeLuca
19 couldn't get it into evidence.
20 THE COURT:  Would you all tell me what was put
21 before the grand jury.  133, is that 11?
22 MR. NORINSBERG:  Yes.
23 MR. MILLER:  Yes.
24 THE COURT:  And what is 7?
25 MR. MILLER:  7 is the first six pages of 11 with

1  two pages at the end.  So DeLuca testifies about 7.
2  THE COURT:  Could you all please at a break make a
3  copy for me of what was 7 and what was 11 because I have
4  been going off of what was attached to grand jury -- I mean,
5  to summary judgment papers, and it's not the same thing that
6  we're talking about here.
7  MR. MILLER:  Understood.
8  THE COURT:  And I have a real problem with
9  straightening out on this record exactly what went before
10 the grand jury and didn't go before the grand jury.
11 So I need for you all to make a copy of what you
12 agree on was 7 and 11 because it's certainly not what I
13 have.
14 There's no problem with this?  He is showing him
15 what was 11?
16 MR. MILLER:  Yes.
17 THE COURT:  Fine.
18 (End sidebar conference.)
19 (Continued on the next page.)
20
21
22
23
24
25

1  Q   Mr. Fusto, I'm showing you Grand Jury Exhibit 11, which
2  is marked as 133 in our trial here.
3  Do you recognize this document?
4  A   I do.
5  Q   This is the Edwin Gonzalez document that was presented
6  to the grand jury, part of the records in Grand Jury 11; is
7  that correct, sir?
8  A   Yes.
9  Q   Now, directing your attention to the left-hand column,
10 do you see where it says CIN number?
11 A   Yes.
12 Q   If you were not acquainted with the Medicaid system,
13 would you have any idea what CIN number means?
14 A   I assume not.
15 Q   And do you think any grand juror looking at that would
16 be able to say, oh, the CIN numbers of these patients are
17 different?
18 MR. MILLER:  Objection.
19 THE COURT:  Overruled.
20 A   I would agree with that, yes.
21 Q   And you would agree that to any grand juror looking at
22 that, they see the same Edwin Gonzalez over and over again
23 and they see all of the dates of service and then they see a
24 bill for $2,327; is that correct?
25 A   Yes.

1  Q   And that was about 25 percent of the $10,000 total that
2  Mr. Castillo testified to, right?
3  MR. MILLER:  Objection; foundation.
4  THE COURT:  Well, I will sustain the objection to
5  that question because I think at this point it assumes a
6  fact not in evidence.
7  Q   Now, who prepared the document that we're looking at
8  here?
9  A   I'm assuming Mr. Castillo.
10 Q   And he prepared it according to your instructions; is
11 that correct?
12 A   I asked him to get me the patients -- the patient
13 information and put them on spreadsheets like this.
14 Q   My question is simply this, Mr. Fusto:  Mr. Castillo
15 prepared this document in accordance with your instructions?
16 Yes, he did or no, he didn't?
17 A   Yes.
18 Q   And you were here when Mr. Castillo testified in court,
19 correct?
20 A   Yes, sir.
21 Q   You heard Mr. Castillo testify that you instructed him
22 to put all of the Edwin Gonzalezes in the system onto this
23 chart, correct?
24 A   I heard him say that, yes.
25 Q   And his testimony was true, wasn't it?

**JA244**

1   A   I don't recall having that conversation with him.

2   Q   But you're not specifically denying it, are you?

3   A   I couldn't say one way or the other.  No, you're right,

4   I'm not specifically denying it because I don't recall.

5   Q   Now, before you actually put this document in front of

6   the grand jury, did you actually look at it, sir?

7   A   I'm assuming I did.

8   Q   When you looked at it, didn't you realize that there

9   were three different CIN numbers?

10  A   I think at the time --

11  Q   Yes or no?

12  A   I'm sorry.  Did I look at the CIN numbers?

13  Q   Did you realize that, sir?

14  A   At the time, I may have.

15  Q   You might have?

16  A   Yes.

17  Q   Now, this record that we're looking at, could it have

18  been part of a larger spreadsheet that was prepared by

19  Mr. Castillo?

20  A   This particular document part of a larger one?

21  Q   Yes.

22  A   I don't think so.  This was probably just created -- if

23  I may explain.

24  Q   I'm not asking you to explain, sir.

25      Was it part of a larger group or not?

---

1       THE COURT:  You mean, this one page?

2       MR. NORINSBERG:  No, this document, Grand Jury 11.

3       THE COURT:  Because Grand Jury 11 has a lot more

4   pages than just this one, correct?

5       THE WITNESS:  Yes.

6       THE COURT:  So what is your question?

7   Q   Was Grand Jury 11 part of a larger group of documents?

8   A   Yes.

9   Q   And how many documents in total were in Grand Jury 11

10  originally?

11      MR. MILLER:  Objection.

12  A   Grand Jury 11?

13  Q   This spreadsheet, how many patients were originally

14  part of the provider profile or spreadsheet that

15  Mr. Castillo prepared?

16  A   I believe there would have been a group of eight, if

17  I'm not mistaken.

18  Q   And, in fact, it might have been a much larger group of

19  patients when Mr. Castillo first prepared this record; isn't

20  that true?

21  A   I'm not sure I understand what you mean.

22  Q   The eight patients who appear here on Grand Jury 11

23  might have been part of a larger group of, say, 50 patients

24  or a hundred patients with very similar profiles, right?

25  A   I couldn't say.

---

1       THE COURT:  Let me just clarify something.

2       In Exhibit 133 that you have before you, how many

3   patients are named in Exhibit 133?  How many patients are

4   reflected in that record?

5       THE WITNESS:  I think Mr. Norinsberg has 133.

6       MR. NORINSBERG:  We can represent for the record

7   there are eight patients in this, Your Honor.

8       THE COURT:  I would really prefer for the witness

9   to look at it.

10      MR. NORINSBERG:  Okay.

11      THE WITNESS:  Thank you.  I count eight.

12      THE COURT:  So there are eight patients that are

13  in 133.  And the Gonzalezes at the last page is one of those

14  pages, right?

15      THE WITNESS:  Yes, Your Honor.

16      THE COURT:  Now, is your question to this witness,

17  at some point prior to putting this exhibit before the grand

18  jury, had Mr. Castillo given him a larger document which had

19  more patients than the eight in that document?

20      MR. NORINSBERG:  That's precisely the question,

21  yes.

22      THE COURT:  All right.  You understand that?

23      THE WITNESS:  Yes, Your Honor.

24      THE COURT:  What's the answer?

25      THE WITNESS:  I don't believe that, no.

---

1       THE COURT:  You don't believe that he had produced

2   such a document to you?

3       THE WITNESS:  I don't believe he did.

4   Q   Referring to your deposition, page 295, line 3.

5       "Question:  Did you review this record before you

6   introduced it into the grand jury?

7       "Answer:  I may or may not have because it might have

8   been part of a larger group."

9       THE COURT:  All right.  What document does the

10  transcript refer to, counsel?

11      MR. NORINSBERG:  This is Grand Jury 11.

12      THE COURT:  All right.  Where does it say that in

13  the transcript?  You want to get to that because it's not

14  clear to me from that question how you're appropriately

15  impeaching the witness, if that's what you're seeking to do,

16  because you don't make reference to a document.

17      MR. NORINSBERG:  I just read it the way it was

18  asked.

19      THE COURT:  I know.  But without the document, it

20  means nothing so I'll sustain an objection to your doing

21  that unless you can tie it to a document.

22      MR. NORINSBERG:  Okay.  Fair enough.

23  Q   Now, I'd like to direct your attention, if we could, to

24  the "DOS" column.

25      Do you see that?

**JA245**

1    A    Yes.

2    Q    That refers to the date of service; is that correct?

3    A    Yes.

4    Q    The date of treatment for this first Edwin Gonzalez is

5    we're looking at dates in 1998; is that correct?

6    A    Yes.

7    Q    And the second Edwin Gonzalez, we're also looking at

8    1998, aren't we?

9    A    Yes.

10   Q    So for those two Edwin Gonzalezes, the treatment

11   rendered by Dr. Morse was sometime back in 1998, two years

12   before this audit period even began; is that correct?

13   A    Yes, it appears to be.

14   Q    Why would you be presenting evidence of billing that

15   took place two years before the audit even started?

16   A    I mean, thinking back seven years, I couldn't say for

17   sure. I mean, I can hazard a guess.

18   Q    Well, would you agree, Mr. Fusto, that these billings

19   going back to 1998 have no relevance at all to the charges

20   that you were presenting to the grand jury?

21   A    Well, they would have no relevance to the larceny --

22   Q    Yes or no?

23   A    There were other charges on the indictment. I can't

24   answer that question as you posed it.

25   Q    Referring to your deposition, page 296, line 6.

---

1        "Question:  What relevance do billings to these two

2    other Edwin Gonzalezes have with respect to the matter that

3    was being presented to the grand jury?

4        "Answer:  Probably none, but I don't recall.  I

5    actually have no recollection as to what Edwin Gonzalez's

6    utility was in the grand jury.  I don't know the answer to

7    that, any of the Edwin Gonzalezes."

8        Do you recall giving that testimony, sir?

9    A    At the deposition, yes.

10   Q    All right.  So when you were asked what relevance these

11   other Edwin Gonzalezes had, you said, "Probably none,"

12   right?

13   A    I think what I meant was probably none to the larceny

14   charge, which was the main charge.

15   Q    You didn't actually say that in your deposition.  You

16   just said, "Probably none," correct?

17   A    You're right; I didn't say that.

18   Q    Wouldn't you agree that you would have no interest in

19   records that are outside the audit period when you're

20   presenting this?

21   A    No, I wouldn't say that.

22   Q    So just to be clear, would you think it's permissible

23   as a prosecutor to put in records even earlier, let's say,

24   from 1995, '96, '97?  Would that be appropriate to show this

25   grand jury when the audit period is starting in 2000?

---

1    A    Theoretically, yes, it could, but, you know, the

2    patient's testimony wasn't really related to the larceny.

3    It was related to the false filings.

4    Q    Actually, it wasn't related to false filings either

5    because you didn't even have a false filing charge for this

6    Edwin Gonzalez, did you?

7    A    No.

8    Q    You didn't, correct?

9    A    No.

10   Q    So in the end, what happened, if I understand your

11   testimony correctly, you presented a patient Edwin Gonzalez

12   that had no relevance to the false filing charges at all.

13   You presented two more patients that had no relevance to the

14   billing period that was in question for this grand jury, and

15   yet you used that number at the bottom to show that

16   Dr. Morse was overbilling, correct?

17   A    There's a lot in that question.  I'd like to be able to

18   answer that if I may.

19        THE COURT:  I think it is a compound question.

20   There are three different questions there.

21            You want to break it down in fairness to the

22   witness.

23        MR. NORINSBERG:  Sure.

24   Q    You used the billings of two Edwin Gonzalezes from

25   outside the audit period to show how Dr. Morse overbilled,

---

1    true?  Yes or no, sir?

2    A    I guess you can look at it that way, but that's not how

3    it came out.

4    Q    You could look at it that way and this jury possibly

5    could look at it that way as well, correct?

6    A    It's up to the jury.

7        MR. MILLER:  Objection.

8        THE COURT:  I'll sustain the objection.

9    Q    You also introduced testimony from a live witness, the

10   third Edwin Gonzalez, but then it turns out you didn't even

11   present any false filing charges related to this witness at

12   all, correct?

13   A    Correct.

14   Q    So the grand jury actually heard testimony from a

15   witness that had nothing to do with the charges that you

16   were actually pursuing; is that correct?

17   A    That's not correct.  I hadn't made a decision yet as to

18   how many false filings charges I was going to have.

19   Q    You made handwritten notes relating to your false

20   filing charges, didn't you, sir?

21   A    Yes.

22   Q    And you made those before you started the grand jury

23   proceeding, didn't you?

24   A    Not sure.

25   Q    Isn't that what you said in your deposition?

**JA246**

1  A    My recollection about when I wrote out what false
2  filing charges were, it could be before or after.
3  Q    I'd like to show you what's been marked as Plaintiff's
4  Exhibit 62.
5  A    Yes.
6  Q    Do you recognize this document?
7  A    Yes.
8  Q    What do you recognize this document to be?
9  A    These appear to be my handwritten notes of the patients
10  testifying in the grand jury.  The second column appears to
11  be the dates of service -- or I'm sorry; the date of
12  submission by looking at this and then the invoice number.
13  These are related to the false filing charges.
14  Q    And, in fact, the top of the document says false
15  filings on it, right?
16  A    Yes.
17        MR. NORINSBERG:  I offer this document into
18  evidence.
19        MR. MILLER:  No objection.
20        THE COURT:  This is exhibit what, counsel?  I'm
21  sorry.
22        MR. NORINSBERG:  62.
23        THE COURT:  All right.  62 is received.
24        (Plaintiff's Exhibit 62 received in evidence.)
25  Q    When exactly, Mr. Fusto, did you prepare this document?

1  A    I don't know exactly.  I mean, time frame, it would
2  have been certainly in the grand jury, I believe.  I mean,
3  not physically done in the grand jury, but during the
4  presentation I'm assuming by looking at it.
5  Q    Would you agree there's no Edwin Gonzalez listed on
6  there, sir?
7  A    Yes.  There's no charge related to Edwin Gonzalez.
8  Q    Now, in addition to showing overbillings by Dr. Morse,
9  you were also trying to show how Dr. Morse repeatedly billed
10  for the same procedures over and over again, right?
11  A    Yes.
12  Q    And you introduced an exhibit, Grand Jury 7, to make
13  that point, correct?
14  A    Could you help me.
15  Q    Do you have Grand Jury 7 in front of you, sir?
16        MR. MILLER:  44?
17        MR. NORINSBERG:  Yes, Exhibit 44.
18  A    I have it, yes.
19  Q    Now, just looking at the first page relates to patient
20  Sawson Suliman.  I want to direct your attention to the last
21  column, the procedures.
22        Do you see that?
23  A    The procedure description?
24  Q    Yes.
25  A    Yes.

1  Q    And it reads, for example, you have repair or replace
2  broken clasp multiple times; is that correct?
3  A    Yes.
4  Q    In fact, the work that was being done was on separate
5  teeth?  True or not true?
6  A    I don't know.
7  Q    You don't know and the grand jury wouldn't know either
8  looking at this document, correct?
9  A    Correct, not by looking at that document.
10  Q    And, in fact, as you go through the profile, all of the
11  tooth numbers that are in the -- that would have been on the
12  original submissions by Dr. Morse have been removed; isn't
13  that true?
14  A    No, they weren't removed.  They were just not -- I
15  think the auditor explained this.  I asked him to pull
16  information down from the provider profile and he asked me
17  what fields, and those are the fields that I asked for.  I
18  did not ask for tooth number.
19  Q    Do you recall being asked the following question and
20  giving the following answer at your deposition?  Page 281,
21  line 25.
22        "Question:  But somebody had to make the decision to
23  actually exclude the tooth numbers from the documents that
24  were being used as Exhibit 7 in the grand jury, correct?
25        "Answer:  Yes."

1        MR. MILLER:  Objection.
2  Q    Page 282, line 8.
3        "Question:  Some human being made that decision,
4  correct?
5        "Answer:  Sure."
6        MR. MILLER:  Objection.
7  Q    Page 282, line 11.
8        "Question:  Who made the decision to delete the tooth
9  numbers from Exhibit 7 that was used before the grand jury?
10        "Answer:  It could very well have been me."
11        Do you recall giving that testimony at your deposition?
12  A    Yes.
13  Q    So you said at your deposition, somebody made a
14  decision to remove the tooth numbers, and that person very
15  well could have been you, John Fusto, correct?
16  A    Yes.
17  Q    Isn't that what you just said and what I read in your
18  testimony?
19  A    Yes.
20  Q    And you gave that testimony under oath, right, sir?
21  A    Yes.
22  Q    So you admitted under oath that you might well have
23  been the person to decide to remove the tooth numbers from
24  these documents?  True or not true?
25  A    I was absolutely the person who asked Mr. Castillo to

**JA247**

1  create these documents and not put the tooth number on
2  there.
3  Q   You were the person who did that?
4  A   Yes.
5  Q   Absolutely, right?
6  A   Oh, sure, yes.
7  Q   He created the record in accordance with your specific
8  instructions, correct?
9  A   Yes.
10 Q   Now, when Dr. Morse actually submitted his bills to
11 Medicaid, he was required by Medicaid regulations to
12 specifically list the teeth that he did the work on,
13 correct?
14 A   I don't know.
15 Q   I'd like to show you what's been marked as Plaintiff's
16 Exhibit 109.
17 A   Thank you.
18        THE COURT:  Do you have a question?
19 Q   Do you recognize this document, sir?
20 A   No.
21 Q   Well, at your deposition you testified it appeared to
22 be a claim form; is that correct?
23 A   Well, it does appear to be a claim form.  I just don't
24 know who it's for.  It's a standard claim form, yes.
25 Q   For Medicaid?

---

1  A   Yes.  I just don't know who James Strong is.
2  Q   It's a sample form showing a dentist how they have to
3  submit their claims to Medicaid in order to get paid, true?
4  A   It appears to be.
5  Q   And you don't have any reason to doubt the authenticity
6  of this form, do you, sir?
7  A   No.
8        MR. NORINSBERG:  I offer this document in evidence
9  as 109.
10       THE COURT:  Is there any objection?
11       MR. MILLER:  No objection.
12       THE COURT:  All right.  109 is received.
13       (Plaintiff's Exhibit 109 received in evidence.)
14 Q   Now, taking a look at this document, the form --
15       THE COURT:  Is this being offered as a sample
16 Medicaid form?  What is this being offered as?
17       MR. NORINSBERG:  It's being offered as a sample
18 form indicating what information must be inputted by a
19 dentist in order to get paid by Medicaid.
20       THE COURT:  But that's what it is, a sample form?
21       MR. NORINSBERG:  That's correct.
22       THE COURT:  All right.  So I just want the jury to
23 understand what the exhibit is.  It's not a form relevant to
24 this case, correct?
25       MR. NORINSBERG:  Well, it's subject to connection

---

1  through Dr. Morse's testimony, I believe it is relevant.
2  Q   Now, the form asked the dentist to specifically
3  identify the tooth numbers that's involved in the work; is
4  that correct?
5  A   I think it depends on what procedure you're billing
6  under.  Some of them I don't think require a tooth number.
7  Some do, some don't.  I can't tell from the sheet.  I don't
8  know what the procedure codes --
9  Q   Directing your attention to paragraph 29 on the form.
10 Do you see that there, sir?
11       THE COURT:  Paragraph 29?
12       MR. NORINSBERG:  Yeah.  There's form numbers.
13 They are hard to see on that.
14 Q   Do you see where it says the word "tooth"?
15 A   Yes.
16 Q   And where it says the word "tooth," that's a required
17 field for the dentist to put in tooth numbers in order to
18 get paid by Medicaid?  True or not true?
19 A   My understanding is that it depends on the procedure.
20 Q   Referring to your deposition, page 283, line 19.
21 "Question:  So would it be fair to say that a provider
22 such as Dr. Morse would have to specifically identify the
23 tooth number that he had done work on in order to get
24 reimbursed by Medicaid?
25 "Answer:  Yes, that would be correct."

---

1  Page 284, line 3.
2  "Question:  And if, in fact, he did not fill out
3  paragraph 29, which he specifically identifies the tooth
4  number, he wouldn't be able to get paid by Medicaid,
5  correct?
6  "Answer:  I guess not.  That looks like it's a required
7  field."
8        Do you recall giving that testimony, sir?
9  A   I do.
10 Q   Does that refresh your memory that a provider such as
11 Dr. Morse would have to specifically say what tooth numbers
12 he worked on on this form in order to get paid?
13 A   What I was trying to say is that implicit in that is if
14 it's a procedure that requires some work on a tooth but
15 there are other procedures that from my understanding
16 don't -- like a cleaning or something like that doesn't
17 have -- as far as I know, doesn't have a requirement for a
18 tooth.  It's a Medicaid billing issue.
19 Q   You never said any of that in your deposition, did you,
20 sir?
21 A   The way you're phrasing the question, I just wanted to
22 amplify or clarify the answer.
23 Q   You said, quote, "It looks like it's a required field,"
24 correct?
25 A   Okay.  On certain procedures it would be a required

**JA248**

1    field.

2    Q    Would you agree that by removing the tooth numbers from

3    the actual exhibits you showed the grand jury, it was

4    misleading to the grand jury, wasn't it?

5    A    I didn't think so.

6    Q    All the grand jury would see was the same procedures

7    being done over and over again without knowing what work was

8    actually done on different teeth, right?

9    A    I didn't think the tooth numbers in this particular

10   case was relevant.

11   Q    You didn't think that was relevant to your

12   presentation, the tooth numbers?

13   A    No.

14   Q    What you did think was relevant was having an expert

15   come in and testify that Dr. Morse was repeatedly doing the

16   same procedures over and over.  That you thought was

17   relevant, right?

18   A    Yes.  And I think that the -- and you're correct, the

19   documents as presented did seem to confuse probably both

20   myself and Dr. DeLuca.

21   Q    And you used these documents, which you just

22   acknowledged were somewhat confusing, you used that to prove

23   the point to the grand jury that Dr. Morse was repeatedly

24   billing for the same procedures over and over again, right?

25   A    No.  I was trying to use them to show that from a

1    clinical standpoint as they were listed per patient, they

2    didn't really seem to make that much sense from a clinical

3    standpoint.  That was the purpose.

4    Q    But you never actually showed Dr. DeLuca the actual

5    patient charts from Dr. Morse and have her compare that with

6    the billings, did you?

7    A    I'm sorry.  The charts with the billings?

8    Q    You never actually showed Dr. DeLuca the actual charts

9    that Dr. Morse did for these patients and have her look at

10   the work documented in the charts and have her say whether

11   that work was appropriate or not appropriate?  You never did

12   that, right?

13   A    No, I did not.

14   Q    Instead, you used Grand Jury 7, which was not a

15   document, that Dr. Morse created, you used that as a basis

16   for Dr. DeLuca's opinions, correct?

17   A    Well, in a sense Dr. Morse did create that record.

18   Q    Dr. Morse created Grand JURY 7?

19   A    In a sense, yes.

20   Q    Dr. Morse had nothing to do with that document.  You

21   guys created it at Medicaid, didn't you?  Yes or no?

22   A    Dr. Morse's billings, in other words, if Dr. Morse

23   didn't bill for anything, that document would be blank so

24   that's actually information that Dr. Morse provides to

25   Medicaid.

1    Q    Dr. Morse's original billings, every single one of them

2    has a specific tooth number, right?

3         MR. MILLER:  Objection.

4         THE COURT:  Is that a yes?  Do you know one way or

5    the other what his billing records showed as to tooth

6    number?  Do you know the answer to that question?

7         THE WITNESS:  I know the answer to that now and

8    I'm assuming that they did.

9    Q    Now, you didn't feel it was necessary to actually show

10   Dr. DeLuca the actual patient charts that Dr. Morse had,

11   right?

12   A    No.

13   Q    You didn't feel it was important to do that, right?

14   Yes or no?

15   A    No.

16   Q    You actually had the patient charts with you physically

17   in the grand jury proceeding, but you never showed your own

18   expert the charts, right?

19   A    I think if I'm not mistaken, she may have seen some of

20   them.  She clearly didn't see all 200 of them or however

21   many there were.  She may have looked at some of them.

22   Q    Would it be fair to say that you never showed

23   Dr. DeLuca a single patient chart for any of the patients

24   that actually testified before this grand jury?

25   A    Don't remember.

1    Q    Referring to your deposition, page 350, line 14.

2         "Question:  For those particular patients, did you show

3    Dr. DeLuca the actual charts from Dr. Morse and give her an

4    opportunity to compare Dr. Morse's charts with the billings?

5         "Answer:  No."

6         Does that refresh your memory, sir?

7    A    Okay, yes.

8    Q    So according to your deposition testimony, you never

9    showed Dr. DeLuca the actual charts for the patients who

10   testified, correct?

11   A    My recollection, as I sit here today, is I actually

12   don't remember.  At the deposition if I said no, then we can

13   go with one of those.  But I couldn't say for sure that I

14   did.

15   Q    You kept your own expert in the dark, didn't you,

16   Mr. Fusto?

17   A    No.

18   Q    You never showed her the original charts.  You never

19   showed her x-rays.  And you never had her actually examine

20   any of these patients, did you?

21   A    The patients who testified at the grand jury?

22   Q    You never had her examine any of the patients in front

23   of the grand jury, did you?

24   A    In front of the grand jury, no.

25   Q    At any point in time before the grand jury

1  presentation, did you ever have Dr. DeLuca actually examine
2  any of those patients that testified?
3  A    I think two of them may have been.  I'm not sure.  At
4  least one of them was.  It was a different group of
5  patients.
6  Q    I'm going to show you now what's been marked as
7  Plaintiff's 108.
8       Do you recognize that document, sir?
9  A    I recognize what it is.
10  Q    Let me show you 108-B.
11       MR. MILLER:  Your Honor, we don't have the
12  sub-exhibits.  We don't have 108-B.  Do you have a copy?
13  Thank you.
14  Q    Do you recognize 108-B?
15  A    I'm not sure I've seen it before, but I recognize what
16  it is.
17  Q    Okay.  And as a practicing attorney, what are you
18  looking at, sir?
19  A    108-B seems to be a Response to Plaintiff's Third
20  Requests For Admissions.
21  Q    And what's the date on that response?
22  A    It looks like March 17th, 2009.
23  Q    Okay.  And tell me if you understand that a request for
24  admission is something that my office sends to the Medicaid
25  Control Unit and asks them questions whether they should

---

1  admit or deny the information, right?
2  A    Yes.
3  Q    Does that sound right?
4  A    Yes.
5  Q    And 108-B specifically deals with the question of
6  whether or not Dr. DeLuca had examined any patients,
7  correct?
8  A    Yes.
9  Q    And your office was asked to admit or deny whether she
10  examined all of the grand jury patients, right?
11  A    That's the way it looks.
12  Q    If I could have 108-B, please.
13  A    Sure.
14       MR. NORINSBERG:  I offer 108-B into evidence, Your
15  Honor.
16       MR. MILLER:  I'm going to object, Your Honor.
17       THE COURT:  It's a request for admission.  What's
18  the basis?  Let me see you.
19       (Sidebar conference.)
20       (Continued on the next page.)
21
22
23
24
25

---

1       THE COURT:  Which one?
2       MR. MILLER:  I don't know where he got this.  We
3  got 108, which is an updated version.  And this is a
4  different document that may have been a prior version of the
5  request that I just got handed.
6       MR. NORINSBERG:  That's absolutely not true.
7  Completely irrelevant.  This has to do with you updated it
8  because originally you were refusing to turn over any grand
9  jury information.  Then once Judge Levy said you had to, you
10  updated your responses.
11       This is a separate document relating to
12  strictly -- relating to the third set.
13       THE COURT:  Is it on your list?
14       MR. NORINSBERG:  Yes.
15       MR. MILLER:  We never got this.  Certainly it was
16  never transmitted to us.
17       MR. NORINSBERG:  These are your responses.
18       MR. MILLER:  I understand that.
19       MR. NORINSBERG:  They're admissions.
20       THE COURT:  The only question is whether -- the
21  only question is whether it's part of 108 that was
22  identified on the exhibit list.  That's a legitimate
23  complaint that it's not what was on -- which one of
24  these --
25       MR. MILLER:  Okay.  All right.  I'll withdraw the

---

1  objection.  I'm sorry, Your Honor.
2       THE COURT:  So --
3       MR. MILLER:  I'll withdraw the objection.
4       THE COURT:  All right.  So you're just seeking
5  to --
6       MR. NORINSBERG:  I'm going to read out loud to put
7  it into the record the ones that I've highlighted.
8       THE COURT:  Are these people who all testified
9  before the grand jury?
10       MR. NORINSBERG:  Yes.
11       MR. FARBER:  Not true.
12       THE COURT:  Did Mr. Gonzalez testify before the
13  grand jury?
14       MR. NORINSBERG:  Edwin Gonzalez?
15       THE COURT:  Yes.  Everyone confuses me.  I thought
16  you tried to elicit that he didn't testify?
17       MR. NORINSBERG:  He wasn't related to any false
18  filing charges.  He testified, but there were no false
19  filing charges.
20       THE COURT:  All right.  I suppose we need to ask
21  this of the witness, but was the money part of the $1
22  million, the money attributed to Edwin Gonzalez?
23       MR. MILLER:  No, none of it was.  Castillo's
24  analysis is a million dollars.  The total amount for the
25  eight patients who testified was less than 10,000.  If you

**JA250**

1  add the two additional Gonzalezes, it goes up a little over
2  10,000.  Couldn't have formed the basis --
3          MR. NORINSBERG:  They were extrapolated.  They
4  were taking the position that there's -- look at these eight
5  patients.  Here's the billings.  When you look at all of his
6  billings, it was over a million dollars.  It directly
7  connects.  There was no question about it that that was the
8  intent and that was accomplished.
9          THE COURT:  We can talk about this later.
10         So Edwin Gonzalez testified, but a false filing
11 charge was not sought with respect to his testimony?
12         MR. NORINSBERG:  Exactly.
13         MR. MILLER:  Correct.
14         THE COURT:  Okay.
15         (End sidebar conference.)
16         (Continued on the next page.)
17
18
19
20
21
22
23
24
25

1  Q   Do you have the admissions in front of you, sir?
2  A   I do.
3  Q   I'm going to direct your attention to Request for
4  Admission in Response Number 1.  It says, "Linda DeLuca,
5  DDS, never conducted an in-mouth examination of Intisar
6  Ahiri."
7      What's the response?
8  A   It says "Admit."
9  Q   Looking at Number 4, "Linda DeLuca, DDS, never
10 conducted an in-mouth examination of Nassa Ahiri."
11 Response, "Admit."
12     Correct?
13 A   Yes.
14 Q   And by the way, we're talking about witnesses that you
15 were calling at the grand jury; is that correct?  You
16 recognize these names, right?
17 A   I do.
18 Q   Number 7, "Linda DeLuca never conducted an in-mouth
19 examination of Asi Othman."  Response, "Admit."
20 A   Yes.
21 Q   Number 10, "Linda DeLuca, DDS, never conducted an
22 in-mouth examination of Sawson Suliman."  Response, "Admit."
23     Correct?
24 A   Yes.
25 Q   Number 13, "Linda DeLuca never conducted an in-mouth

1  examination of Sara Charles."  Response, "Admit."
2      Correct?
3  A   Yes.
4  Q   "Linda DeLuca never conducted an in-mouth examination
5  of Miriam Perez."  Response, "Admit."
6      Correct?
7  A   That's what it says.
8  Q   That's what it says, correct?
9  A   Uh-huh.
10 Q   Number 19, "Linda DeLuca, DDS, never conducted an
11 in-mouth examination of Stacy Rodriguez."  Response,
12 "Admit."
13 A   Yes.
14 Q   Number 22, "Linda DeLuca, DDS, never conducted an
15 in-mouth examination of Edwin Gonzalez."  Response, "Admit."
16     Correct?
17 A   That's what it says.
18 Q   These were all of the patients who appeared before the
19 grand jury, correct?
20 A   As far as I can remember, yes.
21 Q   You had four years to conduct dental examinations of
22 the patients that you wanted it put on before the grand
23 jury, correct?
24 A   Yes.
25 Q   And yet never once during that four-year period did you

1  ever have your own expert look at the mouths -- inside the
2  mouths of the people who were going to testify in the grand
3  jury, true?
4  A   In review of the documents, I thought I saw in-mouth
5  examinations and I thought that Mr. -- either Mr. Gonzalez
6  or Ms. Perez might have been part of the group that had the
7  in-mouth early on.  So I'm not sure if those two are correct
8  as I sit here.
9  Q   So your office might have admitted to something that
10 you say now is not correct?
11 A   They might have made a mistake.
12 Q   Now, Stacy Rodriguez was one of the people who
13 testified before the grand jury, correct?
14 A   Yes, sir.
15 Q   And you presented evidence relating to the billing
16 records of Stacy Rodriguez, correct?
17 A   I did.
18 Q   Mr. Fusto, if you could please step down for a minute.
19     This was the record the grand jury saw relating to
20 Stacy Rodriguez, correct?
21         MR. MILLER:  Counsel, what exhibit is this?
22         MR. NORINSBERG:  This is Exhibit 44.  It's the
23 Stacy Rodriguez page.
24         MR. MILLER:  Okay.
25 Q   Is that correct?

**JA251**

1   A    It appears to be, yes.

2   Q    When the grand jury was looking at this, they saw nine

3   separate procedures that were all performed on the same day,

4   is that correct, on June 4th, 2002, correct?

5   A    Yes.

6   Q    But, in fact, Dr. Morse only performed three procedures

7   on that day, true?

8   A    I learned, yes.

9   Q    You saw that from the original submission, correct, the

10  vendor statement?

11       THE COURT:  Are you showing him another exhibit,

12  counsel?  Counsel, please, did you show him another exhibit

13  when you talked about the original vendor statement?

14       MR. NORINSBERG:  Yes.

15       THE COURT:  What exhibit did you show him?

16       MR. NORINSBERG:  That was 146 I believe.

17       THE COURT:  Is that in evidence?

18       MR. NORINSBERG:  Yes.

19       THE COURT:  You asked him to compare the two

20  exhibits, correct?

21  Q    Did you have a chance to look at them, sir?

22  A    This is the -- yes, okay.

23  Q    What are we looking at here?

24  A    Is this in evidence?

25  Q    Yes.

---

1   A    What number is it?

2   Q    It's 145.

3   A    As I'm looking at 145 --

4        THE COURT:  I'm sorry, now.  You were showing him

5   145 or 146 because I don't have a 146 --

6        MR. NORINSBERG:  145, Your Honor.

7        THE COURT:  -- in evidence.

8        MR. NORINSBERG:  145.

9        THE WITNESS:  145 appears to be what's called a

10  remittance statement that my understanding is when a

11  provider is paid, the remittance statement is an indication

12  of all the paid services that he has.

13  Q    Okay.  So this comes -- is a document from Medicaid to

14  Dr. Morse; is that correct?

15  A    Yes.

16  Q    And if we look here, we can see June 4th, 2002; is that

17  correct?

18  A    Correct.

19  Q    There were three denture-related services by Dr. Morse

20  on that day; is that correct?

21  A    Yes.

22  Q    But when you showed it to the grand jury, those three

23  services became nine services, correct?  That's a yes or a

24  no, sir?

25  A    Yes.

---

1   Q    The grand jury saw nine procedures under the procedure

2   description for that one day, correct?

3   A    Yes.

4   Q    This information is false, isn't it?

5   A    It's not false.

6   Q    He didn't perform nine procedures.  He performed three.

7   You just told us that, correct?

8   A    Yes.  Actually, he billed for three.

9   Q    When he actually billed, it was three procedures.  What

10  you showed the grand jury was nine.  True or not true?

11  A    As it shows on this document, yes.

12  Q    And if a grand jury were looking at this document and

13  trying to evaluate it, they would be left with the

14  impression that Dr. Morse performed nine separate procedures

15  on that one day, correct?

16       MR. MILLER:  Objection.

17  A    I'm assuming that could be a possibility.

18  Q    And not only was it a possibility, you drove home that

19  point with your expert witness, Dr. DeLuca, didn't you?

20  A    I asked Dr. DeLuca about this particular billings.

21  Q    The very first question you asked her related to these

22  triple billings by Stacy Rodriguez; isn't that true?

23  A    I did.

24  Q    And you brought out the information from Dr. DeLuca

25  that this seemed very unusual that there were all these

---

1   three procedures, three of the same thing over and over

2   again, you brought that out through your expert, right?

3   A    I did.

4   Q    By doing that, it was misleading to the grand jury,

5   wasn't it, sir?

6   A    It was not correct.

7   Q    So if it's not correct, it's misleading, wasn't it?

8   A    I guess if you want to characterize it that way.

9   Q    Okay.  And the grand jury could characterize it that

10  way or this jury could characterize it that way as well?

11       THE COURT:  I'll sustain an objection to anything

12  about this jury doing anything.

13  Q    Can we agree, sir, this is not from Dr. Morse's patient

14  charts, is it?

15       THE COURT:  Which exhibit are you referring to?

16       MR. NORINSBERG:  We're talking 44, last page,

17  Stacy Rodriguez.

18  A    It's not from his charts, no.

19  Q    So what you used to drive home the point that he

20  overbilled Medicaid, you used a document not from his charts

21  and a document that on its face is inaccurate, true?

22  A    Yes.

23  Q    Okay.  You please can resume the stand.

24       Now, you're familiar as a lawyer with the term "subject

25  to connection," are you not?

**JA252**

1  A   Yes.
2  Q   When you offered this document with Dr. DeLuca, you
3  said it was subject to connection, correct?
4          THE COURT:  Which document?
5          MR. NORINSBERG:  We're looking at Number 44, Grand
6  Jury 7.
7  A   That's the six sheets?
8  Q   The one you just were looking at with the Stacy
9  Rodriguez record in it.
10 A   Right.  But that exhibit --
11 Q   It had six patients on it.
12 A   Yes.
13 Q   You offered Grand Jury 7 subject to connection,
14 correct?
15 A   Yes, sir.
16 Q   In plain English, "subject to connection" means you're
17 going to bring somebody later on in the proceeding that will
18 lay the proper foundation so the record can come into
19 evidence, right?
20 A   Yes.
21 Q   But you never did that with Grand Jury 7, did you?
22 A   I think there was some confusion to the markings of the
23 exhibits in the grand jury but eventually either 7 or 11
24 went in.  11 I think had two other sheets, but from I
25 understand what was compiled into 11 was also 7.

---

1  Q   Do you recall giving the following testimony in your
2  deposition, page 285, line 11:
3      "Question:  I am referring to Exhibit A, page 8 of your
4  declaration, line 17.  It says, quote, 'I am going to show
5  Grand Jury Exhibit 7 for identification to Dr. DeLuca.
6  Another witness will be called to formally introduce these
7  into evidence because Dr. DeLuca is not qualified to lay the
8  foundation to these.
9      "Answer:  Yes, okay."
10     Do you recall giving that testimony at your deposition?
11 A   Yes, sir.  Is that the deposition or the grand jury?
12 Q   It's quoting from your grand jury at your deposition.
13 Do you recall that?
14 A   Yes.
15 Q   Okay.  So you promised the grand jury that you were
16 going to call another witness later on to lay a foundation
17 for Grand Jury 7, correct?
18 A   Yes.
19 Q   But you didn't keep that promise, did you?
20 A   I think the witness that I had in mind was
21 Mr. Castillo.
22 Q   You never actually laid a foundation for Grand Jury 7,
23 correct?
24 A   I guess not.
25 Q   So the document we just went through that you

---

1  acknowledged had incorrect information in it that you used
2  with Dr. DeLuca to drive home the point that Dr. Morse was
3  overbilling, that same document you never actually laid a
4  foundation, did you?
5          MR. MILLER:  Objection.
6          THE COURT:  What's the grounds of the objection?
7          MR. MILLER:  Mischaracterization.
8          THE COURT:  Overruled.
9  A   I guess I didn't.
10 Q   Now, you actually wound up misplacing Grand Jury 7;
11 isn't that true?
12         MR. MILLER:  Objection.
13         THE COURT:  Overruled.
14 A   I don't remember misplacing it.  I remember there was
15 some question about -- I remember there was some question
16 about where it was located at some point.
17 Q   Right.  And you testified you had no idea what happened
18 to Grand Jury 7; isn't that true?
19         THE COURT:  You're talking about the original
20 document, Grand Jury 7?
21         MR. NORINSBERG:  Yes.
22 Q   The original Grand Jury 7, you lost that document after
23 you used it during the grand jury proceedings, right?
24 A   Well, at what point in time?
25 Q   At some point after you concluded your grand jury

---

1  proceedings, you lost Grand Jury 7; isn't that true?
2  A   I'm assuming it wound up in a different box.  It may
3  have been removed from the items that were in the grand
4  jury.
5  Q   All the other exhibits that you used in the grand jury
6  stayed in that box, but this particular exhibit with the
7  triple billing, Stacy Rodriguez, that one you lost; isn't
8  that true?
9  A   I don't know the answer to that question.
10     (Continued on the next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JA253**

1  Q    And you were actually asked in this case by a judge,
2  Magistrate Judge Levy, to furnish an explanation as to what
3  happened to this document, correct?
4            MR. MILLER:  Objection.
5            THE COURT:  I'll sustain objection to that.
6  BY MR. NORINSBERG:
7  Q    As you sit here today, do you have any idea what
8  happened to the original Grand Jury 7?
9  A    I'm assuming it wound up in the possession of the
10  Attorney General.
11  Q    But you don't know, do you, sir?
12  A    I have no way of knowing.
13  Q    And, sir, do you know whether the original version of
14  Grand Jury 7 had other triple billing records, just like
15  Stacey Rodriguez's records?
16            MR. MILLER:  Objection.
17            THE COURT:  Sustained to the form.
18  BY MR. NORINSBERG:
19  Q    Do you know whether there were other patient summaries
20  that were included in the original Grand Jury 7 that were
21  shown to the grand jury?
22  A    There were no other patient summaries that were --
23  other than the patients who testified.  The eight -- there
24  were eight sheets, eight patients.
25            THE COURT:  I think the question is, is Grand

---

1  Jury -- I believe we've marked it 44.  That was what's been
2  marked as Grand Jury Exhibit 7, correct?
3            MR. NORINSBERG:  That's correct.
4            THE COURT:  Do you think that Exhibit 44 is the
5  same as the original exhibit that you placed before the
6  grand jury?
7            THE WITNESS:  Yes.
8  BY MR. NORINSBERG:
9  Q    Would you agree that without comparing the original
10  Grand Jury 7 side by side with what appears to be a copy --
11  let me start the question clearly.
12       Would you agree that without comparing the original
13  with the one that you actually have in front of you here
14  today, without comparing those two side by side, you
15  wouldn't know whether they're the same?
16            MR. MILLER:  Objection.
17            THE COURT:  You can answer.
18  A    Within the narrow confines of that question, I would
19  have to say yes.
20  Q    Yes, that you wouldn't know, correct?
21  A    I have no reason to believe that they wouldn't be.
22  Q    But you don't know?
23  A    No.
24  Q    Now, you told the grand jury that Dr. DeLuca was an
25  expert, correct?

---

1  A    Yes.
2  Q    But Dr. DeLuca is not an expert, is she?
3  A    She's an D.D.S., dentist.
4            MR. MILLER:  Objection.
5            THE COURT:  Dr. DeLuca herself has acknowledged
6  that she's not an expert in anything, hasn't she?
7            MR. MILLER:  Objection.
8            THE COURT:  Yeah, I'll sustain the objection.
9  BY MR. NORINSBERG:
10  Q    Would you agree that she has no specialized training or
11  qualifications?
12            THE COURT:  In what?
13            MR. MILLER:  Objection.
14            MR. NORINSBERG:  As a Medicaid provider.
15  A    She wasn't offered for that purpose.
16  Q    And when you presented Dr. DeLuca to the grand jury,
17  you presented her without telling the grand jury that she's
18  actually a paid consultant in your office; isn't that true?
19            MR. MILLER:  Objection.  Relevance.
20            THE COURT:  Sustained.
21  BY MR. NORINSBERG:
22  Q    Now, when it came time to come to trial, you used a
23  different expert; you didn't use Dr. Deluca, correct?
24  A    Correct.
25  Q    So you used Dr. DeLuca's testimony to secure an

---

1  indictment, but you chose not to use her testimony at trial,
2  right?
3  A    Right.
4  Q    And you don't remember why you made that decision,
5  true?
6  A    Could be any number of reasons, but I couldn't cite one
7  specific one.
8  Q    You don't remember, correct, sir?
9  A    All right, I don't remember.
10            THE COURT:  All right, Ladies and Gentlemen, we're
11  going to take a morning recess for 10 minutes.
12            (The jury exited at 11:28 a.m.)
13            THE COURT:  We'll resume in 10 minutes.
14            And if plaintiff or defendant, whoever has a copy,
15  could provide the Court with a copy of Grand Jury Exhibits 7
16  and 11, I would appreciate it.
17            (Whereupon, a break was taken at 11:29 a.m.)
18            (The Honorable Carol Amon takes the bench.)
19            THE COURT:  Do you have the exhibits?
20            MR. MILLER:  I have the exhibits that we marked.
21  (Handing.)
22            THE COURT:  Sorry, I was a little bit delayed.  I
23  had a matter of court business come up.
24            Bring the jury in, please.
25            (The jury entered.)

**JA254**

1    THE COURT:  Ladies and Gentlemen, please be
2  seated.
3    I'm sorry we were a little bit delayed.  It was
4  not counsel's fault.  I had an administrative matter come up
5  that I had to -- I had no choice but to deal with.  Sorry I
6  kept you back there a little longer than usual.
7    Okay, Counsel.
8  BY MR. NORINSBERG:
9  Q   Mr. Fusto, besides putting on Dr. DeLuca, you also put
10  on Mr. Castillo as a witness in the grand jury proceedings;
11  is that correct?
12  A   Yes.
13  Q   Now, as a general rule, you, as the prosecutor, decide
14  which questions you're going to ask; is that correct?
15  A   Of course.
16  Q   And the witness never decides what questions you should
17  ask, correct?
18  A   No.  No, they don't.
19  Q   You agree with that?
20  A   I would agree with that, yes.
21  Q   And you've never experienced a situation where a
22  witness presented you with a list of written questions and
23  answers that should be asked, have you?
24  A   In written form?
25  Q   Yes.

1  A   No.
2  Q   Actually, that happened in this case, didn't it?
3  Q   That someone presented me a list of written questions?
4  Q   And answers.
5  A   I don't recall that.
6  Q   I'd like to put on Plaintiff's Exhibit 21 in evidence.
7  (Exhibit displayed.)
8    Do you recognize this document, sir?
9  A   No.  It appears to be handwritten questions and
10  answers.
11  Q   You go down, there are several pages.  You see
12  questions that are being asked, and then we have answers,
13  right?
14  A   That's what it looks like, yeah.
15  Q   And this goes on for several pages; is that correct?
16  A   I don't have it in front of me; but as you're turning
17  them, I can see that it does, yes.
18  Q   You had some input into the questions that were going
19  to be asked on this document, didn't you?
20  A   No.
21  Q   Referring to your deposition, Page 316, Line 25:
22    "Q  Did you have some input as to what the questions
23  were going to be as they appear on this document?
24    "A  Well, certainly.  When I prepped Jose for what we
25  were going to go through, sure."

1    Do you recall giving that testimony, sir?
2  A   Yeah.  I think I misinterpreted what you said.  If this
3  is a document, it would strike me that this is something
4  Jose would have done.  And when I was preparing him, telling
5  him what questions I was going to be asking him -- I mean,
6  that would be routine -- he was probably writing the
7  questions down and putting his answers down.
8  Q   And you also had some input as to what -- the answers
9  he was supposed to give to the grand jury, right?
10  A   No.  I didn't tell him what the answers were.  He knew
11  what the answers were going to be.  I think he used this as
12  a --
13  Q   Referring to your deposition, Page 317, line 18:
14    "Q  Did you have some input as to what the answers
15  would be as they are reflected on this document?
16    "A  In terms of what he found, no.  But in terms of
17  what the question -- what the question and what the
18  expectation of what his result was from his analysis, sure,
19  of course."
20    Do you recall being asked that question and giving that
21  answer at your deposition?
22  A   Yes.
23  Q   So according to your deposition testimony, you, as the
24  prosecutor, had some input as to what the answers were that
25  would appear on this document; is that correct?

1  A   The answers are what he found.  As I'm preparing Jose
2  for the grand jury, he was nervous.  So as we were going
3  through, these are the questions they're going to ask.  And
4  not these are your answers, but these are your findings,
5  whatever they happen to have been.  So no, I understand what
6  you're saying, but -- and I guess in some regard, that would
7  be true, but it wasn't -- this was for Jose to remember what
8  questions were coming up.
9  Q   And to remember what answers he's supposed to give,
10  right?
11  A   I think to some degree, because there were a lot of
12  numbers that he needed to keep straight.
13  Q   When was this document created, sir?
14  A   I don't know.  I did not create it.
15  Q   Could it have been 2005, 2006?
16  A   I'm --
17    THE COURT:  I'll sustain the objection because the
18  witness has already answered that he didn't know when it was
19  prepared.
20  BY MR. NORINSBERG:
21  Q   Are you familiar with what's known as Rosario material,
22  sir?
23  A   Yes, sir.
24  Q   Rosario material is a statement of a witness who's
25  going to testify at trial, correct?

1  A    That's a prior recorded statement, yes.

2  Q    And prosecutors are obligated to turn over Rosario

3  materials, correct?

4  A    Yes.

5  Q    They must be turned over after opening statements,

6  correct?

7  A    On a judge trial, I think so.

8  Q    And defense counsel has to have an opportunity to use

9  these types of statements in cross-examining a witness,

10  correct?

11  A    That's the idea.

12  Q    Mr. Castillo testified at the criminal action, correct?

13  A    I believe he did, yes.

14  Q    So this document that we're looking at right now should

15  have been turned over to Dr. Morse's defense team, correct?

16         MR. MILLER:  Objection.  Foundation.

17         THE COURT:  Sustained.

18  BY MR. NORINSBERG:

19  Q    You never turned this document over, did you?

20  A    I don't know.

21  Q    If we were to have testimony from Dr. Morse that this

22  document was never turned over --

23         THE COURT:  I'll sustain the objection.  It's not

24  an appropriate question.

25  BY MR. NORINSBERG:

1  Q    Now, you were here yesterday when I questioned

2  Mr. Castillo about one year of checks that were missing?

3  A    Yes.

4  Q    And would you agree, Mr. Fusto, that the checks all

5  would have been in one place in your office when they were

6  received?  Would you agree with that?

7  A    I would assume they would, yes.

8  Q    Would you agree that the checks could not have been

9  accidentally misplaced, a whole year of checks?

10  A    Acci- -- anything's possible.  I don't believe they

11  were.

12  Q    And you previously blamed Dr. Morse for the fact that

13  your office did not have a year of checks during that audit

14  period, correct?

15  A    Well, as I recall, we had asked --

16  Q    My question is:  You previously blamed Dr. Morse for

17  the fact that your office actually misplaced a year of

18  checks; isn't that true?

19         MR. MILLER:  Objection.

20         THE COURT:  Sustained as to form.

21  BY MR. NORINSBERG:

22  Q    Did your office lose one year of checks that Dr. Morse

23  had sent?

24  A    Not to my knowledge, no.

25  Q    Now, you had the power to actually subpoena Dr. Morse's

1  bank records, correct?

2  A    Yes.

3  Q    You could have subpoenaed canceled checks from his bank

4  account, correct?

5  A    Yes.

6  Q    But you never actually did subpoena his bank records as

7  part of your four-year investigation, did you?

8  A    No.  We asked him personally.

9  Q    Now, would you agree that Dr. Morse was facing a

10  mandatory jail sentence because he had been indicted on a

11  B felony?

12  A    He was.

13  Q    So if he was convicted of a B felony, he would have

14  gone to jail without question, right?

15  A    No question.

16  Q    And you knew that when you were presenting your case to

17  the grand jury, correct?

18  A    Yes.

19  Q    And the maximum charges he was looking at could have

20  been anywhere up from five to 15 years in prison, true?

21  A    Theoretically.

22  Q    Theoretically, it could have been five to 15 years,

23  correct?

24  A    I think that's the maximum.  I don't think that

25  actually would have happened, but theoretically true.

1  Q    Now, your belief as a prosecutor is you have to be very

2  careful not to destroy a dental provider's practice until

3  you actually have a finding of guilty, correct?

4  A    It's not my intention to destroy a practice in general.

5  Q    And you have previously said you need to be

6  exceptionally careful before you would do anything that

7  could shut down a dentist's practice, correct?

8  A    I try to keep that in mind, yes.

9  Q    Yet, in this case, Dr. Morse's practice was effectively

10  shut down within five days after this indictment, true?

11  A    I'll accept that date.  I know it was.

12  Q    You were aware of the fact that Dr. Morse's Medicaid

13  practice consisted of a very high percentage of Medicaid

14  patients, correct?

15  A    Yes.

16  Q    And you understood that it would be a substantial

17  impact on his practice to terminate his Medicaid privileges

18  when he had such a large percentage of Medicaid patients,

19  right?

20  A    It wasn't a thought I had at the time, but I guess the

21  net effect would be that would be, yes.

22  Q    It would be a very substantial impact on his practice,

23  right?

24  A    Okay, sure.

25  Q    And Dr. Morse, in fact, repeatedly asked you to please

**JA256**

1  restore his privileges until there was an actual finding at
2  the trial of guilty, right?
3  A   He -- yes, he did make that request.
4  Q   And you said, and I quote, I don't want to hear about
5  your fucking Medicaid number, end quote.  Isn't that true?
6  A   I would have said words to that effect.
7  Q   You did say that, right?  Words that effect, correct?
8  A   Yes.  Would you like to know why?
9  Q   You made a statement that you've just acknowledged
10 telling him that, correct?
11 A   I did say that.  I'm just asking if you'd like to know
12 why.
13 Q   I'm sure Mr. Farber can ask you why, if he feels that's
14 important.
15     Now, apart from the Medicaid termination, Dr. Morse was
16 arrested; is that correct?
17 A   We asked him to surrender at the police precinct.
18 Q   Okay.  And he had to surrender.  His liberty was taken
19 away at that moment in time, correct?
20 A   Yes.
21 Q   And that liberty flowed directly from the indictment
22 which you had secured, correct?
23 A   Yes.
24 Q   And then you notified your boss, Peter Bloch, about the
25 arraignment that was coming up, correct?

1  A   I think he would have known that anyway.
2  Q   But you actually sent him an E-mail to make sure he
3  knew, right?
4  A   He was probably asking, because in that particular --
5  when a person -- we don't go to their house and arrest them.
6  We ask them to surrender, and we usually do it as an
7  appointment; and once they leave the police precinct, then
8  they go to the court.  And it's kind of an open question as
9  to when the actual arraignment is going to happen.  So that
10 E-mail was probably telling him around what time it was
11 going to happen.
12 Q   I'm going to show you what's been marked as Plaintiff's
13 Exhibit 137.  (Handing.)
14 A   Thank you.
15     Okay.
16 Q   Is this an E-mail you sent to your boss, Peter Bloch,
17 on April 5th, 2006?
18 A   Yes.
19 Q   And it describes the impending arraignment; is that
20 correct?
21 A   Yes.
22     MR. NORINSBERG:  I offer this document into
23 evidence.
24     THE COURT:  What Exhibit Number is it?
25     MR. NORINSBERG:  137.

1      MR. MILLER:  Your Honor, can we approach?
2      THE COURT:  Yes.
3      (Sidebar begins.)
4      (Continued on the next page.)

1      THE COURT:  I'm sorry, what is the document?  Are
2  you objecting to the document.
3      MR. MILLER:  Well, it's a late produced document,
4  and it has a comment that Mr. Fusto makes.  It's arguably
5  disparaging to his Legal Aid clients.  We would have moved
6  on 403 grounds to keep that document out.  I don't mind him
7  asking the question.  Maybe we can come up with a redaction
8  solution later on.
9      MR. NORINSBERG:  I mean, to me, the fact that he
10 said that is reflective of his state of mind at that moment
11 in time when he's talking about this.  I think it's directly
12 relevant, and they can redirect him on it.  This is
13 cross-examination.
14     THE COURT:  What's the purpose of this document?
15     MR. NORINSBERG:  To show exactly when the
16 arraignment took place and the fact that he was so
17 dismissive about it, he's making fun of it and joking.  It,
18 to me, is consistent with our entire theory of the case.
19     MR. MILLER:  I think it's unfairly prejudicial.
20     THE COURT:  When did you produce this document?
21     MR. NORINSBERG:  We've been exchanging extra
22 documents last week.  Both sides have been doing this.
23     MR. MILLER:  I think it was over the weekend.
24     THE COURT:  No, I'm not going to permit this
25 document to come in for the purposes of you wanting to argue

1  it.  I don't think that's really a fair argument.  If you
2  want to have him establish the date and time of the
3  arraignment, you can do that.  I'm not going to permit the
4  document in.  Sustain the objection.
5            (Sidebar ends.)
6            (Continued on the next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1  BY MR. NORINSBERG:
2  Q    Looking at this document, does that refresh your memory
3  as to the date on which Dr. Morse was scheduled to be
4  arraigned?
5  A    Yes.  It looks like April 5th.
6  Q    So that's the date when he lost his liberty flowing
7  from this indictment, correct?
8  A    Yes.
9  Q    Now, the case eventually went to trial; is that
10  correct?
11  A    Yes, sir.
12  Q    It went to trial approximately 15 months later,
13  correct?
14  A    July of 2007.
15  Q    And during that approximate 15-month time period, there
16  were multiple court appearances in which Dr. Morse was
17  required by law to attend the criminal proceedings, correct?
18  A    Yes.
19  Q    Now, at your -- at the trial that was held before Judge
20  Walsh, correct?
21  A    Yes.
22  Q    And you gave an opening statement to Judge Walsh in
23  this matter, correct?
24  A    We did.
25  Q    And the purpose of an opening statement is to inform

---

1  the judge of the charges and how you intend to prove them,
2  right?
3  A    Yes.  Legally you have to.
4  Q    And you told Judge Walsh that Dr. Morse had received
5  evidence -- had received overpayment in amounts in excess of
6  $1 million, correct?
7  A    Yes.
8  Q    You promised the judge you were going to introduce
9  proof of that, right?
10  A    Yes, sir.
11  Q    But by the time you actually finished the trial --
12            MR. MILLER:  Objection.
13            THE COURT:  Sustained.
14  BY MR. NORINSBERG:
15  Q    -- would you agree your case had gone from a value of
16  $1 million down to $300,000?
17            MR. MILLER:  Objection.
18            THE COURT:  Sustained.
19            MR. NORINSBERG:  Can we approach, your Honor?
20            THE COURT:  Yes.
21            (Sidebar begins.)
22            (Continued on the next page.)
23
24
25

---

1            THE COURT:  I don't think you should be getting
2  into what happened at the trial.
3            MR. NORINSBERG:  But your Honor, it's directly
4  relevant to how weak this case is.  It's not fair to let
5  them attack -- they're basically attacking all the grounds
6  for suspicion they had for him from day one.  And yet the
7  reality is the trial of this case came and proves our theory
8  of the case.
9            THE COURT:  What theory?
10            MR. NORINSBERG:  That there is fabricated evidence
11  because they didn't have a legitimate case to go to trial
12  with.  That's my theory of the case.  I'm not going to spend
13  a lot time on it, I promise you.  But please allow me just a
14  little latitude, your Honor.
15            THE COURT:  How does it prove your theory of the
16  case?  He didn't put -- were these exhibits put before
17  the -- Grand Jury 7, before the judge?
18            MR. NORINSBERG:  That's the whole point.  He
19  didn't.  He used it to secure the indictment; but when he
20  went to trial, he didn't have any evidence besides these
21  fabricated documents.
22            THE COURT:  But he didn't use these documents.
23            MR. NORINSBERG:  I want to ask him about that too.
24  That's the whole point.  I ask for just a little latitude.
25            THE COURT:  A little latitude is one thing, but

1  unfairly presenting the issues in a way that's not relevant
2  is an entirely different matter.  You can't say I'm just
3  going to ask a few questions.
4        MR. NORINSBERG:  I understand, your Honor.
5        MR. MILLER:  I don't think what happened at trial
6  reflects on his intent or belief as to the merits of this
7  case prior to the trial.  There are events that happened at
8  trial that changed the situation.  If he gets on the stand
9  and the judge finds him not credible, so be it.
10       THE COURT:  And "he" was whom?
11       MR. MILLER:  It's the lab owner of the key Design
12  Dental invoices.  The witnesses get on and can't identify
13  Dr. Morse as the doctor.  If he thinks he has evidence from
14  before the trial -- he did cross-examine them.  But he can't
15  say we're going to trial in federal court, therefore it's
16  frivolous.  Not to mention there were two judicial findings
17  there was probable cause to go to trial.
18       THE COURT:  What is the second?
19       MR. MILLER:  Judge Walsh did and you did.
20       THE COURT:  No.
21       MR. MILLER:  Judge Walsh certainly found probable
22  cause.
23       THE COURT:  When?
24       MR. MILLER:  Reasonable cause.
25       THE COURT:  When?

1        MR. MILLER:  Motion to dismiss the indictment.  He
2  hooked at the grand jury minutes and found probable cause.
3        MR. NORINSBERG:  That has absolutely nothing to do
4  with what we're talking about.
5        THE COURT:  We're not going to retry that case in
6  this courtroom.  That's the problem with this, because then
7  we get into the dental records and everything else.  If you
8  want to ask him did he change his numbers at trial, then --
9  did he present a different number at trial than he presented
10  before the grand jury to suggest he didn't have the
11  evidence, then I'll allow you to ask did he provide a
12  different number at trial.  We're not going to try this
13  case.  It's not fair, because different things happen.  The
14  fact that the case -- that there was a not guilty verdict
15  does not mean, therefore, that the evidence was --
16  appropriate evidence was not before the grand jury.
17       MR. NORINSBERG:  But, your Honor, there is more in
18  the sense that defense counsel has been argue- -- you agreed
19  with him that Mr. Fusto's state of mind is relevant.  Our
20  proof of what happened when he was trying to do it with the
21  jury --
22       THE COURT:  His knowledge is relevant.
23       MR. NORINSBERG:  For example, when he put on two
24  patients that were also grand jury patients and he knew from
25  the records that one of them actually had dentures and he

1  still represented to the court that this patient didn't have
2  dentures, it strains his credibility.  It's about this
3  witness's credibility, and that's the way I'm attacking his
4  credibility, that he knew all along he didn't have a case,
5  and he didn't use the same evidence when he got to trial.
6  He didn't use 7, didn't use 11, didn't present Nu-Life.
7  Didn't present any of those other witnesses, basically, he
8  used to secure the indictment.  He got his indictment.  When
9  it came time for trial, he --
10       MR. MILLER:  He doesn't need trial for any of
11  this.  If he believes Mr. Fusto knew any of the patients had
12  dentures before the grand jury, he should try to
13  cross-examine what evidence there was about that.  I believe
14  that piece of paper does completely not establish that, but
15  he's been using that in this case to suggest that there
16  wasn't one such patient.  If he wants to cross-examine to
17  ask him before the grand jury, that's fine.  There's no
18  reason to go into the trial testimony.  It's undisputed that
19  the patient he's talking about testified at the grand jury.
20  If he wants to talk about state of mind, he can plop the
21  document in front of him -- I don't know that he would've
22  seen it beforehand -- and try to get somewhere.  But what
23  happened at trial is not probative in any way of what he
24  knew before the grand jury.
25       MR. NORINSBERG:  That's for us to argue about.

1  It's credibility, because what he did.  He used --
2        THE COURT:  You're saying he put someone at trial
3  that he also put in the grand jury?
4        MR. NORINSBERG:  Yes.
5        THE COURT:  That was whom?
6        MR. NORINSBERG:  Three witnesses, Miriam Perez,
7  Intisar Ahairi -- three witnesses.
8        THE COURT:  That's two.
9        MR. NORINSBERG:  Swanson Suliman, Intisar Ahairi.
10  One of these witnesses, Miriam Perez, they knew in 2003 she
11  actually did have dentures, but he still represented to the
12  court that this woman did not have dentures.
13       MR. MILLER:  That's that bogus document.  He needs
14  to cross-examine using the purported evidence he has.
15       THE COURT:  Why wasn't this part of your -- if
16  this is he's presenting something false to the grand jury,
17  why wasn't that part of your claim in this case, that that
18  was falsified before the grand jury?  That's not part of
19  your claim.
20       MR. NORINSBERG:  We're not talking about
21  testimonial evidence.  We're talking about fabricated
22  evidence.
23       THE COURT:  Yeah, but --
24       MR. NORINSBERG:  But his state of mind is
25  relevant.

**JA259**

1        THE COURT:  What do you mean, his state of mind?
2        MR. MILLER:  He has that document.  Frankly, it's
3  a bogus document with handwritten scrawl on it.
4        MR. NORINSBERG:  That they gave us, but it's
5  bogus.
6        MR. MILLER:  It doesn't establish what he wants it
7  to establish.  However, if he wants to put it in front of
8  him, he can.  He can have his argument that he allegedly
9  knew that Miriam Perez had dentures before he put her in the
10  grand jury.  If he wants to try that, that's fine.  But
11  going into the trial testimony is not probative of the state
12  of mind prior to the grand jury.  He learned information at
13  trial that may have been different.
14        MR. NORINSBERG:  That's an argument he did make to
15  the jury.
16        THE COURT:  What do you want to bring out that he
17  did at trial?
18        MR. NORINSBERG:  There's three things --
19        THE COURT:  Do you have some other area you can go
20  into so we can talk about this --
21        MR. NORINSBERG:  This is where I am in the cross.
22  I'm at the trial section.  It's not that long.
23        MR. MILLER:  I would note, your Honor, that the
24  trial transcript was not on their exhibit list.  The
25  openings and arguments were for impeaching him, but the

1  argument itself was not on the witness list.
2        MR. NORINSBERG:  The judge made a ruling on it,
3  and we're agreed that we're not offering the transcript
4  itself.  Your Honor, you did say specifically, especially on
5  the dentist with the one-year requirement, that I was
6  allowed to cross him on that.
7        MR. MILLER:  That's a totally different subject.
8        THE COURT:  You can do that.
9        MR. NORINSBERG:  But I'm in the trial.
10        THE COURT:  Just because that's in the trial
11  doesn't mean that all the trial comes in.
12        MR. MILLER:  I know.  But I'm just saying --
13        THE COURT:  If you have something that he said at
14  trial that you can reasonably argue that he knew before
15  that --
16        MR. NORINSBERG:  Okay.
17        THE COURT:  But what is that?  And what would that
18  be?
19        MR. NORINSBERG:  That's Miriam Perez.
20        MR. MILLER:  He didn't put in her testimony
21  though.  He put in his statement.
22        MR. NORINSBERG:  I can ask whether he elicited
23  testimony whether she wore dentures.
24        THE COURT:  What did she testify to at the grand
25  jury?

1        MR. NORINSBERG:  She just testified she was a
2  patient of Dr. Morse and she basically -- that she had her
3  Medicaid number, and I don't think she had any dental
4  treatment or denture treatment.  I don't remember.
5        THE COURT:  She testified to that before the grand
6  jury.
7        MR. NORINSBERG:  I don't specifically remember.
8        THE COURT:  Now, you haven't argued that he put
9  that on as far as testimony before, have you?
10        MR. NORINSBERG:  I can't make that argument
11  legally.  That's not an argument I can make.  I can make, I
12  think, some things that he did in the grand jury relating to
13  evidence that he created before the grand jury.  I can
14  attack that.  I can attack his credibility by the fact that
15  he knew a witness had dentures.  The document existed three
16  years before.
17        THE COURT:  You did question him about putting
18  this witness on before the grand jury, and didn't you know
19  that she, in fact -- you can ask him about.  Why do you
20  have to get into the trial to do that?
21        MR. NORINSBERG:  Because it came up at trial.
22        MR. MILLER:  Because her testimony at trial was
23  extremely involved.  At some point, she says she doesn't
24  have dentures, and then she says she does.  It's just a very
25  muddled group of questions.

1        THE COURT:  I'm not going to let you bring out the
2  trial testimony, her trial testimony.  But I will let you
3  cross-examine about the fact that he -- didn't he understand
4  that she -- before he put her in the grand jury or when he
5  put her in the grand jury, that she didn't have dentures.
6  You can ask about that.
7        MR. NORINSBERG:  Okay.  And you'll let me talk
8  about the change in the numbers which you ruled on before?
9        THE COURT:  You can ask him, I think, on the
10  theory that he should -- if he comes up and puts a different
11  number in the trial, you can ask him, didn't he know that
12  was the number prior to going into the grand jury.
13        MR. MILLER:  Hold on.  The different number at
14  trial is asked after Yushvayev has testified and Judge Walsh
15  decided not to let in the invoices.  So the facts changed.
16  It's just going to be misleading and confusing testimony
17  that he lowered the number.  He didn't go into trial with a
18  different number.  He went into trial with the same number.
19  Yushvayev testifies, Judge Walsh throws out --
20        THE COURT:  So Judge Walsh causes the number to be
21  reduced.
22        MR. MILLER:  Because he, Castillo, couldn't
23  testify about his knowledge --
24        MR. NORINSBERG:  There was another lab.
25        THE COURT:  I thought you were saying that when he

**JA260**

1  went in, he himself took a different position.

2         MR. MILLER:  He took the same position.

3         THE COURT:  If he's not taking a different

4  position, then I'm -- if he's not taking a different

5  position but the judge just determined that he hadn't

6  produced something, that's not appropriate to come before

7  the jury.  That's a very different thing.  I thought what

8  you were saying to me is he himself goes in there and, gee,

9  I never could've proved that.

10        MR. NORINSBERG:  He did.  He made the statement to

11  the judge at the end of the case that he can't make --

12        THE COURT:  Is that because the judge excluded

13  testimony?

14        MR. NORINSBERG:  It's also because he didn't even

15  call the other lab.  He didn't try to get the other lab's

16  numbers in.  There still could've been a big number.

17        THE COURT:  We're not going to try the other case.

18        MR. NORINSBERG:  I'm not.

19        THE COURT:  You are if to answer this we have to

20  go into everything that happened in the case.  If he went in

21  before trial and said I'm not proving this, then I think

22  that that's a different issue.

23        MR. MILLER:  And I think he just read from his

24  statement he said he thought it was over a million dollars.

25        THE COURT:  No, you can question him about the

1  exhibit.  We're not going to retry the case.

2        (Sidebar ends.)

3        (Continued on the next page.)

1  BY MR. NORINSBERG:

2  Q    You had represented at trial that you were going to

3  call patients of Dr. Morse; is that correct?

4        MR. MILLER:  Objection.

5        THE COURT:  Sustained.

6  BY MR. NORINSBERG:

7  Q    One of the patients you called was Miriam Perez; is

8  that correct?

9        MR. MILLER:  Objection.

10        THE COURT:  Sustained.

11  BY MR. NORINSBERG:

12  Q    The three patients you called at trial were also

13  patients who appeared before the grand jury, correct?

14        MR. MILLER:  Objection.

15        THE COURT:  Sustained.

16  BY MR. NORINSBERG

17  Q    Who did you call -- strike that.

18        Did you call Intisar Ahairi as a witness before the

19  grand jury?

20  A    Yes.

21  Q    Did you call Miriam Perez as a witness before the grand

22  jury?

23  A    Yes.

24  Q    And you represented to the grand jury, through

25  questioning of Ms. Perez, that she didn't actually have

1  dentures, right?

2        MR. MILLER:  Objection.

3  A    I didn't represent that.  That's what the witnesses

4  said.

5  Q    But, in fact, you knew from a record in your own file

6  that she did have dentures, didn't you?

7  A    No.

8        MR. NORINSBERG:  I'd like to show the witness

9  what's been marked as Plaintiff's Exhibit 82.  (Handing.)

10  BY MR. NORINSBERG:

11  Q    Do you see that?

12  A    Yes.

13  Q    Is that a document that reflects the results of an

14  in-mouth examination that took place in September of 2003?

15  A    I couldn't say.

16  Q    Well, directing your attention to the third page of

17  this document -- the second page, do you see a patient

18  Miriam Perez anywhere?

19  A    Yes.

20  Q    And would you agree, sir, that Miriam Perez did not

21  have dentures per an examination that your office conducted

22  in 2003?

23        MR. MILLER:  Objection.

24        THE COURT:  Sustained.

25  BY MR. NORINSBERG:

**JA261**

1  Q   Did your office conclude that she actually had dentures
2  in 2003?
3          MR. MILLER:  Objection.
4  BY MR. NORINSBERG:
5  Q   As to your knowledge, sir.
6  A   As to my knowledge, they concluded that she didn't.
7  Q   And what does that document tell you?  Anything
8  different, sir?
9          THE COURT:  Sustained.
10         MR. MILLER:  Objection.
11         THE COURT:  The document is not in evidence.
12         MR. NORINSBERG:  I offer it into evidence.
13         MR. MILLER:  Objection.
14         THE COURT:  Objection sustained.  There's no
15  foundation for the document through this witness.
16  BY MR. NORINSBERG:
17  Q   You told us earlier that you had reviewed some
18  documents that showed some of the patients had been
19  examined, right?
20  A   Yes.
21  Q   You mentioned Edwin Gonzalez, right?
22  A   I believe he might have been in one of the groups.
23  Q   And Miriam Perez was the other one that you mentioned,
24  wasn't it?
25  A   I think she was in there as well.

1  Q   So you were aware of the fact that she had been
2  examined, weren't you?
3  A   Yes.  She had been interviewed as well.
4  Q   And you were aware of the fact of the results of that
5  examination as of September 2003, weren't you?
6  A   I can't say I was aware of it in September of 2003, but
7  I was aware of it at some point.
8  Q   There were no false filing counts for Miriam Perez,
9  were there?
10 A   No, I don't believe so.
11 Q   So this is yet another witness that you put before the
12 grand jury to give testimony when there were no charges or
13 counts relating to her; isn't that true?
14 A   Okay.  Yes.
15 Q   A witness who actually had dentures, you had her come
16 to the grand jury and testify that she didn't have dentures?
17         MR. MILLER:  Objection.
18         THE COURT:  Sustained as to form.
19         You can ask the question another way.  The form of
20 the question is not appropriate.
21 BY MR. NORINSBERG:
22 Q   You presented testimony from Ms. Perez in front of the
23 grand jury and you elicited from her that she did not have
24 dentures, right?
25 A   That's what she said.

1  Q   But in fact, you knew that she did, in fact, wear
2  dentures, but you didn't bring that out to the grand jury?
3  A   I had no way of knowing she had dentures.  She said she
4  didn't.
5  Q   You didn't present a false filing for this patient
6  because she did, in fact, wear dentures, true?
7  A   No, I did not.
8  Q   That had nothing to do with it?
9  A   No.  I can explain if you'd like.
10 Q   Mr. Fusto, you've done many trials in your career,
11 correct?
12 A   Yes.
13 Q   I mean, you're an experienced former prosecutor, right?
14 A   Yes.
15 Q   You've cross-examined many, many witnesses in your
16 career, right?
17 A   Yes.
18 Q   And you understand how the dynamics of
19 cross-examination work, correct?
20 A   Generally, yes.
21 Q   You understand that the person who's cross-examining
22 you gives leading questions, and you understand that the
23 other lawyer will have a chance to give you an opportunity
24 to explain whatever you want to explain, right?
25 A   Fair point.

1  Q   Now, you were here yesterday when we looked at some of
2  the Design Dental records; is that correct?
3  A   Yes.
4  Q   And you were here when we hooked at some of the
5  cross-outs on those records; is that correct?
6          THE COURT:  You mean through the testimony of
7  Mr. Castillo?
8          MR. NORINSBERG:  He heard it.  I'm just using it
9  as a transition.
10 BY MR. NORINSBERG:
11 Q   You were here when that testimony from Mr. Castillo was
12 given yesterday, correct?
13 A   Yes.
14 Q   I'm going to show you now portions of the document in
15 Plaintiff's Exhibit 92.  Do you see the date on that?  Do
16 you see it says July and then the year is next to it?
17 A   Yes.
18 Q   And it seems to have originally said July 2000, but
19 then somebody crossed out the zero and put 1; is that
20 correct?
21 A   It looks like somebody put a 1 through a zero or maybe
22 a zero through a 1.  I can't tell.
23 Q   And again, looking at August 2000, it looks like
24 somebody put a 1 through that as well; is that correct?
25 A   Yes or vise versa.

1  Q   And then on this document, it looks like there was
2  March 2000, and it was changed to 2002, correct?
3  A   Okay.  Yeah, it looks that way.
4  Q   And another one, June 2002, the date has clearly been
5  altered, correct?
6  A   I can't tell what the last digit is.
7  Q   It's either a 2 or a zero, correct?
8  A   Okay.
9  Q   You knew about these alterations in these records,
10 didn't you, sir?
11 A   These are the way they came from the lab.
12 Q   But you looked at them, and you realized there were a
13 number of dates that had clearly been altered on the
14 records, correct?
15 A   It looked like dates had been changed or corrected.
16 Q   Well, as a prosecutor, didn't that raise some concerns
17 in your mind as to whether or not these were legitimate
18 records?
19 A   Well, they were legitimate to the extent that they came
20 from the lab.
21 Q   My question is:  Did it raise any concerns in your
22 mind, seeing these multiple cross-outs and date changes?
23 A   There were a lot in this document that caused me
24 concerns.  Your pointing out of a date change, do I put that
25 into the category?  Yeah, it's probably one of several of

1  them.
2  Q   In fact, you previously described these documents as
3  sloppy, handwritten, lacking detail and incomplete, correct?
4  A   True.
5  Q   And yet you built your whole larceny case on these
6  documents, didn't you?
7  A   We built a big part of it, if not all of it.
8  Q   Did you ever ask your investigator to go back to the
9  lab and find out why these dates had been changed?
10 A   I don't recall.  I know they went back more than once,
11 but I'm not sure why as I sit here.
12 Q   Who changed the dates on these records, sir?
13 A   I could speculate.
14 Q   You don't know?
15 A   No.  I'm assuming the lab.
16 Q   And you were the one presenting this case to the grand
17 jury, right?
18 A   True.
19 Q   And part of your presentation relied on these records
20 to project Mr. Castillo's fraud calculations, correct?
21 A   Not to project.
22 Q   To use these records to make his fraud calculations,
23 true or not true?
24 A   True.
25 Q   Weren't you a little concerned that these records may

1  not actually be legitimate records based on these
2  cross-outs?  Yes or no.
3  A   They were what they were.
4  Q   You had three years to go back and find out what
5  happened here, didn't you?
6  A   Well, when the lab gave us these records, this is what
7  we had to work with.
8  Q   But you never went back to the lab to try to find out
9  what the reason was for this, correct?
10 A   I'm not sure that's true.  I think maybe my
11 investigators went back.  I know they went back more than
12 once.  I don't recall as I sit here what the reason was.
13 But I'm sure it had something to do with getting additional
14 records.
15 Q   Now, these records were not allowed into evidence at
16 trial, correct?
17 A   That's true.
18 Q   The judge found the witness, the lab owner, to not be
19 credible, correct?
20 A   As I recall.
21 Q   Now, apart from Design Dental, Dr. Morse had also done
22 business with Nu-Life labs, correct?
23 A   Yes.
24 Q   And you had actually subpoenaed a witness from Nu-Life
25 to appear before the grand jury, correct?

1  A   I may have.  Perhaps.
2  Q   Nu-Life is part of the evidence that you used to secure
3  an indictment in this case, correct?
4  A   Yes.
5  Q   So it was important enough to use the Nu-Life records
6  also in order to present this to the grand jury, correct?
7  A   I'm sorry, could you repeat that?
8  Q   You felt it was important to present the Nu-Life
9  records also when you were trying to get an indictment,
10 right?
11 A   It was part of the evidence in the grand jury, yeah.
12 Q   But you didn't even attempt to call --
13         MR. MILLER:  Objection.
14 BY MR. NORINSBERG:
15 Q   -- Nu-Life at the time of trial, did you?
16         MR. MILLER:  Objection.
17         THE COURT:  I'll sustain the objection.
18         Can I see counsel at sidebar, please.
19         (Sidebar begins.)
20         (Continued on the next page.)
21
22
23
24
25

1    THE COURT:  Mr. Norinsberg, what about my ruling
2  did you not understand?
3    MR. NORINSBERG:  Judge, I am trying.
4    THE COURT:  Did you not understand my ruling?
5    MR. NORINSBERG:  I'm trying to stay within the
6  confines.
7    THE COURT:  I don't think you calling Nu-Life
8  before the trial -- I did understand your disappointment.  I
9  can understand your view that the court may have erred, but
10 that does not permit you to go back and ask questions that
11 are clearly within the realm of what I said should not be
12 inquired into.
13    MR. NORINSBERG:  What I'm asking, I thought, if I
14 can just explain -- what he failed to try to produce at
15 trial is directly relevant to our fabricated theory
16 evidence.
17    THE COURT:  Didn't I say that we weren't going to
18 go into what happened at trial?
19    MR. NORINSBERG:  We're not going into anything at
20 trial.  I'm just saying he didn't attempt to do it.  He
21 didn't try to bring in Grand Jury 7 or 11.  Why can't I do
22 it?  It's a fabricated evidence case.  He used it to secure
23 an indictment.  Once he secured the indictment, he didn't
24 even try to use the records again.  It's my theory of the
25 case.

1    THE COURT:  First of all, the Nu-Life records are
2  not part of your claim of fabrication.  Now, so now you're
3  asking can he put before this jury that he didn't put Grand
4  Jury 7 before the court and didn't put Grand Jury 11 before
5  the court?
6    MR. NORINSBERG:  Yes.
7    THE COURT:  On the theory that he knew they
8  were --
9    MR. NORINSBERG:  Exactly.
10   THE COURT:  They were wrong?
11   MR. NORINSBERG:  Exactly.
12   THE COURT:  Why can't he be permitted?
13   MR. MILLER:  We never put in the entire file
14 because they only had three witnesses.
15   THE COURT:  Did he put in any of it?
16   MR. MILLER:  I think he had -- you know, it's so
17 fallen apart by the end.  I think he had Castillo testify --
18   THE COURT:  I'll allow him to ask if he put Grand
19 Jury 7 or 11 before the judge.  I'll allow that question.
20   (Sidebar ends.)
21   (Continued on the next page.)
22
23
24
25

1  BY MR. NORINSBERG:
2  Q    Now, at trial, Mr. Fusto, you didn't even attempt to
3  introduce Grand Jury 7 as an exhibit at trial, did you?
4  A    I don't believe so, no.
5  Q    You didn't attempt to introduce Grand Jury 11 at trial,
6  did you?
7  A    I don't believe so.
8  Q    So you used Grand Jury 7 and 11 to secure the
9  indictment; but when it came time to actually presenting a
10 case at trial in front of a judge, you didn't use either of
11 those records, correct?
12 A    Well, if you're referring --
13 Q    Is that correct?
14 A    Okay.
15   THE COURT:  I'm sorry.  Is "okay" yes?
16   THE WITNESS:  Yes.  I'm sorry, your Honor.
17 BY MR. NORINSBERG:
18 Q    During the grand jury presentation, there was no judge
19 present when you were making your presentation; is that
20 correct?
21 A    That's correct.
22 Q    And there was no defense attorney present, was there?
23 A    No, sir.
24 Q    There was no one to cross-examine any of the witnesses,
25 right?

1  A    No, sir.
2  Q    No one to point out any possible problems with the
3  documents that you were using, right?
4  A    No, sir.
5  Q    No one to rule on the admissibility of the documents,
6  right?
7  A    No, sir.
8  Q    It was just you and the grand jury, right?
9  A    Yes.
10 Q    You learned at some point about the verdict in this
11 case, correct?
12 A    Yes.
13 Q    And it didn't surprise you, correct?
14 A    It did not.
15 Q    It didn't surprise you because it was a weak case,
16 true?
17   MR. MILLER:  Objection.
18   THE COURT:  I'll sustain the objection.
19 BY MR. NORINSBERG:
20 Q    Have you, yourself used the term that it was a weak
21 case?
22   MR. MILLER:  Objection.
23   THE COURT:  Ladies and Gentlemen, let me excuse
24 you for the luncheon recess.  We're going to have to take a
25 little longer lunch today.  We'll resume at two.  I'm

1  letting you go a little early for lunch, and we'll resume at
2  two.
3          (The jury exited at 12:43 p.m.)
4          THE COURT:  Okay, Mr. Fusto, you can step down.
5          Mr. Norinsberg, when was this statement made that
6  it was a weak case?
7          MR. NORINSBERG:  At his deposition.
8          MR. MILLER:  Which is after the trial, obviously.
9          MR. NORINSBERG:  So what?  He acknowledged that it
10  was a weak case.  Why can't I cross-examine him on that?
11  That's my whole point.  It was a weak case.  That's why he
12  had to falsify evidence.  It's an admission.
13          THE COURT:  So the statement that it was a weak
14  case, that didn't refer to any particular period of time?
15          MR. NORINSBERG:  I'm not sure I understand the
16  Court's question.
17          THE COURT:  Let me see you at sidebar then.
18          (Sidebar begins.)
19          (Continued on the next page.)
20
21
22
23
24
25

1          THE COURT:  In other words, when you asked him the
2  question was it a weak case, you didn't specify a particular
3  time period?
4          MR. NORINSBERG:  Well, the question was asked in
5  the context first, did you learn of the acquittal?  Yes, I
6  did.  Were you surprised by the verdict?  No, I wasn't.  Why
7  weren't you surprised?  Because it was a weak case.
8          MR. FARBER:  No, that's not what he said.  He
9  said, "Because the case at trial was weak as it came out.
10  It happens."
11          THE COURT:  Well, then --
12          MR. NORINSBERG:  Why can't I as an --
13          THE COURT:  Because the problem with it is this:
14  If he had said it was a weak case and the weak case was in
15  the context of, you know, before he started the trial all
16  along, then I grant you, that's a fair subject of
17  cross-examination.  But to the extent that he's saying it's
18  a weak case because the judge excluded evidence, I don't
19  think -- and that's specifically the context in which he
20  said it, I don't think it's a fair area of
21  cross-examination.
22          MR. NORINSBERG:  Okay.
23          Let me just say, your Honor, he also said in his
24  declaration that the evidence wasn't as strong as we
25  anticipated, that we unquestionably made a number of

1  mistakes.  I mean, this is where --
2          THE COURT:  What declaration?
3          MR. NORINSBERG:  He submitted a declaration in the
4  summary judgment motion, which I'm planning to cross him on.
5          Can I ask him -- without referencing as to a prior
6  statement, just ask him, sir, in your opinion, was this a
7  weak case?  And just ask him that.  Can I ask him that
8  question?
9          THE COURT:  You can ask him whether he believed it
10  to be a weak case, but you can't impeach him with that.
11          MR. NORINSBERG:  Okay.  Fair enough.
12          MR. MILLER:  And I think he should clarify at what
13  time.
14          MR. NORINSBERG:  I think you should do that on
15  redirect.
16          THE COURT:  He can ask whether he thought it was a
17  weak case.  It's just not fair to impeach him with that
18  statement.  I'll see you fellows at 2:00 p.m.
19          (Sidebar ends.)
20          (Continued on the next page.)
21          (Whereupon, a break was taken.)
22
23
24
25

1          THE COURT:  All right.  Are we ready to proceed,
2  Gentlemen?
3          MR. MILLER:  I think we have an issue that we
4  wanted to discuss in terms of scheduling.
5          THE COURT:  Do we need to discuss it now or can we
6  bring the jury out?  We're already a little late which is
7  not your fault, it's mine, but ...
8          MR. MILLER:  It concerns the witness order.
9  Mr. Serra and Mr. Flynn are not available tomorrow so we
10  were hoping to switch to them this afternoon.
11          THE COURT:  You mean, interrupt the testimony of
12  this witness?
13          MR. MILLER:  Yes.
14          MR. NORINSBERG:  What they had proposed earlier
15  was when I'm done with this witness, instead of them doing a
16  direct, I would go right into Serra, which I agreed to do.
17          THE COURT:  Is that what you want to do?
18          MR. MILLER:  I hope we can get it all in, but I
19  wanted to make it clear that we have an issue.
20          THE COURT:  What is the problem?  Why can't they
21  be here tomorrow?
22          MR. MILLER:  My understanding is it's Investigator
23  Flynn's retirement party tomorrow and he can't make it.
24          THE COURT:  All day long?
25          MR. MILLER:  I believe he's coming in the

1  morning making the rounds and then there's a lunch that
2  starts at 1:00.  And he's going to be, you know, in with his
3  wife and making the rounds throughout the office and then
4  having his party.
5       THE COURT:  How long is his testimony?
6       MR. NORINSBERG:  Which witness?
7       THE COURT:  Serra.
8       MR. NORINSBERG:  Probably 30 minutes.
9       THE COURT:  Well, we have to end at 5:00 because
10  we have a juror who has to go to school so I don't know how
11  you want to proceed.  Flynn is not a problem, I take it,
12  right?
13       MR. MILLER:  It's Flynn's retirement party
14  tomorrow.
15       THE COURT:  Well, what's Serra's problem?  I
16  thought Serra had to return.
17       MR. MILLER:  Well, he is going to the retirement
18  party, too.
19       THE COURT:  Do they want to have it here this
20  afternoon?
21       MR. MILLER:  I'm sorry, your Honor.
22       THE COURT:  I don't know what to tell you.  You
23  want to -- what you want to do is finish up with this
24  witness.  You'll forego cross-examining him at that point.
25  I don't know that we're going to get two more witnesses in.

1  How much longer do you have?
2       MR. NORINSBERG:  Probably an hour.
3       THE COURT:  A what?
4       MR. NORINSBERG:  An hour.
5       THE COURT:  An hour with this witness, with Mr.
6  Fusto?
7       MR. NORINSBERG:  Probably.  Maybe it's less.  I
8  don't know.
9       THE COURT:  Can we --
10       MR. MILLER:  Investigator Flynn is having dental
11  work done on Thursday.  So Serra is available on Thursday,
12  but Flynn is not.  Flynn is not available the next two days.
13  I can ask again.  I've asked repeatedly.
14       THE COURT:  Well, the event doesn't start until
15  lunch, correct?
16       MR. MILLER:  Yes.
17       THE COURT:  Well, then, they need to be here in
18  the morning if we don't finish up.
19       MR. MILLER:  Okay.
20       THE COURT:  But you do want to follow
21  with -- you'll end -- you want to finish Fusto and then --
22       MR. NORINSBERG:  I'll put Serra right on.
23       THE COURT:  Okay.  Let's move then.
24       We could also start at 9:00 tomorrow.
25       MR. MILLER:  That's fine with us, your Honor.

FUSTO - DIRECT - NORINSBERG

1       THE COURT:  Okay.
2       (Jurors enter the courtroom.)
3       THE COURT:  All right.  Please be seated.  We're
4  ready to begin.
5  DIRECT EXAMINATION (CONTINUED)
6  BY MR. NORINSBERG:
7  Q    Good Afternoon, Mr. Fusto.
8  A    Good afternoon.
9  Q    Mr. Fusto, in this civil case you submitted a
10  declaration; is that correct?
11  A    I believe so, yes.
12  Q    Now, a declaration is the same as an affidavit,
13  correct?
14       MR. MILLER:  Objection.  He needs to ask
15  questions, not ask about a declaration.  It's not a --
16       THE COURT:  I'm not sure I understand the
17  objection.  Overruled.
18  Q    A declaration is the same as an affidavit, correct?
19  A    I would agree with that.
20  Q    In other words, it's a sworn statement that's made
21  under penalty of perjury, correct?
22  A    Yes.
23  Q    And you submitted this affidavit in order to get this
24  case thrown out, true?
25  A    No.  I was asked to sign an affidavit -- a declaration.

FUSTO - DIRECT - NORINSBERG

1  Its purpose, I don't know what that was.
2  Q    You didn't understand that you were trying to get this
3  case thrown out?
4  A    You'd have to ask my lawyers what the process was.
5  Q    You know what a motion for summary judgment is, right?
6       MR. MILLER:  Objection.
7  A    Okay, yes.
8  Q    And you knew that your affidavit was being used in
9  connection with that motion for summary judgment, didn't
10  you?
11       MR. MILLER:  Objection.
12  A    I'm not sure.  I just remember getting the affirmation.
13  Q    Okay.  I'm going to show you now what's been marked as
14  Plaintiff's 72.
15       Thank you.
16  Q    Do you recognize that document, sir?
17  A    Yes.
18  Q    Directing your attention to the last page of that
19  document, do you see where it says, "I declare under penalty
20  of perjury"?
21       Do you see that paragraph?
22  A    Yes.
23  Q    And do you see your signature below that paragraph?
24  A    Yes.
25  Q    So by signing that document, you were attesting that

1   everything that you put in that document was true, correct?
2   A    As I knew it, yes.
3   Q    And you made that representation as a lawyer and former
4   prosecutor understanding that it was essential to tell the
5   truth in your affidavit, right?
6   A    Yes, sir.
7   Q    Now, in your affidavit, you referred to the fact that
8   Dr. Morse's failure to keep prescriptions for more than one
9   year was a deliberate and unjustified destruction of
10  records.  That's what you wrote, correct, sir?  Paragraph
11  33, page 18.
12  A    Yes.
13  Q    In fact, Mr. Fusto, your own expert at the criminal
14  trial testified that a dentist is allowed to discard his
15  prescriptions after just one year; isn't that true?
16  A    He did.
17  Q    In fact, you as the prosecutor actually elicited from
18  your expert witness this fact, right?
19  A    I did.
20  Q    So you knew from that trial that a dentist was
21  absolutely permitted to discard prescriptions after one
22  year, correct?
23       MR. MILLER:  Objection.
24       THE COURT:  Overruled.  He can answer it.
25  A    I didn't believe this law applied to Medicaid

1   providers.  They are required to keep records for six years.
2   Q    You actually brought a Medicaid fraud prosecution,
3   correct?
4   A    Yes, sir.
5   Q    In that fraud prosecution, you produced an expert in
6   order to help prove that Dr. Morse was guilty of Medicaid
7   fraud, right?
8   A    Yes.
9   Q    Your own expert said that all he has to do is keep it
10  for one year, true?
11  A    When he was shown that law, yes.
12  Q    Do you recall the actual questions and answers that
13  Dr. Golieber gave?
14  A    I don't, I'm sorry.
15  Q    Referring to the testimony, page 18.
16       "Question:  Are you familiar with state education law
17  regarding the retention of prescriptions by the dentist?
18       "Answer:  Yes.  The prescriptions that you write to the
19  laboratory are kept for a period of one year.
20       "Question:  Under the law, the actual physical original
21  or whatever is used in that transaction would only need to
22  be kept for one year; is that right?
23       "Answer:  Yes."
24       Do you recall eliciting that testimony from your own
25  expert at the criminal trial?

1   A    Yes, sir.
2   Q    Do you recall the following testimony at the criminal
3   trial, page 24:
4        "Question:  Now, after that one year, what can a
5   dentist do with those documents?
6        "Answer:  Whatever they want.
7        "Question:  So if a dentist saw a patient in 2000, am I
8   correct to say in 2001 he could throw them out?
9        "Answer:  He could.
10       "Question:  And if he saw a patient in 2001, he can
11  dispose of them in 2002?
12       "Answer:  Yes.
13       "Question:  And if he saw a patient in 2002, he can
14  dispose of them in 2003?
15       "Answer:  The lab prescription, yes.  The patient's
16  records, it's on the patient's records also."
17       Do you recall that testimony?
18  A    Yes, sir.
19  Q    So when you represented in your affidavit under oath
20  that Dr. Morse had deliberately destroyed his prescriptions,
21  that statement was a misstatement and it was false, wasn't
22  it?
23  A    I don't believe so, no.
24  Q    Your own expert said that what Dr. Morse did is what he
25  does himself; isn't that true?

1   A    I don't recall him saying that.  I recall him
2   recounting that that's what that education law section said.
3   Q    Okay.  Referring to the same transcript, page 18.  The
4   question of Dr. Golieber, the dental expert.
5        "Question:  Typically, where would a practitioner keep
6   a copy of that?
7        "Answer:  I kept mine in a file cabinet.  You know,
8   it's only a draw for lab receipts."
9        Do you recall that testimony?
10  A    I don't recall it specifically, but I assume you're
11  reading correctly.
12  Q    Okay.  Because in your affidavit, you were also
13  suggesting that it was improper for Dr. Morse to keep the
14  prescriptions in any place other than the actual patient
15  chart, right?
16  A    I'm sorry.  Where are you seeing that?
17  Q    In paragraph 22.
18  A    I'm sorry.  Where are you reading in 22?
19  Q    When you referred to it as being absurd and ridiculous
20  Dr. Morse's reasons for not having the prescriptions in the
21  same place as the chart, isn't that what you were saying,
22  Mr. Fusto?
23       THE COURT:  I don't think that question's clear.
24  You want to try and restate it.
25  Q    Weren't you suggesting in paragraph 22 that it was a

1  ridiculous -- Dr. Morse's explanation was ridiculous for the
2  reasons why he kept his prescriptions in a separate area
3  from where the files were, the charts?
4  A  I'm not seeing where you're saying -- where it says
5  that keeping them in the charts was not -- keeping them in
6  the charts was absurd.  I said his reasons for not keeping
7  them were absurd.  I just don't recall in here, unless I'm
8  missing something.
9  Q  Okay.  And the reason you thought it was absurd was
10 because you believe that a dentist has to maintain the
11 actual prescriptions for six years; is that correct?
12 A  Yes.
13 Q  And you wrote that on your affidavit, too, right?
14 A  Yes.
15 Q  Your own expert didn't testify to that, did he?
16 A  I didn't ask him about the Medicaid billing
17 regulations.
18 Q  You never once brought up any requirement of six years
19 with your dentist expert, did you?
20 A  Not with that witness, no.
21 Q  Not with any witness at the grand jury proceeding and
22 not with any witness at the trial, true?
23 A  About the keeping records?
24 Q  Yes.
25 A  Under Medicaid regulations?

1  Q  Yes.
2  A  I don't recall in the grand jury.
3  Q  And you don't recall in the grand jury, and you never
4  brought that out in trial either; is that correct, sir?
5  A  I think my expectation was I was probably going to
6  bring it out with another witness.  I knew it was an issue
7  so it was going to be explained somewhere down the line.
8  But at that point, it was probably another official from DOH
9  that was going to mention that.
10 Q  Well, the doctor that you called was an expert dentist
11 testifying about what the requirements were for Dr. Morse,
12 correct?
13 A  Well, I asked him --
14 Q  Is that correct, sir?
15 A  Not in completeness.  I asked him about the education
16 law.
17 Q  And you didn't ask him about any other regulation,
18 right?
19 A  I did not.
20 Q  Now, the fact is that your own expert said as long as
21 the dentist puts in his chart what the prescription is,
22 that's sufficient; isn't that true?
23 A  As long as he puts in the chart what the prescription
24 is?
25 Q  Yes.  As long as he details in the chart what the

1  prescription is, that's all he's required to do; isn't that
2  true?
3  A  I don't recall Dr. Golieber saying that.  I mean, I
4  don't have the transcript in front of me, but --
5  Q  Referring to Dr. Golieber's testimony, again, page 18.
6  "Question:  Under the law, the actual physical original
7  or whatever is used in that transaction would only need to
8  be kept for one year; is that correct?  Is that right:
9  "Answer:  Yes.
10 "Question:  Typically, where would a practitioner keep
11 a copy of that?
12 "Answer:  I kept mine in a file cabinet.  You know,
13 it's only a draw for lab receipts."
14 Page 19, line 15.
15 "Question:  And if he saw a patient in 2002, can he
16 dispose of them in 2003?
17 "Answer:  The lab prescription, yes.  The patient's
18 records, it's on the patient's records also.
19 "Question:  It's on the patient's record written in,
20 not with a prescription?
21 "Answer:  Right.
22 "Question:  So you would have to look at the actual
23 patient record in order to see what the prescription was?
24 "Answer:  Yes."
25 Do you recall your own expert giving that testimony?

1  A  Yes.
2  Q  So in this case, you had 329 charts of Dr. Morse's,
3  correct?
4  A  About.
5  Q  Yet you never once actually looked inside of his charts
6  to see what the prescriptions were that were written there;
7  isn't that true?
8  A  No.  We looked for the prescriptions.
9  Q  You never actually looked inside the chart to see what
10 the prescription was that had been written into the true;
11 isn't that true?  Yes or no?
12 A  Your question assumes too much.  You're assuming that's
13 what's written in the chart would have been what's written
14 on the prescription?
15 Q  And assuming that Dr. Morse presents evidence in this
16 trial of those charts which actually contain the
17 prescriptions written into the chart --
18 THE COURT:  That question's inappropriate.
19 Q  Would you agree, Mr. Fusto, that all you had to do in
20 the last -- in the four years you were conducting this
21 investigation, all you had to do was actually open up
22 Dr. Morse's patient chart and look at the prescription
23 entries that were written into the chart to figure out what
24 the prescriptions were?  Would you agree with that, yes or
25 no?

1  A    I would not agree with that.

2  Q    Now, in your declaration, you also say that Dr. Morse

3  should have had prescriptions for at least one year prior to

4  when the first records were demanded; is that correct?

5  A    Where are you reading?

6  Q    Paragraph 12.

7  A    I'm sorry.  Could you point out where here.

8  Q    It's about the sixth line.

9  A    Six from?

10 Q    From the top on page 7.  And it says he should have at

11 least produced records for at least the one-year period

12 prior to the first records demand.

13      Do you see that?

14 A    Yes.

15 Q    Okay.  So your claim was Dr. Morse should have at least

16 had one year of prescriptions; is that correct?  That's what

17 you wrote in the affidavit, right?

18 A    I'm assuming, yes.

19 Q    Well, it's right there in front of you, sir, isn't it?

20 A    Yeah, I'm reading it.

21 Q    Can we agree, Mr. Fusto, that the first time you even

22 asked for prescriptions from Dr. Morse was in 2004?

23 A    I don't recall the exact time we asked for his

24 prescriptions.

25 Q    Referring to your deposition, page 130, line 4.

1      "Question:  We also looked at a document previously

2  that indicated the first time that you had requested by way

3  of subpoena that Dr. Morse furnish prescriptions was in

4  April of 2004, correct?

5      "Answer:  Yes."

6      Do you remember giving that testimony?

7  A    I remember.  I'm not sure it's correct, though.  I

8  don't know the exact time that we did.  All I know is that

9  we did.

10 Q    You actually wasted two years of the investigation

11 before you even asked for the prescriptions from Dr. Morse;

12 isn't that true?

13 A    You can characterize it as you want.

14 Q    You spent 2002, 2003, you never asked him for it.  You

15 waited until 2004, correct?

16 A    As I said, as I sit here today, I don't recall exactly

17 when.  If you have a basis to say that, I'll accept that.

18 Q    Now, when Dr. Morse furnished you with the original set

19 of charts in October 2002, did you ever follow up with him

20 and say, hey, we have the charts but what about the

21 prescriptions?

22      Did you ever do that, Mr. Fusto?

23 A    I don't think so.  I'm not sure.

24 Q    You never did?

25      THE COURT:  Can I ask you a preliminary question.

1  Did he, in fact, provide you with all of his charts in '02?

2      THE WITNESS:  The charts that we asked for, yes,

3  he did.

4      THE COURT:  Okay.

5  Q    Now, you also waited two years until 2004 before you

6  asked the labs for prescriptions; isn't that true?

7  A    Before we asked the labs for prescriptions?

8  Q    Yes.

9  A    Probably.  That's about right.

10 Q    The first time you asked for the labs to furnish

11 prescriptions would have been February of 2004 or after,

12 correct?

13 A    Okay, yes.

14 Q    Would you agree with that, sir?

15 A    I agree with it.

16 Q    And by the time you got around to asking the labs for

17 the prescriptions, they didn't have them anymore either,

18 right?

19 A    They did not.

20 Q    Would you agree, sir, by early 2004 your case had

21 reached a dead end?  Would you agree with that?

22 A    I wouldn't say dead end.  Let me finish.  It was a case

23 that was going to be difficult to work with because we did

24 lack essential records.  For whatever reason, we lacked

25 essential records.

1  Q    They were essential, right?

2  A    Well, if you're going to --

3  Q    That's the word you just used, right?

4  A    I would say records of invoices and prescriptions would

5  have been essential.

6  Q    Okay.  So let's say as of early 2004, you had no

7  prescriptions from Nu-Life, you had no prescriptions from

8  Design Dental, you had no prescriptions from Dr. Morse.  You

9  were missing 11 months of invoices from Design Dental.  You

10 were missing eight months of invoices from Nu-Life.  The

11 Design Dental records were altered.  And the Nu-Life records

12 didn't even describe any procedures at all?

13      MR. MILLER:  Objection.

14      THE COURT:  Sustained.  Sustained as to the form

15 of the question.

16 Q    Would you agree, sir, that internally in your office

17 you had recognized that the clear problem in this case as of

18 February 2004 was --

19      MR. MILLER:  Objection.

20 Q    -- invoices or lack thereof?

21      THE COURT:  I don't understand.

22      MR. MILLER:  No foundation.

23      THE COURT:  You want to --

24      MR. NORINSBERG:  I have a good-faith basis.

25      THE COURT:  I'm sorry.  Would you just ask the

1  question again.
2  Q   Would you agree that as of February 2004, your office
3  internally recognized that you had a problem in this case
4  because of the lack of invoices?  Would you agree with that,
5  sir?
6  A   I don't know what you mean by my office internally.
7  Q   Well, you worked at the Medicaid Fraud Control Unit,
8  right?
9  A   Yes.
10 Q   You were the head of the investigative team, right?
11 A   Yes.
12 Q   You recognized that as of February 2004, you had a
13 problem due to the invoices or the lack thereof, correct?
14 A   It was a hurdle that was -- we were struggling to
15 figure out.
16 Q   It was the clear issue in your case at that point, the
17 clear problem; is that correct?
18 A   I wouldn't say that.  I would say that it was a
19 problem.
20 Q   Okay.  I'm going to show you now what's been marked as
21 Plaintiff's Exhibit 2.
22 A   Okay.
23 Q   Do you recognize this document, sir?
24 A   No.
25 Q   You were asked questions about this document at your

1  deposition, were you not?
2  A   No.  I recognize the document.  I don't know what it
3  is, though.
4  Q   Okay.  Does that document in any way refresh your
5  memory as to the fact that in February of 2004, the clear
6  problem in the case was the invoices or lack thereof?
7      MR. MILLER:  Objection.
8      THE COURT:  Overruled.  He can answer.
9  A   The only thing I can say is that someone wrote that
10 here.
11     THE COURT:  No.  The document's not in evidence.
12 Don't refer to what's in the document.  Either it refreshes
13 your recollection or it doesn't.
14     THE WITNESS:  I'm sorry, your Honor.  It doesn't
15 refresh my recollection.
16 Q   Now, in your affidavit, you also take issue with the
17 claim that there were missing invoices; is that correct?
18 A   Yeah.  There were missing invoices.
19 Q   Well, in your affidavit you suggest that it was
20 misleading for plaintiff to claim that there were missing
21 invoices, didn't you?  Directing your attention to page 6,
22 the line right above paragraph 11.
23 A   I see it.  Yes, okay.
24 Q   So you suggested in this sworn affidavit that plaintiff
25 was making a misleading claim by suggesting there were

1  missing invoices, right?
2  A   Sorry.  I just want to read this.
3      I'm sorry.  Could you just repeat the question one more
4  time.
5  Q   In your affidavit, you were claiming that the plaintiff
6  was making a misleading claim by suggesting that these
7  invoices were missing?
8  A   That's what it says here, yes.
9  Q   And you then further explained that what the term
10 "missing invoices" really meant was simply the nonexistence
11 of records, right?
12 A   Yes.
13 Q   In other words, you were claiming that the invoices
14 were not really lost, they were, rather, never existed in
15 the first place.  Is that your testimony?  Is that what you
16 were saying?
17 A   That was our theory.
18 Q   Sir, you yourself believed that Design Dental had not
19 given you a complete set of invoices, didn't you?
20 A   I not only -- they did not give us -- Design Dental,
21 that was -- as I recall they did not give us a complete set
22 so yes.
23 Q   So there were missing invoices, weren't there?
24 A   I think one of the invoices -- one of the things that
25 we're talking about is also whether Dr. Morse had any

1  invoices as well.
2  Q   We're talking about the invoices from Design Dental,
3  aren't we, sir?
4  A   I think it's both.
5  Q   You think it's both?
6  A   I think the way it's written here, I think we're
7  referring to both.
8  Q   Sir, would you agree that you were fully aware of the
9  fact that, in fact, there were missing invoices for almost a
10 one-year period from Design Dental?  You understood that,
11 right?
12 A   Yes.
13 Q   So to suggest in your affidavit that these records
14 never existed, that was misleading, wasn't it, sir?
15 A   No.  I don't agree with that statement.
16 Q   You have no idea what work was done by the Design
17 Dental lab during that 11-month period, correct?
18 A   No.
19 Q   Is that correct?
20 A   That's correct.
21 Q   And without knowing what work was done, you would have
22 no way of establishing the maximum amount that Dr. Morse
23 could bill Medicaid during those 11 months, correct?
24 A   I guess that would be true.
25 Q   And yet you presented to the grand jury a ceiling of

1   bills submitted by Dr. Morse to Medicaid; isn't that true?
2   A   Yes, sir.
3   Q   And, in fact, you told Mr. Castillo with regard to the
4   missing invoices, don't worry about it, right?
5   A   Did I say don't worry about it that we had missing
6   invoices?  I don't believe I would have said that.
7   Q   Referring to your deposition, page 116, line 14.
8       "Question:  Did you ever tell Jose Castillo in sum and
9   substance, don't worry about it with respect to the missing
10  invoices?
11      "Answer:  I could very well have said that.  I'm not
12  entirely sure what it would have meant, but I use those
13  words, sure."
14      Do you recall that, sir?
15          MR. MILLER:  Objection.
16          THE COURT:  Overruled.
17  A   I remember saying that.  If I said it to him, it wasn't
18  in the context of like just don't worry we don't have the
19  records.  It was probably -- I mean, I've said the words
20  "don't worry" to Jose before about concerns that he had.
21  Q   And you basically told him that even though 19 months
22  of records were missing out of a 36-month period, you said,
23  Jose, don't worry about it, right?
24  A   Well, perhaps in the context of we'll work with what we
25  have.  It's kind of out of context.  I could easily have

1   envisioned saying that to Jose in the context of that
2   conversation, but I just don't know specifically what he was
3   talking about.
4   Q   Would you agree, Mr. Fusto, that you never once told
5   Dr. Morse or his attorney that you were missing 11 months of
6   Design Dental invoices?
7           MR. MILLER:  Objection:  vague.
8           THE COURT:  Did you ever tell -- I'm sorry.  I
9   think you just want to limit your question to --
10  Q   Did you ever tell Dr. Morse that you were missing 11
11  months of Design Dental invoices?
12  A   Did I tell Dr. Morse?
13  Q   Yes.
14  A   Personally, I don't believe so, no.
15  Q   Did you ever tell Dr. Morse's defense attorney that you
16  were missing 11 months of Design Dental invoices?
17  A   I'm not sure whether I told him or he told me, but it
18  was a matter that was discussed between us.
19  Q   Referring to your deposition, page 237, line 8.
20      "Question:  Let me get the question clear on the
21  record.  Before you presented this case to a grand jury and
22  secured an indictment, did you ever tell Dr. Morse or his
23  attorney that you were missing 11 months of invoices from
24  Design Dental?
25      "Answer:  No, I don't believe I did."

1       Page 237, line 25.
2       "Question:  Before you secured an indictment in this
3   case, did you ever tell Dr. Morse or his attorney that you
4   were missing any lab invoices?
5       "Answer:  No, I don't believe we did."
6           MR. MILLER:  Objection.  This is a different time.
7   The question was about whether he had ever told him.
8   Q   Did you ever tell Dr. Morse or his attorneys at any
9   time before you secured the indictment that you were missing
10  invoices?
11          MR. MILLER:  Objection.
12  A   Not before the indictment.
13  Q   Did you ever tell them after the indictment?
14  A   We did talk about it, sure.
15  Q   In fact, you never said a word about the missing
16  invoices, did you?
17  A   We, Mr. Wool and I --
18  Q   The question is, did you ever say one word about the
19  missing invoices after the indictment to Mr. Wool?
20  A   I must have because we talked about it.
21  Q   In fact, the very first time that it came to light that
22  there were missing invoices was only in this civil lawsuit;
23  isn't that true?
24          THE COURT:  Which invoices are you referring to?
25          MR. NORINSBERG:  11 months of missing invoices

1   from Design Dental and eight months of missing invoices from
2   Nu-Life.
3   A   I don't believe I would agree with that statement
4   because I distinctly remember going over the invoices with
5   Mr. Wool, his associate, and I think even with Dr. Morse at
6   some point.  This is all post-indictment.
7   Q   Okay.  Post-indictment, do you remember going through
8   records with Dr. Morse and his attorney?  Is that your
9   testimony?
10  A   Yes.
11  Q   So you went through records that existed.  You went
12  through those records, right?
13  A   The records that we had.
14  Q   That you had?
15  A   Yes.
16  Q   But you never once told Dr. Morse's attorney that you
17  actually were missing 19 months of records, did you?
18  A   I'm sure he would have figured that out for himself.  I
19  mean, I remember having discussions with him along those
20  lines.
21  Q   You never gave him a set of the records, did you?
22  A   I remember going through the records with him.
23  Q   You went through a month or two.  You never gave him
24  the whole set of records, did you?
25  A   I gave -- I went through what we had, as I recall.  I

1 would have no reason not to give him all of them.
2 Q    Now, in your declaration you also provide a summary of
3 what the witnesses were that you called, what they said at
4 trial; is that correct?
5        THE COURT:  At trial?
6        MR. NORINSBERG:  This is part of his declaration
7 of what he represented under oath, your Honor.
8        MR. MILLER:  Objection, your Honor.
9 A    If you can help me.  Where am I looking?
10 Q    Paragraph 29, page 16.
11        THE COURT:  I take it -- can I just see you for a
12 second at sidebar.
13        (Sidebar conference.)
14        (Continued on the next page.)

---

1        THE COURT:  Just to clarify, I take it you're
2 simply seeking to impeach him now because he made a false
3 statement under oath?
4        MR. NORINSBERG:  Exactly.
5        THE COURT:  Do you understand the purpose of why
6 he's asking that?
7        MR. MILLER:  Yeah.  I mean, he's going to try and
8 use paragraph 29 to get --
9        THE COURT:  What does it say?
10        MR. MILLER:  He summarizes the grand jury and
11 trial testimony of the witnesses.
12        MR. NORINSBERG:  I'm only asking about a specific
13 representation he made with regard to the three witnesses.
14        THE COURT:  Can I just see it.
15        What is false about that?
16        MR. NORINSBERG:  Specifically, he testified that
17 all three witnesses testified at trial that they did not
18 wear dentures.  That's emphatically false.  And I want to
19 cross-examine him on that.
20        MR. MILLER:  We're going to have to go all into
21 trial testimony.
22        THE COURT:  Wait a minute.
23        MR. NORINSBERG:  We're not going to get into the
24 trial testimony.  I'm only getting into that one point.
25        MR. MILLER:  That's all --

---

1        THE COURT:  Hold on.  You're seeking to impeach
2 him on the fact that he made a statement in connection with
3 the summary judgment motion that three Medicaid recipient
4 witnesses testified at trial that they did not wear
5 dentures.
6        MR. NORINSBERG:  Exactly.  That's the only point.
7        THE COURT:  And one of those people testified to
8 what, the three people?  What's false about that?
9        MR. NORINSBERG:  Two of them, what they actually
10 said was they don't know what a denture is and they have no
11 understanding of that term.  The third one said actually she
12 did wear a denture.  They knew it because there was no false
13 filing count to her.  That's basically --
14        THE COURT:  That's what they -- I understand the
15 impeachment, but you're saying that he's saying that they
16 testified to the same thing at trial that they testified to
17 before the grand jury, and that's not true because they
18 testified at trial that they didn't know if they had
19 dentures and then another one said, yes, I do have dentures.
20        MR. NORINSBERG:  Yeah.
21        THE COURT:  Why isn't that -- assuming that
22 accurately states the trial testimony.
23        MR. MILLER:  Because the trial testimony is
24 muddled, and I'm going to have to read all of it for the
25 jury to understand it.  It's going to take us down a totally

---

1 separate path.  Perez's testimony is very confusing.  At
2 some point, she does say things but then she takes it back.
3 They all put evidence in that 580 Dental, regardless of who
4 did the work, didn't do the work.  It's not like they came
5 and said, oh, yeah, I have all these dentures.  Very
6 confusing.  I know --
7        THE COURT:  Wait.  I'm sorry.  Let me just ask
8 again.  What did -- did they say at trial -- wait a minute.
9        Did they ultimately at trial say that they did not
10 wear dentures?
11        MR. MILLER:  I have to check the transcript, your
12 Honor.  My memory of Perez, the best I can recall, is that
13 she said -- at some point she gets confused and I think does
14 say she has dentures but then maybe later changes it.  But I
15 need to check it.
16        THE COURT:  What about the other two?  Is it just
17 one person?
18        MR. NORINSBERG:  Three.
19        THE COURT:  All three, you're saying?
20        MR. NORINSBERG:  Yes.
21        MR. MILLER:  Said they had dentures?
22        MR. NORINSBERG:  No.  The other two are saying
23 they don't know what dentures are.  The other one is saying
24 they have dentures.
25        MR. MILLER:  That's a different point.

**JA272**

1     MR. NORINSBERG:  That's my only point, just for

2  impeachment.

3          (End sidebar conference.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1  Q    Mr. Fusto, in your affidavit you have a section called

2  "The Trial"; is that correct?

3  A    Yes.

4  Q    And in this section, you provide a summary of evidence

5  that was presented at trial, correct?

6  A    Yes.

7  Q    And in particular, you describe how three patients

8  appeared at trial and gave testimony, correct?

9  A    It appears to be, yes.

10  Q    And you wrote under oath that each one of these persons

11  said they did not wear dentures, correct?  That's what you

12  wrote?

13  A    That's what it says, yes.

14  Q    It's not what it said.  That's what you wrote in your

15  affidavit, right?

16  A    Well, I didn't write the affidavit.

17          THE COURT:  Well, that's what you swore to,

18  though, you signed it?

19          THE WITNESS:  Yes, your Honor, yes.

20  Q    In fact, Mr. Fusto, two of those patients actually said

21  they don't even know what a denture is; isn't that true?

22  A    I don't know -- I don't recall what their testimony was

23  as I sit here.

24  Q    Referring to the testimony of Ms. Ahiri, page 37, line

25  10.

---

1          THE COURT:  Do you want to show that to the

2  witness first and ask if that refreshes his recollection,

3  that portion of the testimony.  You're showing him the

4  testimony of whom?

5          MR. NORINSBERG:  You don't want me to read the

6  question and answer?

7          THE COURT:  Not until you show it to him and ask

8  if it refreshes his recollection.

9  Q    Directing your attention to line 8 through 11.  Do you

10  see on page 37, lines 10 through 13?  Do you have that in

11  front of you, sir?

12  A    Yes.

13  Q    Have you had a chance to read that?

14  A    Yes.

15  Q    Does it refresh your memory as to the fact that

16  Ms. Ahiri testified that she did not know what a denture is

17  and did not know what false teeth were?

18       Does that refresh your memory as to that, sir?

19  A    Yes.

20  Q    So --

21  A    She said she doesn't wear dentures so ...

22  Q    She said, referring to the testimony, question, page

23  37, line 10:

24       "Question:  Do you know what a denture is?

25       "Answer:  No.

---

1       "Question:  False teeth?

2       "Answer:  No."

3       Do you recall her giving that testimony, sir?

4  A    Yes.

5  Q    You recall that, sir?

6  A    Yes.

7  Q    Do you recall the second witness, Ms. Suliman saying on

8  page 96, line 19:

9       "Question:  And do you know what false teeth are or

10  dentures?  Do you know what that means?

11       "Answer:  No."

12       Do you recall having that testimony at trial?

13  A    But you're not reading the whole thing.

14  Q    Do you recall that testimony at trial, sir?

15  A    Yes.

16  Q    Do you also recall the fact that the third person,

17  Miriam Perez, actually indicated that she does wear some

18  type of dentures?

19  A    I don't recall exactly.

20  Q    So, sir, Mr. Fusto, you understood as an attorney there

21  was no room in this affidavit to make things up and make a

22  false statement, right?

23  A    I didn't.

24  Q    Well, you represented under oath that all three of

25  these witnesses testified they had dentures when, in fact,

1    two of them said they don't even know what a denture is and
2    the third one actually did wear dentures; isn't that true?
3    A    Yeah.  But as I read this, the two --
4    Q    Is that true or not true, sir?
5    A    It would not be true.  You're not reading the whole
6    testimony.
7    Q    Your counsel will have an opportunity to bring out any
8    point that you want, sir.
9    A    Okay.
10   Q    The sworn testimony that I just read to you, was that
11   given at this trial?
12   A    Yes.
13   Q    Now, you yourself have previously said that it's
14   extremely hazardous to build a larceny case based solely on
15   what a patient tells you, correct?
16   A    Yes.
17   Q    You said that Medicaid recipients can be extremely poor
18   historians as to what services they received; is that true?
19   A    They can be, sure.
20   Q    And you also said particularly with dental work they
21   can be poor historians; is that correct?
22   A    True.
23   Q    And so as the head of your investigative team, you'd
24   want to do anything you could to try to corroborate evidence
25   as to what the patients were telling you; is that correct?

1    A    Sometimes it's required, sure.
2    Q    You wouldn't want to just rely on what the patient's
3    saying, you'd want to try to cross-reference that with some
4    other evidence, correct?
5    A    Well, it depends on what it is.
6    Q    Referring to your deposition, page 330, line 5.
7         "Question:  So you wouldn't want to rely entirely on
8    just the word of what the patient is saying.  You would want
9    to cross-reference what they are saying with some type of
10   other evidence, correct?
11        "Answer:  To the extent that we can, yes."
12        Do you recall giving that testimony, sir?
13   A    Yes, sir.
14   Q    So you said at your deposition that to the extent you
15   can confirm what the patient is saying, you want to try to
16   do that, right?
17   A    In a typical dental case, you would want to do that,
18   sure.
19   Q    And one way to find out if these patients actually wore
20   dentures would be to review their patient charts, correct,
21   Mr. Fusto?
22   A    Not necessarily.
23   Q    Wouldn't that be one way you could actually find out if
24   the patient had some type of dentures?
25   A    Not necessarily.

1    Q    You never even looked at the patient charts during your
2    entire four-year investigation?  True or not true?
3    A    I personally did not.  I believe my auditors went
4    through them to some extent.
5    Q    You never looked at it yourself even though you were
6    the head of the team, right?
7    A    Right.
8    Q    It wasn't important to you to actually look at the
9    charts yourself, right?  Yes or no?
10   A    In terms of determining whether or not a service was
11   done, no.  It's easier to write things in a chart.
12   Q    My question is, sir, in this four-year investigation,
13   you never thought it was important for you to actually look
14   at Dr. Morse's charts and see what was in there?  Is that
15   true or is it not true?
16   A    Me personally, I did not, so I guess the answer to that
17   question would be yes.
18   Q    Now, another way to find out if these patients actually
19   wore dentures would be to actually simply interview them in
20   person and find out, right?
21   A    Well, interview them in person, however, but interview
22   them, sure.
23   Q    But you, Mr. Fusto, you never got involved with
24   interviewing witnesses in this case, right?
25   A    A prosecutor does not generally at that point.  That's

1    what you have investigators for.
2    Q    So you didn't get involved in interviewing any
3    witnesses, right?
4    A    Not until the grand jury.
5    Q    How about at the grand jury case?  Did you actually ask
6    people such as Ms. Ahiri whether she understood what the
7    word "denture" meant?  Did you do that before you put her
8    on?
9    A    I think I did, yeah, or I asked her when she was in the
10   grand jury.
11   Q    Did you actually ask these people whether or not they
12   were wearing partial dentures?
13   A    I don't recall.  They may have said they did.
14   Q    And just so we're clear, if a patient had a partial
15   denture of an upper or lower, that would be considered a
16   denture, correct?
17   A    I guess in the common parlance that would be, yes.
18   Q    Well, most people would think of a denture as a
19   complete set of teeth, upper and bottom, right?
20   A    I can't speak for most people.
21   Q    But would you agree, sir, that if somebody has one or
22   two teeth that were not their real teeth, that could also be
23   considered a partial denture?
24   A    I don't know.  I'm sorry.  I don't know whether that
25   would -- whether I can answer it or not.

**JA274**

1  Q   Did Ms. Ahiri wear a partial upper denture?

2  A   As I sit here right now, I don't know.

3  Q   And you didn't know at your deposition either, right?

4  A   I'm not sure.  Probably not.

5  Q   Did Ms. Sawson Suliman wear a partial upper denture?

6  A   I don't recall.

7  Q   Did she wear a partial lower denture?

8  A   I don't recall.

9  Q   Did Miriam Perez wear a partial upper denture?

10 A   I don't recall.

11 Q   Would it be fair to say that you have no idea whether

12 or not the patients that you actually presented to the grand

13 jury wore partial dentures?

14 A   If you're asking me do I remember at this moment, I

15 don't.  I know what they said in the grand jury.

16 Q   Well, at the time of your deposition in 2008, you had

17 no idea whether or not any of the patients that you called

18 at the grand jury actually wore dentures or partial

19 dentures; isn't that true?

20 A   As I was sitting in the deposition, no, I didn't have

21 that information in front of me.

22 Q   Now, you learned of another dentist who worked with

23 Dr. Morse, correct?

24 A   Yes.

25 Q   You learned that there was another dentist named Brian

1  Ketover, correct?

2  A   Yes.

3  Q   And you learned that 50 percent of Dr. Morse's bills

4  came from work done by Dr. Ketover; is that correct?

5  A   I don't know that.  I know some percentage of it was.

6  I don't know if it's 50 percent.

7  Q   And referring to your deposition, page 339, line 12.

8  "Question:  What percentage of Dr. Morse's bills came

9  from the work done by Dr. Ketover?

10 "Answer:  According to this, 50 percent."

11 Does that refresh your memory, sir?

12 Okay.

13 Q   And, in fact, all three witnesses that you called at

14 trial were actually Dr. Ketover's patients, not Dr. Morse's

15 patients, correct?

16 A   When they testified at trial, they said it was

17 Dr. Ketover who treated them.

18 Q   You didn't --

19 A   Or Dr. K.

20 Q   You didn't call one single witness of Dr. Morse at

21 trial, true?

22 A   One single patient?

23 Q   One single patient, true?

24 A   I didn't --

25 Q   It's a simple question.

1  A   Well, they were all Dr. Morse's patients.  It was a

2  question of who was the treating physician.  So when they

3  got into court, they didn't identify Dr. Morse, they

4  identified by name or by reference Dr. Ketover.

5  Q   Can we agree that all of the witnesses called at trial

6  were not treated by Dr. Morse himself, but by Dr. Ketover?

7        MR. MILLER:  Objection.

8        THE COURT:  Sustained.

9  Q   You wrote that in your affidavit?

10       THE COURT:  Sustained.

11 Q   Now, your auditor on this case, the original auditor,

12 actually recommended that you speak with Dr. Ketover,

13 correct?

14 A   He may have said that, sure.

15 Q   He did say that, didn't he?

16 A   That was seven years ago.  I'll accept that he did.

17 Q   And you said that at your deposition, too, right?

18 A   Okay.

19 Q   And you also said previously at your deposition that in

20 hindsight, you realized that you should have spoken to

21 Dr. Ketover, right?

22       MR. MILLER:  Objection.

23 A   Yeah.  That would be a reasonable thing for me to

24 think.

25 Q   But you never actually spoke to the dentist who treats

1  50 percent of the people in that practice at any time during

2  the four-year investigation, right?

3  A   I didn't think it was necessary actually.

4  Q   All right.  But in hindsight, you realized that you

5  probably should have spoken to him, right?

6  A   Well, obviously a lot of things in hindsight can be

7  done better.

8  Q   I'm asking about this particular issue we're talking

9  about, speaking to Dr. Ketover.

10 A   Your question is what?

11 Q   In hindsight, you have realized that you would have an

12 interest in speaking to the other doctor who treated 50

13 percent of the patients in Dr. Morse's practice, right?

14 A   Yes.

15 Q   Now, at some point you had a meeting with Dr. Morse and

16 his attorneys; is that correct?

17 A   Yes.

18 Q   It was after the indictment, correct?

19 A   Yes.

20 Q   And Dr. Morse's attorney expressed confusion a number

21 of times as to what your findings were and how you arrived

22 at those findings, right?

23 A   One of the reasons we had a meeting.

24 Q   And Dr. Morse's attorney tried to impress upon you that

25 the calculations were incorrect, right?

**JA275**

1   A   He did, of course.
2   Q   And he actually pointed out a number of mistakes that
3   Mr. Castillo had made in his calculations, correct?
4           MR. MILLER:  Objection.
5           THE COURT:  Sustained.
6   Q   As you sit here today, would you agree that
7   unquestionably there were mistakes in dollar calculations
8   that you made?
9   A   That I made or that Mr. -- I didn't do the
10  calculations.
11  Q   Would you agree that unquestionably there were mistakes
12  in dollar calculations made by Mr. Castillo?
13  A   I would agree with that, of course.
14  Q   Would you also agree, Mr. Fusto, that you yourself were
15  confused as to what Mr. Castillo's findings were?
16  A   That I was confused as to what his findings were?
17  Occasionally it was a little difficult to understand.
18  Q   You were somewhat confused at to how Mr. Castillo
19  actually arrived at his calculations, right?
20  A   Maybe from time to time.
21  Q   In fact, you couldn't say then and you really couldn't
22  say now that you understand everything Mr. Castillo did when
23  he made his calculations, right?
24  A   In terms of specifics, how he -- in other words, how he
25  arrived at a certain number for a procedure, no, I couldn't

1   say that.  In detail I couldn't say that.
2   Q   Now, you were the one who presented this case to the
3   grand jury and secured an indictment, correct?
4   A   True.
5   Q   But even after you secured the indictment, you still
6   felt that you didn't really have a command of Mr. Castillo's
7   findings; isn't that true?
8   A   No, I wouldn't say that.
9   Q   Well, would you agree that you still needed to have
10  Mr. Castillo's workpapers to sound like you knew what you
11  were talking about?
12          MR. MILLER:  Objection.
13          THE COURT:  Sustained.
14  Q   Do you recall giving the following testimony on page
15  176, line --
16          MR. MILLER:  Objection.
17          THE COURT:  Sustained.
18  Q   Now, you yourself actually wrote an article relating to
19  how to do proper Medicaid fraud calculations, correct?
20  A   Not about -- I guess generically that would be true.
21  Q   This article was published in a magazine in June 2008,
22  correct?
23  A   Yes.
24  Q   That would be around one year after the Morse trial,
25  correct?

1   A   Yes.
2   Q   I'd like to show you what's been marked Plaintiff's 37.
3   A   Thank you.
4   Q   And let me just provide you with a -- it's actually, to
5   correct the record, it's Plaintiff's 12.  There's another
6   sticker from the deposition that's 37, but this is actually
7   12.  Here's the actual full article.
8           THE COURT:  So you're now referring him to
9   Exhibit 12?
10          MR. NORINSBERG:  That's correct.
11  Q   Is that the article that you wrote, sir?
12  A   Yes, it is.
13          MR. NORINSBERG:  I offer the article into
14  evidence.
15          THE COURT:  There being no objection, it will be
16  received.
17          MR. MILLER:  No objection.
18          (Plaintiff's Exhibit 12 received in evidence.)
19  Q   In your article, you wrote, quote, "If the sample is
20  not precise, the projection can be inaccurate by a wide
21  margin and the amount estimated that is due the Government
22  can be overstated substantially."
23      Is that correct, sir?
24  A   Yes.
25  Q   So if the sample is not precise, the projections can be

1   inaccurate by a wide margin, right?
2   A   Yes.
3   Q   In fact, if the sample is not chosen correctly, the
4   projections would be essentially worthless, wouldn't they?
5   A   I believe so, yes.
6   Q   And that's what happened in this case, isn't it?  Yes
7   or no?
8   A   No.
9   Q   Now, you didn't employ a statistician at part of your
10  investigation of Dr. Morse, correct?
11  A   We did not, no.
12  Q   If you had wanted to retain a statistician, you would
13  have been able to do that without question, right?
14  A   Yes.
15  Q   In fact, you had an on-staff statistician named Carl
16  Heiner ready and willing and able to do a statistical
17  analysis for you, correct?
18  A   He's not on staff.  He does a lot of work for us, but
19  he's not on staff.
20  Q   But your feeling was that you didn't need to have
21  somebody actually go through and do a statistical analysis
22  based on Dr. Morse's billings?  Yes or no?
23  A   We did not.
24  Q   So you didn't need a statistician to look at any of the
25  records, you didn't need a dental expert to examine the

**JA276**

1  patients or the charts, and you yourself didn't need to look
2  at the patient charts, correct?
3  A    There's a lot in that.  Could you break that up a
4  little bit.
5  Q    You didn't need a statistician to look at any of the
6  records or invoices, right?
7  A    We did not, no.
8  Q    You didn't need a dental expert to examine the patients
9  or the charts, correct?
10 A    Well, I think there was an examination of patients.
11 Q    Not the people who actually testified at the grand
12 jury, correct?
13 A    Yes.
14 Q    And you didn't need -- you yourself didn't need to look
15 at the patient charts, right?
16 A    I did not, no.
17 Q    None of those things were necessary for you to do a
18 proper investigation in this case?  Is that your testimony,
19 sir?
20 A    I believe that would be true.
21 Q    You and Mr. Castillo, you could figure everything out
22 on your own, right?
23 A    Well, we did the best we could with what we had.
24 Q    Just by looking at the lab invoices, right?
25 A    Yes.

1  Q    Now, would you agree that you and Mr. Castillo --
2  A    And patient testimony.
3  Q    You and Mr. Castillo would confer periodically to
4  address issues that came up with the calculations?
5  A    Yes.
6  Q    You would give ideas and suggestions to Mr. Castillo?
7  A    Yeah, probably.
8  Q    He would give ideas and suggestions to you?
9  A    Sometimes, sure.
10 Q    You were working together as a team in terms of
11 figuring out calculations, right?
12 A    Yes.
13 Q    You're bouncing ideas off each other and collaborating
14 in terms of trying to come up with the right fraud number,
15 right?
16 A    Well, the right estimate, yes.
17 Q    And after a long period of time, you came up with the
18 idea of using the invoices to estimate the overpayment,
19 right?
20 A    Yes, sir.
21 Q    Now, we focused largely on Design Dental invoices
22 earlier, but I'd like to ask you a few questions on Nu-Life.
23 A    Sure.
24 Q    Would you agree from your memory that the Nu-Life
25 invoices have no description of any procedures at all?

1  A    As I recall, they did not.
2  Q    Would you agree, sir, that you have no idea as to how
3  Mr. Castillo actually made his calculations based on the
4  Nu-Life invoices?
5  A    Well, no, I do recall.
6  Q    Referring to your deposition, page 221, line 23.
7       "Question:  As you sit here today, do you have any idea
8  how the calculations were made for the Nu-Life invoices?
9       "Answer:  I have no specific recollection."
10      Do you recall giving that testimony, sir?
11 A    Well, then yes, but now I do.
12 Q    So your memory got better four years later?
13 A    Well, I reviewed documents in preparation for this
14 case.
15 Q    And you reviewed documents before you testified at your
16 deposition, didn't you?
17 A    No, actually, I didn't.
18 Q    So you didn't feel that was necessary before you gave
19 sworn testimony in your deposition?
20 A    I wasn't provided any.  I was just asked to appear at
21 the deposition.
22 Q    Now, going back to the meetings that you had with
23 Dr. Morse and his attorneys.
24      After they pointed out some mistakes in the
25 calculations, you took a break for a while, didn't you?

1  A    I'm sorry.  Can you repeat that.
2  Q    When you were meeting with Dr. Morse and his attorneys,
3  he pointed out some mistakes in the calculations Mr.
4  Castillo made and then you took a break during the meeting,
5  didn't you?
6       MR. MILLER:  Objection.
7       THE COURT:  Sustained.
8  Q    Did you come back at some point later on after the
9  mistakes were pointed out and say, quote, "The people
10 upstairs want the case to continue"?
11      MR. MILLER:  Objection.
12      THE COURT:  Sustained.
13 Q    Did you ever tell Dr. Morse or his attorneys, in sum
14 and substance, that your problems are over when this
15 election is done?
16 A    No.
17 Q    No or not in those words?
18 A    Well, not in those words.
19 Q    Do you acknowledge having a conversation in November
20 2006 with Dr. Morse's defense attorney?
21 A    Sure.
22 Q    And during this conversation, you talked about the
23 potential disposition of the case, right?
24 A    Yes.
25 Q    And you told Mr. Wool that the case could not be

**JA277**

1   disposed of until after the election had been held; isn't
2   that true?
3   A   I think what I meant was I couldn't --
4   Q   I'm not asking you what you meant.  Did you say that or
5   not?
6   A   I'm not sure I said it in those words, but I understand
7   the import.  A conversation along those lines would have
8   been had, yes.
9   Q   And you said words to that effect basically that the
10  case couldn't be terminated until after the election --
11  Mr. Spitzer's election -- in the fall of 2006?  Didn't you
12  make that statement?
13          MR. MILLER:  Objection.
14  A   I didn't say "terminated."
15          THE COURT:  Is it the form of the question you're
16  objecting to?
17          MR. MILLER:  Yes.
18          THE COURT:  What do you recall precisely, as
19  precisely as you can, that you said with regard to this
20  subject?
21          THE WITNESS:  At the time we were meeting,
22  Mr. Wool and I were in discussions about how to dispose of
23  the case with a plea.  And because Dr. Morse had been
24  indicted for a B felony, that carries a mandatory jail
25  sentence.  So Mr. Wool certainly made a very good case for

1   Dr. Morse that jail was probably not the appropriate
2   disposition.  And I agreed.  And my immediate supervisor,
3   Mr. Bloch and Mr. Conosky (phonetic), they tend to insist
4   upon jail.
5           So in order for us to come up with a disposition
6   that would not involve a jail sentence, I would have
7   to -- because I don't have individual discretion, I would
8   have to go to Mr. Conosky and Mr. Bloch.  And because it was
9   around the election time, it was just sort of my intuition
10  was like if I'm going to have that conversation with him,
11  it's best to wait until after the election when things
12  aren't quite so, you know, atmospherically --
13          THE COURT:  Now, which election was this that
14  you're referring to?
15          THE WITNESS:  That was when then Attorney General
16  Spitzer was -- he was just about to be elected Governor.
17          THE COURT:  So that was when he was running for
18  that position?
19          THE WITNESS:  Yes.  Yes, your Honor.  So to put it
20  in context, it was for that.
21  Q   You just said that Dr. Morse was interested in a plea?
22  Was that your testimony?
23  A   No, sir.
24  Q   Do you recall --
25          THE COURT:  Well, wait a minute.  What did you say

1   about a plea?  You said you were discussing a plea.
2           THE WITNESS:  Yes, with his attorney.
3           THE COURT:  You didn't say that he was interested
4   in accepting a plea or is that what you meant to say?
5           THE WITNESS:  No.  His attorney was conveying how
6   we can dispose of this without exposing Dr. Morse to jail.
7   And in the context of ordinary plea discussions, that was a
8   significant issue that really needed to come off the table.
9   So we were talking in those terms.
10  Q   Sir, didn't you actually represent under oath in your
11  declaration, quote, "that after some time it was clear that
12  Dr. Morse had no interest in a disposition and steadfastly
13  asserted his complete innocence"?  Didn't you write that
14  under oath?
15  A   He did.  That would be true.
16  Q   That's in your declaration, right?
17  A   Well, that's why we never had the conversation with
18  Mr. Bloch or Mr. Conosky.
19  Q   Now, you were aware of the fact that Medicaid fraud had
20  become an issue in the campaign that Spitzer was running,
21  correct?
22          MR. MILLER:  Objection.
23          THE COURT:  Overruled.
24  A   Yeah.
25  Q   In fact, you became aware that Medicaid fraud and

1   Mr. Spitzer's handling of Medicaid fraud had become an issue
2   in that election, correct?
3   A   Yeah.
4           MR. MILLER:  Objection.
5           THE COURT:  Overruled.
6   Q   And, in fact, you were aware that Spitzer's political
7   opponents were accusing him of being weak on Medicaid fraud,
8   right?
9   A   Yes.
10  Q   And you learned that, and you saw a lot of newspaper
11  coverage about how weak Spitzer was on handling Medicaid
12  fraud cases, right?
13  A   I wouldn't say a lot, but it was in the papers.
14  Q   Now, after this indictment, you issued a press release;
15  is that correct?
16  A   The office issued a press release.
17  Q   But you yourself actually wrote the press release,
18  didn't you, sir?
19  A   I'm not sure whether I personally wrote it or I
20  provided the information for the person at the press office
21  to write it.  I don't recall.
22  Q   Do you recall testifying that there's a good chance
23  that you yourself could have written this press release?
24  A   I recall saying that, sure.
25  Q   Now, press releases are not issued for all dentists who

1  are arrested by MFCU, are they?

2  A    Not all, at least I don't think so.

3  Q    Press releases are not issued for all Medicaid

4  providers who are arrested by MFCU, are they?

5  A    I wouldn't say all.

6  Q    The press release was issued in this case because it

7  was a million-dollar theft allegation, right?

8  A    Yes.

9  Q    And the purpose of this press release was to publicize

10 the fact that Mr. Spitzer had nailed a dentist for stealing

11 a million dollars from Medicaid; isn't that right?

12 A    I'm sorry.  Say that again.

13 Q    The purpose of this press release was to publicize the

14 fact that Mr. Spitzer had nailed a dentist for stealing a

15 million dollars from Medicaid, right?

16 A    I think the purpose of the indictment is -- purpose of

17 the press release was to announce that someone had been

18 arrested for stealing over a million dollars from Medicaid,

19 yes.

20 Q    And you actually drafted an original version of this

21 press release in which you made up a quote from Eliot

22 Spitzer talking about the Morse case, right?

23              MR. MILLER:  Objection.

24              THE COURT:  Overruled.

25 A    No.

---

1  Q    I'd like to show you Plaintiff's Exhibit 138.

2  A    Okay.

3  Q    Do you recognize this document, sir?

4  A    It appears to be the press release.

5  Q    And the cover page is an e-mail from you to your boss,

6  Peter Bloch, correct?

7  A    Uh-huh.

8  Q    And then the subject matter is Attorney General Eliot

9  Spitzer announced today that Brooklyn dentist Leonard Morse

10 of 11 Pinetree -- do you see that?

11 A    Yes.

12 Q    And in this actual draft press release, you actually

13 made up a quote from Eliot Spitzer, didn't you?

14 A    No, no, no.  I need to clarify something.

15 Q    Did you make up a quote from Spitzer in this press

16 release?

17 A    No.

18              MR. NORINSBERG:  I'm offering 138 into evidence.

19              THE COURT:  All right.  138.  This is a draft

20 press release?

21              MR. NORINSBERG:  Uh-huh.

22              THE COURT:  All right.  Was that a draft of a

23 press release you prepared?

24              THE WITNESS:  It appears to be a press release,

25 but if I may clarify.

---

1              THE COURT:  Yes.

2              THE WITNESS:  At the time the office --

3              THE COURT:  I'm just trying to decide -- I think

4  the only question is, is that a draft of a press release

5  that you prepared?

6              THE WITNESS:  Yeah, I would say so, sure.

7              THE COURT:  All right.

8              (Plaintiff's Exhibit 138 received in evidence.)

9  Q    Referring to the second page of this document.  Do you

10 have it in front of you, sir?

11 A    Uh-huh.

12 Q    It says, quote, "My office is committed to ensuring

13 that taxpayer dollars earmarked for the care of needy

14 persons are not diverted from the intended purpose," end

15 quote, said Spitzer.

16      Do you see that?

17 A    Yes.

18 Q    You made up that quote, didn't you?

19 A    Sir --

20 Q    Did you make up the Spitzer quote, yes or no?

21 A    No.

22 Q    Did Mr. Spitzer himself make that statement?

23 A    I have no reason not to believe he didn't.

24 Q    Did you speak to Eliot Spitzer before you sent this

25 draft press release?

---

1  A    No.  This went through the press office.

2  Q    It's coming from an e-mail from you to your boss saying

3  look at the press release -- proposed press release, right?

4  A    Right.  This may have come back from the press office

5  after they wrote it up.

6  Q    Did Mr. Spitzer make this quote?  Is that your

7  testimony, sir?

8  A    It looks kind of like a standard quote that they would

9  put in a press release.  I did not make this up.

10 Q    Did Mr. Spitzer actually make the quote?

11 A    I have no idea.

12 Q    But you do acknowledge that in that draft press release

13 there's a comment from Eliot Spitzer about the case of

14 Leonard Morse, right?

15 A    It's a statement that says, "My office is committed to

16 ensuring that taxpayer dollars earmarked for the care of

17 needy persons are not diverted from the intended purpose."

18 It sounds more like a sort of boilerplate quote.  It wasn't

19 specific to Dr. Morse.

20 Q    Is this the draft of the press release you're talking

21 about, sir?

22 A    That's the one that's in front of me.

23 Q    And you see the quote there in the middle?

24 A    Yes.

25 Q    And then the actual press release has a headline about

**JA279**

1 how Brooklyn dentist was nabbed for stealing a million
2 dollars, right?
3 A    Okay, yes.
4 Q    Now, sir, this press release was issued at the same
5 time that Mr. Spitzer was being accused of being weak on
6 Medicaid fraud?  True or not true?
7 A    It was -- whatever the date was.  I don't recall if
8 there was something in the news at that time, but generally
9 I wouldn't argue with that.
10 Q    I'd like to show you Plaintiff's 67.
11 A    Thank you.
12 Q    Do you recognize this document, sir?
13 A    It looks like a press release for Dr. Morse.
14 Q    This was the actual press release that went out; is
15 that correct?
16 A    I would have no reason to doubt that.
17         MR. NORINSBERG:  I offer this into evidence,
18 Plaintiff's 67.
19         MR. MILLER:  No objection.
20         THE COURT:  It's received.
21         (Plaintiff's Exhibit 67 received in evidence.)
22 Q    Okay.  So this is a press release issued by
23 Mr. Spitzer's office April 25th, 2006.  And the headline of
24 this press release is Brooklyn dentist indicted for 1
25 million Medicaid theft, right?

1 A    Yes.
2 Q    It mentions towards the bottom of this the people who
3 are involved with prosecuting.  And your name is down there,
4 right?  The case is being prosecuted by Special Assistant
5 Attorney General John Fusto with the Attorney General's
6 Medicaid Fraud Control Unit, right?
7 A    Yes.
8 Q    And once this press release was issued, you became
9 aware of the fact that there was a lot of news coverage on
10 this case, correct?
11 A    I don't recall any news coverage on it, to be honest
12 with you.
13 Q    You never saw any newspaper coverage on this after the
14 press release was issued?
15 A    Not that I recall.
16 Q    Now, in the middle of this document, it says,
17 "According to prosecutors."  Do you see that?
18 A    Yes.
19 Q    Prosecutors, that would be you, right?
20 A    Yes.
21 Q    "According to prosecutors, these billings which
22 included claims for repairing broken or missing teeth,
23 broken clasp or for denture relinings, were often submitted
24 for services provided to Medicaid patients who did not even
25 wear dentures."

1     Do you see that, sir?
2 A    I see it.
3 Q    You wrote that, correct?
4 A    Again, this came out of the press office, but I
5 wouldn't disagree with that statement.
6 Q    There's a very good chance you drafted this entire
7 press release; isn't that true?
8 A    There's no chance I drafted this press release because
9 it came out of the press office.
10 Q    Well, did you testify at your deposition that you
11 were -- there was a very good chance that you wrote several
12 parts of the press release?
13 A    Yeah, but that's not what you asked me.
14 Q    Okay.  Would you agree there's a good chance you wrote
15 several parts of the facts that are put in this press
16 release?
17 A    Probably, sure.
18 Q    Okay.  And being that you were the head of the
19 investigative team, you were the one who provided the
20 information as to most of or often patients were not even
21 wearing dentures?
22 A    Yes.
23 Q    Can you tell the jury right now what percentage of
24 Dr. Morse's patients between 2000 and 2002 actually wore
25 partial or full dentures?

1 A    I don't know.
2 Q    And what percentage of Dr. Morse's Medicaid patients
3 wore full dentures?
4 A    I don't know.
5 Q    Do you have any idea what percentage of the patients
6 whose charts had been subpoenaed were patients who did not
7 even wear dentures?
8 A    I don't know.
9 Q    You don't know, but you put that out there in the press
10 release, right?
11 A    Based on testimony of grand jury witnesses.
12 Q    Is that --
13 A    And also patient interviews which were not in the grand
14 jury.
15 Q    So is that what you're telling us, that that came from
16 your interviews with the patients?  Is that your testimony
17 here?  That's where you got that information from?  Even
18 though you told us before it's extremely hazardous to rely
19 on people who say that they didn't get services.
20     Is that what you're saying?
21         MR. MILLER:  Objection.
22         THE COURT:  Sustained, sustained.
23 Q    Now, you would agree that before this audit took place,
24 Dr. Morse had an unblemished record?
25 A    That's my understanding.

1  Q   As far as you know, he had no brush with the criminal
2  justice system, correct?
3  A   Also my understanding.
4  Q   And you believe Dr. Morse had been audited a number of
5  times before, correct?
6  A   Well, I had been told that by Dr. Morse.
7  Q   Okay.  But your understanding was that he got a clean
8  bill of health on all of his prior audits, correct?
9  A   As either he or his lawyer presented that to me, yes.
10  Q   And you never saw any evidence to the contrary, did
11  you, sir?
12  A   Did not.
13  Q   Dr. Morse, to your knowledge, had never been sanctioned
14  before, correct?
15  A   Not to my knowledge.
16  Q   He had never been fined before, correct?
17  A   Not to my knowledge.
18  Q   Now, in your status report when you were asked whether
19  or not you still believe the crime was ongoing, you said,
20  no, you believed the crime was not still ongoing, correct?
21  A   Right.
22  Q   So it was your impression that as of March 2006 before
23  you moved for an indictment, that this massive
24  million-dollar fraud had suddenly come to a stop; is that
25  correct?  Yes or no?

1  A   As I recall, the billings --
2  Q   Is that your recollection, sir?
3       MR. MILLER:  Objection.
4       THE COURT:  Please let the witness answer your
5  question.
6  A   As I recall, at some point I had been informed that
7  Dr. Morse --
8       MR. NORINSBERG:  Objection as to what he's been
9  told or informed.
10  A   It's the only basis that I can answer the question.
11       THE COURT:  Go ahead.
12  A   That Dr. Morse's billings had decreased substantially.
13  Q   Did you come to the conclusion that there was no
14  evidence of any ongoing fraud when you wrote your status
15  report in March of 2006?
16  A   I had no reason to believe there was so I wouldn't say
17  that it was ongoing.
18  Q   So just so I'm clear, the fraud was going on for
19  several years.  You were doing your investigation.  You
20  continued to let Dr. Morse see Medicaid patients.  And then
21  all of a sudden four years later, that's when you decided to
22  move for an indictment?
23  A   Yes.
24  Q   Now --
25  A   If I can --

1  Q   Would you agree, Mr. Fusto, that there is absolutely
2  nothing improper of Dr. Morse choosing a relatively
3  inexpensive lab and then getting reimbursed from Medicaid at
4  a higher ratio?  Would you agree with that?
5  A   I would agree with that.
6  Q   Would you agree there's nothing wrong with Dr. Morse
7  electing a lab that's able to furnish dentures and dental
8  repairs at a lower price?  Would you agree with that?
9  A   I would.
10  Q   Would you agree that there was nothing wrong if
11  Dr. Morse was being charged by the lab for $1 and if he was
12  able to get paid $4 or $5 by Medicaid for a procedure,
13  there's nothing wrong with that either, correct?
14       MR. MILLER:  Objection.
15       THE COURT:  You can answer.
16  A   Assuming that the lab was doing the work properly, I
17  would agree with that.
18  Q   So if the lab is doing the work properly, there would
19  be nothing wrong at all with having a ratio of maybe $1 to
20  $4 or $5 or even $6, right?
21  A   In and of itself, no.
22  Q   Now, you told us earlier you were not surprised by the
23  verdict in this case of not guilty across the boards, right?
24  A   Correct.
25  Q   So there were 12 separate counts.  He was not guilty on

1  any one of those counts, correct?
2  A   To my knowledge, he was found not guilty of all.
3  Q   You yourself believe that this was a weak case, don't
4  you?
5  A   No.
6  Q   Would you agree that the evidence was not as strong as
7  you had anticipated?
8       MR. MILLER:  Objection.
9       THE COURT:  Sustained.
10  Q   Would you agree that this case was not a strong case?
11       THE COURT:  At what point in time are you asking
12  whether he expressed that opinion?
13       MR. NORINSBERG:  At any point in time.
14  A   I believed it was a triable case.  It had strengths and
15  weaknesses like many cases.  Would I regard it as a slam
16  dunk, no.
17  Q   Would you call it a strong case, Mr. Fusto?
18  A   I believe we had evidence that we can present and
19  beyond a reasonable doubt, yes.
20  Q   My question is, would you actually consider this after
21  all that we've considered during your examination over the
22  last day, would you still consider this to be a strong case?
23       MR. MILLER:  Objection.
24       THE COURT:  Sustained.
25  Q   Now, you actually left the Attorney General's Office

1  Q    before there was a verdict in this case, correct?
2  A    Yes.
3  Q    You joined a company called Daylight Forensic, correct?
4  A    Yes.
5  Q    You joined in July of 2007, correct?
6  A    End of July I believe.
7  Q    And the trial of Dr. Morse took place in July of 2007,
8  correct?
9  A    Yes.
10 Q    So you joined Daylight while the trial was still
11 pending, correct?
12 A    No.  I accepted a position I believe prior to the trial
13 beginning.  There was a lag between the offer and when I
14 started.
15 Q    Did you actually apply for your new job while you were
16 still working on the Morse case?
17 A    Well, while it was pending, sure.
18 Q    During the interview possess, did you tell Daylight how
19 you were in the middle of prosecuting a million-dollar
20 Medicaid fraud case?
21 A    I don't think so.
22 Q    Did you mention -- did you have any other job
23 interviews besides Daylight?
24 A    There may have been one.  There may have been another
25 in there somewhere.

1  Q    Did you mention the fact that you had indicted a
2  dentist on a million-dollar fraud case as one of your
3  selling points during the interview?
4  A    No.
5  Q    Now, would you agree, this was your first job in the
6  private sector?
7  A    Yes.
8  Q    So all of your other jobs have been working in the
9  public sector, correct?
10 A    Yes, sir.
11 Q    And you left the Attorney General's Office at the time
12 of 2007 because you wanted to make more money, right?
13 A    Among a couple of reasons, but it was certainly a good
14 reason.
15 Q    Now, Mr. Fusto, would you agree that the purpose of
16 presenting evidence to a grand jury is to determine if
17 there's enough evidence to proceed with an indictment and
18 charge the individual?
19 A    Yes.
20 Q    Would you also agree that it's the grand jury's role to
21 determine if there's sufficient evidence to charge Mr. Morse
22 or not?
23 A    My understanding is they are the ultimate arbiter of
24 that.
25 Q    And would you also agree that up until the moment that

1  you presented the case in the grand jury, you were working
2  in an investigative capacity?
3  A    Up until what point?
4  Q    Up until the time that you literally presented evidence
5  to the grand jury, would you agree that you were working in
6  an investigative capacity in putting this case together?
7  A    I mean, our investigation had largely concluded.
8  Q    Referring to your deposition --
9           MR. MILLER:  Objection.
10          THE COURT:  Finish your answer.
11 A    I mean, there wasn't really anything left to do
12 certainly by the end of 2005 or into early 2006.
13 Q    Referring to your deposition, page 311, line 13.
14    "Question:  Could you agree that up until the time when
15 you presented evidence to the grand jury, you were acting in
16 an investigative capacity in putting this case together,
17 correct?
18    "Answer:  Yes."
19    Would you agree that's your testimony at the
20 deposition?
21 A    Well, I said it, sure.
22 Q    And you stand by that testimony, don't you, sir?
23 A    Yes.
24          MR. MILLER:  Objection.
25          THE COURT:  Overruled.

1  Q    Now, during the grand jury proceeding itself, you were
2  there just to present evidence for the grand jury to
3  evaluate, correct?
4  A    That's the basic role when you're in there.
5  Q    And if the grand jury had determined that there was no
6  probable cause to move forward, then the case would have
7  ended then and there forever, correct?
8  A    I would have voted no true bill.
9  Q    You helped secure that indictment by presenting false
10 and misleading evidence, didn't you, sir?
11 A    No, sir.
12          MR. NORINSBERG:  I have nothing further.
13          THE COURT:  All right.  Ladies and Gentlemen,
14 we'll just take a ten-minute recess.
15          (Jurors exit the courtroom.)
16          THE COURT:  Could I see the parties, please.  The
17 next witness that you're going to call is Mr. Serra?
18          MR. NORINSBERG:  Yes.
19          THE COURT:  I think he is the subject of some
20 testimony that we know was going to be objected to, right?
21          MR. MILLER:  Right.  Per our in limine motion.
22          MR. NORINSBERG:  But you already ruled on that,
23 your Honor.
24          THE COURT:  I have a question about it, though.
25 What is it -- because I may not have understood this in the

1  way that I should -- what is it that you anticipate that
2  Mr. Serra will testify to about the conversation that he had
3  with Castillo?
4          MR. NORINSBERG:  Castillo came to him and said he
5  was being asked to lie and he asked Serra for his advice.
6  Serra told him not to lie.  Serra reported the conversation
7  to his supervisor, Arthur Lipstein.
8          They had a meeting with Arthur Lipstein and a
9  meeting which Castillo denied, but Serra says they actually
10 did have that meeting in which they addressed the issue of
11 him being asked to change his findings.  That's the essence
12 of his testimony.
13         THE COURT:  Who is that admissible against?
14         MR. NORINSBERG:  It's admissible against, you
15 know, Fusto.
16         THE COURT:  How?
17         MR. NORINSBERG:  Because Fusto is asking --
18         THE COURT:  I know.  Why isn't it -- the question
19 that hadn't hit me before is why isn't it hearsay as to
20 Serra?  Serra can testify as to what Castillo told him and
21 it can be used against Castillo, but how can it be admitted
22 against Fusto?
23         MR. NORINSBERG:  Well, I think it can be admitted
24 against both of them.  But against Fusto, the fact is that
25 Castillo was being asked to lie by Fusto.

1          THE COURT:  And you're offering that --
2          MR. NORINSBERG:  Under 404(b)(2) for absence of
3  mistake, knowledge, intent.
4          THE COURT:  That means it's some sort of similar
5  act.  That's not the issue.  I'm talking about the hearsay
6  issue.  You have Serra saying what Castillo said that Fusto
7  said to him.  That appears to me to be a hearsay question.
8          I don't know how that testimony is admissible
9  against Fusto.  Castillo could have testified to it.  How is
10 it admissible against Fusto?
11         MR. NORINSBERG:  Well, I think it's admissible now
12 against Castillo based on his testimony.
13         THE COURT:  It may be admissible against Castillo,
14 but I don't think it's admissible against Fusto.
15         MR. NORINSBERG:  If Castillo lied about the
16 fact -- yesterday if he lied, in fact, Fusto did ask him to
17 change his numbers and he actually was so upset about that
18 that he went to Serra, it goes back to Fusto manipulating
19 things.
20         THE COURT:  It's not the relevance, counsel; it's
21 the hearsay objection I'm asking you to address.  It's not
22 that's it's not relevant.  Of course it would be relevant.
23 But we have a confrontation issue, we have a hearsay issue.
24         Castillo denied it.  It's probably not a
25 confrontation issue because we don't have a criminal case so

1  it's not a confrontation issue.  I misspoke.  But it's a
2  hearsay issue.  I think the jury -- if you want to bring
3  that out against Castillo, perhaps you can bring out that as
4  to Castillo.  But I think the jury should be instructed that
5  they cannot consider this evidence in any way against Fusto.
6          I don't know how it's admissible against Fusto.
7  It's hearsay.  Explain to me what exception you have.
8          MR. NORINSBERG:  I believe that if you put all the
9  facts together again, it's a fabric --
10         THE COURT:  No, fabric isn't -- show me in the
11 Rules of Evidence where fabric is an exception to the
12 hearsay rule.
13         MR. NORINSBERG:  Here's an investigator, 37-year
14 career in law enforcement, who is swearing under oath some
15 conversation took place that one of the defendants denies
16 and the other defendant acknowledges that he didn't have any
17 type of numbers or fraud calculations until the winter of
18 2006 when he had to change his method of fraud.
19         I'm putting those two facts together.  That's what
20 happened.  He tried to get him to change his numbers.
21         THE COURT:  You're offering it for the truth that
22 Fusto attempted to get him to change his numbers.  That's
23 the very purpose that you can't offer it for.  I don't think
24 that this testimony is admissible against Fusto.  Perhaps
25 it's admissible against Castillo because Castillo denied it

1  and it somehow shows that Castillo was, you know, involved
2  in something involving changing numbers.
3          MR. NORINSBERG:  Okay.
4          THE COURT:  You may be able to offer it against
5  Castillo.
6          MR. NORINSBERG:  Okay.
7          THE COURT:  I am going -- it seems to me that
8  appropriately the jury will be instructed that they cannot
9  consider this testimony in any way against Fusto.  It's
10 hearsay as against Fusto.
11         MR. NORINSBERG:  Fair enough.
12         MR. MILLER:  As to our Rule 403 objection, your
13 Honor?
14         THE COURT:  Well, I can't say that as to Castillo
15 it doesn't have some relevance, but I'm going to tell the
16 jury they cannot consider the testimony in any way against
17 Castillo.  And what, by the way -- is Serra going to say
18 that Castillo told him I was being asked to perjure myself?
19         MR. NORINSBERG:  In many different ways he said
20 that in his deposition.
21         THE COURT:  How?
22         MR. NORINSBERG:  First he said --
23         THE COURT:  Forget the deposition.  What do you
24 think Serra's going to say here?
25         MR. NORINSBERG:  I think he's going to say that

1  Castillo came to me and he was very upset.  He had been
2  asked to change his numbers and he was basically being asked
3  to lie.  And that's what he told --
4       THE COURT:  Did Castillo say I'm being asked to
5  lie?
6       MR. NORINSBERG:  The first time Serra said it in
7  his deposition, he used the exact words.  Let me give you
8  the quote.  "He's asking me to lie, and I'm very
9  uncomfortable about that."
10      Then I asked him were those the exact words?  He
11 said, basically in substance, that's what he conveyed to me.
12      MR. MILLER:  He said he didn't use the word "lie,"
13 and he felt that if he testified to a lower number, it
14 wouldn't represent the true nature of his work.  Something
15 like that.
16      MR. NORINSBERG:  That's for redirect.  There were
17 a number of other things.  He said Serra said that he
18 believed what he was told, that that could constitute
19 perjury.  That actually he believed --
20      THE COURT:  Who said that it could constitute
21 perjury?
22      MR. NORINSBERG:  That was the impression of what
23 the --
24      THE COURT:  I'm not sure that his, quote,
25 impression, unless it has some foundation, that he should be

1  able to testify about an impression.  I'll allow him to
2  testify as to what he says the fellow told Castillo told
3  him.
4       MR. MILLER:  Exactly.  And critically, your Honor,
5  he says -- Serra says in his deposition he did not use the
6  word "lie."
7       MR. NORINSBERG:  But he said it was altering
8  evidence.  He said in 37 years he had never heard of
9  something like this.
10      THE COURT:  Who had never heard it?
11      MR. NORINSBERG:  James Serra.
12      THE COURT:  But Serra's opinion is of somebody
13 altering evidence.  He may not have heard of that.  But the
14 issue is what Castillo said to him in words and substance,
15 what it is that he understood Castillo to be saying to him.
16      MR. NORINSBERG:  What he understood was that
17 Castillo was being asked to lie and commit perjury.  That
18 was his understanding.  That's why he not only confronted
19 Fusto with it --
20      THE COURT:  Who confronted?
21      MR. NORINSBERG:  Serra.
22      THE COURT:  When did he conduct --
23      MR. NORINSBERG:  After the conversation.  He had
24 an actual confrontation with Fusto about this.
25      THE COURT:  Are you going to bring that out?

1       MR. NORINSBERG:  Yes.
2       THE COURT:  What did Fusto say?
3       MR. NORINSBERG:  He didn't say in his deposition
4  what he said.
5       THE COURT:  What are you going to elicit about
6  that?
7       MR. NORINSBERG:  I'm not asking what the
8  conversation was.  I'm asking about actions taken by this
9  witness after the conversation.  He spoke not only to Fusto,
10 but he went above Fusto because he was very concerned about
11 the allegations here of what Castillo was saying that he was
12 being asked to do.  He went way above to Arthur Lipstein.
13      THE COURT:  Then what happened?
14      MR. NORINSBERG:  They had a meeting and then
15 Arthur Lipstein took it to Peter Bloch, who is one of the
16 highest ones in command over there.
17      THE COURT:  And what happened?
18      MR. NORINSBERG:  Nothing happened out of it.  I
19 don't have any record from discovery of what they did in
20 response to this.  I just have his testimony which your
21 Honor pointed out the first time this came up, his testimony
22 by itself, that's viable testimony, that's evidence.  I
23 don't know what happened afterwards.  They never told me.
24 When I deposed Arthur Lipstein, he didn't remember anything.
25 I deposed Bloch; he didn't remember anything.

1       MR. MILLER:  Serra was the only one who used the
2  word "perjury."  The others like Castillo, Lipstein didn't
3  remember it and Bloch didn't remember it.
4       THE COURT:  Please, you can't talk over each
5  other.
6       He can only testify as to what Castillo told him.
7  If you want to have him testify to something he did after,
8  he can testify to what he did after that.  But I don't want
9  him to place any -- I think he should just testify as to
10 what Castillo told him.  What is the relevance of the fact
11 that Serra went to these other people?
12      MR. NORINSBERG:  Because it confirms the fact that
13 there's a very serious allegation, and he lied.  He
14 said -- I'm sorry, your Honor.  He said yesterday that no
15 such meeting took place.
16      THE COURT:  Was Castillo with him?
17      MR. NORINSBERG:  Yes.
18      THE COURT:  You can elicit that Serra was
19 concerned about this and that he went with Castillo to
20 another person to address it.  That he was concerned about
21 what he said to him about altering records and that he and
22 Castillo went to see somebody else to talk about it because
23 that contradicts what Castillo said.
24      MR. NORINSBERG:  I don't want to run afoul of the
25 Court's order and I'm going to do my best.  The way the

1  questioning is set up --
2           THE COURT:  I want him to testify to precisely
3  what the conversation that he had with Castillo was; what he
4  best remembers Castillo said to him and what he said to
5  Castillo, without putting any gloss on it.
6           MR. NORINSBERG:  Okay.
7           THE COURT:  He can then testify, it seems to me,
8  that he was concerned about what he had heard and that he
9  and Castillo -- that he took Castillo to someone else
10  because he was concerned about records being altered.  But I
11  think that his view that it was perjury, if there was
12  something that he could say that Castillo said that led him
13  to that conclusion, but I don't see that there's something.
14           MR. NORINSBERG:  There is something.  In the
15  deposition, the first time he said it, he said, "He's asking
16  me to lie, and I'm very uncomfortable about it."  That is
17  evidence.  He might have qualified it with another answer,
18  but he said it under oath.  How can I not be able to bring
19  that up?
20           THE COURT:  If he said that under oath, you can
21  bring that out.  The fact that he changed it later, you can
22  bring it out.  But if he said it, you can bring it out.
23           We'll have about five minutes.
24           (Recess taken.)
25           (Continued on the next page.)

1           (The Honorable Carol B. Amon takes the bench.)
2           THE COURT:  Okay.  Bring the jury out.  The parties
3  try to keep in mind that the jurors have to leave at five.
4           (The jury entered at 4:16 p.m.)
5           THE COURT:  Ladies and Gentlemen, please be
6  seated.
7           Let me just explain to you.  You know, you will
8  recall that the defendant in this action, Mr. Fusto, was on
9  the stand.  Mr. Norinsberg had completed his examination,
10  and ordinarily what would happen is defense counsel would
11  then begin his cross-examination of that witness.  We have
12  taken a witness out of order to accommodate the witness's
13  personal schedule.  So that's why we're going a little bit
14  out of order.
15           Do you want to call the witness?
16           MR. NORINSBERG:  Sure.  At this time, plaintiff
17  calls James Serra to the stand.
18           THE COURT:  Please swear in the witness.
19           COURTROOM DEPUTY:  Sir, please stand and raise
20  your right hand.
21  JAMES A. SERRA, having first been duly sworn, was examined
22  and testified as follows:
23           COURTROOM DEPUTY:  Please state your name and
24  spell it for the record.
25           THE WITNESS:  Senior Investigator James A. Serra,

1  S-E-R-R-A, shield 991044.
2  DIRECT EXAMINATION
3  BY MR. NORINSBERG:
4  Q    Good afternoon, Mr. Serra.  You're here pursuant to a
5  subpoena, correct?
6  A    I believe it is, yes.
7  Q    And you and I have met before, correct?
8  A    Yes, we have.
9  Q    We met at a deposition that you gave, correct?
10  A    Yes.
11  Q    You were represented by Mr. Farber at that deposition,
12  correct?
13  A    Yes, I was.
14  Q    And you reviewed your deposition testimony before you
15  came here today, right?
16  A    I have, yes.
17  Q    Now, you're currently employed at the New York State
18  Attorney General's office in the Medicaid fraud division; is
19  that correct?
20  A    Yes.
21  Q    And you're a senior investigator; is that correct?
22  A    Yes.
23  Q    And you've been at MFCU for over 10 years; is that
24  correct?
25  A    Fourteen years, yes.

1  Q    Fourteen years.
2       Now, before joining the Medicaid fraud control unit,
3  you worked at the New York City Police Department; is that
4  correct?
5  A    27 years, yes.
6  Q    And you were a detective at the NYPD for about 20
7  years, right?
8  A    Yes.
9  Q    So all together, sir, you've worked for approximately
10  40 years in the field of law enforcement, right?
11  A    Yes.
12  Q    Now, you actually knew Mr. Flynn at the NYPD, right?
13  A    We were in the same academy class, yes.
14  Q    And you became partners with Mr. Flynn as soon as you
15  were assigned to MFCU, correct?
16  A    Yes.  Soon thereafter his assignment.  I was there a
17  year before him.
18  Q    You've been steady partners since at MFCU; is that
19  correct?
20  A    Yes.
21  Q    And you were partners working together on the case of
22  Leonard Morse, correct?
23  A    Yes.
24  Q    Now, John Fusto was the prosecuting attorney on that
25  case, correct?

1   A    Yes, he was.

2   Q    He was the one who was responsible for deciding how

3   this investigation was conducted, right?

4   A    Yes.

5   Q    And your role as an investigator would be to carry out

6   whatever tasks Mr. Fusto asked you to carry out, correct?

7   A    Yes.

8   Q    Now, when you were doing investigations at the NYPD,

9   you would actually be the one making all the decisions for

10  the investigation, right?

11  A    Yes, sir.

12  Q    But here it was Mr. Fusto who actually was, in effect,

13  the chief investigator, right?

14  A    I don't think you'd call him chief investigator.  But

15  he would direct the case and make assignments as to what it

16  was he needed us to do in connection with the case.

17  Q    Now, at some point during the course of this

18  investigation, there came a time where you learned that Jose

19  Castillo had been asked to recalculate the numbers by

20  Mr. Fusto.  Yes or no.

21  A    Not recalculate.  To lessen the numbers or -- not

22  lessen.  Come in with a lower number than he had come in

23  with.

24  Q    Okay.  Referring to your deposition, Page 97, Line 24:

25       "QUESTION:  How did you learn that Mr. Fusto had asked

1   Mr. Castillo to recalculate the numbers?

2        "ANSWER:  He came to us, Castillo, to ask our opinion

3   if whether or not he should do it, and we advised him that

4   what he was being asked to do" --

5        MR. MILLER:  Objection.

6   BY MR. NORINSBERG:

7   Q    -- "would constitute perjury."

8        THE COURT:  Sustain the objection.

9        MR. NORINSBERG:  Can I continue reading rest of

10  the answer?

11       THE COURT:  No.

12       MR. NORINSBERG:  Where He says he's asking me to

13  lie?

14       THE COURT:  You can ask him preliminary questions.

15  At this point, you shouldn't be reading that portion of the

16  testimony.

17  BY MR. NORINSBERG:

18  Q    Did Mr. Castillo represent to you that Mr. Fusto was

19  asking him to lie, and he's very uncomfortable about it?

20       THE COURT:  Ladies and Gentlemen, let me just

21  caution you too.  This is kind of a point of law that may be

22  a little bit difficult to understand.  But this testimony

23  that's being offered can be -- about what Mr. Fusto may have

24  told somebody or said to somebody is being offered for you

25  solely with regard to what Mr. Castillo said about this

1   witness.  This testimony cannot be considered by you for any

2   purpose as against the defendant Fusto.

3   BY MR. NORINSBERG:

4   Q    Mr. Serra, did Mr. Castillo tell you that Mr. Fusto's

5   asking him to lie and he's very uncomfortable with it?

6   A    Did Mr. Castillo say that?  I think if you read further

7   down, Counselor, I corrected that in stating that he did not

8   use the word "lie."

9   Q    Did you say at one point in your deposition, sir,

10  quote, he was very uncomfortable --

11       MR. MILLER:  Objection.

12       THE COURT:  Overruled.

13  BY MR. NORINSBERG:

14  Q    "He was very uncomfortable, very upset with being asked

15  to do this.  He said, he's asking me to lie, and I'm very

16  uncomfortable with it."

17       Did you say those words?  Did those words come out of

18  your mouth at your deposition?  Yes, they did or no, they

19  didn't.

20  A    I answered that they did come out of my mouth.

21  Q    The question is, sir, did you use the words --

22       THE COURT:  He just answered it.  He said they did

23  come out of his mouth.

24  BY MR. NORINSBERG:

25  Q    Now, after Mr. Castillo came to you, you told

1   Mr. Castillo that he shouldn't change his numbers, correct?

2        MR. MILLER:  Objection.

3        THE COURT:  Overruled.

4   A    I believe what I suggested is that he speak with his

5   supervisor before -- his immediate supervisor before

6   changing any numbers.

7   Q    Now, you told Mr. Castillo to not change his numbers

8   because he, in effect, would be telling untruths, correct?

9   A    I don't recall if those were the words I used.  But in

10  essence, yes, that if the numbers he was being asked to

11  change or to lower were not -- were not in fact the numbers

12  that were reflective of his work, then he should talk to his

13  supervisor.

14  Q    Well, in all of your years of law enforcement, you had

15  never heard of a prosecutor trying to alter evidence in this

16  way, had you?

17       MR. MILLER:  Objection.

18       THE COURT:  Sustained.

19  BY MR. NORINSBERG:

20  Q    Now, you and Mr. Flynn advised Mr. Castillo that he

21  shouldn't change the numbers.  Do you agree with that?

22  A    The rest of that statement should include until he

23  spoke with his supervisor.

24  Q    Did you say the following at your deposition, Page 101

25  line 4:

1  "QUESTION:  And you and Mr. Flynn both advised
2  Mr. Castillo that he shouldn't change the numbers, correct?
3  "ANSWER:  Yes."
4  A  Yes.
5  Q  Do you recall giving that testimony, sir?
6  A  Yes.
7  Q  Now, you then told Mr. Castillo that he should talk to
8  his supervisor, correct?
9  A  Say again.
10 Q  You then told Mr. Castillo that he should talk to his
11 supervisor, correct?
12 A  Yes.
13 Q  But you didn't just leave it at that, Mr. Serra, did
14 you?
15 A  I believe we went with him to his supervisor.
16 Q  Following that meeting, you met with John Fusto, didn't
17 you?
18 A  Later on.
19 Q  You and Investigator Flynn met with John Fusto,
20 correct?
21 A  Yes.
22 Q  You discussed the issue that had been raised by
23 Mr. Castillo?
24 A  Yes.
25 Q  And you asked Mr. Fusto why he was trying to have Jose

1  Castillo change the numbers?
2  A  Yes.
3  Q  But you didn't just leave it at that, Mr. Serra.  You
4  actually went to his supervisor at MFCU yourself, correct?
5  A  Whose supervisor?
6  Q  You went to a supervisor, Arthur Lipstein, didn't you?
7  A  That was Castillo's supervisor, yes.
8  Q  Okay.  So you not only told Castillo that he should
9  speak to his supervisor; you, yourself actually spoke to
10 John Fusto and confronted him about it, and you also went to
11 Mr. Castillo's supervisor, Arthur Lipstein, correct?
12 A  I think you have it a little out of sequence.  We went
13 to the supervisor first and then spoke with John Fusto.
14 Q  Fair enough.  You went to your supervisor and then spoke
15 to John Fusto, right?
16 A  Yes.
17 Q  Now, the meeting -- you had this meeting take place in
18 Arthur Lipstein's office; is that correct?
19 A  Yes, sir.
20 Q  And the meeting took place on the 13th floor in the
21 auditor's section of the building of the Attorney General's
22 office, correct?
23 A  Yes.
24 Q  It was -- and during that meeting, Mr. Flynn was there,
25 Mr. Castillo was there, Mr. Castillo's supervisor and Arthur

1  Lipstein were all there; is that correct?
2  A  I know that I was there, Flynn was there, Castillo was
3  there and Lipstein.  I don't know if there was anyone else
4  there.  I don't recall at this time if there was anyone else
5  there.
6  Q  Okay.
7     And after you had this discussion with the supervisor,
8  Arthur Lipstein, Arthur Lipstein then went to another
9  supervisor, Peter Bloch, to talk about the fact that
10 Mr. Fusto was trying to get Mr. Castillo to change his
11 numbers, right?
12 A  To lower his numbers, yes.
13 Q  Sir, we'll get to that in a bit.
14    You went to Arthur Lipstein, and then Arthur Lipstein
15 went to Peter Bloch; is that correct?
16 A  Yes.
17       THE COURT:  Were you there with he and Peter
18 Bloch?
19       THE WITNESS:  No.
20       THE COURT:  Then I don't think it's an appropriate
21 line of inquiry, Counsel.
22 BY MR. NORINSBERG:
23 Q  Now, after Mr. Fusto learned that you had gone to speak
24 to Arthur Lipstein, he became a little upset with you,
25 correct?

1  A  I don't recall that at all.
2  Q  Referring to your deposition, Page 113, Line 23:
3     "QUESTION:  So he was upset with you because you had
4  taken this issue to people above his head?
5     "ANSWER:  Yes."
6     Do you recall that testimony?
7  A  If it's there, I said it.
8  Q  Now, during the course of this investigation, you tried
9  to discuss with Mr. Fusto the evidence that he had
10 accumulated; is that correct?
11 A  Evidence that who had accumulated, sir?
12 Q  The evidence that had been accumulated as part of the
13 investigation that you were conducting.
14 A  You'd have to be a little clearer than that.  I don't
15 know what you mean, discussed with him the evidence.
16 Q  Referring to your deposition Page 46, line 16:
17    "QUESTION:  Did you ever discuss with Mr. Fusto what
18 evidence he had accumulated during the course of this
19 investigation?
20    "ANSWER:  No.  I tried to."
21    Line 22:
22    "QUESTION:  When did you try to do that?
23    "ANSWER:  Several times."
24    Do you recall giving that testimony?
25 A  I don't recall it; but if it's there, I obviously said

1    it.

2    Q    So you actually went to Mr. Fusto several times to find

3    out what investigation Mr. Fusto had uncovered -- what

4    evidence he uncovered during this investigation, right?

5    A    At the time, if I said so, then yes, I recalled it as

6    such then.

7    Q    In fact, both you and Mr. Flynn were very frustrated

8    with the pace of the investigation and wondering why it was

9    taking so long to bring this case to a conclusion, right?

10   A    That is true.

11   Q    And you actually went several times to Mr. Fusto to ask

12   why it was taking so long, correct?

13   A    I would say yes, that we did.  We asked him several

14   times.

15   Q    And you asked him several times about the status of his

16   investigation, correct?

17   A    I would have to say yes.  That went hand in hand with

18   why it was moving so slowly.

19   Q    And Mr. Fusto said to you, I'm the lawyer, you're just

20   the investigator, don't worry about it, right?

21   A    I don't think those were the exact words he used,

22   although I believe what he said was, I'm the lawyer, and

23   I'll take the heat for it or I'll handle it.  Words to that

24   effect.

25   Q    Referring to your deposition Page 48, Line 24:

---

1        "QUESTION:  So essentially Mr. Fusto said, I'm the

2    lawyer, I'll handle this; you're just the investigator,

3    don't worry about it?

4        "ANSWER:  That's it."

5        Do you recall giving that testimony, sir?

6    A    I might have answered yes to your question when you

7    phrased it like that.

8    Q    And you --

9        THE COURT:  Let him finish his answer.

10   BY MR. NORINSBERG:

11   Q    Were you finished with your answer?

12   A    And I don't believe he used the words "you're just the

13   investigator."  I believe those were your words, and I may

14   have just answered yes to it, sir.

15   Q    Well, you agreed with it?

16   A    I agreed to it at the time, under the, you know -- at

17   that moment, yes.

18   Q    And Mr. Fusto told you the same thing every time you

19   asked him about what was going on, correct?

20   A    He was the lawyer and that he would take the heat for

21   it if there was any heat to be brought down on me, yes.

22   Q    Now, most of your NYPD investigations would last a

23   month to a year.  Some would go maybe two -- could be solved

24   even in two years, right?

25   A    Say that again.

---

1    Q    Most of your NYPD investigations would last a month to

2    a year, and even a homicide case would usually take -- could

3    go to trial within two years?

4    A    Go to trial within two years, yes.

5    Q    Okay.

6        Yet this investigation lasted four years, correct?

7    A    Not something I had control over, sir.

8    Q    Twice as long as it would take to get a homicide case

9    to trial, right?

10   A    In some instances, yes.  I mean, I have a homicide case

11   that has never gone to trial.

12   Q    And you were wondering as the years went on why nothing

13   was being done, right?

14   A    Yeah.  I think I answered that, sir.

15   Q    And, in fact, it got to a point where you actually took

16   action, and you went to a supervisor named Richard Harrow,

17   correct?

18   A    Yes.

19   Q    He's the regional director in New York City, right?

20   A    Was the regional director.

21   Q    At the time of these events, he was the regional

22   director of New York City, correct?

23   A    Yes.

24   Q    You and went to Mr. Harrow not once but twice to

25   discuss the slow pace of this investigation, right?

---

1    A    Yes.

2    Q    You had two different conversations with Mr. Harrow in

3    order to try to move things along, correct?

4    A    Yes.

5    Q    And to use your words, you wanted to light a fire under

6    Mr. Fusto, right?

7    A    If those were the words I used, yes.  To get the case

8    moving, yes.

9    Q    And Mr. Harrow said he would take care of it and get

10   this case moving along, correct?

11   A    That's what he said.

12   Q    Now, this is the only time in your career that you ever

13   had to approach a supervisor involving a case under

14   investigation, true?

15   A    That is true.

16   Q    But there was no change in the pace in this

17   investigation even after you spoke to Mr. Harrow two times,

18   correct?

19   A    That is correct.

20   Q    Now, Mr. Fusto never asked you to go out, back to

21   Design Dental, and see if you could recover some missing

22   invoices, did he?

23   A    I don't believe that he did, and I don't know that

24   there were any missing.

25   Q    My question is, sir:  Did he ever ask you to go back to

**JA288**

1  Design Dental to recover some missing invoices?
2  A   No.
3  Q   And no one actually asked you to go out and collect any
4  additional evidence, correct?
5          MR. MILLER:  Objection.
6          THE COURT:  I'll sustain the objection, the form
7  of that question.
8  BY MR. NORINSBERG:
9  Q   Now, at some point, Dr. Morse was placed under arrest;
10 is that correct?
11 A   He surrendered, yes.
12 Q   Okay.  Mr. Fusto made the decision to have him
13 arrested; is that correct?
14 A   I believe the decision, yeah.  It was not entirely his.
15 I mean, it has to be -- it comes from upstairs that it's
16 okay to effect the arrest.
17 Q   And then you carried out that order; is that correct?
18 A   Yes, sir.
19 Q   You and Mr. Flynn arrested Dr. Morse, correct?
20 A   Yes.
21 Q   Now, did you ever learn of any additional records or
22 any additional evidence that had been uncovered in the time
23 period from 2004, in the winter, until 2006, when the arrest
24 took place?
25 A   Not that I'm aware of, no.  Or not that I recall.

1  Q   Now, at the very start of this investigation, back in
2  2002, you were present during an interview of Dr. Morse in
3  his office; is that correct?
4  A   Yes, I was.
5  Q   And Dr. Morse did not appear to be nervous to you at
6  all, did he?
7  A   No.
8  Q   He didn't appear to be acting in a suspicious manner,
9  did he?
10 A   No, he did not.
11 Q   He, in fact, struck you as being fully cooperative,
12 correct?
13 A   He was fully cooperative, sir.
14 Q   Now, in your 40-plus years of law enforcement, you've
15 interviewed many potential suspects as part of your
16 investigations, correct?
17 A   Yes.
18 Q   And sometimes there are telltale signs of deception,
19 such as sweating or hand motions or moving, things like
20 that, correct, sir?
21 A   That's correct.  And sometimes there are not.
22 Q   And you didn't see any of those telltale signs during
23 this interview, did you?
24         MR. MILLER:  Objection.
25 A   No.

1  Q   Now, your custom and practice when you're working in
2  the Medicaid fraud unit is to interview patients in person,
3  correct?
4  A   Not always.
5  Q   Is that your custom and practice, sir?
6  A   I said "not always."  We do -- that is my preference,
7  my personal preference.
8  Q   I'm sorry.
9  A   It's My personal preference to do it face-to-face.
10 However, there are instances where we have interviewed
11 people on the telephone.
12 Q   Referring to your deposition, Page 24 Line 24:
13     "As the senior investigator at MFCU, would your custom
14 and practice be to interview recipients in person?
15     "ANSWER:  Yes, it is."
16     Do you recall giving that testimony, sir?
17 A   Yes, I do.
18 Q   And, in fact, you cannot think of any reason why a
19 recipient would be interviewed by a telephone as opposed to
20 in person.  Isn't that what you testified to at your
21 deposition?
22 A   I may have.
23 Q   And you can't think of any reason why an investigator
24 would not interview in person somebody who actually lived in
25 the New York City Metropolitan area, right?

1  A   I believe I did say that, yes, because I do believe
2  that.  If you know who they are and where they live, that
3  the interview should be conducted in person.
4  Q   Yet in this case, over a four-year investigation, only
5  12 out of 329 patients were interviewed, and all of them
6  were interviewed only by telephone; isn't that true?
7  A   We had a number who were initially interviewed by
8  telephone, and we conducted what I construed as interviews
9  when we served subpoenas later on in the investigation.  So
10 we did speak to people face-to-face, yes.
11 Q   I'm not talking about people.  I'm talking about
12 Medicaid patients.
13 A   Yes.  The ones we served subpoenas on were patients.
14 Q   There were 12 patients in all that were interviewed
15 over a four-year investigation, correct?
16 A   I don't know.  I don't recall how many there were.
17 Q   Now, in this investigation, you were assisting
18 Investigator Flynn, correct?
19 A   Yes.
20 Q   He's the one who was actually doing the interviewing,
21 correct?
22 A   Yes.
23 Q   And he actually conducted all of his interviews by
24 telephone, true or not true?
25 A   He did do interviews by telephone.  However, we did

1  speak face-to-face with people.  Not all of the -- the
2  initial investigation, we were in the street, and we spoke
3  face-to-face with the initial patients that we went out to
4  see.  Or the father, and he had two sons.
5  Q    Now, you're familiar with what's known as an in-mouth
6  examination, correct?
7  A    Yes.
8  Q    What is an in-mouth examination?
9  A    A dentist present, a recipient would show up at the
10 office and be examined by a dentist and generally
11 interviewed at the same time.
12 Q    And an in-mouth exam can tell you, as an investigator,
13 very quickly whether or not the dentist has actually done
14 the work that he had billed for, correct?
15 A    It doesn't tell me anything, because I don't look in
16 the mouth.  It tells the dentist that looks in the mouth.  I
17 mean, I have nothing to do with touching, looking or
18 interacting with the patient other than interviewing the
19 patient after the in-mouth.
20 Q    Referring to your deposition Page 75, line 8:
21      "QUESTION:  An in-mouth examination can tell you very
22 quickly whether or not the dentist has actually done the
23 work that he billed for?
24      "ANSWER:  In most instances, yes.  Or if the work that
25 is present in the mouth, the dentist in fact -- whether or

1  not that dentist did the work is another story."
2      Do you recall giving that testimony?
3  A    Read that back, please.
4  Q    "Question:  An in-mouth examination can tell you very
5  quickly whether or not the dentist has actually done the
6  work that he billed for?
7      "In most instances, yes.  Or if work that is present in
8  the mouth, the dentist in fact -- whether or not that
9  dentist did the work is another story."
10      Do you recall giving that testimony?
11 A    As a generalization, I probably -- I might have said
12 that, yes.  I don't recall specific words at the time.
13 Q    In the four-year investigation in this case, there were
14 actually only 15 people who were examined for an in-mouth;
15 is that correct?
16 A    I think the number was 20, closer to 21, but I'm not
17 sure.
18 Q    And do you know if any of those people actually
19 testified at the grand jury?
20 A    I don't believe they did.
21 Q    Now, you were also present at the criminal trial,
22 assisting the role in bringing witnesses to the trial; is
23 that correct?
24 A    I was present --
25           MR. MILLER:  Objection.

1            THE COURT:  I'll allow him to answer that one
2  question.
3  A    I was present in the hall outside the courtroom, yes.
4  Q    And you observed Mr. Fusto send away a witness at the
5  trial?
6            MR. MILLER:  Objection.
7            THE COURT:  Sustained.
8  BY MR. NORINSBERG:
9  Q    Now, the fact that -- you learned at some point
10 Dr. Morse was acquitted of all charges, correct?
11 A    I believe I did, yes.  No, I did.  I learned later on
12 that he was.
13 Q    You weren't surprised by that, were you?
14           MR. MILLER:  Objection.
15           THE COURT:  Sustained.
16 BY MR. NORINSBERG:
17 Q    Yes or no.
18           THE COURT:  Sustained.
19 BY MR. NORINSBERG:
20 Q    You believe that Mr. Fusto was actually terrified to go
21 to trial in this particular case, didn't you?
22 A    Terrified?  I don't know if I used the word
23 "terrified."  And if I did, I probably inappropriately used
24 it.  But he didn't want to go to trial in this case.
25 Q    Referring to your deposition, Page 108, Line 4:

1      "QUESTION:  In your opinion, he was terrified to go to
2  trial?
3      "ANSWER:  Yes.
4      "QUESTION:  In this case?
5      "ANSWER:  Yes."
6      Page 109, Line 3:
7      "QUESTION:  So you felt he was afraid to go to trial in
8  this particular case as well?
9      "ANSWER:  Absolutely."
10      Do you recall giving that testimony, sir?
11 A    If it's there, I said it.
12 Q    So you believed Mr. Fusto was afraid to go to trial in
13 this particular case, correct?  That's what you testified
14 to.
15 A    I don't believe he was -- the word "afraid," I don't
16 think I meant he was afraid to go other than his desire was
17 to secure a plea rather than go to trial.
18 Q    His desire was to resolve this case by plea
19 disposition; that's your testimony, right?
20 A    Yes.
21 Q    He didn't want to actually have to go to trial in this
22 case, true?
23 A    Yes, that's true.
24           MR. NORINSBERG:  Thank you.  Nothing further.
25           MR. FARBER:  May I approach the witness, your

1  Honor?
2          THE COURT:  Yes.
3          MR. FARBER:  (Handing.)
4  CROSS-EXAMINATION
5  BY MR. MILLER:
6  Q    Good afternoon, Mr. Serra.
7  A    Good afternoon.
8  Q    Do you remember when you started working on the case
9  involving Dr. Morse?
10 A    I believe it was in 2002.
11 Q    What was your role on the case?
12 A    I was the second investigator assigned to the case.
13 Q    What does it mean to be the second investigator?
14 A    I backed up my partner, Investigator Flynn.  The case
15 was specifically assigned to him.
16 Q    Now, how long have you worked at the Medicaid fraud
17 control unit?
18 A    Fourteen years this year.
19 Q    And in the course of those 14 years, how many cases
20 have you worked on?
21 A    Medicaid fraud cases, I'd have to say 100, maybe more.
22 Q    And in the course of those investigations, have you and
23 the other members of the team working with you tried to
24 determine how much money was taken from Medicaid?
25 A    I'm sorry?  Say that again.

1  Q    In the course of working on these cases, have you tried
2  to determine how much money was stolen from Medicaid?
3  A    Yes.
4  Q    In the course of those cases, has the amount that you
5  believed a Medicaid provider took from Medicaid changed over
6  time?
7          MR. NORINSBERG:  Objection.
8          THE COURT:  You mean in an individual case, have
9  you come to --
10         MR. MILLER:  In his experience.
11         THE COURT:  -- different conclusions as you went
12 along in the case?
13         MR. MILLER:  Yes.
14         THE COURT:  Is that what your question is?
15         MR. MILLER:  Yes.
16         THE COURT:  Do you understand the question?
17         THE WITNESS:  Yes, I do.
18         THE COURT:  He can answer.
19 A    Yes.  The dollar amounts have changed during the course
20 of an investigation.
21 Q    In the time you've worked with the Medicaid fraud
22 control unit, have you heard the term "benefit of the
23 doubt"?
24 A    Yes.
25 Q    What does that mean to you?

1          MR. NORINSBERG:  Objection.
2          THE COURT:  Overruled.
3  A    It's a benefit that's given to the defendant or the
4  subject of the investigation when -- if we're unable to
5  prove a dollar -- or a specific bill was generated for a
6  specific patient, then that bill is either eliminated or the
7  dollar amount, the bottom-line figure is adjusted to give
8  that credit to the subject of the investigation.  In other
9  words, he wouldn't be charged with that as a finding.
10 Q    So in your experience, if you've changed your
11 determination as to whether to give the benefit of the doubt
12 to a Medicaid provider, would that affect your determination
13 of how much had been taken from Medicaid?
14         MR. NORINSBERG:  Objection.
15         THE COURT:  Overruled.
16 A    Yes.
17 Q    Now, when Mr. Norinsberg was asking you questions, you
18 talked about an occasion on which Mr. Castillo came to you,
19 correct?
20 A    Yes.
21 Q    And can you explain to the jury what Mr. Castillo said
22 to you?
23 A    Mr. Castillo came to us and indicated that he was
24 concerned that he was asked to testify to a lesser amount
25 than the findings that he had.

1  Q    When you say "lesser amount," what do you mean?
2  A    The findings that he initially had exceeded a million
3  dollars, and he indicated that he was asked if he could
4  adjust his number to be less than 700,000, to lower the
5  number.
6  Q    Okay.
7          And who did Mr. Castillo indicate had asked him to come
8  up with the figure of less than $700,000?
9  A    He indicated that he was asked that by Mr. Fusto.
10 Mr. Fusto asked him to do that.
11 Q    Now, at the time Mr. Castillo came to you, did you have
12 any understanding of the analysis that he had conducted?
13 A    No.
14 Q    Did you know whether or not there were any missing
15 invoices at the time?
16 A    No, I did not.
17 Q    Do you know whether or not Mr. Castillo had any
18 difficulty identifying whether Dr. Morse's patients listed
19 in the laboratory invoices were Medicaid patients or not?
20 A    No, I did not.
21 Q    Did Mr. Castillo indicate to you that Mr. Fusto had
22 asked him to lie?
23 A    No, he did not.  Those were my words, and I corrected
24 them later on in the deposition.
25 Q    Over the course of this investigation, did you develop

1  an understanding whether Mr. Fusto or Mr. Castillo believed
2  the fraud, the alleged fraud was a large amount or a small
3  amount?
4          MR. NORINSBERG:  Objection.
5          THE COURT:  I'll sustain the objection to the form
6  of that question.
7  BY MR. MILLER:
8  Q   Now, Mr. Norinsberg asked you about a conversation you
9  had with Mr. Fusto after your conversation with
10 Mr. Castillo, correct?
11 A   Yes.
12 Q   And what did Mr. Fusto indicate to you in that
13 conversation?
14 A   I had asked -- I specifically asked Mr. Fusto why the
15 change in the numbers.  Why was he lowering the amount of
16 the finding, the dollar -- the bottom line.  And his
17 response was that the higher amount constituted a B felony,
18 which would have been mandatory jail time if the defendant
19 was found guilty, and that the lesser amount could result in
20 a possible plea and no jail time.
21 Q   So was Mr. Fusto saying that he thought a lower crime
22 was appropriate in this case?
23 A   Yes.
24         MR. NORINSBERG:  Objection.
25         THE COURT:  Overruled.

1  BY MR. MILLER:
2  Q   In the course of this case, did you meet any of the
3  Medicaid recipients who became grand jury witnesses?
4  A   Yes, I did, during the subpoena process.
5  Q   Where did you issue subpoenas to Medicaid recipients to
6  come testify at the grand jury?
7  A   In their homes or at their homes.
8  Q   Did you talk to them at their homes?
9  A   Yes, I did.
10 Q   And did you talk to them about the substance of their
11 testimony?
12 A   Yes, I did, and the process which they would be going
13 through as a grand jury witness.
14 Q   Now, during the course of this case, when you were
15 answering questions for Mr. Norinsberg, you indicated that
16 you were concerned with the pace of this investigation?
17 A   Yes.
18 Q   Why were you concerned with the pace of this
19 investigation?
20 A   I just felt that the speed of the case was -- it was
21 just taking entirely too long to prosecute a case that I
22 thought we had, you know, definitely proven or that was
23 definitely -- you know, we would definitely be able to
24 prove.
25 Q   What do you mean, you would definitely be able to

1  prove?
2  A   Well, the numbers were there.  We had the witnesses.
3  We had done the in-mouths.  We had, you know, definite
4  findings during the in-mouths.  And it's very hard to
5  maintain contact with Medicaid recipients, because a lot of
6  them are really transient.  And once you find -- you may
7  find them once, and you may never find them again.  So the
8  speed of the case or the speed in which the case moves along
9  is paramount, as far as we're con- -- I mean, we'd like to
10 see it move along a lot faster.  Makes our lives a little
11 easier.
12 Q   So during the course of the investigation, did you want
13 to see Mr. Fusto seek an indictment earlier than 2006?
14 A   Yes.
15         MR. MILLER:  Thank you, Mr. Serra.
16 REDIRECT EXAMINATION
17 BY MR. NORINSBERG:
18 Q   Mr. Serra, your understanding was that Mr. Fusto was
19 trying to have Mr. Castillo give false testimony before the
20 grand jury and tell untruths?  Yes or no.
21 A   False testimony, no.
22 Q   Referring to your deposition, Page 116, line 11:
23    "QUESTION:  So essentially Mr. Fusto was going to have
24 Mr. Castillo give false testimony before the grand jury?
25    "ANSWER:  That was the issue that Investigator Flynn

1  and I had, and we had related it.  He's asking you to tell
2  untruths in the grand jury, and you can't do that."
3    Do you recall giving that testimony, sir?
4          MR. MILLER:  Objection.
5          THE COURT:  Overruled.
6  A   I made the comment, but I'm almost positive that I
7  clarified that comment.
8  Q   Do you recall giving the following testimony --
9          MR. MILLER:  Objection.  He can't just read from
10 the transcript.
11 BY MR. NORINSBERG:
12 Q   Page 101, Line 10:
13    "QUESTION:  Why did you tell him not to change the
14 numbers?
15    "ANSWER:  Well, it was our feeling that if the numbers
16 reflect -- if the numbers that he actually established were,
17 in fact, accurate and true, then he was asking him to
18 falsify his information, and that could later on come back
19 to hurt him, hurt him personally, and that he should take it
20 up with his supervisor before making any decision to do
21 something like that."
22 A   Counsel, that is advice I would have given to anybody.
23 Q   Do you recall giving that --
24 Q   If you have a set of facts --
25 Q   Do you recall being asked that question and giving that

1   answer, sir?

2   A    If you have a set of facts and you're asked to change

3   the facts, I suggested that he see his supervisor before he

4   changed anything, yes.

5   Q    You believed it could constitute perjury; that was your

6   impression, right?

7   A    If he was asked to testify falsely, yes.

8   Q    And the fact is, Mr. Serra, you were not involved in

9   any way, shape or form with the numerical calculations that

10  were being made, were you?

11  A    No, I was not.

12  Q    You never actually saw any of the calculations, did

13  you?

14  A    No.

15  Q    And as you sit here now, you don't know whether the

16  calculations, in fact, went up, not down, after Mr. Castillo

17  was asked to recalculate his numbers, do you?

18  A    No, I don't.

19          MR. NORINSBERG:  Nothing further.

20          THE COURT:  All right.  Thank you.

21          Do you have anything further?

22          MR. MILLER:  No, your Honor.

23          THE COURT:  Thank you.  You can step down.

24          Ladies and Gentlemen, I'll excuse you for the

25  evening, of course with the admonition not to discuss the

1   case.

2          Do we need to start early tomorrow or no?

3          MR. MILLER:  It would be helpful.  He absolutely

4   needs to leave at noon.  So I think --

5          THE COURT:  Ladies and Gentlemen, I think we're

6   going to begin a little earlier tomorrow morning.  So we'll

7   begin at 9:00 a.m.  So I ask you to be here.

8          Remember, of course, don't discuss the case.

9          So we'll start at nine tomorrow.

10          Somebody mention that to Ms. Holly when you walk

11  out, because I will probably forget to.  Thank you.

12          (The jury exited at 4:56 p.m.)

13          THE COURT:  All right.  So we have Mr. Flynn?

14          MR. MILLER:  Correct.

15          THE COURT:  And then we're going to complete

16  Mr. Fusto?

17          MR. MILLER:  Correct.

18          MR. NORINSBERG:  And Dr. DeLuca.

19          MR. FARBER:  Also Dr. DeLuca.  How long do you

20  anticipate with Dr. DeLuca?

21          MR. NORINSBERG:  Not long at all.

22          THE COURT:  How long with Flynn?

23          MR. NORINSBERG:  Flynn could be an hour or a

24  little more.

25          THE COURT:  So when do you believe you'll rest

1   your case?

2          MR. NORINSBERG:  Not until Thursday.

3          THE COURT:  Okay.  I'll see everyone tomorrow.

4          (Time noted:  4:57 p.m.)

5          (Proceedings adjourned until Wednesday, February

6   6, 2013, at 9:00 a.m.)

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| JOHN FUSTO | | | |
| By Mr. Norinsberg | 241 | | |
| JAMES A. SERRA | | | |
| By Mr. Norinsberg | 441 | | 470 |
| By Mr. Miller | | 464 | |

EXHIBITS

| PLAINTIFF | PAGE |
|---|---|
| 12 | 406 |
| 33A, B, C, D, D-1 | 272 |
| 56 | 245 |
| 62 | 288 |
| 67 | 420 |
| 109 | 293 |
| 138 | 418 |

[*No document reproduced on this page*]