# 13-4074

## United States Court of Appeals for the Second Circuit

Dr. Leonard Morse,

*Plaintiff-Appellee,*

v.

John Fusto, Special Assistant Attorney General,
Jose Castillo, individually, Senior Special Investigator,

*Defendants-Appellants,*

Eliot Spitzer, individually, Robert H. Flynn, individually, Senior Special Auditor Investigator, Levon Aharonyan, individually, Senior Special Investigator, James Serra, individually, Senior Special Investigator, Design Dental Studio, Inc., Office of the Attorney General,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of New York

---

**JOINT APPENDIX: VOLUME 2 (JA295–end)**

---

Law Offices of Jon L. Norinsberg
Suite 2700
225 Broadway
New York, NY 10007
212-791-5396

*Attorney for Appellee*

Eric T. Schneiderman
 *Attorney General of the
 State of New York*
120 Broadway, 25th Floor
New York, New York 10271
(212) 416-8020

*Attorney for Appellants*

# TABLE OF CONTENTS

Page

**VOLUME 1**

Docket Sheet ....................................................................JA1

Complaint, filed Nov. 16, 2007, with exhibits ..........................JA21

Amended Complaint, filed June 15, 2011 ...............................JA124
  *(Exhibits reproduced with original Complaint)*

Second Amended Complaint, filed July 5, 2011.......................JA149
  *(Exhibits reproduced with original Complaint)*

Trial Transcripts...............................................................JA175

**VOLUME 2**

Trial Transcripts...............................................................JA295

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| J. Castillo | 189* | 217 | 225 | 227 |
| J. Fusto | 228 | 346 | 370 | 382 |
| J. Serra | 285 | 291 | 292 | |
| R. Flynn | 297 | 313 | 322 | 323 |
| L. Deluca | 325 | 334 | 340 | |
| L. Morse | 384 | 414 455 | 455 | |
| E. Mantell | 444 | 450 | 454 | |
| L. Aharonyan | 478 | 480 | | |
| C. Erath | 482 | 486 | | |

*Pages refer to Joint Appendix pagination.*

PAGE

**VOLUME 2 (cont'd)**

Court Exhibit 1 – Jury instructions.............................................................JA538

Court Exhibit 2 – Verdict sheet ................................................................JA557

Court Exhibit 3 – Note from jury................................................................JA560

Court Exhibit 4 – Note from jury................................................................JA561

Court Exhibit 5 – Note from jury................................................................JA562

Court Exhibit 6 – Note from jury................................................................JA564

Court Exhibit 7 – Note from jury................................................................JA565

Judgment, filed Sept. 16, 2013................................................................JA566

Notice of Appeal, filed Oct. 15, 2013........................................................JA567

```
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
DR. LEONARD MORSE,            :  07-CV-4793(CBA)

        Plaintiff,            :

    -against-                 :  United States Courthouse
                                 Brooklyn, New York
                              :

ELIOT SPITZER, ET AL.,        :  Wednesday, February 6, 2013
        Defendants.              9:00 a.m.
                              :
- - - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Plaintiff:    JON L. NORINSBERG
                      225 Broadway, Suite 2700
                      New York, New York 10007
                 BY:  JON L. NORINSBERG, ESQ.

For the Defendants:   HON. ERIC T. SCHNEIDERMAN
                      NYS Attorney General
                      120 Broadway, 12th Floor
                      New York, New York 10271-007
                 BY:  CHRISTOPHER Y. MILLER, ESQ.
                      SETH J. FARBER, ESQ.

Court Reporter:   Lisa Schwam, RPR, RMR, CRR
                  Official Court Reporter
                  Telephone: (718) 613-2268
                  Facsimile: (718) 613-2389

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

---

1           (In open court.)

2           (The Honorable Carol B. Amon takes the bench.)

3           THE COURT:  Good morning.

4           COURTROOM DEPUTY:  Morse versus New York.

5           THE COURT:  The jurors are here.

6           MR. NORINSBERG:  I have two brief applications.

7  It can wait, if you want, Your Honor, but I just want to

8  have an opportunity before Dr. DeLuca testifies.

9           Two things.  One, we were just served last night

10 with a new exhibit, approximately a 116-page exhibit that we

11 haven't seen before.  I still haven't seen it, actually.  I

12 just got it by E-mail.  While the parties have tried to work

13 with one another in updating their exhibit list and I don't

14 object in principle to them adding new exhibits, I think

15 it's unfair at this stage to give an exhibit that large.

16 We've had no opportunity to go through it.  I would just ask

17 at this point that that not be allowed to be used in this

18 case.

19          THE COURT:  What does it pertain to?

20          MR. NORINSBERG:  I have no idea.  Like I said, I

21 got it by E-mail last night.  We haven't even printed it

22 out.  We just know that the length of the exhibit itself is

23 very voluminous.

24          THE COURT:  What is it?

25          MR. MILLER:  A remittance statement that the

---

1  Department of Health sent to Dr. Morse.  It is lengthy

2  because there were a lot of claims.  Again, it was sent to

3  Dr. Morse.  It's sent with his check when he gets paid.  It

4  explains which claims he was paid for, which claims were

5  pended and which ones were denied.  It also lists which ones

6  were adjusted, meaning that a change was made to them that

7  didn't affect the monetary bottom line, but it results in

8  claim lines related to that claim.  This essentially deals

9  with the Stacy Rodriguez issue, and it shows that Dr. Morse

10 made adjustments in cycle 326 of 2002, early 2003 that

11 generated additional claim lines that resulted in the second

12 and third lines that you see on the spreadsheet in grand

13 jury selection --

14          THE COURT:  Adjusted claims how?

15          MR. MILLER:  It doesn't indicate exactly how it

16 was adjusted, but it was clearly a non-monetary adjustment,

17 because the net effect is zero.  You can change anything as

18 a provider in your claims at any time.  You can change, you

19 know, the county in which the recipient lives.

20          THE COURT:  What does it all mean?

21          MR. MILLER:  It means that Dr. Morse made a change

22 to his claims that resulted in those two extra lines being

23 in the Stacy Rodriguez data.

24          THE COURT:  Well, you had taken that position all

25 along, hadn't you, that that was the reason that those two

---

1  claims -- they're minuses, right?  So that means that he

2  asked for a claim and then he withdrew that claim?

3           MR. MILLER:  He didn't withdraw it.  What he did

4  was he made an adjustment.

5           THE COURT:  What does that mean?

6           MR. MILLER:  You can make lots of adjustments.  I

7  mean, my understanding at this point, this part is not in

8  the document --

9           THE COURT:  But you want to use this document for

10 cross-examination?

11          MR. MILLER:  Of Dr. Morse.

12          THE COURT:  Do you have just that one portion of

13 it that you're interested in?  You're not using all how many

14 pages, right?

15          MR. MILLER:  Well, the thing is he made hundreds

16 and hundreds of adjustments, actually thousands, over 2,000

17 adjustments in this one cycle.  That was after he was

18 investigated in this case, and so we wanted to bring that

19 out as well.

20          MR. NORINSBERG:  He didn't make any of those

21 adjustments.  Those are Medicaid adjustments, but the point

22 that --

23          THE COURT:  Now you understand what I mean --

24          MR. NORINSBERG:  Why weren't these documents

25 exchanged earlier?  It's not fair for me to have to go

1    through all of this right now, at this stage to have to
2    parse.  Maybe there's something else in there that I want to
3    use.  It's too late in the game to be introducing a document
4    of this size.
5         MR. MILLER:  Your Honor, I'll represent that it
6    was not in our possession until very recently.  We obtained
7    it from the Department of Health.  Dr. Morse, however, would
8    have sent it back in early 2003.  And he's produced a
9    remittance statement in this case for the June 2005 billing
10   related to Stacy Rodriguez.  So we have the remittance
11   statement for the first line of the three lines.  This is
12   now the second remittance statement, the later one that
13   corresponds to line 2 and line 3.
14        THE COURT:  Well, that, I don't think would be
15   very hard for counsel to deal with if you just are seeking
16   that portion of the exhibit.  I guess if you're seeking to
17   put it in for some larger purpose --
18        MR. MILLER:  Well, I think we should be allowed to
19   ask Dr. Morse.  Obviously, we didn't ask him at his
20   deposition because we didn't have the document.  But we
21   should be allowed to ask Dr. Morse if he made these
22   adjustments and bring out the fact that they were made in
23   cycle 326, the remittance statement was mailed in early
24   January 2003; and then in September of 2002, this
25   investigation started, and his claims were under scrutiny,

1    and then he made all these changes.
2         MR. NORINSBERG:  Your Honor, we represented from
3    the first filing of the complaint -- Stacy Rodriguez and her
4    billing was part of this from the original complaint.  They
5    had five years to get this information to us during
6    discovery.  It's unfair, it's prejudicial to just bring it
7    on us at this point in time.
8         I think parenthetically he's completely,
9    absolutely wrong about it.  These are done by Medicaid.  But
10   that's besides the point.  I don't feel like we should have
11   to deal with this.  After Dr. Morse has already had his
12   deposition, that we're first getting this information now.
13   I don't think it's fair.  It's prejudicial.  It's too late
14   in the game.
15        MR. MILLER:  Your Honor, it was not in the
16   original complaint.  The original complaint alleged
17   fabrication of the invoices.
18        MR. NORINSBERG:  No.
19        MR. MILLER:  As you know, you know, the claims
20   crystalized belatedly in this case.
21        MR. NORINSBERG:  It's not true.  Exhibit O was the
22   billing statement for -- Exhibit O of the original complaint
23   was the billing statement of Stacy Rodriguez.
24        THE COURT:  Why don't we bring the jury out.
25   We'll see where we are in the trial.

1         MR. NORINSBERG:  I have one other application, and
2    it relates to Dr. DeLuca.
3         THE COURT:  Go ahead.
4         MR. NORINSBERG:  Counsel had indicated in his
5    opening statement that he wants Dr. DeLuca to now testify
6    that even if the tooth numbers were in there, that, you
7    know, in her expert opinion, that would still be excessive.
8    We object to that.  We believe that now they're trying to
9    turn her into an expert.  But got no expert disclosures.  We
10   got no notice of that opinion.  We ourselves have been
11   stopped in this courtroom from presenting evidence by our
12   statistician to look back at what happened.  They also
13   should be bound by what Dr. DeLuca's testimony was before
14   this grand jury, not to try to clarify and add things now,
15   later in the day, that the original grand jury never knew
16   about.  So we don't feel they should be able to do that at
17   this point.
18        MR. FARBER:  If I might, Your Honor, the very
19   issue of whether or not Grand Jury 6 was a fabrication in
20   part or substantially turns on the contention that
21   Dr. DeLuca was supposedly misled by the absence of tooth
22   numbers.  And so the obvious question is if she had tooth
23   numbers, would she have testified differently.  That's a
24   very significant question here, to determine whether or not
25   the absence of the tooth numbers constituted false evidence

1    or a fabrication.  So that's simply the question I intend to
2    ask her.
3         MR. NORINSBERG:  They're trying to fix something
4    seven years after her testimony.  We have said repeatedly
5    and the Court has said that the focus here is what actually
6    was presented, and to add a new explanation seven years
7    later that the grand jury didn't know about is unfair and
8    prejudicial.  It shouldn't be allowed.
9         THE COURT:  But isn't your whole point of calling
10   her to say that you didn't know this; you wouldn't have said
11   X, Y and Z if you knew this?
12        MR. NORINSBERG:  But she said as much at her
13   deposition.
14        THE COURT:  What difference does it make what she
15   said at her deposition?  We talk about depositions like
16   they're somehow the trial.  If your point of calling her is
17   to say, look, this was material because you would have said
18   something -- you didn't know this, and then you're going to
19   -- I mean, presumably you're going to ask her those
20   questions.
21        I really have to see how her direct goes before I
22   can rule on this.  I'm not going to rule on it until I hear
23   what she has to say.
24        I think the jury is ready.
25        (The jury entered at 9:13 a.m.)

THE COURT: Good morning ladies, and gentlemen. We're ready to begin.

Mr. Norinsberg?

MR. NORINSBERG: At this point plaintiff calls Investigator Robert Flynn to the stand.

THE COURT: Please be seated.

COURTROOM DEPUTY: Sir, please raise your right hand.

ROBERT FLYNN, having first been duly sworn, was examined and testified as follows:

COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Robert Flynn, F-L-Y-N-N.

THE COURT: Good morning. You may inquire.

DIRECT EXAMINATION

BY MR. NORINSBERG:

Q Good morning, Mr. Flynn.
A Good morning.
Q You're here pursuant to a subpoena, correct, sir?
A Excuse me?
Q You're here pursuant to a subpoena, correct?
A Yes, sir.
Q And you and I have actually met before, correct?
A Yes.
Q We met at your deposition?

A Yes.
Q And at that time, you gave sworn testimony; is that correct?
A Yes.
Q And you also gave sworn testimony at the grand jury proceedings, correct?
A Yes.
Q And you've reviewed your prior testimony before coming here today, correct?
A Repeat that.
Q You've reviewed your prior testimony before coming to court today, correct?
A Yeah, some of it. Not all of it.
Q Now, are you currently employed, sir?
A I just retired.
Q Okay.
Before you retired, you were employed at the New York State Attorney General's office, correct?
A Yes.
Q And how long were you working at the Attorney General's office?
A I started in September of 2000, and I worked right up until the end of 2013 -- I retired December 31st, 2012.
Q You were assigned to the Medicaid fraud control unit, sir?

A Yes, sir.
Q And you were working at this unit, which we're referring to as MFCU, since the time you started at the Attorney General's office, right?
A Yes.
Q And your position at MFCU was as a senior investigator, correct?
A Yes.
Q Your duties and responsibilities were to investigate Medicaid fraud, correct?
A Yes.
Q Now, prior to working at MFCU, you had worked at the New York City Police Department, correct?
A Yes.
Q You worked at the NYPD for approximately 27 years?
A Yes.
Q And you were in the detective squad at the NYPD, correct?
A Yes.
Q And at the detective squad, part of your responsibilities were to investigate crimes; is that correct?
A Yes.
Q Crimes ranging from petty larceny to homicide and everything in between, right?

A Yes.
Q Now, you were first assigned to the Morse case in April 2002, correct?
A 2002. I'm not sure of the month.
Q Okay.
Did you prepare something known as a case index?
A Yes.
Q And I'm going to show you the case index. If you need to refer to this just to get the dates correct, by all means do so. This is Plaintiff's Exhibit 73. (Handing.)
Can you just identify for the record, what is a case index?
A It's just a -- it's easier for me to keep track of the case.
Q Does that list all of the things that you did on the case from start to finish?
A Yes.
Q And it gives you the dates that you did them?
A Yes.
Q So like I said, if you need to refresh your memory by looking at that, by all means, do so.
A Okay.
Q So you were first assigned in April of 2002, right?
A Yes.
Q Okay.

1    Now, even though you were the senior investigator,
2  Mr. Fusto was actually the one responsible for directing
3  this investigation, correct?
4  A   Yes.
5  Q   And Mr. Fusto is the attorney who was in charge of the
6  investigation, right?
7  A   Yes.
8  Q   And you took orders from Mr. Fusto with respect to what
9  type of information needed to be gathered, right?
10 A   Yes.
11 Q   Now, directing your attention to August 2002, did you
12 have occasion at that time to interview Dr. Morse?
13 A   Yes.
14 Q   And you interviewed Dr. Morse at his office, right?
15 A   Yes.
16 Q   And Mr. Serra, James Serra, your partner, was there as
17 well during this interview, right?
18 A   Yes.
19 Q   And would you agree that Mr. Serra was simply assisting
20 you in this case, right?
21 A   Yes.
22 Q   He was what you would refer to as a backup investigator
23 in this case?
24 A   Well, you always went out as a team.
25 Q   But he never interviewed any patients in connection

1  with this case, did he?
2  A   I don't believe he did, no.
3  Q   And other than just assisting you to transport
4  documents, did Mr. Serra have anything else to do with this
5  case?
6  A   No.  He just assisted me.
7  Q   Now, there was also the original auditor on this case,
8  Tim Johnson.  He was present during this interview of
9  Dr. Morse as well, correct?
10 A   Yes.
11 Q   Now, as a former detective with the NYPD, you've
12 interviewed many suspects over the years, right?
13 A   Yes.
14 Q   Did Dr. Morse appear to you to be nervous when you were
15 interviewing him?
16 A   No.
17 Q   Did he appear to you to be hiding anything?
18 A   No.
19 Q   Did he appear to you to be acting in any type of a
20 suspicious manner?
21 A   No.
22 Q   Would you agree Dr. Morse was fully cooperative with
23 you?
24 A   Yes.
25 Q   He was willing to answer your questions, right?

1  A   Yes.
2  Q   He was willing to assist you in the investigation,
3  correct?
4  A   Yes.
5  Q   He didn't ask for a lawyer to be present, did he?
6  A   No.
7  Q   Now, at some point in time -- strike that.
8      When you had that first meeting, you did not request
9  any charts from Dr. Morse at that time, correct, sir?
10 A   No, sir.
11 Q   But there came a time later on when you served a demand
12 letter on Dr. Morse, correct?
13 A   Yes.
14 Q   You served a demand letter on October 22nd, 2002; does
15 that sound right, sir?
16 A   Yes.
17 Q   And that's approximately three months or so after the
18 first interview?
19 A   Yeah.
20 Q   And you got -- in response to that demand letter,
21 Dr. Morse sent you a number of charts, correct?
22 A   Well, we picked them up, yes.
23 Q   You picked them up?
24 A   Yes.
25 Q   So you picked up approximately 101 charts the first

1  time, correct?
2  A   I don't know how many there were.
3  Q   Do you recall, sir, that, in total, you picked up
4  approximately 329 charts from Dr. Morse?
5  A   I don't know what the number was.
6  Q   Okay.  Referring to your deposition, Page 88, Line 21:
7      QUESTION: "So we can agree that a total of 329 charts
8  were requested from Dr. Morse?"
9      ANSWER: "Yes."
10     Does that refresh your memory as to the number of
11 charts that you had requested?
12 A   Well, I know I picked up a lot of charts.  The exact
13 number, I don't know.
14 Q   Well, can we agree that by February of 2004, your
15 office had a total of 329 charts provided by Dr. Morse?
16 A   I really don't know.
17 Q   Referring to your deposition, Page 89, Line 9:
18     QUESTION: "So MFCU had a total of 329 charts provided
19 by Dr. Morse as of February 2004, correct?"
20     ANSWER: "Yes."
21     Do you recall being asked that question and giving that
22 answer?
23 A   I don't recall, like I said.
24 Q   Does that refresh your memory that, in fact, there were
25 329 charts that Dr. Morse had provided to your office as of

1  February 2004?

2  A    If that's what they say the number was, I guess that's

3  what it was.  I didn't personally count the charts.

4  Q    Now, you were involved with this investigation over a

5  four-year period, from 2002 to 2006, correct?

6  A    Yes.

7  Q    And the 329 charts that had been delivered or picked up

8  represented the files of 329 different patients, true?

9  A    True.

10 Q    Yet during your entire four-year investigation, you

11 interviewed only 12 of these 329 patients, true?

12 A    Yeah.  Yes.

13 Q    So you never interviewed 317 out of the 329 patients;

14 is that correct?

15 A    Correct.

16 Q    And of the 12 interviews that you did, all of the

17 interviews were actually done just on the telephone,

18 correct?

19 A    Yes.

20 Q    So when you were doing the phone interviews, you

21 weren't able to see the patients, see their mouths while you

22 were interviewing them, right?

23 A    No.

24 Q    You'd have no way of knowing whether they're wearing a

25 denture or partial denture, correct?

1  A    No.

2  Q    And you know the difference between a denture and

3  partial denture, right?

4  A    Yes.

5  Q    So a person can have a partial denture with just one or

6  two teeth to that, right?

7  A    Yes.

8  Q    That's much different than a full denture, right?

9  A    Yes.

10 Q    Now, when you do interviews as an investigator, you

11 like to do interviews face to face, correct?

12 A    Yes.

13 Q    And, in fact, in this case, you were hoping to

14 interview these particular patients in person.  That's what

15 you wanted to do as an investigator, right?

16 A    Yes.

17 Q    But you actually never did that because Mr. Fusto never

18 asked you to do that, right?

19 A    Yes.

20 Q    Now, after your initial telephone interviews, did

21 Mr. Fusto ever ask you to do any follow-up questions

22 relative to the 12 patients that you had interviewed?

23 A    No.

24 Q    Did Mr. Fusto ever ask you to go out and actually speak

25 to these patients again in person?

1  A    No.

2  Q    Did you ever even speak to Mr. Fusto about your

3  interviews?

4  A    No.  Whatever I -- the information I received on the

5  telephone conversations is documented, and a copy was given

6  to John Fusto.

7  Q    So you didn't actually speak to him about these

8  interviews, right?

9  A    No.

10 Q    Did you ever send any type of follow-up letter to the

11 12 patients that you interviewed?

12 A    No.

13 Q    Did you ever request any type of further information

14 from the 12 patients that you interviewed?

15 A    No.

16 Q    And besides yourself, the only other person that was

17 involved with this case was Mr. Serra in terms of

18 investigating, right?

19 A    Yes.

20 Q    But as you told us before, Mr. Serra wasn't doing any

21 work on the case himself, right?

22 A    As far as I recollect, no.

23 Q    So to your knowledge, there was no one else actually

24 going out and interviewing these patients, right?

25 A    Well, when we served subpoenas, other investigators

1  were involved.

2  Q    Referring to your deposition, Page 230, Line 13:

3       QUESTION:  "So to your knowledge, was there anyone else

4  out there interviewing witnesses and reviewing records

5  besides yourself?"

6       ANSWER:  "No."

7       Do you recall giving that testimony, sir?

8  A    Yes.

9  Q    So according to your deposition testimony, no one else

10 was interviewing these witnesses except yourself, right?

11      MR. MILLER:  Objection.

12 A    Of the original witnesses we interviewed, no.

13      THE COURT:  Well, I take it when you talked about

14 other people, you said -- you said that they just helped you

15 serve subpoenas.

16      THE WITNESS:  Yes.

17      THE COURT:  Is that correct?

18      THE WITNESS:  Yes.

19 BY MR. NORINSBERG:

20 Q    Now, during your interview with Dr. Morse in August of

21 2002, Dr. Morse told you that another dentist works in his

22 office, correct?

23 A    Yes.

24 Q    And he actually gave you the name of that dentist,

25 correct?

1   A    Yes.
2   Q    He gave you the name of Brian Ketover, right?
3   A    Yes.
4   Q    And based on your initial interview with Dr. Morse, you
5   understood that Dr. Ketover was seeing 50 percent of the
6   patients in this office, correct?
7   A    Yes.
8   Q    And you had that information as of your first interview
9   in August of 2002, right?
10  A    Yes.
11  Q    But you didn't interview Dr. Ketover in 2002, did you?
12  A    No.
13  Q    You didn't interview him in 2003, did you?
14  A    No.
15  Q    You didn't interview him in 2004, did you?
16  A    No.
17  Q    You didn't interview him in 2005, did you?
18  A    No.
19  Q    You didn't interview him in 2006, did you?
20  A    No.
21  Q    So during this entire four-year investigation, you
22  never interviewed the other dentist, who was seeing
23  50 percent of the patients in that office; is that correct?
24  A    Correct.
25  Q    And you also never interviewed any staff members at

1   580 Dental, correct?
2   A    Correct.
3   Q    So if I understand your testimony correctly, during
4   this four-year investigation, you didn't interview
5   Dr. Morse, you didn't interview any of the staff members
6   and you didn't interview 317 out of 329 patients whose
7   charts had been subpoenaed, correct?
8   A    Correct.
9   Q    Now, when you visited Dr. Morse during August of 2002,
10  he told you about two labs that he did business with,
11  correct?
12  A    Yes.
13  Q    And at that point, you did not ask Dr. Morse for any
14  prescriptions that he wrote to either of these two labs,
15  correct?
16  A    No.
17  Q    And you didn't ask Dr. Morse for any invoices that were
18  sent from these labs to him, correct?
19  A    Correct.
20  Q    In fact, Mr. Flynn, it wasn't until April 22 of 2004
21  that your office requested for the first time that Dr. Morse
22  provide invoices and prescriptions, true?
23  A    Correct.
24  Q    And would you agree that before April 22nd, 2004, your
25  office, MFCU, had never requested Dr. Morse to provide any

1   invoices or any prescriptions, correct?
2   A    Repeat that, please.
3   Q    Before April 22nd, 2004, your office had never
4   requested Dr. Morse to provide any invoices or any
5   prescriptions?
6   A    Correct.
7   Q    So your office waited approximately two years before
8   asking Dr. Morse for any prescriptions or invoices, correct?
9   A    Correct.
10  Q    Why did your office wait two years before first asking
11  Dr. Morse for prescriptions?
12  A    I have no idea.
13  Q    Now, you told us a few moment ago that Dr. Morse told
14  you in the first interview that -- he identified the labs
15  that he was doing business with, correct?
16  A    Yes.
17  Q    He and also told you where these labs were located,
18  correct?
19  A    Yes.
20  Q    So as of August 2002, you knew the full names and full
21  addresses of both labs that Dr. Morse did business with,
22  correct?
23  A    Correct.
24  Q    And you eventually visited these labs, correct?
25  A    Yes.

1   Q    First you went to Nu-Life on October 22nd, 2002, and on
2   November 1st, 2002, you went to Design Dental; is that
3   right?
4   A    2002, correct.
5   Q    But it was not until February of 2004 where you first
6   asked for prescriptions from the labs, correct?
7   A    Correct.
8   Q    And you waited until February 2004 because that's what
9   you were advised to do by John Fusto, correct?
10  A    Correct.
11  Q    And there's no other reason why you waited that long,
12  except for the fact that you were advised to do so by
13  Mr. Fusto, correct?
14  A    Correct.
15  Q    Now, by the time you had actually got around to asking
16  the labs for prescriptions and invoices in February of 2004,
17  they didn't have any at that point, did they?
18  A    No.
19       THE COURT:  I'm sorry, didn't have any invoices?
20       MR. NORINSBERG:  I'm sorry.  The question should
21  have been prescriptions.
22       THE WITNESS:  Prescriptions.
23  BY MR. NORINSBERG:
24  Q    By the time you got around to asking for prescriptions
25  from these labs in 2004, they didn't have any prescriptions,

**JA300**

1   correct?
2   A   Correct.
3   Q   You and told Mr. Fusto as of February 27, 2004 that
4   there were no prescriptions, true?
5   A   I'm not sure of the exact date, but yeah.
6   Q   Referring to your deposition Page 67, Line 5:
7       QUESTION:  "So you told Mr. Fusto on February 27th,
8   2004 that you have no prescriptions, correct?"
9   A   Correct.
10  Q   ANSWER:  "Yes."
11      Do you recall giving that testimony, sir?
12  A   Yes.
13  Q   So does that refresh your memory as of February 27th,
14  2004, that's when you told Mr. Fusto you had no
15  prescriptions?
16  A   You're asking me a question you asked me five years
17  ago.  I don't remember the exact date today.
18  Q   I understand.
19  A   If that's what I testified then, then that's what the
20  date was.
21  Q   I understand.  You'll stand by that testimony, though,
22  right, sir?
23  A   Yeah.
24  Q   Now, you informed Mr. Fusto by E-mail the results of
25  your investigation, that you didn't have prescriptions,

1   right?
2   A   Yes.
3   Q   And did Mr. Fusto ever respond to those E-mails?
4   A   Not that I remember.
5   Q   Did Mr. Fusto ask you to do any type of further or
6   follow-up investigation with respect to these prescriptions?
7   A   I remember going back to interview Design Dental, I
8   believe, Mr. Nissan.  That was quite a ways later on,
9   though.  That was back in 2005.
10  Q   Okay.  Referring to --
11  A   According to my invoice.
12  Q   I'm sorry.  Are you still answering?
13  A   Excuse me?
14  Q   Are you still answering?
15  A   Go ahead.
16  Q   Referring to your deposition, Page 67, Line 12:
17      QUESTION:  "Did Mr. Fusto ask you to do any type of
18  further follow-up investigation with respect to these
19  prescriptions?"
20      ANSWER:  "No."
21  A   What was the date?
22  Q   This is after you -- the question was after you had
23  sent him the E-mail on February 27th, 2004, telling him that
24  you did not have them.
25  A   No, I didn't.

1   Q   So after February 27th, 2004, going all the way up to
2   the point where the grand jury presentation took place in
3   2006, he did not ask you to do follow-up investigations with
4   respect to these prescriptions, did he?
5   A   Yes.
6   Q   That's what you -- you testified at your deposition,
7   that he didn't, correct?
8   A   Well, I'm going -- like I said, my index has me, as of
9   October 2005, reinterviewing Mr. Nissan -- I'm going to have
10  to spell his last name.  It's Y-U-S-H-V-A-Y-E-Z -- at Design
11  Dental Studios.
12  Q   Now, did you discuss at that point the prescriptions?
13  A   Yes.
14  Q   What were you talking about with him at that point?
15  A   We went back to verify whether he kept records on a
16  computer, how he did his records, what happened with the
17  prescriptions.
18  Q   Did you ask him at that point in time, when you went
19  back in 2005, about certain records which appeared to be
20  altered and had their dates changed?  Did you ask him that
21  question?
22  A   No.
23      THE COURT:  What date is that interview?
24      THE WITNESS:  Excuse me?
25      THE COURT:  What date did you have that interview?

1       THE WITNESS:  That was on October 24th of 2005.
2   BY MR. NORINSBERG:
3   Q   Now, besides prescriptions, you were also interested in
4   getting invoices from the labs, correct?
5   A   Repeat, please.
6   Q   Besides prescriptions, you were also interested in
7   getting invoices or bills from the labs; is that correct?
8   A   In 2005?
9   Q   At any point during your investigation.
10  A   On the day I served him the subpoena, that's when I
11  requested records.
12  Q   Okay.
13      And you were interested in getting work invoices for
14  the work that the labs had performed for Dr. Morse, correct?
15  A   Correct.
16  Q   And there came a time when you actually received lab
17  invoices from Design Dental, correct?
18  A   Yes.
19  Q   But you never actually looked at these invoices,
20  correct?
21  A   Correct.
22  Q   And you also received invoices from Nu-Life, correct?
23  A   Correct.
24  Q   But you never looked at those invoices either, correct?
25  A   Correct.

**JA301**

1  Q    Did there come a time, Mr. Flynn, where you learned
2  that there were 11 months of invoices missing from Design
3  Dental?
4  A    Yes.
5  Q    Mr. Fusto himself told you that there were 11 months of
6  missing invoices from Design Dental, correct?
7  A    Yes.
8  Q    He actually told you there's a gap in the invoices,
9  correct?
10  A    Yes.
11  Q    Did Mr. Fusto ever ask you to go back to try to find
12  out where those missing invoices were?
13  A    No.
14  Q    And, in fact, you never went back to Design Dental to
15  try to find out what happened to those missing invoices,
16  right?
17  A    No.
18         THE COURT:  Can you clarify for me, what date did
19  you pick up the lab invoices?  Do you remember?
20         THE WITNESS:  We didn't personally pick the lab
21  reports up.  He had them delivered to our office.
22         THE COURT:  Do you remember when, approximately?
23         THE WITNESS:  No, I don't remember.
24         THE COURT:  Was it before you went back to talk to
25  him on October 22nd?

1         THE WITNESS:  Oh, yes, yes, way before that.
2  Within shortly after we originally served him with the
3  subpoena.
4         THE COURT:  So what did you talk to him about on
5  October 24th, 2005?
6         THE WITNESS:  We wanted to know, because he had
7  given us -- when we subpoenaed the records, he gave us all
8  handwritten invoices.  And we asked, by any chance, did he
9  keep the same records on a computer, which he said he had no
10  computer.  This is the way he did it.  He did it manually.
11  And we asked what happened with the prescriptions.  And I
12  believe, if I remember, he said the prescriptions went back
13  to the dentist with the completed work.
14         THE COURT:  At that point in time, you hadn't
15  known about the missing invoices, so you didn't discuss --
16         THE WITNESS:  In 2005, I really don't remember
17  when I exactly -- I just heard this through conversation
18  with Mr. Fusto, that there were some invoices missing.
19  BY MR. NORINSBERG:
20  Q    Now, the records that you had from Design Dental, there
21  were portions of those records that were illegible, correct?
22  A    Were they legible?
23  Q    Illegible.
24  A    Illegible?
25  Q    Yes.

1  A    I really don't know.  I never looked at them.
2  Q    All right.
3         Do you recall being shown records at your deposition
4  from Design Dental and then giving the following testimony
5  --
6         MR. MILLER:  Objection.
7         THE COURT:  What's the objection?
8         MR. MILLER:  I think he said he couldn't remember.
9         THE COURT:  Go ahead.
10  BY MR. NORINSBERG:
11  Q    Do you recall giving the following testimony at your
12  deposition, Page 232, Line 24:
13         QUESTION:  "My question, Mr. Flynn, is do portions of
14  these papers appear to be illegible?"
15         ANSWER:  "Yes."
16         Do you recall giving that testimony?
17  A    I don't recall.  I can only recall that I -- when I
18  happened to see them in Mr. Castillo's office, I saw they
19  were handwritten, and I saw that they were copies, all
20  right?
21         THE COURT:  And you're talking about invoices?
22         THE WITNESS:  Which weren't the best copies in the
23  world.  But I never physically sat there and looked at them.
24         THE COURT:  You're talking about the invoices,
25  right?

1         THE WITNESS:  The invoices, yes.
2         THE COURT:  These are the invoices -- just to
3  clarify, these are the ones that you went back to him at
4  some point and said do you have something -- in other words,
5  do you have computer records.
6         THE WITNESS:  Yeah.
7         THE COURT:  This is what you have?
8         THE WITNESS:  It's easier for us if it's all
9  computer.
10         THE COURT:  And he said no.
11         THE WITNESS:  Right.  He didn't have a computer.
12  BY MR. NORINSBERG:
13  Q    Now, at the time when you first went to this lab,
14  Design Dental, the lab owner actually showed you original
15  invoices, didn't he?
16  A    Yes.
17  Q    And you had an opportunity --
18  A    Not the invoices we subpoenaed.  He just showed me how
19  he did it.
20  Q    He showed you original invoices when you first went
21  there, correct?
22  A    Yes.
23         THE COURT:  Excuse me.
24         Of Dr. Morse or of somebody else?
25         THE WITNESS:  No, he just -- he did several

1  dentists.
2          THE COURT:  So the original --
3          THE WITNESS:  He just showed me a sample.  It
4  wasn't Dr. Morse.
5          THE COURT:  Of an original invoice?
6          THE WITNESS:  Yes.
7  BY MR. NORINSBERG:
8  Q    When you first went to Design Dental, he showed you
9  original invoices relating to Dr. Morse, didn't he?
10 A    I don't recall that.
11 Q    And you had an opportunity at that moment in time to
12 actually get the original invoices, but you didn't, did you?
13         MR. MILLER:  Objection.
14         THE COURT:  Sustained.
15 BY MR. NORINSBERG:
16 Q    The original invoices were in yellow color, weren't
17 they?
18 A    Yes.
19 Q    And you asked him not about any other lab, you asked
20 him about 580 Dental, right?
21 A    Yes.
22 Q    And that's what he showed you, originals from 580
23 Dental, true?
24         MR. MILLER:  Objection.
25         THE COURT:  Overruled.  He can answer it.

1  A    He showed me a sample of how he did his billings to the
2  dentists.  Did he show me Dr. Morse's invoice?  That, I
3  don't know.  I don't remember.
4  Q    He showed you Dr. Morse's invoices; but at that point
5  in time, you did not ask for those invoices to be turned
6  over --
7          MR. MILLER:  Objection.
8          THE COURT:  Sustained.
9  BY MR. NORINSBERG:
10 Q    True?
11         THE COURT:  Sustained.
12         MR. MILLER:  Objection.
13 BY MR. NORINSBERG:
14 Q    Now, why couldn't you have taken original invoices that
15 related to Dr. Morse, brought them back to the Attorney
16 General's office, made copies and then given it back to
17 Design Dental?
18         MR. MILLER:  Objection.
19         THE COURT:  Sustained.
20 BY MR. NORINSBERG:
21 Q    One of the options you had was to take the originals
22 and bring them back to the Attorney General's office and
23 make copies, true?
24 A    Say that again.
25 Q    One option that you had was actually to take the

1  originals, bring them back to the Attorney General's office,
2  make clear copies and then return the originals, right?
3          MR. MILLER:  Objection.
4          THE COURT:  Did you have that option?
5          THE WITNESS:  We would've been there for days.  I
6  mean, there were hundreds and hundreds of invoices.  Usually
7  on a subpoena, they're given a time frame to produce the
8  evidence.
9          THE COURT:  So it's not your practice to take
10 original document --
11         THE WITNESS:  No.
12         THE COURT:  -- from someone, copy them and bring
13 them back?
14         THE WITNESS:  We get them copied, yes.
15 BY MR. NORINSBERG:
16 Q    So you could have given them, say, two weeks or 30 days
17 or whatever time frame and said, listen, we need to have the
18 originals produced relating to 580 Dental, please produce
19 them to our office --
20 A    Yeah.
21 Q    -- pursuant to subpoena?  You could have done that,
22 right?
23 A    Yes.
24 Q    But, in fact, you waited three more years, until 2005,
25 before you went back to try to get clear copies; isn't that

1  what happened?
2  A    No.
3  Q    Now, during your deposition, do you recall looking at a
4  number of Design Dental invoices that appeared to have
5  altered dates on them?  Do you recall that, Mr. Flynn?
6  A    Repeat that.
7  Q    During your deposition, do you recall being shown a
8  number of records from Design Dental that appeared to have
9  altered dates on them?
10 A    Altered dates on them?
11         MR. MILLER:  Objection.
12         THE COURT:  Sustained.
13         Did you ever review the invoices yourself?
14         THE WITNESS:  No.
15         THE COURT:  At any time during the investigation?
16         THE WITNESS:  No.
17         THE COURT:  Then I'll sustain any objections to
18 further inquiry as to the invoices.
19         MR. NORINSBERG:  May I make an offer of proof at
20 sidebar?
21         THE COURT:  Yes.
22         (Sidebar begins.)
23         (Continued on the next page.)
24
25

**JA303**

1    THE COURT:  Yes?

2    MR. NORINSBERG:  He gave testimony at his

3  deposition when we showed the records to him that these

4  altered records raised very serious concerns in his mind as

5  to the authenticity.

6    THE COURT:  Are you calling him --

7    MR. NORINSBERG:  I'm calling him -- his team and

8  the fact is --

9    THE COURT:  He didn't hook at them at the time.

10  I'm not going to allow him to express any opinion after the

11  fact.  If he had seen them at the time or discussed them

12  with Mr. Fusto, fine.  I don't think it's proper to come in

13  on documents he didn't see today.  It doesn't seem

14  appropriate to be calling him as an expert witness on

15  something after the fact on documents he didn't look at.  I

16  sustain the objection.

17    (Sidebar ends.)

18    (Continued on the next page.)

19

20

21

22

23

24

25

---

1  BY MR. NORINSBERG:

2  Q    Now, Mr. Flynn, you were the arresting officer in this

3  case; is that correct?

4  A    Yes, sir.

5  Q    It was Mr. Fusto's decision to arrest Dr. Morse?

6  A    Well, he has to get approval from higher up, but yes.

7  Q    And Dr. Morse was charged with grand larceny in the

8  first degree; is that correct?

9  A    Correct.

10  Q    And even though you were the senior investigator and a

11  former police officer, Mr. Fusto had the decision to decide

12  what charges were brought against Dr. Morse, correct?

13  A    Correct.

14  Q    Now, as far as you know, the evidence to arrest

15  Dr. Morse was based on the grand jury evidence, correct?

16  A    Correct.

17  Q    And you don't know what evidence was put before the

18  grand jury that led to the indictment?

19  A    Only what I testified to.

20  Q    And you don't know whether any evidence presented to

21  the grand jury was false or misleading evidence, correct?

22  A    Correct.

23  Q    Now, you, yourself, during the course of this

24  investigation, did not see any evidence that would support

25  the false filing charges, correct?

---

1    MR. MILLER:  Objection.

2    THE COURT:  Sustained.

3  BY MR. NORINSBERG:

4  Q    Now, during the course of the investigation, you had

5  only general conversations with Mr. Castillo about what's

6  going on, correct?

7  A    Correct.

8  Q    You wouldn't actually discuss the findings of the

9  investigation with Mr. Castillo, correct?

10  A    Say that again.

11  Q    You didn't actually discuss the findings of your

12  investigation with Mr. Castillo, correct?

13  A    Yeah, I did.

14  Q    You did?

15  A    Yes.

16  Q    Referring to your deposition, Page 155, Line 8:

17    QUESTION:  "Did you ever discuss the findings of your

18  investigation with Jose Castillo?"

19    ANSWER:  "No.  Not really.  No."

20    Do you recall giving that testimony -- my question is

21  first, Mr. Flynn, do you recall giving that testimony?

22  A    No.

23  Q    According to your deposition testimony, you never

24  really discussed the findings of the investigation with

25  Mr. Castillo, true?

---

1  A    Did I ever discuss the findings?  What do you mean by

2  "findings"?

3  Q    The question I asked you at your deposition, which you

4  answered "no" to, did you understand that question, sir?

5  A    Yes.

6  Q    Now, Mr. Castillo did tell you a couple of times that

7  the fraud amount had changed, right?

8  A    That it had changed?

9  Q    Yes.

10  A    I know there was an issue of the final total.

11  Q    Did he ever tell you that a couple of times his fraud

12  amounts had changed?

13  A    I don't recall.

14  Q    Referring to your deposition, Page 157, Line 13:

15    QUESTION:  "Did Jose Castillo ever tell you that his

16  calculations had changed over time?"

17    ANSWER:  "You're talking about the fraud dollar

18  amount?"

19    QUESTION:  "Yes."

20    ANSWER:  "Yeah.  There was a couple of times I know I

21  was informed that the numbers had changed."

22  A    Well, you just changed your question to me when you

23  mentioned the fraud amount, that I recall.

24  Q    Do you recall that testimony?

25  A    Yes.

**JA304**

1  Q    Do you recall giving that testimony, sir?
2  A    Yes.
3  Q    And what you understood was that Jose had redid the
4  numbers and got it up over a million dollars, right?
5  A    Say that again.
6  Q    You understood that Mr. Castillo had redid the numbers
7  and then got it up over a million dollars, correct?
8  A    No.
9  Q    Referring to your deposition, Page 169, Line 25:
10      QUESTION:  "Then Jose redid the numbers, then it got up
11  over a million dollars; is that correct?"
12 A    No.
13 Q    ANSWER:  "Yes."
14 A    I don't recall that.
15 Q    You gave that testimony under oath, didn't you, sir?
16 A    If I could explain myself.
17 Q    Did you give that testimony under oath?
18 A    Yes.  Okay.
19 Q    You knew that you were under an obligation to tell the
20 truth, the whole truth and nothing but the truth, right?
21 A    Yes.
22 Q    Your sworn testimony was that Jose redid the numbers
23 and got it up over a million dollars; that's what you said
24 at your deposition, true?
25 A    Yes.

1  Q    Now, you know the difference, as a former police
2  officer, between grand larceny in the first degree and the
3  second degree, right?
4  A    Yes.
5  Q    And as far as you knew, the calculations were bouncing
6  back and forth between grand larceny in the first degree and
7  second degree, correct?
8  A    Correct.
9  Q    And yet there had been no new evidence that had been
10 uncovered in 2004, 2005 or 2006, true?
11 A    True.
12 Q    In fact, from 2002 to 2006, you were not aware of any
13 new evidence that had been uncovered; isn't that true?
14 A    True.
15 Q    So the evidence that had been obtained in 2002 and 2003
16 was the same evidence that was relied upon when this case
17 was presented to the grand jury in 2006, correct?
18 A    Correct.
19 Q    Now, would you agree, apart from picking up records and
20 serving a subpoena, you did no other investigation in 2004?
21 A    Correct.
22 Q    Would you agree that there were virtually no activities
23 in the case in 2004?
24 A    No activity?
25 Q    Would you agree there were virtually no activities in

1  the case in 2004?
2  A    Hold on.  Other than picking up patient records and
3  serving subpoenas, yes, that's it.
4  Q    Would you agree with the statement that there were
5  virtually no activities in this case done in 2004?
6  A    Yes.  Yes.
7  Q    And other than a few patient interviews and
8  reinterviews, there was virtually no activity done in this
9  case in 2005, true?
10 A    2005?  No, I had other interviews in 2005.
11 Q    Okay.
12      Referring to Page 179, Line 4:
13      QUESTION:  "And other than a few interviews and
14 reinterviews of patients, there was virtually no activity in
15 this case in 2005, correct?"
16      ANSWER:  "Correct."
17 A    Yeah, other than the interviews, you just said it.
18 Q    Do you recall that testimony, sir?
19 A    Yes.
20 Q    So you did a few patient interviews and a few
21 reinterviews, but basically there was no new activity?
22 A    The question you asked me was if there was any new
23 activity.
24 Q    I don't believe it was, but the record will stand as it
25 was.

1       Did you interview anybody between September 22nd, 2003
2  all the way up to February of 2005, anybody?
3  A    Yes.
4  Q    Referring to your deposition Page 90, Line 5:
5       QUESTION:  "What I'm trying to understand, Mr. Flynn,
6  is the last time you conducted an interview on
7  September 22nd, 2003, up until February 13th, 2005, did you
8  interview anyone else?
9       ANSWER:  "No."
10      Do you recall giving that testimony under oath, sir?
11 A    I don't recall.
12 Q    But according to your deposition testimony from
13 September of 2003 to February 2005, you didn't interview a
14 single person; isn't that true?
15 A    Repeat that question.
16 Q    According to what you said at your deposition, you
17 didn't interview a single person between September 2003 and
18 February 2005, correct?
19 A    Okay, yeah.
20 Q    Would you agree you didn't interview any patients in
21 the year 2004?
22 A    2004, no.
23 Q    And you didn't interview any patients in 2006, did you?
24 A    No.
25 Q    So we can agree from March 2005 all the way until April

**JA305**

1  of 2006, when the grand jury presentation was made, you did
2  not interview any other patients, did you?
3  A   No.
4  Q   Now, as an experienced investigator, you believed that
5  this case was going on too long, correct?
6  A   Correct.
7  Q   In fact, you asked Mr. Fusto several times why is this
8  case taking so long, correct?
9  A   Did I ask Mr. Fusto?
10 Q   Yes.
11 A   I don't recall.
12 Q   Referring to your deposition, Page 159, Line 5:
13     QUESTION:  "Did you ask John Fusto what was taking so
14 long in this case?"
15     ANSWER:  "Several times."
16     Page 159, line 8:
17     QUESTION:  "Why did you ask Mr. Fusto several times
18 what was taking so long in this case?"
19     ANSWER:  "Well, the case was just going on too long, in
20 my opinion."
21 A   Okay.
22 Q   Do you recall that, sir?
23 A   Yeah, okay.  I remember.
24 Q   So you asked Mr. Fusto not once, not twice but several
25 times?

1  A   I don't know how many times.
2  Q   You asked him more than one time what was going on with
3  this case, correct?
4  A   Correct.
5  Q   And you actually went into his office to have these
6  discussions, right?
7  A   Correct.
8  Q   Mr. Fusto did not give you any explanation as to why
9  the case was taking so long, did he?
10 A   No.
11 Q   Mr. Fusto, in fact, told you -- he said he'll get to it
12 when he gets to it, right?
13 A   Yes.  I know he had other cases, so --
14 Q   He said he'll get to it when he gets to it?
15 A   Yes.  Okay.
16 Q   Now, you actually had to answer to your own supervisors
17 as to why the case was taking so long, correct?
18 A   Yes.
19 Q   Your supervisor was Ralph Acquino, correct?
20 A   Correct.
21 Q   And Mr. Acquino himself was asking you why was this
22 case taking so long, correct?
23 A   Correct.
24 Q   And Mr. Acquino asked you more than one time, why is
25 this case, this investigation into Dr. Morse taking so long?

1  A   Right.  Correct.
2  Q   And your answer to Mr. Acquino was you couldn't do
3  anything about that until the attorney told you to do
4  something, correct?
5  A   Correct.
6  Q   But eventually you decided to take further action on
7  your own, correct?
8  A   On my own?
9  Q   You felt compelled to actually speak to Mr. Fusto's
10 boss, true?
11 A   I didn't, no.  I don't remember.  I know my partner
12 did.
13 Q   Referring to your deposition, Page 175, line 12:
14     QUESTION:  "So you spoke to Mr. Fusto's boss
15 essentially, right?"
16     ANSWER:  "Yes."
17     Do you recall being asked that question and giving that
18 answer?
19 A   Yes.
20 Q   So you, yourself spoke to Mr. Fusto's boss?
21 A   We.  Me and my partner, we did everything together.
22 Q   Referring to your deposition again.
23 A   Okay, yes.
24 Q   I can read it, but basically you said that you,
25 yourself spoke to Mr. Harrow; is that correct?

1  A   All right.
2  Q   And you told Mr. Harrow to speak to John Fusto and find
3  out why this case is taking so long, right?
4  A   Correct.
5  Q   So you not only spoke to your own boss, you spoke to
6  Mr. Fusto's boss to try to get this case moving along,
7  correct?
8  A   Correct.
9  Q   And after you spoke to Mr. Harrow, he said that he
10 would confer with John Fusto and see what was going on,
11 correct?
12 A   Correct.
13 Q   Now, Mr. Fusto actually did not know that you were
14 going to speak to Mr. Harrow, correct?
15 A   I assume that, yes.
16 Q   You never told him that?
17 A   No.
18 Q   You didn't want to be seen as being a tattletale of
19 sorts, to use the words you used in your deposition, right?
20 A   Correct.
21 Q   But you thought it was important enough to take action,
22 right?
23 A   Correct.
24 Q   Now, I'd like you to assume that we had testimony
25 yesterday from Mr. Fusto to the effect that Medicaid

1  patients can sometimes be very poor historians as to what
2  services they actually received.
3          MR. MILLER:  Objection.
4          THE COURT:  I'll sustain the objection.
5  BY MR. NORINSBERG:
6  Q    Do you agree that some Medicaid patients can be poor
7  historians as to what services they received?
8  A    Could you repeat that question?
9  Q    Do you, yourself have an opinion as to whether the
10 Medicaid patients that you dealt with during your
11 investigation could sometimes be unreliable in terms of what
12 they were telling you about the services they had received?
13 A    I don't think so, no.
14 Q    Referring to your deposition, Page 121, line 21:
15         QUESTION:  "Do you agree with Mr. Fusto that some
16 Medicaid patients can be extremely poor historians?"
17         ANSWER:  "Some."
18         Did you agree with that?
19 A    Some I agree with, not all.
20 Q    And yet when you did your telephone interviews with
21 these patients, you accepted at face value what the patients
22 told you, correct?
23 A    Yes.
24 Q    Whatever they told you, you just wrote it down on paper
25 and took it at face value, correct?

1  A    Yes.
2  Q    For example, Miriam Perez told you that she did not
3  have any false teeth, correct?
4  A    Correct.
5  Q    She's told you that on September 18th, 2003, correct?
6  A    Correct.
7  Q    Yet, according to an in-mouth examination, she actually
8  does have false teeth, doesn't she?
9          MR. MILLER:  Objection.
10         THE COURT:  Sustained.
11         MR. NORINSBERG:  Referring to the deposition of
12 this witness --
13         MR. MILLER:  Objection.
14         THE COURT:  Sustained.
15         MR. NORINSBERG:  Can I make an offer of proof?  He
16 previously gave --
17         THE COURT:  Don't talk about what he gave.  Come
18 over here, please.
19         (Sidebar begins.)
20         (Continued on the next page.)
21
22
23
24
25

1          THE COURT:  The fact that someone may have
2  testified to something at the grand jury doesn't mean that he
3  has the foundation to testify for it here.  I sustained your
4  objection to your asking him that question because there was
5  no foundation.  The fact that he may have answered the
6  testimony in the grand jury doesn't mean anything in that
7  connection.  It wasn't being used to impeach something that
8  he said.  So you can't get something in because you asked him
9  the question in the grand jury.
10         MR. MILLER:  Just for clarity --
11         THE COURT:  Please.
12         MR. MILLER:  Are you referring to his deposition?
13 You said grand jury.
14         THE COURT:  Deposition.
15         MR. NORINSBERG:  He repeatedly -- at his
16 deposition, he acknowledged the fact that this particular
17 patient did not have false teeth.
18         THE COURT:  How does he know that?
19         MR. NORINSBERG:  Because he reviewed the in-mouth
20 record.
21         THE COURT:  When?  That's hearsay.  Those records
22 aren't in evidence.
23         MR. NORINSBERG:  But, Your Honor, I want to try to
24 offer them into evidence.
25         THE COURT:  You can't offer them in evidence.

1          MR. NORINSBERG:  It's the in-mouth exam which he
2  reviewed --
3          THE COURT:  You can't get something in through
4  him.  We're not talking -- it's not at issue what this
5  witness did or didn't do in this case.  You can't get in a
6  record that he looked at simply to prove that he looked at
7  it and get it in through him.  It's not his record.  He
8  didn't look in the woman's mouth.
9          MR. NORINSBERG:  He testified that the information
10 that Ms. Perez gave him was inconsistent with the
11 information that appeared on the in-mouth examination.  Why
12 can't I between these two witnesses, subject to connection
13 with Dr. DeLuca coming next, she's the one doing the
14 in-mouth?
15         THE COURT:  What's the difference?  You're trying
16 to prove a fact, not what he knew about it at the --
17         MR. NORINSBERG:  No, I'm not.
18         THE COURT:  What are you trying to prove?
19         MR. NORINSBERG:  That it goes to our theory.  Weak
20 investigation on the phone; you're accepting at face value
21 what they're saying.
22         THE COURT:  You brought that out.
23         MR. NORINSBERG:  I have two specific examples
24 which I'd like to bring out.  And you can't simply accept at
25 face value.  That's the whole argument.  These eight

1  patients testified at the grand jury, and that's sufficient.
2  I'm trying to refute that case by showing you can't simply
3  accept at face value.  He gave answers to that and agrees
4  with me.
5          MR. MILLER:  Your Honor, the testimony is based on
6  the document with handwriting on it.  He testified at his
7  deposition it wasn't his handwriting.
8          MR. NORINSBERG:  It doesn't matter.  It's the
9  document they produced in discovery.  Their in-mouth exam,
10 which he acknowledges took place.  The results of that exam
11 that what this woman said is not true.
12         THE COURT:  What does he know about this document
13 other than you showed it to him?
14         MR. NORINSBERG:  That it's the record of an
15 in-mouth examination.
16         THE COURT:  Who did the examination?
17         MR. NORINSBERG:  Dr. DeLuca.
18         THE COURT:  You can't get this record in through
19 him.  I sustain the objection.
20         (Sidebar ends.)
21         (Continued on the next page.)
22
23
24
25

1  Q    Mr. Flynn, do you recall interviewing a recipient named
2  Quaman?
3  A    Yes.
4  Q    Is that actually the very first interview that you
5  conducted in this case?
6  A    I believe that was the first one I did.
7  Q    Okay.  And Mr. Quaman had made claims about that he
8  hadn't actually gotten services that Dr. Morse had billed
9  for, right?  That's why you went to speak to him, right?
10 A    We were notified by the Department of Health.
11 Q    Okay.  And you went out and you actually spoke to him
12 in person?
13         MR. MILLER:  Can you let the witness finish.
14         THE WITNESS:  Excuse me?
15         THE COURT:  Had you finished?
16         THE WITNESS:  No, I wasn't done.
17         THE COURT:  You said you were notified by the
18 Department of Health.
19         THE WITNESS:  Yeah.  They would send what they
20 call an EOMB, Explanation of Medical Benefits, I believe it
21 is.  What they do is they'll send it to the recipient with a
22 copy of procedures and what was billed to Medicaid to verify
23 if, in fact, this work was actually done.  And the letter
24 was returned back to DOH that some of the work was not done
25 and then they referred it to us.

1          THE COURT:  So the group that asked you to go out
2  was DOH?  Who was it who requested it?
3          THE WITNESS:  No.  DOH refers everything back to
4  the Attorney General's Office.  When it came back as what we
5  call as a positive that these people are saying they didn't
6  have this work done, then they send a copy of the EOMB with
7  a memo for us to further investigate.
8          THE COURT:  All right.  So pursuant to getting a
9  memo like that, then you go out?
10         THE WITNESS:  That's why we went out and
11 interviewed Mr. Quaman.
12         THE COURT:  When was this?
13         THE WITNESS:  That was back in -- it was back in
14 September 19th of 2002.
15         THE COURT:  Okay.
16         THE WITNESS:  A long time ago.
17 Q    Okay.  So then you went and you interviewed Jorge
18 Quaman to see whether or not he had actually received the
19 services by Dr. Morse, correct?
20 A    I remember interviewing the father.  I don't remember
21 what the names were.
22 Q    Okay.  But do you remember that the son had said that
23 the doctor had only checked his mouth, but had not delivered
24 services; is that right?
25 A    Excuse me?

1  Q    Do you remember the original complaint that the son was
2  saying he hadn't received the services, right?
3  A    Yeah.
4  Q    But then you spoke to his brother, Carlos, correct?
5  A    Yes.
6  Q    And it turned out that the information, the claim that
7  had been made, was false, correct?
8  A    I don't remember which one.  There was two brothers.
9  One had the work done, and one didn't have the work done.
10 That was the results of the interview.
11 Q    Basically, there was a complaint Dr. Morse didn't do
12 the services but when you investigated further, you found
13 out that, in fact, he had done all the services that he had
14 billed for, true?
15 A    Yeah, if I remember.  I don't remember.
16         THE COURT:  Let him finish his answer.  I'm sorry.
17 A    I don't remember exactly what was said to me.
18 Q    Okay.  But you prepared a memorandum in your own
19 handwriting, correct?
20 A    Yes, yes.
21 Q    I'd like to show you --
22 A    Yeah.  I need that to refresh my memory; ten years ago.
23 Q    Plaintiff's 94.
24 A    Okay.
25 Q    Okay.  Do you recognize this document?

**JA308**

1  A    Yes.
2  Q    What do you recognize it to be?
3  A    These are my handwritten notes before I put it onto a
4  memo.
5  Q    And these notes are in connection with the
6  investigation of the case we were just talking about, the
7  recipient Quaman?
8  A    Yes.
9        MR. NORINSBERG:  I offer Plaintiff's 94 into
10 evidence.
11       MR. MILLER:  No objection.
12       THE COURT:  94 is received.
13       (Plaintiff's Exhibit 94 received in evidence.)
14 Q    Now, just directing your attention, if we could, to the
15 last part, the last paragraph here.
16       Do you see it?
17 A    Yes.
18 Q    Okay.  You interviewed Carlos Quaman and he states that
19 he is with his brother in January 5th, 2002, at 580 Dental.
20 Just going to the top here.  And that he did, in fact, have
21 the work done, right?
22 A    Yes.
23 Q    It shows that he actually had four cavities filled, a
24 cleaning, bonding and also x-rays.
25       So you were told that the services hadn't been

1  performed but when you actually investigated it, you found
2  out they had, true?
3  A    Yes.
4  Q    And that tells you you can't always accept somebody's
5  word at face value, you have to look a little further,
6  correct?
7        MR. MILLER:  Objection.
8        THE COURT:  Overruled.
9  A    Yes.
10 Q    And would you agree that before the Morse case, you had
11 only handled one other dental case, correct?
12 A    Yeah.
13 Q    Now, are you familiar with what is known as an
14 "in-mouth exam"?
15 A    Yes.
16 Q    And what is an in-mouth exam?
17 A    An in-mouth is we have recipients come into our office,
18 and we have a dentist that is hired by the State to conduct
19 examinations.
20 Q    To your knowledge, your own personal knowledge, was an
21 in-mouth examination performed in this case?
22 A    Yes.
23 Q    And to your knowledge, what was the date that the
24 in-mouth exam was performed?
25 A    I don't recall.

1  Q    Okay.  Does September 22nd, 2003, sound approximately
2  right?
3  A    Yes.
4  Q    And is that in-mouth examination referenced in your
5  case index?
6  A    Yes.
7  Q    Now, would you agree that and in-mouth examination
8  would be very important in terms of an investigation?
9  A    Yes.
10 Q    And there was only one in-mouth examination during this
11 entire four-year investigation, correct?
12 A    Correct.
13 Q    You're not aware of any other ones except the one done
14 in September of 2003, right?
15 A    Correct.
16 Q    Now, have you ever seen any documents relating to the
17 in-mouth examination of September 2003?
18       MR. MILLER:  Objection.
19       THE COURT:  I'll sustain the objection.
20 Q    Prior to your deposition, did you ever see any type of
21 documents relating to the in-mouth that took place in
22 September of 2003?
23       MR. MILLER:  Objection.
24 A    No.  Sorry.
25       THE COURT:  Pardon me?

1        THE WITNESS:  No, I don't remember.
2  Q    To your knowledge, were there any additional letters
3  sent out after the first September 22nd, 2003, in-mouth
4  examination?
5  A    Not that I know of, no.
6        MR. NORINSBERG:  May I approach side bar?
7        THE COURT:  Yes.
8        (Side bar conference.)
9        (Continued on the next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    MR. NORINSBERG:  I don't want to run afoul of the

2  Court's ruling so I'm coming up beforehand.  I would like to

3  attempt to lay a foundation to see if he recognizes this

4  document.

5    THE COURT:  What is the document?

6    MR. NORINSBERG:  This is the results of the

7  in-mouth exam without asking him the findings simply to lay

8  a foundation subject to connection with Dr. DeLuca so that

9  we can get this into evidence.  And I think he's said it's

10 mentioned in his case index.  He knows it was done.  He has

11 firsthand knowledge of it.  Just to identify this record --

12   THE COURT:  As a record he saw?

13   MR. NORINSBERG:  As a business record.

14   THE COURT:  It's not a business record of his.

15   MR. NORINSBERG:  But it's a record of the Attorney

16 General's Office.  He can at least lay that part of the

17 foundation, and Dr. DeLuca can lay in the rest of the

18 foundation as to the writing on it.  But he could certainly

19 identify what this appears to be as the first part of my

20 foundation.

21   THE COURT:  What type of record is this?

22   MR. NORINSBERG:  This is the results of the

23 in-mouth examination.

24   THE COURT:  Didn't she do that?

25   MR. NORINSBERG:  She did it.  I want to -- but

---

1  this actual record, the record itself is a two-part process.

2  They create a record at the Attorney General's Office with

3  the names of the patients.  The dentist then fills in the

4  information.

5    So what I'm trying to do is establish foundation

6  for the first part of this document that he recognizes this,

7  this is what an in-mouth examination record looks like.

8    THE COURT:  Did he ask her to do it?  Who asked

9  her to do this exam?

10   MR. NORINSBERG:  Fusto asked her.

11   THE COURT:  Did you get this in through Fusto?

12 Did you show this document to Fusto?

13   MR. NORINSBERG:  I might have crossed him on it.

14 I don't remember.  I don't remember.

15   MR. MILLER:  Your Honor, the records of the

16 in-mouths are one-page forms, front and back.  Dr. DeLuca

17 signs the bottom.  That's not what this is.  Those are the

18 records of the in-mouth that we're going to use with Dr.

19 DeLuca.

20   THE COURT:  What is this document?

21   MR. MILLER:  It says "In-mouth" at the top and has

22 names on it.

23   THE COURT:  Do you not know what the document is?

24   MR. NORINSBERG:  It's Bates-stamped with their

25 numbers on it.  We got it from them.

---

1    MR. MILLER:  It's a document that lists some of

2  the patients who appeared for the in-mouth and some who

3  didn't.  And then there's handwriting on the side and no one

4  knows whose it is.  And that's what he wants to get in.

5    MR. NORINSBERG:  Right now I'm just --

6    MR. MILLER:  He was asked about the handwriting in

7  his deposition and he said it wasn't his.

8    MR. NORINSBERG:  Right now I'm only trying to lay

9  a foundation for the first half of this which is to

10 establish it's an in-mouth document generated by the

11 Medicaid Fraud Unit.  He recognizes as such and it pertains

12 to the examination that was done on September 22nd 2003.

13   THE COURT:  How does he know of it?

14   MR. NORINSBERG:  If he doesn't know it, he'll say

15 it, Your Honor.  I'm just asking permission without trying

16 to violate the Court's ruling to at least ask the questions

17 and try to lay a foundation.  If he can't answer it, he

18 can't answer it.

19   THE COURT:  You can ask him -- do not elicit

20 anything that's in this document through this witness, not

21 anything.  If you want to show it to him to indicate whether

22 he recognizes this as a document.

23   MR. NORINSBERG:  Okay.

24   THE COURT:  But I don't know -- you can attempt to

25 lay a foundation.

---

1    MR. NORINSBERG:  That's all.

2    THE COURT:  I don't want any statements about

3  what's in it.

4    (End side bar conference.)

5    (Continued on the next page.)

1  Q   Mr. Flynn, I'd like to show you a document that's
2  marked Plaintiff's Exhibit 82.  I'd like you to take a look
3  at this document.
4  A   Okay.
5  Q   Do you recognize this document, sir?
6  A   Yes.
7  Q   What do you recognize the document to be?
8  A   I believe, if I remember, this --
9          THE COURT:  Is this document a record of Medicaid?
10         THE WITNESS:  No.  This is a list of people we
11  were expecting to come in.
12         THE COURT:  Is it a document that you prepared?
13         THE WITNESS:  No.  The office prepared it.
14         THE COURT:  Just indicate what type of document it
15  is.  Do you recognize it as a document that the Medicaid
16  investigative office prepares?
17         THE WITNESS:  Yes.  This is what I would have
18  gotten from our auditors of people that they were -- they
19  sent letters out to recipients.  And this is the
20  letters -- the people who they sent letters to to come in
21  for this in-mouth examination.  And they gave us this
22  because you don't know who actually is going to show up.
23         THE COURT:  So it's a document prepared by the
24  auditors?
25         THE WITNESS:  Yes.

---

1  Q   It's a document prepared by the auditors in the
2  Medicaid Fraud Control Unit, right?
3  A   Yes.
4  Q   And have you seen documents like this before?
5  A   On in-mouths, yes.
6  Q   And from time to time, do you actually look at these
7  documents as part of your investigations that you're doing?
8  A   The only time I use this is to check people in as they
9  come in so we know who actually came in.
10  Q   Okay.  But this is a document -- the format of the
11  document you're looking at is a standard type of document
12  used by the Medical Fraud Control Unit in connection with
13  in-mouth examinations, correct?
14  A   For all the in-mouths I've done, this is a standard
15  form, yeah.
16         MR. NORINSBERG:  I offer the document into
17  evidence subject to connection.
18         THE COURT:  I'm not going to permit any
19  questioning on the document.  You need to connect it up
20  before any questioning about the document.
21         MR. MILLER:  We object.
22         THE COURT:  Object to what?
23         MR. MILLER:  I'm just preserving our objection.
24         THE COURT:  Oh.
25  Q   Now, if Mr. Fusto had requested additional in-mouth

---

1  examinations to be done, that would have been done, correct?
2  A   Correct.
3  Q   But he never did request any other exams to be done,
4  right?
5  A   No.
6  Q   Now, to your knowledge, out of the 329 patients whose
7  charts were delivered to MFCU, how many were actually
8  examined by a dentist?
9  A   I don't know.  If I recall, off the top of my head, if
10  I remember, we had about 25 people showed up that day.
11  Q   Okay.  Would you agree that you had previously
12  testified only 15 people were actually examined by a dentist
13  for MFCU?
14  A   Yes.
15  Q   15 out of 329; is that correct?
16  A   I don't know how many were actually examined.
17  Q   And would you agree that only one person who testified
18  before the grand jury had actually been subjected to an
19  in-mouth exam at any time?
20  A   Yes.
21  Q   And that one person happened to be Edwin Gonzalez,
22  correct?
23  A   I guess.  Yeah, I don't remember.
24  Q   What's that?
25  A   I don't remember.

---

1  Q   Referring to your deposition, page 141, line 20.
2      "Question:  Who is that one witness who underwent an
3  in-mouth examination?
4      "Answer:  Edwin Gonzalez."
5  A   Okay.  All right.
6  Q   Do you recall that?
7  A   Okay, yes.
8  Q   Now, you had interviewed Edwin Gonzalez as part of your
9  investigation, correct?
10  A   Correct.
11  Q   And you interviewed him back on September 18th, 2003.
12  Does that sound right?
13  A   2003?
14  Q   Yeah.
15  A   Yes.
16  Q   And Edwin Gonzalez told you in 2003 that the last time
17  he'd actually seen Dr. Morse was back in 1997 and 1998,
18  correct?
19  A   Well, I'd have to see my -- I'd have to refresh my
20  memory.
21  Q   He told you the last time that he had seen Dr. Morse
22  was five or six years ago, 1997, 1998, right?
23  A   Repeat that.
24  Q   He told you that the last time he had seen Dr. Morse
25  was five or six years ago, 1997 or 1998, correct?

**JA311**

1   A   Again, I'd have to see my memo to refresh my memory.
2   Q   I'm going to show you Plaintiff's 96.
3   A   This questionnaire wasn't prepared by me.
4   Q   Do you recognize it as part of your investigative file?
5   A   Yes.
6   Q   And what do you recognize it to be?
7   A   This looks like a questionnaire that was -- went out
8   with the investigators when they were serving subpoenas.
9   Q   Okay.  And would you agree that as of the date in 2006,
10  Mr. Gonzalez was saying that the last time he had seen
11  Dr. Morse was seven years before?  Does that document
12  refresh your memory as to that?
13  A   Yeah.  And I never looked at this document.
14  Q   I understand.  Does it refresh your memory at all?
15          THE COURT:  Did you talk to Edwin Gonzalez?
16          THE WITNESS:  No.  This was done by another
17  investigator.
18  Q   To your knowledge, sir, the last time Edwin Gonzalez
19  received dental treatment from Dr. Morse was sometime in
20  1997 or 1998?  True or not true?
21  A   I don't recall.
22  Q   Referring to your deposition, page 142, line 16.
23      "Question:  So according to Mr. Gonzalez, the last time
24  he received a dental treatment from Dr. Morse was sometime
25  in 1997 or 1998, correct?

1       "Answer:  Yes."
2       Do you recall that, sir?
3   A   No.  But I answered yes, yes.
4   Q   The audit period for this investigation didn't even
5   start until 2002, correct?
6   A   Excuse me?
7   Q   The audit period did not start until 2002, correct?
8   A   The audit?
9   Q   Referring to your deposition, sir, page 142, line 21.
10      "Question:  Yet the audit period for this investigation
11  was the year 2000 through 2002, correct?
12      "Answer:  Yes."
13  A   Okay.
14  Q   So the treatment given to Edwin Gonzalez was clearly
15  outside the audit period, true?
16  A   True.
17  Q   And you knew that as early as September of 2003,
18  correct?
19  A   Correct.
20  Q   So the only witness who was actually examined by a
21  dentist and who testified before the grand jury had received
22  treatment years before the audit period, correct?
23  A   Correct.
24  Q   Now, as part of your investigation, did you ever
25  interview a patient named Stacy Rodriguez?

1   A   Yes.
2   Q   Referring to your deposition, page 144, line 18.
3       "Question:  Did you ever interview Stacy Rodriguez as
4   part of your investigation?
5       "Answer:  No."
6       Do you recall giving that testimony, sir?
7   A   Yes.  I just don't remember.
8   Q   Okay.  If you had interviewed a patient such as Stacy
9   Rodriguez, there would be some paperwork reflecting that
10  interview, correct?
11  A   Yeah.
12  Q   But there is no such paperwork, is there, sir?
13  A   Correct.  That's what I'm looking at now.  I don't
14  remember all the names of people I interviewed ten years
15  ago, counselor.
16  Q   I understand, sir.  I'm just asking you based on your
17  knowledge.
18  A   Okay.
19  Q   Now, you filled out a questionnaire with Dr. Morse
20  based on the answers that he gave you; is that correct?
21  A   Correct.
22  Q   And you wrote down the answers; is that correct?
23  A   Correct.
24  Q   Dr. Morse told you at the initial interview back in
25  2002 that 95 percent of patients he was treating were

1   Medicaid patients, correct?
2   A   Correct.
3   Q   And you knew then as of the very start of this
4   investigation, that 95 percent of the patients were Medicaid
5   patients, right?
6   A   Yes.
7   Q   And you documented that on the questionnaire, correct?
8   A   Correct.
9   Q   Then you gave that questionnaire to Mr. Fusto, correct?
10  A   Correct.
11  Q   So Mr. Fusto had the same information that you had
12  recorded on that questionnaire, correct?
13  A   Correct.
14  Q   Now, at the time of your deposition, you had handled
15  approximately 100 Medicaid fraud cases; is that correct?
16  A   Correct.
17  Q   Not a single one of those cases actually went to trial
18  after grand jury proceedings, correct?
19  A   After 2002?
20  Q   Yeah.  You had handled -- at your deposition, you said
21  you handled 100 Medicaid --
22          MR. MILLER:  Objection.
23          THE COURT:  I'll sustain the objection.
24  Q   Would you agree that the Morse case was the only case
25  that you were involved with that actually went to trial?

**JA312**

1    A    I gotta refresh my memory.  If I remember, this may
2    have been the first one, yes.
3    Q    All of the other doctors who were indicted, they wound
4    up copping pleas, but Dr. Morse actually went to trial?
5    A    Correct.
6             MR. NORINSBERG:  Thank you, Mr. Flynn.  I have
7    nothing further.
8             THE WITNESS:  Okay.
9             THE COURT:  All right.  Ladies and Gentlemen,
10   we'll take a ten-minute morning recess.
11            (Jurors exit the courtroom.)
12            THE COURT:  We'll resume in ten minutes.
13            (Recess taken.)
14            THE COURT:  We're ready?
15            MR. NORINSBERG:  Your Honor, just a quick
16   application.  I had meant to introduce two records through
17   this witness just to authenticate handwriting and e-mails.
18   I would request permission on redirect to do that or to just
19   reopen for this limited purpose.
20            THE COURT:  Why don't you just reopen.
21            MR. NORINSBERG:  Okay.
22            (Jurors enter the courtroom.)
23            THE COURT:  Ladies and Gentlemen, please be
24   seated.
25            Mr. Norinsberg, you have requested just to reopen

1    your direct to ask a couple questions?
2             MR. NORINSBERG:  Yes.  Just very briefly.
3             THE COURT:  Okay.
4    Q    Mr. Flynn, I just want to briefly show you two
5    documents and see if you recognize them.  Take a look first
6    at Plaintiff's 90.
7    A    Okay.
8    Q    Is that an e-mail between you and Mr. Fusto?
9    A    Yes.
10   Q    And what's the date of the e-mail?
11   A    This was September 22nd, 2005.
12   Q    And is there handwriting at the bottom of the document?
13   A    Yes.
14   Q    Is that your handwriting?
15   A    Yes, it is.
16            MR. NORINSBERG:  Offer this document into
17   evidence.
18            THE COURT:  Any objection?
19            MR. MILLER:  Did he say it was his?
20            THE COURT:  Yes, I think so.  It's your
21   handwriting?
22            THE WITNESS:  Yes.
23            MR. MILLER:  No objection.
24            THE COURT:  This is Exhibit 90, correct?  Is that
25   the number, 90?

1             MR. NORINSBERG:  Yes, Your Honor.
2             THE COURT:  All right.  90 will be received.
3             (Plaintiff's Exhibit 90 received in evidence.)
4    Q    And at the bottom where it says, "Want SAI Castillo to
5    do printout of billings for denture work.  Wants me to show
6    labs the printout to show work was never ordered."
7             Do you see that?
8    A    Yes.
9    Q    Was that asked of you by Mr. Fusto?
10   A    Yes.
11   Q    So Mr. Fusto wanted Mr. Castillo to do printout of
12   billings for denture work and give it to you and take it to
13   the lab; is that correct?
14   A    Yes.
15   Q    The date that happened was in September 2005; is that
16   correct?
17   A    Yes.
18   Q    Just showing you the other document here is Plaintiff's
19   45.  Can you take a quick look at that document.
20   A    Okay.
21   Q    Do you recognize that document, sir?
22   A    I don't remember the document, but this is my
23   handwriting.
24   Q    Your handwriting's on the document?
25   A    Yes.

1    Q    And the date where you made the note on this document
2    is what date, sir?
3    A    Well, according to this, it's 9-22-03.
4             MR. NORINSBERG:  Okay.  I offer this document into
5    evidence subject to any redactions that either side would
6    have.
7             MR. MILLER:  No objection to the first page.
8             THE COURT:  Pardon me?
9             MR. MILLER:  No objection to the first page of
10   Plaintiff's Exhibit 45, which is, I believe, what he showed
11   the witness.
12            MR. NORINSBERG:  Okay.  Thank you, your Honor.
13            THE COURT:  All right.
14            (Plaintiff's Exhibit 45 received in evidence.)
15   CROSS-EXAMINATION
16   BY MR. MILLER:
17   Q    Good morning, Investigator Flynn.
18   A    Good morning.
19   Q    Do you remember when Mr. Norinsberg was asking you
20   questions this morning, he asked you about whether or not
21   you had sought prescriptions from the dental labs in
22   February 2004?
23   A    Yes.
24   Q    Sitting here right now, do you remember when you first
25   asked for prescriptions from the dental labs?

**JA313**

1   A    The exact date, I don't remember.
2   Q    Okay.  Can you look at Defendant's Exhibit AF.
3   A    In the book here?  What am I looking for?
4   Q    AF.
5   A    Oh, okay.
6        Yes.
7   Q    What is this?
8   A    This is a subpoena.
9   Q    To whom?
10  A    Subpoena to Dental Design.
11  Q    Did you serve the subpoena?
12  A    Yes, I did.
13  Q    Can you look at Defendant's Exhibit AG.
14  A    AG.  Yes.  It's also a subpoena.
15  Q    Okay.  To whom?
16  A    To Nu-Life Dental Laboratory.
17  Q    Did you serve the subpoena?
18  A    Yes.
19       MR. MILLER:  Your Honor, I'd offer Defendant's
20  Exhibits AF and AG.
21       MR. NORINSBERG:  No objection.
22       THE COURT:  All right.  They're received.
23       (Defendants' Exhibit AF and AG received in
24  evidence.)
25  Q    Investigator Flynn, if you could look at AF.

1   A    F?
2   Q    Yes.
3   A    Okay.
4   Q    This is the subpoena to Design Dental, right?
5   A    Yes.
6   Q    And can you look here beneath where it says, "Bring
7   with you."
8   A    Yes.
9   Q    Can you read what that says.
10  A    You want me to read it?
11  Q    Yes.
12  A    It says to "bring with you all invoices and
13  prescriptions for work performed for 580 Dental, Brook
14  Medical Center of 580 5th Avenue, Brooklyn, New York, for
15  the years 2000 through September 2002."
16  Q    What's the date on the subpoena?
17  A    The date I served the subpoena was October 29th, 2002.
18  Q    So does this refresh your memory as to the timing of
19  when you served the subpoena seeking prescriptions --
20  A    Yes.
21  Q    Let me finish.
22       Does this refresh your memory of the timing of when you
23  sought prescriptions from Design Dental?
24  A    Yes.
25  Q    It was back in 2002?

1   A    Yes.
2   Q    Can you look at Defendants' Exhibit AG.
3   A    Yes.
4   Q    What did you seek in this subpoena from -- I'm sorry.
5   AG is the subpoena to Nu-Life Labs, correct?
6   A    Yes, yes.
7   Q    What did you seek in your subpoena to Nu-Life Labs?
8   A    It was all invoices and prescriptions for work
9   performed for 580 Dental, Brook Medical Center of 121
10  33rd Street, Brooklyn, New York, for the years 2000 through
11  September 2002.
12  Q    When did you serve this subpoena?
13  A    October 18th, 2002.
14  Q    So does this refresh your memory as to when you served
15  a subpoena asking for prescriptions in addition to invoices
16  through Nu-Life?
17  A    Yes.
18  Q    Now, did there come a time -- strike that.
19       Do you remember what Design Dental produced in response
20  to the subpoena?
21  A    Invoices.
22  Q    Did they produce any prescriptions?
23  A    No.
24  Q    Okay.  Do you remember what Nu-Life produced in
25  response to the subpoena?

1   A    Only invoices.
2   Q    Did they produce any prescriptions?
3   A    No.
4   Q    Did there come a time when Mr. Fusto asked you to
5   follow up with the labs about the prescriptions that
6   Dr. Morse had allegedly written for dental work?
7   A    Yes.
8   Q    Do you remember when that was?
9   A    I'm not sure exactly.
10  Q    Can you look at Defendants' Exhibit AI.
11  A    Yes.
12  Q    What is this?
13  A    This is an e-mail I sent to Mr. Fusto.
14  Q    Okay.  And in what time period?
15  A    This was February 18th, 2004.
16       MR. NORINSBERG:  I'd offer Defendants' Exhibit AI.
17       THE COURT:  AI will be received.
18       (Defendants' Exhibit AI received in evidence.)
19  Q    Now, looking at this e-mail, Mr. Flynn, does it refresh
20  your memory of when Mr. Fusto asked you to follow up with
21  the labs with respect to the prescriptions?
22  A    Yes.
23  Q    What did you tell Mr. Fusto in your e-mail about what
24  the lab told you about their prescriptions?
25  A    I spoke with Mr. Nissan Yushvayev of Design Dental Lab.

**JA314**

1  He says he does not keep copies of the prescriptions.  Says
2  he sends the prescriptions back to Dr. Morse with the
3  completed work.  He only keeps invoices.
4  Q   Do you remember after this whether Mr. Fusto decided to
5  seek prescriptions from Dr. Morse?
6  A   Yes.
7  Q   And did you serve a subpoena seeking prescriptions from
8  Dr. Morse?
9  A   Yes.
10  Q   Do you know whether Dr. Morse produced any
11  prescriptions in response to that subpoena?
12  A   No.
13      THE COURT:  No, you don't know or no, he didn't?
14      THE WITNESS:  No.  We didn't get any
15  prescriptions.
16  Q   Can you look at Defendants' Exhibit AK.
17  A   Okay.
18  Q   What's this?
19  A   This is an e-mail from me to Mr. Fusto.
20  Q   And when is it dated?
21  A   February 27th, 2004.
22      MR. MILLER:  Your Honor, I'd offer Defendants'
23  Exhibit AK.
24      THE COURT:  All right.  AK will be received.
25      (Defendants' Exhibit AK received in evidence.)

1  Q   Now, why did you send this e-mail to Mr. Fusto?
2  A   To let him know that I had spoken with a representative
3  from the dental lab, Nu-Life Dental Lab.
4  Q   Okay.  And did Nu-Life Dental Lab have any of its
5  prescriptions from Dr. Morse?
6  A   No.
7  Q   Did Nu-Life indicate to you what they had done with any
8  prescriptions they allegedly received from Dr. Morse?
9  A   He said -- well, I spoke to a Mr. Riccobono who said he
10  keeps prescriptions for one year.  And after one year, he
11  destroys them.
12  Q   And after this, you served a subpoena to Dr. Morse for
13  prescriptions, correct?
14  A   Yes.
15  Q   Now, Mr. Norinsberg also asked you whether or not you
16  had conversations with Mr. Castillo about his analysis of
17  the invoices?
18  A   Yes.
19  Q   Now, did you talk to Mr. Fusto at all about Mr.
20  Castillo's calculations?
21  A   Not that I remember.
22  Q   Can you look at Defendants' Exhibit AM.
23  A   Yes.  Okay.
24  Q   What is this?
25  A   It's an e-mail.  Let me see.  It's an e-mail from me to

1  John Fusto.
2  Q   And how many e-mails are on Defendants' Exhibit AM?
3  A   It looks like these three of them on here.
4      MR. MILLER:  I'd offer Defendants' Exhibit AM.
5      MR. NORINSBERG:  No objection.
6      THE COURT:  All right.  They're received.
7      (Defendants' Exhibit AM received in evidence.)
8  Q   Looking at this, now in terms of chronological time,
9  which e-mail here is the first one, Mr. Flynn?
10  A   12:00 p.m.
11  Q   Okay.  And that's the one on the bottom of the page,
12  right?
13  A   Yes.
14  Q   Now, does that e-mail have anything to do with the case
15  involving Dr. Morse and his 580 Dental practice?
16  A   No.
17  Q   In your second -- in the e-mail that follows, the
18  middle e-mail, correct?
19  A   Yes.
20  Q   And that e-mail is from January 3rd, 2006, right?
21  A   Yes.
22  Q   And in that e-mail, you raise the subject of 580 Dental
23  with John Fusto, right?
24  A   Yes.
25  Q   And by "580 Dental," did you mean the case against

1  Dr. Morse?
2  A   Yes.
3  Q   What did you tell Mr. Fusto about Mr. Castillo's
4  calculations in that e-mail?
5  A   "What about 580 Dental?  Jose Castillo redid the
6  numbers and we still have over a million."
7  Q   So does that refresh your recollection as to whether or
8  not you talked to Mr. Fusto or communicated with Mr. Fusto
9  about Mr. Castillo's calculations?
10  A   Yes.  Because -- well, yeah, because I spoke to him via
11  e-mail, not face-to-face.
12  Q   Now, in your e-mail, you say that we still have over a
13  million.  In saying that, were you saying that Mr. Castillo
14  had previously had a grand larceny figure of over
15  $1 million?
16      MR. NORINSBERG:  Objection.
17      THE COURT:  Overruled.
18  A   Yes.
19  Q   Do you know when he had that figure of over $1 million?
20  A   Do I know when?  I don't remember the date.
21  Q   Do you have any idea how long it took Mr. Castillo to
22  redo the numbers?
23  A   I don't remember how long, no.
24  Q   And then in the top e-mail, did Mr. Fusto indicate to
25  you when the case was going to the grand jury?

**JA315**

1   A    No.  Well, early February according to the e-mail 2006.
2   Q    I'm handing you what's been marked as Plaintiff's 25.
3        Do you recognize that document?
4   A    Yes.
5   Q    What is it?
6   A    It's some sort of a printout that Mr. Castillo did
7   regarding the final tally.
8   Q    Okay.  And is it your handwriting on the document?
9   A    Yes.
10       MR. MILLER:  I'd offer Plaintiff's Exhibit 25.
11       THE COURT:  25 will be received.
12       I think 25 may already be.
13       MR. NORINSBERG:  I think it is already.
14       MR. MILLER:  I'm sorry, Your Honor.  I believe it
15  is.  You're correct.
16       THE COURT:  Okay.
17  Q    Now, at the top of this page of Plaintiff's Exhibit 25,
18  there's handwriting that says, "Final Findings 2000-2002."
19  A    Yes.
20  Q    Is that your handwriting?
21  A    Yes.
22  Q    And where it says, "580 Dental," is that your
23  handwriting?
24  A    Yes.
25  Q    Now, do you remember whether or not this spreadsheet

1   correlated to the $1 million figure that Mr. Castillo had
2   before he redid the numbers or after he redid the numbers
3   and still had 1 million?
4   A    Yeah.  I believe this was when he did them again and
5   that's why it's marked final, if I remember.  This is my
6   final findings.
7   Q    Is it your memory that Mr. Castillo generated multiple
8   versions of this model that showed a larceny of over
9   $1 million?
10       MR. NORINSBERG:  Objection; leading.
11       THE COURT:  Overruled.  I'll allow it.
12  A    Yes, yes.
13  Q    Investigator Flynn, you were a detective with the New
14  York Police Department, correct?
15  A    Yes.
16  Q    What kind of cases did you work on there?
17  A    I did everything; homicide to family disputes.
18  Q    Did you interview a lot of witnesses in connection with
19  your work in the New York Police Department?
20  A    Yes.
21  Q    When the case against Dr. Morse and 580 Dental started,
22  do you remember how that got going?
23  A    Yes.
24  Q    How?
25  A    It was a -- how the case started?

1   Q    Yes.
2   A    Yeah.  We received a memo from the Department of Health
3   with numerous dental clinics and facilities throughout the
4   city right after 9/11 where the named clinics -- dental
5   clinics -- where their billings had skyrocketed from prior
6   to 9/11 to after 9/11.
7   Q    And what happened around that time that was a possible
8   theory as to why these billings increased?
9        MR. NORINSBERG:  Objection.
10       THE COURT:  Do you know?  Do you have any idea of
11  your own knowledge?
12       THE WITNESS:  Yes.
13       THE COURT:  All right.  I'll allow him to answer.
14  A    After 9/11, thousands of people became unemployed, lost
15  their medical benefits, and the city issued thousands of
16  temporary Medicaid cards so people would have coverage.
17  Q    And what was the concern about the issuance of those
18  Medicaid cards?
19  A    Excuse me?
20  Q    Was there any concern about the issuance of those
21  Medicaid cards?
22  A    Was there any concern?
23  Q    Yes.
24  A    No, no.  Just that they would be covered, medical.
25  Q    When the investigation started, who was on the

1   investigation team?
2   A    Originally, well, I was assigned.  My partner was my
3   backup.  John Fusto was the original prosecutor.  And
4   originally we had another auditor, Timothy Johnson was
5   originally designed.
6   Q    And after you all got the case, what was the initial
7   focus in the investigation?
8   A    To investigate Medicaid fraud billings.  Procedures
9   that were billed and not performed.
10  Q    And did you start looking at any procedures in
11  particular?
12  A    Excuse me?
13  Q    Did you start looking at any procedures in particular?
14  A    Mostly denture work; bridges, dentures.
15  Q    Why did you start looking at denture work?
16  A    Well, because a lot of it was -- well, that was what
17  spiked.  That's the numbers went up, the dollar amount went
18  up, was for denture work.  And the fact that a lot of
19  dentures were being billed for younger people.
20  Q    So when you say the numbers spiked, are you talking
21  about Dr. Morse's practice or someone else?
22  A    Yes, yes.  Well, actually it was like I say, the
23  original letter had numerous dental facilities.  580 was one
24  of them.
25  Q    Well, with respect to dentures, was it your

1  understanding that there was a spike in Dr. Morse's billings
2  for dentures?
3  A    Yes.
4  Q    Did you start focusing on a particular patient
5  population at the outset of your investigation?
6  A    Yes.
7  Q    What was that?
8  A    Mostly younger people.
9  Q    Why did you focus on young people?
10 A    Well, older people are the ones who usually get
11 dentures, not younger people.  It's not normal for younger
12 people, I'm talking teenagers and early 20s, to be getting
13 dentures.
14 Q    So in terms of interviews, who did you decide to
15 interview at the outset of the case?
16 A    Who did I decide to interview?  Well, I was given a
17 list of recipient names from the auditing division.
18 Q    And was this list of recipient names consistent with
19 looking at young people who had billings for dentures?
20 A    Yes.
21 Q    Can you look at Defendants' Exhibit X.
22 A    What number did you say?
23 Q    X.
24         MR. NORINSBERG:  May we approach, Your Honor?
25         THE COURT:  Yes.

1         THE WITNESS:  I don't see X.
2         (Side bar conference.)
3         (Continued on the next page.)

1         MR. NORINSBERG:  Your Honor, I'm objecting to any
2  potential offering of this evidence.  It's basically a
3  summary of the interviews that he did, hearsay interviews
4  with people where he's writing down notes of what people are
5  telling him.  It's hearsay.  Counsel represented to me
6  before the trial that he's not going to actually try to
7  introduce it into evidence.  He's only going to use it to
8  refresh the dates of an investigation.  That's what he told
9  me.
10        Because I raised my concern, I said I'm going to
11 raise it with the Judge if you're going to try to offer this
12 in.  He said, no, we're really just trying to
13 establish -- we're just really using these records to
14 establish a timeline.  If that's all you're doing, I don't
15 have an objection.
16        Now it's clear to me that he's going to try to get
17 these into evidence.  It's unfair.  It's hearsay; nine or
18 ten different statements from patients who are not here to
19 be cross-examined.  So I have no problem with him using it
20 to establish dates.  I do have a problem with the document
21 itself coming in.
22        MR. MILLER:  It all goes to John Fusto's intent.
23 Everything I'm going to show him was sent to Fusto on the
24 memos itself that it's copied that they were sent to him.
25 It goes to his state of mind.  He was getting, you know, two

1  pages of worth of summaries of patients who said they didn't
2  have dentures in 2003.  That this was a real case.
3         He's trying to try the case that Fusto didn't
4  believe in it.  We have a right to put this in to show that
5  Fusto had every reason to show he had a good case.  If you
6  want to give an instruction as to truth, that's fine, if it
7  comes in for Fusto's intent.  You can't try a case about
8  Fusto not believing in it and then preclude us from putting
9  into evidence that he received during the course of the
10 investigation.
11        MR. NORINSBERG:  He can easily elicit from Fusto
12 that he received information from a number of patients that
13 allegedly didn't wear dentures.  That's fine.  But to
14 actually have these statements coming in or witnesses who
15 can't be cross-examined, it's rank hearsay.
16        Counsel misrepresented to me that he wasn't going
17 to do this so I wanted to raise this as a motion in limine
18 based on the fact that he said he wasn't going to do it.
19 It's unfair to raise it now.  Right now, perhaps offered
20 subject to redaction and this witness can't give any
21 testimony about it.
22        MR. MILLER:  The whole point is that he's getting
23 memos of nine different --
24        MR. NORINSBERG:  This is unfair --
25        THE COURT:  Wait a minute.  Don't start talking to

**JA317**

1  each other like this when the court reporter is trying to
2  make a record.
3          Did you represent to counsel that you weren't
4  going to offer these?
5          MR. MILLER:  No.
6          MR. NORINSBERG:  Yes.
7          THE COURT:  Are they on your exhibit list?
8          MR. MILLER:  Yes.
9          MR. FARBER:  We said basically what Mr. Miller
10 said.  We were offering them for Fusto's state of mind.  We
11 are not asserting the truth of what any of the individuals
12 might have said to the investigators.
13         THE COURT:  Did they say it to this investigator?
14         MR. MILLER:  Yes.  This is his memo.  Then he
15 copied it to Fusto.  It's right here on the memo.  I'm not
16 going to put in handwritten notes that may not have
17 gotten -- may not have gotten to Fusto.  Everything I'm
18 putting in, Fusto was copied on.
19         MR. NORINSBERG:  Your Honor, you had instructed us
20 when we had done our first JPO to try to please work out
21 objections so that you won't have this issue coming up in
22 trial.  In good faith, I had made an objection to them in
23 good faith.  We had a discussion, and I objected on this
24 very ground on hearsay.  They said we're not using it for
25 that.  We're not going to offer it in.  We're only offering

1  it to --
2          MR. MILLER:  I never said that.
3          MR. NORINSBERG:  Now they are changing their
4  position at trial.  It's unfair and prejudicial.  You
5  essentially have testimony of nine people coming in that
6  can't be challenged at all.
7          THE COURT:  You have brought out other testimony,
8  a lot of things that don't appear to me to be particularly
9  relevant to what, in fact, went on before the grand jury,
10 which is what I had envisioned this case being about.  But
11 to the extent that it's part of your theory and I understand
12 this is a theory that Fusto thought he had a very weak case,
13 that he didn't believe in this case, that it was a terrible
14 case, and that was his motive for directing falsification of
15 an exhibit.
16         Isn't that what you're going to argue to this
17 jury?
18         MR. NORINSBERG:  Sure, it is.  It's not fair.
19         THE COURT:  But the problem is, this is not being
20 offered for the truth of the fact but only for the purposes
21 of the fact that this was communicated to Mr. Fusto.  And
22 that's what I'll instruct the jury.
23         MR. NORINSBERG:  Mr. Fusto himself said that he
24 believes that the patients are very poor historians.
25         THE COURT:  You can ask him about that.

1          MR. NORINSBERG:  Why should it come in here, Your
2  Honor?
3          THE COURT:  If you want to offer it, you can have
4  him identify it.  Say he sent these memos to Fusto and then
5  ask Fusto about it.  That seems to me to be appropriate.
6          MR. MILLER:  Can I read one of the entries and
7  what he told Fusto?
8          THE COURT:  I think you can lay a foundation and
9  say that that he did a series of interviews.  That these are
10 the accounts of interviews of patients.  That these are the
11 accounts of the interviews.  And that these interviews were
12 forwarded to Mr. Fusto.
13         MR. MILLER:  Okay.
14         THE COURT:  Then ask Fusto about --
15         MR. MILLER:  I'd like to ask him as well whether
16 he considers these positive findings, in other words,
17 findings of fraud because he has attacked whether the entire
18 team believed in the findings as well.
19         THE COURT:  Well, I'll instruct the jury that
20 what -- I mean, he is not on trial.
21         MR. NORINSBERG:  I haven't attacked him at all.
22 The focus has been Castillo and Fusto, not Flynn.  His
23 personal belief as to what something establishes when he
24 doesn't even look at the records.
25         MR. MILLER:  I think he told Fusto that --

1          MR. NORINSBERG:  He said he had no conversations
2  with Fusto; he said he simply forwarded these to him.
3          THE COURT:  I don't know whether he said it about
4  these.
5          MR. NORINSBERG:  He said that.  I asked him did
6  you ever have any discussions based on your interviews, and
7  he said, no, I just forwarded it to Mr. Fusto.
8          So how can he now say that he had discussions with
9  Mr. Fusto?
10         THE COURT:  I'll allow you to lay the foundation
11 that he interviewed a whole series of people and that he, in
12 turn, forwarded those interviews to Fusto.  And then you can
13 bring out from Fusto that this is what he got and this is
14 what it said.  I'll instruct the jury it's for Fusto's state
15 of mind which has been clearly put into this case.  I think
16 that's a fair way to proceed.
17              (End side bar conference.)
18              (Continued on the next page.)
19
20
21
22
23
24
25

1   Q    Investigator Flynn, when you worked at the Medicaid
2   Fraud Control Unit, was it -- did you have a practice about
3   whether you gave other members of an investigative team
4   copies of materials that you had worked on?
5   A    Yes.
6   Q    Okay.  So when you would conduct an interview, did you
7   normally write a memorandum about it?
8   A    Yes.
9   Q    And would you send it to other members of the
10  investigative team?
11  A    Yes.
12  Q    Have you located Defendants' Exhibit X?
13  A    Yes.
14       MR. NORINSBERG:  Your Honor, I object to -- the
15  Court just made a ruling.
16       MR. MILLER:  Can I publish this to the jury?
17       THE COURT:  No.  X has not been admitted into
18  evidence yet.
19       I thought you were going to have him identify what
20  X is.  Do you have X in front of you?
21       THE WITNESS:  Yes.
22       THE COURT:  All right.  And that is a memo?
23       THE WITNESS:  Yes.
24       THE COURT:  And does that memo contain the results
25  of interviews that you did with Medicaid recipients in this

---

1   case?
2        THE WITNESS:  Yes.
3        THE COURT:  And is that information in turn that
4   you then forwarded to Mr. Fusto for his review?
5        THE WITNESS:  Yes.
6   Q    And when were these interviews conducted?
7   A    These were done on September 18th, 2003.
8   Q    And how many Medicaid recipients did you write about in
9   Defendants' Exhibit X?
10  A    Nine.
11  Q    Can you look at Defendants' Exhibit Y.
12  A    Okay.
13  Q    What is that?
14  A    This is also a memo regarding interviews I did with
15  patients, recipients.
16  Q    When did you conduct those interviews?
17  A    September 23rd, 2003.
18  Q    How many interviews are reflected in Defendants'
19  Exhibit Y?
20  A    Two.
21       THE COURT:  Am I correct that both X and Y were
22  patients that -- the Medicaid recipients in X and Y were
23  patients of Dr. Morse?
24       THE WITNESS:  Yes.
25  Q    And the patients interviewed in Defendants' Exhibit X

---

1   and Y -- I'm sorry.
2        With respect to Defendants' Exhibit Y, did you forward
3   that to Mr. Fusto?
4   A    Yes.
5   Q    Did you send it to the other members of the
6   investigative team?
7   A    Yes.
8   Q    Can you look at Defendants' Exhibit AB.
9   A    AB, okay.
10  Q    What is Defendants' Exhibit AB?
11  A    It's a memo regarding interviews with recipients.
12  Q    You mean Medicaid recipients?
13  A    Yes.
14  Q    And how many recipients are discussed in this memo?
15  A    One.
16  Q    And when is the memo date from?
17  A    March 2nd, 2005.
18  Q    Did you forward your memo to Mr. Fusto?
19  A    Yes.
20  Q    Now, with respect to the last three documents we've
21  talked about, Defendants' Exhibit X, Defendants' Exhibit Y
22  and AB, were these all Medicaid recipients of Dr. Morse?
23  A    Yes.
24  Q    Were these all Medicaid recipients for whom Dr. Morse
25  had submitted billings for dentures?

---

1   A    Yes.
2   Q    Do you know the ages of the Medicaid recipients?
3   A    Do I know their ages?
4   Q    Yes.
5   A    No, not offhand.  It was nobody old.  That's what I
6   remember.  They were all young.
7        THE COURT:  How are you defining "young"?
8        THE WITNESS:  20s.
9        THE COURT:  Go easy there.
10       THE WITNESS:  20s.
11       THE COURT:  So everyone that you interviewed in
12  that group were in their 20s?
13       THE WITNESS:  Yeah.  20s.  Mid to upper 20s.
14       THE COURT:  Okay.
15  Q    In addition to interviewing Medicaid recipients,
16  Investigator Flynn, did you talk to Dr. Morse at the outset
17  of this case?
18  A    Excuse me?  My hearing is not that great.  You have to
19  speak up.
20  Q    At the outset of this case, did you interview
21  Dr. Morse?
22  A    Yes.
23  Q    When was that?
24  A    I believe it was in August of 2002.
25  Q    Can you turn to Defendants' Exhibit V.

**JA319**

1  A    Okay.

2  Q    What is Defendants' Exhibit V?

3  A    This is a memo from me to my supervisor regarding an

4  attached questionnaire.

5  Q    Okay.  What does this attached questionnaire concern?

6  A    The questionnaire is the questionnaire that I brought

7  with me when I interviewed Dr. Morse.

8  Q    And when you say "questionnaire," is that something

9  that was filled out by Dr. Morse or by you?

10  A    By me.

11  Q    And did you send your memo and the questionnaire to the

12  other members of the investigative team?

13  A    Yes, I did.

14  Q    Did that include John Fusto?

15  A    Yes.

16         MR. MILLER:  I'd offer Defendants' Exhibit V.

17         MR. NORINSBERG:  No objection.

18         THE COURT:  V is received.

19         (Defendants' Exhibit V received in evidence.)

20  Q    Investigator Flynn, when you interviewed Dr. Morse, did

21  he say anything about the percentage of Medicaid patients

22  that he had at his practice?

23  A    Yes.

24  Q    What did he say?

25  A    95 percent.

---

1  Q    Did he tell you how many offices he had?

2  A    Just the one.

3  Q    Okay.  And where was the one located?

4  A    580 Dental.  It was 580 5th Avenue.

5  Q    And where is that?

6  A    I think it's Sunset Park, Brooklyn.

7  Q    Park Slope?

8  A    I don't know Brooklyn so ...

9  Q    Did he say anything about how many patients per day he

10  saw?

11  A    Him personally?

12  Q    Yes.

13  A    Like 20, 25.

14  Q    Can you turn to page 9 of the questionnaire.

15  A    Okay.

16  Q    Do you see in the middle where it says, "On average,

17  how many patients does the dentist see a day"?

18  A    Yes.

19  Q    It says, "Myself, 20-22"?

20  A    Yes.

21  Q    Does that refresh your memory of the precise number of

22  patients Dr. Morse indicated he reviewed?

23  A    Yes.

24  Q    When it says "Myself," that means Dr. Morse, correct?

25  A    Yes.

---

1  Q    When you interviewed Dr. Morse, did he say anything

2  about how he does his Medicaid billings?

3  A    Yes.

4  Q    What did he say?

5  A    I asked if he used a billing company or who did his

6  billings.  And he replied that he did the billings himself.

7  Q    Did he say anything about whether he reviewed the

8  billings?

9  A    Yes.

10  Q    What did he say?

11  A    He said he reviewed all the charts before he billed.

12  Q    What did he say -- did he say anything about whether he

13  billed using a paper Medicaid form or if he billed

14  electronically using a computer?

15  A    He billed electronically.

16  Q    And what did Dr. Morse tell you about dental

17  laboratories?

18  A    I asked him if he had any laboratories on his site at

19  508.  He said, no, he sent work out.  And then I asked, you

20  know, how many labs.  He replied he uses two labs and he

21  gave me the names of the two labs, Nu-Life and Dental

22  Design.

23  Q    And what's your understanding of what these labs do?

24  A    They make up the bridges or whatever dental work he

25  needs made or repairs also.  If you have a cracked partial

---

1  or something like that, he'll send that out for repair.

2  Q    Okay.  Did Dr. Morse identify which labs he used?

3  A    Yes.

4  Q    Which ones?

5  A    Nu-Life Dental and Dental Design.

6  Q    And those were the two that you talked about earlier

7  that you served subpoenas on, right?

8  A    Yes.

9  Q    Okay.  Did you go to the labs in person when you served

10  the subpoenas?

11  A    Yes.

12  Q    Do you remember going to Design Dental?

13  A    Yes.

14  Q    And where was that located?

15  A    It was on 72nd Street in Brooklyn.

16  Q    And where was the lab located?

17  A    It was a private house.  You had to go to the rear of

18  the house down a couple of steps into a basement.  That's

19  where the lab was.

20  Q    Now, after you served the subpoenas, did you go back to

21  Design Dental?

22  A    A few years later, yeah.

23  Q    Can you look at Defendants' Exhibit AR.

24  A    Okay.

25  Q    What's this?

1   A   This is a memo regarding -- that's dated October 24th,
2   2005, regarding a visit I made back to Dental Design -- or
3   Design Dental.
4   Q   What was the purpose of your visit to Design Dental at
5   that time?
6   A   We asked him some questions regarding if he was still
7   doing business with 580 Dental.  What kind of work he did.
8   How he kept his records; if he had a computer.
9   Q   Why did you want to know if he kept computer records?
10  A   Well, because we have access to a computer if we have
11  to.  I mean, it's a lot easier for us and for the auditors
12  if everything is on a computer printout rather than looking
13  at manually done invoices.
14  Q   How would you have taken the invoices from the computer
15  when you visited the lab?
16  A   Well, it would either be turned over voluntarily with a
17  subpoena or with a search warrant.  What we would do is we
18  would take the hard drive and download the hard drive and we
19  get all the information.
20  Q   And what did -- who did you speak to when you went to
21  Design Dental?
22  A   To Nissan Yushvayev.
23  Q   Okay.  And what did he say to you about whether or not
24  he had computerized records?
25  A   No.  He said he had no computer; he did everything by

---

1   hand.
2   Q   And your memo here is a summary of your visit to Design
3   Dental in 2005; is that right?
4   A   Yes.
5           MR. MILLER:  I'd offer Defendants' Exhibit AR.
6           MR. NORINSBERG:  No objection.
7           THE COURT:  AR will be received.
8           (Defendants' Exhibit AR received in evidence.)
9   Q   Mr. Flynn, did you send Defendants' Exhibit AR to
10  Mr. Fusto?
11  A   Yes.
12  Q   Can you look at Defendants' Exhibit AE.
13      What's Defendants' Exhibit AE?
14  A   Okay.
15  Q   What is this?
16  A   This is an index that I prepared to show who I was
17  serving grand jury subpoenas to.
18  Q   Do you know whether you successfully served all these
19  grand jury subpoenas?
20  A   I think I did.  I'm not sure.  Maybe one or two we
21  didn't, but most of them, yes.
22          MR. MILLER:  I'd offer Defendants' Exhibit AE.
23          MR. NORINSBERG:  No objection.
24          THE COURT:  AE is received.
25          (Defendants' Exhibit AE received in evidence.)

---

1   Q   Investigator Flynn, do you remember when you prepared
2   the list of people who you were going to serve grand jury
3   subpoenas on?
4   A   It would have had to have been just prior to going into
5   the grand jury in 2006.
6   Q   Can you look at Defendants' Exhibit AD.
7   A   Okay.
8   Q   What's Defendants' Exhibit AD?
9   A   Grand jury subpoenas.
10  Q   Okay.  Now, when you worked in the Medicaid Fraud
11  Control Unit, did you work in some sort of group?
12  A   Yes.
13  Q   What did you call it?
14  A   Team.
15  Q   Okay.  And who served the grand jury subpoenas that are
16  in Defendants' Exhibit AD?
17  A   Well, depending on the amount of subpoenas we have to
18  serve.  If there's a multitude of subpoenas, we get the
19  whole team involved or we just use one or two other members
20  from the team.
21  Q   Did you do that in this case?
22  A   Yeah.  I believe we did, yes.
23  Q   So who else served grand jury subpoenas in addition to
24  you?
25  A   Investigator Kleeger.

---

1           MR. MILLER:  I'd offer Defendants' Exhibit AD.
2           MR. NORINSBERG:  No objection.
3           THE COURT:  AD is received.
4           (Defendants' Exhibit AD received in evidence.)
5   Q   Investigator Flynn, which of these subpoenas did you
6   serve yourself?
7       Let me back up.  These are subpoenas to Medicaid
8   recipients, correct?
9   A   Yes.
10  Q   Which one of the Medicaid recipients did you serve
11  subpoenas on?
12  A   What's the names of the ones I served?
13  Q   Yes.
14  A   I personally?
15  Q   You personally.
16  A   Me personally?
17  Q   Yes.
18  A   Okay.  It was Asi Othman, Sara Charles, Miriam Perez,
19  Sawson Suliman, Nassa Ahiri.
20  Q   When did you serve these subpoenas?
21  A   February 17th of 2006.
22  Q   Can you look at Defendants' Exhibit AQ.
23  A   Okay.
24  Q   What's this exhibit?
25  A   This is another grand jury subpoena.

**JA321**

1  Q   And who is it addressed to?

2  A   It was served by me.

3  Q   And who was being asked to appear pursuant to this?

4  A   This is Intisar Ahiri.

5         MR. MILLER:  I'd offer Defendants' Exhibit AQ.

6         MR. NORINSBERG:  No objection.

7         THE COURT:  Received.

8         (Defendants' Exhibit AQ received in evidence.)

9  Q   When did you serve this subpoena on Ms. Ahiri?

10 A   February 16th, 2006.

11 Q   Now, when you served the grand jury subpoenas, did you

12 talk to the people you were serving subpoenas on?

13 A   Basically, just to let them know why they're being

14 subpoenaed, you know, what they can be expect to be asked.

15 Q   Where did you serve the subpoenas?

16 A   At their residence.

17 Q   Now, you testified before the grand jury in this case,

18 correct?

19 A   Yes.

20 Q   Do you remember what you testified about?

21 A   It's a long time ago.

22 Q   Did you talk about your interview with Dr. Morse?

23 A   Yes.

24 Q   When Mr. Norinsberg was talking to you, he asked you

25 about the speed at which this case was investigated.

1         Do you remember that?

2  A   Yes.

3  Q   Okay.  And were you upset the speed of this

4  investigation?

5  A   Yeah.  I would have liked it to have gone a little

6  faster.

7  Q   Why would you have liked to move faster?

8  A   Because the case was getting old.  I mean, I got the

9  case in 2002 and we're going into the grand jury four years

10 later in 2006.  It makes it very difficult for the

11 investigators after interviewing people four years prior to

12 go out and try and find these people again.

13 Q   And when you say you wanted to see it move faster, what

14 did you want to see happen?

15 A   Well, I would have liked to have seen a grand jury

16 indictment come down a lot sooner than it did.

17 Q   So you thought the case should have gone into the grand

18 jury earlier?

19 A   Yeah.

20        MR. MILLER:  Thank you, Investigator Flynn.

21        THE COURT:  Any redirect?

22        MR. NORINSBERG:  Yes.

23 REDIRECT EXAMINATION

24 BY MR. NORINSBERG:

25 Q   You just testified that you thought this case should

1  have been brought to the grand jury sooner; is that correct?

2  A   Yes.

3  Q   You told us earlier you never actually looked at the

4  invoices that you had picked up, correct?

5  A   Yes.

6  Q   You actually never were aware of any of the specific

7  calculations Mr. Castillo was making, were you?

8  A   No.

9  Q   You really knew nothing about the underlying merits of

10 the investigation, did you, sir?

11 A   The underlying merit?

12 Q   Yeah.

13 A   What do you mean by that?

14 Q   You really weren't involved with anything except

15 picking up documents and bringing them back to Mr. Fusto.

16        Would that be a fair statement?

17 A   Yes.

18 Q   Now, you had testified earlier about when you had

19 served subpoenas and when you were first requesting

20 prescriptions.

21        Do you recall giving that testimony with Mr. Miller?

22 A   Yes.

23 Q   Let's try to be very clear about this.  In terms of

24 Dr. Morse himself, can we agree that the first time you ever

25 requested prescriptions from him was April 2004?  Can we

1  agree on that?

2  A   Yes.

3  Q   And with the labs, while you might have originally

4  mentioned prescriptions in the subpoena, in fact, you didn't

5  follow up with those prescriptions until February of 2004,

6  true?

7  A   True.

8  Q   Now, you mentioned before about patients who had

9  dentures or not having dentures.  Do you remember testimony

10 about that?

11 A   What are you referring to?

12 Q   Do you remember referring to bridges and dentures and

13 things of that nature?

14 A   You mean, stuff that got sent to the lab?

15 Q   Things when you would do interviews with patients.

16 A   Yes.

17 Q   Okay.  Did you use the word "bridge" to mean a denture?

18 A   I don't remember.

19 Q   When you asked patients whether they had dentures, did

20 you ever ask them whether they had partial dentures?

21 A   I don't know.  I'd have to look at my interviews.

22 Q   As you sit here today, do you have any recollection

23 whether you ever used the word "partial" denture when you

24 were interviewing patients?

25 A   Partial denture?  No, I don't think so.  I think I just

**JA322**

1  asked if they ever had any denture work done.
2  Q   Okay.  And you understood and as you testified earlier
3  today, there's a difference between a partial denture and an
4  actual full denture, right?
5  A   Yes.
6  Q   So a person could have a partial denture for one or two
7  teeth and that would be a denture, right?
8  A   Yes.
9  Q   But the person might understand the question to mean
10 whether they have full dentures, correct?
11 A   Correct.
12 Q   And of these patients that you interviewed, were any of
13 these patients actually patients who were examined during
14 the in-mouth exam?
15 A   I don't know.
16 Q   In fact, none of them were, were they?
17 A   I don't know.  I don't know the answer to that.
18 Q   Now, you told us before when you were asked questions
19 about Plaintiff's Exhibit 25, which was already in evidence,
20 that was the document had a said "Final Findings" on top,
21 correct?
22 A   Yes.
23 Q   So Mr. Castillo himself was the one that told you these
24 were his final findings, right?
25 A   Yes.

1  Q   He didn't say these were just preliminary findings,
2  right?
3  A   No.
4  Q   And so if he testified earlier in this trial that those
5  were just preliminary findings, that's not the way you
6  understood it, correct?
7      MR. MILLER:  Objection.
8      THE COURT:  I'll sustain the objection.
9  Q   He made it clear to you that that document he was
10 handing you were his, quote, "final findings," end quote,
11 right?
12 A   If I remember, there was an issue with the numbers and
13 he wanted to be sure.  He redid them again to make sure, and
14 he let me know that these were the numbers he came up with.
15 Q   And in other words, you would never have written "Final
16 Findings" on that document unless you had specifically been
17 told that by Mr. Castillo, true?
18 A   No.  That's my writing.  I'm assuming that's -- because
19 he said he did them again, this is what he had, I assumed
20 that was the final findings.
21 Q   And he told you they were his final findings?
22 A   I don't know what he told me.
23 Q   Isn't that what you testified to earlier, sir?
24 A   I might have.  I don't remember.
25     MR. NORINSBERG:  Nothing further.  Thank you.

1      THE COURT:  Do you have anything further?
2      MR. MILLER:  Yes, Your Honor.
3  RECROSS-EXAMINATION
4  BY MR. MILLER:
5  Q   Mr. Norinsberg just asked you whether you had any
6  knowledge about the merits of this case, correct?
7  A   Yes.
8  Q   Did you interview Medicaid recipients who bills
9  submitted for them by Dr. Morse?
10 A   Yes.
11     MR. MILLER:  Your Honor, I'd like to go through
12 Defendants' Exhibit X.
13     MR. NORINSBERG:  Objection.
14     THE WITNESS:  X again.
15     THE COURT:  You opened the door.
16     MR. NORINSBERG:  You know what, I withdraw the
17 objection.  Ask all the questions you want.
18 Q   Let's look at Defendants' Exhibit X.
19     THE COURT:  You're offering now Exhibit X, right?
20     MR. MILLER:  I offer Defendants' Exhibit X into
21 evidence.
22     (Defendants' Exhibit X received in evidence.)
23     THE COURT:  All right.  Ladies and Gentlemen, I
24 should tell you that these exhibits are being offered for
25 the fact that this is what these individuals said and that

1  was, in fact, communicated to Mr. Fusto.  They are not being
2  offered for the truth of the fact of what it actually said
3  in there, but really for the fact that they said it, that
4  they communicated this to this witness, and that in turn was
5  communicated to Fusto.
6      So that's the purpose for which they are being
7  offered on the two witnesses's state of mind, their
8  knowledge about the strength of the investigation.  Okay.
9  Q   So what's the date of this memo, Investigator Flynn?
10 A   September 18th, 2003.
11 Q   And you sent it to Mr. Fusto?
12 A   Yes.
13 Q   And the memo is based on interviews of Medicaid
14 recipients?
15 A   Yes.
16 Q   And Medicaid recipients who had billings submitted by
17 Dr. Morse for denture work?
18 A   Yes.
19 Q   Can you read what you told -- or what you wrote in your
20 memo that you sent to Mr. Fusto about Michelle Pope after
21 her CIN number.
22 A   "She states she went to Dr. Morse around last April.
23 Dr. Morse requested an authorization from Medicaid for a
24 bridge, but states she never went back to have the bridge
25 put in."

**JA323**

1  Q   Can you look at the second paragraph and read what you

2  told Mr. Fusto through your memo about what Miriam Perez had

3  told you.

4  A   Yeah.  "She states three years ago she went to

5  Dr. Morse.  He referred her to another dentist in

6  Coney Island.  States she had no work done by Dr. Morse and

7  never had any bridgework."

8  Q   Now, there are three recipients discussed in the first

9  page of your memo, correct?

10  A   Yes.

11  Q   How many are discussed on the second page of your memo?

12  A   Okay.  How many?

13  Q   Yes.

14  A   Six.

15  Q   Can you read what it says about Hasan Abusabe.

16  A   Hasan Abusabe.  "He states around one year ago

17  Dr. Morse put a top and bottom bridge in his mouth."

18  Q   Do you know whether this person testified in the grand

19  jury in this case?

20  A   I don't remember.  I don't know.

21  Q   Do you know whether this person's on the list of grand

22  jury subpoenas?

23  A   No, he's not.

24  Q   Okay.  So after you were told by Hasan Abusabe that he

25  or she had had denture work done, no grand jury subpoena was

1  issued for that person, correct?

2  A   That's correct.

3  Q   Can we look down at the entry for Edwin Gonzalez.

4  A   Edwin Gonzalez.  "States five or six years ago he went

5  to Dr. Morse and got authorization for bridgework, but he

6  never went back to have the bridge put in."

7  Q   And can you read what you told Mr. Fusto through your

8  memo in September of 2003 about Virginia Torres.

9  A   "States she went to Dr. Morse prior to 1999.  States

10  she moved to Jacksonville, North Carolina, in 1999 when she

11  married a serviceman.  She hasn't been on Medicaid since

12  1999.  States she is 21 years old and has all of her natural

13  teeth and never had any bridgework done."

14         MR. MILLER:  Your Honor, I'd also like to offer

15  into evidence Defendants' Exhibit AB, which previously had

16  also been subject to connection.

17         MR. NORINSBERG:  No objection.

18         (Defendants' Exhibit AB received in evidence.)

19         MR. MILLER:  Thank you, Investigator Flynn.

20         THE COURT:  Do you have anything else?

21         MR. NORINSBERG:  Yes, briefly.

22  FURTHER REDIRECT EXAMINATION

23  BY MR. NORINSBERG:

24  Q   Miriam Perez was one of the patients that you just

25  referred to; is that correct?

1  A   Yes.

2  Q   And she had told you that she had no fake teeth; is

3  that correct?

4  A   Which exhibit was that?

5  Q   Miriam Perez.

6  A   Yeah, I know.  Which exhibit was that?

7  Q   The one you were just showed.

8  A   I know.  Which one was it?

9  Q   AB -- AX.

10         MR. MILLER:  It was X.

11         THE WITNESS:  Okay.

12  Q   She told you that, right?

13  A   Yes.

14  Q   In that interview?

15  A   Yes.

16  Q   But, in fact, she did wear dentures, didn't she?

17         MR. MILLER:  Objection.

18         THE COURT:  I'll sustain the objection.

19  Q   Did you ever come to learn of your firsthand

20  knowledge --

21         THE COURT:  Did you ever send anything to Mr.

22  Fusto that indicated whether or not she wore dentures?

23         THE WITNESS:  No.

24         THE COURT:  Then I'll sustain the objection.

25  Q   As you sit here today, do you have any knowledge --

1         MR. MILLER:  Objection.

2         THE COURT:  I'll sustain the objection.

3  Q   You were also shown on that document the interview with

4  Edwin Gonzalez; is that correct?

5  A   Yes.

6  Q   And when I had asked you earlier as to whether or not

7  when you first interviewed with Edwin Gonzalez he said the

8  last time that he had been treated five or six years ago,

9  you weren't sure at that time when I asked you that

10  question, right?

11  A   Yeah.

12  Q   Does this refresh your memory that as of the first

13  interview in 2003, Edwin Gonzalez told you that the

14  treatment that he received went five or six years back in

15  time?

16  A   Yes.

17  Q   And that information was passed on to Mr. Fusto in

18  2003, true?

19  A   Yes.

20         MR. NORINSBERG:  Thank you.  Nothing further.

21         THE COURT:  You can step down.

22         (Witness exits the courtroom.)

23         THE COURT:  Do you want to call your next witness?

24         MR. NORINSBERG:  Yes.  At this time, the plaintiff

25  calls Dr. DeLuca at this time.  We have that issue still.

**JA324**

1    MR. FARBER:  She is outside the courtroom so we'll
2 have to go get her.
3    THE COURT:  We're not going to continue with Mr.
4 Fusto?
5    MR. NORINSBERG:  That's their decision.  Whatever
6 they want to do.
7    MR. FARBER:  Dr. DeLuca is a nonparty and she does
8 have dental patients to see, so we would prefer to get her
9 on, with the Court's leave.
10   THE COURT:  Okay.  Is there anything we need to
11 resolve?
12   MR. NORINSBERG:  There was that one open issue the
13 Court had addressed earlier in the morning.
14   (Side bar conference.)
15   (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

1    THE COURT:  But I said I have to hear the direct
2 before we resolve.
3    MR. NORINSBERG:  Okay.  So perhaps we'll take a
4 break after the direct.
5    THE COURT:  All right.
6    (End side bar conference.)
7    (Continued on the next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    THE COURT:  Raise your right hand.
2
3 LINDA DIANE PAULETTE DELUCA, called by the plaintiff,
4         having been first duly sworn, was examined and
5         testified as follows:
6
7    THE COURT:  Please be seated and state and spell
8 your name for the record.
9    THE WITNESS:  Linda, L-i-n-d-a; Diane, D-i-a-n-e;
10 Paulette, P-a-u-l-e-t-t-e; DeLuca, D-e-L-u-c-a.
11 DIRECT EXAMINATION
12 BY MR. NORINSBERG:
13 Q    Good morning, Dr. DeLuca.
14 A    Oh, hi.  Good morning.
15 Q    You're here pursuant to a subpoena; is that correct?
16 A    Yes.
17 Q    And you have previously given testimony in this case,
18 correct?
19 A    Grand jury, yeah.
20 Q    And you also appeared at a deposition, correct?
21 A    Not that I know of.
22 Q    You don't remember me questioning you at a deposition?
23 A    Oh, yes, in your office.  I didn't realize that was a
24 deposition.  Sorry.
25 Q    No problem.  No problem at all.

1    You were represented by defense counsel Mr. Farber at
2 that deposition, correct?
3 A    Yes.
4 Q    And as you just indicated, you also testified before
5 the grand jury in this case, correct?
6 A    Yes.
7 Q    And you were asked questions by the defendant in this
8 case, John Fusto, at the grand jury proceedings, correct?
9 A    Yes.
10 Q    You gave answers to those questions, correct?
11 A    Yes.
12 Q    Did you have a chance to review your prior grand jury
13 testimony before coming here today?
14 A    Yes.
15 Q    Now, you have previously testified before a grand jury
16 prior to your testimony in the Morse case; is that right?
17 A    Other grand juries, you mean?
18 Q    Yes.
19 A    Yes.
20 Q    And you've testified approximately 15 times before a
21 grand jury?
22 A    Approximately.
23 Q    Now, your professional occupation is you're a dentist,
24 right?
25 A    Correct.

**JA325**

1   Q    Are you currently employed?
2   A    Yes.
3   Q    Where are you employed?
4   A    Hillsdale, New Jersey.
5   Q    Okay.
6           THE COURT:  As a dentist?
7           THE WITNESS:  Yes.  Part-time.
8   Q    Now, at the time you did your deposition --
9           THE COURT:  I know you probably didn't hear me.
10          MR. NORINSBERG:  I'm sorry.
11          THE COURT:  You probably didn't hear, but I asked
12  the doctor a question which was in following up on yours, he
13  asked whether you were employed and I asked whether you were
14  employed as a dentist.
15          THE WITNESS:  Yes.  I'm functioning as a dentist.
16          THE COURT:  Okay.  You said part-time?
17          THE WITNESS:  Yes.
18          THE COURT:  Okay.
19  Q    Okay.  When you say "part-time," what do you mean by
20  that?
21  A    Ten hours a week.
22  Q    Do you have an office?
23  A    No.
24  Q    Do you have any patient base, people that you regularly
25  see?

1   A    Sometimes, but it can be random.
2   Q    Now, in the Morse case you testified as an expert
3   before the grand jury regarding whether or not Dr. Morse had
4   provided services that he billed for; is that correct?
5   A    Say the last portion one more time.
6   Q    Sure.
7        You testified as an expert before the grand jury
8   regarding whether or not Dr. Morse had provided these
9   services that he had billed for, correct?
10  A    I don't know who the doctor is when I enter the grand
11  jury or any part of the journey between beginning and the
12  grand jury, so I am learning now who it is.
13  Q    Well, also at your deposition, we were talking about it
14  and you knew at that time, correct?
15  A    At that point I didn't know.
16          THE COURT:  You mean, at the grand jury?
17          THE WITNESS:  Yes, right.
18  Q    Can we agree that your function in general when you are
19  appearing before the grand jury was to decide whether or not
20  services had been provided as opposed to, say, providing
21  whether or not a standard of care had been met.
22  A    Yes.
23  Q    Now, one way to find out if Dr. Morse performed the
24  services he billed for would be to do what's called an
25  "in-mouth examination," correct?

1   A    That's one of the ways, yes.
2   Q    An in-mouth exam is when the dentist actually looks at
3   all the teeth to see if the teeth are present or not present
4   and charts the results on a document, correct?
5   A    Yes.
6   Q    Now, you actually had an area in the Attorney General's
7   Office to do an exam, correct?
8   A    Yes.
9   Q    So you would do your in-mouth exams at that time,
10  correct?
11  A    Yes.
12  Q    And performing an in-mouth exam would allow you to see
13  if a patient was wearing dentures, true?
14  A    If the occasion presented, yes, I could see that.  They
15  would either have a denture that was visible or be without a
16  denture.  Some did come in without a denture.
17  Q    Performing an in-mouth exam would allow you to see
18  whether or not a patient was wearing dentures, right?
19  A    Yes.
20  Q    And performing an in-mouth exam would also allow you to
21  see if the patient was wearing partial dentures?
22  A    No.  If they had the partial denture with them, I could
23  see it.  When you wear a partial, sometimes you don't wear
24  it.  You may own it, but you don't bring it with you so I
25  would see missing teeth.

1   Q    So you would either see a partial denture or missing
2   teeth; is that correct?
3   A    Yes.
4   Q    In a case involving a question of whether or not a
5   patient had a denture or partial denture, it would be
6   helpful to do an in-mouth exam of that patient, correct?
7   A    I would assume, yes.
8   Q    In fact, you never did an in-mouth examination of seven
9   of the eight witnesses who testified before this grand jury;
10  isn't that true?
11  A    I don't know that.
12  Q    Now, if you didn't have an in-mouth examination, x-rays
13  would be the next best source; would that be correct?
14  A    That's possible, yes.
15  Q    You could determine if services was provided by seeing
16  if there were x-rays in the chart; is that correct?
17  A    If there are x-rays in the chart, yes.
18  Q    You were never shown any x-rays for the patients who
19  testified before the grand jury in the Morse case, were you?
20  A    I don't know that.
21  Q    You were never shown x-rays for any of Dr. Morse's
22  patients, were you?
23  A    I don't know that.
24  Q    Well, you certainly didn't testify about your review of
25  x-rays in front of the grand jury, did you?

1  A   Not that I know of.
2  Q   Okay.  You told us before you reviewed your grand jury
3  testimony before you came here today, right?
4  A   That's true.
5  Q   Can we agree that you didn't say one word about looking
6  at the patients' x-rays, did you?
7  A   Not at that grand jury, no.
8  Q   And at that grand jury, you didn't say one word about
9  looking at the patients' charts, correct?
10  A   Not at that grand jury.
11  Q   Now, another way of determining what work had been done
12  would be to actually look at the patient's chart, correct?
13  A   Yes.
14  Q   That could be a useful source of information, actually
15  going into the patient's chart and seeing what work is
16  documented, correct?
17  A   Yes, it can be.
18  Q   You look at the treatment sheet inside the chart to see
19  if the dates and procedures listed, if they fit the order
20  they are supposed to fit and if they match the billings,
21  correct?
22  A   And if the x-rays match the work that was done, yes.
23  Q   And if there were findings that didn't correspond with
24  what's in the chart, you would note that, right?
25  A   I might have more questions than answers, but I might

1  be able to answer some of them.  I might not.
2  Q   Would it be fair to say that you never reviewed any
3  patient charts from Dr. Leonard Morse?
4  A   I don't know that.
5  Q   Referring to your deposition, page 44, line 20.
6  "Question:  To your knowledge, did you ever review any
7  patient charts from Dr. Leonard Morse?
8  "Answer:  To my knowledge, no."
9       MR. FARBER:  Objection.
10  Q   Do you recall being asked that question and giving that
11  answer?
12       MR. FARBER:  Objection.  She's testified she
13  doesn't know.
14       THE COURT:  I'll sustain the objection.
15  Q   Would it be fair to say that at this point having
16  reviewed your grand jury testimony, you didn't examine any
17  of the grand jury patients that you testified about, you
18  didn't examine any of their records, and you didn't look at
19  any of their x-rays?
20       Would it be fair to say based on your actual
21  testimony at the grand jury?
22  A   In the grand jury, I was asked to look at billings.
23  Q   You were not actually shown Dr. Morse's actual patient
24  charts, you were shown billing summaries by the Attorney
25  General's Office, right?

1  A   In that grand jury, yes.  That's what I remember the
2  most.
3  Q   Now, normally, Dr. DeLuca, you would base your grand
4  jury testimony either on review of patient records or
5  in-mouth examinations; is that true?
6  A   On most occasions that was the case, yes.
7  Q   But that wasn't the case in Dr. Morse's grand jury
8  testimony, correct?
9  A   I don't know that for sure.
10  Q   Well, again, based on your review of your own grand
11  jury testimony, can we agree that according to your grand
12  jury testimony, you did not base your opinions on patient
13  records or in-mouth examination?
14       MR. FARBER:  Objection.
15       THE COURT:  Her opinions in the grand jury?
16       MR. NORINSBERG:  Yes.
17       THE COURT:  The opinion that you expressed in the
18  grand jury, do you recall what that was based on?  Were you
19  just looking at a document?
20       THE WITNESS:  I believe I was looking at a
21  document at the grand jury.  When I do in-mouths, I don't
22  know who I'm doing them -- I mean, when I do chart reviews,
23  I don't know who the doctors are.  I don't know who the
24  patients are.  I mean, they don't make any reference to me.
25  There's no linear pattern.  I can be asked to just review

1  charts and I don't know why I'm reviewing them.  I'm looking
2  for dental consistencies with billings.
3       THE COURT:  And I take it that's why you're saying
4  that you don't know, in fact, whether you ever looked at
5  any --
6       THE WITNESS:  Yes.  That's exactly what I'm
7  getting at.  I don't know.  At the time of the review, I
8  don't know.
9  Q   But what you do know, Dr. DeLuca, is at the time when
10  you actually testify in front of the grand jury, if in fact
11  you're being asked questions about an in-mouth examination,
12  you would have your notes, right?
13  A   Yes.
14  Q   And then you would be asked questions based on your
15  notes, correct?
16  A   Yes.
17  Q   And then you could give that testimony to the grand
18  jury, correct?
19  A   Yes.
20  Q   None of that happened in this case, correct?
21  A   I agree with that, yes.
22  Q   Now, you would never base testimony upon records that
23  were created by the Attorney General's Office, would you?
24  A   No.
25  Q   But you did that in this case, didn't you?

**JA327**

1    A    I was asked to see the billings and if I thought, in my
2    opinion, they were excessive.
3    Q    I'd like to, if I could, show you one of the documents
4    that you were shown during the grand jury.
5    A    Sure.
6    Q    Showing the witness a portion of Grand Jury 7, which is
7    Exhibit 44.
8    A    Am I supposed to be seeing that (indicating)?
9    Q    I'm sorry, Dr. DeLuca.  When you have a chance, if you
10   could step down.
11   A    Okay.
12        THE COURT:  What exhibit are you displaying to the
13   witness?
14        MR. NORINSBERG:  Exhibit 44, which is Grand Jury
15   7, the one page.
16        THE COURT:  That's a blowup.
17        MR. NORINSBERG:  It's a blowup.
18   Q    Was this one of the records that you were shown, as far
19   as you remember?
20   A    Yes.  And I'd be interested in this section here
21   (indicating).
22   Q    Okay.  And when you're pointing to this section, you're
23   pointing to the procedure description, right?
24   A    Right.
25   Q    And you were asked questions about all these procedures

---

1    here on the right-hand column, correct?
2    A    Yes.
3    Q    And you told the grand jury it's very unusual that
4    you'd have three of the same procedures like this
5    (indicating) on the same day, right?
6    A    I was concentrating here (indicating).
7    Q    Did you indicate to the grand jury that it was very
8    unusual that each one of these three procedures -- excuse
9    me.
10        Did you indicate that it was unusual that each one of
11   these procedures appeared three times?
12   A    Yes.  It can be considered excessive.
13   Q    And that the fact that there were nine procedures on
14   there, you told the grand jury that seems excessive to you,
15   correct?
16   A    Yes, it did.
17   Q    As an experienced dentist, you understand you're not
18   looking at a patient chart here, right?
19   A    No, I'm not.
20   Q    You're looking at a billing summary that the Attorney
21   General's Office put together, correct?
22   A    Yes.
23   Q    But you told us a moment ago you would never base your
24   opinion on a document created by the Attorney General's
25   Office, correct?

---

1        MR. FARBER:  Objection.
2        THE COURT:  I'll sustain the objection.
3    Q    Now, you also were shown a number of other records
4    during the grand jury proceedings; is that correct?
5    A    I'm not positive of that.  I know that I was asked
6    about procedures.
7    Q    Okay.  Thank you.
8        Now, do you recall specifically being asked the
9    following question and giving the following answer relating
10   to Stacy Rodriguez in your grand jury testimony:
11       "Question:  Now, on June 4th, how many times did those
12   things occur or were indicated that they occurred?
13       "Answer:  I see that adding existing tooth to partial
14   denture is listed three times.  I see repair or replace
15   broken clasp three times.  And I see reline upper, partial
16   denture three lines."
17       Page 10, line 23.
18       "Question:  Does that make any sense to you?
19       "Answer:  No, it does not.
20       "Question:  Why wouldn't it?
21       "Answer:  Because I can't imagine that you would do
22   each of these three times on the same day."
23       Did you give that testimony to the grand jury?
24   A    Yes, I did.
25   Q    So without actually looking at the records that

---

1    Dr. Morse generated when he treated this patient, you based
2    your opinion that his treatment was excessive on this
3    document, correct?
4    A    Yes.
5    Q    You had nothing else to go on but what was put before
6    you by Mr. Fusto, right?
7    A    As far as I know.
8    Q    Now, even with the limited information that you had on
9    this billing record, you formed the opinion that this
10   patient did, in fact, have a partial denture, correct?
11   A    On paper I did.
12   Q    Excuse me?
13   A    From that paper, I assumed the patient had a partial
14   denture.
15   Q    Based on the limited information there, that was your
16   conclusion, that she must have had a partial denture, right?
17   A    Some partial existed in her mouth, yes.
18   Q    Okay.  That would be Stacy Rodriguez we're talking
19   about, that patient, right?
20   A    Yeah.  Whatever the name is there.
21   Q    Now, when you would review billings, Dr. DeLuca, there
22   would usually be an indication as to which tooth number had
23   been worked on, correct?
24   A    Yes.  Tooth numbers and what was done, in fact, to the
25   tooth, a filling, which surfaces had the filling done, that

**JA328**

1  kind of information.
2  Q    And then your role as an expert then, you would try to
3  independently confirm whether or not the dentist had, in
4  fact, done the work on the particular tooth numbers that he
5  claimed to have done, right?
6  A    Yes.
7  Q    These documents that you were shown in the grand jury
8  have no tooth numbers, do they?
9  A    Not that I notice.  I didn't pay attention.  I was
10  looking at the procedure.
11       THE COURT:  Perhaps you want to indicate precisely
12  for the records which document she was shown.
13  Q    You were shown Grand Jury Exhibit 7 during your grand
14  jury testimony; is that correct?
15  A    I don't know.
16  Q    Let me read from the grand jury transcript.  It will
17  clarify it.
18       THE COURT:  Why don't you put what is 7 before the
19  witness, though.  I think that's the problem.
20       MR. NORINSBERG:  This is part of 7.
21  A    I have my copy.  Do you want me to take it out?
22  Q    Sure.  If you have it, take it out.
23       MR. FARBER:  Your Honor --
24       THE WITNESS:  No?  Yes?
25       MR. FARBER:  Is there an exhibit number on the

1  copy you have there?
2       THE WITNESS:  Let me check.
3       MR. FARBER:  Is there a sticker or an indication?
4       THE WITNESS:  Here.  Why don't you look at it.  It
5  just says "Original" stamped at the bottom.
6       MR. FARBER:  Your Honor, I think the witness
7  should be shown an exhibit from this proceeding to keep the
8  record clear.
9       THE COURT:  It seems that way to me.
10       MR. NORINSBERG:  Okay.
11       THE COURT:  Should be Exhibits 133 and 44.
12       MR. NORINSBERG:  Just 44, Your Honor.
13  Q    I'd like to show you, Dr. DeLuca, what's been marked as
14  Exhibit 44, which is Grand Jury Exhibit 7.
15  A    Okay.
16  Q    Now, how many pages are there in that document?
17  A    Six billings and seven including the cover.
18  Q    Okay.  So let's start with the first page of billings.
19  Who is the patient?
20  A    Suliman.
21  Q    Are there any tooth numbers shown for this patient,
22  Suliman?
23       THE COURT:  Well, first of all, were you shown
24  this document in the grand jury?
25       THE WITNESS:  No, I don't think so.

1  Q    Okay.
2  A    I mean, I'm not certain, but --
3  Q    Referring to the grand jury transcript, page 8.  Mr.
4  Fusto, quote, "I'm going to show Grand Jury Exhibit 7 for
5  identification to Dr. DeLuca."  Document referred to was
6  received and marked Grand Jury Exhibit 7 in evidence 3-8-06.
7       Does that refresh your memory at all, Dr. DeLuca?
8  A    Well, I can't be certain this is the exact same one.
9  If you say it's the one, then it's the one.  I mean, I don't
10  memorize that.
11  Q    Fair enough.  So we just talked about the first
12  patient, Suliman.  You indicated there are no tooth numbers
13  on that document, correct?
14  A    Not that I see, no.
15  Q    Let's go to the second patient.  Who was the second
16  patient?
17  A    Is that Ahiri?  Intisar.
18  Q    Intisar Ahiri?
19  A    Yes.
20  Q    Were there any tooth numbers on the document relating
21  to Intisar Ahiri?
22  A    No.
23  Q    Let's go to the third page.  Who is the patient on the
24  third page?
25  A    Nassa Ahiri.

1  Q    Are there any tooth numbers indicated on the billing
2  summary for Nassa Ahiri?
3  A    Not that I can see, no.
4  Q    Let's go to the fourth page.
5  A    Sara Charles.
6  Q    Are there any tooth numbers listed on Sara Charles's
7  billing summary?
8  A    Not that I can see.
9  Q    Let's go to number 5.  Who is the patient?
10  A    Stacy Rodriguez.
11  Q    Are there any tooth numbers on Stacy Rodriguez's
12  billing sheet?
13  A    Not that I can see.
14  Q    Let's go to number 6.  Who is the patient?
15  A    Is that Othman?
16  Q    Are there any tooth numbers listed on Mr. Othman's
17  billing summary?
18  A    Not that I can see, unless they are incorporated in
19  some fashion not visible to me.  Sometimes they are a part
20  of codes.  I don't know that, though.
21  Q    Okay.  But as far as what you see on that document, you
22  did not see tooth numbers for any of the patients; is that
23  correct?
24  A    Correct.
25  Q    Would you agree, Dr. DeLuca, that without the tooth

1  numbers on that document, you would have no way of knowing
2  which teeth actually had been worked on?  True or not true?
3  A    Well, in this particular case, we're talking about
4  partials.
5  Q    Referring to your deposition, page 78, line 21.
6  "Question:  Now, without the tooth numbers shown on
7  that document, would you have any way of knowing which teeth
8  had actually been worked on?
9  "Answer:  No."
10  Do you recall giving that testimony at your deposition?
11  A    No, but if I did, I did.
12  Q    So according to your deposition testimony, looking at a
13  document that doesn't have tooth numbers on it like this
14  one, you'd have no way of knowing which teeth actually had
15  been worked on, true?
16  A    True.
17  Q    Now, you were also -- you just mentioned that the
18  record of a patient Nassa Ahiri, I think the third patient
19  you mentioned, you have that in front of you?
20  A    Yes.
21  Q    And do you remember you actually testified with regard
22  to this patient that if the doctor actually had been working
23  on a number of different teeth, then it should list the
24  teeth?  Do you remember that?
25  A    No, but if I said it and you have a document stating I

1  do, then I did.
2  Q    Okay.  Just to refer to your grand jury testimony, page
3  12, line 15.
4  "Question:  Now, again, the same question.  Does that
5  make any sense to you from a practitioner standpoint?
6  "Answer:  It would be difficult to get all this done in
7  one particular day.  I don't know exactly why this was
8  listed the way it is because if there were six or seven
9  teeth involved, it should list the teeth and services once
10  in my opinion.  But I don't know why it's listed that way.
11  It seems unusual to me, yes."
12  Do you recall giving that testimony at the grand jury?
13  A    Yes.
14  Q    So what you were saying in your answer is that if there
15  were multiple teeth involved, the document itself should say
16  that, right?
17  A    That's what I'm accustomed to.
18  Q    But that wasn't done in this case, correct?
19  A    No.
20  Q    And as the dentist, you testified that you can only go
21  on what you're given, right?
22  A    Yes.
23  Q    So if Mr. Fusto only gives you these billing summaries,
24  that's all you can go on, right?
25  A    Yes.

1  Q    Now, you're not a Medicaid provider, are you, Dr.
2  DeLuca?
3  A    No, I don't have -- are you asking if I had a Medicaid
4  number?
5  Q    Yeah.  Have you ever been a Medicaid provider?
6  A    No, sir.
7  Q    Have you ever had a Medicaid number?
8  A    No, sir.
9  Q    Do you have any experience with Medicaid billing or
10  codes?
11  A    Only what I see at the grand jury, and I think I worked
12  in a Medicaid office for three hours.
13  Q    For three hours?
14  A    Yeah.  It wasn't for me.
15  Q    Okay.  You never billed Medicaid for anything, though,
16  correct?
17  A    I don't believe so in my career, no.
18  Q    And you never have been subject to any type of Medicaid
19  audit, correct?
20  A    No, sir.
21  Q    Now, Dr. DeLuca, do you recall that when you were
22  introduced to the grand jury, you were introduced by Mr.
23  Fusto as an expert?  Do you recall that?
24  A    Yes.
25  Q    But you were honest enough at your deposition to say

1  that you don't consider yourself an expert, right?
2  MR. FARBER:  Objection.
3  THE COURT:  I'll sustain an objection to the form
4  of that question.
5  Q    Do you consider yourself an expert?
6  MR. FARBER:  Objection.
7  THE COURT:  I'll sustain the objection.  You can
8  ask her what she said in the grand jury about that if you
9  want to ask her the question and answer.
10  MR. NORINSBERG:  Okay.
11  Q    Did you say anything to the grand jury as to whether or
12  not you were an expert?
13  A    No, I don't think I did.
14  Q    Okay.  Do you have any areas of specialization?
15  A    No, I don't.
16  Q    Are you affiliated with any hospitals?
17  A    No, sir.
18  Q    Have you ever had any admitting privileges at
19  hospitals?
20  A    No.
21  Q    Have you ever been affiliated with any hospitals?
22  A    No.
23  Q    Do you have any type of advanced specialty training or
24  degrees?
25  A    No.

**JA330**

1    Q    Are you board certified in any ADA-recognized specialty

2    areas?

3    A    No.

4    Q    Have you written any textbooks or chapters in textbooks

5    on dentistry?

6    A    No.

7    Q    Have you ever been a member of the International

8    College of Dentists?

9    A    I was a member of the ADA, unless they changed it to be

10   global now.

11   Q    Have you received any type of honors or professional

12   recognition?

13   A    No.

14   Q    Now, you had a working relationship with the Attorney

15   General's Office for some time; is that correct?

16   A    Yes.

17   Q    When were you first hired as a consultant for the

18   Attorney General's Office?

19   A    I think it was 1994.

20   Q    Now, you actually had graduated from dental school I

21   believe sometime in 1993; is that correct?

22   A    '91.

23   Q    So when you applied in 1994 to become a consultant with

24   the AG's Office, did you have to do any type of testing

25   before you could be a consultant for them?

1    A    No, I don't think so.

2    Q    Did you have to do any type of certification process?

3    A    No.

4    Q    Did you provide any references from any other dentists?

5    A    I can't remember that far if I did or I didn't, but I

6    know my resume was sent and I was contacted a considerable

7    time after.  So there was a big gap and I don't recall how

8    it went.

9    Q    Now, at the time when you were working for the Attorney

10   General's Office, did you consider yourself to be an

11   employee of that office?

12   A    No.

13   Q    Did you ever list on your CV that you were an employee

14   and paid consultant for the Attorney General's Office?

15   A    I did add it to my resume along with other things.

16   Q    Okay.  So on your resume, you actually represented that

17   you were an expert; is that correct?

18   A    Yes, as my title was from that, along with consultant.

19   Q    I'm going to show you what we will mark as Plaintiff's

20   Exhibit 146.

21        Can you take a look at this document.  Do you recognize

22   this document?

23   A    Yes.

24   Q    What do you recognize the document to be?

25   A    This is my resume.

1         MR. NORINSBERG:  Okay.  I offer that into

2    evidence.

3         THE COURT:  146 will be received.

4         (Plaintiff's Exhibit 146 received in evidence.)

5    Q    Dr. DeLuca, would it be fair to say that you actually

6    represent on your resume that you're an expert witness

7    dental consultant for the Office of the Attorney General

8    Medicaid Fraud Unit; is that correct?

9    A    Yes, within the limits of this position.

10        MR. NORINSBERG:  Thank you.  I have nothing

11   further.

12        THE COURT:  Is that what your title was there?

13        THE WITNESS:  Yes.

14        THE COURT:  That's the title?

15        THE WITNESS:  They gave me.  I didn't do it.

16   Q    Okay.  But you put this on your CV that you handed out,

17   correct?

18   A    That's what they would call me and that's what I did

19   for them, so yes.  How else would I describe it?

20   Q    Now, you never actually told the grand jury that you

21   were a paid consultant for the Attorney General's Office,

22   did you?

23        MR. FARBER:  Objection.

24        THE COURT:  Sustained.

25        MR. NORINSBERG:  I have nothing further.

1         MR. FARBER:  Can we approach?

2         THE COURT:  Ladies and gentlemen, why don't I just

3    let you take another five- or ten-minute break.

4         (Jurors exit the courtroom.)

5         THE COURT:  Doctor, you can actually step out for

6    five minutes.

7         (Witness exits the courtroom.)

8         THE COURT:  All right.

9         MR. FARBER:  Well, I believe Mr. Norinsberg has

10   opened the door to my inquiring as to the question of she

11   testified on these documents which didn't have tooth

12   numbers.  The obvious implication of his theory of the case

13   is that she would have testified materially and

14   substantially differently had she been provided with tooth

15   numbers.  Comes a highly important question concerning both

16   the materiality claim and the fabrication claim if her

17   opinion would have changed if she was, in fact, aware of

18   tooth numbers.

19        THE COURT:  I'm not even sure what her opinion was

20   because it really wasn't brought out.  The only thing that

21   was actually brought out was an opinion expressed with

22   regard to Stacy Rodriguez.  Did she issue some other opinion

23   or state something else other than with regard to Stacy?

24        MR. FARBER:  He asked her about -- Mr. Norinsberg

25   asked about one other patient, I believe, and the question

1    concerned whether the services were excessive.

2        THE COURT:  Well, what did she testify to in the

3    grand jury since, you know, at least this jury I'm not sure

4    knows, based on the examination, and I'm not sure I know?  I

5    take it she did testify in the grand jury something about

6    the fact that -- about Stacy Rodriguez.

7        MR. FARBER:  She actually testified about all six

8    of the patients, Your Honor.

9        THE COURT:  And she expressed the opinion what as

10   to all six?

11       MR. FARBER:  She expressed the opinion that in her

12   view, she had questions based on the descriptions of

13   services she was provided concerning the reasonableness of

14   what was provided in her opinion as a dentist.  That's the

15   substance of her testimony.

16       THE COURT:  I think she also said something in the

17   grand jury about she thought it was unusual that there were

18   no teeth numbers, right?

19       MR. FARBER:  She intimated that I think with

20   respect to one of the patients, yes.

21       THE COURT:  All right.  So now I take it someone

22   is going to prove that these records, in fact, showed that

23   these were similar to three different teeth?

24       MR. NORINSBERG:  Uh-huh.

25       MR. FARBER:  Well, that's actually all I

1    want -- that's one of the areas I want to explore with her

2    is show her, in fact, another document, actually a document

3    that's in evidence, that shows different tooth numbers.

4    Exhibit G is in evidence.  It shows tooth numbers.  It's a

5    different form --

6        THE COURT:  What do you expect her to say?

7        MR. FARBER:  I expect her to say that I had

8    concerns as a dentist from reviewing the billings I was

9    shown before the grand jury without these tooth numbers.

10   Now that I see the tooth numbers, I still have clinical

11   concerns even knowing these tooth numbers, and I would have

12   so said to the grand jury.

13       THE COURT:  What are her concerns seeing the tooth

14   numbers?

15       MR. FARBER:  Her concerns are similar; excessive

16   services, unexplained why these many procedures of this

17   nature would be done in this time.  In essence, part of the

18   basis of the fabrication claim is, in fact, that this

19   particular witness may have been mislead by these documents

20   and her testimony would have arguably been materially

21   different had she been provided with tooth numbers.

22       MR. NORINSBERG:  They want this witness to look at

23   Exhibit G, which was never presented to the grand jury and

24   was first exchanged with us here in 2013.  They want to use

25   that document from 2013 to go back in time and say --

1        MR. FARBER:  No.  Excuse me.  Exhibit G was,

2    indeed, before the grand jury in the form of the provider

3    profile.  The individual patients were not blackened out and

4    separated the way they are in this Court.

5        That document was very much before the grand jury.

6        THE COURT:  I thought it was a general question if

7    the tooth numbers had been there, would that have changed

8    your view?  I thought she was just going to be relying on

9    this document.

10       MR. FARBER:  That is certainly a question I will

11   ask her, Your Honor, and then I intend to show her another

12   document in evidence with the tooth numbers and ask her does

13   this change your view.

14       MR. NORINSBERG:  She was never asked that opinion

15   before the grand jury so why now would she be able to

16   express an opinion that was never put to her before the

17   grand jury?

18       THE COURT:  Well, isn't the whole issue whether

19   the falsified document was material?

20       MR. NORINSBERG:  If they wanted to use her for

21   this purpose, Your Honor, we deserve some type of

22   disclosure -- an expert disclosure -- and then we could have

23   focused on that and asked her specific questions on that.

24   They never raised that issue until opening statement.

25   That's the first time I heard that this witness -- they

1    actually moved me -- remember, Your Honor, they moved to

2    preclude me from bringing this witness saying that she was

3    completely irrelevant and that there were already grand jury

4    proceedings.  That was their legal position.

5        Once you allowed me to do it -- and I hope you

6    understand, I drastically reeled in my examination to comply

7    with the Court's order.  I wanted to go with a lot more

8    stuff.  I had a lot more stuff, but you made it clear that

9    you're not going to allow this witness to just come in and

10   get cross-examined like another witness so I didn't.

11       But that being said, they moved to preclude her

12   from coming in.  Now she's in there.  Now all of a sudden

13   they want to effectively use her as an expert to say, no,

14   this is still unusual, it's still excessive even if you have

15   the tooth numbers.  It's unfair, it's prejudicial.  It's too

16   late to do that.  They shouldn't have done that.

17       This appeared before the grand jury.  They can ask

18   her the one general question I wouldn't object to, Your

19   Honor, if there had been tooth numbers, would that change

20   your opinion?  I'm okay with that.  To go into all the stuff

21   and specifics, I think that's improper and that's where it

22   crosses the line.

23       MR. FARBER:  Your Honor, this was another document

24   that was before the grand jury.  They had it available to

25   them.  This is, in fact, the crux of his contention as to

**JA332**

1  both falsity and materiality that, among other things, this
2  particular witness was particularly swayed by the documents
3  in these forms and in particular because of the lack of a
4  tooth number.
5      And so it's a fair question for this jury to hear
6  whether or not if that's the case, if she had tooth numbers,
7  would her opinion have significantly or materially changed?
8      THE COURT:  What has she done now?  She's gone
9  through Exhibit G and compared all of these tooth numbers
10 and you had her do all this?  Is that what's happened?
11     MR. FARBER:  She hasn't done that.  I intend to
12 ask her simply the question now that you know these tooth
13 numbers --
14     THE COURT:  How does she know the tooth numbers?
15     MR. FARBER:  I'm going to show her Exhibit G.  I'm
16 going to show her Exhibit G, a piece of a document that was
17 actually before the grand jury.
18     THE COURT:  And isn't this going to take like
19 another two hours to have her compare all the tooth numbers?
20     MR. FARBER:  I don't have to do it for all six
21 patients, Your Honor.  I can do it for one or two patients.
22     THE COURT:  So she's going to say?
23     MR. FARBER:  What I expect her to say is, look, I
24 had clinical concerns of -- I'm not going to say clinical.
25 I had concerns of excessive services in the grand jury based

1  on these records without tooth numbers.  Okay.  Now, I see
2  tooth numbers, I see them.
3      Dr. Morse's theory is that if she only saw tooth
4  numbers, she would have no clinical concerns.  What I
5  believe she will say is, well, I see the tooth numbers but I
6  still have concerns.
7      THE COURT:  What kind of concerns is she still
8  going to have?
9      MR. FARBER:  Concerns, for example, Your Honor,
10 like a clasp is a device that very rarely breaks in anyone
11 and yet in the case of Dr. Morse's patients, not only are
12 several breaking at the same time, often the same clasp has
13 to be replaced a few months later.  She will testify that
14 that -- I anticipate that she will testify that that's very
15 unusual.  And whether or not she knows the tooth number on
16 that, she would still have concerns about those billings.
17     THE COURT:  That's not an opinion that she
18 expressed in the grand jury, though, correct?
19     MR. FARBER:  She expressed that opinion but
20 without the tooth numbers.  She did express her opinion that
21 the work she saw, including clasps, was excessive.  I
22 believe the contention of plaintiff is that, well, if she
23 had tooth numbers, she would have known that it was
24 different teeth and wouldn't have reached that conclusion.
25 My view is, well, it makes no difference whether she had

1  tooth numbers or not.  If she had tooth numbers, she would
2  still conclude, at least she would have told the grand jury,
3  that she would have concluded that she still felt the
4  services were excessive.
5      MR. NORINSBERG:  He could have hired an expert for
6  that, Your Honor, if that's what they wanted to do.  They
7  are relying on a 5,000-page document that nobody asked any
8  questions about before this grand jury to elicit opinions
9  that were never elicited before the original grand jury and
10 essentially to do what we've been prevented from doing
11 ourselves, which is to do an attack from a 2013 standpoint
12 on evidence that was presented to the grand jury.
13     And I feel what's good for the goose is good for
14 the gander.  We have had an opportunity but we -- you know,
15 to put on our case, which we appreciate, but one angle that
16 was clearly cut down was the angle of bringing in new expert
17 testimony to go back in time and testify as to evidence that
18 was presented to the grand jury.
19     So I would ask the Court to have that same rule
20 that was applied to us to be applied to the defendants as
21 well and bar this outright.
22     THE COURT:  I'll take it under consideration.
23     MR. FARBER:  Thank you, your Honor.
24     THE COURT:  It's 25 to 1:00.  It makes sense to me
25 to have the lunch break and come back at a quarter to 2:00.

1      MR. FARBER:  Sounds reasonable to me, Your Honor.
2      THE COURT:  All right.
3      (Lunch recess taken.)
4      (Continued on the next page.)

**JA333**

1    THE COURT:  I have had the opportunity to look over
2   Doctor DeLuca's testimony and I think the point that counsel
3   for the plaintiff is making, is well taken.  In that I don't
4   think that she should be able to compare the exhibits to
5   Exhibit G, and then come up with different reasons and
6   different conclusions.
7        I think it is similar in analysis to bringing other
8   patients who weren't before the Grand Jury and having them
9   say, with them having problems with Doctor Morse as well.
10       Having said that, if there are specific opinions
11  that she reached about a given person in here, and you want to
12  elicit from her whether that opinion was dependent on tooth
13  number, I think that is appropriate for you to do.
14       But not to have her have conducted a separate
15  analysis that she didn't do at the time, because the question
16  is, again, as I have tried to make plain to all the parties,
17  the question is what was before the Grand Jury at the time and
18  how did that effect the Grand Jury.
19       Not whether a document would look worse later in
20  time or whether you know, the State could have put in
21  different evidence that would have been stronger that they had
22  anyway.  The issue is really centered toward what happened
23  there.
24       I think if you want to go what she said in the Grand
25  Jury and say is that an opinion that you expressed based on

1   tooth number.  Some of them clearly are on the fact-- it seems
2   to me that some of them clearly, her opinion is, that they
3   were all one tooth.
4        But, I think there maybe others where she is saying
5   there is just a lot of broken clasps or something and you can
6   ask her, well, do you know if there were different-- if they
7   had all been different teeth would that have changed that
8   particular opinion that you expressed before the Grand Jury,
9   which was that opinion that you expressed, dependent on tooth
10  number.  I think that is fair.
11       Okay.
12       MR. FARBER:  Your Honor, I will get the witness.
13       THE COURT:  Yes.
14       (Pause.)
15       THE COURT:  You may resume the stand.
16       (Jury entering.)
17       THE COURT:  Ladies and gentlemen, please be seated.
18       Counsel.
19       MR. FARBER:  Thank you, your Honor.
20  CROSS-EXAMINATION BY MR. FARBER:
21  Q    Doctor DeLuca, good afternoon.
22  A    Afternoon.
23  Q    Doctor, where did you attend dental school?
24  A    NYU.
25  Q    And when did you graduate?

1   A    1991.
2   Q    What degree did you obtain?
3   A    A D.D.S., doctor of dental surgery.
4   Q    Have you been practicing dentistry since 1991?
5   A    Yes.
6   Q    Can you describe your professional experience as a
7   dentist?
8   A    In what way?  Procedures or?
9   Q    Well, can you tell us what positions you have held as a
10  dentist since you obtained your degree.
11  A    I have been a general practitioner, in private practice.
12  I have worked in teaching settings, Brooklyn College and,
13  UMDNJ, I taught there.  Also taught at NYU for a brief time.
14  Q    Did you have any experience in the dental field prior to
15  attending dental school?
16  A    Yes, I was a hygienist before I became a dentist.
17  Q    For approximately for how long?
18  A    Ten years.
19  Q    Did you have any experience teaching in the field of
20  dental hygenics?
21  A    Yes, I did.
22  Q    What experience was that?
23  A    Clinical instructor.
24  Q    Where?
25  A    UMDNJ as well as NYU.

1   Q    When did that teaching take place?
2   A    UMDNJ was about 1982 and NYU, 1992.
3   Q    Was that at the dental school?
4   A    Yes.
5   Q    Did there come a time when you performed work for my
6   office, the New York State Office of the Attorney General?
7   A    Yes.
8   Q    And, when did you first start performing work for the
9   Attorney General?
10  A    Somewhere around the summer of maybe, even the spring of
11  1994.
12  Q    And, for about how long did you provide work for the
13  Attorney General's office?
14  A    Beginning of 2006, somewhere in 2006.
15  Q    Somewhere?
16  A    Spring.
17  Q    Somewhere from 1994 to 2006, about twelve years?
18  A    About.
19  Q    What work did you perform for our office?
20  A    In-mouth exams as well as reviewing of charts, Grand Jury
21  testimony if indicated.  What my findings might have been.
22  Q    You were compensated for that work, were you not?
23  A    Yes, I was.
24  Q    Did you work pursuant to some kind of contract or written
25  agreement with the Attorney General?

1  A   There was a contract.  I'm not certain how often it came
2  up for review or continuance, I'm thinking two years.
3       And there were limits on the contract.  It was-- it
4  was given to me, I think every two years, extended or denied.
5  Q   Did there come a time when your contract ended?
6  A   Yes.  2006, I think the Attorney General's office decided
7  to go another route and my contract was then at that time
8  terminated.
9  Q   When you say, go another route, what do you mean?
10 A   To the best of my knowledge, they were going after
11 changing the way that they looked at, at least the dental.
12      THE COURT:  The way they looked at what?
13      THE WITNESS:  At the dental sector of Medicaid.
14 Q   From time to time, with the Attorney General's office,
15 you performed in-mouth examinations; is that correct?
16 A   Yes.
17 Q   Can you describe for the jury what an in-mouth
18 examination is?
19 A   In-mouth examination, patient would come in, we had a
20 chair and a light.  We had disposable mirrors.  We had area
21 technique, mask, gloves and gown and only what was visibly
22 apparent was charted.
23      There were no instruments, there were no intense
24 diagnosis, just with a mouth mirror, filing present, teeth
25 present.  That type of exam.

---

1  Q   So for example, you would not pull on a tooth?
2  A   No, not at all.
3  Q   If you observed some protrusion of any kind, you would
4  not handle it in any way?
5  A   No.  I would make a note, but I would not touch or use an
6  instrument of any kind.
7  Q   When you say, you would make a note, how would you
8  mechanically do that?
9  A   My findings were verbally given to someone in the room,
10 who would then write down what I said.
11 Q   And, who was in the room, who would do that?
12 A   As far as I know, it was a person from the Accounting
13 Department of Medicaid Fraud.
14 Q   That would be of the Attorney General's office?
15 A   Yes.
16      MR. FARBER:  If I can approach the witness, your
17 Honor?
18      THE COURT:  Yes.
19      MR. FARBER:  I would like to show the witness
20 Exhibit AU.
21 Q   Doctor, if you can take a moment to review this document
22 and once you have had a chance to do that, if you can tell me
23 if you recognize this document?
24 A   This is the forms that we used in the in-mouth
25 investigations.

---

1  Q   And, am I correct that at the completion of the form, you
2  would personally sign it?
3  A   Yes.
4  Q   And you would sign it after you had reviewed the findings
5  that were written down by the other person in the room, you
6  have described?
7  A   Yes.
8  Q   And on this document, do you recognize your signature?
9  A   My signature is not on this particular page.
10 Q   Well, look through other pages of the document.
11 A   Yes.
12 Q   Do you see your signature on other pages?
13 A   Yes, I do.
14 Q   This was a document you prepared in the ordinary course
15 of working for the Attorney General's office?
16 A   Yes.  I didn't set up the schematics of it.  I just
17 utilized it.
18 Q   But the information--
19 A   Yes.
20 Q   Checked onto the form, and ultimately your signature was
21 provided by yourself, correct?
22 A   Yes.
23      MR. FARBER:  I would respectfully move Exhibit AU
24 into evidence.
25      THE COURT:  Any objection?

---

1      MR. NORINSBERG:  We are just taking a quick look
2  right now.
3      No objection.
4      THE COURT:  All right.  AU is received.
5      Is that one document or more than one?
6      THE WITNESS:  Several.
7      (Defendants' Exhibit AU received in evidence.)
8  Q   Doctor, would you please turn to the page that is in the
9  lower right corner, SD 00849.
10 A   Ah-him.
11 Q   Do you see the patient's name there?
12 A   Edwin Gonzalez.
13 Q   And, can you tell me from this document, whether the
14 results of your in-mouth, showed whether or not this patient
15 wore dentures by your observation.
16 A   He had several teeth that were missing, number one,
17 number 17, those are both wisdom teeth.
18      18 and 19 are also missing.
19      So there was a dentulous area on the bottom left.
20      THE COURT:  What area?
21      THE WITNESS:  Dentulous, missing teeth on the bottom
22 left.
23      And there was a missing molar on the top right.
24      And number 32, was also missing a wisdom tooth.
25 That doesn't mean it wasn't in the jaw, it just means that it

**JA335**

1  was not in the mouth.
2  Q    In the course of your examination, did you observe the
3  presence of dentures one way or the other?
4  A    I made no note of any dentures.
5  Q    Had you observed dentures, would you have made a note of
6  it?
7  A    Yes.
8  Q    During the course of in-mouth examinations, were you
9  always able to identify whether or not a patient was wearing
10 dentures?
11 A    As I said earlier, if they came with the appliances,
12 partial dentures, then I would know.  Some people have missing
13 teeth and they function fine without them.  Doesn't mean they
14 have a partial.
15      But if a partial was present, at the in-mouth, I
16 made a note of it.
17      An upper denture is a little bit easier because the
18 whole arch is missing, the teeth, so you would assume they
19 would have an upper denture.  If they don't come with it, that
20 means they didn't wear it.
21 Q    Now, at the time you prepared Exhibit AU, did you have
22 any idea of the name of the dentist, of the patients, that you
23 were looking at?
24 A    No.
25 Q    And was that consistent throughout the time you worked

---

1  for the Attorney General?
2  A    Yes.
3  Q    Now, from time to time, you also had occasion to review
4  patient charts; is that correct?
5  A    Yes.
6  Q    Doctor DeLuca, I am going to show you a document that has
7  been marked as Defendants' Exhibit AV.
8       Doctor, please take a few moments to review the
9  document.  Once you have had a chance to review it, please
10 tell me if you recognize the document.
11      THE COURT:  This is A what?
12      MR. FARBER:  AV, your Honor.
13 A    Yes.
14 Q    What do you recognize this document to be, Doctor?
15 A    This is a copy of a medical history, a treatment sheet,
16 and an exam sheet.
17 Q    Can you look at the first page of the document, the page
18 that contains the exhibit sticker, AV?
19 A    Yes.
20 Q    Do you see a copy of a post-it note in the center of this
21 page?
22 A    Yes.
23 Q    What do you recognize that post-it note to be?
24 A    My handwriting.  So this is a post-it note that I wrote.
25 Q    You recognize this to be a review of a patient chart that

---

1  you performed while you were at the Attorney General's office?
2  A    Yes.
3  Q    Is this the kind of documentation you would have made of
4  a patient chart that you reviewed at the Attorney General's
5  office?
6  A    This would have been the first stage, yes, of what I
7  would have reviewed.
8  Q    When you say, this would have been the first stage, what
9  do you mean?
10 A    Sometimes, I was given charts just to, you know, find out
11 if anything is amiss, and make some notes and then that went
12 back to whomever.  And then if they wanted me to proceed
13 further, I would.
14      I don't-- according to this note, I don't think I
15 proceeded further than this note.
16 Q    Was this a note that you made in the course of your
17 ordinary course of your work for the Attorney General's
18 office?
19 A    Yes.
20      MR. FARBER:  I would respectfully move document AV
21 into evidence.
22      MR. NORINSBERG:  Objection.
23      May we approach?
24      THE COURT:  Yes.
25      (Side bar.)

---

1       THE COURT:  Do you have the document?
2       MR. FARBER:  Yes, your Honor.
3       THE COURT:  This is her note, right?
4       MR. FARBER:  That is her note.
5       THE COURT:  And, is this something that went to
6  Fusto?  I'm sorry, why is this relevant?
7       MR. FARBER:  It is part of the work she reviewed,
8  your Honor.  There have been extensive allegations made by
9  counsel that none of the patients-- who testified had, you
10 know, chart reviews or in mouths or anything of that nature.
11      This is a chart review of one of the patients who
12 testified.  The fact that it wasn't later directly brought out
13 in her Grand Jury testimony, doesn't mean that the chart
14 review wasn't performed.
15      Mr. Fusto has not been asked specifically one way or
16 another, whether he has seen this document or this was part of
17 his review.
18      MR. MILLER:  Regardless, your Honor, there are
19 interview memos from Flynn for six of the eight Grand Jury
20 witnesses.
21      There are two-- full interview memos from the 2003,
22 2005 period.  There are two Grand Jury witnesses whom there is
23 no full fledged interview memo.  Both of them had charts
24 reviewed by Doctor DeLuca.  So I think it is a fair inference
25 that then they got called to testify at the Grand Jury because

**JA336**

1  of her review.

2        Regardless of whether in 2013, Mr. Fusto can

3  remember that he chose them for the Grand Jury because of

4  that. It is a fair inference. If she reviewed it, there is

5  no Flynn memo that Fusto must have picked up for Grand Jury

6  because of her review.

7        MR. NORINSBERG:  The request for admissions are in

8  evidence. They admitted this witness never looked at any of

9  these things. They are bound by that admission.

10       MR. FARBER:  That is not true. We denied that.

11       MR. NORINSBERG:  About the chart?

12       MR. FARBER:  We denied that she did not review the

13  chart.

14       MR. NORINSBERG:  This was--

15       MR. FARBER:  We admitted in the mouth. We denied

16  the chart.

17       MR. NORINSBERG:  Then I stand corrected.

18       They never furnished Fusto, Fusto never brought this

19  out. This is not at all relevant to what took place before

20  the Grand Jury.

21       THE COURT:  But haven't you brought out that

22  nobody-- all of this, nobody looked at these people's charts.

23  Haven't you brought that out?

24       MR. NORINSBERG:  Yes, I have.

25       This is the first person, the first part of a

---

1  process. It is just a post-it note, undated, unsigned. It is

2  not clear which patient it pertains to. The fact they stapled

3  it.

4        THE COURT:  They can.

5        MR. NORINSBERG:  It doesn't say the patient's name

6  or doesn't say anything. Just a document with a patient's

7  chart.

8        There is no way she can lay --

9        MR. FARBER:  You can ask her, if the note conforms

10  to the chart.

11       THE COURT:  There has been a lot of cross

12  examination about everybody, nobody doing chart reviews.

13  Why-- you chose to go through all that. Why can't they

14  counter by saying, she did a chart review. Just on the theory

15  that, you know, was brought out that nobody did anything in

16  this investigation.

17       MR. NORINSBERG:  Because when this witness was asked

18  to testify before the Grand Jury, she was not asked about her

19  chart review. She was asked about the-- only to give an

20  opinion based on Grand Jury 7. That is why.

21       THE COURT:  I know that.

22       MR. NORINSBERG:  This is going to mock up things.

23  She was not asked, this --

24       THE COURT:  I know the Grand Jury was -- not heard

25  about it. The Grand Jury didn't-- you have brought out in

---

1  order to try to color this whole investigation, that this was

2  so ridiculously horrible and sloppy and everything else, I

3  mean that has been the whole theme that I have been listening

4  to.

5        You have asked everybody, nobody looked at charts,

6  nobody did anything.

7        It seems like to me, having gone into that, I don't

8  know the real relevance of it. You clearly went into it.

9  Having gone into that, she can say that she reviewed

10  somebody's chart. You can cross her on the fact nobody put

11  this before the Grand Jury.

12       But on all of this argument about how sloppy and

13  awful everything was, and specifically, you must have elicited

14  for two different witnesses that nobody looked at anybody's

15  charts. If she can say this is a chart I looked at, then

16  somebody looked at a chart. What it means or doesn't, I don't

17  know.

18       You went into it, so I think they should be able to

19  do it.

20       MR. FARBER:  Thank you.

21       (Open Court.)

22

23

24

25

---

1  CROSS EXAMINATION MR. FARBER:(cont'g.)

2  Q    Doctor DeLuca, if you would take a moment, look at the

3  post-it note at top and tell me if that post-it note is

4  directed at the pages of patient chart underneath.

5        In other words, is this the patient chart you

6  reviewed to formulate your notes?

7  A    To the best of my knowledge.

8  Q    Doctor, what is the patient's name?

9  A    Stacy Rodriguez.

10  Q    Doctor DeLuca, I'm going to show you what has been marked

11  as Defendants' Exhibit AW.

12       Again, Doctor, please familiarize yourself with the

13  document and when you have had a chance to do that, please

14  tell me if you can identify it.

15  A    Yes, the post-it note on the front is my handwriting.

16  Q    This was a document you conducted during your review of

17  patient charts for the Attorney General's office?

18  A    Yes.

19  Q    And, have you reviewed the patient chart and can you tell

20  me if your note on top conforms to the patient chart

21  underneath?

22  A    To the best of my knowledge.

23       MR. FARBER:  I respectfully move Exhibit AW into

24  evidence, your Honor.

25       THE COURT:  AV and AW are being received.

**JA337**

1    (Defendants' Exhibits AV and AW received in
2  evidence.)
3            MR. FARBER:  Thank you.
4            THE COURT:  Who is the patient in AW?
5            THE WITNESS:  Sara Charles.
6  Q    Doctor DeLuca, do you know who John Fusto is?
7  A    Yes.
8  Q    Who is John Fusto?
9  A    John Fusto is an Assistant Attorney General at the
10 Attorney General's office.
11 Q    And, during the time that you performed work for the
12 Attorney General, did you have occasion to work with Mr.
13 Fusto?
14 A    I did.
15 Q    And, can you tell me on how many cases or matters or
16 investigations did you work on, with Mr. Fusto?
17 A    I would say somewhere around eight.
18 Q    Did Mr. Fusto ever call you to testify before the Grand
19 Juries?
20 A    Yes.
21 Q    And, approximately how many times did Mr. Fusto ask you
22 to testify before a Grand Jury?
23 A    Six, seven maybe.
24 Q    And, during the time you were testifying before Grand
25 Juries, were you ever advised of the specific target of the

1  Attorney General's office investigation or subject of
2  indictment was?
3  A    No.
4  Q    Do you have Exhibit 44 in front of you, Doctor?
5  A    Yes.
6  Q    Am I correct that that is a document you were shown by
7  Special Assistant Fusto at the time you testified before the
8  Grand Jury?
9  A    Yes.
10 Q    Doctor, I'm going to hand you what has been marked as
11 Defendants' Exhibit C-3.
12         Can you identify for the jury what Exhibit C-3 is?
13 A    It appears to be my Grand Jury testimony.
14         MR. FARBER:  Before we proceed, your Honor--
15 Q    Doctor DeLuca, let me go back a moment to Exhibit AV.  Do
16 you have that handy?
17 A    Hold on.  Yes.
18 Q    The note on top, Doctor.
19 A    Yes.
20 Q    Can you read it for the jury?
21 A    No record of 1995 visit in chart.  How do you break a
22 clasp in six days after surgery.  There is no existing upper
23 partial.
24 Q    What was the significance of those findings?
25 A    These are just notes.  I would have billings and I would

1  be comparing what is in the chart to whatever those billings
2  are and I would be making notes regarding them.
3         Since I don't have the billings in front of me right
4  now, I can't be more specific.
5  Q    Let me turn your attention to Exhibit AW.
6  A    Yes.
7  Q    Can you read your note there for the jury.
8  A    No records until 3/19/99.  4/24/01, lower anterior,
9  anterior perio scaling not valid.
10        This patient is seen regularly from June '94 to
11 March 17th, '99.  Then 3/19/99, I wrote, he has a partial.
12 I'm not sure if it is a he.
13        No mention of a prior to 3/19/99.
14 Q    What is the significance of those findings?
15 A    Well, again, I would have billings to answer the
16 questions as to what I found in the chart.  But since I don't
17 have the billings, I'm not-- can't be that specific about why
18 I wrote these notes.
19        But, they corresponded with billings.
20 Q    Thank you, Doctor.
21        Let me now turn your attention to Exhibit C-3.  C-3
22 is the Grand Jury transcript, correct?
23 A    Yes.
24 Q    I also want you to have handy Exhibit 44, correct.  Do
25 you have that handy?

1  A    Yes.
2  Q    Do you recall testifying about a patient named Stacy
3  Rodriguez?
4  A    Yes.  It is here in the testimony.
5  Q    Do you recall what conclusion-- Mr. Fusto showed you the
6  page of Exhibit 44, pertaining to Stacy Rodriguez during your
7  testimony, did he not?
8  A    Yes.
9  Q    As best you can recall-- do you recall what your
10 testimony as to your conclusion concerning Stacy Rodriguez was
11 that you testified before the Grand Jury?
12 A    I'm reminded of it through the document.  But I don't
13 recall the exact minute and words that I spoke.
14 Q    Well, let me see if this refreshes your recollection,
15 this is from page ten of your transcript.  I'm going to say.
16        QUESTION:  "Now on June 4th, how many times did
17 those things occur or indicated that they occurred?"
18        ANSWER:  "I see that add existing tooth to partial
19 denture, was listed three times.  I see repair or replace
20 broken clasp three times, and I see reline upper partial
21 denture three times with a date of 6/4/2002."
22        QUESTION:  "Does that make any sense to you?"
23        ANSWER:  "No, it does not."
24        QUESTION:  "Why wouldn't it?"
25        ANSWER:  "Because I can't imagine that you would do

**JA338**

1  each of those three times on the same day."

2        You see that testimony, ma'am?

3  A   You said, page ten?

4  Q   Page ten of Exhibit C-3.

5  A   Yes.

6  Q   Having seen that, do you recall giving that testimony?

7  A   Yes.

8  Q   Directing your attention back to Exhibit 44, the Stacy

9  Rodriguez page.

10  A   Yes.

11  Q   I will direct your attention to the amount paid column.

12        Do you see that?

13  A   Yes.

14  Q   Do you see the minus sign?

15  A   Barely.

16  Q   Did you see the minus signs at the time you testified?

17  A   No.

18  Q   Were you looking at the amount paid at the time you

19  testified?

20  A   No.

21  Q   What were you looking at?

22  A   The procedures.

23  Q   That is procedure description?

24  A   Yes.

25  Q   And, in the right column that is, add tooth to existing

---

1  partial denture?

2  A   Yes.

3  Q   Repair or replace broken clasp?

4  A   Yes.

5  Q   Reline upper part denture lab?

6  A   Right.

7  Q   Now, am I correct, this document-- I will ask you to

8  assume that each of the services on the right column, only

9  appeared once instead of three times.

10        Now, had you seen that, would your Grand Jury

11  testimony have differed significantly from what it was?

12        MR. NORINSBERG:  Objection.

13        THE COURT:  You mean the testimony you just read?

14        MR. FARBER:  Correct.

15        THE COURT:  She can answer that.

16  A   It still seems as though many things are happening to

17  this partial all at once. I didn't have the tooth numbers

18  either to decide which clasps were involved, if it was the

19  same one, or many clasps on the partial.

20        And, when you add a tooth to an existing partial

21  denture, it implies that a tooth is missing or has been

22  extracted. So, there are still questions as to the amount of

23  work being done.

24  Q   That would be even if each of the items in the procedure

25  description appeared only once?

---

1  A   Yes. I still would have other questions.

2  Q   Now, you noted that there is no tooth number present on

3  this document?

4  A   Right.

5  Q   Now, if in fact a tooth number were provided, or teeth

6  number were-- a column of teeth number were provided would

7  that-- would that have changed your Grand Jury testimony?

8  A   I still would have had questions about the procedures.

9  And it may have shed a little more light, defined it a little

10  better.

11        But, we still need to see how many clasps are

12  involved in the reline and which teeth were being added.

13  Q   Again, I will ask you, but at the time you testified

14  before the Grand Jury, did you even look at the amount paid

15  column?

16  A   No.

17  Q   Let me direct your attention to page 11 of Exhibit C-3.

18        With respect to Document 44, the patient's name is

19  Sawson Suliman. The page of Exhibit 44 conforming to Sawson

20  Suliman.

21        Do you see that?

22  A   Yes.

23  Q   Let me-- do you recall what you testified to the Grand

24  Jury concerning patient Sawson Suliman?

25  A   Yes. It is here.

---

1  Q   It is in front of you. Without the document, do you

2  recall what you testified to?

3  A   No.

4  Q   So if I read the document, will that assist your

5  recollection? I am reading from Exhibit C-3, page 11 at line

6  19.

7        QUESTION:  "Okay. Go ahead."

8        ANSWER:  "On May 25th, 2000, the tooth was added to

9  the partial denture, reline of the lower partial denture was

10  done, also a repair or replace of a broken clasp twice on the

11  same day.

12        On June 19th, 2000, repair or replace broken clasp

13  twice again, and reline upper partial denture as well."

14        QUESTION: "Does that series of repairs or items make

15  any sense to you from a dentist's standpoint?"

16        ANSWER:  "Well, it would seem to me if you send the

17  product to the laboratory and got it back the same day, you

18  still could not send it back out again the very same day, even

19  if it was incorrectly done. It just seems very difficult to

20  get it back, insert it in the mouth, check again and send back

21  to the laboratory for what maybe indicated all in the same

22  day, twice or three times."

23        Do you see that testimony, Doctor?

24  A   Yes.

25  Q   Now, looking at the page of Exhibit 44, conforming to

**JA339**

1  patient Sawson Suliman, do you see the procedure description?
2  A    Yes.
3  Q    And, can you read the procedure descriptions for the
4  jury, please?
5  A    Yes.
6           Add tooth to existing partial denture, reline lower
7  partial denture, lab.  Repair, replace broken clasp.  Repair,
8  replace broken clasp.  Repair or replace broken clasp; repair
9  or replace broken clasp; reline upper denture, lab.
10 Q    Is upper part denture lab?
11 A    Sorry, upper partial denture, lab.
12           THE COURT:  Those are on two different dates though,
13 correct?  It is not all in the same day?
14           THE WITNESS:  Yeah, I'm sorry.
15           THE COURT:  Are you directing--
16           THE WITNESS:  Do you want me to separate that,
17 because I was just asked to read it.
18           MR. FARBER:  My fault, your Honor.
19 Q    So, am I correct on May 25th, four services were
20 performed and then on June 19th, three additional services
21 were performed, correct?
22 A    Yes.
23 Q    This page does not contain tooth numbers, correct?
24 A    No, it doesn't.
25 Q    Now, had you had tooth numbers on the document you were

1  presented at the Grand Jury, would that have significantly
2  affected your testimony?
3  A    It would have given me a better picture of what was
4  happening with the upper and the lower.  And where the teeth
5  actually were, and the clasps.
6           But in all honesty, I have never replaced or
7  repaired a broken clasp on a denture in my entire career.
8  Q    Why not?
9  A    It doesn't happen that often.
10 Q    Why not?
11           THE COURT:  Well, but the opinion you expressed
12 before the Grand Jury, you said, well it would seem to me that
13 if you send the product to the lab, got it back the same day,
14 you still could not send it back out again the very same day
15 even if it was incorrectly done.  It just seems very difficult
16 to get it back, insert it in the mouth, checked again and sent
17 back to the laboratory, for whatever maybe indicated all on
18 the same day, twice or three times.
19           That is the-- would that have-- that opinion have
20 changed had you seen tooth numbers?  Because that is the
21 opinion you expressed.
22           THE WITNESS:  Yes, I understand.
23           It would have given me a better picture of where the
24 partial sat in the mouth, and it would have identified how
25 many clasps are in the mouth.

1           THE COURT:  But would it-- what you found strange, I
2  take it was all these things were being done, going back and
3  forth to the lab the same day.
4           THE WITNESS:  Right.  And then--
5           THE COURT:  Had that been different teeth would you
6  still have that same concern?
7           THE WITNESS:  Well, I was also, you know, seeing
8  many repairs and I didn't-- could not identify if it was one
9  clasp that kept breaking or many, multiple clasps on the same
10 partial.  That was more of what the tooth number would
11 identify for me.
12           And if it was the same clasp breaking, I can't see
13 how you could be sending that back and forth two times in the
14 same day.
15           THE COURT:  But if it were different clasps
16 breaking?
17           THE WITNESS:  That might, you know explain more.
18           THE COURT:  About going back and forth.
19           THE WITNESS:  With the tooth number.  Because it
20 would tell me how many are there.
21 BY MR. FARBER:
22 Q    Let me turn your attention to page twelve of Exhibit C-3.
23 Do you recall testifying about a patient called Nassa Ahiri.
24 A    Ah-him.
25 Q    Yes?

1  A    Yes.
2  Q    Do you recall what you testified about Nassa Ahiri?
3  A    Yes.
4  Q    What did you testify concerning Nassa Ahiri?
5  A    This is dated November 2nd, 2001.  Yes, all of these
6  dates are the same.  There is a replace broken tooth, per
7  tooth.  This indicates that there is more than one tooth.
8           And that is listed seven times in one day.  There is
9  a realignment of the upper partial denture for the same date,
10 replace broken teeth again.  One more time.  And reline the
11 lower partial denture.  Same day.
12 Q    Then, you expressed an opinion to the question, now
13 again, same question, does that make any sense to you from a
14 practitioner standpoint.
15           ANSWER:  "It would be difficult to get all this done
16 in one particular day.  I don't know exactly why this is
17 listed the way it is, because if there were six or seven teeth
18 involved, it should list the teeth in the service once in my
19 opinion.  I don't know why it is listed that way, it seems
20 unusual to me, yes."
21           You gave that testimony
22 A    Yes.
23 Q    And assuming that you were provided tooth numbers on this
24 document, would that have significantly changed the testimony
25 you gave to the Grand Jury?

**JA340**

1   A    Yes, it could have helped me see what is happening to the
2   partial.  But, it does seem like a significant number of teeth
3   have been broken here.  So I would have needed more
4   information.
5   Q    Even if you had the tooth numbers?
6   A    Yes, definitely.
7   Q    Let me turn your attention to page--
8        THE COURT:  Let me clarify something.
9        You said it would be difficult to get all this done
10  in one particular day.  Are you talking about meaning
11  everything listed that you have just addressed on the exhibit?
12       THE WITNESS:  Yes, your Honor.
13       THE COURT:  Would the fact that it was a different
14  tooth make a difference to that conclusion?
15       THE WITNESS:  No, it would have given me a clearer
16  picture of exactly what was happening.  But it would not
17  change the laboratory time in repairing it.  It seems
18  excessive.
19  Q    Let me turn your attention to page 13 of Exhibit C-3.
20       Did you express an opinion concerning a patient Sara
21  Charles?
22  A    Yes.
23  Q    Also going to direct your attention to the page of
24  Exhibit 44, that addressed Sara Charles.  Do you see that?
25  A    Yes.

1   Q    Am I correct, there are one, two, three, four, five,
2   six-- ten services listed for March 1, 2000?
3   A    Yes.
4   Q    And there are six services listed for October 24th, 2000,
5   correct?
6   A    Yes.
7   Q    Turning your attention to page 13 of the Grand Jury
8   transcript, do you recall giving the following testimony?
9        QUESTION:  "Next document in that group of Grand
10  Jury 7."
11       ANSWER:  "This is Sara Charles, the date in question
12  is March 1st, 2000 and then again on October 24th, 2000.
13  March 1, 2000, was add tooth to existing partial denture five
14  times same date.  Repair, replace broken clasp again, March 1,
15  2000.  Reline lower partial denture, replace broken teeth per
16  tooth again listed twice.  Reline, upper partial denture
17  again, May 1, 2000."
18       QUESTION:  "March 1st?"
19       ANSWER:  "Did I say May, I'm sorry.  March 1st,
20  2000.  October 24th, 2000, add tooth to existing partial
21  denture, add tooth to existing partial denture twice; repair,
22  replace, broken clasp four times in the same day,
23       QUESTION:  "Now again, the series of procedures that
24  were, that were purportedly done on March 1st and
25  October 24th, the same question, does that upon your viewing,

1   does that seem to make any sense from a dental practitioner
2   standpoint?"
3        ANSWER:  "No.  I think that if some of these repairs
4   are this drastic perhaps a new partial is in order.  I mean,
5   it just seems odd that you are replacing a broken clasp four
6   times in the same day."
7        Do you recall giving that testimony, Doctor?
8   A    Yes.
9   Q    Now, once again, the Sara Charles page did not contain
10  tooth number information, correct?
11  A    Correct.
12  Q    Now, had you had tooth number information at the time you
13  testified, your testimony have been significantly different?
14  A    I still would have had questions about how many repairs
15  are being done to this denture in one day.
16  Q    That would be even if you had tooth numbers on this
17  document?
18  A    Yes.
19  Q    I will turn your attention to page 14 of Exhibit C-3,
20  Grand Jury transcript.
21       Do you recall expressing an opinion to the Grand
22  Jury on patient Intisar Ahiri?
23  A    Yes.
24  Q    Let me recall-- ask if you recall giving this testimony:
25       QUESTION:  "I'm going to show you another document

1   in that group there, seven."
2        ANSWER:  "Intisar Ahiri.  This is April 14th, 2000,
3   and there are four entries.  They are reline lower partial
4   denture, repair or replace broken clasp, repair or replace
5   broken clasp, add tooth to existing partial denture.  That is
6   on April 14th, 2000.
7        August 11th, 2000, it is reline upper partial
8   denture, repair or replace broken clasp, repair or replace
9   broken clasp, repair or replace broken clasp.
10       Did I do one too many?  Yes, I think I did.  Go on."
11       QUESTION:  "Go on."
12       ANSWER:  "Yes, I'm sorry.  There were two repair or
13  replace broken clasps for August 11th, 2000.  Then July 16th,
14  2001, there are services done.  Repair or replace broken teeth
15  per tooth, repair or replace broken teeth per tooth.  Replace
16  or broken clasp, reline lower denture.
17       Then, April 12th, 2002, repair or replace broken
18  clasp; repair or replace broken clasp; repair or replace
19  broken clasp; add tooth to existing partial denture, and then
20  replace broken teeth per tooth, twice in the same visit.
21       QUESTION:  "Now, same question even in toto, all of
22  those dates combined, would that particular patient, does that
23  make any sense from a dental practitioner standpoint?"
24       ANSWER:  "No, it is excessive in my opinion."
25       QUESTION:  "Why would you say that?"

**JA341**

1     ANSWER:  "Because the problem is not being
2  addressed, and I don't know how many possible clasps can be
3  breaking in one given day.  It seems to me that if the partial
4  denture went out for repair, the patient wasn't even able to
5  break it four times in the same day, because it was at the
6  lab."
7     Doctor, if you would, turn to the page of
8  Exhibit 44, conforming to patient Intisar Ahiri.
9  A     Okay.
10 Q     You are on that page, Doctor?
11 A     Yes.
12 Q     Now, am I correct, once again, there is no indication to
13 you on this page, of tooth number, correct?
14 A     Correct.
15 Q     Now, had there-- assuming there had been an indication of
16 tooth number in the document you were presented with at the
17 time you testified to the Grand Jury.  Would that have
18 significantly altered your testimony?
19 A     No.
20 Q     Why not?
21 A     I still think that there are some red flags with the
22 amount of repairs to the partials.
23 Q     And even if I provided you with a group of tooth numbers,
24 you would-- would you reach that same conclusion?
25 A     Yes.

---

1  Q     Let me ask you if you gave testimony concerning patient
2  Asi Othman.
3     I will direct your attention to page 16 of the
4  exhibit.
5  A     Yes.
6  Q     Let me ask you if the you gave this testimony:
7     QUESTION:  "Othman."
8     ANSWER: "Othman.  This is March 19th, 1999, eight
9  entries.
10    Add tooth to existing partial denture; add tooth to
11 existing partial denture.  Repair or replace broken clasp;
12 repair or replace broken clasp; repair or replace broken
13 clasp; repair or replace broken clasp.
14    Reline lower partial denture; reline upper partial
15 denture.
16    And then, April 7th, 2000, repair or replace broken
17 clasp; repair or replace broken clasp; repair or replace
18 broken clasp; repair or replace broken clasp; repair or
19 replace broken clasp; repair or replace broken clasp.
20    Repair resin saddle or base.  Repair broken teeth
21 per tooth, repair broken teeth per tooth.
22    Then, on March 9th, 2001, add tooth to existing
23 partial denture; repair or replace broken clasp; repair or
24 replace broken clasp; repair or replace broken clasp; replace
25 broken teeth per tooth; reline lower partial denture; lab

---

1  reline upper partial denture.
2     Then on January 11th, 2002, repair or replace broken
3  clasp; repair or replace broken clasp; repair or replace
4  broken clasp; repair or replace broken clasp; reline, again;
5  lower partial denture; reline again, upper partial denture."
6     QUESTION: "Now that was all on one patient.  And
7  again, I ask you the same question, does that make any sense
8  to you from a dental practitioner's standpoint?"
9     ANSWER: "No."
10    QUESTION: "And why?"
11    ANSWER: "It seems excessive.  It seems as though
12 either the patient is chronically dropping, breaking, falling
13 with the denture or it is a very, very old partial that needs
14 replacement and is instead being repaired and should be
15 replaced."
16    Do you recall giving that testimony, Doctor?
17 A     Yes.
18 Q     Turning your attention to the page of Exhibit 44,
19 conforming to Asi Othman, do you see that?
20 A     Yes.
21 Q     Am I correct, that this page does not contain any
22 indication of tooth number, correct?
23 A     Correct.
24 Q     I am asking you, assuming that this page had provided
25 tooth number information, would that have significantly

---

1  altered the opinion you provided to the Grand Jury?
2  A     No.
3  Q     Why not?
4  A     Still seems to be an excessive amount of repairs to the
5  same partials.
6     THE COURT:  Even if they were all different teeth?
7     THE WITNESS:  How do you mean all different teeth?
8     THE COURT:  Well, the broken clasp-- those are not,
9  as you read them, individual tooth related?
10    THE WITNESS:  It depends on which teeth are still
11 present in the mouth, and where those clasps are adhering and
12 how many there are.
13    And, even if there are four clasps in the mouth, it
14 is very difficult to break all four at the same time.
15    If it is the same one over and over, you know, if
16 they are spread out through the mouth, you have to ask
17 yourself, why is it still breaking.
18 Q     Is it fair to say, Doctor, even had you had tooth numbers
19 available to you on this document, you would have reached a
20 similar conclusion?
21 A     Yes.
22    MR. FARBER:  Thank you, Doctor.
23 REDIRECT EXAMINATION BY MR. NORINSBERG:
24 Q     Good afternoon again, Doctor DeLuca.
25 A     How are you?

**JA342**

1 Q    Doctor DeLuca, would you agree--

2         THE COURT:  Can I just clarify something.

3         I don't believe you offered the transcript into

4 evidence, I take it.

5         MR. FARBER:  I apologize, I would respectfully move

6 Exhibit C-3 into evidence.

7         MR. NORINSBERG:  No objection.

8         THE COURT:  C-3 is received.

9         (Defendants' Exhibit C-3 received in evidence.)

10        THE COURT:  I'm sorry, Mr. Norinsberg.

11 BY MR. NORINSBERG:

12 Q    Would you agree, Doctor DeLuca, that whatever opinions

13 you expressed in the Grand Jury, were based simply on the

14 billing summaries that were put in front of you, would you

15 agree with that?

16 A    On the procedure codes, yes.

17 Q    You actually have no idea what work was done by Doctor

18 Morse on any of these patients, do you?

19 A    Again, I don't know what I may have looked at in--

20 in-mouth situation or a chart situation.  But as far as these

21 procedure-- billings go, that day, I can only go by that,

22 whatever was in front of me.

23 Q    And, we know now by looking at your Grand Jury

24 transcript, you were not relying on notes from an in-mouth,

25 correct?

---

1 A    I don't believe I was.

2 Q    There is no reference anywhere in your testimony as to

3 looking at in-mouth examinations, correct?

4 A    What I saw in the Grand Jury were-- was the billing

5 sheet.

6 Q    The billing sheets prepared by the Attorney General's

7 office, correct?

8 A    Yes.

9 Q    Which you told us earlier, you would never base an

10 opinion on, right?

11        MR. FARBER:  Objection.

12 A    I didn't say that.  I don't think.

13 Q    You didn't say that?

14 A    I'm not sure if I did.

15        MR. FARBER:  Still objection.

16        THE COURT:  An opinion as to what?  I don't think

17 that-- I think you have to clarify your question.

18        You reached opinions reviewing these records,

19 correct?

20        THE WITNESS:  It was my opinion that the billings

21 were excessive.

22        THE COURT:  That was based on a review of records.

23        THE WITNESS:  That was based on the billings.

24        THE COURT:  The billings.  Okay.

25 BY MR. NORINSBERG:

---

1 Q    Referring to your deposition testimony, page 48, line

2 three:

3         QUESTION:  "Would you ever base your testimony upon

4 records that were actually created by the New York State

5 Attorney General's office?"

6         ANSWER:  "No."

7         Do you recall giving that testimony?

8 A    I never got a copy of that.

9         MR. FARBER:  Objection.

10        THE COURT:  I will sustain the objection.  There is

11 no-- without the context, I don't know that that is a proper

12 impeachment.

13        MR. NORINSBERG:  Fair enough.  Let me give proper

14 context.

15 Q    Would you agree in your normal course of rendering

16 opinions, you would base your Grand Jury testimony either on

17 review of patient records or on in-mouth examinations, would

18 you agree with that?

19        THE COURT:  Testimony about what counsel?

20        MR. NORINSBERG:  Testimony about whether or not

21 procedures were excessive.

22 A    The majority of the testimony I gave was based on either

23 an in-mouth or a chart review or both.

24 Q    But in this case, your entire Grand Jury testimony had

25 nothing to do with an in-mouth exam, had nothing to do with a

---

1 chart review, correct?

2 A    That seems to be the case here.

3 Q    So this was the exception to the norm of what you would

4 normally do, correct?

5 A    You could say that, yes.

6 Q    And, then, in this context, you were asked the question

7 of whether or not you would ever base testimony on records

8 that were generated by the Attorney General's office as

9 opposed to, looking at patient records or looking at in-mouth

10 examination notes.

11        And you gave the following testimony in that

12 context --

13        MR. FARBER:  Objection.

14 Q    Page 48 line three.

15        QUESTION:  "Would you ever base your testimony upon

16 records that were actually created by the New York State

17 Attorney General's office?"

18        ANSWER:  "No."

19        MR. FARBER:  Objection.

20        THE COURT:  I will sustain the objection.

21 BY MR. NORINSBERG:

22 Q    Would it be fair to say what you did in this case was

23 highly unusual in terms of what you did, or would normally do?

24 A    It was different than what I normally did do.  However, I

25 never saw the testimony.

**JA343**

1  Q    You never saw what testimony?
2  A    Whatever you are referencing, I have never seen.
3  Q    So Mr. Farber never gave you a copy of your own
4  deposition testimony?
5  A    I never got it.
6  Q    Did you ever ask for it?
7           MR. FARBER:  Objection.  Really going a field here.
8           THE COURT:  I will sustain the objection, about ever
9  asking for it.
10  Q    Did there come a point in time, where you had a
11  discussion with Mr. Farber about obtaining a copy of your
12  deposition testimony?
13           MR. FARBER:  Objection.
14           THE COURT:  Sustained.
15  Q    Now, you gave testimony on Exhibit AU, relating to Edwin
16  Gonzalez; is that correct?
17  A    Yes.
18  Q    And, you indicated on your notes that this patient was
19  missing seven teeth, correct?
20  A    Can I get to the page.
21  Q    Sure.
22  A    Was it 49?
23  Q    It was AU.
24  A    Yes, I have that.
25  Q    Defense Exhibit AU.

1           MR. FARBER:  Page counsel?
2           MR. NORINSBERG:  I don't have it in front of me.
3  49.
4  A    You want to know how many missing teeth.
5  Q    He was missing seven teeth, wasn't he?
6  A    Yes.
7  Q    You have no idea as you sit here now, you have no idea
8  whether or not he actually had a partial denture, do you, yes
9  or no?
10  A    If I didn't write it down, then he didn't have it with
11  him.
12  Q    Do you remember you told us earlier this morning, and
13  again this afternoon, that it depends on if the patient
14  actually brings the appliance to the examination?
15  A    Yes.
16  Q    So, if he didn't bring the appliance to the examination,
17  you would have no way of knowing whether he had one or not,
18  true or not true?
19  A    Absolutely right.
20  Q    Did you-- you would also agree that you gave testimony on
21  Sara Charles, Exhibit AW.  Do you have that in front of you?
22  A    Yes.
23  Q    And, in your notes, for this patient, you said, quote,
24  she has a partial, end quote, true?
25  A    Which note?

1  Q    Your post-it note that Mr. Farber asked you about.
2           MR. FARBER:  Objection.
3           Sidebar, please.
4           THE COURT:  All right.
5           (Sidebar.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           THE COURT:  I can't imagine what this would be like
2  if I hadn't spent two full days with you guys going through
3  this.
4           MR. FARBER:  The objection, your Honor, is that the
5  review was of Morse's patient chart.  She did not examine this
6  patient.  So, to say she had a partial denture, her testimony
7  is, the records showed a partial.  She can't say whether or
8  not the patient wore a partial.  She can say, according to
9  this dental chart, the patient wore a partial.  Was presumed
10  it was-- presumably prepared by Morse's office.
11           The question implies that the patient actually had a
12  partial.  She can't tell us that.  She didn't examine the
13  patient.  All she can tell us, this is what the patient
14  chart--
15           MR. NORINSBERG:  Her note is in evidence.  Now, her
16  note says, she has a partial, I'm entitled to ask, he can
17  redirect.  The note says that.
18           THE COURT:  She says that her notes were as a result
19  of the reviewing of the charts.
20           MR. NORINSBERG:  She is also making conclusions on
21  that that people-- he had to bring out.  Things the patient
22  didn't have, now I'm entitled to recross on what the note
23  said.  She wrote, her own note.  He can recross on that.
24           MR. FARBER:  Not by misleading the jury as to what
25  she examined.

**JA344**

1    (Open Court.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

RB      OCR

---

1    BY MR. NORINSBERG:
2    Q    I'm reading from your notes here, on Exhibit AW relating
3    to patient Sara Charles, do you have that in front of you?
4    A    I do.
5    Q    It says, he has a partial.  Do you see that?
6    A    It says, this patient is seen regularly from June '94 to
7    March 17th, 1999.  Then, March 19th, 1999, he had a partial.
8    No mention of it prior to 3/19/1999.
9         Now--
10   Q    My question is, did you write the words, that this
11   patient, you are referring to, as a he.  It is a she.  Sara
12   Charles, right?
13        Did you write the words that this patient has a
14   partial based on your review of the chart of Doctor Morse, yes
15   or no?
16   A    Based on the billing.
17   Q    Based on the billing, which you didn't have in front of
18   you in front-- when you testified in the Grand Jury, right?
19        MR. FARBER:  Objection.
20   A    I'm sorry I'm not following.
21        THE COURT:  I will sustain the objection to that.
22   Q    You actually were never -- you never brought any of this
23   out in front of the Grand Jury when you testified about Sara
24   Charles, did you?
25   A    Because I don't know who these people are.  That is not

RB      OCR

---

1    my decision.
2    Q    But what is your decision is, when you come to court, and
3    you know you are testifying about an in-mouth exam, you are--
4    A    This is not an in-mouth exam, sir.
5    Q    It is based on a review of a patient chart that you were
6    testifying about in front of the Grand Jury?
7    A    They are two different things.
8    Q    Would you agree that when you testified in front of the
9    Grand Jury, you were asked questions about this particular
10   patient, correct?
11   A    Yes.  But if this is not in--
12        THE COURT:  Let her finish.
13        MR. NORINSBERG:  I'm sorry.
14   A    If this information is not given to me at that time, how
15   can I make testimony on it?
16   Q    So it is up to the attorney who is presenting the case,
17   Mr. Fusto, to actually provide you with your notes, correct?
18   A    I would assume, yes.
19   Q    But you weren't provided with the actual notes for Sara
20   Charles, were you?
21   A    I don't believe I was.  If this is even pertinent, sir, I
22   don't know what the questions regarding my notes are
23   originally.  I don't know why I was asked to look at this
24   chart.
25        So I can't-- I'm in the dark, I only have this one

RB      OCR

---

1    window.
2    Q    They kept you in the dark, when they were asking you
3    these questions, didn't they?
4    A    I don't know.
5    Q    You were forced to give--
6    A    How can I answer that?
7    Q    You were forced to give an opinion under oath in a Grand
8    Jury, where they kept almost all of the pertinent information
9    from you, isn't that true?
10        MR. FARBER:  Objection.
11        THE COURT:  Sustained.
12   A    I don't agree.
13   Q    You were forced to give opinions without having the
14   patient chart in front of you, without having the actual
15   billings in front of you, without having the x-rays in front
16   of you, without having your notes from in-mouth examinations,
17   true or not true?
18        MR. FARBER:  Objection.
19        THE COURT:  Sustained.
20        MR. NORINSBERG:  Nothing further.
21        THE COURT:  Do you have anything?
22        MR. FARBER:  I have nothing further, your Honor.
23        THE COURT:  Thank you, Doctor.
24        MR. NORINSBERG:  Can I get my exhibits, your Honor.
25        THE WITNESS:  I'm free to go this time?

RB      OCR

**JA345**

1    THE COURT:  Yes, you are.

2    (Witness excused.)

3    MR. MILLER:  Your Honor, can we get the document

4 camera set up?

5    THE COURT:  Are we going to have a witness or look

6 at movies?

7    MR. MILLER:  Mr. Fusto.

8    THE COURT:  Okay.  Mr. Fusto, you will remember that

9 you were under oath from your first appearances here as a

10 witness.

11    THE WITNESS:  Yes, your Honor.

12    THE COURT:  Do you want to use this?

13    MR. MILLER:  I do, your Honor.  I think we lost some

14 lights however.

15 J-O-H-N  F-U-S-T-O, having been previously duly sworn,

16 resumed that stand and testified further as follows:

17 CROSS EXAMINATION BY MR. MILLER:

18 Q    Afternoon Mr. Fusto.

19 A    Afternoon.

20 Q    Where did you go to college.

21 A    Western Connecticut State University.

22 Q    When did you graduate?

23 A    May of 1983.

24 Q    Where did you go to law school?

25 A    Pace, in White Plains, New York.

---

1 Q    When did you graduate?

2 A    June 1986.

3 Q    What was your first legal job after law school?

4 A    I started an at the Legal Aid Society.

5 Q    What was that?

6 A    The Legal Aid Society?

7 Q    What type of work did you do?

8 A    Criminal defense.

9 Q    What kind of cases did you handle?

10 A    Started off with handling misdemeanor cases and worked

11 yourself up to handling felony matters.  Represent indigent,

12 poor people, who were accused of crimes.

13 Q    Where did you practice when you were with the Legal Aid

14 Society?

15 A    In the Bronx.

16 Q    Did you have any trials?

17 A    Several, yes.

18 Q    Roughly how many?

19 A    Over twenty, I think.

20 Q    Where did you go after you worked at the Legal Aid

21 Society?

22 A    Then I went to the Kings County District Attorney's

23 office, right around the corner here.

24 Q    When you initially started there, what kind of work did

25 do?

---

1 A    I came in as a lateral, I had experience from Legal Aid

2 which they give you credit for, so you don't have to start at

3 the bottom again.  They put me in like Felony Trial Bureau.

4 Then after about six months, they sort of reorganized the

5 office and dis-banned the Homicide Bureau and the murder cases

6 were going to be handled by senior assistant trial assistants

7 and I had been promoted into that unit.

8 Q    What kind of cases did you handle as a senior trial

9 assistant?

10 A    Pretty much almost all murder cases.

11 Q    How long did you work at the Brooklyn D.A.'s office?

12 A    About two and a half four years.

13 Q    Did you take another job after that?

14 A    Yes, I became a-- called them court attorneys for State

15 Supreme Court Judge up in the Bronx.

16 Q    Who was the Judge?

17 A    Justice Steven Barrett.

18 Q    What kind of work did you do there?

19 A    That was also in the criminal term of Supreme Court and

20 as a court attorney, you tend to write, you know, opinions or

21 drafts of the opinions.  Serve as kind of in court advisor.

22 Q    How long did you work there?

23 A    From August of 1993 to August of 1999.

24 Q    Did you have any fraud cases while you were working for

25 Judge Barrett?

---

1 A    Yeah, from time to time, I mean generally speaking, most

2 of the cases that Judge Barrett handled were typical Street

3 crime cases, ranging from, you know, whatever, you know, car

4 theft all the way up to murder cases.

5    But from time to time, fraud cases would come in

6 from either the Bronx D.A.'s office fraud unit or sometimes

7 from the Attorney General's office.

8 Q    Did you have a case come in from the Medicaid Fraud

9 Control Unit?

10 A    They didn't have them very often, one of them did come

11 in, yes.

12 Q    What did you do after you worked for Judge Barrett?

13 A    I went to-- I opened up my own law practice for about a

14 year and a half.

15 Q    Then what job did you take after that?

16 A    I took a job at the Attorney General's office in the

17 Medicaid Fraud Control Unit.

18 Q    When was that?

19 A    That was in-- I started in February of 2001.

20 Q    Can you explain what the Medicaid Fraud Control Unit is?

21 A    Sure.

22    I don't want to complicate things.  The Attorney

23 General's office is a State office.  The Medicaid Fraud

24 Control Unit is apart of the Attorney General's office, but it

25 is also somewhat guided or under some restrictions.

**JA346**

1  procedures, policies from also involving the federal
2  government.
3          The reason that is, is because, the Medicaid program
4  is fifty percent federally funded.  So, the U.S. government
5  has a distinct interest in that.
6          Because of that, every State that administers a
7  Medicaid program, has a Medicaid Fraud Control Unit.
8  Q    What is the purpose of the Medicaid Fraud Control Unit?
9  A    It is to investigate and prosecute matters involving
10 fraud that is committed by the providers of the service.
11         In other words, the Medicaid Fraud Unit doesn't do
12 or doesn't investigate the recipient of fraud.  The fraud can
13 be at both ends.
14 Q    When you say provider, Medicaid provider, what do you
15 mean?
16 A    The individuals or entities that actually provide the
17 medical services for Medicaid recipients.  That can be
18 anywhere from a solo doctor, all the way to you know a-- a
19 huge hospital.
20 Q    What was your title when you worked at the Medicaid Fraud
21 Control Unit?
22 A    Special assistant Attorney General.
23 Q    Where does the Medicaid Fraud Control Unit get its cases?
24 A    We can get our cases any number of ways.  More often than
25 not, we-- way more often than not, we get our cases as a

1  referral from the Department of Health.  The Department of
2  Health had, and I think it is a different name now.  They had
3  a sort of a program integrity division that would apparently
4  do their own investigations, and if they had investigations
5  that rose to the level of possible fraud, then they would
6  refer it to the Attorney General's office.  Medicaid Fraud
7  Control Unit.  That is the normal process.
8  Q    You mentioned the Department of Health, are you talking
9  about the New York State Department of Health?
10 A    Yes.
11 Q    What is the Department of Health's role in connection
12 with Medicaid program in New York?
13 A    The New York State Department of Health is the State
14 entity that administers the program.
15 Q    When you worked at the Medicaid Fraud Control Unit, did
16 you have any cases involving dental providers?
17 A    From time to time, they would come up.
18 Q    Did you have any prior to the case involving Doctor
19 Morse?
20 A    I'm sure I did, yeah.
21 Q    What kind of cases were those?
22 A    In terms of like what kind of dental case it was?
23 Q    What kind of allegations were you investigating in those
24 cases?
25 A    I think every dental case that I had and most of my

1  colleagues would have, involved procedures that are billed but
2  not performed.
3          But, they were normally cases involving fillings or
4  certain cleanings that like a perio-scaling that was alleged
5  to have been billed and paid for but not done.
6  So --
7  Q    Did you have any cases involving alleged billing for
8  dentures that weren't provided prior to your case involving
9  Doctor Morse?
10 A    No.
11 Q    Did you work on other types of cases when you were at the
12 Medicaid Fraud Control Unit?
13 A    Oh, sure.
14 Q    What other kinds?
15 A    Well, you know, you work on-- the Medicaid program is a
16 huge program.  It is very comprehensive in terms of medical
17 services.
18         Not just medical services, but also kind of related
19 services that Medicaid pays for like transportation.  It could
20 even be social workers, it could be things of that nature.
21         So you would-- I have had cases involving social
22 workers, transportation cases, psychiatrists, pharmacy cases,
23 are often very common that we had.
24         Anything, any provider who is registered with
25 Medicaid, along the gambit of services that are paid for,

1  those are the cases that we would have, and I had the gambit
2  of them.
3  Q    On your dental cases, prior to your investigation of
4  Doctor Morse, did you have someone conduct an in-mouth
5  examination?
6  A    I don't order or have anything to do with that.  The in
7  mouths are usually done, at least in my experience, done
8  before we even get the case, is assigned to the assistant.
9          In mouths are common, common things that were
10 performed for dental cases.
11 Q    Were any in mouths done on any cases that you were
12 subsequently assigned to?
13 A    Sure.
14 Q    Were there any limitations to those in mouths?
15 A    Limitations in the sense of their utility, overall
16 utility?
17 Q    Yes.
18 A    There were-- there were several.  They sort of manifested
19 themselves over time.
20         One of the main limitations is that-- I think Doctor
21 DeLuca explained, it is not just a matter of putting a
22 recipient in a dental chair and have a dentist look.  They are
23 not-- if we are using Doctor DeLuca as an example, those
24 recipients are not her patients.  So she can't use dental
25 probes.  She can't really get into the mouth that much.  A lot

**JA347**

1  of it is just eye balling.

2      And, in the typical dental case, a lot of them

3  were-- most of the dental cases would be what we call

4  restorative procedures, which are really fillings.  And we

5  would often have a lot of cases where the amount of fillings

6  appeared excessive.

7      So, Doctor DeLuca or someone would look in a

8  patient's mouth, but a lot of those fillings were amalgam

9  fillings, excuse me, resin fillings, which were the white

10  ones.  She could not often see them.

11  Q    Did there come a time when you left the Medicaid Fraud

12  Control Unit?

13  A    When I left the Attorney General's office.

14  Q    When was that?

15  A    In end of July, late July of 2007.

16  Q    Where did you go to work after that?

17  A    I went to go-- took a position at a-- I guess what they

18  call a forensic consulting firm.  Neither a law practice nor

19  an accounting practice.

20      But they-- that company was interested in starting a

21  health care compliance practice and I was one of the first

22  people hired.

23  Q    Where do you work now?

24  A    I work at Fidelity National Title Insurance Company.

25  Q    Can you explain to the jury, how the case involving

---

1  Doctor Morse and his dental practice got started?

2  A    I believe what happened was, the case-- Mr. Flynn

3  explained, there was some indication from the Department of

4  Health, they obviously sent letters out, I think that is a

5  common thing that they do to ensure that services-- that were

6  billed for were provided to the patients.  I think that got

7  the ball rolling to us.

8      As I recall, Investigator Flynn had conducted some

9  interviews of some of the patients, I believe an in-mouth

10  examination had been done.  And from that point on, I was

11  provided with information about basically what patients were

12  talking about.  About, you know, what the results of the

13  interviews were.

14  Q    Do you remember when the case first started?

15  A    I saw the memo, the opening memo that said, I believe it

16  was April of 2002.

17  Q    Can you look at Plaintiff's Exhibit 46.

18  A    I don't think I have that one up in front of me.

19  Q    Here you go.

20  A    Thank you.

21  Q    So Mr. Fusto, what is Plaintiff's Exhibit 46?

22  A    I have it.

23  Q    What is it?

24  A    Excuse me?

25      That appears to be the opening memo from Richard

---

1  Harrow and obviously assigning 580 Dental to me.

2  Q    What is the date of it?

3  A    April 5th, 2002.

4      MR. MILLER:  I offer Plaintiff's Exhibit 46.

5      THE WITNESS:  Excuse me, sir.

6      THE COURT:  You are offering Plaintiff's Exhibit 46?

7      MR. MILLER:  Yes.

8      MR. NORINSBERG:  No objection.

9      THE COURT:  Received.

10      (Plaintiff's Exhibit 46 received in evidence.)

11  Q    You see in this exhibit, that the subject line is, World

12  Trade Center dental referrals?

13  A    Yes.

14  Q    What is that a reference to?

15  A    That was-- it was, as Mr. Flynn said this morning, there

16  was a, I believe a program that shortly after 9/11, the

17  Department of Health had issued a program where they can give

18  temporary Medicaid cards to persons, and as a result of that

19  program, there was a spike in-- a huge spike in billings.  Not

20  just among dentists, but with other providers as well.

21      And, that generated a lot of investigations and 580

22  Dental, appeared to have been part of the World Trade Center

23  spike cases.

24  Q    Initially, who was assigned to the team at the Medicaid

25  Fraud Control Unit that was investigating Doctor Morse?

---

1  A    I'm sorry.

2  Q    At the outset of the investigation, who was assigned in

3  the Medicaid Fraud Control Unit to work on the investigation?

4  A    That would have been myself, I see Tim Johnson, who was

5  an auditor and Bob Flynn.

6  Q    What initial steps did you have Mr. Johnson take in

7  connection with the case?

8  A    I think at that point, Mr. Johnson had probably done some

9  preliminary work, because I remember he had indicated to me

10  that there were a lot of billings for patients who appeared to

11  be very young.  580 Dental was billing for dentures and

12  denture repairs.  That was the crux of it.

13  Q    Did Mr. Johnson identify any particular patient

14  population that he wanted to investigate?

15  A    I think patients under a certain age if I recall.

16  Q    And, initially, did you have the investigators talk to

17  Doctor Morse?

18  A    Yes.  That is often one of the first things that we like

19  to do.  One of the things about being a Medicaid provider, you

20  do have to submit to certain requirements.  One of those is

21  that you really do have to talk to the investigators.  It is

22  just part and parcel of being a provider in the program.

23      The questionnaire that Investigator Flynn was

24  talking about was a standard questionnaire that we use for

25  dentists.  There is a lot of blanks on there, because it

**JA348**

1  didn't apply to what we were really looking for on this
2  particular case.
3          With other kinds of dental cases, some of those
4  questions which would be much more important.  In this
5  particular case, we understood that with dentures and denture
6  repairs, follows a very different process, very different
7  process than a typical dental case.
8          If I can elaborate on that if you want.
9  Q   Well, did you learn from Mr. Flynn's memo or
10 questionnaire, about dental labs that Doctor Morse used?
11 A   Yes.  That was one of the pieces of information we
12 needed.
13 Q   Can you explain your understanding of how the process
14 worked with respect to Doctor Morse, the labs he used, and
15 billing for denture services to the Medicaid program?
16 A   Sure.
17          Doctor Morse is the provider.  He is registered as a
18 Medicaid provider.  He gets paid by Medicaid.  The labs are
19 not providers.  They are not registered with Medicaid.
20          In the ordinary course of events with a dental
21 office, if you perform the procedures-- while the patient is
22 in the office, fillings, cleanings, things like that, you
23 simply bill Medicaid directly for that work.  With dentures,
24 it works a little differently, because whatever work a
25 provider of denture matters does, they do the work, and then

1  they send out the work to be done at a lab, which is either--
2  the lab of your choosing.  Medicaid doesn't force you to pick
3  whatever lab it is.
4          And then, once that is done, then the provider such
5  as Doctor Morse, they submit their bill and Medicaid pays
6  whatever they pay for that particular thing that is done for
7  the dentures.
8          So, I'm not sure I am answering your question.  But
9  the-- we needed to know two things.
10          We needed to know whether or not the lab work was
11 being done on premises, or was it being sent out.  Doctor
12 Morse had indicated to us that he sends his work out to two
13 labs, Nu-Life and Design Dental.
14 Q   And, after the work is done, this process is supposed to
15 work where Doctor Morse would then do the work and bill
16 Medicaid for each procedure, correct?
17 A   Yes, once the procedure is completed, yes.  You are
18 entitled to bill for it.
19 Q   Is it your understanding that at this point in time, this
20 was a fee for service situation, in terms of every service
21 performed, corresponds to a particular billing to Medicaid?
22 A   Yes.  That is also how the system works.  Medicaid is a
23 sort of a code basis team.  The manuals, the payment manuals
24 for whatever rate they pay, is very specific.
25          And for each particular procedure that you bill for,

1  it has a different amount that it pays the provider.
2  Q   So, after you found out that Doctor Morse was using two
3  labs for dental services, what did you do to try to get
4  information from those laboratories?
5  A   Well, we, you know, again this was going to be a case
6  that was-- we were investigating from the standpoint of, you
7  know, because you are involving another vendor that is a non
8  Medicaid provider, there is going to be another set of records
9  out there that will help us figure out, whether or not a fraud
10 was occurring here.
11          So, we wanted whatever records they had, relating to
12 work that they performed for Doctor Morse, to backup his paid
13 claims.  That is the only-- certainly the only rational thing
14 that we could have looked for.
15 Q   Did you serve subpoenas on the labs?
16 A   We did.
17 Q   What year was that, do you remember?
18 A   2002, I believe.
19 Q   And what did those subpoenas seek?
20 A   Specifically, I know the invoices, maybe the
21 prescriptions, if they had prescriptions.
22          If I may backup for a second and just explain that.
23 Q   We will get to that.
24          Can you look at Defendants' Exhibit AF.
25 A   A?

1  Q   Which is in evidence.
2  A   I didn't hear the second one.
3  Q   AF as in Frank.
4  A   Okay.  I have it.
5  Q   What is AF?
6  A   AF is one of the subpoenas that we sent out.  Standard
7  one for Design Dental.
8  Q   And what was requested in that?
9  A   It says, all invoices and prescriptions for work
10 performed for 580 Dental.
11 Q   Why did you ask for prescriptions?
12 A   Well, we had also learned that the principal document,
13 that goes along with the-- as we understood the processes that
14 a patient comes in, they may have dentures, maybe there is
15 something wrong with them.  Whatever the case maybe, a repair,
16 add a tooth, whatever.
17          Because it is not being done at 580 Dental it goes
18 to the lab, the physician or the doctor rather will write out
19 on the prescription, what needs to be done to tell the lab
20 what to do.
21          Therefore, there is another document that sort of
22 goes along with the work.  So our natural assumption is that
23 the labs would have kept a record of the prescriptions for the
24 individual patients for which Doctor Morse would have sent the
25 work for.

1  Q    Why are you trying to find documents like the
2  prescriptions relating to the work that Doctor Morse billed
3  for?
4  A    Because that would have been the best piece of evidence
5  that the work was actually done.  The work was sent to the lab
6  to be done.
7  Q    Do you remember whether or not the labs produced
8  invoices?
9  A    The labs produced invoices.
10 Q    Did the labs produce prescriptions?
11 A    They did not.
12 Q    Do you remember how long it took for the labs to produce
13 invoices?
14 A    I don't know.  We do normally give them time.  You know,
15 if we give them a subpoena, you know, I'm not entirely sure
16 how much time we give them to make copies and send them to us.
17 Q    I am handing you Plaintiff's Exhibit 53, which is in
18 evidence.
19 A    Thank you.
20 Q    What is this document?
21 A    This is-- three pages, apparently an E-mail, a six-month
22 report.
23 Q    When did you send out this six-month report?
24 A    It looks like it was sent out Wednesday, March 1, 2006.
25 Q    Can you look at paragraph seven.

1  A    Yes.
2  Q    Do you see below the initial text it says, subpoena to
3  labs, October 2002, complied with, December 2003?
4  A    Ah-him.
5  Q    Does that refresh your recollection about when the labs
6  produced their subpoenas-- produced the invoices to you?
7  A    It could have been in December of 2003.  Specifically, I
8  can't really tell.
9  Q    Did you also try to get records from Doctor Morse?
10 A    Yes.
11 Q    What kind of records did you seek?
12 A    Well, I think initially we were looking for, just
13 standard, let's look at his charts kind of thing.
14      I think we asked him for, I don't remember the exact
15 number, maybe one hundred to two hundred, something like that.
16 That was-- I think that was the first thing we looked for.
17 Q    Can you look at Plaintiff's Exhibit 74.
18 A    I see it.
19 Q    What is this?
20 A    This is what is known as a demand letter.  We can get
21 records any number of ways.  Again because you are a Medicaid
22 provider, you are required to comply with a lot of laws.
23      And, rather that giving somebody a Grand Jury
24 subpoena, that sometimes frightens them, we will send a letter
25 which-- they still have to comply with it, so this was a

1  letter sent to Doctor Morse, with a list of patient charts
2  that I believe my auditor had compiled.
3  Q    When is it dated?
4  A    October 18th, 2002.
5       MR. MILLER:  I will offer Plaintiff's Exhibit 74.
6       MR. NORINSBERG:  No objection.
7       THE COURT:  74 is received.
8       (Plaintiff's Exhibit 74 received in evidence.)
9  Q    Can you look at Plaintiff's Exhibit 75.
10 A    I see it.
11 Q    What is Plaintiff's Exhibit 75?
12 A    It looks like another letter to Doctor Morse.
13 November 5th, 2003.  I think we are looking for more charts.
14 Q    So, this is a letter seeking patient charts from Doctor
15 Morse?
16 A    That's what it looks like.
17      MR. MILLER:  I would offer Plaintiff's Exhibit 75.
18      MR. NORINSBERG:  No objection.
19      THE COURT:  75 is received.
20      (Plaintiff's Exhibit 75 received in evidence.)
21 Q    Now, after you got the patient charts, did you personally
22 look at them?
23 A    I didn't look at them.
24 Q    Did you have anyone else look at them?
25 A    I gave them in the ordinary course of business, you get

1  the patient charts.  I actually-- we don't go in and take
2  them.  We usually give the provider some time to produce them.
3  They will either ship them to us or we will just go and pick
4  them up.  The investigators will have that.  They will usually
5  take it right to the auditor.  So I would not ordinarily have
6  seen them.
7  Q    Did anyone from the Medicaid Fraud Control Unit look in
8  the patient charts for prescriptions or invoices?
9  A    Yes.  That was either-- by the date of 2003, I think Mr.
10 Johnson still had the case.  Certainly after Mr. Castillo got
11 the case, he looked through them for prescriptions.  That is
12 really what we were looking for.
13 Q    Did he find any?
14 A    To my knowledge, he found none.
15 Q    And, did you at some point then serve a subpoena
16 specifically for prescriptions to Doctor Morse?
17 A    I believe we did.
18 Q    And, did he produce any prescriptions in response to that
19 subpoena?
20 A    He did not.
21 Q    How did you find out?  Do you know whether he had any
22 prescriptions?
23 A    At what point in time?
24 Q    Well, after you served the subpoena, did he just not
25 respond to it or did you have a conversation with Doctor Morse

**JA350**

1  about it?
2  A    I don't-- I did not have a conversation with Doctor Morse
3  directly.  It is possible I may have been informed because at
4  that time, he had retained counsel.  I was communicating with
5  him.
6         I believe-- however, I found out that he didn't have
7  any, would have come from, I believe his attorney Mr. Wool.
8         THE COURT:  What was his attorney's name?
9         THE WITNESS:  Richard Wool.
10 Q    Do you remember when you served that subpoena on Doctor
11 Morse for prescription?
12 A    As I sit here today, no, I don't.
13 Q    Can you look back at Plaintiff's Exhibit 53.
14 A    53?
15 Q    Correct.  One of the loose ones, not in the binder.
16 A    I'm sorry.
17       It looks like April of 2004.
18 Q    So, are you looking at the portion that says, subpoena
19 580 for specific lab slips?
20 A    Yes.
21 Q    April 2004, records do not exist?
22 A    Yes.
23 Q    Were you surprised that Doctor Morse didn't have copies
24 of the prescriptions that he had allegedly sent to the two
25 labs?

1  A    Yes.
2  Q    Why?
3  A    This has to do with being enrolled in the Medicaid
4  program as a provider.  Medicaid has very strict record
5  keeping requirements.  Both State and Federal law, because it
6  is 100 percent public money and as such, they set the rules,
7  and the record keeping requirements are unforgiving.
8         As I-- I don't have the law in front of me, but the
9  law requires that every Medicaid provider must keep records
10 pertaining to the patient services that they bill and pay for
11 for a period of six years.
12 Q    Now, in this case, what time period was the focus of your
13 investigation?
14 A    2000, 2001, 2002, I believe was our audit period.
15 Q    How long was the prescriptions that were written in early
16 2002, how long should that have been kept-- I'm sorry, early
17 2000?
18 A    Early 2000, would have been expected to have been kept
19 six years hence, would be early 2006.
20 Q    And you asked Doctor Morse, whether he had any
21 prescriptions by subpoena in April of 2004, correct?
22 A    Correct.
23 Q    And he didn't have any?
24 A    He did not.
25 Q    In response to your subpoena to Doctor Morse, did you get

1  any invoices?
2  A    Invoices for the labs?
3  Q    Correct.
4  A    In other words, copies that we would expect Doctor Morse
5  to have had?
6  Q    Right.
7  A    No.
8  Q    Were you surprised that Doctor Morse didn't have copies
9  of the invoices from Design Dental and Nu-Life laboratory?
10 A    Yes, I was surprised.
11 Q    Why?
12 A    Well, part of this job is somewhat exercises common
13 sense, you say to yourself, you do business with these labs,
14 you pay them money, for purposes of your own record keeping,
15 you would have copies of invoices, work that you would send
16 out.
17       Whether it is disputes with vendors or maybe even
18 backup your requirements for Medicaid.  The absence of
19 invoices at the provider end was surprising.
20 Q    The other day, Mr. Norinsberg was asking you some
21 questions about an Education Law, and can you explain what
22 your understanding is of the provision of the Education Law
23 that he was talking about?
24 A    Well, the Education Law that was presented to me, and is
25 that was raised by, I believe Doctor Morse's counsel to me, as

1  an excuse, as to why there were no prescriptions.
2         I don't recall exactly when, and my first reaction
3  was, that doesn't make any sense.  But when he showed me the
4  law, I can read plain English as well as anybody.  My
5  reaction, I was-- I must tell you I was just completely
6  unmoved by that argument because you do have a requirement
7  under Medicaid to keep those records.
8  Q    So, what is the difference in your understanding between
9  the requirements of the Education Law and Medicaid rules about
10 keeping records related to patient care for six years.
11 A    You're a Medicaid provider, you keep those records for
12 six years.
13       (Continued on the next page.)
14
15
16
17
18
19
20
21
22
23
24
25

1       THE COURT:  Do you understand them to be separate
2  requirements?
3       THE WITNESS:  I actually don't.
4       THE COURT:  I mean, distinct requirements, one
5  entity requires two but the other one requires six?
6       THE WITNESS:  I would have -- I mean, it's actually
7  kind of a hard question to answer, but I would assume that if
8  you're a Medicaid provider and it says six years, you keep
9  them for six years.  In other words, the education law would
10 have effectively been trumped by the Medicaid rules.  I don't
11 think that education law was specific to Medicaid.  It would
12 have struck me as odd that they would have carved out an
13 exception for the blanket requirement of six years just for
14 prescriptions.  It didn't make any sense.
15 Q    Is there anything in the education law that exempts
16 Medicaid providers from their six-year requirement of
17 maintaining records relating to patient care?
18 A    Not to my knowledge.
19      THE COURT:  Is the Medicaid regulation you're
20 referring to a state regulation or a federal regulation?
21      THE WITNESS:  I think it's outlined in one of the
22 documents that I've seen, but as far as I know, it's a state
23 regulation, but it may be mandated by federal law.
24 Q    Though you tried to get prescriptions but weren't able
25 to, and then you had invoices from the labs; is that right?

1  A    Correct.
2  Q    Okay.  Did you ask someone on your team to look at the
3  invoices and analyze them?
4  A    Of course I did.  I mean, I think -- I don't remember
5  whether Mr. Johnson had left the office and they were given to
6  Mr. Castillo at that point, but ultimately Mr. Castillo was
7  asked to look at the invoices.
8  Q    Okay.  And in asking Mr. Castillo to look at the
9  invoices, what did you ask him to try and determine?
10 A    Well, in the absence of the prescriptions and a review of
11 the invoices, what we tried to do was we tried to match
12 up -- both invoices had their own set of problems.  The Design
13 Dental ones were handwritten.  The Nu-Life ones appeared more
14 professional, but I think the problem with that was that they
15 didn't identify patients or they didn't identify procedures.
16      The Design Dental ones were handwritten.  They
17 identified patients, some procedures to the extent they were
18 legible, and then the amount charged by the lab for the
19 procedure that Dr. Morse wanted performed.  That price that
20 was on that Design Dental had no relationship to what Medicaid
21 pays.
22 Q    So initially, did you have to look at the invoices and
23 try and determine whether they concern Medicaid billings?
24 A    That was one of the things that Mr. Castillo as a
25 threshold matter had to figure out.  We knew that according to

1  Dr. Morse that 95 percent of his practice was Medicaid.
2  Q    What was your understanding of what Mr. Castillo would do
3  once he had isolated the patients who actually were on
4  Medicaid and therefore a bill could have been submitted for
5  their care to the Medicaid program?
6  A    Okay.  What we tried to do was that there was -- just to
7  back up for a second.
8       The vast majority of invoices in terms of the
9  billings related to Design Dental.  And we noticed that the
10 prices that Design Dental charged, at least as they were shown
11 on the invoices, were really, really low.  And for the amount
12 of invoices that we had, I think Mr. Castillo had added all of
13 what was charged to Dr. Morse and it came out to, I don't
14 know, somewhere between 170- and $200,000 over that period of
15 time.
16      But the billings for the denture repairs and all of
17 that was close to $2 million.
18 Q    So was there a reason that you didn't -- or did you think
19 about whether the fraud could be calculated by how much
20 Dr. Morse paid to the labs versus how much Medicaid paid
21 Dr. Morse?
22 A    Well, that's how we tried to do it because, you know, we
23 felt that, you know, that kind of a profit spread in and of
24 itself is not wrong.  As an investigator or a prosecutor,
25 particularly dealing with somebody, that's a lot of money, but

1  in and of itself, that's not enough to prosecute somebody.  If
2  you manage to find the world's cheapest lab, bless your heart.
3  Q    So what did you do to try and account for that profit
4  margin?
5  A    Well, what we needed to do was flatten out the profit
6  margin.  And the way to do that was to take the invoices that
7  we had and simply plug in the amount that Medicaid paid, okay.
8  So if the lab charged $30, as you can see on one of these
9  things, for that patient, and Medicaid paid Dr. Morse $75 -- I
10 mean, the spread could be that much -- we just simply plugged
11 in the 75, okay.
12      And in theory for these invoices in order to -- we
13 were trying to figure out what that profit meant in terms of
14 whether it was fraudulent or whether it was just dumb luck.
15 If you took what Medicaid paid for the services and then
16 substituted those numbers for what Medicaid paid,
17 theoretically those two columns should even out or nearly even
18 out.
19 Q    So can you clarify which two numbers you're comparing.
20 The first number was -- am I right that if you take the
21 billings and you take the amounts that Nu-Life or Design
22 Dental charged and convert those over to Medicaid rates and
23 add all of those up, is that the first figure?
24 A    Exactly.
25 Q    What did you call that?

**JA352**

1  A    I'm not sure I understand your question.

2  Q    Did you call it the ceiling?

3  A    Yes.  What we tried to do was we tried to set a ceiling

4  to determine how much Medicaid could have actually paid the

5  doctor.

6  Q    And then what did you do with the ceiling?

7  A    Well, that's -- from that point on, once you do this

8  analysis, once you use the Medicaid numbers, you'll be able to

9  establish under the best, at least for us, the best case

10 scenario what Dr. Morse could have actually charged.  And that

11 difference, the difference between that ceiling and what

12 Medicaid actually paid him, that to us was the amount of

13 fraud.

14 Q    And what did Medicaid actually pay Dr. Morse in the

15 period you were looking at for denture work?

16 A    It was approximately $1.9 million.

17 Q    Okay.

18 A    As I recall.

19 Q    And do you remember in terms of Mr. Castillo's final

20 calculations, how much the ceiling was?

21 A    I know that there's a document that tells me what that

22 is.  I don't have it in front of me.

23 Q    Okay.  Can you turn to Defendants' Exhibit D.

24 A    I'm sorry?

25 Q    Can you turn to Defendants' Exhibit D.

---

1  A    It's not going to tell me what that is, what the ceiling

2  is.

3  Q    I understand.

4       What is Defendants' Exhibit D?

5  A    These were the invoices that were received from Design

6  Dental.

7  Q    Did you introduce these to the grand jury?

8  A    I'm not sure.  I think I probably did for Mr. Castillo to

9  testify as to what his numbers were.

10      MR. MILLER:  I'd offer Defendants' Exhibit D.

11      THE COURT:  B?

12      MR. MILLER:  D, as in "David."

13      THE COURT:  D.

14      MR. NORINSBERG:  We already have Design Dental in

15 evidence.

16      THE COURT:  Pardon me?

17      MR. NORINSBERG:  I have no objection, but it's

18 already in evidence.

19      THE COURT:  As what?  Obviously another number.

20      MR. NORINSBERG:  I believe it was 92.  I'll

21 double-check it.  Yes, it is 92.

22      THE COURT:  Is there any reason to believe there's

23 any difference between 92 and D?

24      MR. MILLER:  Your Honor, I haven't done the precise

25 comparison, but I have noticed sometimes there are

---

1  differences, and that's why I did it, in other exhibits.

2       THE COURT:  Okay.  D will be received.

3       (Defendants' Exhibit D received in evidence.)

4  Q    Can you look at Defendants' Exhibit E.

5  A    Yes.

6  Q    What is Defendants' Exhibit E?

7  A    These are the invoices we received from Nu-Life Lab.

8       MR. MILLER:  I'd offer Defendants' Exhibit E.

9       MR. NORINSBERG:  Again, they are in evidence but no

10 objection.

11      THE COURT:  All right.  E will be received.

12      (Defendants' Exhibit E received in evidence.)

13 Q    Now, you mentioned there were some issues in analyzing

14 the invoices.  Looking at Defendants' Exhibit E, do you recall

15 what the principal issue was with the Nu-Life invoices?

16 A    There were no procedure descriptions.

17 Q    Do you remember what you decided to do?

18 A    Well, as I mentioned earlier, each procedure is very

19 specific in what it pays.  Depending on what it is, it could

20 be, you know, repair of a tooth or repair of a clasp could pay

21 theoretically 50 bucks.

22      Because we didn't have that, we didn't have a

23 Medicaid number to plug in, so I believe in order to do this,

24 we tried to give the maximum amount that Medicaid would pay.

25 And I believe for Nu-Life we set $600 as the maximum that

---

1  Medicaid would pay.  I mean, we felt that was reasonable

2  because $600 was kind of -- that was at the top end of the

3  procedures that Medicaid paid for.

4       Then I think Mr. Castillo had done that for at least

5  the patients he was able to recognize from the Nu-Life

6  invoices.

7  Q    So even if there was a procedure that cost, say, $75, you

8  would give a $600 credit toward the ceiling when you analyzed

9  the Nu-Life invoices?

10 A    Exactly.  In other words, the way we worked it was that

11 the more you permitted -- or the higher the Medicaid number,

12 the more conservative the number was going to be.  The ceiling

13 would have been much higher because it's coming out of that

14 1.9 million.

15      I know it's complicated, but it's the best I can do

16 to explain it.

17      THE COURT:  Let me just clarify one thing.  I take

18 it, though, the basic assumption was if there was not a

19 Nu-Life invoice or a Design Dental invoice backing up

20 something, the assumption was it wasn't done; is that correct?

21      THE WITNESS:  Not initially.  We went back and forth

22 on that question a lot.

23      THE COURT:  But ultimately, is that the decision

24 that you reached?

25      THE WITNESS:  I believe ultimately that was the

**JA353**

1  decision.
2         THE COURT:  When you got to the million figure?
3         THE WITNESS:  It was one of the ways, I believe that
4  -- it was a big decision, but I believe that we had come to
5  that conclusion.
6  Q   Why did you come to that conclusion?
7  A   Well, as I said -- and I know there's been a lot of
8  questions about, you know, talking to Jose or whatever -- but
9  the way the process worked was that -- I'll give you an
10 example.  If you can go to D just as an illustration.
11 Q   What page are you referring to?
12 A   Any one of those pages.  The first page is a good one to
13 look at.
14        This was a work in progress because if you had the
15 invoice, the column that says "Amount" is what the lab in this
16 particular case, Design charged Dr. Morse.  And that number
17 next to it, that 800 for whatever that procedure Jose was able
18 to identify, Medicaid, we assumed that was the procedure, we
19 gave Dr. Morse credit for $800 because that's what Medicaid
20 would have paid.
21        This was a way to get the two numbers to, you know,
22 if there was no taking the profit margin out, the two numbers
23 should have somehow balanced.
24 Q   So in the first line that we're looking at here,
25 procedure cost Dr. Morse $140; is that correct?

1  A   Yes.
2  Q   And in your analysis, you were analyzing that and saying
3  that Dr. Morse could have been paid up to $800 for that?
4  A   Yeah, basically, yes.
5  Q   And is that how you went about calculating the ceiling?
6  A   Correct.  Because as I said, this lab in particular was
7  charging Dr. Morse what seemed to be an unnaturally low price.
8  Just as a general rule, Medicaid doesn't pay a lot which is
9  why you don't have a lot of providers here.  It seemed like a
10 lot of very little amount of money.
11 Q   Now, for the months where there were no invoices, did you
12 ever conduct an analysis of -- that tried to give Dr. Morse
13 credit even though there were no invoices for a particular
14 month?
15 A   I believe we did.  As I said, this was a process that had
16 a lot of subjective judgments to it.
17 Q   Do you remember what that analysis showed?
18 A   I do not, no.  I know it was done.  I don't have that
19 number in front of me.
20 Q   I'm handing you Plaintiff's Exhibit 4 which is in
21 evidence.
22 A   Thank you.
23 Q   Can you look at the second page of this exhibit, the one
24 that has a deposition sticker on it, Plaintiff's Exhibit 17.
25 A   Yes, I see.

1  Q   You see the area at the bottom?  First of all, what's
2  this line here if you look at the document, "Total for dental
3  lab work from 2000 to 2002"?
4  A   That's the amount of money that Medicaid paid Dr. Morse.
5  Q   And then what's the following line, "Total from invoices
6  Nu-Life Lab"?
7  A   Using the process I just described about setting the
8  ceiling, I believe that's the amount that we were able
9  to -- that's the ceiling for the Nu-Life Lab number.  In other
10 words, for what we were able to identify that was Medicaid, if
11 any for Nu-Life, the ceiling that was derived at was $86,400.
12        THE COURT:  Was that using the higher Medicaid
13 number?
14        THE WITNESS:  Yes, your Honor.
15        THE COURT:  Okay.
16 Q   And then the line after that says, "Total from invoices
17 Design Dental Lab," right?
18 A   Yes.
19 Q   And what figure is that?
20 A   That's 733,263.
21 Q   So is that the total amount that Dr. Morse could have
22 been paid based on Mr. Castillo's analysis of the Design
23 Dental invoices that he had?
24 A   Yes.  That's the ceiling for Design Dental.
25 Q   And then what's the line that follows that, "Total

1  dollars for the 8 missing months"?
2  A   That appears to be the ceiling or, again, we didn't have
3  any information so we had to set I think some kind of a number
4  for that.
5  Q   Was that in an attempt to give some credit for the
6  missing months?
7  A   I think it was, yes.
8  Q   Okay.  And then the next line is "Total dollars for the 3
9  missing months," right?
10 A   Yes.
11 Q   Was that an attempt to also give credit for missing
12 months?
13 A   Yes.
14 Q   And in this analysis, the 1.9 million is reduced by all
15 the following lines, correct?
16 A   Correct.
17 Q   Okay.  So under this analysis where Dr. Morse would get
18 credit for at least 11 of those missing months, what was the
19 total difference between the ceiling and the amount he was
20 paid by Medicaid?
21 A   $744,000.
22 Q   So under this analysis, you felt that even if you gave
23 Dr. Morse credit for 11 of the missing invoices, that the
24 fraud still would have been $744,000?
25        THE COURT:  You mean 11 months, right?

1    MR. MILLER: 11 months. I'm sorry.
2  A   Yes.
3        THE COURT: Is that amount of fraud still a felony?
4        THE WITNESS: Oh, yes. It's grand larceny in the
5  second degree. Not a problem, but the sort of quirk is to go
6  from grand larceny in the second degree, which is a C Felony,
7  that has to be a theft of $50,000 or more. The next level is
8  a B Felony, which is, as I recall, the million dollars.
9        So between a C Felony and a B Felony, there is a
10 spread of $950,000. So despite the fact that this is a lot of
11 money, it still would have been in the C Felony range because
12 it falls within that.
13       THE COURT: In determining the missing months and
14 putting a number on the missing months, how did you do that?
15 Did you use an average from the months that you had invoices?
16       THE WITNESS: I'm not sure. I think Mr. Castillo
17 probably would have been able to answer that. I don't recall.
18 I know that we did provide some level. I mean, you know, we
19 had to be reasonable about it. We just didn't have any
20 records for it.
21 Q   In your working with Mr. Castillo on this analysis, what
22 was your general guidance of how to approach decisions in
23 connection with invoices?
24 A   There were many discussions about what procedure to give
25 Dr. Morse credit for. I had mentioned to Jose Castillo a

1  number of times, try to be as conservative as we can, meaning,
2  give him as much credit as we reasonably can. We don't want
3  to be foolish. You're not going to give, you know, $600
4  credit for something that, you know, Medicaid really paid, you
5  know, $70 more.
6        But we want to be as reasonable as possible and had
7  the Medicaid price as closely correlated with what was written
8  on the invoice. That's why the numbers kept changing. There
9  was also -- in the course of doing this, it really was very
10 time consuming and painstaking. We didn't have a lot to work
11 with. There were annual price changes that Medicaid paid on
12 the procedure so we often had to go back and recalculate that
13 again.
14       So it was working with what we had and, you know,
15 again, there were a lot of subjective decisions. It was not
16 these are the numbers and that's the end of it.
17 Q   In what time period, generally speaking, did Mr. Castillo
18 conduct his analysis?
19 A   Much has been made of, you know, we didn't do this and we
20 didn't do that. This has been sort of the work of the
21 Attorney General's Office. You have other cases. Sometimes
22 -- you know, Jose is not going to do this day after day after
23 day. He is going to work on something else. As will I. Long
24 periods of time can go by where he'll get around to it again.
25 Q   Well, roughly, though, when was he working on this, what

1  years?
2  A   My assumption is sometime after he was assigned to it in
3  2004 sometime until the end of 2005. So for about that
4  year and a half. We would go back and forth.
5  Q   Do you remember when you had a pretty good idea that the
6  analysis was complete or near complete?
7  A   It was -- you know, we had gotten to the point towards
8  the end of 2005 that we were going to go to the grand jury.
9  There was just no avoiding it. And probably as we were
10 approaching the end of 2005, we were making additional
11 decisions about what to add, perhaps what to give credit for.
12 And ultimately sometime at the end of 2005, we were pretty
13 comfortable as a group with the $1.1 million that we arrived
14 at.
15 Q   Can you look at Plaintiff's Exhibit 53 again. This is
16 your six-month status report, correct?
17 A   Yeah.
18 Q   Do you see in the top paragraph on the page numbered
19 SDE-69 in the second-to-last sentence where it says, "Records
20 from labs compared and analyzed with billings completed in
21 October 2005"?
22       Do you see that?
23 A   I'm sorry. Point that out to me.
24 Q   The top paragraph here (indicating).
25 A   I'm sorry. "Records from labs compared and analyzed with

1  billings completed in October 2005." Yeah.
2  Q   Is that consistent or inconsistent with your recollection
3  of when you had a pretty good idea that the analysis was
4  complete or nearly complete?
5  A   It was nearly complete.
6  Q   Was there additional work on the analysis after that
7  time?
8  A   Well, I see here that we went back to the lab in November
9  2005 on final documents confirming overbilling by Morse. I
10 think that, as I recall, as we were putting the final touches
11 on what we had, I think we wanted to go back and double-check
12 the lab and see if they had anything else that could have
13 helped us with it.
14 Q   And who did you ask to go check -- who did you ask to go
15 find out if there was more relevant information from the lab?
16 A   Investigator Flynn. He was the investigator so I would
17 have sent him out.
18 Q   Now, in the end, you believed that the theft by Dr. Morse
19 was over a million dollars; is that right?
20 A   Yes.
21 Q   And what charge did you bring based on that analysis in
22 this case?
23 A   Grand larceny in the first degree.
24 Q   And as I think you explained before, the threshold for
25 that is what in dollar terms?

**JA355**

1    A    Okay.  In New York State, larceny levels of felony are
2    dollar dependent so that one is a million dollars.  In other
3    words, there has to be a theft of a million dollars or more.
4    It could be a million, it could be 50 million.  Doesn't
5    matter.  But that's what it is.
6    Q    Did you pursue other charges in this case?
7    A    Well, yes.
8    Q    What were they?
9    A    Those were filing false instruments.  I don't have
10   the -- if I had the indictment in front of me, I could read it
11   per se.
12   Q    You mentioned a false instrument.  What's a false
13   instrument?
14   A    Well, when you -- the ordinary -- whenever we've had a
15   fraud case and we indict for grand larceny, that's the normal
16   charge for fraud.  That's always the main charge.
17        What tends to follow the charges are what's called,
18   you know, the false filing charges.  And those are dependent
19   upon patient testimony or patients, okay, because what that
20   means is that you have to identify -- according to the
21   statute, you have to identify a couple of things.  One is you
22   need to identify the instrument that was used to defraud and
23   also the date that it was submitted.
24   Q    Okay.  Let's back up.
25   A    Sure.

1    Q    In terms of an instrument, what was the instrument in
2    this case?
3    A    Well, that would be Dr. Morse's submission of his bills.
4    I understand that he bills electronically, but it doesn't
5    matter whether it's electronic or by paper.
6    Q    Okay.  And the basis for this charge was largely what?
7    A    From what patients say.
8    Q    And in the course of your investigation, who collected
9    most of the evidence to support these charges?
10   A    I'm not sure I understand what you mean.  It's very
11   simple.
12   Q    Who talked to the patients?
13   A    Well, the way the case comes or at least it was presented
14   to me is I believe that there were in-mouths done.  In-mouths
15   to me are of limited utility for any of those reasons.
16        But all those patients were interviewed.  Some said
17   they had dentures, some said they didn't, but I don't recall
18   which ones.  But there were a group of patients that were
19   interviewed by Mr. Flynn and I think another group of patients
20   separately from the in-mouths that had been interviewed that
21   indicated to me or indicated through these interviews that
22   they did not either wear dentures, partial dentures, things of
23   those nature, and didn't have them repaired.  Because a lot of
24   the billings are not just for the dentures, but a lot of it is
25   for the repairs.

1    Q    Let's talk about the timing of when you got this
2    information.  Can you look at Defendants' Exhibit X.
3    A    Okay.
4    Q    We looked at this this morning, and this is what docket?
5    A    Right.  These interviews were conducted in September of
6    2003.
7    Q    And these are the interviews that Investigator Flynn
8    talked about this morning, correct?
9    A    Right.
10   Q    And he sent you this memo because you were the attorney
11   leading the case, right?
12   A    Right.
13   Q    Can you look at Defendants' Exhibit Y.
14   A    It's another memo indicating or recounting what the
15   patients said --
16   Q    Hold on.  Can you explain what this is.
17   A    It's another memo from Investigator Flynn recounting what
18   the patients said to him.
19        MR. MILLER:  Okay.  Your Honor, I don't think I
20   offered this one at the end of Mr. Flynn's testimony so I'd
21   offer Defendants' Exhibit Y at this time.
22        MR. NORINSBERG:  No objection.
23        THE COURT:  Y is received.
24        (Defendants' Exhibit Y received in evidence.)
25   Q    This is a memo from what date?

1    A    September 23rd, 2003.
2    Q    And Mr. Flynn sent it to you?
3    A    Yeah.
4    Q    Okay.  Can you just read what he told you through his
5    memo about his conversation with Sawson Suliman.
6    A    "She states that she went to Dr. Morse about nine months
7    ago.  She states that she had a tooth pulled.  Never had any
8    denture work done."
9    Q    And then did Investigator Flynn do some interviews later
10   on in the case?
11   A    I believe he did, yeah.
12   Q    Okay.  Can you look at Defendants' Exhibit AB.
13   A    Okay.
14   Q    And what is Defendants' AB?
15   A    It looks like another interview by -- of a 580 patient.
16   Q    Okay.  And which patient is this?
17   A    Asi Othman.
18   Q    Was he one of the people who testified in the grand jury?
19   A    I think so.
20   Q    And then looking back at Defendants' Exhibit Y.
21   A    Yes.
22   Q    There's a reference to Sawson Suliman and Intisar Ahiri.
23   A    Yes.
24   Q    Were they grand jury witnesses?
25   A    I believe they were, yes.

**JA356**

1  Q    And then on the second page of Defendants' Exhibit Y,
2  there's also a reference to Nassa Ahiri.
3  A    Yes.
4  Q    And was that person a grand jury witness as well?
5  A    Yes, as I recall.
6  Q    And then looking back at Defendants' Exhibit X.
7  A    Yes.
8  Q    There's a reference here to Miriam Perez, correct?
9  A    Yes.
10 Q    Was she a grand jury witness?
11 A    She was.
12 Q    And there's a reference to Edwin Gonzalez as well?
13 A    Yes.
14 Q    Was he a grand jury witness?
15 A    Yes.
16 Q    So is it your understanding that Investigator Flynn had
17 finished most of his interviews sometime in 2005?
18 A    Looked like he did the bulk of it in 2003.  Looks like
19 there was an additional one in 2005.
20 Q    Now, did you personally review the patient charts in this
21 case?
22 A    Do I?  No.
23 Q    Did you have Dr. DeLuca review patient charts in this
24 case?
25 A    I may have.  If I did, it was just a handful of them.

1  Q    Right.
2  A    I can explain why.
3  Q    Why did you only have her review a handful of charts?
4  A    Well, again, you know, we do dental cases.  We do other
5  cases.  It may sound counterintuitive, but the reality is
6  we're looking at a fraud case in terms of how to quantify
7  things, how to quantify if there is a theft, how much it is.
8  That's really what we're looking at.
9        Patient charts in my experience at the Attorney
10 General's Office, and most of my colleagues, is that patient
11 charts almost inevitably match the billings.  So by looking at
12 the patient charts, you can see all the things that a
13 proprietor says they did.  And the reason is because most
14 providers simply bill off of that chart.
15       So the fact that something's notated in the chart by
16 the provider is really of no value to me because anybody can
17 write in the chart.  And because the billings inevitably
18 match, it wasn't of quite consequence to me.
19       I assumed Dr. Morse's billings matched his charts.
20 And the reason is because it's proof of nothing to me; that's
21 why.  Our concern is not what's in the charts, it's what's
22 billed and paid to the provider.  That's really our focus.
23 Q    Okay.  And so in the grand jury, you had witnesses
24 testify who were Medicaid recipients, right?
25 A    Correct.

1  Q    And they testified about the services they did receive or
2  didn't receive from Dr. Morse?
3  A    They did.
4  Q    And then did you need any evidence from Dr. Morse to help
5  with your false filing case?
6  A    I don't understand what your question is.
7  Q    Well, when Investigator Flynn went and talked to
8  Dr. Morse, he talked about billing procedures, right?
9  A    Yes.
10 Q    Was that important to your false filing case?
11 A    Yes.
12 Q    Why was it important?
13 A    Because according to Dr. Morse's statements, he does the
14 billings.  It's really just that simple.
15 Q    And then what evidence did you put in about the claims
16 that Dr. Morse had filed?
17 A    We put in the -- we called someone from the Department of
18 Health.  Is that what you're referring to?
19 Q    Yeah.  Who was that?
20 A    Mr. Aharonyan.  In a normal Medicaid or one of our
21 presentations, the documentation that's essential in order for
22 evidentiary purposes is what's called the provider profile,
23 okay.  And the provider profile, it's filled with huge
24 electronic stored documents.  And it's for everybody in
25 Medicaid who bills.

1        They often come down in two or three very large
2  books.  And someone has to identify from the Department of
3  Health that these are the billed and paid claims to the
4  provider in question, in this case, Dr. Morse.
5  Q    And did Mr. Aharonyan testify about those in the grand
6  jury?
7  A    Yes, of course he did.
8  Q    And did he put them into evidence?
9  A    Yes.
10 Q    And did this have -- I'll withdraw that.
11       And the provider profile has claims from Dr. Morse,
12 correct?
13 A    Every claim ever submitted for the period of time that we
14 were looking for.
15 Q    Okay.  So when would you say you made the decision that
16 you were going to seek an indictment of Dr. Morse?
17 A    Late 2005 when we were -- we had gone back and forth
18 enough about the numbers with Mr. Castillo.  And once we were
19 comfortable with that, it was ready to go.  I mean, the
20 reality is I could have gone in long before just simply on
21 patient testimony, but you don't really make a fraud case
22 really with just patient testimony.  It wasn't really the
23 focus here.
24 Q    Why do you say that?
25 A    Well, for any number of reasons.  I mean, you have

1  statutory elements of the amount of fraud that you're
2  alleging.  And in this particular case, the amount of fraud to
3  us seemed massive, in excess of a million dollars.  To build a
4  fraud case you need to -- by patients, you'd have to have
5  literally hundreds of them come in and say they didn't get
6  this, they didn't get that, and then somehow figure out what
7  they got and what they didn't get.
8       To build a fraud case of any kind of significance or
9  to get an idea of how much money we're talking about, you
10  can't rely on patient testimony.  It can't be done.  It can't
11  be done on charts.  It can't be done --
12  Q    You mean, in terms of showing a large larceny?
13  A    In terms of showing not just a large larceny, but to show
14  a reasonable calculation of what the larceny is.
15  Q    Right.  To capture the full extent of the fraud?
16  A    Exactly.
17  Q    Why don't you look at Defendants' Exhibit AM which is in
18  evidence.
19       You see in the top e-mail from you to Investigator
20  Flynn, you say, "580 goes to grand jury in early February"?
21  A    Yes.
22  Q    You're referring to the case against 580 Dental and
23  Dr. Morse?
24  A    Yes.
25  Q    This is an e-mail from January 3rd, 2006, right?

---

1  A    Yes.
2  Q    Would you say you had decided to seek an indictment at
3  around this time or sometime prior to that?
4  A    By reading that e-mail, I do remember that I did have a
5  matter that was of some concern in Queens.  I'm certain that
6  we had reached the conclusion to go to the grand jury sometime
7  in late -- probably late December, early December, whatever.
8  We just -- there was a logistical matter at that point.
9  Q    Can you look at Defendants' Exhibit F.
10  A    Okay.
11  Q    Can you describe this document.
12  A    Looks like the patient profile of a recipient Sawson
13  Suliman.  Is that what I'm looking at?
14  Q    Well, there are a number of them, right?  How many are
15  there?
16  A    Eight.
17  Q    Do you recognize this as Grand Jury Exhibit 11?
18  A    Yes.
19       MR. MILLER:  Your Honor, I'd offer into evidence
20  Defendants' Exhibit F.
21       MR. NORINSBERG:  Once again, it's in evidence but I
22  have no problem.  No objection.
23       THE COURT:  I take it it's the same document as 133?
24       MR. NORINSBERG:  That's correct, your Honor.
25       MR. MILLER:  Just a better copy.

---

1       THE COURT:  All right.  It will be received.
2       (Defendants' Exhibit F received in evidence.)
3  Q    And can you look at Defendants' Exhibit F.
4  A    I see it.
5  Q    Okay.  And can you explain or describe what's in this
6  document.
7  A    Patient profiles of patients testifying in the grand
8  jury.
9  Q    Okay.  And do you recognize this as Grand Jury Exhibit 7?
10  A    Yes.
11       MR. MILLER:  Your Honor, I'd offer Defendants'
12  Exhibit F.
13       THE COURT:  You're referring to these as patient
14  profiles?
15       THE WITNESS:  They're the -- the billings that
16  Dr. Morse billed, was paid for for the patients who testified
17  at the grand jury.
18       THE COURT:  All right.  I'll receive this.
19  Q    Now, you used both Defendants' Exhibit F and S in the
20  grand jury, correct?
21  A    I did.
22  Q    Do you remember who prepared these documents?
23  A    These would have come from Mr. Castillo.
24  Q    Do you remember when you asked him to prepare them?
25  A    Around the time I was going to the grand jury.

---

1  Q    Can you be any more precise than that?
2  A    I couldn't give you a date.  I know that they were done,
3  by looking at them, for the grand jury.  The reason being is
4  because I know what I needed on the fields.
5  Q    Okay.  Now, how many patients are referred to in
6  Plaintiff's Exhibit F?
7  A    I think eight.
8  Q    Okay.  Is there an overlap between the patients in
9  Defendants' Exhibit F and Defendants' Exhibit S?
10  A    Is your question are there -- yeah, there is an overlap.
11  Q    Okay.  How many of the patients in Defendants' Exhibit S,
12  which is Grand Jury 7, are also in Defendants' Exhibit F,
13  Grand Jury 11?
14  A    I think six.
15  Q    And then there are two additional patient spreadsheets in
16  Defendants' Exhibit F?
17  A    I think the two that were in 11 are Edwin Gonzalez and
18  Miriam Perez.
19       THE COURT:  That are not in 7?
20       THE WITNESS:  Yes.  As far as I could see, they were
21  not in 7.
22  Q    So in terms of patient names, does that mean the overlap
23  is for Sawson Suliman, Intisar Ahiri, Nassa Ahiri, Sara
24  Charles, Stacy Rodriguez and Asi Othman?
25  A    That's what it appears to be.

**JA358**

1   Q   So starting from the left-hand side, which is Defendants'
2   Exhibit F, can you explain what the columns here are.
3   A   Well, the first one is CIN number.  That's the patient's
4   Medicaid number, I think.  Whatever that number is is the
5   identifier that they're a Medicaid recipient.  Obviously, last
6   name, first name.
7           Amount paid is the amount paid for the -- it's all
8   line items; the amount paid for whatever services there.  The
9   date of service is the date that it was purportedly done.  The
10  invoice number is every claims submission has this invoice
11  number.  That's how you identify what the invoice is that was
12  submitted for payment.
13  Q   Okay.
14  A   The Julian date, that's an auditor thing.  I never really
15  understood what they were talking about, but apparently that's
16  the date that the document was submitted.  There's a
17  difference between the date the service was supposed to be
18  provided and the date that it was submitted is often a
19  different date.
20          That's important.  Those two columns are important
21  really for the false filing.  That and the amount paid.
22          THE COURT:  Did you direct Castillo to produce these
23  documents, in other words, to search these fields and come up
24  with this document?  Did you ask him to do that?
25          THE WITNESS:  Yeah.

1           THE COURT:  You say that you remember it was around
2   the time you were going into the grand jury.
3           THE WITNESS:  It would have been knowing that these
4   are the patients who were testifying.  And ordinarily I
5   wouldn't consider what the invoice number was or the Julian
6   date, but that's telling me that this was done for the
7   purposes of the false filing charges because those are really
8   the important items here.
9           THE COURT:  So you asked that these documents be
10  produced for the grand jury in connection with the false
11  filing charges?
12          THE WITNESS:  Yes.  Certainly in anticipation of the
13  patient's testimony so it would have been done for that
14  reason.
15  Q   And you mentioned the invoice number.  Why is the invoice
16  number important to your false filing charge?
17  A   Well, that's how you identify the invoice.  If I can see
18  a copy of the indictment, I can explain it a little better.
19  Q   Sure.  Look at Defendants' Exhibit I.
20          Before you start talking about it, what is
21  Defendants' Exhibit I?
22  A   This is the indictment.
23  Q   The indictment against Dr. Morse?
24  A   Dr. Morse, yes.
25          MR. MILLER:  Your Honor, I'd offer Defendants'

1   Exhibit I.
2           THE COURT:  It will be received.
3           (Defendants' Exhibit I received in evidence.)
4           THE COURT:  You know, at this time I'm going to
5   conclude just a bit earlier than we have in the past given
6   that you didn't have a break this afternoon so we went a bit
7   longer.  Generally, we're going to go to 5:00, but I have to
8   conclude earlier today.
9           So we'll begin at 9:30 tomorrow morning.  Please
10  don't discuss the case, and I'll see everyone in the morning.
11          (Jurors exit the courtroom.)
12          THE COURT:  We'll begin tomorrow morning at 9:30.
13  How much longer do you think you'll be of this witness?
14          MR. MILLER:  It's still a bit more, your Honor.
15  Another hour and a half.
16          THE COURT:  And then what?
17          MR. NORINSBERG:  We're going to put Dr. Morse on.
18  We have two economists in the afternoon so I don't know how
19  all this is going to happen.
20          THE COURT:  I think you should ask fewer questions.
21          MR. NORINSBERG:  Your Honor, could I raise an issue
22  I'd like to raise concerning testimony that we just heard?
23          THE COURT:  If you'd like to raise it, we'll begin
24  at 9:00 tomorrow morning so I'll ask the court reporter to
25  come in at 9:00 and ask the lawyers to come in at 9:00.  I

1   can't do anything now.
2           (Time noted:  4:31 p.m.)
3           (Proceedings adjourned until Thursday, February 7,
4   2013, at 9:00 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JA359**

736

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ROBERT FLYNN
By Mr. Norinsberg   484          585
By Mr. Miller                551          590

LINDA DELUCA
By Mr. Norinsberg   598          667
By Mr. Farber        663

JOHN FUSTO
By Mr. Miller        680

EXHIBITS

| PLAINTIFF: | PAGE |
|---|---|
| 45 | 551 |
| 46 | 690 |
| 74 | 698 |
| 75 | 698 |
| 90 | 550 |
| 94 | 532 |
| 146 | 622 |

Lisa Schwam, RPR, CRR, RMR
Official Court Reporter

737

EXHIBITS (CONTINUED)

| DEFENDANTS: | PAGE |
|---|---|
| AB | 593 |
| AD | 583 |
| AE | 581 |
| AF | 552 |
| AG | 552 |
| AI | 555 |
| AK | 556 |
| AM | 558 |
| AR | 581 |
| AQ | 584 |
| AU | 639 |
| AV | 648 |
| AW | 648 |
| C-3 | 668 |
| D | 710 |
| E | 710 |
| F | 730 |
| I | 734 |
| V | 576 |
| X | 590 |
| Y | 722 |

Lisa Schwam, RPR, CRR, RMR
Official Court Reporter

1

$

$140 [1] - 712:25
$200,000 [1] - 706:14
$30 [1] - 710:7
$50,000 [1] - 716:7
$600 [6] - 710:25, 711:2, 711:8, 717:3
$70 [1] - 717:5
$744,000 [2] - 715:21, 715:24
$75 [2] - 717:9, 711:7
$800 [2] - 712:19, 713:3
$86,400 [1] - 714:11
$950,000 [1] - 716:10

'

'91 [1] - 620:22
'94 [2] - 650:10, 677:6
'99 [1] - 650:11

0

00849 [1] - 649:21
07-CV-4793(CBA) [1] - 476:3

1

1 [75] - 559:15, 559:19, 561:1, 561:3, 561:9, 661:2, 661:13, 661:14, 661:17, 696:24
1.1 [1] - 718:13
1.3 [4] - 708:16, 711:14, 715:14
1.6 [1] - 610:17
100 [3] - 547:15, 547:21, 701:6
10007 [1] - 476:14
101 [1] - 490:25
10271-007 [1] - 476:17
1.1 [2] - 504:2, 504:5, 654:17, 655:5, 715:18, 715:23, 715:25, 716:1, 729:17, 731:13, 731:17
116-page [1] - 477:10
1st [1] - 663:7, 663:13, 668:2
12 [8] - 492:11, 492:16, 493:22, 494:11, 494:14, 501:16, 522:13, 617:3
120 [1] - 476:17
121 [2] - 524:14, 554:9
12:00 [1] - 558:10
12th [2] - 476:17, 663:17
13 [3] - 495:2, 515:14, 660:19, 661:7
133 [2] - 613:11, 729:23
13th [1] - 519:7
14 [2] - 492:10, 542:19
141 [1] - 543:1
142 [2] - 544:22, 545:9
144 [1] - 546:2
146 [4] - 621:20, 622:3, 622:4, 736:24
14th [2] - 663:2, 663:6
15 [4] - 542:12, 542:15, 599:20, 617:3
15x [1] - 514:16
157 [1] - 515:14

159 [1] - 520:12, 520:16
16 [2] - 544:22, 665:3
169 [1] - 516:9
16th [2] - 584:10, 663:13
17 [2] - 639:17, 713:24
170 [1] - 706:14
175 [1] - 522:13
179 [1] - 518:12
17th [2] - 583:21, 650:11, 677:7
18 [2] - 546:2, 639:18
18th [2] - 525:5, 543:11, 554:13, 555:15, 573:7, 591:10, 698:4
19 [2] - 639:18, 655:6
1982 [1] - 635:2
1983 [1] - 680:23
1986 [1] - 681:2
1991 [2] - 634:1, 634:4
1992 [1] - 635:2
1993 [2] - 620:21, 682:23
1994 [4] - 620:19, 620:23, 635:11, 635:17
1995 [1] - 649:21
1997 [3] - 543:17, 543:22, 543:25, 544:20, 544:25
1998 [3] - 543:17, 543:22, 543:25, 544:20, 544:25
1999 [7] - 593:9, 593:10, 593:12, 665:8, 677:7, 682:23
19th [2] - 530:14, 655:12, 660:20, 665:8, 677:7
1:00 [1] - 630:24
1st [4] - 499:2, 661:12, 661:18, 661:19, 661:24

2

2 [22] - 480:13, 706:17
2,000 [1] - 479:16
20 [5] - 543:1, 577:13, 605:5
20-22 [1] - 577:19
2000 [45] - 485:22, 545:11, 553:15, 554:10, 655:8, 655:12, 661:2, 661:4, 661:12, 661:13, 661:15, 661:17, 661:20, 663:2, 663:8, 663:17, 663:13, 665:6, 665:20, 665:10, 677:7, 701:18, 701:19, 701:25, 729:11, 707:11, 707:18, 714:3
2000-2002 [1] - 560:18
2001 [8] - 659:3, 560:8, 545:22, 663:19, 701:14
2002 [43] - 478:10, 480:24, 487:3, 487:4, 487:23, 488:11, 490:14, 492:5, 495:21, 496:9, 496:17, 496:24, 498:2, 499:1, 499:2, 499:4, 517:12, 517:15, 530:14, 532:19, 545:5, 545:7, 545:11, 552:3, 552:25, 554:11, 554:13, 575:24, 585:9, 663:17, 666:2, 689:16, 690:3, 694:18, 697:3, 698:4, 714:1, 714:3
2003 [35] - 478:10, 480:8, 480:24, 484:13, 517:15, 519:1, 519:7, 519:13,

519:17, 525:5, 534:1, 534:14, 534:17, 534:22, 535:3, 538:12, 543:11, 543:13, 543:16, 545:17, 567:2, 573:7, 573:17, 591:10, 593:8, 595:13, 595:18, 643:21, 697:3, 697:7, 698:13, 699:9, 722:6, 723:1, 724:18
2004 [32] - 491:14, 491:19, 492:1, 496:15, 497:20, 497:24, 498:3, 499:5, 499:8, 499:16, 499:25, 500:3, 500:8, 500:14, 501:23, 502:1, 517:10, 517:20, 517:23, 518:1, 518:5, 519:21, 519:22, 551:22, 555:15, 556:21, 586:25, 587:5, 700:17, 700:21, 701:21, 718:3
2005 [26] - 480:9, 496:17, 501:9, 502:9, 502:19, 503:1, 503:8, 505:5, 505:16, 510:24, 517:10, 518:9, 518:10, 518:15, 519:2, 519:7, 519:13, 519:18, 519:25, 549:11, 550:15, 574:17, 580:2, 581:3, 643:22, 718:3, 718:10, 718:12, 718:21, 719:1, 719:9, 724:12, 724:19, 727:17
2006 [20] - 492:5, 496:19, 502:3, 517:10, 517:12, 517:17, 519:23, 520:1, 544:9, 544:13, 544:17, 544:20, 544:25, 585:7, 587:14, 720:19, 720:25, 720:20, 726:13, 735:4
20s [6] - 564:12, 575:6, 575:10, 575:12, 575:13
21 [1] - 491:9, 524:14, 545:9, 593:12, 616:5
2007 [1] - 688:15
2012 [1] - 485:23
2013 [1] - 476:17, 485:23, 625:24, 625:25, 630:11, 644:2, 735:4
20s [6] - 564:12, 575:6, 575:10, 575:12, 575:13
22 [1] - 497:20
22S [1] - 476:14
22nd [6] - 490:14, 497:24, 498:3, 499:1, 504:25, 519:1, 519:7, 534:1, 535:3, 538:12, 549:11
23 [1] - 610:17
230 [1] - 490:2
23rd [2] - 573:17, 723:1
24 [1] - 506:12
24th [6] - 503:1, 505:5, 580:1, 661:4, 580:20, 589:16, 661:20, 661:16, 661:18, 661:19, 665:6, 665:10, 677:6, 714:3
25 [2] - 516:9, 542:10, 542:12, 560:13, 665:21, 665:25, 644:23, 735:4
25th [2] - 663:8, 665:10
26th [1] - 663:17
27 [1] - 552:3
28 [1] - 500:7, 500:13, 501:23, 502:1, 556:21
29th [1] - 553:17
2nd [2] - 574:17, 659:5

2

Lisa Schwam, RPR, CRR, RMR
Official Court Reporter

**JA360**

2

3

3 [4] - 480:13, 715:8
3-8-06 [1] - 614:6
3/19/1999 [1] - 677:8
3/19/99 [3] - 650:8, 650:11, 650:13, 698:13
30 [1] - 510:16
317 [2] - 492:13, 497:6
31st [1] - 485:23
32 [1] - 639:24
326 [2] - 478:10, 480:23
329 [10] - 491:4, 491:7, 491:15, 491:18, 491:25, 492:7, 492:8, 492:11, 492:13, 497:6, 542:6, 542:13
33rd [1] - 554:10
3rd [2] - 558:20, 728:25

4

4 [5] - 486:10, 518:9, 524:14
4/24/01 [1] - 650:8
4/24/04 [6] - 613:9, 650:8, 613:11, 613:14, 649:4, 650:24, 651:6, 652:8, 654:18, 654:19, 655:25, 660:24, 664:8, 666:18
45 [5] - 550:15, 551:10, 551:14, 736:18
46 [1] - 689:21, 690:4, 690:6, 690:10, 736:19
47 [1] - 670:1, 671:14
484 [1] - 736:5
49 [1] - 672:22, 673:3
4:31 [1] - 735:2
4th [2] - 610:11, 651:16

5

5 [4] - 500:6, 519:4, 520:12, 615:9
5,000-page [1] - 620:7
50 [1] - 578:19
53 [4] - 696:17, 700:13, 700:14, 718:15
532 [1] - 736:23
551 [4] - 550:8, 551:8, 553:1, 736:18, 736:22
555 [1] - 737:8
556 [1] - 737:9
558 [1] - 737:10
576 [1] - 737:21
580 [21] - 497:1, 508:22, 508:23, 532:19, 553:13, 553:14, 554:9, 558:15, 558:22, 558:25, 559:5, 560:22, 561:21, 563:23, 577:4, 580:7, 690:1, 690:21, 691:1, 695:10, 695:17, 700:19, 722:15, 728:22, 728:22
581 [2] - 737:5, 737:11
583 [1] - 737:4
584 [1] - 737:12
585 [1] - 736:5

590 [2] - 736:6, 737:22
593 [1] - 737:3
598 [1] - 736:9
5:00 [1] - 734:7
5:33 [3] - 532:19, 553:14, 577:4, 690:3, 698:13

6

6 [3] - 476:7, 482:16, 615:14
6/4/2003 [1] - 651:21
613-2260 [1] - 476:22
613-2389 [1] - 476:22
622 [1] - 736:24
63 [1] - 736:9
64 [1] - 737:13
663 [1] - 737:14, 737:15
663 [1] - 736:10
667 [1] - 736:9
668 [1] - 737:16
680 [1] - 736:20, 736:21
689 [1] - 736:19
690 [1] - 736:19
698 [2] - 736:20, 736:21

7

7 [4] - 477:6, 610:13, 612:13, 612:18, 612:20, 613:14, 614:4, 614:6, 645:20, 661:10, 730:9, 731:12, 731:19, 731:21, 735:3
710 [1] - 737:17, 737:18
718 [2] - 476:22, 476:22
722 [1] - 737:23
724 [1] - 579:15
73 [1] - 487:10
730 [1] - 737:19
733,263 [1] - 714:20
734 [1] - 737:20
74 [2] - 697:9, 698:1, 698:7, 698:8
75 [2] - 697:9, 698:1, 698:7, 698:8, 698:20, 707:11, 736:21
78 [1] - 615:5
7th [1] - 665:16

8

8 [4] - 514:16, 520:16, 614:3, 715:1
800 [1] - 712:17
82 [1] - 540:2
84 [1] - 615:6
89 [1] - 491:17

9

9 [5] - 491:17, 577:14
9-22-03 [1] - 551:3
9/11 [5] - 562:4, 562:6, 562:14, 690:16
90 [5] - 519:4, 549:8, 549:24, 549:25, 550:2, 550:3, 736:22

92 [4] - 709:20, 709:21, 709:23, 736:23
94 [6] - 531:23, 532:9, 532:12, 532:13, 736:23
95 [4] - 546:25, 547:4, 576:25, 706:1
9:40 [1] - 524:21
9:00 [5] - 476:8, 734:24, 734:25, 735:4
9:13 [1] - 483:25
9:30 [2] - 734:9, 734:12
9th [1] - 665:22

A

a.m [3] - 476:8, 483:25, 735:4
aback [8] - 574:8, 574:9, 574:10, 574:22, 593:15, 593:18, 594:9, 723:12, 723:14, 737:3
able [16] - 482:16, 492:21, 605:1, 625:10, 629:9, 640:9, 646:18, 664:4, 704:24, 708:8, 711:5, 712:17, 714:8, 714:10, 716:17
absence [5] - 482:21, 482:25, 702:18, 705:10
absolutely [2] - 481:9, 673:19
Abusabe [5] - 592:15, 592:16, 592:24
accept [1] - 524:23
accepted [1] - 524:21
accepting [1] - 527:20
access [1] - 580:10
according [10] - 495:9, 519:12, 525:7, 544:23, 551:3, 560:1, 606:11, 616:12, 642:14, 675:8, 705:25, 720:20, 726:13
account [1] - 707:3
Accounting [1] - 637:12
accounting [1] - 688:19
accounts [2] - 570:10, 570:11
accrued [1] - 524:21
accustomed [1] - 617:17
acknowledged [1] - 526:16
acknowledging [1] - 526:16
Acquino [6] - 521:9, 521:21, 521:24, 522:2
acting [1] - 489:19
action [2] - 523:2, 523:5
activities [5] - 517:22, 517:25, 518:5
activity [6] - 517:24, 518:8, 518:14, 518:21, 518:23
actual [3] - 537:1, 588:4, 605:20, 605:23, 678:19, 679:14
AD [5] - 582:6, 582:8, 582:16, 583:1, 583:4, 583:2, 583:3, 584:7, 737:4
ADA [2] - 620:1, 620:9
ADA-recognized [1] - 620:1
add [16] - 482:14, 483:6, 621:15, 651:18, 652:25, 653:20, 656:6, 661:13, 661:20, 661:21, 663:5, 663:19, 665:10, 665:20, 652:20, 695:16, 720:20, 736:21
added [5] - 654:12, 655:8, 706:12
adding [1] - 657:13

Lisa Schwam, RPR, CRR, RMR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

DR. LEONARD MORSE,          : 07-CV-4793(CBA)

    Plaintiff,          :

    -against-          : United States Courthouse
                        : Brooklyn, New York

ELIOT SPITZER, ET AL.,     : Thursday, February 7, 2013
                        : 9:00 a.m.
    Defendants.          :

- - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Plaintiff:      JON L. NORINSBERG
                        225 Broadway, Suite 2700
                        New York, New York 10007
                 BY: JON L. NORINSBERG, ESQ.

For the Defendants:     HON. ERIC T. SCHNEIDERMAN
                        NYS Attorney General
                        120 Broadway, 12th Floor
                        New York, New York 10271-007
                 BY: CHRISTOPHER Y. MILLER, ESQ.
                        SETH J. FARBER, ESQ.

Court Reporter:  Lisa Schwam, CSR, CRR, RMR
                Official Court Reporter
                Telephone: (718) 613-2268

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

---

1      (In open court.)

2      (The Honorable Carol B. Amon takes the bench.)

3      COURTROOM DEPUTY:  Morse versus Spitzer.

4      THE COURT:  All right.  Counsel?

5      MR. NORINSBERG:  I'm very sorry, your Honor.

6      THE COURT:  What happened?

7      MR. NORINSBERG:  I've literally been up since two in

8 the morning.  I'm not functioning.  I don't know.  I'm so

9 sorry.  I feel very bad about making everybody wait for me.

10     THE COURT:  Okay.  For planning, I think we'll break

11 at noon and have the luncheon from noon to one.  I have a

12 guilty plea in a case that's going to have a lot of people

13 here and a lot of press and all of that.  So it probably will

14 take some time.  So rather than just take a break, we'll have

15 the luncheon recess from noon to one.

16     Do you need to raise -- we are going to be here

17 at nine to raise something.

18     MR. NORINSBERG:  We can raise it later.

19     THE COURT:  Okay.  Bring the jury in.

20     (The jury entered at 9:43 a.m.)

21     THE COURT:  Good morning, ladies and gentlemen.

22 Please be seated.

23     I think we're ready to proceed, Counsel.

24 CROSS-EXAMINATION

25 BY MR. MILLER:

---

1 Q    Good morning, Mr. Fusto.

2 A    Good morning.

3 Q    Yesterday we were talking about Defendants' Exhibit F.

4 Can you turn to that in your binder?

5 A    (Witness complies.)  Yes, sir.

6 Q    And yesterday we spoke about the columns with

7 information that you asked Mr. Castillo to include in the

8 document?

9 A    Yes.

10     THE COURT:  Can you, perhaps, just so we keep this

11 clear -- this is one of the grand jury exhibits, correct?

12     MR. MILLER:  Correct.  11.

13     THE COURT:  All right.  I think when you ask

14 questions, we ought to probably -- there's a number of

15 exhibits.  I guess it's F, which is what you've marked

16 today.

17     MR. MILLER:  As 11 -- Grand Jury 11.  F is Grand

18 Jury 11.

19     THE COURT:  Plaintiff has already put it in as

20 Plaintiff's Exhibit 133, correct?

21     MR. NORINSBERG:  Yes.

22     THE COURT:  So this one exhibit, ladies and

23 gentlemen is 133, F, but for the purposes of the trial, its

24 key designation in terms of the plaintiff's allegation is

25 Grand Jury 11.

---

1     So when you're showing him documents, I think it's

2 always good to clarify if it is a grand jury exhibit that's

3 at issue so that we know what grand jury exhibit it is.

4     MR. MILLER:  I agree.  Thank you, Judge.

5 BY MR. MILLER:

6 Q    And in Grand Jury Exhibit 7 -- in Grand Jury Exhibit

7 11, did you ask Mr. Castillo to include the invoice number?

8 A    Yes.

9 Q    And what was the purpose of that?

10 A    It's a little easier for me to explain if I explain the

11 other -- the invoice number is important for filing the

12 false instrument charges.

13 Q    And in asking Mr. Castillo to prepare Grand Jury 11,

14 did you ask him to include tooth numbers?

15 A    No.

16 Q    Why not?

17 A    I didn't think they were important for purposes of the

18 patient's testimony, certainly for the false filings.  Just

19 didn't.

20 Q    Why didn't you think it was important for the patient's

21 testimony and the false filings?

22 A    First of all, as I recall, none of the patients

23 testified that either they had dentures or they had any of

24 the work that was billed.  And if you see the last column,

25 where it says "Procedure Description," my feeling was if

1    they didn't have the dentures or they didn't get the work,
2    the tooth number was not particularly important.
3    Q    Now, let's take a look at Grand Jury 7, which is
4    Defendants' Exhibit S.
5         (Document displayed.)
6    A    I see it.
7    Q    Does this document have the same columns on it as Grand
8    Jury 11?
9    A    Yes.
10   Q    So when you asked Mr. Castillo to create Grand Jury 7,
11   was your reasoning the same as when you asked him to create
12   Grand Jury 11?
13   A    Yes.  It was the same for all the patients that
14   testified.
15   Q    Mr. Fusto, can you explain to this jury what a grand
16   jury is?
17   A    Sure.  In New York State, you have degrees of crimes.
18   You have misdemeanors and you have felonies.  Under the law,
19   if you going to charge someone with a felony, absent a
20   special circumstance, you must present some evidence to
21   what's called a grand jury.  And a grand jury sits for a
22   period of time.  I think it's anywhere from 16 to 23 people.
23   It varies during the course of the time that they sit.  And
24   they hear evidence of cases that prosecutors put in.  It's
25   not a trial --

1    Q    Mr. Fusto, when they hear evidence, do they hear
2    evidence about just one case or is it multiple cases?
3    A    They'll hear evidence of multiple cases.  And in this
4    case, we use a District Attorney's office grand jury.  So
5    the grand jury will sit for a month or so, and they'll hear
6    D.A.'s office's cases.  And for us to get time in the grand
7    jury, you have to make arrangements to go in.  And you put
8    your case in, and you leave; and they'll hear other evidence
9    on other cases.
10   Q    And do you have to present all of your evidence in a
11   certain block of time?
12   A    If you're -- yeah.  It's time permitting, because you
13   go in, put your case in; and you walk outside, and there are
14   five D.A.s waiting to put their case in.  It's just the
15   nature of the practice.
16   Q    Do you have to put all your evidence in in one day?
17   A    You don't have to, of course not.  Oftentimes you
18   can't.
19   Q    And in this case, do you remember, was the evidence put
20   in in one day or multiple days?
21   A    It was multiple days.
22   Q    Were those days consecutive or were there gaps between
23   them?
24   A    I'm sure there were gaps.  I think it was probably two,
25   three sessions, something like that.  Depending on how much

1    time you were allotted from the D.A.'s office.
2    Q    But it was the same grand jury hearing?
3    A    Yes.  It has to be.
4    Q    At the conclusion of your presentation, what do you ask
5    a grand jury to do?
6    A    At the conclusion of the presentation, you put your
7    evidence in, and then you instruct them on the law.  You
8    effectively almost act like the judge, and you simply read
9    them the instructions that a grand jury is supposed to
10   follow in evaluating evidence.  And then you read them the
11   elements of the -- of each charge that you're going to
12   prosecute.  And you read them the indictment.  And then you
13   asked them to consider it.  You leave the room, and they
14   deliberate and they come back, and they decide whether or
15   not there's -- they're not deciding guilt or innocence.
16   Q    When you come back -- when they come back, if they
17   agree to indict, what's the result of that?
18   A    The result is an indictment.  It's an accusation.  It's
19   the mechanism for which prosecution of felonies in the State
20   of New York, all felonies are done, and it's the way that
21   you are able to have what's called an accusatory instrument.
22   Q    And who's there besides you and the grand jury?  Is
23   anybody else in the room?
24   A    Not during the deliberations, I'm not there.
25   Q    Right.  But when testimony is presented, is someone

1    else there?
2    A    The grand jurors, myself and whatever witnesses are in
3    there and a court reporter.
4    Q    Why is there a court reporter there?
5    A    To transcribe what happens in the grand jury.
6    Q    So is there a transcript of the whole proceeding put
7    together?
8    A    Yes.
9    Q    What happens to that transcript?
10   A    Then the transcript is -- as a case progresses through
11   the criminal justice system, a defense lawyer will make a
12   motion to dismiss the indictment.  It's a standard motion to
13   a judge.  And then the judge reads the grand jury minutes to
14   see a number of things.  They look to see if there was
15   enough evidence presented to establish probable cause and
16   also to see if the instructions were correct.
17   Q    Was there a transcript of the grand jury that heard the
18   case against Dr. Morse?
19   A    Yes.
20   Q    Can you look at Defendants' Exhibit C?
21   A    (Witness complies.)  Yes.
22   Q    What is Defendants' Exhibit C?
23   A    This appears to be the transcript of the grand jury
24   presentation.
25        MR. MILLER:  Your Honor, I offer Defendants'

1  Exhibit C.
2          THE COURT:  Please hold up the document for a
3  moment.
4          THE WITNESS:  (Witness complies.)
5          THE COURT:  That's the entire grand jury
6  presentation, is C?
7          MR. MILLER:  Yes.
8          THE COURT:  C will be received.
9          (Defendants' Exhibit C received in evidence.)
10 BY MR. MILLER:
11 Q    Now, in the grand jury, Mr. Fusto, can you just
12 generally summarize what the main evidence was for your
13 false filings claims?
14 A    For the false filings claims?  The main evidence would
15 be the testimony from the patients.  Some of the information
16 that's on the Grand Jury Exhibit 11, some of those columns
17 and the amount paid for the patients that testified.
18 Q    Let's look at some of the testimony.  Can I direct you
19 to Defendants' Exhibit C at Page 12769?
20 A    Yes.
21 Q    And whose testimony begins here?
22 A    It looks like Intisar Ahairi.
23 Q    And does she indicate how old she is?
24 A    Twenty-six.
25 Q    I'll read from SD 12770.

1          QUESTION:  "Could you tell the grand jury what work was
2  performed on you when you went to 580 Dental?"
3          ANSWER:  "Three or four cavities and a root canal that
4  was never done because I never got the crown put on.  That's
5  it."
6          QUESTION:  "Do you wear dentures?"
7          ANSWER:  "I don't."
8          QUESTION:  "Have you ever had the need to have any
9  dentures repaired or made for you by 580 Dental?"
10         ANSWER:  "No."
11         Mr. Fusto is that testimony consistent or inconsistent
12 with the billings that Dr. Morse -- or rather 580 Dental
13 submitted to Medicaid?
14 A    It would be inconsistent.
15 Q    Let's look back at Grand Jury Exhibit 11.  Can you turn
16 to the page --
17 A    Can you help me with that again?
18 Q    It's F.
19 A    F.  Okay.
20 Q    Can you turn to the page concerning Intisar Ahairi.
21 A    Yes.
22 Q    What types of procedures did Dr. Morse -- I'm sorry,
23 what type of procedures did 580 Dental bill related to
24 Intisar Ahairi?
25 A    I think it speaks for itself.  These appear to all be

1  denture-related repairs.
2  Q    So what's the first one?
3  A    It says "reline lower part denture lab."  I think
4  that's reline lower partial denture.
5  Q    What's the next one?
6  A    Repair/replace broken clasp.
7  Q    So based on Ms. Ahairi's testimony and Grand Jury 11,
8  was it necessary to have tooth numbers or not necessary to
9  have tooth numbers to show that Dr. Morse had billed for
10 services that were not performed at 580 Dental?
11 A    I didn't think they were, based on the testimony and
12 the billing.
13 Q    Can I direct you back to Defendants' Exhibit C,
14 Page 12722?
15 A    Okay.
16 Q    Whose testimony begins on that page?
17 A    Sara Charles.
18 Q    Does she indicate how old she is?
19 A    Thirty.
20 Q    Did she say she went to 580 Dental?
21 A    Yes.
22 Q    Reading from Page 12744, line 12:
23         QUESTION:  "Do you recall what work was done?"
24         ANSWER:  "Yes."
25         QUESTION:  "What was that?"

1          ANSWER:  "My front tooth that's chipped and these
2  fillings."
3          QUESTION:  "In the year 2000, did you have any
4  dentures?"
5          ANSWER:  "No."
6          QUESTION:  "When you went to 580 Dental, did you have
7  any need or any requirement for the repair or even the
8  creation of dentures?"
9          ANSWER:  "No."
10         Mr. Fusto, is that testimony consistent or inconsistent
11 with the billings that 580 Dental submitted to the Medicaid
12 program for Sara Charles?
13         (Continued on the next page.)
14
15
16
17
18
19
20
21
22
23
24
25

1    A    Appears to be inconsistent.
2    Q    Can you turn to the page of Grand Jury Exhibit 11 that
3    depicts Sara Charles'?
4    A    I have it in front of me.
5    Q    What type of procedures did 580 Dental bill for for
6    Sara Charles in the 2000 time period?
7    A    Again, my understanding is that these were repairs to
8    dentures or some denture-type thing.
9    Q    So based on Ms. Charles' testimony, was it necessary or
10   not necessary to have tooth numbers to demonstrate that the
11   billings that 580 Dental submitted for work had not been
12   performed?
13   A    Again, I didn't think it did.  I didn't think tooth
14   numbers were helpful one way or the other.
15   Q    Okay.  Can I direct you back to Defendants' Exhibit C,
16   grand jury transcript at page 12785.
17   A    Okay.
18   Q    Whose testimony begins on this page?
19   A    Looks like Miriam Perez.
20   Q    Reading from 12785, line 25.
21        "Question:  Did you ever have any dental work done at a
22   location here in Brooklyn known as 580 Dental?
23        "Answer:  I went there, but they didn't do anything.
24        "Question:  What do you mean?
25        "Answer:  Like he just, it was a checkup because I

1    never went back.
2        "Question:  Excuse me?
3        "Answer:  It was a checkup, like, he checked on me, but
4    I never went back to get anything done.
5        "Question:  Do you have any dentures?
6        "Answer:  No."
7        Mr. Fusto, is this testimony from Ms. Perez in the
8    grand jury consistent or inconsistent with billings that
9    were submitted by 580 Dental for denture work on Ms. Perez?
10       Mr. Fusto?
11   A    Does not appear to be consistent.
12   Q    And why is that?
13   A    Because billings show, again, repairs to dentures for
14   some kind of denture-related thing.
15   Q    I direct you back again to Defendants' Exhibit C at
16   page 12799.
17   A    Okay.
18   Q    Whose testimony begins on that page?
19   A    Looks like Stacy Rodriguez.
20   Q    And does she indicate that she's a Medicaid recipient?
21   A    Yes.
22   Q    Did she testify as to what her Medicaid identification
23   number or CIN number was?
24   A    Yes.
25   Q    Okay.  Reading from page SD-12801.  I'm sorry.  Let me

1    back up.
2        Did she indicate that -- did Ms. Rodriguez in her grand
3    jury testimony indicate that she went to 580 Dental?
4    A    Yes.
5    Q    Okay.  Reading from SD-12801, line 19.
6        "Question:  Okay.  When you were there, do you recall
7    what work was done?
8        "Answer:  I had one tooth pulled.
9        "Question:  One tooth pulled?
10       "Answer:  Yes.
11       "Question:  That was it?
12       "Answer:  That's it.
13       "Question:  Do you have any dentures?
14       "Answer:  No.
15       "Question:  Okay.  When you went there in 2002, did you
16   have any dentures at that time?
17       "Answer:  No."
18       Is that testimony consistent or inconsistent with the
19   billing at Medicaid that 580 Dental submitted for Stacy
20   Rodriguez?
21   A    No.
22   Q    Do you remember what billings had been submitted by 580
23   Dental for Stacy Rodriguez?
24   A    In terms of what Grand Jury 11 shows?
25   Q    Well, let's look at Grand Jury Exhibit 11.  In the 2002

1    time frame, what types of services did 580 Dental submit
2    claims for?
3    A    Repair of some kind of denture.  Denture-related thing.
4    Q    Now, was the testimony of the other Medicaid recipients
5    who were grand jury witnesses consistent or inconsistent
6    with their billings?
7    A    They were inconsistent with the billings.
8    Q    Now, in the grand jury you asked Dr. DeLuca to testify,
9    correct?
10   A    Yes.
11   Q    What was the purpose of her testimony?
12   A    The purpose largely was her look at the procedure
13   description for the patients and just basically ask -- you
14   know, it just looked to me like there was a lot.  I just
15   sort of wanted her to talk about whether or not it made any
16   sense at all.  You know, I mean, I wasn't thinking in terms
17   of tooth numbers.  I was just thinking in terms of, you
18   know, does the work itself make any sense?
19   Q    Now, at the time you had her look at Grand Jury Exhibit
20   7, correct?
21   A    Yes.
22   Q    And how many patient spreadsheets are in Grand Jury
23   Exhibit 7?
24   A    I believe in 7 there were the six.
25   Q    And why did you think -- let me ask -- strike that.

**JA364**

1    When you presented the testimony of Dr. DeLuca, did you
2 think it was necessary to include tooth numbers?
3 A    No.
4 Q    Why not?
5 A    Again, because the patients didn't have the services,
6 but in general, adding the tooth number, at least in my
7 mind, really didn't seem to add or detract from anything
8 because it just seemed, you know, as you look at the number
9 of procedures -- and I understand that there was a mistake
10 on one of them, but if you looked at for the other patients,
11 it looked like there was just a lot of work.  And sort of
12 looking at it in total, you know, adding the tooth, all the
13 repair clasps, just in general, does that make any sense?
14 That was really the only purpose of it.
15    I felt it was relevant for -- that was part of the
16 reason.  The other part is that she also testified as to
17 what -- when a dentist does lab-related services for
18 dentures, basically what the procedure is in terms of the
19 descriptions and things of that nature.  So that was the
20 other part.
21 Q    You mentioned that there were six spreadsheets
22 concerning billings for patients in Grand Jury Exhibit 7.
23 A    Yes.
24 Q    Is Edwin Gonzalez -- the names of the Edwin Gonzalez
25 recipients in that exhibit?

1 A    That Linda DeLuca looked at?
2 Q    Yes.
3 A    No.
4 Q    So did Dr. DeLuca testify at all about a spreadsheet
5 concerning Edwin Gonzalez?
6 A    No.
7 Q    Is the spreadsheet concerning Edwin Gonzalez in a
8 separate document?
9 A    Not in a separate document, but I think a separate
10 collection of the documents which is I think Grand Jury 11.
11 Q    Now, you asked Dr. DeLuca about Stacy Rodriguez,
12 correct?
13 A    Yes.
14 Q    Let's take a look at Grand Jury Exhibit 7's version of
15 the Stacy Rodriguez spreadsheet.
16 A    I see it.
17 Q    Now, looking at the "Amount Paid" column, do you see
18 any entries that contain minus signs or not?
19 A    Of course I do.
20 Q    And which lines do you see entries with minus signs?
21 A    The third from the top, the sixth from the top, and the
22 ninth, the last one.
23 Q    At the time you questioned Dr. DeLuca in the grand
24 jury, did you notice those minus signs?
25 A    No.

1 Q    Now, you were here for Mr. Castillo's testimony.
2 A    Yes.
3 Q    Do you recall that he mentioned that he pointed out to
4 you that there were some minus signs in this document?
5 A    I think it was pointed out to me at some point.  It
6 wasn't pointed out to me when I showed Dr. DeLuca, as far as
7 I remember.
8 Q    Do you have any memory of Mr. Castillo talking to you
9 about there being minus signs in this document?
10 A    Obviously, at some point it was shown to me that there
11 were minus signs.  I don't know at what point.  I mean,
12 obviously I know it now and at some point in the past I knew
13 it.  I don't know when.  My point is when I showed it to
14 Dr. DeLuca, I just hadn't noticed it.
15 Q    Looking at the "Procedure Code" column in the Stacy
16 Rodriguez spreadsheet in Grand Jury Exhibit 7, how many
17 different procedure codes are there?
18 A    Procedure codes, there are nine.
19 Q    Sorry.  How many different procedure codes are there?
20 A    There's, looks like, three sets of three different
21 ones.
22 Q    Okay.  So the one at the top is 05650, correct?
23 A    Yes.
24 Q    And then the next one is 05630, correct?
25 A    I'm sorry?  That's the fourth -- oh, the fourth line

1 down.  Okay.
2 Q    And the next one is 05760, correct?
3 A    Yes.
4 Q    And what's the amount paid for the first one?
5 A    $87.
6 Q    What's the amount paid for 05630, the second one?
7 A    $174.
8 Q    And what's the amount paid for 05760?
9 A    $174.
10 Q    Do you know what that ads up to?  I have a calculator
11 if you'd like.
12 A    I can do it in my head.
13 Q    If you need it.
14 A    Maybe I do.  Thank you.
15    $435.
16 Q    And is that the figure that appears on this
17 spreadsheet?
18 A    Yes.
19 Q    Now, at the time you questioned Dr. DeLuca in the grand
20 jury, did you notice that the total here corresponded to one
21 charge for each of the three procedure codes?
22 A    No.  I wasn't looking at that.
23 Q    Now, let's turn to Grand Jury Exhibit 11.
24 A    Is that F?
25 Q    Which is Defendants' Exhibit F.

**JA365**

1     Do you remember in the grand jury which witness
2  discussed Grand Jury Exhibit 11?
3  A    I think Mr. Castillo did.
4  Q    And do you remember whether he testified before or
5  after Ms. DeLuca -- Dr. DeLuca?
6  A    I think he testified after.
7  Q    Okay.  Was he on the last day of the testimony?
8  A    Yeah.
9  Q    And Grand Jury Exhibit 11 is the collection of
10 spreadsheets that has one for Edwin Gonzalez, correct?
11 A    Correct.
12 Q    Did Mr. Castillo discuss Edwin Gonzalez in his
13 testimony?
14 A    Specifically, no.
15 Q    Do you remember having any discussion with Mr. Castillo
16 about which Edwin Gonzalez or Gonzalezes should be included
17 in Grand Jury Exhibit 11?
18 A    I don't recall any specific conversation about that.
19 Q    What were your instructions to him with regard to the
20 preparation of Grand Jury Exhibit 11 in terms of which
21 patients you wanted to appear?
22 A    All I said was -- I mean, it's not a big conversation.
23 You know, as we're getting ready to put everything in, I
24 would simply tell him -- or he would ask me who do you want,
25 and I said these are the patients that are going in.  And

1  he'd ask me, what field do you want?  And I'll tell him the
2  ones that you see on 11, these are the ones that I'll need.
3  And that's pretty much it.  And then he'll hand me the stack
4  of them so when I go in, I'll have them.
5  Q    So do you know why there are three Edwin Gonzalezes on
6  the spreadsheet in Grand Jury Exhibit 11?
7  A    I'm not a hundred percent sure.  I really don't know
8  how that happened.  I can hazard a guess, but I don't really
9  know for sure.  I mean, I can give you my speculation.
10       MR. NORINSBERG:  Objection.
11 Q    Don't speculate.
12 A    Okay.  Sorry.
13 Q    Did you have someone from the Department of Health
14 testify at the grand jury?
15 A    Yes.
16 Q    Who was that?
17 A    Levon Aharonyan.  Am I getting that right?
18 Q    I think so.
19       And generally speaking, what did he testify about?
20 A    Well, when you put a case like this, there's a lot of
21 documents -- there's a lot of Department of Health documents
22 so he's required to come in and bring in the provider
23 profile, some of the Department of Health documents that
24 would relate to Dr. Morse's submissions.  He would talk
25 generally about the Medicaid program; what it is, what a

1  provider is, sort of laying down a lot of basic facts about
2  the Department of Health's program and the documents that
3  the grand jury would be -- you know, need to be presented
4  to.
5  Q    Does he talk about how people become a Medicaid
6  recipient?
7  A    Yes.  A recipient?  I'm assuming he did, yeah.
8  Q    Do you recall whether or not he talked about whether
9  Medicaid recipients have a unique identifying number?
10 A    Yes.
11 Q    Okay.  And what did he say?
12 A    That every Medicaid recipient has a unique identifying
13 number.
14 Q    Now, let's turn to the indictment which we started
15 discussing yesterday, which is Defendants' Exhibit I.
16 A    Okay.
17 Q    So how many counts were in the indictment?
18 A    Looks like 12.
19 Q    And what was the first count?
20 A    It's grand larceny in the first degree.
21 Q    Okay.  And generally speaking, what was the evidence
22 that supported the grand larceny in the first degree?
23 A    The evidence that related to this count was the invoice
24 analysis.
25 Q    Okay.  And was there a monetary threshold that you had

1  to show in order to reach -- to show grand larceny in the
2  first degree?
3  A    Yes.  It has to be -- statutorily, it has to be a
4  million dollars or more.
5  Q    And then what were Counts Two through Twelve in the
6  document?
7  A    Those are offering of a false instrument for filing in
8  the first degree.
9  Q    And did each of those counts -- well, let me direct you
10 to the second paragraph.
11      Do you see where there's a reference to a claim form
12 invoice number 00096361?
13 A    Yes.
14 Q    What is that a reference to?
15 A    That's a reference again to the -- what I mentioned
16 were the -- for these counts, the important columns on Grand
17 Jury 11, that's an invoice number.  That's the number that
18 identifies the claims submission for a particular
19 transaction -- one particular transaction.
20 Q    So for each of the Counts Two through Twelve, was there
21 one invoice number for each of those accounts or multiple?
22 A    No.  There would be one.  Looks like there would be
23 one.  As I recall, I don't think you can put more than one
24 in.
25 Q    And is there any monetary threshold that you needed to

1  show in order to bring a charge for offering a false
2  instrument for filing in the first degree?
3  A    The answer to that question is no, but there's a minor
4  explanation for it as well.  Because one of the elements of
5  this is that you need an intent to defraud and that's an
6  element of the crime.  And part of the intent to defraud is
7  that something of value needs to be acquired.  That could be
8  anything, but in this particular case it would be money.
9  Q    Could it be a dollar?
10 A    Could be a dollar, could be 25 cents.  They don't
11 really define it, but --
12 Q    So that's the only monetary threshold for the false
13 filing counts?
14 A    Yes.  It's the only aspect of this count that has
15 something to do with value, for lack of a better term.
16      If I can just expand?
17 Q    No.
18 A    Okay.
19 Q    I'm handing you what's been marked as Defendants'
20 Demonstrative No. 1.
21 A    Yes.
22 Q    What is this?
23 A    This appears to be a list of the patients who
24 testified -- I'm sorry.  Reading from left to right, it
25 would be what the count is -- the count in the indictment --

1  the charge, the charges for each of the counts.  The next
2  column would be what the invoice number was.  And then the
3  last name and first name of the patient who testified and
4  what the invoice number was in relationship to the claim for
5  that particular patient.
6  Q    Okay.  Now, was this document prepared for this case
7  that is before this jury?
8  A    I can't answer that.  I don't know.
9  Q    Well, did you review it in preparation for your
10 testimony?
11 A    Yeah, I've seen this before.
12 Q    And did you confirm the accuracy of it?
13 A    Oh, sure.
14      MR. MILLER:  Your Honor, I'd like to publish the
15 demonstrative.
16      THE COURT:  All right.  Ladies and Gentlemen, this
17 is what we call a chart.  It's a chart based on evidence,
18 but this itself is really a demonstrative exhibit.  It
19 doesn't constitute evidence itself.  So it's for you to
20 determine ultimately whether it correctly and accurately
21 summarizes the evidence.
22      But with that cautionary instruction, I'll receive
23 Defendants' Exhibit 1.
24      (Defendants' Exhibit 1 received in evidence.)
25 Q    So with respect to Counts Two to Ten, which are the

1  only ones that fit on the display here, let's turn to line
2  2.
3       What is the invoice number there?
4  A    0009361.
5  Q    And in the last name column, it says "Suliman."  What
6  does that refer to?
7  A    That's the last name of the patient who testified.
8  Q    For that -- and the invoice number relates to the
9  patient how?
10 A    If I have to crosscheck that with Grand Jury 11,
11 because that particular claim has a line to it for that
12 patient.  So it would relate to a claim that Dr. Morse
13 submitted and was paid for for that patient on a specific
14 date.
15 Q    Okay.  So Count Two then relates to invoice for Sawson
16 Suliman?
17 A    Yes.
18 Q    The same goes for Count Three?
19 A    Correct.
20 Q    Who does Count Four relate to?
21 A    Intisar Ahiri.
22 Q    Who does Count Five relate to?
23 A    Intisar Ahiri.
24 Q    Who does Count Six relate to?
25 A    Nassa Ahiri.

1  Q    Who does Count Seven relate to?
2  A    Nassa Ahiri.
3  Q    Who does Count Eight relate to?
4  A    Sara Charles.
5  Q    Who does count Nine relate to?
6  A    Sara Charles.
7  Q    Who does Count Ten relate to?
8  A    Stacy Rodriguez.
9  Q    Who does Count Eleven relate to?
10 A    Asi Othman.
11 Q    Who does Count Twelve relate to?
12 A    Asi Othman.
13 Q    Was there any count relating to offering a false
14 instrument for filing that was submitted for Edwin Gonzalez?
15 A    No.
16 Q    And in your indictment, was there any count submitted
17 relating to offering a false instrument for filing for
18 Miriam Perez?
19 A    No.
20 Q    Now, at the outset of the grand jury, do you give them
21 the indictment?
22 A    At the outset of grand jury?  No, I don't think so.
23 Q    Why not?
24 A    A, it probably hasn't been drafted yet and B, I'm not
25 sure it's proper.

1   Q    So when you normally -- let me back up.

2        You were a prosecutor at the Brooklyn District

3   Attorney's Office?

4   A    Yes.

5   Q    And then you were a prosecutor at the Medicaid Fraud

6   Control Unit?

7   A    Yes.

8   Q    In your experience, when do you normally present the

9   indictment to the grand jury?

10  A    We leave it with them after the instructions, as I

11  remember.  It's been a while, but I think that's the --

12  Q    Why do you leave it with them at that time?

13  A    It's what you do.  Apparently, that is the law.

14  Q    Why don't you give it to them at the outset and say

15  here's what we're going to talk about?

16  A    Because they haven't heard the evidence yet.  You don't

17  give it.

18  Q    So you wait to hear the evidence before presenting them

19  with an indictment?

20  A    Well, that's the normal procedure.  That's what the

21  purpose of a grand jury is; they hear the evidence and then

22  they consider whether the evidence supports the proposed

23  counts in the indictment.  It sounds technical, but that's

24  just the way it works.

25  Q    Based on your experience at the Brooklyn DA's Office

---

1   and Medicaid Fraud Control Unit, what's your understanding

2   of whether it's permissible to present evidence that doesn't

3   specifically relate to one of the charges that the grand

4   jury at the end of the proceeding is presented with in the

5   indictment?

6   A    In other words, you put additional evidence in and you

7   don't charge them with it?

8   Q    Yes.

9   A    There's nothing wrong with it.  You're not asking them

10  to consider it.

11  Q    And in this case, you asked the grand jury to indict on

12  all twelve counts?

13  A    Yes.

14  Q    What did they do?

15  A    They voted to indict, what's called a true bill.

16  Q    Now, when Mr. Norinsberg was questioning you the other

17  day, he brought up a declaration that you had written.

18  A    Yes.

19  Q    Okay.  I'm sorry.  And in that declaration, you signed

20  the last page, right?

21  A    Yes.

22  Q    Okay.  Did you prepare the initial draft of that

23  declaration?

24  A    No.

25  Q    Okay.  But you did sign it in the end?

---

1   A    Yes.

2   Q    Do you know who prepared the initial drafts?

3   A    I'm assuming someone at the Attorney General's Office.

4   Q    Now, in your testimony the other day, Mr. Norinsberg

5   asked you about Miriam Perez's trial testimony.

6        Do you recall that?

7   A    I remember being asked about it, yeah.

8   Q    And do you recall saying you weren't sure exactly what

9   she had testified to?

10  A    I hadn't read her trial testimony when he asked me that

11  so I didn't actually remember.

12  Q    Reading from page 91 of the trial transcript.

13       THE COURT:  Trial transcript?

14       MR. MILLER:  Yes.

15       MR. NORINSBERG:  Objection.

16       THE COURT:  Or grand jury transcript?

17       MR. MILLER:  Trial.  May we approach?

18       THE COURT:  Yes.

19       (Sidebar conference.)

20       (Continued on the next page.)

21

22

23

24

25

---

1        MR. NORINSBERG:  I purported to impeach him the

2   other day.  The trial transcript says she doesn't wear

3   dentures.

4        THE COURT:  Impeach him on what?

5        MR. MILLER:  On his declaration.

6        MR. NORINSBERG:  What?

7        MR. MILLER:  The other day he purported to impeach

8   him and attack his credibility and he asked --

9        THE COURT:  Do you have the page?

10       MR. MILLER:  I have the transcript of what he

11  said.

12       THE COURT:  What page are we at?

13       MR. MILLER:  Page 395.

14       THE COURT:  Of this transcript?

15       MR. MILLER:  Of what he said.

16       THE COURT:  Wait a minute.

17       MR. MILLER:  This is the trial transcript from the

18  other day, from the 5th.

19       THE COURT:  Oh, okay.  I'm sorry.  All right.

20       MR. MILLER:  Line 16, he says, "Do you also recall

21  the fact that the third person Miriam Perez actually

22  indicated that she does wear some type of dentures?"

23       "I don't recall exactly."

24       And then he goes on to say, "You represented under

25  oath that all three of these witnesses testified they wore

1  dentures when, in fact, two of them said they didn't even
2  know and the third one did wear dentures."
3       So he got this questioning in.  Well, the actual
4  trial transcript of Mrs. Perez's testimony shows she's asked
5  do you wear -- are you familiar with what are called
6  dentures or false teeth?  Yes.  You know what they are,
7  right?  Uh-huh.  Do you have any in your mouth?  No.  Have
8  you ever?  No.
9       I just want to bring that out and then ask him
10 whether he thinks his declaration was accurate or inaccurate
11 to address the credibility issue that was raised by
12 counsel's questioning and thereby not open the door to the
13 whole trial.
14      MR. NORINSBERG:  As I recall, your Honor, that
15 counsel had said with respect to this witness that there's a
16 lot of confusing testimony.  At first she indicated that she
17 did wear dentures.  Then she indicated she didn't wear
18 dentures and it was confusing.  And counsel is trying to
19 stop me from asking because of all that confusing testimony.
20 Now he wants to cherry-pick one part of it without allowing
21 me to go back to the other part.
22      THE COURT:  Hold on.  I allowed you to ask the
23 question.
24      MR. NORINSBERG:  Right.
25      THE COURT:  And you asked a question, "Do you also

1  recall that a third person Miriam Perez actually indicated
2  she doesn't wear some dentures?"  So you were trying to
3  cross-examine him about that.
4       MR. NORINSBERG:  I'd like redirect to go back to
5  her early trial testimony where she's all over the place.
6       THE COURT:  What do you mean, "she's all over the
7  place"?
8       MR. MILLER:  She doesn't at any point as I've
9  reread it now say that she had dentures.  I don't think the
10 denture testimony is at all confusing.  If you can point to
11 somewhere in here where she says she has dentures.  It's not
12 there.  So I just want to go at the denture point.
13      THE COURT:  Well, the only question he
14 asked -- well, in cross-examining him, you were allowed to
15 bring out that Ms. Ahiri said she didn't know what a denture
16 was.  You went into all of this.
17      MR. NORINSBERG:  True.
18      THE COURT:  It's fair game, please.
19      (End sidebar conference.)
20      (Continued on the next page.)
21
22
23
24
25

1  Q    So Mr. Fusto, do you remember the other day being asked
2  about Miriam Perez's trial testimony?
3  A    Yes.
4  Q    And do you remember being asked whether or not she
5  testified about whether she wore dentures?
6  A    I remember being asked about that, yes.
7  Q    This was in the context of a declaration you submitted,
8  correct?
9  A    Yes.
10 Q    Reading from page 91 of the criminal trial transcript,
11 line 22 of Miriam Perez's testimony:
12      Question:  Do you wear -- are you familiar with what
13 are called dentures or false teeth?
14      "Answer:  Yes.
15      "Question:  You know what they are, right?
16      "Answer:  Uh-huh.
17      "Question:  Do you have any in your mouth?
18      "Answer:  No.
19      "Question:  Have you ever?
20      "Answer:  No.
21      "Question:  When you went to that dental office, did
22 you have any dentures or false teeth?
23      "Answer:  No."
24      Does that refresh your memory?
25 A    To the extent that you're reading that, yes.

1  Q    To the extent your declaration indicated that Ms. Perez
2  testified at trial that she did not have dentures, was your
3  declaration accurate or inaccurate?
4  A    I believe it to have been accurate.
5  Q    During the course of this trial, have you heard some
6  discussion about the pace of your investigation?
7  A    Yes.
8  Q    And did you indicate to others that you would take the
9  heat for the pace of the investigation?
10 A    I'm sure I did.
11 Q    And what did you mean by that?
12 A    Well, you know, just to -- so that things aren't taken
13 out of context, you know, Medicaid Fraud Control Unit, being
14 under the umbrella of the Attorney General's Office, was
15 largely always generally criticized for the slow pace of our
16 cases.  You know, I know that there was reference to a
17 six-month report and a one-month report.  And it was largely
18 because they often felt that cases moved too slow.
19      Everybody had to answer to their superiors, whether it
20 was the auditors, whether the investigators, whether it was
21 us, the lawyers' standpoint, why is it taking so long, you
22 know, they just wanted updates because you would have long
23 periods of time where there seemed to be no movement.
24      So if Jimmy Serra or Bob Flynn would gripe about
25 something and they would whatever, I would say, look, you

1  know, it's my decision at what point to move so if you're
2  catching heat, tell them it's my fault.  And that's what
3  that meant.  Because ultimately it is my responsibility when
4  a case actually moves, it's not theirs.
5      So the moment I choose to indict or dismiss a case,
6  whenever it may be, it's my call.  If it takes long, I'll
7  take the heat.
8          MR. MILLER:  Thank you, Mr. Fusto.
9  REDIRECT EXAMINATION
10  BY MR. NORINSBERG:
11  Q    Good morning, Mr. Fusto.
12  A    Good morning.
13  Q    Mr. Fusto, you told this jury the other day that you
14  were surprised that Dr. Morse did not have his
15  prescriptions?  Was that your testimony, sir?
16  A    Well --
17  Q    Was that your testimony?  Yes or no?
18  A    Yes.
19  Q    And you also said that you thought what Dr. Morse was
20  saying in this one-year requirement, that was just an excuse
21  he and his lawyers came up with, right?  Is that what you
22  testified to, sir?
23  A    I don't believe I said those words.
24  Q    Did you remember saying you were unmoved by that
25  argument?  Do you recall that, sir?

1  A    I remember that.
2  Q    In fact, Mr. Fusto, you yourself pointed out at trial
3  that Dr. Morse was only required to keep his prescriptions
4  for one year, didn't you?
5  A    Yes.
6  Q    You yourself brought it out; it wasn't Dr. Morse's
7  lawyers, true?
8  A    The Judge needed to know.  That's what the law said.
9  Q    So, in fact, in that proceeding -- in that criminal
10  proceeding -- you represented to that judge that it's a
11  one-year requirement for prescriptions, but here we are now
12  in the civil lawsuit when you're named as a defendant and
13  all of a sudden it's a different requirement, right?
14  A    No.
15  Q    Now, the fact is, Mr. Fusto, there's a big difference
16  between keeping a chart for six years and keeping
17  prescriptions for six years, correct?
18  A    No.
19  Q    Really?  You don't think there's any difference?  Is
20  that your testimony?
21  A    Medicaid requirements --
22  Q    Excuse me.  Is that your testimony, sir?
23  A    That's my testimony.
24  Q    Your own expert said at trial that the dentist only
25  keeps the chart for six years, not the prescriptions; isn't

1  that true?
2  A    I don't think he said it in that way that you're
3  describing it.
4  Q    Let me read it for you then, sir.  Page 18, line 1.
5      "Question:  Are you familiar with the state education
6  law regarding the retention of prescriptions by the dentist?
7      "Answer:  Yes.  The prescriptions that you write to the
8  laboratory are kept for a period of one year.
9      "Question:  One year?
10      "Answer:  By the lab and the dentist.  The record that
11  you made of this prescription into the patient's record is
12  kept for a period of six years, but the laboratory
13  prescription itself is one year."
14      Do you recall your own expert giving that testimony,
15  sir?
16  A    Yes.
17  Q    So what he was clearly saying was that the prescription
18  itself you can throw out after one year as long as it's
19  documented in the chart which you keep for six years.
20      Wasn't that what he was saying?  Wasn't that what he
21  was saying clearly?
22  A    The testimony is what it is.
23  Q    You brought that testimony --
24          THE COURT:  Let him finish his answer.  I'm sorry.
25  Did you want to complete your answer?

1          THE WITNESS:  Yes.  The testimony of Dr. Golieber
2  was brought out because it was pointed out to me by
3  Dr. Morse and his lawyer that this was his reason for doing
4  so.  When he showed me the law, it was my obligation, at
5  least I felt, to have this presented to the judge at trial.
6  At some point during the trial, other information about
7  Medicaid records would have come out so in that context,
8  you're right.
9  Q    You never once brought out anything about the six-year
10  requirement before that judge, did you, sir?  Yes or no?
11  A    No.
12  Q    You never brought it out at the grand jury either, did
13  you?
14  A    Well, I didn't have to.  Didn't know about it.
15  Q    You didn't bring out the six-year requirement in the
16  grand jury, you didn't bring it out in criminal trial.  The
17  first time you ever brought it out was here in this lawsuit;
18  isn't that true?
19  A    No.
20  Q    In fact, it wasn't you who came up with that idea, it
21  was Mr. Farber, the attorney who wrote that affidavit for
22  you?
23          MR. FARBER:  Objection.
24          THE COURT:  Sustained.
25  A    No.

**JA370**

1    THE COURT:  Sustained.

2  Q    You never even thought about that until you were named

3  as a defendant in this lawsuit and you knew you would have

4  to explain to this jury why you felt that you had a case

5  against Dr. Morse; isn't that true?

6  A    No, sir.

7  Q    Can you point to any document anywhere that indicates

8  that you ever raised the six-year requirement before this

9  lawsuit started?  Anywhere?

10 A    Before it started?  No.  But that's what the law says.

11 Q    Your answer is no; isn't that correct, sir?

12 A    Yes, my answer is no.

13 Q    In fact, you submitted a declaration in this lawsuit in

14 which you cited this Medicaid regulation for the very first

15 time; is that correct?

16 A    Yeah, I guess.

17 Q    There's not one word about prescriptions in this

18 declaration?

19    THE COURT:  In what?

20 Q    In this Medicaid regulation.

21    THE COURT:  Are you showing him something that has

22 a regulation attached to it, counsel?

23    MR. NORINSBERG:  I'm showing him his own

24 declaration in which he represented that this is the

25 regulation.

---

1    THE COURT:  Is a copy of the regulation attached?

2    MR. NORINSBERG:  It's his excerpt that he wrote.

3    MR. MILLER:  Can we approach?

4    THE COURT:  Yes.

5    (Sidebar conference.)

6    (Continued on the next page.)

---

1    THE COURT:  Is this regulation in evidence

2  somewhere in this case?

3    MR. MILLER:  It's not.

4    THE COURT:  Why not?

5    MR. MILLER:  We'll get it in.

6    THE COURT:  What's your objection to what

7  counsel's doing?

8    MR. MILLER:  I mean, I think it's going far afield

9  in terms of -- you know, your ruling originally was you can

10 cross him about the fact that he put Golieber on.  It is law

11 of the case that the six-year requirement applies.  It's law

12 of the case.  You didn't have factual testimony that

13 conflicts with law of the case.

14    If you wanted to attack his credibility, which is

15 what he told you when he got your ruling, he can and he's

16 done that.  Now he's getting into what the actual rule is.

17 I don't want to put in the order.  I want an instruction

18 from the Court as to what the rule is.  We shouldn't be

19 putting in evidence of regulations; we should be putting in

20 an instruction that says what the rule is.

21    It's a rule of law.  The Court's ruled on it.

22 There shouldn't be factual testimony.  His application to

23 you to go into Golieber was about credibility and he's done

24 that.

25    MR. NORINSBERG:  It's about credibility.  He's

---

1  represented in a sworn affidavit about the six-year

2  requirement.  In fact, there's not one word about

3  prescriptions and he knows it.  He knows it.

4    THE COURT:  Wait a minute.  Why wasn't this raised

5  with the Court a long time ago?  Now you're trying to

6  undermine a ruling that was never challenged by this Court

7  that this governed this.

8    MR. NORINSBERG:  It was a qualified immunity

9  finding to a defendant that's been dismissed.  It has

10 nothing to do with this defendant's credibility.  He made a

11 sworn statement under oath.

12    THE COURT:  Now you're saying this isn't the

13 regulation?

14    MR. NORINSBERG:  It doesn't apply at all.

15    THE COURT:  This isn't the time to be raising

16 this, Mr. Norinsberg.

17    (End sidebar conference.)

18    (Continued on the next page.)

**JA371**

1    THE COURT:  Ladies and Gentlemen, let me excuse
2  you for a moment.
3    (Jurors exit the courtroom.)
4    THE COURT:  You can step down.
5    This is the first time, as far as I understand it,
6  Mr. Norinsberg, that you are challenging the fact that this
7  regulation, in fact, applied.  My understanding of this
8  two-year or this one-year rule, whatever it was, was that
9  that was a separate part of the education law.  It has
10  never, as far as I know, been challenged before me that this
11  regulation did not apply.
12    Now you're trying to bring out through a
13  cross-examination of a witness that the regulation, in fact,
14  does not apply.  That's what you're trying to do.
15    MR. NORINSBERG:  I want to clarify my position,
16  your Honor.  The regulation applies.  It requires a
17  practitioner to maintain his chart.  It does not require
18  prescriptions.  That's a false argument.  They got away
19  with it.
20    THE COURT:  Why haven't you brought it to my
21  attention before right now that it's a false argument?  This
22  is something that I --
23    MR. NORINSBERG:  Your Honor --
24    THE COURT:  Let me finish.  This is something that
25  I relied on.  We talked about this at pretrial about how you

---

1  would be permitted to use this.  Now you're taking a
2  position in front of this jury that this regulation doesn't
3  apply and that somehow he knew it.
4    That is not an appropriate thing to do at this
5  point in time in the litigation.  We had pretrial
6  discussions about everything that needed to be raised.  I
7  don't recall that at any point you told me that you wanted
8  to go into this to prove that, in fact, this regulation does
9  not apply in the way that it's being argued that it's
10  applied.  I have never understood that before.  That is
11  something we would have clearly taken up outside the
12  presence of the jury that we would have resolved pretrial so
13  that I understood that you wanted to raise that before them
14  and to raise with the law.
15    This is not an appropriate way to proceed on this
16  issue.
17    MR. NORINSBERG:  Your Honor, it's his credibility.
18    THE COURT:  It's not his credibility.  It's more
19  than his credibility.  You're arguing that this doesn't
20  apply and he knew it didn't apply, and that seems to me to
21  be a question of law that should have been raised long
22  before now if you wanted to argue that.
23    MR. NORINSBERG:  He knew it didn't apply because
24  he brought it out at the trial.  I just read that testimony.
25  It's the chart you keep for six years, not the

---

1  prescriptions.
2    THE COURT:  Why haven't you brought that issue up?
3  Excuse me.  I want to know why that issue hasn't been
4  brought up and made plain to the Court that that was your
5  position before today?  I don't know whether that position
6  has merit or doesn't have merit, but it seems like to me
7  that it's something that should have been raised long before
8  right now in this context.
9    MR. NORINSBERG:  Your Honor --
10    THE COURT:  You have never at any point made that
11  plain to the Court, and I think that this Court relied on
12  that construction.  It wasn't challenged in any way in any
13  pretrial papers that I've seen.
14    MR. NORINSBERG:  It was.  Most certainly we
15  challenged it, your Honor.  But the issue had always
16  been --
17    THE COURT:  That this regulation didn't apply?
18    MR. NORINSBERG:  The issue had always been that
19  state education law controls and trumps.
20    THE COURT:  That's a difference.
21    MR. NORINSBERG:  I understand.
22    THE COURT:  You can bring out that he didn't think
23  it applied, you know, but to say now, to argue to him that
24  it doesn't apply, I think is -- and to argue to this jury
25  that legally this regulation doesn't apply is a problem.

---

1  It's a serious problem.
2    MR. NORINSBERG:  It applies.  It just doesn't use
3  the word "prescriptions."
4    THE COURT:  You're saying it doesn't apply to
5  prescriptions.
6    MR. NORINSBERG:  It applies to his charts, not his
7  prescriptions.
8    THE COURT:  Well, why am I hearing that, that
9  that's your position for the first time in this lawsuit?
10  When we argued this, I did not understand you to be making
11  that argument.
12    MR. NORINSBERG:  I'm sorry, your Honor.
13    THE COURT:  Do you understand why it's a problem?
14    MR. NORINSBERG:  I understand why the Court
15  believes it's a problem.  My view is this is a credibility
16  issue that he knew because he put that expert on.  The
17  expert said it clearly at trial and yet he presented an
18  affidavit to convince you to throw out our case.
19    That's what's happened here.  That's serious.
20    THE COURT:  Don't you think perhaps you should
21  have raised it with me as opposed to the jury?
22    MR. NORINSBERG:  I did.
23    THE COURT:  You raised to this Court that he put
24  in an affidavit that was false and that this doesn't apply?
25  You want to show me in the papers?

**JA372**

1    MR. NORINSBERG:  I did not say it like that, your

2    Honor.  But when you're prepping for trial and you're doing

3    a cross-examination, this is the stuff -- you look at stuff

4    again and again and it becomes clear that he lied.  And he

5    lied to convince you and effectively.

6        THE COURT:  Are we going to go into what he said

7    in summary judgment motions and then have before this jury

8    that he was trying to convince the Court here in this Court

9    that he lied about that as well?

10       MR. NORINSBERG:  Not at all.  Well, the bottom

11   line is, your Honor, he is trying --

12       THE COURT:  What do you think we have premotion

13   conferences for, counsel?  What do you think the point of

14   all that is?

15       You know, I have tried -- I know that this is a

16   difficult case for both sides.  I've tried my level best to

17   make sure that we have issues resolved so that we don't

18   have, you know, the jury being concerned about something.

19   But I have a real problem with the fact that you're trying

20   to argue at this point in time that the regulation doesn't

21   apply and that he lied about it.

22       MR. NORINSBERG:  This is my argument.  He wrote

23   this declaration or at least signed off on it.  According to

24   the declaration he submitted to this Court, the word

25   "prescription" is nowhere in there.  And he knows that.  And

1    he still submitted this affidavit to this Court.

2        THE COURT:  Now you're going to argue before the

3    jury that he lied to this Court.  Now, what are they going

4    to do?

5        MR. NORINSBERG:  I've already opened on that he

6    lied.  I crossed him that he lied.

7        THE COURT:  That he lied before this Court?

8        MR. NORINSBERG:  I opened that he lied to the

9    affidavit.  When I crossed him, the first thing I said is

10   you submitted it in connection with the summary judgment

11   motion.  You were trying to get the case thrown out.

12       THE COURT:  Well, not as to this issue.  Did you

13   raise this issue in your opening statements about

14   prescriptions?

15       MR. NORINSBERG:  Yes.  I didn't open on what he

16   lied about because I didn't want to tip everybody off on the

17   other side.

18       THE COURT:  How about not tipping me off?

19       MR. NORINSBERG:  I'm sorry, your Honor.

20       THE COURT:  How about not tipping the Court off?

21       MR. NORINSBERG:  I'm just trying to do my job,

22   your Honor, I swear.  That's all I'm trying to do.  I'm

23   fighting for my client.

24       THE COURT:  I understand that, but I hope you

25   understand my position.

1        MR. NORINSBERG:  I do.

2        THE COURT:  I'm not going to -- at this point in

3    time whether it would have been valid at any other point in

4    time after all that has gone on, I am not going to allow you

5    to cross-examine on this affidavit and on this regulation.

6    You can cross-examine him to the extent that you can say he

7    didn't raise this regulation before, that's fair game.  You

8    can argue about his putting the judgment.

9        But I'm not going to allow you to make an argument

10   at this point in time that this regulation doesn't apply.

11       MR. NORINSBERG:  Okay.

12       THE COURT:  That's not fair.

13       MR. MILLER:  Your Honor, we moved in limine saying

14   it was law of the case that the six-year rule applied here.

15   So, you know, I think we're entitled to an instruction to

16   the jury that the six-year rule applies.  That's the law of

17   the case.

18       MR. NORINSBERG:  That's completely wrong.

19       THE COURT:  That's something we can raise after

20   you've had time to point -- I'm not going to deal with that

21   issue and keep the jury out now on that issue.  We can talk

22   about that later.  I'm not going to permit cross-examination

23   on this at this point in time.  It's just not fair.

24       Okay.  Here you go, counsel.  We'll come back in

25   about five minutes, okay.

1        (Recess taken.)

2        THE COURT:  All right.  Bring the jury out.

3        (Jurors enter the courtroom.)

4        THE COURT:  All right.  Ladies and Gentlemen,

5    we're ready to proceed.

6    Q    Can we agree, Mr. Fusto, that the date of your

7    affidavit was approximately November 20th, 2009?  Does that

8    sound right?

9    A    It sounds right.

10   Q    So, in fact, sir, the very first time you raised this

11   issue was almost eight years after the Morse investigation

12   opened, true?

13       MR. MILLER:  Objection; vague.

14       THE COURT:  Overruled.

15   A    The first time I raised the issue?

16   Q    The first time you raised the issue anywhere at any

17   time was almost eight years after the Morse investigation

18   had opened, true?

19   A    I'm just not sure what you mean by "raised the issue."

20   Q    You raised it in your declaration about the six-year

21   requirement, correct?

22   A    Well, it's a yes.

23   Q    You never raised that issue about a six-year

24   requirement at any time prior to that going all the way back

25   to 2002, right?

1    A    No, that's not true.

2    Q    Show us one document, one memo, one indication anywhere

3    that you raised it before 2009.

4    A    Not in a document.  I had these conversations with

5    Dr. Morse's defense counsel.

6    Q    You never once had that conversation, did you, sir?

7    A    We argued somewhat about that.

8    Q    Would you agree, Mr. Fusto, that if you believed as the

9    prosecutor in this case that it was important to keep

10   prescriptions for six years, you would have been obligated

11   to bring that up while you were prosecuting the case,

12   wouldn't you?

13             MR. MILLER:  Objection.

14             THE COURT:  I'm going to sustain the objection and

15   ask you to move on to a different area of inquiry.

16   Q    Now, you told us yesterday, sir, that part of the

17   process you went through with Mr. Castillo is you were

18   trying to figure out a ceiling for the Medicaid numbers; is

19   that correct?

20   A    Yes, sir.

21   Q    And part of figuring out a ceiling required you to plug

22   in what the proper Medicaid price would be, right?

23   A    Yes.

24   Q    So it would be important to make sure that you were

25   using the correct Medicaid price when you're doing that

1    plug-in process, correct?

2    A    Yes.

3    Q    Because, in fact, the Medicaid prices were consistently

4    increasing over the course of the audit period, true?

5    A    I think there was at least one price increase.  I don't

6    know what juncture they're increased at it, though.

7    Q    Would you agree that Mr. Castillo consistently used the

8    wrong, outdated lower numbers for every partial upper

9    procedure that he designated?  Would you agree with that?

10   A    I couldn't agree with that.  I don't know.

11   Q    Would you agree that he used consistently the wrong

12   lower number for every partial lower denture that he

13   assigned a value to?  Would you agree with that?

14   A    I couldn't agree with that.  I can tell you that it

15   would come up, and he would have to go back and do it again.

16   Q    Would you agree that he consistently used the wrong

17   lower Medicaid value for every full upper denture that he

18   evaluated?  Would you agree with that?

19   A    As I sit here, no, I can't answer that.

20   Q    Would you agree that he consistently used the wrong,

21   lower outdated Medicaid value for every lower denture that

22   he ascribed to?

23   A    Again, my answer would be the same.  Whenever he found

24   out about that, I believe he went back and redid it again.

25   That's one of the reasons why we had a lot of back and

1    forth.

2    Q    Actually, he never did redo it, did he?

3    A    No, I'm pretty certain he did.

4    Q    He actually admitted at his deposition --

5             MR. MILLER:  Objection, objection.

6             THE COURT:  Sustained.

7    Q    You were here during the first day of the trial, sir?

8    A    Yes.

9    Q    Did you hear me cross-examine Mr. Castillo about

10   consistently using five procedures, using the wrong lower

11   price?  Did you hear that?

12             MR. MILLER:  Objection.

13             THE COURT:  Sustained.

14   Q    Now, you were the supervisor of this team, correct?

15   A    No.  It's like -- you're not supervising.  You're just

16   sort of running it.  You're not they're superiors.

17   Q    So you're not really the supervisor on the team?

18   A    No.  You're running the investigation.

19   Q    Doesn't the buck stop here with you?  I mean, you're

20   the head of the investigative team.

21   A    Yes.

22   Q    At the end of the day, isn't it your job to make sure

23   that you're presenting correct, factual information by the

24   time you go to a grand jury?

25   A    My responsibility, yes.

1    Q    Those numbers were significantly wrong because you were

2    using the wrong Medicaid prices; isn't that true?

3    A    No.  I don't believe that to be true at all.

4    Q    Did you ever double-check and see whether he was using

5    the proper prices?  Yes or no?

6    A    I rely on what Mr. Castillo does.

7    Q    So you have no firsthand knowledge as you sit here

8    today as to whether or not he used the wrong prices, true?

9    A    Firsthand in the sense that I double-checked his

10   numbers, no, you would be right.

11   Q    Now, you were shown Defendants' Exhibit D, a first page

12   of Design Dental.  Do you recall taking a look at this, sir?

13   A    Yes.

14   Q    And you pointed out how about Mr. Castillo was giving a

15   $800 credit and $400.  Do you see that?

16   A    That's the way I'm reading this document, yeah.

17   Q    Well, did you read the rest of the document that it was

18   attached to, all the other pages?  Because there are no

19   values on any of the other --

20             THE COURT:  Why don't we have a question answered

21   first.

22             Did you look at the balance of the pages on that

23   exhibit?  I take it Exhibit D has more than one page?

24             MR. NORINSBERG:  That's correct.

25             THE COURT:  Did you look at the balance of those

1  pages?
2          THE WITNESS:  No.  I was looking at the front
3  page.
4          THE COURT:  So you haven't seen the balance of the
5  pages?
6          THE WITNESS:  No, your Honor.
7  Q    These are the Design Dental invoices.  I want you to
8  take a look at them.  Take a look through it, sir.
9  A    Yes, sir.
10 Q    You were using page 1 as an example.  You wanted to
11 show as an example of what Castillo was doing, right?
12 A    Yeah.  Looks like an example of what I thought he did.
13 Q    Okay.  But, in fact, it's not an example because he
14 doesn't do it on any other page throughout the entire
15 document.
16         THE COURT:  Is that a question?
17         MR. NORINSBERG:  Yes.
18         THE COURT:  Okay.
19 Q    Correct?
20 A    I don't see numbers in those columns, yes, correct.
21 Q    All right.  So the one that you wanted to show the jury
22 as an example actually is only an example of one of those
23 pages, right?
24 A    Okay.
25 Q    He didn't do any of those calculations on any of the

1  other pages, true?
2  A    He did the calculations.  He obviously did the
3  calculations.  I mean, his numbers are what they are.  Where
4  he put the numbers -- the Medicaid numbers for the
5  procedures that are listed on here, I can't really say.
6  Q    And you do see the OOO on the right-hand column?
7  A    Yes.
8  Q    And with question marks, those all got assigned zeros,
9  too, correct?
10 A    At what juncture these were done, I can't really say.
11 Obviously, he had questions.
12 Q    Now, you heard testimony in this trial about the fact
13 that there were very poor copies and difficult to read.  Did
14 you as the head of the team ever try to get clearer copies
15 for your auditor to review?
16 A    I think we went back to the lab to try to get something
17 better.
18 Q    But actually the first time your investigator went to
19 the lab, they still had the originals, true?
20 A    I don't know that.  I heard Investigator Flynn talk
21 about that yesterday.  He would know.
22 Q    Now, do you remember talking yesterday about how you
23 were -- you did a number of calculations, and you were
24 giving Dr. Morse some of the charts?  You were giving him
25 credits for missing invoices.

1      Do you remember that testimony, sir?
2  A    I'm sorry.  Say that again.
3  Q    Do you remember looking at certain exhibits that you
4  were shown by Mr. Miller and saying that your office was
5  trying to give Dr. Morse credit?  Do you remember that?
6          MR. MILLER:  Objection; mischaracterizes.
7          THE COURT:  You were trying to -- I'm sorry.
8  Could you just repeat your question.
9  Q    Do you remember testifying that as part of the
10 evaluation process you were trying to give Dr. Morse certain
11 credit for missing invoices?  Do you recall testifying to
12 that?
13         MR. MILLER:  Objection.
14         THE COURT:  Overruled.
15 A    Yes.  For missing invoices?
16 Q    Yeah.
17 A    I think ultimately we did.  Or, no, my mistake.  I
18 think ultimately -- for missing invoices from the labs?  I
19 want to make sure I understand your question.
20 Q    Yes, that's correct.
21 A    I think ultimately we decided not to.
22 Q    That was that big decision you were talking about,
23 right?
24 A    Well, it was one of the decisions that struck us as
25 probably important at the time, yeah.

1  Q    So the decision was do we give Dr. Morse zero credit
2  for 19 months of invoices out of 36 months, right?  That was
3  the question on the table, right?
4  A    I think it was more the 11 months because we were
5  focused on Design Dental.  I'll agree with what you're
6  saying about 19, but I think we were more focused on the 11
7  for the Design Dental ones, but yes, the principle is the
8  same.
9  Q    You didn't give him credit on the eight months either?
10 Can we agree on that?
11 A    No, we did not.
12 Q    So in total you gave zero credit for 19 months out of
13 36 months, correct?
14 A    Yes.
15 Q    But you were trying to do everything you could to
16 benefit Dr. Morse, right?
17 A    Within reason.
18 Q    That was one of the reasons you tried to help Dr. Morse
19 by giving him zero credit for 19 months out of 36 months,
20 correct?
21         MR. MILLER:  Objection.
22         THE COURT:  Overruled.
23 A    The idea was not to --
24 Q    It's a yes or no, sir.
25 A    Repeat the question, please.

**JA375**

1  Q   The way -- one of the ways you were trying to help

2  Dr. Morse and benefit him was by giving him zero credit for

3  19 months out of 36 months in this audit, right?  That was

4  the way you were trying to help him?

5  A   The idea wasn't to help.

6  Q   It's a yes or no.

7       THE COURT:  No, it's not a yes or no.  If you ask

8  that type of question, the witness can explain the answer.

9       Go ahead.

10  A   Okay.  The idea was not to help.  The idea was to try

11  and be as reasonable and hopefully as fair as we could be

12  given what we had to work with.  It's that.

13       In other words, we weren't investigating the case to

14  help Dr. Morse.  We were investigating the case because we

15  believed a fraud had been committed.  But in order to

16  determine that, you don't want to go off half-cocked, but

17  you need something to work with.  And that's what it was.

18  So a decision had to be made.

19  Q   Okay.  And that decision that was made was that when

20  you get in front of the grand jury, you're going to give

21  numbers that give Dr. Morse zero credit for the missing

22  months; is that correct?

23  A   That appears to have been the final calculation.

24  Q   You never disclosed to the grand jury that there were

25  19 months of missing invoices, did you?

1       MR. MILLER:  Objection.

2       THE COURT:  Sustained.

3  Q   Did you ever elicit any testimony from Mr. Castillo

4  with respect to how he did his analysis with regard to any

5  missing invoices?

6       MR. MILLER:  Objection.

7       THE COURT:  Sustained.

8  Q   Mr. Castillo told the grand jury that he had based his

9  audit on a full three years of invoices?  True or not true?

10      MR. MILLER:  Objection.

11      THE COURT:  Sustained.

12  Q   Were there any calculations presented to the grand jury

13  relating to missing invoices?

14      MR. MILLER:  Objection.

15      THE COURT:  Sustained.

16  Q   Now, you testified before that you came up with a

17  number that you thought was a ceiling, and you felt pretty

18  comfortable with that number, right?

19  A   Yeah.  Yes.

20  Q   In fact, Mr. Fusto, without knowing what work was done

21  during those missing months, you would have no way of

22  establishing the maximum amount that Dr. Morse could have

23  billed Medicaid during those months; isn't that true?

24  A   To a certainty, no.

25      THE COURT:  I just need to clarify something

1  because it's not clear to me.

2       Were you operating, Mr. Fusto, on the premise that

3  if the invoices did not exist, that the work wasn't done?

4  Was that the premise you were operating on or not?

5       THE WITNESS:  I think ultimately we did.  We did

6  go back and forth about that because, you know, to some

7  degree there's -- if you have missing invoices, you know,

8  you're making a decision in a vacuum.  We did go back and

9  forth about whether we were going to do an analysis giving

10  Dr. Morse credit on that or not.

11      And ultimately, obviously the numbers are what

12  they are, but ultimately we decided it was just -- it

13  was -- there was no particular reason we can think of to do

14  that.

15      THE COURT:  Just so it's clear, and I only asked

16  the question to clarify, you were then operating on the

17  premise that if the invoices weren't there, then the work

18  hadn't been done?  Was that the reason the credit wasn't

19  just given, just so I understand?

20      THE WITNESS:  Yes.  That would be the ultimate

21  decision.

22  Q   In fact, you yourself believed that Dr. Morse was still

23  doing work during that time, didn't you, sir?

24  A   I had no reason -- during the time that there was no

25  invoice?

1  Q   Yes.

2  A   In the absence of something to the contrary, I guess I

3  would have to take that position, yes.

4  Q   Referring to your deposition --

5       THE COURT:  I'm sorry.  Take what position?

6       THE WITNESS:  That theoretically Dr. Morse

7  was -- would have been doing some work then.

8  Q   Referring to your deposition, page 117, line 5.

9       "Question:  Would you agree that Dr. Morse was still

10  sending work to these labs during the months when there were

11  missing invoices?

12      "Answer:  I would have assumed he did, yes."

13      Page 117, line 11.

14      "Question:  And to the extent that he was sending work

15  to the dental labs during those missing months, he was

16  getting charged for the work that the labs were doing,

17  correct?

18      "Answer:  I would assume so.  I would assume he was,

19  yes."

20      Do you recall giving that testimony, sir?

21  A   Yes, sir.

22  Q   So, in fact, it was your personal belief that he was

23  still doing work and actually getting charged by these labs

24  for those 11 months, correct?

25  A   It was my personal -- my personal belief has nothing to

1  do with it.  As a prosecutor, I wanted -- in the absence of
2  something, there was a period of time when I wanted to give
3  the benefit of the doubt.  That's the way I was thinking.
4  Q    But you didn't give him the benefit of the doubt by the
5  time it got in front of the grand jury?
6  A    I think ultimately at that point we had decided that it
7  was -- it may, in fact, be giving too much of a benefit of
8  the doubt.  I mean, you have to make a decision.  You can
9  agree with it or not agree with it, but we did.
10 Q    So that $600,000 fraud number that you were reporting
11 to your supervisor in March 2006 went up over a million
12 dollars by the time you presented to the grand jury; is that
13 correct?
14 A    I'm sorry.  Went up over a million dollars?
15 Q    Yeah.
16 A    Ultimately it did, yes.
17 Q    And by having that charge over $1 million, that ensured
18 that you could issue a press release relating to the dentist
19 being nabbed by Spitzer for a million dollars Medicaid
20 fraud, right?
21 A    No.
22 Q    Now, you testified at length yesterday about all the
23 methodologies and the different things that you and
24 Mr. Castillo were doing in terms of coming up with numbers
25 in explaining to this jury how you did it, right?

1  A    Yes.
2  Q    Would you agree, sir, that at your deposition you had
3  no idea how these calculations were made?  Would you agree
4  with that?
5  A    Well, when you were asking at the deposition, I didn't
6  really recall.
7  Q    Would you agree, sir, that even after the indictment,
8  you had no idea how the calculations were made?
9  A    Well, in the specifics, no, I couldn't testify like
10 Mr. Castillo could.  I didn't have the details.
11 Q    And you still don't have the details, do you, sir?
12 A    In terms of what Mr. Castillo did, no, that would be
13 correct.  That was Mr. Castillo's role.  I know how he did
14 it and I know what decisions were made, but in terms of the
15 specifics of it, I couldn't tell you.
16 Q    Now, you testified yesterday that doing in-mouth
17 examinations are of a limited usefulness; is that correct,
18 sir?
19 A    Yeah, they can be.  They have limitations.
20 Q    But in this case you were claiming that patients didn't
21 even wear dentures, right?
22 A    I wasn't claiming that.  The patients were saying that.
23 Q    Weren't you building your case on that theory, that the
24 patients were claiming they didn't have dentures?
25 A    That was part of the case, of course.

1  Q    Now, if you examined their mouths and they didn't have
2  any dentures or partial dentures, that would help prove your
3  case, right, sir?
4  A    It could or maybe.  I don't know the answer to that.
5  Q    Well, so an in-mouth exam actually can be very useful
6  for this type of case when the issue is whether or not the
7  patient has dentures, true?
8  A    Sure.  Could be.
9  Q    In fact, what better evidence could there be in a case
10 like this than actually having a dentist simply look in the
11 mouth of the patient to see if the patient has a partial or
12 full denture.
13      What better evidence could there be than that, sir?
14 A    What the patient says.
15 Q    You told us the other day that you have to take with a
16 grain of salt everything the patient says, right?
17 A    For some types of procedures, yes.
18 Q    Didn't you testify, to use your exact words, that
19 Medicaid patients can be extremely poor historians
20 especially with respect to dental services?  Didn't you
21 testify to that, sir?
22 A    And I stand by that.  For some -- for many dental
23 procedures, of course.
24 Q    The one way to get past that and not just rely on the
25 patients is to actually have your doctor, Dr. DeLuca, look

1  at the people, right?
2  A    I think she did.
3  Q    Well, we know for sure at this point six out of the
4  eight patients were never examined by her; isn't that true?
5        MR. MILLER:  Objection.
6  A    Right.
7  Q    Isn't it also true that the other two, there were no
8  false filing counts?
9  A    There weren't any.
10 Q    Now, you were shown yesterday a list of the patients
11 that Mr. Flynn had spoken to, correct?
12 A    I think so, yeah.
13 Q    Do you remember Mr. Miller asking you and having you go
14 through that document that the jury was looking at with the
15 names of patients that he spoke to in September of 2003?
16      Do you remember that?
17 A    Do I remember the testimony?
18 Q    Yes.  Do you remember that yesterday, testifying about
19 that?
20 A    Yes.
21 Q    So you had the information as early as September 2003
22 as to what the patients were allegedly saying, right?
23 A    Yes.
24 Q    And yet you go three years later to the grand jury and
25 none of those patients were ever examined, were they?

**JA377**

1    A    Examined?

2    Q    By Dr. DeLuca, were they?

3    A    No.  Not that I know of, no.

4    Q    Now, one of those people on that list was a patient

5    called Miriam Perez, correct?

6    A    Yes.

7    Q    Miriam Perez, in fact, has dentures, doesn't she?

8    A    I don't believe she ever -- I don't believe that to be

9    true.

10   Q    I'd like to show you a document that's been marked

11   Plaintiff's Exhibit 82.  I'd like you to take a look at that

12   document.

13   A    Okay.

14   Q    Do you recognize that document, sir?

15   A    No.

16   Q    It's a document from your office, isn't it?

17   A    It looks like it is, yeah.

18   Q    Do you see a Bates stamp number at the bottom?

19   A    Yes.

20        MR. MILLER:  Objection.

21        THE COURT:  To what?  It hasn't been offered.

22   Q    Without reading the document just yet, directing your

23   attention to the highlighted portion of the document in

24   front of you, you read it to yourself.

25        Does that refresh your memory, sir, as to the fact that

---

1    Miriam Perez did actually wear dentures?

2    A    No.

3    Q    It doesn't refresh your memory?

4    A    No.  I don't know what this is.

5        THE COURT:  Well, you don't say anything else

6    about it.

7        THE WITNESS:  I'm sorry.

8    Q    Do you understand, Mr. Fusto, the difference between a

9    denture and a partial denture?

10   A    I guess in general terms I do.

11   Q    Dentures that people talk about generally, they think

12   of pulling out a whole set of teeth, right?

13   A    I guess that's one way to look at it, sure.

14   Q    But a partial denture could be even one or two teeth in

15   the mouth, correct?

16   A    Don't know.

17   Q    Did you ever ask any of the patients you interviewed

18   whether or not they wore partial dentures?

19        MR. MILLER:  Objection.

20   A    Specifically about partial dentures, I don't remember.

21   Q    In fact, the transcript that we just heard, every time

22   you asked the question, you always used the word "denture,"

23   right?

24   A    Okay.  If that's what it says.

25   Q    You never once said partial denture, did you?

---

1    A    Not that you've read or I've seen.

2    Q    Isn't it true, Mr. Fusto, that every single

3    juror -- every single patient who testified in front of that

4    grand jury, every single one of them has partial dentures;

5    isn't that true?

6    A    I don't know that to be true.

7    Q    Well, you're the prosecutor, you were in charge of this

8    investigation.  Wouldn't that have been due diligence to

9    find that out?

10        MR. MILLER:  Objection.

11        THE COURT:  Sustained.

12   Q    As you sit here today, can you tell this jury under

13   oath --

14        MR. MILLER:  Objection.

15        THE COURT:  Sustained.

16   Q    Do you know at all whether any of the patients --

17        MR. MILLER:  Objection.

18        THE COURT:  Sustained, sustained.

19   Q    Sir, before you put these witnesses on the stand,

20   wouldn't you want to talk to them first?

21   A    I did.

22   Q    And wouldn't you want to find out if you're talking to

23   them whether or not they had partial dentures?

24   A    I asked them about the dentures.  It's entirely

25   possible when I said dentures, I sort of generically as a

---

1    category, I --

2    Q    Would you agree that most people when they hear the

3    word "dentures" think of it the way I just described it?

4        MR. MILLER:  Objection.

5        THE COURT:  Sustained.

6    Q    Now, you testified yesterday that you don't believe in

7    actually looking at a patient's chart; is that correct, sir?

8        MR. MILLER:  Objection.

9        THE COURT:  Overruled.

10   A    What I said was looking at a patient's chart to

11   determine whether or not something had been done or not done

12   is to me of limited utility.

13   Q    The issue in this case was whether the patients had

14   dentures or partial dentures.  Wasn't that the main issue,

15   sir?  Yes or no?

16   A    I think the main issue --

17   Q    Yes or no?

18   A    I would actually have to say no.  It was an issue.  It

19   wasn't the main one.

20   Q    Would you agree that if you had actually bothered

21   looking at these patients charts, you might have actually

22   seen x-rays in those charts?

23        MR. MILLER:  Objection.

24        THE COURT:  Sustained.

25   Q    Now, in your history of working at the Medicaid Fraud

**JA378**

1  Control Unit, did you come to learn that dental patient
2  charts sometimes have x-rays in them?
3      A    Yeah.
4      Q    And did you come to learn the possible significance of
5  those x-rays in figuring out whether somebody has partial
6  dentures?
7      A    I've had a number of dental cases where I've asked
8  the -- a dentist, a consulting dentist, to look.  And more
9  often than not, the x-rays were not -- they were not
10 illustrative and very time-consuming.
11     Q    Time-consuming to simply have your dental expert look
12 at a patient's chart to look at x-rays?
13     A    No.  For the expert to go through the series of that.
14 It's been done.  My experience has been it's not that
15 illustrative.
16     Q    Have there been cases where it's actually been
17 illustrative and helpful?
18     A    I don't recall.  Sometimes -- like I said, it's not as
19 simple as you're making it out to be.
20     Q    Apart from the x-rays, the patient charts also would
21 have something, an in-mouth dental chart, which documents
22 all the missing teeth in the chart; isn't that true?
23     A    I'm sorry.  Could you repeat that.
24     Q    The patient charts actually have inside of them another
25 chart, a diagram that shows all of the teeth that are there

1  and all the teeth that are missing; isn't that true?
2          MR. MILLER:  Objection.
3          THE COURT:  Sustained.
4      Q    Are you familiar with the type of diagrams that
5  dentists use when they document missing teeth inside of
6  patient charts?
7          MR. MILLER:  Objection.
8          THE COURT:  Sustained.
9          Can we wrap this up, counsel.
10     Q    Now, you testified --
11         THE COURT:  How much longer, counsel, do you think
12 you're going to be?
13         MR. NORINSBERG:  Not that much longer, your Honor,
14 but I don't want to represent that it's a few minutes.  It's
15 going to be a little longer than that.
16         THE COURT:  Ladies and Gentlemen, I asked that
17 question because we're going to take our lunch earlier
18 today.  It will be from noon from 1:00.  And I would like
19 to, if possible, get this witness off the stand before then.
20     Q    Now, you testified yesterday that you prepared charts
21 based on witnesses that were going to testify in the grand
22 jury, is that correct, that you had Mr. Castillo prepare
23 charts based on witnesses who were going to testify in the
24 grand jury?
25     A    Prepare charts?

1      Q    The charts that we were talking about with the patient
2  summaries, Grand Jury 7 and 11.
3      A    Those aren't charts.  Those are the patient
4  summary -- the billing summaries.
5      Q    Okay.  They are the summary of the billings.  You had
6  Mr. Castillo prepare that according to what you told us
7  yesterday based on patients that were expected to testify;
8  is that right?
9      A    Yes.
10     Q    Okay.  Which of the three Edwin Gonzalezes were you
11 expecting to come to court?
12     A    I'm assuming it was going to be the one that had been
13 interviewed and had been examined for the in-mouth.
14     Q    So you knew that there was actually only one that had
15 been examined for the in-mouth and interviewed, right?
16     A    Well, I knew that there was one, yes.
17     Q    What about the other two?  You weren't expecting them
18 to come, were you?
19     A    Well, one of the three was going to be there.
20     Q    You knew that two of the three weren't going to be
21 there because they had never been subpoenaed, true?
22     A    Well, by logic, yes, that would be true.
23     Q    So you knew in advance that that Edwin Gonzalez chart
24 was going to reflect the billing summaries of three
25 patients, but, in fact, only one of them was going to show

1  up?  True or not true?
2      A    There were three of them on there so I guess that would
3  be true.
4      Q    Now, you told us that these documents were prepared
5  around the time of the grand jury.  That's what you told us
6  yesterday?
7      A    Yes, sir.
8      Q    In fact, do you remember telling us, sir, that when I
9  asked you the same question, you said they might have been
10 part of a much larger set of documents and you weren't sure
11 where they were prepared?  Do you remember that?
12     A    Some iteration of them may have been, but the documents
13 that I needed for Grand Jury 7 and 11 were for the grand
14 jury for the presentation.
15     Q    Well, there were quite a few iterations of the similar
16 looking documents during this investigation, weren't there,
17 sir?
18         MR. MILLER:  Objection.
19         THE COURT:  I'm sorry.  I don't understand the
20 question.
21     Q    In other words, there were earlier versions of
22 documents that looked almost identical which were created
23 long before the grand jury presentation, right?
24         MR. MILLER:  Objection.
25         THE COURT:  What's the basis of the objection?

1    MR. MILLER:  Foundation.
2    THE COURT:  He's asking -- do you know if there
3  were documents -- I'm sorry.  Documents that what?
4  Q    That look substantially the same as the ones you
5  presented to the grand jury but they were created during the
6  investigation.
7    Do you remember that, sir?
8  A    Could very well have been, sure.
9  Q    Let me show you what's been marked into evidence as
10 Plaintiff's 45.
11   MR. MILLER:  What number, counsel?
12   THE COURT:  45.
13 Q    Take a look at that document, sir.
14 A    Yeah.
15 Q    Does that document look very similar to the type of
16 document that appears in Grand Jury 7, the first page?
17 A    It would be.  There's a couple of fields that are not
18 on here that were on the Grand Jury 7 and 11.
19 Q    Would you agree it looks very similar?
20 A    Well, with that exception, yes.
21 Q    And that was created back in September 2003, correct?
22 A    Could be, sure.
23   THE COURT:  Do you know when it was created?
24   THE WITNESS:  I don't know.
25 Q    Is there a date on there?

---

1  A    It says 9-22-03.
2  Q    I'd like for you to take a look at Plaintiff's 90.
3    THE COURT:  I'm sorry.  Just so the record is
4  clear, you said that Exhibit 45, that there were fields that
5  were on 7 and 11 that were not on 45?
6    THE WITNESS:  Yeah.
7    THE COURT:  What fields were they?
8    THE WITNESS:  The invoice number and the Julian
9  date.
10   THE COURT:  Okay.
11 Q    But everything else was the same, correct, sir?
12 A    Well, I think these were -- the auditor would have
13 looked at these when the patients were interviewed so I
14 think they were comparing the patient's interview with the
15 patient's bill.  But that's ordinarily what they would have
16 done.
17 Q    In fact, in September of 2005, you asked Mr. Castillo
18 to do printouts of these billing summaries and show them to
19 the labs; is that fair to say?  Take a look at 90 that's in
20 evidence.
21 A    I don't know whose handwriting this is.
22 Q    I understand, but it's in evidence and it's been
23 identified.
24   Does that refresh your memory at all as to whether or
25 not you asked Mr. Castillo to go out print patient summaries

---

1  and speak to the labs in September of 2005?
2  A    No.  Because -- it doesn't because what you're
3  referring to is in the handwriting and it's not mine.
4  Q    But you see you're on the e-mail exchange, aren't you?
5  A    Right.  But I'm assuming the handwriting wouldn't have
6  been on the e-mail exchange.
7  Q    But the handwriting comes from a directive that you
8  gave?  Is that true or not true?
9  A    I can't say that.  That could have been the
10 investigator asking that.
11 Q    Now, you gave some testimony about your initial opening
12 of this investigation and that it came from the Department
13 of Health; is that right?
14 A    I think that's my understanding of it.
15 Q    And would you agree, sir, that the purpose of that
16 initial case opening memo was simply to have you investigate
17 to see if there even was a case?  Would you agree with that?
18 A    Sure.
19 Q    That was actually explicitly set down in the
20 investigative memo, right?
21 A    Yeah, that's what it is.
22 Q    And it took you four years to figure that one out,
23 right, sir, that you had a case?
24   MR. MILLER:  Objection.
25   THE COURT:  Sustained.

---

1  Q    Now, we've heard some testimony here, a suggestion that
2  somehow you needed to lower a number in order to enter into
3  plea negotiations.  Were you here when that testimony took
4  place?
5  A    I was here.
6    THE COURT:  Was this addressed in counsel's
7  questioning because if it's not, I don't think it's
8  appropriate to open up another area and go back into that
9  area.
10   MR. NORINSBERG:  I think it was addressed with the
11 discussions with counsel and dispositions and things like
12 that.
13   THE COURT:  I don't believe so.  We can look at
14 the transcript later, but I don't believe so so I'll
15 preclude now any cross-examination about that area.
16   MR. NORINSBERG:  Okay.
17 Q    Now, Mr. Fusto, are you familiar with what the term
18 "chart audit" means?
19   THE COURT:  I'm sorry, what?
20 Q    Chart audit.
21 A    I've heard the term.  I don't know what it entails.
22   MR. MILLER:  Objection.
23 Q    You actually --
24   THE COURT:  I'm going to sustain the objection to
25 this inquiry as well.  I don't think this had anything to do

**JA380**

1  with the subject matter of the cross and direct of the
2  defendant.
3         MR. NORINSBERG:  It only goes to the calculations
4  that were supposedly made in this case, your Honor.  I think
5  it's fair game.
6         THE COURT:  I think that it should have been gone
7  into before.
8  Q   Now, you were asked questions about missing tooth
9  numbers in Grand Jury 7.  Do you recall that?
10  A   Yes.
11  Q   Would you agree, sir, that there was an earlier version
12  of this document, Grand Jury 7, which actually contained
13  tooth numbers?
14         MR. MILLER:  What is he showing the witness?
15         MR. NORINSBERG:  134.
16  A   This is some version of it, sure.
17         MR. NORINSBERG:  I offer 134 into evidence.
18         MR. MILLER:  Objection; foundation.
19         THE COURT:  I'll sustain the objection unless
20  there's some further foundation as to when the document was
21  created.
22  Q   When was that document created?
23         THE COURT:  Did you ask that the document in front
24  of you be created?
25         THE WITNESS:  No.

1  Q   But it was part of your investigation, wasn't it, sir?
2  A   Could have been part of the auditor's running of the
3  billings.  They often will do their own spreadsheets.  It
4  wasn't something I was specifically asking for.
5  Q   You saw an earlier version of Grand Jury 7 and after
6  seeing that version with tooth numbers, that's when you made
7  a decision to delete them?  True or not true?
8         MR. MILLER:  Objection.
9         THE COURT:  You can answer.  Well, I think that
10  you are going to have to break your question down in parts
11  because it's a number of questions.
12         And I guess the first question is, did you see an
13  earlier version of 7 that had tooth numbers prior to your
14  asking that 7 be produced?  Do you remember seeing a
15  document that had tooth numbers?
16         THE WITNESS:  No.
17  Q   Isn't that the document in front of you?
18  A   I can't say that I've seen this before.
19  Q   But you might have seen it before during your
20  investigation?
21         MR. MILLER:  Objection.
22         THE COURT:  Sustained.
23  Q   Now, sir, you mentioned during your examination of
24  Mr. Miller that you're working for Fidelity Trust Company?
25  A   National Title Insurance Company.

1  Q   Are you practicing law?
2  A   Not at the moment.
3  Q   So you stopped being an active practitioner in the law?
4  A   No.  Right now I'm sort of in a management issue that I
5  have to assist the company in creating like a unit.
6  Q   Okay.  Could we agree as of now you're no longer
7  practicing law?
8  A   No.  I'm actively practicing law.  I'm just not during
9  this period of time actively practicing.
10  Q   Now, you testified yesterday about the price of the
11  labs being very low.  Do you recall that?
12  A   The prices?
13  Q   Of the labs that Dr. Morse was doing business with.
14  A   One of them, yeah.
15  Q   In fact, the price of Design Dental is comparable to
16  many other small labs in the New York area; isn't that true?
17  A   I have no idea.
18  Q   You never investigated that, did you, sir?
19  A   No.
20  Q   So why did you tell this jury that it seemed very small
21  when you hadn't even investigated the other labs' prices?
22         MR. MILLER:  Objection.
23         THE COURT:  Sustained.
24  Q   Did you ever at any time during your investigation look
25  at the other lab prices?

1  A   What other lab prices?
2  Q   Other labs in New York that were providing the same
3  services as Design Dental.
4  A   No.
5  Q   Now, you told us yesterday that there's nothing wrong
6  with a profit spread itself, right?
7  A   In and of itself, of course not.
8  Q   And you told us when I was asking you questions the
9  other day that a practitioner could have the ratio of up to
10  1 to $6; in other words, $1 dollar spent on the lab and he
11  could recover 6 from Medicaid, correct?
12  A   Theoretically, yes.
13  Q   Could even be more.  It could be 7- or 8- or $9, right?
14  There's no set limit on that ratio, is there?
15  A   No.
16  Q   Now, if Dr. Morse had actually paid these labs
17  $318,000, six times that number would be $1.8 million,
18  wouldn't it?
19  A   Okay.
20  Q   And you'd have no problem, just that in itself wouldn't
21  tell you anything about Dr. Morse doing anything wrong,
22  right?
23  A   That fact alone?
24  Q   Right.
25  A   That fact alone would cause me to think about it, but

1    alone, I would not indict or charge somebody on that basis

2    alone.

3    Q    That's exactly what happened in this case; he paid the

4    labs over $300,000 --

5              MR. MILLER:  Objection.

6              THE COURT:  I'll sustain the objection.

7    Q    Sir, you told us that you were comfortable with the

8    $1.1 million; is that correct?

9    A    Eventually, yes.

10   Q    But, in fact, you couldn't even prove $3,000, true?

11             MR. MILLER:  Objection.

12             THE COURT:  Sustained, sustained.

13             MR. NORINSBERG:  Nothing further.

14             THE COURT:  Do you have anything further?

15             MR. MILLER:  I have a few short ones.

16             THE COURT:  We'll be done by noon?

17             MR. MILLER:  I believe so.

18   RECROSS-EXAMINATION

19   BY MR. MILLER:

20   Q    Mr. Fusto, when was the last time you appeared in a

21   courtroom as an attorney?

22   A    End of -- middle of December last year.

23   Q    Okay.  And what were the circumstances of that?

24   A    Well, I had to -- I was pro hoc into a case in Texas.

25   Q    Okay.  Where were you working at the time of this?

1    A    Here at Fidelity.

2    Q    So in your current job you've done trials for your

3    current employer?

4    A    Three.

5    Q    You've done three trials for Fidelity?

6    A    Uh-huh.

7    Q    Okay.  Mr. Norinsberg asked you some questions about

8    various spreadsheets.  You remember that?

9    A    Yes, I do.

10   Q    And you indicated that some of the spreadsheets he

11   showed you didn't have an invoice number column on it or

12   Julian date column on it?

13   A    Yes.

14   Q    What is the significance of that to you?

15   A    Well, as I mentioned, it's for the false filing

16   charges.  False filing is a very technical crime.  And for a

17   submission, you need in the charge the invoice number and

18   the date of submission.  Those are the two principal pieces

19   that help establish the elements of crime.

20        The Julian date, as I mentioned yesterday, that's like

21   an auditor thing.  When they asked me what columns do you

22   want or what fields do you want, they would ask me do you

23   want the Julian date.  And they tried to explain it to me

24   and it kind of goes over my head, but it has something to do

25   with the date in the Department of Health database that they

1    need to convert into something called the Julian date.  So

2    that's how I know.

3    Q    So if a spreadsheet -- a summary spreadsheet -- didn't

4    have an invoice number on it, could you use it in the grand

5    jury?

6    A    No.  I need the invoice number, and I need the date of

7    submission.

8    Q    Mr. Norinsberg asked you about the Grand Jury Exhibit

9    11 and the page concerning Edwin Gonzalez.

10   A    Yes.

11   Q    At the time you presented Grand Jury 11 to the grand

12   jury, did you notice that there were three different Edwin

13   Gonzalezes on that page?

14   A    I couldn't say for sure.  I mean, those three Edwin

15   Gonzalezes were also -- were probably going to be in the

16   provider profile, which was also in evidence.  It wasn't

17   something that, you know, I thought of any significance

18   because one of them was testifying and I wasn't going to use

19   it for any other purpose than his testimony.

20   Q    With respect to the testimony in the grand jury of the

21   Medicaid recipients, did you ask them what services they

22   received when they went to 580 Dental?

23   A    Yes.

24   Q    Did they describe what services they received when they

25   went to 580 Dental?

1    A    I mean, in relevant and broad terms, they did, yes.  It

2    was consistent with what they testified in the grand jury.

3    Q    Do you remember whether Stacy Rodriguez indicated that

4    she had a partial denture when she testified in the grand

5    jury?

6    A    I mean, without going back over the testimony, I

7    couldn't say for sure.

8    Q    Well, reading from SD-12801, line 19.

9         "Question:  When you were there, do you recall what

10   work was done?

11        "Answer:  I had one tooth pulled.

12        "Question:  One tooth pulled?

13        "Answer:  Yes.

14        "Question:  That's it?

15        "Answer:  That's it."

16        Do you remember that?

17   A    That's what she said.

18   Q    Does that refresh your recollection as to whether Stacy

19   Rodriguez indicated she had a partial denture when she

20   testified in the grand jury?

21   A    It refreshes my recollection as to what her testimony

22   was.  How it relates to the billings --

23   Q    And did she indicate that she had a partial denture?

24   A    No.

25   Q    Do you remember whether or not Sara Charles indicated

**JA382**

1  that she had a partial denture when she testified before the

2  grand jury?

3  A    Again, without having it in front of me.

4  Q    Reading from SD- -- Defendants' Exhibit C, SD-12774.

5     "Question:  Do you recall what work was done?

6     "Answer:  Yes.

7     "Question:  What was that?

8     "Answer:  My front tooth that's chipped and three

9  fillings.

10     "Question:  In the year 2000, did you have any

11  dentures?

12     "Answer:  No."

13     Does that refresh your memory about whether she

14  testified about whether she had partial dentures?

15  A    She did not say she had partial dentures.

16        MR. MILLER:  All right.  That's all I have.  Thank

17  you.

18        THE COURT:  All right.  Thank you.  You can step

19  down.

20        Ladies and Gentlemen, I'm going to excuse you for

21  the luncheon recess.  We'll resume at 1:00.

22        (Jurors exit the courtroom.)

23        THE COURT:  Gentlemen, we'll begin at 1:00.

24        (Recess taken.)

25        (Continued on the next page.)

---

1        (The Honorable Carol B. Amon takes the bench.)

2        THE COURT:  I told the jurors to come in at 9:30

3  tomorrow morning, and I canceled my calendar or the rest of

4  my calendar.  I was going to start this trial later, but we

5  need to get through this.  I canceled my calendar.  I also

6  told them if the weather was bad, if several live out in

7  Long Island, to let them leave early, just to let you know.

8        MR. FARBER:  Before we bring the jury back, we

9  have a scheduling matter I'd like to discuss with the Court.

10        THE COURT:  Does it affect Friday?

11        MR. FARBER:  It might affect Friday.  It's the

12  issue of my economist that I brought down from

13  Massachusetts.  He is outside now, downstairs.  And I

14  discussed now at the same time breaking from plaintiff's

15  testimony so I could get my economist on the stand.  We had

16  agreed to do that, and counsel now wants to condition what I

17  can ask my economist, which I can't really agree to.

18  Essentially, he's a rebuttal witness.  He has to address

19  what it is he'll be rebutting, and that would include the

20  ultimate damages figure.  And so as it is, my economist

21  isn't available tomorrow anyway.  He's got to testify at

22  another proceeding.  He might be available Monday.  I don't

23  even want to mention that word.  However, the State of New

24  York has paid to bring him down now, and I want him to

25  testify today.  That was my understanding, that we'd be

---

1  ready for him.

2        THE COURT:  How can he testify today?  Isn't that

3  going to be kind of awkward?

4        MR. FARBER:  It's awkward, your Honor, but he will

5  did testify regarding what we anticipate will be coming in.

6  I mean he's here, he's available.  This is my understanding.

7  We knew he was not available tomorrow under any

8  circumstances.

9        THE COURT:  Mr. Norinsberg, do you have a problem

10  with that?

11        MR. NORINSBERG:  No.  I've been trying to

12  accommodate them, as much as I don't want to break up my

13  plaintiff's testimony.

14        THE COURT:  Why don't we do it now?

15        MR. FARBER:  No.  I don't want him to go on

16  before my plaintiff.  I said he can testify completely

17  consistent with his report.  His report basically dissects

18  all of the premises and assumptions made by Dr. Mantel.  I

19  have no problem with that.  What I don't want him doing is

20  bandying about 6 million figures in front of the jury when

21  my economist hasn't even come on to give an opinion on how

22  he arrived at that.  He didn't just lump a number together

23  out of thin air.

24        THE COURT:  That's not going to work.  He

25  obviously needs to talk about what it is your economist is

---

1  going to talk about.  So it won't work to say it's okay with

2  us if he testifies, but he can't testify to the full scope

3  of what they want him to testify about.  It's just not going

4  to work if that's your position.

5        MR. NORINSBERG:  Then I would request that he

6  comes back on Monday morning.  It's not -- he's not a long

7  witness, and I still believe we can sum up Monday right

8  after him.

9        MR. FARBER:  If the plaintiff is willing to

10  reimburse the State of New York --

11        THE COURT:  Why should the plaintiff reimburse the

12  State of New York?

13        MR. FARBER:  Because the witness was ready today.

14        THE COURT:  If anything, you want me to reimburse

15  the State of New York?  It's not plaintiff's -- well, I

16  don't know whose fault it is that this case has droned on so

17  long.  Why should plaintiff pay to have him come back?

18  Plaintiff's position that he doesn't want him to testify at

19  this particular juncture seems to me not unreasonable that

20  he wouldn't want him to testify.  I don't think it's then

21  fair to say that the plaintiff has to pay for him to come

22  back.

23        MR. FARBER:  All right, your Honor.

24        THE COURT:  It's unfortunate.  I'm trying to do my

25  best keep this case going, including canceling my calendar

**JA383**

1 and taking other matters up at lunch.
2          MR. FARBER:  In that event, your Honor, the
3 witness did advise me he is available early on Monday.  He
4 does have to be back in Boston by the afternoon.  So if we
5 can take him first thing Monday.
6          THE COURT:  We'll take him first thing Monday.
7 Hopefully, your economist has gotten -- has gotten to
8 testify.
9          MR. NORINSBERG:  He'll be here tomorrow morning.
10          THE COURT:  There's a question about how far we
11 can go tomorrow morning.  At least he will have gotten in
12 whatever testimony you want him to get on even if you have
13 to break it up.
14          MR. NORINSBERG:  Exactly.
15          THE COURT:  He'll get that much testimony out.
16          MR. NORINSBERG:  Definitely.
17          MR. FARBER:  We'll bring him back Monday morning.
18          THE COURT:  Well, you know, life's tough.  If
19 you're trying to make me feel guilty about that, I'm not.
20 So let's move on.
21          MR. FARBER:  Thank you.
22          (The jury entered at 1:15 p.m.)
23          THE COURT:  All right, please be seated.
24 Mr. Norinsberg.
25          MR. NORINSBERG:  At this time, your Honor,

1 plaintiff calls Dr. Leonard Morse to the stand.
2          THE COURT:  Please stand and raise your right
3 hand.
4 LEONARD P. MORSE, after having first been duly sworn, was
5 examined and testified as follows:
6
7          THE COURT:  Please be seated and state and spell
8 your name for the record.
9          THE WITNESS:  Leonard, L-E-O-N-A-R-D, middle
10 initial P, last name Morse, M-O-R-S-E.
11 DIRECT EXAMINATION
12 BY MR. NORINSBERG:
13 Q    Good afternoon, Mr. Morse.
14 A    Good afternoon, Mr. Norinsberg.
15 Q    Are you currently employed, Dr. Morse?
16 A    Yes, I am.
17 Q    Where do you work?
18 A    I work at New York Methodist Hospital, here in
19 Brooklyn.
20 Q    What is your position at Methodist Hospital?
21 A    I'm an attending dentist, and I'm the chief of
22 restorative dentistry at the hospital.
23 Q    Can you tell us, Dr. Morse, what are your duties and
24 responsibilities in that position?
25 A    I supervise a dozen residents, and I also have several

1 other attendings under me in the restorative dentistry
2 program.
3 Q    How many days a week do you work at the hospital?
4 A    It varies.  Between two to three days, I attend at the
5 hospital.
6 Q    What hours do you work when you're attending at the
7 hospital?
8 A    We work from nine to five.
9 Q    Dr. Morse, what is your date of birth?
10 A    I was born on June 20th, 1947.
11 Q    How old are you now, sir?
12 A    I'm currently 65 years old.
13 Q    Are you married?
14 A    Yes, I am.
15 Q    Who are you married to?
16 A    I'm married to my wife, Darrell, who's sitting there.
17 Q    How long have you been married to Darrell?
18 A    This is my second marriage.  My first wife,
19 unfortunately, passed away.  I've been married for 18 years.
20 Q    Do you have any children?
21 A    I actually have six children.
22 Q    How many biological, how many stepchildren?
23 A    I have two by biologic and four step, but I consider
24 them all of my children because we've really grown up
25 together as a family.

1 Q    Do you have any grandkids at all?
2 A    We almost have nine grandchildren.  My other daughter's
3 back there and is pregnant delivering in a few months.
4 Q    Can you please tell the members of the jury a little
5 about your educational background?
6 A    Sure.  I went to high school here in Brooklyn Technical
7 High School.  Then I won a scholarship to NYU for a
8 seven-year program for a BS/D.D.S. combined degree.
9 Q    And when did you first decide that you wanted to become
10 a dentist?
11 A    I was actually in second grade.
12 Q    How did you know when you were just in second grade
13 that you wanted be a dentist?
14 A    I loved building models, and I loved conspiracies.  So
15 it seemed like a natural choice.
16 Q    Did you do a residency at some point?
17 A    When I finished NYU dental school, I spent a year in
18 Queens Hospital Center doing a general practice residency.
19 Q    What year did you actually graduate the program you
20 described a moment ago?
21 A    I graduated the hospital residency in 1973.
22 Q    And can you please tell the members of the jury a
23 little bit about your work history after your residency?
24 A    After my residency, I went into private practice with
25 the hospital director, Dr. Burton Wasserman, in Flushing;

1  and then after that stint of work, I went into private
2  practice here in Brooklyn, in Park Slope.
3  Q    Now, do you currently have a private practice,
4  Dr. Morse?
5  A    No, I do not.
6  Q    When was the last time you actually had a private
7  practice?
8  A    In April of 2006.
9  Q    Now, at that time, where was your office located?
10 A    I was located 588 Fifth Avenue in Park Slope, Brooklyn.
11 Q    And how long did you have a practice at that address?
12 A    For over 30 years.
13 Q    And can you tell us, Dr. Morse, what was it like in
14 that neighborhood when you first set up your practice and
15 going forward over the years?  What was it like?
16 A    It was working class.  It was families.  The majority
17 of the patients had insurance through the Medicaid program.
18 Q    And can you tell us, Dr. Morse, what type of patients
19 were you typically treating at your office?
20 A    I had several generations.  I treat -- I don't know how
21 better to phrase this.  I would treat children, who would
22 then grow up with me.  They would get married, have
23 children, and then their children would become my patients
24 also.
25 Q    And did there come a time where you were treating

1  mostly Medicaid patients?
2  A    Well, really, from the get-go, 95 percent of my patient
3  base was insured through the Medicaid program.
4  Q    How did it happen that way, that 95 percent of your
5  patient base were Medicaid patients?
6  A    Well, really two reasons.  It was the demographics of
7  the neighborhood, and it was also the fact that most
8  dentists -- I think there are only 5 percent of the dentists
9  in New York State who actually accept Medicaid patients in
10 their practice.
11 Q    And what was the other 5 percent of your practice?
12 A    We had varied.  We had some private patients.  I had
13 some police officers.  We had people from the UFT, from the
14 hospital union, 1199.
15 Q    When did you first become authorized to accept Medicaid
16 patients?
17 A    I received my Medicaid number in 1974.
18 Q    Can you tell us, Dr. Morse, in what manner would you
19 submit Medicaid bills for payment?
20 A    During what time frame?
21 Q    Starting basically at the beginning and just working it
22 through.  If it changed, tell us when it changed.
23 A    In the first few years, we were on a manual basis, a
24 number 2 pencil kind of thing.  Then as computers became
25 more popular, we switched over to computer billing.

1  Q    Now, did you work with any other dentist in your
2  practice?
3  A    Yes, I did.
4  Q    Who did you work with?
5  A    I had an associate for 25 continuous years, his name
6  was Dr. Brian Ketover.
7  Q    And how were the patients divided between the two of
8  you at your practice?
9  A    It was really mostly on a first come, first serve
10 basis.  There would be some patients that we were
11 historically treating other family members, so we tried to
12 have continuity with those patients.
13 Q    Roughly, what was the percentage breakdown of the
14 patients you were seeing and Dr. Ketover was seeing?
15 A    It was basically 50/50.  We would both see
16 approximately half the patient load.
17 Q    What was the name of the dental practice?
18 A    I was practicing under the name of 580 Dental PC.
19 Q    Now, Dr. Morse, when you first opened up your practice,
20 how many people, if anyone, did you have working with you at
21 that time?
22 A    As far as employees?
23 Q    Yes.
24 A    I had maybe two or these employees at the beginning, at
25 the start of my practice.

1  Q    And moving forward to 2006, how many people were
2  working in your office at that time?
3  A    At that point in time, I had eight other employees.
4  Q    And what positions did they have within the practice?
5  A    I had dental assistants, nurses, phlebotomists.  I had
6  a medical center, so I was also providing staff for my two
7  physicians in the building.
8  Q    Do you have any rough idea of how many patients
9  580 Dental has treated over that 30-year period?
10 A    I have a pretty good exact idea of how many patients I
11 had historically treated.
12 Q    How many?
13 A    About 30,000 patients, individual patients, in total.
14 Q    How do you know that?
15 A    When we computerized, we had all the patients put in a
16 database, so you could actually search it A through Z.
17 Q    During that 300year period, Dr. Morse, did you ever do
18 any type of advertising?
19 A    Not at all.  It was totally unnecessary.
20 Q    Why is that?
21 A    Because we had patients who were satisfied sending us
22 other patients.  Word of mouth was the best advertising you
23 could ever do.
24 Q    During that 30-year period doctor, did you have any
25 type of complaint against you?

**JA385**

1  A    Not a single one.

2  Q    Any type of malpractice lawsuits?

3  A    Not a single one.

4  Q    Did you own the building where 580 Dental was located?

5  A    No, I did not.

6  Q    What was the arrangement that you had for that office?

7  A    I had a long-term lease with the building owner.

8  Q    When you say "long-term lease," can you tell us first,

9  when did you first enter into that lease?

10  A    In 1974, I started working, and we had a 10- or 15-year

11  lease.  And the last lease I entered into was for 21 years.

12  Q    What year did you enter into that lease?

13  A    It was going to go until 2023.  So it was 2002, if I

14  did the math correctly.

15  Q    I'd like to show you what's been marked Plaintiff's

16  Exhibit 100.  (Handing.)

17       Do you recognize that document, Dr. Morse?

18  A    Yes.  It's a lease agreement for 580 Fifth Avenue,

19  Brooklyn by the owner of the building, Bernard Bank, with

20  580 Dental PC as the lessee, which would be me.

21  Q    And is that the lease that you were just referring to

22  that goes until 2022 or so?

23  A    Yes.  I see under the terms of the lease, it says for

24  21 years, commencing January 15th of '01 and expiring

25  January 14th of 2022.

1  Q    Okay.

2       MR. NORINSBERG:  I offer Plaintiff's Exhibit 100

3  into evidence.

4       MR. FARBER:  No objection.

5       THE COURT:  100 is received.

6       (Plaintiff's Exhibit 100 received in evidence.)

7  BY MR. NORINSBERG:

8  Q    Dr. Morse, why did you enter into a 21-year lease?

9  A    I fully anticipated practicing until the year 2022.

10  Q    And did you have any other tenants in your office at

11  the time?

12  A    Well, we were operating in a medical center, as I said

13  before.  So I had a physician, and I also had a pediatrician

14  in the building that I was renting space to.

15  Q    And they paid 580 Dental rent?

16  A    Correct.

17  Q    Now, did there come a time in your practice where you

18  were subject to an audit by Medicaid?

19  A    During what point in time?

20  Q    Let's talk globally over the 30 years.  Were you ever

21  subject to a Medicaid audit?

22  A    Absolutely.  I had numerous audits.  I had maybe four

23  or five comprehensive audits over those years, which was

24  almost continuous, because each audit is not really for a

25  year's work, it's for multiple years.

1  Q    Can you tell us, Dr. Morse, with respect to all of the

2  audits before 2002, what were the results of those audits?

3  A    There were no sanctions, no admonitions.  I was found

4  to have a perfect clean bill of health after the audit.

5  Q    Were there ever any issues raised with your

6  recordkeeping practices?

7  A    Absolutely none.

8  Q    Were there any issues raised with where you were

9  keeping prescriptions and so forth?

10  A    Absolutely never.

11  Q    Now, were you also subject to health department

12  inspections of your medical and dental practice?

13  A    Of course.  We had a shared health facility, so we had

14  periodic reviews by the health department.

15  Q    And did managed care companies also perform yearly

16  inspections of your office?

17  A    It was mandated.  They had to do that.  So they'd come

18  down on a yearly basis, and inspect what was done for the

19  patients and what our recordkeeping protocols were.

20  Q    Did you ever receive any sanctions from the yearly

21  managed care audits?

22  A    Never.

23       THE COURT:  Could you just explain what managed

24  care audits were?  I mean, what group conducted that audit?

25       THE WITNESS:  Managed care is a group of patients

1  that are under the umbrella of Medicaid.  And what they do

2  is they've taken on several thousands of patients as the

3  provider, and they divided them up to dentists, you know,

4  based on zip codes.  So for instance, a practitioner may

5  have a thousand or 2,000 that are managed care, that are not

6  what we call fee for service.  They're getting a set rate

7  per patient per month for providing dental services.

8       THE COURT:  But the group that comes to inspect,

9  who are they?  Is it an agency?

10       THE WITNESS:  An agency.  It's the people that are

11  actually running the managed care program that have the

12  agreement with the state.

13       THE COURT:  Okay.

14  BY MR. NORINSBERG:

15  Q    Now, directing your attention to August of 2002.  Did

16  there come a time then that you learned you were subject to

17  a Medicaid audit at that time?

18  A    Yes, there did.

19  Q    And when you first learned of the audit in August of

20  2002, what was your reaction?

21  A    I had no reaction at all.  It was just standard.

22  Q    And after you learned of that, did there come a time

23  that you had an interview with certain investigators from

24  the Medicaid fraud control unit?

25  A    Yes.  Officers Flynn and Serra, who testified in

**JA386**

1 previous days, did come to my office.

2 Q   Did they ask you at some point following that interview

3 for patient charts?

4 A   Yes, they did.

5 Q   Did you provide them with patient charts?

6 A   Yes, I was compliant.

7 Q   In total, how many patient charts did you provide to

8 Investigators Flynn and Serra?

9 A   I turned over a total of 329 of my patient charts.

10 Q   Now, when officers -- when Investigators Flynn and

11 Serra first came to you in August of 2002, did they ask you

12 for prescriptions?

13 A   No, they did not.

14 Q   Did there come a time where they did come to your

15 office and ask for prescriptions?

16 A   They served a subpoena in 2004 that requested

17 prescriptions.

18 Q   And that was the first time that they'd asked you for

19 that?

20 A   That was the initial first time, yes, sir.

21 Q   Did you have a custom and practice as to what you would

22 do with prescriptions?

23 A   Yes, I did.

24 Q   Can you explain to the members of the jury what your

25 custom and practice would be?

1 A   I would maintain the original prescription for a period

2 of one year; and then after that, I was following the

3 guidelines of the education law of the State of New York.  I

4 would no longer preserve those prescriptions.  When we do

5 that, we purge the files on a monthly basis.  What would be

6 13 months old, we would cull out and continue going forward.

7 Q   How long did you have that practice?

8 A   From the day I started practice.

9 Q   And in terms of the information that would be contained

10 on a prescription, can you tell the members of the jury what

11 would actually be on that?

12 A   Well, a prescription is basically the name of the

13 patient, the date, and it's an order.  It's like if you went

14 to a restaurant and ordered bacon, lettuce and tomato and

15 wrote BLT on another piece of paper.  Whatever you write on

16 the prescription at the same time would be written in the

17 patient's permanent record.

18 Q   Why would you also write it into the patient's

19 permanent record?

20 A   It's mandated to keep a patient's record for a period

21 of six years, and you want to keep that record to be

22 compliant with the Medicaid regulations.

23 Q   I'd like to show you what's been marked as Plaintiff's

24 Exhibit 115.  (Handing.)

25       Take a look at that document, please.

1 A   (Witness complies.)  Yes.

2 Q   Do you recognize that document, sir?

3 A   Yes, I do.

4 Q   What do you recognize the document to be?

5 A   This is a blank lab prescription for Design Dental

6 Studios, one of the dental laboratories.

7       MR. NORINSBERG:  I offer 115 into evidence.

8       MR. FARBER:  A moment, your Honor.

9       No objection to this.

10       THE COURT:  115 is received.

11       (Plaintiff's Exhibit 115 received in evidence.)

12       THE COURT:  Can I just see it?

13       MR. NORINSBERG:  Sure.  (Handing.)

14 BY MR. NORINSBERG:

15 Q   Dr. Morse, I'd like to just put this up on the screen

16 and have you walk us through it.  What exactly are we

17 looking at here?

18 A   You're looking at a blank laboratory form for Design

19 Dental.

20 Q   What type of information would you put on this

21 document?

22 A   You're going to put on this document what you want the

23 laboratory to do for the patient.

24 Q   Do you see the diagrams below?

25 A   Yes, I do.

1 Q   What's the purpose of those diagrams?

2 A   That's to sketch out what the bridge is going to be or

3 whatever repair is going to be and the tooth numbers

4 associated with that work.

5 Q   Would you have a custom and practice of filling those

6 out when you would send out the prescriptions?

7 A   At all times, yes.

8 Q   Now, you said before that the information that you have

9 on these prescriptions would also be put into the patient's

10 chart; is that correct?

11 A   That's correct.

12 Q   And would that be done for all patients?

13 A   With no exceptions.

14 Q   I'd like to show you Exhibit 143.  (Handing.)

15       Do you recognize those documents, Dr. Morse?

16 A   Yes, I do.

17 Q   Can you tell the members of the jury what are those

18 documents?

19 A   These are Xerox copies of my original records that I

20 turned over to the MFCU.

21 Q   To what patients do these records pertain?

22 A   One is for Abdullah Suliman, one is for Stacy

23 Rodriguez, another is Asi Othman and the last one is Intisar

24 Ahiri.

25 Q   Abdullah Susman or Suliman, is that a person that is

1  also known as Swanson Suliman?

2  A   The patient has two separate names.

3  Q   Can you tell us what those are?

4  A   Swanson Suliman Abdullah and a Medicaid card says it's

5  Abdullah Suliman.

6  Q   Were these four of the patients who appeared at the

7  grand jury in the criminal case?

8  A   Yes, they were.

9  Q   And these are their charts; is that correct?

10  A   These are Xerox copies of the original charts, yes.

11       MR. NORINSBERG:  I offer this document into

12  evidence, your Honor, 143.

13       THE COURT:  143?

14       MR. FARBER:  No objection, your Honor.

15       THE COURT:  143 is received.

16       (Plaintiff's Exhibit 143 received in evidence.)

17  BY MR. NORINSBERG:

18  Q   Now, Dr. Morse, we're going to get back to the charts

19  in a little while.  Just quickly, for now, can you tell us

20  if there are prescriptions indicated in these charts?

21  A   I'll take the first one, Abdullah Swanson.  And yes,

22  there's two prescriptions in this chart.  Stacy Rodriguez,

23  her prescription has been memorialized.  Asi Othman, he has

24  a copy of a prescription in his chart also.  They're

25  actually two separate entries here.

1  Q   Now, Dr. Morse, you told us a few moments ago that

2  there were these 29 patient charts that were given over to

3  MFCU; is that correct?

4  A   That is correct.

5  Q   Did all of those patient charts, the 329 of them,

6  actually have the prescription information written into the

7  patient records?

8  A   Yes, they did.  They were identical to the four samples

9  I'm looking at now.

10  Q   Now, Dr. Morse, I'd like to direct your attention to

11  April 5th, 2006.  Do you recall the events that of that day?

12  A   Yes.  It was a very special red-letter day in my life.

13  Q   Tell us what you mean by that.

14  A   What I mean is I got a call from my attorney that I had

15  been indicted by the grand jury.

16  Q   And did you get any details as to what the indictment

17  was for?

18  A   Not at that time, no, sir.

19  Q   Did there come a point where you learned about the

20  details of the indictment?

21  A   Yes, there did.

22  Q   When did you learn about it?

23  A   Well, the following weekend, we were going to a

24  wedding, myself, my wife and my attorney, and that's really

25  when I got all of the details of what this indictment really

1  meant.

2  Q   What was your understanding at that point of what the

3  indictment meant?

4  A   Well, my attorney had explained to me I was indicted

5  for a B felony, which was a million dollar theft, and

6  associated with that was a mandatory jail time of up to 25

7  years.

8  Q   Can you just tell us in your own words what was your

9  reaction when you first really learned about the details of

10  this indictment?

11  A   I was dumbstruck.  I just could not believe it because

12  I had spent 30 years practicing right here in Park Slope.  I

13  had multiple comprehensive audits.  There was never a

14  patient complaint.  There was never a complaint from the

15  health department, from any officials about any record

16  deficiency.  There was never any question of any work not

17  being done.  And here I was, right out of the blue, I'm

18  being accused by -- basically, Eliot Spitzer was announcing

19  this indictment of stealing a million dollars.

20  Q   Now, you told us that the initial interview was

21  actually back in August 2002; is that correct?

22  A   That is correct.

23  Q   Now, it's not until essentially four years later when

24  this indictment took place; is that correct?

25  A   That's correct.

1  Q   Did you have any idea that the indictment was going to

2  come down anywhere around that time?

3  A   I had no inkling whatsoever.

4  Q   Did there come eye time that you had to explain this to

5  your family, what you being charmed with?

6  A   Oh, yes, there did.

7  Q   Can you describe for the jury what that was like?

8  A   It could have torn your heart out.  I had to have a

9  meeting with my six children to tell them basically that I

10  was going to go to jail, that this was going to become

11  public knowledge.  I then -- my wife Darrell has two

12  octogenarian patients.  We had to go over to their home and

13  tell them also.  I was going to be arrested, turn myself in,

14  and I was facing a mandatory jail term.

15  Q   Now, did there -- what was it like for you when you had

16  to tell this to your family from your standpoint?

17  A   It was just a crushing blow.

18  Q   Did you have to also explain to some of your friends

19  what was going on?

20  A   Everybody who ever knew us, and we had a wide social

21  network.  And the same thing in my professional life.  At

22  the hospital, you have hundreds of physicians, a large

23  dental staff, administration.  It was beyond humiliating.

24  It was beyond belittling.

25  Q   Now, Dr. Morse, after you learned of the indictment,

**JA388**

1  how did you present yourself to the authorities?
2  A    Well, I was requested to turn myself in to the 72
3  precinct here in Brooklyn, which was also a problem.
4  Q    Why was that a problem?
5  A    Well, a lot of the officers at the 72 precinct happened
6  to be my dental patients.
7  Q    Can you explain to us how that came to be?
8  A    Well, I was also a PBA dental provider, so that was my
9  local police precinct; and I would see many of the officers,
10 and some of the superior officers for years had been my
11 patients and also, I guess at that point, my friends.
12 Q    Did you see any of these officers when you were
13 actually in the precinct?
14 A    Yes, I did.
15 Q    And which precinct was it?
16 A    It was the 72nd precinct here in Brooklyn.
17 Q    What was it like when you saw these patients of yours
18 in the precinct?
19 A    Initially, the officers thought I was there for a
20 social visit.  Why wouldn't they?  And then, when they found
21 out I was there to be arrested, prosecuted, they were
22 stunned.
23 Q    And were you photographed at that point in time?
24 A    Yeah, I was photographed, I was fingerprinted.  I was
25 put in a jail cell.  I was put in handcuffs.

1  Q    I'd like to show you Plaintiff's Exhibit 125.
2  (Handing.)
3       Do you recognize that document, sir?
4  A    Yes, I do.
5  Q    What do you recognize that document to be?
6  A    This is basically my mug shot and prisoner movement
7  slip from the New York City Police Department.
8       MR. NORINSBERG:  I offer that Exhibit, 125 into
9  evidence.
10      MR. FARBER:  No objection.
11      THE COURT:  125 will be received.
12      (Plaintiff's Exhibit 125 received in evidence.)
13 BY MR. NORINSBERG:
14 Q    Is this the mug shot that was taken that day?
15 A    Yes, it is.
16 Q    What was that like for you, going through that process?
17 A    I really couldn't think of anything more humiliating.
18 Q    Had you ever had to go through anything like this in
19 your life?
20 A    I had no intersects with the criminal justice system.
21 Q    What happened after this part of the process ended?
22 Where were you taken to?
23 A    I went to, I think, what they call the tombs, central
24 booking, where I sat in another jail cell.  And I had been
25 taken there, transported from the 72 precinct in one of the

1  officer's private cars, but then I was handcuffed.  I was
2  put on public display.  Marched me on the street here in
3  Brooklyn to Brooklyn criminal court for my arraignment.
4  Q    Just describe what it was like going through that
5  process.
6  A    I felt like I was an animal in the zoo.  I was being
7  caged up.  I was shackled, handcuffed.  It was probably one
8  of the worst moments of my life I could've imagined.  I
9  don't think in a nightmare you can imagine from being a
10 respected man of your community, a doctor, and then all of a
11 sudden, in a flash moment, you're arrested, you're a
12 criminal.  You're basically in the gutter.
13 Q    Now, after you were indicted, were you able to continue
14 working as a dentist?
15 A    Not in my practice, no, sir.
16 Q    Can you tell us, sir, why you were not able to continue
17 working as a dentist?
18 A    Post-indictment I got a five-day notice from New York
19 State, suspending my Medicaid provider number, which
20 effectively closed down my practice because 95 percent of my
21 patients were insured through the Medicaid program.
22 Q    Auto I'd like to show you what's been marked as
23 Plaintiff's Exhibit 9.  (Handing.)
24      Do you recognize that document?
25 A    Yes, I do, Mr. Norinsberg.

1  Q    What do you recognize it as?
2  A    It's a letter from the State of New York, the Office of
3  Medicaid Inspector General, written to me, Leonard Morse,
4  580 Fifth Avenue, Brooklyn, New York, and the title is
5  "Notice of Immediate Agency Action."  And it has my provider
6  number, 00294977.  And then it says, "Dear Provider" --
7  Q    That's okay.  We'll first offer it into evidence.
8       THE COURT:  What exhibit number?
9       MR. NORINSBERG:  Exhibit 9.
10      MR. FARBER:  No objection.
11      THE COURT:  9 is received.
12      (Plaintiff's Exhibit 9 received in evidence.)
13 BY MR. NORINSBERG:
14 Q    Can you tell us, Dr. Morse, what -- just in plain
15 English, what exactly did this letter convey to you?
16 A    This conveyed to me that after five days after I
17 received this letter, I was basically out of business.
18 Q    When you say you were basically out of business, why?
19 A    Well, I can no longer provide services to any of my
20 Medicaid patients, and that was 95 percent of my practice.
21 Q    What steps, if any, did you take to challenge this
22 determination?
23 A    Well, the letter allows you a 45-day period to grieve
24 this decision.
25 Q    And did you in fact, try to appeal this decision?

1  A    Yes, I did.  I had my attorney write a letter to the
2  state that basically said, listen, just based on an
3  allegation and my pristine history of 30 years, this was
4  really an unfair action to take against me, and I asked them
5  to stay the action until I had my day in court.
6  Q    Were you given any type of hearing to determine that
7  allegation?
8       MR. FARBER:  Objection, your Honor.
9       THE COURT:  Yeah, I'll sustain the objection.
10 BY MR. NORINSBERG:
11 Q    And after you put in a response seeking to challenge
12 this determination, what happened?
13 A    Well, the state had statutorily had 45 days to respond
14 to my pleadings.  On the exact 45th day, my attorney
15 received an express mail letter saying that the appeal had
16 been denied and I was going to be terminated from the
17 Medicaid program.
18 Q    Once the appeal was denied, what steps did you take at
19 that point?
20 A    The only step to take as far as business -- is that the
21 question?
22 Q    Yes.
23 A    Well, there was only one step to take.  I had to
24 liquidate my practice.
25      THE COURT:  I'm sorry, I couldn't hear you.

1       THE WITNESS:  I had to liquidate my practice.  If
2  95 percent of your income is Medicaid reimbursement
3  dependent and now you don't have 95 percent of your income
4  but you're still incurring 100 percent of your overhead,
5  it's a simple math equation.  You're out of business.
6  BY MR. NORINSBERG:
7  Q    Now, you had mentioned earlier some managed Medicaid
8  healthcare companies.  Can you just say it again what the
9  names were?
10 A    It was Health Plex and MHS managed health services.
11 Q    What, if anything, happened with Health Plex after you
12 were indicted?
13 A    As soon as they found out about the indictment, they
14 called me up and said they were canceling my contract.
15      THE COURT:  What was that a contract for?
16      THE WITNESS:  A contract to provide dental
17 services to Medicaid patients.
18 BY MR. NORINSBERG:
19 Q    I'd like to show you Plaintiff's Exhibit 129.
20 (Handing.)
21      Please take a look at that document.
22 A    (Witness complies.)  Yes.
23 Q    Do you recognize that document?
24 A    Yes, I do.
25 Q    What do you recognize it to be?

1  A    It's a letter from Health Plex Dental Services, written
2  to me at 580 Fifth Avenue, telling me basically they're
3  telling me they're closing my practice to mitigate patients.
4       MR. NORINSBERG:  I offer Plaintiff's Exhibit 129
5  into evidence.
6       MR. FARBER:  We have no objection, your Honor.
7       THE COURT:  129 received.
8       (Plaintiff's Exhibit 129 received in evidence.)
9  BY MR. NORINSBERG:
10 Q    Is this the letter from Health Plex?
11 A    Yes, it is.
12 Q    And Dr. Morse, the letter is dated April 20th, 2006; is
13 that correct?
14 A    That's correct.
15 Q    It's approximately two weeks or so after the
16 indictment?
17 A    Within that time frame, yes.
18 Q    And was there any way to challenge this decision from
19 Health Plex?
20 A    Binding decision.  There is really no appeal process to
21 this at all.
22 Q    What effect did losing Health Plex have on your
23 practice?
24 A    It cost me thousands additional of lost revenue.
25      THE COURT:  Can you explain that?  You have

1  already been told you couldn't see Medicaid patients, right?
2  You lost your license or whatever it was, right?
3       THE WITNESS:  I did not lose my dental license.  I
4  lost my Medicaid number.  But it requires a little bit of an
5  explanation, if I could, your Honor.
6       THE COURT:  Yes.  I'm sorry, I misstated it.  You
7  lost your Medicaid number.
8       THE WITNESS:  Correct.
9       THE COURT:  Would this Health Plex have been
10 something in addition to that?  Without a Medicaid number,
11 you couldn't see Medicaid patients, or is it something
12 different.
13      THE WITNESS:  It's a little bit different.  What
14 was happening is we were what was called mandated swipers.
15 So when a Medicaid patient would come to our office, it
16 would be like if you went with a Visa or Master Card slide
17 through a reader.  When I lost my Medicaid number, what New
18 York State did was they shut down this terminal.  These
19 patients were -- so I still could have received some monthly
20 income from the managed care company if they still allowed
21 me to treat those patients.  That's the difference.
22      THE COURT:  You could treat them without a
23 Medicaid number?
24      THE WITNESS:  At that point in time, they might
25 have taken the position that unless and until I was actually

**JA390**

1  convicted of something, they were going to allow me to stay
2  in business.
3  BY MR. NORINSBERG:
4  Q   Now, Dr. Morse, you had mentioned earlier your work at
5  Methodist Hospital.  How long were you working at Methodist
6  Hospital before April 2006?
7  A   Seven years.
8  Q   And as a result of your indictment, what, if anything,
9  happened with Methodist Hospital?
10 A   I was terminated from my duties.
11 Q   When you say terminated from your duties, can you just
12 tell us specifically what happened?
13 A   I was no longer to teach.  I was no longer to treat any
14 patient.  I was no longer to sign any chart.
15 Q   I'd like to show you what's been marked as Plaintiff's
16 Exhibit 119.  (Handing.)
17     Do you recognize this document?
18 A   Yes, I do.
19 Q   What do you recognize this document to be?
20 A   This is a letter from New York Methodist Hospital,
21 signed by Robert Seminara, S-E-M-I-N-A-R-A, D.D.S.  It
22 states I can no longer supervise residents on any clinical
23 training program at New York Methodist, I could no longer
24 sign patient charts, and my responsibility as the assistant
25 chief of the program was being terminated.

1      THE COURT:  Do you want to offer that?
2      MR. NORINSBERG:  Yes, your Honor.
3      THE COURT:  So 119?
4      MR. FARBER:  No objection, your Honor.
5      THE COURT:  119 is received.
6      (Plaintiff's Exhibit 119 received in evidence.)
7  BY MR. NORINSBERG:
8  Q   What effect did it have on you just losing your
9  hospital privileges at that point?
10 A   Well, I had been teaching in hospitals sips the day I
11 graduated my residency.  I was an attending at Queens
12 Hospital Center.  I spent nine years in Maimonides Hospital,
13 teaching in dental medicine.  At the time, I was teaching
14 pediatric dentistry.  Part of my practice was being an
15 educator.  It was just a crushing blow to me not to be with
16 my students in the hospital.
17 Q   Now, immediately following the indictment, was there
18 any news coverage at all?
19 A   Newspaper, whatsoever.
20 Q   Did there come a time when there was a press release
21 issued in connection with your indictment?
22 A   Yes, there did.
23 Q   When was that press release issued?
24 A   I believe it's April 11th, 2006.
25 Q   Who was that press released issued by?

1  A   It was released by Eliot Spitzer.
2  Q   And to your knowledge, in sum and substance, what was
3  contained in that press release?
4  A   Eliot Spitzer was accusing me of falsely billing for a
5  million dollars of dental services.
6  Q   Once that press release came out, was there any type of
7  press coverage that resulted?
8  A   They had a satellite TV mobile van in front of my
9  office with a recorder, wanting to get commentary.
10 Q   Let me show you actually now what's in evidence as
11 Plaintiff's Exhibit 67.
12     Now, is this the press release you were referring to?
13 A   Yes, it is.
14 Q   And as a result of this press release, was there any
15 coverage in the local New York newspapers of your case?
16 A   Absolutely.  The Daily News picked this up.  The Post
17 picked this up.  This was posted on the Internet.
18 Mr. Spitzer sent this to Medicaid fraud control units in all
19 50 states.  They posted this on the Attorney General -- the
20 Attorney General of New York State has an official website.
21 So if somebody were to Google something, since they're the
22 Government, that comes up as site one or two in the Google
23 seven.  So they publish this as a story on their official
24 Attorney General website.
25 Q   I'd like to show you now what's marked as Exhibit 7A,

1  7B and 7C.  (Handing.)
2      Take a look at those documents, please.
3  A   (Witness complies.)  Yes.
4  Q   Do you recognize those documents?
5  A   Yes, I do.
6  Q   What are those documents?
7  A   These are newspaper reports of this indictment story.
8  One's from the New York Post, entitled "Dentist Pulled a
9  Million Dollar Fraud."  One is from the Daily News, and that
10 one says I actually pleaded guilty to the charges.
11 Q   Did you actually ever plead guilty to those charges?
12 A   Never.
13 Q   And what's the third one?
14 A   I guess from Upstate New York, North Country Gazette,
15 AG, Mr. Spitzer, Brooklyn dentist defrauded Medicaid.
16     MR. NORINSBERG:  I offer 7A through C into
17 evidence.
18     MR. FARBER:  We have no objection, your Honor.
19     THE COURT:  7A through C is received.
20     (Plaintiff's Exhibits 7A-C received in evidence.)
21     MR. FARBER:  Although, I note, your Honor, we have
22 this as Exhibit 7 rather than 7A, B and C.
23     THE COURT:  But it's the same pieces of paper?
24     MR. FARBER:  It appears to be.
25 BY MR. NORINSBERG:

**JA391**

1  Q   Now, do you recognize this article, Dr. Morse?

2  A   Yes, I do.

3  Q   Where did this article come from?

4  A   This was published in the New York Post.

5  Q   Now, just reading from the first paragraph it says,

6  "With gubernatorial opponent Tom Suozzi at his heels, State

7  Attorney General Eliot Spitzer announced yesterday that he

8  nabbed a Brooklyn dentist who allegedly stole more than a

9  million dollars from the Medicaid program."

10         Do you see that?

11         MR. FARBER:  Objection, your Honor.

12         THE COURT:  You didn't object to it going into

13  evidence.  Did he read it incorrectly?  What's your

14  objection?

15         MR. FARBER:  Withdraw the objection, your Honor.

16  A   Yes, I see that.

17  Q   Did there come a point in time where you became aware

18  of people that you knew who had read this article?

19  A   I think if I'm going to state it correctly, the New

20  York Post has about 500,000 subscribers daily.

21  Q   Did you have any friends or family members indicate

22  they had seen the article?

23  A   I don't think there was anybody who didn't see the

24  article.

25         THE COURT:  Of your family or friends?

---

1         THE WITNESS:  Of my family, friends.

2  BY MR. NORINSBERG:

3  Q   I show you now Plaintiff's Exhibit 7C.

4         Do you recognize that article?

5  A   Yes, I do.

6  Q   What do you recognize that article to be?

7  A   This is a story on the same indictment that Spitzer

8  released for the New York Daily News.

9  Q   What was it like to have your name in the newspaper

10  with these stories that we just looked at?

11  A   It was beyond humiliating and debasing.  Basically, I

12  became the poster boy for Medicaid fraud for a million

13  dollar theft.

14  Q   And would you ever have any discussions with anybody

15  about what had happened in the news?

16  A   I had constant discussion.  Every time you would meet

17  somebody, whether it was a professional colleague, a family

18  member or friend, this was the buzz.  You stole a million

19  dollars?  I mean it's Eliot Spitzer, he's the Attorney

20  General of the State of New York.  He's one of the most

21  powerful people.  You must have done this.

22  Q   What would you say to these people?

23  A   I absolutely didn't do this at all.  Whether or not

24  that was believable or not to those folks, probably not.

25  Q   Now, were the stories that we just looked at, did they

---

1  generate any additional coverage outside of New York?

2  A   Once it was published in the newspapers, it went on the

3  Internet, so it really basically went globally.

4  Q   I'd like to show you Plaintiff's Exhibit 8.  (Handing.)

5         Please take a look at those documents.

6  A   (Witness complies.)  Yes.

7  BY MR. NORINSBERG:

8  Q   Do you recognize those documents?

9  A   Yes, I do.

10  Q   What do you recognize those documents to be?

11  A   I recognize these documents as Internet searches from

12  different search engines that include my name to see what

13  comes up when you put my name and search for it on the

14  Internet.

15         MR. NORINSBERG:  Offer this document into evidence

16  as Plaintiff's Exhibit 8.

17         MR. FARBER:  No objection, your Honor.

18         THE COURT:  8 will be received.

19         (Plaintiff's Exhibit 8 received in evidence.)

20         THE COURT:  Just as a question, do you know when

21  that search was done?  The search that produced that

22  documents, do you know when it was done?

23         THE WITNESS:  I believe, your Honor, on the

24  bottom, there's a date when it was printed out.  If I could

25  get a chance to look at the documents again, I can really --

---

1         MR. NORINSBERG:  I'll put it on the Elmo.

2  BY MR. NORINSBERG:

3  Q   You referenced a date on the bottom.  Do you see the

4  date, September 30th, 2007?

5  A   Right.  The bottom right-hand corner memorializes the

6  date that this was printed out.

7         THE COURT:  Can you read the date?

8         THE WITNESS:  It's 9-30 of 2007.

9         THE COURT:  Okay.

10  BY MR. NORINSBERG:

11  Q   Not to jump ahead, Dr. Morse, but that's actually after

12  you were acquitted of all charges; is that correct?

13  A   Yes.  I was acquitted all charges in August of 2007.

14  Q   So this is still showing up after your acquittal?

15         MR. FARBER:  Objection.

16         THE COURT:  What's the basis of the objection?

17         MR. FARBER:  Asked and answered.

18         THE COURT:  The answer will stand.

19  BY MR. NORINSBERG:

20  Q   Dr. Morse, over the years since you did this Internet

21  search, have you seen additional stories that are similar

22  like this?

23  A   Yes, I have.

24  Q   Did you actually see any stories that actually

25  published your acquittal?

**JA392**

1    A    Not one.
2    Q    And to your knowledge, did the New York State Attorney
3    General's office ever publish the acquittal on its website?
4    A    No, they did not.
5    Q    Now, we talked about press coverage here in the
6    United States locally and then on the Internet.  Was there
7    any other press coverage that you're aware of?
8    A    Basically around the world.  This story was picked up
9    by dentistsguide.com, which is a dental portal for dentists
10   around the world, and they basically translated this story
11   for all the local dentists in their local tongue, whether
12   that was Portuguese or Spanish or, you know, whatever it
13   was.
14   Q    And to your knowledge, was this story ever translated
15   into foreign languages here in the New York region?
16   A    Well, actually, Eliot Spitzer had it translated into
17   two foreign languages himself when he made this initial
18   press release.
19   Q    I'd like to show you Plaintiff's Exhibit 127.
20   (Handing.)
21             MR. FARBER:  What number?
22             MR. NORINSBERG:  Sure.  It's 127.
23             MR. FARBER:  Thank you.
24   BY MR. NORINSBERG:
25   Q    Do you recognize these documents?

---

1    A    Yes, I do.
2    Q    What do you recognize them to be?
3    A    This is the Russian press release that Eliot Spitzer
4    announced in Russian on his official website.
5    Q    And are there any other languages in there?
6    A    There's one in Chinese.
7    Q    Dr. Morse, going back to April of 2006, did you have
8    Russian and Chinese patients?
9    A    With over 30,000 patients, yes, I'm certain I had a few
10   of each.
11   Q    And what happened -- strike that.
12        What you're looking at here, are these actually
13   certified translations, Dr. Morse?
14   A    Well, the top page says Legal Language Services
15   translation interpreting the transcription, so it appears to
16   be an official English translation of the foreign press
17   releases from Mr. Spitzer.
18             MR. NORINSBERG:  I'd like to offer this document
19   into evidence.
20             THE COURT:  This is 127?
21             MR. NORINSBERG:  This is 127.
22             MR. FARBER:  We have no objection.
23             THE COURT:  127 is received.
24             (Plaintiff's Exhibit 127 received in evidence.)
25   BY MR. NORINSBERG:

---

1    Q    What do you recognize this document to be that we're
2    looking at on the screen?
3    A    This is the official Eliot Spitzer news release on his
4    Attorney General website in Russian, announcing my
5    indictment.
6    Q    And how about this document?
7    A    This is the Eliot Spitzer Chinese version of the same
8    indictment story posted on his official Attorney General
9    website.
10   Q    Now, after you had a chance to actually look at the
11   certified translations, were there any differences in the
12   way this story was reported in these foreign press releases
13   as they had been in the English version?
14   A    There's a startling difference.
15   Q    What is the difference?
16   A    The Russian version actually says I've been convicted
17   of this crime.
18   Q    Now, was there any television news coverage of your
19   indictment?
20   A    As I said before, right after this story broke with
21   Eliot Spitzer, I had a news crew -- one of these mobile
22   satellite dishes appeared at the front door of my medical
23   center.
24   Q    What effects did all this news coverage have on you,
25   Dr. Morse?

---

1    A    It was humiliating.  It was debasing.  It was beyond
2    embarrassing.
3    Q    Just explain, though, what was going on that made it
4    that way?
5    A    Well, everybody that I had known professionally,
6    socially was reading the story from Mr. Spitzer that I had
7    stolen a million dollars, and they had to be believing it.
8    So now I had lost my credibility.  Everybody was looking at
9    me as if I had a big X on my back as a million dollar thief.
10   Q    Now, did there come a time that you had to sell your
11   dental practice?
12   A    Yes, there did.
13   Q    When did you sell your dental practice?
14   A    In August of 2006.
15   Q    That would be roughly four months or so after the
16   indictment?
17   A    Correct.
18   Q    Why did you sell your dental practice at that point?
19   A    I had no other choice.  It was the only option I had
20   left.
21   Q    Why do you say that?
22   A    I didn't have the resources.  I didn't have the cash
23   flow to stay in business.  I had lost 95 percent of my
24   income.
25   Q    And what amount of money did you sell the practice for?

1  A   I sold the practice for $450,000.
2  Q   Who did you sell it to?
3  A   I sold it to my associate, Brian Ketover.
4  Q   Do you believe that $450,000 represented fair market
5  value at that time for your 30-year-old practice?
6  A   Not at all.
7  Q   Can you explain to us why you feel that that number was
8  not fair market value?
9  A   In the first place, I never had intended to sell my
10 practice at all.  I had just entered into that 21-year lease
11 you showed me before.  I planned on practicing until the
12 year 2022.  And secondly, it was basically a fire sale.
13 Once some's announced, someone with the stature of
14 Mr. Spitzer, that you've stolen a million dollars, that
15 practice is tainted.  Nobody else is going to come along to
16 buy it.  So there's no more leverage left as far as going
17 into a business relationship where you're going to get top
18 dollar or fair market value for what you're selling.
19 Q   I'd like to show you Plaintiff's Exhibit 101.
20 (Handing.)
21     Please take a look at this document.
22 A   (Witness complies.)
23 Q   What do you recognize this document to be?
24 A   I recognize this as the sale agreement for my practice.
25 Q   And that's between you and did Dr. Ketover?

1  A   Correct.  It's between me and my associate, Doctor
2  Brian Ketover.
3      MR. NORINSBERG:  Offer Plaintiff's Exhibit 101
4  into evidence.
5      MR. FARBER:  No objection.
6      THE COURT:  101 will be received.
7      (Plaintiff's Exhibit 101 received in evidence.)
8  BY MR. NORINSBERG:
9  Q   Going back in time a little bit, back to 2001, had you
10 entered into any type of an agreement, a business agreement
11 with Dr. Ketover regarding the potential sale of your
12 business or your dental practice?
13 A   Yes, I had.
14 Q   And just tell the members of the jury, what generally
15 was the purpose of that agreement?
16 A   The purpose of the agreement was basically if I had
17 become disabled or I'd become deceased, what was going to
18 happen to that practice, because Dr. Ketover didn't have an
19 equity interest in the practice.  He had been there for 25
20 years, and he wanted to know that he could continue to
21 practice if I was no longer able to practice.
22 Q   Was there anything in particular going on in your life
23 that made you do that?
24 A   It was only in response to a request from Dr. Ketover.
25 I was feeling perfectly fine.

1  Q   I'm going to show you now what's been marked as
2  Plaintiff's Exhibit 107.  (Handing.)
3      I'd like you to please take a look at this.
4  A   (Witness complies.)  Yes.
5  Q   Do you recognize this document?
6  A   Yes, I do.
7  Q   What do you recognize it to be?
8  A   It's a business agreement between myself and
9  Dr. Ketover, addressing if there's a possibility of death or
10 disability and my being unable to continue in my dental
11 practice.
12     MR. NORINSBERG:  I offer Plaintiff's Exhibit 107
13 into evidence.
14     MR. FARBER:  We have no objection, your Honor.
15     THE COURT:  107 is received.
16     (Plaintiff's Exhibit 107 received in evidence.)
17 BY MR. NORINSBERG:
18 Q   Now, when you entered into this agreement with
19 Dr. Ketover, were there any terms dealing with how the
20 practice would be evaluated in the event you had to sell it?
21 A   Yes, there were.
22 Q   What were the terms, the general terms of the agreement
23 between you and Dr. Ketover?
24 A   I set a valuation of taking the last 12 months of
25 deposits for the business of the medical dental center and

1  dividing it in half, and that would become the purchase
2  price.
3  Q   But as it turned out, your actual sale after the
4  indictment was significantly less than that; is that
5  correct.
6  A   Yes, that is correct.
7  Q   Dr. Morse, when did your criminal trial begin?
8  A   It began in June of 2007.
9  Q   Is that approximately 15 months after the indictment?
10 A   Yes, it is.
11 Q   Can you tell the members of the jury, what was it like
12 during that 15-month period when you're waiting to go to
13 trial?
14 A   You could call it hell on earth.  I still felt like I
15 had the handcuffs on me.  I was under court supervision.  I
16 really didn't have my life to live it the way I wanted to.
17 I was very distressed.  I was very withdrawn.  I was
18 basically humbled and humiliated.
19 Q   Now, what were you doing during that 15-month period?
20 A   Mostly staying home and sleeping.
21 Q   Were you able to do any type of dentistry or dental
22 work during that time?
23 A   I had no place to do any dentistry.
24 Q   During that 15-month period, did you make any court
25 appearances?

1    A    Several.

2    Q    And were these mandatory court appearances?

3    A    If I didn't show up when the judge told me to show up,

4    the judge would have issued a warrant for my arrest.

5    Q    Before you actually went to trial, did you ever have

6    any conversations with John Fusto, the defendant in this

7    case?

8    A    Yes, I did.

9    Q    Can you tell us how many times, in total, did you have

10   meetings with Mr. Fusto and Mr. Castillo before the trial?

11            THE COURT:  Could you just clarify?  Because your

12   first question was directed to Mr. Fusto.  Then you assumed

13   Castillo.

14            MR. NORINSBERG:  Yes.

15   BY MR. NORINSBERG:

16   Q    Did there come a time in which you met defendants Fusto

17   and Castillo, along with your defense attorney?

18   A    Yes, I did.

19   Q    And how many times in total, before the trial, did that

20   take place?

21   A    To my best recollection, there were three separate

22   meetings.

23   Q    What was the purpose of those meetings?

24   A    It was court-mandated meetings at the beginning, the

25   first one.  And I think the idea of the second and third

---

1    ones we were we were going to present and sit down with

2    Mr. Fusto and Mr. Castillo, the prosecutor and the auditor,

3    to go over what their findings were.

4    Q    And can you tell us what happened during the first

5    meeting?

6    A    Well, the first meeting really, in reality, didn't

7    happen.  We had waited for an hour at 120 Broadway, the

8    office of the Attorney General.  I sat with my criminal

9    attorney, Mr. Wool, W-O-O-L.  I sat for an hour, waiting for

10   Mr. Fusto to show up.  As I said, we had a court appointed

11   date to have this meet.  An hour later he showed up, and he

12   said to me and Mr. Wool, why are you folks here?  We said,

13   well, the judge ordered us to have this meeting, you know;

14   he set it up.  And he said, oh, my bad.  I forgot.  And then

15   a few minutes later, he invited us into his office.  And

16   Mr. Wool tried to set up a second meeting, a new meeting to

17   replace the one that we were going to have.  And then I had

18   respectfully said to Mr. Fusto here -- I had asked him to

19   please consider reinstating my Medicaid number.  Because at

20   that point, I still hadn't sold my practice, and I really

21   thought that, you know, I had a chance to at least resurrect

22   my practice until I had my day in doubter.  And then

23   Mr. Fusto said to me -- I was more than courteous to him.

24   And I don't want to use bad language in front of the jurors,

25   but the direct quote Mr. Fusto said to me, I don't want to

---

1    hear any more about your fucking Medicaid number, and then

2    he threw us out of his office.

3    Q    And what was your reaction at that point in time?

4    A    I was stunned.  I mean, I'm a professional.  I've been

5    doing this for 35 years.  I've had no intersects with the

6    criminal justice system at all.  I've had plenty of

7    intersects with Medicaid and audits.  Nobody had ever spoken

8    to me in this fashion, in this manner, let alone a

9    high-ranking government official.  I just thought it was the

10   ultimate dis of myself and my attorney.

11   Q    What happened next?  Did you have a second meeting?

12   A    Yes, we did.

13   Q    When did that take place?

14   A    Several months after the one that never happened.

15   Q    And during that meeting, what, if anything happened?

16   A    Well, Mr. Fusto offered us the opportunity -- he was

17   there with Mr. Castillo, and my attorney and myself attended

18   that meeting.  And he offered an opportunity that we could

19   review one the months of my Medicaid billings.  So he had a

20   stack of papers on his desk.  He had a calculator.  And he

21   basically pecked one month at random.  He wouldn't let me

22   touch the calculator.  He was in charge of running all the

23   numbers.  And we went through with his auditor, line by

24   line, what he felt was the appropriate, correct Medicaid

25   reimbursements for all of the procedures that I had billed

---

1    Medicaid.  And then he totaled the amount and compared it to

2    the total billing that the auditor, Mr. Castillo, had said I

3    was entitled to bill Medicaid.  And when he compared the two

4    numbers, he saw that if Mr. Castillo had given me X-dollar

5    credit for the month, it actually added up to double that

6    amount, 2X.

7    Q    And what do you mean by that?  I'm not sure I followed

8    that.  Can you explain it?

9    A    Well, if I was entitled to bill $30,000 for the month

10   with legitimate Medicaid billings, Mr. Castillo, when he had

11   run the numbers, was allowing me only $15,000 for the month

12   that they had randomly selected out of the three-year audit

13   period.

14   Q    When you say the month they randomly selected, were you

15   ever given a copy of the full set of the Design Dental

16   invoices?

17   A    No.  They held that close to their chest.  I never saw

18   all of those things, only the one time they pulled out this

19   one invoice.

20   Q    And after you had pointed out the discrepancies and

21   mistakes in Mr. Castillo's calculations, what happened next?

22   A    Well, Mr. Fusto called a time out, and he mentioned --

23   and he motioned to Mr. Castillo to leave the room.

24   Q    And how long were they gone from the room?

25   A    They were absent for 10 or 15 minutes.

**JA395**

1  Q   After the 10 to 15 minutes, did they come back to into
2  the room?
3  A   They returned to the conference room, yes, they did.
4  Q   And did they say anything to you at that point in time?
5  A   They said something, and they gestured.  Mr. Fusto
6  raised his hand, and he said, the people upstairs want this
7  case to continue.
8  Q   Did he clarify who he meant by that?
9  A   He didn't clarify, but I knew who was upstairs.  It was
10 Eliot Spitzer.
11      MR. FARBER:  Objection.
12      THE COURT:  Sustained.
13 BY MR. NORINSBERG:
14 Q   Did you have any further discussions with Mr. Fusto or
15 Mr. Castillo at that time?
16 A   Not at that time, no.
17 Q   Did there come a time when you actually had a third
18 meeting?
19 A   Yes, there did.
20 Q   When was the third meeting, to the best of your memory?
21 A   Maybe another two or three months.  I mean, it was
22 definitely pre-trial.
23 Q   What was the purpose of that meeting?
24 A   We were going to sit down and see if we could go over
25 the numbers that Mr. Castillo had come up with as far as his

1  calculations.
2  Q   And just to be clear, did you ever broach the topic of
3  plea discussions at any point during these meetings?
4  A   That was just not going to happen, okay?
5      THE COURT:  The question is did you or did you
6  not.
7      THE WITNESS:  I did not.
8  BY MR. NORINSBERG:
9  Q   Why didn't you, Dr. Morse?
10 A   I didn't broach that because I had done nothing wrong.
11 I hadn't stolen one penny from the Medicaid system.  And I
12 was a principled individual.  I was going to have my day in
13 court, I was going to fight these charge, and I wanted to be
14 vindicated.  I didn't want to take any plea.  Even though I
15 was facing 25 years in jail, that was just not going to be
16 me.
17 Q   And what then was the purpose, as far as you
18 understood, of having these meetings with Mr. Castillo and
19 Mr. Fusto?
20 A   It was my hope and expectation that after I would show
21 them how flawed their analysis was, that they would just
22 drop the entire indictment.  I wasn't there for a plea
23 agreement or a plea arrangement.
24 Q   And during that third meeting, can you tell us in sum
25 and substance what happened?

1  A   Yes, I can.  Mr. Castillo took out one of the Design
2  Dental monthly invoices, and he started to explain to me how
3  he was going to do the calculations.  Then he said, well,
4  let's take a look at this.  And I said to Mr. Castillo, very
5  respectfully, sir, I'm not an auditor.  But, sir, you're not
6  a dentist.  So let's go over this and see if we can come to
7  some common grounds.
8      And the first line on that Design Dental invoice had
9  the initial PU, which was a partial upper.  It was a partial
10 upper dental bridge, and there was a number 65, $65 I had
11 paid the lab.
12     The next line below that had PU/PL, and what that
13 indicated was that I had fabricated a partial upper and
14 partial lower for that individual patient.  And then in the
15 right-hand column, it showed that I paid the laboratory
16 $130.
17     So what I was entitled to was, for the first line,
18 where it said partial upper, I was entitled to the full
19 Medicaid fee for that date for one bridge that I had
20 provided to the patient.  And on the second line, where it
21 had the PU, partial upper, and partial lower designation,
22 that indicated that I had made for that patient two bridges,
23 and I was entitled to get credit for both of those bridges.
24 Mr. Castillo then looked at it and said, oh, Doctor, this is
25 not how it's going to work.  I said to him, once again

1  respectfully, well, how are you going to do the analysis?
2  And he said, sir, I really don't give a blankety-blank what
3  you paid the lab.  Do you see the first line?  It's one
4  bridge.  The second line, it's all on one bridge.  So I'm
5  going to give you credit for a single bridge.  That's how
6  I'm going to count.  And I was just beyond flabbergasted,
7  because this is an audit that's over three years for two
8  full-time dentists.  We had made hundreds of bridges, upper
9  and lower bridges, for patients.  And if he was going to
10 count every time I made two bridges as one, he was going to
11 short me hundreds of thousands, maybe even a million dollars
12 worth of the work that I had legitimately done for patients
13 and legitimately billed to Medicaid.
14 Q   After you pointed this out to Mr. Castillo, what did he
15 say?
16 A   He said to me, quote, I've sat here in this office, and
17 I've plenty of doctors look me in the face, and they're
18 liars.  And that's how I'm going to do the math.
19 Q   Now, what happened after that?
20 A   Well, I guess at that point, it would be fair to say
21 they pushed my buttons, and I was enraged.  And I knew if
22 they were going to do the math that way and that's how they
23 were going to show that I had stolen a million dollars from
24 the people of New York State -- I just got up and left.
25 There was really nothing further to discuss.  I just wanted

1  to have my trial, period.
2  Q   And when did your trial actually take place, Dr. Morse?
3  A   It began in June of 2007.
4  Q   Where did your trial take place?
5  A   It took place here in Kings County in criminal court,
6  superior criminal court would be the right way to phrase it.
7  Q   Who presided over your trial?
8  A   The Honorable Walsh, Judge Walsh.
9  Q   Can you tell us, Dr. Morse, what it was like actually
10 being in court at your trial?  Can you just give us a sense
11 of what it was like for you at that time?
12 A   It was basically surreal because when they read the
13 charges, basically the court clerk says it's the people of
14 the State of New York versus Leonard Morse.  So it was like
15 this 500-pound gorilla, like David and Goliath.  Every
16 single citizen of New York is against me.
17 Q   How long did the trial go on for?
18 A   The verdict was issued about six weeks after the trial
19 started.
20 Q   Were there starts and stops to the trial in between?
21 A   It was intermittent.  It wasn't every single day.
22 Q   How many witnesses did the prosecution call at the
23 trial?
24 A   I think there were six witnesses in total.
25 Q   Were any of these witnesses patients that you had

---

1  actually treated?
2          MR. FARBER:  Objection.
3          THE COURT:  I'm going to sustain the objection.
4  BY MR. NORINSBERG:
5  Q   Were any of the labs called to the trial?
6          MR. FARBER:  Objection.
7          THE COURT:  Sustained.
8          MR. NORINSBERG:  May we approach, your Honor?
9          THE COURT:  Yes.
10         (Sidebar begins.)
11         (Continued on the next page.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1          THE COURT:  Yes, Mr. Norinsberg?
2          MR. NORINSBERG:  Your Honor, our position is just
3  as a plaintiff, this is part of what he had to go through.
4  He sat through his trial.  He can testify as a witness.  It's
5  his direct knowledge to his damages.  It's what it's like
6  being there.
7          THE COURT:  It's not what he's testifying about,
8  though.  You're asking him to testify about what patients,
9  what records were put in.  It's perfectly appropriate to
10 have him testify I had to sit through this trial, I had to
11 listen to witnesses, it was a strain.  That's appropriate
12 areas of inquiry.  But not what kind of evidence was put
13 before him, who the witnesses were, any of that.  I thought
14 we had been through this ground innumerable times.  You
15 can't back-door it in just because he's the plaintiff.
16         If the purpose of this is to show damages, then he
17 can explain that it was difficult for him to sit there and
18 have to come back to each of these events.  That's all fair
19 game, but not what happened.
20         (Sidebar ends.)
21         (Continued on the next page.)
22
23
24
25

---

1  BY MR. NORINSBERG:
2  Q   Dr. Morris, you told us a few moments ago that the
3  trial lasted on and off, I think you said, for the better
4  part of six weeks; is that correct?
5  A   That's correct.
6  Q   And each time when you would go in there and sit there
7  every day and listen to whatever was happening, what was
8  that like for you?
9  A   It was agonizing.
10 Q   Why?
11 A   Well, you want to believe in the criminal justice
12 system or the justice system, but you really have no way of
13 how this is going to play out.  So basically you're facing a
14 B felony.  That's what the prosecutors are charging you
15 with.  And if you're going to be found guilty of that,
16 you're going to jail.  It really says in the indictment 25
17 years.  I think Mr. Fusto said yesterday that it would be 15
18 years in state prison.  But the thought of being in state
19 prison for 15 years, basically I was going to die in jail if
20 I was convicted of these charges.
21 Q   Now, after the evidence was concluded at the trial, did
22 there come a point where the judge gave a verdict?
23 A   Yes, there did.
24 Q   What was the date of the verdict?
25 A   The date of the verdict?

1  Q    Do you recall?
2  A    It was in August of 2007.  I don't recall the exact
3  date.
4  Q    And can you tell the members of the jury, what was the
5  judge's verdict?
6  A    Not guilty on all counts.
7       THE COURT:  Can I qualify something?  Do you
8  recall in the six-week period, how many trial dates there
9  were; in other words, how many times you had to come to
10  trial, days?  Trail days.
11      THE WITNESS:  Yeah, I think there were about six
12  days of trial.  Some were mornings; some were afternoons.  I
13  don't think every day was like we're doing here, in other
14  words, a full day.  The judge was hearing other cases.
15      THE COURT:  I have other cases too.
16      THE WITNESS:  I understand.
17      THE COURT:  But there were six -- in other words,
18  in total, how many days did you have --
19      THE WITNESS:  I think six individual periods.
20  BY MR. NORINSBERG:
21  Q    I'd like to show you now what's been marked as
22  Plaintiff's Exhibit 114.  (Handing.)
23      Take a look at that document, Dr. Morse.
24  A    (Witness complies.)
25  Q    Do you recognize that document?

1  A    Yes, I do.
2  Q    What do you recognize that document to be?
3  A    This is the certification of disposition acquittal.
4  This is the result of my trial, that I'd been acquitted.
5  And also in the top right-hand corner, it actually costs
6  $10.  You have to pay the court $10 to get an official
7  version of the document.
8  Q    Is this the official version?
9  A    This is the official version.  I bought 10 of them.
10      MR. NORINSBERG:  I'd like to offer Plaintiff's
11  Exhibit 114 into evidence.
12      THE COURT:  I take it there's no objection.
13      MR. FARBER:  Can I see it, please?
14      MR. NORINSBERG:  (Handing.)
15      MR. FARBER:  No objection, your Honor.  Thank you.
16      THE COURT:  114 is received.
17      (Plaintiff's Exhibit 114 received in evidence.)
18  BY MR. NORINSBERG:
19  Q    Now, Dr. Morse, are we looking at a certificate of
20  disposition?
21  A    Yes, we are.
22  Q    And when did you actually get the printed copy of it?
23  Do you remember?
24  A    I think the moment that the judge declared me innocent
25  of all charges, I think I went immediately to the court

1  clerk to get one of these.
2  Q    Why did you get 10 of them?
3  A    I got 10 of them because I really -- you know, at that
4  point I wanted to use it.  I thought it was almost like a
5  death certificate.  I was going to send it out to whomever
6  just to prove, hey, I'm innocent, here it is.
7  Q    When the judge acquitted you of all charges, how did
8  you feel at that time?
9  A    It was a mixed bag, basically.  I mean, I was happy I
10  wasn't going to jail.  I had already been arrested and been
11  in jail a numbers of hours.  So that certainly wasn't going
12  to be fun.  But at the same time, my life was ruined
13  socially, financially.  So it wasn't -- you know, it wasn't
14  overly joyous.
15  Q    Well, when you say "financially," I mean, what was your
16  financial state at the point where you actually were
17  acquitted of all charges?
18  A    Well, this acquittal didn't take place for 15 months.
19  So I really had no income, and I had incurred tens of
20  thousands of dollars in expenses on my criminal attorney to
21  defend these charges.
22  Q    And after you were acquitted of all charges, what steps
23  did you take in terms of trying to go back and practice
24  dentistry again?
25  A    Well, at that point, I really tried to apply for, you

1  know, jobs, positions in hospitals.  I went to the ADA
2  journal, the New York State dental journal, the New York
3  Times, all of the dental schools in the Metropolitan area.
4  Q    What happened when you made these applications?
5  A    No response whatsoever.
6  Q    Did you ever get a single interview after you submitted
7  these applications?
8  A    Not a one.  But I think one of the other factors was
9  that the official Attorney General's office still had my
10  indictment story up on their website.  So anybody who would
11  Google me for a possible interview, they would see
12  immediately that I'd been indicted for a million dollar
13  Medicaid theft.  They would have no --
14      MR. FARBER:  Objection.  Motion to strike.
15      THE COURT:  What's the basis of the objection?
16      Did you go to the website and see after this that
17  your story was still there?
18      THE WITNESS:  Your Honor, I went almost on a daily
19  basis to website.  I had written a letter to Andrew Cuomo,
20  who, after Mr. Spitzer became the Governor of the State of
21  New York, he took over the Attorney General's website.  I
22  had pleaded with him in my letter to please remove this
23  posting, that it was destroying me financially and
24  personally.  And the only time they removed that story was a
25  month after my deposition, which was two years after my

**JA398**

1  acquittal on all these charges.  So for two years, these
2  folks over there kept that story on their official
3  government website, and they destroyed me with that.
4  BY MR. NORINSBERG:
5  Q    I'm going to show you, Dr. Morse, Plaintiff's Exhibit
6  117 (Handing.)
7       Do you recognize this document, Dr. Morse?
8  A    Yes, I do.
9  Q    What do you recognize this document to be?
10  A    This is a certified letter to Andrew Cuomo, Office of
11  the Attorney General, Albany, New York, asking Mr. Cuomo to
12  purge his website about this indictment story.
13  Q    What's the date of the letter?
14  A    Well, this letter is dated September 10th, 2009, but it
15  references that since my acquittal in August of 2007, I've
16  contacted you and several other New York State officials and
17  requested the removal of this press release.  Despite all of
18  my efforts, nothing has been done about this.  I am now once
19  again asking you to please correct the record.
20  Respectfully, Dr. Leonard Morse.
21       MR. NORINSBERG:  I offer Plaintiff's Exhibit 117
22  into evidence.
23       MR. FARBER:  By have no objection to 117, your
24  Honor.
25       THE COURT:  117 is received.

1       (Plaintiff's Exhibit 117 received in evidence.)
2  BY MR. NORINSBERG:
3  Q    Dr. Morse, is this the letter you sent to Governor
4  Cuomo?
5  A    This is the letter I sent certified mail, return
6  receipt requested.
7  Q    Before you had sent this letter what steps, if any, had
8  you taken to get the story of your indictment removed from
9  the Attorney General's website?
10  A    Well, Andrew Cuomo, who had succeeded Mr. Spitzer as
11  Attorney General, had a protocol that anything on the
12  website, you would contact him via the Internet.  So I had
13  written him basically the same letter, you know, indicating
14  what my acquittal number was so he could look up the records
15  if there was any question.  And then I had contacted a half
16  a dozen officials from the Medicaid Fraud Control Unit, and
17  I had thumb conversations with these people at the local
18  level here in New York, up in Albany.  And despite all these
19  telephone conversations, nobody ever scrubbed and purged
20  that story for over two years post acquittal.  They just
21  kept it up on their website.
22  Q    Now, you mentioned that after you were deposed in this
23  case, a month later, the story was finally taken down?
24  A    Amazingly, after Mr. Farber conducted his deposition,
25  one month after that, when I complained once again about

1  this story destroying me personally and financially, it was
2  just an amazing coincidence.  It was serendipity.  All of a
3  sudden, I got a one-paragraph letter from the state saying
4  that they're going to remove any reference to me and that
5  indictment.  But they didn't have the courtesy of actually
6  saying and posting on their website that I had been
7  acquitted of those charges.  So that story lived on anyway.
8  All the media had picked up the indictment story.  And if
9  you go today to the Internet and Google me, you're going to
10  see the original indictment story.  It doesn't exist on
11  their official website, but it exists all over the Internet.
12  So there's really no missing it.
13       THE COURT:  There's no what?
14       THE WITNESS:  No missing, that anybody could be
15  confused that I wasn't indicted.  Nobody would see that the
16  Attorney General -- that we had a trial and that I was
17  acquitted.  They never officially acknowledged my acquittal
18  at trial.
19  BY MR. NORINSBERG:
20  Q    Dr. Morse, did there come a time where you were advised
21  by Medicaid that your Medicaid privileges were being
22  restored?
23  A    Only after I reapplied to the program.  It wasn't an
24  automatic restitution.  We had to do a reapplication.
25  Q    Was that after your acquittal as well?

1  A    That was about three months after my acquittal.
2  Q    I'd like to show you Plaintiff's Exhibit 147.
3  (Handing.)
4       MR. FARBER:  No objection.
5       THE COURT:  This is 147?
6       MR. NORINSBERG:  Yes, your Honor.
7       THE COURT:  It will be received.
8       (Plaintiff's Exhibit 147 received in evidence.)
9  BY MR. NORINSBERG:
10  Q    Dr. Morse, is this the letter that you received from
11  the -- from Medicaid?
12  A    Yes.  This is dated September 27, 2007.  This is my
13  reinstatement of my Medicaid number.
14  Q    How did you feel when you finally got reinstated with
15  Medicaid?
16  A    Too little, too late.
17  Q    Why?  What difference did it make?  At least you were
18  now being given your privileges back, right?
19  A    To practice on whom and where?  My 30-year practice, my
20  30,000 patients had been dissipated.  As part of the sale of
21  my practice to Dr. Ketover, I had entered into an agreement
22  for five years, that I wouldn't even practice in the
23  neighborhood.  And in the hospital, along with being the
24  chief of restorative dentistry, I was also the assistant
25  director of program, and that position had gone to another

1  dentist during my absence.

2  Q    Now, once you got your Medicaid privileges back, why
3  didn't you just try to open up a new dental practice on your
4  own?

5  A    It would cost hundreds of thousands of dollars.  My
6  credit rating had been destroyed by this action.  My
7  financial resources had been withered down by this action.
8  And it was really very, very difficult.  Something that took
9  30 years, a medical and dental center that had taken 30
10 years to build up with multi generations of patients, you
11 couldn't just go out and secure something like that.  I had
12 spent my professional lifetime building this practice.

13 Q    Now, what type of costs are involved in terms of
14 opening up a dental practice?

15 A    Well, you would have to spend several hundreds of
16 thousands of dollars on equipment.

17 Q    And when you're talking about equipment, what type of
18 equipment do you mean?

19 A    You need X-ray equipment, you need dental chairs, you
20 need compressors.  The rooms have to know lead-shielded to
21 be in conformance with the health department laws.

22 Q    What about just working for another dentist in someone
23 else's practice?  Did you try to do that?

24 A    Absolutely.  That was the purpose of my trying to get a
25 job, basically.  And it was to no avail.  I'm the dentist

1  that stole a million dollars, basically.  That's what I've
2  been branded as.  Nobody wanted me in their office.

3  Q    What about Dr. Ketover, did you try to go back to
4  Dr. Ketover and work something out with him?

5  A    He didn't want me in the office either.  As I
6  referenced before, there was a five-year restrictive
7  covenant as part of the sale provisions of my practice.  So
8  I was basically neutered.

9  Q    Did there come a time when you filed a civil action in
10 federal court related to this case?

11 A    Yes, I did.

12 Q    When did you file this lawsuit?

13 A    The civil lawsuit was filed in November of 2007.

14 Q    Can you tell the members of the jury, why did you file
15 this lawsuit?

16 A    Well, I wanted my reputation back.  I wanted my good
17 name back.  I didn't know, you know, how to go about that.
18 I basically wanted to find out what went on here.  When
19 everybody's talking about the grand jury, it's basically
20 like electing the Pope.  It's a secret conclave.  You don't
21 know what's going on.  You don't know what witnesses are
22 appearing against you.  You don't know what evidence is
23 being presented.  So I was basically hell bent on finding
24 out who did what to me and why.  Because I knew I was a
25 pristine practitioner.  I knew I had my heart and soul in my

1  practice.  I loved my patients, my patients loved me.  And
2  overnight I had become collateral damage.  I was just thrown
3  in the gutter.  So I wanted to get to the truth.  I think in
4  America people are entitled to know what the truth is.  And
5  this took me seven years to do.  In fact, today is the
6  2,500th day since this incident.

7  Q    Did you have any idea when you went into the civil
8  lawsuit route what evidence had been used during the grand
9  jury proceedings?

10 A    Absolutely none.  And the grand jury proceeding itself
11 is actually a secret transcript.  It's only after the
12 federal judge ordered the Government to release this in an
13 unredacted form that I was able to actually read the
14 transcript and see who had testified against me.

15 Q    Dr. Morse, I'm showing you an exhibit which we
16 previously identified as Grand Jury 11, Plaintiff's Exhibit
17 133 in this case.  (Handing.)

18    Have you had a chance to see this exhibit before coming
19 here today?

20 A    Yes, I have.

21 Q    Do you see that this document -- is this a document
22 that you submitted to Medicaid?

23 A    Absolutely not.

24 Q    Does this look like any of your billing submissions at
25 all?

1  A    None that I've ever done.

2  Q    And is this a record that you ever received from
3  Medicaid in any of your transactions?

4  A    Never.

5  Q    When was the first time that you learned about the
6  Edwin Gonzalezes who appeared at the grand jury or at least
7  of this Edwin Gonzalez record?  When was the first time you
8  learned about it?

9  A    During the civil lawsuit.

10 Q    What did you recognize, Dr. Morse, when you looked at
11 this particular document?

12 A    I realized because I'm a 30-year, 40-year Medicaid,
13 that this is a compilation of three patients that had the
14 common name Edwin Gonzalez.

15 Q    Now, I know it's because you're a practitioner, but
16 what is it about this document that tells you that there are
17 three different Edwin Gonzalezes on there?

18 A    In the top left-hand column, it has "CIN," and that's
19 an abbreviation for client identification number, which is
20 basically the patient's Medicaid number.

21 Q    And apart from that column, the CIN number, is there
22 anything else that would tell somebody looking at this
23 document that there are actually three separate Edwin
24 Gonzalezes that have been merged into this one document?

25 A    There would know no way for anybody to tell that.

1    Q    Dr. Morse, I'd like, if you could, to please step down

2    for a moment.

3    A    (Witness complies.)

4    Q    If you could take a look at -- this is the last page

5    of Grand Jury -- one of the last pages of Grand Jury 7,

6    showing the patient Stacy Rodriguez.  It comes from

7    Plaintiff's Exhibit 44 in evidence.

8         Do you recognize this particular document?

9    A    As part of my billings that I would submit, is that the

10   question?

11   Q    Yeah.

12   A    No.

13   Q    Have you ever seen this document before?

14   A    Not until we started this civil lawsuit.

15   Q    Now, according to this document, how many procedures

16   were performed on June 4th, 2002 on this patient?

17   A    This lists nine procedures.

18   Q    Did you, in fact, perform nine procedures on this

19   patient on that date?

20   A    No, I did not.

21   Q    How do you know that?

22   A    I save all of my records.  I have all of my patient

23   charts for 30 years.  I have all of my vendor statements.

24   And when the Government produced this as part of this civil

25   lawsuit, I went back to my original vendor statements and

---

1    Xeroxed copies of the charts that they provided me, and I

2    compared it to my vendor statement, and my vendor statement

3    is accurate that I provided three procedures, three services

4    for this patient, and I was paid for three services.

5         THE COURT:  What is a vendor statement?

6         THE WITNESS:  A vendor statement is what Medicaid

7    prints out when they pay you on a weekly basis.  So it shows

8    what the doctor has inputted computer-wise and what Medicaid

9    is paying you back.  So it's a direct reflection on that

10   statement what you billed for and what you're getting paid

11   for.  Anything you've typed in on your computer comes back

12   the next week, and you get a check and you get a printout of

13   all the procedures you billed for.

14        THE COURT:  It's a Medicaid document, then?

15        THE WITNESS:  Right.

16        THE COURT:  Not a record of yours.

17        THE WITNESS:  No.  This is produced by Computer

18   Science Corporation, which is the vendor that processes all

19   Medicaid-related payments, whether you're a doctor, a

20   dentist, a pharmacy.  So this is what you would get on a

21   weekly basis.

22        THE COURT:  Do you have any questions about the

23   exhibit?

24        MR. NORINSBERG:  I'm just about to show him the

25   exhibit.

---

1    BY MR. NORINSBERG:

2    Q    I'm going to show you what's been marked as Plaintiff's

3    Exhibit 144.  It's a blowup of 144.  Can you please take a

4    look at this document, sir?

5    A    This is -- here has Medicaid, has my business name,

6    580 Dental PC, and we've highlighted Stacy Rodriguez.  And

7    you can see there are only three procedure codes.

8         THE COURT:  Is this in evidence?

9         MR. NORINSBERG:  Yes, your Honor.

10        THE COURT:  144 is?

11        MR. NORINSBERG:  Yes.

12        THE WITNESS:  Not nine.

13        THE COURT:  144 here says sample prescription

14   filled out with --

15        MR. NORINSBERG:  You know, unfortunately, I'm

16   going off my memory, and my colleague just told me it's not

17   that.  It's Plaintiff's Exhibit 32.  So I was only off by

18   100 something.

19   A    So basically what we're looking at here is an unaltered

20   version --

21        THE COURT:  I don't have 32 in evidence either.

22        Please put it down.  Don't show it to the jury.

23        MR. NORINSBERG:  It's definitely in evidence, your

24   Honor.  I think the only question is what number.

25        THE COURT:  It says "Vendor statement from

---

1    plaintiff to Dr. Morse."  I don't have it checked off as in

2    evidence.  Is it an error on my part?  Does anyone have 32

3    in evidence?

4         MR. FARBER:  I don't think it's 32, your Honor.

5    We think it might be 146.

6         MR. NORINSBERG:  I don't think it's 146.  I

7    thought it was 144 or 145.

8         THE COURT:  There must be an original document

9    somewhere.  That's a blowup.  You must have in your exhibits

10   an original 32.  Do you want to see what that is?  I realize

11   that's a copy of something, correct?

12        MR. NORINSBERG:  Your Honor --

13        THE COURT:  Doctor, you can sit back down while we

14   try to figure this out.

15        MR. NORINSBERG:  We seem to have a consensus it's

16   in the 140s, your Honor.

17        THE COURT:  That's helpful.

18        MR. NORINSBERG:  We're getting closer.

19        THE COURT:  What does it purport to be?  You saw

20   the exhibit.  Is it a vendor statement, Doctor?

21        THE WITNESS:  This is the actual unaltered payment

22   statement that I got from Medicaid.

23        THE COURT:  Therefore, you just answered my

24   question.  It's a vendor statement, correct?

25        THE WITNESS:  Correct, your Honor.

**JA401**

1  THE COURT:  So it's a vendor statement.  On your
2  exhibit list, you have vendor statement from plaintiff
3  Dr. Morse 32.  But I don't know if that's a blowup of that,
4  and it's not in evidence.  So you need to lay a foundation,
5  offer it, and then we'll show it to the jury, but not before
6  then.
7  MR. NORINSBERG:  Okay.
8  BY MR. NORINSBERG:
9  Q  Do you recognize --
10  THE COURT:  Let's make sure it's 32, because I
11  don't mind if you're using copies, but I want to make sure
12  it's the same thing as the marked exhibit.
13  MR. NORINSBERG:  Yeah, it's definitely 32.
14  MR. MILLER:  I think it was introduced earlier as
15  a higher number, but it was originally 32.  And we're fine
16  if he wants to use it as 32.  Just offer it again.
17  THE COURT:  What was it introduced as?
18  MR. MILLER:  I think 145 or 146.
19  THE COURT:  We have something called a remittance
20  sheet.
21  MR. MILLER:  It's one and the same.
22  THE COURT:  So it's in twice.  It's in as 145 now?
23  MR. MILLER:  It's in as 145.  It was marked as 32.
24  And if they have a copy of 32 and want to use that, that's
25  fine.

1  THE COURT:  No.  We have too many copies of the
2  same exhibits floating around to make this more confusing.
3  So it's in as 145.  You're sure that's -- 145 is the same as
4  what's on the chart as 32?
5  MR. MILLER:  Yes.
6  THE COURT:  Let's call it 145, and let's call what
7  you want to show the doctor 145A, a blowup.
8  MR. NORINSBERG:  Okay.
9  BY MR. NORINSBERG:
10  Q  Okay.  Dr. Morse, walk us through, what are we actually
11  looking at here?
12  A  You're looking at a Medicaid remittance statement,
13  which is printed by New York State on a weekly basis, and it
14  shows the patients, the procedures and what you're getting
15  paid, what you actually input into your computer system for
16  that billing cycle.  And what we're looking at, what's
17  specifically highlighted is this Rodriguez case.  And they
18  don't list the first names but go by the Medicaid numbers.
19  And you can see on the service date of June 4th, 2002, three
20  procedures were billed to this patient along with three
21  payments.  And there are no six additional lines of billing
22  with a minus sign or anything else.  That is the difference
23  between that and the other document.
24  Q  Thank you, Dr. Morse.
25  Now, Dr. Morse, there's been some suggestion during

1  this trial that you backed out some of the claims that are
2  shown on there.  Did that happen, Dr. Morse?
3  A  That's absolutely not true.
4  Q  How do you know that's not true?
5  A  Because I had an opportunity to take a look.  They only
6  told us at the last minute, after five years of
7  litigation --
8  THE COURT:  Let's not give a story about it.  Just
9  tell us why you did it.
10  MR. FARBER:  Objection.
11  A  I looked at my vendor statement.  I did not personally
12  back out anything.
13  THE COURT:  What does "back out" mean to you,
14  Doctor?  I'm not sure the jury understands the term.
15  THE WITNESS:  Well, that's the terminology that
16  Mr. Farber used.
17  THE COURT:  But it must have a meaning to you
18  because you said you didn't do it.  So what is it?
19  THE WITNESS:  What it means to me is you have to
20  do an adjustment or a void on the claim.  So there's a
21  procedure for doing an adjustment or a void, and what it
22  involves is you have to get paid for the claim, then you
23  have to take that 22-digit claim number, re-input it into
24  the system, and then you have to delete that payment.
25  THE COURT:  And you're saying you did not do that?

1  THE WITNESS:  I'm saying categorically I did not
2  do that.
3  THE COURT:  Okay.
4  BY MR. NORINSBERG:
5  Q  Dr. Morse, I'm going to display what has been
6  identified as Grand Jury 7 in this case, and Plaintiff's
7  Exhibit 44 is the exhibit number.
8  Before we get into details here, I just wanted to ask
9  you some general questions.
10  Can you see it from there?  I have an extra copy that
11  might be helpful.  You can look at it.
12  A  It's a little grainy on my screen.
13  Q  Okay.  (Handing.)
14  A  Thank you.
15  Q  Do you have it in front of you, Dr. Morse?
16  A  Yes, I do.
17  Q  Let me start just by asking again, is this a document
18  that comes from you or your office?
19  A  I do not generate these kind of documents, no, sir.
20  Q  Do you generate anything that looks remotely similar to
21  what's shown here?
22  A  Not at all.
23  Q  When was the first time you saw this document?
24  A  I saw this document after we started the civil lawsuit.
25  Q  Now, Dr. Morse, we've have had some discussions about

1  tooth numbers, and it's clear there are no tooth numbers in
2  any these documents in Grand Jury 7; is that correct?
3  A    That is correct.
4  Q    Now, when you actually submit your payment or submit
5  your forms for payment to Medicaid, are there any
6  requirements with respect to tooth numbers?
7  A    It's a mandated field.
8  Q    What does that mean, that it's a mandated field?
9  A    That means if the provider doesn't fill in a tooth
10 number for a code that requires a tooth number, the claim is
11 not processed.  It's thrown out of the computer system.
12      (Continued on the next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q    I'm going to show you what's been marked as Plaintiff's
2  42.
3       Do you recognize that document?
4  A    Yes, I do.
5  Q    What do you recognize that document to be?
6  A    It's a sample Claim Form A that's used for billing
7  Medicaid.  It explains to the dental provider how they
8  should fill out their forms for billing.
9       MR. MILLER:  Your Honor, I didn't think that's
10 what we have for 42.  I think it's a mixup in exhibits.
11 Sorry.
12      MR. NORINSBERG:  We have to fix this.
13 Q    Okay.  I'm going to show you what's been marked
14 Plaintiff's 60, which is a document I handed to you before.
15      Can you identify for the record what Plaintiff's 60.
16 A    It's a copy of Claim Form A which is how to bill
17 Medicaid.  It's a sample billing form for Medicaid.
18      MR. NORINSBERG:  I offer Plaintiff's 60 into
19 evidence.
20      MR. FARBER:  We have no objection to 60, your
21 Honor.
22      THE COURT:  60 is received.
23      (Plaintiff's Exhibit 60 received in evidence.)
24 Q    Dr. Morse, I'd like you to come down.  We have a blowup
25 of 60 I'd like to show you.

1       THE COURT:  Can you just put it on that easel
2  there if you want to do that where the jurors can see it and
3  others can see it as well.
4  Q    Dr. Morse, just starting at the top, what are we
5  looking at here?
6  A    We're looking at a sample Medicaid dental claim form
7  and it's called "Claim Form A."
8  Q    And what's your understanding of the purpose of this
9  form?
10 A    This is the official form, how you have to enter your
11 billings for the Medicaid program.
12 Q    Directing your attention to the highlighted section of
13 document, I believe it says 29 and then it says "Tooth."
14      Can you explain to the members of the jury what is that
15 section for?
16 A    Well, that's for indicating what tooth the dentist is
17 actually working on.  Teeth come from numbers 1 through 32.
18 So you would have to when you're doing your billing, if it's
19 a code that requires identifying a unique tooth, you would
20 have to put that unique tooth number in that column so that
21 you could actually do this billing and actually get paid
22 from Medicaid.  Without that number, you're not going to
23 have that claim processed.
24 Q    Well, what exactly would happen?  Let's say you
25 submitted a form but you left that section blank and you

1  didn't identify the tooth numbers?  What would actually
2  happen?
3  A    On your remittance statement -- could I touch the
4  exhibit?
5  Q    Sure.
6       THE COURT:  Now you're referring to what exhibit?
7  145?
8       MR. NORINSBERG:  Yes.
9  A    On the remittance statement, you would have a line here
10 (indicating).  If you didn't put the tooth number, instead
11 of saying "Paid," it would say, "Denied; no tooth number
12 indicated," and that would be the end of the claim.
13 Q    Dr. Morse, before we get into specific details on Grand
14 Jury 7, I wanted to just get some general explanations for
15 some of the dental terms that we might be using here.
16      We heard a lot of talk in this trial about dentures and
17 partial dentures and so forth.  Can you just explain to us
18 what some of these terms are.  I'd like you to start with
19 dentures.  We do have some models that may help to explain
20 to the jury.
21 A    I think it's easier with a visual if we could show the
22 jury members what a denture is.
23 Q    Okay.  Start with a denture.
24      MR. NORINSBERG:  Would it be acceptable, your
25 Honor, for the witness to step down?

1    THE COURT:  I don't think he needs to.
2    MR. NORINSBERG:  Okay.
3    THE COURT:  Are these going to have little tags on
4  them or something so we know which exhibit is being
5  discussed?  How about a number?  Do they have a number now?
6    MR. NORINSBERG:  I think we're up to 147.  We can
7  put tags on them.
8    THE COURT:  I think you're up to 148.  And you can
9  make it 148-A, B and C.  But it's always important to have a
10  clear record of what the witness was referring to.  That's
11  why we need to do that.
12    So you picked up something, Doctor, that we'll
13  call 148-A.  Do they go together those two things you picked
14  up?  Okay.  What's 148-A?
15    THE WITNESS:  This is a sample of a complete upper
16  and a complete lower denture.  So when there was testimony
17  about, well, where do you wear a denture, this is what the
18  question would be:  Do you have one of these in your mouth
19  on top or on bottom or maybe both?  Are you missing all of
20  your God-given teeth?  That's what's generally known as a
21  denture.
22  Q    Now, we've heard a lot of talk also in the trial
23  about partial dentures.  Can you just explain to us what's
24  the difference between a partial denture and the full
25  denture.

1  A    Sure.  A full denture is the complete replacement of
2  all your God-given natural teeth, either top or bottom.  A
3  partial denture is replacement of just some of your teeth
4  and it could be as small as a single tooth like this one
5  (indicating) or it could be a larger one where multiple
6  teeth have been replaced and the patient still has special
7  God-given teeth but most of the teeth are replacement teeth.
8  Q    Are partial dentures considered to be actual dentures?
9  When people refer to a partial denture --
10    THE COURT:  Well, maybe you want to ask if a
11  dentist refers.
12  Q    Would a dentist refer to a partial denture as being a
13  denture as well?
14  A    A dentist would say a denture is one of these
15  (indicating).
16    THE COURT:  One of these being?
17    THE WITNESS:  One of these complete replacements
18  would be a denture.
19  Q    What would you refer to the partial denture as?
20  A    I would call this partial denture.
21  Q    Are there any other names that dentists use?
22  A    It could be a bridge.  You could refer to it as a
23  bridge.  And full bridge, partial bridge.
24  Q    What exactly is a bridge?
25  A    A bridge could come either as a removable -- these are

1  removable appliances or it could come as like a series of
2  caps and crowns that are permanently installed in a
3  patient's mouth.
4    THE COURT:  Excuse me.  Can I just clarify
5  something.  If you have a bridge -- I mean, a crown, that's
6  considered --
7    THE WITNESS:  Several crowns together are
8  considered a bridge, or you might have a missing tooth and
9  then two crowns at the end and that would be a three-part
10  bridge.
11    THE COURT:  Okay.
12  Q    Do you have any samples of bridges in that?
13  A    No, I do not.
14  Q    Okay.  Are there any other models up there that might
15  be helpful in explaining?
16  A    Well, also the clasp.  If a patient isn't having a full
17  denture, you know, complete denture, and they're having a
18  partial denture, since this is a removable appliance, it's
19  anchored to the patient's natural teeth by little clips on
20  the side.
21    THE COURT:  That's a clasp?
22    THE WITNESS:  This is a clasp (indicating), this
23  little metal thing.
24    THE COURT:  I can't see it.
25    Okay.  There's something metal.  All right.

1    THE WITNESS:  It's a little metal hook.
2  Q    That's what a clasp is?
3  A    That's basically what it is.
4    MR. FARBER:  Your Honor, for the record, he can
5  tag these things.
6    THE COURT:  Pardon me?
7    MR. FARBER:  If the witness could tag these
8  things, it could be helpful.
9    THE COURT:  What you just hold up that had
10  the clasp on it, and we'll call that -- can you make sure
11  these get marked 148-B.  So the full denture is 148-A.  And
12  the denture with the -- whatever it is, with the clasp, is
13  148-B.
14    What would you call 148-B?  I know it has a clasp.
15    THE WITNESS:  I would call it a partial denture.
16  Q    I would like to, Dr. Morse, go back to Grand Jury 7,
17  Plaintiff's Exhibit 44, and look at some of the procedures
18  that are described here and see if you can help us
19  understand what they are talking about.
20    We're looking at the first page of the patient Sawson
21  Suliman.  Where it says, "Add tooth to existing partial
22  denture," what does that mean?
23  A    It means the patient has a partial denture like this
24  (indicating) and we're going to add an additional tooth or
25  sometimes multiple teeth to that bridge -- to that partial

**JA404**

1  bridge.
2  Q   Going to the next procedure, "Reline lower part denture
3  lab," what does that mean?
4  A   What that means is we're going to add some extra
5  material, some extra cushion underneath the bridge.
6  Q   The next one, "Repair or replace broken clasp."  Can
7  you explain that.
8  A   That's a repair/replacement of one of these tiny clips
9  that are on the removable partial bridge.
10 Q   Now, when you have to repair or replace a broken clasp,
11 can you just describe what that entails.
12 A   That entails putting the bridge back in a patient's
13 mouth, taking an overall model or impression of the
14 patient's mouth with the bridge in place, sending that off
15 to the laboratory and having the required repairs done,
16 whether it's a tooth, five teeth, whether it's multiple
17 clasps.  It's one single impression for the lower, one
18 single impression for the upper bridge.
19 Q   You were here yesterday when you heard Dr. DeLuca
20 testify about how some of the procedures in Grand Jury 7
21 appeared to be excessive.  Were you here?
22 A   Yes, I was.
23 Q   I'd like to start with Stacy Rodriguez, what we were
24 looking at before.
25     And can you tell us, Doctor, what are the three

1  procedures you actually performed on Stacy Rodriguez?
2  A   One additional tooth was added to her partial.  One
3  clip, one of those clasps, were added to the partial, and
4  some additional material was added to the inside of the
5  bridge as a reline.
6  Q   Would there be anything unusual about doing this type
7  of work on a patient in one session?
8  A   Absolutely nothing.  This is just standard dentistry.
9  Q   I'd like to go to Intisar Ahiri.
10     Now, Doctor, just looking at the dates on this page, do
11 you see those dates, Doctor?
12 A   Yes, I do.
13 Q   Does it tell you that there are actually multiple
14 different dates where treatment is being performed?
15 A   This is over a three-year period of time for this
16 patient.
17 Q   Okay.  Now, directing your attention to August 14th,
18 2000.  Do you see that?
19 A   Yes, I do.
20 Q   And you see there are multiple entries for repair or
21 replace broken clasp?
22 A   Yes, I do.
23 Q   Would it be unusual to have multiple procedures
24 relating to a broken clasp?
25 A   Not at all.

1  Q   Can you just explain to us just in plain English so we
2  can all follow, why would that not be unusual?
3  A   Well, it's very simple.  If you take a look at a
4  removable bridge with clasp, this has what we call "path of
5  insertion."  In other words, this part is removable, but it
6  has to fit over the patient's natural God-given teeth.
7      So if any portion is damaged, it may require that both
8  of those clasps or maybe there will be three or four clasps
9  have to be redone, reengineered so that the bridge can fit
10 back in the patient's mouth.
11 Q   Why would it be if one part is broken that it might
12 have an effect on other parts of the bridge?
13 A   It's just like when you were a kid on a seesaw.  If
14 these things aren't perfectly flushed and perfectly
15 engineered, the bridge moves around in the patient's mouth
16 and it just further distorts.
17 Q   Turn to another patient, Nassa Ahiri.  Now, again,
18 Doctor, directing your attention to the procedures here that
19 are performed.  There are multiple entries that talk about
20 repair -- I'm sorry, replace broken teeth per tooth.
21     Do you see that?
22 A   Yes, I do.
23 Q   Why would there be multiple entries relating to what
24 appears to be a single procedure?
25 A   Well, there's really no provision in the Medicaid

1  billing if multiple teeth are damaged and have to be
2  replaced.  It's going to be printed out on individual lines.
3  But in reality it's a single visit and you're replacing just
4  as many teeth as have to be.
5      If we take a look at the partial example, here's a
6  partial where the patient only had four of their God-given
7  teeth left so if a whole segment were to break off, there
8  might be four or five teeth that have to be replaced.  The
9  way it would be billed would be individual codes because you
10 have to indicate the tooth number just like we saw in Claim
11 Form A so you would see when it's printed out, replace
12 tooth, replace tooth, replace tooth, replace tooth.
13     And there's really nothing unusual about that.  If you
14 understand Medicaid and you've done Medicaid billing, this
15 is just normal procedures.  There's nothing unusual at all
16 about that.
17 Q   So we're seeing -- I'm not counting it, but I'm
18 guessing six or seven or whatever the number is there.
19     Are there actually six or seven procedures going on?
20 A   It's really all part of one procedure where the dentist
21 is taking an impression, a mold, a model of the patient's
22 either upper jaw or lower jaw and at the same time with that
23 same impression replacing multiple teeth.  So this isn't
24 something that requires separate visits where the patient is
25 going to fix one tooth or the dentist and then they are

**JA405**

1   going to come back two hours later and fix another.  It's
2   all done in a single visit.
3   Q    What would happen if you just tried to bill this with
4   Medicaid as just one category?  For example, let's say you
5   just described it as fixing broken bridge as one category.
6        What would happen?
7   A    There's no such code as fixing broken bridge.  And the
8   codes for fixing broken teeth, each one of them have to come
9   with a unique identifier with the tooth number where that's
10  being fixed from either 1 through 32.
11       THE COURT:  Can I just clarify something.  When it
12  says, "Fix broken tooth," what does that mean you're doing?
13       THE WITNESS:  That means that one of these plastic
14  teeth are being replaced on the bridge.  Or if it says that
15  several times, it means two or three or however many in that
16  section are being replaced.
17  Q    We're talking about artificial teeth.  We're not
18  talking about somebody's broken teeth?
19  A    No, no, no.  We're not talking about if you fell down
20  and chipped your God-given tooth.  We're talking about a
21  prosthetic teeth or laboratory produced teeth, not your
22  natural, God-given teeth.
23  Q    Are partial dentures removable?
24  A    Yes, they are.
25  Q    In your experience, do patients take these out at night

1   sometimes?
2   A    Frequently.
3   Q    What are some of the circumstances which would lead to
4   partial dentures needing to be repaired?
5   A    They could take them out and what the patient is
6   instructed to do is to keep it wet because it's made out of
7   acrylic.  If the patient really leaves it out of the mouth
8   for any kind of period of time and it doesn't stay moist,
9   these things distort.  They're only plastic.
10  Q    We heard testimony from Dr. DeLuca yesterday to the
11  effect that if there are a number of broken clasps, why not
12  just replace it with a brand new bridge or something along
13  those lines.
14       Do you recall that?
15  A    Yes, I do.
16  Q    Can you explain to the jury why you would not do that
17  and the reasons for not doing that.
18  A    In all due respect to Dr. DeLuca, I think if I remember
19  her testimony correctly, she said she spent all of three
20  hours working in a Medicaid office and it was, I think the
21  words she used, not for her.  So I don't think she really
22  has any clinical experience in this type of dentistry.
23       MR. FARBER:  Objection, your Honor.
24       THE COURT:  I'll sustain the objection.
25  Q    But just in terms of understanding conceptually, how

1   would you decide whether or not to try to fix something that
2   exists already or decide instead to say, you know what,
3   let's just get a brand new prosthesis or whatever you would
4   call it?
5   A    It's actually very easy.  Medicaid allows this once
6   every five years so it's like if you had -- your car was
7   broken but you couldn't get a new car and you had to fix it,
8   you just gotta fix it or have no teeth at all.
9   Q    Now, you heard Dr. DeLuca's grand jury testimony about
10  this concept of going back and forth to the lab every day.
11       Did that ever happen, Dr. Morse?
12  A    Never.
13  Q    How many lab pickups were there per day in your
14  practice?
15  A    We had one pickup and delivery.  Same thing, pickup and
16  deliver at the same time.
17  Q    So when we're seeing multiple procedures here where
18  there's no tooth number involved, does this suggest -- as an
19  experienced dentist, does this suggest to you in any way
20  that these are procedures where you keep breaking the same
21  tooth over and over and going back and forth to the lab?
22  A    Without the tooth number, nobody could really tell.
23  Even an expert like myself couldn't tell that so you might
24  easily be conceived and come to the false conclusion that
25  the same tooth is being repaired over and over again.

1        And I think that's what her grand jury testimony
2   indicates.  She's giving a scenario that the same tooth is
3   broken repeatedly three times in a day, four times in a day.
4        MR. FARBER:  Objection.
5        THE COURT:  What's the basis of the objection?
6        MR. FARBER:  Exceeding the question, and he was
7   not asked for his assessment of her.
8        THE COURT:  You mean, it's an unresponsive?
9        MR. FARBER:  No.  He was not -- in part it's
10  nonresponsive.
11       THE COURT:  Let me just see you for a moment.
12       Ladies and Gentlemen, why don't we take an
13  afternoon recess.
14       (Jurors exit the courtroom.)
15       THE COURT:  I guess I'm not clear on the
16  objection.  What was the last -- can you just read back the
17  last question that was asked of the doctor.
18       (Record read as requested.)
19       THE COURT:  What's the problem with that question?
20       MR. FARBER:  I didn't hear -- that's not the
21  question I heard.  If that is the question, I withdraw my
22  objection.
23       THE COURT:  Okay.
24       MR. FARBER:  I heard other words in there.
25       (Recess taken.)

1    THE COURT:  We'll bring the jury out.
2    THE COURTROOM DEPUTY:  Yes, Judge.
3    (Jurors enter the courtroom.)
4    THE COURT:  Okay.  Ladies and Gentlemen, please be
5  seated.  We're ready to begin.
6  Q    Dr. Morse, focus you here on Grand Jury 7 again.
7    Dr. Morse, as a dentist, can you tell us just by
8  looking at Grand Jury 7, is it possible to know the actual
9  work that was done on these patients?
10  A    It's impossible.
11  Q    Why is it impossible?
12  A    Without the tooth numbers, a dentist would have no way
13  of knowing where those items, those procedures, are done.
14  Q    Why does it matter if the tooth numbers don't show up
15  here?  Why can't you just look at the procedures and figure
16  it out from that information?
17  A    The procedures go hand in hand with the unique tooth
18  identifying numbers.  Without those numbers, this is a
19  totally misleading document.  No one could tell where the
20  work is being done.
21  Q    What if you were called on to evaluate this record for
22  another dentist?  Would you be able to draw any conclusions
23  about what work was done?
24  A    Not at all.
25  Q    And what other information would you need to accurately

1  determine what work had been done?
2  A    Are you asking me if there were no tooth numbers, in
3  absence of the tooth number, what else would help me?
4  Q    Yes.
5  A    I'd either need the patient's chart, I'd have to look
6  at the chart, or the x-rays, the radio graphs to see which
7  teeth were missing.  And then I'd have some idea of what's
8  being replaced or repaired.
9  Q    Why it would be important to look at the patient's
10  chart to figure out what work was actually done?
11  A    The chart has what is called the charting.  It has the
12  mapping out of the teeth that are present.  The chart also
13  has indications, it has a duplication of whatever lab
14  ticket, whatever lab prescription was ordered by the
15  dentist.
16  Q    When you say the charting out, what exactly is that?
17  A    Well, it's going to show which teeth are present, which
18  teeth are missing.
19  Q    And you mentioned a moment ago the x-rays.  Why would
20  looking at x-rays be helpful in trying to figure out what
21  work has been done?
22  A    Well, the x-rays are taken without these bridges in the
23  patient's mouth.  What happens is if the patient goes to the
24  dentist with one of these (indicating) and they have the
25  clips, when the dentist takes the x-rays, that metal piece

1  would be superimposed over the teeth so they wouldn't be
2  able to see what the teeth look like.  So when we take
3  x-rays, when any dentist takes x-rays, since this is a
4  removable bridge, it's a removable partial, the patient is
5  instructed to take this out of his or her mouth before those
6  x-rays are taken.  Then when the dentist has the x-rays, at
7  least at minimum you could see where the missing teeth are.
8  Q    Now, earlier when we were going through your
9  examination, I introduced some of the patient records.  Do
10  you have a few of those in front of you still?
11  A    I have a few of them.
12  Q    Can you please take a look at whichever one you have
13  right there.  Just identify for the record and I'll ask you
14  a question or two.
15  A    I have Asi Othman.
16  Q    Can you tell us, Dr. Morse, looking at Asi Othman's
17  chart, does this patient wear actual dentures?
18  A    Yes, I can.
19    MR. FARBER:  What exhibit number?
20    THE COURT:  What exhibit number are you referring
21  to?
22    MR. NORINSBERG:  It's 143.
23  Q    What can you tell us about this patient in terms of
24  whether or not he has partial dentures?
25  A    Well, I can tell if the patient is wearing a partial.

1  You can take a look from their charting that they are
2  missing 13 teeth spread out between top and bottom.
3    THE COURT:  Which exhibit are you referring to?
4    MR. NORINSBERG:  143.
5    THE COURT:  143 is patient charts.
6    MR. NORINSBERG:  That's one of the charts.
7    THE COURT:  You're looking at one person's chart?
8    THE WITNESS:  I'm looking at an individual chart,
9  your Honor.  It says Asi Othman.
10    THE COURT:  Okay.
11  Q    So Asi Othman was one of the people that appeared
12  before the grand jury.  This patient's actually missing 13
13  teeth; is that correct?
14  A    That's correct.
15  Q    And what does that tell you in terms of the likelihood
16  of this patient having partial dentures?
17  A    Well, I don't think anybody would want to be what
18  walking around with 13 teeth missing.
19  Q    Are there any indications of prescriptions for this
20  patient?
21  A    Yes, there are.  It's clearly written in the chart.
22  Q    Tell the members of the jury what is written in the
23  chart.
24  A    There is a service date.  Just like it would be on the
25  laboratory prescription, there are two partial relines for

1  the upper and the lower bridge.  Two of these little clips.
2  Two of these little metal clips that we're showing were
3  replaced.  He's having 4, 5 of the 13 teeth are being
4  replaced.
5  Q    Now, can you take a look at another chart you have in
6  front of you.  Just identify the name of the patient.
7  A    I have Intisar Ahiri.
8  Q    And what can you tell us about Intisar Ahiri looking at
9  the actual patient chart in front of you?
10 A    Let's see.  Okay.  According to the chart, she's
11 missing nine teeth.
12 Q    Does Intisar Ahiri have partial dentures?
13 A    Yes, she does.
14 Q    Is that indicated in the chart itself?
15 A    Well, you can see that we're doing repair on a partial
16 so there's a date of entry with a transcription of the lab
17 prescription showing the clasps with the tooth numbers and
18 two of the old teeth that are being replaced.
19 Q    And if we could just look at one more.  Whatever the
20 next one is in front of you.
21 A    I have Stacy Rodriguez.
22 Q    Can you please take a look at that chart.
23 A    Okay.  I can see here that the patient also has a
24 partial.  She is having a reline, one of these small little
25 clips and a new tooth replaced.

1  Q    Dr. Morse, during the course of this litigation, did
2  you have a chance to review the patient charts of all of the
3  patients who appeared before the grand jury?
4  A    Yes, I did.
5  Q    Did all of these patients have partial dentures?
6  A    Yes, they did.
7       MR. FARBER:  Objection.
8  Q    And do you --
9       THE COURT:  Can I see you?
10      (Sidebar conference.)
11      (Continued on the next page.)

1       MR. FARBER:  The charts are not in evidence.
2       THE COURT:  Why aren't they in evidence?
3       MR. NORINSBERG:  We'll get them, your Honor.  I
4  just wanted to give them a sample.
5       THE COURT:  You're trying to prove all of the
6  charts of eight people.  Seems like you need to.
7       MR. NORINSBERG:  Subject to connection, I'd like
8  to offer this testimony.
9       THE COURT:  Where are the charts?
10      MR. NORINSBERG:  They are probably somewhere in my
11 office right now.  I mean, I just wanted to use a few
12 samples.  He has looked at them all, I know a hundred
13 percent.  We've gone through them together.
14      THE COURT:  You have to have them available if you
15 want to cross-examine him.  They need to be here.
16      MR. NORINSBERG:  Okay.  I can ask that one global
17 question?  He can cross-examine him if he wants to on it.
18      All right.  I'll move on.
19      (End sidebar conference.)
20      (Continued on the next page.)

1  Q    Dr. Morse, how is it indicated in the chart?  How do
2  you know whether or not a patient has a partial denture?
3  A    Well, you see the procedures are being done.  And by
4  definition, they would have a partial.
5  Q    And is there any type of coding that's put in the
6  chart?
7  A    No.  The coding isn't in the chart.  It's just an
8  actual duplication of what is written on the lab
9  prescription.
10 Q    Now, we heard some mention of the young age of
11 recipients who were treating or who were being treated by
12 580 Dental and who had some type of partial dentures.
13      Now, first of all, can we clarify.  Did you have any
14 young recipients who were actually wearing full dentures?
15 A    No, I did not.  That would be extremely rare because
16 what we're referring to with a full denture is a patient who
17 would have to have this (indicating).  Occasionally you have
18 a patient that has a genetic anomaly and they are missing
19 teeth or the enamel, the outer coding, the protective layer
20 is missing, so those teeth will rot out readily.  Or
21 occasionally you have a patient that has medical conditions
22 that interfere with the saliva flow so they have dry mouth
23 and their teeth, you know, get destroyed and have to be
24 distracted.  But not amongst that group.
25      What we're really talking about, it was a misnomer to

1  say, you know, those patients who have dentures have these
2  complete replacements.  What it really is is those patients
3  who have partials.  And some of those, like the example, can
4  be just a single tooth.
5  Q    So was it unusual in your practice to find younger
6  patients who actually had partial dentures?
7  A    Not at all.  Out of 30,000 patients.
8  Q    To your knowledge, sir, why would patients in this
9  younger age group need to have any type of partial dentures?
10 A    Well, it's very simple.  They might have gotten a tooth
11 knocked out.  They might have been involved in an accident.
12 Most times, Medicaid isn't doing any implantology.  They're
13 not do any crowns or bridgework, anything of a fixed nature.
14 So if they would lose one of those teeth, it would be
15 replaced with a small partial denture, but they would have a
16 partial.
17           THE COURT:  Medicaid doesn't pay for implants?
18           THE WITNESS:  No, it's not part of the program.
19 They are not getting permanent teeth.  They are only getting
20 samples of these (indicating).
21 Q    Just for our understanding, because it's new to all of
22 us, what do you mean, "they are not getting permanent
23 teeth"?
24           What's the difference between what's being done by your
25 office versus what would be done in a private place that's

---

1  not connected with Medicaid.
2  A    Well, in a private dental setting, patients who are
3  missing teeth would either have permanent bridges, which
4  would be caps or crowns.  They could be gold.  They could be
5  porcelain tooth colored.  But they have implantology.
6  Wherever they were missing a God-given tooth, we would do
7  surgery to put in a root, an implant, and then we would
8  cover that implant with a permanent cap or crown.
9           But that's not part of the Medicaid program.  The
10 Medicaid program is only limited to removable, to these
11 plastic replacement teeth.
12 Q    So the teeth literally are plastic?
13 A    They are.  You could look at them.  They are plastic.
14 Q    Are there any differences in the durability of Medicaid
15 denture products versus products available to private-sector
16 patients?
17 A    Not with a removable denture.  I mean, all removable
18 dentures are made out of plastic or acrylic.
19 Q    Now, we heard Mr. Fusto talk yesterday about the
20 unusually low prices of Design Dental Lab.  Can you tell us,
21 Dr. Morse, how did the prices of Design Dental compare
22 generally with the prices of other denture labs in the metro
23 region?
24 A    Standard industry pricing.  The pricing is really based
25 on volume also.  So if you're sending one or two partials or

---

1  dentures to the lab a month or a year, well, obviously, you
2  know, you're going to be paying a lot more.  If you're doing
3  a lot of these, if you're in a situation where you're making
4  hundreds of these bridges, obviously the laboratory is going
5  to charge you a more favorable fee.
6           But that would be the same for any dentist that had a
7  large practice.  It wouldn't be unusual that they are
8  charging me below-market rate prices for the work that
9  they're doing.
10 Q    Now, can you tell us, Dr. Morse, why did you choose
11 Design Dental as one of the labs that you do business with?
12 A    Well, they had come to see me maybe about 10 or 15
13 years ago.  They were local.  They were in Brooklyn.  I had
14 been using Nu-Life up to that point, but it's always good to
15 have more than one laboratory working with you.
16 Q    What about Nu-Life?  How were their prices generally?
17 A    Nu-Life was a little more expensive but, like I said,
18 we had a long-standing relationship so I really didn't want
19 to cut them off.  I still wanted to send some of the work to
20 Nu-Life.
21 Q    Now, Dr. Morse, we've had some discussion in this trial
22 about 9/11 and the impact this had on billings.  Was there,
23 in fact, an increase in your firm's billings following 9/11?
24 A    Absolutely.
25 Q    And can you please tell the members of the jury what

---

1  were the reasons for the increased billings?
2  A    Well, after 9/11 Medicaid New York Health Department
3  established emergency Medicaid.  A lot of their records from
4  Medicaid New York Health Department were stored in the Twin
5  Towers.  When that tragedy occurred, they lost the records.
6  So to make sure none of the patients would fall through the
7  cracks, they issued temporary emergency Medicaid cards.
8           And here in Brooklyn I think there were about 225,000
9  of those individual cards.  They inputted another 225,000
10 patients into the Medicaid program into the system.
11 Q    And what did these cards look like?
12 A    They were large pieces of paper, almost look like Claim
13 Form A that we saw before.  8-1/2 by 11-inch paper.
14 Q    If somebody came to your office with that type of form,
15 would they be eligible for treatment by your office?
16 A    Well, there would be no way -- I think before I
17 described the mandatory swiping program where you'd actually
18 have to take the real patient Medicaid card like their Visa
19 or MasterCard and run it through that official terminal.
20 Well, there was no way to take the paper version to run it
21 through a terminal so the State basically had begged
22 providers to please take these patients in even if you
23 couldn't verify eligibility, even if you weren't going to
24 get paid for months.  And we stepped up to the plate.  We
25 saw hundreds of these patients.

**JA409**

1  Q    Besides the increased issuance of temporary Medicaid
2  cards, were there any other factors that led to the increase
3  in your billings during the audit period?
4  A    Absolutely.  In June of 2000, New York state settled a
5  lawsuit with the Dental Society of the State of New York
6  that had been going on for many years.  The dental Medicaid
7  fees had been frozen for 20 years and the participation
8  level of the number of dentists willing to treat this
9  patient population, they had 2- or 3 million patients in New
10 York State under Medicaid.  And they had 5 percent of the
11 licensed dentists who were willing to take these cases on.
12      So as a settlement, Medicaid decided -- New York State
13 Health Department decided to substantially increase the
14 fees.  Some of them went up fivefold at that time.
15 Q    Even with these price increases, how did the Medicaid
16 prices compare with the private-sector at that time?
17 A    It was just a fraction of what you get in private care
18 dentistry.  I don't think they really enticed any more
19 dentists to enter into the program.  Maybe a handful.
20 Q    Now, we heard some suggestion yesterday that your
21 denture billings were unusually high in terms of the
22 percentage of your overall work.  What percentage of your
23 dental billing related to dentures or partial dentures?
24 A    Around 40 percent, 45 percent.  It would vary.  If we
25 look back historically, you know, during all my previous

---

1  years, it would still basically be the same percentage of my
2  overall billing would be for prosthetic services.
3  Q    Now, Dr. Morse, during the trial we've had some
4  discussion about the question of what checks you actually
5  had paid to the labs during the three-year audit period.
6  I'd like to show you Plaintiff's 113 and ask you whether you
7  can identify this document.
8       Do you recognize that document?
9  A    Yes, I do.
10 Q    What do you recognize that document to be?
11 A    These are checks that I issued to my two laboratories,
12 Nu-Life and Design Dental studio to pay for the prosthetic I
13 was billing to Medicaid.
14 Q    What period of time do those checks cover?
15 A    From 2000 to 2002 which was the audit period.  I think
16 there were a few towards the end of 1999.  Because the
17 dental billings, you have to understand that the billings
18 when you're doing the work and when you're paying for it
19 aren't really always in sync.  Sometimes there's overlap.
20 Sometimes there are a little bit of gaps.
21      But it's kind of an easy concept to understand because
22 each of the checks was issued on a weekly basis.  They are
23 in chronologic order and they are in numerical order from my
24 checkbook.  And they are all endorsed on the back.  They
25 have all been cashed.

---

1  Q    Did you have a chance, Dr. Morse, to total up the
2  numbers of the checks that are in there?
3       MR. FARBER:  Objection.
4       THE COURT:  Basis?
5       MR. FARBER:  Can we approach, your Honor?
6       THE COURT:  What exhibit is this?
7       MR. NORINSBERG:  I don't have it in front of me.
8       THE WITNESS:  This is 113.
9       THE COURT:  You haven't offered 113 in evidence.
10      MR. NORINSBERG:  I'm offering it into evidence.
11      THE COURT:  Is there an objection to entering it
12 into evidence?
13      MR. FARBER:  Yes.
14      (Sidebar conference.)
15      (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

---

1       MR. FARBER:  If I'm not mistaken, these were the
2  checks produced by you to me during the civil litigation,
3  correct?
4       MR. NORINSBERG:  Uh-huh.
5       MR. FARBER:  Is that a yes?
6       MR. NORINSBERG:  I believe so.
7       MR. FARBER:  These aren't the checks.  These are
8  the ones he produced during this litigation.  They are not
9  relevant.
10      MR. NORINSBERG:  These are copies of the entire
11 set of checks that were sent to the AG's Office.  There's a
12 factual dispute as to whether or not they received the
13 entire set.  We say they did, they say they didn't.  This is
14 Dr. Morse's testimony.  He sent that entire set to the AG's
15 Office.
16      MR. FARBER:  If it's a factual dispute.  It's no
17 longer a relevant one, in any event.  It certainly doesn't
18 go to anyone's state of mind concerning fabrication
19 considering we didn't have these checks until years after
20 this indictment and years into this litigation.  This is not
21 relevant.
22      THE COURT:  Is it relevant if he testifies here
23 that these are the copies of the checks he sent at the time?
24 That's what he's saying, as I understand it, not that he
25 found them later.  I agree if he found them later that would

1  be a problem.

2       MR. FARBER:  He's going to dispute that he found

3  them later.  He is going to assert that they were what was

4  produced to us.  We have produced a set of what was produced

5  to us.

6       THE COURT:  But isn't that -- doesn't that become

7  a question of fact?

8       MR. MILLER:  I also think the witness didn't send

9  them.  I think the lawyer sent them, not the witness.

10      MR. FARBER:  In any event, even if that's the

11 case, the lawyers that are with the Attorney General's

12 Office were --

13      THE COURT:  The what?

14      MR. FARBER:  The lawyer's interaction with the

15 Attorney General would have been subsequent to the

16 indictment.

17      THE COURT:  Oh, these were sent after the

18 indictment?

19      MR. FARBER:  Yes.

20      THE COURT:  If they were sent before -- if he says

21 he sent them before, I'll let them offer it into evidence.

22 If they are sent after, I don't think it's relevant.

23      MR. NORINSBERG:  It's directly relevant because it

24 shows that he spent $318,000.  Fusto testified that 1 to 6

25 ratio that would account for a 1.9 million in billings.

1  That's the point.  Castillo claims that he never got the

2  checks.  That was his claim under oath.  We're contesting

3  that claim by showing he in, fact got a full set of checks

4  for $318,000.

5       MR. MILLER:  They are post-indictment.

6       MR. NORINSBERG:  It has nothing to do with the

7  indictment.  It goes to Castillo's claim that he never got

8  the checks when he got them all along.  It's a factual

9  dispute.  It's not a legal issue.  It's a factual issue

10 going directly to his credibility.  His tabulations show

11 there's an entire year of checks missing.  Our point is he

12 had those checks the whole time.

13      THE COURT:  When he made what tabulation?

14      MR. NORINSBERG:  When he went before the grand

15 jury --

16      THE COURT:  You just said he didn't have them.

17      MR. NORINSBERG:  I just realized.  They are

18 absolutely incorrect misrepresenting something.

19      MR. FARBER:  There's no grand jury testimony about

20 Morse's checks.

21      MR. NORINSBERG:  That's absolutely not true.  I

22 just remembered now.  He testified to $226,000 in lab

23 totals.  Not only did he testify to that, but I read it in

24 this trial.  I cross-examined him on that.  His testimony

25 was there was 226,000.  It was before the grand jury.

1       THE COURT:  What was before the grand jury?

2       MR. NORINSBERG:  The amount of checks.  It was

3  directly before the grand jury.  He testified there was

4  $226,000 in total lab payments which we're disproving

5  showing that there were 318,000.  He left out one year.

6       THE COURT:  But you just said a moment ago that he

7  didn't get them before the --

8       MR. NORINSBERG:  I made a mistake, your Honor.

9  It's absolutely incorrect.

10      THE COURT:  The only thing that concerns me is we

11 went to trial on this case and everyone was on notice of two

12 things that you were contending here; that Grand Jury 7 and

13 Grand Jury 11 were the fabricated evidence put before the

14 grand jury.  There was no claim whatsoever of anything else

15 being false that was put before that grand jury.

16      Now it seems to me that we're claiming everything

17 that was put before the grand jury was false.

18      MR. NORINSBERG:  Your Honor, this particular claim

19 is not false.  This is just showing a fact.  It's a question

20 under 404(b)(2).  He is an alleged fabricator.  He didn't

21 take into account $100,000.  He is a defendant in this case.

22      THE COURT:  How are you going to prove that you

23 sent all those checks?

24      MR. NORINSBERG:  He is going to lay the foundation

25 because he sent one single package.  We have the Federal

1  Express receipt from what his lawyer sent to the Attorney

2  General's Office so there's no question about it.

3       THE COURT:  What's the date of the Federal Express

4  receipt?  Are you going to put that in?

5       MR. NORINSBERG:  I have it here.

6       MR. FARBER:  Our reading of the grand jury

7  testimony is Mr. Castillo is not testifying about checks.

8  He is testifying about -- not about checks, but about how

9  much labs were paid based on lab invoices.

10      MR. NORINSBERG:  Fusto's declaration, it's

11 226,000.  There was another exhibit which tabulated all of

12 the checks that were presented by Castillo and by Fusto in

13 his declaration saying those numbers were derived at the

14 grand jury proceeding.  If you want to see the declaration

15 later on, I can show you.

16      THE COURT:  What are we doing here?  What's the

17 point of this?

18      MR. NORINSBERG:  To show that, in fact, there were

19 $318,000 in checks.  In fact, that all of the payments were

20 consistent with the billings.

21      THE COURT:  No.

22      MR. NORINSBERG:  Castillo left out one full year.

23 In our view, he lied about it.  He acknowledged the

24 possibility --

25      THE COURT:  Where?

1      MR. NORINSBERG:  He lied about it in front of the

2  grand jury and in front of the deposition again.  It's

3  credibility.

4      MR. MILLER:  The transcript doesn't say anything

5  about checks.  It says 226 is the amount the labs charged

6  Dr. Morse, not the amounts he paid the labs.

7      MR. NORINSBERG:  That's not correct.

8      THE COURT:  Show me where he said --

9      MR. MILLER:  It says the total using the lab price

10  was 226,881.  It doesn't sound like a tabulation of checks

11  to me.

12      THE COURT:  What testimony has he given here in

13  this court that is inconsistent with this?

14      MR. NORINSBERG:  I cross-examined him on it.  He

15  said that, in fact, he only had one year -- he only had like

16  120,000 of checks or something like that.

17      THE COURT:  Checks from Dr. --

18      MR. NORINSBERG:  He said in total 226,000.  He

19  testified that it was only $226,000.  Our point of view is

20  we have proof that he left out one year that he had in front

21  of him the whole time and he never calculated it.  And it's

22  a direct factual dispute.  It's credibility.

23      THE COURT:  Did you ask him?

24      MR. NORINSBERG:  Yes, your Honor, a hundred

25  percent.  We'll pull the transcript.  I definitely asked

1  him.

2      THE COURT:  Where was he asked about it at the

3  grand jury?

4      MR. NORINSBERG:  The checks that are being paid?

5  That's the only section.  There's a section it gets into it.

6  I know with one of these two defendants I read this and

7  impeached them with it.  I believe it was Castillo.  Could

8  have been Fusto.  But I definitely brought this out already

9  at this trial.

10      THE COURT:  I'll allow it.

11      (End sidebar conference.)

12      (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q    Do you have the checks in front of you, Doctor?

2  A    Yes, I do.

3  Q    Could you just identify what are those checks?  What do

4  they represent?

5  A    These represent the payments that I made for the

6  laboratory work for the dentures and partials that I billed

7  Medicaid for the years 2000 through 2002.  And as I

8  explained earlier, I think there are two or three checks

9  from 1999 because there isn't a perfect seam, there isn't

10  perfect symmetry between when you're billing to the lab,

11  when you're billing to Medicaid, when those appliances are

12  actually charged out from the laboratory when the dentist is

13  paying them.

14  Q    Okay.  Now, Dr. Morse, are these checks fair and

15  accurate copies of the actual checks that were provided to

16  the Attorney General's Office?

17  A    Yes, they are.

18  Q    When were they provided to the Attorney General's

19  Office?

20  A    I don't remember the exact date, but I think I have an

21  Express Mail receipt for mailing the package of these

22  checks.

23  Q    I'm going to show you what's been marked Plaintiff's

24  28.

25      Do you recognize this document?

1  A    This is the Express Mail U.S. Post Office, you know,

2  next-day delivery for these checks for the package that I

3  sent to my attorney, Mr. Richard Wool, in Plainview, New

4  York.  It has the Express Mail number on it which was

5  ET867881476US.  And it's dated -- I can't see the months,

6  but it's the 14th of 2004.

7  Q    So that would be two years or so before your

8  indictment?

9  A    That would be correct.

10      MR. NORINSBERG:  I offer both exhibits into

11  evidence.

12      THE COURT:  I'm sorry.  What was the date that you

13  said it was?

14      THE WITNESS:  Your Honor, I can't read the month.

15  It's a little not clear, but it's the 14th day of whatever

16  month in the year 2004.

17      THE COURT:  That's the slip that you -- that

18  reflects the checks that you mailed?

19      THE WITNESS:  Right.  That reflects the copies,

20  the package that I mailed to my attorney of all these

21  checks.

22      THE COURT:  You mailed them to your attorney?

23      THE WITNESS:  I mailed them to my attorney.  And

24  then my attorney forwarded --

25      THE COURT:  I'll sustain the objection.

**JA412**

1    MR. FARBER:  Thank you, your Honor.

2  Q   What happened after they were mailed to your attorney?

3  A   My attorney mailed them --

4    THE COURT:  I'll sustain the objection.  That can

5  only be based on hearsay.

6    You weren't there when he put them in the mailbox,

7  correct?

8    THE WITNESS:  No, I wasn't physically there.

9    THE COURT:  Then I'll sustain the objection.

10  Q   Did you see proof of mailing for the second mailing by

11  your attorney?

12  A   Yes, I did.

13    THE COURT:  I'll sustain the objection.

14  Q   Dr. Morse, to your personal knowledge, how much money

15  did you pay these labs over the entire audit period 2000 and

16  2002?

17  A   I paid $318,000 to these laboratories for the dental

18  work I billed Medicaid.

19  Q   And did you ever see any tabulations done by

20  Mr. Castillo as to the checks that were sent to the Attorney

21  General's Office?

22  A   Yes, I have.

23  Q   And did you notice whether or not there was a complete

24  three-year set of checks in there?

25  A   Well, when you look at what Mr. Castillo did, it's a

1  little deceptive in the sense that my business records are

2  in chronologic and numeric order.  What Mr. Castillo did

3  with his spreadsheet -- with his Excel spreadsheet -- he put

4  these in a jumbled order.  So the only way that anybody

5  could really see that there was a missing year of checks

6  would be to reorganize them alphabetically and numerically.

7    But I went through that exercise.  The way he presented

8  it that way, I think it was on three different pieces of

9  paper to the grand jury.  And I actually went through the

10  trouble of typing out the dates, typing out the numbers

11  from, you know, the checks, and then you couldn't miss that

12  there was a year missing that he had not accounted for.

13    And it wasn't at the beginning or the end.  It's right

14  in the middle of the three years so you couldn't say, oh,

15  you know, we were cut short or we started too late.  It's

16  dead center in the middle of the three years of the audit.

17  Q   And during the three years when you were working with

18  these labs, did you ever stop doing business with them at

19  any point in time during that audit period?

20  A   Never.  Even 9/11 we were open the next day.  We worked

21  six days a week.

22  Q   You've heard some testimony about 11 months of invoices

23  missing from Design Dental.  Was there ever a period of time

24  during those 11 months where you were not doing business

25  with Design Dental?

1  A   Not a single time.

2  Q   What about Nu-Life?  We heard testimony about eight

3  months of missing records.  Were you ever not doing business

4  with Nu-Life during that time?

5  A   No.  We were constantly doing business with both

6  laboratories.

7  Q   And so doing business means you were sending them

8  things to do for you, and they were charging you, right?

9  A   That's correct.

10  Q   Now, Dr. Morse, are there any safeguards in the

11  Medicaid system that you're aware of to prevent

12  double-billing such as the one you're being accused of or

13  were accused of?

14    MR. FARBER:  Objection.

15    THE COURT:  Sustained.

16  Q   Are there any type of safeguards in the Medicaid system

17  that you're aware of based on your 30 years of experience in

18  dealing with Medicaid?

19  A   There are multiple safeguards built into the system by

20  Medicaid.

21  Q   What are some of those safeguards?

22  A   When we saw a vendor statement.  Before they pay out

23  anything, it goes through a computer-filtering system and

24  there are edits to see if the recipient is eligible, if the

25  dentist or the doctor, for that matter, has actually had

1  that patient in his or her office and has actually taken the

2  patient's identification card and swiped it through their

3  terminal and gotten authorization to treat the patient.

4    Then we heard some testimony I think from Investigator

5  Flynn a few days ago about an EOMB, an Estimation of Medical

6  Benefits.  They randomly send out letters to these patients

7  who you've billed for, and they ask the patient basically,

8  did the dentist do the work?  And there's a number --

9  there's a form to fill out and a phone number that the

10  patient could make a direct complaint to the Department of

11  Health and say, no, I'm seeing what the dentist billed for

12  and those services on that date, and I haven't received

13  those services.

14    And then what would happen is what would happen with

15  the Quamans.  When the actual investigators went to their

16  house, they physically visited the patient to do a follow-up

17  to see if it was true that the work had been done.  So if

18  any of the work that I was doing -- and you don't know who

19  they're sending these, you know, spot checks to, the safety

20  checks.  So they'd be sending out hundreds of these because

21  we had thousands of patients.  And not one of these ever

22  came back, to my knowledge, to the Department of Health

23  stating that I hadn't provided a service that I had billed

24  Medicaid for.

25  Q   So we heard testimony just about the Quaman brothers,

**JA413**

1  that one that Investigator Flynn testified about, right?

2  A   That's correct.

3  Q   In your 30-year career, did you have any other

4  Explanation of Medical Benefit inquiries like that?

5  A   Nobody ever came to my office with a form that a

6  patient had complained about not receiving a billed service.

7  Q   Now, Dr. Morse, you had mentioned earlier that you had

8  tried to apply and get jobs in various dental offices; is

9  that correct?

10  A   That's correct.

11  Q   I'd like to show you Plaintiff's Exhibit 70.  Do you

12  recognize Plaintiff's Exhibit 70?

13  A   Yes, I do.

14  Q   What do you recognize this exhibit to be?

15  A   This is a memorialization, copies of all the job

16  applications.  I clipped out the ads, whether it was from

17  the American Dental Association Journal, the New York State

18  Dental Association Journal, from the *New York Times* for

19  health care positions.  So I actually made a copy of each of

20  those ads that I responded to.  I dated that and I kept the

21  file on this of everywhere I had applied.

22        MR. NORINSBERG:  I offer Plaintiff's 70 into

23  evidence.

24        MR. FARBER:  We have no objection, your Honor.

25        THE COURT:  70 is received.

---

1        (Plaintiff's Exhibit 70 received in evidence.)

2  Q   Now, Dr. Morse, what effect has this indictment had on

3  your income looking at it from where you were beforehand to

4  where you are now afterwards?

5  A   Well, beforehand I was making between 2- and $300,000 a

6  year in income.  And now I'm making 15, 20, $25,000.

7  Depends.

8  Q   And where does your income come from now?

9  A   There's only one source of my income, and that's my

10  teaching position at New York Methodist Hospital, my

11  attending dentist position.

12  Q   I'd like to show you now Plaintiff's Exhibit 99.

13        THE COURT:  Do you have a question about 99?

14  Q   Yes.  Do you recognize those documents?

15  A   These are my business and personal income tax returns.

16  Q   What range of tax returns, what years are covered here?

17  A   Let's see.  We've got 2002.  We've got 2004, 2005,

18  2006, and 2007.  Wait.  2007, 2008, a 2009, a 2010, and a

19  2011.  We don't do a 2012 until April of 2013.  That's not

20  in yet.

21        THE COURT:  Is this what you're calling Exhibit 99

22  on the list?  It just says 2002 through 2006.

23        MR. NORINSBERG:  We should make it maybe 99-1 for

24  the ones that come after.

25        THE COURT:  So you want 99 to be 2002 through 2006

---

1  and then 99 I think A is probably better.  99-A is 2007

2  through 2011?

3        MR. NORINSBERG:  That's correct.

4        THE COURT:  Do you want to make sure you mark them

5  that way.

6        MR. NORINSBERG:  I offer Plaintiff's 99 and 99-A

7  into evidence, your Honor.

8        THE COURT:  Is there any objection?

9        MR. FARBER:  No objection.

10        THE COURT:  All right.  They are received.

11        (Plaintiff's 99 and 99-A Exhibit received in

12  evidence.)

13  Q   Dr. Morse, can you tell us in your own words what

14  impact this indictment had on you and your life.

15  A   It destroyed --

16        MR. FARBER:  Objection.

17        THE COURT:  Sustained.  I think this question has

18  been asked and answered.

19        MR. NORINSBERG:  I'm just bringing it up to the

20  present tense, your Honor.

21        THE COURT:  I think it's been asked and answered.

22  Q   Did you ever -- Dr. Morse, have you ever once in your

23  career, have you ever stolen money from Medicaid?

24  A   Not a penny.

25  Q   Did you ever bill Medicaid for work you didn't do?

---

1  A   Never.

2  Q   Did you ever offer a false instrument for filing in the

3  Medicaid office?

4  A   No, I did not.

5  Q   Did you ever steal a million dollars from Medicaid,

6  Dr. Morse?

7  A   No, I did not.

8        MR. NORINSBERG:  Thank you, Dr. Morse.  I have no

9  further questions.

10  CROSS-EXAMINATION

11  BY MR. FARBER:

12  Q   Good afternoon, Doctor.

13  A   Good afternoon.

14  Q   Can you tell the jury where you went to dental school.

15  A   I attended New York University, College of Dentistry.

16  Q   And when did you receive your degree?

17  A   I received my DDS degree in the year 1972.

18  Q   And have you obtained any other degrees?

19  A   No.  I was a general practitioner my entire career.

20  Q   And can you please tell the jury your work history as a

21  dentist since you've graduated from dental school.

22  A   From 1972 when I graduated from NYU, I went to Queens

23  Hospital Center for my residency, which was a one-year

24  general practice residency.  Then in 1973 when I finished

25  that practice residency, for a year I was associated with

**JA414**

1   Dr. Burton Wasserman who was the hospital director.  I was
2   in his private practice for a year and a half.  And then I
3   opened my own practice here, my own medical center in Park
4   Slope, Brooklyn.
5   Q   What year was that, sir?
6   A   I think it was about 1975.
7   Q   Was that at the location you've previously identified,
8   580 5th in Park Slope?
9   A   That would be correct.
10  Q   Do you currently have any professional licenses?
11  A   I have a Doctor of Dental Surgery degree.
12  Q   Are you licensed to practice dentistry?
13  A   In the State of New York.
14  Q   Are you licensed to practice dentistry in any other
15  states?
16  A   Not at the current moment, no.
17  Q   What year did you first obtain your license to practice
18  dentistry?
19  A   In 1972 when I graduated from New York University.
20  Q   And you've been continuously licensed since 1972?
21  A   Yes, I have.
22  Q   And am I correct your license was not interrupted as a
23  result of the indictment?
24  A   No, it was not.
25  Q   Are you currently an enrolled provider in the Medicaid

1   program?
2   A   Yes, I am.
3   Q   Are you currently an enrolled program in the Medicare
4   program?
5   A   Medicare does not provide dental services unless the
6   patient would unfortunately have a tumor.  I mean, in the
7   hospital we do cancer surgery, you know, dental cancer
8   surgery on patients that don't have Medicaid that have
9   Medicare.  But except for excising a tumor or dental
10  radiation, that wouldn't apply.  That's incorrect.
11  Q   You do currently work in a hospital setting, correct,
12  sir?
13  A   I have my -- most of my career I have and I currently
14  do, yes, sir.
15  Q   All right.  So with that said, with the limitation
16  you've given, are you an enrolled provider in the Medicare
17  program?
18  A   No.
19  Q   And when did you first become enrolled in the New York
20  State Medicaid program?
21  A   I believe it's 1974.
22  Q   Okay.  And I take it you have been subject to audit by
23  the Medicaid program?
24  A   Yes, I have.
25  Q   How many times?

1   A   Five in total.
2   Q   Do you recall when those audits took place?
3   A   I believe the first audit was about 1980.
4   Q   Okay.  And when was the second audit?
5   A   1985.
6   Q   Third audit?
7   A   I mean, I'd really have to speculate.
8   Q   After 1985?
9   A   It was after 1985.  But each audit is a multi-year
10  audit so pretty much we're being blanket audited.  One audit
11  would begin and end, then the next audit would start.
12  Q   Do you know if any of the audits -- you've described
13  five audits.  Besides the audit that was the subject of the
14  indictment, do you know if any of the audits involved
15  patient interviews?
16          MR. NORINSBERG:  Objection.
17          THE COURT:  Overruled.
18  Q   Do you know that, sir?
19  A   I really wouldn't have firsthand knowledge of that.
20  Q   Were you ever advised that any of the audits involved
21  patient interviews?
22  A   If they sent me paperwork -- I think what you're asking
23  is did those patients have in-mouth exams.  If they did, I
24  mean, they might have, but they really weren't sharing that
25  information with me as a provider.

1           THE COURT:  So the answer is you don't know?
2           THE WITNESS:  The answer is I really wouldn't
3   know.
4           THE COURT:  The answer is you don't know.
5           THE WITNESS:  I don't know.  He'd have to show me
6   something to refresh my memory.  This goes back 30 years
7   some of these.
8   Q   All right.  Doctor, I am going to show you a document
9   we have marked as Defendants' Exhibit AC.
10          Doctor, please take a few moments to review the
11  document.  Then when you have a chance, can you please tell
12  me if you recognize this document.
13  A   Well, I recognize the document, but to read it I'm
14  going to need magnifying glasses.  The print is very small.
15  Q   Why don't you identify the document, please.
16  A   The document is from Medicaid Management Information
17  System.  It's a Certification Statement for Provider
18  Utilizing Electronic Billing.  And it's dated January 2nd,
19  1999.
20  Q   Okay.  And it's a multi-page document.  What's the date
21  of the second page, sir?
22  A   It's January 2nd, 2000.  It's dated.  Then there's one
23  underneath this for January 1st, 2001.  January 1st, 2002.
24  January 31st, 2003.  January 31st, 2004.  And January 30th,
25  2005.

**JA415**

1    Q    What are these documents, sir?
2    A    These are certifications that a provider fills out to
3    bill Medicaid electronically.
4    Q    And, in fact, you filled this out, correct?
5    A    Absolutely.
6    Q    And, in fact, on each of these pages, your signature
7    appears; is that correct?
8    A    Yes, it does.
9    Q    In fact, your signature is actually notarized, isn't
10   it?
11   A    Yes, it is.
12   Q    And this was a document you prepared in the ordinary
13   course of your dental practice, was it not?
14   A    On a yearly basis when the years we were doing
15   electronic billing.
16        MR. FARBER:  I would respectfully move AC into
17   evidence.
18        MR. NORINSBERG:  No objection.
19        THE COURT:  AC is received.
20        (Defendants' Exhibit AC received in evidence.)
21   Q    Are you aware of what the certification provides with
22   respect to recordkeeping requirements?
23   A    The provider is actually agreeing to keep records.
24   Q    Okay.  Well, I'd like to read a portion and ask you if
25   you recall that at the time you signed the January 1st,

1    2000, certification.  That is, "All statements, data and
2    information transmitted are true, accurate, and complete to
3    the best of my knowledge.  No material fact has been
4    omitted.  I understand that payment and satisfaction of this
5    claim will be from federal, state, and local public funds
6    and that I may be prosecuted under applicable federal and
7    state laws for any false claims, statements, or documents,
8    or concealment of a material fact.  Taxes from which the
9    state is exempt are excluded.  All records pertaining to the
10   care, services, and supplies provided, including all records
11   which are necessary to disclose fully the extent of care,
12   services, and supplies provided to individuals under the New
13   York State Medical Assistance program will be kept for a
14   period of six years from the date of payment and such
15   records and information regarding these claims and payment
16   therefore shall be promptly furnished upon request to the
17   local or state Departments of Social Services, the State
18   Medicaid Fraud Control Unit or the Secretary of the
19   Department of Health and Human Services."
20        Do you recall reading that at the time you signed the
21   certification on January 2nd, 2000?
22   A    I wouldn't have signed it and I wouldn't have had it
23   notarized had I not read this statement.
24   Q    Okay.  Are you aware of what records you are supposed
25   to maintain as a Medicaid program provider?

1    A    Well, if you would show me -- are you Mr. Miller or
2    Mr. -- I'm a little confused, sir.
3    Q    We've met before, sir.  I'm Farber.
4    A    Mr. Farber.  Excuse me.  My bad.
5         Mr. Farber, if you would show me where it states in
6    this certification where the word -- let's see.  You're
7    saying that the prescriptions I think that's -- if you'd
8    show me the word "prescription," if you'd point that out to
9    me, or laboratory invoice, that would be your
10   interpretation.
11        THE COURT:  I'm sorry.  What was your question?
12   Could you read back the question.
13        (Record read as requested.)
14        THE COURT:  Is the answer yes or no?
15        THE WITNESS:  Yes.
16        MR. FARBER:  Thank you, your Honor.
17   Q    What records are you supposed to maintain as a Medicaid
18   provider?
19        THE COURT:  You mean, what is his understanding of
20   the records?
21        MR. FARBER:  Yes, your Honor.
22        What is the doctor's understanding of what records
23   he is supposed to maintain as a program provider.
24        THE WITNESS:  You maintain the patient's chart.
25   You maintain a copy of the insurance forms.  You maintain

1    your x-rays.  You maintain your charting.  And that's what
2    my custom and practice was for 30 years.
3    Q    And how long are you supposed to maintain those
4    records?
5    A    Those records, the patient chart and that material, is
6    supposed to be retained for six years, but the reality is I
7    have every chart going back 30 years.
8    Q    From time to time, have you been provided with Medicaid
9    program updates concerning recordkeeping requirements?
10   A    There's a possibility.
11   Q    Have you attended any courses or programs on Medicaid
12   recordkeeping?
13   A    Not really.  There's a requirement for dentists to do
14   60 hours of continuing education in the State of New York,
15   but there's no requirement to go to Medicaid billing updates
16   or whatever you're talking about.
17   Q    All right.  Can you tell me what 580 Dental, PC is.
18   A    580 Dental, PC is the name under which my business name
19   that I functioned.
20   Q    And I'm correct that "PC" stands for professional
21   corporation?
22   A    That would be correct.
23   Q    And when did 580 Dental, PC come into formation?
24   A    I don't remember the exact date.
25   Q    Do you remember the approximate date?

**JA416**

1    A    I'm going to stick with my previous answer.  I don't
2    remember the exact or approximate date of the corporation.
3    Q    All right.  As of the period from 2000 through the
4    beginning of 2006, can you tell me who owner or owners of
5    580 Dental, PC was?
6    A    That was me.
7    Q    And can you tell me for that same time period, who the
8    officers of 580 Cental, PC was?
9    A    Myself also.
10   Q    And with respect to that same time period, who were the
11   directors of 580 Dental, PC?
12   A    Me also.
13   Q    All right.  Can you tell me what Brook Medical is.
14   A    Brook Medical is the name on the outside of my medical
15   dental center.
16   Q    Does Brook Medical have some relationship to 580
17   Dental, PC?
18   A    It's maybe a "doing business as" name.
19   Q    Have you ever enrolled 580 Dental, PC as a Medicaid
20   provider?
21   A    I have a Medicaid number.  I have what we call a group
22   Medicaid number.  But 580 Dental, PC has my same number that
23   I've had for all these years as an individual practitioner,
24   if that's what you're asking.
25   Q    So both you and 580 Dental, PC have the same Medicaid

1    ID number?
2    A    That would be correct.
3    Q    Do you have a separate individual practitioner number
4    for Medicaid?
5    A    No, I do not.
6    Q    All right.  Now, you testified earlier, of course, that
7    you sold your dental practice, correct, in 2006?  You sold
8    it, correct?
9    A    That's correct.
10   Q    All right.  Now, essentially what happened to the
11   Medicaid number of the practice after you sold it?
12   A    Well, the Medicaid number of the practice at the time I
13   sold it was in suspension.  I was on a disqualified list so
14   nobody could use that number.  It was an invalid number.
15   Q    All right.  So Dr. Ketover, did he have his own number?
16   A    He had his own number.  He had his own number all the
17   time because we had a shared health facility.  I wasn't
18   practicing as a solo dentist.  I had a medical and dental
19   center.  I had physicians.
20        So under the statute, New York State Health Department
21   Medicaid, any practitioner that's working in a shared health
22   facility, that shared health facility has to have each of
23   those individual practitioners, you know, registered with
24   the Medicaid program and have their own individual
25   practitioner numbers.

1    Q    All right.  Am I correct, though, that with respect to
2    the period I've described from 2000 to 2006, Medicaid claims
3    were filed with respect to the 580 Dental, PC entity; is
4    that correct?
5    A    Yes, sir, that's correct.
6    Q    All right.
7         THE COURT:  Under one number or two numbers?
8         THE WITNESS:  Under the 580 Dental, PC number, but
9    it's the same number that I would have as an individual.
10        THE COURT:  So how does the other doctor fit into
11   that?
12        THE WITNESS:  I'm billing for everything.  So if
13   you were to look at the actual billing invoice, it would
14   have our group number but my individual number.  That's how
15   it ties together.
16        THE COURT:  Even though the other doctor had a
17   number, it's all coming through your number?
18        THE WITNESS:  Right.  It's all under my number.
19   Correct, ma'am.
20   Q    Were you aware of any Medicaid program requirements
21   that any services done by Dr. Ketover have a notation
22   pertaining to his individual practitioner number?
23   A    No, I'm not.
24   Q    With respect to 580 Dental during the period from 2000
25   through the beginning of 2006, can you tell me who the

1    individual or individuals were responsible for maintaining
2    dental records and other records for Medicaid compliance
3    purposes?
4    A    Myself.
5    Q    And can you tell me at 580 Dental for that same period
6    from 2000 to 2006, who was responsible for submitting bills
7    or claims to the Medicaid program for services rendered?
8    A    Myself.
9    Q    Okay.  And am I correct that you essentially did this
10   electronically; is that correct?
11   A    Yes, that would be correct.
12   Q    All right.  And is there a particular reason why you
13   did not engage either a billing clerk or a billing service
14   to do this?
15   A    I always billed myself.  I never had a billing service
16   in 30 years or a billing clerk.  I always did that myself.
17   Q    And although there's been some discussion of him, can
18   you please identify for the jury who Brian Ketover is.
19   A    Brian Ketover was my associate dentist for 25 years in
20   my dental practice.
21   Q    And again, Dr. Ketover had an individual Medicaid
22   provider number?
23   A    Yes, he did.  He had a valid number.  He was
24   registered.
25   Q    All right.  One moment, please.

**JA417**

1       Doctor, I'm going to hand you what's been marked as
2   Exhibit 34.  Doctor, please review Exhibit 34 and after
3   you've had a moment or two to do that, please tell me if you
4   can identify this document.
5       A    This is my registration -- my group
6   registration -- with the New York State Department of
7   Health, Office of Health Systems Management.  And it
8   certifies that Brook Medical & Dental and has Leonard P.
9   Morse as administrator and my office address at 580
10  5th  Avenue in Brooklyn and my registration number.
11      Q    Okay.  And now that registration number, did you -- I
12  see no mention of 580 Dental, PC on any of these documents.
13  So did there come a time when something happened that 580
14  Dental, PC became the entity under which you practiced?
15      A    Well, you had asked me earlier what the date was when I
16  incorporated 580 Dental, PC, and my response was I really
17  didn't know.  If you have a document showing my
18  incorporation date, that would really refresh my memory.
19      Q    Well, am I correct there was a time when you practiced
20  as Brook Medical & Dental?
21      A    Well, Brook Medical & Dental, as I testified before, is
22  my d/b/a, my "doing business as."  If you would look at the
23  medical center outside, in big letters it would say Brook
24  Medical & Dental.
25      Q    Okay.  Now, on the fourth page of this document, if

1   you'd turn to that under Section 4-A.  Do you see that?
2       A    On my copy, it says, it looks like, PO6 on the --
3       Q    Yes.  It says PO6 in the upper right, but it is the
4   fourth page.
5       A    But it's labeled the number 6 page.  That's what you're
6   saying?
7       Q    Correct.  Do you see paragraph 4-A?
8       A    Yes, I do.
9       Q    It states, "List all practitioners" --
10          THE COURT:  Have you offered this into evidence
11  yet?
12          MR. FARBER:  I apologize, your Honor.
13      Q    Dr. Morse, Exhibit 34, this is, in fact, the
14  certificate that you filed with the Office of Health Systems
15  Management?
16      A    Well, it's not the certificate that I filed.  This is
17  the certificate that they issued to me authenticating that I
18  do have a shared health facility and it's been approved by
19  the Health Department.  It's not my -- that's what it is.
20      Q    This is a document you received, however?
21      A    Oh, yes.
22          MR. FARBER:  I respectfully move Exhibit 34 into
23  evidence.
24          MR. NORINSBERG:  No objection.
25          THE COURT:  It's received.

1           (Plaintiff's Exhibit 34 received in evidence.)
2       Q    On paragraph 4-A, can you identify the person
3   identified on the first line.
4       A    Well, it's a little fuzzy, but it looks like Brian,
5   maybe initial M., Ketover.
6       Q    And there's a Medicaid provider number on the far
7   right?
8       A    Yeah.  It has a Social Security number in between, and
9   then on the far right column there's Medicaid provider
10  number.  It's illegible.  I can't make out.  Maybe I could
11  make out what his number is.  I wouldn't swear to it.  It's
12  not a great copy of it.
13      Q    Second line appears to be your name, correct?
14      A    That's easier to read.  It's definitely me.
15      Q    Okay.  And who is on the third line?
16      A    That's the pediatrician.
17      Q    And can you tell the jury the pediatrician's name.
18      A    Sure.  It's Dr. Irfan Amin.
19      Q    And did Dr. Amin have a dental license?
20      A    No.  He's a pediatrician.  He is not a dentist.
21      Q    Does Dr. Amin practice dentistry at all?
22      A    I never saw him doing that, not to my knowledge.  I
23  don't think he's certified.  Only in pediatrics, not
24  pediatric dentistry, which is medical pediatrics.
25      Q    So it's your testimony that he performed pediatric

1   services simply at the same physical location?
2       A    Correct.  I'm renting space to a pediatrician.  I've
3   got a medical center.  I'm not practicing just as a dentist.
4   I have a business.  So I guess I have a landlord/tenant
5   relationship with the physicians.  They are paying me rent
6   for services and space.
7       Q    Can you identify -- again, it's difficult to read --
8   but can you identify the last individual right under
9   Dr. Amin?
10      A    I know who that is because he's actually a physician at
11  New York Methodist so I see him occasionally.  That's Babu
12  Duddempudi.  Dr. Duddempudis.
13      Q    What is that doctor's specialty?
14      A    He is an internist.  Actually his wife is an internist
15  also.  They're pretty close.  The two Duddempudis.
16          THE COURT:  All right.  Could you spell that name
17  for the court reporter, please.
18          THE WITNESS:  Okay.  B-a-b-u, that's the first
19  name.  D-u-d-d-e-m-p-u-d-i.  He's a great internist with a
20  funny name.
21      Q    All right.  Now, in front of you is the document that
22  Mr. Norinsberg introduced into evidence.  I believe
23  it's -- it was Exhibit 60.  That's the blank Medicaid claim
24  form.
25      A    Claim Form A, is that what you're referring to?

**JA418**

1  Q   Yes, sir.
2  A   Yes, sir.
3  Q   Do you have the document in front of you?
4  A   I'm looking at it, sir.
5  Q   I'm going to direct your attention to -- I'm going to
6  call it field 21.  Do you see that?  Service provider, ID
7  number?
8  A   I see that.
9  Q   Do you see that?
10 A   Yes, I do.
11 Q   Do you know what that signifies, sir?
12 A   Well, this isn't really a fair comparison because this
13 is basically, you know, a paper claim.  So some of the
14 things on the paper claim and the electronic claim, like the
15 tooth numbers match up, but on the electronic claim that I'm
16 filling out, I really don't see this.  There isn't a field
17 for this in my computer system.  That's not the way I'm
18 billing.
19     So you really couldn't make a comparison to this, to,
20 you know, what I'm billing on.
21 Q   In the course of filing claims for 580 Dental, had you
22 ever made an attempt at any time to designate services
23 performed either by yourself or by Dr. Ketover or by anyone
24 else?
25 A   Well, my group number is on all the claims.  They are

1  like 50 fields.  But that's not one of the claims that I had
2  on my electronic billing program.
3  Q   The answer is, no, you haven't?
4  A   No.
5  Q   Now, there came a time when you met with investigators
6  from the Attorney General's Office, specifically its
7  Medicaid Fraud Control Unit; is that correct?
8  A   That is correct, sir.
9  Q   Do you recall when that took place?
10 A   I think it was in the summer of 2002.  I think maybe it
11 was August 2002.  Would that be correct?
12 Q   Is that your recollection, sir?
13 A   That's my recollection.  It's the summer of 2002.
14 Q   Do you recall who you spoke to?
15 A   Oh, that definitely.  It was the two individuals who
16 testified earlier this week.  It was James Serra and
17 Mr. Flynn.
18 Q   Okay.  And at that time in August of 2002, did you
19 speak to anyone else from the Medicaid Fraud Control unit or
20 the Attorney General's Office?
21 A   Not to my recollection.
22 Q   Now, you had testified previously that prior to the
23 investigation that led to the indictment, you had had, am I
24 correct, four additional audits from the Medicaid program,
25 correct?

1  A   I had four comprehensive audits, correct, sir.
2  Q   Am I correct, you were visited by officials from the
3  state, the Government during those times, correct?
4  A   Yes.
5  Q   Had you prior to August of 2002 been visited by any
6  employee of the Attorney General's Office?
7  A   Well, they might have visited me, but, you know,
8  they're coming as government officials so they don't always
9  identify themselves.  If you said to me did someone actually
10 show me their business card that said, you know, I'm
11 Mr. So-and-so or Mrs. So-and-so and I work for the Attorney
12 General's Office or not the Health Department.  But no, we
13 didn't have that.
14     THE COURT:  No, you didn't have what?
15     THE WITNESS:  I didn't have someone who actually
16 came to my office with a business card.  This time Mr. Serra
17 and Mr. Flynn came with their actual business card that
18 said, here, you know, we're with the Medicaid Fraud Control
19 Unit.  My previous audits with the Health Department or
20 whatever the Government officials, they really just came
21 down and said, okay, we're from Medicaid, we're from the
22 Health Department, we want you to do yada, yada, yada.  This
23 is what we're here for.
24 Q   So it's fair to say that you don't know if prior to
25 Flynn and Serra visiting you you had been visited by the

1  Attorney General's Office?
2  A   I would have no way of knowing.
3  Q   Do you recall telling Mr. Flynn and Mr. Serra that you
4  saw an average of 20 to 25 patients per day?
5  A   Yes, I do.
6  Q   Do you recall telling them that you were responsible
7  for maintaining patient records?
8  A   Yes, I do.
9  Q   Do you recall telling them that you employ or engaged
10 an associate dentist?
11 A   Yes, I did.
12 Q   Do you recall telling them that approximately 95
13 percent of your practice was Medicaid patients?
14 A   Yes, I did.
15 Q   Do you recall telling them that you personally filed
16 all claims to the Medicaid program on behalf of 580 Dental?
17 A   Yes, I did.
18 Q   And do you recall telling them that you engaged the
19 services of two outside laboratories for the purpose of
20 performing denture laboratory work?
21 A   Yes, I did.
22 Q   Now, in your dental practice, can you tell me the sorts
23 of things you write or would write prescriptions for.
24 A   Well, they are basically two kinds of prescriptions,
25 and I guess it applies to any dentist.  They write

1  prescriptions for medications for patients; antibiotics,
2  pain medication, things like that.  And you'd write
3  laboratory orders -- laboratory prescriptions.
4  Q   Okay.  So you would write prescriptions for dental
5  appliances or dentures?
6  A   Could you repeat the question.  I couldn't hear.
7  Q   Sure.
8      Are you telling the Court that you -- am I correct that
9  you wrote prescriptions for dentures or dental appliances?
10 A   That would be correct sir, yes.
11 Q   Okay.  All right.
12     Now, during Mr. Norinsberg's examination, he provided
13 you with some patient charts.  Do you recall that?
14 A   Yes, I do.
15 Q   I believe they are still in front of you, sir.  Can you
16 take a look at them for me.  I believe that's Exhibit 143.
17 A   Mine have, you know, this SD, this Bates stamping on
18 the bottom.  I don't have one that has an exhibit number on
19 it.
20 Q   You have the correct document, sir.
21 A   Okay.
22     THE COURT:  What's the numbering of that document
23 in this case?
24     MR. FARBER:  I believe this is Exhibit 143-A, B,
25 C, and D, your Honor.  And I believe it's in evidence.  The

1  witness apparently only has three.
2      THE WITNESS:  It's five minutes to 5:00.
3      THE COURT:  Excuse me just a second.
4      (Pause in the proceedings.)
5      THE COURT:  I'm sorry.
6      MR. FARBER:  Thank you, your Honor.
7  Q   Doctor, do you have four separate patient charts in
8  front of you for four individual patients?
9  A   It looks like that.
10 Q   So we're not doubling up.
11 A   It appears to be so.
12 Q   Let me turn your attention, if you would, to the chart
13 for -- it says Rodriguez, Stacy or Stacy Rodriguez.
14     Do you have that chart, sir?
15 A   Yes, I do.
16 Q   Okay.  Now, am I correct, sir, this chart does not
17 actually contain a dental prescription, does it?
18 A   If you're asking me does it contain a copy of the
19 original prescription?
20 Q   That is my question, sir.
21 A   No, it does not.
22 Q   It does contain a notation that you were writing a
23 prescription, correct?
24 A   Well, it contains the same information --
25     THE COURT:  Would you answer the question.

1  A   Could you repeat the question.
2  Q   Sure.
3      MR. FARBER:  Actually, could you read the question
4  back, please.
5      (Record read as requested.)
6  A   Correct.
7      THE COURT:  All right.  Ladies and Gentlemen, why
8  don't -- it's almost 5 o'clock.  Why don't I excuse you for
9  the evening with the admonition not to discuss the case of
10 course.  We'll begin at 9:30.
11     (Jurors exit the courtroom.)
12     THE COURT:  I have an issue just because I've been
13 trying to think of issues pertaining to the charge.  The
14 claim here is depravation of liberty.  And there were how
15 many charges?  There were 12, I believe?
16     MR. NORINSBERG:  Yes.
17     THE COURT:  12 charges?
18     MR. FARBER:  Yes.  Total of 12 charges, your
19 Honor.
20     THE COURT:  I take it that a proper indictment on
21 any one of those charges would have resulted in a
22 depravation of liberty?
23     MR. FARBER:  Yes, your Honor.  They are felony
24 charges.  They would have, yes.
25     THE COURT:  So just in terms of the jury's

1  analysis, it seems to me that if the jury found in one
2  instance that the two purportedly fabricated documents were
3  not material to a given charge, then I think that that would
4  result in a finding of no liability.  I just wanted
5  to -- this comes to mind because of *Ricciutti*.  If a
6  conviction on one charge was proper, like in *Ricciutti*, I
7  think the problem was is that the false evidence only went
8  to one charge, and therefore there would have still been the
9  depravation of liberty.
10     So thinking this through, it seems to me that for
11 the jury to find that false evidence resulted in a
12 depravation of liberty, then the false evidence would have
13 to be material to every single charge in the indictment.
14     MR. NORINSBERG:  Your Honor, I just feel we're
15 just needlessly complicating this process for the jury.  The
16 standard that the Second Circuit said is material to the
17 depravation of liberty, it's likely to result, likely to
18 result.  To actually make them go through charge by charge
19 is absolutely not what's required under the case law.
20     THE COURT:  Why do you say that?
21     MR. NORINSBERG:  Your Honor, it's ironic that the
22 defendants actually proposed a verdict charge that I think
23 properly articulated the standard of law in the original
24 verdict sheet.
25     And I agree with their proposition as to the

1  materiality charge so I don't know why we would revisit
2  that.  Both parties had originally agreed that's a proper
3  charge.
4      THE COURT:  Well, I'm just trying to come up with
5  a proper charge and things occur to the Court listening to
6  the testimony as it develops.
7      MR. NORINSBERG:  But the false filing charges fit
8  into one universe.  And you can't separate out because of
9  testimony about these charges, about repeated overbillings
10  for Stacy Rodriguez clearly could influence the other
11  charges.
12      THE COURT:  I know.  I'm not saying that it
13  doesn't.  I'm not saying that it can't.
14      MR. NORINSBERG:  But that's what I'm saying,
15  though.  Once you go down the road where we try to
16  artificially distinguish between these charge, I think it's
17  impossible for the jury to do in an already complicated
18  case.
19      THE COURT:  Do you think I'm incorrect?
20      MR. NORINSBERG:  I do, your Honor.  Based on my
21  reason would be the case of *Posr versus Posr*.  It's a Second
22  Circuit case.  The context is malicious prosecution, but the
23  analysis the Court Second Circuit made is even if one of the
24  charges was valid, if any one of these charges could have
25  resulted in a depravation of liberty, then that is a viable

1  malicious prosecution claim even if there was valid grounds
2  to support some of the other charges.
3      THE COURT:  I know, but that's the flip side.  Am
4  I wrong -- I may ultimately agree with you that it might be
5  unnecessarily confusing.  But if the jury were to conclude
6  that one of these charges stands completely on its own and
7  that the purportedly fabricated exhibits would not likely
8  have influenced the jury's decision on that one charge, I
9  take it that plaintiff would not have made up its
10  depravation of liberty claim.
11      MR. NORINSBERG:  I don't know.  I think that that
12  would force us to speculate about whether or not he would
13  have had -- let's say, you know, he would have just had an
14  indictment on a false filing charge.  I mean, I don't know
15  what the difference would be in terms of depravation of
16  liberty, but I think it's impossible to know that --
17      THE COURT:  The depravation of liberty here is he
18  was arrested.  He didn't stay overnight, as far as I
19  understand, correct?
20      MR. NORINSBERG:  No.
21      THE COURT:  And then he had to make court
22  appearances.
23      MR. NORINSBERG:  Right.
24      THE COURT:  Well, all of that would have happened
25  on even a single charge.

1      MR. NORINSBERG:  But the point of all of that is
2  your concerns are covered by having materiality as the
3  second question on the verdict sheet.  If the jury finds
4  that the fabricated evidence was not material to this
5  indictment, then we lose the case, period.  I mean, the
6  question is resolving that issue.  I think it's a very clear
7  way for the jury to make that determination.
8      I think defense counsel, they are going to have
9  every opportunity to argue to the jury and say, listen, even
10  without this fabricated evidence, look at all the other
11  evidence we had.  I expect them to do that.  That's going to
12  be their argument.  That's why the question as we have it
13  already covers that issue very well.
14      THE COURT:  But let me just -- you agree with the
15  proposition that I'm stating?  That's the thing.  Forget
16  about how I precisely charge or how we want to make it as
17  simple as possible.  Suppose the jury were to come back and
18  say do we still find him liable if we find that it was
19  material to all the other charges but not material to charge
20  X?
21      I want to know what your answer to that is because
22  I'd like to anticipate problems.  It's what I do best.
23      MR. NORINSBERG:  I think we're on the same page.
24  That means we would lose on materiality.  They wouldn't be
25  able to answer the second question in our favor.  Obviously,

1  our view is, your Honor, they are interconnected in a way
2  that you can't separate it out like that, but that's for us
3  to argue to the jury.
4      THE COURT:  Right.
5      All right.  Where do we stand?  It's supposed to
6  snow so we have told the jurors -- we've given the jurors a
7  number to call, and this is the number that we'll let them
8  know whether the Court has been closed.  I can't anticipate
9  that the court is going to be closed at all, but they asked
10  questions about it.  And this is -- I'll give the number to
11  you all.  This is a number that you can call starting at
12  5:00 a.m.
13      What I told the jury, just so you understand, I
14  told them that they should come unless they are told the
15  court is closed.  I want them to be here.  I did tell
16  them, however, because I think a couple live on Long Island,
17  that if it's really snowing heavily, I'm not going to keep
18  them here to a point in time where they can't safely get
19  home.
20      So I just tell you all that based on your
21  witnesses.
22      MR. NORINSBERG:  Okay.
23      THE COURT:  How long do you think you're going to
24  be with the plaintiff?
25      MR. FARBER:  Perhaps another hour.

1       THE COURT: Then we have?

2       MR. NORINSBERG: Then we have the economist

3  tomorrow.

4       THE COURT: Is that the end of your case?

5       MR. NORINSBERG: We were going to put Darrell

6  Morse on for ten minutes.

7       THE COURT: And then your economist.

8       MR. FARBER: He will now be coming Monday.

9       MR. MILLER: We have Mr. Aharonyan.

10      MR. NORINSBERG: When would he be?

11      MR. MILLER: Tomorrow, if we can get him in.

12      MR. FARBER: If you're going to rest tomorrow, it

13  would be tomorrow. If not, then it will be Monday.

14      THE COURT: You know, I have no idea what will

15  happen tomorrow. We may have to end on Monday at 4:00. I

16  had no idea that this case was -- would go past this week

17  and I've agreed to speak at a university. So I have to

18  leave at 4:00 to do that. Although I would like not to do

19  that, I'm not sure that I could appropriately get out of

20  that commitment. That's one other thing I'll just let you

21  know.

22      MR. NORINSBERG: So Tuesday most likely would be

23  summation?

24      THE COURT: Right. That would be my guess. I

25  don't know how long you're going to go on Monday or how far

---

1  we are going to go tomorrow.

2       MR. NORINSBERG: Will we have a chance, your

3  Honor, to see the verdict sheet before?

4       THE COURT: Of course. I looked through all your

5  materials and tried to come up with my own formulations.

6       And let me address that because there's one issue.

7  If you want to call the document false, that's easy enough.

8  It's false, it's knowingly false. If you're going to call

9  it altered or misleading, then I think it does have to be --

10  the concept has to be fraudulently altered or fraudulently,

11  which I think you include in your instructions.

12      MR. NORINSBERG: Yes.

13      THE COURT: But the concept of fraud itself

14  requires an intent to deceive.

15      Now, I'm going to charge the jury that you do not

16  have to intend that someone -- don't have to intend to

17  violate someone's constitutional rights. But when you have

18  a concept of a fraudulent document and you've tried to make

19  something misleading, then there is the element of you did

20  that because you wanted to make it misleading, which is

21  different from intending to violate someone's constitutional

22  rights.

23      So that concept will be in there. If you want me

24  to -- and I guess the parties want me to charge the way

25  you've asked in your jury instructions, false or

---

1  fraudulently altered. For that fraudulently altered, I will

2  have to charge that there had to be an intent when it was

3  altered in intent to deceive.

4       MR. NORINSBERG: That's the charge as opposed to

5  on the verdict sheet itself. That's where we were having

6  the disagreement. I don't have a problem with you making

7  that part of the charge.

8       THE COURT: I'll say false or fraudulently

9  altered. But in the jury charge, I have to explain what

10  fraudulently altered means, which meant it was altered with

11  the intent to deceive.

12      MR. NORINSBERG: Okay. I think that's going to

13  work.

14      THE COURT: Just to let the parties know that

15  that's -- that that showing does have to be made. It's not

16  like you just changed a few numbers. There had to be to do

17  that for a reason.

18      Okay. See you tomorrow.

19      (Time noted: 5:12 p.m.)

20      (Proceedings adjourned until Friday, February 8,

21  2013, at 9:30 a.m.)

22

23

24

25

---

1                       INDEX

2  WITNESS          DIRECT CROSS REDIRECT RECROSS

3

4  JOHN FUSTO

5  By Mr. Norinsberg              774

6  By Mr. Miller           739            822

7

8  LEONARD MORSE

9  By Mr. Norinsberg    831

10 By Mr. Farber              953

11

12                     EXHIBITS

13

14 PLAINTIFFS:                    PAGE

15 7A-C                          861

16 8                            864

17 9                            853

18 34                           968

19 60                           907

20 70                           951

21 99, 99-A                     952

22 100                          839

23 101                          871

24 107                          872

25 114                          887.

**JA422**

1
2 EXHIBITS (CONTINUED)

PLAINTIFFS:                                   PAGE
3    115                                        844
4    117                                        891
5    119                                        859
6    125                                        851
7    127                                        867
8    129                                        856
9    143                                        846
10   147                                        893
11
12   DEFENDANTS:                                PAGE
13   1                                          763
14   C                                          746
15   AC                                         958
16
17
18
19
20
21
22
23
24
25

---

1

**$**
$10 [2] - 887:6
$100,000 [1] - 940:21
$130 [1] - 880:16
$15,000 [1] - 877:11
$174 [2] - 757:7, 757:9
$226,000 [3] - 939:22, 940:4, 942:19
$25,000 [1] - 951:5
$3,000 [1] - 822:10
$30,000 [1] - 877:9
$300,000 [2] - 822:4, 951:5
$318,000 [6] - 821:17, 938:24, 939:4, 941:19
$400 [1] - 793:15
$435 [1] - 757:15
$450,000 [2] - 870:1, 870:4
$600,000 [1] - 802:10
$65 [1] - 880:10
$800 [1] - 793:15
$87 [1] - 757:5

**'**
'01 [1] - 838:24

**0**
000 [1] - 795:6
0009361 [1] - 764:4
0009636 [1] - 761:12
00294977 [1] - 853:6
05630 [2] - 750:24, 757:6
05650 [1] - 756:22
05760 [2] - 757:2, 757:8
07-CV-4793(CBA) [1] - 738:3

**1**
1 [12] - 762:20, 763:23, 763:24, 776:4, 794:10, 802:17, 821:10, 908:17, 918:10, 938:24, 986:13
1,1 [1] - 822:8
1,8 [1] - 821:17
1,9 [1] - 938:25
10 [7] - 838:10, 877:25, 878:1, 887:9, 888:2, 888:3, 932:12
100 [5] - 838:16, 839:2, 839:5, 839:6, 855:4, 900:18, 985:22
10007 [1] - 738:14
101 [5] - 870:19, 871:3, 871:6, 871:7, 985:23
10271-0071 [1] - 738:17
107 [5] - 872:2, 872:12, 872:15, 872:16, 985:24
108 [1] - 804:10
11 [26] - 740:12, 740:17, 740:18, 740:25, 741:7, 741:13, 742:8, 742:12, 746:16, 747:15, 748:7, 750:2, 752:24, 752:25, 755:10, 757:23, 758:2, 758:9, 758:17,

758:20, 759:2, 759:6, 761:17, 764:10, 797:4, 797:6, 801:13, 801:24, 812:2, 813:13, 814:18, 815:5, 824:9, 824:11, 896:16, 940:13, 947:22, 947:24
11-inch [1] - 933:13
113 [1] - 935:6, 936:8, 936:9
114 [3] - 886:22, 887:11, 887:16, 887:17, 985:25
115 [3] - 843:24, 844:7, 844:10, 844:11, 986:3
117 [4] - 801:8, 801:13, 890:6, 890:21, 890:23, 890:25, 891:1, 986:4
119 [5] - 858:16, 859:3, 859:5, 859:6, 986:5
1199 [1] - 835:14
11th [1] - 859:24
12 [6] - 748:22, 760:18, 872:24, 976:15, 976:17, 976:18
120 [2] - 738:17, 875:7
126,000 [1] - 942:16
125 [6] - 851:1, 851:8, 851:11, 851:12, 986:6
127 [7] - 866:19, 866:22, 867:20, 867:21, 867:23, 867:24, 986:7
12722 [1] - 748:14
12744 [1] - 748:22
12770 [1] - 746:25
12785 [2] - 750:16, 750:20
12799 [1] - 751:16
129 [5] - 855:19, 856:4, 856:7, 856:8, 986:8
12h [1] - 738:1
130 [3] - 843:6, 925:2, 925:12, 925:18, 926:3
133 [3] - 740:20, 740:22, 896:17
134 [2] - 818:15, 818:17
140s [1] - 901:16
143 [10] - 845:14, 846:12, 846:13, 846:15, 846:16, 924:19, 925:2, 925:4, 925:5, 974:16
143-A [1] - 974:24
145A [1] - 942:7
146 [3] - 900:3, 900:10, 900:13, 901:7
147 [8] - 845:16, 901:18, 902:18, 902:19, 902:20, 903:3, 903:6, 909:7
148 [1] - 910:8
148-A [4] - 910:9, 910:13, 910:14, 913:11
148-B [3] - 913:11, 913:13, 913:14
149-B [4] - 638:25, 915:17, 940:6, 945:15
15-A [5] - 873:9, 877:25, 878:1, 885:17, 885:19, 888:18, 932:12, 951:6
15-month [7] - 873:12, 873:19, 873:24
15-year [1] - 839:8
15th [1] - 838:24

**2**
16 [2] - 742:22, 769:20
17-A [1] - 776:4, 832:19
18 [6] - 752:5, 797:2, 797:6, 797:12, 797:19, 798:3, 798:5, 825:8
1947 [1] - 832:10
1972 [4] - 953:17, 953:22, 954:19, 954:20
1973 [2] - 833:21, 953:24
1974 [4] - 835:17, 838:10, 955:21
1975 [1] - 954:6
1980 [1] - 956:3
1985 [3] - 956:5, 956:8, 956:9
1999 [1] - 935:16, 944:9, 957:19
1:00 [3] - 811:18, 826:01, 826:23
1:15 [1] - 830:22
1st [3] - 957:23, 958:25

2 [4] - 764:2, 830:24, 934:9, 951:5
2,000 [1] - 841:5
2,500th [1] - 806:6
2000 [10] - 749:3, 750:6, 826:10, 915:18, 934:4, 935:15, 944:7, 946:15, 957:22, 959:1, 959:21, 962:3, 964:2, 964:24, 965:6
2001 [2] - 871:9, 957:23
2002 [23] - 752:15, 752:25, 789:25, 838:13, 840:2, 841:15, 841:20, 842:11, 848:21, 898:16, 903:19, 902:15, 903:16, 951:25, 951:10, 957:15, 952:1
2003 [4] - 805:15, 805:21, 814:24
2004 [2] - 835:19, 842:3
2005 [4] - 815:17, 816:1, 951:17, 957:25
2006 [1] - 802:11, 834:8, 837:1, 847:11

**2**
9 [6] - 821:13, 864:4, 864:16, 864:18, 864:19, 976:10

2

225,000 [2] - 933:8, 933:9
226 [1] - 942:5
226,000 [3] - 939:25, 941:11, 942:18
226,881 [1] - 942:10
23 [1] - 742:22
25 [8] - 750:20, 762:10, 836:5, 848:6, 871:19, 879:15, 885:16, 885:19, 973:4
27 [1] - 893:12
2700 [1] - 738:14
28 [1] - 944:24
29 [2] - 847:2, 908:13
2nd [2] - 957:18, 957:22, 959:21
2X [1] - 877:6

**3**
3 [1] - 934:9
30 [3] - 834:12, 839:20, 848:12, 864:3, 894:9, 898:23, 948:17, 957:6, 961:2, 967:1, 965:16
30,000 [3] - 837:13, 867:9, 893:20, 930:7
30-year [3] - 837:9, 837:24, 893:19, 897:12, 950:3
30-year-old [1] - 837:17
300years [1] - 837:17
318,000 [1] - 940:5
31st [3] - 957:24
32 [8] - 900:17, 900:21, 901:2, 901:4, 901:10, 902:3, 902:10, 902:13, 902:15, 902:16, 902:23, 902:24, 903:4, 908:17, 918:10
329 [2] - 842:9, 847:5
34 [6] - 900:2, 967:13, 967:22, 968:1, 985:18
35 [1] - 876:5
36 [4] - 797:2, 797:13, 797:18, 798:3
385 [1] - 769:13

**4**
4 [1] - 926:3
4-A [3] - 967:1, 967:7, 968:2
4X [1] - 934:24
40-year [1] - 897:12
404(b)(2) [1] - 940:20
42 [2] - 907:2, 907:10
44 [3] - 898:7, 905:7, 913:17
45 [2] - 814:12, 815:4, 815:5, 854:13, 934:24
45-day [1] - 853:23
45A [1] - 854:14
4:00 [2] - 982:15, 982:18
4th [2] - 898:16, 903:19

**5**
5 [6] - 801:8, 835:8, 835:11, 926:3, 934:10, 976:8

**6**
6 [6] - 821:10, 821:11, 828:20, 938:24, 967:5
60 [4] - 907:14, 907:15, 907:18, 907:20, 907:22, 907:23, 907:25, 961:14
613-2268 [1] - 738:22
635 [1] - 832:12, 880:10
67 [1] - 860:11

**7**
7 [3] - 738:7, 741:6, 742:3, 742:10, 753:20, 753:23, 753:24, 754:22, 756:16, 812:2, 813:13, 814:16, 814:18, 815:5, 818:6, 818:7, 819:3, 819:13, 819:14, 821:13, 891:20, 885:6, 900:5, 906:2, 900:14, 913:16, 914:20, 922:6, 922:8, 940:12
74 [1] - 755:14
70 [6] - 950:11, 950:12, 950:22, 950:25, 951:1, 985:20
718 [1] - 738:22
72 [3] - 850:2, 850:23, 855:21
72nd [1] - 850:16
739 [1] - 985:6
746 [1] - 986:14
763 [1] - 986:13
774 [1] - 985:5
7A [3] - 860:25, 861:16, 861:19, 861:20, 985:16
7B [2] - 861:1, 863:3
7C [1] - 861:1, 863:3

**8**
8 [1] - 821:13, 864:4, 864:16, 864:18, 864:19, 984:20, 985:16

**50**
50 [2] - 860:19, 971:1
500 [1] - 836:15
500,000 [1] - 862:20
60 [4] - 747:2, 747:9, 747:12, 747:23, 748:10, 749:20, 749:6, 749:11, 750:5, 750:11, 750:22, 751:9, 752:3, 752:9, 752:19, 752:22, 753:1
588 [1] - 834:10
5:00 [2] - 975:2, 981:12
5:12 [1] - 984:19
5s [1] - 769:18, 847:11, 954:8, 966:10

**9**
8-1/2 [1] - 933:13
82 [1] - 806:11
822 [1] - 985:6
831 [1] - 985:9
839 [1] - 985:22
84 [1] - 986:3
846 [1] - 986:9
851 [1] - 986:6
853 [1] - 985:17
856 [1] - 986:8
859 [1] - 986:5
861 [1] - 985:16
867 [1] - 986:7
889 [1] - 986:5
891 [1] - 985:23
893 [1] - 986:10
872 [1] - 985:24
887 [1] - 985:25

9 [6] - 821:13, 852:23, 853:9, 853:11, 853:12, 985:17
90 [2] - 815:2, 815:19
907 [1] - 985:19
91 [2] - 766:12, 772:10
91-b [6] - 835:2, 835:4, 852:20, 853:20, 855:2, 855:5, 869:23, 973:12
93 [1] - 985:23
952 [1] - 985:10
956 [1] - 986:8
958 [1] - 985:18
9b [4] - 951:12, 951:13, 951:21, 951:25, 952:1, 952:6, 952:11, 985:21
93-A [1] - 951:23
99-A [1] - 762:9, 952:6, 952:11, 985:21
9:00 [1] - 738:8
9:43 [1] - 739:20

**A**
a.m [4] - 738:8, 739:20, 981:12, 984:21
abbreviation [1] - 857:19
Abdullah [5] - 845:22, 845:25, 846:4, 846:5, 846:21
abide [1] - 744:21, 852:13, 852:16, 871:21, 873:21, 896:13, 922:22, 924:2, 980:25
absence [4] - 801:2, 802:1, 894:1, 923:3
absent [2] - 742:19, 877:25
absolutely [1] - 863:23, 904:3, 915:8, 932:24, 934:4, 939:18, 939:21, 940:9, 958:5, 977:19
Absolutely [7] - 752:23, 840:7, 840:10,

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

DR. LEONARD MORSE,          :    07-CV-4793(CBA)

    Plaintiff,          :

    -against-          :    United States Courthouse
               :    Brooklyn, New York

ELIOT SPITZER, et al.     :    Thursday, February 7, 2013
               :    9:30 a.m.
    Defendants.          :

- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE CAROL BAGLEY AMON
CHIEF UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:     JON L. NORINSBERG
                    225 Broadway, Suite 2700
                    New York, New York 10007
              BY:    JON L. NORINSBERG, ESQ.

For the Defendants:    HON. ERIC T. SCHNEIDERMAN
                    NYS Attorney General
                    120 Broadway, 14th Floor
                    New York, New York 10271-007
              BY:    CHRISTOPHER Y. MILLER, ESQ.
                    SETH J. FARBER, ESQ.

Court Reporter:    Lisa Schwam, CSR, CRR, RMR
                Official Court Reporter
                Telephone: (718) 613-2268

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

---

1      (In open court.)

2      THE COURTROOM DEPUTY:  Morse versus Spitzer.

3      THE COURT:  Are the parties ready?  We'll bring

4  the jury out.  Everyone is ready to proceed?

5      MR. FARBER:  Yes, Your Honor.

6      MR. NORINSBERG:  Do you want Dr. Morse to take the

7  stand?

8      THE COURT:  Yes.

9      (Jurors enter the courtroom.)

10     THE COURT:  All right.  Good morning, Ladies and

11  Gentlemen.  Please be seated.  I think we're ready to begin.

12  CROSS-EXAMINATION

13  BY MR. FARBER:

14  Q   Good morning, Dr. Morse.

15  A   Good morning, Mr. Farber.

16  Q   Doctor, you like to sue people, don't you?

17     MR. NORINSBERG:  Objection.  May we approach?

18     THE COURT:  I'll sustain the objection.  I

19  sustained the objection.

20  Q   This is not the first time you have been a civil

21  plaintiff in a lawsuit?

22     THE COURT:  All right.  Can I see you, please.

23     MR. FARBER:  Sure.

24     (Sidebar conference.)

25     (Continued on the next page.)

---

1      THE COURT:  What's the relevance of this line of

2  inquiry?

3      MR. FARBER:  He's told us essentially he gave a

4  reason for why he's bringing this action as essentially the

5  American way to clear his name.  The fact is, this is a

6  civil damages action.  That's why he's bringing -- he's

7  brought damages actions before.

8      THE COURT:  For what?

9      MR. FARBER:  It goes to his credibility.  He's had

10  two malpractice actions, at least one other injury action.

11  It goes to his credibility when he makes a statement like I

12  am suing for vindication, I am suing to clear my name, I'm

13  suing to clear the record.  So he's obviously suing for

14  money.  He sued for money before.  It goes to his

15  credibility.

16      MR. NORINSBERG:  It's completely relevant.  The

17  fact that he had personal injury actions in his past

18  sometime has nothing to do with the civil rights action.

19  The Second Circuit has expressly stated that you cannot do

20  what he's trying to do.  You can't use someone's prior

21  litigation history to attack their credibility.  It's

22  irrelevant, prejudicial.

23      THE COURT:  I'm going to sustain the objection.

24  You can cross-examine him about isn't it a fact that he

25  wants money in this lawsuit, but you can't talk about

---

1  lawsuits.

2      MR. FARBER:  Thank you, Your Honor.

3      (End sidebar conference.)

4      (Continued on the next page.)

**JA424**

1  BY MR. FARBER:
2  Q   Doctor, do you recall yesterday testifying that when
3  Mr. Norinsberg asked you if you could tell the members of
4  the jury why you filed this lawsuit, you told them you
5  brought this lawsuit because you wanted your reputation back
6  and you wanted your good name back?
7      Do you recall that testimony?
8  A   Yes, I do.
9  Q   In fact, you're suing for monetary damages, aren't you?
10 A   Yes, I am.
11 Q   Yesterday we talked a bit about your practice
12 concerning recordkeeping as indicated with laboratory
13 prescriptions.
14     Am I correct, you stated that you keep your
15 prescriptions or you kept them in a segregated file; is that
16 correct?
17 A   That is true.
18 Q   All right.  Is there a reason you didn't keep them
19 together with patient charts?
20 A   Yes, there is.
21 Q   Please state that reason, sir.
22 A   The reason is working order.  So you're working with a
23 patient.  You're taking impressions to do repairs.  And the
24 chart -- the patient's chart -- that has to be maintained
25 for six years, is a pristine record.  It has x-rays in it.

1  So you wouldn't want to take a piece of paper that might
2  have impression material and commingle it with your pristine
3  chart.
4  Q   Why would your prescription have impression material on
5  it, sir?
6  A   It's a work order, sir.  We're taking -- to do these
7  prosthetic procedures, you have to take alginate
8  impressions.  If you've ever gone to the dentist and had an
9  impression taken, it's not necessarily a neat thing to do.
10 And that laboratory prescription is out on the tray, and
11 you're mixing materials.  You're mixing anesthetics.  It's
12 not a sterile area.
13 Q   So you're telling us that you would allow the piece of
14 prescription paper to actually touch the impression
15 materials?  Is that your testimony?
16 A   It oftentimes does.
17 Q   We've spoken a great deal in this trial concerning
18 Medicaid claims you filed between 2000 and 2002.
19     Let me ask you, you were paid for the claims you filed
20 in this action, correct?
21 A   Yes, I was.
22 Q   All right.  I'm going to approach you and show you
23 Exhibit J.  Please take a moment or two to familiarize
24 yourself with Exhibit J.  And when you've done so, can you
25 tell me if you can identify Exhibit J.

1  A   These are a series of Medicaid checks paid to me.  And
2  it starts in 1999, and it goes through 2003.  It actually
3  includes the years 2004.  And there are more checks from
4  2004.  And then there are more checks from 2004.  And it
5  continues on with more checks from 2004.
6      And it actually -- if it's in chronologic order, it
7  actually goes through almost 2005.  It appears to end at
8  11/15.  Actually, it's 11/22 of the year 2004.
9  Q   Are these checks you received for your Medicaid claims
10 filed in that time?
11 A   I don't see it endorsed, but I'm going to accept your
12 premise that, yes, these are the checks that I received for
13 the work that I did.
14     MR. FARBER:  I'm going to respectfully move
15 Exhibit J into evidence.
16     MR. NORINSBERG:  To the extent that they are
17 checks that are within the audit period, we have no
18 objection.  We object to any checks that go beyond the audit
19 period as being completely irrelevant to this case.
20     THE COURT:  Do you want to offer the checks from
21 the audit period in that group which I guess would exclude
22 the checks in '99?
23     MR. NORINSBERG:  And 2004.
24     THE COURT:  And 2004?
25     MR. NORINSBERG:  That's completely outside the

1  audit and 2003 is outside the audit.
2      MR. FARBER:  I will withdraw my offer at the
3  moment and we'll see if we can come back to it.
4      THE COURT:  Okay.
5  Q   Now, you testified that you would receive invoices, am
6  I correct, from the Design Dental Laboratory and Nu-Life
7  Laboratory on a monthly basis; is that correct?
8  A   That's correct.
9  Q   What did you do with those invoices after you received
10 them?
11 A   I reviewed the invoices, and then I paid the
12 laboratories.
13 Q   All right.  And from time to time, you observed billing
14 errors, correct?
15 A   As would be in any business.  There are always errors.
16 Q   And what happened when you observed business errors?
17 A   We'd have a correction.  There might be an
18 underbilling, an overbilling.
19 Q   Then what?
20 A   I'm sorry; I don't understand the question.
21 Q   After you made your corrections, then what would
22 happen, sir?
23 A   Then I would pay the bill.
24 Q   Then what would you do with the invoice?
25 A   After the bill was paid, I discarded the invoice.

1  Q    About how long after the bill was paid would you
2  discard the invoice?
3  A    Within that month, by the time the next bill had
4  arrived from the laboratory.
5  Q    You testified yesterday that with respect to
6  prescriptions, you discarded them after approximately a year
7  or exactly a year after you were paid with respect to the
8  service; is that correct?
9  A    That's correct.
10 Q    All right.  Now, besides prescriptions and laboratory
11 invoices which you've just testified that you discarded, you
12 actually had no other records that would document laboratory
13 work billed to your practice, did you?
14 A    That's not correct.
15 Q    Do you recall coming to my office in August of 2009?
16 A    Yes, I do.
17 Q    Do you recall giving testimony at a deposition?
18 A    Yes, I do.
19 Q    Do you recall the following testimony:
20      "Question:  Were there any other records besides the
21 prescriptions and the laboratory invoices that would reflect
22 laboratory work billed to your dental practice?
23      "Answer:  No."
24 A    That is not a correct transcript of what I testified
25 to.  At the end of the transcript, there are multiple pages

1  called errata pages, and I had about six pages of excerpts
2  from the transcript, including things that were not
3  transcribed correctly by the court reporter.  And I did not
4  say that.
5       THE COURT:  It's your position it was
6  mistranscribed?
7       THE WITNESS:  I have my original --
8       THE COURT:  That's your position that you
9  didn't -- your position is you didn't respond no to that
10 question?
11      THE WITNESS:  That's correct.
12 Q    Well, all right.  What other records besides
13 prescriptions themselves or your laboratory invoices would
14 document laboratory work billed to your practice?
15 A    Well, I have $318,000 in canceled checks showing that I
16 paid for every single procedure that I billed Medicaid for.
17 Q    Besides your canceled checks, anything else?
18 A    Well, those were the same records I had for 30 years.
19 And apparently they were sufficient for every other audit.
20      THE COURT:  I think -- is the answer to the
21 question no?
22      THE WITNESS:  You want to make it a yes or no,
23 I'll say no.
24 Q    It's fair to say, Doctor, that you did not actually
25 provide prescriptions for denture work when you provided

1  patient charts in response to the Attorney General's Office
2  request you described yesterday; is that correct?
3  A    Well, the Attorney General's request occurred two years
4  after the start of this audit so it was not done in a timely
5  fashion.
6  Q    If you could just answer yes or no, please.
7  A    If you want a yes or no, I'll say no.
8  Q    Do you have in front of you, sir, an exhibit that is
9  Exhibit 44 in evidence?  It's the Grand Jury 7.
10 A    You might have to help me.  I've got a lot of paperwork
11 on the desk here.  Some of it is not labeled as an exhibit,
12 sir.
13 Q    Fair enough.  I'm going to approach and show you what's
14 been marked as Defendants' Exhibit F.
15      Do you see Exhibit F, sir?
16 A    Yes, I do.
17 Q    I'm going to ask you to turn to the record pertaining
18 to patient Stacy Rodriguez.  I'm sorry; I'm not showing you
19 that document on the screen.  I will, though.
20      Do you see the page I'm referring to for patient Stacy
21 Rodriguez?
22 A    Yes, I do.
23 Q    When did you first see this document, sir?
24 A    After I filed the civil lawsuit.
25 Q    Well, do you recall giving the following testimony when

1  I took your deposition:
2       "Question:  And then you said there was another
3  meeting?
4       "Answer:  I believe there was an additional meeting."
5       By the way, I'm reading from page 71, line 8 of your
6  deposition.
7       "I think we had a third meeting when he sat down to go
8  over some additional, shall I call them, records, evidence
9  that was being shown to me.  And I took exception to what
10 the auditor and Mr. Fusto were showing me.  I saw records
11 that were not my billing records that had been altered, that
12 had been manufactured, that were illegible.  Mr. Castillo
13 started to explain to me in just general terms how he was
14 doing the math.  There was one case, Stacy Rodriguez, where
15 someone had produced a manufactured triple billing form.  I
16 was looking at this, and I had brought a copy of my vendor
17 statement to show no triple billing ever occurred."
18      Do you recall giving that testimony at your deposition,
19 sir?
20 A    Yes, I do.
21 Q    Is that testimony not accurate, sir?
22 A    Oh, I think it's accurate, but there are 20,000
23 documents in this case so I might have mistaken.  It's
24 possible with 20,000 documents not to remember exactly what
25 documents were cherry-picked by the government.

**JA426**

1  Q   Am I correct here, sir, that your testimony is, sir,
2  that you were actually provided nothing that was shown to
3  the grand jury during the time you met with Mr. Fusto and
4  Mr. Castillo; is that correct?
5  A   I certainly didn't have the grand jury minutes.  They
6  are secret minutes.
7         THE COURT:  I think the question was did you say
8  that you had -- what was your question again, counsel?  You
9  want to restate your question.
10        MR. FARBER:  If it can be read back, I'd
11 appreciate it.
12        (Record read as requested.)
13        THE COURT:  He's just asking you if that's what
14 you said earlier, Doctor.  Try, please, to limit your
15 responses to the questions -- excuse me.  When I'm talking,
16 just wait until I finish.
17        THE WITNESS:  I'm sorry.
18        THE COURT:  I would just caution you to try and
19 respond just simply to the question that's asked, okay.
20 Q   And during the time that you met with Special Assistant
21 Fusto and with Auditor Castillo, did they show you any
22 portion of a spreadsheet or any other record dealing with a
23 patient named Edwin Gonzalez?
24 A   Yes.
25 Q   All right.  I'd ask you to turn to the Edwin Gonzalez

1  page of Exhibit F, if you would.
2         THE COURT:  Could you just place a time on this.
3         MR. FARBER:  Sure.
4         THE COURT:  Do you know when this meeting was,
5  Doctor, approximately?
6         THE WITNESS:  It's between my indictment and my
7  trial so I don't know the exact month, but if I'm indicted
8  in April of 2006 --
9         THE COURT:  It was after the indictment?
10        THE WITNESS:  Yeah, it was after the indictment.
11 It was probably several months after the indictment because
12 that was the second meeting.  The first meeting we testified
13 yesterday didn't happen because Mr. Fusto forgot about it.
14        THE COURT:  Okay.  But this is after the
15 indictment?
16        THE WITNESS:  Correct.
17        THE COURT:  Okay.
18        I'm sorry; so you were asking about Gonzalez?
19        MR. FARBER:  Yes, Your Honor.
20 Q   Am I correct that you, in fact, were shown this at the
21 time at least one of your meetings with Special Assistant
22 Fusto and Auditor Castillo?
23 A   That's correct.
24 Q   Can you tell us, Dr. Morse, between 2000 and 2002,
25 approximately how much did 580 Dental or you on behalf of

1  580 Dental bill the Medicaid program for dental services
2  rendered?
3  A   Are we referring to prosthetic services that we're
4  talking about here or all services?
5  Q   That's a good point.  Why don't we address both.  Why
6  don't we start with all services?
7         MR. NORINSBERG:  Objection.  Anything outside
8  dental prosthetics, it's irrelevant to this case.
9         MR. FARBER:  Can we approach?
10        THE COURT:  I'll overrule.  I'll let him answer
11 the question.
12        MR. FARBER:  Thank you.
13 Q   You can answer, Doctor.
14 A   Our total billings were in the neighborhood of about
15 $4 million and the dental prosthetics part was about
16 40 percent of that, about a million 7, a million 8.
17 Q   Let me turn back to the Stacy Rodriguez page.  Now, am
18 I correct, Doctor, that you contend that Dr. DeLuca actually
19 gave false testimony before the grand jury by not taking
20 cognizance of the minus signs in this document?
21        Is that a fair statement?
22 A   Would you repeat that once again, please.
23 Q   Sure.
24        Am I correct that you believe Dr. DeLuca gave false
25 testimony before the grand jury?

1  A   Well, that is correct.
2  Q   All right.  And what is it you contend Dr. DeLuca
3  testified falsely at the grand jury?
4  A   Well, Dr. DeLuca as an expert Medicaid dentist, she
5  spent three hours, I believe she testified, in Medicaid
6  dentistry.  She was misled also by the prosecutor, Mr.
7  Fusto, because her testimony --
8         THE COURT:  The question, I think, Doctor, is you
9  said that you believe she gave something -- said something
10 false.  What is it that you think she said that was false?
11        THE WITNESS:  In the grand jury transcript, she
12 described to the grand jurors that each of these procedures
13 had in reality been done three separate times in my office,
14 and that's not true.
15 Q   All right.  Now, you heard her testify, correct?
16 A   Oh, yes, I did.
17 Q   She testified that she simply did not even look at the
18 "Amount Paid" column and simply missed the minus signs.
19        Did you hear that testimony?
20 A   Oh, yes, I did.
21 Q   All right.  Do you have any reason to believe that
22 wasn't a truthful recollection on her part?
23        MR. NORINSBERG:  Objection.
24        THE COURT:  Overruled.
25 A   Well, she also testified at her deposition she doesn't

1   even know the Medicaid codes, so I think the fact in her
2   testimony speaks for itself.
3   Q    Do you have a specific issue with her concerning
4   whether or not she saw the minus signs?
5            MR. NORINSBERG:  Objection.
6            THE COURT:  Sustained to the form of the question.
7            MR. FARBER:  Sure.  Okay.
8   Q    Am I correct, you just testified a moment ago that you
9   believe Dr. DeLuca is not an expert in Medicaid practice
10  dentistry, correct?
11  A    That's absolutely correct.
12  Q    All right.  Do you contend that she isn't an expert in
13  the field of dentistry at all?
14  A    Well, dentistry covers a lot of things.  I teach this
15  in a hospital for 30 years.  There's prosthetic dentistry,
16  there's restorative dentistry.  I think the bulk of
17  Dr. DeLuca, what she said here in the courtroom, was she was
18  talking about restorative dentistry, fillings and the like.
19  And I think she was pretty much mystified by any removable
20  dentistry because she really doesn't have any expertise in
21  that area.
22  Q    Well, my specific question to you concerns dentistry.
23  So do you contend she is not an expert in dentistry?
24  A    She admitted the same at her deposition.  She doesn't
25  consider herself an expert in dentistry out of her own

---

1   mouth.
2   Q    Well, given that Dr. DeLuca has told us that she's
3   practiced for 20 years, went to and taught at the same
4   dental school as you did, do you have any reason to believe
5   she's not an expert in the field of general dentistry?
6            MR. NORINSBERG:  Objection.
7            THE COURT:  Overruled.
8   A    Well, general dentistry has nothing to do with the case
9   at hand here.
10  Q    That was a yes-or-no question, Doctor.
11  A    Could you repeat the question again, Mr. Farber.  Could
12  I have the question read back.
13           THE COURT:  Do you believe that she was an expert
14  in the field of general dentistry?
15           THE WITNESS:  I would say no.
16  Q    Doctor, since the time of your indictment, at any time
17  have you sought or obtained mental health treatment from
18  either a practicing psychiatrist or any other mental health
19  provider?
20  A    No, I have not.
21  Q    And since the time of your indictment, have you sought
22  medical treatment for emotional distress, pain and
23  suffering, or related issues from any medical provider?
24  A    No, I have not.
25  Q    Now, you testified yesterday that the press release

---

1   here had been translated into Russian and Chinese, correct?
2   A    That's correct.
3   Q    All right.  And am I correct that you -- let me ask you
4   if you recall this testimony from yesterday:
5        "Question:  Dr. Morse, going back to April of 2006, did
6   you have Russian and Chinese patients?
7        "Answer:  With over 30,000 patients, yes, I'm certain I
8   had a few of each."
9        Do you recall that testimony, sir?
10  A    Yes, I do.
11  Q    Okay.  Do you recall testifying at your deposition that
12  you actually didn't have Chinese-speaking patients or
13  Chinese patients?
14  A    Yes, I do.  But with 30,000 patients, I think you're
15  entitled to have further reflection on the matter of each
16  type of patient you might have had over 30 years.
17           THE COURT:  I guess the question is do you now
18  recall that you had a Chinese patient?
19           THE WITNESS:  Well, I have several upon further
20  reflection, yes, Your Honor.
21  Q    And you did not recall that at the time of your
22  deposition?  Is that your testimony?
23  A    That's correct.
24  Q    Doctor, do you have the Exhibit 143, and specifically
25  that is the four individual patient charts we were talking

---

1   about yesterday?
2   A    I think I have three of those.  I have Intisar Ahiri,
3   Asi Othman, and Stacy Rodriguez.
4   Q    Okay.  Do you have Sawson Abdallah there?
5   A    Yes, I do.  I have Sawson Abdallah, yes, yes.
6   Q    All right.  Now, just before we broke yesterday
7   afternoon, I believe you were -- am I correct, do you recall
8   that you were looking at the Sawson Abdallah chart?
9   A    That sounds correct.
10  Q    Okay.  If you have it in front of you, I'd like you to
11  take a moment or two to flip through it and familiarize
12  yourself.
13       My question, sir, is, is there an actual
14  dental -- denture prescription in this document?  That is a
15  yes-or-no question.
16  A    Yes, there are.
17  Q    Okay.  And am I correct -- let me ask you, are you
18  referring to page SD-009455?
19  A    That's the page I'm looking at, yes.
20  Q    Okay.  All right.  That's this page, Doctor
21  (indicating).  Do you see the screen?
22  A    I'm just comparing the paper version.
23  Q    Okay.  Go ahead.
24  A    Could you just slide it down a little so I can see the
25  last entry, please.

**JA428**

1          Yes, that's what I'm looking at.
2     Q    Okay.  So you're referring to a notation you made on
3     the patient chart, correct?
4     A    Well, this isn't my handwriting, no.
5     Q    Well, you said a moment ago there was a prescription in
6     this document and you referred me to this page, correct?
7     A    Yes, I did, but you didn't ask me who wrote this.
8     Q    My question, sir, is, is there a prescription on this
9     page?
10    A    The answer is yes.
11    Q    All right.  Am I correct, sir, that what's actually on
12    this page is a notation in a chart directing that a
13    prescription should be issued?  Is that not more accurate?
14    A    It's a copy of the prescription, but you're asking me
15    if I personally wrote it, if I understand the question
16    correctly.
17    Q    I did not ask you that, sir.
18    A    Then I misunderstood it.  So it's a copy of the lab
19    prescription that was written on that service date.
20    Q    Well, I repeat, is this --
21         THE COURT:  Could you just point to what -- what
22    part of that page are you saying is the prescription,
23    Doctor?
24         THE WITNESS:  I'm saying -- on the 5-2500, on the
25    top portion.

1          THE COURT:  So where is the prescription?
2          THE WITNESS:  It's on the fifth line going across.
3     Q    Here (indicating)?
4     A    Yes.
5          THE COURT:  Just for the record, what chart is
6     this?
7          MR. FARBER:  Sure.  Your Honor, this is Exhibit
8     143.  This is specifically the Sawson Abdallah chart.
9          THE COURT:  Okay.
10    Q    Well, Doctor, yesterday Mr. Norinsberg showed you a
11    blank piece of paper from the Design Dental Lab, and I
12    believe you testified that that was, you know, a blank
13    prescription.
14         Do you recall that testimony?
15    A    Yes, I do.
16    Q    You'd agree, Dr. Morse, that this page looks nothing
17    like that piece of paper?
18    A    It has the same information basically.  It's not an
19    exact Xerox copy of the lab prescription, no, it's not.
20    Q    Well, this is an indication that either you or whomever
21    wrote this believed that a prescription is appropriate,
22    correct?
23    A    Well, the prescription was written.  That's why this is
24    in the patient's permanent record.
25    Q    But the prescription itself is not here, is it?

1     A    No, it is not.
2     Q    Now, do you recall giving the following testimony
3     yesterday, Doctor?
4          "Question:  Now, Dr. Morse, we're going to get back to
5     the charts in a little while.  Just quickly for now, can you
6     tell us if there are prescriptions indicated in these
7     charts?
8          "Answer:  I'll take the first one, Abdallah, Sawson
9     and, yes, there's two prescriptions in this chart.  Stacy
10    Rodriguez, her prescription has been memorialized.  Asi
11    Othman, he has a copy of a prescription in his chart also.
12    They are actually two separate entries."
13         If you would, could you please turn to the document
14    that is the chart of Asi Othman.
15         MR. NORINSBERG:  Is there a question here?
16         THE COURT:  Are you still reading from the
17    deposition?
18         MR. FARBER:  No, Your Honor.  That's actually the
19    transcript of yesterday's proceedings.
20         MR. NORINSBERG:  What's the actual question?
21    Q    The question is, once you've found the Asi Othman
22    chart -- have you found it, sir?
23    A    I'm looking at it.
24    Q    Okay.  You have the Asi Othman chart?
25    A    It's in front of me.

1     Q    Thank you, Doctor.
2          Can you show me in this chart a copy of Mr. Othman's
3     prescription or at least indicate which page it is or pages
4     and I'll put them up on the camera.
5     A    I'm looking at the Bates stamp SD-12335.
6     Q    Okay.  All right.  I'm going to put 12335 on the camera
7     here, and I'm going to run my pen down and when you tell me
8     I've got to the prescription part, please stop me and we'll
9     look at that.
10    A    Keep moving down.  Slow down a little.  A little more.
11    There you go.  That line, yes, sir.
12    Q    All right.  By the way, can you read for the jury
13    what's on that line.
14    A    It says, "Partial, partial, reline clasp 6, 11, 22 and
15    new 31 old 30."
16    Q    Okay.  And that is an indication that this patient
17    needed a denture prescription, correct?
18    A    That's correct.
19    Q    But this is not, in fact, a denture prescription, is
20    it?
21         MR. NORINSBERG:  Objection.
22         THE COURT:  He can answer.
23    A    I think you're parsing words.  You're saying is this an
24    exact Xerox copy of the prescription?  No, it is not.  Is
25    this the pertinent information that was written on the

1  prescription to the laboratory?  Yes, it is.
2       So if you want to ask me is this a Xerox copy of the
3  prescription, the answer is no.  If you want to ask me does
4  this contain the same information as was on the dental
5  prescription, the answer is going to be yes.  But you're
6  parsing about what Xerox or copy means.
7  Q    Sir, do you recall testifying that Asi Othman, he has a
8  copy of a prescription in his chart also?  Do you recall
9  that testimony?
10      MR. NORINSBERG:  Objection.
11      THE COURT:  Overruled.
12 A    If you have it there, then I used the word "copy," yes,
13 sir.
14 Q    So it would be fair to say that that was not the
15 correct?  Fair to say that's not correct, sir?
16 A    You're parsing the words, but it's fair to say it's not
17 correct if that's how you want to look at it, yes, sir.
18 Q    Is it fair to say there came a time when you were
19 charged with a crime or crimes by the Attorney General's
20 Medicaid Fraud Control Unit; is that correct?
21 A    That is correct.
22 Q    And when did you first learn that you were charged with
23 a crime or crimes?
24 A    I think it's April 5th, 2006.
25 Q    And did you hire an attorney to represent you in

1  connection with those charges?
2  A    Yes, I did hire an attorney.
3  Q    And whom did you hire?
4  A    I hired Richard Wool, W-o-o-l.
5  Q    When did you hire Mr. Wool?
6  A    Well, I testified at my deposition I didn't remember
7  the exact date, and I still don't have a clear memory of the
8  exact date.
9  Q    All right.  And in the present case, you contend you've
10 suffered a depravation of your rights as a result of
11 fabrication of evidence?  Is that a fair statement?
12 A    Well, a depravation of my liberty.  I think that would
13 be more the terminology.
14 Q    But whatever it is a depravation of, your contention is
15 that it is as a result of fabrication of evidence; is that
16 correct?
17 A    That's correct.
18 Q    All right.  I'm going to show the witness what's been
19 marked as Defendants' Exhibit G.
20      Doctor, do you have Defendants' G before you?
21 A    Yes, I do.
22 Q    Am I correct, sir, that in the course of your filing
23 claims and receiving payment for Medicaid, this is not a
24 document that you have actually received in the ordinary
25 course of your dental practice?  Is that a fair statement?

1  A    That's correct.  I mean, we saw yesterday my Medicaid
2  vendor statement.  It doesn't look anything like that.
3  Q    Now, do you recognize the patients whose names are set
4  forth on Exhibit G, which is in evidence?  And it might be
5  more specific, do you recognize them as patients of 580
6  Dental?
7  A    I'm just finishing looking through the names.
8  Q    Absolutely.  Take as much time as you need.
9  A    Yes, I do.
10 Q    All right.  You've had a chance -- you recognize all
11 eight of the patients here as patients of 580 Dental?
12 A    I didn't count them up, but I'll go with the eight,
13 with your figure.
14 Q    The names you've seen you recognize as 580 Dental's
15 patients; is that correct?
16 A    That's correct.
17 Q    And could you see various information on this document
18 such as amount paid, procedure code, tooth code, surface
19 code, service date?  Do you see that?
20 A    Well, I'm looking at the first page.
21 Q    Sure.
22 A    It's SD-002584.
23 Q    Let me put it on the screen here.
24 A    I'm going to correct that because I didn't see you
25 blocked out a lot of it so I wasn't following the columns.

1  There is an amount paid.  There's a big blocked area and,
2  yes, there's an amount paid next to the names, that's
3  correct.
4  Q    Okay.  Next to the amount paid is a procedure code,
5  correct, Doctor?
6  A    Yes, I see procedure codes.
7  Q    Next to that is tooth code, correct?
8  A    I see tooth codes indicated also.
9  Q    And next to that is a surface code?
10 A    Well, there's no surface code associated with that
11 dental prosthetic billing code so it's all zeros.
12 Q    I understand that.  But do you recognize the column to
13 be "Surface Code"?
14 A    Well, it's captioned at the top, it says "SURF Code" so
15 I guess that abbreviation would be surface code.
16 Q    Is surface code a field on Medicaid claims?
17 A    On some claims but not all.
18 Q    On a filling, for example, that would apply, correct,
19 because there are five potential surfaces on a tooth that
20 could be filled?  Is that a fair statement?
21 A    Well, there might be more than five because some of
22 them come in combinations.  I understand you're not a dental
23 expert.  I'll go with your answer.
24      THE COURT:  I'm sorry.  You indicated that he
25 wasn't a dental expert.  I don't understand you'll go with

1 his answer. What's the correct answer?

2 THE WITNESS: He is saying that there are only

3 five things that you could check off.

4 THE COURT: I know. Is that right or wrong?

5 That's the question.

6 THE WITNESS: To keep it simple and move on, I'll

7 just say it's correct.

8 Q Regardless of what a dentist might do, am I correct

9 that for Medicaid purposes, there are only five surfaces you

10 could claim?

11 A We'll say five. That's fine.

12 Q Next to that is service date. Do you see that?

13 A I see that.

14 Q Okay. And do you know the significance of the "from"

15 and "to" for Medicaid billing purposes?

16 A I have never seen this form before I don't believe.

17 Q Okay. With respect to your Medicaid claims billing,

18 did you have fields or other indications or a "from" date

19 and a "to" date?

20 A Not in my billings. We just had a date of service.

21 Q And you see next to it I'm showing you -- I'm pointing

22 to claim? Do you see that?

23 A Yeah. I see claim, and then underneath it says

24 "Reference."

25 Q Right. Do you have any idea what those are referring

---

1 to?

2 A Well, that's the unique -- let me see how many digits.

3 I think there's 16 numbers. That's the unique claim

4 reference number associated to each claim line.

5 Q Sure. And then billing cycle and then there's a slash,

6 appears to be date.

7 A I see that.

8 Q All right. Could you tell us what a billing cycle is,

9 sir.

10 A A billing cycle is the weekly remittance statement. We

11 saw one page of that the other day, a Medicaid remittance

12 statement. That's done on a weekly basis.

13 Q And a numerical code is assigned to each billing cycle,

14 correct?

15 A Each week has a different number.

16 Q Am I correct that the numbers move up with each week?

17 A They might move down, but I've only seen them move up.

18 Q And there's a column for "Referring Provider." Do you

19 see that?

20 A I see that at the end, yes.

21 Q All right. Is there any indication -- do you recall

22 with respect to the claims you filed dealing with a code

23 called referring provider?

24 A Well, I think we're back to the Claim Form A, and it

25 was different on my electronic billing so I really wouldn't

---

1 see that when I'm billing electronically. But I see that on

2 this piece of paper you're giving me.

3 Q Okay. Am I correct, you said these are patients of 580

4 Dental, correct?

5 A That's correct.

6 Q In fact, sir, they're the patients that are identified

7 on Exhibit F, the grand jury document, correct?

8 A It appears to be correct, yes.

9 Q Am I correct that you have had occasion to actually

10 review your actual billings with respect to the patients

11 that are contained in the grand jury exhibit? Would that be

12 a fair statement?

13 A I think that would be fair.

14 Q All right. If you would -- I take it you're familiar

15 with dental procedure codes for the Medicaid billing system?

16 A Yes, I am.

17 Q I would ask if you could take a few moments, sir, and

18 tell me if, with respect to Exhibit G, there's

19 anything -- and I understand the limitations, but is there

20 anything that you believe is incorrect information

21 containing the billings you made on Exhibit G?

22 MR. NORINSBERG: Objection.

23 THE COURT: Overruled.

24 A No. You'd have to really compare this to the patient's

25 chart because what we're really looking at here is not a

---

1 reflection of the other document. We have other codes as

2 far as fillings and exams so I couldn't say with scientific

3 certainty that this actually matches my original charts.

4 And the situation we have is I turned over 329 of my

5 original charts. The State became the custodian of those.

6 I only got back Xerox copies, and there are problems with

7 that. Without seeing my original chart, you know, in its

8 entirety, you know, you're showing me here a

9 document -- this is Defendants' Exhibit F, and they have

10 cherry-picked, they have culled out some procedures.

11 This other document that I'm looking at, G, doesn't

12 have the same procedures. It has some of those, but it has

13 other procedures also. So it's not a mirror-image. If

14 you're saying that this copy G is a copy of F, that is

15 incorrect. If you're saying some of the information in both

16 overlaps, that's correct.

17 Q Well, I would suggest that some of the information

18 overlaps. If you would -- by the way, am I correct that the

19 patient Sawson Abdallah was also known from time to time as

20 Sawson Suliman?

21 A Well, the government issued two different Medicaid

22 cards for this person, two different names. I had nothing

23 to do with that. But I'll accept your representation that

24 they are two different names for this person.

25 THE COURT: Two different names for one person?

**JA431**

1    THE WITNESS:  That's correct.
2    THE COURT:  That was one of your patients?
3    THE WITNESS:  That is one of my patients, yes.
4  There was a Medicaid card with the same identification
5  number, but it had two different names with that ID number.
6  Q   Okay.  Now, Doctor, yesterday you testified that you
7  kept your Medicaid remittance statements; is that correct?
8  A   I have all my remittance statements going back 30
9  years.
10 Q   Okay.  And do you have any reason to believe that the
11 information contained on Exhibit G -- and, again, I'm going
12 to limit my question to the five codes, the denture work, so
13 you don't have to concern yourself with the other
14 services -- do you have any reason to believe that the
15 descriptions of services on this document Exhibit G are
16 inconsistent with your remittance statements?
17 A   I think that's a fair statement.
18     THE COURT:  That they are inconsistent?
19     THE WITNESS:  Oh, inconsistent?  No.  I would say
20 it's fair that they are consistent.  I'll accept that.
21 Q   Do you have 145 in front of you, Doctor?  That's the
22 remittance statement.  I think it's 145 actually.  The big
23 one is 145-A.  Have you found it?
24 A   I'm swamped over here with documents at the moment.
25 Q   My apologies.

1  A   Is this a copy of what we have a blowup?
2  Q   It actually is.  I was actually going --
3  A   Do you want me to come off the stand and look at the
4  blowup?  Would that be helpful to everyone?
5  Q   Absolutely.
6      THE COURT:  What are you showing now?
7      MR. FARBER:  Your Honor, this was marked yesterday
8  as 145-A.
9      THE COURT:  Okay.
10     MR. FARBER:  And I believe it's in evidence.
11     MR. NORINSBERG:  Yes.
12     THE COURT:  Yes, it is.
13     MR. FARBER:  Thank you.
14 Q   Doctor, this is a blowup of a remittance statement,
15 correct?
16 A   That is correct.
17 Q   And it is to 580 Dental?
18 A   Yes.
19 Q   That's the address that remittance statements were sent
20 to, correct?
21 A   That's correct.
22 Q   Doctor, am I correct that you had a practice when you
23 received remittance statements of reviewing them, correct?
24 A   Yes.
25 Q   And as far as you know, you've maintained your

1  remittance statements, correct?
2  A   Well, I testified to that, yes.
3  Q   Were those remittance statements an accurate reflection
4  of the amounts you billed and were paid for?
5  A   I have no reason to believe they weren't.
6  Q   And up here is the number 0045973.  Any idea what that
7  is?
8  A   Could you let go of the exhibit for a second.  It's not
9  the page because it says page number 12.  It's truncated the
10 number.
11     Could you explain it to me.  I don't really know.
12 Q   My question is, do you know, sir?
13 A   I would have to say no.
14 Q   Now, date 6-7-2002.
15 A   I know what that is.
16 Q   Cycle 294, that's the billing cycle we discussed
17 earlier?
18 A   Yeah, the weekly billing cycle.
19 Q   It says "Dentist."
20 A   I'm a dentist, yeah.  I agree with that.
21 Q   Provider ID 00294977.  Was that the provider ID of 580
22 Dental?
23 A   Yes, it is.
24 Q   In fact, sir, is that still your Medicaid provider
25 number?

1  A   Yes, it is.
2  Q   Okay.  Remittance number 020610049, do you have any
3  idea what that means or --
4  A   I'm not qualified to comment on that.  I really don't
5  know what that means.
6  Q   Locator code 03, do you know what that is?
7  A   I believe that's for dental.  For any dentist it's an
8  03.  For psychiatrist it's another number.  Podiatrist.
9  Q   Okay.  Let me turn to the column headings.  Can you
10 point me to "Provider Invoice Number."
11 A   That's right up here (indicating).
12 Q   What is that, sir?
13 A   Well, what happens when you bill electronically, the
14 computer assigns an invoice number.  On paper bills, if
15 you're doing paper billing, the government has a different
16 number on each piece of paper.  In electronic form it's
17 automatically input into the billing so that number that the
18 computer generates is going to appear here.  It comes down
19 in sequential order.
20     So each time a claim is done, the next claim that
21 you're putting in has the next number, it has one digit
22 higher than the previous number.  That's how it works.
23 Q   Okay.  And the next little tiny column, "LN Number," do
24 you know what that is?
25 A   That would be a line number.  I think that would be the

**JA432**

1  same as like on the paper claims have different lines, the
2  computer decides how many lines there could be on each page.
3  There isn't a physical page in computer land, but I think
4  that's how the information is transcribed.
5  Q    The next document recipient name, do you see that?
6  A    Uh-huh.
7  Q    Am I correct that's just the last name of the
8  recipient, correct?
9  A    Correct.
10 Q    Am I correct that frequently in your practice you had
11 several patients with the same last name?
12 A    I had 30,000 patients.  I mean, it would be like Smith
13 and Jones.
14 Q    Is that yes?
15 A    Yes, it's yes.
16 Q    Fair to say you would -- if you just saw the name Smith
17 or Jones, you would have to look further to figure out which
18 Smith or Jones, correct, or would you know?
19 A    I'm not sure if I understand your question.
20 Q    How would you know, for example, assuming you had more
21 than one patient named?  Let's take Ruiz down here.
22 A    I'd have to look in my computer database and I would
23 type the number in, and it's all cross-referenced so I know
24 which Ruiz it is.
25 Q    Recipient ID number, do you see that?

1  A    That's right here (indicating).
2  Q    Do you know what that is, sir?
3  A    That's the CIN number we were talking about yesterday,
4  the client identification number.  That's the Medicaid
5  number that the government has assigned to each of these
6  patients, you know, on their benefit card.
7  Q    That would be cross-referenced in your computer,
8  correct?
9  A    Sure.  You need to know this because if we went back to
10 Ruiz, okay, we're seeing what we're billing.  We could have
11 a hundred Ruizes.  We're going to bring up the one that has
12 the correct client identification number.
13 Q    Next the "Claim Reference Number," do you see that
14 column, sir?
15 A    This is what I was talking about.  Maybe if I count it
16 up.
17 Q    Feel free.
18 A    There's actually 15 digits.  That's a unique number
19 that's assigned to every single claim.  So each part of
20 every claim.  If you did, like, five fillings or you did
21 five teeth as a denture repair, each one of those individual
22 teeth would have a unique 15 digit claim reference number.
23 Q    Next we have date the service.  Let me say it that's simply
24 the date the patient came into the office and had treatment?
25 A    Correct.  That's the date.  If you follow down the

1  column, you can see all these different patients had
2  services, you know, on that date.  It wasn't like just one
3  patient was in the office.  There were multiple patients.
4  Q    Okay.  And next is "Rate/Procedure Code."  Do you see
5  that column?
6  A    Yes.  I do.  It's right over here (indicating).
7  Q    Am I correct that in the 05 series generally
8  represented prosthetic?
9  A    Right.  Like the 0274, that represents x-rays,
10 radiographs.  The 0110, that's a cleaning.  02160 is a
11 three-surface filling.  Then it goes into the five series
12 with the 05s.  Most of those are prosthetics, teeth, those
13 things.
14 Q    And the next column you see "Charged," correct?
15 A    It says "Un-its."  I think it means to say units, but
16 there's not enough room on the form to spell it out in one
17 line.
18 Q    Do you know what that's referring to since every one of
19 these has 01 under it?
20 A    Sometimes there are multiple units if you do some
21 codes.
22 Q    What does that mean, sir?
23 A    That means there might be.  I don't know the exact
24 code, but there are some codes where you can do two units.
25 In other words, if you have anesthesia -- in the hospital we

1  put patients to sleep.  There's a Medicaid fee for general
2  anesthesia.  That goes by units.  That goes by 15-minute
3  increments.  If that patient for us to do the surgery is
4  asleep for 45 minutes, we're going to have an 03 code in
5  that because they have had three units of that anesthesia.
6  That's what that means.
7       I don't think that's going to apply to this because in
8  my own practice I'm not doing general anesthesia.  This is a
9  hospital thing.  They would print out the same remittance
10 thing for a hospital also.
11 Q    Next to that is "Charged."  Am I correct that this
12 column "Charged" simply reflects the price Medicaid is
13 paying for the specific procedure code?
14 A    Right.  That is the mandated price.  These two items go
15 together.  In other words, when you type in the code,
16 automatically the computer inputs the correct fee for that
17 code.
18 Q    All right.  The next column is "Paid."  That's simply a
19 reflection of whether or not Medicaid paid you for the
20 billing code that you submitted?
21 A    That's a correct description.
22 Q    All right.  Next to it is "Remarks" and under most of
23 them is "Paid."  I see the very last two apparently say
24 "Denied" for whatever reason.
25      Do you see that?

**JA433**

1    A    Yeah, I see that.  I can explain the reason.
2         THE COURT:  Are you asking for the reason,
3    counsel, or no?
4    Q    That wasn't my question.
5    A    Do you want the reason?
6    Q    I will ask you, can you tell me the significance of
7    "paid" and then can you tell us the significance of
8    "denied"?
9    A    It's simple.  If you get paid for something, you've
10   been paid for it.  If you get denied, you haven't been paid
11   for it.  Then they are going to explain the reason why
12   you're not getting paid for it.
13   Q    That would be in this column without a heading,
14   correct?
15   A    Right.  There's a blurb at the very far.  Most of them
16   are blank because we are getting paid for those services
17   that we're doing.  Then every once in a while you're going
18   to have one of these and a brief explanation of why you're
19   not getting paid.
20   Q    Some of these would be what you've described yesterday
21   as edits, correct?
22   A    Well, what happens here, the Medicaid computer system
23   has built in a safety net, okay.  So in other words, if you
24   wanted to do the same tooth on a bridge, one of those we
25   looked at yesterday, if you wanted to do the same tooth two

1    or three times and you put in tooth number 03 and tooth
2    number 03 and tooth number 03, Medicaid, the government's
3    computer system would see that that was billed three times.
4    You'd get paid for the one time.  The other two would come
5    out as duplicate services.  And it would be screened out, it
6    would be culled out from your cycle.  So you couldn't double
7    or triple or quadruple the system.  That's what this is all
8    about.
9    Q    Do you recall from your review of remittance statements
10   if there were other terms that would show up in the
11   "Remarks" column besides "Paid" or "Denied"?
12   A    Sure.  Can I go back to Claim Form A.  I think it's
13   easier to explain from that.
14   Q    Sure.
15        MR. FARBER:  What number is this?  Is this 60?
16        MR. NORINSBERG:  Yes.
17        MR. FARBER:  All right.  Is the blowup marked as
18   60-A?  Could we respectfully deem the blowup as 60-A, Your
19   Honor?
20        THE COURT:  Sure.
21   Q    Showing the witness 60-A.
22   A    Up here --
23        THE COURT:  What happened to the little stand,
24   does anyone know?
25        THE WITNESS:  Do we have the laser pointer?

1         THE COURT:  Somebody just put the stand up and
2    move back from the jury, please.
3         THE WITNESS:  Yes, Your Honor.  I don't want to
4    obscure the view of what we're looking at.
5    Q    Okay.
6    A    This is Claim Form A.  This is a paper version.
7         THE COURT:  Is there a question pending?  I'm
8    sorry.  What was your question, counsel?
9         (Record read as requested.)
10        THE COURT:  So the question is now to have him
11   explain from this exhibit if there are other items that come
12   up in that column?
13        MR. FARBER:  That apparently is how the witness
14   proposes to answer the question, Your Honor.
15        THE COURT:  You understand what the question was?
16        THE WITNESS:  I absolutely understand the
17   question.
18        THE COURT:  Okay.
19   A    If we take a look at the paper version of the computer
20   form, they have up here -- it's kind of really small -- but
21   it's adjustment or void.  They have an O or a V, okay.  Then
22   they have this 15 digits goes in here (indicating).  15
23   numbers.  So what we're saying is if you were to -- I have
24   to go back to this, I apologize.  Instead of --
25   Q    Referring to 145-A.

1    A    Instead of seeing a deny, if you were to see an
2    adjustment or a void, what that would mean is someone would
3    have to type in that 15-digit number.  This claim reference
4    number, it's 15 digits, and each of those numbers would have
5    to go into those 15 slots here (indicating).  And then what
6    would happen in the computer, the computer on the government
7    side would realize you want to make an adjustment or a void.
8    They would take out the monies that was paid, and then
9    they'd make the adjustment or a void.
10        That's how you have to do it.  But you would have to
11   manually type in all those 15 digits to do that.  That was
12   really a rarity.  Over the years --
13        THE COURT:  Doctor, who would type them?
14        THE WITNESS:  I would have to type them in.
15        THE COURT:  If you were making an adjustment, you
16   would have to type in the 15 numbers you're talking about?
17        THE WITNESS:  Correct.
18        THE COURT:  That somehow changes the column that
19   counsel asked you about a few moments ago?
20        THE WITNESS:  Right.  Then on the remittance
21   statement an adjustment or void appears and then that is
22   deducted or added to your original bill.  That's what he's
23   talking about.
24   Q    All right.  You can resume the stand now, Doctor.
25        Now, Doctor, you did indicate that from time to time

1  you would make adjustments or voids; is that correct?
2  A   It's a rarity, but yes, I would.
3  Q   It has happened?
4  A   Infrequently, but it does happen.
5  Q   For what reasons would you make an adjustment or void?
6  A   Well, I guess there are a variety of reasons.
7  Something might have been -- I don't know.  I made so few of
8  them, I mean, I think it's going to be hard really without
9  having an example in front of me to say exactly why
10 something would be adjusted or voided.  Maybe you might have
11 the situation maybe one of the claims you go back and take a
12 look and something wasn't billed or maybe you do a
13 two-surface filling and you realize it really was a
14 three-surface filling.  And maybe you were paid for three
15 surface, but it was a two surface so you'd want to go back
16 and correct the official record.  That kind of thing.  But
17 that happened infrequently at best.
18 Q   From time to time, did the Department of Health or
19 Medicaid Management Information Systems or whoever was
20 managing the Medicaid program, did the program make
21 adjustments?
22 A   Well, Computer Science Corporation is the individual --
23 is the company that manages this.  And I believe, yeah,
24 occasionally they would do it because they would go through
25 beta things where they put in new computer systems.  And

1  they really have control on their end.  We don't have
2  control as a practitioner.  We only have an input control.
3  We don't have the output control that the government has.
4  Q   Fair enough.  I'm going to show you what's been marked
5  as Defendants' Exhibit AY and have you to take a look at
6  this.
7      Now, Doctor, I'm going to represent to you that this is
8  one page from a longer document.  With that limitation, can
9  you tell me what this document is, specifically AY?
10 A   It's a list of adjustments on cycle number 326 which
11 was generated January 16th of 2003.  And it's page 46 of an
12 "I don't know how many" page document.  You'd have to show
13 it to me.
14 Q   Do you recognize this to be a page of a remittance
15 statement sent to 580 Dental, PC?
16 A   That's what it says so I'll agree with that.
17     MR. FARBER:  I'd respectfully move Defendants'
18 Exhibit AY into evidence.
19     THE COURT:  It will be received.
20     (Defendants' Exhibit AY received in evidence.)
21 Q   Okay.  Doctor, I'm going to turn your attention down to
22 the portion of the page dealing with patient Rodriguez.
23 A   I see that.
24 Q   Do you know if that patient we're referring to is
25 patient Stacy Rodriguez?

1  A   Well, once again, since it only has the last name, I'd
2  have to take a look at the patient's Medicaid card.  If
3  you'd bear with me for a moment, I'll get a copy out here.
4  Q   Feel free.
5  A   The client identification number matches up.
6  Q   That's Stacy Rodriguez, correct?
7  A   That's what it says on the paper version, not the
8  printout.
9  Q   You have Exhibit F in front of you.  I hate to do this
10 to you, Doctor.  I can assist you with that.  Exhibit F is
11 the grand jury exhibit.
12 A   Is that this, sir (indicating)?
13 Q   Okay.
14 A   I have the exact page actually.
15 Q   In fact, does the Medicaid client ID number match?
16 A   There's a matchup of the two CIN numbers, yes, sir.
17 Q   Does the invoice number match?  I'm sorry.  Does the
18 invoice number on Defendants' AY remittance statement match
19 the invoice number indicated on Exhibit F, the page
20 conforming to Stacy Rodriguez?
21 A   I'll agree.  There are nine digits.  I'm not going to
22 go through each one.  I'll accept it as correct.
23 Q   Okay.  Am I correct that this document appears to make
24 a number of adjustments with respect to date of
25 service -- serviced performed on June 4th, 2002?  Is that a

1  fair characterization of the remittance statement?
2  A   Not only for Stacy Rodriguez; every single patient
3  listed.  This is page 46 of the larger document so I would
4  -- really to answer this question, I would need the rest of
5  it shown to me.
6  Q   Fair enough.  But with respect to Stacy Rodriguez, you
7  recognize this as adjustments to her?
8  A   I see the minus signs as I do for every single line.
9  Q   By the way, do you have -- did you make these
10 adjustments?
11 A   No, I did not, sir.
12 Q   You did testify from time to time the program would
13 make adjustments, correct?
14 A   Well, I think if you produce the document in its entire
15 form, what you're really not saying is at the end of the
16 remittance statement on the last page, it shows the dollar
17 amount and the number of adjustments that have been made.
18 So instead of looking -- cherry-picking this one page out, I
19 think this is about a 200-page document if I remember
20 correctly.
21 Q   Doctor, I'm just going to show you what we've marked as
22 Defendants' Exhibit AX and ask you to take a look at it.
23 A   It's not a copy.  It's only 112 pages.
24     THE COURT:  What's your question, counsel?
25 Q   All right.  This is the larger remittance statement you

1  just testified about, correct?  The full document from --
2  A   You're showing me page 46.
3         THE COURT:  The question is, do you recognize that
4  as the larger exhibit that page 46 was contained in or not?
5  Just yes or no.
6         THE WITNESS:  Yes, I do.
7  Q   This is a copy of a remittance statement you received
8  from the Medicaid program, correct?
9  A   That's correct.
10         MR. FARBER:  I'd respectfully move Exhibit AX into
11  evidence, Your Honor.
12         MR. NORINSBERG:  No objection.
13         THE COURT:  AX is received.
14         (Defendants' Exhibit AX received in evidence.)
15  Q   If anything on this document assists you in answering
16  this question, if you can, of what reason that the Stacy
17  Rodriguez claims were adjusted, please tell us what caused
18  Stacy Rodriguez claims to be adjusted.
19  A   Well, I think the answer is on page 1 12.  If you would
20  put that up on the screen to show everyone.
21  Q   Sure.  One moment, please.
22         THE COURT:  Is this the last page of the exhibit
23  that you have in front of you, Doctor?
24         THE WITNESS:  Yes, Your Honor.
25         THE COURT:  All right.

1  Q   So we're showing the witness and putting on the screen
2  page 112 of Defendants' Exhibit AX in evidence.  I'm putting
3  my pen --
4  A   It's the first line.
5  Q   Void adjust.
6  A   Then it shows the dollar amounts that the provider has
7  adjusted and it's zero.  Next to that -- if you take your
8  pen just straight across left to right, it says "Number
9  of Claims," and there are 2426 claims.  So what that means,
10  what I just explained, somebody, or if you want to say the
11  provider, me, if that's what we're saying here, would have
12  to type in 2,426 adjustments, each one with 15 unique digits
13  and do that within a period of time.  I'm a pretty fast
14  typer, but I don't think I'm that fast.
15         THE COURT:  So is the answer you don't -- I'm
16  sorry.  That leads you to the conclusion that you're not the
17  one who made the adjustments?  Is that your testimony?
18         THE WITNESS:  Correct.  This is computer
19  generated.  This is not human generated.
20  Q   All right.  And at least as of January 16th, 2003, when
21  you got the remittance statement, were you aware of what
22  those adjustments were for?
23  A   Not at all.  I actually used it as a doorstop at home,
24  I think.
25         THE COURT:  Are you serious about that or being

1  facetious?
2         THE WITNESS:  I actually used it as a doorstop at
3  home.  Look at it (indicating).
4         THE COURT:  You took that document and used it as
5  a doorstop at home?
6         THE WITNESS:  Right.  Under the kitchen door.  We
7  had a swinging door.  We just jammed it in.  Because this is
8  ten times bigger than any remittance statement I had ever
9  seen.
10  Q   All right.  And do you know since January of 2003, have
11  you ever come to learn why those adjustments were in the
12  remittance statement?
13  A   I have no idea.
14  Q   All right.  Let me turn us back to Exhibit F.  I'm
15  going to start by showing you --
16  A   Could you tell me what F is.
17  Q   F is the grand jury exhibit.
18  A   Thank you.
19  Q   I believe it was Grand Jury 11.  The first page has
20  patient Suliman, Sawson.
21  A   I'm on that page, sir.
22  Q   So patient Suliman Sawson.  Now, 580 Dental had a
23  patient named Suliman, Sawson, correct?
24  A   That's correct.
25  Q   And this is the patient we've also described as also

1  known as Sawson Abdullah?
2  A   Well, Medicaid issued her two separate names under one
3  ID number so I'll accept that.
4  Q   Well --
5  A   I recognize the patient.
6  Q   You recognize the patient's name?
7  A   Yes, agreed.
8  Q   By the way, did you personally call her one or the
9  other, Suliman, Sawson or Sawson Abdallah?
10  A   I'm referring to SD-009455, which is a Xerox copy of
11  Abdullah, Sawson.  I'm looking at the handwriting on this
12  page, and the handwriting is from my associate dentist,
13  Dr. Ketover so I wouldn't be calling this patient anything.
14  I never saw this patient physically.  I didn't have an
15  intersect with this patient.
16         I'm looking at the rest of the service dates for all of
17  the service dates listed here.  And I actually had a copy of
18  the patient's -- if you want to put this up on the big
19  screen here, you could actually see that there's a different
20  name for that same ID number that the government issued, if
21  that's of any import.
22  Q   Not necessary, sir.
23         Turning back your attention to Exhibit F.  Regardless
24  of her name, 580 Dental had a patient named Sawson Suliman,
25  correct?

**JA436**

1   A   That is correct, yes, sir.
2   Q   And her CIN number TS71712R.  Do you have any reason to
3   believe that's not her Medicaid client ID number?
4   A   No.  That matches up with the Xerox copy of her
5   Medicaid card.  Whatever name you want to call her, that's
6   on the card.
7   Q   My pen is pointing to the "Amount Paid" column.  With
8   respect to services Ms. Suliman received at 580 Dental on
9   either May 25th, 2000, or June 19th, 2000, do you have any
10  reason to believe that the amounts 580 Dental was paid for
11  those services as contained in the "Amount Paid" column was
12  inaccurate?
13  A   I don't have the vendor statement in front of me, but
14  I'll accept that as being a correct amount, yes, sir.
15  Q   And "Invoice Number," there are a series of invoice
16  numbers in that column.  Do you have any reason to believe
17  that those invoice numbers are incorrect?
18  A   Once again, subject to my looking at my actual
19  remittance statements -- there are thousands of these in
20  this case -- I'm going to go with your presentation that
21  that is the correct one.
22  Q   I take it you believe that -- strike that.
23      Julian date, do you have any idea what that is?
24  A   I think we had testimony from the defendants in the
25  previous days that the Julian date wasn't the actual date of

1   service.  The Julian date was the day that the claim that we
2   put in electronically actually reached the government's
3   computer system.
4       So that's my understanding of the Julian date.  And
5   that's what was explained here.  And I would agree with
6   that.
7   Q   These Julian dates all appear to be one day after the
8   date of service.  Would that be within the normal range by
9   which you would file claims to the Medicaid program?
10  A   Well, there was a variety.  Sometimes we'd have daily
11  claims.  Sometimes we do it twice a week, once a week.
12  Occasionally I'd go on vacation, we'd do it in a two-week
13  interval.  I guess it would be no less than one day after
14  you did the claim till the government got it.  It could be
15  any number of days after that.
16  Q   Next to that are "Procedure Code" columns.  Do you see
17  that?
18  A   Yes, I do.
19  Q   Next to that is "Procedure Description."  Do you see
20  that?
21  A   Yes, I do.
22  Q   All right.  Based on your knowledge of submitting
23  Medicaid claims, do the procedure codes accurately conform
24  to the procedure descriptions?
25  A   They have to because they are electronically keyed

1   together.
2   Q   I understand that.  If you would kindly take a look at
3   this document.
4   A   I'm looking at it.  It matches up.
5   Q   Thank you.  Let's turn to the next page.  Intisar
6   Ahiri.  Are you on that page, sir?
7   A   Yes, I am.
8   Q   Okay.  And you see her CIN number?
9   A   Yes, I do.
10  Q   Do you have any reason to believe that that is not
11  Ms. Ahiri's client identification number from the Medicaid
12  program?
13  A   Well, I'm going to compare it to the copy of the
14  recipient's Medicaid card that we keep in the chart just to
15  make sure.
16  Q   Okay.
17  A   YS87165E.  It's a match up.
18  Q   Okay.  All right.  Now, am I correct that 580 Dental
19  provided services to Ms. Ahiri on various dates; April 14th,
20  2000, August 11th, 2000, July 16th, 2001, April 12th, 2002?
21      Do you see that?
22  A   I see that printed out, yes, sir.
23  Q   Do you have any reason to believe that those are not
24  the dates of service that Ms. Ahiri received services from
25  580 Dental?

1   A   See, the problem here is on your state defendant, your
2   Bates stamp numbers of this chart, the chart is incomplete.
3   I don't have all of those service dates that are on this
4   printout on Exhibit F.  So what I'm saying is State
5   Defendant 12286 through State Defendant 12299 doesn't
6   include a complete copy of the records as they were turned
7   over to the Attorney General's Office.  Maybe you have a
8   more complete copy that I could look at.
9       THE COURT:  What's the problem?
10      THE WITNESS:  He's asking me to compare, you know,
11  what the services were on the patient's chart.  And the
12  chart is not inclusive of all these service dates that are
13  printed out.
14      THE COURT:  So there are more service dates on the
15  exhibit than you have in your chart?
16      THE WITNESS:  Correct, Your Honor.
17      THE COURT:  Okay.  Maybe I'm confused.  Shouldn't
18  your chart have all the service dates in it?
19      THE WITNESS:  Well, could I explain, Your Honor?
20      THE COURT:  No.  When you do your chart, don't you
21  put down each day you saw a patient?
22      THE WITNESS:  We do.  But this is not a true,
23  complete copy of my original records that I turned over.
24      THE COURT:  So the chart that you have in front of
25  you, your patient chart, it's not a copy of your original?

1    THE WITNESS:  It's a copy, but it's not a complete
2  copy, Your Honor.
3          THE COURT:  It's missing pages?
4          THE WITNESS:  Correct, Your Honor.
5          THE COURT:  How do you know that?
6          THE WITNESS:  Because it ends -- it doesn't
7  have -- it just ends.  It's got 2001.  And here it has
8  service dates for 4-14-2000.  If I read it correctly, that
9  page is not part of this.  I also know -- I testified at my
10 deposition that there were many problems with these Xerox
11 copies.  What had happened when I got back the copies of my
12 records, the defendants, the government, commingled hundreds
13 of pages of other dentists' work in this.  So a lot of --
14         THE COURT:  Do you still have your original
15 document?
16         THE WITNESS:  No.  I turned them over.
17         THE COURT:  So you got back a copy?
18         THE WITNESS:  I got back Xerox copies.
19         THE COURT:  You don't have the original chart?
20         THE WITNESS:  No.  They are the custodians of my
21 original charts.  I never saw them again after 2002.
22         THE COURT:  Okay.
23         THE WITNESS:  What I'm saying is when we got -- in
24 the civil lawsuit when we got Xerox copies back, at my
25 deposition I testified -- Mr. Farber asked me if there was

1  any reason to believe that the Xerox copies I had received
2  from the government weren't a true copy of what I turned
3  over.  And I pointed out to him that in these Bates-stamped
4  numbers -- they are all sequentially numbered showing that
5  these are what my records are -- there are hundreds of pages
6  of two other dentist records included.  He asked me how did
7  I know that --
8          MR. FARBER:  This is way beyond the question.
9          THE COURT:  The question is that -- your
10 explanation is that what's been presented to you was not, in
11 fact, a full copy of your chart?
12         THE WITNESS:  Fair enough.
13 Q    Without referencing any other document, can you tell me
14 if this document I'm putting on the screen here, the page of
15 Intisar Ahiri's portion of Grant Jury Exhibit 11,
16 Defendants' Exhibit F here at this trial, do you have any
17 reason to believe that the "Amount Paid" and "Date of
18 Service" columns don't conform to the claims you submitted
19 to the Medicaid program?
20 A    Once again, subject to actually comparing it to my
21 actual vendor statement, which isn't here for this patient,
22 I'll agree with what you're saying.  I think it's a fair
23 representation.
24 Q    All right.  Same question concerning the "Invoice
25 Number" and "Julian Date" columns.

1  A    Once again, subject to comparing it to my actual vendor
2  statement which isn't here in front of me, I'll go along
3  that it's a true representation.
4  Q    Same question concerning the "Procedure Code" and
5  "Procedure Description" columns.
6  A    I'll give the same answer.
7  Q    Thank you, sir.  Let's turn your attention to the next
8  page of this document, Nassa Ahiri.
9          First of all, 580 Dental had a patient named Nassa
10 Ahiri, correct?
11 A    That's correct.
12 Q    Let me turn your attention to the "Amount Paid" and
13 "Date of Service" columns.  Do you have any reason to
14 believe that this document does not conform to the claims
15 you filed on behalf of 580 Dental?
16 A    Well, my same answer.  Subject to comparing it to my
17 original chart, which is apparently no longer available or
18 my vendor statement, nobody's brought that here, so I'll go
19 along with your representation, sir.
20 Q    With respect to the Julian date.  Any reason to believe
21 that does not reflect the billings you filed with the
22 Medicaid program?
23 A    Subject to my previous answer of not being able to
24 connect it by looking at my original documents, I'll agree
25 with you, sir.

1  Q    Same question concerning the procedure codes and
2  procedure description.  Do those accurately reflect, as best
3  you can tell, the procedures that you billed the Medicaid
4  program for on behalf of 580 Dental?
5  A    Subject to my same concerns which I previously stated,
6  I'll agree with that statement.
7  Q    Thank you, Doctor.  I'm going to turn your attention to
8  the next page, Sara Charles.
9          Am I correct 580 Dental had a patient named Sara
10 Charles, correct?
11 A    That's correct.
12 Q    All right.  My question, sir, is turning to the "Amount
13 Paid" and "Date of Service" columns, do you have any reason
14 to believe that those columns do not accurately reflect the
15 amounts paid and dates of service that you filed on behalf
16 of 580 Dental with respect to patient Sara Charles?
17 A    Subject to my same previous concerns not having my
18 original chart available and not having my vendor statement
19 in front of me, I will agree with that statement, sir.
20 Q    Do you have any reason to believe that the invoice
21 number and Julian dates do not reflect the claims you filed
22 with the Medicaid program?
23 A    Subject to not having my Medicaid vendor statement in
24 front of me to compare it to say with scientific accuracy
25 that they are an exact match, I would agree with that

**JA438**

1   statement, sir.

2   Q    With respect to procedure code and procedure

3   description, do you have any reason to conclude that those

4   columns do not accurately reflect what you billed to the

5   Medicaid program with respect to patient Sara Charles on

6   behalf of 580 Dental?

7   A    Subject to my previous concerns, I will agree with what

8   you're saying, sir.

9   Q    Let's turn to Stacy Rodriguez here.

10       THE COURT:  How many more of these do you have to

11  go through?

12       MR. FARBER:  There are four more pages, Your

13  Honor.

14       THE COURT:  Perhaps you could formulate a summary

15  question that might shorten this.

16       MR. FARBER:  Sure.  Absolutely, Your Honor.

17  Q    With respect to the last four pages, Stacy Rodriguez,

18  Asi Othman, Miriam Perez, Edwin Gonzalez -- actually, Your

19  Honor, Rodriguez and Gonzalez are special cases.

20       So I'm going to direct your attention specifically to

21  Othman and Perez, the second- and third-to-last pages.

22  Start with Othman.

23       Do you have any reason to believe that any of the

24  information on this page does not conform to the information

25  you filed with Medicaid program?

1   A    Well, I'm going to have an issue with Asi Othman if we

2   count those first lines.  There's eight lines of services in

3   March 1999 which is well --

4        THE COURT:  That's not the question.  Doctor, wait

5   a minute.  Please listen to the question.  The question is

6   forget what the date was.  The question is only whether the

7   information that's reflected on that code, do you believe

8   that that information is accurate subject to your concerns

9   that you've stated?

10       THE WITNESS:  Yes, Your Honor.

11  Q    Thank you.

12       Same question turning the page to Miriam Perez.  Do you

13  have any reason to believe that the information on this page

14  does not conform to the information you provided the

15  Medicaid program when you filed claims on behalf of 580

16  Dental for Miriam Perez?

17  A    Subject to my previous concerns, no, I do not.

18  Q    Thank you, Doctor.  I'm going to have you turn back to

19  approximately two pages before to the Stacy Rodriguez page.

20       Do you see the Stacy Rodriguez page?

21  A    I'm on that page, yes.

22  Q    This is the page with the minus signs, correct?

23  A    In the "Amount Paid" column, but nowhere else.

24  Q    Correct.  You see that?

25  A    Just on the amount paid.

1   Q    Absolutely.  All right.  Now, with respect to the other

2   items on here, am I correct that on June 4th, 2002, Stacy

3   Rodriguez was provided services by 580 Dental, correct?

4   A    That's a correct statement, sir.

5   Q    Now, am I correct that 580 Dental was paid a total of

6   $435 for services rendered to Stacy Rodriguez?

7   A    I would agree with that statement, yes.

8   Q    And do you have any reason to believe that the invoice

9   number is not correct, 113386?

10  A    Subject to my previous concerns, I would have no reason

11  not to agree with you.

12  Q    Now, Julian date reflects two dates here.  I see a

13  6-5-02.

14       Be it fair to say that that would reflect when you

15  first filed the claim, correct?

16  A    Well, the Julian date isn't when I filed it.  The DOS

17  means date of service, sir.  That's when I filed the claim.

18  The Julian date is when the government says it received it.

19  I don't put in the Julian dates.  I only do the

20  date-of-service dates.

21  Q    Do you have any reason to believe that the government

22  didn't receive this claim on June 5th?

23  A    In this case, yes.  No, sir.

24  Q    Now, the 12-18-02, you see that date there?

25  A    I see three of those, yes.

1   Q    Okay.  All right.  Turning your attention to Exhibit

2   AY, that's the one page of the remittance statement that I

3   showed you.  I'll hand you another copy.

4        THE COURT:  Wasn't it page 46?

5        THE WITNESS:  I have A-1.  I have it.

6   Q    All right.  Now, AY is dated January 16th, 2003,

7   correct?

8   A    Well, are you referring to the date under the page

9   number?

10  Q    Upper right corner.

11  A    It says -- it's page 46 and underneath that is a date

12  indicated is 1-16-2003.

13  Q    All right.  Now, is there some lag time between the

14  activity reflected on a Medicaid remittance statement and

15  the time it reaches you?

16  A    I'm not sure if I fully understand the question.

17  Q    All right.  In other words, the date of 1-16-2003, that

18  might reflect claim activity such as claims paid, claims

19  denied, for an earlier period than just January 16th, 2003?

20       Would that be a fair statement?

21  A    It could represent claims going back ten years I guess.

22  I don't think there's any back-limit date on these

23  documents.  But I don't create them, you know.  The

24  government does.

25  Q    Okay.  Do you have any reason to believe one way or

**JA439**

1   another that the Julian date 12-18-2002 does not conform to
2   the adjustments that are made on Exhibit AY?
3   A   You lost me.  Could you just point out the Julian date.
4   There are a lot of lines.  You lost me there for a minute.
5   Q   I apologize.  12-18-02.
6   A   That's not AY.  You asked me about AY.  You're not
7   showing that.
8   Q   Okay.  Here's AY (indicating).
9   A   Okay.
10  Q   All right.  Here's the Rodriguez adjustments.
11      First of all, am I correct there's no specific
12  indication on this document as to the date of the
13  adjustment, correct?
14  A   I mean, you know, these computer printouts have a lot
15  of fields.  They maybe have 50 fields.  They might be, but
16  it's not reflected in what you're showing me.  So I wouldn't
17  be competent, I wouldn't be qualified.  You need someone
18  from Computer Science Corporation --
19      THE COURT:  No.  The question is, do you see a
20  date on that document that you would construe as being a
21  date that the adjustment was made?  I think that's the only
22  question.
23      MR. FARBER:  Thank you, Your Honor.
24      THE WITNESS:  I'm sorry.  Could we repeat the
25  question one more time so it's clear in my mind what I'm

1   answering.
2   Q   I'll just withdraw the question.
3       On AY, can you look for me in the "Paid" column.
4   A   Okay.  I have the "Paid" column.
5   Q   You see a bunch of minus signs, correct?
6   A   Every claim has a minus sign.
7   Q   Well, is that a fair statement?
8   A   Wait.  No, no.  Excuse me.  There are a few non-minus
9   signs.
10  Q   Now, with respect to Rodriguez here where my pen is,
11  you see 174 and then under it minus 174, correct?
12      Could you just sharpen that up a bit.  It's kind of
13  blurry.
14  Q   Okay.  Do you see where I'm pointing?
15  A   I just can't see the name.
16  Q   Okay.  Do you see the 174 and the minus 174?
17  A   On my copy, do they have the line numbers on the left
18  side?  Is that 12 line number?
19  Q   Yes, sir.
20  A   Okay.  Then I see a 174 and I see a minus, yes, sir.
21  Q   And then right after that, you see another 174 and a
22  minus 174, correct?
23  A   I see that.
24  Q   And then under that, you see 87 and a minus 87?
25  A   Yes, I see that.

1   Q   All right.  Now, is it fair to say you testified before
2   that you're not aware of what caused those adjustments to be
3   made, correct?
4   A   Well, yes.  It's part of a larger document with
5   thousands of adjustments.  That's fair to say.
6   Q   All right.  And you did not make those adjustments,
7   correct?
8   A   Absolutely not.
9   Q   All right.  Let me turn your attention back to Exhibit
10  F, please.  We're going to turn to the very, very last page.
11  A   Tell me what F is again, please.
12      I have it.
13  Q   Grand Jury 11.
14  A   It's in front of me.  I have it.
15  Q   Thank you, sir.  This would be the Edwin Gonzalez
16  document, correct?
17  A   Yes, I'm on that page, sir.
18  Q   Am I correct your practice had actually -- did have
19  more than one patient named Edwin Gonzalez; is that correct?
20  A   That is a correct statement.
21  Q   In fact, did your practice have more than three
22  patients named Edwin Gonzalez?
23  A   No.  I think there were only three.
24  Q   All right.  And do you have any reason to believe that
25  the client identification number or CIN numbers in this

1   column here do not accurately reflect the respective Edwin
2   Gonzalezes?
3   A   Subject to my original concerns that I don't have my
4   original charts to compare to, I'll accept what you're
5   saying, yes, sir.
6   Q   Thank you, Doctor.
7   A   Are you saying you're done?
8   Q   I'm taking the exhibit off.
9   A   Oh, okay.
10  Q   Now, it's fair to say, sir, that in this action, you
11  contend you've suffered damages as a result of the loss of
12  rights or loss of your liberty as a result of what you claim
13  is fabrication of evidence, correct?
14      MR. NORINSBERG:  Objection to form.
15  Q   You contend you've been damaged as a result of the
16  defendants' actions?  Is that a fair statement?
17  A   I think that would be the way you've pronounced it now
18  as a fair representation of what my concerns are.
19  Q   Is that yes, sir?
20  A   That would be yes.
21  Q   Thank you.
22      Am I correct that one of your contentions is that you
23  were forced to sell your practice below fair market value?
24  Is that a fair characterization?
25  A   Yes.

1   Q    And your other contention -- another of your
2   contentions is that you were unable to secure other income
3   either by employment or otherwise as a result of the
4   defendants' actions.  Is that a fair statement?
5        MR. NORINSBERG:  Objection to form.
6        THE COURT:  Overruled.
7   A    Yes.
8   Q    Okay.  Do you have Exhibit 101 in front of you?  I hate
9   to do this to you.
10       That is your agreement to sell your practice to
11  Dr. Ketover.
12  A    Do you have one because the one I was handed starts --
13  it says 3 of 12 it looks like so I'd like to see the cover
14  page.
15  Q    It's a two-sided document, sir.
16       Do you recognize this document, sir?
17  A    Yes, I do.
18  Q    What is this document, sir?
19  A    It's the sale of my dental and medical practice.
20  Q    And you sold this to Dr. Ketover, correct?
21  A    That's correct.
22  Q    The sale price was $450,000, correct?
23  A    That's what's indicated in the document, yes, sir.
24  Q    And regardless of the reason -- it's a yes-or-no
25  question -- besides Dr. Ketover, did you have occasion to

1   solicit other offers for the practice?
2   A    No.
3   Q    Okay.  And did you have occasions to advertise for
4   other offers for the practice?
5   A    No.
6   Q    All right.  Let me turn to Exhibit 107.  That is the
7   2001 agreement between yourself and Dr. Ketover.  I can just
8   hand you one.
9   A    That would be fine.  It will expedite things.
10  Q    Again, Doctor, this is a two-sided document.  And what
11  do you recognize Exhibit 107 in evidence to be?
12  A    This is a business agreement between myself, Leonard P.
13  Morse, and my associate Brian Ketover, DDS.
14  Q    And you signed this in 2001, correct?
15  A    It's notarized and dated December 11th, 2001, yes, sir.
16  Q    Okay.  And am I correct that referring to page 3 of the
17  document under Section A, Purchase Price, and I'll put that
18  up, am I correct that you determined in this agreement the
19  purchase price as follows:  "The set sum shall be determined
20  conclusively by totaling the deposit amounts indicated on
21  the corporation's monthly bank statements for the 12 months
22  immediately prior to the month in which the date of death or
23  onset of total and permanent disability occur," correct?
24  A    That's correct.
25  Q    So your agreement with Dr. Ketover was basically take

1   the prior 12 months' gross receipts of the practice, split
2   them in half and that's the price, correct?
3   A    Well, under death and disability clause, that's the
4   price, yes, sir.
5   Q    And this document, Exhibit 107, does not refer to items
6   such as goodwill or value of a lease or equipment or
7   anything of that nature, correct?
8   A    Well, I haven't read the whole document, but that's my
9   recollection of it, yes, sir.
10  Q    Thank you.  In 2006, do you recall when you sold your
11  practice to Dr. Ketover?
12  A    I think it's August of 2006, my best recollection.
13  Q    And in the 12 months prior to when you sold the
14  practice to Dr. Ketover, would it be fair to say that the
15  gross income of your practice was in the range of $1
16  million?  Is that a fair characterization?
17  A    It's fair.  It may not be totally accurate, but I could
18  accept that.
19  Q    Is that the order of magnitude?
20  A    I don't know for sure without actually looking at my
21  bank receipts.  This goes back seven years.
22  Q    You don't recall that it was 10 million, for example?
23  A    No, it was not 10 million.
24  Q    You don't recall that it was 5 million?
25  A    Let's just go with a million dollars, if that's what

1   you want to use.  Save time.
2   Q    Fair enough.
3        Now, at some point in the year 2006 you were excluded
4   from the Medicaid program as a result of your indictment,
5   correct?
6   A    That's correct.
7   Q    All right.  And even at some point in 2007, after the
8   not guilty finding, you were reinstated to the Medicaid
9   program, correct?
10  A    After I reapplied, that's correct.
11  Q    And am I correct that as of 2006, you had been doing
12  work for New York Methodist Hospital, as of 2006 prior to
13  the Medicaid exclusion?
14  A    Right.  Preindictment, pre-exclusion, I was doing work
15  for the New York Methodist Hospital.
16  Q    And what were you doing?
17  A    I was an attending.  I had 13 residents under my
18  jurisdiction.  I had several other attending dentists that
19  were under my supervision and direction.  I was functioning
20  in two capacities.  I was the Assistant Director of Dental
21  Medicine at New York Methodist, and I was also the Section
22  Chief of Restorative Dentistry.
23  Q    When you were excluded from the Medicaid program, the
24  hospital was obliged to let you go, were they not?
25  A    Well, I no longer had a Medicaid number so I couldn't

**JA441**

1  touch any patient.  And over in the hospital, the same kind
2  of reflection of the patient load, probably 90 percent of
3  the patients were Medicaid so I really couldn't operate on
4  any of these patients along with my residents.  It was
5  impossible.
6  Q    I take it that New York Methodist was aware of your
7  indictment?
8  A    I think everybody was.
9  Q    My question is regardless --
10 A    They were aware of it.
11 Q    New York Methodist was aware?
12 A    They were aware of it, yes, sir.
13 Q    All right.  In fact, New York Methodist Hospital
14 reinstated you or at least hired you to another position,
15 correct?
16 A    Well, I didn't retain --
17        THE COURT:  Is the answer yes or no?  Did they
18 take you back in some capacity?
19        MR. NORINSBERG:  At what point?
20        THE COURT:  After the not guilty verdict.
21        THE WITNESS:  In some capacity, yes.
22 Q    Okay.  And am I correct that after you filed the
23 present lawsuit, you applied for a number of positions as a
24 dentist, correct?
25 A    That is correct.

1  Q    Do you have Exhibit 70 in front of you?  I can provide
2  you a copy.
3  A    Could I just revisit the previous question?
4  Q    What, sir?
5  A    Could I just have the previous answer reread to me?
6        THE COURT:  No.  There's no answer or question
7  pending.
8        THE WITNESS:  Okay.
9  Q    I'm showing you what is Exhibit 70 in evidence.  Can
10 you tell me what that document is.
11 A    Well, this is a file of all the jobs that I applied to
12 with the actual ads cut out of the *New York Times*, the
13 American Dental Association, the New York State Dental
14 Society, the *New York Times*, the health section.
15 Q    Okay.  And in here somewhat appear to be copies of
16 letters to prospective employers, correct?
17 A    That's what it appears, yes.
18 Q    All right.  Let me show you one just by way of example.
19 About the seventh or eighth page, this is a letter to
20 Dr. Rory Sadoff.
21        Have you come to that page?
22 A    I am on that page.
23 Q    Is this the actual document you sent out or copy of the
24 actual copy you sent out?
25 A    Yes, it is.

1  Q    Was New York Methodist aware that you were using their
2  stationery for this purpose, sir?
3  A    I had absolute authority to use their stationery.
4  Q    Did you, in fact, send this in this handwritten form,
5  sir?
6  A    I believe that it was this way.  I don't believe that
7  it was typed out.
8  Q    I might ask how come you didn't type it out?
9  A    I think it's a lot nicer and a lot more personal if you
10 write it in your own handwriting.
11 Q    Did you type out -- do you recall typing any letters to
12 prospective job applications?
13 A    Well, I may have applied for some of these positions on
14 the Internet, but it looks like I have a number of personal
15 letters that are sent out.
16 Q    Let me ask you to go down to a page with two pictures
17 on it.  It appears to be the Dr. Ghalili page.  I'm going to
18 put it up here and see if you can find it in your copy 70.
19 A    I see that page.
20 Q    You found it, sir?
21 A    Yes, I did.
22 Q    That's your note on the lower right?
23 A    Yes, it is.
24 Q    You had an interview with Dr. Ghalili or with NYU?
25 A    Well, actually, he had forgotten about this.  I never

1  spoke to him directly; I spoke to his secretary.  And I
2  ended up sitting at NYU for an hour.  And he was just very
3  dismissive of the whole thing.  He really told me there's no
4  position for me.
5  Q    Had he called you in for an interview and then that
6  happened?
7  A    No.  I arranged that with his secretary.  And when I
8  arrived on the date of the interview, he didn't know who I
9  was or why I was there.  He was totally dismissive of me.
10       And this is my own NYU.  I went there for seven years.
11 I have two degrees from there.  Even they weren't interested
12 in offering me a position.
13 Q    Doctor, if you would, if you could tell me in this
14 Exhibit 70, if you could tell me the latest date that you
15 applied for employment, please.
16 A    Well, I see one starts at May 2nd, 2010.  I'd have to
17 go through every one of them.
18 Q    I guess the easy question is do you have any dates
19 after May 2nd, 2010?  That should make it easy.
20 A    It looks like that's the latest date of an application.
21 Q    All right.  Now, is it fair to say, sir, that no
22 prospective employer told you they weren't hiring you
23 specifically because of the indictment for Medicaid fraud?
24       Is that a fair statement?
25 A    Well, if you never get to meet with any prospective

**JA442**

1    employer, how would you have that conversation, sir?

2    Q    So the answer is yes or the answer is no such employer

3    told you so?  That's my question.

4    A    It's a disingenuous question.

5    Q    Sir, did any prospective employer tell you that they

6    were not hiring you as a result of the indictment?

7    A    Sir, if you never have an interview, a face-to-face

8    interview, if you apply for these 30 or 40 positions and

9    nobody actually calls you back, nobody does a face-to-face

10   interview with you, how could you answer that question?

11   They are not there to say to you, oh, by the way, Dr. Morse,

12   you were the first person on the disqualified list.

13         MR. FARBER:  Motion to strike as nonresponsive.

14         THE COURT:  I'll sustain the objection.  I take

15   it -- let's perhaps clarify something.  Of all of those

16   letters sent out that are contained in your exhibit, you did

17   not get anyone to call you in for an interview except the

18   one that you made reference to?  No one else called you in

19   for an interview?

20         THE WITNESS:  That's correct, Your Honor.

21         THE COURT:  So then you had a conversation with no

22   one about why they didn't call you in for an interview?

23         THE WITNESS:  Thank you for clarifying, Your

24   Honor.

25         MR. FARBER:  All right.

---

1          THE COURT:  Counsel, how much longer are you going

2    to be?

3          MR. FARBER:  15 to 20 minutes.

4          THE COURT:  Why don't you just take a morning

5    ten-minute recess, okay.

6          MR. FARBER:  Thank you, Your Honor.

7          (Jurors exit the courtroom.)

8          THE COURT:  Counsel, you're going to be how much

9    longer?

10         MR. FARBER:  15 minutes.

11         MR. NORINSBERG:  My economist is outside.

12         THE COURT:  I have to send the jury home early

13   because of the weather.  What other areas are we going into?

14         MR. FARBER:  Essentially, I have a couple more

15   questions about the Edwin Gonzalez issue that I need to

16   clear up with this witness.  I'm trying to do it as fast as

17   I can.  It will take a couple minutes.

18         THE COURT:  Well, try and, you know, look over

19   your questions and speed them up a little bit because we

20   need to get moving with this.

21         MR. FARBER:  Okay, Your Honor.

22         THE COURT:  How long is your -- I take it you're

23   not going to have redirect to amount to anything, are you,

24   Mr. Norinsberg?

25         MR. NORINSBERG:  I mean, honestly, I do have

---

1    points I would do.  I mean, maybe we'll put the economist on

2    and do a redirect.

3          THE COURT:  How long is the economist going to be?

4          MR. NORINSBERG:  30 minutes.

5          THE COURT:  You know, I've got problems.  It's

6    getting bad out there.

7          MR. FARBER:  Do you think we'll be here to at

8    least 1:00?

9          MR. NORINSBERG:  Can I do my redirect and then on

10   Monday we just put the economist on when he's done?  I'm

11   willing to interrupt him to put the economist on.

12         THE COURT:  Do you want to do that now?

13         MR. NORINSBERG:  Unless counsel would just get

14   done with this now in 15 minutes, we'd be okay.  I think I'd

15   prefer that to just get it done.

16         MR. FARBER:  Why don't I just interrupt him and

17   you can have whatever you need with your economist?

18         THE COURT:  I don't want you to then have that

19   open the door to another hour of cross.

20         MR. FARBER:  I don't have another hour of cross,

21   Your Honor.

22         THE COURT:  Why don't we do that then.  Why don't

23   we just do that and call your economist and hopefully we can

24   get your economist done.

25         MR. NORINSBERG:  Okay.

---

1          MR. FARBER:  Thank you, Your Honor.

2          (Recess taken.)

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA443**

1    THE COURT:  Are we ready to proceed?
2    MR. NORINSBERG:  Yes, Judge.
3    (Jury entering.)
4    THE COURT:  Ladies and gentlemen, be seated, please.
5    We are going to do some things a little out of order
6  again.  There is a witness, Mr. Norinsberg wants to call now
7  and so we are going to interrupt the cross-examination of
8  Doctor Morse and have this witness come in.  Then we will
9  resume with that.
10    Do you want to call your next witness.
11    MR. NORINSBERG:  At this time, the Plaintiff calls
12  Doctor Edmund Mantell.
13  D-R   E-D-M-U-N-D   M-A-N-T-E-L-L, having been first duly
14  sworn, took the stand and testified as follows:
15  DIRECT EXAMINATION BY MR. NORINSBERG:
16  Q    Afternoon, Doctor Mantell.
17  A    Good afternoon.
18  Q    Can you tell the jury what is your professional
19  occupation?
20  A    I am a consulting economist.
21  Q    And, can you tell us, do you have a field of
22  specialization?
23  A    Yes, sir.
24  Q    Please tell the jury what your field of specialization
25  is?

---

1  A    I specialize in microeconomics.
2  Q    Can you tell us, just in plain English, what is
3  microeconomics?
4  A    Microeconomics is a specialty within the field of
5  economics generally.  Microeconomics concerns itself with the
6  activities, the economic activities of natural persons,
7  individuals or individual firms, in the marketplace in which
8  they sell their goods and services.
9  Q    Doctor Mantell, are you currently employed?
10  A    Yes, sir.
11  Q    What is your employment, can you tell the jury, please?
12  A    I am employed as a professor of economics and finance at
13  the Lubin School of Business, Pace University, New York.
14  Q    How long have you been a professor at that business
15  school?
16  A    About thirty years.
17  Q    Can you tell us, briefly, Doctor Mantell, about your
18  educational background?
19  A    I graduated from college at the State University of New
20  York, after leaving college, I attended graduate school at the
21  University of Pennsylvania, specifically the Wharton School of
22  Finance and Commerce, which is one of the subdivisions of the
23  University of Pennsylvania.
24    University awarded me a master of arts degree in
25  economics and finance.  After receiving the master degree, I

---

1  continued my graduate studies also at the University of
2  Pennsylvania, and 1972, that institution awarded me the degree
3  of Phd, doctor of Philosophy in economics and finance.
4  Q    Doctor Mantell, can you tell us about your employment
5  history since graduate school?
6  A    From 1972 to 1975, I think, I was employed as a vice
7  president and senior economist at the John Hancock Mutual Life
8  Insurance Company, which at that time had its headquarters in
9  Boston, Massachusetts.
10    My duties at that company consisted of preparing--
11  projections and analyses, of the income earning capacity of
12  people in different occupations.
13    My analyses and my projections were used by the
14  Actuarial Department in that company to design various kinds
15  of insurance policies, such as life insurance policies,
16  disability income insurance policies and so forth.
17    From 1975 to about 1980, I was employed as a
18  managing director at the IBM World Trade Corporation, at their
19  corporate headquarters which at that time was in Armonk, New
20  York.
21    My duties at the IBM corporation, consisted of
22  preparing analyses and projections of various economic
23  variables which were of interest to the way IBM conducted its
24  various lines of business activity at that time.
25    From 1980 to the present, professor of finance at

---

1  the institution I mentioned earlier.
2  Q    Doctor Mantell, have you written any articles in
3  professional journals?
4  A    Yes.
5  Q    What types of articles have you written?
6  A    All of my articles appear in professional periodicals.
7  Every profession has periodicals which circulate among the
8  people working in that profession.  Economics is one of those.
9    So all of my articles have been written about
10  economics to be read by other economists in specialty peer
11  reviewed economics journals.
12  Q    Now, do you hold any professional licences or
13  certificates?
14  A    Yes.
15  Q    Can you tell us about them?
16  A    I am licensed to practice law in the State of New York.
17  Q    Do you actually practice law?
18  A    I do not.
19  Q    Have you practiced law in your career?
20  A    Never.
21  Q    Now, Doctor, apart from your teaching responsibilities at
22  the business school, do you do consulting work as well?
23  A    I do.
24  Q    And, are you being compensated for the consulting work
25  that you have done in connection with this case?

**JA444**

1    A    Yes.

2    Q    What is your rate of compensation?

3    A    $600 per hour.

4    Q    Have you testified before in Federal and State Courts?

5    A    Yes.

6    Q    Did there come a time my firm requested that you perform

7    an analysis with respect to the economic losses sustained by

8    Doctor Leonard Morse?

9    A    Yes.

10   Q    And was that sometime in September of 2012?

11   A    Yes.

12   Q    Now, were you provided certain records in order to

13   perform this analysis?

14   A    Yes.

15   Q    Can you tell the members of the jury what were some of

16   the records that you were given in order for you to be able to

17   perform your economic analysis?

18   A    I was given photocopies of the income tax returns, income

19   tax returns, federal income tax returns prepared by Doctor

20   Morse and his accountants beginning around 1999.  I think.

21   Right up to the-- year 2011.

22        I was also provided with a business agreement which

23   I think was drafted and executed in I think 2001, regarding

24   the possible sale of the practice from Doctor Morse to another

25   dentist with whom he worked.

1         I was given the contract which governed the actual

2    sale of Doctor Morse's practice 580 Dental which occurred in

3    2007.

4         I was given photocopies of job applications which

5    had been prepared by-- had been prepared by Doctor Morse when

6    he tried to secure employment.

7    Q    Now, Doctor Mantell, are you familiar with the category

8    of economic losses known as past loss earnings?

9    A    Yes.

10   Q    Can you explain to us, what does that category refer to,

11   past lost earnings?

12   A    When a person who is actively working and generating

13   earnings from his employment, when he loses the ability to

14   generate those earnings, whether through a physical illness or

15   trauma, whether death, or some other kind of impairment of his

16   earnings capacity, those earnings can be analyzed from the

17   date at which they stopped until the present date.

18        In this case, I recognized that Doctor Morse's

19   earning capacity was impaired at the date when the indictment

20   was made public against him and continues up to the present

21   date.

22        So, all the earnings that he would have received if

23   it had not been for the false accusation, those are past

24   earnings losses.

25   Q    So, that would be covered roughly the time period of from

1    where the indictment is, 2006 to the present time 2013, that

2    would cover the past lost earnings category, correct?

3    A    Yes.

4    Q    Now, as part of your analysis in this case, were you

5    asked to actually determine the amount of Doctor Morse's past

6    lost earnings?

7    A    Yes.

8    Q    Did you come to an opinion within a reasonable degree of

9    economic certainty as to what Doctor Morse's past lost

10   earnings were?

11   A    Yes.

12   Q    Would it assist you, if you were able to use this board

13   here and write out some of your findings, Doctor?

14   A    Yes, sir.

15        MR. NORINSBERG:  I would ask permission, your Honor,

16   the Doctor --

17        THE COURT:  Write out his findings on what?  On the

18   paper?

19        MR. NORINSBERG:  Yes, we are just talking about past

20   lost earnings now and explain.

21        THE COURT:  Do you want him to come to a number and

22   perhaps explain how he got to the number so we can cut through

23   it a bit.

24   Q    What was your findings with respect to Doctor Morse's

25   past lost earnings over that period of time 2006 through 2013?

1    -- the end of 2012?

2    A    $1,733,941.

3    Q    Can you explain to the members of the jury, how you

4    arrived at that calculation?

5    A    There are basically three components to my calculation of

6    past lost earnings.  The first component is the income that

7    Doctor Morse would have received from his dental practice if

8    he had not been the victim of a false accusation, and if all

9    this adverse publicity had not circulated around him.  We call

10   that cash flow one.  The gross lost earnings.

11        But I also have tax returns showing the actual

12   earnings he did receive after the year 2006.  You call that

13   cash flow two.

14        Thirdly, I have information that he sold his dental

15   practice 580 Dental, in year 2007 for a lump sum price of

16   $450,000.  Call that cash flow three.

17        The net loss to Doctor Morse has been to take his

18   gross loss of income, I have called that cash flow one, I

19   subtract from it, his actual earnings, between 2006 and 2012

20   and I also subtract from it, the sales price he received when

21   he sold the practice 580 Dental.

22        So the difference between those two is, as I have

23   testified a moment ago, $1,733,941.

24   Q    Now, can you just show us now, using the easel, I want to

25   ask you about the cash flow categories, you have identified.

**JA445**

1    THE WITNESS:  May I?

2    THE COURT:  Sure.  Is there a pen or something?

3    THE WITNESS:  I have one.

4    MR. NORINSBERG:  I gave him one.

5    Try if you can, do not block the jury's view.

6    THE COURT:  Can you see from over there?

7    MR. MILLER:  No.

8    THE COURT:  Do you want to sit back so you can see.

9  Q   Can you just put on the top, "past lost earnings" so it

10 is clear what category we are talking about.

11 A   I have written on top of the "past lost earnings of

12 Leonard Morse".  I'm going to put a period of time that I'm

13 defining to be the past.  That is from year 2006 to year end

14 2012.

15       Now, I have computed what I call the gross lost

16 income, I previously referred to today as cash flow one.  I

17 will put an entry on this easel that says "gross lost income".

18       According to my calculation, that was $2,349,859.

19 Q   Did you run out of ink?

20 A   I ran out of eye strength.

21       I also have cash flow two, which is--

22       THE COURT:  Can I ask a question, sir.

23       Are these numbers that you are now taking the time

24 to write on that board, are they written on a separate piece

25 of paper that we can just refer to instead of writing

                    RB      OCR

1  everything on the board?  Do you have it on a diagram, exactly

2  the way you want to put it now?

3        THE WITNESS:  Yes, I do.

4        THE COURT:  Can we agree just to put that piece of

5  paper up.  You can show it and have him explain it.

6        MR. NORINSBERG:  We will mark it as Exhibit 149.

7        THE COURT:  That is fine.

8        MR. NORINSBERG:  149.

9        THE COURT:  It seems to me to make more sense than

10 writing everything on the board.

11       MR. NORINSBERG:  I'm happy to do that, your Honor.

12       THE COURT:  Okay.

13       MR. NORINSBERG:  Do you have that?

14       THE WITNESS:  This is my only copy.

15       MR. NORINSBERG:  We will work off the screen then.

16       I wanted something left with the jury.

17       THE COURT:  We can make a copy of that.  If that is

18 what you want.  I don't see the point sitting here where we

19 write, you know, if it is already written down.

20       The shortness of life principle I have been talking

21 about since we began.

22       THE WITNESS:  I hear that.

23       THE COURT:  You can take a seat.

24 BY MR. NORINSBERG:

25 Q   So, we are looking now--

                    RB      OCR

1        THE COURT:  Are we looking at the top figure.

2        MR. NORINSBERG:  The top figure, Plaintiff's Exhibit

3  49, which I will offer into evidence.

4        THE COURT:  Okay.

5        MR. FARBER:  149.

6        MR. NORINSBERG:  149.

7        (Plaintiff's Exhibit 149 received in evidence.)

8  Q   Let's just go category by category, only looking at the

9  top right now on-- that top part, where it says, period of

10 loss 2006 to 2012, that is where you are looking at?

11 A   Yes, sir.

12 Q   When you say "lost gross income", where does that number

13 come from?

14 A   Please repeat the question.

15 Q   When you look at that top category, "lost gross income",

16 where does that number come from?

17 A   It is a number which I calculated.

18 Q   How did you calculate it?

19 A   Well, I first calculated what Doctor Morse's average

20 income was reported income, for the four years preceding the

21 year of the false accusation.

22 Q   How did you do that, what did you base that on?

23 A   I based it on the income tax returns filed by Doctor

24 Morse.

25 Q   Okay.

                    RB      OCR

1  A   And the average, the annual average for those, for those

2  four years was $296,834.

3  Q   Now, going to the second category, where it talks about

4  post accusation gross income, talking about income that Doctor

5  Morse earned after the indictment; is that right?

6  A   Yes, sir.  But with all respect, I have not completed my

7  explanation.

8  Q   Please finish, I have a tendency to do that.

9  A   So, I assumed that if the indictment had not been made

10 public or if he had not been indicted at all, that in year

11 2006, he would have earned the average of his earnings in the

12 preceding four years.  Thereafter, I assumed that his annual

13 earnings would increase, year by year at exactly the same

14 annual percentage increase of the consumer price index which

15 measures the price increases of dental services.

16       The consumer price index is sometimes referred to in

17 the newspaper as the CPI.

18       The gross CPI is a general measure of how inflation

19 affects the prices of all consumers goods and services in the

20 economy.  The things that everybody buys, food, clothing,

21 shelter and so forth.

22       But the CPI itself, is broken down into components.

23 One of those components is the price of dental services, and

24 that is published separately from the CPI.  It is available on

25 the Internet, anybody who has access to the Internet can find

                    RB      OCR

**JA446**

1   the data and use it as I did.

2        So, I know what the actual historical increase in

3   the dental services component of the CPI was, because it is

4   printed out by the Bureau of Labor Statistics.

5        I applied those increases to compute how his annual

6   earnings would have increased each year from 2006 to year end

7   2012.

8   Q    What rate CPI did you use?

9   A    Well, it is a different rate for each year.  I can tell

10  I-- do you want to know what they were?

11  Q    Was there an average rate?

12  A    The average rate is 4.47 percent.

13  Q    And that was based on looking back at how many years of

14  prior dental CPI information?

15  A    From-- let me see, just a moment.  From 1993 to 2011.

16  Q    So you took a 18-year average of the dental CPI and then

17  you applied it to this particular case in trying to figure out

18  what-- how the earnings would have increased during the

19  six-year period; is that right?

20  A    Well, the historical period from 2006 to 2011, I have the

21  actual percentage increases, and that is what I applied for

22  those years.

23  Q    Okay.

24        Moving onto the second category, post accusation

25  gross income?

---

1   A    Yes, sir.

2   Q    Does that refer to the income after the indictment?

3   A    Yes, sir.

4   Q    And, you have a number of $165,918; is that right?

5   A    Yes, sir.

6   Q    How do you know that Doctor Morse earns 165,000 over that

7   time period?

8   A    Well, that is what is reported on his income tax returns.

9   Q    Did you use the actual income tax returns to make that

10  determination?

11  A    Yes.

12  Q    Now, I see that you have in parenthesis, does that mean

13  you subtracted it from the first number, the larger number?

14  A    Yes.

15  Q    Why were you subtracting the income from that, Methodist

16  Hospital that Doctor Morse earned from the larger number?

17  A    My task, my assignment was to determine what his net

18  income loss, and in terms of my assignment, I defined the net

19  income loss as the difference--

20        THE COURT:  Sorry, the jurors can't see the witness.

21        MR. NORINSBERG:  I didn't realize that.

22        JUROR #8:  Thank you.

23  Q    Do you remember where we were?

24  A    Yes, I do.

25  Q    Okay.

---

1   A    Before I just started discussing these numbers, I defined

2   what I meant by the net income loss, you may recall, I

3   mentioned three cash flow streams.

4        The first is the gross loss, the total income,

5   professional income that is, that Doctor Morse would have

6   received, if he had not been indicted.

7        But he didn't lose all of that because he did earn

8   something between the four years 2006 and 2011-- 2012.  I call

9   that, I have labeled it as post accusation gross income.

10       So I subtract what he did earn from what he would

11  have earned if he had not been indicted.

12  Q    Now, moving onto the third category, it says, sale of 580

13  Dental in year 2006.

14  A    I see it.

15  Q    You have next to that, $450,000.  Where did you get that

16  information from?

17  A    That is not a number which I calculated.  That number

18  came right out of the buy and sell agreement in which Doctor

19  Morse sold the entirety of his practice 580 Dental.

20  Q    So, you actually had a copy of the agreement as part of

21  the records that you reviewed?

22  A    Yes, sir.

23  Q    And you plugged that in and then again, I see you have

24  parenthesis around that number?

25  A    Yes.

---

1   Q    Does that mean that you also subtracted that number as

2   well from the overall gross earnings?

3   A    Yes.

4   Q    And just, very briefly explain why you did that for the

5   sale of the practice, why you subtracted that as well?

6   A    Because the sale of the practice by Doctor Morse

7   represented income to him when he sold the practice he was

8   paid for it.

9        And to some extent that will from an economics point

10  of view, that will mitigate his gross income losses because of

11  his impaired ability to generate earnings through his dental

12  practice.

13  Q    So, just to sum up on the first category, you figured out

14  the gross income and detected what he earned from Methodist

15  Hospital.  You deducted what he earned from selling the

16  practice and then you got the number, the 1.7 number that you

17  have there; is that correct?

18  A    Yes, sir.

19  Q    Is there anything else that needs to be explained in

20  terms of that first category before we move onto future lost

21  earnings?

22  A    I can't think of anything.

23  Q    You are familiar with the category of future loss

24  earnings, right, Doctor?

25  A    Yes, sir.

1  Q   Can you explain to the jury what does the category,

2  future lost earnings represent?

3  A   When a person is disabled from generating earning

4  capacity for whatever reason that maybe, that impairment of

5  his earnings capacity may continue into the future.

6      I have been asked to assume that if Doctor Morse had

7  not been indicted, not only would he have worked as a dentist

8  between 2006 and 2012, but I have been asked to assume he

9  would continue to work as a dentist at his own practice, 580

10  Dental into the future.

11      And, I have also been asked to assume that he will

12  continue to try to generate some professional earnings for

13  himself.  Even though he is no longer the owner or chief

14  practitioner in 580 Dental.

15  Q   Now, I see you put the period of loss from 2013 to 2022;

16  is that correct?

17  A   Yes, sir.

18  Q   Why does the period of loss stop at 2022, what is the

19  reason for that?

20  A   My information is that in the year 2001, Doctor Morse

21  entered into a 20-year lease for the physical premises where

22  580 Dental was located.  And, that is evidence that he

23  intended to continue in the active practice of dentistry

24  during the term of the lease.  The lease itself expires in

25  January 2022.

1  Q   So, you used the actual end date of the lease to

2  represent the end date of his earnings as a dentist; is that

3  correct?

4  A   That's correct.

5  Q   Just so we are clear, when we talk about the bottom half

6  of the chart, that is the chart that if you were up there

7  labeling, you would call it "lost future earnings"?

8  A   Yes, sir.

9  Q   So let's start with the first category, that you have

10  under the lost future earnings, discounted lost gross income.

11      Before we go into the concept of discounting, just

12  explain in general term, for us, so we can all follow it, how

13  did you go about calculating what Doctor Morse's gross income

14  would have been, over that ten-year period approximately?

15  A   Well, the loss of the gross income in the future, and

16  when I use the words, the future, what I mean by that is,

17  every year, beginning 2013, which would be this year actually,

18  and ending in January 2022.

19      I began with what his gross income would have been

20  in the year 2012.  That is last year.  If he had not been

21  indicted and accused of Medicaid fraud.

22      And, I assumed that that would increase each year

23  thereafter until the year 2022.  And, the rate at which they

24  would increase, would correspond to the average annual

25  percentage rate of increase, in the CPI component, pertaining

1  exclusively to the price of dental services.

2  Q   Now, just to be clear, when we were talking before when

3  you were using the CPI in the past lost earnings, you were

4  using the actual numbers, you had an average of the actual

5  numbers for the years 2006 to 2012; is that right?

6  A   Yes-- well, correct, not to 2012, to 2011.

7  Q   Okay.

8      Now, for the future years that we are looking at

9  this period, from 2013 to 2022, what CPI rate are you using to

10  project increases of income during that time period?

11  A   The year 2012, I applied a rate of increase of three in

12  the year 2013, I applied a rate of increase of 3.5 percent.

13      In the year 2014, I applied a rate increase of four

14  percent, and for all the four years after 2014, I applied the

15  long-term average annual rate of increase was CPI component

16  for dental services 4.47 percent.

17  Q   Just briefly, how did you choose those CPI rates that you

18  just told us about?

19  A   Well, I mentioned that the long-term average, 19-year

20  average, was 4.4 percent.  I thought it unreasonable to expect

21  it to jump immediately from 2.4 percent up to 4.47 percent.

22  It is not impossible, but I thought it was unlikely.  So I

23  gradually increased it and I assumed that it would, the long

24  run average in the year 2015.

25  Q   Now, in terms of figuring out the gross income over that

1  nine-year period, what were you using to calculate what Doctor

2  Morse's actual earnings would be during that period?

3  A   His actual earnings?

4  Q   Okay.

5  A   That is your question?

6  Q   Yes.

7  A   I assumed that Doctor Morse's actual earnings would be

8  the average of his earnings for the years subsequent to the

9  accusation against him and that average was $17,814.

10      Now in some years it was more, in some years it was

11  less.  That is the annual average.

12  Q   So, you are talking about what he actually earned from

13  the time of the indictment up until 2012?

14  A   Up till 2011.

15  Q   So, you used what he actually did earn during that

16  five-year period and you used that to project that he would

17  continue to earn at least as much money during this time

18  frame, up until 2022; is that right?

19  A   Yes.

20  Q   And then you subtracted that number from the gross income

21  that you projected; is that right?

22  A   Yes.

23  Q   What about the last category here, the sale of the dental

24  practice in January of 2022.  Can you explain what you mean by

25  that third category?

**JA448**

1   A    Yes.

2        You heard me testify a moment ago that I assumed

3   Doctor Morse would remain active in the practice of dentistry,

4   in his own dental practice until the expiration of his lease.

5        Now, when the lease expires, that will signal the

6   end at which he personally participates.  But the practice has

7   a value.  Every professional practice, if it is a successful

8   practice, has a market value, whether it is a dental practice,

9   medical practice, legal practice or accounting practice.

10       Professional practices like dental practices are

11  bought and sold all the time.  There is a market for them.

12  And I assumed that in January of 2022, if he had not been

13  indicted, he would have discontinued his own dental practice,

14  but he would have sold it to a third party.

15  Q    How did you calculate what that value would be in 2022?

16  A    Well, first my starting point was the actual sale price

17  for the practice in 2007, which I understand to be $450,000.

18       The value of the practice is determined by various

19  assets in it, including the lease.  So, I subtracted the value

20  of the lease from the actual sale price of the assets, because

21  of course in 2022, he wouldn't have the lease.  It will have

22  expired.  There will be nothing for him to sell in terms of a

23  lease.

24       I also subtracted the so called contract allocation

25  to good will.  That, in that contract that was $13,000.

---

1   Q    What contract?

2   A    The contract of which the practice was actually sold.

3   Q    So, when he sold the practice in 2006, a few months after

4   the indictment, the good will value was only $13,000?

5   A    That's what it says in the contract itself.

6   Q    Okay.

7   A    I also subtracted that, because I reasoned that the

8   goodwill had been tainted.  Goodwill is exactly what it

9   suggests, basically the luster of a professional's reputation,

10  in the market in which he sells his services.

11       I wanted to be able to derive a value for the dental

12  practice which was unaffected by the lease, and unaffected by

13  the adverse publicity received by Doctor Morse.

14       So, this allows me to identify the value of the

15  assets without the lease and without the goodwill, which I

16  made out to be $117,000 in 2007.

17       To that, I added back what would have been the

18  statistical average portion of the goodwill, if Doctor Morse

19  had not been the victim of all of this adverse publicity.

20  That was 37 percent of average of his gross revenues.  That

21  37 percent, is exactly that, a statistical average.

22       I myself did not personally conduct an extensive

23  market survey.  I referred to a statistical average because

24  that was going to represent a projection at the time of the

25  hypothetical sale of the practice in the year January 22nd.

---

1   Q    Okay.

2   A    Thereafter, I had a hypothetical valuation of the

3   practice, in the year 2006.  I increased that each year from

4   2006 up until 2021 and the method of increase was to apply the

5   historical average annual increase in the CPI component of

6   dental services.

7   Q    Now, are you familiar with what is known as the goodwill

8   registry?

9   A    Yes.

10  Q    What is the goodwill registry?

11  A    The goodwill registry is a statistical database

12  maintained by what is called the health care group.  That is a

13  private organization which assists dentists, physicians, and

14  other health care professionals buy and sell practices.  There

15  is an organized market for dental practices.

16       It provides a statistical mean goodwill rate for

17  general dental practices at roughly 37 percent of the annual

18  gross revenues.  Specialty practices, command a higher

19  percentage, but I did not assume that Doctor Morse was engaged

20  in a specialty practice.

21  Q    Now, so the 37 percent that you used, you got that from

22  the goodwill registry; is that correct?

23  A    Yes, sir.

24  Q    Is the goodwill registry the type of source of

25  information that the experts in your field reasonably rely

---

1   upon?

2   A    I believe it is.

3   Q    Now, in terms of putting this altogether, Doctor Mantell,

4   what other factors did you use?

5   A    Well, there is one more factor that appears on the screen

6   I have not mentioned it yet, that is discounting.

7   Q    You are familiar with the term discounting something in

8   present value?

9   A    I am familiar with the term.

10  Q    When you say discounted on those categories, at the

11  bottom, does that refer to discounting present value?

12  A    Yes, sir.

13  Q    Can you just explain to us, in just in plain English,

14  what does it mean when you discount the number to present

15  value?

16  A    The expression, discounting to present value is a term of

17  art, used by economists, actuaries, accountants and other

18  financial professionals.

19       Basically it represents the time value of money.

20  Any fixed amount of money, say $100, to be received one year

21  from today, has a value less than if it were received today.

22  I can illustrate this.

23       If hypothetically, I would offer you a choice, I

24  have $100 cash in hand today, or a reliable promissory note,

25  to give you $100 one year from today, which would you prefer.

1       Every adult recognizes that is a no brainer because
2  that represents the time value of money.  There is a well
3  known mathematical formula for calculating the time value of
4  money, it can be found in any college textbook on finance or
5  economics.
6       I applied that formula in this case to reduce all of
7  Doctor Morse's future economic losses to their present
8  discounted value.
9  Q    So, you had actually a higher number, without the
10 discount, but then you applied the discount rate and you
11 brought the number back down; is that correct?
12 A    Yes, sir.
13 Q    What rate did you actually use for your discount rate?
14 A    Let's see, 1.6 percent.
15 Q    How did you choose 1.6 percent as your discount rate?
16 A    1.6 percent was the effective yield to maturity on
17 treasury bills.
18 Q    Why did you use that particular formulation, why did you
19 choose 1.6 percent?
20 A    Well, the actual numerical value appears on the website
21 of the Federal Reserve Board.  It is the yield to maturity on
22 ten-year treasuries at the time I performed my analysis.
23      Every day, every business day, the yield moves
24 around a little bit, by tiny tiny increments.
25      But I regarded 1.6 as a reasonable discount rate to

1  use at the time.
2       My choice of the treasury-- ten-year treasury bill
3  is motivated by what I understand to be the law in New York
4  State Courts.  I know of only one statute in New York State
5  law which prescribes the rate which should be used as a
6  discount rate to measure future economic losses.  That statute
7  is CPLR, I think 50-A.
8       That applies to medical malpractice cases.  I
9  understand this is not a medical malpractice case, I fully
10 understand that.  However, it is the only source I know for
11 New York State law which prescribes discount rates to be
12 applied and the calculation.  That prescribes treasury
13 securities.
14 Q    So, reasoning by analogy, you applied the 1.6 percent
15 rate for that type of civil action, you applied it in this
16 civil action as well, the same rate that is used under 50-A,
17 Section 50-A; is that correct?
18 A    Yes, sir.
19 Q    Once you applied the discount rates, that got you to the
20 figure on the bottom; is that correct?
21 A    The 4.5 million figure, yes.
22 Q    Then you added up the past loss earnings and the future
23 lost earnings to get the total discount economic loss; is that
24 correct?
25 A    Yes, sir.

1  Q    Did you apply discounted rate to the past loss earnings?
2  A    I did not.
3  Q    Can you explain to us why you would not apply the
4  discount rate to the top category, only the bottom?
5  A    The discount rate is never applied to past cash flow,
6  whether they are costs, income, or any other cash flow because
7  what is passed is passed.
8       A discounting process applies only to future cash
9  flows.
10      MR. NORINSBERG:  Thank you Doctor Mantell, I have
11 nothing further.
12      MR. FARBER:  Can you leave that up on the screen.
13      MR. NORINSBERG:  Sure.
14 CROSS-EXAMINATION BY MR. FARBER:
15 Q    Afternoon, Doctor Mantell.
16 A    Good afternoon, sir.
17 Q    Now, looking at your supplementary Exhibit 4 that is up
18 on the screen here.  Am I correct that only, you have got six
19 numbers.  You have got approximately six numbers in this
20 column here, correct?  Six individual components of your final
21 figure?
22 A    Yes.
23 Q    Am I correct, only two of those numbers reflect actual
24 numbers, and the other four reflects some kind of projection,
25 correct?

1  A    Yes.
2  Q    And the two that reflect actual numbers are the post
3  accusation gross income, the credit of 165,000 and the sale of
4  580 Dental, the credit of 450, correct?
5  A    Yes, sir.
6  Q    So, to get the lost gross income figure of the
7  2.3 million, that requires some element of projection,
8  correct?
9  A    Yes, sir.
10 Q    And can you tell me, now you testified that you projected
11 that based on an average of years of income, right?
12 A    Yes, sir.
13 Q    What years did you average?
14 A    2002, to 2005.
15 Q    So, '02, '03, '04, '05?
16 A    Yes, sir.
17 Q    Are you aware, '02 was within the four years that the
18 Attorney General's office accused Doctor Morse of committing
19 fraud, are you aware of that?
20      MR. NORINSBERG:  Objection.
21      THE COURT:  Overruled.
22 Q    Were you aware of that?
23 A    I don't believe that I was, no.
24 Q    Am I correct, based on a review of Doctor Morse's tax
25 returns, in fact his income was actually trending downward, is

**JA450**

1  that fair to say?
2  A    I respectfully disagree.
3  Q    Well, was his income in the years 2004, and 2005, higher
4  or lower than his income in the years 2002 and 2003?
5  A    His income in year 2003, was larger than his income in
6  year 2004.  His income in year 2005, was larger.
7        THE COURT:  Than '03?
8        THE WITNESS:  No, I may have made a mistake.  I'm
9  trying to read this here.  Let me begin again, I'm sorry.
10        Income in year 2003 was larger than income in year
11  2004.  But in year 2005, was larger than income in 2004.  So,
12  there is a dip there.  What goes down, it goes back up.
13  Q    Did you have occasion to discuss a longer term trend in
14  income direction with Doctor Morse himself?
15  A    I did.
16  Q    Can you tell the jury the sum and substance of your
17  discussion?
18  A    Well, I asked him whether he had experience sufficient to
19  discuss this with me, about the trend in his income, from
20  various sources.  He said he did.
21        THE COURT:  He said what?
22        THE WITNESS:  He said he did.
23        THE COURT:  He did.
24  Q    And, did you discuss specific reasons with Doctor Morse
25  as to why there was some kind of a dip in his income?

1  A    Yes.
2  Q    What were those specific reasons that you discussed with
3  Doctor Morse, sir?
4  A    Well, his explanation was that he had various sources of
5  income.  He had the wages and salary of tips, which show on
6  his 1040 filing.
7        THE COURT:  Tips?
8        THE WITNESS:  I'm sorry, 1040.
9        THE COURT:  You said he had-- something-- did you
10  say "tips" that appeared.
11        THE WITNESS:  That is what the IRS calls it.  I am
12  not suggesting that his patients tipped him.  That is just a
13  category given by the IRS for-- to report various kinds of
14  income on the federal income tax returns and on W-2, the
15  Internal Revenue Code puts various kinds of labels for income.
16  It is not my label, I simply am adopting what they did.
17        Doctor Morse paid himself a salary.  He also had
18  business income from the dental practice.  He also had rental
19  income from tenants in his dental practice.  He also had what
20  I refer to as, other income, and this is income he derived
21  from his practice as a dentist working for other health care
22  providers such as, New York Methodist Hospital and Brooklyn
23  Dental and Park South Physicians.  So they all of them appear
24  on his 1040 filings.
25  Q    My question was, whether you discussed any reason for a

1  downward trend.
2  A    Yes, I did.
3  Q    What was the reason you discussed?
4  A    He told me that the demographic characteristics of the
5  population that he served in his-- in the area in which his
6  practice was located, that was changing.  It was being
7  gentrified.
8  Q    What does gentrification -- how would that affect Doctor
9  Morse's practice?
10  A    Most of his patients were Medicaid patients.  It is my
11  understanding about roughly, 95 percent.  And, they are
12  Medicaid patients because many of his patients are
13  inpecunious, if they weren't inpecunious, they would not
14  qualify.
15  Q    You mean poor?
16  A    Yes.
17  Q    And, so, because of gentrification there were fewer poor
18  people in the neighborhood?
19  A    Well, they are replaced by people who are wealthier, that
20  is what gentrification does.  The community still is not
21  abandoned, not a bunch of empty apartment buildings in
22  Brooklyn somewhere.  Poor people, for whatever reason why,
23  migrate out of the neighborhood and much higher earning, much
24  higher income residents were moving into the neighborhood.
25  Q    It would be fair to say that that would not be good for

1  income trends of a 95 percent Medicaid practice, correct?
2  A    I respectfully disagree.
3  Q    That would be good for a 95 percent Medicaid practice?
4  A    The point is, that when poor people leave a neighborhood
5  and are replaced by people with more income, his patient base
6  will become increasingly dominated by private payer patients.
7  These would not be Medicaid patients.  These patients would be
8  private pay or indemnified by private health insurance and he
9  would command larger fees.
10  Q    Was there any evidence, that you observed in the
11  documents presented that that had actually happened?
12  A    No.
13  Q    Now, am I correct that in computing the lost gross
14  income, you applied your 4.47 percent long-term dental CPI,
15  correct?
16  A    For years after 2014, I did.
17  Q    I'm sorry.  So for those years, you applied the actual
18  dental CPI, correct?
19  A    Up until the year 2011, I applied the actual CPI.  After
20  year-- shall I continue?
21  Q    Sure.
22  A    After year 2011, I increased it gradually.  I think I
23  explained in my direct testimony, I thought it was
24  unreasonable to jump from what it was in 2011, namely 2.4 to
25  jump up to 4.7 so I increased gradually.

1  Q    To get to 4.47 percent, you took an average going back to
2  the year 1993, correct?
3  A    Yes, sir.
4  Q    Now, you would agree, would you not, that we are
5  currently in a period of historically low inflation, would
6  that be a fair statement?
7  A    Yes.
8  Q    In fact, we have been in a period of relatively low
9  inflation for a number of years now, is that fair?
10 A    I agree.
11 Q    So, 1993, and the middle, early middle of 1990's were a
12 period of somewhat higher inflation than we have now, correct?
13 A    Yes, they were.
14 Q    So, my understanding is, you were asked to make a number
15 of assumptions in the course of preparing your analysis; is
16 that correct?
17 A    Yes.
18 Q    And, it is fair to say that Doctor Morse's attorney Mr.
19 Norinsberg provided you with those assumptions, correct?
20 A    Yes.
21 Q    It is fair to say that you did not conduct an independent
22 examination or assessment of the reasonableness of the
23 assumptions you were asked to prepare?
24 A    No, I would not say it is fair to characterize it.
25 Q    How would you characterize it, sir?

1  A    Well, for example, I have been asked to assume that
2  Doctor Morse would have remained active in the dental practice
3  until January 2022.
4  Q    Okay.  Why is that a reasonable assumption?
5  A    Because it is supported by firm evidence.  The firm
6  evidence being that is the year when the lease expires.  He
7  entered into a long term lease, and he explained to me, he was
8  contemplating participating in his own dental practice for the
9  entirety of the lease.
10 Q    Doctor Morse is it here -- do you know how old he is?
11 A    I have his date of birth, which I have to be June 20th,
12 1947.
13 Q    That makes him 65, at present, correct?
14 A    Yes.
15 Q    Actually 65 and a half, is that correct?
16 A    Yes.
17 Q    So, projecting us to 2022, would make him 74 and a half,
18 correct?
19 A    That's correct.
20 Q    So you found it reasonable to assume that by 74 and a
21 half, he would still be engaged in full time dental practice,
22 correct?
23 A    Well, I asked some questions about that.  I asked-- yes,
24 I asked questions.
25 Q    You can continue.

1  A    I asked Doctor Morse to characterize his general health
2  today, on September, when I prepared this.  I asked him if
3  he-- I asked him if he had any life threatening medical
4  conditions that he knew about.  And, I asked him, if he knew
5  of any physical reason why he could not continue to practice
6  dentistry indefinitely.  I got a negative answer to both
7  questions.
8  Q    Well, in your economics practice, have you used work life
9  tables?
10 A    I have.
11 Q    And it is fair to say, you regularly use work life
12 tables?
13 A    That is fair.
14 Q    You did not use a work life table in this case?
15 A    Correct.
16 Q    Why not?
17 A    Well, because I reasoned that a statistical work life
18 expectancy table would not apply to Doctor Morse.
19 Q    Why not?
20 A    Well, I'm quite familiar with these tables as counsel has
21 mentioned.  I use them quite often.  Work life expectancy
22 tables are published by the Bureau of Labor Statistics based
23 on enormously large sample of workers.  Hundreds of thousands
24 of people.
25      But almost all the people in the statistical sample

1  have characteristics quite different from those of Doctor
2  Morse.  Firstly, almost all the people in the sample, are
3  salaried employees, not self employed persons.
4        Secondly, almost all the people in the sample, have
5  formal education attainments, far less than that of Doctor
6  Morse.
7        Thirdly, almost all the people in the sample, are
8  not professionals in the sense that I am using the word
9  professional, I mean a dentist, a physician, perhaps an
10 actuary.
11       And, these work life expectancy tables I think are
12 not reliable guidelines for persons with the demographic and
13 professional characteristics of Doctor Morse.
14       THE COURT:  You are telling us professionals live
15 longer.
16       THE WITNESS:  No, I'm saying they work longer.
17       THE COURT:  I was just hoping that.  Okay.
18 Q    Assuming an average worker approximately age 65 or 66,
19 approached you and asked you to find their expected work life,
20 how would you do that?
21 A    Well, if this average worker was a salaried employee, and
22 reasonably good health.  By reasonably, I don't mean no
23 ailments, I simply mean no life threatening medical conditions
24 that is what I mean by good health.
25       I would first determine his age, sex, because work

**JA452**

1   life expectancy varies by sex.  Race.  Black, white, Hispanic.
2   Work life expectancy varies by race and level of formal
3   education attainment.  Work life expectancy varies by that as
4   well.
5               When I collect the data, then I would go to the
6   table.
7   Q   Do you know with respect to--
8               THE COURT:  I'm sorry, do these tables account for
9   all of those differences that you mentioned, or do you mean
10  you take these differences and then consider them in what the
11  table tells you?
12              THE WITNESS:  That is a good question.
13              The table controls for some of the differences, some
14  of those characteristics, but I know of no table that controls
15  for them all simultaneously.
16              For example, there will be a table for women of a
17  certain age and educational attainment, a different table for
18  men.  But there wouldn't be a table which mixes them both.
19  There will be a table for women.
20              THE COURT:  Did you look at a table for men here?
21              THE WITNESS:  I did.
22              I did not use the table in my calculations, I'm
23  aware of it though.
24  Q   What did the table show for shall we say a 65-year old
25  white male with a graduate degree?

1   A   Well, doesn't show -- entry for 65-year old white male
2   with a graduate degree.  That is one of the reasons I didn't
3   use it.
4               The table that I usually use shows the work life
5   expectancy for perhaps a 65-year old male with 15, pardon me,
6   15 or more years of education.
7   Q   Okay.  Why don't you tell the jury what that table shows
8   for a 65-year old male?
9   A   I don't have the table in front of me, but my
10  recollection, I'm not sure about myself on this point.  My
11  recollection, it will show work life expectancy to about age
12  70.
13  Q   Four or five years, correct?
14  A   Yes.
15  Q   Am I correct in the course of your analysis, you did not
16  consider the possibility that Doctor Morse is malingering,
17  correct?  Do you understand what I mean by the term
18  "malingering"?
19  A   No, I don't.
20              MR. NORINSBERG:  Objection.
21              THE COURT:  I will sustain the objection to the form
22  of that question.
23              MR. FARBER:  Fair enough.
24  Q   You are assuming Doctor Morse is continuing to actively
25  seek other areas of employment or income, is that a fair

1   assumption-- fair assessment of your assumption?
2   A   I'm assuming Doctor Morse is continuing to seek income
3   derived from rendering dental practices.
4   Q   Okay.
5   A   Yes.
6   Q   And, your assumption is that he will -- not only is and
7   has been unable to do so, but will be unable to do so, going
8   forward, correct?
9   A   Not quite.
10  Q   Other than the New York Methodist income, correct?
11  A   Or some other kind of health care provider in which he
12  works as an independent contractor.  Yes.
13  Q   But you have essentially and let me point to this line,
14  this line, correct?  That is the 185 credit for discounted
15  post accusation gross income.  You have essentially put an
16  annual average expectancy on that, correct?
17  A   Not quite, sir.
18  Q   How would you explain it, why don't I ask you that?
19  A   I began with the assumption that in year 2012, he would
20  earn $17,814.  Now, I know that 2012 has come and gone.  At
21  the time I prepared this return, I didn't have a filing, an
22  income tax filing for 2012.
23              Thereafter, I assumed that that amount, $17,814
24  would increase every year by the amount of the increase in the
25  CPI, component for dental services.  So I did not assume it

1   would be constant.
2   Q   Fair enough.
3               Did you do any kind of a labor market analysis for
4   dentists or dentistry in the New York area?
5   A   No.
6   Q   Did you rely on any market analysis in your conclusion
7   that Doctor Morse would be unable to find work for the next
8   ten years?
9   A   I did not myself conduct a market analysis.  I did review
10  documents given to me evidencing Doctor Morse's attempts to
11  find work as a dentist.
12  Q   Am I correct, the latest such document was dated in 2010,
13  do you recall that?
14  A   I don't recall the exact date, sir.  I don't dispute it.
15  I just don't remember it.
16  Q   In terms of long-term practice income, in the course of
17  your analysis, did you consider the effects on Medicaid
18  providers of trends toward Medicaid managed care programs?
19  A   No.
20  Q   Are you aware of either present or long-term trends in
21  Medicaid reimbursement rates?
22  A   No.
23  Q   Let's talk a bit about the sale of Doctor Morse's
24  practice.
25              Now, I take it one of the documents that you were

1  provided was an agreement between Doctor Morse and Doctor
2  Kefover concerning the sale of the practice in the event of
3  Doctor Morse's death or disability?
4  A    Yes.
5  Q    You did review that document, correct?
6  A    I read it.
7  Q    You are aware that that document simply sets a sale price
8  in the event of death or disability based solely on a
9  percentage of the previous year's gross income, are you aware
10 of that?
11 A    I have a vague memory. I don't have-- I don't remember
12 all the language of the document, but that sounds right.
13 Q    You do recall that that document did not make specific
14 breakouts for goodwill, equipment, lease value or anything of
15 that nature, do you recall that, correct?
16 A    I don't recall it well enough to agree or disagree to
17 that.
18 Q    You are aware that with respect to the $450,000 price
19 that Doctor Morse obtained, he did not solicit competitive
20 bids, are you aware of that one way or another?
21 A    I have no knowledge as to what activity Doctor Morse
22 engaged in in the time period around the sale of the practice.
23 Q    So you don't know if he advertised?
24 A    I don't know.
25 Q    You don't know if he solicited other offers?

1  A    I don't know.
2  Q    You don't know if he had other offers?
3  A    I don't know.
4  Q    Would it have been relevant to your analysis had you
5  known those things?
6  A    It might have been.
7        MR. FARBER: Thank you very much, Doctor.
8        THE COURT: Do you have anything?
9        MR. NORINSBERG: Just two minutes, one minute.
10       THE COURT: Okay.
11 REDIRECT EXAMINATION BY MR. NORINSBERG:
12 Q    Doctor Mantell, you were just asked a question about the
13 business agreement from 2001 that it didn't have any
14 allegation for goodwill.
15       The sale agreement in 2006 did have an allegation of
16 goodwill didn't it?
17 A    It did.
18 Q    That allegation was only $13,000, right?
19 A    Correct.
20 Q    Does that appear to be a fair market value for this
21 30-year old dental practice?
22       MR. FARBER: Objection.
23       THE COURT: I will sustain the objection.
24 Q    In your opinion, Doctor Mantell, was that fair market
25 value for Doctor Morse's practice?

1        MR. FARBER: Objection.
2        THE COURT: I sustained the objection just because I
3  don't believe there is any foundation to issue an opinion on
4  that.
5  Q    Did you do a calculation of fair market value?
6  A    For Doctor Morse's practice?
7  Q    Yes.
8  A    Yes.
9        THE COURT: On the date-- at the time of the sale
10 did you do a fair market valuation at the time of the sale in
11 2006?
12       THE WITNESS: I used a statistical method.
13       THE COURT: I am asking, did you do that fair market
14 value for that period of time in 2006?
15       THE WITNESS: Yes, I did.
16       THE COURT: So, then he can answer the question.
17 Q    Was it fair market value for the practice in 2006?
18 A    What was it, is that what you are asking?
19 Q    In your opinion, was it fair market value?
20       MR. FARBER: Was what?
21 A    I'm not clear on the question.
22 Q    Was the sale of the practice at $450,000 was that a fair
23 market value for that practice?
24 A    No.
25 Q    Why not?

1  A    Because the goodwill which was itemized in the buy and
2  sell agreement was grossly, in my opinion, my professional
3  opinion, grossly out of line with what a 30-year old dental
4  practice with a viable reputation could command in the
5  marketplace.
6        It seems to me that the goodwill which was allocated
7  in the actual buy, sell agreement, was so small because it
8  reflected all of the adverse publicity and notoriety which had
9  swirled around Doctor Morse in the previous year.
10 Q    Is part of your calculations, did you make any
11 determination as to what the actual fair market value of a
12 practice would have been in 2006?
13 A    I did without a lease.
14 Q    Okay.
15 A    Do you want me to give the number?
16 Q    Please.
17 A    According to my calculation, the fair market value of the
18 practice in 2006, exempting the value of the lease, was
19 $590,494.
20 Q    So, approximately, $150,000 higher than what it actually
21 sold for; is that correct?
22 A    Roughly.
23       MR. NORINSBERG: Thank you, I have nothing further.
24       MR. FARBER: Nothing from me, your Honor.
25       THE COURT: All right. Thank you. You can step

**JA454**

1  down.

2          (Witness was excused.)

3          THE COURT:  Does the plaintiff want to resume the

4  stand?

5          MR. NORINSBERG:  Doctor Morse.

6          THE COURT:  Your food is not here yet.

7          (Pause.)

8  D-R  L-E-O-N-A-R-D   M-O-R-S-E, having been previously duly

9  sworn, resumed the stand and testified further as follows:

10 CROSS-EXAMINATION BY MR. FARBER:

11 Q    Sorry to have to do this, I will refer you back to

12 Exhibit F, that is the Grand Jury exhibit.  Specifically, I

13 will have you look at the Edwin Gonzalez' page, Doctor.

14 A    I located it.

15 Q    Your contention of course, this is three different

16 people; is that correct?

17 A    Correct, sir.

18 Q    Now, I'm going to ask you to-- with respect to each one,

19 I will ask my question with respect to each one.

20          With respect to Edwin Gonzalez, with a SIN number

21 ZE4180J, am I correct, 580 Dental had such a patient who had

22 such a SIN number?

23 A    That's correct.

24 Q    And, with respect to the entries that is to say, amount

25 paid, date of service, invoice number, procedure code,

---

1  procedure description, do you have any reason to believe that

2  the claim information pertaining to that particular Edwin

3  Gonzalez is not itself an accurate reflection of what you

4  billed to the Medicaid program?

5  A    No.

6          THE COURT:  Would the same be true with respect to

7  the other two Edwin Gonzalez's and the amounts paid on that

8  form.  The same be true that you would have no reason to doubt

9  that it is inaccurate?

10          THE WITNESS:  Correct, your Honor.

11          MR. FARBER:  Thank you, you saved me a great deal.

12          I will turn this back to Stacy Rodriguez page.

13 Q    I am going to refer you to Exhibit AY, that is the one

14 page of the January '03 remittance statement that we have.

15          THE COURT:  Do you have that in front of you?

16          THE WITNESS:  Yes.

17          THE COURT:  What is the question?

18 Q    Is there--

19          THE COURT:  What is up on the board?

20          MR. FARBER:  What is up on the board, your Honor, is

21 Exhibit F, the Stacy Rodriguez page.

22          THE COURT:  Also known as Grand Jury?

23          MR. FARBER:  Grand Jury 11 and Exhibit F in this

24 trial.

25          THE COURT:  Okay.

---

1  Q    I am going to--

2          THE COURT:  Now, you have asked him.  He has AY.

3          MR. FARBER:  He has them both?

4          THE COURT:  Yes.

5          What is the question?

6  Q    Do you have any reason to conclude that the minus signs

7  on Exhibit AY, I will point to them.  Minus signs down here

8  for patient Rodriguez.  I am referring to the minus 174, minus

9  174, minus 87.  And the 174, 174, 87, above them.

10          Do you have any reason to conclude that those

11 entries on Exhibit AY, are not the entries that are reflected

12 in the Stacy Rodriguez entry of Exhibit F?

13 A    No.

14          MR. FARBER:  Thank you, your Honor, we have no

15 further questions.

16          THE COURT:  Do you have anything further?

17          MR. NORINSBERG:  I do, some brief redirect.

18          THE COURT:  Brief?

19          MR. NORINSBERG:  I mean a few minutes, take a few

20 minutes.

21          I will rip through it quickly.

22          THE COURT:  Okay.

23 REDIRECT EXAMINATION BY MR. NORINSBERG:

24 Q    Doctor Morse, you were asked some questions about the

25 prescriptions and whether you have actual copies of the

---

1  prescriptions in your files.

2  A    That's correct.

3  Q    Now, we had previously put up Plaintiff's Exhibit 115,

4  showed you this form, do you remember?

5  A    Yes.

6  Q    When we talk about a copy, does this form actually get

7  copied physically and put in a file?

8  A    No.  It doesn't get xeroxed.

9  Q    What actually happened, what information is taken from

10 that and put into the file?

11 A    The exact order to the laboratory is put in the file not

12 a Xerox copy of the entire prescription.

13 Q    Basically instructions that would appear on here, would

14 also be contained in the file; is that correct?

15 A    That's correct.

16 Q    Now, you were also asked--

17          THE COURT:  Just so I can clarify.  You are talking

18 something different than notes you make in your chart.  You

19 are talking about a separate document?

20          THE WITNESS:  I'm talking about the dental

21 prescription, what we are writing to the laboratory.  Those

22 instructions are transcribed the same way into the patient's

23 permanent record.

24          But the physical, the entire physical form is not

25 physically xeroxed and then included in the patient's record.

**JA455**

1   Just the instructions portion is put into the patient record.
2           THE COURT:  But that is a separate document than
3   your chart notes, correct?
4           THE WITNESS:  Well, the prescription blank is a
5   separate document.  What I am saying is, the prescription
6   blank where the instructions, where the line says,
7   instructions.
8           THE COURT:  Right.
9           THE WITNESS:  It is written out.  That language is
10  then exactly written into the patient's permanent record.
11          THE COURT:  What are you calling the patient's
12  permanent record?
13          THE WITNESS:  The copies of what we have here.
14          THE COURT:  The chart?
15          THE WITNESS:  The patient's chart.
16          THE COURT:  Didn't you for a year keep that
17  information in some other form, other than in the patient's
18  chart?
19          THE WITNESS:  Yes.  I kept that actual original or
20  copy of that for one year period of time in a separate file.
21          THE COURT:  That is what I thought he was asking.
22          MR. NORINSBERG:  I wasn't asking that.
23          THE COURT:  Then I misunderstood your question.
24          You did keep-- you filled out that document, right?
25          THE WITNESS:  Yes.

1           THE COURT:  You sent that document to a lab.
2           THE WITNESS:  A copy of it.
3           THE COURT:  You kept the original for a certain
4   period of time in a separate file, not with the patient's
5   charts, correct?
6           THE WITNESS:  Correct, your Honor.
7           THE COURT:  I'm sorry, I thought you were asking
8   that question.
9   BY MR. NORINSBERG:
10  Q    After the one year, the actual physical prescription
11  would be thrown out; is that correct?
12  A    Correct.
13  Q    But the information that was on that prescription is
14  permanently in the patient's chart, correct?
15  A    Correct.
16  Q    Anyone who wanted to know what information you had on the
17  prescription all they have to do is go into the chart and they
18  can find it, correct?
19  A    That's correct.
20  Q    Now, you were asked questions about whether or not you
21  keep the invoices from the labs after you paid the bill?
22  A    That's correct.
23  Q    Now, you actually have records of what you paid through
24  your checks; is that correct?
25  A    That's correct.

1   Q    Again, anyone who wanted to know what you paid to the
2   lab, all they have to do is check and see what your bank
3   statements or checks were, correct?
4   A    That's correct.
5           MR. FARBER:  Objection.
6           THE COURT:  Overruled.
7   Q    Now, the questions you were asked by Mr. Farber as to
8   what you keep or don't keep in the files, you mentioned you
9   had been subjected to multiple audits before.  Was there ever
10  any issue raised as to your record keeping practices in the
11  four prior audits?
12          MR. FARBER:  Objection.
13          THE COURT:  Overruled.
14  A    Never.
15  Q    You were also asked about when you first were asked for
16  prescriptions by Medicaid, by the MFSU, do you remember that?
17  A    Yes, I do.
18  Q    So, when you first were interviewed by the investigators,
19  and when they first asked for the charts, did they actually
20  ask for prescriptions?
21  A    No, they did not.
22  Q    When was the first time relative to this issue, when did
23  they actually first ask you for prescriptions?
24  A    In the year 2004.
25  Q    Approximately two years after the first interview or so?

1   A    That would be correct.
2   Q    Now, you were asked questions about Doctor DeLuca and
3   what her areas of expertise would be.  Do you believe that
4   Doctor DeLuca has any expertise relative to the specific
5   dental treatment that we are dealing with in this case?
6   A    No, I do not.
7   Q    Why do you feel that?
8   A    I feel Doctor DeLuca by her own admission was never a
9   Medicaid provider.  She had no Medicaid provider number and
10  Doctor DeLuca by her own testimony here, said she had spent
11  all of three hours in a Medicaid practice and it was I think
12  in her words, not for her.
13          And also Doctor DeLuca seems to be practicing on a
14  very limited basis ten hours per week, I believe her testimony
15  was.
16  Q    Now, why would knowledge of Medicaid billing procedures
17  matter in terms of when you are trying to analyze Grand Jury 7
18  or 11?
19  A    Well, the only way to analyze it, is to understand the
20  procedure codes and what they mean.  And I believe Doctor
21  DeLuca's deposition testimony was, that she did not know the
22  codes and she never billed Medicaid for any procedure.
23  Q    Now, we have talked about the fact that the records
24  didn't have tooth numbers on them.  I want to show you Grand
25  Jury-- I want to show you Defendants' Exhibit G, that you were

**JA456**

1  asked questions about.
2           Do you see Doctor Morse where there is a column that
3  says, procedure code?
4  A   Yes, I do.
5  Q   Do you see right next to that procedure code, there is
6  tooth code, correct?
7  A   That's correct.
8  Q   Then if you go down that column there is specific tooth
9  numbers that correlate with those procedures, correct?
10 A   Yes, there are.
11 Q   So there is a document in the possession of the Medicaid
12 records, that indicates what procedure was performed and what
13 tooth it applied to, correct?
14 A   That's correct.
15 Q   But when this document, the Grand Jury 7 was presented to
16 the Grand Jury, tooth numbers were not presented, correct?
17 A   That is correct.
18           MR. FARBER:  Objection.
19           THE COURT:  I will sustain the objection.
20 Q   You mentioned--
21           THE COURT:  And strike the answer.
22           Ladies and gentlemen, when I sustain an objection
23 and a witness has answered before that, you are to disregard
24 the answer given.  That has happened a number of times.
25 Q   Now, you indicated Doctor Morse that to this day, in

1  2013, you never received your original charts back; is that
2  correct?
3  A   That's correct.
4  Q   What did you actually get back from the Attorney
5  General's office?
6           MR. FARBER:  Objection.
7           THE COURT:  I don't understand the basis for the
8  objection.
9           MR. FARBER:  Relevance, and it is beyond the scope
10 of my examination.
11           MR. NORINSBERG:  It goes directly to what he was
12 asking about.
13           THE COURT:  I think it went directly to some answer
14 he gave.
15           Go ahead.  Are you asking him what records he got
16 back?
17 Q   What records did you actually get back from the Attorney
18 General's office relating to your charts?
19 A   I got Xerox copies of those charts back.
20 Q   Now, you mentioned before that it appeared that your
21 records were mixed in with a few other dentists; is that
22 correct?
23 A   That's correct.
24           MR. FARBER:  Objection.
25           THE COURT:  I will sustain the objection to this.

1  Q   Did you get actually complete records back for the charts
2  that we are talking about?
3  A   No, I did not.
4  Q   You were asked questions about Stacy Rodriguez and the
5  adjustments that showed up on Defendants' Exhibit AY, and on
6  AX.  Do you recall that Doctor Morse?
7  A   Yes, I do.
8  Q   Doctor Morse, how do you know that you weren't the one
9  that made these adjustments?
10 A   Well, I actually went back.  I kept all my vendor
11 statements.  So I went back to cycle 326, that was issued to
12 me by Medicaid on 1/16/2003.  I examined the entire week's
13 remittance cycle.  I can see that pretty much every single
14 claim on that cycle, on that one hundred plus page document,
15 has an adjustment on it.  I did not do that.
16 Q   Now, Doctor Morse, did there come a point in time where
17 you had stopped actively searching for jobs?
18 A   Yes, there did.
19 Q   And, when did that happen to the best of your memory?
20 A   About three years after my acquittal in the criminal
21 trial.
22 Q   Why did you stop searching for jobs?
23 A   I think after a three-year period of time it is pretty
24 apparent that that is just not going to happen.  You are not
25 going to get a job.

1           MR. NORINSBERG:  Thank you, Doctor Morse, nothing
2  further.
3           MR. FARBER:  Nothing from me, your Honor.
4           THE COURT:  Okay.  Thank you.  You can step down.
5           THE WITNESS:  Thank you, your Honor.
6           (Witness excused.)
7           THE COURT:  The food is still not here yet.  Do you
8  want to call your next witness.
9           MR. NORINSBERG:  We are done with witnesses, your
10 Honor.  So, what we-- we are concluding.
11           THE COURT:  You are resting?
12           MR. NORINSBERG:  I actually would ask the
13 opportunity to, given the large volume of documents, to
14 formerly rest Monday and make sure there are no other records
15 that need to be put in.
16           There also might be possible one or two brief
17 deposition readings, but I will do that very quickly on Monday
18 morning if it is going to be done.
19           With the Court's permission.
20           THE COURT:  So, it would just be-- you have not
21 decided whether you want to read other testimony in?
22           MR. NORINSBERG:  I believe that there will be very
23 limited readings on Monday.
24           THE COURT:  You don't have those available now that
25 you can read?  We have some minutes and the jury's lunch

**JA457**

1  hasn't arrived.
2       MR. NORINSBERG:  If you want to take a brief
3  two-minute recess, I can check the file.  We might well have
4  that and we might not.
5       MR. FARBER:  Can we have a scheduling side bar.
6       (Side bar conversation.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       MR. MILLER:  How late do you intend to go today?
2       THE COURT:  Till 2:30.  When the lunch comes, I will
3  give them about fifteen minutes to eat the lunch.
4       What is the problem?
5       MR. MILLER:  I guess I am wondering whether you want
6  us --
7       THE COURT:  Do you have something?
8       MR. MILLER:  We had a witness.  I thought we were
9  going to stop at one, so I asked him to leave.  I'm sorry, I
10  thought we were going to stop at one based on our earlier
11  discussion.  We don't have the witness here at this time.  We
12  have Rule 50 motions to make when he rests.  There are things
13  we can do.
14       THE COURT:  That is all right if you don't have a
15  witness.
16       The problem is, I would like to wrap up your case.
17       MR. NORINSBERG:  I'm just concerned, your Honor, and
18  I normally never have this in a case.  Given the large volume
19  of records, I would like an opportunity to double check and
20  make sure that everything that was, for example, might have
21  just used and marked for identification --
22       THE COURT:  That is one thing.  If you are going to
23  go through and make sure all the exhibits are in.  Perhaps
24  that is one thing.  If you are talking about reading
25  deposition testimony, read it now or don't read it.

1       MR. NORINSBERG:  Can I perhaps be given a
2  five-minute recess to do that, make that decision?
3       THE COURT:  Hold on a minute.
4       (Open Court.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       THE COURT:  Ladies and gentlemen, I will send you
2  back for five minutes, if your lunch comes if the interim, you
3  will have longer to eat your lunch and then I will bring you
4  back.
5       (Jurors left courtroom.)
6       THE COURT:  I will let you know if for some reason
7  their lunch comes in five minutes, we will have a little
8  longer of a break.  If not, then you better start looking now
9  so we can.
10       MR. NORINSBERG:  We are looking now.
11       THE COURT:  Okay.
12       (Recess taken.)
13       THE COURT:  All right.  Are we ready to proceed?
14       MR. NORINSBERG:  I'm sorry, your Honor, I don't know
15  where my clients are.  I will proceed if you want me to right
16  now.  I think they went to get lunch.
17       THE COURT:  Didn't they know we were coming back?
18       MR. NORINSBERG:  They are in the cafeteria right
19  now.
20       THE COURT:  They knew or should have known they were
21  just going to eat their lunch and come back.
22       MR. NORINSBERG:  It is my fault really.  I was
23  pre-occupied with the deposition.  Do you want me to go down
24  and quickly get them.
25       THE COURT:  Why don't you have your associate do

**JA458**

1    that.
2                What do you need to do?
3                MR. NORINSBERG:  Just wait two minutes until they
4    come back up.
5                THE COURT:  I understand that.  Are you going to
6    read the deposition transcript?
7                MR. NORINSBERG:  I am just showing counsel what I am
8    going to read.
9                MR. MILLER:  We need to look at it.  We have not
10   seen the designations.
11               THE COURT:  Whose testimony are you reading?
12               MR. NORINSBERG:  Levon Aharonyan.
13               MR. FARBER:  Mr. Aharonyan, will be testifying on
14   Monday morning.
15               MR. NORINSBERG:  I want this in my case in chief not
16   through cross-examination.
17               (Pause.)
18               THE COURT:  Now, did you have an opportunity to go
19   through your exhibit list?
20               MR. NORINSBERG:  I did not.  I will rest on the
21   record, your Honor, subject to possibly reopening if we
22   discover something that is not there.  I believe we have
23   everything that.
24               THE COURT:  You are talking about an exhibit,
25   something like an exhibit you may not have formally moved in.

1    You are not talking about having somebody else to testify
2    about something.
3                MR. NORINSBERG:  Exactly.
4                THE COURT:  Okay.
5                So, counsel can make their whatever Rule 50
6    arguments that they want to make today.
7                MR. NORINSBERG:  Yes.
8                THE COURT:  Let's bring the jurors in.
9                (Jury entering.)
10               THE COURT:  Please be seated.  We just have as I
11   understand it, Mr. Norinsberg, you are just going to read some
12   excerpts of a deposition.
13               MR. NORINSBERG:  Yes, that's correct.
14               THE COURT:  Then we will send you home.
15               MR. NORINSBERG:  Reading now from the deposition
16   transcript of Levon Aharonyan, dated May 19th, 2009.
17               Starting with page six, line three:
18               QUESTION:  "Where are you employed?"
19               ANSWER:  "I am employed at the office of Medicaid
20   Inspector General."
21               Page six, line 6.
22               QUESTION:  "What is your position at the office of
23   Medicaid Inspector General?"
24               ANSWER:  "Currently, I'm an assistant director.  One
25   of two assistant directors at our New York City office and I

1    supervise our staff.  Investigator staff."
2                Page six, line 24.
3                QUESTION:  "What are your duties and
4    responsibilities as assistant director?"
5                ANSWER:  "I basically directly supervise a number of
6    managers, investigative staff in our offices."
7                Page seven, line 5.
8                QUESTION:  "What type of staff do you supervise?"
9                ANSWER:  "Actually we have some investigators, we
10   have some audit type staff also."
11               Page 32, line ten.
12               QUESTION:  "So as the assistant director, how many
13   people do you oversee?"
14               ANSWER:  "At least 30."
15               Page nine, line 23.
16               QUESTION:  "How long did you work at the New York
17   State Department of Social Services?"
18               ANSWER:  "My career is 30 years as Social Services
19   was absorbed into DOH, I believe in 1998, we became DOH
20   employees, and essentially the same capacity.  The work didn't
21   change."
22               Page 11, line 18:
23               QUESTION:  "When did you first become a supervisor?"
24               ANSWER:  "In 1983."
25               Page 12, line 11.

1                QUESTION:  "Did there come a time in your career
2    where you supervised auditors, who were looking into
3    fraudulent Medicaid bills?"
4                ANSWER:  "Fraudulent Medicaid billing?"
5                QUESTION:  "Yes."
6                ANSWER:  "Well, some of our findings would lead us
7    into cases where billings were reviewed, records didn't
8    document billings.  So we would have false claims and other
9    things, yes."
10               Page 12, line 22:
11               QUESTION:  "Was that the purpose of your unit, to
12   determine whether or not the billings were in fact accurate?"
13               ANSWER:  "We would do the physical review, financial
14   review of the records, yes.  The object of the audit would be
15   to confirm the records verified the claims that were paid for
16   those cases."
17               Page 14, line six:
18               QUESTION:  "What steps would you take to verify that
19   the documentation supported the claims that were being made?"
20               ANSWER:  "We would request records and then check
21   the records to make sure that they verified what was billed."
22               Page 14, line 15:
23               QUESTION:  "So, for example, in the case of a
24   dentist, you would actually request the dentist's patient
25   charts?"

**JA459**

1  ANSWER:  "Yes."

2  Page 14, line 19:

3  QUESTION:  "And why would you want to see the actual

4  patient charts of the dentist?"

5  ANSWER:  "To verify the work that was billed for and

6  paid."

7  Page 15, line 7:

8  QUESTION:  "So you were looking to see whether or

9  not the bills that the dentist has submitted to Medicaid

10  correlated with the work that the dentist had written down in

11  his patient chart?"

12  ANSWER:  "Yes."

13  Page 15, line 13:

14  QUESTION:  "So you would consider the patient charts

15  to be important in terms of your evaluation, correct?"

16  ANSWER:  "Yes."

17  Page 15, line 23:

18  QUESTION:  "Without looking at the patient charts,

19  would you have any way of being able to determine whether or

20  not the dentist had actually done the work, that he had

21  submitted bills for?"

22  ANSWER:  "There maybe, I'm going to say, no.  You

23  would need the records to verify."

24  Page 16, line eight:

25  QUESTION:  "So you would need the actual patient

RB      OCR

---

1  charts to verify whether or not the work had been done,

2  correct?"

3  ANSWER:  "The specific work to be done, yes.  The

4  actual work.  Yes."

5  Page 16, line 13:

6  QUESTION:  "Can you think of any reason why you

7  would not want to-- wouldn't examine the patient charts in

8  trying to determine if the work had been done?"

9  ANSWER:  "There maybe other ways to verify what was

10  being done, but typically we would ask for documentation, such

11  as the medical record."

12  Page 56, line 21:

13  QUESTION:  "But in terms of dental providers, would

14  the patient chart be the first step in looking for supporting

15  documentation?"

16  ANSWER:  "Yes."

17  That concludes my deposition reading, your Honor.

18  THE COURT:  And I understand that the plaintiff

19  rests subject to reviewing your exhibit list.

20  MR. NORINSBERG:  Yes, at this time, the plaintiff

21  rests.

22  THE COURT:  All right.  Ladies and gentlemen, I'm

23  going to excuse you for the weekend.  I will tell you to be

24  real careful getting home.  I don't know whether this big

25  storm is going to come off or not, but it might well.

RB      OCR

---

1  So, be real careful and have a nice weekend in the

2  snow.  Don't discuss the case and we will begin Monday morning

3  at 9:30.  Have a nice weekend.

4  I think it is little slippery outside, so be

5  careful.

6  (Jurors left the courtroom.)

7  THE COURT:  You indicated you wished to make a

8  motion.

9  MR. FARBER:  Yes.

10  MR. NORINSBERG:  I have a motion too, as a

11  plaintiff.

12  If you want to go first.

13  THE COURT:  Your motion.

14  MR. NORINSBERG:  I'm moving for a partial directed

15  verdict on the issue of whether or not Doctor Morse suffered a

16  deprivation of liberty.  I think the evidence has been

17  uncontested in this case, that he was arrested, he was

18  arraigned, he had multiple court appearances which were

19  mandatory.  There is no conflicting evidence, so I don't

20  believe that particular issue should go to the jury.  I think

21  the Court should decide that issue as a matter of law.  That

22  he did in fact suffer a depravation of liberty.

23  THE COURT:  I don't know that-- it depends on what

24  you mean by, suffered a deprivation of liberty.

25  I certainly am not going to find on the record that

RB      OCR

---

1  there is proximate cause.  In other words, that their conduct

2  caused -- the defendants' conduct caused the deprivation.  But

3  I think-- I don't suppose defendants have any problem with the

4  Court in their-- in its charge saying that if someone has to

5  come back to court and that that constitutes a deprivation of

6  liberty.

7  Are you in any way disputing anything but proximate

8  cause?  I mean is it contested that coming back, that he had

9  to come back to court and that that constitutes depravation of

10  liberty?

11  MR. MILLER:  We are not contesting that.  Obviously

12  the causation we contest.

13  MR. NORINSBERG:  Our view is this, the jury finds,

14  yes, there are falsified records and, yes, material to the

15  indictment, then as a matter of law, we have made out a fair

16  trial claim.

17  What the damages are, that is a separate issue.

18  But, to the extent that we had to prove that there was

19  depravation of liberty, it should not be on the verdict sheet

20  and that is where my motion is directed to, because defendants

21  have submitted a verdict sheet, which has a separate

22  interrogatory on that question.

23  And, I don't believe that that question should be on

24  the verdict sheet at all.

25  MR. MILLER:  I think our verdict sheet it was tied

RB      OCR

**JA460**

1  to causation. So I think in some ways, you know, that-- if
2  that question is there, if we are going to address causation
3  in that context, that question should be there.
4       Now, I gather the Court has been working on a
5  verdict sheet, so, you know, we would be interested to see.
6       THE COURT: Perhaps the question shouldn't be simply
7  did he-- was there a depravation of liberty. Maybe the
8  question should be, was somehow tied to the proximate cause
9  issue.
10      MR. MILLER: That is what our question is, your
11 Honor.
12      Our question asks whether or not they have proven,
13 by a preponderance, plaintiff was deprived of his liberty as a
14 result of the purported fabricated evidence, that is what we
15 have.
16      MR. NORINSBERG: To us, that is a question that is
17 an unnecessary question. If the jury has found that there was
18 fabricated evidence that was material to the indictment, then
19 as a matter of law, they would have to find in our favor.
20 They could not then find that it was material to the
21 indictment, however, no depravation of liberty resulted that
22 would not be a legally possible outcome of this case.
23      That is what my application is.
24      THE COURT: That is the problem with the whole
25 problem with the case, which is, when you looked at the very

1  elements that you asked me to charge, they have the
2  materiality question and then they say, was there a loss of
3  liberty, I think as a result. It is not clear-- this is what
4  I thought the problem from day one is. That I am not sure
5  that their couldn't be a case where it was likely to influence
6  the jury's decision, but then, the depravation of liberty
7  didn't result. I don't know.
8       MR. NORINSBERG: It would be an inconsistent finding
9  by a jury. It would not stand up for a minute. I just don't
10 think they could possibly have-- that cannot be an outcome.
11 Once it is material to the indictment, there is no way they
12 can win on that issue.
13      THE COURT: What is your position on that?
14      MR. MILLER: I mean I think he needs to show
15 causation and to your point --
16      THE COURT: Give me a scenario in this case.
17 Assuming the Grand Jury were to find that the two
18 exhibits were material to the Grand Jury's investigation. Is
19 there some argument you had that he still hasn't prevailed?
20      MR. MILLER: Well, there is the all twelve charges
21 issue.
22      THE COURT: Apart from that argument. If you agree
23 with that, then I don't think-- I think we can deal with it.
24      MR. MILLER: I think it depends whether materiality,
25 has the definition that the Court offered earlier or if it has

1  the lower threshold likely to influence factor.
2       THE COURT: I think what the cases talk about is, it
3  is likely to influence.
4       MR. MILLER: If it is likely-- if the standard is
5  only likely to influence, then I think the proximate cause
6  charge--
7       THE COURT: How are they different? How are the
8  standards different? Because it is confusing.
9       MR. MILLER: Well, I think the difference is, that
10 likely to show, really gets at the idea that it was material
11 to some issue that the jury was deciding. Whereas the
12 causation issue gets at the issue as to whether it actually is
13 what really would have pushed the jury to make a decision.
14      THE COURT: So how do you separately charge on that?
15      MR. MILLER: Well, I mean you could have--
16      THE COURT: Are you really going to argue that or
17 can we just charge the elements as they are?
18      MR. MILLER: I think there needs to be--
19      THE COURT: In all the cases talk, use the phrase--
20 I did suggest that one case, one of the parties, I wanted to
21 look at. I don't know whether it entirely fits the context
22 here.
23      But it is a troubling question, that I'm not sure I
24 really know the answer to. So, what are we-- it really
25 depends on practically what the defendants want to do here.

1  If you have some argument that or a line of argument you want
2  to make to the jury, I mean what is it? Assuming I charge the
3  following:
4       That they have to show that the evidence was
5  material that is likely to influence the jury's decision and
6  plaintiff suffers a depravation of liberty as a result.
7       Is there some argument that you want to make that it
8  may have been material, but it didn't deprive him of his
9  liberty?
10      Do you want to be seated, please in the courtroom.
11      I mean we don't need to go there if we are not going
12 to argue the case that way.
13      MR. MILLER: I guess I should say, your Honor, I
14 think it is in the cases, you need to show that the plaintiff
15 was deprived of his liberty as a result. And so I think that
16 should be included in the charge.
17      THE COURT: I will charge that. I mean that is what
18 it says. The question is, what does it mean and whether you
19 are going to try to argue that it means something different.
20 If you are, do we need to talk about that now?
21      We don't need to go into this if you are not going
22 to be making that argument. I can just charge the jury.
23      MR. MILLER: I mean-- one thing, in terms of likely
24 to influence, I think it is important that the instructions be
25 clear that it is likely to influence on an issue the jury

**JA461**

1 needs to decide.

2 And, I think that is, you know, a critical part of

3 what is going here and that gets to the, as a result of issue.

4 Because, you can say likely to influence, well, you know you

5 might introduce evidence that would make someone think, a

6 particular way about a criminal defendant. Might influence

7 their view of him. But it has to be on an issue that is in

8 the case that they decide on, because you can only be deprived

9 of your liberty as a result of a decision that relates to a

10 particular claim.

11 So, that is where the materiality connects up with

12 being deprived of liberty as a result of. You can only be

13 deprived of your liberty if they decide a particular issue

14 that is put to the Grand Jury.

15 THE COURT: And that piece of evidence was likely to

16 influence them on whether they returned that charge?

17 MR. MILLER: Exactly. So Edwin Gonzalez is

18 obviously the perfect example there. There is no charge on

19 him and therefore--

20 THE COURT: It still could-- that doesn't

21 necessarily mean-- I have to think about that. I suppose that

22 is not a bad point.

23 MR. MILLER: It is just likely to influence, then it

24 is not connected to a particular decision and a separate

25 question is, gets to the issue of the fact that the

RB     OCR

1 fabrication needs to be tied to a decision to indict on a

2 particular felony charge.

3 MR. NORINSBERG: There is no support in the record

4 for making a distinction like that. Once the jury finds it is

5 material to the indictment that embodies the charges in the

6 indictment, you-- the Court asked counsel to state, give us a

7 scenario where it is material to the indictment, but somehow

8 it is not the result in the depravation of liberty. You asked

9 counsel ten minutes ago for that and I still have not heard

10 that.

11 I feel we are spending a lot of time on an issue

12 that they are not going to argue. It is not an actual

13 legitimate position legally to take in this particular case.

14 Materiality, the way-- you can't parse it

15 artificially with each charge in there. The cumulative

16 effect, the totality of the false evidence on the indictment

17 given. That is what the case is about.

18 I mean they heard false evidence, was that likely to

19 influence--

20 THE COURT: The evidence had nothing to do with a

21 particular charge.

22 MR. NORINSBERG: Then they find it is not material

23 to the indictment.

24 How could-- we only have two charges, your Honor,

25 you can parse it anyway you want. Basically a false filing

RB     OCR

1 charge and grand larceny charge. To me it is impossible to do

2 what counsel wants to do, start separating out and figuring

3 out, you know, did the Edwin Gonzalez exhibit influence them

4 or the Stacy Rodriguez exhibit. Or was it both of the

5 exhibits.

6 You know, or was it the missing tooth numbers that

7 led to the false filing counts. I mean it is our position,

8 the evidence in total, was a substantial factor in influencing

9 them.

10 The Courts say it is material. Likely to influence.

11 That is what we are talking about.

12 THE COURT: But, you also have the Ricciuti charge,

13 where they say, that that particular evidence was unrelated to

14 that charge. If the evidence is unrelated to a charge, I

15 think your position is different. You seem to say that it's

16 all related to both charges.

17 MR. NORINSBERG: As a matter of law it is all

18 related to both charges. There is no way to parse out three

19 distinct pieces of fabricated evidence and say it relates to

20 one charge.

21 THE COURT: Three distinct pieces.

22 MR. NORINSBERG: Three.

23 THE COURT: What is the third?

24 MR. NORINSBERG: We have the triple billing, the

25 Edwin Gonzalez and the omissions of the tooth numbers. You

RB     OCR

1 are talking about three different types of fabricated

2 evidence.

3 THE COURT: Wait a minute. Let me make sure I

4 understand this.

5 The material omission of the tooth numbers.

6 MR. NORINSBERG: The Stacy Rodriguez triple billing,

7 and the three Edwin Gonzalez's.

8 So, three types of false evidence contains

9 collectively in two documents, Grand Jury 7 and 11.

10 THE COURT: What do the triple billings and the

11 three Edwin Gonzalez's have to do with the grand larceny

12 charge?

13 MR. NORINSBERG: If triple billing is basically

14 somebody who is stealing from Medicaid and billing for nine

15 procedures on one particular day, and an expert says it is

16 very unusual. It doesn't make sense. That person is much

17 more likely to be found guilty of also committing grand

18 larceny in the first degree.

19 And the Court itself, the Court itself made that

20 conclusion in your opinions when you decided that we actually

21 had a viable claim to go to trial. You made the connection

22 that if the jury were to find the fabricated evidence relating

23 to one, it could also find it to all. Even though Castillo's

24 analysis was rather abstract, they can connect it to

25 everything.

RB     OCR

1       That is really ultimately the question.  Could a
2  reasonable jury make that connection.  That is why, I don't
3  think we can parse it out.  I don't think people would be
4  inclined to do that in any way, but I don't think it is
5  possible to do it in this situation.
6       THE COURT:  The jury could do it if they saw fit.
7       MR. NORINSBERG:  How?  How could a jury decide right
8  now, the one exhibit relates to one thing and another relates
9  to another.  It is collectively all the falsified evidence was
10 likely to influence the decision to indict.  That is what we
11 are required to show under Second Circuit case law.
12      And I think that--
13      THE COURT:  Well, you have to show that it was
14 material to all of the charges.
15      MR. NORINSBERG:  To the indictment.
16      THE COURT:  To all of the charges in the indictment.
17 You have to show that the evidence was material to all of the
18 charges in the indictment.
19      MR. NORINSBERG:  But how could it possibly be if
20 they found the evidence is material to the indictment.  How
21 would it not apply to all of the charges automatically.
22      THE COURT:  Why isn't counsel entitled to an
23 instruction that says it has to be material to all of the
24 charges in the indictment, because if it wasn't and there is
25 just one charge that bore no relationship to, the doctor would

1  have still been deprived of his liberty.  Why is that
2  something that should be taken away from the jury?
3       MR. NORINSBERG:  It is not-- it is not a question
4  they can decide.  It is not possible to go through each false
5  filing charge.
6       THE COURT:  Why not?
7       MR. NORINSBERG:  How can they possibly decide the
8  Stacy Rodriguez exhibit relates to this particular charge but
9  not that charge.  The point is, this man is being accused of
10 stealing money from Medicaid, they put on a false document,
11 they have an expert testify about the false document and then
12 they render an indictment.
13      How could a jury be expected to parse out, you know,
14 whether or not that particular false document coupled with the
15 testimony of Doctor DeLuca, relates to one charge or the
16 other.
17      It is collectively, it is false, misleading
18 evidence.
19      THE COURT:  Isn't that your argument?
20      MR. NORINSBERG:  It is misleading to the indictment
21 period.  It is not you can parse it out and say it relates to
22 one charge or another.
23      THE COURT:  Why is that impossible to do?
24      MR. NORINSBERG:  Because a jury easily could draw
25 the conclusion that it relates to everything.  When you hear--

1       THE COURT:  They can draw that conclusion that is
2  the conclusion that you want to draw.  Why should the
3  defendants be not permitted to make the argument that it
4  wasn't material to X, Y, Z.
5       MR. NORINSBERG:  I would like to hear that argument
6  articulated.
7       THE COURT:  I don't know whether they are going to
8  make it or not.  Why should I preclude them from making it?
9       MR. NORINSBERG:  They can make the argument if they
10 want.  I am only debating whether or not the jury has a
11 verdict sheet question that relates to that.  That is the only
12 reason I raise the issue.  Once we make a showing of
13 materially, the depravation on liberty is irrelevant, it flows
14 as a matter of law.
15      THE COURT:  That is-- now you are talking something
16 else.  I don't know if they are going to argue to you about
17 that.
18      MR. NORINSBERG:  That is what led into this
19 discussion.  If they want to make the argument to the jury
20 that it wasn't material to one charge or another.  I have no
21 problem with them doing it.  I have no problem with that.
22      I do have a problem with this being a separate
23 interrogatory in a verdict sheet or the Court making a
24 separate charge, telling them that.
25      THE COURT:  If it is not wrong, and you say that

1  they can make that argument, why wouldn't it be the
2  appropriate subject of an instruction, if it is not wrong and
3  you agree they can make the argument.
4       MR. NORINSBERG:  There is all types of arguments.
5  Just like I can argue that they shouldn't have lost Grand Jury
6  7 and where is Grand Jury 7.  I can make the argument, but you
7  are not charging on it.  I mean there are many instances where
8  a lawyer makes an argument that doesn't necessarily have the
9  Judge essentially backing up the lawyers' position.  That is
10 what I am afraid of.
11      THE COURT:  If the position is legally correct, it
12 is not backing up their position.  It is not saying,
13 instructing them, yes, I agree.  It is not material to that
14 charge.  It is-- I'm not saying that.
15      The question is, doesn't it have to-- when we talk
16 about depravation of liberty, doesn't the information have to
17 be material to all of the charges in the indictment.
18      MR. NORINSBERG:  I don't have a problem with that
19 general statement.
20      THE COURT:  That is what I was talking about
21 charging.
22      MR. NORINSBERG:  But my problem, where the issue
23 starts to become to me, much more difficult, is when we start
24 parsing out each separate count in the indictment.
25      THE COURT:  I didn't say I was going to give a jury

**JA463**

1    interrogatory.

2         MR. MILLER:  That is what we will argue.

3         THE COURT:  I can say that it has to be material to

4    all of the charges in the indictment.

5         MR. NORINSBERG:  I don't have a problem with that

6    general statement.  I don't have a problem with that at all.

7         THE COURT:  They can argue that if they find that it

8    is not material to even one of the charges, that they are

9    entitled to a verdict in their favor.

10        MR. NORINSBERG:  They can argue that just like I can

11   argue about the lost exhibit.

12        THE COURT:  It is a very different thing.

13        MR. NORINSBERG:  I don't think that should come from

14   the Court.

15        THE COURT:  Mr. Norinsberg, please.  Everyone seems

16   to like to talk over me.  The witnesses do, you guys do.

17        And, you know it is fine, forget the fact it is

18   disrespectful.  I think it is hard on the Court Reporter, when

19   he is trying to take down two people speaking at the same

20   time.

21        I don't know that we have a disagreement about

22   anything.  I don't-- I'm not going to propose a verdict sheet

23   that says, was it material to count one, was it material to

24   count two, was it material to count three.

25        I think they are entitled to a charge that it has to

1    have been material to all of the charges in the indictment.

2         MR. NORINSBERG:  Okay.

3         THE COURT:  What is your motion?

4         MR. FARBER:  Your Honor, we respectfully move for a

5    directed verdict or alternative, a dismissal of plaintiff's

6    complaint pursuant to Rule 50 on the following grounds:

7         No evidence has been adduced at this trial that

8    either Grand Jury 7 or Grand Jury 11 were actually fabricated.

9         Plaintiff has in fact, testified that he is not

10   aware of any falsity in the data actually contained in Grand

11   Jury Exhibit 11 or Exhibit F at this trial, which is the

12   document that contains all eight relevant pages to his

13   fabrication claim.

14        Second, plaintiff has admitted that with respect to

15   the page pertaining to Stacy Rodriguez, there are no actual

16   fabrication insofar as the extra six lines on Grand Jury

17   Exhibit 7 and 11, conform both to his remittance statements

18   and to the relevant sections of the provider profile.  He has

19   acknowledged that both of those documents accurately reflect

20   his claims as filed.

21        Third point, is that plaintiff has failed to prove

22   materiality here.  First, under whatever standards involved,

23   there is the plaintiff here, was not even the subject of a

24   charge relating to Edwin Gonzalez.  And hence, under no

25   circumstances, can the evidence relating to Edwin Gonzalez be

1    a demonstration of materiality.

2         Second, with respect to the false filing charge,

3    pertaining to Stacy Rodriguez.  It is undisputed that the

4    plaintiff was paid for three claims for Stacy Rodriguez, and

5    hence, the six additional claims shown on the sheet, are

6    irrelevant.

7         Third, with respect to the issue of tooth numbers on

8    Grand Jury Exhibit 7 and 11, all of the Grand Jury patients

9    testified that they simply did not have the services and

10   hence, the presence or absence of tooth numbers was utterly

11   irrelevant to the ultimate question of whether the plaintiff

12   could properly have been charged for false instrument.

13        THE COURT:  The Grand Jury witnesses said what?

14        MR. FARBER:  I'm sorry.

15        All the Grand Jury witnesses who were patients,

16   testified that they did not receive the services that for

17   which Doctor Morse, 580 Dental billed the Medicaid program and

18   hence, the presence or absence of tooth numbers is irrelevant

19   to the question of materiality with respect to the offering

20   false instrument charges.

21        Our next argument, your Honor, is that plaintiff,

22   this is the proximate cause argument.  That plaintiff has not

23   established a deprivation of liberty, specifically

24   attributable to the alleged fabrication.  For that we actually

25   do rely on the same arguments we raised with respect to

1    materiality.

2         Our next argument, your Honor, is that the

3    Defendants Fusto and Castillo are on the evidence shown in

4    this trial, entitled to qualified immunity.  The evidence

5    shows that officers acted objectively, reasonably here when

6    they simply downloaded what are admittedly true claims data,

7    and then presented that claims data to a Grand Jury for the

8    specific purpose of advancing specific charges.

9         And, our final argument, your Honor, is absolute

10   immunity.  And the present case, the evidence is un-rebutted,

11   that Grand Jury 7, and Grand Jury 11, were created shortly

12   before the time that the defendants made their presentation of

13   evidence to the Grand Jury, and after the decision to indict

14   had been made, and further, the creation of the documents,

15   Grand Jury Exhibit 7 and Grand Jury Exhibit 11, involved

16   specific discretion, particularly in selecting which fields to

17   select in order to create the document.  And that such

18   discretion was exercised in the discharge of duties by those

19   officials.

20        Finally, we argue that with respect to both

21   materiality and proximate cause, there was insufficient

22   evidence in this record, to establish that the fabrication

23   pertained to all twelve of the relevant charges.

24        Thank you, your Honor.

25        THE COURT:  Do you want to be heard?

**JA464**

1    MR. NORINSBERG:  Yes, your Honor.

2    I mean this is fundamentally a case about

3 credibility.  Every single document that we have alleged is

4 fabricated.  There is evidence in the record, that supports--

5 that our position that they were fabricated or materially

6 altered in a misleading way.

7    The billing issue with Stacy Rodriguez, we have in

8 evidence, the original vendor statement from Doctor Morse,

9 which shows there were only three distinct procedures that

10 were performed on that day.

11    However, the Grand Jury heard evidence by Doctor

12 DeLuca that there were nine procedures performed that day, and

13 she based that evidence on Grand Jury 7 which has a misleading

14 tabulation, total of nine separate procedures.

15    And every witness agreed that they were focused on

16 the procedure part of that document, not on any of the

17 billings, whether there was a minus sign or not.

18    So, to have that issue before the Grand Jury and to

19 have an expert testify about it, not only testify about it,

20 but that was the first point that was made through her

21 testimony, when it was covered by Mr. Fusto, was the very

22 first point he made through Doctor DeLuca, how excessive this

23 Stacy Rodriguez billings were.  That is clearly an issue of

24 fact for this jury to decide about that.

25    With respect to the--

1    THE COURT:  There is nothing-- I mean the document

2 that had the pluses and the minuses though, there was another

3 document that had the same-- another Medicaid document that

4 had the same information, the pluses and the minuses, correct?

5    MR. NORINSBERG:  I don't know what you mean by that.

6    THE COURT:  Exhibit G?

7    MR. FARBER:  Yes, your Honor.

8    THE COURT:  What is Exhibit G?

9    MR. FARBER:  Excerpt of the provider profile.

10    MR. MILLER:  Also in AW, combined both remittance

11 statements, you get all nine lines.

12    THE COURT:  What does the argument boil down to.

13 Exhibit itself, was not fabricated.  That is the way the

14 exhibit appeared.  It is more that it was misinterpreted.

15    MR. NORINSBERG:  I think that-- our position all

16 along is that it is a very simple position.  He only did three

17 procedures that day, he had nothing to do with backing out

18 claims.  That was his testimony which a jury could accept.

19    And the fact of the matter is, he did three claims,

20 nine were presented to the Grand Jury.  They can argue about

21 why it was appearing that way.  But there is no question it

22 was a false document.  He did not perform nine procedures.

23    THE COURT:  There is nothing false about the

24 document itself, it has the minus signs.

25    But the document was being interpreted falsely.  I

1 don't know if there is-- a difference.

2    MR. NORINSBERG:  I don't know what the difference

3 would be.

4    THE COURT:  I don't know if there is a difference.

5    MR. NORINSBERG:  Our view is, for purposes of what a

6 jury can decide, there is ample evidence in the record that

7 the original procedures were only three.  But nine showed up,

8 nine were testified to.

9    So, we really think-- without question, that is an

10 issue for a jury to decide.  They have their defense.  They

11 can argue it is the same information but there is more than

12 sufficient record for a jury--

13    THE COURT:  What are you going to argue.  What do

14 you intend to argue?

15    MR. NORINSBERG:  It is a false, fake, misleading

16 document.  It shows nine procedures when the original one he

17 clearly only did three.

18    THE COURT:  It doesn't show nine procedures, it

19 shows on the document, it has the minus signs.  So it doesn't

20 show nine procedures.

21    If someone knows what they are looking at.  But the

22 problem would be, that it was presented as if it showed nine

23 procedures.

24    So I don't know whether that is a different argument

25 or it is the same theory if you present a document in a way

1 that it is misleading, it is almost presentation of the

2 document as opposed to the document itself.

3    I mean the document is a document spun out of the

4 Medicaid records.  You can't argue, there is no evidence to

5 show that Castillo or the codefendant actually created this

6 document and put nine procedures on it.

7    There is no evidence about that that either Fusto or

8 Castillo did that.  You could argue that that is how they

9 presented the document, but the document itself is not a false

10 document.

11    MR. NORINSBERG:  It is created by Mr. Castillo, and

12 the actual original vendor statement shows that there are only

13 three procedures.  So we might disagree on this, your Honor.

14 We believe on its face without any testimony, when you see one

15 column here, and it lists procedures and there are nine

16 separate procedures, when in fact only three were performed

17 that is materially misleading on its face without any

18 testimony.

19    The fact they used an expert to drive home that

20 point makes it worse and suggests that there was clear

21 knowledge about it.  And I don't see, I think to parse this

22 issue of how it was created doesn't-- us arguing, whatever led

23 to its creation, the bottom line is, it is materially

24 misleading in its format, with or without testimony.  With

25 testimony it is especially misleading.

**JA465**

1    Clearly it will be an issue for a jury to decide.
2    THE COURT:  I don't recall the testimony.  Didn't
3 Mr. Castillo say about what he put in to get that record to
4 come out that way.  I mean that is the way the Medicaid
5 records worked.  They may have been wrong.  Somebody at
6 Medicaid may have caused the screw up by putting something
7 twice and then being required to minus it out, because they
8 made a mistake.
9    I mean I don't know that in this record, anybody has
10 proved where the mistake is.  But that is what the Medicaid
11 records showed and they showed the minus.
12   MR. NORINSBERG:  No one talked about the minus.
13   THE COURT:  I understand that.  But, there is an
14 argument perhaps about, they used this document and they used
15 it in a way that made the document misleading.  That is a
16 different argument, I think from the fact that they put a
17 false document per se before the Grand Jury.
18   Because the document has minus signs and when you
19 get down to the bottom it has the total 435.
20   Now, I grant you, it was that particular document
21 was a misleading document.  If used in the way in which it was
22 used.  But I don't know that it is a false document.  It is
23 not a false document.
24   MR. NORINSBERG:  Well, your Honor, I mean I just
25 look at that as a jury question.  The jury has to decide that.

1 I believe it is false on its face.
2    Because Doctor Morse did not have anything to do
3 with it.  That is his sworn testimony.
4    THE COURT:  That doesn't make the document false.
5 It was presented I take it as a Medicaid record.
6    MR. NORINSBERG:  It is clearly not his record.
7    MR. MILLER:  Yes.
8    MR. NORINSBERG:  He didn't create it.  He didn't
9 perform nine procedures and the document says he did.  To us
10 that makes it false on its face.  On the surface without any
11 further explanation about it.  Certainly a jury can draw that
12 same conclusion.
13   They can argue, again, they can make that argument
14 there is nothing wrong with it.  They want to say it is a
15 glitch in the system and really not false, that is fine and
16 the jury will, if the jury agrees with them, then they can
17 check off the first question against us, that there were no
18 false document.
19   But our view, for what we are doing right now is a
20 Rule 50 motion is clearly an issue of fact for a jury.
21   THE COURT:  What was the next?
22   MR. NORINSBERG:  The next thing, the argument that
23 there is clear undisputed evidence in this case, that the
24 Edwin Gonzalez records were merged from three separate
25 patients.  We have testimony from Mr. Castillo saying that he

1 was specifically asked to include all of the different Edwin
2 Gonzalez's and put them together.
3    And, that is absolutely sufficient evidence for the
4 jury to conclude the there was a false and misleading record
5 put before the Grand Jury here and the idea--
6    THE COURT:  The only argument on that one was that
7 it was not material.  That was a document that was kind of
8 screwed up.
9    MR. MILLER:  All the information in it is true.  I
10 believe in cross-examination today, that is what Doctor Morse
11 indicated.
12   MR. NORINSBERG:  No one has ever contested there
13 were three patients, that was our whole point.
14   MR. FARBER:  Further, Castillo's testimony was that
15 he simply typed in Edwin Gonzalez and three of them popped
16 out.  The testimony as to what was done with it subsequently
17 is another matter.
18   As to the creation of the document, simply asked did
19 we have Edwin Gonzalez.
20   MR. NORINSBERG:  That is not the testimony.  The
21 testimony of Castillo, he was specifically instructed by Fusto
22 to get all three of the Edwin Gonzalez's, put them in there.
23 I remember that moment at trial, I was surprised how he
24 absolutely admitted what we have been trying to prove for the
25 last five years.  So we-- there is no question about that.

1    This argument, I feel it is the argument that it
2 doesn't relate to false filing charges, we feel that is very
3 disingenuous.  To us it is more egregious they presented
4 evidence using a fake fictitious super patient, three patients
5 wrapped into one.
6    Yet, two of these patient billings are completely
7 outside of the audit period and they don't use it for false
8 filing.  You are presenting evidence that is materially false
9 and misleading and not even tying it into any charge.  It is
10 even more egregious from our view.  Certainly for purposes of
11 a Rule 50 motion, it is a clear issue of fact for the jury to
12 decide.
13   The third thing, your Honor -- I mean I don't think
14 there is any question now about the significance of the
15 missing tooth numbers.  We have testimony that when I cross
16 examined Mr. Fusto, I asked him, somebody was to specifically
17 make that decision to remove it.  He said, yes.  I said some
18 human being did that, correct?  Yes. You were the one who did
19 it, very likely it was me.
20   We have without question, testimony showing how it
21 is misleading.  It is false and misleading when you take out
22 the tooth numbers.
23   You can't possibly realize by looking at the
24 document that you are actually looking at different teeth that
25 were involved.

1    Doctor Morse's testimony just emphatically refuted
2  the testimony that we heard from Doctor DeLuca about this.  So
3  again, I feel that is clearly a factual issue that has to go
4  to a jury.
5    I also just point out that both Doctor DeLuca and
6  Mr. Fusto at various points in their testimony acknowledged
7  that it could be somewhat confusing the way it was presented
8  without tooth numbers.  So I just feel clearly this would be a
9  question for a jury to decide.
10    With regard to qualified immunity, I don't believe
11  that is even an issue we should have any discussion about.
12  Clearly under Second Circuit case law, if there is a
13  falsification of evidence under Ricciuti there is no qualified
14  immunity, it is not a viable defense in this case.  That is
15  well established.
16    There is no possible way given the facts that if the
17  jury found it was false evidence and it was material to the
18  indictment, there is no way they can argue that they are
19  entitled to qualified immunity.
20    With respect to absolute immunity, we have all types
21  of testimony in the record now as to when these records were
22  created.  There are multiple records which I introduced that
23  have different dates on them going back to September of 2003,
24  January of 2005.  Then the Grand Jury exhibits which show--
25    THE COURT:  Let me ask you something.  The exhibits,

1  the three Edwin Gonzalez's, which you called the super
2  exhibit.
3    MR. NORINSBERG:  That is Grand Jury 11.
4    THE COURT:  You got what evidence is there in
5  the record that that was made at some point prior to the
6  decision to indict.
7    MR. NORINSBERG:  Through Castillo's testimony, I
8  asked him about it when were these records created.  He said
9  at some point during the investigation.  Could have been 2004,
10  yes.  Could it have been 2005, yes.  Could it have been 2006,
11  yes.
12    There is no way that they could win that issue as a
13  matter of law.  His testimony alone defeats that argument.
14    So, you know, a jury certainly could accept that
15  testimony, credit what Castillo said that it could have gone
16  way back.  He actually used the words, during the
17  investigation.  That is what he said.
18    Now, Mr. Fusto might have given a different
19  interpretation, but his interpretation is directly
20  contradicted by Castillo.
21    So, there is no way that the Court could decide as a
22  matter of law to credit Fusto's testimony and reject
23  Castillo's testimony.
24    THE COURT:  Wasn't there testimony from Castillo
25  that the exhibits may have been created during the early part

1  of the investigation?
2    MR. FARBER:  Some exhibits may have been created
3  during the early part of the investigation.
4    I think--
5    THE COURT:  Did Mr. Castillo even really remember
6  there was an investigation here?
7    MR. FARBER:  Mr. Castillo is aware there was an
8  investigation.
9    THE COURT:  Possibly.
10    MR. FARBER:  Possibly.
11    THE COURT:  I don't know.
12    MR. FARBER:  At some point.
13    THE COURT:  I won't comment any further.
14    MR. NORINSBERG:  That is all that I wanted to say in
15  response to the Rule 50 motion.
16    MR. FARBER:  At some point, Mr. Castillo did testify
17  that this was a few weeks before he testified before the Grand
18  Jury.  That was his best recollection as to when these
19  documents were created.
20    I think Mr. Norinsberg is referring to a lot of
21  other testimony about a lot of other documents with respect--
22    THE COURT:  I'm not sure that he is.  I think Mr.
23  Castillo's testimony was hardly what I would describe as a
24  model of clarity on any point.
25    MR. FARBER:  That may well be, your Honor.

1    THE COURT:  I was just looking at the Rule.  I don't
2  know if this is like a criminal case where the Court can
3  reserve on this motion and have the-- you go forward with your
4  case and present your case to the jury.
5    MR. FARBER:  I have had other Judges do that.
6    THE COURT:  Certainly, you are allowed to renew it
7  afterwards.  I think after all that is said and done it might
8  be better for everybody concerned if we completed the case and
9  have a jury verdict on the case and these are issues that we
10  can really take up after that.
11    Your case on Monday is going to consist of?
12    MR. FARBER:  We have two witnesses.  We hope that
13  each of them will be in the range of one hour or less.  I have
14  the economist expert who hopefully will be able to -- Boston
15  will be passive and he will be able to get here by Monday.
16  They is optimistic.
17    We have Mr. Aharonyan, and that is Mr. Miller, how
18  long do you anticipate?
19    MR. MILLER:  About an hour with Mr. Aharonyan.
20    THE COURT:  He is the fellow in charge of the
21  investigators; is that correct?
22    MR. MILLER:  Well, he is from the Department of
23  Health.  He is going to talk about the remittance statements
24  and some of the things we are talking about today.
25    MR. NORINSBERG:  I just have to make an objection,

1  if that is what they are going to do.

2        My understanding, this witness during the course of

3  our litigation.  They represented to the Court in a

4  declaration that the only purpose that Mr. Aharonyan, I can't

5  say the name, we will call him Levon, the only purpose that

6  this witness' testimony was offered for at the Grand Jury was

7  simply to authenticate documents.  That is the only purpose he

8  should be allowed to testify here.

9        He shouldn't be allowed to come in and start

10  explaining things that the Grand Jury never knew about, to try

11  to add to what was presented to them for the same reasons I

12  could not call my statistician which I wanted to call to

13  refute the invoice analysis.  To me it is the same issue.

14        THE COURT:  What do you want him to testify about?

15        MR. MILLER:  Plaintiff put in the remittance

16  statements from-- the June 2002 period when Doctor Morse was

17  initially paid for the Stacy Rodriguez claims that was not

18  before the Grand Jury.  Plaintiff put it in.

19        We want to show, that if you combined that

20  remittance statement with the statement we put in today, you

21  get three lines from-- of claims from the first remittance

22  statement and then another six lines from the second

23  remittance statement.  When you combine them, the Medicaid

24  claims database has nine lines of code in it.

25        So whenever you go and you printout the claims for

1  June 4th for denture services for Stacy Rodriguez, you get

2  nine lines of claims.  That is what happened in the provider

3  profile which we saw today, and that is what happened in

4  Exhibit F as well.

5        THE COURT:  That is to prove, I take it what you are

6  seeking to prove is not a false document.

7        MR. MILLER:  Correct.

8        MR. NORINSBERG:  So they can just--

9        THE COURT:  Why can't they prove the document is not

10  a false document?  That is not going outside of the jury.

11        MR. NORINSBERG:  It is already in evidence.  Their

12  argument, they just made, they can make it without the

13  witness.  Why do they need a witness to come in and make that

14  same argument.  It is just a waste of Court time.

15        THE COURT:  I take it how the documents are run and

16  how they are produced.  So to rebut the claim that this is

17  something that somebody did on purpose to make it false.

18        MR. MILLER:  Right.

19        Doctor Morse knew a fair amount about the documents

20  I think Mr. Aharonyan can add a little bit more detail to help

21  the jury understand, understand them and understand how the

22  dating system works.

23        MR. NORINSBERG:  An hour's worth of testimony on

24  this, for somebody who is represented to be just an

25  authentication witness.

1        THE COURT:  When?

2        MR. NORINSBERG:  During a declaration they submitted

3  when they moved for summary judgment.

4        THE COURT:  They didn't represent in the pretrial

5  order that he was just an authentication witness, did they?

6        MR. NORINSBERG:  I honestly don't remember.

7        THE COURT:  Why are we talking about what is in

8  summary judgment?

9        MR. FARBER:  He was on the plaintiff's list.

10        THE COURT:  Things happen during the course of a

11  trial.  This is not to me the same as trying to present

12  evidence before the Grand Jury that wasn't there.  This is to

13  explain why a document is not false.

14        MR. NORINSBERG:  It is essentially what they are

15  doing is going back in time and clarify something why it would

16  not have been materially misleading.  I --

17        THE COURT:  No, they are not.  They are saying this

18  is why it is not false.  You have made the argument here, that

19  it was a false document.  Itself.  That the document itself

20  was false.  Somehow somebody created this document in a way

21  intentionally to make it false.

22        They are saying you put these numbers in the

23  computer, this is what you get.  Nobody tried to make it

24  false.  This is what the document looks like.

25        I think from your perspective what really happened

1  here, I don't know whether this presents its own problem, but

2  I guess it does present a problem in a way because it is a

3  problem of immunity.  Relates directly to immunity.

4        I think the argument is, that the document was

5  falsely mischaracterized in the Grand Jury.  But that maybe

6  something for which the defendants have immunity.

7        MR. NORINSBERG:  I mean we believe that they can

8  explain what they want to explain.  But the bottom line is, to

9  us, this is where we differ, your Honor, it is false no matter

10  what explanation leads to its generation.  It is false in the

11  sense that nine procedures are shown and only three performed.

12  You can't get away from that fact.

13        THE COURT:  Have you ever gotten any kind of

14  statements from banks or anything else, where they mess up and

15  they add something and then they subtract it and then they add

16  it in and subtract it.  You look at it and you go what are

17  these clowns doing.  You realize that they have made mistakes

18  and this is how they rectify their mistakes.

19        But it is on the face of it, you can see what

20  happened.  Now, this document is different, but I think you

21  got a hard road to hoe to say that it was-- what you have to

22  show is that it was created at a time predating the Grand Jury

23  investigation and that it was created by them as a false

24  document.

25        Because, there is a difference.  If in fact what

**JA468**

1  happened was, it was a real document, and a valid document,
2  but it was simply someone in the Grand Jury was told to
3  mischaracterize it, then that is something that the prosecutor
4  has absolute immunity for.
5          MR. NORINSBERG:  Your Honor, the point is, the jury
6  has heard a lot of evidence where they can put together that
7  this was something that Mr. Fusto was well aware of, and did
8  absolutely intentionally mislead the Grand Jury.
9          THE COURT:  He has got immunity for doing that.
10         MR. NORINSBERG:  If he was involved in somehow with
11 the creation of this document, they don't have to accept the
12 explanation of the defendants.  They can listen to all the
13 other acts that we have--
14         THE COURT:  And conclude what?
15         MR. NORINSBERG:  Conclude it was done intentionally
16 regardless of what they say.  Regardless of what they purport
17 their computer system says.
18         It doesn't mean because a witness comes in and says
19 it, doesn't mean it is true.  Doesn't mean that the jury has
20 to accept it.
21         THE COURT:  What are you going to argue?  Are you
22 going to argue to the jury that Castillo as directed by Mr.
23 Fusto monkeyed around with the information that was in
24 Medicaid and came up with this exhibit?
25         MR. NORINSBERG:  Yes, I am.  I am going to argue

---

1  that.
2          THE COURT:  You have proof of a that?
3          MR. NORINSBERG:  I have proof of him monkeying
4  around with the two other records and I think this is a
5  continuation of the same pattern.  I think a jury can find
6  that.
7          You know, I understand the Court may have a
8  different view.  All I am suggesting is, ultimately this is a
9  jury call.
10         THE COURT:  I'm not sure-- I wonder if it is.
11         I understand your point about how one can argue that
12 they created a false document by-- intentionally misleading
13 document by leaving off tooth numbers.  I guess with that
14 document the question is materiality, since all the people who
15 have testified said, if I understand it correctly, he never
16 did anything for us.  So.
17         MR. FARBER:  Didn't do what is on the page.  He did
18 some things, but not what is claimed here.  He did a cleaning
19 but didn't do denture repair or whatever.
20         THE COURT:  Right.
21         I have to review what the witnesses said.  They are
22 entitled to call the witness, it goes to the heart of whether
23 that was a false document.
24         So you are calling that person and the economist.
25 What will you economist say?

---

1          MR. FARBER:  The economist is simply going to offer
2  his expert opinion on the methodological flaws in Doctor
3  Mantell's presentation.
4          THE COURT:  He is not coming up with numbers
5  himself.
6          MR. FARBER:  He is not coming up with an independent
7  set of numbers.  Just argue methodological flaws.
8          THE COURT:  What are the flaws, give me a preview.
9  I am just interested.
10         MR. FARBER:  Essentially that it is not sound
11 economic practice to assume the work life to near 75.  That
12 the reliance on the income figures suggested here was not
13 reasonable.  That the consumer price index is aggressively
14 high and you had to go back and--
15         THE COURT:  I don't guess it is fair to take into
16 account the recent election which means nobody will be making
17 that kind of money.
18         MR. FARBER:  Well, particularly health care
19 providers, your Honor.
20         MR. NORINSBERG:  Just in terms of scheduling so we
21 are all on the same page.  I know the Court mentioned probably
22 going to wrap things up at four on Monday.
23         THE COURT:  Yes, unfortunately.
24         MR. NORINSBERG:  So we are definitely going to do
25 closing Tuesday?

---

1          THE COURT:  How long do you think it will take for
2  this?
3          MR. FARBER:  If Mr.-- Doctor Eric can get here, I
4  think between us both, we can be done between 11 and 11:30.
5          MR. MILLER:  I think we can do Mr. Aharonyan first
6  to allow Mr. Eric the time to get here.  I think we can wrap
7  up in the morning with our case.
8          MR. NORINSBERG:  This is what I'm concerned about.
9  I think number one we should sum and charge the same day, not
10 different days.
11         I am very concerned--
12         THE COURT:  I think we are doing it plaintiff,
13 defendant, rebuttal.
14         MR. NORINSBERG:  Right.
15         THE COURT:  So why do we all have to do everything
16 the same day?
17         MR. NORINSBERG:  I have always done that in my
18 career that way.
19         THE COURT:  If a trial ended at 9:00 in the morning,
20 the Judge said, you can go home?
21         MR. NORINSBERG:  Not at all.
22         My concern, I don't I know if we ironed out the
23 issues.  I think the verdict sheet is important.  I just don't
24 won't to be foreclosed that opportunity.  The pressure we
25 resolve this quickly and run into summations when we are going

**JA469**

1  to break early anyway.  I just think it would be--

2      THE COURT:  We will have to see where we are.  I

3  will try, I can't promise this, I will certainly have it first

4  thing Monday morning, if possible, I will file an ECF a draft

5  charge and verdict sheet on Sunday.  It might be later in the

6  day on Sunday.  So you can see something.

7      I will give you time to look over the verdict sheet

8  and the instructions to make all your arguments about that

9  before you have to sum up.  I will not make you sum up without

10  knowing what the Charge will say, I agree with you.  You don't

11  have to sum up before that process is completed.

12      MR. FARBER:  With respect to length of closing, do

13  you have any thoughts about that?

14      THE COURT:  I don't like to reign in lawyers.  But I

15  am hoping that both sides don't over do it.  I sort of like to

16  let lawyers try their cases.  I don't like-- I don't want

17  three hour summations from anybody.

18      And I also hope that the issues in this case are

19  fairly narrow and, you know, you have got to remember that

20  what we are talking about, when we are making arguments and

21  materiality and everything, is that what was before the jury

22  at that time, and what the jury heard, and not argue about

23  the-- how that evidence may have unraveled at the later date.

24  So, you know, you have got to be careful about that.

25      Now, I know that you counsel have talked about the

---

1  fact that the evidence wasn't strong and that might have been

2  a motive for Mr. Fusto to direct Castillo to come up with

3  these kinds of exhibits.  I mean, some of that can be argued

4  in the context of motive if you want.  But it has got to be,

5  how you view the evidence as it existed at the time.

6      And you can talk-- in terms of talking about

7  materiality, you really have to talk about what the evidence

8  is at the time.

9      I don't think you can argue for instance that the

10  jury shouldn't have given weight to the testimony of these

11  witnesses because you have heard here, that they are

12  notoriously poor reporters of their conditions.  You can't

13  make that argument.

14      MR. NORINSBERG:  Your Honor, they can-- they are

15  going to get up and argue about how reliable it is and how it

16  is material.  How can I be stopped from arguing my case?

17      The point is the fabricator of evidence, Fusto knows

18  they are unreliable, deliberately doesn't have his doctor

19  check them.  The doctor never looks at the chart, never

20  examined them.  This goes to the theory of my case.

21      I hope I have an opportunity to argue my case based

22  on evidence that we have in the record.  Based on evidence

23  that I wasn't-- there were no objections, was I allowed to

24  elicit the evidence.  I want to be able to comment on the

25  evidence in a way that I feel is most persuasive to the jury.

---

1      Without having to worry about whether I will have to

2  be stopping every two minutes with objections.

3      THE COURT:  That depends on how you argue it.  It

4  depends on how you argue it.

5      Do you think that you should be permitted to argue

6  to the jury, that these were material because the witnesses

7  who testified before the Grand Jury, that the Grand Jury

8  should not have been credited with what they said because we

9  all know now that they were not reliable?

10      MR. NORINSBERG:  Not at all.  I am not arguing that

11  at all.

12      What I am arguing, the fabricator of evidence, knows

13  that these patients are unreliable, deliberately doesn't have

14  them examined, doesn't have the records put in.  Has instead

15  his doctor look at a document that is not a record created by

16  Doctor Morse.

17      These are fabric of points that connect together.  I

18  just don't-- I feel as the plaintiff's attorney here, if we

19  have evidence in the record, I should be able to organize it

20  in a way that I feel is most persuasive.

21      THE COURT:  You have to argue it in a way that is

22  appropriate though.  It depends on how you argue it.

23      MR. NORINSBERG:  I am certainly not going to argue

24  the Grand Jury shouldn't have believed these people because we

25  know they are not reliable.  If that is your concern, that is

---

1  not my argument.

2      I feel like both sides should be--

3      THE COURT:  Arguing it on the materiality issue, I

4  would have a problem with.  If you want to argue about the

5  prosecutor's purported motive to come up with these exhibits,

6  that is one thing.  But you can't say, this was material

7  because these witnesses weren't reliable.

8      MR. NORINSBERG:  I'm not making that argument at

9  all.

10      THE COURT:  The Grand Jury heard these witnesses,

11  you have got to accept that this is what they said.  That is

12  what they told the Grand Jury.  The fact that later on it may

13  have turned out to be incorrect is besides the point in terms

14  of the-- what they actually heard.

15      So we have to talk about what they heard when you

16  are arguing the question of materiality.  It has got to be,

17  was it material in light of the evidence that was put before

18  the Grand Jury.

19      They are going, I suppose defendants are going to

20  argue, this wasn't material because "X" witness said, I never

21  had anything happen.  "Y" witness said, I never had anything

22  happen.  You know, didn't do this kind of work.  That is why

23  this document is not material.  I don't think you can turn in

24  your rebuttal and say, but, you know, they weren't credible.

25  Et cetera.

**JA470**

1    MR. NORINSBERG:  It goes to the motive of the
2  prosecutor.  That is how I argue it.
3        THE COURT:  That is the way you have to argue it.
4        MR. NORINSBERG:  That is the way I am planning on
5  arguing it.
6        MR. MILLER:  Your Honor, I think one thing in
7  particular, I want to make sure there is not going to be any
8  reference to the testimony at trial of the Grand Jury Medicaid
9  recipients.  That was only offered for impeachment during this
10  trial.
11        THE COURT:  What?
12        MR. MILLER:  The trial testimony of the Medicaid
13  recipients.
14        THE COURT:  They have not been-- that is not in
15  evidence.
16        MR. MILLER:  It was only offered for impeachment.  I
17  want to make sure that that is not offered.
18        THE COURT:  Impeachment of who?
19        MR. NORINSBERG:  Fusto.  Of course I will argue with
20  respect to Fusto that he knew all along about these people as
21  evidenced by what we have here at the trial, that they did not
22  even know what the word denture meant.  They are asking
23  denture not partial denture.  This is the whole theory of the
24  case that is in evidence.  There is no lawful basis to stop me
25  from arguing that.

1        MR. MILLER:  He didn't know all along.  This was at
2  the trial when the testimony came out about purported lack of
3  knowledge of dentures.
4        Again it was only offered for impeachment, not
5  offered as evidence in this case.
6        MR. NORINSBERG:  I will argue it as impeachment to
7  show how this is not a witness to be believed.  That is a
8  credibility issue.
9        THE COURT:  But that means that you are not going to
10  argue that these witnesses in fact all had dentures and didn't
11  know it.
12        MR. NORINSBERG:  We have evidence in the record,
13  your Honor, which clearly states we have testimony from Doctor
14  Morse and multiple patient charts which clearly state that
15  they do in fact have partials.
16        THE COURT:  What did Doctor Morse say about anybody
17  having partials.
18        MR. NORINSBERG:  He said that, he read through the
19  records on what the prescriptions were.  These are all denture
20  related prescriptions.  Clearly if it is in evidence, I can
21  make that argument.  Where I fit it in, in the argument, I
22  have not figured that out yet.  I definitely intend to argue
23  that.
24        THE COURT:  So, just refresh my recollection, Doctor
25  Morse went through the chart of all of these folks and said

1  they all had dentures.
2        MR. FARBER:  He had four charts.
3        THE COURT:  What about the others?
4        MR. FARBER:  The other four charts are not in
5  evidence.
6        MR. NORINSBERG:  I don't think they ever turned them
7  over, but I'm not sure.
8        THE COURT:  Doctor Morse did not say that so don't
9  argue something that is not in the record.
10        MR. FARBER:  He testified I think that he made a
11  notation on dentures that these patients needed.  I'm not even
12  quite sure where it goes from there.  I think he was --
13  specifically the question of prescriptions and I think he
14  noted, I think this one or two that he made a notation about
15  prescriptions in the chart.  I don't think this specific issue
16  of whether or not the patients wore partial is actually in
17  evidence, at least from Doctor Morse.
18        In any event it certainly wasn't, that parsing was
19  not before the Grand Jury.
20        MR. NORINSBERG:  It is not a Grand Jury argument.
21  This goes to Fusto in what he knew, his state of mind which
22  defendants have argued now is very much relevant what he knew.
23  It goes directly to what he knew and when he knew it.
24        We believe that they can make whatever argument they
25  want.  We believe--

1        THE COURT:  It doesn't make any difference what he
2  knew after the Grand Jury.
3        MR. NORINSBERG:  Our view, he knew it all along.  He
4  said he spoke to these people beforehand.  They can argue it
5  to the contrary, we have evidence to support our position.
6        THE COURT:  You will be arguing it in terms he knew
7  this before he went into the Grand Jury.  You are not-- I take
8  it the arguments are you won't, are restricting yourself to
9  what he knew before he put the case into the Grand Jury.
10        MR. NORINSBERG:  Exactly.
11        THE COURT:  Not what he found out later.  Because
12  what he found out later is irrelevant.
13        MR. NORINSBERG:  But our position is what happened
14  later in our view, a jury can absolutely conclude he knew that
15  all along.  It is further evidence of bad faith.
16        They can argue he didn't know about it because that
17  happened at the trial.  Our view is he did know about it.  He
18  talked to these people before he put them on in the Grand
19  Jury.  He absolutely knew the truth.
20        THE COURT:  Wait a minute.  You are not arguing to
21  the Grand Jury-- now we will have, he suborned perjury before
22  the Grand Jury of these witnesses, is that what you will
23  argue?
24        MR. NORINSBERG:  He didn't suborn perjury, I'm not
25  arguing that.  What I will argue, he knew factually he did not

**JA471**

1   have-- these people actually did have partial dentures and
2   that is why he had DeLuca look at this fabricated evidence as
3   opposed to the real records.  It is all tied to the
4   fabrication claim.
5           MR. MILLER:  Your Honor, he can't use the trial to
6   do that.  To the extent he--
7           THE COURT:  He cross examined about the trial.
8           MR. MILLER:  It was for impeachment number one and
9   number two, it is obviously after the fact.
10          THE COURT:  I will need to read over that testimony.
11          There was some questioning about Elliot Spitzer.
12  Are you intending to make any argument about that?
13          MR. NORINSBERG:  Yes, I am.
14          THE COURT:  On what basis?
15          MR. NORINSBERG:  On the basis of sworn testimony
16  that we had that Fusto actually said, he acknowledged that he
17  thought the election did have an impact on how this case was
18  going to be quote, disposed of, on the fact that he
19  acknowledged that Spitzer was being accused of being weak on
20  Medicaid.
21          THE COURT:  What did he say?  What evidence?
22          MR. NORINSBERG:  He said, I cross examined him.  Did
23  you have a conversation with Mr. Wool, did you say something
24  about the upcoming election.  And he acknowledged that he had
25  a conversation, that it related to the disposition of the

1   case, the case could not be disposed of until after the
2   election.
3           Then he proceeded to explain what his spin on it, so
4   to speak of what he really meant.
5           But we have more than sufficient evidence of this in
6   the record.
7           THE COURT:  What else?
8           MR. NORINSBERG:  We have the actual testimony.  We
9   have the newspaper article which clearly talks about this
10  Spitzer thing, the press release.
11          THE COURT:  That was only relevant insofar as it
12  effected-- you were going to try to link that to Fusto's
13  exercise of judgment in this case.
14          Where did you link that up?
15          MR. NORINSBERG:  I'm not sure I follow you, your
16  Honor.
17          THE COURT:  The only way in which I allowed any of
18  this discussion about the press releases, or Spitzer, or any
19  of that, was the argument that this influenced Fusto to-- some
20  influence on what would have given him a motive to monkey
21  around with these exhibits.
22          MR. NORINSBERG:  Right.
23          THE COURT:  And what evidence do you have that
24  influenced Fusto.  I don't think you even asked him.
25          MR. NORINSBERG:  I did ask him.  I mean he is aware

1   of the election.
2           THE COURT:  You asked him if he knew about it, so
3   what?
4           MR. NORINSBERG:  He knows about it, he actually
5   acknowledged having a discussion with the defense attorney
6   that the election is one of the factors that is going to
7   effect how this case is disposed of.  Why would I need more
8   than that.  That is sworn testimony from the defendant.
9           THE COURT:  So you can infer back from that, that
10  the election also effected the Grand Jury presentation as
11  opposed to how the charges are disposed of.
12          MR. NORINSBERG:  I'm not arguing--
13          THE COURT:  How the charges are disposed of is after
14  the fact.
15          MR. NORINSBERG:  I'm not talking about that at all.
16  I'm talking about his state of mind which the defendants have
17  argued all along is extremely important.  Our argument is that
18  the election was definitely on his mind.  It is relevant to
19  his state of mind.  He made admission at his deposition.  I
20  cross examined him--
21          THE COURT:  What was that?
22          MR. NORINSBERG:  He said he had a conversation with
23  Richard Wool, it took place, you know in the fall right around
24  the time of the election.  He clearly said that there could be
25  no disposition of this case because of the election.

1           He connected it, that these two consents were
2   connected.  The case and how he was handling this case was
3   connected to how the election was going on.
4           Now, you may not believe it, your Honor, but why
5   can't a jury draw the conclusion when he admitted making the
6   statement?  You know, he is the one that's making--
7           THE COURT:  When were all these press releases or
8   press stories about the election and people saying he was weak
9   on--
10          MR. NORINSBERG:  Starting August of 2005 leading
11  right up to the spring of 2006.  Perfectly coinciding when the
12  case went to Grand Jury.  It started on the New York Times
13  article in August of 2005, just six months before the Grand
14  Jury presentation.
15          THE COURT:  Anything else we need to take up?
16          MR. FARBER:  I think that is it, your Honor.
17          THE COURT:  I will see you Monday at 9:30.
18  Hopefully we will be able to at least get one summation in.
19  It is only yours, then it is no unfairness attached to it
20  because you still have a rebuttal the next day.
21          MR. NORINSBERG:  Okay.
22          THE COURT:  I have another trial starting very soon,
23  so I don't have the luxury to give folks a day to do
24  something.
25          (Matter concluded.)

**JA472**

1183

1
2          INDEX
          WITNESS          DIRECT   CROSS   REDIRECT   RECROSS
3
4    DR. LEONARD MORSE
5       By Mr. Norinsberg                 1111
6       By Mr. Farber             988              1113
7
8    DR. EDMUND MANTELL
9       By Mr. Norinsberg        1067            1108
10      By Mr. Farber                     1093
11
12                EXHIBITS
13
14   PLAINTIFF:                                PAGE
15   149                                       1077
16
17   DEFENDANTS:
18   AY                                        1032
19   AX                                        1035
20
21
22
23
24
25

*Lisa Schwam, CSR, CRR, RMR*
*Official Court Reporter*

1

$
$1,733,941 [2] - 1074:2, 1074:23
$100 [3] - 1090:20, 1090:24, 1090:25
$117,000 [1] - 1088:16
$13,000 [3] - 1087:25, 1088:4, 1108:18
$150,000 [1] - 1110:20
$165,918 [1] - 1089:4
$17,814 [3] - 1086:9, 1105:20, 1105:23
$2,349,859 [1] - 1075:18
$296,834 [1] - 1078:2
$315,000 [1] - 996:15
$435 [1] - 1049:6
$450,000 [6] - 1052:2, 1074:16, 1081:15, 1087:17, 1107:18, 1109:22
$590,494 [1] - 1111:19
$600 [1] - 1071:3

'
'02 [2] - 1094:15, 1094:17
'03 [3] - 1094:15, 1095:7, 1112:14
'04 [1] - 1094:15
'05 [1] - 1094:15
'99 [1] - 993:22

0
00294977 [1] - 1021:21
004597 [1] - 1021:6
01 [1] - 1025:19
0110 [1] - 1025:10
020610049 [1] - 1022:2
02460 [1] - 1025:10
0274 [1] - 1025:9
03 [8] - 1022:6, 1022:8, 1026:4, 1028:1, 1028:2
05s [1] - 1025:12
07-CV-4793(CBA) [1] - 987:3

1
1 [2] - 1035:19, 1057:15
1-16-2003 [2] - 1050:12, 1050:17
1.6 [4] - 1091:14, 1091:15, 1091:16, 1091:19, 1091:25, 1092:14
1/16/2003 [1] - 1121:12
1007 [2] - 1057:22, 1057:23
10007 [1] - 987:14
101 [1] - 1055:8
10211-007 [1] - 987:17
1032 [1] - 1183:18
1035 [1] - 1183:19
1040 [3] - 1096:6, 1096:8, 1096:24
1067 [1] - 1183:9
1077 [1] - 1183:15
1093 [1] - 1183:10

11 [1] - 1010:14, 1037:19, 1044:15, 1053:13, 1112:23, 1118:18, 1129:22, 1129:25, 1142:9, 1148:8, 1148:11, 1148:17, 1149:8, 1150:11, 1150:15, 1160:3, 1170:4
1109 [1] - 1183:6
1111 [1] - 1183:5
1113 [1] - 1183:6
1122 [1] - 993:8
1108 [1] - 1183:9
11:06 [1] - 1183:5
112 [2] - 1034:23, 1036:2
113386 [1] - 1049:9
115 [1] - 1114:3
11:30 [1] - 1170:4
11:33 [2] - 1041:20, 1056:15
11:37 [2] - 1052:14, 1055:18, 1055:23, 1057:1, 1057:13, 1129:25, 1130:10
12-18-02 [2] - 1049:24
12-18-2002 [1] - 1051:1
120 [1] - 987:17
12286 [1] - 1042:5
12299 [1] - 1042:5
12th [2] - 987:17, 1041:20

13 [3] - 1058:17, 1131:13, 1132:5
14 [1] - 1130:17, 1130:22, 1131:4
143 [2] - 1005:24, 1008:8
145 [2] - 1019:21, 1019:22
145-A [3] - 1019:23, 1022:8, 1028:9
149 [6] - 1076:8, 1076:9, 1077:5, 1077:7, 1183:15
14s [1] - 1041:19
15 [2] - 1024:18, 1024:22, 1029:22, 1030:4, 1030:5, 1031:10, 1060:16, 1038:12, 1064:3, 1064:10, 1065:14, 1104:5, 1104:6, 1130:22, 1131:7, 1131:13, 1131:17
15-digit [1] - 1030:3
15-minute [1] - 1026:2
16 [1] - 1016:3, 1131:24, 1132:5
165,000 [2] - 1080:6, 1094:3
16th [3] - 1030:12, 1030:20, 1041:20, 1050:6, 1050:19
17/4 [1] - 1052:14, 1060:16, 1052:21, 1052:22, 1113:8, 1113:9
18 [1] - 1129:22
15-year [1] - 1079:16
185 [1] - 1105:14
19 [1] - 1131:2
19-year [1] - 1085:19
1947 [1] - 1100:12
1972 [1] - 1069:2, 1069:6
1975 [2] - 1069:6, 1069:17
1980 [2] - 1069:17, 1069:25
1992 [1] - 1129:19
1990's [1] - 1099:11
1996 [3] - 1015:19, 1099:2, 1099:11
1998 [1] - 1129:19

1999 [4] - 993:2, 1048:3, 1071:20
19th [2] - 1039:9, 1128:16
1st [1] - 1065:8

2
2,426 [1] - 1030:22
2.3 [1] - 1094:7
2.4 [2] - 1085:21, 1088:24
20 [2] - 1005:4, 1106:22
20,000 [2] - 998:22, 998:24
20-page [1] - 1083:21
200-page [1] - 1034:19
200 [2] - 992:18, 1000:24, 1039:9, 1041:20
2001 [8] - 1041:20, 1043:7, 1056:7, 1056:14, 1096:18, 1107:3, 1108:13
2002 [6] - 992:18, 1000:24, 1033:25, 1041:20, 1043:21, 1049:2, 1094:14, 1095:4, 1163:16
2003 [11] - 993:2, 994:1, 1032:11, 1036:20, 1037:10, 1050:6, 1050:19, 1095:4, 1096:5, 1096:10, 1159:23
2004 [12] - 993:3, 993:4, 993:8, 993:23, 993:24, 1095:3, 1095:6, 1095:11, 1117:24, 1160:9
2005 [9] - 993:7, 1094:19, 1095:6, 1095:11, 1159:24, 1160:5, 1160:7, 1160:18, 1160:20
2006 [11] - 1000:8, 1005:5, 1011:24, 1057:10, 1057:12, 1058:3, 1059:11, 1058:12, 1073:1, 1073:25, 1074:12, 1074:19, 1075:13, 1077:16, 1079:6, 1079:16, 1081:9, 1081:18, 1083:5, 1083:8, 1083:11, 1089:4, 1118:13, 1101:14, 1109:14, 1100:9, 1100:17, 1110:12, 1116:13, 1160:10, 1162:11
2007 [4] - 1058:7, 1072:3, 1074:15, 1087:17, 1088:16
2010 [3] - 1062:16, 1062:19, 1106:12
2011 [4] - 1071:21, 1079:15, 1079:20, 1081:8, 1085:6, 1086:14, 1086:19, 1098:22, 1098:24
2012 [16] - 1071:10, 1074:1, 1074:19, 1075:14, 1077:10, 1079:7, 1081:8, 1083:8, 1084:20, 1085:5, 1085:6, 1085:11, 1086:13, 1105:19, 1105:20, 1105:22
2013 [9] - 987:7, 1073:1, 1073:25, 1081:8, 1085:11, 1085:8, 1085:12, 1120:1
21-page [1] - 1085:13, 1085:14, 1086:18
2015 [1] - 1085:24
2021 [1] - 1089:4
2022 [16] - 1083:15, 1083:18, 1083:25, 1084:18, 1084:23, 1085:8, 1085:24, 1086:24, 1087:12, 1087:15, 1087:21

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

2

1100:3, 1100:17
20th [1] - 1100:17
21 [1] - 1132:12
22 [2] - 1010:14, 1130:10
225 [1] - 987:14
22nd [1] - 1088:25
23 [2] - 1129:15, 1131:17
24 [1] - 1129:2
2426 [1] - 1038:9
25th [1] - 1039:9
2700 [1] - 987:14
294 [1] - 1021:16
2:30 [1] - 1124:2
2nd [2] - 1062:16, 1062:19

3
3 [2] - 1055:13, 1056:16
3.5 [1] - 1085:12
30 [8] - 996:18, 1003:15, 1005:16, 1010:15, 1019:8, 1063:8, 1065:4, 1129:14, 1129:18
30,000 [3] - 1005:7, 1005:14, 1023:12
30-year [2] - 1108:21, 1110:3
31 [1] - 1010:15
32 [1] - 1129:11
326 [2] - 1032:10, 1121:11
329 [1] - 1018:4
37 [4] - 1088:20, 1088:21, 1089:17, 1089:21

4
4 [2] - 1005:13, 1100:17
4-14-2000 [1] - 1043:8
4.4 [1] - 1085:20
4.47 [3] - 1079:12, 1085:16, 1085:21, 1098:14, 1099:1
4.5 [1] - 1092:21
4.7 [1] - 1098:25
40 [3] - 1010:16, 1063:8
435 [1] - 1155:19
44 [1] - 997:9
45 [1] - 1026:4
450 [1] - 1004:4
46 [8] - 1032:11, 1034:3, 1035:2, 1035:4, 1050:4, 1060:10
48 [1] - 1077:3
4th [3] - 1023:25, 1049:2, 1164:1

5
5 [2] - 1057:24, 1129:7
5-2500 [1] - 1007:24
50 [7] - 1051:15, 1124:12, 1128:5, 1148:6, 1156:20, 1158:11, 1161:15
50-A [3] - 1092:7, 1092:16, 1092:17
56 [1] - 1132:12
580 [26] - 1000:25, 1001:1, 1013:5, 1013:11, 1013:14, 1017:3, 1020:7,

1021:21, 1032:15, 1037:22, 1038:24, 1039:8, 1039:10, 1041:18, 1041:25, 1045:9, 1045:15, 1046:4, 1046:9, 1046:16, 1047:6, 1048:15, 1049:3, 1049:5, 1072:2, 1074:10, 1074:21, 1081:12, 1081:19, 1083:9, 1083:14, 1083:22, 1094:4, 1111:21, 1164:1
5th [2] - 1011:24, 1049:22

6
6 [2] - 1010:14, 1128:21
6-5-02 [1] - 1049:13
6-7-2002 [1] - 1021:14
65 [2] - 1002:15
60-A [5] - 1028:18, 1028:21
613-2268 [1] - 987:21
65 [3] - 1100:13, 1100:15, 1102:18
65-year [4] - 1102:24, 1104:1, 1104:5, 1104:8
66 [1] - 1102:18

7
7 [4] - 987:7, 997:9, 1001:16, 1118:17, 1119:15, 1131:7, 1142:9, 1146:8, 1148:8, 1148:17, 1149:8, 1150:11, 1150:15, 1151:13
70 [5] - 1001:1, 1060:9, 1061:18, 1062:14, 1104:12
71 [1] - 998:5
718 [1] - 987:21
74 [2] - 1100:17, 1100:20
75 [1] - 1169:11

8
8 [2] - 998:5, 1001:16, 1080:22
87 [1] - 1052:24, 1113:9

9
90 [1] - 1059:2
95 [2] - 1097:11, 1098:1, 1098:3
988 [1] - 1183:6
9:00 [1] - 1170:19
9:30 [3] - 987:8, 1133:3, 1182:17

A
A-1 [1] - 1050:5
a.m [1] - 987:8
abandoned [1] - 1097:21
abbreviation [1] - 1014:15
Abdallah [7] - 1006:4, 1006:5, 1008:8, 1009:6, 1018:19, 1038:9
Abdullah [2] - 1038:1, 1038:11
ability [2] - 1072:13, 1082:1
able [15] - 1045:23, 1071:16, 1073:12, 1088:11, 1131:19, 1162:14, 1162:16, 1162:18, 1163:10

absence [2] - 1149:10, 1149:18
absolute [6] - 1061:3, 1150:9, 1159:20, 1167:4
absolutely [11] - 1003:11, 1013:8, 1020:5, 1029:16, 1047:16, 1049:1, 1053:8, 1157:3, 1157:24, 1167:8, 1178:14, 1178:19
absorbed [1] - 1129:19
abstract [1] - 1142:24
accept [13] - 993:11, 1018:23, 1019:20, 1033:22, 1038:3, 1039:14, 1054:4, 1057:18, 1152:18, 1160:14, 1167:11, 1167:20, 1174:11
access [1] - 1078:25
according [2] - 1075:18, 1110:17
account [2] - 1103:8, 1169:16
accountants [2] - 1071:20, 1090:17
accounting [1] - 1087:9
accuracy [1] - 1046:24
accurate [6] - 998:21, 998:22, 1007:13, 1021:3, 1048:8, 1057:17, 1112:3, 1130:12
accurately [6] - 1040:23, 1046:2, 1046:14, 1047:4, 1054:1, 1148:19
acetaminophen [4] - 1072:23, 1074:8, 1078:4, 1079:24, 1091:9, 1091:25
accused [4] - 1084:21, 1094:18, 1144:9, 1178:19
acknowledged [4] - 1148:19, 1159:6, 1179:16, 1179:19, 1179:24, 1181:5
acquittal [1] - 1121:20
acted [1] - 1150:5
action [8] - 989:8, 989:10, 989:18, 992:20, 1054:10, 1092:15, 1092:16
actions [5] - 989:7, 989:10, 989:17, 1054:16, 1055:4
active [2] - 1083:23, 1087:3, 1100:2
actively [1] - 1072:12, 1104:24, 1121:17
activities [2] - 1060:6
activity [4] - 1050:14, 1050:18, 1069:24, 1107:21
acts [1] - 1167:13
actual [47] - 1008:13, 1009:20, 1017:10, 1037:18, 1039:25, 1044:21, 1045:1, 1060:12, 1060:23, 1060:24, 1061:5, 1067:12, 1072:16, 1074:17, 1079:22, 1080:9, 1084:1, 1085:4, 1086:2, 1086:13, 1087:15, 1107:12, 1109:22, 1110:5, 1110:9, 1125:4, 1133:1, 1133:6, 1133:12, 1135:12, 1139:2, 1149:3, 1149:17, 1164:22, 1170:6
Actuarial [1] - 1069:14
actuary [1] - 1069:12
actuary [1] - 1102:10
add [3] - 1163:11, 1164:20, 1166:15
added [3] - 1030:22, 1088:17, 1092:22

alginate [1] - 992:7
allegation [3] - 1108:14, 1108:15, 1108:24
alleged [2] - 1149:24, 1151:3
allocate [1] - 1110:8
allocation [1] - 1087:24
allow [2] - 992:13, 1170:6
allowed [3] - 1162:6, 1163:8, 1163:9, 1162:23, 1168:17
allows [1] - 1089:14
almost [3] - 993:7, 1161:25, 1102:2, 1104:7, 1107:25
alone [1] - 1160:13
aloud [1] - 968:11, 1151:6
alternative [1] - 1148:3
altogether [1] - 1090:3
American [2] - 989:5, 1060:13
AMON [1] - 987:11
Amount [7] - 1002:18, 1039:11, 1041:7, 1046:12, 1046:12, 1048:23, 1057:3, 1069:21, 1073:10, 1089:20, 1104:19, 1104:24, 1105:8, 1105:24, 1112:14, 1112:19, 1120:16, 1160:11
amount [40] - 1013:18, 1014:1, 1021:4, 1027:8, 1040:24, 1041:7, 1046:23, 1064:3, 1073:5, 1082:15, 1105:5, 1105:24, 1111:4, 1114:19
ample [1] - 1153:6
analogy [1] - 1092:14
analyses [3] - 1069:11, 1069:22
analysis [14] - 1071:13, 1071:17, 1073:4, 1091:22, 1092:8, 1095:15, 1104:15, 1106:3, 1106:6, 1106:9, 1106:17, 1108:14, 1142:23, 1163:15
analyze [2] - 1092:12, 1163:13
analyzed [1] - 1072:16
anesthesia [1] - 992:25, 1026:5, 1026:8
anesthetics [1] - 992:11
annual [10] - 1078:1, 1078:12, 1078:14, 1079:5, 1084:24, 1085:18, 1086:11, 1089:5, 1089:17, 1105:16
ANSWER [16] - 1128:19, 1128:24, 1129:5, 1129:6, 1129:9, 1129:12, 1129:15, 1129:24, 1130:4, 1130:20, 1131:2, 1131:5, 1131:8, 1131:22, 1131:23, 1132:9
answer [35] - 995:23, 996:20, 997:6, 998:4, 1001:10, 1001:13, 1005:7, 1007:10, 1009:22, 1011:3, 1015:4, 1015:16, 1016:14, 1016:18, 1019:5, 1020:19, 1020:23, 1047:6,
ahead [2] - 1006:23, 1025:18
Ahiri [5] - 1006:2, 1044:6, 1041:17, 1041:24, 1045:8, 1045:10
Ahiri's [2] - 1041:11, 1044:3
Aided [1] - 987:23
ailments [1] - 1142:8
al [1] - 987:7

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

3

additional [3] - 984:4, 998:8, 1149:5
adduced [1] - 1148:7
adjourn [1] - 1148:24
adjusted [4] - 1031:10, 1035:18, 1036:7
adjustment [3] - 1029:21, 1030:2, 1030:7, 1030:10, 1033:4, 1034:10, 1031:5, 1051:13, 1051:21, 1051:25
adjustments [5] - 1031:1, 1031:21, 1032:12, 1038:24, 1034:7, 1034:10, 1034:13, 1034:16, 1037:24, 1037:5, 1051:12, 1051:20, 1051:22
administration [5] - 1118:8, 1118:19
admitted [6] - 1003:24, 1148:14, 1157:24, 1182:5
admittedly [1] - 1150:6
adopting [1] - 1090:16
ads [1] - 1060:12
adult [1] - 1091:1
advancing [1] - 1150:8
adverse [4] - 1074:9, 1088:13, 1088:19, 1110:8
advertise [1] - 1090:3
advertised [1] - 1107:22
affect [1] - 1037:8
affects [1] - 1078:19
afraid [1] - 1146:10
afternoon [5] - 1006:7, 1067:16, 1071:7, 1073:4, 1091:25, 1104:15, 1106:6, 1109:5, 1164:3, 1168:14, 1169:25, 1170:6
afterwards [1] - 1162:7
age [8] - 1102:18, 1102:25, 1103:17, 1104:1
ago [6] - 1005:3, 1025:21, 1030:10, 1074:23, 1087:2, 1104:9
agree [33] - 992:13, 1170:2, 1003:21, 1040:5, 1044:22, 1046:6, 1046:10, 1046:25, 1049:8, 1049:19, 1050:14, 1051:6, 1090:10, 1107:10, 1136:22, 1146:3, 1146:10, 1171:10
agreed [8] - 1038:7, 1151:18, 1056:11, 1056:17, 1056:20, 1081:18, 1081:20, 1107:1, 1108:12, 1132:13, 1132:15, 1133:15, 1151:12, 1151:13, 1131:12, 1131:22, 1122:3, 1132:9, 1131:18, 1131:25
agrees [1] - 1156:16
Ahreonyam [8] - 1127:12, 1127:13, 1128:16, 1162:17, 1162:19, 1163:4, 1164:22, 1170:5
ahead [2] - 1006:23, 1025:18

anyway [2] - 1140:25, 1171:1
apart [1] - 1037:20
apartment [1] - 1007:21
apologies [1] - 1019:25
apologize [2] - 1029:24, 1051:5
apparent [1] - 1121:24
apparently [3] - 1040:7, 1060:15, 1070:25, 1096:4, 1108:20, 1114:13
appearances [1] - 1133:18
appeared [2] - 1090:10, 1120:20, 1122:21
appearing [1] - 1152:21
application [2] - 1062:20, 1135:23
applications [2] - 1061:12, 1072:4
applied [22] - 1059:5, 1060:11, 1061:13, 1062:10, 1079:7, 1079:21, 1079:22, 1081:17, 1085:2, 1085:14, 1085:16, 1091:9, 1091:10, 1091:10, 1092:10, 1092:12, 1108:16, 1118:19, 1119:13
applies [2] - 1092:8, 1092:8
apply [8] - 1014:18, 1026:7, 1063:8, 1089:4, 1093:1, 1093:3, 1101:18, 1143:21
appreciate [1] - 999:11
approach [6] - 988:17, 992:22, 997:13, 1020:9
approached [1] - 1102:19
appropriate [2] - 1040:20, 1146:2, 1173:22
April [8] - 1000:8, 1005:5, 1011:24, 1041:19, 1041:20, 1050:6, 1050:19, 1041:19, 1163:16
April [23] - 1118:18, 1138:19, 1139:1, 1145:16, 1146:4, 1147:12, 1147:7, 1147:10, 1147:11, 1150:20, 1152:11, 1153:13, 1153:14, 1154:4, 1154:9, 1156:13, 1157:6, 1167:21, 1167:22, 1167:25, 1169:21, 1172:18, 1172:9, 1172:15, 1173:3, 1173:21, 1173:24, 1174:10, 1174:20, 1175:2, 1175:5, 1175:16, 1176:6, 1176:10, 1176:22, 1177:9, 1178:4, 1178:16, 1178:23, 1178:25
argued [3] - 1172:3, 1177:22, 1181:17
arguing [10] - 1154:22, 1172:16, 1173:10, 1173:12, 1174:3, 1174:16, 1175:5, 1175:25, 1176:7, 1178:7, 1178:20
argument [3] - 1130:19, 1136:22, 1138:1, 1138:7, 1138:22, 1144:19, 1145:3, 1145:6, 1146:5, 1146:6, 1146:6, 1146:8, 1149:22, 1149:25, 1152:12, 1152:24, 1154:16, 1160:18, 1162:2, 1163:22, 1164:14, 1165:18

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

JA473

```
1184
```

```
 1  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
 2  -------------------------------------x
    DR. LEONARD MORSE,
 3
                    Plaintiff,
 4
         versus                          07 CV 4793 (CBA)
 5
    ELIOT SPITZER, ET AL.,
 6                                        U.S. Courthouse
                    Defendants.          Brooklyn, New York
 7  -------------------------------------x
 8                                        February 11, 2013
                                          9:30 a.m.
 9          Transcript of Civil Cause for Trial

10  Before:   HONORABLE CAROL B. AMON,
                         District Court Chief Judge
11            (and a jury.)

12                    APPEARANCES

13  Attorney for Plaintiff:
    JON L. NORINSBERG, ESQ.
14  255 Broadway, Suite 2700
    New York, New York 10007
15
    Attorney for Defendant:
16  ERIC T. SCHNEIDERMAN, ESQ.
    NYS Attorney General
17  120 Broadway, 12th Floor
    New York, New York 10271
18  BY:  CHRISTOPHER Y. MILLER, ESQ.
         SETH J. FARBER, ESQ.
19
    Official Court Reporter:
20  MICHELE NARDONE, CSR, RPR, CRR
    225 Cadman Plaza East
21  brooklyn, New York 11201
    Phone:  718-613-2601
22  Fax:  718-613-2631
    Email:  Mishrpr@aol.com
23
    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
                    Morse v. Spitzer              1185
```

```
 1       (In open court.)
 2       THE CLERK:  Morse versus Spitzer.
 3       THE COURT:  All right.  Parties state their
 4  appearances.
 5       MR. NORINSBERG:  John Norinsberg on behalf of
 6  plaintiff, Dr. Leonard Morse.
 7       MR. MILLER:  Christopher Miller from the Office of the
 8  Attorney General on behalf of Defendants John Fusto and Jose
 9  Castillo.
10       MR. FARBER:  Seth Farber, also from the Office of the
11  Attorney General, also for the defendants.
12       THE COURT:  All right.  We are apparently waiting for
13  one juror.  I thought we should use the time did -- are the
14  witnesses here?
15       MR. MILLER:  Yes, your Honor.
16       THE COURT:  You have two?
17       MR. MILLER:  Yes.
18       THE COURT:  How long do you think they will take?
19       MR. MILLER:  I think Mr. Aharonyan will shorter than
20  we thought on Friday.  We have curtailed his testimony, so it
21  may only be 15, 20 minutes or so; and then Mr. Erath, the
22  damages expert, on direct is probably 30 minutes.
23       THE COURT:  All right.  I put on ECF the jury
24  instructions with jury interrogatories.  I just notice the
25  first thing is that -- and the caption is incorrect.  It
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
                    Morse v. Spitzer              1186
```

```
 1  shouldn't be Morse versus Eliot Spitzer, so that has to be
 2  corrected.
 3       Are there any objections by the plaintiff?
 4       MR. NORINSBERG:  Yes, there are, your Honor.
 5       THE COURT:  All right.  Let's hear them.
 6       MR. NORINSBERG:  With respect to the nominal damages
 7  charge, it's our position that there shouldn't be any
 8  instruction on nominal damages and it should not be an option
 9  for the jury.  We are relying on a case called Kerman versus --
10  K-E-R-M-A-N -- City of New York, 374 F.3d 93.  Essentially this
11  case stands for the proposition that once there is a loss of
12  liberty involved it's impossible for a jury to actually award
13  nominal damages.
14       We are relying on that case as well as a district
15  court case, Vilkhu -- V-I-L-K-H-U -- versus City of New York.
16  It's Judge Sifton's case, 2009 U.S. District Lexis 16616, and
17  that was March 3, 2009.
18       THE COURT:  What's the defendants' position?
19       MR. MILLER:  As I think your Honor is aware, in the
20  Ricciuti case there is clearly contemplation that nominal
21  damage award could be appropriate.  It's explicitly mentioned
22  in that opinion.
23       THE COURT:  Appropriate in what sense?
24       MR. MILLER:  Appropriate if the jury, for instance,
25  finds that there was no proximate causation for damages and
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
                    Morse v. Spitzer              1187
```

```
 1  that therefore nominal award is appropriate.
 2       THE COURT:  If there is no proximate cause, there is
 3  no damages.
 4       MR. NORINSBERG:  Well, if there is no proximate cause
 5  I lose the case; but once they get to the point of damages
 6  there has to be an award of damages.
 7       THE COURT:  That's the problem that I have with
 8  Ricciuti referring to it to that principle in that way, and I
 9  actually include that principle under the proximate causation
10  prong.
11       So I think that it really is more a question of
12  whether one has proven the case versus one has nominal damages.
13  So that concept, in other words, that the grand
14  jury would have indicted him anyway without this evidence, you
15  know, would have indicted him for charge X, you would want to
16  argue that.  I think that would come under the proximate cause,
17  where it says has the burden of proving that he suffered
18  injuries and the injuries would not have occurred without the
19  wrongful conduct of the defendant.
20       So perhaps counsel is right.  Maybe a nominal damages
21  charge is not appropriate.
22       Anything else from plaintiff?
23       MR. NORINSBERG:  Yes, your Honor.  I'm concerned about
24  some of the language in this special interrogatory section on
25  page 16.  I believe that we -- if we added just a few words I
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1  think we could have language that would work for both sides.

2       The language as it appears right now suggests that if

3  defendants prove that it was created in connection with

4  preparation for presentation to the grand jury that that ends

5  the issue.  However, your Honor, when you actually denied their

6  motion for absolute immunity, you pointed out that Hill versus

7  City of New York, that Second Circuit case made it clear that

8  just because something is contemplated for being presented to

9  the grand jury is not dispositive of the issue.

10      So I would suggest that we add the language in there,

11 the language to the effect after the investigation was

12 completed.  So let me just specifically read it the way I would

13 recommend it:  Defendants contend that they created grand jury

14 exhibit 7 and 11.  I'm going to add the words solely in

15 connection with the preparation for the presentation to the

16 grant jury of evidence to the grand jury, and I'm adding after

17 their investigation was complete.

18      And then I would go down to where plaintiffs contend

19 that these exhibits were created during the investigatory stage

20 of the proceedings while defendants were still building a case

21 against Morse and, and I would add the word, not solely in

22 preparation for presentation of evidence to the grand jury.  I

23 think if we added just those few words, I think it would be as

24 close as we are going to get to a fair representation of what

25 the law is under the Second Circuit.

1       THE COURT:  Read the first sentence again that you

2  want?

3       MR. NORINSBERG:  Sure.  Defendants contend that they

4  created Grand Jury Exhibits 7 and 11 solely in connection with

5  the preparation for the presentation of evidence to the grand

6  jury after their investigation was completed.  Plaintiff

7  contends that these exhibits were created during the

8  investigatory stage of the proceedings while defendants were

9  still building a case against Morse and not solely in

10 preparation for the presentation of evidence to the grand jury.

11      THE COURT:  Do you have any objections to those

12 changes?

13      MR. MILLER:  Yes.  Again, it doesn't seem to capture

14 the idea that you can decide to indict, know that you have

15 enough evidence to indict, and then still go about gathering

16 some evidence and investigate after you have already decided to

17 indict.  And by using the word "investigation" here, we are

18 losing that aspect of it.

19      And that also means that to the extent the word

20 "solely" appears there, you know that's not an accurate

21 depiction of the law.  You can decide to indict and then go

22 about gathering some additional facts.

23      The Supreme Court is very clear about that, going

24 about gathering some additional facts and evidence to make sure

25 you have a good presentation to the grand jury.  So it doesn't

1  need to be solely.

2       MR. NORINSBERG:  On the specific facts of our case the

3  position the defendants have taken -- and they opened on this

4  and clearly have presented evidence to this -- is that they had

5  completed their investigation.  That was their position.  They

6  were simply creating these to present documents to the grand

7  jury.

8       So our view is -- I mean whatever general principles

9  might be out there in this particular case, that is the legal

10 position that they have taken.  They have finished their

11 investigation, and these were solely for grand jury preparation

12 and use.  So I think that's their position and they should be

13 bound by that in this question.

14      THE COURT:  Well, they should be bound by what the law

15 is.

16      MR. NORINSBERG:  But that is the law.  I mean they

17 can't -- the reality is that if they want to argue that they

18 were still investigating the case, then that's something that

19 they are not going to get.  They are not going to get absolute

20 immunity on it.

21      I mean they would lose their defense.  They would

22 absolutely lose the defense if they were going to concede they

23 were still investigating this while the grand jury proceeding

24 was going on.  I haven't heard that defense in this case.  I

25 would love for them to say that.  I think that would be great

1  for us.  I haven't heard that.  I heard something completely

2  different.

3       What I'm concerned about is just based on your Honor's

4  decision and your reading of Hill versus City of New York that

5  it's clear just saying it in contemplation for grand jury use

6  is not dispositive, and the question as it stands right now

7  makes it dispositive.  If the jury finds it's connected to

8  grand jury use, we lose on that; and that's not the law.

9       THE COURT:  You are saying contend -- the words

10 "solely" and "in connection with the preparation and

11 presentation of evidence."  Well, I guess the real question is

12 what should the jury interrogatories say.  I don't know that

13 it's correct to say after the investigation was completed.

14      Perhaps your argument that it was created solely in

15 connection with preparation for presentation of evidence to the

16 grand jury might be accurate, but I don't know after the

17 investigation was completed.

18      Isn't there some case that suggests that as long as

19 you can still be looking into facts that you want to put before

20 the grand jury -- let's assume you have got a grand jury

21 presentation ongoing and you put a series of witnesses in

22 there.  And you then, the prosecutor, then says, you know what,

23 I think I need another witness.  I want to hear somebody else

24 whose got -- went to see the doctor.  Go find that person.  And

25 they go find that person, and let's say it's a Coffey

**JA475**

1  situation, where the claim is the person was told to lie.

2         Are you saying there wouldn't be immunity for that?

3         MR. NORINSBERG:  The analysis has to be a functional

4  approach.  What are they trying to do with that witness?  Are

5  they simply presenting grand jury testimony, or are they

6  investigating further?

7         As you have pointed out and the courts have noted,

8  it's a vexing problem for courts.  I don't know that there is a

9  bright-line answer.

10        I do know on the facts in our particular case there

11 has been no claim at all during this trial by the defendants

12 that they were still investigating at the time of the grand

13 jury.  I mean clearly their position is they already determined

14 there was a strong case, there was probable cause to indict,

15 and they were presenting it to the grand jury; and that's their

16 legal position and so whatever theoretical possibilities might

17 exist on another set of facts.

18        In this case, that's clearly the set of facts we have

19 here.

20        THE COURT:  Why doesn't it work if I just put do the

21 defendants object -- do defendants contend that they created

22 Grand Jury Exhibits 7 and 11 solely in connection with the

23 presentation of evidence to the granted jury?

24        MR. MILLER:  Are you talking about in the

25 interrogatory?

1         THE COURT:  Yes, both, both.

2         MR. MILLER:  In both?

3         THE COURT:  In other words, defendant contend that

4  they created Grand Jury Exhibits 7 and 11 solely in connection

5  with preparation for the presentation of evidence to the grand

6  jury.  Why doesn't that capture this case?  Then I will just

7  put that question to the jury.  I think that would probably

8  satisfy both sides.

9         I'm not going to add after the investigation was

10 completed.

11        MR. MILLER:  Okay.

12        THE COURT:  Okay.  Do you have anything else?

13        MR. NORINSBERG:  I do, your Honor.  We had made a

14 request in our proposed charges for instructions on past lost

15 earnings and future lost earnings, and we had also submitted a

16 verdict sheet with specific interrogatories for those

17 questions.

18        I do feel, especially in light of Dr. Mantell's

19 testimony and in light of Dr. Erath's testimony this morning,

20 this is an issue that's before the jury; and I think the jury

21 needs some guidance from the court on past and future earnings,

22 and I also feel like we should have special interrogatories for

23 those two categories in the event that there is any type of

24 post trial litigation, that we have a clear finding of fact as

25 to each category so we know exactly what they found.

1         If we lump everything together it will be impossible

2  to figure out what part of it went to civil rights damages,

3  what part of it was past lost earnings, what part was future.

4         THE COURT:  Okay.  You have discussions.  I just

5  hadn't focused on that.  You have jury instructions about past.

6         MR. NORINSBERG:  Yes, we included that, your Honor.

7         THE COURT:  Do you have any objection to their jury

8  instructions on past lost earnings and future lost earnings?

9         MR. MILLER:  I would have to check them, your Honor;

10 but my memory, as far as the instructions, they were generally

11 okay.  You know, given the number of questions that the jury is

12 being asked, I don't think they should be broken out into

13 separate categories on the verdict form.

14        THE COURT:  It actually -- I think it makes review of

15 any verdict easier, quite frankly.  So I think it makes sense

16 for that reason, so we will try and do that.

17        Anything else?

18        MR. NORINSBERG:  Yes.  Just along with that point, on

19 page 12, when you are talking about compensatory damages,

20 midway down in that paragraph you have a sentence that says

21 compensatory damages are not limited merely to expenses that

22 plaintiff may have borne.

23        I would request that instead of expenses we say, are

24 not limited merely to lost earnings that plaintiff may have

25 suffered, and then I think the rest of it would make sense.

1         THE COURT:  So the damages, the expense-type damages

2  you are talking about is lost earnings.

3         MR. NORINSBERG:  Exactly, exactly.

4         THE COURT:  Do I need to do any more than just

5  indicate at page 14 that there are separate interrogatories for

6  each of these areas?

7         In other words, I say, in determining damage you may

8  consider past -- and this is on page 14 -- past and future lost

9  earnings, mental and emotional pain, suffering due to

10 defendants' violation of plaintiff's rights?  Each of these

11 categories of damages are broken out separately.

12        MR. NORINSBERG:  Yeah, I think that's fine.

13        MR. MILLER:  That's fine, your Honor.

14        THE COURT:  So just add that.

15        MR. NORINSBERG:  Yeah.

16        THE COURT:  And then add it to the verdict sheet.

17        MR. NORINSBERG:  Yeah.

18        THE COURT:  Okay.  Anything else?

19        MR. NORINSBERG:  Yes, your Honor.  Just -- and this is

20 the last point.  Just on the verdict sheet itself, on questions

21 one and two, at the very last clause of the question it says,

22 knowing that such information was false or fraudulent.  My only

23 objection to that is the standard which you actually charge on

24 you say it would be knowingly and recklessly, and the reckless

25 part is lost in the question and obviously --

**JA476**

1    THE COURT:  Well, I'm sorry.  Go ahead.

2    MR. NORINSBERG:  Obviously our first preference would

3    be simply that that clause should just be deleted because it's

4    in the charge already.  I don't think it needs to be in the

5    actual interrogatory.  If the court, though, disagrees, then we

6    would just ask that it say, knowing that such information was

7    false or fraudulent, or recklessly disregarding the possibility

8    that such information was false or fraudulent.

9    THE COURT:  I don't think that's actually correct.

10   Let's see.

11   (Pause.)

12   THE COURT:  I'm not going to change the language

13   because I think it's even -- it would be even more confusing.

14   For something to be fraudulent, again, we are talking about the

15   overall violation, which is a little difficult to parse out

16   because of the nature of this offense.

17   I'm trying to think if that would arise in another

18   context, but a subpart of that is that they presented a false

19   document, particularly when they presented a fraudulently

20   altered document, they have to do that particular act with an

21   intent to deceive.  It wouldn't be enough, in my view, that

22   they just put a document before the grand jury that they didn't

23   understand what it meant.  That's not sufficient.

24   So, you know, when I charge the reckless act, that's

25   sort of an overall knowledge element with the whole entire

---

1    violation, but I don't think it would be correct to say that.

2    So I'm not going to change that.

3    Anything else?

4    MR. NORINSBERG:  No, your Honor.  That's it.

5    THE COURT:  Do you have any objections to the charge?

6    MR. MILLER:  Yeah.  I think we have largely covered

7    this ground, so I largely want to preserve.

8    The objection, for the record, is with respect to ECF

9    number 133, in our view is that a literally true document

10   cannot constitute a fabrication; and, therefore, we object to

11   questions one and two to the extent they say false or

12   fraudulently altered documents.  And, in addition, with respect

13   to the last phrase in those questions, knowing that such

14   information was false or fraudulent, we object to that.

15   THE COURT:  Why do you object to that?

16   MR. MILLER:  I mean I believe that this tort is

17   limited to when you make up evidence.  If something is

18   literally true, it can't be a fabrication.  A fabrication is

19   something that's made up.

20   THE COURT:  Well, I think you can argue that to the

21   jury.  I'm certainly not going to preclude you from arguing

22   that to the jury.

23   MR. MILLER:  I understand, your Honor, but again --

24   THE COURT:  You are just arguing it's not false

25   because it wasn't made up, and it's not fraudulently -- well,

---

1    you know, you can argue that there was no intent to

2    fraudulently alter.

3    MR. MILLER:  We will argue that, your Honor; but,

4    again, I don't think that in the end this tort is designed to

5    capture basically a document that's misleading.  It seems to

6    capture when people make stuff up.  So the fraudulently altered

7    idea that the way you combine a document makes it --

8    THE COURT:  That's part of your rule 50 argument.

9    MR. MILLER:  Exactly.  So I'm largely preserving this.

10   THE COURT:  It's not something the jury would

11   determine.  It's nothing you want me to ask the jury to

12   determine differently.  You are just saying that because of the

13   position you have articulated you are entitled to judgment as a

14   matter of law.

15   MR. MILLER:  That's correct.

16   THE COURT:  All right.

17   MR. MILLER:  So just to cover the other instances in

18   which this appears, for the record, excuse me, on page 8, in

19   the description of the allegations, refers to creating false or

20   fraudulent altered summaries.  Likewise on page 9, in paragraph

21   beginning first, the first, defendants creating false or

22   fraudulently altered documents, and later on in the paragraph

23   it goes into the definition of fraudulent; and, again, for the

24   record we preserve our objection there.

25   THE COURT:  Okay.  Anything else?

---

1    MR. MILLER:  No, your Honor.

2    THE COURT:  Okay.  Something I wanted to ask you about

3    again.  This is just so we have the answers to all the

4    questions that we need.  I changed the verdict sheet to have

5    them answer question seven even if they find no to one and two

6    because I still think we all want an answer to that.  Does

7    everybody agree to that?  So I will take the brackets out.  I

8    just sort of bracketed -- see how I did it?  I'm just asking

9    for an answer to seven in any event.

10   MR. MILLER:  That's fine, your Honor.

11   THE COURT:  Okay.  Is the witness here?

12   MR. MILLER:  Yes.

13   THE COURT:  Do you want the witness to step up so we

14   are ready to go.

15   MR. MILLER:  Sure.

16   (Mr. Aharonyan took the witness stand.)

17   (Continued on the next page.)

18

19

20

21

22

23

24

25

**JA477**

```
 1          (Jury enters.)
 2          THE COURT:  Good morning, ladies and gentlemen.
 3  Please be seated.
 4          The defendants have called another witness.
 5          MR. MILLER:  Defendants call Levon Aharonyan.
 6          Good morning, Mr. Aharonyan.
 7          THE COURT:  Wait.  We have to swear the witness.
 8          THE CLERK:  Sir, stand and raise your right hand.
 9  LEVON AHARONYAN, called as a witness, having been
10      first duly sworn/affirmed, was examined and
11      proceeded to testify as follows:
12          THE WITNESS:  Yes, I do.
13          THE CLERK:  Please state and spell your name for the
14  record.
15          THE WITNESS:  My name is Levon Aharonyan.  L-E-V-O-N.
16  Last name is A-H-A-R-O-N-Y-A-N.
17  DIRECT EXAMINATION
18  BY MR. MILLER:
19  Q   Good morning.
20  A   Good morning.
21  Q   If you could try to speak into the microphone so the jury
22  can hear you.
23  A   Okay.
24  Q   Mr. Aharonyan, where do you work now?
25  A   I work at the New York State Office of the Medicaid
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

```
 1  Inspector General.
 2  Q   Is the office of the Medicaid Inspector General part of a
 3  bigger department?
 4  A   It's part of the Department of Health.
 5  Q   What's your title?
 6  A   I currently am an assistant director at our New York City
 7  office.
 8  Q   What are your responsibilities in your current job?
 9  A   Well, I supervise roughly half the office, investigations,
10  and some other activities that we do.
11  Q   What are the activities that your office does?
12  A   We do some of the cover operations and surveillances and
13  things like that.
14  Q   Can you explain what these investigations concern?
15  A   These investigations are concerning New York State Medicaid
16  providers.
17  Q   When you are looking into Medicaid providers what are you
18  looking for?
19  A   All our investigations are based on complaints that are
20  received by the department, and so we are looking for -- we are
21  verifying or looking into the activities that are suggested in
22  the complaint.
23  Q   Are the complaints about fraud of care or billing fraud or
24  something else?
25          THE COURT:  It can be quality of care.  We get quite a
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

```
 1  few of those, and it has to do with billing and fraudulent
 2  claims and types of services that are being done or not being
 3  done.
 4  Q   Where did you go to college?
 5  A   I went to City University, Baruch College.
 6  Q   When did you graduate?
 7  A   I think it was in '76.
 8  Q   What was your degree in?
 9  A   It was a business degree.
10  Q   When did you first take a job that related to the Medicaid
11  program?
12  A   1979.
13  Q   In what agency did you work at the time?
14  A   Back then it was the New York State Department of Social
15  Services.
16  Q   What was that department's responsibilities with respect to
17  the Medicaid program in New York?
18  A   Right.  That unit was called audit and quality control, and
19  essentially it was auditing of Medicaid providers, and the
20  quality control was looking at recipients.  There was a certain
21  number of recipients that would be.
22  Q   What do you mean by "looking at recipients"?
23  A   We would be looking and verifying facts about recipients
24  based on their application.
25  Q   You mean whether they were entitled to be in the Medicaid
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

```
 1  program?
 2  A   Yes.
 3  Q   And what was your first position at the Department of
 4  Social Services?
 5  A   I was an auditor.
 6  Q   Okay.  Did you get promoted at some point?
 7  A   Eventually I got promoted, and a few years later I was a
 8  supervisor.
 9  Q   Did there come a time when you no longer worked for the
10  Department of Social Services?
11  A   In 1998, Social Services was broken into different
12  agencies, and then we became part of the Department of Health.
13  Q   Now, in your work at the Department of Social Services and
14  the Department of Health as an investigator, have you worked
15  with Medicaid claims?
16  A   Yes, that's what we do, yeah.
17  Q   And what kind of things do you do with Medicaid claims?
18  A   We look at trends, we look at -- we do audits.  We used to
19  do audits, verifying claims, looking at documentation, looking
20  at services, interviewing clients.
21  Q   How many years have you been working with Medicaid claims?
22  A   Thirty-three -- 33.
23  Q   Can you explain to the jury what happens when an electronic
24  claim is submitted to the Medicaid program in New York?
25  A   When a provider, an enrolled provider, submits electronic
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    claims, it's received in Albany by CSC, Computer Sciences
2    Corporation, and it's recorded.  It's downloaded, and that
3    information is retained forever currently.
4    Q    Well, how does the Department of Health keep track of each
5    claim that's submitted?
6    A    When a claim is submitted it's assigned, automatically
7    assigned a unique number.  Each claim is assigned a number, and
8    that number is stored and the data is stored, and that's
9    submitted for payment.
10   Q    When you say "claim" do you mean when a provider sits down
11   and enters data into the system, all that data is one claim?
12   A    That's a one-line -- one claim is for a particular service,
13   a line of service, and all the data related to that service is
14   stored and a number is assigned to that line.
15   Q    So if you did a filling -- two fillings, one on one tooth
16   and one or another, how many claim lines would that be
17   reflected in?
18   A    Two lines.
19   Q    Can you explain what happens after the claim is received?
20   A    Once the claim is received it's processed, and three things
21   can happen.  The claim is paid, it gets denied, or it can be
22   pendent.
23   Q    What do you mean by pendant?
24   A    Pendant means it will require additional review, something
25   is wrong with the claim or it's being pulled out to have a

1    manual review.
2    Q    Now, if a claim is to be paid, what happens at that point?
3    A    Medicaid program has -- pays within roughly two to three
4    weeks.  So that whole process takes about two to three weeks,
5    and what happens is a remittance statement is created.
6         So the program pays on a weekly cycle.  So the
7    Medicaid program pays 52 cycles a year, once a week.  So as the
8    claims come in, whatever is processed for that week will appear
9    on a remittance statement, which will accompany the payment.
10   Q    Does the Department of Health keep track of the payment
11   data?
12   A    Absolutely, yes.
13   Q    And if there is subsequently a change to any paid claim
14   does the Department of Health keep track of that?
15   A    Yes.
16   Q    Okay.  Does the Department of Health or its vendors keep
17   and maintain the claims data that we have been discussing in
18   the ordinary course of business?
19   A    Yes, it does.
20   Q    You mentioned earlier the remittance statement.
21        Is there something that accompanies a remittance
22   statement that's sent to a provider?
23   A    Usually a payment.
24   Q    In the form of a check?
25   A    It can be.

1    Q    Okay.  Can it be paid otherwise?
2    A    Electronically.
3    Q    Generally speaking, what information appears on the
4    remittance statement?
5    A    Similar to the way it was submitted as a claim.  That data
6    will now appear on the remittance statement.
7    Q    Now, you mentioned that Medicaid pays in billing cycles.
8         How many billing cycles are there in a year?
9    A    Fifty-two.
10   Q    Okay, and are they numbered 1 to 52?
11   A    They are numbered going back to when it was first created
12   in 1977.
13   Q    So what was the first billing cycle back in 1977?
14   A    One.
15   Q    What billing cycle are we at now?
16   A    Roughly 1860, 1,860, I believe.
17   Q    And are there any billing cycles that have the same number?
18   A    No.
19   Q    In a lot of Department of Health documents are some of the
20   billing cycles referred to by their last three digits or all
21   four digits?
22   A    Last three digits.
23   Q    Mr. Aharonyan, what is a provider profile?
24   A    A provider profile is a download of data that's requested
25   by -- we requested them also, and it's basically all the

1    services for that -- that were submitted by that provider for a
2    given period of time.
3    Q    What is reflected in it?
4    A    A lot of data, a lot of the information that's submitted by
5    the provider for payment is then listed on -- in columns on the
6    spreadsheet.
7    Q    And does it have payment data, or what kind of data is in
8    there?
9    A    It identifies the recipient, Medicaid recipient, ID number
10   for that recipient.  It identifies the provider.  It identifies
11   date of service, the procedure code, the amount paid, and the
12   claim reference number, which is the number that Computer
13   Sciences assigns to that line.  There is other data, yes.
14   Q    Is there information in there about what happens to claims
15   after they are paid?
16   A    There are voids and other adjustments that can happen to
17   that claim.
18   Q    Are those reflected in the provider profile?
19   A    Yes, it can.
20   Q    Does the provider profile contain all the fields that are
21   associated with a particular claim?
22   A    Not all the fields.
23   Q    Is there a standard set of fields that are generated in
24   provider profiles?
25   A    Usually, yes.

1  Q  I'm handing you what's been marked as Defendants' Exhibit

2  M-1.

3        Can you explain what that is?

4  A  This is a provider profile.

5  Q  For whom?

6  A  This is for the provider ID number, and it's for 580 Dental

7  P.C., provider ID number is 00294977.

8  Q  What time period does it cover?

9  A  This covers October 1999 through December 2002.  These are

10  based on its in-service date.

11  Q  When was it created?

12  A  This was created January 24, 2005.

13  Q  How many pages is it?

14  A  We looked at -- it's -- I think it was 2500.

15        THE COURT:  How many?  I'm sorry.  I didn't hear.  How

16  many pages?

17        THE WITNESS:  2,501.

18  Q  How is the information sorted in this document?

19  A  This is sorted by recipient ID number.

20  Q  What group at Department of Health generates provider

21  profile?

22  A  This is, at that time, the electronic data processing, the

23  ED unit.

24        MR. MILLER:  Your Honor, I would offer Defendant's

25  Exhibit M-1.

---

1        THE COURT:  This is not in evidence with any other

2  number?

3        MR. MILLER:  Right.

4        THE COURT:  No?

5        MR. MILLER:  There is an excerpt in, but that's it.

6        THE COURT:  All right.  M-1 will be received.

7        (Defendants' Exhibit M-1 so marked.)

8  Q  Mr. Aharonyan, did you testify in the grand jury in this

9  case?

10  A  Yes.

11  Q  Did you testify about this provider profile?

12  A  Yes.

13  Q  Okay, and as a result of your testimony was this provider

14  profile entered into evidence in the grand jury that indicted

15  Dr. Morse?

16  A  Yes.

17        MR. MILLER:  Thank you.

18        THE COURT:  Can you just establish for the record if

19  it had an exhibit number with the grand jury?  Can we

20  stipulate, if that's the case?

21        MR. MILLER:  I think we will have to stipulate, your

22  Honor.

23        THE COURT:  Okay.

24

25

---

1  CROSS-EXAMINATION

2  BY MR. NORINSBERG:

3  Q  Good morning, Mr. Aharonyan.  How are you?

4  A  Good morning.  Good.

5  Q  Sir, the purpose of your unit, among other things, is to

6  determine whether or not billings are accurate; is that

7  correct?

8  A  Yes.

9  Q  And in order to verify that billings were accurate you

10  would request records from the provider and then check the

11  records to make sure they were verified; is that correct?

12  A  That's part of what we do, yes.

13  Q  So, for example, in the case of a dentist you would

14  actually request the dentist's patient charts, correct?

15  A  Yes.

16  Q  The reason why you would actually look at the patient

17  charts is to verify that the work that was billed for was

18  actually done, correct?

19  A  That it was recorded into the medical record, yes.

20  Q  And you were looking to see that the bills that the dentist

21  had submitted to Medicaid correlated with the work that was

22  actually recorded in the profile, in the patient's chart,

23  correct?

24  A  Yes.

25  Q  And you would consider the patient charts to be important

---

1  in terms of your evaluation, correct?

2  A  Yes.

3  Q  In fact, without looking at the patient charts you would

4  have no way of actually being able to determine whether or not

5  the dentist had actually done the work that he had submitted;

6  is that correct?

7  A  Yes.

8  Q  And so, you would agree, sir, that you would need to look

9  at the actual patient charts to verify whether or not the work

10  had been done, correct?

11  A  Yes.

12  Q  In terms of looking at whether or not a dentist had done

13  the services he billed for, looking at the patient chart would

14  actually be the very first step in terms of trying to verify

15  the claim, correct?

16  A  Not always, no.

17  Q  Referring to your deposition, page 56, line 21.

18        Question:  But in terms of dental providers, would the

19  patient chart be the first step in looking for supporting

20  documentation?

21        Answer:  Yes.

22        Do you recall giving that testimony, sir?

23  A  Right.

24  Q  So that was your testimony at your deposition that that

25  would be the very first step in the process, true or not true?

**JA480**

1   A   That's in an audit, yes.

2   Q   In an audit?

3   A   Yeah.

4   Q   That's what your department did, audits, right?

5   A   I used to do audits, yes.

6   Q   That would be in an audit, the very first step would be to

7   look at the actual patient charts, right?

8   A   In an audit, yes.

9   Q   Now, I would like to show you what's been marked as

10  Plaintiff's 44 and also identified as Grand Jury Exhibit 7.

11          MR. MILLER:  Objection, your Honor, to scope.

12          THE COURT:  Yes, I will sustain the objection.

13  Q   Have you had experience in your work with the Department of

14  Health and with Social Services in seeing Medicaid documents?

15  A   Yes.

16  Q   And would you know a Medicaid document when you saw one?

17          MR. MILLER:  Same objection, your Honor.

18          THE COURT:  Well, he can answer that question.

19  Q   Would you recognize a Medicaid document when you saw one?

20  A   Usually, yes.

21  Q   Okay.  Now, the document that you have in front of you --

22          MR. MILLER:  Objection.

23          THE COURT:  This is the document you introduced into

24  evidence?

25          MR. MILLER:  No.  I'm sorry.  I thought he was talking

1   about the document he just placed in front of him.

2           THE COURT:  Which document are you referring to?

3           MR. NORINSBERG:  I'm talking about Grand Jury 7.

4           THE COURT:  All right.  I will sustain the objection.

5           MR. NORINSBERG:  May we approach?

6           THE COURT:  Yes.

7           (Continued on the next page.)

1           (Sidebar conference.)

2           THE COURT:  I take it your position is this is outside

3   of the scope of the direct examination.

4           MR. MILLER:  Yes, your Honor.

5           MR. NORINSBERG:  This is cross-examination.  I mean he

6   can offer this witness for one purpose, but I am allowed to

7   cross-examine him on the things that he would have direct

8   knowledge about.

9           THE COURT:  No, that's not cross-examination.  If he

10  didn't testify about it, if he wasn't offered for that purpose.

11          MR. NORINSBERG:  Let's say he made a very damaging

12  admission at his deposition and the defendants didn't want me

13  to get into it.  Could they simply avoid asking the question,

14  and I would be precluded from making that statement?  I just

15  don't believe that that's the case.

16          THE COURT:  Why can't you call him as your witness if

17  you want to?

18          MR. NORINSBERG:  Your Honor, I only have a few points.

19          THE COURT:  This is -- that's one of your favorite

20  arguments, I only have a few points.  Really.

21          MR. NORINSBERG:  It is my favorite.

22          THE COURT:  It's really irrelevant, but it will only

23  take a minute.

24          MR. NORINSBERG:  It will only take a minute.  The

25  point being simply that he has testified in his deposition that

1   Grand Jury 7 is not a Medicaid form.  It is not something he

2   recognizes.  It's not --

3           THE COURT:  He hasn't been offered to say that it was.

4   He was just --

5           MR. NORINSBERG:  He has 30 years of experience.  Why

6   can't I have him say that?

7           THE COURT:  That's falling as outside the scope.  If

8   you want to call him as your witness, you can.  Is he on your

9   witness list?  You would have to call him as your witness.

10          MR. MILLER:  Your Honor, he offered deposition

11  testimony about him during his case.

12          THE COURT:  Is it already in the record?

13          MR. MILLER:  It's already in the record.

14          THE COURT:  This part?

15          MR. MILLER:  No, other parts.  But he is well aware of

16  Mr. Aharonyan's role.

17          THE COURT:  He basically testified, as I understand,

18  to get this provider file into evidence.

19          MR. MILLER:  Correct.

20          THE COURT:  The whole thing, which I take it is going

21  to show whatever it shows, he hasn't been called to testify to

22  anything else.  You would have to call him as your witness.

23          MR. NORINSBERG:  So if I recalled him now on my case

24  in chief to -- I mean my rebuttal case.

25          THE COURT:  It would have to rebut something.  You

**JA481**

1  chose not to call him.  This is outside the scope of his

2  direct.

3          You could have called him and put this into your case.

4  You didn't.  I don't know whether it's appropriate to do this.

5          MR. NORINSBERG:  Okay.  I will move on.

6          THE COURT:  Okay.

7          (End of sidebar conference.)

8          (Continued on the next page.)

---

1          (In open court.)

2  BY MR. NORINSBERG:

3  Q   Now, at the time you testified before the grand jury did

4  anyone explain to you the nature of the allegations against

5  Dr. Morse?

6  A   No.

7  Q   And any time after that, after your testimony at the grand

8  jury, did you ever learn what the allegations were?

9          MR. MILLER:  Objection.

10         THE COURT:  Sustained.

11 Q   Lastly, Mr. Aharonyan, can you think of any reason at all

12 why you wouldn't examine the patient charts when trying to

13 determine if the work had been done, yes or no?

14 A   Yes.

15 Q   Referring to your deposition, page 16, line 13.

16         Question:  Can you think of any reason why you

17 wouldn't examine the patient charts when trying to determine if

18 the work had been done?

19         Answer:  There may be other ways to verify what was

20 being done, but typically we would ask for the documentation,

21 such as the medical record.

22         Do you recall giving that testimony?

23 A   Yes, yes, I do.

24         MR. NORINSBERG:  Thank you.  Nothing further.

25         THE COURT:  Do you have anything further?

---

1          MR. MILLER:  Nothing, your Honor.

2          THE COURT:  Thank you.  You can step down.

3          MR. MILLER:  Your Honor, our next witness is outside

4  the courtroom.

5          THE COURT:  Okay.  You want to find him.

6          (Pause.)

7          MR. FARBER:  Your Honor, the defendants call

8  Dr. Christopher Erath.

9          THE COURT:  Step up, doctor.  Raise your right hand.

10 CHRISTOPHER ERATH, called as a witness, having been

11     first duly sworn/affirmed, was examined and

12     proceeded to testify as follows:

13         THE WITNESS:  I do.

14         THE COURT:  All right.  Please be seated and state and

15 spell your name for the record.

16         THE WITNESS:  My name is Christopher Erath, E-R-A-T-H.

17         MR. FARBER:  Thank you.

18 DIRECT EXAMINATION

19 BY MR. FARBER:

20 Q   Thank you, sir.  Good morning, Dr. Erath.

21 A   Good morning.

22 Q   Are you presently employed, sir?

23 A   I am.

24 Q   Where are you presently employed?

25 A   I am employed by a consulting firm called BLDS.

---

1  Q   Where are they located, sir?

2  A   I have offices in Philadelphia and in Natick,

3  Massachusetts.

4  Q   Which office do you work out of?

5  A   In the Massachusetts office.

6  Q   Can you describe your education, starting with college?

7  A   I went to college at Bowdoin College in Maine.  I've got

8  undergraduate degrees in economics and mathematics.

9          I then attended graduate school at the University of

10 Wisconsin, where I obtained a master's degree and a Ph.D. in

11 economics.

12 Q   What year did you obtain your doctorate degree?

13 A   1987.

14 Q   Can you tell the jury your employment history since you

15 received your Ph.D. degree?

16 A   After graduate school I was employed by a firm called

17 National Economic Research Associates.  I stayed there until

18 about two years ago, when I joined BLDS.

19 Q   Have you published any articles in any professional

20 journals?

21 A   Yes.  I have published several articles on -- in legal

22 journals on topics of the proper way to estimate economic

23 losses in matters such as the one we are here to talk about

24 today.

25 Q   And do you have other specialties within the economics

**JA482**

1  profession?

2  A  My two specialties are labor economics, which is simply the

3  study of how employers and employees interact -- bless you --

4  and statistics.

5  Q  From time to time you perform services as an expert

6  witness; is that correct?

7  A  Yes, I do.

8  Q  You or your firm is compensated for those services, are you

9  not?

10 A  Yes.

11 Q  In the present case, can you tell the jury what is your

12 rate of compensation?

13 A  My firm is being compensated at $475 per hour.

14 Q  And in the past two years approximately how many times have

15 you testified?

16 A  I don't keep a running count, but since you said

17 approximately, ten.

18 Q  Now, before this case you have done work for the Attorney

19 General's Office of New York State, have you not?

20 A  I have.

21 Q  In fact, you have worked with me before, have you not?

22 A  I have.

23 Q  However, this is the first case in which you have actually

24 testified for our office; is that correct?

25 A  Yes.

1  Q  All right.  There came a time when I asked you to work on a

2  case involving a plaintiff named Dr. Leonard Morse; is that

3  correct?

4  A  Yes.

5  Q  With respect to that, I asked you to provide an evaluation

6  of expert opinions prepared by Dr. Edmund Mantell on behalf of

7  Dr. Leonard Morse; is that correct?

8  A  I did.

9  Q  You did such an evaluation; is that correct?

10 A  I did.

11 Q  All right.  I'm going to put on the screen a document that

12 was also shown to Dr. Mantell during his testimony, called

13 Summary Exhibit 4, summary statement of a discounted economic

14 loss sustained by Leonard Morse, DDS because of accusations of

15 criminal misconduct.

16    Do you see that document?

17 A  Yes.

18 Q  All right.  Is this one of the documents you reviewed in

19 preparing your assessment of Dr. Mantell's opinion?

20 A  I believe so.

21 Q  All right now, your -- am I correct you are aware that in

22 formulating his opinion Dr. Mantell relied on a number of

23 assumptions, correct?

24 A  Yes.

25 Q  All right.  Specifically, the assumptions Dr. Mantell

1  relied upon concern Dr. Morse's expected work life, his

2  assumption on --

3         MR. NORINSBERG:  Your Honor, object to counsel --

4         MR. FARBER:  I will rephrase.

5         MR. NORINSBERG:  -- testifying.

6         MR. FARBER:  I will rephrase.  I will withdraw the

7  question and rephrase.  Thank you.

8  BY MR. FARBER:

9  Q  All right.  Were you aware of Dr. Mantell's assumption

10 concerning Dr. Morse's expected work life?

11 A  Yes.

12 Q  What was Dr. Mantell's assumption?

13 A  That Dr. Morse would work full time as a dentist through

14 the year 2022, when Dr. Morse would be over 74 years old.

15 Q  Did you conclude that was a reasonable assumption?

16 A  No.

17 Q  Why not?

18 A  Well, the only basis that Dr. Mantell gave for that

19 assumption was that Dr. Morse had signed a lease that extended

20 through the year 2022.  And that's no basis for conclusion one

21 way or another about how long someone would or would not work.

22    A practice, a dental practice, a lease for a dental

23 practice is an asset of that practice that can be sold when the

24 practice is sold, as in fact this one was.  When Dr. Morse sold

25 his practice he sold his lease along with it.  So that was

1  certainly no impediment to the sale of the practice.

2     Instead of looking at something like a lease, which

3  doesn't have anything to do with how long someone would work,

4  there are a number of data sources available at which

5  Dr. Mantell could have looked.  There are a couple that are

6  compiled by the federal government.  One, the Bureau of Labor

7  Statistics, publishes what are called labor force participation

8  rates, which tell you for people at a given age what percentage

9  of them are actually in the labor force.

10    By "in the labor force" they mean working in any

11 capacity, whether it's full time, part-time, doing some

12 consulting work, doing some sporadic temporary work, any of

13 those things, or even if you are looking for work.  You don't

14 even have to be working.  All of those things count as

15 participating in the labor force.

16    If you look at the labor force participation rates

17 that the Bureau of Labor Statistics puts out, they show that

18 for people 65 or over that labor force participation rate is

19 less than 20 percent.  So, in other words, eight out of ten men

20 65 or over are not participating in the labor force in any way,

21 shape, or form.  So that's certainly inconsistent with an

22 assumption that Dr. Morse certainly would have worked full time

23 until age 74 and a half.

24    A second source that the federal government has put

25 out in the past is something called work life tables.  Those

**JA483**

1 are tables that show for a given age how many more years of
2 labor force participation an individual is expected to have.
3 So if you look at those tables for someone who -- of the age of
4 65, as Dr. Morse is, you will get a number in there of four or
5 five years, four or five years of additional expected labor
6 force participation.
7        First of all, that number is quite a bit less than the
8 nine more years that Dr. Mantell has assumed; and, second of
9 all, it's important to keep in mind that that's again five more
10 years of labor force participation in any way.  It's not
11 full-time work.  It's full-time work, part-time work, doing a
12 little consulting work, you know, seasonal work, or even
13 looking for work.  All of those things would go into it.
14        So, again, no support there.  In fact, a direct
15 contradiction to Dr. Mantell's assumption of work through age
16 74 and a half.
17        There is also information available on retirement
18 intentions of dentists.  The Academy of General Dentistry did a
19 survey of its members and asked them at what age they plan to
20 retire, and that survey showed that, again, eight out of --
21 roughly eight out of ten dentists were not going to be working
22 full-time or did not plan to be working full time past the age
23 of 62.  They would retire either completely or transition to
24 part-time work after the age of 62.  So the median age, the
25 typical age in which those dentists in that Academy of General

1 Dentistry survey ceased working full time, is 62.  Again,
2 direct contradiction to the assumption that Dr. Mantell has
3 made in this case.
4        There are other similar surveys of dentists and
5 retirement intentions that will give you a number in the same
6 ballpark in showing that the -- there isn't support for an
7 assumption of uninterrupted full-time work through age 74 and a
8 half.
9 Q  And did you reach your conclusion with respect to
10 Dr. Mantell's assumption that the only work that Dr. Morse
11 would be able to obtain was income derived from his work at
12 New York Methodist Hospital?
13 A  Yes.
14 Q  What was your conclusion, sir?
15 A  On that score, there is no evidence that Dr. Mantell did
16 any analysis to or made any determination of what Dr. Morse is
17 or is not capable of earning as a dentist.  All he did was take
18 the earnings that Dr. Morse has reported since 2006 and
19 apparently take an average of those and say, that's all that's
20 going to be available to Dr. Morse at any point between now and
21 2022.  There is no evidence that Dr. Mantell did an evaluation
22 of what Dr. Morse might or might not be able to earn, could or
23 could not have earned at some point in the past.
24        From all we can tell from what Dr. Mantell has done,
25 he has only taken an average of those few years and said that's

1 it, that's the only amount he is ever going to be able to earn;
2 and that's leads to, you know, that leads directly to the
3 figures we see here.
4 Q  Did you reach an opinion concerning Dr. Mantell's
5 conclusion with respect to the annual rate of Dr. Morse's
6 income or on this chart specifically the figures associated
7 with lost gross income in the period of the loss and discounted
8 lost gross income down here?
9 A  I did.
10 Q  What were your conclusions, sir?
11 A  I think those numbers are overstated.
12 Q  Why is that, sir?
13 A  Well, one reason is the one we already discussed, that
14 these numbers build in the assumption of working until age 74
15 and a half.  We have already talked about that.
16        So if we set that aside, another reason is that
17 Dr. Mantell assumes that had Dr. Morse continued to operate his
18 practice he would have earned $297,000 per year in each and
19 every -- well, as a base figure, and then he assumes that
20 number would increase.
21        Let's talk about the 297 to start with.  I understand
22 that Dr. Mantell claims that's an average over the last four or
23 five years that Dr. Morse operated his practice.  If you look
24 at the revenues that doctor -- not the revenues but the
25 money that Dr. Morse received from the practice in the last two

1 years he operated the practice, 2004 and 2005, the last two
2 full years, those numbers are $220,000 in one year, $240,000 in
3 the other year.  Quite a bit less than he had made prior to
4 that time.  So there is a downward trend in the money Dr. Morse
5 received from the practice.
6        Dr. Mantell testified at deposition that he asked
7 Dr. Morse why, you know, the reason for the downward trend and
8 was told that one reason was the gentrification of the Park
9 Slope area, meaning that since Dr. Morse's practice was
10 primarily from a Medicaid practice, as the Park Slope area
11 became more affluent there were fewer Medicare -- Medicaid
12 patients there and therefore the revenues went down.  So
13 Dr. Mantell takes this information set that he's got a
14 declining revenue base, a declining money coming from Dr. Morse
15 from the practice in those last couple of years, and
16 Dr. Morse's statement that it's due to the gentrification of
17 Park Slope and nonetheless takes an average of those two last
18 years and several prior years to arrive at this higher
19 $297,000-per-year figure; and he uses that as the basis --
20 bless you -- for all of his calculations.
21        It's as if we are looking at a stock price and five
22 years ago a stock was worth $10 a share and now it's worth $3 a
23 share, and you are asked what's a share of that company worth;
24 and you say, well, let's take the overage of that.  So we will
25 take an average of ten and three, and you get $6.50, and that's

**JA484**

1   what it's worth.  Well, that's not what it's worth.  It's worth
2   $3.  That's the current price.
3          So Dr. Mantell's whole calculation is based on the
4   assumption that the base figures from Dr. Morse's receipts from
5   the practice would be 297,000, even though that's much higher
6   than he received in 2004 or 2005, the last two full years he
7   operated the practice.  Then on top of that, to get to the
8   figure in the chart here, Dr. Mantell then assumes that that
9   $297,000 base would go up in each and every year between now
10  and 2022, and he doesn't really give a basis for that
11  assumption that it would go up.
12         The number that he uses is drawn from a consumer price
13  index that the government puts out that's specific to dental
14  services.  That number is obviously not specific to Dr. Morse's
15  practice.  It's not specific to Medicaid practices.  It's not
16  specific to Medicaid practices in areas undergoing
17  gentrification.  It's not specific to Medicaid practices in
18  areas undergoing gentrification where revenues have been
19  declining.  It's a generic number for gross rate in dental
20  service costs per se.  So it's not just that to get to this
21  figure here.
22         There are really three major errors.  The first is
23  that it's run all the way out to age 74 and a half.  The second
24  is that the base figure is too high at 297.  And the third is
25  that we start at that base, and then Dr. Mantell assumes it's

1   going to get higher and higher and higher despite the evident
2   decline in the receipts from the practice by Dr. Morse.
3   Q    Did you have occasion to review the assumptions made by
4   Dr. Mantell with respect to the valuation of the dental
5   practice that was sold by Dr. Morse in 2006?
6   A    Yes.
7   Q    Did you draw any conclusions concerning Dr. Mantell's
8   analysis?
9   A    In terms of the sale of the dental practice, as you
10  mentioned, Dr. Morse sold the practice for $450,000 in 2006.
11  Dr. Mantell assumes that in 2022 Dr. Morse would have sold the
12  practice for a figure of $900,000 and change, as we see here,
13  thereby generating an additional loss.
14         And the $926,000 figure that's on this chart,
15  according to Dr. Mantell that is derived from the steps he took
16  to get to that are he took an average revenue figure, average
17  projected revenue figure for the dental practice over a number
18  of years.  So, again, it's a long-term average.
19         We have already talked about the dangers in taking a
20  long-term average, particularly when you have a practice where
21  you have declining revenues, as we have here.  He takes that
22  long-term average, multiplies it by 37 percent, and says that
23  that will give him a measure of the so-called goodwill of the
24  practice, which you can think of as the intangible value,
25  intangible assets of the practice.

1          Then the final step is he takes the tangible assets,
2   the equipment, the lighting, fixtures, all of that stuff, and
3   adds on another amount there.  The 37 percent figure appears to
4   have been derived from some registry of sales of dental
5   practices and what they claim their goodwill was from those
6   sales.
7          To my knowledge, Dr. Mantell has not produced any of
8   the data upon which he relied.  We can't see what types of
9   dental practices those were.  We don't know if any of them were
10  Medicaid practices.  We don't know if any of them were Medicaid
11  practices in areas undergoing gentrification.  We don't know if
12  they are declining revenues.  We don't know what period of time
13  they were over.
14         There has been a lot of downward pressure on Medicaid
15  reimbursement rates, because of the government's financial
16  issues.  So these transactions go back ten years.  It would be
17  a very different landscape than they are now.
18         All he tells us is that based on this unspecified
19  sample of sales of dental practices there is 37 percent should
20  be multiplied by revenues and that will give you this so-called
21  goodwill; and, you know, that's obviously a generic figure that
22  doesn't have any direct correlation to Dr. Morse's practice.
23         The final component, as I mentioned, is that
24  Dr. Mantell takes the listed value of the tangible assets, the
25  fixtures, the equipment that was actually in the sale agreement

1   in 2006 and then it assumes that those -- that those fixtures,
2   equipment, would appreciate in value, would go up by the same
3   dental services CPI, all the way through 2022.  And I find that
4   to be an odd assumption in that when you are talking about
5   things like equipment and tools, those things tend to
6   depreciate over time.  The more you use them, the less valuable
7   they become.  But he has an assumption that they will
8   appreciate over time, they will get more valuable overtime; and
9   he takes that and adds that on top of the goodwill, and that's
10  where he ends up with this $926,000 figure.
11         So I just don't see that he has advanced any basis for
12  a claim of a loss there from the sale of the practice.
13  Q    Did you reach any conclusions concerning any other of
14  Dr. Mantell's assumptions?
15  A    I think the one other -- we have covered the big ones here.
16  I think the one other one is that it's necessary to, when you
17  are talking about amounts that would be -- would have been
18  obtained in the future, it's necessary to discount those
19  amounts to present value.  And Dr. Mantell does discount them
20  to present value, but he does so at what appears to be a
21  risk-free rate equivalent to the rate on treasury securities,
22  on U.S. treasury securities.
23         And it's not appropriate to -- if you discount
24  something at a risk-free rate you are saying that stream of
25  money is absolutely certain.  There is no risk, there is no

**JA485**

1   uncertainty, we know with absolute clarity and precision
2   exactly what moneys would have been received in every year
3   between now and 2022; and that's wrong.  Obviously no one has
4   that kind of crystal ball and could tell us exactly what would
5   have happened, what those numbers would have been.
6           So Dr. Mantell should have used a discount rate that
7   embodied risk but which would have led him to get a lower
8   number.
9   Q   Overall, did you reach a conclusion concerning the overall
10  usefulness of Dr. Mantell's analysis?
11          MR. NORINSBERG:  Objection.
12          THE COURT:  Overruled.
13  A   I don't find it to be useful at all.
14  Q   Is that conclusion within a reasonable degree of economic
15  certainty?
16  A   It is.
17          MR. FARBER:  Thank you, Dr. Erath.
18  CROSS-EXAMINATION
19  BY MR. NORINSBERG:
20  Q   Good morning, Dr. Erath.
21  A   Good morning.
22  Q   You and I have met before, correct?
23  A   We met over a video conference link, if that counts.
24  Q   Fair enough.  You had your deposition approximately three
25  weeks ago; is that right?

1   A   I think so.
2   Q   Since that time you have had a chance actually to look at
3   your deposition testimony, correct?
4   A   I have.
5   Q   So you are familiar -- if I refer to any part of your
6   deposition you will be familiar with that, right?
7   A   I haven't committed it to memory, but try me now.
8   Q   You had expressed opinions that you disagree with
9   Dr. Mantell's findings; is that correct?
10  A   That's correct.
11  Q   But you haven't made any findings of your own, have you?
12  A   My findings are limited to evaluating Dr. Mantell's report,
13  as we have been discussing.
14  Q   You have no opinion as to Dr. Morse's actual past lost
15  earnings, true or not true?
16  A   I have not attempted to come up with a figure.
17  Q   You have no opinion as to Dr. Morse's future lost earnings,
18  correct?
19  A   Well, my opinion is that Dr. Mantell's analysis is
20  inaccurate.  I have not tried to come up with a calculation of
21  my own.
22  Q   Do you have any number at all as to what you think the jury
23  would determine is an appropriate amount for future lost
24  earnings, any number that you have come up with, yes or no?
25  A   As I just said, I did not attempt to come up with a number

1   on my own.  I was evaluating what Dr. Mantell had done.
2   Q   Did you come up with an evaluation of what would be fair
3   market value of the practice when it was sold in 2006, yes or
4   no?
5   A   I did not attempt to come up with a fair market value of
6   the practice.
7   Q   So if I understand your testimony correctly, you have no
8   opinion as to past lost earnings, no opinion as to future lost
9   earnings, and no opinion as to the fair market value of the
10  practice in 2006, correct?
11  A   As I said, my --
12  Q   Is that true or not true, sir?
13  A   My opinion is that Dr. Mantell's analysis is seriously
14  overstated.
15  Q   You have an opinion about his analysis, but you have no
16  opinion about your own, do you?
17          MR. FARBER:  Objection.
18          THE COURT:  I will sustain the objection.
19  Q   You have form --
20          THE COURT:  Excuse me.  Let me finish.  I sustained an
21  objection to the form of the question.
22  Q   Would you agree, Dr. Erath, that you could have formulated
23  opinions as to economic losses in this case if you wanted to,
24  would you agree with that?
25  A   With some additional information at hand, yes, I could

1   have.
2   Q   But you didn't do so because you weren't asked to by
3   Mr. Farber; is that correct, yes or no?
4   A   Mr. Mr. Farber asked me to evaluate Dr. Mantell, that's
5   correct.
6   Q   You didn't do anything except critique Dr. Mantell; is that
7   correct?
8   A   That's right.  That's what I was asked to do.
9   Q   Now, if you wanted to attempt to calculate Dr. Morse's
10  future lost earnings after 2006, you could have, right?
11  A   Again, with more information than Dr. Mantell appears to
12  have collected, yes, I could have.
13  Q   You also say you have no opinion as to whether or not the
14  accusation against Dr. Morse and the publicity impaired his
15  professional income; is that right?
16          MR. FARBER:  Objection.
17          THE COURT:  I will sustain the objection.
18  Q   Now, the first assumption that you took issue with is that
19  the loss extends to 2022, correct?
20  A   Yes.
21  Q   In other words, you don't believe it's reasonable to assume
22  that Dr. Morse could have continued working as a dentist at age
23  74, right?
24  A   It means I don't consider it reasonable to assume that with
25  absolute certainty he would have continued working full time

**JA486**

1  through 74, or 2022.

2  Q   You wrote in your report that there was no justification

3  for this assumption; isn't that true, yes or no?

4  A   I also have not committed my report to memory, as I

5  mentioned in my testimony.  The only justification I'm aware of

6  Dr. Mantell presenting is the duration of the lease.

7  Q   You testified approximately 50 times in your career; is

8  that correct?

9  A   Something in that ballpark.

10  Q   You have been cross examined many times in your career,

11  haven't you?

12  A   About the same number of times.

13  Q   You understand the concept of a yes-or-no question, don't

14  you?

15       MR. FARBER:  Objection.

16       THE COURT:  Sustained.

17  Q   Sir, would it be fair to say that you actually wrote in

18  your report that there was no justification whatsoever for

19  concluding that Dr. Morse would continue working at age 74,

20  true or not true?

21       MR. FARBER:  Objection.

22       THE COURT:  Overruled.

23  A   I haven't committed the report to memory, but I believe

24  that to be an accurate statement.

25  Q   In fact, he had a lease that stated that he was going to

1  work until 2022, but you disregarded that in your report,

2  didn't you?

3  A   I don't think he had a lease which stated he would work

4  until 2022.

5  Q   You testified to this jury about a number of sources you

6  looked at to determine what the proper working retirement age

7  would be for dentists, correct?

8  A   I testified about a number of sources at which Dr. Mantell

9  could have looked but appears not to have done so.

10  Q   Right, and one of those sources was called The Wealthy

11  Dentist, an Internet marketing guru's website, right?

12  A   That was one source that I mention in my report.

13  Q   You consider that to be a reliable source; is that correct?

14  A   I consider it to be one data point at which Dr. Mantell

15  could have looked instead of ignoring all available evidence.

16  Q   It's run by a guy named Jim DuMolin; is that correct?

17  A   Sounds right.

18  Q   He is one of the leading Internet marketing experts for

19  dentists in the country, right?

20  A   I believe he bills himself that way anyway.

21  Q   And you have no opinion as to whether or not any of the

22  surveys he did were valid, do you, sir?

23  A   I am not privy to his methodology.

24  Q   He has also had other surveys that he cited, such as

25  Dentists Dating Patients, right?

1       THE COURT:  That who cited?

2       MR. NORINSBERG:  That this wealthy dentist website

3  cited on the source that you are relying on.

4       THE COURT:  Cited for what purpose?

5       MR. NORINSBERG:  This doctor, this expert --

6       THE COURT:  I'm sorry.  Don't refer to "this expert."

7  Could you just reform your question, Mr. Norinsberg.

8       MR. NORINSBERG:  Sure.

9       THE COURT:  Is the question did he know that this

10  person did charts or did analysis based on something?  Is that

11  the question?

12  BY MR. NORINSBERG:

13  Q   The question is did you see other surveys that this website

14  that you relied on and told the jury is a reliable source of

15  information, did you look at any of the other surveys?

16       MR. FARBER:  I'm going to object to the form of the

17  question.

18       THE COURT:  Yes, I will sustain the objection to the

19  form of the question.

20  Q   Did you see this same website -- when you were on this

21  website did you see a survey on how romance blooms in the

22  office?

23  A   I don't remember one particularly on that topic, but I was

24  only looking for ones that had anything to do with retirement

25  age.

1  Q   Did you see the other survey that says one in five dentists

2  has dated a dental patient?

3       MR. FARBER:  Objection.

4       THE COURT:  Sustained.

5  Q   Do you go through any type of screening process before you

6  rely on something you see on the Internet and make that part of

7  a report?

8  A   I do.

9  Q   You didn't do that in this case with The Wealthy Dentist,

10  did you, sir?

11  A   I did.

12  Q   Yes or no?

13  A   Yes.

14  Q   And you consider, as you sit here today, you consider The

15  Wealthy Dentist to be a reliable scientific survey; is that

16  correct?

17       MR. FARBER:  Objection.

18       THE COURT:  Overruled.  He can answer that.

19  A   I did not say that.  I said it was a data point, as I

20  mentioned, the one from the Academy of General Dentistry and

21  others, all of which point to roughly the same conclusion about

22  dentists' retirement intentions.

23  Q   You didn't tell this jury about some of the other things in

24  the AGD survey?

25       THE COURT:  I will sustain the objection to the form

**JA487**

1  of the question.  You want to start over?

2  Q   Would you agree that according to the AGD survey full

3  retirement is not in the vocabulary of most dentists, and most

4  do not have any intentions to retire fully from their

5  profession?  Do you recall reading that in the survey, sir?

6  A   That's entirely consistent with what I testified to

7  earlier.

8  Q   My question is not whether it's --

9           MR. FARBER:  Objection.

10          THE COURT:  Reading it in what survey?

11          MR. NORINSBERG:  In the AGD survey.

12          THE COURT:  First of all, did you read that survey?

13          THE WITNESS:  I read a summary of the results of that

14  survey.

15          THE COURT:  Now, so your question is?

16  BY MR. NORINSBERG:

17  Q   Do you recall reading the portion of that summary where it

18  said full retirement is not in the vocabulary of most dentists?

19  Do you recall that, sir, yes or no?

20  A   I recall reading that eight out of ten dentists retire

21  either fully or partially past the age of 62, and that's

22  entirely consistent with what you said.

23          MR. NORINSBERG:  Move to strike as nonresponsive.

24          THE COURT:  I think the question was do you remember

25  that portion that he just read.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1           THE WITNESS:  Yes.

2  BY MR. NORINSBERG:

3  Q   Do you recall another portion where it says most dentists

4  do not have any intention to retire fully from their

5  profession?  Do you recall that portion, yes or no?

6  A   Fully from the profession, so they would be working

7  possibly part-time, yes, I recall.

8  Q   You recall reading that, right?

9  A   Yes.

10  Q   Do you recall reading this part of it, where it says, our

11  results clearly show that most AGD dentists have no intention

12  to give up their work completely?

13          Do you recall that, sir, yes or no?

14  A   Again, the word "completely," indicating that they are not

15  working fully, yes, I recall it.

16  Q   You never mentioned any of those things when you just told

17  the jury about that survey, did you?

18  A   That's entirely --

19          MR. FARBER:  Objection.

20          THE COURT:  I'm going to sustain the objection to the

21  form of that question.  Do not ask a question like that again,

22  counsel.

23  BY MR. NORINSBERG:

24  Q   Now, you also had mentioned the Bureau of Labor Statistics;

25  is that correct?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1  A   I did.

2  Q   Would you agree, sir, that according to the Bureau of Labor

3  Statistics someone of Dr. Morse's age now, 65, would be

4  expected to work until at least age 70?  Do you agree with

5  that?

6  A   Depends on your definition of work.  As I said in my

7  testimony, I'm assuming you are alluding to work-life tables.

8  Those include years spent working full time, part-time,

9  sporadically, seasonally, or even looking for work.  So if

10  that's the definition you of work you are using, not full-time

11  but an amalgamation of all those things I just mentioned, the

12  answer is yes.

13  Q   Didn't you testify at your deposition that you yourself

14  agreed that you would expect Dr. Morse to work until at least

15  age 70?  You formed that opinion, didn't you?

16          MR. FARBER:  Objection.

17          THE COURT:  I assume that there is a basis for asking

18  the question, unless that's the source of the objection.

19          MR. FARBER:  Well, there is a foundation question.

20  There was a very specific question that went with it, and

21  counsel is summarizing it in a slightly different way than the

22  specific question that was asked.

23          THE COURT:  So there is no foundation for the

24  question?

25          MR. FARBER:  Correct.  There is a foundation and form

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1  objection.

2           THE COURT:  What was the question again,

3  Mr. Norinsberg?

4  BY MR. NORINSBERG:

5  Q   The question is whether or not you expressed an opinion at

6  the deposition that you would expect Dr. Morse to work to age

7  70, based on the Bureau of Labor Statistics tables.

8           Do you recall that?

9  A   I assumed we would have had the same discussion as what I

10  just mentioned, about the definition of work, but if you are

11  including as work all of the things I just mentioned, part-time

12  work, full-time work, consulting work, sporadic work, seasonal

13  work, looking for work.  If you put all of those things in your

14  definition of work, then I will agree with the statement.

15          It's certainly not a basis for assuming five years of

16  full-time work.

17  Q   Did you form any opinion at all of your own as to when you

18  believed Dr. Morse would continue working until?

19  A   No.  I did not.  As we discussed repeatedly, I was

20  evaluating Dr. Mantell.

21  Q   So the answer to my question is no, you didn't form an

22  opinion on what age you would expect him to retire; is that

23  right?

24  A   That's right.

25  Q   You also formed no opinion as to whether or not the good

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

**JA488**

1  will of his practice would have been affected by the

2  indictment, correct?

3  A   Correct.

4  Q   But you did express an opinion that the $13,000 assigned as

5  goodwill in the sale of 2006 was a low figure, right?

6  A   I believe you and I had a lengthy discussion about low

7  relative to what, but I think I ultimately agreed in general

8  statement, in general principle with that statement.

9  Q   Referring to your deposition, page 113, line 21.

10      Question:  Do you have an opinion as to whether or not

11  13,000 would be a full goodwill value for a 30-year-old

12  practice with over a million dollars of gross revenues and a

13  patient base of 30,000 patients?

14      Answer:  That seems like a low figure.  We have no

15  idea how that 13,000 figure was arrived at.

16      Do you recall being asked that question and giving

17  that answer?

18      THE COURT:  I'm sorry, counsel.  Are you reading that

19  because it's supposed to be inconsistent?

20      MR. NORINSBERG:  I'm going to read one more question

21  and answer.  Page 114 line 7.

22      Question:  So the 13,000 would seem to be a low figure

23  for a practice such as Dr. Morse's practice in August 2006,

24  true or not true?

25      Answer:  As I just said, I believe that to be low, but

---

1  we don't know how that figure was arrived at.

2      Do you recall being asked those questions and giving

3  those answers?

4  A   It sounds familiar.

5  Q   Okay.  So you didn't know how the figure was arrived at,

6  but the figure to you seemed to be a low figure for goodwill,

7  right?

8  A   Again, I think you and I had a lengthy discussion about low

9  relative to what, but I think what you read is accurate.

10 Q   You -- to this day you have never attempted to assign a

11 value for the practice in 2006, correct?

12 A   Correct.

13 Q   And you have never attempted to determine what the fair

14 market value of Dr. Morse's practice would be in August 2006,

15 did you?

16 A   I have not.

17 Q   And I would like you to assume that Mr. Mantell testified

18 that the fair market value of 2006 -- in 2006 of Dr. Morse's

19 practice is approximately $590,000.

20      MR. FARBER:  Objection.

21 Q   Would you agree or disagree with that valuation?

22      MR. FARBER:  Objection.

23      THE COURT:  Unless your objection is that it doesn't

24 accurately state the record, I will allow him to ask the

25 question.

---

1      MR. FARBER:  I will withdraw the objection, your

2  Honor.

3      THE WITNESS:  I have lost the question.

4  BY MR. NORINSBERG:

5  Q   I would like you to assume that Dr. Mantell testified that

6  the approximate fair market value of the practice was $590,000

7  in 2006.

8      Do you agree or disagree with that figure of $590,000?

9  A   I would have to know more about how he arrived at that

10 figure.

11 Q   In fact, you haven't done any calculations on it.

12      So you can't say whether or not you would agree,

13 right?

14 A   Yeah.  I think I have already testified I have not

15 attempted to value it on my own.

16 Q   Now, in your report, you indicated that under the business

17 agreement that Dr. Morse and Dr. Ketover had entered into in

18 2001, according to that evaluation, the practice's value would

19 have been approximately $565,000 in 2006.  Correct?

20 A   No.

21 Q   Do you recall writing in your report that the actual

22 expected value based on the revenue was, quote, $565,000 and

23 that, quote, the maximum possible loss would be $115,000?

24      Do you recall writing that?

25 A   What I was writing there was about the option --

---

1      MR. NORINSBERG:  Your Honor.

2      THE COURT:  No.  I will allow him to explain his

3  answer.

4  A   What I was writing there was that the business agreement

5  between Dr. Morse and Dr. Ketover gave Dr. Ketover the option

6  to buy the practice.

7      It didn't say this is the value of the practice.  It

8  doesn't say he had to buy the practice.  It says he has the

9  choice.

10      That agreement had to do in the event of Dr. Morse's

11 incapacitation.  He had the choice to buy the practice for

12 one-half of the revenue of the preceding 12 months.  It doesn't

13 mean that that's the value of the practice.

14      And, as we also discussed at my deposition, we don't

15 know what the revenue was in the 12 months immediately

16 preceding the, you know, the date in question, the actual sale.

17 So that's my -- in the quote you just read, I used the phrase

18 "maximum" because if Dr. Morse agreed to sell at that price,

19 but it's not the value.  It's not a value of the practice

20 because it's simply an option to buy.

21 Q   Okay.  So if Dr. Ketover had exercised his option under the

22 agreement in 2006, the price would have been approximately

23 $565,000, true or not true?

24 A   As I just said, we don't know what the revenues were in the

25 preceding -- in the 12 months preceding the sale.  If we knew

**JA489**

1  that, then we could take half of it and that would have been
2  the price at which Dr. Ketover could have brought the practice,
3  had he chosen to do so.
4  Q   We do know what the revenues were in 2005, when they were
5  approximately 1.13 million; isn't that correct?
6  A   I believe that's correct.
7  Q   You relied on that in your report, in terms of evaluating
8  what the sales price would be under the agreement, didn't you?
9  A   Again, it's not the sales price.  It's the option to buy.
10 So that's why I used the word "maximum" in there, to say this
11 is the largest it could possibly be.  It's not meant to say
12 this is the number.
13 Q   Okay.  The largest it could possibly be would be
14 approximately $115,000 more than what Dr. Morse actually sold
15 it for, right?
16 A   Under the terms of that agreement, yes.  That would be the
17 maximum.
18 Q   Could you --
19        THE COURT:  Would you please not step on his answers?
20 I'm sorry.  Would you finish your answer.
21 A   Thank you.  I was simply pointing out, again, because it's
22 the maximum the largest possible different not in any actual
23 difference.
24 Q   The largest possible difference would be $115,000 below
25 what it actually sold for?

---

1  A   The largest possible difference would be $115,000.  That's
2  right, that's the maximum it could be.
3  Q   That would be over a 20 percent loss of fair market value,
4  wouldn't it be?
5        MR. FARBER:  Objection.
6        THE COURT:  Yes.  I will sustain the objection.  I'm
7  not sure there is a foundation for that question.
8  Q   Now, you indicated in your report that you took issue with
9  the $297,000 in annual -- as an annual figure; is that correct?
10 A   Yes.
11 Q   And you said there was no source for that figure, correct?
12 A   Yes.
13 Q   But in fact you have since learned that there is a source
14 for that figure -- it's the average of the tax returns going
15 back four years; isn't that true?
16 A   I remember reading that it was an average.  I don't
17 remember if it was four or five years but something in that
18 ballpark.
19 Q   And is it your testimony, sir, that for Dr. Mantello to
20 actually look back and take the average of one, two, three,
21 four years and put it together, that that's unreasonable?  Is
22 that your testimony?  Yes, it is or no, it isn't.
23 A   It is unreasonable.
24 Q   And can you tell the jury what's your opinion, how many
25 years back would be reasonable to go back when you are looking

---

1  at prior earnings?
2        MR. FARBER:  Objection.
3        THE COURT:  Overruled.  He can answer.
4        THE WITNESS:  I'm sorry?
5        THE COURT:  You can answer it.
6  A   There is no particular set number, set magic number.  One
7  must look back three years, five years, ten years.  You have to
8  look at the actual data, and the problem we have here is that
9  we have a decline in revenues, that the revenues for Dr. Morse
10 in 2004 and 2005 are so much lower than they were in the
11 preceding years.
12 Q   The revenue -- I'm sorry?
13 A   We have, of course, his own explanation for that, of
14 gentrification of the Park Slope area, and if it's like the
15 example I gave earlier in my testimony about the stock price
16 dropping from ten to three and calling the average six and a
17 half, that's not the current price.
18 Q   Sir, my question is this:  Can you express an opinion to
19 this jury as to what you believe to be a proper amount of years
20 to look back for tax returns?  Do you have an opinion on that?
21 A   You know, in the abstract there is no magic number.  You
22 have to look at the actual data and look at the trends in those
23 data or you are just guessing.
24 Q   How about not in the abstract.
25        In this case do you have an opinion you can share with

---

1  the jury as to what would be the appropriate number of years to
2  look back and look at tax returns?  Do you have an opinion on
3  that, sir?
4  A   My opinion is that four years is clearly wrong.  I have not
5  attempted to ascertain the correct number, nor do I believe the
6  necessary data to do so is before us.
7  Q   Would five years be appropriate?
8  A   Probably not, for the same reasons that four years is
9  inappropriate.
10 Q   Would three years be inappropriate?
11 A   I don't recall what the revenues were in the third
12 preceding year, but for any of these questions the answer is
13 going to be we need more information about the trend in
14 revenues and the reasons for that.
15 Q   Sir, do you -- you testified how there was a downward trend
16 in revenues.
17        That your testimony, sir, yes or no?
18 A   Yes.
19 Q   In fact, the revenue went up from 2004 to 2005, didn't it?
20 Yes or no, sir?
21 A   It went up from 220 to 240, which is still considerably
22 less than it was in 2003 or 2002.
23 Q   So the answer to my question would be yes, it actually went
24 up in the last year before this indictment, true?
25 A   True, and remained at a level very much less than it was in

**JA490**

1  the -- in the first two years than Dr. Mantell's average.

2  Q   What was Dr. Morse earning in the first four months of 2006

3  before the indictment?  Do you know the answer to that?

4  A   I don't.

5  Q   Do you know whether it continued going up, do you know

6  that?

7  A   I don't know what those numbers are.

8  Q   You took issue also with Dr. Mantell using 37 percent for

9  the goodwill evaluation, right?  You took issue with that as

10 well, correct?

11 A   I mentioned that was a generic fix of limited applicability

12 to Dr. Morse's situation.

13 Q   Tell the jury what's your opinion, what would be the proper

14 percentage figure that you would believe that that would be

15 appropriate when doing goodwill calculations?

16 A   Again, I don't think there is a magic number that you seem

17 to think exists in all these cases.  There is no perfect

18 number.

19     You are going to have to look at the specifics of the

20 case and make a determination based on that.

21 Q   So in other words, that's another thing you yourself have

22 no opinion on in this case, correct?

23 A   I have not attempted to make that calculation.

24 Q   So as you sit here today you do not have an opinion as to

25 what the proper percentage rate would be for the goodwill

1  calculation, true?

2      MR. FARBER:  Objection.

3      THE COURT:  Sustained.  It's been asked and answered

4  several times.

5  Q   Now, you actually had an opportunity to look at the tax

6  returns of Dr. Morse for the years 2007 through 2011, the

7  post-indictment tax returns, right?

8  A   I don't think I saw his entire tax returns for those years.

9  Q   You didn't look at his post-indictment tax returns?

10     MR. FARBER:  Objection.

11     THE COURT:  Sustained.

12 Q   Did you ever -- to this date have you looked at Dr. Morse's

13 post-indictment tax returns, yes, you have or no, you haven't?

14     MR. FARBER:  Objection.

15     THE COURT:  I will sustain the objection.

16 Q   Have you looked at any tax returns after the year of 2006?

17 A   I looked at sheets, which had -- I think they were the

18 first sheets of the tax returns.  I don't think I saw complete

19 tax returns.  The first couple of pages.

20 Q   Did you ask for any additional records for Mr. Farber?

21 A   I don't recall doing so.

22 Q   Would you agree if you looked at what Dr. Morse's income

23 was, his income before this indictment and his income in the

24 five years or so since the indictment, there was a dramatic

25 decrease in his annual earnings?

1      Would you agree with that?

2  A   There certainly is a difference.

3  Q   In fact, in average during that five-year period he

4  averaged $17,000 in annual income in earnings; is that correct?

5  A   Approximately 17,000.  I don't think it's exactly that

6  figure.

7  Q   You would agree that before this incident he was clearly

8  averaging $200,000 or more in all of the years you looked at;

9  isn't that true?

10 A   That's true.

11 Q   Again, now, all of the years indicate an average somewhere

12 around $17,000; isn't that true?

13 A   When you say "all of the years" you mean?

14 Q   The years from 2007 to 2011.

15 A   The average is in that ballpark, yes.

16 Q   Did you do any type of labor market analysis for dentistry

17 in the New York City area?

18 A   No.

19 Q   That's because you weren't asked to do that, right, sir?

20 A   Correct.  I was asked to evaluate what Dr. Mantell had

21 done, and there was no such analysis anywhere in his report or

22 supporting papers.

23 Q   Do you have any opinion as to whether or not Dr. Morse has

24 failed to mitigate his damages in this case?

25 A   I have reviewed the information that's -- the job search

1  information that Dr. Morse produced, which was a dozen or so

2  applications, but I have not formed an opinion.

3      (Continued on the next page.)

**JA491**

1 CROSS-EXAMINATION (continued)

2 BY MR. NORINSBERG:

3 Q   So as you sit here now, you have no opinion as to whether

4 or not Dr. Morris failed to mitigate his damages, right?

5        MR. FARBER:  Objection.

6        THE COURT:  Sustained; asked and answered.

7 Q   As you sit here today, do you believe that Dr. Morse is, in

8 fact, capable of finding work as a dentist in the New York City

9 area?

10 A   As I understand it, the amount he's earning is related to

11 his practice of dentistry, so I assume the answer is yes.

12 Q   Well, do you understand that there's a difference between

13 holding a teaching position in a hospital and actually working

14 in the private sector as a dentist, don't you, sir?

15 A   There would be a distinction.  I didn't understand that

16 distinction in your prior question.

17 Q   Do you believe, as you sit here now, that Dr. Morse is

18 capable of finding work as a dentist in the New York City area?

19 A   I don't know.

20 Q   Do you have any opinion that you could share with this jury

21 as to whether or not Dr. Morse will ever be able to join

22 someone else's practice in New York City during the remainder

23 of his work life?

24 A   It's not something I've investigated.

25 Q   So you have no opinion on that either, right, sir?

MARIE FOLEY, RMR, CRR

---

1 A   That's right.

2 Q   Do you have any opinion as to whether or not the publicity

3 from this indictment affected Dr. Morse's ability to get

4 another job as a dentist?

5        MR. FARBER:  Objection.

6        THE COURT:  Overruled.

7 A   I don't.

8 Q   Can you tell the members of the jury what type of costs

9 would be involved with opening up a dental practice in the New

10 York City area in 2013?

11        MR. FARBER:  Objection.

12        THE COURT:  I'll sustain the objection just because

13 there's been no foundation for asking the question.

14 Q   Do you have any opinion, sir, as to what the costs would be

15 in terms of opening up a dental practice in 2013?

16 A   No.

17 Q   Now, you testified that you disagreed with the 1.6 percent

18 discount rate; is that correct?

19 A   Yes.

20 Q   And yet, again, you have no opinion of your own as to what

21 the proper discount rate should be in this case, do you, sir?

22 A   My opinion is that it should be one that involves and

23 embodies some amount of risk rather than assuming there's no

24 uncertainty of the future projections, but I can't say to a

25 specific figure as I sit here.

MARIE FOLEY, RMR, CRR

---

1 Q   So you agree with the 1.6 percent, but you have no other

2 percentage that you believe would be appropriate; is that

3 correct?

4 A   Well, certainly a higher one, but I can't cite you a

5 specific figure.

6 Q   Now, you indicated that your company is located in

7 Massachusetts; is that correct?

8 A   The office in which I work is located in Massachusetts.

9 The headquarters is in Philadelphia.

10 Q   So it's headquartered in Philadelphia and you work out of

11 Massachusetts.

12        Does your company have any office in New York?

13 A   No.

14        MR. FARBER:  Objection.

15        THE COURT:  I'll sustain the objection, and I'll

16 strike the answer.  I don't know what the relevance of that is.

17 Q   Are you familiar with the New York State statute which

18 prescribes the discount rate of 1.6 percent?  Are you familiar

19 with that New York statute?

20 A   No.

21 Q   Well, you said that you read Dr. Mantell's deposition,

22 correct?

23 A   Yes.

24 Q   Do you recall Dr. Mantell specifically identifying CPLR

25 Section 50(a) as the section which he relied on to come up with

MARIE FOLEY, RMR, CRR

---

1 the 1.6 percent rate in this case?  Do you recall that, sir?

2 A   I recall him making reference to some section.  I don't

3 remember the particular citation you just mentioned, and I also

4 remember that that citation had to do with a different type of

5 case.

6 Q   Well, to your knowledge, are there any other statutes in

7 the state of New York that deal with setting forth the proper

8 discount rate in a civil action?

9 A   I don't know.

10 Q   And did you actually ever research this statute that Dr.

11 Mantell mentioned before coming here today?

12        MR. FARBER:  Objection.

13        THE COURT:  Sustained.

14 Q   Did you ever see that statute, yes or no?

15        THE COURT:  Can I see you at sidebar for a moment?

16        (Sidebar.)

17        (Continued on next page.)

18

19

20

21

22

23

24

25

MARIE FOLEY, RMR, CRR

1    (Sidebar conference held on the record out of the

2  hearing of the jury.)

3    THE COURT:  What's the good faith basis in a federal

4  action to be asking about a New York State CPLR provision?

5    MR. NORINSBERG:  There's two bases.

6    THE COURT:  Well, tell me.

7    MR. NORINSBERG:  Number one, the state substantive

8  still controls.  This is state substantive law.  My expert

9  relied upon it.  This is not a state forum.  He doesn't even

10  know the statute.

11    THE COURT:  Are you saying that the discount rate is

12  1.6 percent under CPLR and it governs this case?

13    MR. NORINSBERG:  I'm arguing that it does apply to

14  this case and does govern in this case.

15    THE COURT:  Do you have any legal point?

16    You're putting this to him as if this is the law.  I

17  don't know that this is the law.

18    MR. NORINSBERG:  But Your Honor, how could I not

19  challenge his credibility?

20    THE COURT:  Because you're stating as if this is what

21  the law is and I don't know that it's the law.

22    MR. NORINSBERG:  But it's my expert's opinion.  He

23  disagrees with the expert's opinion.  Why doesn't he have an

24  obligation to at least look up the statute?

25    MR. FARBER:  It applies to malpractice cases.

---

1    THE COURT:  I don't want any further live inquiry on

2  this.

3    (Sidebar end.)

4    (Continued on following page.)

---

1    (In open court.)

2  BY MR. NORINSBERG:

3  Q   Now, you also disagreed with Dr. Mantell's using a 4.47

4  percent rate for the dental CPI; is that correct?

5  A   I objected for him using that as an assumed rate of growth

6  in Dr. Morse's earnings.

7  Q   Even though he derived the 4.47 rate from looking at a

8  18-year average, you don't think that's appropriate, right?

9  A   Certainly not.

10  Q   And you have no opinion, once again, as to what would be

11  the appropriate percentage rate for CPI, do you, sir, yes or

12  no?

13  A   My opinion is that you can't just look at a CPI of any

14  type.  You need to look at the specifics of this practice.  You

15  can't just take this quick and dirty approach that Dr.

16  Mantell's done and say I don't want to look at the facts of the

17  case, I don't want to look at the facts of Dr. Morse's

18  practice, I'm going to go to a generic CPI and say that is the

19  rate at which it would have appreciated.  We need to look at

20  the specifics, look at the fact that we have decline in

21  revenues here, try and figure out why and make your projection

22  based on that.

23  Q   And you had every opportunity to do that in this case, to

24  make your own opinion and form your own judgment as to what

25  would be the appropriate rate, but you didn't do so, did you?

---

1    MR. FARBER:  Objection.

2    THE COURT:  I'll allow that question to be asked.

3    Did you make an independent determination of what CPI

4  rate you thought would apply?

5    THE WITNESS:  I don't think any CPI rate would apply.

6  I think that would be trumped by the specifics of the

7  situation.

8    THE COURT:  So that's your opinion, that it doesn't

9  apply, period?

10    THE WITNESS:  Correct.

11  BY MR. NORINSBERG:

12  Q   Now, you've worked up to ten times before for the attorney

13  general's office; is that correct?

14  A   I believe you're citing a discussion where I told you I

15  couldn't recall precisely how many and you asked me a question

16  could it be as high as ten and I said no.  So I have worked for

17  the attorney general before, not ten times.

18  Q   Is it somewhere in the range of three being the low and ten

19  being the highest?

20  A   Somewhere in that range, but it's not ten.

21  Q   And your normal billing rate is $525 per hour; is that

22  correct?

23  A   Yes.

24  Q   But in this case, you billed the attorney general's office

25  475 an hour, correct?

**JA493**

1 A   Correct.

2 Q   You gave them a discounted rate for your services, right?

3 A   Yes.

4 Q   Your company has lower rates for government agencies,

5 right?

6 A   Yes.

7 Q   Those lower rates aren't actually published on your

8 Web site though, are they?

9 A   I don't think we have any rate information on our Web site.

10 Q   Now, you had 20 separate conversations with the attorney in

11 this case, Seth Farber, did you not?

12 A   Again, I think you're referring to part of my deposition

13 where you asked me how many times and I couldn't tell you and

14 we arrived at some round figure.

15 Q   And you agreed that it was approximately 20 times, correct?

16 A   I told you I couldn't remember with any specificity, but we

17 had talked a number of times.  Twenty may have been mentioned.

18 Q   And you said it was somewhere in that ballpark, correct?

19 A   Sure.

20 Q   Now, you generally keep your time entries when you work on

21 a case; is that correct?

22 A   Yes.

23 Q   But in this case, you have no records reflecting how much

24 time you spent on the phone with Mr. Farber, correct?

25 A   I followed my normal practice and did not, for this case

---

1 and every other case, and did not write down specifically when

2 I talked to Mr. Farber or any other attorney in any matter upon

3 which I'm working.

4 Q   Now, you had expressed an interest at your deposition of

5 seeing the actual transcript of Dr. Mantell's testimony,

6 correct?

7 A   I don't recall if I did or did not.

8 Q   Referring to your deposition page 40, line 24:  "Question:

9 Would you be interested in seeing the actual transcript of the

10 testimony that Dr. Mantell gave at his deposition?

11          "Answer:  Sure."

12          Page 41, line 8:  "Question:  Why would you be

13 interested in seeing Dr. Mantell's actual testimony?

14          "Answer:  To see what he said."

15          Do you recall giving that testimony?

16 A   Sounds good.

17 Q   And yet you never asked Mr. Farber for a copy of Dr.

18 Mantell's deposition before forming your opinions in this case,

19 did you?

20 A   I don't even know if he had been deposed before I did my

21 report.

22 Q   In fact, Doctor, you testified previously that it never

23 even occurred to you to ask for the deposition; isn't that

24 true?

25          MR. FARBER:  Objection.

---

1          THE COURT:  Sustained.

2 Q   Do you recall being asked the following questions and

3 giving the following answer, page 41, line 22:

4          "Question:  Did you ask Mr. Farber to see a copy

5 of" --

6          THE COURT:  Sustained.  I sustained the inquiry, so

7 when I sustain an objection, you don't go about impeaching on a

8 question that wasn't permitted to be answered.

9 Q   Would you agree that you had reserved your rights to amend

10 your report once you had reviewed the deposition?

11 A   I don't think I said anything that specific.  I know I

12 wrote something in my report saying if more information becomes

13 available, I reserve the right to amend the report.

14 Q   Now, you testified earlier that you testified upwards of 50

15 times in your career; is that correct?

16 A   I don't remember saying that.

17 Q   Referring to your deposition.

18          THE COURT:  Well, no, I'll sustain the objection.

19          If you want to ask a question now, fine, but you're

20 not appropriately seeking to impeach someone, if that's what

21 you were trying to do.

22 Q   Have you testified upwards of 50 times in your career,

23 approximately?

24 A   Somewhere in that ballpark.  I don't keep a count.

25 Q   And would you agree you testify an average five to seven

---

1 times every year?

2 A   I think, again, you're citing the deposition there, and I

3 told you I couldn't give you a specific figure, but we agreed

4 on that ballpark.

5 Q   So the answer to my question would be that's a reasonable

6 estimate, five to seven times a year you come to court and

7 testify, right?

8 A   My recollection of our conversation at deposition was that

9 it was not limited to come to court and testify.  It was any

10 sort of testimony, but as long as we're talking -- you know, as

11 long as we realize that that's an approximation, that's the

12 right ballpark.

13 Q   Would you agree that 50 percent of your work is devoted to

14 litigation consulting?

15 A   Again, I think I gave you that estimate.

16 Q   And do you currently hold any teaching position, sir?

17 A   No.

18 Q   Have you ever taught at a business school?

19 A   No.

20 Q   Have you ever taught at any type of graduate school?

21 A   I taught at the University of Wisconsin while I was a

22 graduate student there.

23 Q   Since your days as a graduate student, have you ever held

24 any type of teaching positions?

25 A   No.

**JA494**

1  Q   Would you agree that the majority of the work that you do

2  is for defendants?

3  A   Yes.

4  Q   And in fact, somewhere in the range of 90 percent of the

5  cases that you work on are for defendants, correct?

6  A   Again, we had that discussion at my deposition and I'm sure

7  I mentioned that I didn't have a precise count in mind, but I

8  think we agreed that -- on that approximate figure.

9  Q   So you agree that you work approximately 90 percent of the

10 time for defendants in litigation matters, true or not true?

11 A   Yes, if we're limiting it to litigation matter, I don't

12 have the precise number, but that's the ballpark.

13 Q   Ninety percent would be the ballpark, right?

14 A   Yeah.

15         MR. NORINSBERG:  Thank you.

16         I have nothing further.

17         THE COURT:  Do you have anything further?

18         MR. FARBER:  Nothing for me, Your Honor.

19         THE COURT:  Thank you.  You can step down.

20         THE WITNESS:  Thank you, your Honor.

21         (The witness leaves the witness stand.)

22         THE COURT:  Do you have any additional witnesses?

23         MR. FARBER:  Well, Your Honor, subject to -- we are

24 going to rest.

25         Can we approach at the side?

---

1         THE COURT:  Ladies and gentlemen, why don't I send

2  you for a midmorning recess.

3

4         (Jury exits the courtroom.)

5

6         (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1         MR. FARBER:  Your Honor, I was somewhat hesitant in

2  that I'm trying to recall under Rule 50 whether I'm technically

3  obliged to renew my motion prior to resting or immediately

4  after.  So I wanted to preserve that regardless, which is why I

5  was somewhat hesitant, but we do want to renew our Rule 50 at

6  this time at the close of evidence.

7         THE COURT:  All right.  So deem it renewed on the same

8  grounds you articulated before, right?

9         MR. FARBER:  Precisely, Your Honor, right.

10        THE COURT:  All right.  Do you have any rebuttal

11 witnesses?

12        MR. NORINSBERG:  No, your Honor.

13        I do have some applications though.

14        THE COURT:  Okay.

15        MR. NORINSBERG:  I want to just make a motion to amend

16 the pleadings to conform to the proof as it exists now at the

17 close of all evidence.  I also want to make a motion --

18        THE COURT:  What is that?

19        MR. NORINSBERG:  What's that?

20        THE COURT:  Amend it how?

21        MR. NORINSBERG:  I believe, Your Honor, that there's

22 additional evidence in this case, additional falsified evidence

23 that I want on the record.  In my view, there's clear evidence

24 to support a claim that the million dollar grand larceny charge

25 was fabricated.  We've heard from witnesses who talked about

---

1  Mr. Castillo saying that he was being asked to lie.  We have a

2  report written the day before the grand jury presentation which

3  has the amount of fraud at 600.  The presentation that follows

4  is a 1.1 million dollar amount.  We have testimony from Mr.

5  Flynn who said Jose did redo the numbers and got it over a

6  million.  We have Mr. Castillo admitting that in his affidavit

7  he had changed the amount of fraud calculations by

8  approximately $900,000 from what he had testified to at the

9  grand jury but failed to have any explanation when I asked him

10 about that as to why.

11        So, I believe, Your Honor, under the law, we can move

12 to amend pleadings even at the close of evidence, and I've even

13 read cases where it's done post-verdict.  I just want to put on

14 the record that I believe that's a separate and independent

15 basis of fabricated evidence that when you string together all

16 of the evidence that we have at this trial is really an

17 independent claim in its own right and should go to the jury as

18 well, and I believe that the application, now that defendants

19 have rested, is the appropriate time to make that application.

20        I do have one other application, but I can wait.

21        MR. FARBER:  Can we be heard on that one, Your Honor?

22        THE COURT:  What rule are you relying on, counsel?

23        MR. NORINSBERG:  I believe it's Rule 15.

24        THE COURT:  Rule 15 what?

25        MR. NORINSBERG:  I believe it's -- it might be C, Rule

1  15(c). I'm not sure. I don't have it in front of me.

2  THE COURT: There's amendments during and after

3  trial. This is Rule 15(b)(1): "If at trial a party objects

4  that evidence is not within the issues raised in the pleadings,

5  the court may permit the pleadings to be amended. The court

6  should freely permit an amendment when doing so will aid in

7  presenting the merits and the objecting party fails to satisfy

8  the court that the evidence would prejudice the party's actions

9  or defense on the merits. The court may grant a continuance to

10  enable the objecting party to meet the evidence." That's all

11  it says.

12  The question I would have, counsel, is what did you

13  learn during this trial that you didn't know before? There's

14  nothing that's come out, as far as I understand it, that's new

15  or additional to what you already knew. I don't know why this

16  issue is being raised at this point in time. That's my

17  concern.

18  MR. NORINSBERG: Well, we have Mr. Fusto acknowledging

19  for the first time ever that the fraud amount was actually

20  around 600,000, and at his deposition, he didn't take a

21  position. At the deposition his position was he didn't know

22  where that came from, it was never an amount, it was always

23  around a million. Now he tried to explain the change from

24  600,000 to a million by saying no, it was just from an earlier

25  report that I had, so that is an earlier version of the number.

1  So that dynamically changes how you look at that evidence.

2  He's acknowledged now that there was a time when it was

3  $600,000 and that it was grand larceny in the second degree in

4  that report, not in the first, and somehow it changed to grand

5  larceny in the first.

6  I just want to add parenthetically, Your Honor, the

7  trial is -- I mean, we have tried throughout this litigation,

8  it's been a hotly contested issue, as to the fraud amount.

9  It's not a surprise to the defendants. This is absolutely

10  something that they've been aware of, and in my view, they've

11  tried it as well.

12  THE COURT: But the problem is this. You're talking

13  about his testimony at the grand jury for which he has

14  immunity.

15  MR. NORINSBERG: Whose testimony?

16  THE COURT: Castillo.

17  MR. NORINSBERG: I'm not talking about Castillo. I'm

18  talking about during the investigative stage, Castillo and

19  Fusto getting a number that's around $600,000 and adding half a

20  million dollars to it during the grand jury proceeding.

21  MR. FARBER: Your Honor, he's talking quite literally

22  about the decision to indict. He's going to the core of

23  absolute immunity if that's what he's talking about.

24  MR. NORINSBERG: Not at all.

25  THE COURT: You're not talking about any document that

1  was fabricated. You're talking about the testimony that they

2  put before the grand jury, for which both Castillo and Fusto

3  have absolute immunity.

4  MR. NORINSBERG: They have immunity for the

5  presentation to the grand jury. They definitely do not have

6  immunity if four months before the grand jury presentation they

7  fabricated evidence while they were still investigating it.

8  They absolutely do not have that, and the fact that they later

9  on presented it to a grand jury, I have Supreme Court authority

10  on this, that does not retroactively transform that to give

11  them a shield of immunity to a prior case.

12  THE COURT: What fabricated document exists that they

13  created during the investigative stage that they put before

14  this grand jury?

15  MR. NORINSBERG: This is not a document. It's a

16  calculation.

17  THE COURT: It's testimony then.

18  MR. NORINSBERG: But if people -- if they come up with

19  a number during the investigative phase, they agree that it's

20  $600,000 and then at some point while they're still

21  investigating they decide that, you know what, it's actually

22  not 600,000, it's going to be a million, and then a few months

23  later they present that to the grand jury.

24  THE COURT: That's false testimony before the grand

25  jury. You're not talking about some document. It just seems

1  like to me that what you're saying is that they put false

2  testimony before the grand jury and that it seems that they

3  both have absolute immunity for.

4  MR. NORINSBERG: Well, I'm looking at Zahrey versus

5  Coffey, Your Honor.

6  THE COURT: Well, and you've seen that case for quite

7  some time, haven't you?

8  MR. NORINSBERG: Yeah.

9  THE COURT: And there's nothing new that's happened

10  that I can think of.

11  MR. NORINSBERG: The first time I ever had any clear

12  testimony that somebody acknowledged that there was a number

13  different than a million dollars was here in this trial with

14  John Fusto. I never had that before. All the time what they

15  were saying was well, you know, these numbers keep changing.

16  They keep changing. This is the first time he actually

17  acknowledged the fraud amount was $600,000 and only sufficient

18  for grand larceny in the second degree, and I asked him to

19  pinpoint when exactly did it change and he couldn't because

20  that's still pre-grand jury.

21  And I think under Zahrey, the Second Circuit makes it

22  clear that if somebody fabricates evidence before they present

23  it to a grand jury and that fabricator later uses that same

24  evidence in front of the grand jury --

25  THE COURT: What is fabricated?

**JA496**

1    MR. NORINSBERG:  If you're fabricating --
2         THE COURT:  What is the fabricated evidence?
3         MR. NORINSBERG:  A phony million dollar claim that
4    never existed and we have direct --
5         THE COURT:  How is that based on anything other than
6    testimony?
7         MR. NORINSBERG:  It's based on the numerical
8    calculations that we know the real number was actually $600,000
9    according to his internal report, which he acknowledged.
10        THE COURT:  Is there some document that shows a
11   600,000 figure?
12        MR. NORINSBERG:  Yeah, the status report from March
13   1st, 2006.
14        MR. FARBER:  Sure, which Mr. Fusto testified came from
15   earlier reports and he simply carried forward.  Indeed he still
16   used the $600,000.  He still had information that was obsolete
17   at the time he wrote it because that's what he was doing.  So
18   yes, there's no question that perhaps he was sloppy in an
19   internal report.  Nonetheless, there's nothing consistent with
20   fabrication.
21        Further, from the present standpoint, Your Honor,
22   we've been defending a case about eight pieces of paper.  Now I
23   hear argument transforming this essentially into revivifying
24   the long-dismissed malicious prosecution claim essentially.  We
25   haven't defended on this.  What Mr. Norinsberg has had, the

1    data he's describing since at least the time of the summary
2    judgment motions going back to 2009.  Raising this argument at
3    this stage is peculiarly prejudicial to us, if nothing else.
4         In any event, Your Honor, in response to Your Honor's
5    question, he hasn't pointed to anything specifically fabricated
6    that he alleges beyond, of course, the subject of this case,
7    Grand Jury 7 and 11.
8         THE COURT:  By the way, that report of Mr. Fusto's
9    that you've made reference to, you've had that in your
10   possession for quite some time.
11        MR. NORINSBERG:  I did and at his deposition he
12   specifically denied, he said, "That's not a number I ever
13   heard.  Jose never gave me that number.  We never had that as a
14   real number."  He said, "I don't know where that number came
15   from."  Now at trial he acknowledged actually that was a real
16   number, it might have been a few months old, but it was a real
17   number.
18        Again, we have other testimony about Castillo's state
19   of mind, about him being asked to lie about numbers, about
20   Flynn saying Jose redid the number.
21        THE COURT:  What he testified about was lowering
22   numbers, not raising numbers.
23        MR. NORINSBERG:  Right, but that's what his testimony
24   was, but the actual evidence shows that it went in the opposite
25   direction.  It actually went up by a half a million dollars,

1    and I asked Mr. Fusto at his deposition how to explain that and
2    he said "I have no explanation for that."
3         THE COURT:  This is all stuff you've had for quite
4    some time.
5         MR. NORINSBERG:  Except for the one fact that he
6    acknowledged now that there was a time not long before the
7    indictment that $600,000 was the number.  I believe it's one
8    extra question that the jury should be asked.
9         THE COURT:  What?
10        MR. NORINSBERG:  Whether or not these defendants
11   falsified the million dollar figure.  I mean, we should have a
12   specific finding on that.  It's part of this case.  There's no
13   prejudice at all.  We've been talking about this issue all
14   along.  It's just that it crystalized with Mr. Fusto's
15   testimony here at this trial.
16        THE COURT:  What's your other application?
17        MR. NORINSBERG:  With respect to the verdict sheet
18   with respect to Mr. Castillo's assertion of immunity.  It's our
19   position that as a matter of law, he has failed to sustain his
20   burden to prove by preponderance of evidence that he created
21   documents that were solely for the purpose of the grand jury.
22        I reviewed his testimony over the weekend.  He has
23   documents possibly going back to 2004, 2005, 2006.  He has no
24   idea when these documents were created, and there's no way that
25   he has met his burden which --

1         THE COURT:  What did Mr. Fusto say about it?
2         MR. NORINSBERG:  I'm not talking about Mr. Fusto.
3         THE COURT:  But what did he say about it?
4         MR. NORINSBERG:  Fusto said it was some time in
5    connection with the grand jury.
6         THE COURT:  Why isn't that sufficient?  He's a witness
7    too.  He's a witness Castillo can rely on.  They don't have to
8    both prove it out of their own mouth.  They can rely on other
9    witnesses.  In this case, he's relying on Fusto.
10        MR. NORINSBERG:  But he has his own burden of proof
11   and his testimony --
12        THE COURT:  His burden of proof can include the
13   testimony of his co-defendant, can it not?
14        Am I missing something?
15        MR. NORINSBERG:  Your Honor, the way I understood the
16   verdict sheet question was talking about whether he himself has
17   proven it.
18        THE COURT:  Do you get what I'm saying?
19        MR. NORINSBERG:  Yes, I do.
20        THE COURT:  Well, then don't pretend like you don't.
21        MR. NORINSBERG:   I understand it, Your Honor.  I'm
22   just making an argument.
23        THE COURT:  You can make an argument, but please do
24   not think that you can pretend like you don't understand what
25   I'm saying and then keep addressing the other thing because I'm

**JA497**

1  making I think what is a valid point and you're acting like you
2  have no idea what I'm talking about, and I know that you are an
3  extremely intelligent, capable lawyer who knows exactly what I
4  am talking about and I just find that troubling.
5       And I also find it troubling that with the summations
6  starting in ten minutes that you now want to raise this issue
7  that I think could have been brought up quite a long time ago.
8       MR. NORINSBERG:  Your Honor, I'm sorry, but I wanted
9  them to rest to make sure that they weren't going to fill in
10 any gaps in the case before I made the motion.
11      MR. FARBER:  Thereby potentially increasing our
12 prejudice.
13      MR. NORINSBERG:  No, I'm allowed to under the rules,
14 and that's what I did.
15      THE COURT:  Well, no, it says you can make it at any
16 time.  It doesn't say that -- you've known about making this
17 argument ever since Castillo testified.
18      MR. NORINSBERG:  Right, but defense counsel had
19 indicated that they might call either one of these defendants
20 at some point, which obviously they've decided not to do this
21 morning.
22      THE COURT:  I know, but you're the one with the
23 burden here, counsel.  You're the one who here at the eleventh
24 hour wants to amend your pleadings, and it's not a question of
25 waiting til somebody rests.

MARIE FOLEY, RMR, CRR

---

1       All right.  I'll come back.  We'll resume in ten
2  minutes.
3       MR. FARBER:  Thank you, your Honor.
4       (Recess taken.)
5       (In open court.)
6       THE COURT:  Counsel for plaintiff had asked for the
7  verdict sheet, but that was attached to my charge.  You've seen
8  it before.
9       MR. NORINSBERG:  No, just because we had made changes
10 this morning, I thought.  I just wanted to, as part of my
11 summation, go through actual questions.
12      THE COURT:  It hasn't been changed.
13      MR. NORINSBERG:  I thought we were going to put the
14 word "solely."
15      THE COURT:  Well, we are going to do that, but I
16 haven't done it yet.  I went back upstairs.  I'll do it
17 before it's handed out to the jurors, but what you have is what
18 I sent you over the weekend, but we were going to put the word
19 "solely" in there.
20      MR. NORINSBERG:  So the only change then is on the
21 last interrogatory; is that correct?
22      THE COURT:  Right, "solely in connection with
23 preparation for presentation of evidence."
24      MR. NORINSBERG:  All right.  So if I read it like
25 that, that's going to be the verdict sheet, that's the only

MARIE FOLEY, RMR, CRR

---

1  change?
2       THE COURT:  I think that's the only thing we decided
3  on.
4       MR. MILLER:  And the caption will be changed as well.
5       THE COURT:  Yes, please.
6       All right.  I've considered the application made by
7  counsel to amend the pleadings, and I'm going to deny that
8  application because of a number of things.
9       I think it greatly prejudices the defendants in this
10 action to have, at this eleventh hour after the presentation of
11 all evidence has been concluded, to have the case go to the
12 jury on a theory that has never been articulated before in the
13 long, sad history of this case, and that being that part of the
14 fabricated evidence was whatever presentation was made as to
15 the fraud amount.
16      Had this argument wanted to have been made, apparently
17 plaintiff indicates it somehow was related to something Fusto
18 testified to, his testimony was last week.  This could have
19 been raised before the Court and raised with the defendants
20 then and not at a point in time where everyone is ready to sum
21 up and put this case before a jury.
22      I also don't think that the Court is required to, at
23 this stage, change instructions, change verdict sheets when
24 something is raised at this hour.
25      I also think substantively that the way in which it's

MARIE FOLEY, RMR, CRR

---

1  been advanced to the Court would suggest that it also would be
2  the subject of absolute immunity and that the theory is that
3  they were going along, they had this 600,000 figure and they
4  change it at the very point in time they were going to the
5  grand jury.  So it's just a version of a false statement being
6  put to the grand jury by a prosecutor.  Castillo would have
7  absolute immunity for his testimony and Fusto would have
8  absolute immunity because it was done, even plaintiff's theory
9  is because we got to the grand jury presentation and wanted to
10 put in a million, not six hundred thousand.  So it seems to me
11 that even were I to permit this theory of the last hour, it
12 would be precluded on the legal grounds that it would be
13 subject to absolute immunity.
14      Mentioning Zahrey, in Zahrey the issue of absolute
15 immunity wasn't even resolved because they didn't argue that
16 before the Second Circuit Court of Appeals.  They assumed that
17 what he did was in his investigative capacity, and the
18 Government didn't argue absolute immunity.  There are footnotes
19 in that opinion that says that there's nothing that on remand
20 would preclude the Government from offering absolute immunity.
21 So I don't think Zahrey can be used as an example of a case to
22 say that this kind of thing would not be the subject of
23 absolute immunity.  So that's my ruling, and we are ready to
24 go.
25      MR. NORINSBERG:  Your Honor, just one thing.  I don't

MARIE FOLEY, RMR, CRR

**JA498**

1   want to run afoul of the Court's ruling, but in my summation I
2   do have a section where in terms of credibility attacks, I am
3   referencing the change of numbers.  I am referencing Castillo's
4   state of mind and the discussions with Serra, and I'm not
5   arguing in any form about fabricated evidence, but I think it's
6   relative to credibility and relative to just the general state
7   of mind of Castillo as one of the fabricators in this case, and
8   I don't want to run afoul of the Court's ruling, but it's
9   already in the summation.  I was going to argue it just on
10  credibility like that.
11          THE COURT:  Well, it depends.  You're going to have to
12  tie it to things, if you're arguing it on credibility, you'll
13  have to tie it to false statements that you think that he made
14  and not to the fact that he put false evidence before a grand
15  jury.  You're going to have to argue it as credibility and not
16  argue it as being false evidence before the grand jury.  So
17  somehow you're going to have to tie it to something that he
18  said before that he now admits to know is not correct and you
19  can consider it on credibility if he tells you that this other
20  exhibit, which we are claiming is false, was not done so
21  intentionally.
22          MR. NORINSBERG:  Okay.
23          THE COURT:  You can argue it that way, but it's a fine
24  line.  You have to be careful.
25          With regard to the Spitzer argument, I don't want to

1   hear any arguments that Eliot Spitzer was out to get doctors or
2   anything like that.
3          If you want to say that Fusto knew that this was
4   important to his office, you can argue it as to his state of
5   mind that he knew that this kind of prosecution would be
6   important to his office because he knew about this, but I don't
7   want to hear that Spitzer was going after doctors.  I don't
8   want to hear that he had conversations with Spitzer because
9   there's nothing in the record about any of that.  So I don't
10  want to turn this into a trial of Eliot Spitzer, despite the
11  fact that I almost sent the verdict sheet to the jurors with
12  his name on it, but I don't want to hear that.
13          So if you want to argue that it was in the papers that
14  this was a case that was important to Spitzer and he knew that,
15  then you can argue it in that limited way, but I don't want to
16  hear it argued in any other way.
17          MR. NORINSBERG:  Okay.
18          THE COURT:  All right.  Are we ready to proceed?
19          (Pause in the proceedings.)
20          (Jury enters the courtroom.)
21          THE COURT:  All right.  Ladies and gentlemen, please
22  be seated.
23          Do the defendants rest?
24          MR. MILLER:  Yes, your Honor.
25          THE COURT:  Is there any rebuttal case, Mr.

1   Norinsberg?
2          MR. NORINSBERG:  No, your Honor.
3          THE COURT:  Ladies and gentlemen, we are at that point
4   in the proceedings, the trial, where the lawyers will give
5   their closing statements.
6          As I told you at the very beginning of this trial, you
7   will remember that what the attorneys say themselves does not
8   constitute evidence.  What they are doing is reviewing what
9   they believe the evidence has shown in this case and what
10  inferences you should draw from it, but it is always your
11  recollection of the evidence that controls, not counsel's.  So
12  if an attorney says something about the evidence that you think
13  is incorrect, it is your recollection that governs.
14          Also, we have these trial transcripts that you see
15  here.  So if in the course of your deliberations there was
16  something you were not sure of that you needed read back to
17  you, if you try and narrow your question if you have that type
18  of a issue, but it could be read back to you.
19          Also, if the attorneys say something, they may mention
20  to you what they think I may charge you about the law and they
21  may even mention a verdict sheet that might be presented to
22  you.  That's not inappropriate for them to do that, but once
23  again, you have to remember that the law is going to come from
24  the Court.  So if you think that you hear something said about
25  the law that strikes you as different from what you hear from

1   me, it's what you hear from me that governs.
2          Okay.  Mr. Norinsberg.
3          MR. NORINSBERG:  Thank you, your Honor.
4   SUMMATION BY
5   MR. NORINSBERG:
6          MR. NORINSBERG:  Good afternoon, folks.
7          Before I get into the actual discussion here, I just
8   want to sincerely thank all of you for being here, not just for
9   the time that you've given us, which has been a lot, but for
10  the fact that you paid very close attention.  I mean, it's
11  obvious when we have a chance to look at you that you
12  understand how important this case is to us, how much it means,
13  and you take your jobs very seriously.  From our standpoint,
14  that means everything, and I just wanted to tell you that all
15  of us, not just plaintiffs, but everybody here appreciates that
16  very much.
17          If we go back to the beginning of the case, I told you
18  one of the first things I said to you it's a disturbing case,
19  and you've had a chance to hear all of the evidence right now,
20  and I think you probably have a much better sense of what I
21  meant when I said that.  What I want to do is I want to walk
22  through the evidence together with you.
23          Oftentimes it's said a trial is like a jigsaw puzzle,
24  and it's very true.  There are things here like a jigsaw
25  puzzle, there are pieces that are strewn about in the

**JA499**

1  courtroom.  The way I see my job right now, I see my job to
2  pick up those pieces, to organize them, put them in a logical
3  way in a structure, and then present it back to you.  So I
4  organize it.  I present it to you.  You decide.  That's the way
5  I see this as going.
6       So, in looking at the evidence, what I'd like to do is
7  first take a step back and look at one of the larger issues in
8  this case.  Before we even get into the question of falsified
9  evidence, I think it's a critical issue in this case is
10  credibility.  Credibility.  So much of what you have to decide
11  here depends on credibility.  And so before we evaluate the
12  actual evidence in the trial in terms of falsified evidence, I
13  wanted to step back and look at the credibility of the two
14  defendants.
15       You heard from both of them, you heard them testify as
16  we talked the first two witnesses in this case.  What did you
17  think of their testimony?  Did you find them to be credible
18  witnesses?  Did you find them to be consistent witnesses?  Did
19  you have them to be honest and reliable witnesses?
20       Ladies and gentlemen, how many times, how many times
21  did I directly impeach them on something where they had changed
22  the testimony?  You have to understand the question that I'm
23  asking, they were asked the same question at their depositions,
24  they give one answer.  They come to court, the answer
25  completely changes.  How many times did I hear "I don't knows"

MARIE FOLEY, RMR, CRR

---

1  to things that you expect them to know?  You expect them to
2  know.  It's all reasonable.  How many times did you hear them
3  say "I don't remember" to things where you expect them to
4  remember?  How many times during this trial?
5       What I'd like to do is look at some particular things,
6  what I think are some real red flags about credibility as we
7  lead our way.  As I said, we'll walk through the evidence
8  together on the falsification, and I'll tell you now that when
9  we get to that phase, you're not going to have to rely on your
10  memory.  I'm actually going to read to you some transcript
11  portions of testimony that you heard in this trial so that
12  you'll be clear.  It's not going to just be what we're saying,
13  it's actually going to be in the transcript and it will be
14  clear about what was said in this courtroom and be very
15  understandable about what happened.
16       But let's start first with Mr. Fusto.  Mr. Fusto came
17  into court and there were things that he said here under oath
18  which absolutely are not true, absolutely not true.  Now, for
19  example, Mr. Fusto told you, he said it was very suspicious
20  that Dr. Morse didn't have his prescriptions.  He said that's
21  very suspicious.  He deliberately destroyed his records.
22  Really?  That's not what you said at the criminal trial.  He
23  had his own expert, Dr. Richard Golieber, at the criminal trial
24  actually testifying, "No, it's okay after one year for a
25  dentist to discard his prescriptions.  That's what I do."

MARIE FOLEY, RMR, CRR

---

1       Now, Mr. Fusto himself brought out that testimony.  If
2  that's the case, why in that courtroom, in that procedure in a
3  criminal court you're telling the judge in that case that one
4  year is okay, and then all of a sudden here when we get into
5  the civil case and now he's a defendant, all of a sudden now
6  the rule is changed?  Eight years later is the first time he
7  ever said anything as a defendant in this lawsuit, eight years
8  later.  But why would he do that in this case when, in fact, he
9  took the completely different position at the trial?
10       What's another thing you heard here?  You heard Mr.
11  Fusto say when I cross-examined him about his affidavit, he
12  said: "Well, the term 'missing invoices' we don't really mean
13  missing invoices.  The term is better meant as the invoices
14  didn't exist."  Really?  That's not what you said at your
15  deposition.  At your deposition you said that you knew that
16  there were missing invoices.  You said that you knew that there
17  was work being done, and not only did he know it, folks, but
18  look at this chart.
19       (The above-referred to exhibit was published.)
20       MR. NORINSBERG:  I understand it's probably still hard
21  to read even from this close, but how many times -- this is
22  their chart, this is what they exchanged during discovery.  How
23  many times does the word "missing invoices" appear on here?
24  How many times?
25       THE COURT:  What exhibit number is that, counsel?

MARIE FOLEY, RMR, CRR

---

1       MR. NORINSBERG:  This is Plaintiff's 19.
2       How many times?
3       What part of this word is not clear?  What part of the
4  term "missing invoice" is not clear?
5       And if this is here on their own record that they
6  exchanged, why did Mr. Fusto submit an affidavit under oath
7  saying that there were no missing invoices, that's not the
8  claim the plaintiff's making?  Why?  Does that make sense?
9       Remember what Mr. Fusto said?  He said: "Well, I
10  didn't write that affidavit."  Then you heard Judge Amon say:
11  "Well, you signed it, didn't you?  You signed it."  It's his
12  affidavit under penalty of perjury.  We'll get back very
13  shortly, but the missing invoices is going to be critical to
14  you understanding, it all ties together, and that's what we're
15  doing here, to understand everything and why evidence was
16  falsified in this case.  That's going to be a key component.
17  We'll come back to it very shortly.
18       Another thing I think you're going to learn, another
19  thing that we went through how things have changed from the
20  testimony at the deposition to here.
21       Another example, why is there no written summary of
22  the evidence?  Mr. Farber said as a rule in the office, at his
23  deposition, he said it's a rule, it's administrative policy.
24  And I asked him this question here, I said: "Isn't it true,
25  sir, that in all cases you're supposed to detail a written

MARIE FOLEY, RMR, CRR

1 summary to your boss about what the evidence is in the case?"
2 And he goes: "Well, you know, sometimes you do, sometimes you
3 don't." I said: "Mr. Fusto, that's not what you said at your
4 deposition. You said there were no exceptions to that rule,
5 didn't you?" And then I cross-examined him on that and brought
6 out that point. The question and answer: "Were there any
7 exceptions to that rule?" "No."
8        Think about it, ladies and gentlemen, if the office
9 policy is to summarize evidence, why is it that there is no
10 summary? And why is it that the fraud amount supposedly, the
11 fraud amount, which I use that term lightly and we'll get back
12 to that, but his internal report to his supervisor right before
13 he's presenting the case to the grand jury $600,000. All of a
14 sudden the same month it's up to 1.1 million dollars. And I
15 asked him about that and I said: "Sir, how is that possible?
16 Do you have any explanation for that?" "Yes, I have an
17 explanation." I said: "You didn't have an explanation at your
18 deposition, did you?" At your deposition I asked him that
19 question: "What is the explanation? How is that possible?"
20 He said: "I have no explanation. I have no explanation."
21        This all goes to credibility. Now when he comes to
22 court, he knows he's going to look foolish in front of
23 this jury if you're sitting here and you're evaluating
24 testimony and now he has to look you folks in the eye and say,
25 "I'm sorry, I don't have any explanation," he knows that's

1 going to look really bad. So he just decides now when he's in
2 front of a jury now is the time to come up with an explanation.
3        Another example on credibility. Remember that section
4 when I was talking to him about lab prices and remember there
5 was one day in the middle of the week where he was like another
6 thing we thought was very suspicious, these lab prices were
7 much lower than other lab prices. So I made a note of that,
8 got back up when I had a chance to cross him again. I said:
9 "Sir, you testified that these lab prices were lower. Did you
10 ever speak to any other lab? Did you ever investigate any
11 other lab?" "No." "Did you speak to any other lab?" "No."
12 He literally makes something looking at your folks in the
13 eye and it's believable, right? You're hearing him saying
14 that. You're thinking well, he must be talking about that, it
15 must be true. Then it turns out he never actually spoke to a
16 lab, and in fact it's his first dental case in his career. So
17 why would you look at a jury directly in the eye and tell them
18 something like that knowing that you actually have no basis for
19 doing that? Why?
20        Another example credibility. Do you remember that
21 time Mr. Miller was up there showing the Design Dental labs and
22 there was a handwriting of Mr. Castillo showing the labs and
23 the calculations? This was presented to you folks to show that
24 Mr. Castillo, his analysis, how fair he was to Dr. Morse. Look
25 at this, this is just an example, it's only one page. Yeah,

1 it's only one page. It was the only page. When I got back up,
2 I questioned him and actually showed him the rest of the
3 document. Didn't have any of those fair Morse-friendly
4 calculations they like to tell you about.
5        Again, it goes to honesty. It's honesty. When you
6 come to court, you have an obligation to be truthful. He's a
7 lawyer. He's a former prosecutor. He knows better than
8 anyone, but what you saw in this courtroom and it leads into
9 the fabrication, we're getting to that point, but to understand
10 it, understand the mentality of somebody that would look you
11 directly in the eye and lie and not even think about it and as
12 long as he's not called out on it, he's fine with it, and this
13 is what happened in this trial.
14        Now, let's talk a little bit about the other person in
15 credibility, Mr. Castillo. One of the first things we talk
16 about Mr. Castillo, he testified in front of the grand jury the
17 amount of fraud is 1.1 million dollars. Then I said: "Well,
18 sir, you filled out an affidavit under oath. You said actually
19 the amount of fraud, it's not 1.1 million dollars. According
20 to this affidavit, it's 2.75 -- $275,000." I said: "That's a
21 $900,000 difference. How is that possible that you changed
22 your calculations by $900,000?" The evidence stayed the same,
23 ladies and gentlemen.
24        Remember this, and you'll have a chance, you'll look
25 at it, there's only two small piles of bills, one set of bills

1 from the one lab, one set of bills from another lab. You don't
2 have to be an auditor to know there's something wrong with the
3 picture. It doesn't make sense. So I asked him, I said: "Do
4 you have an explanation, Mr. Castillo, now is it possible
5 that it went down $900,000? Do you have any explanation?"
6 "No, I don't." He had no explanation.
7        Now, let me tell you, and I want to be clear about
8 this, with these numbers, these numbers, not one of these
9 numbers, I mean you're hearing a lot of numbers and maybe some
10 of you, I'm not sure, maybe some of you say well, if it's not
11 one number, it's another. Absolutely not true. There is no
12 way, based on the evidence that they had, that they could come
13 up with any legitimate calculation, anything. None of these
14 numbers are legitimate. You might as well put up a dartboard
15 up there, put a blindfold on me and have me just throw it out
16 there and see what hits because there's not one legitimate
17 number here.
18        What's the next thing? Mr. Castillo said, I asked
19 him, I said: "Sir, did you ever put together a question and
20 answer sheet where you had questions that you were going to be
21 asked in the grand jury and answers that you were required to
22 give?" "Who me? I never did that." Really? Take a look at
23 this, and you'll have a chance, it's in evidence.
24        (The above-referred to exhibit was published.)
25        MR. NORINSBERG: You see the format, 12, 13, you have

**JA501**

1  questions with a question mark, you have answer ANS, here's
2  what I'm supposed to say, question and then you have an answer,
3  here's what I'm supposed to say.  And it goes on for page after
4  page.  This is everything that he's going to say.
5       If you think about it, ladies and gentlemen, when I
6  asked him that, I asked him, I said:  "Sir, isn't this your
7  handwriting?  Didn't you make this?"  "Well, yeah, I did, but
8  you see, these are just my notes.  They're not questions and
9  answers."  Really?  Take a look at that sheet.  It's all
10 question and answers.  And I ask you as the jurors, you're the
11 ones that decide this case at the end.  We present it, you
12 decide.  Why?  If these are real numbers, if he really has a
13 legitimate calculation, why, why do you need to have a script
14 that tells you everything that you're supposed to say?
15      And then I said:  "Well, you did that because you
16 wanted to make it easy for yourself, right, in the grand jury?"
17 "No, that's not true."  Then immediately impeached with the
18 deposition testimony, that's what his actual terms were, he
19 wanted to make it easy for himself.  If you think about it with
20 these numbers, he needs a script because this man has no idea
21 at all what the calculations are, and that's why they keep
22 changing from a million-one, 744,000, 600,000, 275,000,
23 160,000.  They're all over the place because they're not
24 legitimate.
25      What's the next thing he tells you?  One of these

MARIE FOLEY, RMR, CRR

---

1  documents I asked him about, the whole idea he put on numbers
2  about what's the most that Dr. Morse could have legitimately
3  charged the lab, the Nu-Life lab, and he said 86,000.  I said:
4  "Sir, didn't you prepare a document where it was $50,000
5  higher?  Didn't you do that?"  And he said:  "No, I didn't."
6  So I showed it to him and he goes:  "Oh, that document.  These
7  are just preliminary findings."  "Really?  It's not what the
8  document says.  It's says final findings."  He says:  "Well,
9  that's not my handwriting."  Okay.  Well, we heard from Mr.
10 Flynn.  Mr. Flynn said that's what Mr. Castillo told him.  Why
11 doesn't he just own it?  His numbers keep changing.  Why do
12 they keep changing?  This man has zero credibility.
13      What's the next thing it tells you?  "Everything I did
14 was for the benefit of Mr. Morse."  Really?  Was it for the
15 benefit of Dr. Morse when you were excluding 87 out of 231
16 patients in Nu-Life, one-third of all the patients?  Zero
17 credit.  Was that for his benefit?  When you lost one year of
18 checks, was that for his benefit?  When he gave him zero credit
19 for 19 months of missing invoices, was that for his benefit?
20 And the most disturbing thing of all, the whole way this is
21 presented to you is that all he's doing, he's taking numbers
22 off the invoices and then plugging in what Medicaid would pay.
23      But what did we learn?  What did we learn about the
24 actual Medicaid practice?  He's consistently using the wrong
25 prices, the wrong outdated lower prices.  Partial uppers,

MARIE FOLEY, RMR, CRR

---

1  wrong, outdated lower price.  Partial lower, wrong, outdated
2  lower price.  Full uppers, wrong, outdated lower price.  Full
3  lowers, wrong, outdated price.  Realigns, wrong, outdated
4  price.  So I asked him that:  "How is it possible, Mr.
5  Castillo, how is it possible you're consistently using all of
6  the wrong prices?"  You remember what he said?  Does anyone
7  remember?  He said:  "I don't have any explanation."  He had
8  zero explanation.
9       Then the most telling thing on the missing invoices, I
10 asked him about that.  Do you remember what he said at his
11 deposition at the beginning before he knew that we knew about
12 the missing invoices?  I said:  "Mr. Castillo, you knew about
13 these missing invoices, didn't you?"  And he said:  "Who me?  I
14 didn't know about it.  I didn't know about that."  Well, you'll
15 see, ladies and gentlemen, he actually wrote in one of his
16 handwritten notes that he's the one that discovered the missing
17 invoices.  So why are both defendants trying to deny knowledge
18 about these missing invoices?  Why?
19      I'll tell you why.  Because once you actually put it
20 into the equation and understand that we're dealing with a
21 36-month audit period, when you're missing 19 months of
22 invoices, over half the audit period, it's impossible to make
23 any calculations.  Both of these defendants at different times
24 admitted they have no idea what the actual ceiling is, zero,
25 but if that's the case, why are you presenting testimony that

MARIE FOLEY, RMR, CRR

---

1  there's a ceiling when in fact you're missing so much
2  information you have no idea?
3       And what you heard, ladies and gentlemen, they hid
4  this information from Dr. Morse.  He never found out about the
5  missing invoices.  They never told him or his lawyer about 19
6  months until this lawsuit because, you want to know why,
7  because when you know about the missing invoices, it blows that
8  claim out of the water.  It blows their whole fraud calculation
9  out of the water.  It just rips it to shreds.  There's nothing
10 you can do with that when you're missing that much information
11 and that's why they didn't get to it.
12      And you heard, ladies and gentlemen of the jury, it
13 goes to Mr. Castillo's credibility.  Remember I was asking Mr.
14 Castillo about whether or not he had this meeting.  Remember
15 Mr. Serra, Mr. Serra's words were, and I understand he tried to
16 back off and tried to change it a little, but here were his
17 exact words.  He's describing Castillo, he said, quote:  He's
18 asking me to lie and I'm very uncomfortable with it.  This is
19 James Serra.  This isn't our witness.  This isn't somebody we
20 have.  This is a state investigator, a man who spent 40 years
21 in law enforcement, and his recollection is that Castillo came
22 to him and Castillo was very upset because, quote:  He's asking
23 me to lie and I'm very uncomfortable with it.
24      Why would that happen?  It goes to his credibility.
25 Mr. Castillo asked him about it.  Remember, Mr. Serra didn't

MARIE FOLEY, RMR, CRR

**JA502**

1 rest, he didn't just say, "Oh, well, you shouldn't lie."  What
2 he did, he took action.  At first he went to Fusto.  When he
3 was done with Fusto, he actually went above Fusto, went to his
4 boss and he went to Castillo's boss Arthur Lipstein, you
5 remember, and they actually had a meeting about this issue.
6 Arthur Lipstein was there, Mr. Flynn was there, Mr. Castillo
7 was there.  I asked Mr. Castillo about that.  "Meeting?  What
8 meeting?  I don't remember any meeting."  Well, you heard again
9 from Mr. Serra.  Why would he make it up?  What's his motive?
10 You think this is a good career move for him to actually say
11 that another colleague in his office was asking the auditor to
12 lie?  What does he get out of it?  He doesn't know me.  I don't
13 know him.  He told the truth.  Something's rotten about this
14 case, it's rotten to the core, and things like this keep
15 happening in this case.
16          This is the framework as we lead up until we get to
17 the falsified evidence here.  Let's talk about the falsified
18 evidence now.  This was the framework I wanted you to have when
19 you were evaluating this evidence, the framework of
20 credibility.  Let's talk about the actual evidence.
21          Edwin Gonzalez, there is no dispute, there is no
22 dispute that three different patients were merged into one
23 fictitious super patient and presented to the grand jury.
24 There is no ands, ifs, or buts about it.  If you look at this
25 document here, which I believe is 145, with the three Edwin

---

1 Gonzalezes, their names, their addresses, their dates of birth,
2 there are three different human beings there, three different
3 people, three different CIM numbers, three different dates of
4 birth, three different addresses.  Why are these three people
5 being merged together and put on to one document and shown to a
6 grand jury just like you?  Why?  Why are they doing that?
7          Well, I asked Mr. Castillo, I asked Mr. Castillo:
8 "How exactly did this happen?  How did it happen?  Do you
9 folks remember what he said?  Does anyone remember what he
10 said?  He said:  "Fusto told me to do it.  John Fusto, the
11 attorney, told me to do it that way."
12          Again, I'm not going to have you rely on my
13 recollection.  I'm going to read the transcript to you.  This
14 is actually a section of the transcript, it's page 130.  He's
15 actually at this point in the transcript talking to the judge.
16 The judge is asking him questions, and this is what he said.  He
17 said:  "Your Honor, when I prepared this, the attorney in
18 charge of the case asked a specific, told me specific
19 directions, quote, I want everybody named, everybody whose
20 family is Edwin Gonzalez on this spreadsheet.  It wasn't just
21 for one particular Edwin Gonzalez."
22          Then the judge said:  "You understood that the three
23 people on the spreadsheet were three different people?"
24          And the witness, Mr. Castillo said:  "Right.  I raised
25 that question to the attorney in charge of the case and he made

---

1 the decision to you, you know, to take these three different
2 people.  The reason why, I don't know."
3          Then the judge asks:  "What's reflected on those?"
4          And the witness said:  "It's reflected that we add up
5 those three people."
6          Then I followed up after the judge's questioning and
7 here's what he said.  I said:  "Question:  So Mr. Fusto
8 actually asked you to put these three Edwin Gonzalezes
9 together?"
10          "Answer:  I recall that he asked me.  He directed me
11 to take every Edwin Gonzalez that's there in the data that we
12 received from the data from the DH and put it into that
13 spreadsheet."
14          Then I asked him, I said:  "Did you know it was
15 improper to do that?"  And he said basically "I don't know if
16 it's improper."
17          Then I impeached him with his deposition:  "Question:
18 Wouldn't it be improper do that?"
19          "Answer:  I would think so."
20          So you folks have when you're talking about the first
21 piece of falsified evidence, unquestionably this was not a true
22 document.  It was false.  These three patients were presented
23 as one.  Mr. Castillo was directed by the defendant Fusto in
24 this case and he knew and said he knew that it was improper to
25 do that.

---

1          One last thing just on this issue, very important to
2 understand this.  This couldn't have happened by accident.
3 Here's the question and answer, this is from page 131:
4 "Question:  Would you agree that it wouldn't be possible to
5 accidentally simply lump three different people into one person
6 if they have different dates of birth and lived in different
7 parts of the city?"
8          And here's what he said, ladies and gentlemen, here's
9 what he said:  "Answer:  Like I said, I wouldn't have done it
10 accidentally.  It was a request that was made."
11          "Question:  So it couldn't have been done by accident,
12 right?"
13          "Answer:  No."
14          This is your bible in terms of going into this trial
15 and deciding, look back at the transcript.  The words are in
16 there.  You folks have the power.  Any time that you're not
17 sure about something, go back to the transcript.  We have daily
18 copy.  It's in there.  There is no dispute about this is what
19 happened.
20          Now, some of you might say okay, but what did Mr.
21 Fusto have to say?  And I know everyone here paid a lot of
22 attention in this case, but it's hard to remember everything.
23 What Fusto said, he didn't deny.  I asked him first whether or
24 not he was here when Castillo gave that testimony, and he said:
25 "Yes, I was here."  "Do you have any reason to believe that was

**JA503**

1  not true?"  "No."  "Do you deny it?"  "I don't recall, so I
2  guess I can't deny it."
3       Here is the exact testimony.  Rely on this testimony,
4  page 279, line 14:  "Question:  My question is simply this, Mr.
5  Fusto.  Mr. Castillo prepared this document in accordance with
6  your instructions.  Yes he did or no he didn't?"
7       "Answer:  Yes."
8       Line 21.  "Question:  You heard Mr. Castillo testify
9  that you instructed him to put all the Edwin Gonzalezes in the
10 system on to this chart, correct?"
11      "Answer:  I heard him say that, yes."
12      Then I said:  "And his testimony was true, wasn't it?"
13      And he said:  "Answer:  I don't recall having that
14 conversation with him."
15      "Question:  But you're not specifically denying it,
16 are you?"
17      And he said:  "Answer:  I couldn't say one way or the
18 other.  No, you're right, I'm not specifically denying it
19 because I don't recall."
20      So one person says he was specifically instructed to
21 do it.  The other person doesn't deny it, he just can't
22 remember.  You decide.  The facts are here in front of you.
23      Ladies and gentlemen, what's more disturbing, just
24 having three patients, that just begins, that's the tip of the
25 iceberg.  It gets worse because not only do you have these

MARIE FOLEY, RMR, CRR

---

1  patients, but two out of the three are clearly outside the
2  audit period.  I mean, we're talking about an audit that
3  doesn't start until 2000.
4       I have a question for you, please answer in your
5  heads.  Why on earth would you put in evidence going back to
6  1998 about bills that were done for a patient?  Why would you
7  do that if the audit period starts in 2000?  Does anybody have
8  an answer for that?"  I asked Mr. Fusto, I said: "What reason
9  would you have, what relevance would there be to this?"  Do you
10 remember what he said, folks?  He said:  "Probably none.
11 Probably none."  Not only are you presenting a fictitious
12 patient, but you're presenting bills that are outside the audit
13 period, that have no relevance to it.
14      But the worst thing of it, I think the most troubling
15 part of this is there were no false filing counts for this
16 fictitious patient.  So in other words, you're presenting all
17 this evidence to a grand jury for no reason.  There were no
18 counts relating to him.  Does anyone have an explanation why
19 you're presenting evidence of two patients that never appeared
20 before the grand jury for years outside of the audit period for
21 a count that's not even presented for the grand jury to vote
22 on?  There's no explanation for that.
23      Remember, ladies and gentlemen, you're going to see
24 Mr. Castillo's role in this, I understand Mr. Castillo
25 basically saying, "Hey, don't blame me.  Mr. Fusto told me to

MARIE FOLEY, RMR, CRR

---

1  do it."  But you'll see, ladies and gentlemen, and you're not
2  going to hear anything in the charges that you're going to be
3  read by the judge that allows Mr. Castillo to get off the hook
4  if he's doing something that he knows to be improper, and he's
5  just not asking questions about it, he's on the hook too.  He
6  can't just say, "I don't know.  I'm not sure.  You have to ask
7  the attorney why he wanted it."  He's responsible
8  under the law, the judge is going to charge you.
9       Now, we move on to the second main piece of fabricated
10 evidence: the missing tooth numbers.  Once again we start at a
11 point where things are crystal clear.  The starting point,
12 there can be no question that the actual form that is submitted
13 by Dr. Morse you have to name the tooth number.  If you don't
14 put the tooth number in this paragraph 29, you're not getting
15 paid, period.
16      (The above-referred to exhibit was published.)
17      MR. NORINSBERG:  This is a required field.  So when
18 you folks are looking about whether a document is true or not
19 true, Dr. Morse has to fill this in so we know at the inception
20 when this document was submitted to Medicaid clearly it had a
21 tooth number on it for every procedure, but not only do we know
22 it because that's the testimony we heard regarding Form A, Mr.
23 Castillo himself, Mr. Castillo admitted that there was an
24 original document that had tooth numbers.
25      Again, I don't want you to rely on my word.  I want to

MARIE FOLEY, RMR, CRR

---

1  read to you the actual testimony.  Starting on page 149:
2  "Question:  In the original format of this document, there's an
3  entire column that talks about tooth numbers, right?"
4       He said:  "Answer:  Yes."
5       Page 155, and this is the judge now following up to
6  clarify with Mr. Castillo what exactly is he talking about.
7  The judge said:  "So just so you understand the question, did
8  you create a version of this document before the one in front
9  of you, Exhibit 44, that had -- that was the same except it had
10 tooth numbers?"
11      "Answer:  Yes, ma'am."
12      Question by the judge:  "You did create it?"
13      "Answer:  Yes, I did create it."
14      "The Court:  You did create a document like that?"
15      "Answer:  Yes, as part of the request."
16      So in other words, the Grand Jury 7, did he create a
17 document, an original version of Grand Jury 7 that actually had
18 the tooth numbers?  Yes, that's what he told the judge.
19      Remember Mr. Farber in his opening statement, there
20 was no original document, these are all just computer
21 generated.  Really?  That's not what your witness said.  That's
22 not what Mr. Castillo just told the judge.  There was an
23 original document.  It was absolutely there.
24      Now, obviously somebody had to remove that tooth
25 number, those tooth numbers.  Somebody had to do that.  That

MARIE FOLEY, RMR, CRR

**JA504**

1 somebody, who is that somebody? Who might that be? There's no
2 dispute in this case about who that somebody is. You know why?
3 Because that somebody in this court in this room on that
4 witness stand admitted it after he was cross-examined, he
5 admitted the truth. And here's what he said, page 291. First
6 he references back to the deposition and then he gives present
7 testimony. 291, line 13: "Question: So you said at your
8 deposition somebody made a decision to remove tooth" --
9    THE COURT: Counsel, I'm sorry, can you just tell us
10 whose testimony you're reading?
11    MR. NORINSBERG: This is John Fusto during the direct,
12 page 291, line 13.
13    "Question: So you said at your deposition somebody
14 made a decision to remove tooth numbers and that person may
15 very well could have been you, John Fusto, correct?"
16    "Answer: Yes."
17    Then line 22: "Question: So you admitted under oath
18 that you might well have been the person to decide to remove
19 the tooth numbers from these documents, true or not true?"
20    And here's what he said, this is the key part of the
21 whole testimony. "Answer: I was absolutely the person who
22 asked Mr. Castillo to create these documents and not to put the
23 tooth number on there."
24    And I said: "Question: You were the person who did
25 that?"

1    "Answer: Yes."
2    And I said: "Absolutely, right?"
3    And he said: "Oh, sure, yes."
4    And I said: "He created the record in accordance with
5 your specific instructions?"
6    "Answer: Yes."
7    The proof is in the book here. The proof is in the
8 transcript. That was a key moment at this trial because up
9 until this point, no one owned it. No one clearly owned it,
10 how this happened. That was the first time after I impeached
11 him and reminded him of prior testimony that one of these
12 defendants finally admitted clearly, unequivocally under oath
13 that it was Mr. Fusto who made that decision and he made it
14 absolutely knowing that they were going to remove the tooth
15 numbers here.
16    So we've covered two out of the three, and I know it's
17 tough, I know it's tedious. I do know it, especially we're
18 getting to lunch. I just feel it, I know it's hard for you
19 folks, but you've done this job so far, just to finish it the
20 right way. I know it's sometimes hard to sit here and listen,
21 but once we go through this evidence it will be easier,
22 actually, when you do deliberations because things will be
23 organized. So as hard as it is, if you could do what you've
24 done throughout this and stay with it, we really appreciate it.
25    We've covered two out of the three falsified evidence.

1 What did we learn on the two out of the three? Unquestionable
2 intentional decisions were made. There were no accidents.
3 Decisions were made. Orders were given and they were carried
4 out. Unquestionably, we know that.
5    Now let's talk about the third one, Stacy Rodriguez.
6    (The above-referred to exhibit was published.)
7    MR. NORINSBERG: Now, we're looking at one of the --
8 this is a blowup exhibit of Exhibit 44, one of the pages which
9 is Grand Jury 7. Now, imagine for a moment you're not on this
10 jury but you're actually on the grand jury. What are you
11 looking at here? How many procedures are you looking at that
12 this dentist billed for this day? How many? There are nine
13 separate procedures. They can talk pluses and minuses all they
14 want. If you look at it, everyone's looking at the procedures.
15 Dr. DeLuca's testifying about the procedures, nine procedures.
16 This is absolutely misleading, and why is it misleading?
17 Because we know for sure. We know for sure. Go back to
18 Plaintiff's 145.
19    (The above-referred to exhibit was published.)
20    MR. NORINSBERG: This is a blowup of the original
21 billing submission. If you compare this, if you look at it the
22 best you can side by side, you have three denture-related
23 procedures here versus nine, three versus nine. This is how it
24 came in. This is what the grand jury heard about.
25    Now, Mr. Fusto made a very important admission with

1 regard to this document, referring back to the Stacy Rodriguez
2 billing document. He admitted during this trial that this is
3 misleading on its face. If you look at it, it's confusing.
4    This is as close as you're going to get to a clean hit
5 at trial as you're ever going to see. I mean, he basically
6 admits the whole point of what we were saying all along. Page
7 311 question, line four, this is Mr. Fusto: "Question: By
8 doing that, it was misleading to the grand jury, wasn't it,
9 sir?"
10    "Answer: It was not correct."
11    "Question: So if it's not correct, it's misleading,
12 wasn't it?"
13    And he said: "Answer: I guess if you want to
14 characterize it that way."
15    Then later on the same page: "Question: So what you
16 used to drive home the point that he overbilled Medicaid, you
17 used the document not from his charts and a document that on
18 its face is inaccurate, true?"
19    And he said: "Answer: Yes."
20    He admits that this document, even if you had no
21 testimony at all, is inaccurate on its face. But you see, you
22 did have testimony. You had testimony from Dr. DeLuca. And
23 who do they use the first point they make during the grand jury
24 proceedings, he calls Dr. DeLuca, point number one, Dr. DeLuca
25 testifies how unusual this is. She tells the grand jury, "I

**JA505**

1  don't get it.  He's doing three of everything here all in one
2  day.  It doesn't make sense."
3       Remember what the defendants said in their opening?
4  They said in their opening, Mr. Farber said well, now, yes,
5  there was a mistake.  That's great, they're admitting that
6  seven years after the fact, but the grand jury is looking at
7  this and believing it and the point is being driven home by Dr.
8  DeLuca.
9       By the way, I don't blame Dr. DeLuca.  We're not here
10 to blame her.  She was kept in the dark.  They didn't show her
11 the actual patient charts at the grand jury.  They didn't have
12 her review the actual x-rays.  They didn't have her testify off
13 her notes.  All they do is show you a document that's not
14 a document from Dr. Morse, not a document that's a legitimate
15 reflection of what happened that day and ask her questions
16 about it.
17      So she with her background, and again not to insult
18 her but it's the reality, she doesn't know about Medicaid
19 billing, she's got this completely backwards.  She's looking at
20 this document and saying, "Oh, this is all on the same tooth
21 numbers and why do they keep doing multiple procedures on the
22 same tooth?"  Well, actually it's not.  It's the exact
23 opposite.  There are multiple teeth involved and it's one
24 procedure.  She's got it all backwards.
25      Now, you heard about the defendants, they tried to

---

1  come into this court and blame Dr. Morse for this after all
2  these years like it's his fault.  You heard from Dr. Morse
3  whatever adjustments that were on there, there were literally
4  thousands at a time.  You would have to physically go in and
5  make two thousand edits with a 15-digit number.  Did not
6  happen.  This is their mistake.  They presented it to the grand
7  jury deliberately in a way that's misleading.
8       Now, if they wanted to do an honest presentation, you
9  didn't have to show this.  Here's what you can do.  Stacy
10 Rodriguez was one of the few people that was actually examined
11 by Dr. DeLuca.  How do we know that?  Because she had a Post-it
12 Note.  It's in evidence.  Why not just simply ask her: "What
13 was your findings on Stacy Rodriguez's chart?"  Why not just
14 let her do that?
15      Now, remember, Dr. DeLuca said she never would testify
16 based on only a document created by the attorney general's
17 office.  She would want to actually look at the charts.  They
18 had a chart in court.  They had this patient's chart in court.
19 They had her notes from the review.  Why didn't they do that?
20 It was intentionally misleading.  They used something that was
21 manipulating to show what they wanted to.
22      One last point on this and we'll move on.  It wasn't
23 just misleading to the grand jurors.  It was confusing to Dr.
24 DeLuca and Mr. Fusto, according to his testimony.  This is what
25 he said, page 296: "You're correct.  The documents as

---

1  presented did seem to confuse probably both myself and Dr.
2  DeLuca."
3       Well, here's a question for you folks.  If these
4  documents are confusing to both Mr. Fusto and Dr. DeLuca, what
5  impact do you think this might have had on the grand jury?
6  Obviously confusing the grand jury as well.  So you put all
7  this together, you have this fake triple patient, fictitious
8  patient that doesn't exist, you have billing records from
9  outside the audit period for him, you have no false filing
10 charges for him, you have a whole series of records in which
11 the one key piece of information where the work is being done,
12 the tooth numbers, is removed, and you have a false triple
13 billing record that we know looking at the original record did
14 not happen.  You put it all together and it tainted this whole
15 proceeding, tainted it.  It infected it.  You have false
16 misleading evidence.  No one's there to clarify anything.
17      Remember, there's no judge in the grand jury
18 proceedings.  There was no defense attorney to cross-examine
19 anybody.  There's no one to point out any problems with this.
20 It's all Mr. Fusto himself and the grand jury, and so you folks
21 in this courtroom, you got to see things that that grand jury
22 never knew about.  You got to hear things that grand jury never
23 knew about it, and you got to see the truth about the documents
24 that were presented.  They sold that grand jury a bill of
25 goods.  They misled them and deceived them, and that's what

---

1  happened here.
2       Which brings us to a question.  Why?  Why did they do
3  it?  And I think when you look at the evidence there's a lot of
4  stuff going on behind the scenes here, factors that come into
5  play.  You're reasonable, intelligent folks, you'll figure this
6  out.  What I would like to do is just talk about some of the
7  obvious reasons of what was going on.
8       Number one, this case was a case that had massive
9  holes in it from the beginning.  Now, not only, and I know --
10 not only did they have the missing invoices.  Forget about
11 that.  Let's put that aside for a minute, the 19 months of
12 missing invoices.  Let's talk about the evidence they did have,
13 the records they did have.  You have a document, a set of
14 documents from Design Dental that are clear, unquestionably
15 altered documents.  Something's wrong with them.
16      (The above-referred to exhibit was published.)
17      MR. NORINSBERG:  You folks remember this, the year
18 2000 becomes 2001.  2000 becomes 2001 again.  Who's doing this?
19 2000 becomes 2001.  Then look at this, now 2000 jumps two years
20 to 2002.  This is what they built their fraud case on?  A man
21 can go to jail on this?  Remember, this is all they had.  This
22 is what they built their fraud analysis on.
23      Some of you might say well, what about the Nu-Life
24 records?  What about them?  You know what about the Nu-Life,
25 there's not one single procedure listed on there, nothing.

1   Remember when I asked Mr. Castillo, I said, "Would you agree
2   the very first thing you need to do when you're calculating,
3   doing a fraud calculation, you have to know the work that was
4   done, right?" "Yes, I agree with that."  There are no
5   procedures listed on the other set of lab invoices.  You might
6   as well just make it up out of thin air.  You'll look at it on
7   your own when you see it.  There literally are no procedures
8   listed.  There are some first names, some last names and some
9   numbers.  So the Nu-Life labs are completely worthless.  The
10  other lab has completely doctored, altered records.  The man
11  goes to jail possibly on those?  That's what the case is about.
12  It's easy to lose sight of that.  Some of you might say well,
13  counsel, there must have been something.  What else is there?
14  There is nothing.  I'm telling you, we've litigated this five
15  years, this is what the evidence was based on, these two sets
16  of lab bills, what you just said.
17          I asked Mr. Fusto, I said, "Didn't that raise any
18  questions in your mind?  Weren't you a little bit concerned
19  about those lab records and building your whole case on that?"
20  Remember what he said?  "Yeah, I was concerned.  I was
21  concerned about a lot of things about those records."
22          And remember, by the time it got to trial, the judge
23  wouldn't allow those records in.  And remember, Mr. Fusto
24  himself, this is what the exact words he described, he said
25  these records were sloppy.  They were handwritten.  They were

1   incomplete, they were lacking details, and they're altered.  So
2   on what part of it, what part of those records are you going to
3   build a fraud case on?  It's dishonest.  Dishonest.  And they
4   hid this.  Dr. Morse didn't know the truth until this lawsuit
5   started what happened.
6          So you have this is your starting point.  You're
7   missing 19 months.  The other records you do have are basically
8   worthless.  So on top of it though to make matters worse, you
9   have a perfect storm for Mr. Fusto, a perfect storm, a Trifecta
10  of arrogance, laziness, and incompetence, not doing the most
11  basic things that you would expect to do in an investigation.
12  Some of you might say well, what do you mean, counselor?  What
13  are you talking about?
14          Let's talk specifics.  They go through the trouble of
15  getting 329 patient charts, which that's a first step, but do
16  they bother speaking to these people?  Do you recall that over
17  the entire course of investigation they never spoke to 317 out
18  of the 329 people, not so much as a phone call, nothing, and
19  the twelve people that they did speak to was all by telephone?
20          I asked Mr. Serra about that, "What's your custom and
21  practice?"  "Well, my practice, you need to speak to people
22  face-to-face."  I asked Mr. Flynn about that, I said, "Why
23  didn't you go out there?"  "Hey, I actually wanted to go out
24  there, but the attorney said it wasn't necessary."
25          So you have a four-year investigation.  Forget about

1   the records.  You don't even talk to most of the people.  The
2   only people you talk to, you're only speaking to twelve out of
3   329 people.  And instead of collecting evidence, Mr. Fusto
4   collected excuses.
5          Let's go through, what do you think, remember some of
6   these excuses?  "Mr. Fusto, why didn't you actually have your
7   expert look at the x-rays?"  "Well, you have to understand it
8   takes a long time to go through x-rays."  Really?  You're
9   talking about eight patients that wound up testifying.  How
10  long could that possibly take.  It's not like you were in a
11  rush to do anything, you had four years.
12  And I asked him:  "Well, what about actually looking at the
13  patient charts?"  "You know, I don't think you really need to
14  look at the patient charts.  What's that going to tell you?"
15  Well, that's funny.  Mr. Aharonyan, the man who testified here
16  today, he's the same guy that I read the deposition testimony
17  to you on Friday and I explained all that.  What do we get out
18  of him?  The first step if you're trying to verify if a doctor
19  is trying to verify a claim, the first thing you do is look at
20  the chart, just logic, common sense, what is the doctor
21  claiming versus what is he billing versus what does his checks
22  to the lab show.  This isn't rocket science.  But Mr. Fusto
23  didn't think that was necessary.
24          What's another excuse he came up with?  I said:  "What
25  about the in mouth exams, why didn't you do that?"  "Well,

1   those are really a limited value.  You don't need to do that.
2   Well, what do you need to do.  I mean, if you're claiming that
3   people don't have partial dentures, wouldn't that be the first
4   thing you do?  You look and see inside the person's mouth.
5   Wouldn't that logically, do you have to be a dentist to know
6   that?  So you put it all together, they don't speak to anyone,
7   they don't review x-rays, they don't have their doctor examine
8   the people, they don't have the doctor look at the charts, and
9   then you wonder why four years later all of a sudden the case
10  moves forward to a grand jury indictment.  Why?  I asked him, I
11  said didn't the case reach a dead-end in the winter of 2004.
12  Didn't it reach a dead-end?  And I was asking him about it, he
13  said no, well, we were still investigating.  And I had said to
14  him, I said:  "Why didn't you go, why didn't you go and move
15  for an indictment in the winter of 2004?  Do you remember what
16  he said, folks?
17          (Continued on following page.)
18
19
20
21
22
23
24
25

**JA507**

1  (In open court.)

2  MR. NORINSBERG:  Do you remember what he said, folks?

3  He said other investigation wasn't complete.

4  I said, why didn't you do it in 2005?  Why didn't you

5  move for an indictment then?  Our investigation still wasn't

6  complete.

7  Why didn't you move for it at the very beginning of

8  2006?  Our investigation still wasn't complete.

9  But then I asked him, I said, what new evidence did

10  you discover from the point in 2004, when you did not have

11  enough evidence to get an indictment, to 2006, when all of a

12  sudden you did?  What new evidence?  Somebody here on the jury,

13  tell me what evidence they discovered.  There is nothing,

14  literally nothing, and he admitted that.

15  This case had massive problems, and they weren't

16  solved by just delaying it over time.

17  So what happens?  So, finally -- he sat on this case

18  for four years, sat on his hands long enough.  Finally, he

19  starts getting some heat from his supervisors.  They want to

20  know what's going on.  You heard these two investigators.  They

21  were saying, hey, is this a case or not?  They went above his

22  head to his supervisor.  They want to I know.

23  So finally Mr. Fusto starts getting some heat on it,

24  and he's got a choice to make.  He's got a critical choice to

25  make.  He's got to choose:  Do I just come clean and tell the

1  truth to my supervisor, the truth being I sat on this case for

2  four years, I have done virtually nothing, I have collected

3  virtually no evidence, and I have nothing to show for it?  Does

4  he come clean and just tell the truth, or does he try to spin

5  it and make up a story as to why it's taking so long and why he

6  really does have a case after all?

7  Well, we are here today because he chose the path of

8  dishonesty and deception with his own supervisor.  Remember

9  what he said in that status report?  He said, oh, well, there

10  was a delay because we had a change in auditor.  Folks, the

11  change in auditor?  This is back in 2004.  How does that have

12  anything do with why it would take another two years?

13  You heard Mr. Flynn say a homicide investigation can

14  be started and finished within two years.  And the auditor has

15  nothing do with it.

16  What's the other thing he came up with, the excuse?

17  Well, we have to recalculate our fraud methods.  Yes, he did.

18  We heard about how he recalculated things.

19  Then all of a sudden for the first time four years

20  into this investigation, all of a sudden, this is the million

21  dollars case he is handling.  Yeah.

22  The other factor -- and I think there are multiple

23  things going on here, but there is no question that this

24  prosecutor was aware of and knew about the election that was

25  going on that year, and it absolutely influenced him.  Now, you

1  can listen, because he actually said this in his testimony, and

2  I asked him about the election.  Remember what he said?  He

3  admitted speaking to Mr. Woll, the defense attorney.  He

4  admitted talking about the election.  He admitted saying that

5  the election -- that there couldn't be a disposition until

6  after the election.

7  You heard Dr. Morse say that during one of those

8  meetings, after he showed all the calculations were wrong,

9  there was a break and they came back, and what did they say?

10  People upstairs want this case to continue.  Did you hear

11  anybody from the defense get back on the stand and say, no,

12  that conversation didn't take place?  No.  When we said people

13  upstairs we weren't really talking about people upstairs.

14  There is something in the record.  There is more than

15  just what was going on internally.  There is no question this

16  played a part in it.

17  And here you have a prosecutor, he has a chance to

18  make a name for himself.  He's the guy and he helps his boss.

19  They nail the dentist for a million dollars, and they get the

20  big publicity out of it.  You put it together.

21  I believe you have factors going on inside the office,

22  and you have stuff going on outside; but you are the ones.  You

23  will take a look at it.

24  But, there is no question this press release came

25  about.  They are bragging about this.  He is boasting about it,

1  Spitzer, about the million dollar dentist Medicaid theft.

2  There is no question.

3  Ladies and gentlemen, he told you, Fusto told you they

4  don't always do press releases like this.  They don't do it in

5  all dental cases.  They don't do it in all arrests, but here

6  they did.

7  It's up to you, folks.  You put together the pieces on

8  this case.

9  THE COURT:  Counsel, how much longer do you think you

10  are going to be?

11  MR. NORINSBERG:  It might be an appropriate time to

12  break now, your Honor.

13  THE COURT:  All right.

14  Ladies and gentlemen, I will excuse you for the

15  luncheon recess.  We will resume at 2:15.

16  (Jury exits.)

17  THE COURT:  Counsel, how much longer do you think you

18  will be?

19  MR. NORINSBERG:  I'm going to guess about a half hour.

20  THE COURT:  How long do you think -- who is summing

21  up?  Are you?

22  MR. MILLER:  I think I will be 30 to 40 minutes.

23  THE COURT:  Okay.  I told you all earlier that I have

24  to leave, right, at 4:00.  So try and move them along.

25  One certain I had, counsel, you showed jury -- the

**JA508**

1    jury 19, but I don't have that in evidence.  Is it something I
2    missed?
3         MR. NORINSBERG:  I might have misread the number.  Do
4    you remember what it was referring to, your Honor?
5         THE COURT:  It was Castillo's work records about
6    missing invoices.
7         MR. NORINSBERG:  What was it, your Honor?
8         THE COURT:  Exhibit 19.
9         MR. NORINSBERG:  I'm look at plaintiff's exhibit on
10   the sticker on there.  I thought that's what we had.
11        THE COURT:  Is that work records from Castillo using
12   the term missing invoices?
13        MR. NORINSBERG:  Yeah.
14        THE COURT:  I don't have it in evidence.
15        MR. NORINSBERG:  Yeah.  I definitely -- I moved it in,
16   but maybe under a different number.  We will figure it out.
17        THE COURT:  Yes, because that's a problem, if it's not
18   in evidence.
19        (Lunch recess.)
20        (Continued on the next page.)
21
22
23
24
25

---

1         A F T E R N O O N   S E S S I O N
2         (In open court.)
3         THE COURT:  All right.  Did you determine the issue
4    with the jury, with the exhibit?  I'm sorry.
5         MR. NORINSBERG:  I believe they worked that out.
6         MR. FARBER:  I believe it was Exhibit 4, your Honor.
7    I'm not sure if it was 4-A or 4-B, but it was one of those two.
8    It's part of Exhibit 4.
9         THE COURT:  All right.
10        (Jury enters.)
11        THE COURT:  All right.  Ladies and gentlemen of the
12   jury, we are, I believe, ready to proceed.  Please be seated.
13        Just to tell you a little bit about timing, I am going
14   to have to conclude the proceedings at 4 o'clock today, so just
15   so you know.
16        MR. NORINSBERG:  May I proceed, your Honor?
17        THE COURT:  Yes.
18        MR. NORINSBERG:  Welcome back, folks.  Hope everyone
19   had a good lunch.
20        Where we were when we were leaving off the last
21   session, we were talking about problems in the case and why
22   this evidence had to be falsified; and the last point I wanted
23   to leave you on that, before we get into the final sections of
24   the summations -- we are going to get to the end, I promise
25   you.

---

1         The final sections, before we get into that, I just
2    want to read a quote from Mr. Fusto.  This goes to the issue of
3    whether there was any -- any new evidence that they had
4    actually discovered from 2004, when he said he didn't have
5    enough evidence to go to a grand jury to 2006, when he actually
6    presented the case.
7         This is the question, on page 220.
8         Question:  Would you agree that whatever stopped you
9    from presenting the case to the grand jury in 2004 and 2005
10   hadn't changed when you actually did present the case in 2006?
11        And then he said, Answer:  I guess to some degree that
12   would be true.
13        Now, what other evidence did you hear, what new
14   evidence did they discovery?  Nothing.  And all of this ties
15   together as to what happened and why there were gaps in this
16   case that had to be filled in.
17        What do the defendants say about this?  Basically,
18   from what I gathered during this trial, essentially something
19   like this:  It doesn't matter if they created a false billing
20   document for Edwin Gonzalez and merged two patients into one.
21   It doesn't matter if two of those patients never appeared in
22   its outsider billing.  It doesn't matter if they never even
23   bothered to present falsified accounts for that fictitious
24   patient, Edwin Gonzalez.  It doesn't matter that there was a
25   completely fake triple billing document for Stacy Rodriguez and

---

1    that the dentist and the prosecutor both admitted it would be
2    confusing.  It doesn't matter that they removed intentionally
3    removed tooth numbers and created a much more misleading,
4    deceptive document so that the grand jury wouldn't know what
5    they were looking at.  None of that matters.  None of that
6    matters.
7         What matters is that they had such a strong case
8    without the fabricated evidence.  Okay.
9         What evidence did they have?  What strong case?  The
10   case that he got acquitted on?  Twelve counts, 12 not guilty,
11   acquitted.  We are still waiting to hear that evidence what a
12   strong case they had.
13        What else, ladies and gentlemen?  You heard about he
14   didn't -- they don't need -- and I expect Mr. Miller will get
15   up here and tell you this.  We didn't need the fabricated
16   evidence.  What about the patient testimony?  What about the
17   patients?
18        Well, I ask to you, ladies and gentlemen:  What about
19   the patients?  What about them?
20        Remember Mr. Miller put that exhibit up there?  They
21   want to talk about an interview of patients that took place ten
22   years ago, in 2003.  Remember that?  And the judge explained
23   that's not being offered to prove that these patients actually
24   wore dentures.  It's just being offered to show Mr. Fusto's
25   state of mind.  Okay.

**JA509**

1    Well, let's talk about Mr. Fusto's state of mind.
2  What did Mr. Fusto tell you?  The words, the exact words out of
3  his mouth.  He said, the Medicaid patients, he said, it's
4  extremely hazardous.  These are his words.  Check the
5  transcript, extremely hazardous to build a case based on
6  patient testimony.  He said that Medicaid patients, in his
7  opinion -- this is not our words.  This is somebody who has
8  been dealing with it.  He said Medicaid patients are extremely
9  poor historians with respect to the services they have
10  received, especially dental services.
11    This is what the prosecutor himself has said.  This is
12  somebody who knows because he has talked to these people.  He
13  talked to them before the grand jury.  He knows that these
14  people, several of them said they literally did not know what a
15  denture was or whether or not they had false teeth.
16    MR. MILLER:  Objection.
17    THE COURT:  Sustained.
18    Ladies and gentlemen, you have to consider the
19  evidence, not as it may have developed later but the testimony
20  as it was before the grand jury, what the grand jury heard in
21  terms of some of the issues you will be required to consider;
22  and I will instruct you on that in my instructions.
23    MR. NORINSBERG:  And you will learn, ladies and
24  gentlemen, that patients -- actually, if you read that
25  transcript.  Asi Othman, a patient in front of the grand jury,

---

1  guess what, he says he has false teeth.  Right there.
2    Guess what?  Stacy Rodriguez, the actual person that
3  was given testimony about, that Dr. DeLuca testified about, she
4  herself said Stacy Rodriguez obviously, obviously is wearing a
5  partial denture.  That was their dentist's conclusion.
6    So when you hear about the patient testimony, look at
7  the whole picture.  Look at the whole picture here.
8    Now, one other part of the case that I just want to
9  talk about and bring to your attention, a lot of things, a lot
10  of records that you would expect to actually see disappeared.
11  Grand Jury 7, the original record, the one --
12    MR. MILLER:  Objection.
13    MR. NORINSBERG:  -- the one that was actually used in
14  court has never been found, and I asked Mr. Fusto about it.
15  Maybe it's what they -- maybe it's the same record.  It's a
16  copy.
17    But why isn't it -- why did that exhibit, of all the
18  possible exhibits that are kept together, that one is gone
19  forever?
20    The missing checks.  A whole year of checks you saw.
21  We put it on display.  One full year of checks that were
22  missing.  An entire year of checks unaccounted for; and I asked
23  Mr. Castillo is it possible that those checks were there the
24  entire time and that you did not include those checks in your
25  analysis?  Yes, it is possible.

---

1    The charts themselves, the original dental charts.
2  You heard from Dr. Morse's testimony, to this day he never got
3  the originals back.  What he did get back were charts of three
4  other dentists merged into his records.
5    All of this, this brings us full circle.  This case,
6  no matter where you look at it, no matter what angle, top to
7  bottom, inside and out, it's rotten to the core.  There is no
8  part of this case that stands up on its own, if you look
9  closely and carefully.
10    If you actually take the time and look at what they
11  are claiming and see what the actual evidence is, it doesn't
12  stand up.  It does not stand up.
13    This man was wrongfully indicted.  He should not have
14  been indicted.  This shouldn't have happened.  It was not
15  right.  So we come full circle, ladies and gentlemen, to the
16  decisions that you are going to have to make in this case.
17    We have what's called a verdict sheet, and you will
18  get a copy.  The judge is going to give you a copy, and you
19  will have a chance to look at it and go through all the
20  questions on your own.  But I just wanted to go through a
21  little bit of the questions you are going to be asked here.
22    The first two questions essentially relate to the
23  question of whether or not there were false documents that were
24  used in this case.  The question is exactly:  Has Plaintiff
25  Leonard Morse proven by a preponderance of the evidence that

---

1  Defendant John Fusto created false or fraudulently altered
2  documents or directed Jose Castillo to create false or
3  fraudulently altered documents consisting of Grand Jury
4  Exhibits 7 an 11, knowing that such information was false or
5  fraudulent?
6    The second one:  Has Plaintiff Leonard Morse proven by
7  a preponderance of evidence that Defendant Jose Castillo
8  created false or fraudulently altered documents consisting of
9  Grand Jury Exhibits 7 and 11, knowing that such information was
10  follows and fraudulent?
11    Ladies and gentlemen, as sure as I am standing here in
12  front of you, the answer to those two questions is absolutely,
13  unequivocally yes; and if you need proof, and I say you do, go
14  back into the transcript because the answers are in the
15  transcript.  They absolutely created false records, and they
16  knew that.
17    And you know what, there is no question that these
18  records were material to the indictment, and that's the third
19  question:  Has Plaintiff Leonard Morse proven by a
20  preponderance of the evidence that the false or fraudulent
21  evidence was material -- meaning that it was likely to
22  influence the grand jury's decision to indict -- and that he
23  was deprived of the liberty as a result of the false and
24  fraudulent evidence.
25    The best way I would like to present it, if you want

**JA510**

1 to think, was it material to the indictment? Think it was like
2 this. Imagine if I had this bottle of water here. Imagine if
3 this bottle of water, if I were to take off the cap and pour
4 some red dye into it and shake it up a little. This entire
5 bottle would be tainted. You can't sit there and separate
6 water from the red dye. That's what happened in this
7 indictment. It's like looking at a well. If you drop poison
8 into a well, you can't separate the water from the poison.
9 It's all part of this proceeding. It's material. It
10 had an effect that was likely, very likely to influence a jury
11 and did influence them. And if you have any doubts about that,
12 think about if we didn't have cross-examination in this case,
13 if all you saw was the Stacy Rodriguez triple billing document,
14 the Edwin Gonzalez three merged into one, that huge set of
15 bills, which were 25 percent of what Castillo testified to.
16 If you saw this repair and replace, repair and
17 replace, repair and replace, over and over and over again,
18 wouldn't you think, wouldn't you think, oh, yes, this doctor
19 did something wrong? It's misleading. It was misleading what
20 they did. They knew what they did, and that's how they secured
21 this indictment.
22 Now, you will see on the question of damages -- you
23 can go through it. It doesn't need my explanation. The one
24 point, the one part I did want to talk to you about, though.
25 You heard from this guy this morning, Dr. Erath. He

1 came in here, and I would expect you as jurors, I understand,
2 and it's completely your call, as I said before. But here is
3 the way this plays out, the way I see it.
4 You have one expert who is actually a professor at
5 Pace Business School, has been there for the better part of 30
6 years teaching business and actually is legitimate, and he
7 walked you through everything that he did. And then you have
8 someone else who comes in here and doesn't have an opinion
9 about anything.
10 What's your opinion, Dr. Erath, about past lost
11 earnings? I don't have one. What about future lost earnings?
12 I don't have one. What about the fair market value of the
13 practice? I don't have an opinion on that. What about the
14 proper CPI? I don't have an opinion about that. What about
15 the goodwill of the practice? I don't have an opinion about.
16 Well, what do you have an opinion about?
17 This guy, he comes in here, he is obviously very
18 familiar with the court system. He comes in here, he said he
19 admits at least that 90 percent of the time he comes in for the
20 defendants.
21 Think about this. This is the State of New York. The
22 two defendants are State of New York employees. We don't hear
23 from a single expert in the State of New York. They get this
24 company from Massachusetts to come here and start poking holes
25 in Dr. Mantell's analysis.

1 At the end of the day it's a matter of common sense.
2 You were given one scenario, a clear scenario, laid out. You
3 were given another with no numbers, no findings, no opinions,
4 simply everything Dr. Mantell did was wrong, but I don't have
5 any opinions on my own.
6 So my view is you, as jurors, you take that, you look
7 at it side by side, and you draw your own conclusions. As I
8 said, what I want to do here is simply put it before you. In
9 the end you have to decide.
10 Just one other category of damages that I wanted to
11 talk about. Actually, I misspoke. There are two. One is --
12 let's put aside lost earnings for a second. Completely put it
13 aside. Let's say that wasn't an issue in this case at all.
14 There is a whole separate category of what happened
15 here. And, ladies and gentlemen, there is no question this
16 man, his reputation was destroyed. It was destroyed by this
17 indictment, when you look at the way this was played out in the
18 news.
19 How would you like to have that article about
20 yourself, read about how you stole a million dollars, the whole
21 world seeing it? All of his students are seeing it, all of his
22 professional colleagues. Everybody and anybody that knows him
23 sees this story, and it's not just in The Post. Here is The
24 Daily News article. Just in case anyone missed it in The Post,
25 here is another coverage in The Daily News. So everyone knows.

1 Ladies and gentlemen, what this did when this word got
2 out, it just destroyed everything he had worked for. This man
3 spent 30 years building up a practice, and it was gone in five
4 days when Medicaid terminated his privileges.
5 Just look what he did. This was a letter he wrote
6 asking the Attorney General's office to simply take down the
7 news of the indictment. He had been acquitted of the charges.
8 It's causing me damage. Just take it down so people don't see
9 it any more. Here is the letter he wrote, 2009. It's in
10 evidence. You can see it. Just pleading with them to please
11 take this down because it's affecting his professional
12 reputation and ability to work.
13 It wasn't until two years after the acquittal that it
14 was finally at long last removed.
15 I understand, ladies and gentlemen, when we are
16 talking, if it's not our own families, our own friends, it's
17 difficult. You are dealing with someone you don't know. But
18 this has been an absolute nightmare, an ordeal.
19 He wanted to fight this case out to see it to the end,
20 to get to you as a jury and let you see what had happened. But
21 there is no question what happened here. It was wrong what
22 they did, and there is no question he can't work again.
23 Do you think -- he is 65 -- he is going to go out, and
24 you think a lot of dental practices are going to hire him now?
25 Anyone who looks up this man will know immediately he is the

**JA511**

1  guy that stole a million dollars of Medicaid.  His entire life,
2  what he worked for, was taken away, and there was no reason for
3  it.
4        The last item of damages I want to talk to you about
5  is the category of punitive damages, and you will hear from the
6  judge.  The judge will explain to you.  Punitive damages are
7  designed to punish.  They are designed deter.  They are
8  designed to make sure that the next prosecutor that has the
9  idea that they can fill in gaps in their cases and make up
10  stuff and put it before a grand jury because no one is
11  watching, that that prosecutor understands there are
12  consequences to that action.  It's designed to punish and
13  deter.
14        You have the chance, ladies and gentlemen.  This is an
15  extremely important case here.  It's very, very unusual that
16  you have a case where you have a prosecutor on trial in a civil
17  arena for falsifying evidence.  You have a chance through your
18  verdict to actually send a message and make sure that this type
19  of thing never happens again, ever.  To make sure that the next
20  time somebody has a case like this, where they think they can
21  just fill in gaps and plug holes and no one is going to watch
22  because no one is in the grand jury, and then hopefully just
23  get the guy to cop a plea.
24        Because that's what Fusto thought all along was going
25  to happen.  He would jam him up with this million dollar

---

1  charge.  He figured Dr. Morse would just fold, like all the
2  other doctors, like all the other doctors.  This is the first
3  one that went to trial.
4        Let me tell you something, ladies and gentlemen, this
5  man is never going to fold.  He was going to see this case
6  through to the end, no matter how hard it was, no matter how
7  long it took, no matter how many obstacles he had to overcome.
8  That's what this case is, at long last to have a jury.
9        It's so important to have a jury say, you know what,
10  Dr. Morse, we saw what happened, it was wrong, you shouldn't
11  have been indicted.  That's what the case is about.  The most
12  important thing.  The second thing is to make sure it doesn't
13  happen again.  That's what punitive damages are for.
14        The end of the day, ladies and gentlemen, it may not
15  be apparent to you but this case is a case in which we brought
16  under the constitution.  This case is not a tort case.  This is
17  a case under the United States Constitution because what's at
18  issue here is whether or not a government official can falsify
19  evidence and take away someone's liberty.
20        It's up to you.  You read about things.  You might say
21  it's not up to us, we can't control it.  You have a chance now
22  to do something.  They took this man's liberty away.  They
23  wrongfully indicted him.  They destroyed everything he worked
24  for, and this is the last chance we are going to have in this
25  courtroom.  This is the end of the road.

---

1        What decision you make today will literally just
2  change one -- either his life is going to go in one direction
3  or another.  And I ask you, at long last, to please do justice
4  here and hold these two defendants accountable for what they
5  did to this man.  Thank you.
6        THE COURT:  Mr. Miller?
7        MR. MILLER:  Ladies and gentlemen, first of all, I
8  would also like to thank you for serving on this jury and for
9  all your attention.
10        You have heard a lot of evidence over the course of
11  the trial, and it wasn't until last Friday when Mr. Farber
12  flipped through Grand Jury Exhibit 11 with Dr. Morse, page
13  after page.  Maybe it wasn't scintillating testimony, but page
14  after page where Dr. Morse said was that he had no reason to
15  believe that the information printed on those pages was
16  inaccurate.  And at the very end of the day he admitted that
17  the information in his remittance statement is the information
18  that was in the Stacy Rodriguez page.
19        What does that mean?  That means that when plaintiff's
20  counsel told you in opening argument that you were going to see
21  spreadsheets with, quote, completely fake information on it,
22  that that was not true.  The information in the Stacy Rodriguez
23  page came from the Medicaid system.  It came from Dr. Morse's
24  remittance statements.  It may be a little bit confusing, but
25  it's definitely not false.

---

1        Now plaintiff has changed his tune and started telling
2  you, oh, it was actually misleading.  That's the problem.
3        The truth is at the end of the day Mr. Fusto and
4  Mr. Castillo built a solid case on the false filings, and it
5  was based on truthful and accurate information, as Dr. Morse
6  himself on Friday admitted.
7        I'm going to start with the false filings case because
8  that's what Grand Jury 7 and 11 relate to.  That's the
9  allegation of fabrication in this case.  There is no allegation
10  of fabrication related to the invoices.  That's a distraction.
11        We are talking about Grand Jury 7 and 11.  Grand
12  Jury 7 has six spreadsheets.  Six spreadsheets of six people
13  who testified in the grand jury, Medicaid recipients.  Grand
14  Jury 11 has those same six spreadsheets and plus two additional
15  ones, one for Miriam Perez and one for Edwin Gonzalez.
16        Now, let's talk about how Mr. Fusto and Mr. Castillo
17  built their case on the false filings, and they built what they
18  had every reason to believe was a solid case on the false
19  filings.  They knew there were problems with the invoices, but
20  they built -- but the false filing case, they had every reason
21  to believe, was solid.  They had no motive to fabricate
22  evidence to help out their false filings case.
23        So it started off in 2002.  Investigator Flynn
24  interviews Dr. Morse.  He says he sees 20 to 22 patients a day,
25  and he does all the billing himself.  Why is the billing

**JA512**

1  important?  Because it means that he may have had the intent to
2  know that his billings were false when they were submitted.  He
3  can't say that, oh, I had some biller do it and they made a
4  mistake.
5           What did Mr. Fusto have the auditor do?  At the time
6  it was Tim Johnson.  He looks at the billings.  He finds that
7  there is a high volume of denture repair work going on in this
8  practice.  He also finds that there is a significant amount of
9  billings for people who are young, people who may not have
10 dentures.
11          So what do they do?  They do what's logical.  They go
12 out and they -- Investigator Flynn picks up the phone, and he
13 calls Medicaid recipients who are young, who had denture repair
14 work billed for, and then he writes a memo.  He sends a memo to
15 Mr. Fusto about his first nine calls.  We looked at that the
16 other day.  The first page talks about his interviews with
17 three people.  The second page talks about his interviews with
18 an additional six people.
19          And what does he find?  Seven of the nine claim that
20 they didn't have denture repair services that Dr. Morse billed
21 for.  So right there in 2003, there is evidence that Mr. Fusto
22 has that seven of the nine people that Investigator Flynn
23 initially called had work billed in their names that wasn't
24 actually done.
25          Now, Flynn then goes on to do additional interviews.

1  Interviews, Sawson Suliman, Intisar Ahiri, Nassa Ahiri.  And in
2  2005, which is the time period where plaintiff's counsel is
3  saying no work was done, he interviews additional people,
4  including Asi Othman.  In the original interview he also
5  interviewed Miriam Perez and Edwin Gonzalez.  That accounts for
6  six of the eight grand jury witnesses.
7           In addition, Mr. Fusto had Dr. DeLuca review some
8  patient charts.  She reviewed Stacy Rodriguez, Sara Charles,
9  had some concerns.  That accounts for the two additional grand
10 jury witnesses.  There are eight ultimately.
11          And based on this investigation, Mr. Fusto and
12 Mr. Castillo had no reason to doubt that there was a solid case
13 on the false filings.  That belief was backed up when we got to
14 the actual grand jury.
15          Let's look at the actual testimony.  One of the
16 Medicaid recipients who testified was Intisar Ahiri.  By the
17 way this is Defendant's Exhibit C.  It has the entirety of the
18 grand jury transcript.  It's certainly something you can read
19 or look at, if you want; and, in particular, if you want to
20 look at a witness' testimony, look at the top of the page.  It
21 has the name there.  So you can quickly flip through and check
22 someone's testimony.
23          She says, Intisar Ahiri, she says she is 26 years old,
24 went to 580 and she was asked, Could you tell the grand jury
25 what work was performed on you when you went to 580 Dental?

1           Answer:  Three or four cavities and a root canal that
2  was never done because I never got the crown put on.  That's
3  it.
4           Question:  Do you wear dentures?
5           Answer:  I don't.
6           Question:  Have you ever had the need to have any
7  dentures repaired or made for you by 580 Dental?  No.
8           What do we know from the billings?  This is one of the
9  many people for whom denture repair work was billed by 580
10 Dental that wasn't actually done.
11          Now, as Ms. Ahiri also tells the grand jury, that she
12 wasn't there along enough at 580 to actually have denture work
13 done.
14          Question:  When you went to 580 do you remember
15 approximately how many visits you had with the dentist at the
16 time?
17          Answer:  I stopped going there because the most you in
18 there is like two minutes.
19          Sara Charles also testified before the grand jury.
20 She said she was 30 years old.  Again, another young person.
21 She went to 580.
22          She is asked, Question:  Do you recall what work was
23 done?
24          Answer:  Yes.
25          Question:  What was that?

1           Answer:  My front tooth that's chipped and three
2  fillings.
3           Question:  In the year 2000 did you have any dentures?
4           Answer:  No.
5           Question:  When you went to 580 Dental did you have
6  any need or any requirement for the repair or even the creation
7  of dentures?
8           Answer:  No.
9           Nassa Ahiri also went to 580, one time only.
10          Question:  Do you remember what work was done?
11          Answer:  He pulled out a few of my teeth, and that was
12 about it.
13          Question:  Okay.  Do you have dentures?
14          Answer:  No.
15          Question:  When you went to see the dentist back in
16 2001 did you have dentures?
17          Answer:  No.
18          Stacy Rodriguez also went to five -- testified before
19 the grand jury, and she went to 580; and what did she tell the
20 grand jury about what services were actually performed?
21          When you went there do you recall what work was done?
22          Answer:  I had one tooth pulled.
23          Question:  One tooth pulled?
24          Answer:  Yes.
25          Question:  That's it?

**JA513**

1  Answer:  That's it.

2  Now, that's four of the six patients for whom false

3  filing charges were brought.  In the grand jury there were two

4  witnesses who indicated they had dentures, who plaintiff's

5  counsel's argument that the prosecution team in this case had

6  no ability to discern whether or not someone had dentures or

7  not, just doesn't stand up.

8  Sawson Suliman said he had fake teeth.  He said he

9  went in, had a cleaning and some x-rays; but he makes it clear

10  that he didn't have dentures when he went to 580.  You can

11  check the testimony.

12  Asi Othman, he said he actually had partial dentures

13  done at 580, but he said he never had them repaired or fixed by

14  the dentist.

15  If you look at the billings, the Grand Jury 7 or 11,

16  they are all denture repairs.  So, again, that testimony and

17  all the other testimony in the grand jury supported the

18  prosecution, the prosecution's theory that Dr. Morse and 580

19  had billed for a lot of denture repair services that they

20  simply hadn't done.

21  Finally, two other people did testify before the grand

22  jury, but charges were not asserted based on their testimony.

23  Miriam Perez testified that she had a checkup and never went

24  back to get anything done; and Edwin Gonzalez said he had a

25  couple of teeth pulled out, said he got fitted for dentures but

1  he never got them.  At the time Edwin Gonzalez testified, he

2  said he was no longer on Medicaid and he didn't give his SIN

3  number during the testimony.

4  So, at the end of the day, at the end of the grand

5  jury, the prosecution decided to indict just on six of the

6  patients' testimony:  Intisar Ahiri, Sara Charles, Nassa Ahiri,

7  Stacy Rodriguez, Sawson Suliman, and Asi Othman; and the

8  testimony of the grand jury was consistent with what

9  Investigator Flynn had told Mr. Fusto back when he wrote his

10  memos.  There was no, again, no reason for them to believe that

11  this was a solid case.

12  And the plaintiff's counsel in this case has put

13  forward all sorts of reasons why you shouldn't believe people

14  when they talk about what dental work that they claim they had

15  done and didn't have done.  First of all, none of that argument

16  or evidence was before the grand jury, so you need to keep that

17  in mind.

18  To the extent that they are claiming that Mr. Fusto

19  knew he should have done more, something like that, their

20  arguments simply don't stand up.  First of all, they claim, oh,

21  patients don't know whether or not they have partials or not.

22  That's not true.  Mr. Fusto elicited testimony from two people

23  who talked about having partial dentures.

24  And when I read the testimony did you notice the way

25  the questioning works in the grand jury, he asked them what

1  services they had first.  They describe the services.  Remember

2  those first four?  They all said they didn't have any denture

3  work done at all.  And then they are asked, do you have

4  dentures.  So even if they didn't understand what a denture

5  was, they describe what work was done, and it didn't include

6  denture services.  It was a solid case.

7  Secondly, plaintiff's counsel tells you, oh, they

8  should have done an in-mouth exam; but you were here when

9  Dr. DeLuca testified.  What did she say about an in-mouth?  If

10  a patient doesn't wear their partial denture, the in-mouth, she

11  doesn't know whether they have one or not.

12  At a criminal trial, where you need to prove beyond

13  any reasonable doubt that services weren't performed,

14  Dr. DeLuca could be cross examined on the fact that she doesn't

15  really know whether the patient has a partial denture or not

16  because they might not have worn it in their mouth exam.  So

17  that doesn't help you build a criminal case.  To build a

18  criminal case you need to actually talk to people about what

19  work was done.

20  Last, plaintiff's counsel says, oh, they should have

21  looked more closely at the patient charts.  But we know that

22  you can write anything in a patient chart.  It doesn't mean

23  that it happened.

24  Dr. DeLuca testified that Stacy Rodriguez' chart

25  indicated that she had a partial denture.  But Ms. Rodriguez

1  testified in the grand jury that she only had work done on a

2  chipped tooth and fillings.

3  As Mr. Fusto explained to you, charts typically match

4  the billings.  Why?  Because when the audits are conducted,

5  that's typically how they are conducted.  You compare the

6  patient charts with the billings.

7  I believe Dr. Morse told you himself that in his

8  experience no one who had conducted an audit had ever actually

9  talked to his patients.  He made sure that his charts matched

10  the billings.  He knew that that was how he would get paid, if

11  he made sure that the charts matched his billings, because that

12  was his experience from prior audits.

13  What was done in this case was something beyond that.

14  It was actually going and talking to the patients who

15  supposedly had the work done in their mouths.

16  Now, let's talk about the creation of Grand Jury 7 and

17  Grand Jury 11.  To prove a case, Mr. Fusto presented the

18  testimony of the witnesses who said that they didn't have

19  denture repair work done or that Dr. Morse didn't do any

20  denture repairs on them.  To prove that, he didn't need to

21  create a spreadsheet that included tooth numbers.  He only

22  needed to solicit the fact that denture repair work was billed.

23  Patients were saying they didn't have dentures at all,

24  they just had a chipped tooth fixed and the like.  So there is

25  no reason, in terms of corresponding with the patient

**JA514**

1 testimony, to include the tooth numbers.

2 Now, with respect to Dr. DeLuca's testimony, Mr. Fusto

3 did ask her to testify, and she looked at Grand Jury 7 only,

4 the spreadsheet, the collection of spreadsheets and only had

5 six pages. And Mr. Fusto told you here that he didn't think it

6 was necessary to include tooth numbers for her to review those

7 billings. He hadn't done a denture case before, and he just

8 thought it wasn't something that was necessary. He was honest

9 with you. He told you that during his testimony.

10 As it turns out, he was really right, because what did

11 Dr. DeLuca say? Dr. DeLuca said that even if the tooth numbers

12 had been on the document, and even if they had all been

13 different, she would have largely reached the same conclusion

14 that the billings 580 Dental submitted to Medicaid were very

15 suspicious.

16 What did Dr. DeLuca say about Intisar Ahiri if the

17 tooth numbers had been different? I think that there are some

18 red flags with the amount of repairs to the partials.

19 What did she say about Sara Charles, assuming the

20 tooth numbers had been different? She would still have a

21 question about the number of repairs.

22 Nassa Ahiri, she said it still seems excessive.

23 Sawson Suliman had four broken clasps. She testified

24 the clasps weren't broken.

25 Asi Othman, she said even if the tooth numbers were

1 different it still seems to be an excessive amount of repairs

2 to the same partials.

3 So at end of the day, the documents presented contain

4 truthful information and contain truthful information in Grand

5 Jury 7 that was presented to Dr. DeLuca, information about the

6 patients and what their billings were. It didn't actually have

7 the tooth numbers, but that doesn't make the document false.

8 The document is true.

9 Dr. Morse admitted that when he did his page flip on

10 Friday with Mr. Farber.

11 Now, Mr. Fusto admitted to you that he didn't

12 notice -- that he is the one who made the decision to not

13 include the tooth numbers in the document. And I submit to you

14 that's a testament to his honesty before you in this

15 proceeding.

16 Now, with respect to Stacy Rodriguez, it again took to

17 Friday afternoon when Mr. Farber -- I'm sorry -- on direct

18 plaintiff's counsel showed Dr. Morse one remittance statement,

19 one from right around the time the Stacy Rodriguez billing

20 occurred. It showed three lines of surfaces, three repairs,

21 three repaired surfaces related to denture repairs.

22 On cross-examination Mr. Farber showed him a second

23 remittance statement that had changes to those original

24 billings. Those changes were contained in six slides. You add

25 up the three lines from the first one, you add up the six lines

1 from the second one, you get nine lines. That's precisely what

2 is in Grand Jury Exhibit 7 and Grand Jury Exhibit 11.

3 So again, as Dr. Morse has effectively admitted the

4 Stacy Rodriguez spreadsheet contained truthful information. It

5 did not -- it contained the information that was in the

6 Medicaid claims data system.

7 So what you heard today from plaintiff's counsel was

8 not that there was a clearly made-up document, as he said in

9 his opening statement. Instead, he told you it was a

10 misleading document.

11 But let's look at what Mr. Castillo said about the

12 document, the page containing Stacy Rodriguez. I'm reading

13 from page 192 of the transcript.

14 Question: And is this how you -- is this document in

15 front of you, this Stacy Rodriguez page, is this how the

16 Medicaid claims computer system provided the document in

17 response to the field request you made?

18 Answer: Yes.

19 All he did was print out the page in the way in which

20 the Medicaid computer system gave it to him. There is no

21 intent to develop some intentionally misleading document. It

22 may be that Medicaid claims are a bit confusing.

23 Remember we talked about the provider profile earlier

24 today? This is the provider profile. Medicaid claims are

25 complex. They have a lot of information in them, a lot of

1 fields in them. The provider profile doesn't even give you the

2 procedure description. You don't see any words on that page.

3 It's all numbers.

4 When they created Grand Jury Exhibit 7 they wanted a

5 summary document that was a little easier to understand. They

6 added the procedure description to it. Now, they left the

7 Stacy Rodriguez page the way it was.

8 And maybe it is that if claims are backed out, whether

9 it was by Dr. Morse or some computer need for an adjustment to

10 a claim, that it results in something that's a little

11 confusing. You have to look closely to see the minus signs,

12 but all that happened here is that Mr. Castillo printed the

13 page as it came out when he pulled the data from the Medicaid

14 claims warehouse.

15 Now, when Mr. Castillo used the document in the grand

16 jury, he admitted to you here this week or last week that he

17 didn't see the minus signs; and, again, I ask you: Is that the

18 kind of statement you hear from someone who is here to just

19 tell you untruths and mislead you? It's not. He said he just

20 simply made a mistake, and people do make mistakes, as

21 Dr. Morse pointed out in his testimony.

22 Maybe he should have studied the document more

23 closely, maybe he should have noticed the small little minus

24 signs on it; but the fact that he didn't notice them doesn't

25 mean that he deliberately set out to mislead anybody. All that

1 happened is that Mr. Castillo just printed the claims as they
2 appeared to him.
3      Now, let's talk about Edwin Gonzalez. Both sides
4 agree that the spreadsheet shows three different people.
5 Indeed, the first column of the document has the SIN number for
6 three different people.
7      Dr. Morse was shown this spreadsheet on Friday. He
8 admitted that the information in it is accurate. It is not
9 false.
10      Now, plaintiff wants you to believe that this document
11 was created, this special merge, with some sort of desire to
12 deceive the grand jury. But look at what actually happened in
13 the grand jury. You haven't heard about that from plaintiff's
14 counsel.
15      Dr. DeLuca shown six spreadsheets, not eight. She is
16 not shown the Edwin Gonzalez spreadsheet. She does not talk
17 about it. Likewise, when Mr. Castillo testifies, he puts Grand
18 Jury Exhibit 11 into evidence. He doesn't go through the Edwin
19 Gonzalez claims. He doesn't say, look, see all these billings.
20 And at the end of the day Mr. Fusto didn't include a charge
21 related to Grand Jury Exhibit 11.
22      So if you set out to try and mislead someone by
23 creating this document, would you then not include a charge on
24 it? That doesn't make any sense. The more likely explanation
25 is that this document was an afterthought.

1      Grand Jury Exhibit 7 appears earlier on in the grand
2 jury with Dr. DeLuca. Grand Jury Exhibit 11 comes in on the
3 last day of testimony through Auditor Castillo.
4      Edwin Gonzalez testified at the grand jury that he was
5 no longer on Medicaid, and he didn't give his Medicaid number.
6 So the inclusion of the multiple Edwin Gonzaleses may have just
7 been a way to make sure that the spreadsheet was prepared in a
8 way that would ensure that the claims for whichever Edwin
9 Gonzalez testified were actually in the record.
10      Remember this morning Mr. Aharonyan testified about
11 the provider profile. He said it started in October of 1999.
12 Well, the Gonzalez claims are from '98. So if these figures
13 weren't in the record, then there wouldn't be billings in the
14 record related to Edwin Gonzalez.
15      Let's talk about the invoice analysis that you have
16 heard so much about. You may be surprised that there is
17 actually no allegations that the invoices were fabricated in
18 this case. The fabrications only have to do with the false
19 filing evidence, the spreadsheets concerning the individual
20 patients.
21      Everyone agrees there was lots of problem getting
22 records in this case. Dr. Morse admitted that he threw out a
23 prescription after one year, but Mr. Farber read him a
24 certification that Dr. Morse himself signed every single year
25 specific to the Medicaid system and specific to his Medicaid

1 claims that he submitted electronically. It's Defendants'
2 Exhibit AC. It says, All records pertaining to the care,
3 services, and supplies provided, including all records which
4 are necessary to disclose fully the extent of care, services
5 and supplies provided to individuals other than the New York
6 State Medical Assistance Program, will be kept for a period of
7 six years. So every single year Dr. Morse promised the
8 Medicaid system that he would keep his Medicaid records for six
9 years.
10      It may be that if you are not a Medicaid provider you
11 don't have to keep your prescriptions for six years, but if you
12 are in Medicaid you've got to keep your prescriptions for six
13 years. Look at it. It's Defendants' Exhibit AC. It's right
14 there. The prosecution team didn't have the prescriptions to
15 work with, and that was the fault of Dr. Morse.
16      Everyone agreed that there were problems with the
17 invoices. Why were there problems with the invoices? It's
18 because they are invoices that were created by the vendors that
19 Dr. Morse himself selected. He said he selected Design Dental
20 because it was a lower-priced provider. Indeed, it operated
21 out of a private house. Indeed, they had handwritten invoices.
22 The problems with the records is because he selected a provider
23 that did business that way.
24      The prosecution team did their very best with those
25 records that they could, and in the end it wasn't good enough.

1 As plaintiff's counsel alluded to, they weren't admitted at his
2 criminal trial; but there is no allegations here that there was
3 any manufacture of records to support the invoice analysis.
4      In the grand jury, the invoice analysis was presented
5 through the testimony of the two lab owners, put their invoices
6 into evidence; and then Mr. Castillo, who testified about his
7 analysis -- and I urge you to read that in the grand jury
8 transcript -- he actually goes into a lot of the caveats about
9 his analysis, explaining why he excluded 87 people because they
10 clearly weren't Medicaid recipients, but for an even larger
11 group, if he couldn't tell they were Medicaid recipients, he
12 included them just to be on the safe side.
13      Over time, because of the difficulties with the
14 analysis, because of the difficulties of looking at these
15 documents, these handwritten documents or documents that didn't
16 describe the services that were provided, the calculations
17 varied. Choices had to be made, and at one point Mr. Fusto
18 himself considered lowering the dollar total of the larceny
19 charge, as Investigator Serra testified, to below $700,000.
20      Remember, Mr. Fusto is the person the plaintiff would
21 have you believe went out of his way to manufacture or
22 fabricate evidence against Dr. Morse. He is the person who
23 asked Mr. Castillo to look at a different analysis in which the
24 larceny charge was only less than $700,000. This doesn't sound
25 like the kind of person who would fabricate evidence against

1   someone, does it?
2           The results of this is that Mr. Serra got very upset.
3   Investigator Serra got very upset.  Investigator Flynn got very
4   upset.  There were lots of meetings, and in the end the charge
5   ended up being for the $1 million figure.  But again, in terms
6   of credibility and who you believe in this case, I think you
7   should believe the person who seriously considered and
8   deliberated over what the dollar value of the charge should be.
9           Now, ultimately, the grand larceny charge wasn't
10  relevant to the issues that we are dealing with in this case.
11  As I said before, the larceny evidence was put in through
12  witnesses who didn't -- through Mr. Castillo and the two lab
13  owners.  In contrast, the evidence of the false filings was
14  through the patients themselves and Dr. DeLuca.
15          At the end of the day, Dr. Morse was acquitted, and
16  that's how our system works.  The government has to prove its
17  case, but that doesn't mean that there wasn't any evidence to
18  support the charges.  It doesn't mean that anyone fabricated
19  evidence.
20          Now, as you deliberate, either today or tomorrow,
21  consider a few things.  Consider whether or not Grand Jury 7
22  and 11 actually contained any false information.  So we heard
23  from Dr. Morse.  He himself does not allege that they do.  The
24  Stacy Rodriguez spreadsheet contains accurate information
25  printed from the Medicaid system.

1           The spreadsheets, to the extent they didn't have tooth
2   numbers in them, are still truthful printouts of printing.
3   Even the Edwin Gonzalez spreadsheet contains truthful
4   information about three people.  Even Dr. Morse admitted this.
5           Think about whether or not anyone in this case set out
6   to confuse anybody when they created this document.  As I just
7   read to you earlier, the Rodriguez spreadsheet reflects what
8   Mr. Castillo printed out from the Medicaid system.  Maybe they
9   could have gone on and created a different spreadsheet that had
10  colored lines on it reflecting which were the adjusted claims
11  and which were not; but that doesn't mean that they set out to
12  deliberately confuse anyone.  They just simply used the sheet
13  that was printed out.
14          Now, with respect to the tooth numbers, again,
15  Mr. Fusto reasonably believed that it wouldn't affect the
16  nature of Dr. DeLuca's testimony.  That belief was validated
17  here in this courtroom.
18          And, finally, with respect to Edwin Gonzalez, would
19  Mr. Fusto really have created this spreadsheet, risked losing
20  his job, risked so much by intentionally trying to mislead
21  someone and then not even include a charge on it?  That doesn't
22  make any sense.
23          Also, as you deliberate, I want you to consider
24  whether or not Dr. Morse would have been arrested anyway.  In
25  other words, even if you find that some of the evidence was

1   false, it all related -- all the evidence the plaintiff alleges
2   was false here related to the false filing charges.  None of it
3   related to the grand larceny charge.  As a result, the result
4   from the grand jury would have been the same.  The grand jury
5   would have indicted on the grand larceny charge.  Dr. Morse
6   would have been arrested anyway.  That means that he would have
7   been deprived of his liberty in any event.
8           Now, a few words about credibility, which plaintiff's
9   counsel talked about in his statement.  With respect to
10  Mr. Castillo, he created notes.  He created notes to help him
11  testify before the grand jury and again before trial.  I think
12  this shows that he was a conscientious person.  He wanted to
13  make sure that his testimony was accurate.
14          It also may reflect some belief in himself that maybe
15  he is not the best person to remember things.  Maybe you saw a
16  bit of that here.  That doesn't mean that he was the kind of
17  person who would make something up, try and convict someone
18  based on false evidence.
19          Likewise, Mr. Fusto, the person, who seriously
20  considered lowering the grand larceny charge.  He didn't deny
21  that he was the one.  He didn't make up some story about Edwin
22  Gonzalez.  He didn't deny that he didn't see the minus signs in
23  the spreadsheet concerning Stacy Rodriguez.
24          Now, defendants certainly think that you shouldn't
25  find any liability in this case; but, if you do, I want to give

1   you a few thoughts about whether you should award any damages.
2           When Dr. Morse was indicted he was nearly 59 years
3   old.  He wants to tell you now that he would have earned
4   $6.1 million if he had not been indicted.  I won't repeat all
5   the points that Mr. Erath made this morning on about why that
6   $6.1 million figure doesn't make any sense, but consider
7   whether Dr. Morse would have really worked until he was 74 and
8   consider about whether his income would have continued to climb
9   even as the Park Slope neighborhood gentrified and there were
10  fewer Medicaid patients.
11          Most importantly, I want you to consider the
12  handwritten job applications that Dr. Morse sent out and ask
13  yourself whether Dr. Morse has seriously given effort to
14  finding a job, a new job, after his indictment.  Indeed, the
15  one entity who appears to have known about Dr. Morse's
16  indictment, New York Methodist Hospital, actually hired him
17  back.
18          In the end, Dr. Morse hasn't shown that he couldn't
19  have found a similar job, and therefore is entitled to nothing.
20          Mr. Norinsberg also talked a little bit about punitive
21  damages and the message that you could send.  I think if you
22  award punitive damages in this case you will be sending the
23  message that people who use truthful and accurate information
24  need to worry about the being sued for fabrication of evidence.
25          Finally, you are going to be asked one question, one

**JA517**

1  straightforward question at the end, about the creation of
2  Grand Jury Exhibits 7 and 11.  Auditor Castillo testified that
3  he created the documents from the database of Medicaid claims,
4  and his testimony was clear that they were created around
5  February 2006, shortly before the grand jury presentations
6  began on March 2, 2006.
7        This timing is consistent with what we saw in the
8  records from Investigator Flynn.  His subpoenas to grand jury
9  witnesses who were Medicaid recipients were dated February 10
10  and were served the subpoena on February 16.  And so it makes
11  sense that you prepare the spreadsheets for the witnesses you
12  plan to use at around the time you have identified who is going
13  to actually testify.
14        Plaintiff's counsel will say, well, there were other
15  spreadsheets and they may have been derived from those; but
16  when you deliberate look at those other spreadsheets and look
17  at whether or not they contain an invoice number column.  The
18  invoice number column is critical to the false filing charges.
19  When we looked at the indictment, each of counts two through
20  twelve has the invoice number in it.  Those older spreadsheets
21  don't have the invoice number, and so Grand Jury Exhibit 7 and
22  11 could not have been derived from them.
23        Finally, to the extent there may be one spreadsheet in
24  the record that has the invoice number column, look at who is
25  in that collection of documents.  It's the same people who

1  testified in the grand jury, plus two additional people who
2  appear on Investigator Flynn's list of proposed grand jury
3  witnesses, Eric Feliciano and Aviles.
4        So again, that spreadsheet is consistent with the idea
5  that Grand Jury Exhibits 7 and 11 were created shortly before
6  the grand jury for the use to which they were ultimately put.
7  They were put to use in the grand jury.
8        Finally, Dr. Morse wants to tell you that he got a raw
9  deal.  The truth is he has already had his day in court.  After
10  his indictment, he was found very guilty -- he was found not
11  guilty.  That's a very high standard.  It's a standard of proof
12  beyond a reasonable doubt.  It doesn't mean that evidence was
13  fabricated.
14        In this case he is trying do something else.  He is
15  trying get $6.1 million from Mr. Fusto and Mr. Castillo.  All
16  the defendants did in this case was pursue an investigation.
17  They relied on truthful, accurate information in doing so.
18        During this case, plaintiff's counsel has picked over
19  every single aspect of their prosecution.  Mr. Norinsberg is
20  extremely thorough, but at the end -- he goes over everything
21  in meticulous detail, but at the end of the day he and his
22  client cannot point to anything in Grand Jury Exhibits 7 and 11
23  that's false.  They contain accurate information.
24        Thank you.
25        MR. NORINSBERG:  This is the last round, I promise,

1  and I'm not going to be that long with you.  There are some
2  things that I really do want to address with you, though.  It's
3  disturbing to sit there and listen to some of the things, and I
4  just really would like to clarify the record.
5        The suggestion that Mr. Fusto was honest because he
6  admitted that he is the one that directed the tooth numbers to
7  be removed.  Ladies and gentlemen, the only reason he admitted
8  that was after I cross examined him repeatedly and showed that
9  his deposition testimony was inconsistent with what he was
10  saying to the jury now.  I don't feel that from somebody coming
11  up here and tell you that he is being honest like that, that's
12  really distortion of the record.
13        The idea that we admitted in some way from what
14  Dr. Morse said on Friday that these are accurate records is
15  misleading.  From day one, from the start of this trial, we
16  talked about Stacy Rodriguez.  We told you -- and I stand by
17  that 100 percent -- it's a false document.  It shows nine
18  procedures when we know 100 percent three were performed.  What
19  do you call that?  What other work would there be?  How would
20  you describe that?
21        A true document would be three procedures would be
22  showing; and you have to understand, ladies and gentlemen, they
23  hammered him with this, with Dr. DeLuca, the nine procedures.
24  It wasn't just about that it got before the grand jury.  They
25  hammered him on that.  That was the very first point.

1        To suggest that Mr. Fusto didn't know about that, I
2  think that's just not being honest here.  You have to look at
3  the reality.  The idea that these Edwin Gonzalezes, there were
4  SIN numbers on there, so the grand jury should have known that
5  these were different people?  You folks are jurors.  Who would
6  possibly know if you weren't in a courtroom and dealing with
7  SIN numbers, how would you possibly know looking at that
8  exhibit?  How would you know that in fact you are dealing with
9  three separate people?
10        This is not something that we are saying.  It's not
11  guesswork on our part.  I read to you before the transcript
12  from Mr. Castillo himself.  He was directed to present this in
13  that way; and now it's all just a big understanding?
14        It's amazing to me.  These people will not acknowledge
15  any responsibility.  It's always someone else's fault.
16        Dr. Morse's fault, it's his fault he didn't keep the
17  records.  It's his fault the way he did business.  It's the
18  lab's fault, they didn't keep proper records.  It's not the
19  investigators' faults, that they sat on it for two years and
20  didn't even take the original records when they had the chance.
21  It's the lab's fault, or it's the Medicaid patient's fault,
22  everyone's fault except for the people that actually did this.
23        Ladies and gentlemen, this notion you were told about,
24  this Mr. Castillo using these questions and answers, if it's
25  just a legitimate thing that he was doing, then I have a

**JA518**

1  question:  Why not simply come clean with it, acknowledge it,
2  and be honest, be truthful?  Just say, yes, I did write the
3  questions and answers, here is why.
4        But that's not what happened.  He actually testified
5  under oath that he never did that, and Fusto testified under
6  oath that he would never do that with a witness; and yet that
7  happened in this case.  That's exactly what happened.
8        Now, this thing -- I just wanted to say with the
9  missing tooth numbers, this is really disturbing, the idea that
10  this somehow is just an inconsequential thing that they did.
11        Here is testimony from Dr. DeLuca.  This is what she
12  herself was confused.  Here is what she says, page 13 of the
13  grand jury transcript.
14        I don't know exactly why this was listed the way it
15  is, because if there were six or seven teeth involved it should
16  list the teeth and the service once, in my opinion, but I don't
17  know why it's listed that way.
18        That's the whole point, ladies and gentlemen.  There
19  were six or seven teeth involved, but no one would ever know
20  that.  At the end of the day, whether they did this knowingly
21  or recklessly, they did it to him; and at the end of the day
22  they are accountable for it.
23        The grand jury was sold a bill of goods here.  There
24  is no question, and if you look at that evidence, look at it
25  carefully.  I suggest what you do.  Imagine you are the grand

1  jury.  Just imagine you had no lawyer here cross-examining
2  anyone.  Imagine all you did was see the triple billing,
3  imagine you saw these three patients, imagine for the three
4  Edwin Gonzalezes imagine that you saw repair, replace, repair,
5  replace, repair, replace 18 times.  Imagine.  What would you
6  think as a grand juror?
7        It's a tainted indictment.  It's the red dye I told
8  you about before.  It's infected.  You can't do what they are
9  suggesting.  You can't pull out the water and separate it from
10  the red dye.
11        If you folks were in that grand jury, odds are very
12  good that if you didn't hear anything that you heard in this
13  trial, you folks would have done it too.  You would have
14  indicted too, because you would be basing it on the evidence
15  that was presented.  It was false, misleading, and deceptive.
16        For counsel for the defense to suggest that in any way
17  we backed off that claim, that's absolutely, emphatically not
18  true.  What our trial has been about is false, misleading,
19  dishonest, deceptive evidence.  Nothing has changed about that.
20        And any grand jury or if you as jurors, if you were in
21  the shoes of that grand jury and you didn't see the evidence
22  you saw here in this trial, the result probably would have been
23  the same.
24        Now, counsel read for you.  He read some grand jury
25  testimony to you.  There is a lot more to this case.  The one

1  thing I notice counsel didn't read to you, he didn't read to
2  you from some of the other patients.
3        I would like to just read, please.  Mr. Othman.
4        THE COURT:  Is this grand jury testimony?
5        MR. NORINSBERG:  This is grand jury testimony, page 6.
6        Question:  Do you remember what work was done in your
7  mouth at that location?
8        Answer:  Yes.
9        By that dentist?
10        Answer:  It was two bridges on the bottom.
11        (Continued on the next page.)

1        MR. NORINSBERG:  "Question:  Uh-huh."
2        "Answer:  And one was on the top."
3        "Question:  Well, what was done."
4        "Answer:  It was the metal pieces."
5        "Question:  Yeah."
6        "Answer:  It was two metal pieces like the bridge and
7  there's one cap, small cap in the front."
8        "Question:  Okay.  Now, you mentioned that you have --
9  do you have partial dentures, partials."
10        "Answer:  Partials."
11        "Question:  You know what a denture is, it's fake
12  teeth."
13        "Okay."
14        When he asked it that way:  "Answer:  Fake teeth,
15  yeah."
16        "Okay.  How many teeth in your mouth are fake."
17        "Answer:  All right."
18        "Question:  In other words, how many did he do for
19  you."
20        "Answer:  How many did he do for me?  It comes on the
21  bridge.  It's like four teeth, the one you take out."
22        "Question:  Right.  And you have two bridges."
23        "Answer:  Two bridges, each comes in like five teeth
24  on the bridge."
25        "Question:  So each bridge has five teeth."

1    "Yes."

2         Dr. Morse did the denture work he said.  It's in here.

3    This person admitted, yet there's still a false filing charge

4    that he's indicted for.  Why?  It's obvious that false evidence

5    influenced the grand jury.

6         Here's another one.

7         MR. MILLER:  Objection.

8         THE COURT:  Can I just see you at sidebar for a

9    moment?

10         (Sidebar.)

11         (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARIE FOLEY, RMR, CRR

---

1         (Sidebar conference held on the record out of the

2    hearing of the jury.)

3         THE COURT:  I don't want a speaking objection.  Mr.

4    Miller.

5         What's your objection?

6         MR. MILLER:  Is that he's introducing another alleged

7    fabrication.  He's bringing in the idea that the testimony was

8    false before the grand jury, which is not part of this case.

9         THE COURT:  I didn't think he was saying it was false.

10    I thought he was saying they gave that testimony and they still

11    had a charge against him.

12         MR. NORINSBERG:  That's exactly it.

13         THE COURT:  I don't know what that means one way or

14    the other, quite frankly.

15         MR. MILLER:  I may have misunderstood.

16         THE COURT:  Are you going to wrap this up?

17         MR. NORINSBERG:  Five minutes.

18         (Sidebar end.)

19         (Continued on following page.)

20

21

22

23

24

25

MARIE FOLEY, RMR, CRR

---

1         (In open court.)

2         MR. NORINSBERG:  Here's another example,

3    Sawson Suliman.

4         "Question:  Okay.  And do you have dentures?"

5         The answer:  "Dental?"

6         "Question:  Dentures, fake teeth."

7         "Answer:  Yeah, I have."

8         He was indicted on that too, on that false count.

9    Why?

10         THE COURT:  Which person is this?

11         MR. NORINSBERG:  This is Sawson Suliman.

12         The point being, ladies and gentlemen, it's that false

13    evidence.  Having that doctor get up there and talk about all

14    these procedures obviously impacted the grand jury.  Obviously

15    it made this guy look like he's a phony, like he's billing for

16    things he never did, and that clearly tainted everything else

17    because here you have patients that are admitting that they

18    actually have dentures and have denture work done and still the

19    false filing charges they're indicting him on.  Obviously this

20    fabricated evidence had a major, major impact on these

21    proceedings.

22         Now, this one final question which Mr. Miller

23    mentioned to you, this is the last question on the verdict

24    sheet, and this is a question that's an extremely, extremely

25    important question to get right.  You'll hear from the judge,

MARIE FOLEY, RMR, CRR

---

1    the judge is going to charge you with respect to an immunity

2    claim that these defendants are making, and the judge is going

3    to decide that issue, the immunity, whether they get immunity.

4    Your role in this is to decide a factual question which decides

5    essentially do they get immunity and get off the hook or not.

6    All the marbles are riding on this last question.

7         Here's the question:  "Has defendant John Fusto proven

8    by a preponderance of the evidence that he created or directed

9    the creation of the billing summaries, Grand Jury 7 and 11, in

10    connection with preparation for the presentation of evidence to

11    the grand jury?"  And then the same question is for Jose

12    Castillo.

13         Ladies and gentlemen, everything is riding on that

14    last question.

15         Now, the answer --

16         THE COURT:  Ladies and gentlemen, I'm sorry, you will

17    just be called upon to determine the factual issue that that

18    question asks.  That's all you're being required to do, and

19    it's the burden of proof, as the question indicates, is on the

20    defendant, but you're just being asked to answer that question.

21    The result of what happens as a result of that is a legal

22    determination that you need not concern yourselves with.

23         MR. NORINSBERG:  Now, ladies and gentlemen, as you

24    just heard from the judge, the last two questions, the

25    defendants have to prove it, and all I would suggest to you,

MARIE FOLEY, RMR, CRR

Rebuttal - Norinsberg

1 and again I put it back in your hands, they have not proven
2 anything. The questions here, the last two questions, the
3 answer is "no," "no." They proved nothing. What they have
4 proved is everything -- when they come into this courtroom,
5 they tell you day, it's night. If they tell you black, it's
6 white. Everything they say has turned out to be not true, it's
7 the opposite.
8        And it's up to you, this is something I trust your
9 conscience that you're going to give this case everything that
10 you can because you see hard we've been fighting for this case,
11 and now we want you in the last day to do the right thing on
12 justice here.
13        Now, ladies and gentlemen, our view is that that last
14 question, you'll hear the law from the judge, they have not
15 established anything. What they have proven there are billing
16 summaries that go back in time that look very similar all the
17 way back to 2003 or 2005. Our view is that these -- whenever
18 they created this, we don't care. It's the fact that they
19 created it and used it to fill in gaps in their case and to say
20 that it was solely for the grand jury, it could have been for
21 the trial, it could have been early in the investigation, it
22 could have been when there were problems that first came out.
23 You'll decide that, but our view is you'll see they actually
24 have similar summaries with additional patients who never came
25 to the grand jury, ever, ever. So obviously it wasn't just

---

Rebuttal - Norinsberg

1 solely for the grand jury. The answer to those questions
2 should be "no."
3        Ladies and gentlemen, at the end of the day, this
4 lawsuit, as you have heard, has gone on for five years. For
5 five years these defendants have denied responsibility. For
6 five years they've refused to accept any blame for what
7 happened here. For five years they've gotten off completely
8 without any accountability here. This is the last chance that
9 we're going to have, ladies and gentlemen, the last chance.
10 What happened to this man, what happened to him in this grand
11 jury when he was indicted, it was wrong. He was wrongfully
12 indicted. It was not fair. It was an injustice, but I'll tell
13 you one thing, if you let these two defendants walk out that
14 door scot-free without holding them accountable, that's a
15 travesty of justice, a travesty. And you can't undo what the
16 other grand jury did, but you have this in your power now. At
17 long last, hold these two defendants accountable. Don't let
18 them get off the hook.
19        Thank you.
20        THE COURT: Ladies and gentlemen, at this point,
21 because I cannot complete my instructions to you in the time
22 left before four o'clock, I'm going to excuse you. I don't
23 want to break up the jury instructions between today and
24 tomorrow. It would be better if we just did them all at one
25 time.

---

Morse v. Spitzer

1        So I'm going to excuse you with the admonition not to
2 discuss the case. Of course I've told you not only not to
3 discuss the case with anyone else, but not even as among
4 yourselves. So even at this point, even after you've heard the
5 summations, you are still not to discuss the case among
6 yourselves. You won't do that until after I instruct you
7 tomorrow on the law and I excuse you to begin your
8 deliberations. So if a few of you get back here tomorrow
9 morning and you're sitting in the jury room waiting for us to
10 begin, don't talk about the case then either. It's not the
11 time yet.
12        Have a nice evening. I'll see you tomorrow morning
13 9:30. Thank you.
14        (Jury exits the courtroom.)
15        (Continued on following page.)
16
17
18
19
20
21
22
23
24
25

---

Morse v. Spitzer

1        THE COURT: Mr. Norinsberg, I'm going to have to
2 change or either come up with some instruction to deal with the
3 problem that was just created by what you said to the jurors
4 about this exhibit being solely for use in the grand jury. You
5 said if they made up this exhibit to use at trial, then you
6 can't answer that question that way. That's not right. If
7 they created this exhibit, it can't have been created just for
8 trial, but if it was created in connection with grand jury and
9 trial, we'll use this exhibit later at trial, they still have
10 absolute immunity. So how did you make that argument to the
11 jury.
12        MR. NORINSBERG: Because if they're investigating the
13 case, Your Honor, and they decide we've got problems right now,
14 let's create a document that fills in the gaps, it doesn't
15 matter. What if they used it only at trial. The point is if
16 they create it while you're --
17        THE COURT: That's not what you said. You said if
18 they created this, it's got to be solely for the grand jury.
19 If they created this exhibit for trial, then you have to find
20 against them on that question, and that's not correct. That's
21 confusing.
22        MR. NORINSBERG: Well, you know what, Your Honor, they
23 have the burden of showing it was solely created for the grand
24 jury. Whatever purpose besides the grand jury that they
25 created it for would be improper. They're not going to get

**JA521**

1  absolute immunity on it.
2       THE COURT:  Are you kidding me?  What if they created
3  it for trial?  They get absolute immunity if they create an
4  exhibit for trial.
5       MR. NORINSBERG:  If they do it during the
6  investigative phase?
7       THE COURT:  That's not the way you said it.
8       MR. NORINSBERG:  You know, judge, I'm sorry.  I'm
9  doing the best I can.  I'm fighting as hard as I can.  I'm
10 sorry, I didn't mean to mislead the jury.
11      THE COURT:  Well, I have a problem with the way the
12 interrogatory is phrased now in light of what you said.
13      MR. NORINSBERG:  Do you really think, Your Honor,
14 tomorrow when you give them the instructions that they're going
15 to be fixating on what I said here at 4:30?
16      THE COURT:  I'm sure you hope they are.  I'm sure you
17 wouldn't have worked so hard on your summation and given a good
18 summation if you didn't think they were going to rely on it.
19      MR. NORINSBERG:  I'm sure they're not going to be
20 thinking about that one particular angle.  I mean, that's just
21 not what the thrust of my argument was.  If I misspoke, it
22 wasn't intentional.  My point was --
23      THE COURT:  I'm not saying you even thought it was
24 intentional.  I'm saying it's created a problem in my mind.
25      MR. NORINSBERG:  I feel like fixing that problem is

---

1  going to draw an undue amount of attention to something that
2  would have no bearing how they're going to decide this case.
3  They're not going to decide that question because they think
4  oh, this might have been a trial exhibit so they don't win on
5  that issue.  I just don't see that based on the evidence.  It's
6  going to be either they believe their story --
7       THE COURT:  Then why did you say it?
8       MR. NORINSBERG:  I made a mistake.  Maybe a word came
9  out of my mouth.  I shouldn't have used "trial."  What I meant
10 to say was for any other purpose other than the grand jury.
11 That's what I meant to say.
12      THE COURT:  Well, it could have been for another
13 purpose that they would still have immunity for.
14      MR. NORINSBERG:  But, Your Honor, you told me before
15 the summation you agreed with the language "solely" and I was
16 relying on that for --
17      THE COURT:  Well, I didn't know you were going to do
18 that.  I didn't know you were going to suggest that if it was
19 created at trial or it was a trial exhibit that that would mean
20 they don't have immunity for that.
21      MR. NORINSBERG:  I think it would be giving it undue
22 influence.  The jury is not going to be focusing on whether
23 it's for trial.  The only evidence they've heard in this case
24 it was either for the grand jury or it was some time during the
25 investigative phase, which is what your instructions say.

---

1  That's the issue.  You describe the issue in your charges.  I
2  don't see how they could possibly misunderstand that.
3       THE COURT:  Counsel, do you want to be heard on this?
4       MR. MILLER:  Yes.  I think maybe a way of solving it
5  is by including something in the instructions themselves that
6  doesn't specifically point to what Mr. Norinsberg said but
7  deals with the issue of trial as distinct from the grand jury
8  and leaving the interrogatory the way it is.
9       THE COURT:  Well, maybe you all want to try and come
10 up with something together that you believe would solve the
11 problem.
12      MR. MILLER:  We can do that, Your Honor.
13      THE COURT:  If you can propose some language maybe in
14 the charge that might deal with the issue.
15      MR. MILLER:  Sure.
16      THE COURT:  Is there anything else that we need to
17 address before tomorrow?
18      MR. NORINSBERG:  No, Your Honor.
19      MR. MILLER:  No, Your Honor.
20      THE COURT:  Okay.  I'll see everyone at 9:30 then.
21      MR. MILLER:  Thank you, your Honor.
22      (Pause in the proceedings.)
23      THE COURT:  I do want you all to see I did put the
24 questions on the verdict sheet that you asked for,
25 Mr. Norinsberg, about past and future and number of years, and

---

1  then I added one section of the instruction about past earnings
2  and future earnings.
3       MR. NORINSBERG:  Okay.
4       THE COURT:  I wasn't going do that, but then I thought
5  they needed to know why we were asking about years and all.
6       MR. NORINSBERG:  So it's in the instruction as well?
7       THE COURT:  Yes.
8       Do you all want to look at it now?
9       (Pause in the proceedings.)
10      THE COURT:  Did you all get a chance to look at it?
11      MR. MILLER:  At first glance, it looks fine, Your
12 Honor.
13      THE COURT:  But there's also a change to the body in
14 my charge.  It's at page 14.
15      (Pause in the proceedings.)
16      MR. MILLER:  It looks fine.  Thank you.
17      THE COURT:  I think it came out of yours,
18 Mr. Norinsberg.
19      MR. NORINSBERG:  Okay.
20      THE COURT:  All right.  So I'll see everybody in the
21 morning.
22      (Time noted:  3:46 p.m.)
23      (Proceedings adjourned to Tuesday, February 12, 2013
24 at 9:30 a.m.)
25

**JA522**

Morse v. Spitzer

1      I N D E X

2          WITNESSES

3      LEVON AHARONYAN

4          Direct/Miller              1200

5          Cross/Norinsberg           1210

6      CHRISTOPHER ERATH

7          Direct/Farber              1218

8          Cross/Norinsberg           1232

9      Summation – Norinsberg         1287

10     Summation – Miller             1338

11     Rebuttal – Norinsberg          1361

12

13              EXHIBIT

14          M-1            1209

15              o O o

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

**JA523**

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
 3   ------------------------------------x
     DR. LEONARD MORSE,
 4                        Plaintiff,
 5        versus                    07 CV 4793 (CBA)
 6   ELIOT SPITZER, ET AL.,
                                     U.S. Courthouse
 7                        Defendants. Brooklyn, New York
 8   ------------------------------------x
                                     February 12, 2013
 9                                   9:30 a.m.
10            Transcript of Civil Cause for Trial
11   Before:     HONORABLE CAROL B. AMON,
                           District Court Chief Judge
12               (and a jury.)
13                      APPEARANCES
14   Attorney for Plaintiff:
     JON L. NORINSBERG, ESQ.
15   255 Broadway, Suite 2700
     New York, New York 10007
16
     Attorney for Defendant:
17   ERIC T. SCHNEIDERMAN, ESQ.
     NYS Attorney General
18   120 Broadway, 12th Floor
     New York, New York 10271
19   BY:  CHRISTOPHER J. MILLER, ESQ.
          SETH J. FARBER, ESQ.
20
     Official Court Reporter:
21   MICHELE NARDONE, CSR, RPR, CRR
     225 Cadman Plaza East
22   Brooklyn, New York 11201
     Phone:  718-613-2601
23   Fax:  718-613-2631
     Email:  Mishrpr@aol.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
 1        (In open court.)
 2        THE CLERK:  Morse versus Spitzer.
 3        Please state your appearances for the record.
 4        MR. NORINSBERG:  John Norinsberg on behalf of
 5   Plaintiff Leonard Morse.
 6        MR. MILLER:  Christopher Miller from the office of the
 7   Attorney General in Manhattan, for Defendants John Fusto and
 8   Jose Castillo.
 9        MR. FARBER:  Seth Farber, also from the Office of the
10   Attorney General, for the defendants.
11        THE COURT:  Good morning.
12        MR. NORINSBERG:  Good morning.
13        MR. MILLER:  Good morning.
14        THE COURT:  Is there something we had to take up?
15        MR. NORINSBERG:  Yes.  You suggested counsel add
16   perhaps a sentence to explain or qualify some of the remarks
17   with respect to the immunity issue.
18        Counsel had come up with some language.  I reviewed it
19   with fresh eyes this morning.  I was largely in agreement with
20   the language that he made.  I made very minor revisions.
21        And then counsel informed me this morning that he no
22   longer wants the language that he himself proposed.  So I don't
23   know where that leaves us at this point.
24        MR. MILLER:  That's not exactly where we are, your
25   Honor.
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
 1        You know, I proposed some language last night.  I
 2   still think that language should be included in the
 3   instructions themselves.  But having read the transcript of
 4   yesterday this morning, I noticed that the very first
 5   alternative that Mr. Norinsberg offered to the idea that 7
 6   and 11 were created for the grand jury was trial.
 7        You know, I think we should revisit the issue of
 8   whether "solely" goes in the instructions and in the
 9   interrogatories themselves.  I think "solely" -- the pitch
10   yesterday on "solely" was that the parties' contentions were
11   very clear; that we were arguing that the documents were
12   created for grand jury, and he was arguing an investigation;
13   and that's not what happened yesterday.  He brought up the
14   trial.  He brought up it could have been created for anything.
15        So I think at this point we should go back to the way
16   you originally had the instructions, which was without the word
17   "solely" in the description of the parties' contentions in
18   section ten and without the word "solely" in the
19   interrogatories at the end.
20        In addition, I would propose that we add the language,
21   which I can read to you, that just addresses the trial issue in
22   the instructions at the very end of section ten; and the
23   language is as follows:  "For the purposes of deciding this
24   question only" --
25        THE COURT:  Where are you?  I'm sorry.  Page what?
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

```
 1        MR. MILLER:  Section ten on the special interrogatory.
 2        THE LAW CLERK:  Page 16.
 3        MR. MILLER:  Do you have it, your Honor?
 4        THE COURT:  Uh-huh.
 5        MR. MILLER:  So at the very end of that I would also
 6   add the language that I proposed last night, which was, "For
 7   the purposes of deciding this question only, you should
 8   consider any judicial proceeding that follows the grand jury,
 9   such as a trial, to be an extension of the grand jury and
10   therefore part of the grand jury."  I have the language here,
11   your Honor, if you would like to see it.
12        THE COURT:  Where do you want that to go in?  In
13   connection with preparation for --
14        MR. MILLER:  It would go at the very end of section
15   ten.  Add a new last sentence to paragraph two of section ten.
16        THE COURT:  Read it again to me.  For the purposes of
17   what?
18        MR. MILLER:  For the purposes of deciding this
19   question only.
20        THE COURT:  You said you have it written down.  I need
21   to see it.
22        (Mr. Miller handed up a document.)
23        THE COURT:  Could all of this be -- I'm wondering
24   whether we can solve the problem by saying defendants contend
25   that Grand Jury 7 and 11, that they created 7 and 11 in
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1 connection with the presentation of evidence to the grand jury
2 and not as a part -- and not as a part of the investigation of
3 this case. So it makes that clearer. Maybe taking the
4 "solely" out, and then plaintiffs contend that they were
5 created. Maybe that would at least solve that problem.
6 In other words, defendants contend they created Grand
7 Jury Exhibits 7 and 11 in connection with the preparation for
8 the presentation of evidence to the grand jury and not as a
9 part of the investigation of the case.
10 MR. MILLER: And not as a part of their investigation
11 of the case?
12 THE COURT: Right. Does that work, and then take
13 "solely" out?
14 MR. MILLER: Well, I would think we take "solely" out
15 there and also in the interrogatories there as well.
16 THE COURT: Well, then, I guess I will add that
17 language in the interrogatories too and so we make that point.
18 That seems to me to solve it.
19 Then we can say -- the problem with this last thing is
20 for the purposes of deciding this question only. I don't know
21 that the jury is going to understand what that means. I don't
22 know if it's worth highlighting, actually.
23 You see, there is just no basis for them -- I mean,
24 the problem I have, even with the argument, is that there is
25 nothing on the record that in any way suggests that this was a

1 trial exhibit.
2 MR. MILLER: It's undisputed that it was created prior
3 to the grand jury. Maybe we can mention that.
4 MR. NORINSBERG: Your Honor, when you read the charge
5 that you have, when you read it with fresh eyes this morning,
6 it perfectly covers the issue for both sides. It covers my
7 argument, it covers defense argument, it reflects the evidence
8 as it was presented. There is no need to change this at all.
9 There is no confusion. It's crystal clear, and I
10 think we are spending a lot of time on an issue that the court
11 has already adequately covered in the charge as it exists.
12 THE COURT: Well, I mean, you know, I didn't create
13 the problem. I mean the problem was created in part by the
14 argument that was made.
15 MR. NORINSBERG: I don't recall counsel objecting to
16 that. At some point the court sua sponte --
17 THE COURT: Does it make a difference to object to it?
18 Grant you, counsel, my role is to make sure that something is
19 fairly presented; and when I hear something that is a clear
20 misstatement of what the jury has to consider, it's my
21 obligation to ensure that the jury is not confused.
22 MR. NORINSBERG: I understand. But the position the
23 defendants have taken consistently in this litigation is that
24 this document was created solely for purposes of grand jury
25 use, and they did that in their motion for absolute immunity.

1 THE COURT: But it conveys the same thing. The
2 problem I have with "solely" now is that the argument that was
3 made that would confuse the jury about what solely means, and
4 that's been introduced by the argument. So I think that the
5 term "solely" -- and I will say that it has been in connection
6 with the preparation, the presentation of evidence to the grand
7 jury and not as a part of the investigation of the case, and
8 that clearly sums it up.
9 Then you say it was created during the investigatory
10 and not in preparation for present. That correctly states the
11 law, and I think it means also that I don't have to give any
12 additional charge about trial or anything else, which I think
13 will just confuse matters. So that's how I'm going to change
14 it.
15 MR. NORINSBERG: Your Honor. Just on the word
16 "solely," I asked the court before I summed up on it.
17 THE COURT: Well, I will tell the jury.
18 MR. NORINSBERG: I read it to them.
19 THE COURT: I know. I will take care of that.
20 MR. NORINSBERG: It's not fair. That's their
21 position. They should be estopped from changing their
22 position.
23 THE COURT: They are not changing their position. The
24 problem is with how "solely" was used in the summation.
25 Now, if you want, I will tell the jury that -- if you

1 want me -- I don't know that you want me to highlight it. If
2 you want me to, I will be happy to tell the jury that counsel
3 appropriately read the jury interrogatory as it had been
4 fashioned at that point in time, after discussions with the
5 parties, you know, or something, the court changed the exhibit.
6 I don't know that you want me to do that, but I will be happy
7 to do that if you have a question about your concern that the
8 jury would think that you said something, that you were
9 misreading something on purpose. If you want me to fashion
10 something to say to the jury, I will be happy to do that.
11 But the problem is, I think, with the way in which you
12 used it, and rather than go into some explanation about a trial
13 and all of that, I think I can clarify it in that way; and
14 that's what I intend to do.
15 I understand your problem. If there is something you
16 want me to say to the jury, I will be happy to do that, and
17 tell them that you weren't misreading anything, that you were
18 appropriately reading the interrogatory. I don't know that you
19 want me to call it to their attention.
20 MR. NORINSBERG: Judge, I just want to point out right
21 after I introduced that section, I talked about it. I
22 immediately talked about you will remember there are records in
23 evidence that go back to 2003 that September. There is another
24 one from 2005.
25 THE COURT: So.

**JA525**

1  MR. NORINSBERG: They haven't proved it was solely in

2  connection. That was the essence of my argument. I relied on

3  the court's instruction. I made one stray remark about a

4  trial, but that doesn't change the argument I made, which I

5  relied on.

6  It's incredibly prejudicial now. I want it read back,

7  the transcript of what I actually said, because I remember

8  specifically talking about 2003, 2005. Those are pre-grand

9  jury proceedings. It's terribly unfair now to change this.

10  THE COURT: Your argument doesn't change at all. It

11  doesn't make your argument any less compelling.

12  MR. NORINSBERG: It does. You are giving them a huge

13  advantage by taking the word "solely" out. Now it could be

14  anything.

15  THE COURT: No, it's not. I'm going to say, and not

16  as a part of the investigation of the case, which is what your

17  argument was.

18  MR. NORINSBERG: No. My argument was it was part of

19  the investigation. It wasn't solely for the grand jury.

20  Their position has been from day one it's solely for

21  the grand jury. That was the whole thing, and now I argued

22  that. I committed myself.

23  THE COURT: This is what it says. It says it was

24  created in connection.

25  MR. MILLER: Your Honor, if you are looking for the

1  section in the transcript, I think it's at 1372.

2  THE COURT: Our view that these, whenever they created

3  this, we don't care. It's the fact that they created it and

4  used it to fill gaps in their case and to say that it was

5  solely for the grand jury. It could have been for trial. It

6  could have been earlier in the investigation. It could have

7  been whether there were problems that first came out. You

8  decide that.

9  MR. NORINSBERG: So there is one single reference

10  about trial. Everything else --

11  THE COURT: But it's confusing. You are basically

12  saying to the jury that it could have been at any time. It

13  could have been afterwards. It could have been subsequently.

14  Any time. You are basically saying to them it doesn't make a

15  difference when these exhibits were created.

16  MR. NORINSBERG: Your Honor, if you look further in

17  the transcript I said 2003, I said 2005. I said there were

18  documents about people that never showed up at the grand jury.

19  I clearly tied it to pre-grand jury.

20  And you had asked us to come up with language.

21  Counsel proposed language. I didn't want to do this, but I

22  agreed to the language to solve the problem.

23  THE COURT: The language doesn't make any sense.

24  MR. NORINSBERG: But the language, that's something

25  they came up with that I'm willing to do, but to change the

1  verdict sheet now after I committed my theory of the case for

2  one stray remark is unfair. It's prejudicial.

3  THE COURT: It's not unfair.

4  MR. NORINSBERG: It's terribly prejudicial.

5  THE COURT: All right. That's your position.

6  If you want me to say something to the jury about your

7  reading of the verdict sheet, I will. Just tell me if you want

8  me to make a statement to them about your reading of the

9  verdict sheet.

10  MR. NORINSBERG: What proposed language would the

11  court suggest?

12  THE COURT: Well, you can propose some or I can

13  propose some, that if you want me to make it general and not

14  pinpoint something, counsel may have read to you from the

15  verdict sheet yesterday during their summation. If you view

16  that something they said may be different from the verdict

17  sheet that you got, that's not the fault in any way of counsel,

18  that the court changed the portion of the verdict sheet after

19  their summations.

20  MR. NORINSBERG: That's fine. I just want to be

21  clear, though. My objection is still preserved on the record.

22  THE COURT: I think that's clear.

23  I think I will change it to read this way: Defendants

24  contend that they created Grand Jury Exhibits 7 and 11 in

25  connection with the preparation for the presentation of

1  evidence to the grand jury and not earlier as a part of the

2  investigation.

3  MR. NORINSBERG: Okay.

4  THE COURT: Here is the other question that I have,

5  not to complicate my life and yours. If we have -- they have

6  the special interrogatories, where I separated out by Fusto and

7  Castillo. Is there any conceivable view of the evidence here

8  that would suggest that it could be yes for one and no for the

9  other?

10  MR. NORINSBERG: On the immunity question?

11  THE COURT: Yes. I mean I think we would all be real

12  sorry if at the end of the day we get yes for one person and no

13  for the other person.

14  MR. NORINSBERG: Okay.

15  THE COURT: I just wonder if I could get -- I know I

16  separated it out. There may be some metaphysical, you know,

17  thought out there somewhere that it should be different, but I

18  can't actually see that it is different. I just think everyone

19  would be very unhappy with a verdict that had yes to one and no

20  to the other.

21  I would change it to read -- I can add to the verdict

22  sheet the language I just added to and not earlier as part of

23  the investigation.

24  MR. NORINSBERG: Fine.

25  THE COURT: But I would just change it to one

**JA526**

1 interrogatory, which reads, have Defendants John Fusto and Jose

2 Castillo proven by a preponderance of the evidence that the

3 billing summaries, Grand Jury Exhibits 7 and 11, were created

4 solely -- created in connection with the preparation for the

5 presentation of evidence to the grand jury and not earlier as a

6 part of the investigation. I just don't see that it's

7 different for either person.

8         So does that work for everyone?

9         MR. NORINSBERG: Yeah, that works for us.

10        MR. MILLER: I think so, your Honor.

11        THE COURT: Okay. Because I think if we got a

12 different answer you would be like what do we do now.

13        MR. MILLER: There can be differences in terms of

14 discretion, but I don't think that that's what this question is

15 getting at anyway. In other words, Mr. Fusto exercised

16 discretion in creating the document, which is sort of --

17        THE COURT: But that's not something I'm putting to

18 the jury.

19        MR. MILLER: Exactly. There may be a difference

20 there, but I'm not sure that's what the question the jury is

21 answering. Mr. Fusto clearly exercised discretion in choosing

22 fields and that sort of thing, but that's not what they are

23 being asked to decide.

24        THE COURT: This is just a timing question. So I

25 don't think it's different.

1         MR. MILLER: Right.

2         THE COURT: I will change the interrogatories too. So

3 that's how it's going to read.

4         Let me just read it to you, so everybody is on the

5 same page. Have Defendants John Fusto and Jose Castillo proven

6 by a preponderance of the evidence that the billing summaries,

7 Grand Jury Exhibits 7 and 11, were created in connection with

8 the preparation for the presentation of evidence to the grand

9 jury and not earlier as a part of the investigation, which

10 tracks the language in the instructions. Okay?

11        MR. MILLER: Okay.

12        (Pause.)

13        THE COURT: I gave you all a copy of the jury

14 instructions today. You know what language I'm going to add.

15 So I'm not going to recopy them right now, but the copy that

16 goes to the jury will be the copy that has the language in it.

17 But I am going to have my clerk go do the interrogatories

18 because I will have to explain them to the jury.

19        MR. NORINSBERG: Okay.

20        (Pause.)

21        THE COURT: Do you all the have the exhibits ready to

22 go in to the jury?

23        MR. NORINSBERG: Yes.

24        MR. MILLER: Yes, your Honor.

25        THE COURT: Could you all do me a favor and put in

1 like a separate like manila folder, something, Grand Jury

2 Exhibits 7 and 11 with your, you know, tell them what they are.

3         MR. MILLER: Yes.

4         (Pause.)

5         MR. NORINSBERG: Your Honor, we had actually put

6 together a brief description of each exhibit for our own use

7 internally. Do you think this would be helpful for the jury to

8 have as well?

9         THE COURT: If it's the description you have on your

10 verdict sheet, I think -- I don't know. Are you objecting to

11 it?

12        MR. MILLER: Yes. They are descriptions that claim

13 what the evidence is.

14        THE COURT: Yes, I think that's the problem.

15        MR. NORINSBERG: Okay.

16        THE COURT: Because in reading over descriptions you

17 sort of characterize them from your standpoint.

18        MR. NORINSBERG: Okay.

19        THE COURT: But you all have looked at each other's

20 exhibits and have agreed that everything is in evidence?

21        MR. MILLER: Yes, your Honor.

22        MR. NORINSBERG: Yes.

23        THE COURT: Okay. I just want to make sure.

24        But I think you should, as I say, put those in folders

25 and mark on the front, you know, like Grand Jury Exhibit 7 on

1 the front of the folder, in fairness to them.

2         (Pause.)

3         MR. MILLER: Your Honor, I thought maybe at the very,

4 very end say "their" investigation instead of "the"

5 investigation.

6         THE COURT: Is it worth making 14 additional copies of

7 it at this point?

8         MR. MILLER: No. Fine.

9         MR. NORINSBERG: No one is going to misunderstand what

10 it means.

11        (Pause.)

12        (Jury enters.)

13        THE COURT: All right. Ladies and gentlemen, please

14 be seated. I'm sorry for the delay in beginning. There were

15 just some last-minute matters that counsel and I needed to

16 address, but I'm ready to begin now.

17        Ladies and gentlemen of the jury, now that you have

18 heard all the evidence in the case and the argument on each

19 side, it's my duty to give you instructions as to the law

20 applicable in this case. It's your duty as jurors to follow

21 the law as I state it and to apply the law to the facts as you

22 find them from the evidence presented.

23        I'm going to begin by giving you some general

24 instructions. And I will then charge you about the particular

25 claim at issue in the case.

1    In the course of the trial attorneys may have referred
2  to some of the governing rules of raw.  If there appears to you
3  to be any difference between the law as stated by counsel and
4  the law as I state it to you now, it's my instructions on the
5  law that you must follow.  You should not single out any one
6  instruction as alone stating the law.  You should consider
7  these instructions as a whole when you retire to deliberate in
8  the jury room.
9    Now, you should not be concerned about the wisdom of
10  any rule of law that I state, regardless of any opinion that
11  you may have about what the law may be or should be.  It would
12  be a violation of your oaths as jurors to base your verdict
13  upon any other view of the law than that given to you in the
14  instructions.  In charging you on the applicable law, let me be
15  clear that I'm expressing no opinion about how you should
16  decide the facts of this case.
17    Nothing I have said or done in the course of the trial
18  should be taken by you as expressing any opinion about the
19  facts.  On occasion I may have asked questions of a witness.
20  You should attach no special significance to these because they
21  were asked by the court.
22    It is your function, not mine, to determine the facts.
23    Now, under your oaths as jurors you must be guided
24  solely by the evidence during the trial without regard to the
25  consequences of your decision.  You must perform your duties as

1  jurors without bias or prejudice as to any party.  The law does
2  not permit you to be governed by sympathy, prejudice, or public
3  opinion.  All parties expect that you carefully and impartially
4  consider all the evidence, follow the law as it is now being
5  given to you, and reach a just verdict regardless of the
6  consequences.  All prior persons and entities are equal before
7  the law.
8    Now plaintiff has brought his claim against two
9  defendants, Jose Castillo and John Fusto.  In reaching your
10  verdict you are directed to consider whether the plaintiff has
11  satisfied his burden of proof with respect to each of the
12  defendants individually.  That is, you could find that the
13  plaintiff has proven his case by a preponderance of the
14  evidence with respect to one defendant but not with respect to
15  the other.  Your verdict as to each defendant must be
16  determined separately with respect to that defendant, solely on
17  the evidence or the lack of evidence presented against that
18  defendant.
19    In a civil action such as this, the burden of proof is
20  on Plaintiff Leonard Morse, to prove every essential element of
21  his claim by a preponderance of the evidence.  If the proof
22  fails to establish any essential element of plaintiff's claim
23  by a preponderance of the evidence, the jury should find for
24  the defendants.
25    To establish something by a preponderance of the

1  evidence means to prove that it is more likely so than not.  In
2  other words, a preponderance of the evidence means such
3  evidence that, when considered and compared with the evidence
4  opposed to it, produces in your minds the belief that what is
5  sought to be proved is more likely to be true than not true.
6    A preponderance of the evidence means the greater
7  weight of the evidence.  The greater weight of the evidence
8  does not mean the greater number of witnesses or greater length
9  of time taken by either side, but what -- which witnesses and
10  evidence appeal to your minds as being most accurate and
11  trustworthy.
12    If you find that the credible evidence on a given
13  issue is in balance or evenly divided between the parties, or
14  that the evidence produced by the party having the burden of
15  proof is outweighed by evidence against his claim, then you
16  must decide that issue against the party having the burden of
17  proof or the plaintiff in this case.  That is because the party
18  bearing the burden, in this case the plaintiff, must prove more
19  than simple equality of evidence.  He must prove the element at
20  issue by a preponderance of the evident.
21    On the other hand, the party with the burden of proof
22  need prove no more than a preponderance.  So long as you find
23  that the scales tip, however slightly, in favor of that party,
24  that what it claims is more likely true than not true, the
25  element has been proved by a preponderance of the evidence.

1    Now, your verdict in this case must be based only on
2  the evidence.  The evidence upon which you are to decide the
3  facts of this case comes in several forms.
4    First, the sworn testimony of witnesses, both on
5  direct and cross-examination and regardless of who called the
6  witness.  Second, exhibits that may have been received by the
7  court in evidence.  Third, facts to which the lawyers have
8  agreed or stipulated.  A stipulation is an agreement among the
9  parties that a certain fact is true.  You must consider such
10  stipulated facts as true.
11    Finally, any fact that the court may have instructed
12  you to accept is true, you must consider these facts as true.
13    Certain things are not evidence and must be
14  disregarded by you in deciding the facts of this case.
15  Arguments, remarks, questions, and objections by the attorneys
16  are not evidence.  Nothing said or done by the court is
17  evidence.  Obviously, anything you may have seen or heard
18  outside the courtroom is not evidence.  Any evidence ordered
19  stricken by the court must be entirely disregarded by you in
20  your deliberations.
21    There are generally speaking two types of evidence
22  from which you may properly determine the facts.  One is direct
23  evidence, such as the testimony of an eyewitness.  The other is
24  indirect or circumstantial evidence.  This is proof by a chain
25  of circumstances that point to the existence or nonexistence of

**JA528**

1 certain facts.

2     A simple example would be the following. You come to

3 court on a day when the weather is clear and dry. After some

4 hours in the courtroom, a person enters through the rear door

5 wearing a raincoat and shaking a wet umbrella. Without ever

6 looking outside, you might infer from those circumstances that

7 while you were sitting in court it had rained outdoors.

8     So in a trial, you are permitted to make reasonable

9 inferences as seem justified in light of your experience.

10 Inferences are deductions or conclusions that reason and common

11 sense lead you, the jury, to draw from the facts that have been

12 established by the evidence in the case. The law makes no

13 distinction between direct and circumstantial evidence.

14 Instead, it requires simply that you base your verdict on a

15 reasonable assessment of all the evidence in the case.

16     Now, you are the sole judges of the credibility of the

17 witnesses and the weight their testimony deserves. You should

18 carefully scrutinize all of the testimony given, the

19 circumstances under which each witness testified, and every

20 matter in evidence that tends to show whether a witness is

21 worthy of belief.

22     Your decision whether or not to believe a witness may

23 depend on how that witness impressed you. Was the witness

24 candid and forthright, or did the witness seem as if he or she

25 was hiding something, being evasive or suspect in some way?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1 How did the way the witness testified on direct examination

2 compare with how the witness testified on cross-examination?

3 Was the witness consistent in his or her testimony, or did the

4 witness contradict himself or herself? Did the witness appear

5 to know what he or she was talking about and strike you as

6 someone trying to report his or her knowledge accurately?

7     In addition, you may consider whether a witness had

8 any possible bias, any relationship to a party, any motive to

9 testify falsely, or any possible interest in the outcome of the

10 case. Such a bias or relationship does not necessarily make

11 the witness unworthy of belief. These are just simply factors

12 that you may consider.

13     Inconsistencies or discrepancies in the testimony of a

14 witness or between the testimony of different witnesses may or

15 may not cause you to discredit such testimony. In weighing the

16 effects of a discrepancy, you should consider whether it

17 pertains to a matter of importance or an unimportant detail and

18 whether discrepancy results from an innocent error or

19 intentional falsehood.

20     If you find that any witness has willfully testified

21 falsely as to any material fact, the law permits you to

22 disregard completely the entire testimony of that witness upon

23 the principle that one who testifies falsely about one material

24 fact is quite likely to testify falsely about everything. You

25 are not required, however, to consider such a witness as

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1 totally unworthy of belief. You may accept so much of the

2 testimony as you deem true and disregard what you feel is

3 false.

4     By the processes that I have just described you, the

5 jury, as the sole judges of the facts determine which of the

6 witnesses you will believe, what portion of their testimony you

7 accept, and what weight you give to it.

8     Now, in this case certain witnesses were permitted to

9 express their opinions about matters that are in issue. A

10 witness may be permitted to testify to an opinion on those

11 matters about which he or she has special knowledge, skill,

12 experience, and training. Such testimony is presented to you

13 on the theory that someone who is experienced and knowledgeable

14 in the field can insist -- can assist you in your understanding

15 the evidence or in reaching an independent decision on the

16 facts.

17     In weighing this testimony, you may consider the

18 witness' qualifications, his opinion, the reason for

19 testifying, as well as all the other considerations that

20 ordinarily apply when you are deciding whether or not to

21 believe a witness' testimony. You may give the opinion

22 testimony whatever weight, if any, you find it deserves in

23 light of all the evidence in the case.

24     You should not, however, accept opinion testimony

25 merely because the witness was allowed to testify concerning

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1 his opinion. Nor should you substitute it for your own reason,

2 judgment, and common sense. The determination of the facts in

3 this case rests solely with you.

4     Now I will instruct you on the law that controls this

5 case. Plaintiff brings his claim under a statute known as

6 section 1983 of Title 42 of the United States Code. Section

7 1983 states in relevant part, Every person who, under color of

8 any statute, ordinance, regulation, custom, or usage of any

9 state subjects or causes to be subjected any citizen of the

10 United States to the deprivation of any rights, privileges, or

11 immunities secured by the constitution and laws shall be liable

12 to the party injured in an action at law. Section 1983 creates

13 a federal remedy for persons who have been deprived by state

14 officials of their rights -- of the rights, privileges, and

15 immunities secured by the United States Constitution and

16 federal statutes.

17     In order to prove a claim under Section 1983,

18 plaintiff must establish by a preponderance of the evidence

19 each of the following three elements: First, that the conduct

20 complained of was committed by a person acting under color of

21 state law. Second, that this conduct deprived the plaintiff of

22 rights, privileges, or immunities secured by the constitution

23 or laws of the United States. And, third, that the defendants'

24 acts were the proximate cause of the injuries and consequent

25 damages sustained by the plaintiff.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

**JA529**

1    I will now discuss the elements of plaintiff's claim
2  in more detail.
3    The first element:  Under color of state law.  Acting
4  under color of state law means that defendants claim to be
5  acting pursuant to authority given them by the state, even if
6  they are misusing that authority.  The defendants, as officers
7  in the New York State Attorney General's office, were acting
8  under color of state law when investigating and prosecuting
9  Leonard Morse.  So this element is deemed proven.
10    Now, the second element that has to be established is
11  the deprivation of a constitutional right.  Now, the second
12  element of plaintiff's claim is that the defendant deprived him
13  of a federal constitutional right.  The right alleged to have
14  been violated in this case is the plaintiff's constitutional
15  right not to be deprived of liberty on the basis of false
16  evidence.
17    Plaintiff Leonard Morse alleges that Defendants Fusto
18  and Castillo created false or fraudulently altered summaries of
19  Morse's billing records, specifically Grand Jury Exhibits 7
20  and 11, knowing that such summaries were false or fraudulent.
21  Morse also claims that he was deprived of his liberty as a
22  result of this false or fraudulent evidence.
23    Defendants Fusto and Castillo denied that Grand Jury
24  Exhibits 7 and 11 were false or fraudulent.  They also deny
25  that Morse was deprived of his liberty as a result of Grand

1  Jury Exhibits 7 and 11.
2    Plaintiffs must show that the defendants acted
3  knowingly or with reckless disregard.  An act is done knowingly
4  if it is done voluntarily and deliberately and not because of
5  mistake, accident, negligence, or any -- or other innocent
6  reason.  An act is done with reckless disregard if it's done in
7  conscious disregard of its known probable consequences.
8    The plaintiff does not need to show that the defendant
9  specifically intended to deprive him of a constitutional right.
10  If you find that the acts of the defendants were merely
11  negligent or incompetent, then even if you find that the
12  plaintiff was injured as a result of those acts, you must
13  return a verdict in favor of the defendants.
14    Now, to prove this second element of his claim -- and
15  again, this is the deprivation of the constitutional right --
16  plaintiff must prove by a preponderance of the evidence the
17  following:  First, plaintiff must prove by a preponderance of
18  the evidence that the defendants created false or fraudulently
19  altered documents.  A document is false if it is untrue when
20  made and was known to be untrue when made by the person making
21  it or causing it to be made.  A document is fraudulent if it is
22  falsely made with intent to deceive.
23    Deceitful half-truths or the deliberate concealment of
24  material facts may also constitute false or fraudulent
25  information.

1    Second, the plaintiff must prove by a preponderance of
2  the evidence that the false or fraudulent evidence was
3  material, meaning that it was likely to influence the jury's
4  decision to indict.
5    Now, the grand jury in Morse's case was asked to
6  decide whether there was reasonable cause to believe that Morse
7  committed two types of offenses.
8    Count one of the indictment charged Leonard Morse with
9  grand larceny in the first degree.  So in order to find grand
10  larceny in the first degree, the grand jury needed to find
11  reasonable cause that property valued in excess of a million
12  dollars was stolen by Plaintiff Leonard Morse from its owner,
13  which can include the Medicaid Program of the State of New
14  York, through successive takings that were all part of a single
15  sustained criminal impulse and execution of a general
16  fraudulent scheme.  A person steals property and commits
17  larceny when, with the intent to deprive another of property or
18  to appropriate the same to himself or a third person he
19  wrongfully takes, obtains, or withholds such property from an
20  owner thereof.
21    Count two of the Morse indictment charged in counts 2
22  through 12 charged Leonard Morse with offering a false
23  instrument for filing in the first degree.  In order to find
24  offering a false instrument for filing in the first degree, the
25  grand jury needed to find reasonable cause that Plaintiff

1  Leonard Morse, knowing that a written instrument contained a
2  false statement or false information and when with intent to
3  defraud the state or any political subdivision, he offered or
4  presented it to a public officer or public servant with
5  knowledge or belief that it would have been filed with or
6  registered or recorded in or otherwise became part of the
7  record for such public servant or office.
8    Now, reasonable cause means that there exist facts and
9  circumstances sufficient to support a reasonable belief that
10  the offense has been committed or is being committed.
11    If you find that Grand Jury Exhibits 7 and 11 were
12  false or fraudulently altered, you must next determine whether
13  or not that evidence was material in that it was likely to
14  influence the grand jury's determination of reasonable cause to
15  believe Morse committed the offense as described above.  In
16  reaching your determination one factor you may consider is the
17  weight of the testimony in evidence other than Grand Jury
18  Exhibits 7 and 11 that were before the grand jury.
19    You should consider this other evidence as it was
20  presented to the grand jury at that point in time and not as
21  the testimony and evidence as may have been presented in
22  subsequent proceedings, such as Morse's criminal trial.  The
23  relevant question is the effect all the evidence would have had
24  on the grand jury at the time of the grand jury proceedings and
25  whether Grand Jury Exhibits 7 and 11 would have been material

**JA530**

1  to the grand jury's finding of reasonable cause to indict.

2      Third, plaintiff must prove by a preponderance of the

3  evidence that false or fraudulent evidence resulted in a

4  deprivation of his liberty.  A deprivation of liberty occurs

5  when an individual is required to post bail to ensure his

6  return to court, when his travel is restricted under the terms

7  of a release bond, when he is under a legal obligation to

8  appear in court.

9      It is undisputed that Morse was deprived of liberty.

10  The question is whether that deprivation of liberty was as a

11  result of false or fraudulent evidence presented to the grand

12  jury.

13      In sum, if you find that plaintiff has proven by a

14  preponderance of the evidence that defendants knowingly or with

15  reckless disregard created materially false or fraudulently

16  altered evidence that resulted in plaintiff's deprivation of

17  liberty, then plaintiff has satisfied the second element of his

18  1983 claim.

19      I now turn to the third element, which is referred to

20  as proximate cause.

21      The third element which plaintiff must prove is that

22  the defendants acts were a proximate cause of any injury

23  sustained by the plaintiff.  Proximate cause means that there

24  must be a sufficient causal connection between the acts of

25  defendants and any injury or damage sustained by the plaintiff.

1  An act is a proximate cause if it was a substantial factor in

2  bringing about the alleged injury or damage and the injury or

3  damage was a reasonably foreseeable consequence of the

4  defendants' act.

5      To recover damages, Plaintiff Leonard Morse has the

6  burden of proving that he suffered injuries and that the

7  injuries would not have occurred without the wrongful conduct

8  of the defendants.

9      If you find that the plaintiff has proven by a

10  preponderance of the evidence the elements of his Section 1983

11  claim, you must also determine the damages to which plaintiff

12  is entitled.  You should not infer that the plaintiff is

13  entitled to damages merely because I am instructing you on how

14  to award damages.  You must decide liability first.  I'm

15  instructing you on damages only so that you will have guidance

16  should you decide that plaintiff is entitled to recovery.

17      The burden of proving damages rests with the

18  plaintiff.  Now, the purpose of the law of damages is to award,

19  as far as possible, just and fair compensation for the loss, if

20  any, which resulted from defendants' violation of plaintiff's

21  rights.  If you find that the defendants are liable on the

22  false evidence claim as I have explained it to you, then you

23  must award the plaintiff sufficient damages to compensate him

24  for any injuries proximately caused by the defendants'

25  conducts.  These are known as compensatory damages.

1      Compensatory damages seek to make plaintiff whole,

2  that is, to compensate him for the damage suffered.

3  Compensatory damages are not limited merely to lost earnings

4  plaintiff may have suffered.  A prevailing plaintiff may also

5  be entitled to compensatory damages for the pain and suffering,

6  mental anguish, shock and discomfort that he suffered because

7  of defendants' conduct.

8      I remind you that you may award compensatory damages

9  only for injuries the plaintiff proved were proximately caused

10  by the defendants' allegedly wrongful conduct.  That is, you

11  may not simply award damages for any injury suffered by the

12  plaintiff.  You must reward damages only for those injuries

13  that are a proximate result of defendants' violation of

14  plaintiff's rights.

15      The damages you award must be fair and reasonable,

16  neither inadequate nor excessive.  You should not award

17  compensatory damages for speculative injuries but only for

18  those injuries that plaintiff has actually suffered or is

19  reasonably likely to suffer in the near future.  Compensatory

20  damages must not be based on speculation or sympathy but on the

21  evidence presented at trial.

22      In awarding compensatory damages, if you decide to

23  award them, you must be guided by dispassionate common sense.

24  Computing damages may be difficult, but you must not let that

25  difficulty lead you to engage in arbitrary guesswork.

1      On the other hand, the law does not require a

2  plaintiff to prove the amount of his losses with mathematical

3  precision but only with as much definiteness and accuracy as

4  the circumstances permit.  In all instances, you are to use

5  sound discretion in fixing an award of damages, drawing

6  reasonable inferences where you deem appropriate from the facts

7  and circumstances in evidence.

8      If you find that plaintiff is entitled to compensatory

9  damages, you must also determine whether the plaintiff could

10  have done something after the injurious conduct to lessen the

11  harm that he suffered.  The burden is on the defendant to prove

12  by a preponderance of evidence that the plaintiff could have

13  lessened the harm that was done to him and that he failed to do

14  so.

15      If the defendants convince you that the plaintiff

16  could have reduced the harm done to him but failed to do so,

17  the plaintiff is entitled only to the damages sufficient to

18  compensate him for the injury that he would still have suffered

19  even if he had taken appropriate action to reduce the harm to

20  him.

21      In determining compensatory damages, you may consider

22  past and future lost earnings and mental and emotional pain and

23  suffering due to the defendants' violation of plaintiff's

24  rights.  Your verdict sheet, which I will explain in more

25  detail in a moment, is broken down into these categories.  If

1  you finds the defendant is entitled to compensatory damages,
2  you must determine the amount you deem appropriate for each
3  category and fill in the verdict sheet accordingly.
4          I'm now going to give you some more specific
5  instructions on lost earnings.
6          (Pause.)
7          THE COURT:  In assessing compensatory damages, you may
8  include an amount attributable to the lost earnings sustained
9  by Plaintiff Leonard Morse resulting from his indictment by a
10  grand jury on April 5, 2006.
11         In this case plaintiff is seeking damages for the
12  income which he lost as a result of no longer being able to
13  practice as a dentist.  This category of damages is referred to
14  as lost earnings.  And plaintiff is seeking damages for both
15  past lost earnings and future lost earnings.
16         I will now explain to you what each of these terms
17  mean.  With respect to past lost earnings, this category of
18  damages refers to all earnings that plaintiff has -- all loss
19  of earnings that plaintiff has incurred from the date of the
20  incident to the date of your verdict.
21         With respect to future lost earnings, that category of
22  damages refers to all earnings you believe plaintiff would have
23  earned in the future for however long you believe plaintiff
24  would have continued working as a dentist, had he not been
25  indicted in April 2006.  Please note, if you find that

1  plaintiff is entitled to an award for future lost earnings, you
2  must specifically state the period of years for which this
3  dollar amount is intended to cover into the future.
4          Now, during this trial you have heard conflicting
5  testimony with respect to what earnings plaintiff has lost as a
6  result of his indictment and the adverse publicity surrounding
7  the indictment.  It is up to you, as finders of fact, to decide
8  what amount of lost earnings, if any, plaintiff may recover in
9  this action.
10         If you find in favor of plaintiff on his
11  constitutional claims, then plaintiff is entitled to recover an
12  amount that will fairly compensate him for any lost earnings
13  that may be said to reasonably flow from his indictment.
14  Plaintiff may only recover for lost earnings which he has
15  proven with a reasonable degree of certainty, and any award you
16  make for lost earnings must not be the result of speculation.
17  However, the law does not require a plaintiff to prove the
18  amount of his losses with mathematical precision but only with
19  as much definiteness and accuracy as the circumstances permit.
20         Now, whether or not you award the plaintiff
21  compensatory damages, you may also in your discretion make an
22  award of punitive damages.  Punitive damages are rewarded in
23  the discretion of a jury to punish a defendant for extreme or
24  outrageous conduct and to deter or prevent a defendant and
25  others like him from committing such conduct in the future.

1          You may award the plaintiff punitive dangers if you
2  find that the acts of the defendant were done maliciously and
3  wantonly.  An act is maliciously done if it is prompted by
4  ill-will or spite towards the injured person.  An act is wanton
5  if it is done with reckless or callous disregard for the rights
6  of the injured person.
7          The plaintiff has the burden of proving by a
8  preponderance of the evidence that the defendant acted
9  maliciously or wantonly with regards to the plaintiff's rights.
10  If you find by a preponderance of the evidence that defendant
11  acted with malicious intent to violate the plaintiff's rights
12  or unlawfully injure him, or if you find that the defendant
13  acted with callous or reckless disregard of the plaintiff's
14  rights, then you may award punitive damages.
15         An award of punitive damages, however, is
16  discretionary.  That is, if you find that the legal
17  requirements for punitive damages are satisfied, then you may
18  decide to award punitive damage or you may decide not to award
19  them.
20         In making this decision, you should consider the
21  underlying purpose of punitive damages.  Punitive damages are
22  awarded in the jury's discretion to punish a defendant for
23  outrageous conduct or to deter him and others like him from
24  performing similar conduct in the future.  Thus, in deciding
25  whether to award punitive damages, you should consider whether

1  the defendant would be adequately punished by an award of
2  punitive damages only or whether the conduct is so extreme and
3  outrageous that compensatory damages are inadequate to punish
4  the wrongful conduct.
5          You should also consider whether compensatory damages
6  standing alone are likely to deter or prevent the defendant
7  from similar wrongful conduct in the future, if it was in fact
8  wrongful or whether punitive damages are necessary to provide
9  deterrence.  Finally, you should consider whether punitive
10  damages are likely to deter or prevent other persons from
11  performing wrongful acts similar to those defendant may have
12  committed.
13         If you decide to award punitive damages, the same
14  purposes should be kept in mind as you determine the
15  appropriate sum of money to be awarded as punitive damages.
16  That is, in fixing the sum to be awarded, you should consider
17  the degree to which the defendant should be punished for his
18  wrongful conduct and the degree to which any award of one sum
19  or another will deter the defendant or persons like him from
20  committing wrongful acts in the future.
21         You must also decide a factual issue that bears on
22  whether the defendants are entitled to an immunity defense.
23  Whether immunity is warranted is a question of law for the
24  court.  However, for the court to make this determination you
25  must decide a factual question bearing on the timing of the

**JA532**

1  creation of Grand Jury Exhibits 7 and 11.

2       Defendants contend that Grand Jury Exhibits 7 --

3  excuse me.  Defendants contend that they created Grand Jury

4  Exhibits 7 and 11 in connection with the preparation for the

5  presentation of evidence to the grand jury and not earlier as a

6  part of the investigation.

7       Plaintiff contends that these exhibits were created

8  during the investigatory stage of the proceedings, while

9  defendants were still building a case against Morse, and not in

10 preparation for the presentation of evidence to the grand jury.

11 Accordingly, you will see on the verdict sheet question number

12 six asks if the defendants have proven by a preponderance of

13 the evidence that they created Grand Jury Exhibits 7 and 11 in

14 connection with the preparation for the presentation of

15 evidence to the grand jury and not earlier as a part of the

16 investigation.

17      Now, I have now outlined for you the rules of law

18 applicable to the case and the processes by which you should

19 weigh the evidence and determine the facts.

20      In a few minutes you will retire to the jury room for

21 your deliberations.  Traditionally Juror Number 1 acts as

22 foreperson.  If, however, Juror Number 1 does not wish to serve

23 as foreperson when you go to the jury room to begin to consider

24 the evidence in this case, I suggest to you that you first

25 selected another member of the jury to act as your foreperson.

1       In order that your deliberations may proceed in an

2  orderly fashion, you must have a foreperson; but, of course,

3  his or her vote is not entitled to -- is entitled to no greater

4  weight than that of any other juror.

5       Your function, of course, is to reach a fair

6  conclusion to the law and the evidence.  It is an important

7  one.  Your verdict must be unanimous.  That means you all have

8  to agree.

9       When you are in the jury room, listen to each other,

10 discuss the evidence and the issues in the case among

11 yourselves.  It is the duty of each of you as jurors to consult

12 with one another and to deliberate with a view to reach an

13 agreement on a verdict, if you can do so without violating your

14 individual judgment and your conscience.

15      While you should not surrender conscientious

16 convictions of what the truth is and of the weight and effect

17 of the evidence and while each of you must decide the case

18 solely for yourself and not merely acquiesce in the conclusion

19 of your fellow jurors, you should examine the issues and the

20 evidence before you with candor and frankness, with proper

21 deference to and regard for the opinions of each other.

22 Remember in your deliberations that the dispute between these

23 parties is, for them, no passing matter.  They and the court

24 rely on you to give your full and conscientious deliberation

25 and consideration to the issues and evidence before you.

1       If it becomes necessary during your deliberations to

2  communicate with the court, you may send me a note signed by

3  your foreperson or by one or more members of the jury.  No

4  member of the jury should ever attempt to communicate with the

5  court by any means other than a signed writing.  The court will

6  never communicate with any member of the jury on any subject

7  touching on the merits of this case other in writing or here in

8  open court.

9       I will send in all the exhibits received in evidence

10 for you to have during your deliberations.  If you wish to have

11 any portion of the testimony repeated, you may simply indicate

12 that in a note.  I will also provide you with a copy of my jury

13 instructions.  You must consider the instructions as a whole

14 and not single out any one instruction as stating the law.  If

15 you need any further instructions on the law, simply send me a

16 note.

17      When you have reached a verdict, send me a note signed

18 by your foreperson that you have reached a verdict, but don't

19 indicate what the verdict is.  In no communications with the

20 court should you give a numerical count on where the jury

21 stands in your deliberations.

22      I have prepared a verdict sheet for you, to assist you

23 in your deliberations in rendering a verdict, and I'm going to

24 hand out a copy to each of the jurors now.  So I will just go

25 through it with you.

1       First of all, I want to mention, ladies and gentlemen,

2  that you may have heard counsel make reference to the verdict

3  sheet in their summations.  If you perceive that the verdict

4  sheet is different from what you may have heard one of the

5  lawyers say about it, that is not their fault.  After the

6  summations often the court goes back and looks at issues and

7  may change something slightly.  So if you perceive a

8  difference, it was not that counsel was misreading the verdict

9  sheet.  It was that things just changed slightly between

10 summation.  So I just wanted you to understand that.

11      So I think the verdict sheet is fairly

12 straightforward.  It has a series of questions, but you then

13 have to follow the instructions at the bottom.  You have the

14 first question, which is the liability question, and it -- you

15 can read both the questions are separated out by each

16 defendant, Fusto and Castillo, and if you answer no to both

17 questions one and two, then you have reached a verdict in this

18 case, if your answer were no to both of them.

19      But the court still would ask you, even though you

20 have reached a verdict, the court still asks that you answer

21 question six, which is the special interrogatory.  So I still

22 would ask you to answer that question for the court, even

23 though you will have reached a verdict if your answer to both

24 was no.

25      Now, if your answer to either of the liability

**JA533**

1 questions as written out there is yes, you answered yes to
2 either question one or question two, then you have to go to
3 question three. Now, again, it tells you, I think quite
4 clearly, if you answer question three no, then once again,
5 that's it, you have reached a verdict; but the court is still
6 requiring you to answer question six. So you will have reached
7 a verdict if your answer is no; but the court still wants you
8 to answer question six.
9      So now, if your answer is yes, so if you have answered
10 yes to either question one or two, and you have answered yes to
11 question three, then you have to go to the question of damages;
12 and, as I told you before, I have broken out the damages
13 consistent with those jury instructions that I have read to you
14 as to past lost earnings, future lost earnings, mental or
15 emotional pain or suffering.
16      Then you go to question five, and then again, you
17 still, once again, you have to answer question six. So no
18 matter what, you have to answer question six, so. I think I
19 just I wanted to just go over the verdict sheet with you.
20      Let me just consult with counsel before I send you to
21 deliberate. So hold on for a second, make sure I didn't miss
22 anything.
23      (Continued on the next page.)
24
25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1      (Sidebar conference.)
2      THE COURT: Are there any exceptions to the charge?
3      MR. MILLER: None from us, your Honor.
4      THE COURT: Plaintiff?
5      MR. NORINSBERG: No exceptions to the charge as read.
6 We still have objections to the proximate cause charge
7 and to deleting the word "solely" in the charge. Other than
8 those, we don't have objections.
9      THE COURT: When did you make an objection earlier to
10 the proximate cause?
11      MR. NORINSBERG: I have been making it throughout the
12 trial, that the Second Circuit requires only that it's material
13 to the indictment. They essentially added a third element,
14 which is not consistent with Evanovich (phonetic) versus City
15 of New York. I have made that argument throughout, and the way
16 it's read it's actually a separate element in addition to
17 materiality; and I think that's not correct at all.
18      THE COURT: I think it refers -- the proximate cause
19 is part of the third element of no continuing violation, and I
20 think the way in which it's principally charged I think really
21 appears to go more to damages, the issue of proximate cause of
22 damages.
23      So in any event, your exceptions are noted.
24      (End of sidebar conference.)
25      (Continued on the next page.)

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1      (In open court.)
2      THE COURT: Vanessa, can we have the marshal. Can you
3 swear in the marshal.
4      THE CLERK: Please raise your right hand.
5      (The marshal was sworn.)
6      THE COURT: All right. Ladies and gentlemen, I'm
7 going to send you out to begin your deliberations.
8      We will give you a copy of all the exhibits. I should
9 tell you the parties marked Grand Jury Exhibits 7 and 11. They
10 are marked with other trial designations here, but I have asked
11 the lawyers to put them in separate folders.
12      Also, the plaintiffs put in evidence -- the
13 plaintiff's numbered Grand Jury Exhibits 7 and 11, and then
14 defendants put them in with defendant numbers. So it's all the
15 same exhibit, but I have given it to you in two different
16 folders. So I didn't want you to be confused about that, but
17 we are giving all the exhibits as soon as I get my charge ready
18 you can take a copy of vest sheet I left on your seats with you
19 so you can have it to look at, but we will give one verdict
20 sheet for you to fill out.
21      Okay. You are excused to begin your deliberations.
22      (Jury exits.)
23      (The jury retired to commence deliberations at
24 11:07 a.m.)
25      THE COURT: All right. I will see you.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

---

1      MR. NORINSBERG: Your Honor, are we free to go up and
2 down the building here as long as we are in cell phone contact?
3      MR. MILLER: Should we give cell phone numbers to
4 Vanessa?
5      THE CLERK: Yes, you can leave cell phone numbers.
6      THE COURT: Okay.
7      (Court in recess awaiting the verdict of the jury.)
8      (In open court.)
9      (Court Exhibits 3 and 4 so marked.)
10      THE CLERK: Morse versus Spitzer.
11      THE COURT: All right. I have had two notes. One, I
12 understand, Court Exhibit 3, that you are still working on; but
13 with respect to Court Exhibit 4, would it be possible to make
14 copies of Plaintiff's Exhibit 149 for purpose of review by each
15 of the jurors? I take it both parties agree to that; is that
16 correct?
17      MR. MILLER: Yes, your Honor.
18      THE COURT: All right. Then we will send back copies
19 of that. How close are you to answering the other issue?
20      MR. NORINSBERG: I would say probably another ten
21 minutes.
22      MR. MILLER: At least, your Honor. It's -- the
23 testimony is a little scattered. So we are trying to make sure
24 we get it all.
25      THE COURT: Okay. All right. So just let Ms. Holly

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1  know when you are ready.

2         MR. FARBER:  Yes, your Honor.

3         (Lunch recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         A F T E R N O O N   S E S S I O N

2         (In open court.)

3         THE CLERK:  Morse versus Spitzer.

4         THE COURT:  All right.  So I see that the parties have

5  come up with a list of the passages that they want read back

6  with marked spots, two portions of which are disputed.  Okay.

7         So on page 131 everyone agrees it should be 1 through

8  26?

9         MR. FARBER:  No, your Honor, 1 through 6.

10        THE COURT:  1 through 6, and what's objected to is 10

11 through 22?

12        MR. FARBER:  Yes, your Honor.

13        THE COURT:  I don't understand the relevance of 10

14 through 22 to the question.

15        Do you want to be heard?

16        MR. NORINSBERG:  Yes, your Honor.  It's just about the

17 reasons why he created it and his knowledge of whether it was

18 improper.  I think it all fits under the umbrella issue of the

19 creation of the document.

20        THE COURT:  I think it's a separate line of inquiry.

21 So I agree with the defendants' position.

22        The next thing is 753.  So plaintiff objects, just so

23 I understand, to anything on page 753?

24        MR. NORINSBERG:  It was 753, line 8 through 754, line

25 20.  There is a specific objection.

1         MR. MILLER:  I think, your Honor, it could end on

2  line 14 as opposed to line 20.

3         THE COURT:  What's the theory for why that's relevant?

4         MR. MILLER:  Your Honor, I think it certainly does

5  discuss Dr. DeLuca's testimony, but it also gets into why he

6  thought it wasn't relevant for her to see tooth numbers when he

7  created the document.  So while it does get into her testimony

8  it also gets into the creation issue.

9         THE COURT:  I agree with it.  I don't think that that

10 directly relates to the questions.  So we won't read that

11 portion either.  Okay.  So I will give this to the court

12 reporter.

13        You want to mark this as a court exhibit?

14        THE CLERK:  Yes, judge.

15        THE COURT:  Everything else on that list with the

16 exception of both sides' objections is agreed upon, correct?

17        MR. NORINSBERG:  That's correct, your Honor.

18        MR. MILLER:  Yes, your Honor.

19        THE COURT:  So I have marked as Court Exhibit 5, the

20 portions of the transcripts the parties want to read back, and

21 now I will have the court reporter read it back when the jury

22 comes out.

23        (Court Exhibit 5 so marked.)

24        (Pause.)

25        (Jury enters at 2:11 p.m.)

1         THE COURT:  All right.  Ladies and gentlemen, please

2  be seated.  I have had two notes, one of which we have already

3  responded to, and that was your request for additional copies

4  of Exhibit 149.

5         Then I have your other request, which is, reads:  Your

6  Honor, the jury would like to review the testimony of both

7  defendants re the creation of Grand Jury Exhibits 7 and 11.  I

8  believe we have been able to locate the portions of the

9  transcripts that are responsive to your request, and now the

10 court reporter will read those back to you.

11        (Record read.)

12        THE COURT:  All right.  I think, ladies and gentlemen,

13 that completes the readbacks of the portions you requested.

14        So I will excuse you again to resume your

15 deliberations.

16        (The jury retired to continue deliberations at

17 2:45 p.m.)

18        (Court in recess awaiting the verdict of the jury.)

19        (In open court.)

20        THE COURT:  Okay.  We have a note that says, the jury

21 has reached a verdict.  So we are bringing the jury out.

22        (Jury enters at 3:55 p.m.)

23        THE COURT:  All right.  Ladies and gentlemen, I have

24 your note that you have reached a verdict.  If you would be

25 seated, except the foreperson, who would remain standing.

**JA535**

1    I will ask my courtroom deputy to take the verdict.
2    THE CLERK:  In the case of Leonard Morse versus John
3 Fusto and Jose Castillo.  Liability:  Deprivation of liberty
4 due to false or fraudulent evidence.
5    Number one, has Plaintiff Leonard Morse proven by a
6 preponderance of the evidence that Defendant John Fusto created
7 false or fraudulently altered documents or directed Jose
8 Castillo to create false or fraudulently altered documents
9 consisting of Grand Jury Exhibits 7 and 11, knowing that such
10 information was false or fraudulent, yes or no?
11   THE FOREPERSON:  Yes.
12   THE CLERK:  Number two, has Plaintiff Leonard Morse
13 proven by a preponderance of the evidence that Defendant Jose
14 Castillo created false or fraudulently altered documents,
15 consisting of Grand Jury Exhibits 7 and 11, knowing that such
16 information was false and fraudulent, yes or no?
17   THE FOREPERSON:  Yes.
18   THE CLERK:  Number three, has Plaintiff Leonard Morse
19 proven by a preponderance of the evidence that the false or
20 fraudulent evidence was material, meaning that it was likely to
21 influence the grand jury's decision to indict, and that he was
22 deprived of liberty as a result of the false or fraudulent
23 evidence, yes or no?
24   THE FOREPERSON:  Yes.
25   THE CLERK:  B, damages.  Number four, compensatory
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1 damages.  Please state the total amount, if any, of
2 compensatory damages that plaintiff has proven by a
3 preponderance of the evidence were proximately caused by the
4 violation of the plaintiff's constitutional rights by the
5 defendants.  Past lost earnings?
6    THE FOREPERSON:  $1,733,941.
7    THE CLERK:  Future lost earnings?
8    THE FOREPERSON:  $2,490,995.
9    THE CLERK:  Mental, emotional pain and suffering?
10   THE FOREPERSON:  2.5 million.
11   THE COURT:  The award of future lost earnings, you
12 have to state the period of years this was --
13   THE CLERK:  I'm sorry, judge.
14   THE COURT:  -- intended to cover.
15   THE FOREPERSON:  2013 through January 2022.
16   THE COURT:  Okay.
17   THE CLERK:  Should I go on to number five, judge?
18   THE COURT:  I'm sorry.  2.5 million was the mental and
19 emotional pain and suffering?
20   THE FOREPERSON:  Correct.
21   THE COURT:  Yes.  Go on to the next question.
22   THE CLERK:  Punitive damages.  Has Plaintiff Leonard
23 Morse proven by a preponderance of the evidence that he is
24 entitled to punitive damages, yes or no?
25   THE FOREPERSON:  Yes.
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    THE CLERK:  The amount for John Fusto?
2    THE FOREPERSON:  750,000.
3    THE CLERK:  And the amount for John (sic) Castillo?
4    THE FOREPERSON:  250,000.
5    THE CLERK:  Number six, special interrogatory:  Have
6 Defendants John Fusto and Jose Castillo proven by a
7 preponderance of the evidence that the billing summaries, Grand
8 Jury Exhibits 7 and 11, were created in connection with the
9 preparation for the presentation of evidence to the grand jury
10 and not earlier as part of the investigation yes or no?
11   THE FOREPERSON:  No.
12   THE COURT:  All right.  Ladies and gentlemen -- do you
13 want the jury polled?
14   MR. MILLER:  Yes, your Honor.
15   THE COURT:  Would you poll the jury.
16   THE CLERK:  Juror number 1, is this your verdict?
17   THE FOREPERSON:  Yes.
18   THE CLERK:  Juror number 2, is this your verdict?
19   JUROR:  Yes.
20   THE CLERK:  Juror number 3, is this your verdict?
21   JUROR:  Yes.
22   THE CLERK:  Juror number 4, is this your verdict?
23   JUROR:  Yes.
24   THE CLERK:  Juror number 5, is this your verdict?
25   JUROR:  Yes.
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    THE CLERK:  Juror number 6, is this your verdict?
2    JUROR:  Yes.
3    THE COURT:  Juror number 7, is this your verdict?
4    JUROR:  Yes.
5    THE CLERK:  Juror number 8, is this your verdict?
6    JUROR:  Yes.
7    THE CLERK:  Juror number 9, is this your verdict?
8    JUROR:  Yes.
9    THE COURT:  All right.  Ladies and gentlemen, at this
10 point in time you are excused from jury service and you are
11 excused with the sincere thanks of the court and, I'm sure, the
12 parties for the time and attention that you have directed to
13 this matter.
14   I know it was a little lengthier than we had
15 anticipated, and I very much appreciate your service.  So thank
16 you on behalf of the court for your service.
17   You are excused.
18   JUROR:  Do you want these back?
19   THE CLERK:  I will talk to you in the back.
20   (Jury exits at 4:00 p.m.)
21   THE COURT:  Is there anything further?
22   MR. FARBER:  Well, your Honor, we will be moving under
23 rule 59.  I believe, if I'm not mistaken, the federal rules
24 provide for 14 days.  I think that's the rule.  I am actually
25 scheduled to be on vacation at the end of that 14 days, and, if
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

**JA536**

1  counsel has no objection, I would like a one-week extension
2  because of that.
3        THE COURT:  You want to move for a new trial?
4        MR. FARBER:  I'm sorry.  Rule 50 or 59.
5        THE COURT:  Don't make me pick.
6        MR. FARBER:  My apologies, judge.  Judgment
7  notwithstanding verdict.
8        THE COURT:  So what you want to do is renew a motion?
9        MR. FARBER:  Correct, your Honor.  I think it's
10 50(a)(2)(B).
11       THE COURT:  50(2)(B)?
12       MR. FARBER:  Looks like 50(a)(2)(B).  I see that the
13 rule provides for 28 days.  So I don't need any additional time
14 to do it.
15       THE COURT:  So you will file your motion by what?  Do
16 we have a book there?  So you will file your motion what date,
17 what date?
18       MR. FARBER:  I believe by March 12, your Honor.
19       THE COURT:  By when?
20       MR. FARBER:  Twenty-eight days from today is, I
21 believe, March 12.
22       THE COURT:  So you intend to file your motion by --
23 I'm not counting, so make sure you are right.  I'm not doing
24 this.  By March 12?
25       MR. FARBER:  Twenty-eight days from today is March 12.

1        THE COURT:  And, counsel, when can you respond.
2        MR. NORINSBERG:  I think about three weeks, your
3  Honor.
4        THE COURT:  Okay.  So like April 5?
5        MR. NORINSBERG:  That would be great.
6        THE COURT:  Any reply due by April 12.
7        MR. FARBER:  That's fine, your Honor.  I'm not sure
8  when the Jewish holidays fall this year.
9        THE COURT:  I don't see anything written down.
10       MR. FARBER:  Actually, your Honor, can I have the
11 19th?  That way it won't matter.
12       THE COURT:  There is nothing written down on the 12th.
13 Usually they have the major holidays.
14       MR. FARBER:  If it's Tuesday, could I have until the
15 Friday, please?
16       THE COURT:  April 12 is a Friday.
17       MR. FARBER:  Is Friday?  Okay, that's fine.  That's
18 fine, your Honor.
19       THE COURT:  Okay.  Is there anything further that we
20 need to take up?
21       MR. NORINSBERG:  No, your Honor.
22       THE COURT:  Okay.
23       MR. FARBER:  Thank you, your Honor.
24       THE COURT:  Thank you.  See you.
25       Also, gentlemen, I don't keep the exhibits.  So would

1  you all make sure that you keep your exhibits and keep them
2  together, if there is any, you know, further review or
3  anything.  So everybody keeps their stuff together.
4        MR. NORINSBERG:  Yes, your Honor.
5        THE COURT:  Okay.
6        (End of proceedings.)

                         I N D E X

                  Jury Charge          1396


                      COURT EXHIBITS

                      3, 4             1424

                      5                1427


                         o O o

**JA537**

COURT EXHIBIT

_1_

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LEONARD MORSE,

                        Plaintiff,

      -against-

JOHN FUSTO and JOSE CASTILLO,

                       Defendants.
----------------------------------------------------------X
AMON, UNITED STATES DISTRICT JUDGE:

**JURY CHARGE**
07-CV-4793 (CBA)

1. **Role of the Court and Jury**

      Ladies and gentlemen of the jury, now that you have heard all of the evidence in the case and the arguments of each side, it is my duty to give you instructions as to the law applicable in this case. It is your duty as jurors to follow the law as I state it and to apply the law to the facts, as you find them, from the evidence presented.

      I am going to begin by giving you some general instructions. I will then charge you about the particular claim at issue in this case.

      In the course of the trial, the attorneys may have referred to some of the governing rules of law. If there appears to you to be any difference between the law as stated by counsel and the law as I now state it to you, it is my instructions on the law that you must follow. You should not single out any instruction as alone stating the law. You should consider these instructions as a whole when you retire to deliberate in the jury room.

1

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

You should not be concerned about the wisdom of any rule of law that I state. Regardless of any opinion that you may have about what the law may be—or should be—it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that given to you in these instructions.

In charging you on the applicable law, let me be clear that I am expressing no opinion about how you should decide the facts of this case. Nothing I have said or done in the course of the trial should be taken by you as expressing any opinion about the facts. On occasion, I may have asked questions of a witness. You should attach no special significance to these because they were asked by the court. It is your function, not mine, to determine the facts.

## 2. <u>Impartial Consideration of the Evidence</u>

Under your oath as jurors, you must be guided solely by the evidence during the trial, without regard to the consequences of your decision. You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be governed by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences. All persons and entities are equal before the law.

## 3. <u>Consideration of Each Defendant Separately</u>

Plaintiff has brought his claim against two defendants, Jose Castillo and John Fusto. In reaching your verdict, you are directed to consider whether the plaintiff has satisfied his burden of proof with respect to each of the defendants individually. That is, you could find that the plaintiff has proven his case by a preponderance of the evidence with respect to one defendant, but not with respect to the other. Your verdict as to each defendant must be determined

2

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

separately with respect to that defendant, solely on the evidence, or lack of evidence, presented against the defendant.

## 4. **Preponderance of the Evidence**

In a civil action such as this, the burden of proof is on Plaintiff Leonard Morse to prove every essential element of his claim by a preponderance of the evidence. If the proof fails to establish any essential element of plaintiff's claim by a preponderance of the evidence, the jury should find for the defendants.

To establish something "by a preponderance of the evidence" means to prove that it is more likely so than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with the evidence opposed to it, produces in your minds the belief that what is sought to be proved is more likely to be true than not true. A preponderance of the evidence means the greater weight of the evidence. The greater weight of the evidence does not mean the greater number of witnesses or greater length of time taken by either side but which witnesses and evidence appeal to your minds as being most accurate and trustworthy.

If you find that the credible evidence on a given issue is in balance or evenly divided between the parties, or that the evidence produced by the party having the burden of proof is outweighed by evidence against his claim, then you must decide that issue against the party having the burden of proof, or the plaintiff in this case. That is because the party bearing the burden, in this case the plaintiff, must prove more than simple equality of evidence—he must prove the element at issue by a preponderance of the evidence. On the other hand, the party with the burden of proof need prove no more than a preponderance. So long as you find that the scales

3

**JA540**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

tip, however slightly, in favor of that party—that what he claims is more likely true than not true—then the element will have been proved by a preponderance of evidence.

## 5. **Types of Evidence**

Your verdict in this case must be based only on the evidence. The evidence upon which you are to decide the facts of this case comes in several forms:

First, the sworn testimony of witnesses, both on direct and cross-examination, and regardless of who called the witness.

Second, exhibits that have been received by the court in evidence.

Third, facts to which the lawyers have agreed or stipulated. A stipulation is an agreement among the parties that a certain fact is true. You must consider such stipulated facts as true.

Finally, any fact that the Court may have instructed you to accept as true. You must consider these facts as true.

Certain things are not evidence and must be disregarded by you in deciding the facts:

Arguments, remarks, questions, and objections by the attorneys are not evidence.

Nothing said or done by the Court is evidence.

Obviously anything you may have seen or heard outside the courtroom is not evidence.

Any evidence ordered stricken by the Court must be entirely disregarded by you in your deliberations.

## 6. **Direct and Circumstantial Evidence**

There are, generally speaking, two types of evidence from which you may properly determine the facts. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence. This is proof by a chain of circumstances that point to the

4

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

existence or nonexistence of certain facts. A simple example would be the following: you come

to court on a day when the weather is clear and dry. After some hours in the courtroom, a person

enters through the rear door wearing a raincoat and shaking a wet umbrella. Without ever

looking outside, you might infer from these circumstances that while you were sitting in court, it

had rained outdoors.

So in a trial, you are permitted to make reasonable inferences as seem justified in light of

your experience. Inferences are deductions or conclusions that reason and common sense lead

you the jury to draw from the facts that have been established by the evidence in the case.

The law makes no distinction between direct and circumstantial evidence. Instead, it

requires simply that you base your verdict on a reasonable assessment of all the evidence in the

case.

### 7. Witness Credibility

You are the sole judges of the credibility of the witnesses and the weight their testimony

deserves. You should carefully scrutinize all of the testimony given, the circumstances under

which each witness testified, and every matter in evidence that tends to show whether a witness

is worthy of belief.

Your decision whether or not to believe a witness may depend on how that witness

impressed you. Was the witness candid and forthright or did the witness seem as if he or she was

hiding something, being evasive or suspect in some way? How did the way the witness testified

on direct examination compare with how the witness testified on cross-examination? Was the

witness consistent in his or her testimony or did the witness contradict himself or herself? Did

5

**JA542**

the witness appear to know what he or she was talking about and strike you as someone trying to report his or her knowledge accurately?

In addition, you may consider whether a witness had any possible bias, any relationship to a party, any motive to testify falsely or any possible interest in the outcome of the case. Such a bias or relationship does not necessarily make the witness unworthy of belief. These are simply factors that you may consider.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. In weighing the effects of a discrepancy, you should consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from an innocent error or intentional falsehood.

If you find that any witness has willfully testified falsely as to any material fact, the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is quite likely to testify falsely about everything. You are not required, however, to consider such a witness as totally unworthy of belief. You may accept so much of the testimony as you deem true and disregard what you feel is false. By the processes which I have just described, you the jury, as the sole judges of the facts, determine which of the witnesses you will believe, what portion of their testimony you accept and what weight you will give to it.

A. **Expert Witnesses**

In this case, certain witnesses were permitted to express their opinions about matters that are in issue. A witness may be permitted to testify to an opinion on those matters about which he

6

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

has special knowledge, skill, experience and training. Such testimony is presented to you on the

theory that someone who is experienced and knowledgeable in the field can assist you in

understanding the evidence or in reaching an independent decision on the facts.

In weighing this testimony, you may consider the witness's qualifications, his opinions,

the reasons for testifying, as well as all of the other considerations that ordinarily apply when

you are deciding whether or not to believe a witness's testimony. You may give the opinion

testimony whatever weight, if any, you find it deserves in light of all the evidence in this case.

You should not, however, accept opinion testimony merely because the witness was allowed to

testify concerning his opinion. Nor should you substitute it for your own reason, judgment and

common sense. The determination of the facts in this case rests solely with you.

## 8. Substantive Law

Now I will instruct you on the law that controls this case.

Plaintiff brings his claim under a statute known as Section 1983 of Title 42 of the United

States Code.  Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage of any State . . . subjects or causes to be subjected, any citizen of the United
> States . . . to the deprivation of any rights, privileges or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law . . . .

Section 1983 creates a federal remedy for persons who have been deprived by state officials of

the rights, privileges, and immunities secured by the United States Constitution and federal

statutes.

In order to prove a claim under Section 1983, plaintiff must establish, by a preponderance

of the evidence, each of the following three elements:

7

**JA544**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

First, that the conduct complained of was committed by a person acting under color of state law;

Second, that this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States; and

Third, that the defendants' acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff.

I shall now discuss the elements of plaintiff's claim in more detail.

## A. First Element: "Under Color of State Law"

Acting "under color of state law" means that defendants claim to be acting pursuant to authority given him by the state, even if they are misusing that authority. The defendants, as officers in the New York State Attorney General's Office, were acting under color of state law when investigating and prosecuting Leonard Morse. This element is deemed proven.

## B. Second Element: Deprivation of a Constitutional Right

The second element of plaintiff's claim is that defendants deprived him of a federal constitutional right. The right alleged to have been violated in this case is the plaintiff's constitutional right not to be deprived of liberty on the basis of false evidence. Plaintiff Leonard Morse alleges that defendants Fusto and Castillo created false or fraudulently altered summaries of Morse's billing records (specifically, Grand Jury Exhibits 7 and 11) knowing that such summaries were false or fraudulent. Morse also claims that he was deprived of his liberty as a result of this false or fraudulent evidence. Defendants Fusto and Castillo deny that Grand Jury Exhibits 7 and 11 were false or fraudulent. They also deny that Morse was deprived of his liberty as a result of Grand Jury Exhibits 7 and 11.

8

**JA545**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

Plaintiff must show that the defendants acted knowingly or with reckless disregard. An act is done knowingly if it is done voluntarily and deliberately and not because of mistake, accident, negligence or other innocent reason. An act is done with reckless disregard if it is done in conscious disregard of its known probable consequences. The plaintiff does not need to show that the defendants specifically intended to deprive him of a constitutional right. If you find that the acts of the defendants were merely negligent or incompetent, then even if you find that the plaintiff was injured as a result of those acts, you must return a verdict in favor of the defendants.

To prove this second element of his claim, plaintiff must prove by a preponderance of the evidence the following:

First, plaintiff must prove by a preponderance of the evidence that the defendants created false or fraudulently altered documents. A document is false if it is untrue when made and was known to be untrue when made by the person making it or causing it to be made. A document is fraudulent if it is falsely made with intent to deceive. Deceitful half-truths or the deliberate concealment of material facts may also constitute false or fraudulent information.

Second, plaintiff must prove by a preponderance of the evidence that the false or fraudulent evidence was material, meaning that it was likely to influence the jury's decision to indict.

The grand jury in Morse's case was asked to decide whether there was reasonable cause to believe that Morse committed two types of offenses.

Count one of the indictment charged Leonard Morse with grand larceny in the first degree. In order to find grand larceny in the first degree, the grand jury needed to find reasonable cause that property valued in excess of $1 million was stolen by Plaintiff Leonard

9

**JA546**

Morse from its owner (which can include the Medicaid program of the state of New York) through successive takings that were all part of a single sustained criminal impulse in execution of a general fraudulent scheme. A person steals property and commits larceny when, with the intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains, or withholds such property from an owner thereof.

Counts two through twelve of the indictment charged Leonard Morse with offering a false instrument for filing in the first degree. In order to find offering a false instrument for filing in the first degree, the grand jury needed to find reasonable cause that Plaintiff Leonard Morse, knowing that a written instrument contained a false statement of false information and when, with intent to defraud the state or any political subdivision thereof, he offered or presented it to a public officer or a public servant with knowledge or belief that it would have been filed with or registered or recorded in or otherwise become part of the record of such public servant or office.

"Reasonable cause" means that there exist facts and circumstances sufficient to support a reasonable belief that an offense has been or is being committed.

If you find that Grand Jury Exhibits 7 and 11 were false or fraudulently altered, you must next determine whether or not that evidence was material, in that it was likely to influence the grand jury's determination of reasonable cause to believe Morse committed the offenses described above. In reaching your determination, one factor you may consider is the weight of the testimony and evidence other than Grand Jury Exhibits 7 and 11 that were before the grand jury. You should consider this other evidence as it was presented to the grand jury at that point in time, not as the testimony and evidence may have been presented in subsequent proceedings

10

**JA547**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

such as Morse's criminal trial. The relevant question is the effect all the evidence would have had on the grand jury at the time of the grand jury proceedings and whether Grand Jury Exhibits 7 and 11 would have been material to the grand jury's finding of reasonable cause to indict.

Third, plaintiff must prove by a preponderance of the evidence that false or fraudulent evidence resulted in a deprivation of his liberty. A deprivation of liberty occurs when an individual is required to post bail to ensure his return to court, when his travel is restricted under the terms of a release bond, and when he is under a legal obligation to appear in court. It is undisputed that Morse was deprived of liberty. The question is whether that deprivation of liberty was a result of false or fraudulent evidence presented to the grand jury.

In sum, if you find that plaintiff has proven by a preponderance of the evidence that defendants knowingly or with reckless disregard created materially false or fraudulently altered evidence that resulted in plaintiff's deprivation of liberty, then plaintiff has satisfied the second element of his Section 1983 claim.

## C. **Third Element: Proximate Cause**

The third element which plaintiff must prove is that defendants' acts were a proximate cause of any injuries sustained by the plaintiff. Proximate cause means that there must be a sufficient causal connection between the acts of defendants and any injury or damage sustained by the plaintiff. An act is a proximate cause if it was a substantial factor in bringing about the alleged injury or damage and the injury or damage was a reasonably foreseeable consequence of the defendants' acts. To recover damages, Plaintiff Leonard Morse has the burden of proving that he suffered injuries and that the injuries would not have occurred without the wrongful conduct of defendants.

11

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

## 9. Damages

If you find that plaintiff has proven by a preponderance of the evidence the elements of his Section 1983 claim, you must also determine the damages to which plaintiff is entitled. You should not infer that plaintiff is entitled to damages merely because I am instructing you on how to award damages. You must decide liability first. I am instructing you on damages only so that you will have guidance should you decide that plaintiff is entitled to recovery. The burden of proving damages rests with the plaintiff.

### A. Compensatory Damages

The purpose of the law of damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from defendants' violation of plaintiff's rights. If you find that defendants are liable on the false evidence claim, as I have explained it, then you must award the plaintiff sufficient damages to compensate him for any injury proximately caused by the defendants' conduct. These are known as "compensatory damages." Compensatory damages seek to make the plaintiff whole--that is, to compensate him for the damage suffered. Compensatory damages are not limited merely to lost earnings plaintiff may have suffered. A prevailing plaintiff may also be entitled to compensatory damages for the pain and suffering, mental anguish, shock and discomfort that he suffered because of a defendant's conduct.

I remind you that you may award compensatory damages only for injuries that a plaintiff proves were proximately caused by a defendant's allegedly wrongful conduct. That is, you may not simply award damages for any injury suffered by plaintiff—you must award damages only for those injuries that are a proximate result of the defendants' violation of the plaintiff's rights.

12

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

The damages that you award must be fair and reasonable, neither inadequate nor excessive. You should not award compensatory damages for speculative injuries, but only for those injuries that plaintiff has actually suffered or is reasonably likely to suffer in the near future. Compensatory damages must not be based on speculation or sympathy but on the evidence presented at trial.

In awarding compensatory damages, if you decide to award them, you must be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require a plaintiff to prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit. In all instances, you are to use sound discretion in fixing an award of damages, drawing reasonable inferences where you deem appropriate from the facts and circumstances in evidence.

If you find that plaintiff is entitled to compensatory damages, you must also determine whether the plaintiff could have done something after the injurious conduct to lessen the harm that he suffered. The burden is on the defendants to prove, by a preponderance of evidence, that the plaintiff could have lessened the harm that was done to him, and that he failed to do so. If the defendants convince you that the plaintiff could have reduced the harm done to him but failed to do so, the plaintiff is entitled only to damages sufficient to compensate him for the injury that he would still have suffered even if he had taken appropriate action to reduce the harm done to him.

In determining compensatory damages, you may consider past and future lost earnings and mental or emotional pain and suffering due to the defendants' violation of plaintiff's rights.

13

**JA550**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

The verdict sheet has been broken down into these categories. If you find that plaintiff is entitled to compensatory damages, you must determine the amount you deem appropriate for each category and fill in the verdict sheet accordingly. I will now give you more specific instructions on lost earnings.

### i. Lost Earnings

In assessing compensatory damages, you may include an amount attributable to the lost earnings sustained by plaintiff Leonard Morse resulting from his indictment by a grand jury on April 5, 2006. In this case, plaintiff is seeking damages for the income which he lost as a result of no longer being able to practice as a dentist. This category of damages is referred to as "lost earnings," and plaintiff is seeking damages both for past lost earnings and future lost earnings. I will now explain what each of these terms means.

With respect to "past lost earnings," this category of damages refers to all earnings that plaintiff has incurred from the date of the incident to the date of your verdict. With respect to "future lost earnings," this category of damages refers to all earnings that you believe plaintiff would have earned in the future, for however long you believe plaintiff would have continued working as a dentist, had he not been indicted in April 2006. Please note that if you find that plaintiff is entitled to an award for lost future earnings, you must specifically state the period of years for which this dollar amount is intended to cover into the future.

During this trial, you have heard conflicting testimony with respect to what earnings plaintiff has lost as a result of his indictment and the adverse publicity surrounding his indictment. It is up to you, as the finders of fact, to decide what amount of lost earnings, if any, plaintiff may recover in this action. If you find in favor of plaintiff on his constitutional claim,

14

**JA551**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

then plaintiff is entitled to recover an amount that will fairly compensate him for any lost earnings that may be said to reasonably flow from his indictment. Plaintiff may only recover for lost earnings which he has proven with a reasonable degree of certainty, and any award that you make for lost earnings must not be the result of speculation. However, the law does not require a plaintiff to prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

### B. Punitive Damages

Whether or not you award the plaintiff compensatory damages, you may also, in your discretion, make an award of punitive damages. Punitive damages are awarded, in the discretion of the jury, to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct in the future.

You may award the plaintiff punitive damages if you find that the acts of a defendant were done maliciously or wantonly. An act is maliciously done if it is prompted by ill will or spite towards the injured person. An act is wanton if done with a reckless or callous disregard for the rights of the injured person. The plaintiff has the burden of proving, by a preponderance of the evidence, that defendant acted maliciously or wantonly with regard to the plaintiff's rights.

If you find by a preponderance of the evidence that a defendant acted with malicious intent to violate the plaintiff's rights or unlawfully injure him, or if you find that a defendant acted with a callous or reckless disregard of the plaintiff's rights, then you may award punitive damages. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

15

**JA552**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether defendant may be adequately punished by an award of compensatory damages only, or whether the conduct is so extreme and outrageous that compensatory damages are inadequate to punish the wrongful conduct. You should also consider whether compensatory damages, standing alone, are likely to deter or prevent the defendant from similar wrongful conduct in the future, if it was in fact wrongful, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those defendant may have committed.

If you decide to award punitive damages, these same purposes should be kept in mind as you determine the appropriate sum of money to be awarded as punitive damages. That is, in fixing the sum to be awarded, you should consider the degree to which the defendant should be punished for his wrongful conduct, and the degree to which an award of one sum or another will deter the defendant or persons like him from committing wrongful acts in the future.

## 10. **Special Interrogatory**

You must also decide a factual issue that bears on whether defendants are entitled to an immunity defense. Whether immunity is warranted is a question of law for the Court. However, for the Court to make this determination, you must decide a factual question regarding the timing of the creation of Grand Jury Exhibits 7 and 11.

16

**JA553**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

Defendants contend that they created Grand Jury Exhibits 7 and 11 in connection with the preparation for the presentation of evidence to the grand jury, and not earlier as part of the investigation. Plaintiff contends that these exhibits were created during the investigatory stage of the proceedings, while defendants were still building a case against Morse, and not in preparation for the presentation of evidence to the grand jury. Accordingly, Question 6 on the verdict sheet asks if the defendants have proven by a preponderance of the evidence that they created Grand Jury Exhibits 7 and 11 in connection with the preparation for the presentation of evidence to the grand jury, and not earlier as part of the investigation.

**11. <u>Closing Instructions</u>**

I have now outlined for you the rules of law applicable to this case and the processes by which you should weigh the evidence and determine the facts. In a few minutes, you will retire to the jury room for your deliberations.

Traditionally, Juror Number 1 acts as foreperson. If, however, Juror Number 1 does not wish to serve as foreperson, when you go to the jury room to begin considering the evidence in this case I suggest that you first select another member of the jury to act as your foreperson. In order that your deliberations may proceed in an orderly fashion, you must have a foreperson, but of course, his or her vote is entitled to no greater weight than that of any other juror.

Your function, to reach a fair conclusion from the law and the evidence, is an important one. Your verdict must be unanimous. That means you must all agree.

When you are in the jury room, listen to each other and discuss the evidence and issues in the case among yourselves. It is the duty of each of you, as jurors, to consult with one another and to deliberate with a view to reaching agreement on a verdict, if you can do so without

17

**JA554**

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

violating your individual judgment and your conscience. While you should not surrender

conscientious convictions of what the truth is and of the weight and effect of the evidence, and

while each of you must decide the case for yourself and not merely acquiesce in the conclusion

of your fellow jurors, you should examine the issues and the evidence before you with candor

and frankness, and with proper deference to and regard for the opinions of each other.

Remember in your deliberations that the dispute between the parties is, for them, no passing

matter. They and the court rely upon you to give full and conscientious deliberation and

consideration to the issues and evidence before you.

If it becomes necessary during your deliberations to communicate with the court, you

may send me a note signed by your foreperson or by one or more members of the jury. No

member of the jury should ever attempt to communicate with the court by any means other than

a signed writing. The court will never communicate with any member of the jury on any subject

touching on the merits of this case other than in writing or orally here in open court. I will send

in all the exhibits received in evidence for you to have during your deliberations. If you wish to

have any portion of the testimony repeated, you may simply indicate that in a note. I will also

provide you with a copy of my jury instructions. You must consider the instructions as a whole

and not single out any one instruction as stating the law. If you need further instructions on any

point, simply send me a note.

When you have reached a verdict, send me a note signed by your foreperson that you

have reached a verdict. Do not indicate what the verdict is. In no communication with the court

should you give a numerical count on where the jury stands in its deliberations.

18

Jury Instructions, Morse v. Fusto, et al., 07-cv-4793

I have prepared a verdict sheet for you to use in recording your decision. The verdict sheet contains questions to assist you in rendering a verdict. Answer each question until directed to stop.

Now let me consult with counsel to be certain I have not overlooked any point.

19

Verdict Sheet, Morse v. Fusto, et al., 07-cv-4793

**COURT EXHIBIT**   d+f

2
_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
LEONARD MORSE,

                    Plaintiff,

-against-

JOHN FUSTO and JOSE CASTILLO,

                    Defendants.
-------------------------------------------------------X

<u>VERDICT SHEET</u>
07-CV-4793 (CBA)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

FEB 1 2 2013

## A.  <u>LIABILITY – Deprivation of Liberty Due To False or Fraudulent Evidence</u>

1. Has plaintiff, LEONARD MORSE, proven by a preponderance of the evidence that defendant JOHN FUSTO created false or fraudulently altered documents, or directed Jose Castillo to create false or fraudulently altered documents, consisting of Grand Jury Exhibits 7 and 11, knowing that such information was false or fraudulent?

                Yes ____✔____            No _____

2.  Has plaintiff, LEONARD MORSE, proven by a preponderance of the evidence that defendant JOSE CASTILLO created false or fraudulently altered documents consisting of Grand Jury Exhibits 7 and 11, knowing that such information was false or fraudulent?

                Yes ____✔____            No _____

*If your answer is "no" to both Questions 1 and 2, you have reached a verdict.  The Court, however, requests that you also respond to Question 6.  Once you have done so, the jury foreperson should sign and date the form below and advise the Court Security Officer that you have reached a verdict.*

*If your answer is "yes" to either or both Questions 1 and/or 2, please proceed to Question 3.*

3.  Has plaintiff, LEONARD MORSE, proven by a preponderance of the evidence that the false or fraudulent evidence was material, meaning that it was likely to influence the grand jury's decision to indict, and that he was deprived of liberty as a result of the false or fraudulent evidence?

                Yes ____✔____            No _____

1

**JA557**

Verdict Sheet, Morse v. Fusto, et al., 07-cv-4793

*If your answer is "no," you have reached a verdict. The Court, however, requests that you also respond to Question 6. Once you have done so, the jury foreperson should sign and date the form below and advise the Court Security Officer that you have reached a verdict.*

*If your answer is "yes," please proceed to Question 4.*

## B. DAMAGES

4. Compensatory Damages – Please state the total amount, if any, of compensatory damages that plaintiff has proven by a preponderance of the evidence were proximately caused by the violation of the plaintiff's constitutional rights by the defendant(s).

Past Lost Earnings             $ 1,733,941

Future Lost Earnings           $ 2,490,995

If you have made an award of future lost earnings, state the period of years for which this award is intended to cover: 2013 - 2022 (Jan)

Mental / Emotional Pain and Suffering      $ 2,500,000

*Please proceed to Question 5.*

5. Punitive Damages – Has plaintiff Leonard Morse proven by a preponderance of the evidence that he is entitled to punitive damages?

Yes   ✓                    No _____

*If your answer is "no," please proceed to Question 6.*

*If your answer is "yes," please indicate in the space provided the amount of punitive damages as to those defendants for whom you answered "yes" in Questions 1 and/or 2.*

JOHN FUSTO        $ 750,000

JOSE CASTILLO     $ 250,000

*Please proceed to Question 6.*

2

**JA558**

Verdict Sheet, Morse v. Fusto, et al., 07-cv-4793

## C. **SPECIAL INTERROGATORY**

6. Have defendants, JOHN FUSTO and JOSE CASTILLO, proven by a preponderance of the evidence that the billing summaries (Grand Jury Exhibits 7 and 11) were created in connection with the preparation for the presentation of evidence to the grand jury, and not earlier as part of the investigation?

Yes _____          No ___✓___

*The Foreperson must sign and date the verdict sheet. Advise the Court Security Officer that you have reached a verdict.*

Dated: 2/12/2013          _____Jennifer Strauss_____
                          FOREPERSON

3

**JA559**

Your Honor:

The jury would like to review the testimony of both defendants re: the creation of grand jury exhibits 7 & 11

Thank you
Jury Foreperson
Jenfer Strauss

Your Honor:

Would it be possilbe to make copies of
Plantiff's exhibit 149 for purpose of review
by each of the jurors
Thank you

Jury Foreperson
Jennifer Strauss

Castillo

| Page # | Line |
|--------|------|
| 130: | 6 - 17 |
| | 22 - 24 |

| 131: | 1 - 6 |
| | ~~10 - 22~~ * Defendants object |
| | 23 - ~~##~~ 132:5 |

134: 22 - ~~##~~ 135:15

136: 14 - 138:13

154: 9 - 155:14

187: 18 - 192:1


Fusto

279: 7 - 280:4

280:17 - 283:3

290:10 - 292:9

729:9 - 730:4

730.19 - 730:4

~~453:8 - 454:20~~ * Plaintiff objects

758:15 - 759:12

Additional Reality

Re: Creation

732:22

to

733:14

———

193:21

to

154:15

COURT EXHIBIT

6

CV07-4793

Your Honor:

The jury would like clarification on Q. 5 Punitive Damages. If the jury believes Punitive Damages are to be awarded, are we required to assign amounts to both defendants.

Also, may we request a calculator?

Thank you,
Jennifer Strauss
Foreperson.

COURT EXHIBIT

7

CV07-4793

Your Honor:

The jury has reached a verdict.

Thank you:
Jennifer Strauss
Foreperson

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 1 3 2013 ★

BROOKLYN OFFICE

**JA565**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
LEONARD MORSE,                                              JUDGMENT
                                                           07-CV- 4793 (CBA)
                    Plaintiff,

        -against-

JOHN FUSTO and JOSE CASTILLO,

                    Defendants.
--------------------------------------------------X

        An Order of Honorable Carol Bagley Amon, United States District Judge, having

been filed on September 13, 2013, granting Plaintiff's application to accept the Court's remittur

pursuant to the Court's Order dated August 29, 2013; and directing the Clerk of Court to enter

judgment in the remitted amounts of $4,624,936.00 for compensatory damages and $100,000.00

for punitive damages ($75,000.00 against Defendant John Fusto and $25,000.00

against Defendant Jose Castillo); it is

        ORDERED and ADJUDGED that judgment is hereby entered in favor of Plaintiff

Leonard Morse and against Defendants John Fusto and Jose Castillo, jointly and severally, in the

remittur amount of $4,624,936.00 for compensatory damages plus as against Defendant John

Fusto for punitive damages in the amount of $75,000.00 and as against Defendant Jose Castillo

for punitive damages in the amount of $25,000.00.

Dated: Brooklyn, New York                          Douglas C. Palmer
       September 16, 2013                           Clerk of Court

                                            by:    /s/ Janet Hamilton
                                                   Deputy Clerk

**JA566**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
LEONARD MORSE,

                                        Plaintiff,              07-CV-4793 (CBA)

                        - against -

JOHN FUSTO and JOSE CASTILLO,                           **NOTICE OF APPEAL**

                                        Defendants.
--------------------------------------------------------------------------------x

Notice is hereby given that defendants JOHN FUSTO and JOSE CASTILLO

("Defendants-Appellants") hereby appeal to the United States Court of Appeals for the Second

Circuit from each and every part of the Judgment of the United States District Court of the Eastern

District of New York, entered in the above-captioned case on September 16, 2013 (Docket No.

154), annexed hereto.

The other parties to the Judgment appealed from and the names and addresses of the

respective attorneys are as follows:

        Plaintiff:    Leonard Morse

        Plaintiff's Attorney:   JON NORINSBERG, ESQ.
                                225 Broadway, 27th Floor
                                New York, NY 10007

Dated: New York, New York
        October 15, 2013                ERIC T. SCHNIEDERMAN
                                        Attorney General of the State of New York
                                        Attorney for Defendants-Appellants

                                By: _____
                                        Seth J. Farber
                                        Assistant Attorney General
                                        120 Broadway, 24th Floor
                                        New York, New York 10271
                                        212-416-8029
                                        seth.farber@ag.ny.gov

**JA567**